**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Hon. Anthony J. Trenga |
| | ) | |
| CLAUDIO ALVAREZ | ) | Motions Hearing: Sept. 22, 2021 |
| RODRIGUEZ | ) | |

## DEFENDANT'S MOTION TO DISMISS INDICTMENT

Defendant Claudio Alvarez Rodriguez hereby moves to dismiss the Indictment because 8 U.S.C. § 1326 is unconstitutional. The statute, originally enacted in 1929, was motivated by racial animus and has had a disproportionate effect on Latinx individuals. Indeed, 99 percent of the people prosecuted under 8 U.S.C. § 1326 in 2019 were Hispanic, according to the Sentencing Commission. The statute's discriminatory purpose violates the equal protection guarantee of the United States Constitution, an infirmity that has not been cured by its later reenactment. As such, § 1326 is unconstitutional under *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252 (1977). Accordingly, the indictment must be dismissed. *See, e.g.*, *United States v. Carillo-Lopez*, --- F.3d ---, 2021 WL 3667330 (Aug. 18, 2021) (dismissing indictment because defendant "established that [§] 1326 was enacted with a discriminatory purpose and that the law has a disparate impact on Latinx persons, and the government fails to show that [§] 1326 would have been enacted absent racial animus").[1]

---

[1] The question whether 8 U.S.C. § 1326 is unconstitutional under *Arlington Heights* is pending before the Fourth Circuit. *See United States v. Palacios-Arias*, No. 21-

## I.     Factual Background

Claudio Alvarez Rodriguez was born in 1975 in Jalisco, Mexico.  He was brought to the United States when he was a toddler.  His family settled near Los Angeles, where they have remained ever since.  Mr. Alvarez Rodriguez grew up in southern California and went to school there.  He speaks fluent English.  In 1987, when he was 12 years old, Mr. Alvarez Rodriguez received temporary residence status in the U.S.  Two years later, he was accorded legal permanent residency.  Both of Mr. Alvarez Rodriguez's parents are naturalized citizens.  His siblings are citizens.  For 15 years, Mr. Alvarez Rodriguez has been married to a U.S. citizen, Amber Alvarez. The couple has three U.S. citizen children and are expecting a fourth child in November of this year.

In 2001, when he was 26, Mr. Alvarez Rodriguez was convicted of unlawful taking of an automobile under California law.  He was sentenced to suspended time and probation.  A few months later, Mr. Alvarez Rodriguez—who admits to struggling with addiction at the time—was arrested for and convicted of possession of methamphetamine.  He was sentenced to serve 16 months in prison, which he did. As his release date neared, Mr. Alvarez Rodriguez was advised that his LPR status could be revoked and he could be deported.  At a hearing in 2002, held while Mr. Alvarez Rodriguez was in custody, an immigration judge determined that Mr. Alvarez

---

4020 (on appeal from District Court's ruling, E.D. Va. Case No. 3:20-cr-62-JAG, that § 1326 does not violate Fifth Amendment's equal protection guarantee).  *Palacios-Arias* currently is tentatively calendared for argument during the Fourth Circuit's October 2021 session.

Rodriguez should be deported to Mexico on the basis of his state convictions, which triggered removability under immigration law.

Mr. Alvarez Rodriguez was removed on September 12, 2002.  Although he applied for reentry a month later, Mr. Alvarez Rodriguez's immigration file does not document how that application was handled.  But, Mr. Alvarez Rodriguez later was stopped attempting to reenter the U.S. without permission twice and deported again, the last time on February 2, 2004.

Thereafter, Mr. Alvarez Rodriguez reentered the United States and relocated to Virginia to get away from his prior lifestyle.  Until his arrest leading to the instant prosecution in June 2021, Mr. Alvarez Rodriguez had lived quietly with his wife and children, working in mold abatement and for a towing company.  Due to the age of his criminal history, he would have no criminal history points under the federal Sentencing Guidelines.  Accordingly, counsel estimates that, were Mr. Alvarez Rodriguez convicted of the offense charged in the indictment, Dkt. No. 16, his advisory Guidelines range would be 0 to 6 months.  *See* U.S.S.G. § 2L1.2; *id*. App. Note 3.

## II.    The Equal Protection Clause Prohibits Enactment of Statutes for Discriminatory Purpose

The Fifth Amendment of the Constitution provides that no person shall be "deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.  This clause contains an implicit guarantee of equal protection in federal laws

identical to what the Fourteenth Amendment guarantees in state laws. *See Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1686 n.1 (2017).

A law may violate equal protection in three ways. First, a law may discriminate on its face. *See, e.g., Loving v. Virginia*, 388 U.S. 1 (1967). Second, authorities may apply a facially neutral law in a discriminatory way. *See, e.g., Yick Wo v. Hopkins*, 118 U.S. 356 (1886). Third, a legislature may enact a facially neutral law with a discriminatory purpose, which disparately impacts a disfavored group. *See, e.g., Arlington Heights*, 429 U.S. at 265–68. Here, Mr. Alvarez Rodriguez challenges the illegal reentry statute, 8 U.S.C. § 1326, under the third rationale, that is, under the legal framework of *Arlington Heights*.

*Arlington Heights* clarified that the effect of a racially discriminatory law does not alone make it unconstitutional: Challengers must also show "[p]roof of racially discriminatory intent or purpose" at the time of the law's passage. *Id.* at 265 (emphasis added). Determining whether a purpose was discriminatory requires "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* at 266. In *Arlington Heights*, the Court offered a non-exhaustive list of relevant factors to consider in this determination, including:

- the historical background of the decision;

- the specific sequence of events leading to the challenged action;

- departures from normal procedural sequence;

- the legislative history; and

4

- the disproportionate impact of the official action, i.e., "whether it bears more heavily on one race than another."

*North Carolina State Conf. of NAACP v. McCrory*, 831 F.3d 204, 220-21 (4th Cir. 2016) (citing *Arlington Heights*, 429 U.S. at 266–67).

The threshold for satisfying these factors is low. Since legislatures are rarely "motivated solely by a single concern," a challenger need not show that the legislature's actions "rested solely on racially discriminatory purposes." *Arlington Heights*, 429 U.S. at 265–66. Instead, the challenger need only show "proof that a discriminatory purpose has been a motivating factor in the decision." *Id.* at 265–66 (emphasis added). *See also McCrory*, 831 F.3d at 220 (quoting *Arlington Heights* to hold that a challenger need not prove discrimination was the "sole purpose" of the challenged action—only that it was a "'motivating factor'"). Once the challenger shows that discriminatory purpose was a "motivating factor," "the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *See id.* at 221 (quoting *Hunter v. Underwood*, 471 U.S. 222, 228 (1985)). If the government cannot show that the legislature would have enacted the law solely on the basis of the legislature's "actual non-racial motivations," the law violates the Fifth Amendment and must be invalidated. *See id*.

Courts have applied *Arlington Heights* to a variety of laws and government actions. One of the first involved a provision in the Alabama constitution that barred voting for any person convicted of a "crime involving moral turpitude." *Hunter*, 471

U.S. at 222. Though neutral on its face, the provision disenfranchised ten times as many Blacks as whites. *See id*. at 227. To prove discriminatory intent in its passage, challengers submitted transcripts of the 1901 Alabama constitutional convention where lawmakers had originally enacted the provision, as well as several historical studies and the testimony of two expert historians. *See id*. at 229. This evidence showed that "zeal for white supremacy ran rampant" at the 1901 convention and was a "motivating factor" underlying the voting provision. *Id*. at 229–31. And because the provision "would not have been adopted by the convention or ratified by the electorate in the absence of the racially discriminatory motivation," the Supreme Court held that it violated equal protection. *Id*. at 231.

Similarly, this Court applied *Arlington Heights* in a challenge to an omnibus statute enacted by the North Carolina legislature imposing a number of voting restrictions that disproportionately affected African Americans. *See McCrory*, 831 F.3d at 216. There, the Fourth Circuit stated that "the ultimate question remains: did the legislature enact a law 'because of,' and not 'in spite of,' its discriminatory effect. *Id*. at 220. The panel reversed and remanded, concluding that the District Court had "missed the forest in carefully surveying the many trees . . . [leading it] to ignore critical facts bearing on legislative intent, including the inextricable link between race and politics in North Carolina." *Id*. at 214.

These cases show that courts have used *Arlington Heights* for decades to invalidate facially neutral laws enacted with a discriminatory intent that have

disparately impacted racial groups. As the Fourth Circuit observed in *McCrory*, "'[o]utright admissions of impermissible racial motivation are infrequent and plaintiffs often must rely upon other evidence." 831 F.3d at 221 (quoting *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999) (alteration original)). Here, as the *Carillo-Lopez* Court concluded, the racial animus that infects § 1326 is apparent from both the context and the plain language employed by those who enacted the original statute. 2021 WL 3667330 at *9 ("the Act of 1929 was passed during a time when nativism and eugenics were widely accepted, both in the country at large and by Congress, and that these racist theories ultimately fueled the Act's passage").

## III.   The Statutory Background of 8 U.S.C. § 1326 Clearly Establishes Its Discriminatory Purpose

Enacted at the height of the eugenics movement, the "Undesirable Aliens Act of 1929" was conceived, drafted, and enacted by white supremacists out of a belief that the "Mexican race" would destroy the racial purity of the United States. Legislators referred to Mexicans as "mongrels" and "peons." They claimed Mexicans were "poisoning the American citizen." They sought to keep the country's blood "white and purely Caucasian." They solicited reports and testimony from a eugenicist who likened immigration policy to the "breed[ing] of thoroughbred horses." Not only did this racism underlie the original version of § 1326, the law also has disparately impacted Mexicans, like Mr. Alvarez Rodriguez, and other Latinx individuals in the century since.

7

Because the facts and historical evidence presented herein show that the original illegal reentry law was enacted with a discriminatory purpose, § 1326 is presumptively unconstitutional under *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). The burden thus shifts to the government to show that Congress would have passed the 1929 law in the absence of any discriminatory purpose. If the government cannot make this showing, the law is invalid, and the Court must dismiss Mr. Alvarez Rodriguez's criminal charge.

### A.      Congress enacted illegal reentry with a discriminatory purpose.

While not "purporting to be exhaustive," the five *Arlington Heights* factors constitute the "proper inquiry in determining whether racially discriminatory intent existed." *Arlington Heights*, 429 U.S. at 268. And as recent Supreme Court precedent confirms, courts must consider this historical evidence in determining the statute's constitutionality. *See Ramos v. Louisiana*, 140 S. Ct. 1390, 1394 (2020) ("Though it's hard to say why these laws persist, their origins are clear. Louisiana first endorsed nonunanimous verdicts for serious crimes at a constitutional convention in 1898. According to one committee chairman, the avowed purpose of that convention was to 'establish the supremacy of the white race,' and the resulting document included many of the trappings of the Jim Crow era: a poll tax, a combined literacy and property ownership test, and a grandfather clause that in practice exempted white residents from the most onerous of these requirements.").

A close examination of the political context underlying the criminalization of illegal entry in 1929 reveals a disturbing truth: that racism and eugenics were not

only a "motivating factor" in the legislature's passage of this law.  *Arlington Heights*, 429 U.S. at 265.  They were the primary factor.

### 1.    *"The historical background of the decision."*

Historians often refer to the 1920s as the "Tribal Twenties," a time when the Ku Klux Klan strengthened, Jim Crow laws were enacted, and public figures praised eugenics.  World War I had produced "a feverish sentiment against presumably disloyal 'hyphenated Americans,'" and "few could resist the combination of nativism, job scarcity, and anti-Bolshevism that fueled the politics of restriction."[2]  Prominent restrictionists "spoke increasingly of 'racial indigestion,'"[3] and "the 'contamination' of Anglo-American society."[4]  The decade also brought a flood of immigration legislation fueled by fears of "non-white" immigration.[5]  At the start of the decade, Congress passed the first numerical restriction on immigration in the United States.[6]  During the remainder of the decade, legislators aimed for "'America [to] cease to be the 'melting pot.'"[7]  Although the arrival of southern and eastern Europeans in the early

---

[2] Mae M. Ngai, *Impossible Subjects*, 19, 20 (2004 William Chafe, et al.).

[3] *Id.* at 23.

[4] Kelly Lytle Hernández, *Migra!: A History of the U.S. Border Patrol*, 28 (2010).

[5] *See generally* Daniel Okrent, *The Guarded Gate: Bigotry, Eugenics, and the Law That Kept Two Generations of Jews, Italians, and Other European Immigrants Out of America* (2019).

[6] Emergency Immigration Act of 1921, Pub. L. 67-5, 42 Stat. 5 (1921).

[7] Jia Lynn Yang, *One Mighty and Irresistible Tide: The Epic Struggle Over American Immigration*, 2020, 3 (2020) (quoting Senator David A. Reed).

1900s "fueled the rise of American manufacturing," nativists saw these groups as "'undesirable immigrants'" who were "socially inferior, culturally alien, and politically suspect."[8]

These fears of non-white immigration were bolstered by the growing acceptance of eugenics—a theory that "captured the imagination of many of America's leading intellectuals."[9]   The popular magazine *The Saturday Evening Post* ran articles warning that new immigrants were racially inferior, impossible to assimilate, and a threat to stability and democracy.[10]   The leader of a major scientific institution contended that neither education nor environment could alter the "'profound and inborn racial differences' that rendered certain people inferior."[11]   And states throughout the country were drafting laws "based on this burgeoning race science, including aggressive sterilization programs."[12]

At the center of the eugenics movement was Dr. Harry H. Laughlin, the director of the Eugenics Record Office.[13]   Dr. Laughlin was well known for his model sterilization law that many states and countries, including the Third Reich of Nazi

---

[8] Hernández, *supra*, at 28.

[9] Yang, *supra*, at 35.

[10] *Id*. at 8.

[11] Okrent, *supra*, at 3.

[12] *Id*. at 38. Those sterilization laws were affirmed in the now infamous decision *Buck v. Bell*, 274 U.S. 200, 207 (1927).

[13] Ngai, *supra*, at 24.

Germany, used as a template.[14]  During the 1920s, Dr. Laughlin testified before Congress multiple times and produced four reports that discussed topics such as "race crossing," "mate selection," "fecundity," "racial composition," and the "individual quality of future population."  *See* Exhibit A (The Eugenical Aspects of Deportation). Relying heavily on these theories, Congress would anchor its immigration legislation in eugenics and racial inferiority for the remainder of the decade.[15]

> **2.      *"The specific sequence of events leading to the challenged action."***

In the early 1920s, Congress began to focus its legislation around the exclusion of "undesirable" immigrants—which was often code for non-white.  *See Ave. 6E Investments, LLC v. City of Yuma*, 818 F.3d 493, 505–06 (9th Cir. 2016) (holding that "the use of 'code words' may demonstrate discriminatory intent").  *Cf. Cromartie*, 526 U.S. at 553 (acknowledging that "outright admissions of impermissible racial motivation are infrequent").  The first such law was the National Origins Act of 1924, which established quotas based on the national origins of U.S. citizens as reflected in the 1920 census.

---

[14]  *Harry Laughlin and Eugenics*, Truman State University. Accessible at https://historyofeugenics.truman.edu/altering-lives/sterilization/model-law/.

[15] *See* E.P. Hutchinson, *Legislative History of American Immigration Law, 1798-1965*, 212-13 (1981).

The quotas created by the National Origins Act were skewed to keep the nation's "racial strains" predominantly Anglo-Saxon.[16]  The law on its face did not count "nonwhite people residing in the United States" toward the quotas it established.  Indeed, its newly-created "Quota Board" interpreted this provision to exclude all Black people; all East and South Asians (including those who had American citizenship by birth); and all citizens in Hawaiʻi, Puerto Rico, and Alaska.[17]  Congress and the president accepted these exclusions under pressure to "stand firm against the efforts of 'hyphenates' who would 'play politics with the nation's blood stream.'"[18]  Yet there was a wrinkle in the National Origins Act—it did not set quotas on immigrants from countries in the Western Hemisphere.  This was due to the influence of large agricultural businesses that relied heavily on labor from just over the border.[19]  As one representative complained, there was no chance of capping the number of Mexican immigrants because too many growers were "interested in the importation of these poor peons."  *See* Exhibit B (Feb. 16, 1929 Congressional Record excerpt, at 3619).

So, despite passing the most sweeping immigration law in years, legislators were not happy.  Representative Madden grumbled that the bill "leaves open the

---

[16] Ngai, *supra*, at 24–25.

[17] *Id.* at 26.

[18] *Id.* at 35.

[19] *See* Hans P. Vought, *The Bully Pulpit*, 179 (2004).

doors for perhaps the worst element that comes into the United States—the Mexican peon." [20]   *See* Exhibit C (April 8, 1924 Congressional Record excerpt, at 5841). Representative Patrick O'Sullivan criticized the restrictions on Italian immigrants, stating that "the average Italian is as much superior to the average Mexican as a full-blooded Airedale is to a mongrel." *See id.* at 5900.   Legislators proposed numerous bills restricting Mexican immigration, but none could survive opposition from southwestern growers.   To solve this problem, a group of key figures began to strategize a new type of immigration bill that would approach immigration from a criminal—rather than a civil—angle.

### 3.    *"The relevant legislative or administrative history."*

After passage of the National Origins Act of 1924, the Department of Labor (which governed the Bureau of Immigration) began implementing Congress's new quota system.[21]   Then-Secretary of Labor James Davis was a strong advocate of Dr. Laughlin and his eugenics theories—even using them as the basis for policies he had developed and published under the title "Selective Immigration or None."[22]   Davis warned that the "rat type" was coming to the United States, and that these "rat men" would jeopardize the American gene pool.[23]

---

[20] Benjamin Gonzalez O'Brien, Benjamin, Chap. 1, *Handcuffs and Chain Link* (2018).

[21] *See* Vought, *supra*, at 174–79.

[22] *Id.*

[23] *Id.* at 174–75.

Secretary Davis was nevertheless torn between his belief in eugenics and his responsibility to maintain a large labor supply for the railroad and agriculture industries.[24] So together with devout racist (and suspected Ku Klux Klan member) Senator Coleman Blease,[25] Davis developed a compromise—Congress would criminalize border crossing after the fact, rather than prevent it in the first place.[26] That way, they reasoned, authorities could expel Mexicans through a criminal prosecution after the growing season was over, thereby avoiding resistance from businesses that depended on Mexican labor.[27]

Secretary Davis and Senator Blease found two eager collaborators in the House of Representatives, both of whom were on the powerful Immigration and Naturalization Committee.   Representative John C. Box from Texas had long characterized the goal of immigration law as "the protection of American racial stock from further degradation or change through mongrelization."  *See* Exhibit D (Feb. 9,

---

[24] *Id.* at 216.

[25] For biographical and historical context about Senator Blease, s*ee* B. Simon, *The appeal of Cole Blease of South Carolina: Race, Class, and Sex in the New South*, The Journal of Southern History, 62:1, pp. 57–86 (Feb. 1996), available at http://www.jstor.com/stable/2211206.

[26] Ian MacDougall, *Behind the Criminal Immigration Law: Eugenics and White Supremacy*,   ProPublica   (June   19,   2020),   available   at https://www.propublica.org/article/behind-the-criminal-immigration-law-eugenics-and-white-supremacy.

[27] *Id.*

14

1928 Cong. Rec. at 2817).  In one speech at an immigration conference, Rep. Box had

explained that:

> [t]he Mexican peon is a mixture of Mediterranean-blooded Spanish
> peasant with low-grade Indians who did not fight to extinction but
> submitted and multiplied as serfs.  Into that was fused much negro slave
> blood . . . .  The prevention of such mongrelization and the degradation
> it causes is one of the purposes of our [immigration] laws.

*Id.*  Box believed this importation was "raising a serious race question" because

Mexicans were "essentially different from us in character, in social position."  Exhibit

B (Feb. 16, 1929 Cong. Rec. at 3619-20).

Box was joined by the influential Chairman of the House Immigration and

Naturalization Committee, Representative Albert Johnson of Washington.

Chairman Johnson—for whom the 1924 "Johnson-Reed" National Origins Act was

named—was an "energetic and vehement racist and nativist."[28]  He headed the

Eugenics Research Association, a group that opposed interracial marriage and

supported forced sterilizations.[29]  He also proudly described his 1924 law as a

"bulwark against 'a stream of alien blood, with all its inherited misconceptions

respecting the relationships of the governing power to the governed."[30]  Within two

years of the 1924 Act, Chairman Johnson turned to legislation that would exclude the

---

[28] Dennis Wepman, *Immigration: From the Founding of Virginia to the Closing of Ellis Island*, p. 242–43 (2002).

[29] *Id.*

[30] Roger Daniels, *Guarding the Golden Door*, p. 55 (Hill and Wang, 2004).

"Mexican race," explaining that while the argument for immigration restriction had previously been economic, now "'the fundamental reason for it is biological.'"[31]

Following these legislators' lead, other lawmakers soon "turned to narratives of racial threat to justify restriction."[32]   In February 1928, for instance, Representative Robert A. Green of Florida delivered a speech (read into the congressional record by Representative Lankford) that advocated for Western Hemisphere quotas.  He asserted that countries south of the U.S. are "composed of mixture blood of White, Indian, and negro."  *See* Exhibit E (Feb. 3, 1928 Congressional Record excerpt, at 2462).  Immigration from these countries, he believed, created a "very great penalty upon the society which assimilates," and put it at a disadvantage to countries that have "kept their blood white and purely Caucasian."  *Id.*

Chairman Johnson had convened hearings on new immigration legislation. *See* Exhibit F (Deportation – Hearings Before the House Committee on Immigration and Naturalization).  At the first hearing, in January 1926, Chairman Johnson admitted into the record a letter from a constituent in El Paso who urged the legislators to keep out "the scoff and scum, the mongrel, the bootlegger element, from Mexico."  *Id*. at 30.  In response to this letter, Commissioner General of Immigration Harry Hull stated, "I think he is right."  *Id.*  Rep. Box added, "I have some letters, Mr. Chairman, just like that."  *Id.*  In April 1926, the same House committee held a

---

[31] Okrent, *supra*, at 3.

[32] Gonzalez O'Brien, *supra*, at Chap. 1 (Kindle edition).

hearing entitled, "The Eugenical Aspects of Deportation," where the principal witness was the well-known eugenicist Dr. Laughlin. *See* Exhibit A at 1. Early in the hearing, Chairman Johnson praised Dr. Laughlin's prior reports to Congress on race crossing, mate selection, and fecundity, describing one as a "priceless" resource that would "***bear intimately upon on immigration policy***." *Id.* at 3 (emphasis added). Dr. Laughlin testified about his latest eugenics report, the goal of which was to "protect American blood from alien contamination." *Id.* at 4. When Dr. Laughlin encouraged the committee to conduct future research on the effect of "race crossing within the United States," Chairman Johnson replied that such a study would "be of great use to the committee in its deliberations." *Id.* at 11.

Dr. Laughlin discussed the need for further research into "mate selection" because "whenever two races come in contact there is always race mixture" even though the "upper levels tend to maintain themselves because of the purity of the women of the upper classes." *Id.* at 19. The job of any government, Dr. Laughlin explained, was to "demand fit mating and high fertility from the classes who are better endowed physically, mentally, and morally by heredity." *Id.* By deporting or excluding the "lower races" from the country, Dr. Laughlin contended, "[i]mmigration control is the greatest instrument which the Federal Government can use in promoting race conservation of the Nation." *Id.* In response, Chairman Johnson advocated for Congress's use of the "principle of applied eugenics" to "do everything possible" to reduce crime by "debarring and deporting" more people. *Id.* at 25. Rep.

17

Box agreed, stating, "we will have to control immigration to suit our own needs or we will lose our national character," which would "spell destruction for the future of America." *Id.*

Dr. Laughlin even compared the drafters of deportation laws to "successful breeders of thoroughbred horses," who would never consider "acquiring a mare or a stallion not of the top level" for their "stud farm." *Id.* at 44. One such successful breeder he knew "weeds out from the lower levels and recruits by purchase"—a process that is "analogous to immigration in man." *Id.* at 44-45. "Man is an animal," Dr. Laughlin explained, "and so far as heredity and future generations are concerned, there is considerable real basis for [this] comparison." *Id.* at 45. When such racial engineering is not possible, Dr. Laughlin warned, deportation of the "undesirable individual" becomes even more critical; otherwise, "we cannot get rid of his blood no matter how inferior it may be, because we cannot deport his offspring born here." *Id.* Dr. Laughlin predicted that so long as the nation's borders remained open to immigrants, "there will always be need for deportation, or the 'final selection.'" *Id.* at 44. In response to this testimony, Chairman Johnson agreed that "[i]mmigration looks more and more like a biological problem, and if the work of this committee results in establishing this principle in our immigration policy we will be well repaid for our efforts." *Id.* at 46.

Though Chairman Johnson's initial legislation failed, the compromise with the agricultural industry brokered by Secretary Davis and Senator Blease soon made a

18

breakthrough.   On January 18, 1929, Senator Blease, on behalf of the Senate Committee on Immigration, submitted a report to the full Senate recommending passage of a law that would penalize "aliens who have been expelled from the United States and who reenter the country unlawfully."  Exhibit G (Report No. 1456).  This report was accompanied by a letter from Secretary Davis on behalf of the Department of Labor advocating for passage of the law.  *Id.* at 2.

The following week, Senator Blease presented this bill on the Senate floor, where he reported that Chairman Johnson had "asked me to get the measures over to the House [within two days] if I possibly could."  Exhibit H (Jan. 23, 1929 Congressional Record excerpt).  The full Senate passed the bill with almost no discussion or debate.  *See id.* at 2092.  Two weeks later, Chairman Johnson submitted a report from the Committee of Immigration and Naturalization to the full House recommending passage of the illegal reentry law.  *See* Exhibit I (House Report No. 2397).

During debate on the bill, Rep. Thomas L. Blanton complained that Mexicans "come into Texas by hordes" and that "my friend Judge Box has been making a just fight against this situation for years."  Exhibit B (Feb. 16, 1929 Cong. Rec. at 3619). Rep. Blanton urged the House to "apprehend the thousands of these Mexicans who are in Texas now unlawfully and put them back across the Rio Grande and keep them there."  *Id.*  Rep. Schafer added that "[t]hese Mexicans also come into Wisconsin in droves," and Rep. Blanton challenged others to visit the international ports of entry

19

in Texas to see the "hordes that come across the bridges with no intention of ever

going back." *Id*. at 3619.  Rep. Fitzgerald then added that from a "moral standpoint,"

Mexicans were "poisoning the American citizen" because they are "of a class" that is

"very undesirable."   *Id*. at 3620.   Minutes later, the bill passed the House of

Representatives.  *Id*. at 3621.  The president signed it into law three days later.  *See*

Exhibit J (70th Congress Session II Chapter 690).

This legislative history easily clears the relatively low threshold of showing

that racism and eugenics were a "motivating factor" for enacting the law.  Like other

*Arlington Heights* cases, passage of the racially motivated law followed a predictable

pattern.  A broad social movement founded on principles of white supremacy and

eugenics gained popular support in the 1920s.  *Compare Hunter v. Underwood*, 471

U.S. 222, 229 (1985) (discussing "a movement that swept the post-Reconstruction

South to disenfranchise blacks").   Dr. Laughlin, the notorious eugenics "expert,"

promoted theories of racial inferiority through multiple reports and testimony to

Congress.  *Compare North Carolina State Conf. of NAACP v. McCrory*, 831 F.3d 204,

225 (4th Cir. 2016) ("As one of the State's experts conceded [at trial], 'in North

Carolina, African American race is a better predictor for voting Democratic than

party registration.'").   Key lawmakers like Chairman Johnson, Senator Blease, and

Representative Box (along with Secretary of Labor Davis) promoted these theories

and repeatedly endorsed them during legislative sessions.  *Compare id*. at 226 ("The

State then elaborated on its justification, explaining that '[c]ounties with Sunday

20

voting in 2014 were disproportionately black' and 'disproportionately Democratic.'  In response, SL 2013–381 did away with one of the two days of Sunday voting.  Thus, in what comes as close to a smoking gun as we are likely to see in modern times, the State's very justification for a challenged statute hinges explicitly on race— specifically its concern that African Americans, who had overwhelmingly voted for Democrats, had too much access to the franchise.") (citations omitted); *Arce*, 793 F.3d at 978–79 (legislators accused ethnic studies program of inciting "racial warfare"). Other legislators expressed similar sentiments.  And even Congressmen who might not have otherwise endorsed racially motivated legislation were consistently advised of the "inferiority" of the "Mexican race" during legislative sessions in the five years leading up to the law's passage.  *Compare Democratic National Committee v. Hobbs*, 948 F.3d 989, 1041 (9th Cir. 2020) (finding that "good faith belief" of "sincere legislators" did not shield law from discriminatory, motivating factor under the "cat's paw" doctrine—where others convinced these legislators to act based on others' discriminatory motives).  In other words, the evidence of racial discrimination in the legislative history and events leading up to the passage of the 1929 law easily meets— and seemingly readily exceeds—the evidence in other *Arlington Heights* cases where race was found to be a "motivating factor."

### 4. *"The legislature's departures from normal procedures or substantive conclusions."*

Examining the fourth *Arlington Heights* factor—whether a decisionmaker departs from "normal procedures or substantive conclusions"—requires courts to

consider the timing of the enactment of a law that could signal a discriminatory intent.  *See Arlington Heights*, 429 U.S. at 268 ("For example, if the property involved here always had been zoned R-5 but suddenly was changed to R-3 when the town learned of MHDC's plans to erect integrated housing, we would have a far different case.").  Courts may also consider illogical or counter-intuitive conclusions in the decision-making process.  *See, e.g.*, *Ave. 6E Investments, LLC v. City of Yuma*, 818 F.3d 493, 507 (9th Cir. 2016) (citing the city's decision to "disregard the zoning advice of its own experts").  Here, not only do the overtly racist statements of legislators during the law's passage show its discriminatory purpose, several irregularities and illogical conclusions in the passage of the 1929 law also implicate this factor.

First, the 1920s was the first and only era in which Congress openly relied on the now-discredited theory of eugenics to enact immigration legislation.  Both the 1924 and 1929 immigration laws drew heavily on Dr. Laughlin's debunked beliefs that immigration control was a matter of racial engineering, akin to horse breeding.  And while Congress ultimately acknowledged the discriminatory origins of the National Origins Act of 1924 and repealed it in 1965,[33] illegal reentry remains one of the few laws still in effect from that era.

---

[33] *See* Immigration and Nationality Act of 1965, Pub. L. 89–236 (abolishing the National Origins Formula); Gabriel J. Chin, *The Civil Rights Revolution Comes to Immigration Law: A New Look at the Immigration and Nationality Act of 1965*, 75 N.C. L. Rev. 273, 301 (1996) (noting Congress' "racial egalitarian motivation" for repealing the National Origins Act).

Second, the racial vitriol expressed during the debates was directed almost exclusively at Mexicans—even though Canadians were also entering the United States in record numbers. *See* Exhibit B at 3621 (stating that 81,506 Canadians entered the United States in 1928). If the 1929 Act were motivated by generalized xenophobia or economic anxiety, rather than racism, one would expect legislators to criticize foreigners across the board. But no legislator referred to Canadians as "mongrels"; none complained of "hordes" of Canadians crossing the border; none objected that Canadians were "poisoning the American citizen." And a representative from Wisconsin complained only about Mexicans taking jobs, not Canadians. *See* Exhibit B at 3619. These irregularities show that not only was Congress's passage of the Undesirable Aliens Act based on eugenics and racism, it also departed from typical substantive conclusions underlying immigration law.

### 5. *"The impact of the official action and whether it bears more heavily on one race than another."*

*Arlington Heights* requires challengers to show that a law was enacted with a discriminatory purpose and disparately impacts a particular group. *See* 429 U.S. at 265. Here, not only were racism and eugenics a discriminatory purpose motivating the enactment of the first border crossing laws, such laws continue to disparately impact Mexican and other Latinx defendants.

23

Within a year of the 1929 law's passage, the government had prosecuted 7,001 border crossing crimes; by 1939, that number rose to over 44,000.[34]  In each of these years, individuals from Mexico comprised no fewer than 84 percent of those convicted, and often made up as many as 99 percent of defendants.[35]  And the number of prosecutions has jumped in recent years, making illegal reentry one of the most common felony federal crimes today.  Between 2017 and 2019, the number of § 1326 cases rose by nearly 40 percent to 22,077.[36]  Indeed, illegal reentry offenses accounted for nearly a third of the federal criminal docket in 2019.[37]  In those cases, "99.0% of illegal reentry offenders were Hispanic, 0.7% were White, 0.3% were Black, and almost none were Other races."[38]  Overall, these disparities are comparable to disparities that have supported other successful *Arlington Heights* challenges.  *See, e.g.*, *McCrory*, 831 F.3d at 216-218 (dissecting the multiple ways in which North Carolina voting law, which  relied on data showing racial breakdown of early voting

---

[34] *Annual Report of the Attorney General of the United States for the Fiscal Year 1939*, 37; Kelly Lytle Hernández, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles, 1771-1965*, n.6 at 138–39 (UNC Press, 2017).

[35] Hernández, *supra* n.5, at 138–39 (citing U.S. Bureau of Prisons, *Federal Offenders*, Fiscal Years, 1931–36).

[36] *See* United States Sentencing Commission, *Quick Facts: Illegal Reentry Offenses*, Fiscal Year 2019, *available at*: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Illegal_Reentry_FY19.pdf.

[37] *See id*.

[38] *Id.*  (emphasis added).

usage, disproportionately targeted mechanisms relied on by African American voters); *Ave. 6E Investments*, 818 F.3d at 497 (concentrating most low-income housing in neighborhoods that are 75 percent Hispanic); *Arce*, 793 F.3d at 978 (targeting a program, 90 percent of whose enrollees were of Mexican or other Hispanic origin); *Community Improvement*, 583 F.3d at 704 (excluding 71 percent Latinx areas from benefits, while extending those benefits to other areas that were only 48 percent Latinx).

The executive branch continues to wield § 1326 as a tool of mass prosecution that disproportionately affects Mexicans and Latin Americans.  In April 2018, then-Attorney General Jeff Sessions announced a "zero tolerance" policy targeting illegal entry.[39]   The following month, Sessions made clear that "the Department of Homeland Security is now referring 100 percent of illegal Southwest Border crossings to the Department of Justice for prosecution.  And the Department of Justice will take up those cases."[40]   Sessions and others have drawn inspiration from the discriminatory immigration laws of the 1920s:  In a 2015 interview, Sessions expressed alarm at the rising percentage of "non-native born" Americans, noting that

---

[39] *See* DOJ, Attorney General Announces Zero-Tolerance Policy for Criminal Illegal Entry (Apr. 6, 2018), available at <https://www.justice.gov/opa/pr/attorney-general-announces-zero-tolerance-policy-criminal-illegal-entry>.

[40] DOJ, Attorney General Sessions Delivers Remarks Discussing the Immigration Enforcement Actions of the Trump Administration (May 7, 2018), available at <https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-discussing-immigration-enforcement-actions>.

when immigration levels were "about this high in 1925," the President and Congress "changed the policy, and it slowed down immigration significantly."[41]  He warned that repeal of those policies in 1965 had primed the country for a "surge fast past what the situation was in 1924."[42]  In sum, nearly a century after its enactment, the crime of illegal reentry is being prosecuted in exactly the way that the legislators in the 1920s intended it to be used—to remove Latinx persons from the United States.

### B.   The 1952 Enactment Did Not Erase the Statute's Discriminatory Purpose

The government will almost certainly contend, as it has elsewhere and as the Court concluded in *United States v. Palacios-Arias*, No. 3:20-cr-62-JAG, Dkt. No. 37 (E.D. Va. Oct. 13, 2020), that the illegal reentry statute's discriminatory purpose was wiped away by a pro forma reenactment of the statute in 1952.  This is not so. Congress made no attempt to remove or distance itself from the 1929 legislation's discriminatory purpose—indeed, there is evidence that the 1952 Congress harbored similar intent.  The Supreme Court has repeatedly affirmed that "we do not presume that the revision worked a change in the underlying substantive law 'unless an intent to make such [a] chang[e] is clearly expressed.'"  *Keene Corp. v. United States*, 508 U.S. 200, 209 (1993) (quoting *Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S.

---

[41] Adam Serwer, *Jeff Sessions' Unqualified Praise for a 1924 Immigration Law*, Atlantic (Jan. 10, 2017), available at <https://www.theatlantic.com/politics/archive/2017/01/jeff-sessions-1924-immigration/512591/>.

[42] *Id.*

222, 227 (1957))). *See also Hunter v. Underwood*, 471 U.S. 222, 232-33 (1985) (later enactments do not "legitimate" provision when statute's original enactment motivated by racial animus); *Anderson v. Pac. Coast S.S. Co.*, 225 U.S. 187, 198-99 (1912) ("[I]t will not be inferred that Congress, in revising and consolidating the laws, intended to change their effect unless such intention is clearly expressed."); *United States v. Ryder*, 110 U.S. 729 (1884) ("It will not be inferred that the legislature, in revising and consolidating the laws, intended to change their policy, unless such intention be clearly expressed.").

In two decisions last year the Supreme Court again underscored the point: reenacting a law with a discriminatory purpose does not cleanse the law of that purpose. First, the majority in *Ramos v. Louisiana*, 140 S. Ct. 1390, 1401 & n.44 (2020), rejected Justice Alito's dissent arguing that recodification of a jury non-unanimity rule cleansed it of its racist intent, finding that if courts must "assess the functional benefits" of a law, they cannot "ignore the very functions those rules were adopted to serve." Then, in *Espinoza v. Montana Dep't of Revenue*, the majority relied on the law's "checkered tradition" of underlying religious discrimination to overturn it, even though the law was later reenacted "for reasons unrelated to anti-Catholic bigotry." 140 S. Ct. 2246, 2259 (2020). *Ramos* and *Espinoza* reiterated a principle that the Supreme Court has embraced for over a century. *See, e.g.*, *Bear Lake & River Waterworks & Irrigation Co. v. Garland*, 164 U.S. 1, 11-12 (1896) (explaining that a statutory repeal and recodification has no impact on the intended effect of the

substantive provisions that remain the same).  *See also Oneida County v. Oneida Indian Nation of New York State*, 470 U.S. 226, 245-46 & n.18 (1985) (articulating the same standard, citing the same cases, when interpreting the federal Nonintercourse Act).

The absence of any congressional statement in 1952 to vitiate the racist origins and intent of the 1929 statute that the 1952 statute reenacted defeats the contention that the later enactment cleansed the original statute's discriminatory purpose.  But as the *Carrillo-Lopez* points out, this Court need not rely on Congressional silence alone; rather, evidence indicates that the 1952 Congress had no intention of moving away from the discriminatory origins of the original statute.  *See* --- F.3d ---, 2021 WL 3667330, at *10-11 (Aug. 18, 2021).  It is for this reason that the logic of the *Palacios-Arias* decision in another division of this District fails.  No. 3:20-cr-62-JAG, Dkt. No. 37.  There, the District Court's credulously relies on Congress's authority to legislate in the area of immigration, *id*. at 6, while dismissing the plainly stated intent of the 1929 Congress, the inaction of the 1952 Congress in the face of robust discussion regarding the statute's impacts, and the statute's overwhelmingly disproportionate burden on Latinx people, which was, in fact, what the enacting Congresses intended.  *See Carrillo-Lopez*, 2021 WL 3667330, at *9-16.

In reenacting the crime of illegal reentry in 1952, Congress could have chosen to reflect on the law's racist origins and consequences, decided that there were other permissible reasons to keep the law on the books, and reenacted the law without the

taint of racism.  That did not happen.  Instead, after President Truman vetoed the Immigration and Nationality Act fearing the laws contained therein would stoke rather than abate racism that was deeply imbedded in our country's immigration laws, *see* Exhibit K (Truman veto), Congress simply reenacted it over President Truman's veto.  The only substantive change to the 1952 statute expanded the grounds for prosecution and conviction making the statute *more* punitive than the 1929 version—a change adopted from the letter of support from Deputy Attorney General Peyton Ford that included the use of the racially derogatory word "wetback."  *See* Exhibit L (Deputy Attorney General Peyton Ford Letter).

## IV.    Conclusion

Accordingly, Mr. Alvarez Rodriguez respectfully moves this Court to dismiss the indictment because the sole count rests on a statute, 8 U.S.C. § 1326, that violates the U.S. Constitution's equal protection guarantee.

Respectfully submitted,

CLAUDIO ALVAREZ RODRIGUEZ

By counsel,

Geremy C. Kamens
Federal Public Defender

_____/s/_____
Cadence A. Mertz
Va. Bar No. 89750
Assistant Federal Public Defender
R. Ryan Hoak
Va. Bar No. 94200
*Pro Bono* Attorney
Office of the Federal Public Defender

29

1650 King Street, Suite 500
Alexandria, VA 22314
(703) 600-0800 (Tel)
(703) 600-0880 (Fax)
Cadence_Mertz@fd.org

## **CERTIFICATE OF SERVICE**

      I certify that on Sept. 1, 2021, I will file the foregoing using the CM/ECF system, which will automatically serve true and correct copies on counsel of record.

                             /s/
                         Cadence A. Mertz
                         Va. Bar No. 89750
                         Assistant Federal Public Defender
                         Office of the Federal Public Defender
                         1650 King Street, Suite 500
                         Alexandria, VA 22314
                         (703) 600-0800 (Tel)
                         (703) 600-0880 (Fax)
                         Cadence_Mertz@fd.org