# EXHIBIT D

Quartermaster Clerk Joseph R. Morris to be a chief quartermaster clerk in the Marine Corps, to rank with but after second lieutenant, from the 29th day of August, 1927.

Pay Clerk Frealigh R. Powers to be a chief pay clerk in the Marine Corps, to rank with but after second lieutenant, from the 10th day of August, 1927.

Pay Clerk Edward J. Donnelly, jr., to be a chief pay clerk in the Marine Corps, to rank with but after second lieutenant, from the 10th day of August, 1927.

Pay Clerk Allen A. Zarracina to be a chief pay clerk in the Marine Corps, to rank with but after second lieutenant, from the 10th day of August, 1927.

Pay Clerk John D. Erwin to be a chief pay clerk in the Marine Corps, to rank with but after second lieutenant, from the 10th day of August, 1927.

Pay Clerk Frank H. O'Neill to be a chief pay clerk in the Marine Corps, to rank with but after second lieutenant, from the 10th day of August, 1927.

---

## CONFIRMATIONS

*Executive nominations confirmed by the Senate February 9, 1928*

### FOREIGN SERVICE

*To be secretaries, Diplomatic Service*

Mahlon Fay Perkins.
McCeney Werlich.

### POSTMASTERS

#### ALABAMA

Elmer L. Klick, Sheffield.
Minnie L. Garrett, Uriah.
Emma Rippetoe, Vredenburgh.

#### CALIFORNIA

Hannah C. Dybo, Baypoint.

#### COLORADO

Zina N. Cleveland, Julesburg.

#### FLORIDA

Julius H. Trente, Groveland.

#### ILLINOIS

Guilford M. Humphrey, Beardstown.

#### NEBRASKA

Daniel C. Leach, Bayard.
Georgia Muirhead, Hemingford.
Leona V. Snyde, Papillion.
Carl H. Olderog, Springfield.
Louis J. Bouchal, Wilber.

#### NEW JERSEY

John H. Tyrrell, Perth Amboy.
Nathaniel S. Hires, Salem.

#### NORTH CAROLINA

Jacob M. Stancil, Kenly.
Nora Stedman, Moncure.
Nannie M. Moore, Warrenton.

#### VIRGINIA

Noah Markey, Beaverdam.
Roscoe C. Travis, Bowling Green.
James A. Riddel, Bridgewater.
Francis C. Fitzhugh, Cape Charles.
Hugh T. Arwood, Disputanta.
James M. Nunn, East Radford.
Mary P. Leftwich, Forest.
Charles A. Hammer, Harrisonburg.
William R. Rogers, Hilton Village.
Susan B. Lewis, Hopkins.
Frank D. Paul, Leesburg.
Rodney F. Woodward, Marshall.
Charles P. Smith, jr., Martinsville.
Oswell H. Hopkins, Narrows.
Roger G. Dyson, North Emporia.
Mary E. Spratt, Richlands.
Bessie H. Moon, Saxe.
Joseph B. Jones, Smithfield.
Gilbert F. Stiles, Wachapreague.
John B. Grayson, Warrenton.
William M. Chamberlain, Waverly.
Benjamin A. Dratt, Woodford.

#### WYOMING

Johan O. Hedemann, Columbine.

## HOUSE OF REPRESENTATIVES

### THURSDAY, *February 9, 1928*

The House met at 12 o'clock noon.

The Chaplain, Rev. James Shera Montgomery, D. D., offered the following prayer:

O Thou who hast created us wilt not leave us alone. Thou dost understand our possibilities, and we ask Thee to help us make the best use of ourselves. Surely Thou wilt watch over us until all Thy promises are fulfilled. Purify every desire, cleanse every motive, and deliver us from the throes of weakness and sin. O sin, the monster—how it hurts him who cherishes it as well as the one against whom it rages! Clear the way and make firm and steadfast our footsteps that we may prove ourselves worthy of Thy daily providential care. Keep our minds free from evil and our hearts from guile, and may we indulge ourselves in the great hope that righteousness is destined to cover the wide earth even as the waters cover the seas. When the curtain of the day is drawn may we have no regrets, but peace, sweet peace, the gladdest and the happiest possession of earth. Amen.

The Journal of the proceedings of yesterday was read and approved.

#### MESSAGE FROM THE SENATE

A message from the Senate, by Mr. Craven, its principal clerk, announced that the Senate had passed a bill and joint resolutions of the following titles, in which the concurrence of the House of Representatives was requested:

S. 2996. An act to authorize the Secretary of the Treasury to prepare a medal with appropriate emblems and inscriptions commemorative of the achievements of Col. Charles A. Lindbergh;

S. J. Res. 5. Joint resolution to grant a preference to the wives and minor children of alien declarants in the issuance of immigration visas; and

S. J. Res. 82. Joint resolution providing for the cooperation of the United States in the Pacific Southwest Exposition in commemoration of the landing of the Spanish padres in the Pacific Southwest and the opening of the Long Beach, Calif., world port.

The message also announced that the Senate agrees to the report of the committee of conference on the disagreeing votes of the two Houses on the amendments of the House to the bill (H. R. 278) entitled "An act to amend section 5 of the act entitled 'An act to provide for the construction of certain public buildings, and for other purposes,' approved May 25, 1926."

The message also announced that the Senate had passed without amendment a bill of the House of the following title:

H. R. 7013. An act authorizing and directing the Secretary of War to lend to the Governor of Arkansas 5,000 canvas cots, 10,000 blankets, 10,000 bed sheets, 5,000 pillows, 5,000 pillowcases, and 5,000 mattresses or bed sacks, to be used at the encampment of the United Confederate Veterans to be held at Little Rock, Ark., in May, 1928.

The message also announced that the Senate insists upon its amendments to the bill (H. R. 9136) entitled "An act making appropriations for the Department of the Interior for the fiscal year ending June 30, 1929, and for other purposes," disagreed to by the House of Representatives, and agrees to the conference asked by the House on the disagreeing votes of the two Houses thereon, and had appointed Mr. SMOOT, Mr. CURTIS, and Mr. HARRIS to be the conferees on the part of the Senate.

#### ENROLLED BILLS SIGNED

Mr. CAMPBELL, from the Committee on Enrolled Bills, reported that they had examined and found truly enrolled bills of the following titles, when the Speaker signed the same:

H. R. 5583. An act granting the consent of Congress to the Kansas City, Mexico & Orient Railway Co. of Texas and the Kansas City, Mexico & Orient Railway Co. to construct, maintain, and operate a railroad bridge across the Rio Grande River, at or near Presidio, Tex.;

H. R. 6099. An act granting the consent of Congress to the States of New York and Vermont to construct, maintain, and operate a bridge across Lake Champlain between Crown Point, N. Y., and Chimney Point, Vt.; and

H. R. 10636. An act to make an additional appropriation for the water boundary, United States and Mexico.

#### SENATE BILL AND JOINT RESOLUTIONS REFERRED

A bill and joint resolutions of the following titles were taken from the Speaker's table and, under the rule, referred to the appropriate committees, as follows:

S. 2996. An act to authorize the Secretary of the Treasury to prepare a medal with appropriate emblems and inscriptions



AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

commemorative of the achievements of Col. Charles A. Lindbergh; to the Committee on Coinage, Weights, and Measures.

S. J. Res. 5. Joint resolution to grant a preference to the wives and minor children of alien declarants in the issuance of immigration visas; to the Committee on Immigration and Naturalization.

S. J. Res. 62. Joint resolution providing for the cooperation of the United States in the Pacific Southwest Exposition in commemoration of the landing of the Spanish padres in the Pacific Southwest and the opening of the Long Beach, Calif., world port; to the Committee on Ways and Means.

JOINT RESOLUTION AND BILLS PRESENTED TO THE PRESIDENT

Mr. CAMPBELL, from the Committee on Enrolled Bills, reported that this day they presented to the President of the United States for his approval a joint resolution and bills of the House of the following titles:

H. J. Res. 104. Joint resolution granting consent of Congress to an agreement or compact entered into between the State of New York and the State of Vermont for the creation of the Lake Champlain bridge commission and to construct, maintain, and operate a highway bridge across Lake Champlain;

H. R. 108. An act granting the consent of Congress to the States of North Dakota and Minnesota to construct, maintain, and operate a bridge across the Red River of the North;

H. R. 164. An act to authorize appropriations for construction at the Pacific Branch, Soldiers' Home, Los Angeles County, Calif., and for other purposes;

H. R. 172. An act to authorize the Secretary of War to grant and convey to the city of Vancouver a perpetual easement for public highway purposes over and upon a portion of the Vancouver Barracks Military Reservation, in the State of Washington;

H. R. 193. An act to extend the time for commencing and completing the construction of a bridge across the Mississippi River, at or near the village of Clearwater, Minn.;

H. R. 194. An act granting the consent of Congress to the county of Morrison, State of Minnesota, to construct, maintain, and operate a bridge across the Mississippi River at or near Little Falls, Minn.;

H. R. 199. An act granting the consent of Congress to the State of Minnesota to construct, maintain, and operate a bridge across the Mississippi River at or near Monticello, Wright County, Minn.;

H. R. 319. An act to legalize a bridge across the Snake River at Idaho Falls, Idaho;

H. R. 444. An act to extend the times for commencing and completing the construction of a bridge across the Missouri River at or near Wolf Point, Mont.;

H. R. 495. An act granting the consent of Congress to the county of Armstrong, a county of the State of Pennsylvania, to construct, maintain, and operate a bridge across the Allegheny River at Kittanning, in the county of Armstrong, in the State of Pennsylvania;

H. R. 766. An act for the relief of Ida F. Baum;

H. R. 1405. An act granting six months' pay to Marla J. McShane;

H. R. 2138. An act for the relief of the owner of the schooner *Sentinel*;

H. R. 2145. An act for the relief of Albert J. Zyvolski;

H. R. 3400. An act to correct the military record of Andrew B. Ritter;

H. R. 4127. An act for the relief of Joel T. Smith;

H. R. 4393. An act for the relief of Howard V. Sloan;

H. R. 4707. An act for the relief of Calvin H. Burkhead;

H. R. 4777. An act to compensate Robert F. Yeaman for the loss of certain carpenter tools, which was incurred by reason of a fire in the Government area at Old Hickory Ordnance Depot;

H. R. 4995. An act for the relief of Sabino Apodaca;

H. R. 5228. An act for the relief of Finus M. Williams;

H. R. 5300. An act for the relief of Lewis H. Francke and Blanche F. Shelley, sole legal heirs of Ralph K. Warrington;

H. R. 5510. An act granting the consent of Congress to the city of Duluth, Minn., to construct, maintain, and operate a bridge across the Duluth Ship Canal;

H. R. 5583. An act granting the consent of Congress to the Kansas City, Mexico & Orient Railway Co. of Texas and the Kansas City, Mexico & Orient Railway Co. to construct, maintain, and operate a railroad bridge across the Rio Grande River at or near Presidio, Tex.;

H. R. 5628. An act to extend the time for commencing and the time for completing the construction of a bridge across the Potomac River;

H. R. 5638. An act granting the consent of Congress to rebuild and reconstruct and to maintain and operate the existing railroad bridge across the Tombigbee River, at Epes, in the State of Alabama;

H. R. 5744. An act granting the consent of Congress for the reconstruction of a bridge across the Grand Calumet River at East Chicago, Ind.;

H. R. 5994. An act for the relief of George C. Hussey;

H. R. 6041. An act granting the consent of Congress to the Pennsylvania Railroad Co. to construct, maintain, and operate a railroad bridge across the Allegheny River;

H. R. 6045. An act granting the consent of Congress to the commissioners of Mahoning County, Ohio, to reconstruct, maintain, and operate the existing bridge across the Mahoning River at South Avenue, Youngstown, Mahoning County, Ohio;

H. R. 6046. An act granting the consent of Congress to the city of Youngstown to construct a bridge across the Mahoning River at or near West Avenue, Youngstown, Mahoning County, Ohio;

H. R. 6099. An act granting the consent of Congress to the States of New York and Vermont to construct, maintain, and operate a bridge across Lake Champlain between Crown Point, N. Y., and Chimney Point, Vt.;

H. R. 6162. An act for the relief of Thomas M. Ross;

H. R. 6466. An act granting a part of the Federal building site at Phoenix, Ariz., to the city of Phoenix for street purposes;

H. R. 6479. An act to extend the times for commencing and completing the construction of a bridge across the Susquehanna River between the Borough of Wrightsville, in York County, Pa., and the Borough of Columbia, in Lancaster County, Pa.;

H. R. 6483. An act granting the consent of Congress to the State of Illinois, the county of Lee, and the city of Dixon, or to any or either of them, jointly or severally, to construct, maintain, and operate a bridge across the Rock River at Dixon, Ill.;

H. R. 6512. An act granting the consent of Congress to the county of Cook, State of Illinois, to construct, maintain, and operate a bridge across the Little Calumet River at or near Wentworth Avenue, in Cook County, State of Illinois;

H. R. 6513. An act granting the consent of Congress to the county of Cook, State of Illinois, to construct, maintain, and operate a bridge across the Little Calumet River at or near Ashland Avenue, in Cook County, State of Illinois;

H. R. 6514. An act granting the consent of Congress to the county of Cook, State of Illinois, to construct, maintain, and operate a bridge across the Little Calumet River at or near Indiana Avenue, in Cook County, State of Illinois;

H. R. 6938. An act granting the consent of Congress to the city of Youngstown to construct a bridge across the Mahoning River at Youngstown, Mahoning County, Ohio;

H. R. 6959. An act to legalize a bridge across the Caney Fork River in De Kalb County, Tenn.;

H. R. 7192. An act to extend the time for commencing and completing the construction of a bridge across the Ohio River between the municipalities of Rochester and Monaca, Beaver County, Pa.;

H. R. 7370. An act granting the consent of Congress to the State of Idaho to construct, maintain, and operate a bridge across the Snake River near Indian Cove, Idaho;

H. R. 7374. An act granting the consent of Congress to the State of Idaho to construct, maintain, and operate a bridge across the Snake River near Swan Valley, Idaho;

H. R. 7466. An act granting the consent of Congress to the State of Montana, Valley County, Mont., and McCone County, Mont., or to any or either of them, jointly or severally, to construct, maintain, and operate a bridge across the Missouri River at or near Glasgow, Mont.;

H. R. 7745. An act granting the consent of Congress to the Chicago & Northwestern Railway Co., a corporation, its successors and assigns, to construct, maintain, and operate a railroad bridge across the Rock River;

H. R. 7913. An act granting the consent of Congress to the Highway Department of the State of Alabama to construct a bridge across Elk River on the Athens-Florence road, between Lauderdale and Limestone Counties, Ala.;

H. R. 8092. An act for the relief of Randolph Sias;

H. R. 8369. An act for the relief of Josephine Thibodeaux;

H. R. 8889. An act for the relief of Adriano Cruceta, a citizen of the Dominican Republic; and

H. R. 10636. An act to make an additional appropriation for the water boundary, United States and Mexico.

TERMS OF PRESIDENT, VICE PRESIDENT, ETC.

Mr. SNELL, chairman of the Committee on Rules, reported the following rule for printing in the RECORD:

House Resolution 112

*Resolved,* That upon the adoption of this resolution it shall be in order to move that the House resolve itself into the Committee of the Whole House on the state of the Union for the consideration of House Concurrent Resolution 18, proposing an amendment to the Constitution. That after general debate, which shall be confined to the House concurrent resolution and shall continue not to exceed five hours, to be equally divided and controlled by those favoring and opposing the House concurrent resolution, the House concurrent resolution shall be read for amendment under the five-minute rule. At the conclusion of the reading of the House concurrent resolution for amendment, the committee shall rise and report the House concurrent resolution to the House with such amendments as may have been adopted, and the previous question shall be considered as ordered on the House concurrent resolution and the amendments thereto to final passage without intervening motion except one motion to recommit.

Mr. SNELL. Mr. Speaker, I would like to make a short announcement. This resolution for the consideration of House Concurrent Resolution 18 provides five hours of general debate, but if it develops during the discussion of resolution that we need more time we will ask to have the rule amended and give more time. We appreciate this is a most important matter, and we want the House to have ample time to discuss it freely and fully from all sides.

I have been asked when the rule will probably be called up. I may say I will give the House, as near as possible, a week's notice before it is called up. I do not believe it will be called up next week on account of some other matters that will interfere and as several Members have requested that it be put over to a later date.

Mr. HASTINGS. What is the resolution about?
Mr. SNELL. It is a resolution providing for the consideration of the White-Norris constitutional amendment.
Mr. McCLINTIC. Mr. Speaker, I ask unanimous consent to address the House for eight minutes on the subject of submarines.
The SPEAKER. Is there objection to the request of the gentleman from Oklahoma?
There was no objection.

CALL OF THE HOUSE

Mr. McDUFFIE. Mr. Speaker, I make the point of no quorum.
The SPEAKER. The gentleman from Alabama makes the point of order that there is no quorum present. Evidently there is not a quorum present.
Mr. TILSON. Mr. Speaker, I move a call of the House.
A call of the House was ordered.
The Clerk called the roll, when the following Members failed to answer to their names:

[Roll No. 27]

| | | | |
|---|---|---|---|
| Ackerman | Douglas, Ariz. | Johnson, S. Dak. | Purnell |
| Adkins | Doyle | Kendall | Quayle |
| Anthony | Roy G. Fitzgerald | Kindred | Reed, Ark. |
| Auf der Heide | Foss | Kunz | Robsion, Ky. |
| Beck, Pa. | French | Larsen | Romjue |
| Begg | Gallivan | Leatherwood | Sanders, N. Y. |
| Bell | Gilbert | Lehlbach | Sirovich |
| Bohn | Glynn | Linthicum | Steagall |
| Boies | Graham | Maas | Strong, Pa. |
| Britten | Griffin | Mead | Strother |
| Burdick | Haugen | Michaelson | Sullivan |
| Campbell | Hickey | Monast | Taylor, Tenn. |
| Celler | Hogg | Morrow | Tucker |
| Clancy | Houston | Norton, N. J. | Updike |
| Connolly, Pa. | Howard, Okla. | O'Connell | Weller |
| Cooper, Ohio | Hughes | O'Connor, N. Y. | White, Me. |
| Curry | Hull, Tenn. | Parks | Williamson |
| Davey | Igoe | Porter | Wingo |
| Dickstein | Jacobstein | Prall | Winter |

The SPEAKER. Three hundred and fifty-six Members have answered to their names, a quorum.
On motion of Mr. TILSON, further proceedings under the call were dispensed with.

COMPLETION AND REPAIR OF CUSTOMS BUILDINGS IN PORTO RICO

Mr. KIESS. Mr. Speaker, I ask unanimous consent that the bill (H. R. 9363) to provide for the completion and repair of customs buildings in Porto Rico be rereferred from the Committee on Ways and Means to the Committee on Insular Affairs.
The Clerk read the title of the bill.
Mr. GREEN of Iowa. Mr. Speaker, reserving the right to object, and I shall not object, this bill pertains merely to the affairs of the people of Porto Rico. The construction of these buildings is to be paid out of the revenues of Porto Rico and has nothing to do with continental United States. While the bill technically may be within the jurisdiction of the Ways and Means Committee, I shall not object, with the understanding that the rereference is without prejudice, to which I understand the gentleman from Pennsylvania consents.

The SPEAKER. The gentleman from Pennsylvania asks unanimous consent that the bill just reported be rereferred from the Committee on Ways and Means to the Committee on Insular Affairs. Is there objection?
There was no objection.

RELIEF OF CERTAIN PORTO RICAN TAXPAYERS

Mr. KIESS. Mr. Speaker, I ask unanimous consent that the bill (S. 754) for the relief of certain Porto Rican taxpayers be rereferred from the Committee on Ways and Means to the Committee on Insular Affairs.
Mr. GREEN of Iowa. Mr. Speaker, I reserve the right to object simply for the purpose of stating the situation. This bill also pertains entirely to the affairs of the people of Porto Rico. It is an amendment of an act originally passed upon by the Committee on Insular Affairs. I have consulted with members of the committee on both sides of the House and there seems to be no objection to this rereference, with the same understanding as was had with respect to the other bill.
The SPEAKER. Is there objection to the request of the gentleman from Pennsylvania?
There was no objection.

SUBMARINES

Mr. McCLINTIC. Mr. Speaker, I ask unanimous consent to revise and extend my remarks and include a short editorial on submarines from the Washington Post.
The SPEAKER. Is there objection to the request of the gentleman from Oklahoma?
There was no objection.
The editorial is as follows:

SUBMARINES IN SEA LANES

It may be necessary for Congress to prohibit the maneuvering of undersea boats in commercial lanes. There are hundreds of miles of water space within easy reach of the coasts that are free at all times from commercial traffic, in which submarine tests could be made with safety.

The location of the appalling accident to the *S–4*, which has resulted in destroying the lives of two score or more officers and men, is in a narrow channel constantly traversed by merchant ships and in the course of vessels of the Coast Guard.

There is no way in which a surface vessel can locate an undersea boat except when the submarine shows her periscope or conning tower. In the case of the *S–4* it appears that the commander of the *Paulding* had no knowledge whatever of the fact that a submarine was anywhere in the vicinity, and it was only when her conning tower appeared above the surface that her presence was even suspected. Then it was too late. The collision was inevitable. No seaman, however expert, can change his course or stop the headway of his ship within a distance less than the length of his hull.

In such circumstances the accident which has brought sorrow to so many homes is reported as "unavoidable." But it could have been prevented if the naval authorities had taken the precaution to direct the commanders of undersea boats to refrain from submerging their vessels near the coast, and especially within commercial lanes in the vicinity of ports.

It is time that steps were taken to stop this unnecessary loss of life. If the naval authorities do not have common sense enough to order submarine tests in unoccupied waters, Congress should direct them to do so.

Mr. McCLINTIC. Mr. Speaker and gentlemen of the House, I shall try to conclude my remarks as quickly as possible, as I understand that the river and harbor amendment comes up immediately after I conclude. I sought this opportunity this morning to make a short address for the purpose of bringing to the attention of the House a very significant statement that I have just received in the way of a letter referring to submarines. Simon Lake, who is given credit for the invention of the submarine, who lives at Milford, Conn., has written me a letter in which he makes the statement that some time ago while at Provincetown, Mass., he was told by certain of those who participated in the rescue of the *S–4* that if they had had on this ship the new appliances he had put on other submarines built for other nations that the 38 or 40 of those who lost their lives could have been rescued in one hour. I ask that the Clerk read the letter in my time.
The Clerk read as follows:

From the evidence so far attained the loss of the *S–4* was due to no fault in the boat itself. It was due to a collision at sea, and since then several other surface ships have been sunk by collision and collisions are going on between surface ships at the rate of several per day, as maritime statistics show, frequently accompanied by very large loss of life. Such losses are so frequent as to be commonplace, and only attract a brief notice in the press; but because those men were not drowned at once, as practically always occurs when surface ships sink with their crews and passengers entrapped, the whole world became

interested in the possibility of their rescue. The fact that some of these men were alive for days is to my mind a proof that the submarine is safer than the surface ships. In no other type of ship could men survive 100 feet under water for days. It is unfortunate that the *S-4* was not fitted with certain safety features, similar to which were installed in the boats I built for foreign governments some years ago. Had these features been installed on the *S-4* I believe, from the information given me by some of the officers in the rescue fleet at Provincetown on a recent visit there, that at least 38 of the 40 men could have been rescued within an hour after the *S-4* was sunk.

Mr. McCLINTIC. Mr. Speaker and gentlemen of the House, that is one of the most startling statements I have ever heard with respect to submarines in the Navy for the reason certain naval officers have denied that any new devices with merit have been submitted to the Navy.

Mr. MADDEN. Will the gentleman yield?

Mr. McCLINTIC. I will.

Mr. MADDEN. I want to ask the gentleman who wrote the letter?

Mr. McCLINTIC. Simon Lake, the inventor of submarines. This letter shows that this inventor has supplied new safety appliances to other nations of the world in the construction of submarines. This means that he has been building submarines for other Governments and that our Navy has not seen fit to adopt his suggestions. It means by inference that the United States Navy has not considered his suggestions as being necessary, yet foreign nations have adopted these new appliances for safety. It seems to me if we had the right person at the head of this department in our Navy that our submarines would have been fitted with new safety appliances, and that the 38, if not all of those who lost their lives in the disaster, might have been saved.

Mr. Speaker, a report has been given out by the press that the special committee of naval officers appointed by the Navy has held its hearing and made its report, but that this report has not been given to the public, and the Secretary of the Navy makes the statement that he does not know when it will be given to the public. I want to say to you here and now that if this committee that has made the special investigation has not consulted men with the same qualifications as Simon Lake, the inventor of submarines, and has not considered who was responsible for not providing safety devices, and has not ascertained whether new ideas along that line have been submitted to the Navy from time to time—I say now that their report will be nothing more and nothing less than a whitewash of the Navy.

Everyone knows that when a committee of this kind is appointed it is its duty to go into every phase of the situation, and the point uppermost in the minds of the American people to-day is why did not the Navy and those charged with the responsibility require the kind of safety devices that were then known, as testified to by Mr. Lake in his letter, which would have brought about the rescue when the accident occurred?

I say to you the time has come for us to take some action in a matter of this kind. I suggested some time ago, and introduced a bill that called for a survey of conditions in southern waters for the relocation of a base to be used in the training of submarine crews. Everyone knows that our submarine training activities should be taken out of the ship-travel lanes and be put at some place where they would not be subject to disasters like the one that sunk the *S-4*. Southern waters are warm and much clearer; therefore something should be done at once in this connection.

I do not know whether it is going to be possible to get a resolution passed along this line or not, but I do say that if another such accident occurs in the travel lanes of the ocean whereby 40 or 50 men are sent to their death in a submarine accident, then there will be those in the Nation who will feel that the Secretary of the Navy ought to be prosecuted criminally—and he ought to be summarily removed if he does not attend to this work in a proper manner. [Applause.]

Mr. MANSFIELD. Will the gentleman yield?

Mr. McCLINTIC. I will.

Mr. MANSFIELD. Can the gentleman tell us what other naval powers have done in the way of providing safety devices?

Mr. McCLINTIC. I am glad the gentleman from Texas has asked that question. I have a statement of a German sailor who was in a German submarine lost at the bottom of the sea for a day or so; afterwards it was located, and this ship was raised in sufficient time to effect the rescue of all of those in the ship.

SAYS GERMAN DEVICE COULD HAVE RAISED "S-4"—FORMER GUNNER'S MATE IN KAISER'S NAVY HELPED BUILD SUCCESSFUL SALVAGE CRAFT

In Germany a marine device which would have raised the sunken *S-4* from the bottom of Provincetown Harbor probably within 48 hours under the most adverse conditions and would have made possible the saving of her crew of 40 men, was built and used successfully more than 10 years ago, according to Ernest Hermann Hagemann, now of Hartford, and during the World War artilleristen maat (gunner's mate) in the German Navy.

The craft, designed and built for the Government at Wilhelmshaven, Prussia, a large naval base, in 1917, was basically two separate ships with specially constructed hulls joined together by rigid steel beams in such a way that there was space enough between them to allow the floating of undersea boats of the size and type in use at that time. A giant crane was mounted between the two vessels equipped with lifting machinery powerful enough to bring sunken craft to the surface even if partly filled with water.

According to Mr. Hagemann's story, after he had gone through a harrowing experience in a disabled submarine at the bottom of the North Sea, and subsequently had been declared unfit for undersea service, he was transferred to the engineering branch of the navy as an assistant draftsman late in 1916.

Shortly after that, with a number of naval architects and engineers, he was sent to the shipyards of the firm of Blum & Foss, at Wilhelmshaven, where the "submarine lift boat" was to be built.

The first type which was evolved was similar to a second one built later in the year, after a period of experiment, except that it had three arched cranes for lifting instead of one. Each of the two halves of the lift boat was completely fitted out as though it were a separate ship, Mr. Hagemann continues. In addition, there was on each vessel the machinery and air pumps necessary for diving. The contrivance was approximately 18 meters (59 feet) long and of about 1,500 gross tons.

EQUIPPED WITH HOOKS

After this idea had been worked out all submarines were equipped with properly mounted hooks, to which divers could attach the steel cables for lifting. In practice and experimental work the submarines could be raised sometimes in an hour, sometimes two or three.

The first time the lift boat was called out for actual use Mr. Hagemann and the other draftsmen and engineers who had worked on her and on the first one which was built were aboard. It was late in 1917.

A school submarine from the Heligoland base, with a double crew on board, had submerged and failed to come up some distance out from the island. In the meantime, according to Mr. Hagemann, a storm came up and after it had to some extent abated the sunken submarine was found lying on a sandbar about 35 feet under water. In all she was on the bottom 36 hours, but only a few hours were required to bring her to the surface once the lift boat commenced operations, and her crew was saved.

During the years he served in the navy, Mr. Hagemann said, there were a number of other cases where the lift boat was able to rescue sunken and disabled submarines without loss of life among their crews. At the time of the sinking of the *S-51* in Block Island Sound, two years ago, he said, he was surprised that no such device had been evolved by the United States Navy, and was doubly so when the sinking of the *S-4* brought to light the fact that none has since been developed.

Mr. Hagemann came to Hartford four and a half years ago from Germany because of the postwar economic depression. He is now a cabinetmaker in the employ of the L. F. Dettenborn Woodworking Co. He was born in Wilhelmshaven in 1891. Following his graduation from "real gymnasium," similar to the American trade school, he joined the navy and during the war served in a number of important naval engagements.

In 1916, after he had been for some years stationed at the Heligoland naval base, he was ordered to Kiel, where he took a course in the submarine school for six weeks. Immediately after this he was assigned to the *U-67*.

I want to put this statement in the RECORD for the reason that this German boy sent me a telegram and offered to come to Washington if his expenses were paid and tell this Government how this German rescue ship was constructed.

The SPEAKER. The time of the gentleman from Oklahoma has expired. [Applause.]

MIDDLE RIO GRANDE CONSERVANCY DISTRICT

The SPEAKER laid before the House the following communication:

IN THE SENATE OF THE UNITED STATES,
*February 8, 1928.*

*Ordered,* That the House of Representatives be respectfully requested to return to the Senate the message of the Senate announcing its agreement to the amendment of the House of Representatives to the bill (S. 700) entitled "An act authorizing the Secretary of the Interior to execute an agreement with the Middle Rio Grande conservancy district providing for conservation, irrigation, drainage, and flood control for the Pueblo Indian lands in the Rio Grande Valley, N. Mex., and for other purposes."

Attest:

     (Signed)      EDWIN P. THAYER, *Secretary.*

The SPEAKER. Without objection, the request will be complied with.

Mr. ARENTZ. Mr. Speaker, reserving the right to object, I received a communication in my mail this morning from the American Indian Defense Association, and it was stated in that communication that "Senate bill 700 has been recalled from the House and a motion to reconsider it is pending in the Senate." Apparently this association has given its orders. The Senate is asking for the recall of this legislation introduced by Representative MORROW, of New Mexico.

Has any Member of this body or the body at the other end of the Capitol such power? Could any of us dictate the policy of this House in the manner of this association?

Whether they are right or wrong in this instance no individual, no group of men or women, no association should be able to force their opinions or policies down the throats of any Member, and God forbid that the weight of their influence should be felt in any committee of either House or Senate.

The Morrow bill was thoroughly discussed in the Committee on Indian Affairs of the House. Mr. Collier, secretary of this association, sat in on these hearings; Mr. CRAMTON offered his amendment and was heard by this committee. It is true that his amendment was not accepted in toto, but it was accepted by Mr. MORROW and by the Committee of the Whole when offered by Mr. CRAMTON from the floor.

Mr. Speaker and Members of the House, I have felt the full force of the tyrannous action of this association and of the Indian Rights Association in my endeavor to deal justice alike to Indians and whites on the Walker River in my beloved State of Nevada. Here the Paiute Indians live on the Walker River Indian Reservation, where they were driven by United States soldiers in 1859. They have not tilled the self-same soil since the time of Christ, as it is reported the tribes of Cochiti, Santo Domingo, and San Felipi have upon the Middle Rio Grande Valley.

The Walker River Indians learned to till the soil from the white settlers and did not commence the growing of crops on the reservation until 1871. The whites commenced in 1859. They stepped out of the covered wagon into their cabin. They filed on the water of the stream and put it to beneficial use and now have under cultivation over 100,000 acres.

The Indians have 2,023 acres under cultivation. Their primary water right only covers this acreage. I have always insisted that the Indians are entitled to this acreage of primary water rights. The Indian Rights Association have insisted that this right must be doubled. This is unfair. Where these people who are so solicitous in the interest of the Indian have in this instance coerced Congress, in the case of the Walker River, they have, I am forced to believe, browbeaten some officials of the Indian Bureau into accepting their views of the Walker River matter.

I am kindly disposed toward all American Indians. To them I always want to extend a helping hand, to be fair and just, to give them the benefit of the doubt on questionable matters, and at the same time to treat my white brethren with equal justice and to always bear in mind that in the eyes of our Government the white man should be looked on with equal favor as the Indian.

Mr. MORROW. Mr. Speaker, I perhaps would be the one Member in the House that might raise an objection to this message being sent back to the Senate, but having taken part in the legislation, knowing it to be in the interest of the Indians and to be vitally in the interest of my State, if there is any further investigation needed, I take pleasure in withdrawing my objection to its being sent back to the Senate.

The SPEAKER. Is there objection?

There was no objection.

### WAR DEPARTMENT APPROPRIATION BILL

Mr. BARBOUR. Mr. Speaker, I move that the House resolve itself into the Committee of the Whole House on the state of the Union for the further consideration of the bill (H. R. 10286) making appropriations for the military and nonmilitary activities of the War Department for the fiscal year ending June 30, 1929, and for other purposes.

The motion was agreed to.

Accordingly the House resolved itself into the Committee of the Whole House on the state of the Union for the further consideration of the War Department appropriation bill, with Mr. TILSON in the chair.

The Clerk reported the title of the bill.

The Clerk read as follows:

### RIVERS AND HARBORS

To be immediately available and to be expended under the direction of the Secretary of War and the supervision of the Chief of Engineers:

Mr. SEARS of Florida. Mr. Chairman, I offer the following amendment, which I send to the desk.

The Clerk read as follows:

Page 78, after line 16, insert a new paragraph, as follows:

"Harbor improvements: To pay the city of Miami, out of any funds available in the Treasury not otherwise appropriated, for part reimbursement of the $1,605,000 advanced or loaned to the Government by said city for the improvement of Miami Harbor, as provided under the river and harbor act passed March 3, 1925, in accordance with House Document 516, the sum of $605,000."

Mr. BARBOUR. Mr. Chairman, on that I reserve the point of order.

Mr. SEARS of Florida. Mr. Chairman, it is, indeed, unfortunate that my good friend and colleague from California [Mr. BARBOUR] is the chairman of this subcommittee. There is no man in this House for whom I have a higher esteem. Some years ago there was a good deal of friction between California and Florida, but joining with them in their fights for relief, and they joining with me, that friction has been swept aside. I do not believe that I am overstating it when I say that if the chairman of the subcommittee were at liberty to do so, he would support my amendment.

I want the attention of this House because I feel that I have a meritorious cause, and I know that I have a meritorious amendment. The facts of the case are as follows:

In 1925 under the river and harbor act, as my colleagues will recall, there was authorized for the deepening of Miami Harbor 25 feet, the sum of $1,605,000. On page 14, section 11, of that bill is found the following proviso:

That whenever local interests shall offer to advance funds for the prosecution of a work of river and harbor improvement, duly adopted and authorized by law, the Secretary of War may, in his discretion, receive such funds and expend the same in the immediate prosecution of such work. The Secretary of War is hereby authorized and directed to pay, without interest, from appropriations which may be provided by Congress for river and harbor improvement, the money so contributed and expended.

In January, 1926, Miami, Fla., put up $500,000. Due to a local fight, nothing could be done. The local fight was on the turning basin and the kind of docks that they would have, so the Government had $500,000 of our money for more than 12 months without spending a dollar of it. In September, 1926, Miami put up the balance of the fund, making it $1,605,000 on which she is paying 5¼ per cent interest. A few weeks after we deposited that the hurricane struck Miami, and the city had to spend hundreds of thousands of dollars in clearing her streets, removing the débris, reconditioning the sewerage, and if I paint too sorrowful a picture, I am sure that my friends Congressmen FREEMAN, of Connecticut, CHALMERS and MORGAN, of Ohio, STRONG of Pennsylvania, CARTER and SWING, of California, LYON, of North Carolina, McDUFFIE, of Alabama, and DEAL, of Virginia, who went down there and saw the destruction that was visited on the good people, will say so or that the picture could not be overdrawn.

Facing that condition and with a loss of $78,000,000 in the storm section, Miami now comes to you and asks you to give back to her, not an appropriation, but the money that she advanced to you in good faith. If it were a foreign country like Japan, for whom you voted a million dollars, perchance it would pass without opposition. But, unfortunately, I am appealing to you for your own people; that they may be given the relief they are entitled to. On June 5 of this year—my colleagues, listen to this—those bonds mature, and unless you give this relief Miami will have to reissue bonds and will have to pay between $50,000 and $60,000 additional interest, brokerage, printing, and so forth.

The CHAIRMAN. The time of the gentleman from Florida has expired.

Mr. SEARS of Florida. May I have five minutes more?

The CHAIRMAN. Is there objection to the request of the gentleman from Florida?

There was no objection.

Mr. SEARS of Florida. I say to you that when a city or a municipality is hit so hard by an act of Providence, and by law can only assess a certain millage, and they can only raise a certain amount of taxes, you, my colleagues, will realize the importance of the proposition and give back to Miami her money in order that she may take up those bonds on the 5th day of June of this year and not compel them to pay between $50,000 and $60,000 additional.

Then I want to call your attention to these facts: Miami has expended on that harbor $3,596,373.85. The Government of the United States has spent on that harbor $2,956,000. Miami will have expended, when you shall have returned to her the $605,000, nearly as much as the Government has expended on the harbor.

My colleagues put it in the law that we had to construct the channel, and my friend from Connecticut [Mr. FREEMAN] went over it and saw it. We had to dig the channel across the bay to a depth of 15 feet in order to get our first appropriation. I do not believe that when a city has expended nearly $4,000,000 of her own money and then advanced to the Government $1,605,000 to complete the harbor, you should refuse to give back to her now her money in order that she may meet her obligations.

Mr. SNELL. Mr. Chairman, will the gentleman yield?

Mr. SEARS of Florida. Yes.

Mr. SNELL. May I ask the gentleman if this money was not spent originally at the request of the people of Miami? Did she not want to get her work done in advance of other work in connection with rivers and harbors?

Mr. SEARS of Florida. That may be so. But I say to you, my friends, as I said before, Miami would not be asking for this now if it were not for that act of Providence over which she had no control. Therefore I want you to be as liberal to her as you are to foreign countries. We advanced the money in good faith. We had nothing to do with the hurricane. We had nothing to do with the cause that makes it necessary to ask that she get back at once all of the money advanced to the Government.

Mr. SNELL. You do not say that we have not lived up to all our legal rights?

Mr. SEARS of Florida. No; I have not said that. Unfortunately Congress can wait 10 years and we are estopped from complaining. General Jadwin has been kind to me.

Mr. SNELL. How much is this?

Mr. SEARS of Florida. Five hundred thousand dollars.

Mr. SNELL. How much is in this bill?

Mr. MADDEN. It is $1,605,000 altogether. Five hundred thousand dollars of that was paid last year, and $500,000 will be paid back this year. Six hundred and five thousand dollars it is now proposed will be paid back next year. But the gentleman is not willing to wait.

Mr. SNELL. That is what I asked about.

Mr. SEARS of Florida. I am unwilling to wait, because we are entitled to it, and the city authorities say they can not wait. They must refund those bonds on the 5th of June. I ask you, my colleagues, to take that fact into consideration. If you were in my place, and if it were your city that you were pleading for, a city suffering from a hurricane, you would realize my situation. When the disastrous floods occurred I wired to the President to go the limit, and I promised him that I would back him up when Congress convened. It is true that we might wait 10 years; but, as I say, the city must have the money before June.

Mr. MADDEN. The gentleman knows that there is no disposition to wait 10 years. It is distinctly understood that the gentleman's city is going to get $500,000 right away.

Mr. SEARS of Florida. Yes. We get it out of this bill. I want to be perfectly fair.

Mr. MADDEN. And it is also distinctly understood that you will get the other $605,000 next year. The gentleman is trying to legislate it in this bill.

The CHAIRMAN. The time of the gentleman from Florida has again expired.

Mr. SEARS of Florida. Mr. Chairman, may I proceed for five minutes more?

The CHAIRMAN. Is there objection?

There was no objection.

Mr. SPEAKS. Mr. Chairman, will the gentleman yield?

Mr. SEARS of Florida. Yes.

Mr. SPEAKS. As I understand it, the Government next year will refund to Miami the $605,000 you are asking for now. If the House refuses to comply with your request it will cost the city of Miami about $50,000 in interest and other charges.

Mr. SEARS of Florida. Yes; approximately; and the city has no funds to redeem the bonds.

Mr. SNELL. The gentleman does not mean to say that it will cost $90,000, does he?

Mr. SEARS of Florida. I am talking about the sale of bonds.

Mr. SNELL. It certainly will not cost that much.

Mr. SEARS of Florida. I do not want to quibble about it. It is 5½ per cent on $605,000. There is the interest, about $30,000; the brokerage and the printing of the bonds and the expenses of the sale, if you can get a sale for them. I do not want to mislead the House. It is over $30,000.

Mr. SNELL. It is for the improvement of the city. I am talking about the harbor improvement.

Mr. SEARS of Florida. Yes. We have spent nearly $4,000,-000, and the Government has spent less than $3,000,000 on the harbor, so that we have been more than fair.

You say, "Why are you asking for this?" We would not complain if the hurricane had not struck us. Those people are not asking for charity. I will leave it to my good friend from Connecticut [Mr. FREEMAN] and my good friends from Ohio [Messrs. CHALMERS and MORGAN], who went down there and saw the devastation. I leave it to my good friend, Mr. CARTER, of California. They saw conditions shortly after the hurricane, and I want it understood we are not asking for sympathy. We are simply asking you to do that which we believe we are entitled to.

Let me call your attention to this: For the removal of wrecks after the hurricane Miami expended $66,508 in getting the wrecks out of the harbor. The sand was 3 feet deep on some of the streets. Barges, loaded with ballast and rock, were blown into the Royal Palm Park. God knows why the loss of life was not greater. It took hundreds of thousand of dollars for those people to restore streets, and so forth, of the city, and no city ever came back faster than Miami.

I will say, my friends, in conclusion, that I have presented the case as well as I could. If this is setting a precedent, I think it can well be done in view of the terrible disaster which came to Miami. I do not believe I have overdrawn the picture. If any of my colleagues, either on the Republican side or on the Democratic side, who went down there and saw conditions will say that I have overdrawn the picture I will withdraw the amendment.

Mr. MADDEN. Will the gentleman yield?

Mr. SEARS of Florida. Yes.

Mr. MADDEN. The understanding was, was it not, that this would be paid back in three installments?

Mr. SEARS of Florida. No.

Mr. MADDEN. What was it, then?

Mr. SEARS of Florida. The understanding was that it would be paid back.

Mr. MADDEN. It might not be paid back, then, in 20 years, according to that statement.

Mr. SEARS of Florida. That is true; but the understanding also was that this great Government of ours, with a boasted surplus of $600,000,000 during times like those I have pictured to you, would not hold us to 20 years, because Miami would not have advanced the money if that had been understood.

Mr. MADDEN. Let me ask another question. I have been helping the gentleman to get the money.

Mr. SEARS of Florida. That is true, and the hearings show I have thanked the gentleman repeatedly.

Mr. MADDEN. And I will continue to help the gentleman all I can, and I do not think they will have any trouble in getting the money when the time comes.

Mr. SEARS of Florida. But will you loan me $40,000 to pay the interest?

Mr. MADDEN. I think the gentleman is romancing.

Mr. SEARS of Florida. No; I am not romancing. I am not able to do it myself.

Mr. MADDEN. They did receive $500,000 last year, did they not?

Mr. SEARS of Florida. Yes.

Mr. MADDEN. The gentleman knows he is going to get $500,000 more, does he not?

Mr. SEARS of Florida. I have that assurance from General Jadwin, and General Jadwin has never yet broken his word.

Mr. MADDEN. And the gentleman has my assurance that I am going down there with him for the purpose of trying to get General Jadwin to allocate this other $605,000. I think the gentleman is trying to legislate this out of the Treasury, and he ought not to be permitted to do so.

The CHAIRMAN. The time of the gentleman from Florida has again expired.

Mr. SEARS of Florida. Mr. Chairman, I ask unanimous consent to proceed for one additional minute.

The CHAIRMAN. The gentleman from Florida asks unanimous consent to proceed for one additional minute. Is there objection?

There was no objection.

Mr. SEARS of Florida. Sometimes a man talks too much, but there have been so many speeches on the other side during my time, I want to say this. The city commissioners last December advised me they had to have this money, and on January 17 I received this telegram:

JANUARY 17, 1928.

One million one hundred five thousand harbor notes bearing 5½ per cent interest mature June 1, 1928.

L. J. GRIFFIN,
*Director of Finance.*

That is the whole question. Those bonds mature in June and we have no money with which to take them up. The city commissioners have asked me to put this up to my colleagues and I have tried to make my case. All I ask of you is to vote as you would have me vote if conditions in your district were just like ours.

Mr. HASTINGS. Will the gentleman yield?

Mr. SEARS of Florida. Yes.

Mr. HASTINGS. I saw in the newspapers a statement to the effect that three banks had failed there the other day and that they were shipping $7,000,000 by airplane to save another one of your banks in Miami; is not that correct?

Mr. SEARS of Florida. That is true; but I am not referring to that. That is another condition, due, I am told, to propaganda, while the other was the act of God. [Applause.]

Mr. SPEAKS. Mr. Chairman, I rise for the purpose of inquiring of the chairman of the Rivers and Harbors Committee whether there is a large sum lying dormant and to the credit of river and harbor activities as a contingent fund?

Mr. DEMPSEY. No. The situation is always this: There are always outstanding contracts, and while the books apparently show an unexpended balance, we will say, of $20,000,000 or $30,000,000, almost invariably at least $25,000,000 out of, we will say, $30,000,000 has been obligated for contracts which have been partially performed but which have not been completed and upon which payments are not due. There is really in the hands of the engineers of unexpended balances only a small sum like $5,000,000 or $6,000,000 carried along from time to time to meet extraordinary emergencies which may arise. For instance, we are carrying in this bill $10,000,000 for the Mississippi, but that is not the sum we are going to carry in the flood control bill.

This $10,000,000 is to meet extraordinary emergencies which may arise, and the engineers have been expending down there from this fund the sums which were necessary to meet the pressing and immediate necessities of the situation anywhere all over this country. At any time we may have a disaster like the Galveston flood or like the Mississippi flood.

Mr. MADDEN. Will the gentleman yield?

Mr. DEMPSEY. Yes.

Mr. MADDEN. This $10,000,000 is the $10,000,000 annual obligation under the act providing for Mississippi River flood control?

Mr. DEMPSEY. Yes.

Mr. MADDEN. And can not be spent anywhere else.

Mr. SPEAKS. Will the gentleman state, as chairman of the committee, that to his knowledge there are no funds to the credit of the river and harbor commission which will not be required during the next fiscal year?

Mr. DEMPSEY. I think that is very, very clear, and I intend, if I am able to get the floor, to deal with that very subject. I do not think there is any question about that. They will not have any fund which they can spare beyond the $500,000 they have allocated for the payment of this debt to Miami, and next year, in the 1930 appropriation, they propose to allocate $605,000, the remainder.

Mr. SEARS of Florida. I have been assured by General Jadwin that if this bill were increased $10,000,000 Miami could not get another penny more, and I am not asking any city in this country which has a river or harbor to be cut down in order that Miami may benefit by it. In other words, I stand or fall on my proposition.

Mr. MADDEN. Mr. Chairman, I make the point of order against the amendment that it is a change of existing law.

The CHAIRMAN (Mr. TILSON). The amendment reads:

To pay the city of Miami, out of any funds available in the Treasury not otherwise appropriated, for part reimbursement of the $1,605,000 advanced or loaned to the Government by said city for the improvement of Miami Harbor, as provided under the river and harbor act passed March 3, 1925, in accordance with House Document 516, the sum of $605,000.

I find in the Statutes at Large, Sixty-eighth Congress, page 1187, this statement of the law:

Miami Harbor, Fla.: In accordance with the report submitted in House Document 516, Sixty-seventh Congress, fourth session, and subject to the conditions set forth in said document.

The gentleman's amendment refers to the same document and provides that this payment must be made in accordance with House Document 516, which appears to be the law on the subject.

It would seem to the Chair that this furnishes a basis for the appropriation, if Congress wishes to make it, and therefore the Chair will overrule the point of order.

Mr. MADDEN. Mr. Chairman, the Chair has ruled on the question?

The CHAIRMAN. The Chair overrules the point of order because the amendment states that the proposed appropriation is in accordance with a certain document to which it refers, and which by reference of the river and harbor act is made the law controlling the appropriation.

Mr. MADDEN. But this is changing the law. The document is the law.

The CHAIRMAN. If the appropriation is not in accordance with the document referred to, of course that fact can be shown.

Mr. MADDEN. This is not in accordance with the document.

The CHAIRMAN. I do not see how the Comptroller General could pay it unless it is done in accordance with the document referred to, because the amendment states specifically that it is to be done in accordance with that document.

Mr. MADDEN. The amendment is either a reenactment of the statute or it is nothing.

The CHAIRMAN. The river and harbor act provides an authorization as set forth in a certain document.

Mr. MADDEN. This money is paid out of the general river and harbor fund, according to the statements made by the Chief of Engineers of the Army.

The CHAIRMAN. It seems to the Chair that the Comptroller General would not allow payment of this sum, even though it were carried in this bill, unless it is found to be in accordance with House Document 516, which the river and harbor act makes the law.

Mr. CHALMERS rose.

The CHAIRMAN. The Chair therefore overrules the point of order unless the gentleman from Ohio wishes to be heard.

Mr. CHALMERS. I simply wanted to say, Mr. Chairman, I think the Chair is absolutely correct in the ruling, and if necessary I would be pleased to give my reasons.

The CHAIRMAN. The Clerk will report the amendment.

The Clerk read as follows:

Amendment offered by Mr. SEARS of Florida: On page 78, after line 16, insert a new paragraph, as follows:

"Harbor improvements: To pay the city of Miami, out of any funds available in the Treasury not otherwise appropriated, for part reimbursement of the $1,605,000 advanced or loaned to the Government by said city for the improvement of Miami Harbor as provided under the river and harbor act passed March 3, 1925, in accordance with House Document No. 516, the sum of $605,000."

The CHAIRMAN. The question is on agreeing to the amendment.

The question was taken; and the Chair being in doubt, the committee divided, and there were—ayes 101, noes 87.

Mr. MADDEN. Mr. Chairman, I demand tellers.

Tellers were ordered, and the Chair appointed as tellers Mr. BARBOUR and Mr. SEARS of Florida.

The committee again divided; and the tellers reported that there were—ayes 142, noes 115.

So the amendment was agreed to.

The Clerk read as follows:

For the preservation and maintenance of existing river and harbor works, and for the prosecution of such projects heretofore authorized as may be most desirable in the interests of commerce and navigation; for survey of northern and northwestern lakes, Lake of the Woods, and other boundary and connecting waters between the said lake and Lake Superior, Lake Champlain, and the natural navigable waters embraced in the navigation system of the New York canals, including all necessary expenses for preparing, correcting, extending, printing, binding, and issuing charts and bulletins and of investigating lake levels with a view to their regulation; for examinations, surveys, and contingencies of rivers and harbors, provided that no funds shall be expended for any preliminary examination, survey, project, or estimate not authorized by law; and for the prevention of obstructive and injurious deposits within the harbor and adjacent waters of New York City, for pay of inspectors, deputy inspectors, crews, and office force, and for maintenance of patrol fleet and expenses of office, $50,000,000.

Mr. GIBSON. Mr. Chairman, I move to strike out the last word and do so for the purpose of making a statement pertinent to this section and asking a question as to the construction of it.

In the early days of last November a great disaster overtook the State of Vermont in the form of a flood. People have not yet come to fully realize its full extent or far-reaching effect. In 24 hours a damage was caused equal in amount to one-tenth of the assessed valuation of all the taxable property in the State. Our highway and bridge damage was $7,377,469, according to a survey by the Bureau of Public Roads. Our total damage was $30,435,000, according to the latest information. The highway and bridge damage means a per capita loss of $21 for every man, woman, and child in the State; our total damage a per capita loss of $86. I venture the assertion that

this was one of the greatest disasters that ever overtook the people of any State in the history of the Nation.

Going back we find that other disastrous floods occurred in 1869, 1850, 1830, 1811, and 1785. These floods affected practically the same valleys and the same areas. No survey to determine if there is any practicable way of controlling floods or lessening the damages therefrom has ever been made for Vermont.

I have filed with the Committee on Flood Control petitions signed by hundreds of Vermont citizens asking the Federal Government to take some action for their protection.

Now, I wish to know from the chairman if sufficient funds are available from this appropriation to make this survey possible by the engineers of the War Department.

Mr. BARBOUR. It is the judgment of the subcommittee, I will state to the gentleman from Vermont, that this paragraph does carry enough money; in fact, the Chief of Engineers testified before the committee that out of this $50,000,000 he proposes to allocate $1,500,000 for surveys with respect of flood control, power possibilities, navigation, and purposes of that kind.

Mr. GIBSON. Is it the opinion of the chairman of the subcommittee that this will be sufficient to take care of all the work?

Mr. BARBOUR. Yes; because this appropriation is a lump-sum appropriation. It is allocated to different projects. It is sometimes found that one-project can use more money than has been allotted to it, while another project does not need so much. So there is enough money here, in the opinion of the committee, and if the Chief of Engineers needs any more money for these surveys, in addition to the $1,500,000 which he proposes to allocate, the committee is of the opinion he can find it.

Mr. GIBSON. Mrr Chairman, I withdraw the pro forma amendment.

Mr. McDUFFIE. Mr. Chairman, I offer the following amendment.

The Clerk read as follows:

Page 79, line 10, strike out the figures " $50,000,000 " and insert in lieu thereof " $55,886,310."

Mr. McDUFFIE. Mr. Chairman and gentlemen, this deals with appropriations for river and harbor work throughout the entire country. It is quite an important item, and I suggest to the chairman of the subcommittee that we agree upon a limit of reasonable time in which to discuss it.

Mr. BARBOUR. What does the gentleman say to a half hour on each side?

Mr. DEMPSEY. I would like to have 20 minutes.

Mr. BARBOUR. Well, say 40 minutes on a side.

Mr. NEWTON. Reserving the right to object, in the division of time is it to be from this side of the aisle and that side of the aisle, or for and against the amendment?

Mr. BARBOUR. For and against the amendment is my understanding, one-half to be controlled by the gentleman from Alabama and one-half by myself.

Mr. BANKHEAD. Mr. Chairman, this is a very important question, and I hope the chairman of the subcommittee will agree to an hour on a side. We are not under great pressure for time.

Mr. McDUFFIE. I have had several requests for time on this side.

Mr. BARBOUR. Let us make it 45 minutes on a side.

Mr. McDUFFIE. That is agreeable to me.

Mr. BARBOUR. Mr. Chairman, I ask unanimous consent that the time for debate on this paragraph and all amendments thereto be limited to an hour and a half, one-half to be controlled by the gentleman from Alabama and one-half by myself.

The CHAIRMAN. The Chair will say to the gentleman that there can be no control of time by agreement in Committee of the Whole. An agreement may be entered into for the limitation of debate. The gentleman from California asks unanimous consent that the time for debate upon this paragraph and all amendments thereto be limited to an hour and a half. Is there objection?

Mr. MADDEN. Reserving the right to object, I suggest that the speeches of five minutes each be alternated for and against the amendment.

The CHAIRMAN. That is in the control of the Chair, and doubtless the Chair will follow that suggestion.

Mr. MADDEN. I think it better to be understood in the agreement.

Mr. McDUFFIE. We do not want any such agreement as that, to limit the remarks to five minutes. It is difficult to speak upon a matter of this importance in five minutes with any satisfaction.

Mr. MADDEN. I did not mean that every speech would be limited to five minutes, but that the speeches should be alternated for and against the amendment.

The CHAIRMAN. The gentleman from California asks unanimous consent that debate on this paragraph and all amendments thereto be limited to one hour and a half. Is there objection?

There was no objection.

The CHAIRMAN. The Clerk will again report the pending amendment.

The Clerk again reported the amendment.

Mr. ENGLAND. Mr. Chairman, ordinarily I vote to sustain the action of the committee, but I am impelled not to do so in this particular instance. I favor the adoption of the pending amendment. No money is used by our Government which means more to our commercial life than that appropriated for the improvement of our inland waterways and harbors. Water transportation is much cheaper than land transportation; high freight rates are impeding our industrial development. I understand that the Army engineers say that approximately $56,000,000 can be used in the development of these waterways and at the same time conserve the rules of economy. West Virginia will not get any improvement out of this appropriation. I am especially interested in the improvement of the Great Kanawha River. The Government built 10 dams in this river between 1880 and 1898 to improve navigation. A portion of these dams are now entirely obsolete, and the remainder are inadequate for the present requirements of that great industrial valley. There are approximately 18,000,000,000 tons of unmined coal lying within the bowels of the earth in this valley; much of this coal is the finest quality in the world. Our chemical industry at and near Charleston is developing so rapidly that it will soon be the greatest chemical center of the Nation. We have the largest ax factory as well as the largest glass plant in the world; we also have numerous other factories of various kinds. Nature has made this section one of the most desirable for factory purposes in the United States.

I assume that all the river and harbor improvements authorized by Congress are meritorious, but I venture the assertion that but few, if any, have more merit than the Great Kanawha River from the standpoint of available tonnage shipments.

It is my purpose to introduce a bill within the next few days in this body authorizing the improvement of the Great Kanawha River, after which I shall have more to say relative to the improvement of same. It is my purpose to fully inform Congress of the inexhaustible resources of this valley and of the immense tonnage that will be transported therefrom as soon as the Government equips the river with proper transportation facilities. The Ohio and Mississippi Rivers need the tonnage from this valley, and if this improvement is made the Kanawha Valley will be able to supply the southern consumers with cheaper coal and also establish a large foreign market from Panama. We will also be able to furnish the West and great Northwest with the finest quality of coal in the world at a much lower rate than they are now paying.

Every Member of this House ought to be, and perhaps is, in favor of a great inland waterway system. These improvements should be completed at the earliest possible date, and I earnestly plead with my colleagues to manifest their interest therein by voting for the adoption of this amendment. [Applause.]

Mr. DEMPSEY rose.

The CHAIRMAN. The Chair would recognize some Member opposed to the amendment.

Mr. DEMPSEY. This is with the consent of the other side.

The CHAIRMAN. The gentleman from New York.

Mr. DEMPSEY. Mr. Chairman and my colleagues, my own present situation is such, owing to the fact that I have been endeavoring to negotiate a compromise of the subject matter of this amendment, that I feel constrained to follow the Committee on the Rivers and Harbors appropriation item. I do think, however, that there are certain vital matters which are not thoroughly appreciated either by the committee or by the House, and to which I shall direct attention.

We have in the United States adopted projects, live projects, to complete which will call for an expenditure of $250,000,000. We have all agreed, as I understand it, the engineers, the Committee on Appropriations, the House, and the public that works of this nature should be prosecuted with such reasonable celerity as the circumstances will permit. We have the funds and the time has come when we are not faced with a war situation. We have reduced taxes four times. We have reduced the expenses of the Government. The President in a recent message said that we are now at a point where we may undertake great internal improvements, and certainly there are no improvements so important as the development of navigation in

this country through improving our harbors and inland streams. We have reached an agreement, unwritten, and which is perhaps no more than a general understanding, that works of this nature should be completed in five years. We have found from experience that if funds are provided this can be done.

We have $250,000,000 to-day of uncompleted, important improvements of this nature. If we are to complete these projects within five years we must have more than $50,000,000 a year. I am not speaking in regard to this particular appropriation, but I am speaking as to the duty of this country toward river and harbor appropriations in the immediate future, and I want to show what the situation is.

How much were we able to use last year on the new work out of a $50,000,000 appropriation? We expended $17,000,000 for maintenance and that left only $33,000,000 for new work. We need, therefore, without taking into account new projects, which are sure to be adopted, if we are to carry out our five-year program, as we all agree we should do, $50,000,000 a year for new work and $17,000,000 a year for maintenance, $67,000,000 a year in all. We have adopted a provision for a survey of practically all of the navigable streams in the United States, for navigation, for power, for irrigation, for municipal uses, for every possible use to which water can be put. It is probably the most important legislation which Congress has adopted in many years. Formerly we made separate appropriations for them, in addition to the lump sum. This, which will amount to $1,500,000, is included this year in the $50,000,000, as is also the ordinary surveys, which will cost $250,000, making altogether $1,750,000 to come out of this $50,000,000 before we can apply it to maintenance and new work.

Mr. JOHNSON of Texas. Mr. Chairman, will the gentleman yield?

Mr. DEMPSEY. In a moment. Maintenance last year cost $17,000,000. You can easily figure that with an appropriation of $50,000,000 we are not going to be able to complete our five-year program; but when you come to consider the matter, you find that it is not a five-year program for $250,000,000. Why do I say that? Because in a great country like this, growing in business, developing and multiplying in transportation, increasing in wealth, increasing just as rapidly in commerce, you are bound to make your waterway improvements keep pace with the times. We must develop our waterways just as we develop the railroads and keep pace with the railroads. To illustrate that, on the Great Lakes the average size of a lake freighter in 1900 was 3,500 tons and to-day it is 14,000 tons, and without that growth we could not have maintained the low cost of transportation on the Great Lakes, the lowest cost of transportation the world has ever known. 1 mill per ton per mile, upon which is based all of the steel and iron development of this great country of ours. We find that in order to keep the Great Lakes in line with transportation developments as they are progressing, we must increase the depth of the channels. To be sure, to-day, through the fact that we have had an excessive rainfall and that we are in a deep-water cycle, the Great Lakes have come back to pretty nearly the statutory depth of 20 to 21 feet, but for a long period of years we had only about 18 feet, and we must provide not alone for the high-water times but for the low-water times, and in order to do that we must deepen the channels of the Great Lakes. There is coming in here within the next two weeks a report in favor of deepening the Great Lakes at a cost undoubtedly of several million dollars, and that adds to your $250,000,000.

As I stepped into the Hall this morning I ran across a Representative from the State of New Jersey who is a friend of the Representative from Camden. They are to have a report made in their favor which shows that the city of Camden itself is to spend $2,000,000 on terminals and docks, and modern loading and unloading devices, to make that a great and modern and useful port. The locality has shown its belief in the project by bonding itself for $2,000,000. Undoubtedly the expenditure on the part of the United States will be many millions of dollars, and how are we to provide for it? We should not delay work on the projects already adopted. These two cases—the Great Lakes and the Camden case—are simply illustrative of numerous cases all over the United States. This country does not stand still. This country is moving forward at an astounding pace, and as it goes forward we find that in places where you thought you had no particular need for transportation suddenly there arises a great tonnage, and that tonnage demands transportation.

Take in further illustration the city of Los Angeles. A harbor was improved there which many people thought would be of little value. It had after a time a tonnage of 2,000,000 tons a year, and then there was discovered there great quantities of oil, and in one year the tonnage jumped from 2,000,000 tons per year up to 2,000,000 tons per month. And what happened in Los Angeles is happening all over the Texas coast, where they have a most tremendous oil and a very great fruit development. To provide for the growing needs of this great country in waterway transportation and to carry out a five-year program we must have much more money than we have had in the past.

Mr. DENISON. Mr. Chairman, will the gentleman yield there?

Mr. DEMPSEY. Yes.

Mr. DENISON. This so-called five-year program was adopted some two or three years ago, was it not?

Mr. DEMPSEY. Yes.

Mr. DENISON. Now, since that was done, Congress has authorized a great many additional projects for the improvement of rivers and harbors, projects as have been approved. How much do those projects involve?

Mr. DEMPSEY. The last bill, I think, carried something like $60,000,000 or $70,000,000.

Mr. DENISON. If that is true, there will have to be some appropriations made to begin those projects?

Mr. DEMPSEY. Not only those projects, but other projects which will be adopted from time to time. Here we have, first, the public demanding water transportation. Go to any port, any great vicinity where they have developed a large commerce, and you will find a whole city a seething mass demanding river and harbor development. Out in the Middle West you find the farmer is suffering from a long period of hard times. He says transportation is one of his largest costs, and he knows, by studying the figures, that he can get cheaper transportation by water than otherwise. Mr. Babson says in one of his letters that we have become the greatest mass-producing manufacturing Nation of all the nations of the world, and we have solved that problem of mass production; but he says we have utterly failed and gone back on the problem of distribution, so that to-day a product the manufacturing cost of which is 20 cents costs the consumer a dollar. And he said that in the next few years he confidently believes that the problem of distribution will be solved just as successfully as we have solved that of mass production. The prime problem confronting us will be that of distribution, and that will eventually be cut down to reasonable proportions. Part of what is saved in the distribution of agricultural products will go to the farmer and increase his profits.

The farmer believes that improving of the channels in our rivers will give him cheaper transportation, that what he saves will be largely, if not wholly, his, and that these river improvements will be a large measure of farm relief. The farmer regards the making of our rivers navigable as something that is practical, something that is at hand, and something that can be done for him now.

Let us take the other aspect of the matter. Here are the farmers of the Middle West, those who, for instance, can ship by the Missouri when its channel is deepened and its banks stabilized, saying that cheap transportation will afford them relief. Let us see what the attitude of Congress is toward that question. I happened just yesterday to have a talk with the chairman of the committee that deals with that question in the other body, and he said to me, "Are you going to have a rivers and harbors bill?" I said, "Here is the Great Lakes problem on which the iron and steel business of the country depends. It is a question in which every American is interested, and if the report on deepening the Great Lakes channels comes to us we feel that we must have a bill." He said, "What good is there of a bill? You are not going to make appropriations to complete within a reasonable time even the projects already adopted. How are you going to add new projects to the ever growing list and get the money necessary to finish the five-year program?" That is the feeling of all those in Congress who are interested in waterway transportation. How much time have I used, Mr. Chairman?

The CHAIRMAN. The gentleman has consumed 14 minutes.

Mr. McDUFFIE. Mr. Chairman, may I interrupt the gentleman?

Mr. DEMPSEY. Yes.

Mr. McDUFFIE. Does not the gentleman think the Congress should appropriate immediately money sufficient, even if it takes a hundred million dollars, in the interest of economy to complete the major projects that are of primary importance?

Mr. DEMPSEY. Yes; I will answer that question. So far as this bill is concerned, I feel three things: First, that I was a party to the negotiation of a compromise which makes me a supporter of the present bill as it is; second, I do not think we have given the country full and fair notice of this five-year program or what it means; and third, I recognize also that there are unusual and very large demands on the Treasury at

this session of Congress. And so all of those things unite in tying my hands. Yet I believe that we should adopt a program of appropriating each year one-fifth of the total amount of money necessary to complete every live project, and also each year, whatever sum it is necessary to expend for maintenance. Appropriations for surveys, both the annual surveys and these unusual surveys of the rivers of the country, for which we recently provided and which cost millions of dollars, should be made in addition to those necessary for other new work and for maintenance.

Mr. McDUFFIE. After having adopted the amendment a moment ago taking care of Miami, it means that $605,000 more shall come out of this bill, and that means that we shall have in a year $605,000 less for the construction of rivers and harbors. That is true, is it not?

Mr. DEMPSEY. That is true if the amendment means anything. I think the amendment as adopted does not mean anything. I think it means they are to be paid according to the law as it is, and the law as it is is that they are to be paid as the Government wants to pay them. But I do think there is no work so important to the people of this country—I do not think the work even of providing for the Army or the Navy is of greater importance—than to provide the cheap transportation by water for all our products, whatever they may be.

I believe that the iron and steel business would never have come into existence, that we would not have supplied even our own domestic needs, much less would we have been exporting, except for cheap transportation on the Great Lakes. Let me add also that cheap transportation on rivers is illustrated by the Monongahela River, where they carry coal at about 15 cents a ton as against a railroad rate of about $1.12 a ton.

Now, there is another reason besides the fact that transportation is cheaper why we should provide transportation by rivers.. This country is rapidly growing. We will have 40,000,000 more people in 25 years, but we have no transportation facilities for them. The easiest, the cheapest, and best way to provide that transportation is by water. It is the only way, because new railroads are not being built. We have no additional mileage. We have practically the same railroads to-day we had 10 years ago. We have not added any considerable mileage in that time and we do not bid fair to add additional mileage. Unless we provide these transportation facilities by water we will lack, as Mr. Loree, president of the Delaware & Hudson Railroad Co., recently said, the transportation with which to supply our people with the necessaries of life—with food to sustain life and with coal to keep them warm.

This is the situation in a general way. We might as well face the fact that if we are to continue waterway development we must have a program of appropriations sufficient to meet the needs of the country, and those needs, as generally recognized and sensed, mean a 5-year program; the completion of every project not in 20 years, as the Ohio is about to be completed, but in 5 years, because that is economical, because it gives you in a reasonable time the use of the many millions which you have expended on a project and you never have any substantial r—urn in being able to navigate a stream until the improvement is complete, because it provides the transportation which is promised when we adopt the project, and because a five-year program insures the performance of the work on every project in a businesslike and sensible as well as an economical way. Delays on these projects are always costly. They mean that the people do not get what Congress promises each time it adopts a project. By indefinite delays we lose in great part the benefit of the legislation.

Mr. MADDEN. Will the gentleman yield?

Mr. DEMPSEY. I yield.

Mr. MADDEN. I take it from what the gentleman says—and I have been listening very attentively in order to get a word of cheer somewhere—that the Rivers and Harbors Committee has a plan under which it does not propose to establish any new projects until the end of this five-year period, during which we will appropriate sufficient money to complete the projects which the committee has already worked out—is that right?

Mr. DEMPSEY. No. What we have in mind is that we believe we have a great chairman of the Committee on Appropriations who has broad vision, splendid judgment, and who can see the needs and necessities of the country and that he will provide for new projects of merit in just the same broadminded and splendid way that he has in the past in helping to provide for existing projects. [Applause.]

I have referred to the fact that the cheap transportation of the Great Lakes was the basis of the development of the iron and steel business of this country, and has served as a most economical method to distribute the coal of Pennsylvania

through the Northwest. The cheap transportation of these lakes, too, has been the means of building up the numerous great cities which border on them, commencing with Duluth, taking in Chicago, Milwaukee, Detroit, Toledo, Cleveland, and ending with Buffalo. The crying need of to-day is for a deep-waterway connection between the Great Lakes and the ocean. Such a waterway will pay a splendid profit on the cost of construction, whatever it may be. Circumstances may, however, delay the adoption of this project for some time. Deep-water navigation is being extended through Canada to Lake Ontario by the construction of the Welland Canal, which is nearing completion. This canal is 25 miles in length, and its construction involves an expenditure of about $125,000,000. The question arises whether the United States should be content to use this Canadian connection between the two lakes, or whether, on the other hand, the United States should have a canal of its own and within its own territory.

Every citizen of the United States agrees that if the commerce between Lakes Erie and Ontario is to be large and important—if it is to be large in volume and great in value—it would be better to have a canal of our own, rather than to depend on one wholly within a foreign country, which belongs to it alone, and over the operation of which it will have sole and exclusive jurisdiction. While we may not expect a traffic on Lake Ontario comparable to that on the other Great Lakes, the greatest commerce in the world, it is but natural to expect that enough commerce will go in both directions to make the volume large for any inland water other than the Great Lakes. It is to be remembered that Buffalo has now an annual water-borne commerce of 20,000,000 tons, yet the great iron and steel business there is only in its infancy, the many huge plants there having been started a comparatively few years ago. So far Buffalo and the Niagara frontier have been, so far as water transportation is concerned, in a similar position to a vicinity which has a standard-gauge railroad running in one direction and a narrow-gauge road only in the other direction. In other words, the Niagara frontier has had the enormous benefit of the Great Lakes system to the west, but has had leading east only the Erie Canal, which is too shallow and accommodates boats of such small tonnage as not to be able to compete successfully with the large units of modern transportation.

With deep water transportation to the east, a large tonnage coming and going on Lake Ontario is, it is firmly believed, assured. It is quite certain, however, that the tonnage on a canal running through the Niagara frontier, which already has 20,000,000 tons of water-borne commerce annually, would be much larger than by the Welland Canal, which runs through an open country, from which practically no tonnage would come.

So we come naturally to the point that as a large commerce can be expected through a deeper waterway connecting the two lakes and on Lake Ontario, it would be better for this country to own and control the operation of a canal of its own rather than to use the foreign Welland Canal, provided a canal of our own can be constructed at a reasonable cost, as compared with that of the Welland, and which will afford facilities at least equal to those of the Welland Canal.

The great objection to all canals is that, owing to the fact that vessels passing through them at a high rate of speed wash away and destroy the banks, ships must be slowed down to about one-third of their speed on the Great Lakes. This prolongs the journey and adds to the cost of transportation. While the Welland Canal is, as has been said, 25 miles long, and owing to the geography of the locality, had to be constructed in a straight line north and south, the situation on the American side is such that it provides two natural and highly desirable routes, one from La Salle to Lewiston, both on the Niagara River, and the other from Tonawanda, also on the Niagara River, via Lockport, to Olcott. The La Salle-Lewiston route is only 11 miles long; that from Tonawanda to Olcott is 24 miles long.

A survey was made in 1900 of these two routes which is so comprehensive and able as to rank as highly as any waterway report made in the history of the country. It shows that at that time a 21-foot channel by the La Salle-Lewiston route would have cost $43,214,344, while the cost of such a canal by the Tonawanda-Lockport-Olcott route would have been $49,274,-894. The president of one of our greatest railroads, who has had a great experience in construction work and knows its cost well, says that such costs as those involved here have not increased on the whole since 1900; while the cost of labor has increased largely, the expense of the work to be done by machinery has decreased greatly, owing to the greater efficiency of the machinery of to-day, so that the increase in the one case is just about offset by the decrease in the other.

The conclusion, therefore, is natural, if not inevitable, not alone that there will be a large volume of commerce through a

deep waterway connecting Lake Erie with Lake Ontario, and on Lake Ontario, but that a canal shorter in distance and in the time necessary to navigate it can be constructed on the United States than on the Canadian side, and it is obvious that it would be to the advantage of the United States to have this commerce rather than to have it go to a foreign country. It will be a decided advantage, also, to our country to own, control, and operate its own waterway rather than to depend upon a foreign waterway. It will be a decided and great benefit, too, to have this waterway pass through the thickly settled American Niagara frontier, where there are nearly a million people, and which already has a waterway-transportation business of 20,000,000 tons a year rather than for the American frontier to be obliged to send to and receive from the Welland Canal, for a distance of 25 miles, all of its Lake Ontario water-borne commerce, both passenger and freight.

Next, the Tonawanda-Lockport-Olcott Canal is shorter than the Welland, and a canal by the La Salle-Lewiston route would be less than half the length of the Welland. A canal by either American route will cost only a fraction of the expense of the construction of the Welland Canal. An American canal by either route would be quicker to navigate than the Welland, because by the La Salle-Lewiston route we would have less than half the canal navigation which would be encountered on the Welland, and by the Tonawanda-Lockport-Olcott route, owing to the fact that the canal from Lockport to the lake passes through a deep gulf, with natural, high banks, which would not wash, the time occupied in navigating the canal would be considerably shorter than by the Welland Canal.

The American Niagara frontier is the largest center for any canal connecting the two lakes—Erie and Ontario. It has the second largest tonnage of any place on the Great Lakes and is the largest center of population between Lake Erie and New York City. It is growing with prodigious strides, and when once such an increased diversion of water for power purposes is permitted to be made from the Niagara River as can be safely granted without impairment to the scenic grandeur, judging by the growth of the city of Niagara Falls since the present diversion was made, the increase in population, wealth, and transportation by water will be rapid and enormous. For all freight originating in the Niagara frontier and to go east, or coming from the east with the Niagara frontier as its destination, the Tonawanda-Lockport-Olcott route is the best of the three routes and incomparably better than the Canadian route by the Welland.

*Distances by the Welland Canal and by the two American routes to and from Olcott for freight from the east or going east and either originating in or destined to the cities in the American Niagara frontier*

| City | By the Welland Canal | By the Tonawanda-Lockport-Olcott route | By the La Salle-Lewiston route |
|------|------|------|------|
| | *Miles* | *Miles* | *Miles* |
| Buffalo | 77 | 34 | 08 |
| The Tonawandas | 87 | 24 | 48 |
| Niagara Falls | 102 | 39 | 45 |
| Lockport | 99 | 12 | 60 |

*Savings in distances in using the American routes on freight above described over the Canadian route*

| City | By the Tonawanda-Lockport-Olcott route | By the La Salle-Lewiston route |
|------|------|------|
| | *Miles* | *Miles* |
| Buffalo | 43 | 19 |
| The Tonawandas | 63 | 39 |
| Niagara Falls | 63 | 57 |
| Lockport | 87 | 39 |

*Similar savings in distances by the American routes over the Canadian route on round trips between the American Niagara frontier and places to the east*

| City | By the Tonawanda-Lockport-Olcott route | By the La Salle-Lewiston route |
|------|------|------|
| | *Miles* | *Miles* |
| Buffalo | 86 | 38 |
| The Tonawandas | 126 | 78 |
| Niagara Falls | 126 | 114 |
| Lockport | 174 | 78 |

To-day the Niagara frontier has, as has been said, water transportation east only by the Erie Canal, which is too shallow to make it economical or practical.

Transportation by the Welland Canal to or from the east for the entire Niagara frontier would be both uneconomical and impractical because of the added distances shown by the preceding tables.

As the frontier already has deep-water transportation to and from the west, and the Welland Canal is neither practical nor economical for transportation to the east, it is hard to see how it is of advantage to or adds to the facilities of any part of the Niagara frontier.

On the other hand, with the Niagara River deepened to the same depth as the Great Lakes channels from Tonawanda to Niagara Falls, the Tonawanda-Lockport-Olcott route would not alone furnish the shortest and most economical transportation for the frontier to and from the east, but it would also be of very great value for water transportation between the different points in the frontier.

It is to be remembered, too, that the Niagara frontier, with all of the facilities which come with a million of population, would afford the many advantages needed by ships, such as supplies, dry docks for repairs, and, whenever advantageous, the taking on or discharging of part of a cargo, none of which advantages would be afforded on the route of the Canadian waterway.

Then, too, Buffalo, with its great harbor, would afford safety and protection to vessels in case of storm, with no such protection afforded the Erie entrance of the Canadian Canal.

Even for through traffic the Tonawanda-Lockport-Olcott route is shorter than that by the Welland Canal in distance and would be much shorter in time because, as has been said, of the fact that for much of the distance from Lockport to Olcott that route is between high banks, which will not wash, and a boat would not be required to slow down.

Because, therefore, it is better to own a canal of our own, better to control and operate it than to depend upon a foreign canal; because we have two routes on the American side, both of which are highly preferable for all traffic, and especially so to all freight originating in or the destination of which is the Niagara frontier, for navigation purposes to the Canadian route; because both of the American routes pass through a great center of population, where a great volume of freight originates and is received; because a canal by either American route will cost much less than the Canadian canal will cost; and because the operation of an American route will build up American commerce and help make certain that we continue to hold, as we do to-day, the great volume of transportation on the Great Lakes; and because the routes on our side are American routes and not foreign routes I earnestly advocate the speedy adoption of the project for the construction of an American canal connecting Lake Erie with Lake Ontario by a channel of the same depth as the channels in the Great Lakes.

It is to be borne in mind that the question is a practical and financial one. The International Joint Commission, representing this country and Canada, in 1921 agreed upon a report which was submitted to the Senate, Sixty-seventh Congress, second session, Document No. 114, pages 178 and 179, in which it was recommended that—

each country should be debited with its share of the entire cost of all works necessary for navigation, including the cost of the Welland Canal, based upon * * * cargo tonnage * * *.

The report said also—

* * * the fair and reasonable plan appears to be to divide the cost in proportion to the benefits each receives.

Our commerce on the Great Lakes amounts to over 100,000,000 tons annually and that of Canada to about 7,000,000 tons, so if the division is to be made in proportion to tonnage we would pay over $100,000,000 of the cost of the Welland Canal, and yet have no interest in it and no control over its operation. We can construct a canal of our own, a very much better canal, which we will own and control, which will serve our commerce infinitely better, at a fraction of what Canada would deem, if we use it, we should pay toward the cost of the Welland Canal. And we, a rich, prosperous people, want no friction with a smaller, poorer, and friendly neighbor over a question of this kind; we would want to pay what Canada deems fair or not use her canal.

There is another improvement for which there is a crying need on the Niagara River. We have throughout our century and a half of existence been allowing many of our water powers to run to waste and have been drawing, needlessly and extravagantly, to the extent that water power would take its place, upon our limited supplies of coal. The greatest of all our water powers is that at Niagara Falls. Two hundred and twenty-six

thousand cubic feet per second of water flow down the Niagara River. By treaty with Canada 56,000 cubic feet is diverted for power purposes—36,000 on the Canadian side and 20,000 in our country. Niagara Falls is divided into two parts, the American Falls, of 1,000 feet in width, and the Horseshoe Falls, 3,000 feet wide, with Goat Island between the two falls. Ten thousand cubic feet per second flow over the 1,000 feet on the American side, and makes a most beautiful spectacle, presenting a deep stream, with no rocks anywhere visible. The remaining 160,000 cubic feet flow over the Horseshoe Falls, most of it in a few hundred feet in the center of the fall, where it has eroded and worn back the face of the fall for hundreds of feet, while the greater part of the 3,000 feet is bare rocks, with practically no water flowing over it.

A miniature of Niagara Falls has been constructed adjacent to the bank on the American side of the river and is in operation, by which to demonstrate that by placing cement blocks in the bed of the Canadian side of the stream the flow of the water can be spread so that it will cover evenly the entire Canadian or Horseshoe Falls, just as the face of the American Falls is covered to-day. On the basis of 10,000 feet making a beautiful fall over a width of 1,000 feet, the Horseshoe Falls, after the spread in the flow of the river has been accomplished, should require but 30,000 feet to make as beautiful and satisfying a spectacle as the American Falls presents. This would result in its being safe to divert 130,000 cubic feet more for power purposes. I do not suggest that there be an immediate additional diversion of this amount of water, however. A diversion of 80,000 cubic feet, only two-thirds of what it would seem perfectly safe to divert, without impairing or imperiling the beauty or grandeur of the Falls, would be highly conservative and could not by any possibility do harm.

The question of permitting any additional diversion could be left to commissioners representing the two countries, who would proceed only as they found, on actual experience, it safe and wise for them to do so. Of course, the permit to divert additional water should be coupled with a condition that the licensees should construct the works in the Canadian River spreading the flow of the water over the Horseshoe Falls.

As a result of such an added diversion, and of simultaneously constructing works in the bed of the river to spread its flow, we would stop the erosion of the Horseshoe Falls and would have there a continuous fall, 3,000 feet in width, with no bare or unsightly rocks visible, but with only a beautiful waterfall for that entire broad width. Man will have improved upon nature, and this one of the seven wonders of the world will be a grander sight than it has ever before been. And at the same time, a diversion of 80,000 additional cubic feet per second will produce 2,400,000 additional horsepower, the equivalent of the enormous volume of 24,000,000 tons of coal annually. While this additional power will add enormously to the prosperity of the Niagara frontier, the question is by no means a local one. Through the power already developed, Niagara Falls has become the electrochemical center of the world, and the power has been carried besides to municipalities 200 miles away. The position of Niagara Falls as an electrochemical center enables it to manufacture many products of the greatest value to us in times of peace and in the World War this power produced over 80 per cent of many of the ingredients going into the manufacture of our munitions of war. All this has been accomplished through a diversion of only 20,000 cubic feet for power purposes on the American side. What stupendous results will be accomplished when we add 40,000 cubic feet more and put it at work for the benefit of the Nation. It is hard to conceive the enormous benefits which are certain to come to all of us.

The CHAIRMAN. The time of the gentleman from New York has expired.

Mr. OLIVER of Alabama. Mr. Chairman, I ask unanimous consent that the gentleman from Alabama [Mr. McDUFFIE] may proceed for 20 minutes.

Mr. HASTINGS. As I understand, the gentleman is in favor of this amendment?

The CHAIRMAN. He is in favor of the amendment. The gentleman is the proponent of the amendment. Is there objection to the request of the gentleman from Alabama?

There was no objection.

The CHAIRMAN. The gentleman from Alabama is recognized for 20 minutes.

Mr. McDUFFIE. Mr. Chairman and gentlemen of the committee, I hope I may have the attention of the distinguished chairman [Mr. MADDEN] and that he will be convinced of the absolute necessity for the adoption of this amendment. I was not surprised but somewhat gratified to hear the speech made by my friend Mr. DEMPSEY, the chairman of the Rivers and Harbors Committee, who said that while he was going along with the committee and support the $50,000,000 Budget figures,

because of a certain situation in which he finds himself he is not in a position now that justifies him in going with many of those, even on his own side as well as on our side of the aisle, who believe that this amendment should be adopted.

His speech and attitude on this amendment reminds me of a little story I heard—if you will permit me to tell it—about a colored minister down home in the far Southland who was taking the devil for his text in a series of meetings. He talked about the devil day in and day out. He described the devil as having red skin, a long forked tail, forked hands and forked ears, breathing smoke from his nostrils, and with fire in his eyes. He could not say enough bad things about the devil. At the end of the seventh day, and late in the evening as the minister was as usual accusing the devil, a youngster in the community, dressed to look like the devil as he had been described, crawled in the window of the church. He had an electric apparatus which permitted him to have his eyes shine like fire, and as he smoked a cigarette the smoke was blown out of his mouth and nostrils. The congregation, of course, began to get to the door so as to pass out as quickly as possible. The devil got between the door and the preacher. The preacher being shut off from escape looked at him and said, "Mr. Devil, I want to say something to you." He said, "It is true I have said all manner of evil things against you. I have charged that all of these troubles and shootings in this community are traceable directly to you. I have said hard things about you, it is true, but I just want to say to you right now that my heart has been with you all the time." [Laughter.]

That, gentlemen, is the attitude of the chairman of the Rivers and Harbors Committee [Mr. DEMPSEY]. He is voting with the committee against the amendment and praying to God the amendment will be adopted. [Laughter and applause.] There may be others on your side in the same fix. I hope there are not many.

There is no pleasure, certainly none for me, and none on the Democratic side, in this or any other effort to disturb the President's Budget figures. The Budget is not a sacred thing, however, and Members of Congress owe something to their constituencies and the country as well as to the Budget. While the country may believe that but for the President's "sitting on the lid," the Congress would have long ago pulled all the money out of the Treasury and wasted it, the record shows—and I call the chairman [Mr. MADDEN] as a witness—that the Congress, under the leadership of himself and others, with the cooperation of the Democratic side as well, has appropriated $250,000,000 less since the installation of the Budget system than the President's Budget estimates.

Mr. MADDEN. It is more than $350,000,000 less.

Mr. McDUFFIE. So much the better. Then, why be afraid the Congress is going to run away with the Public Treasury and waste the country's financial resources?

Mr. MADDEN. We gave that back to the taxpayers, as the gentleman knows.

Mr. McDUFFIE. Yes; and in appropriating for this great work you are going to give the taxpayers more money and more advantages, according to the words of the President himself, who many times has approved appropriations for rivers and harbors, and even in his last message he said, "Improvements of this kind are compatible with economy." Again he said, "Such expenditures are creative of wealth; they add to taxable values and tend to lower the tax burdens." These are the words of the President of the United States, whose Budget officers cut the estimate of the engineers $5,886,310 without assigning any reason whatsoever.

The amendment I have just offered, gentlemen, which I hope you will adopt, simply raises the Budget figures from $50,000,000 to $55,886,310, the amount the engineers estimate is needed for the next year. Why should this be done?

The gentleman from Illinois [Mr. DENISON] just called to your attention the fact that since we adopted, or, rather, since some sort of suggestion was made that we should appropriate $50,000,000 a year for five years to complete a program; since we began that program we have added $73,000,000 in authorizations to be carried out and appropriated for by the Congress.

Mr. MADDEN. I wonder if the gentleman would answer the question which my friend, the gentleman from New York [Mr. DEMPSEY], failed to answer—whether in carrying out this five-year program you are going to add $72,000,000 to the program.

Mr. McDUFFIE. I do not know how many more projects are going to be added to the program. The Illinois River is the gentleman's State will need a little more attention. The survey provided for in this bill will determine that and fix our future policy in using all our inland waterways.

Mr. MADDEN. The Illinois River is only $3,000,000.

Mr. McDUFFIE. And I want to help the gentleman and will help him get that project completed at the earliest date. Does

1928            CONGRESSIONAL RECORD—HOUSE            2805

the gentleman from Illinois wish to stop appropriating for projects that are absolutely necessary in the proper and orderly functioning of our transportation systems?

Mr. MADDEN. No; but I want the committee, including the leading Democrat on the committee and the leading Republican on the committee, who is the chairman——

Mr. McDUFFIE. I thank you, but I am not the leading Democrat on the committee.

Mr. MADDEN. Yes; the gentleman is easily the leading man wherever he happens to be. [Laughter and applause.]

Mr. McDUFFIE. The gentleman is very clever, but he is now "damning me with faint praise." [Laughter.]

Mr. MADDEN. Is it not worth being damned for?

Mr. McDUFFIE. Well, to say the least, I would rather have the gentleman's compliment in the cloakroom or elsewhere than at this particular time and place.

Mr. MADDEN. More people will know about it here.

Mr. McDUFFIE. Oh, well, the others here may have the same keen intelligence and perception the gentleman possesses and may have already found it out themselves. [Laughter.]

Mr. MADDEN. I am glad to know the gentleman acknowledges it. [Laughter and applause.] Seriously, if we are sincerely for the five-year program and want to complete it, of course we can not complete it if we double it in that time. That is fair, is it not?

Mr. McDUFFIE. That is fair; but we are not going to double it. There is no intention of doubling it. We must continue to adopt worthy projects.

Mr. DEMPSEY. What the gentleman means is that you can not complete the program if you add to it unless you simultaneously also add to the appropriation.

Mr. McDUFFIE. Why, of course.

Mr. MADDEN. That is not what I meant. [Laughter.]

Mr. WILLIAM E. HULL. May I ask the gentleman a question here which I think will clarify the situation?

Mr. McDUFFIE. Yes.

Mr. WILLIAM E. HULL. If this amendment carries we are then going on a basis of $55,000,000. We have a nine-year program ahead of us instead of a five-year program.

Mr. McDUFFIE. At the rate of $50,000,000 a year; yes.

Mr. WILLIAM E. HULL. If we keep on a $55,000,000 basis or probably raise it to $60,000,000, we can catch up, and then when certain projects are completed that money will go on the new projects that will come in.

Mr. MADDEN. Will the gentleman let me make just one statement here? While you are doing that, of course, you will have hundreds of millions of dollars to be appropriated for flood control. Do not forget that.

Mr. McDUFFIE. Let me say to the gentleman that the people of this Nation are committed to the proposition of controlling the flood hazards of the Mississippi River regardless of what we do in a bill of this kind or regardless of what happens to this amendment.

Mr. MADDEN. Not yet, but they ought to be.

Mr. McDUFFIE. Yes; and the Congress will endeavor to formulate—and I hope we can fix at this session—a definite, permanent, and adequate policy for Mississippi River flood control, and appropriate ample funds to begin the work at an early date.

Mr. MADDEN. I think they will, and I will help them.

Mr. McDUFFIE. Let me give the Members here a concrete example, from the hearings, as to what is going to happen in the expenditure of public funds for this work, if we expend $55,000,000, and, on the other hand, if we expend $50,000,000 during the next year. I want to call your attention to some of the new projects and show you how they are affected. These are the last projects adopted in the last river and harbor bill:

The Thames, Conn., under the $55,000,000 scheme, gets $300,-000, while under the $50,000,000 it gets $250,000, a difference of $50,000.

Passaic (N. J.) and Hackensack Harbors get $300,000 under the $55,000,000 appropriation and $250,000 under the $50,000,000 plan.

Appomattox, Va., would be cut down $11,000.

Channel to Newport News, in which the Navy is interested, cut down $82,500.

Beaufort-Cape Fear River Channel would be cut down $150,000.

Charleston Harbor, another place that the Navy is interested in, $15,000.

Savannah Harbor, $30,000.

Jacksonville to Miami, $50,000.

Sabine-Neches waterway, Tex., $220,500.

Galveston Channel, $71,000.

Moline, Ill., and Hastings Lock and Dam, Minn., instead of spending $1,500,000, as would be done under a $55,000,000 appropriation, under the $50,000,000 carried in this bill, they would spend $1,300,000, a cut of $200,000.

On the Missouri River from Kansas City to Sioux City it is hoped they can spend $600,000, whereas under the $50,000,000 program as now carried in the bill, they can only spend $450,000—a difference of $150,000.

The Illinois River, under the $55,000,000 program, they would spend $825,000, while under the $50,000,000 program they would spend $475,000.

At Michigan City there is only a change of $5,000.

At Sandusky Harbor, Ohio, under the $55,000,000 program they would spend $605,000, whereas under the $50,000,000 program only $500,000—a difference and reduction of $105,000.

In the State of California, for projects there, very worthy ones, too, $150,000 less can be expended under the terms of the bill as presented us than will be expended if my amendment is adopted. Let us remember that the usual amount for preliminary surveys—$250,000, which we always provide in addition to the $50,000,000—must, under this bill, come out of the $50,000,000. With $1,500,000 for general surveys, we have a total of $1,750,000 to be expended outside of the regular construction and maintenance work. This leaves less than $50,-000,000 for the work next year.

It is elemental that the less money you give the engineers the less progress they are going to make. This money will not be wasted and there is no "pork" in this appropriation.

Mr. WILLIAM E. HULL. Is it not true that we only have $30,000,000 or $32,000,000 to expend on projects under the present plan?

Mr. McDUFFIE. I think that is true, and I thank the gentleman. The testimony before the committee shows that it is absolutely necessary to have $2,000,000 to begin what I think is the most constructive step forward taken by the Congress in years in reference to the utilization of waterways. This bill carries the initial appropriation for that work.

The last Congress provided a general study of all the streams of the country with a view of getting their maximum development from the standpoint of power, flood control, and navigation, treating each stream as a unit. Every State in the Union is affected by this survey, and the survey is for the progress in every State in proportion to the amount of money furnished by Congress to expedite this important work.

Many projects have been found useless—probably a hundred of them—on which the engineers are no longer spending much money. Some have been abandoned entirely. This study will disclose their uselessness, wherever they may be, and Congress can act more intelligently in striking these projects from the calendar, and thereby save that much money, which will go into the general fund for more meritorious and for the major projects of the country.

Here is a map recently made by the engineers and the Power Commission showing the country divided into zones. In each zone where you see a red figure, immediately on the passage of this bill the engineers will put their experts there to study every stream with a view of developing its maximum utilization for the purposes I have just mentioned; that is, for navigation, power, and flood control.

We are just entering the power age, the age of electricity, as we did the steam age. Electricity is being multiplied in its uses. It is doing away with the drudgery of the home and becoming the "hewer of wood and the drawer of water." The electrical industry is making more progress to-day than probably any other industry in the country. The time has come when we are going to need and utilize every water power and develop every stream in the country.

In 1869 our industries employed only about 2,350,000 primary horsepower, while at the last census in 1919 our industries employed nearly 30,000,000 primary horsepower, an increase of about 1,200 per cent. The use of electricity in manufacturing operations was first noticeable in 1889, when the census returns showed approximately 15,600 horsepower of electrical energy employed in manufacturing. At the last census in 1919, after a lapse of 30 years, this electrical power had grown to 16,317,000 horsepower. In other words, the last census showed that something over 55 per cent of the power used by our industries was electrical energy, and the increase during the last 10 years has been very rapid and enormous.

The value of all of our agricultural crops in 1899 was about $3,000,000,000. Twenty years later it was about $15,500,000,000, but our manufactured products, which in 1899 had a value totaling $11,400,000,000, reached the enormous total of $62,400,-000,000 in 1919, or more than four times the value of all our farm crops put together. The figures for farm crops do not

include livestock. The importance of fully utilizing our power resources, therefore, can not be overestimated.

Who knows the power resources of our country?

Nobody. Many guesses have been made. For example, on the Tennessee the highest estimate was 1,900,000 horsepower, and a careful, detailed study, authorized by Congress, has shown that outside of Muscle Shoals the Tennessee River has 58 dam sites and more than 3,000,000 horsepower available. The same results, in proportion, may be found in other sections of the country. It appears that 72 per cent of the power now developed in this country is east of the Mississippi River, while 79 per cent of our potential power is in the West. This study or survey will point the way for capital interested in power development; it will show the potential power existing throughout the various sections of the country, and will not only menu the conservation of power resources but show the best plan for developing and using our inland streams to their maximum capacity for navigation, flood control, and irrigation as well.

Mr. DEMPSEY. Will the gentleman yield?

Mr. McDUFFIE. Yes.

Mr. DEMPSEY. Just as business has developed at Niagara, where we can develop 3,000,000 horsepower and supply a more beautiful and wonderful waterfall than we have ever had in all the history of Niagara.

Mr. McDUFFIE. Mr. Chairman, let me call attention to one more thought I have, and that is the vast use of our inland streams, connecting channels, the lake and coast harbors. Last year we carried on our water courses and our harbors more tonnage than ever before in the history of this Nation. That tonnage was carried at a saving to the producer and the consumer of many times the amount carried in this bill. Shall the greatest and the richest Nation in the world, worth some four hundred billions of dollars, hesitate to spend a few more million dollars in a work that is so all important as this? Last year we appropriated nearly four billions for the expenses and all governmental activities. Out of every dollar we used only 12½ mills for river and harbor development. If you put 540,000,000 tons of commerce in railroad cars, 30 tons for each car, you would have 18,000,000 carloads. This vast tonnage had a value of more than $27,000,000,000. Shall we hesitate? We can find money enough to put $7,000,000 and more down here on the Avenue, to buy or condemn a building and to build for the Department of Commerce.

Mr. MADDEN. Seventeen and a half million dollars.

Mr. McDUFFIE. Yes; but you raised the original ten millions seven and a half million dollars, and the amount you found for that raise is what I am talking about now. I do not know where it came from, but I know it appears mighty easy for the Appropriations Committee sometimes to find ample money for other purposes, while they blue-pencil appropriations for something that is bringing a return to the Public Treasury.

Mr. MADDEN. It was not so easy.

Mr. McDUFFIE. Well, it was done, and for Lord's sake let us get this amount raised a little.

Mr. OLIVER of Alabama. And does the amount carried in the gentleman's amendment correspond with the recommendation of the engineers?

Mr. McDUFFIE. Yes.

Mr. OLIVER of Alabama. Did the engineers in making their recommendations take into account the additional projects added since the $50,000,000 was agreed on?

Mr. McDUFFIE. Yes. I have just read a list of those. The engineers were authorized to submit a $50,000,000 budget, or did submit those figures to the Budget Office. They had estimated $56,000,000 in round numbers, but without reason, without giving any excuse the Budget Office blue-penciled $5,586,000, and said that was as much as we could have for river and harbor work. The committee, of course, followed the Budget. We know the committee likes to follow the Budget and the members do also. We appreciate the work done by that splendid gentleman from California [Mr. BARBOUR] and his colleagues on this subcommittee, but none of us are infallible. The subcommittee made a mistake in not providing amounts in accord with the engineers' estimate. Let us provide in this bill sufficient funds to carry on properly this important work for the benefit of all the people of the entire Nation. [Applause.]

Mr. HUDSON. Mr. Chairman, it seems to me that we are losing sight in this discussion of the real meaning of this amendment. It is not a question of whether this Congress is in favor of developing further river transportation and navigation. The whole question is as to whether the amount carried in the bill will economically and judiciously forward work on inland navigation as well as keep intact the harbors of the coast and the Great Lakes. All of us believe with the chairman of the Committee on Rivers and Harbors that this is a great problem that is before us, but we sometimes wonder just where he was talking when he made that speech. I made me think of a laborer we had on the farm, when I was a boy, who used to come into the corn field with his overalls on hind-side first, because he said he wanted the wear on both sides.

The bill appropriates $50,000,000 and they say they want more in this amendment because they want to finish certain work. Look at these figures on page 147 of the hearings, part 2, which show from year to year the balance that the engineers have to work on. The balance they say on November 1, 1927, was $56,428,534, and taking out the outstanding liabilities there was left an available balance on that date of $37,291,932.

Mr. McDUFFIE. Mr. Chairman, will the gentleman yield?

Mr. HUDSON. In just a moment.

Mr. McDUFFIE. I want to give the gentleman the exact figure.

Mr. HUDSON. Gentlemen on the other side will say that has been allocated. General Jadwin further says, in another place in the report:

We find we can take these items and through wise discretion change them onto projects that ought to be finished first.

In other words, there is a balance of $37,000,000 which under the wisdom of the engineers can be placed anywhere in the completion of a project. On page 136 he says:

We have eight or nine times as much work authorized by Congress to be done as we have money available each year for new work, so it gives us quite a good deal of discretion in the matter. We try to go over them all very carefully and recommend what we think is needed on those that are needed the most.

We might increase this amendment by several million dollars, instead of by $6,000,000, and we would not meet all of the demands of these projects.

Mr. WILLIAM E. HULL. Mr. Chairman, will the gentleman yield?

Mr. HUDSON. In a moment. The gentleman from Alabama [Mr. McDUFFIE] cited these various projects, suggesting that this State should lose so much and that State so much and so on. In the 46 projects there is a difference between the $50,000,000 and the $56,000,000 in round numbers of $2,000,000. The Chief of Engineers, General Jadwin, says in a report that it is often found that a project started will not warrant its completion, because there is not enough commerce to warrant it. You can not tell whether this project allocated here in this report will ever go to completion even if we give the other additional $6,000,000.

I read further from the hearings on page 159:

Mr. BARBOUR. Will the appropriations carried in this bill enable you to carry on the work as expeditiously as heretofore, or possibly even to a greater extent than heretofore, because of the fact that you have a better organization, a better program, and a more smoothly working machine?

Major ROBINS. Yes, sir. With the $50,000,000 we have had for the last few years, $50,000,000 for next year would enable us to keep our organization intact and our machine going smoothly. It will enable us to carry on the work at the same rate that we have carried it on for the last year.

Mr. McDUFFIE. Mr. Chairman, will the gentleman yield there?

Mr. HUDSON. In a moment. Just one more statement. Now, Mr. Chairman, there is only one item in this that I am concerned about, and that is in the $50,000,000 from which they are taking the item for a survey. That must be taken out of the $50,000,000, and I will offer an amendment to cover that amount, namely, $2,000,000.

The CHAIRMAN. The time of the gentleman has expired. The Chair would like now to recognize some gentleman in favor of the amendment.

Mr. CHALMERS rose.

The CHAIRMAN. The Chair will recognize the gentleman from Ohio.

Mr. CHALMERS. Mr. Chairman, this amendment in itself is not of paramount importance, and is important only in this, that the Committee on Rivers and Harbors and those Members of the House who are in favor of the proper development of water transportation feel that they should give notice to the Budget authorities and to the Committee on Appropria-

tions that they must plan for a sufficient appropriation to take care of the river and harbor projects within a period of five years.

We can not say that we can not afford it. Why, the farmer might just as well say that he could not afford to buy seed corn or seed wheat. I want to say this to the membership of the House: It is a small matter, but we of the Great Lakes States expect to come before the House in a short time for a large appropriation to deepen the lake channels. I introduced a bill in the House about two years ago for a 25-foot channel for the Great Lakes. That bill will probably be reported by the committee within a very few weeks. That project will possibly run into a total of approximately $60,000,000, and if we accomplish it in a five-year period it will cost approximately $12,000,000 annually.

Who can say we can not afford it? The chairman of our committee has stated this afternoon that we handle freight on the Great Lakes at a mill per ton-mile. What does it cost on the railroads? More then ten times that amount.

Mr. DEMPSEY. And three times as much on the sea and five times or six times as much on some of the inland waterways.                    •

Mr. CHALMERS. I want to call your attention to the record of 1923 on the Great Lakes. There were 367 lake freighters locking through the Soo Canal and the St. Marys River. I want to give you the draft and the possibilities of these freighters. There were 367, disregarding the class below 2,000 tons. The average cost per ton on all of the tonnage hauled by these freighters amounted to 88 cents; 88 cents a ton for the haul, and the average haul was 801.3 miles. Now, I have figured the capacity of those 367 boats. They were built for greater service than they were able to perform. They were built, or some of them at least, for a draft of 24½ feet, but they were compelled to accommodate themselves that year to an 18¾-foot draft. If we had had a sufficient channel in the Detroit River, at the Limekiln Crossing, the Livingston Channel, in the St. Clair Flats, in the St. Marys River, and the West Neebish Channel, if we had had a sufficient depth, these 367 Lake freighters could have carried 26,000,000 tons additional freight. That additional amount could have been carried with the same crew, the same officers, the same men, and I want to say that the 88 cents a ton covers the loading and unloading of the freight except coal. Before I get through I hope to show that the cost of loading and unloading coal can be almost disregarded. What would have been the saving in actual dollars and cents if we had had the draft to accommodate these big boats?

Let us see what it is worth in dollars and cents, 26,000,000 tons additional and 88 cents a ton. Let us throw off 13 cents for the loading and unloading of coal, and that is ample. I have stood on the bank of the Maumee River and have seen the Hocking Valley and the New York Central derricks load coal into lake freighters. I have seen them load 260 tons of coal in three minutes. Those derricks pick a car right off of the tracks, elevate it, turn it upside down, and drop the coal into the hold of the ship, set the car on the tracks again, and the car will automatically go up an incline and away out to the yard miles away.

Two hundred and sixty tons of coal loaded into a lake freighter every three minutes, and that means 110,000 tons of coal every 24 hours. So 13 cents a ton will amply cover the additional cost of the loading and unloading of the coal. Then we have a clear profit of 75 cents a ton for every ton of extra freight loaded on these 367 boats, which amounts to $25,350,000 a year—not for all time, but for each year. And what is it going to cost to complete the project of the bill for deeper ship channels for the Great Lakes? From Buffalo to Duluth, a distance of 1,000 miles, to Chicago, and to all of the intermediate ports, what is it going to cost? Sixty million dollars, and an annual profit of over $25,000,000. When you add the Lake Michigan tonnage to that of Superior it gives us 33,800,000, tons. So that the entire tonnage saved will be 33,800,000 tons, which, figured at a profit of 75 cents, would amount to $25,350,000.

Do you tell me we can not afford that expenditure for approximately 50 per cent profit each year? So I want to say to the Membership of the House that while this is a small matter on this bill, it will, under the plans of our committee, require an expenditure to complete these projects in a five-year period of approximately $75,000,000. We are to-day simply laying the foundation for future water transportation policy. I thank the committee.

Mr. TABER. Mr. Chairman, I am opposed to the amendment.

The CHAIRMAN. The Chair is trying to hold the balance even, politically as well as geographically.

Mr. HASTINGS rose.

The CHAIRMAN. The gentleman from Oklahoma is recognized.

Mr. HASTINGS. Mr. Chairman, I think I may say that there is no man in the House who is more deeply interested in flood control than I am. I am interested in the internal development of our country. I do not want to throw an obstacle in the way of it. I am for the internal development of my country, and I have sought on the floor of the House during my brief membership here, to promote that object, and I have voted every dollar of encouragement where I thought the money would be expended for internal improvement.

This amendment is to add $5,886,310 to the $50,000,000. My understanding is that out of this $50,000,000, $1,500,000 will go for certain surveys that are allocated.

Mr. McDUFFIE. If we have this amendment adopted $2,000,-000 will be spent for surveys.

Mr. HASTINGS. That is the point I am coming to. If this amendment is adopted, $2,000,000 will be allocated to surveys of certain rivers and streams.

Mr. HUDSON. Mr. Chairman, will the gentleman yield there for a suggestion?

Mr. HASTINGS. Yes.

Mr. HUDSON. I propose to offer an amendment that will take care of that proposition.

Mr. HASTINGS. I am not voting on future amendments. I am voting on this pending amendment. The point to which I want to invite attention is the injustice of this allocation. I represent in part the State of Oklahoma. That State is a typically Western State. It is deeply interested in the development of the Arkansas River. Let us see what this amendment will do to the second largest tributary of the Mississippi River, next to the Missouri River. Under the $50,000,000 as it stands in this bill a million and a half dollars is allocated to surveys. I invite your attention to pages 156 and 157 of the hearings. Out of that there is allocated to the Arkansas River and its tributaries for surveys what? Fifty thousand dollars. If we adopt this amendment, then I understand $2,000,000 will be taken out of it for surveys. Let us look at the Arkansas River. It gets $50,000 under the one, and if you add the amendment it gets $50,000 out of the $2,000,000. Most other streams get increases for surveys.

Now, Mr. Chairman and gentlemen of the committee, I am not going to stultify myself by sitting on the floor of this House and permit this discrimination against one of the great rivers of the country, and I am not going to vote for any amendment which does not do justice to the Arkansas and to all other streams.

Mr. ABERNETHY. Will the gentleman yield?

Mr. HASTINGS. Yes.

Mr. ABERNETHY. Does the gentleman think he can help the Mississippi flood situation by cutting out $150,000 for a project of mine and vote me out because the gentleman will not get a few dollars more?

Mr. HASTINGS. I will answer that in this way, that we have sat here in patience for years and years; we have tried to lift up our voices for one of the great streams of this country, and we are not going to sit idly by any longer. The voice of the Arkansas River is going to be heard upon this floor, and we are going to demand that justice be done the Arkansas River along with the other streams.

I have been appealing in every way I can for justice to be done to the Arkansas River. Next to the Missouri River, it is the longest tributary of the Mississippi. It is 1,460 miles long. It rises in Colorado and flows through Kansas, Oklahoma, and Arkansas, emptying into the Mississippi. Appropriations were made to improve the Arkansas River as far back as 1832 and as far up the river as Wichita, Kans. This major tributary of the Mississippi has been held navigable by the Government for a hundred years. It was actually navigated as far up as Fort Gibson, which is opposite Muskogee, for 75 years. When railroads were built through the country transportation on the river fell into disuse. During the past few years little, if any, appropriations have been made for snagging or keeping the channel open or reveting its banks. During my first term in Congress we succeeded in getting an appropriation of $235,000 for the Arkansas River in Arkansas and Oklahoma. We were not able to force the engineers to expend any of this money on the Arkansas River in Oklahoma. I know that the river is navigable, provided a reasonable amount of money is expended in opening up and keeping clear the main channel of the stream.

Case 1:21-cr-00179-AJT   Document 23-4   Filed 09/01/21   Page 17 of 34 PageID# 293

Let us examine the allocations found on pages 156 and 157 of the hearings on this bill. I am inserting the tables found in these two pages, which are as follows:

*Tentative allotments for fiscal year 1929 for surveys of streams in the interest of navigation, flood control, power development, and irrigation (H. Doc. No. 398, 69th Cong., 1st sess.)*

| Stream | On basis of $1,500,000 | On basis of $2,000,000 |
|---|---|---|
| St. Croix | $5,500 | $7,400 |
| Machias | 4,000 | 5,000 |
| Union | 3,000 | 4,000 |
| Penobscot | 15,000 | 20,000 |
| Kennebec | 12,000 | 17,000 |
| Androscoggin | 8,000 | 10,000 |
| Presumpscot | 3,000 | 4,000 |
| Saco | 5,500 | 7,400 |
| Kennebunk | 3,000 | 3,700 |
| Salmon Falls | 4,000 | 5,000 |
| Merrimack | 12,000 | 16,000 |
| Taunton | 1,000 | 1,000 |
| Pawtucket | 1,000 | 1,000 |
| Pawtuxet | 1,000 | 1,000 |
| Thames | 1,000 | 1,000 |
| Connecticut | 11,500 | 11,500 |
| Housatonic | 1,500 | 1,500 |
| Hudson and tributaries | 37,300 | 37,300 |
| Lake Champlain | 700 | 700 |
| Poultney | 1,500 | 1,500 |
| Otter Creek | 2,200 | 2,200 |
| Boquet | 1,600 | 1,600 |
| Ausable | 300 | 300 |
| Saranac | 300 | 300 |
| Big Chazy | 2,700 | 2,700 |
| Winooski | 3,300 | 3,300 |
| Lamoille | 2,700 | 2,700 |
| Missisquoi | 2,600 | 2,600 |
| Raritan | 5,000 | 11,000 |
| Delaware and tributaries | 50,000 | 68,000 |
| Susquehanna | 9,000 | 12,000 |
| Potomac | 48,000 | 64,000 |
| Patuxent | 6,500 | 9,000 |
| Rappahannock | 9,500 | 13,000 |
| Pamunkey | 10,000 | 13,500 |
| James | 6,500 | 8,700 |
| Roanoke | 6,200 | 8,300 |
| Meherrin | 1,300 | 1,500 |
| Neuse | 4,500 | 6,000 |
| Tar | 1,000 | 1,500 |
| Monongahela | 6,400 | 8,500 |
| Ohio | 2,600 | 3,500 |
| Beaver | 1,000 | 1,500 |
| Muskingum | 13,000 | 17,000 |
| Little Kanawha | 8,000 | 11,000 |
| Big Sandy | 7,500 | 10,000 |
| Guyandot | 15,000 | 20,000 |
| Kanawha | 16,000 | 22,000 |
| Miami | 7,500 | 10,500 |
| Licking | 8,000 | 11,000 |
| Kentucky | 500 | 500 |
| Salt | 1,800 | 2,500 |
| Green and barren | 16,000 | 16,000 |
| Wabash | 34,000 | 45,000 |
| Tradewater | 1,200 | 1,500 |
| Rainy | 2,700 | 3,600 |
| Kawishiwi | 1,000 | 1,400 |
| Vermilion | 3,000 | 4,000 |
| Little Fork | 3,300 | 4,500 |
| Big Fork | 3,300 | 4,500 |
| St. Louis | 1,500 | 2,200 |
| Pigeon | 1,600 | 2,200 |
| Brule | 1,400 | 1,900 |
| Temperance | 700 | 950 |
| Poplar | 700 | 950 |
| Baptism | 700 | 950 |
| Beaver Bay | 700 | 950 |
| Cascade | 700 | 950 |
| Gooseberry | 700 | 950 |
| Devil Track | 700 | 950 |
| Manitou | 700 | 950 |
| Bad | 2,600 | 3,500 |
| Montreal | 1,300 | 1,800 |
| Cape Fear | 7,500 | 10,500 |
| Yadkin-Peedee | 3,000 | 4,000 |
| Santee Basin | 3,000 | 4,500 |
| Savannah | 2,600 | 3,500 |
| Altamaha and tributaries [1] | 3,300 | 4,200 |
| St. Marys | 600 | 1,000 |
| Satilla | 600 | 800 |
| Suwannee | 1,500 | 2,000 |
| Withlacoochee | 2,500 | 3,500 |
| Mobile, including Coosa and tributaries [1] | 60,000 | 68,000 |
| Apalachicola | 25,000 | 46,000 |
| Pearl [1] | 25,000 | 28,300 |
| Tombigbee and tributaries [1] | 40,000 | 54,000 |
| Warrior and tributaries [1] | 35,300 | 42,500 |
| Calcasieu | 7,500 | 10,000 |
| Amite | 5,200 | 7,000 |
| Tickfaw | 3,700 | 5,000 |
| Tangipahoa | 3,000 | 4,000 |
| Chefuncte | 2,200 | 3,000 |
| Bayou Nezpique | 3,400 | 4,500 |
| Bayou Teche | 1,500 | 2,000 |
| Guadalupe | 5,000 | 12,500 |
| Red [1] | 51,000 | 51,000 |
| Ouachita | 25,000 | 25,000 |
| Yazoo and tributaries [1] | 24,000 | 24,000 |
| St. Francis | 10,000 | 10,000 |
| Arkansas and tributaries | 50,000 | 50,000 |

[1] Added by Congress.

*Tentative allotments for fiscal year 1929 for surveys of streams in the interest of navigation, etc.—Continued*

| Stream | On basis of $1,500,000 | On basis of $2,000,000 |
|---|---|---|
| Mississippi and minor tributaries | $35,500 | $43,000 |
| Meramec | 8,000 | 11,000 |
| Iowa | 4,000 | 4,000 |
| Des Moines | 3,000 | 3,000 |
| St. Croix | 5,700 | 7,000 |
| Chippewa | 3,300 | 4,000 |
| Wisconsin | 33,000 | 42,000 |
| Missouri and tributaries | 70,000 | 90,000 |
| Cumberland | 71,000 | 97,000 |
| Tennessee | 100,000 | 100,000 |
| Allegheny | 9,000 | 12,000 |
| Aunicon | 700 | 950 |
| Sturgeon | 1,200 | 1,500 |
| Carp | 700 | 950 |
| Manistique | 3,500 | 4,700 |
| Menominee | 8,000 | 11,000 |
| Peshtigo | 2,600 | 3,500 |
| Oconto | 2,600 | 3,500 |
| Wolf | 7,300 | 9,700 |
| St. Joseph | 10,000 | 13,500 |
| Kalamazoo | 4,700 | 6,300 |
| Grand | 10,000 | 13,000 |
| Muskegon | 3,700 | 5,000 |
| Manistee | 3,600 | 4,800 |
| Illinois | 40,000 | 54,500 |
| Eel | 8,500 | 16,000 |
| Mad | 5,000 | 9,000 |
| Klamath | 15,000 | 25,000 |
| Sacramento | 12,000 | 16,000 |
| San Joaquin | 16,000 | 22,000 |
| Kearn | 4,000 | 5,000 |
| Columbia | 57,000 | 116,000 |
| Cowlitz | 1,000 | 1,500 |
| Lewis | 1,000 | 1,500 |
| Willamette | 7,000 | 10,000 |
| John Day | 2,000 | 9,000 |
| Snake | 25,000 | 60,000 |
| Skagit | 14,000 | 21,000 |
| Stillaguamish | 7,000 | 13,000 |
| Snohomish | 7,000 | 20,000 |
| Chehalis | 5,000 | 12,000 |
| Puyallup | 5,000 | 10,000 |
| Total | 1,500,000 | 2,000,000 |

Without this amendment it will be noted there will be allocated to the Arkansas River $50,000. With this amendment adopted there will be allocated to the Arkansas and its tributaries only $50,000. That is what I object to. There is a discrimination against the Arkansas River. There are innumerable small streams mentioned in this table not known out of the county through which they run, and practically every one of them gets an additional amount for a survey if this amendment is adopted.

Take the first one, for instance, the St. Croix. As the bill now stands it gets $5,500. If the amendment is adopted it gets $7,400. The Arkansas River, the second most important tributary of the Mississippi, gets not a single dollar additional if this amendment is adopted. Let us take the Cape Fear River. It gets $7,500. If the amendment is adopted it gets $10,500. Let us take the important River Tickfaw. It gets $3,700. If the amendment is adopted it gets $5,000, or an increase of $1,300. Who knows where this stream is? Then let us take the Amite River. It gets $5,000. If this amendment is adopted it gets $7,000. Search your geography for this river. Let us take the Missouri and its tributaries. It gets $70,000. If the amendment is adopted it gets $90,000. Take nearly all of the other items; the same increase applies. I am not complaining against the amount appropriated for the Missouri and its tributaries, but I do not propose to sit on the floor and permit the Arkansas to be longer discriminated against, and until justice is done the Arkansas River I want to serve notice upon the Members of the House that I am not going to vote for increased allocations for other streams without allocations for the Arkansas River. My State and district are deeply interested in flood-control legislation. I will go as far as any Member of the House in making adequate appropriations for surveys and flood control. I favor river and harbor improvements, and I favor the use of the rivers of our country to cheapen freight rates, but I will not longer sit silent and permit the Arkansas River to be thus discriminated against. The Board of Engineers might as well know that now. Major Putnam in 1915 made an illuminating report, urging additional appropriations for improvements on the Arkansas River. It can be made navigable, and in my judgment it is a mistake not to do so. It is urged that I can get this another year, or out of another appropriation. That does not satisfy me. I have heard that long enough. What we want on the Arkansas River is an adequate appropriation to carry forward the work now. If we do our duty with the Arkansas River and this river is restored to its usefulness, we

need not fear but what the coming generation will continue adequate appropriations for it. I want to urge, and repeat again, that no one in Congress is more interested in the internal development of our country than I am; but the members of the Committees on Rivers and Harbors and Flood Control have to be made to understand that the Arkansas River is on the map, and that we must have appropriations for it, and that justice must be done this river while appropriations are being made for the other streams throughout the country. The time to get these appropriations is when bills like this come up for our consideration. I am going to continue to urge as strongly as I may the importance of this river, and, of course, in order to get it improved we must make adequate appropriations for surveys so that correct estimates may be submitted for appropriations.

Mr. TABER. Mr. Chairman and gentlemen of the committee, I realize it is not a popular thing to come here and oppose an increase in appropriations. Personally I favor the improvement of our rivers and harbors just as rapidly as it can be done in decency and appropriate enough money to reasonably take care of them, but I do not see any sense in going beyond that.

We have heard a little bit about the survey item. I call your attention to the statement of General Jadwin and Major Robins on page 155 of the hearings. In the preliminary allocations of their $50,000,000 they allocated $1,500,000 for surveys, but they kept back about $3,000,000 to be allocated later. General Jadwin says that that $1,500,000 can very readily be increased to $1,800,000 or $2,000,000. That is the survey end of the situation.

I want to go into the status of funds. On pages 158 and 159 you will see that in June, 1925, they had an unexpended balance of $69,471,000 and liabilities and contracts amounting to $21,500,-000, or a net amount in the Treasury of $47,900,000. In June, 1926, they had an unexpended balance of $72,433,000 and contracts and liabilities of $17,000,000, or a net unexpended balance of $55,000,000, an increase of $8,000,000 over the year before. In June, 1927, the unexpended balance in the Treasury was $81,000,000, contracts and liabilities $25,000,000, net $56,000,000, an increase of $1,000,000 over the year before. On July 1, 1926, they had unallocated sums from the year before of $668,000. On July 1, 1927, they had unallocated sums of the year before of $2,167,000, an increase all the time.

We are not in a position where we need to increase this appropriation to let them go on in decency with the work. I want to call your attention to one part of the authorization act, which is now section 621 of the code:

Any public work on canals, rivers, and harbors adopted by Congress may be prosecuted by direct appropriations, by continuing contracts, or by both direct appropriations and continuing contracts.

Which is practically an authorization for the entering into of any work which needs to be done immediately.

I want to call your attention to one other thing. These contracts and these projects can be carried on much better than they could in the years before, because now the department and the contractors have available a great lot of equipment suitable for the projects and they can do a lot more work with the same money. Taking all this into consideration, I think we have carried enough in this appropriation bill and that it should not be increased.

Mr. WILLIAM E. HULL. Mr. Chairman and gentlemen of the committee, I simply want to answer some of the statements with reference to the amount of the balances which the gentleman who preceded me and the gentleman from Michigan [Mr. HUDSON] said were in the Treasury. We brought General Jadwin before our committee and we asked him about the present balance, which is about $69,000,000. Remember, that when he made that report it was July, 1927. In that $69,-000,000 was the $50,000,000 that you appropriated last year. Consequently, when you run around to July 1, 1928, you will have spent the $69,000,000, with the exception, probably, of a balance of from $10,000,000 to $20,000,000, which is necessary to run the business. In other words, put it on a business basis. If you are running a wholesale business you have got to have a balance in the bank of $20,000 or $30,000 that you can check against. In a business of this kind, where you are spending $50,000,000 a year, you have to have a balance that you can check against in order to keep your contracts going. This is necessary from a business standpoint, and you can not do business without money. In carrying on this work, if you allowed them to go along in any other way, then by July 1, 1928, the Treasury account they are drawing against would be out of funds. So they are dependent upon the appropriation you are talking about for next year's river and harbor work.

As far as I am concerned, I can get along with the Illinois River and take the reduction. It does not make any difference to me personally, but if you are going to complete these projects, then you must have more money; and, as the gentleman

from New York [Mr. DEMPSEY] has told you, we ought to appropriate at least $65,000,000 a year until we can catch up and get these projects done. If you continue to do it the way you are doing it now, you will waste more by delaying the projects than you will gain.

Let us take the Missouri River as an illustration. Under the proposed plan of $55,886,310 we can probably have the Missouri River dredged so that we can use boats on it in three years' time and give the farmers of the West the opportunity of shipping their grain over that waterway.

Mr. HUDSON. Will the gentleman yield?

Mr. WILLIAM E. HULL. I can not yield now.

Therefore I say that letting this thing drag along with small appropriations is on the same principle of a man deciding to build a house and contracting with me to go ahead and build a house for $10,000, but when I have completed the house up to the point of plastering it he would then say to me, "We will not plaster until next year." Would there be any common sense in holding up the construction of a house a whole year because you did not want to plaster it? The same thing is true with respect to this river and harbor proposition.

We had on January 1, $46,000,000 unexpended. Seventeen million dollars of that amount has already been allocated, leaving a balance of $29,000,000 which they will have to use for other projects between now and July 1.

I am making this speech more with the idea of clarifying the thing, if I can, in a common-sense way, and to show that on July 1, 1928, if you did not appropriate any more money, it would be practically out of funds.

Mr. BRIGGS. Will the gentleman yield for a question?

Mr. WILLIAM E. HULL. Yes.

Mr. BRIGGS. Is it not true that the Chief of Engineers reported that for last year they carried over the waterways and through the harbors of the United States, including the Panama Canal, commerce of over 500,000,000 tons, valued at over $26,000,000,000, the greatest ever carried in the history of this country.

Mr. WILLIAM E. HULL. That is true.

Mr. BRIGGS. Showing the port development and the necessity of transportation facilities within the country.

Mr. WILLIAM E. HULL. Yes.

Mr. ABERNETHY. Mr. Chairman and gentlemen of the committee, I shall only detain you a few moments. I want to address my remarks to this side of the House for the time being, and particularly to the gentlemen who were in the great controversy involving the Illinois River and the lake diversion last Congress.

The gentleman from Alabama [Mr. McDUFFIE] in the facts and figures which he gave here, shows that unless this increase is made, the continuation of the inland waterway beginning in my district is cut to the extent of $150,000 this coming year. This cripples for several years the completion of that great inland waterway.

You gentlemen of the Missouri River territory, you gentlemen of the Illinois River territory, you gentlemen who want to carry through this flood-control program for the Mississippi River, and to the gentleman from Oklahoma who is not satisfied with this amendment because he is not going to get $100,000 but $50,000—think of the situation on the rivers and waterways in my country. We do not get a cent for any survey unless this amendment is passed and are cut $150,000 on the inland waterway appropriation. The gentleman from Oklahoma gets $50,000 for surveys in any event. We have stood with you people on the Mississippi River, we have stood with you on the Missouri River, we have stood with you on the Illinois River, and now we ask you to stand with us on this proposition if you expect us to stand with you in the future. [Applause.]

Mr. NEWTON. Mr. Chairman and gentlemen, we have just heard from "the boys," or at least one of "the boys" on the Arkansas River who seemed to favor this proposition but was not going to vote for it. Let us are now going to hear from one of "the boys" on the Mississippi River who is in favor of the amendment and is going to vote for it. [Applause.]

Mr. MADDEN. If the gentleman will permit, some one has said here that the murmur of the waters of the Arkansas flowing down to the Everglades is like the singing of the birds.

Mr. NEWTON. I understand so, but I would like to have it articulated here with a little different kind of note.

Here is the way I look at this proposition, and it is the way I have tried to look at each and every one of these rivers and harbors appropriations for the last several years. We have a policy that has been established by Congress, a legislative policy of authorizing certain projects.

Under the law it is the duty of the Chief of Engineers to study these projects and to annually advise us just how much

money he can economically expend in a given year in carrying out the policy of Congress.

During the past several years we have had considerable trouble here in the House in getting the appropriation up to the estimate of the Chief of Engineers. If my recollection serves me correctly, for some two or three successive years the Budget estimates were substantially less than the estimates of the Army engineers. Congress felt that it had laid down the legislative policy and that there should be appropriated sufficient moneys so that that policy could be put into effect. We in the House felt that the judgment of the Army engineers was better than that of the Director of the Budget. On those successive occasions the appropriation was increased so as to conform to the estimates of the Army engineers.

We did not want to override the Budget; neither did we think that the Budget ought to override the express wish of Congress. Happily an understanding was entered into by the rivers group with the executive branch of the Government about two years ago. This understanding in substance called for the completion of the then authorized projects in a period of five years, with an annual appropriation of $50,000,000 for that purpose. As a result of that understanding provision was made for $50,000,000 two years ago with a like sum one year ago.

During the last Congress we passed a new rivers and harbors authorization act. It was the first one of its kind for years. We authorized additional projects aggregating an expenditure of $72,000,000. I voted for that bill, and when I did so I did not have the idea that I was making a mere gesture in favor of the development of our inland waterways. To me it was the commencement of an additional program of river improvement, the commencement of which was to be in the immediate future and the completion of which was to come along in due time. It did not occur to me that the passage of that legislation was going to result in decreasing the expenditures upon existing projects. Certainly no one supporting that measure had any such thought. Congress was announcing a supplemental program of rivers and harbors construction, and we naturally thought it was going to be carried out.

Mr. HUDSON. Will the gentleman yield?

Mr. NEWTON. I can not yield until I complete my statement, if the gentleman will permit, and then I will be pleased to yield.

Mr. Chairman, I certainly counted upon the cooperation of the Budget in the carrying out of this express policy of Congress. However, when we came back here this fall we found out that no additional provision had been made for the commencement of any one of these projects. The Budget called for only $50,000,000. This clearly meant that either the earlier program was to be slowed up, or that no work whatever was to start on any of the new projects. This was disappointing. Then, as I looked into the question more closely, I learned that as a matter of fact the Budget was not even recommending for existing projects the sum of $50,000,000, which had been recommended one year and two years ago.

Heretofore it has always been the practice to carry a blanket sum for the projects—this has been $50,000,000 the last two years, as I have said—and an additional sum for the survey items. Whatever was appropriated for surveys was in addition to the sum appropriated for projects. It will be observed that the Budget this year recommended $50,000,000, which was to cover both projects and surveys. Now, the surveys that the Army engineers contemplated making this year and which had been authorized by Congress called for an appropriation of nearly $2,000,000. Therefore, if this appropriation is to stand as it is, the appropriation for the projects that Congress has authorized will have been cut down approximately $2,000,000 less than what they were one and two years ago. This means that we can not even carry out the five-year program that was in existence when the understanding was entered into.

Are we for the improvement and development of our inland waterways or not? Are we merely playing with this proposition? I feel this way about it: The legislative branch of the Government, with the approval of the Executive, has announced the policy. Having announced that policy, we ought to pass an appropriation bill which will carry it out. I have examined the hearings and it is perfectly clear from the testimony of General Jadwin that he and his assistants feel that if this policy of Congress is going to be carried out in an efficient and economical way that the appropriation ought to be $55,800,000. When General Jadwin so reports, he does so with the full appreciation of the responsibilities of his position. He knows the situation. He knows what his job is. He knows where his equipment is, where his help is located. He ought to know more than anyone else how this program can be economically and efficiently carried out if the policy of Congress is to be carried out.

I believe in the development of our inland waterways. There is not a day hardly but what information comes to me of the extreme desirability, if not necessity, to the industrial and agricultural interests of the Middle West for cheaper and more adequate transportation. The products of our farms come into competition on our eastern and western coasts with the farm products of foreign countries. These countries have a cheap ocean freight haul to our coast, whereas our farmers have an expensive railroad freight haul. Therefore I want to see these projects which Congress has started finished just as soon as they can be economically finished.

Mr. HUDSON. Does the gentleman think the addition of $6,000,000 is a proper ratio for the $72,000,000? If you will make the basis of the change $72,000,000, I will vote for ten or fifteen million dollars to do it.

Mr. NEWTON. Here is the situation: We are never going to complete these projects unless we get the money, and we have not got the money this year that we had two years ago. Let me ask the gentleman, Does he think that in this bill we ought to take less than we had a year ago and less than we had two years ago?

Mr. HUDSON. No——

Mr. NEWTON. Then the gentleman very clearly ought to vote for our amendment.    [Applause.]

Mr. HUDSON. No; because the engineer has said that the machinery set up could use $50,000,000.

Mr. NEWTON. Oh, no!

The CHAIRMAN. The time of the gentleman from Minnesota has expired.

Mr. BRIGGS. Mr. Chairman and gentlemen of the committee, anybody who has read the hearings before the Appropriations Committee with reference to river and harbor items ought to be convinced that the amount of $50,000,000 is altogether insufficient.

Mr. Robbins, for the Chief of Engineers, testified that with an annual appropriation of only $50,000,000 it would take eight or nine years to complete the new work now in sight.

This appropriation of only $50,000,000 proposed by the committee denies the completion of new projects within a reasonable time as outlined by the Chief of Engineers. Of course, Members of Congress must know that these balances in the hands of the Chief of Engineers which we have been hearing about are not surplus funds which can be added to the appropriation carried in this bill. They are balances not available to new authorized projects; they are balances which represent commitments already made; obligated funds and funds yet to be allocated for maintenance and carrying on river and harbor work throughout the remainder of the whole fiscal year ending June 30, 1928.

When you state that a large balance existed on the 1st of November, you must remember that the engineers have to carry through project work until the 1st of July out of that appropriation. It must be further remembered the engineers tell you that they can not do as much work in the colder season of the year as they are able to do in the warmer season, and they do practically double the work in the summer months that they do in the winter months. If you test your balance in the winter, you are taking out of the equation that feature which is so sharply emphasized by the engineers.

It seems to be penny-wise and pound foolish to be postponing the completion of these projects adopted by the Congress, and which represent urgent need of the improvements authorized.

The Chief of Engineers calls attention in his testimony to the fact that where they have plans ready to carry through this work it means an actual loss to the Government not to carry them through in accordance with the plans as contemplated. He says, page 152 of the hearings:

If that plant is not employed continuously somebody has to pay for it, and in the long run the Government must pay for it in the cost of the work, because you will get less work for the money. From our experience in the past we have found that when the appropriations were dropped they were discontinued, and it is hard to get the work done at the right prices under those conditions.

Not a great many of our citizens probably are familiar with the tremendous commerce moving over the waterways of the Nation, and through its great ports.

The 1927 report of the Chief of Engineers, United States Army, page 3, volume 2 of such report, reflects that the commerce of the United States during the calendar year 1926 amounted to the vast total of 540,500,000 tons, valued at $26,722,000,000, which the Chief of Engineers, in his testimony before the Appropriations Committee of this House, further stated was the greatest amount of commerce ever before carried in the history of this country.

There is probably no service by the Government which has produced greater returns for the people than is exemplified in the great river and harbor projects of the Nation.

Without the existence of deep-water ports the great foreign or coastwise trade of the United States could never have been developed to anything like its present proportions.

Foreign goods moving through such national gateways as Galveston, Texas City, New Orleans, Mobile, Savannah, Charleston, Norfolk, Baltimore, Philadelphia, New York, Boston, Seattle, Portland, San Francisco, Los Angeles, and other great ports, are paying custom duties into the United States of over $500,000,000 a year.

In addition to such enormous sum in custom receipts so collected, the great river and harbor national gateways have exercised a tremendous influence in the reduction of freight rates to and from the ports, and have further resulted in the rapid development and increased wealth of the territory within the States contiguous or adjacent thereto.

The United States engineers have officially indicated that the creation of the great port of Galveston has resulted in rate reductions amounting from $10,000,000 to $20,000,000 annually; a saving to the people in one year of the total cost of the river and harbor improvement at Galveston throughout its whole history.

The Chief of Engineers has indicated plainly that, if the proposed river and harbor appropriation for all the waterways of this country is not increased from $50,000,000 to $55,000,000, the completion of the new work authorized in the last river and harbor bill, with other projects, will be materially delayed.

Instead of being able to allocate the sum of $621,000 for completion of the 32-foot project at Galveston within the next year, the Chief of Engineers has notified Congress that only $550,000 can be allocated to this most important improvement at the port of Galveston, which has recently attained the distinction of handling more than a billion dollars of commerce in one year.

In the last eight years commerce through the port of Galveston has practically doubled; and when Congress last year learned how great and increasing a service it was performing for the Nation, and particularly for the southwestern part thereof, and how great a need for an even deeper channel existed, it directed an increase of the project depth in Galveston Channel as well as an increased depth in Galveston Harbor. It is urgent that the money for this and other projects authorized should be provided with the least possible delay, so that such projects can be promptly carried to completion.

The testimony of the Chief of Engineers and his assistants have demonstrated beyond question that funds on hand are only sufficient to carry on the work estimated for in the last Army appropriation bill, and that it is absolutely essential that the customary reserve be maintained in order that the engineers will at all times have some funds on hand with which to meet unexpected and very serious situations in the maintenance of the river and harbor work of the United States.

Mr. McDUFFIE. Mr. Chairman, will the gentleman yield?

Mr. BRIGGS. Yes.

Mr. McDUFFIE. As a matter of fact, at the end of each fiscal year the only money unallocated by the engineers is the amount of approximately $5,000,000, which they must keep for emergency purposes.

Mr. BRIGGS. Certainly; they must have a reserve fund, and they testified in these hearings that if they had not done that, they could not have carried through the relief and survey work which they did on the Mississippi last summer after that terrible flood. The Congress of the United States was not in session, and there was no source to which they could turn except to the reserves held by the engineers, and through the use of those reserves the work was accomplished.

Mr. HUDSON. Mr. Chairman, will the gentleman yield?

Mr. BRIGGS. No. I am sorry I can not. My time is too limited.

Mr. HUDSON. I would like to call attention to the fact that "allocated" is not "contracted."

Mr. BRIGGS. I understand that perfectly, but the allocation of these funds to other projects delays matters. The great Intercoastal Canal has allocated to it a sum of money, and they are waiting now only for the rights of way. If you transfer that allotment to some other project, you will have seriously delayed the completion of that great project. You are not carrying out your program, but you are procrastinating and delaying your program by such a course, and this Congress ought to adopt this amendment. [Applause.]

The CHAIRMAN. The time of the gentleman from Texas has expired.

Mr. BARBOUR. Mr. Chairman, I do not think there is anything that I can say at this time that will change anyone's

vote on this amendment. It is one of the river and harbor proposals which always bring a big crowd to the floor of the House, and always cause more or less enthusiasm; but there is no occasion for any enthusiasm on the part of the average Member interested in river and harbor projects in this amendment. My good friend from Ohio [Mr. CHALMERS] made a fine speech about the Great Lakes and the necessity for the deepening of the channels and harbors of the Great Lakes. If this amendment is adopted, the Great Lakes are not going to get any of it to speak of. The amount that would go to that section of the country would not make a ripple in a fish pond, let alone do any good to the Great Lakes. The amount that would go to the great majority of the projects in this country that you gentlemen are interested in would not make any difference at all if you should get any of this $5,586,310. What are they going to do with this money if the amendment is adopted? You will find at page 294 of the hearings General Jadwin said:

It was my further intention, had the $5,000,000 increase in the appropriation been approved, to allot from that about $2,000,000, so that they would have pretty close to $5,000,000 instead of $3,000,000 allotted the coming year.

He was talking about the Missouri River between Kansas City and the mouth. Two million dollars of your $5,000,000 is going into that one project.

Mr. WILLIAM E. HULL. Mr. Chairman, will the gentleman yield?

Mr. BARBOUR. No. General Jadwin further said:

Allotting the remaining $3,000,000 of the $5,000,000 to other works would then have given approximately the same ratio in which the $50,000,000 is allotted; since the $50,000,000 is divided, about $20,-000,000 in the Mississippi system and about $30,000,000 to the Great Lakes and the works on the three coasts.

According to that statement the Missouri River below Kansas City is going to get $2,000,000 and the whole Mississippi system is going to get about $1,300,000 of the $5,585,000 in addition to what it will get under the $50,000,000, and then all of the rest of the country, the Great Lakes included, I will say to my friend from Ohio, and all of the Atlantic coast and all of the Gulf coast, down in my friend McDUFFIE's section of the country, and all of the Pacific coast——

Mr. McDUFFIE. It does not affect my district at all.

Mr. BARBOUR. I have not yet yielded. All of these sections of the country are going to get about $2,300,000. Gentlemen, what do you expect to get in this division of the $5,558,000? Ninety-five per cent of you are not going to get any benefit worth mentioning. Major Robins testified before the committee that the only thing the $50,000,000 will not do is to enable them to rush certain important projects that there is a great demand for. So if you get your additional $5,558,310 the only thing which they can do which they could not otherwise do would be the rush of a few of the projects.

Mr. CHALMERS. Mr. Chairman, the gentleman has referred to me. Will he yield?

Mr. BARBOUR. Yes.

Mr. CHALMERS. I just wanted to say this, that we of the Great Lakes are looking to the future.

Mr. BARBOUR. Well, that is a good time to look to, and not the present, in regard to this appropriation.

Mr. HUDSON. And if the House will adopt my amendment, it takes care of that very thing that the gentleman speaks of?

Mr. BARBOUR. Absolutely.

Mr. HUDSON. That $2,000,000.

Mr. BARBOUR. Gentlemen, there is a regular, businesslike way of doing this. The committee has been appropriating for the last two or three years $50,000,000 a year for rivers and harbors. A few years ago the appropriation bills for the War Department carried $40,000,000 a year for river and harbor work. Then there came before the committee certain Members of the House who were interested in the waterways of this country.

The CHAIRMAN. The time of the gentleman from California has expired.

Mr. BARBOUR. I ask unanimous consent to proceed for five minutes more.

The CHAIRMAN. Is there objection?

There was no objection.

Mr. BARBOUR. These gentlemen came before the committee. They did not represent the Rivers and Harbors Committee; they did not represent anybody, probably, but themselves; but they told the committee that if it would increase the appropriation to $50,000,000 a year all of the work that was necessary to be done would be taken care of. I know the answer to that is that since that time we have authorized new projects. Then the businesslike way of handling those new prospects is to go

through the Budget and come here to Congress with estimates. If we now tie onto this bill this additional $5,586,310 for certain favored projects, it is going to establish a precedent that will do us no good in the future, because when a river and harbor appropriation comes in hereafter it will not go through with orderly consideration, but everyone who has a favorite project will then have this precedent before him for adding to the appropriation and tying his favorite project onto the bill.

Mr. McDUFFIE. Mr. Chairman, will the gentleman yield?

Mr. BARBOUR. Yes.

Mr. McDUFFIE. The gentleman stated that nobody would get any benefit with the exception of one or two projects.

Mr. BARBOUR. Well, say three or four.

Mr. McDUFFIE. I want to call the gentleman's attention to page 151 of the hearings, where practically $2,000,000 is taken off the projects adopted in the last bill, to say nothing of the projects existing when the later projects were adopted.

Mr. BARBOUR. For surveys?

Mr. McDUFFIE. Not altogether for surveys.

Mr. BARBOUR. But there were many of these projects that did not deserve very much consideration anyway. I am discussing the matter of where this $5,558,000 is going. It is going to a few favored projects, and the rest of the projects are not going to get any benefit from it at all worth mentioning.

Gentlemen, you are soon coming to this Congress with a program for flood control, to cost anywhere from $275,000,000 for $1,250,000,000, according to the estimates that have been submitted. Congress is going to meet that problem, and I confidently believe that Congress is going to provide a program for adequate relief. It is going to cost a lot of money. Why not take up this matter in a businesslike way instead of gouging here and there for particular projects? Why not wait and meet that problem when it comes, and take care of all projects in a businesslike manner?

Mr. MOREHEAD. Mr. Chairman, will the gentleman yield?

Mr. BARBOUR. Yes.

Mr. MOREHEAD. The gentleman spoke of the Missouri River, as I thought, in a rather light way.

Mr. BARBOUR. No. I think that is one of the important projects before us.

Mr. MOREHEAD. I want to say that the States bordering on the Missouri River produce 45 per cent of all the agricultural products in the United States, and that particular section of the river which we hope will be made navigable will enable us to secure a reduction in the cost of transportation. The people of that section now are paying the highest freight rates, and we think it would be of great benefit to the agricultural interests of the country if that improvement were made.

Mr. BARBOUR. I had no intention of speaking lightly of the Missouri River, because in my opinion the project below Kansas City is one of the most important in the country.

Mr. WILLIAM E. HULL. Mr. Chairman, will the gentleman yield?

Mr. BARBOUR. Yes.

Mr. WILLIAM E. HULL. Is it not true that if we have the $5,558,000 granted we deduct 10 per cent off all the projects?

Mr. BARBOUR. That means that when we allocate to these different projects, 10 per cent will be deducted for contingencies.

Mr. WILLIAM E. HULL. As a rule all the projects that are included now will be affected.

Mr. BARBOUR. That will provide even less money for the Great Lakes.

Mr. WILLIAM E. HULL. The gentleman stated nobody will get any benefit from this. I say they will all get benefit from it.

Mr. BARBOUR. I say the average run of river and harbor projects throughout the country will not get any benefit from this amendment worth mentioning.

Mr. WILLIAM E. HULL. I disagree with the gentleman on that. I think all will benefit from it.

The CHAIRMAN. The time of the gentleman from California has expired. All time has expired.

Mr. HUDSON. Mr. Chairman, I offer an amendment to the amendment.

The CHAIRMAN. The gentleman from Michigan offers an amendment, which the Clerk will report.

The Clerk read as follows:

Amendment offered by Mr. HUDSON to the amendment offered by Mr. McDUFFIE: In lieu of the sum proposed in the said amendment insert "$52,000,000."

The CHAIRMAN. The question is on agreeing to the amendment to the amendment.

The question was taken, and the Chairman announced that the noes seemed to have it.

Mr. HUDSON. A division, Mr. Chairman.

The CHAIRMAN. A division is demanded.

The committee divided; and there were—ayes 45, noes 130.

So the amendment to the amendment was rejected.

The CHAIRMAN. The question is on agreeing to the amendment offered by the gentleman from Alabama [Mr. McDUFFIE].

The question was taken, and the Chairman announced that the ayes seemed to have it.

Mr. MADDEN. Mr. Chairman, I demand a division.

The CHAIRMAN. A division is demanded.

The committee divided; and there were—ayes 140, noes 40.

So the amendment was agreed to.

The CHAIRMAN. The Clerk will read.

The Clerk read as follows:

MUSCLE SHOALS

For operating, maintaining, and keeping in repair the works at Dam No. 2, Tennessee River, including the hydroelectrical development, $275,000, to remain available until June 30, 1929, and to be expended under the direction of the Secretary of War and the supervision of the Chief of Engineers.

The CHAIRMAN. Without objection, the Clerk will be authorized to correct the spelling of the word "expended" in line 15, page 79.

There was no objection.

The CHAIRMAN. The Clerk will read.

The Clerk read as follows:

Eastern Branch, Togus, Me.: Current expenses, $57,500;
Subsistence, $113,000;
Household, $105,000;
Hospital, $72,000;
Transportation, $500;
Repairs, $35,000;
Farm, $26,000;
In all, Eastern Branch, $409,000.

Mr. BARBOUR. Mr. Chairman, I ask unanimous consent to correct the spelling of the word "subsistence" in line 17 of page 83.

The CHAIRMAN. Without objection, the Clerk will make the correction in the spelling.

There was no objection.

The CHAIRMAN. The Clerk will read.

The Clerk read as follows:

Marion Branch, Marion, Ind.: Current expenses, $57,000;
Subsistence, $260,000;
Household, $105,000;
Hospital, $1,006,000, of which sum there shall be available immediately $600,000 for the construction of three cottages, with an aggregate capacity of 200 beds, and $100,000 for the construction of a sanitary fireproof annex to the present hospital with a capacity of 50 beds, including on account of each of such projects the construction of such necessary approach work, roadways, and other facilities leading thereto, heating and ventilating apparatus, furniture, equipment, and accessories as may be approved by the Board of Managers of the National Home for Disabled Volunteer Soldiers. The Secretary of the Treasury, upon request of the Board of Managers, may have all architectural and inspection work in connection with the work herein provided for performed by the Office of the Supervising Architect of the Treasury Department and the proper appropriations of that office may be reimbursed from this appropriation on that account;
Transportation, $1,000;
Repairs, $55,000.

Mr. LUCE. Mr. Chairman, I move to strike out the last word.

The CHAIRMAN. The gentleman from Massachusetts moves to strike out the last word.

Mr. LUCE. Mr. Chairman, not a few Members of the House are interested in the program of hospital construction now being considered by a subcommittee of the Committee on World War Veterans' Legislation. I speak at this point in order to call your attention to the anomalous situation presented by the items here for support of the hospitals connected with the 10 National Homes for Disabled Volunteer Soldiers, commonly spoken of as the soldiers' homes. The hospital items amount to $2,902,000, being almost exactly one-third of the total for the homes—$8,590,300. Omitting the construction item of $700,000 for the home at Marion, Ind., from both figures, they would be, respectively, $2,200,000 and $7,800,300, making the hospital maintenance cost 28 per cent of the whole. There are in these hospitals about 1,735 Veterans' Bureau patients—that is, World War veterans. In the haste of the war several of these hospitals were built on the grounds of soldiers' homes as a matter of convenience. They and their occupants are not now under the jurisdiction and control of the Veterans' Bureau, as they should be. By reason of this the bureau can not use all the hospital resources owned by the Federal Government to the best advantage of the suffering victims of the World War.

Better classification of patients could be made, more beds would be available where most needed, the convenience of friends and relatives of patients could be more subserved, less expenditure for new construction would be required—in short, the needs of World War veterans could be more efficiently and more economically met if all the hospital facilities owned by the Government should be brought under one control. I am taking this opportunity to inform the Members of the House that the possibility of legislation to this end is under consideration by the subcommittee of the Committee on World War Veterans' Legislation that is studying the hospital-construction program, and to bespeak for it the attention of the House in case it should be reported.

Mr. MADDEN. Is the gentleman going to make a motion to strike out the item in this bill?

Mr. LUCE. Not at all. It is simply a pro forma amendment.

Mr. MADDEN. I thought perhaps the gentleman wanted to cut the bill down.

Mr. LUCE. No. I do not desire to disturb the appropriation. I was informing the House that an attempt may be made to get the approval of the House for some method of meeting the situation. I withdraw the pro forma amendment.

The CHAIRMAN. The pro forma amendment is withdrawn. The Clerk will read.

The Clerk read as follows:

Total, Panama Canal, $8,660,000, to be available until expended.

Mr. McSWAIN. Mr. Chairman, I move to strike out the last two words, and ask unanimous consent to proceed out of order.

The CHAIRMAN. Is there objection to the request of the gentleman from South Carolina?

There was no objection.

Mr. McSWAIN. Mr. Chairman, ladies and gentlemen of the committee, I have not read the bill for agricultural relief of the distinguished gentleman from Texas [Mr. CONNALLY], but if it does undertake and look to accomplish the object he has in mind, it will be a godsend and a blessing to the farm people of the country, because it will help not only the producers of cotton but the lesson it will teach will be of untold value to the producers of agricultural commodities throughout the Nation and the world.

Let me call your attention to this remarkable fact: There is no exchange for dealing in speculative margins on any products under the sun save the products of the farmer. Now, think of that! Just as a mere matter of pure logic and reason you would think that the speculation would be in the commodities which are ready for the market, ready to sell, ready to use, and you would think that the speculation would be in shoes and not in hides; you would think the speculation would be in shirts and not in raw cotton; you would think the speculation would be in oil and not in the raw cottonseed; you would think the speculation would be in flour already for use and in the barrel or in the sack and not in the wheat in the elevator. Yet, as a matter of fact, there is no speculation on any of the finished products. What would happen if there should be set up in New York or Chicago or Pittsburgh an exchange to speculate on future marginal contracts relating to steel? How long would such an exchange be able to pay the rent, much less the other overhead expense of an exchange that proposed to deal in steel? Who fixes the price of steel? The manufacturers regulate it, of course, by the slow process of supply and demand. In order that the steel plants may not be completely shut down they will slowly, under conditions, let down the price to satisfy the consuming public, but no class, whether steel producers or shoe producers, clothing producers, flour millers, or other finished-product manufacturers, is subject to the fluctuating, irrational, vacillating prices that are produced by the speculative marginal futures contracts.

Now, why have they picked out from all the producers of the world those who produce the raw products of the farm? Because of the simple fact that the farmer in his unorganized, solitary state of production is unable to defend himself from the fluctuating prices that the purely speculative futures contract imposes upon him. He is utterly helpless. Therefore those who have not spun yet are clothed in raiment and fine linen at the expense of the fellow who has produced it, who has labored, who has cooperated with God in the bringing into existence of something which was not. They take advantage of him who is helpless as he stands before the arbitrary, artificial, economic forces of combined financial power, just as he was helpless as he stood when God sent the hail or sent the windstorm or sent the flood or sent the drought. He stands helpless, solitary, alone in his distress against the combined forces of nature and of man.

Why, it seems to me, my friends, if there is anything that the power of government ought to do, it is to reach out with a strong arm and protect against those who seek to profit from the labors of the man who has stood alone to bring into existence that which was not, and which are necessary to man's life, and to save him and to protect him from these fluctuations, these unnecessary, these unjust fluctuations that the combined power of wealth can bring to bear down prices when they use the money that they can borrow on short-term loans with the securities which are the property of the people themselves, to wit, their own products, thus using our crops to depress the prices. [Applause.]

The pro forma amendment was withdrawn.

The Clerk read as follows:

In addition there is appropriated for the operation, maintenance, and extension of waterworks, sewers, and pavements in the cities of Panama and Colon, during the fiscal year 1929, the necessary portions of such sums as shall be paid as water rentals or directly by the Government of Panama for such expenses.

Mr. COLLINS. Mr. Chairman, I have an amendment at the Clerk's desk.

The CHAIRMAN. The gentleman from Mississippi offers an amendment, which the Clerk will report.

The Clerk read as follows:

Amendment offered by Mr. COLLINS: On page 92, line 22, insert a new paragraph, as follows:

" Without authorization by Congress no part of the funds appropriated by this act shall be expended in the transportation of any portion of the armed forces provided for in this act to the territory of a foreign country over which the United States does not now possess sovereign jurisdiction."

Mr. BARBOUR. Mr. Chairman, I make a point of order against the amendment on the ground that it is legislation, and particularly call attention to the first four words of the amendment.

The CHAIRMAN. The gentleman from California makes a point of order against the amendment. Does the gentleman from Mississippi wish to be heard?

Mr. COLLINS. I think it is a limitation on the appropriation, Mr. Chairman.

The CHAIRMAN. Will the gentleman cite the Chair to any precedent sustaining his contention?

Mr. GARRETT of Tennessee. Mr. Chairman, it seems to me it is clearly a limitation upon the funds carried in the bill. The first four words to which the gentleman has called attention do not change the character of it at all and do not make it legislation in any way. The meaning of it is that no part of the appropriations made in the bill shall be used to pay for the transportation of troops within a certain area therein defined. The words " without authorization of Congress" do not change the character of the limitation.

The CHAIRMAN. The gentleman, of course, realizes that aside from the four words which were specially called to the attention of the Chair it is clearly a limitation couched in the usual language of a limitation. Whether these four words affect the case is, of course, the question.

Mr. GARRETT of Tennessee. I do not see how they possibly can.

Mr. MOORE of Virginia. Mr. Chairman, I would like to suggest, in emphasizing what has just been said by the gentleman from Tennessee [Mr. GARRETT] that the point of order can not be well taken with respect to the words in question for this reason: If the words were not used, nevertheless it would be implied and recognized that Congress has full jurisdiction. The use of the words, therefore, can not in any substantial way affect the proposal that is covered by the amendment.

If the words are used "without the authority of Congress," it is expressly stated that the subject is entirely within the power of Congress to be dealt with as it thinks proper. On the other hand, if the words are not used, it is equally the case that the subject rests with Congress to deal with it as it may think proper. Accordingly, there is an utter absence of logic in the proposition raised by the point of order.

Mr. BARBOUR. It seems to me that under the present law we have authority to send troops to foreign countries without a special act of Congress. But here is the point that occurs to me: The amendment might be construed so that we could not send a military attaché abroad, and that would clearly be a change of the law which authorizes the sending of military attachés, who are a part of the armed forces. An Army officer in active service who is designated as military attaché is a part of the armed forces of the country.

Mr. MAPES. Mr. Chairman, I would like to suggest a thought for the consideration of the Chair: With the four

words referred to, can the Chair say that the amendment shows on its face that it will necessarily reduce expenditures or limit the appropriation? Does the Chair know whether or not Congress has authorized the use of the money in the way that the amendment suggests? If it has, then the amendment would not reduce expenditures.

The CHAIRMAN. Does the gentleman have in mind that already under existing law Congress may have fully authorized the Executive to send armed forces to these countries, and that even though the amendment passed carrying these four words he would still have the same authority to send these forces abroad?

Mr. MAPES. For all that the Chair may know, I doubt whether the Chair can say that on its face the amendment is a limitation of appropriation, because the law already may authorize the President to do that very thing.

The CHAIRMAN. That may be true, but it seems to the Chair that that fact would not affect the ruling. The question is whether under the guise of a limitation an attempt is here made to enact legislation or to change existing law. With such examination as the Chair has been able to make, he is not able to find a decision that would warrant holding that including these four words would so change the law. Therefore the Chair overrules the point of order.

Mr. COLLINS. Now, Mr. Chairman, I would like to see if we can not agree on some time to discuss this amendment?

Mr. BARBOUR. How would five minutes on a side suit the gentleman?

Mr. COLLINS. I would like at least 30 or 40 minutes.

Mr. BARBOUR. We can not finish the bill to-night if we take such time to discuss an amendment under the 5-minute rule. I would consent to 10 minutes on a side.

Mr. COLLINS. But there are a half dozen Members on this side who want to speak.

Mr. BARBOUR. I am willing to agree to 10 minutes on a side.

Mr. COLLINS. This is a very important amendment, and there are at least a half dozen Members on this side that want time, and I think we will consume more than that time, in my opinion, under the five-minute rule.

Mr. BARBOUR. We have been very liberal on this bill. There has been no request for time on the part of anybody that has not been granted. This is the sixth day we have spent considering this bill. Every man who has asked for additional time has had it without objection. We are coming to the point now where we ought to finish the bill, and we are within two pages of the end. Any reasonable request will not be objected to.

Mr. COLLINS. Will the gentleman say 20 minutes on a side?

Mr. BARBOUR. No; I will consent to 15 minutes on a side.

Mr. COLLINS. Well, we will take the 15 minutes.

Mr. BARBOUR. Mr. Chairman, I ask unanimous consent that the debate on this paragraph and all amendments thereto be limited to 30 minutes, 15 minutes to be used by those supporting the amendment and 15 minutes by those opposed.

The CHAIRMAN. The gentleman from California asks unanimous consent that debate on the paragraph and all amendments thereto be limited to 30 minutes. Is there objection? [After a pause.] The Chair hears none.

Mr. HUDDLESTON. Mr. Chairman, the Constitution of the United States clothes Congress with the exclusive function of declaring war. The purpose of this amendment is to reassert that constitutional responsibility.

The tendency is growing in this country for the absorption by the Executive of the powers that belong to the legislative branch of the Government. The tendency is increasing for the President not to ask the consent of Congress whether he shall carry on war, but to proceed on his own initiative to use our armed forces in military enterprises in foreign countries. Shall we allow that practice to increase, or shall we ask for a return to the fundamental principles of a democratic government, which clothe the representatives of the people with the right to say when our country shall go to war?

The tendency is to leave to Congress merely the poor function of declaring the legal state of war, while the Executive proceeds to do the things which bring on war and to take actions to conduct that war. It is now within the technical power of the President to send our armed forces to any part of the world if he may choose. To-morrow he may send them for an invasion of Canada, or he may send our fleet to bombard London. He has the technical authority to so complicate our affairs by a pernicious military activity as to virtually make of himself a dictator and to bring us into conflict with the whole world. The founders of the Republic never intended to place such powers in the Executive. They are powers which

those who love the Constitution and intend to abide by its spirit will never accord to the Executive.

This amendment will curb the arbitrary power of the President to make war without the consent of Congress. If there be any among us who believe in the American system, a system of divided responsibility, in which each branch of the Government shall be separate within its own sphere and function, I ask them, Will you not now vote to show your faith?

Are you willing that the President shall make war without the consent of Congress? If you are, then let things go as they are. If you are willing to abdicate your sworn responsibility as representatives of the people, then vote against this amendment. But if you believe in Americanism, if you hold to the fundamentals on which our country was founded, if you adhere to the faith of the fathers, then I beg you do not forget it now. [Applause.]

Mr. NEWTON. Mr. Chairman, this amendment is an attempt under the guise of a limitation upon an appropriation bill to restrict and limit the President of the United States in the discharge of a constitutional duty. It is an attempt to have Congress do indirectly what it could not constitutionally do directly.

Under our Constitution the executive powers of Government are granted to the President. He is made the Commander in Chief of our Army and Navy. In my judgment, this is in effect a violation of the constitutional powers of the Commander in Chief.

Furthermore, Mr. Chairman, it is clear that this is aimed at the President in the present effort he is making to bring order out of chaos and to protect American life and property in one of the Central American countries. There is no one who has been to any of those countries that we have occupied for portions of the time who has not been impressed with the character of the work of our Navy and marines and our other armed forces. We have as a Nation a great responsibility, one that we do not merely fulfil at the water's edge. We have responsibilities by reason of the position that we occupy in this hemisphere. This amendment is an attempt to thwart the President of the United States in the effort that he is making, honestly making, in accordance with his ideas of the powers that are conferred upon him to bring order out of chaos in that country.

Mr. OLIVER of Alabama. Mr. Chairman, will the gentleman yield?

Mr. NEWTON. Yes.

Mr. OLIVER of Alabama. I, of course, know not what the intent of others may or may not have been. The effect of this amendment, however, would not in any way interfere with the sending of marines to Nicaragua, because this amendment refers to the Army and can only refer to the Army.

Mr. NEWTON. The gentleman is correct; but can the gentleman cite an instance where the present President of the United States has ever sent members of the Army to any foreign country in violation of law?

Mr. OLIVER of Alabama. The language of the amendment recognizes the right to send them where Congress has authorized them to be sent. For instance, they may be sent to Tsientsin, China. There is a treaty authorizing the President to send them there. This in no way interferes with any legal authority now existing authorizing him to send the Army abroad.

Mr. NEWTON. Does the gentleman hold the opinion that the President of the United States is going to send the Army of the United States where he is not authorized to send it, under the law and the Constitution?

Mr. OLIVER of Alabama. Since the gentleman asks me the question, may I say that I have no way of knowing whether he intends to do so or not. So far as I am advised, he has not done so; and so far as I know he has never sent the Army where he was not authorized to send them.

Mr. NEWTON. Then why the occasion for offering this amendment at this time?

Mr. RANKIN. Mr. Chairman, will the gentleman yield?

Mr. NEWTON. No; I can not yield. Under the Constitution the President of the United States is the Commander in Chief of the Army and Navy, and it is his business to use the Army and the Navy in accordance with that Constitution and the laws of the land. Of course, he can abuse those powers.

The Constitution conferred great powers upon the President. These powers can be used or abused. That is true of any person in any public office or private position of trust and responsibility. For that reason the President must answer to the people every four years, and to further guard against abuse of power he is made subject to impeachment.

Mr. Chairman, this is not the first time that a President of the United States has been called a dictator. They repeatedly said it of Lincoln, and I presume it has been said of several

others from Lincoln to Wilson. But the mere assertion of the charge did not prove the case. Every Member of this House knows that no just charge of that kind can be made against the present President of the United States. And every citizen knows it also.

At this time, when the Republics of this hemisphere are gathered together in conference in Habana to promote cordiality and good will, with representatives of both of our great political parties in attendance as delegates, it ill behooves this Congress or any Member thereof to attempt to embarrass the President in the discharge of his constitutional duties. [Applause.]

Mr. GARRETT of Tennessee. Mr. Chairman, the only possible objection that I could conceive of being offered to this plain declaration of policy would grow out of a possibility that an emergency might arise at some time when the Congress is not in session, and that, to my mind, is not a sufficient reason to justify a vote against this declaration of policy.

Armed intervention of a nation in the affairs of another is war. [Applause.] And any condition that might arise serious enough to justify armed intervention surely is serious enough for the President to ask the counsel of Congress, the constitutional war-declaring part of the Government of the United States. For that reason I have no hesitation whatsoever, standing upon the Constitution of my country, in declaring here in this bill that which I believe to be the law now, which I believe ought to be respected, the organic law of the Republic.

It is not a particular reflection upon the present Executive. I have said before and I say again that I respect the Executive. I respect his office and I respect his person. But as a Member of Congress, charged with a duty to the Constitution itself, I, too, have a right as long as I am a Member to have some voice in saying whether the facts in regard to life and property in another nation justify the sending of the armed forces of my country to intervene in the affairs of another nation.

Mr. WAINWRIGHT. Mr. Chairman, will the gentleman yield for a question?

Mr. GARRETT of Tennessee. Certainly.

Mr. WAINWRIGHT. On the 31st of January, as I remember, the gentleman from Vermont [Mr. GIBSON] made a speech here where this question was involved, wherein he recited, as I remember, 21 cases arising between the year 1895 and the year 1921 where armed forces of the United States has been used outside of the continental limits of the United States for the protection of American life and property, and many of those cases happened when Congress was not in session, most of them being cases of great emergency. Would the gentleman go so far as to say that in cases of that kind, where the situation was sufficiently serious to justify the President of the United States to send our armed forces for the protection of our citizens, he should not have that power?

Mr. GARRETT of Tennessee. Mr. Chairman, I can make it no stronger, I think, than I made it a moment ago, anticipating that that very question might be asked, or at least might be in the minds of some gentlemen. If there is a situation existing in any country serious enough to justify the sending of armed forces—an act of war—it is serious enough to warrant the calling of Congress in session and having it take action on the matter. [Applause.]

Mr. FRENCH. Mr. Chairman, I am opposed to the pending amendment because it involves a proposition that ought to be considered not as an amendment to a great appropriation bill but as an independent proposition referred to an appropriate committee.

No one questions that the war-making power of the Government is rightly vested in the Congress of the United States. No one seeks to disturb the organic law of the country or to modify the time-honored policy of our Government in respecting the organic law. Here is an amendment, however, that is not limited to the uses of the military forces of the United States as agencies of war, but goes so far as to prevent the administration from using the military forces of the United States conceivably in an emergency for the maintenance of peace, for the protection of lives and property of American citizens, and for the preservation of orderly conduct of peoples where otherwise war might ensue.

I doubt not that the proposed amendment is aimed at the administration on account of present conditions where it has been believed necessary by the administration in the preservation of peace to use armed power.

Within the few moments at my disposal it would be impossible for me to begin to outline the situation. This very fact suggests that a proposition so broad as that proposed in the amendment should not be considered under the five-minute rule on a bill to which it does not pertain and at a time when

Members generally were not aware that such an amendment was to be proposed.

Generally speaking, the people of the United States have trusted the national administration of whatever party might be in power with discretion in the use of armed forces of the United States for the preservation of peace and order when war was not conceivable and when the use of the armed power has at times been within the United States and at times been within the territories of other countries, where for the time being orderly processes of government had been stayed.

Only a few years ago it was my privilege to visit Santo Domingo, where were stationed a limited number of the armed forces of the United States. Santo Domingo was then, as now, an independent Republic. The limited number of armed forces of our Government, members of the Marine Corps, had been in Santo Domingo maintaining peace and order since 1916. Just prior to their landing in Santo Domingo a coup d'état had occurred which had resulted in the overthrow of the President of the Republic. That was in April, 1916. This revolutionary action was followed by wild lawlessness, and marine forces of the United States were promptly landed, suppressed the uprising, and brought about a condition of orderly processes of government that meant the saving of human life, of citizens of the United States, of citizens of the Republic of Santo Domingo, and of citizens of other nations of the world. The very presence of the marines on that occasion meant peace, not war. Gentlemen of the House, the event to which I refer occurred during the time that the Presidency of the United States was filled by a man belonging to the party of those in this Chamber who are seated on my right, President Wilson. During the balance of the administration of President Wilson and during the administration of President Harding and well into the administration of President Coolidge marines of the United States were maintained in Santo Domingo in carrying out the policy that the Wilson administration believed meant for order, for peace, for humanity.

May I mention another illustration?

A few years ago I was in Haiti, at Port au Prince, and I remember that as I was being driven through one of the streets of the capital of that neighboring Republic there was pointed out to me the building and grounds that had been occupied by the French legation in 1915, and it was pointed out to me that from that home of the French minister to Haiti the President of that little Republic on a night in July, 1915, was seized and assassinated and his body dragged through the streets, from which law and order had fled.

This was part of a debacle that meant the destruction of hundreds of human lives and the utter abandonment of security. Not only was there no protection for citizens of Haiti but the life of no foreign citizen was more secure.

Within two hours after the desperate act of murdering the President had been committed the marines of the United States had landed from a cruiser. Civilization superseded anarchy, and order was restored. [Applause.]

Woodrow Wilson was President of the United States. Gentlemen of this House, we do not know at what moment some disaster may occur in some place where the responsibility should be assumed by one of the strong nations of the world to restore and maintain order.

Mr. OLIVER of Alabama. Mr. Chairman, will the gentleman yield?

Mr. FRENCH. Not now.

Not only was prompt action taken then, but under the same administration and the succeeding administrations of two different Presidents, under the policy of two political parties, the power of the United States has been present in Haiti for the maintenance not of war but of peace. [Applause.] We were there not for the purpose of destroying life but for the purpose of saving the lives of men, women, and children, at an hour when the hand of Haitian authority had failed.

The responsibility for peace was upon any civilized country; the United States, if you please, and President Wilson did not shrink. More than that, in bringing about peace and stability the Wilson administration and the two succeeding administrations have followed a common program.

Mr. OLIVER of Alabama. Had this amendment been written into the Army appropriation bill at that time, it would not have interfered with the President in the exercise of that authority?

Mr. FRENCH. Oh, no; because these were marines that were sent there. But the proposition is no different here. Soldiers and marines are both part of the armed forces of the United States. Mr. Chairman, we do not know the day or the hour when in some part of this world of ours mob rule may wipe out orderly government for the time being. The demands of humanity may call for any nation at hand to assume respon-

sibility. Indeed, in the two illustrations to which I have briefly referred—Santo Domingo and Haiti—if the Government of the United States had not interfered some other nation, in all probability, would have assumed the prerogative that was assumed by our Government, and would have protected the lives of men, women, and children at a time when government had been superseded by mob rule. The amendment should not prevail. [Applause.]

The CHAIRMAN. The time of the gentleman from Idaho has expired.

Mr. MOORE of Virginia. Mr. Chairman, I was never freer from any spirit of partisanship in dealing with any matter that has come before the House in my time than I am now. I have not the slightest inclination to visit criticism upon the President of the United States. From what has just been said by the gentleman from Idaho it is quite apparent it would be in vain to try to make this a party question. He has referred to the action of the administration under a Democratic President as well as under Republican Presidents. I believe we ought to treat this proposal very cooly and very deliberately and without any partisan excitement whatever.

Now, what is designed? The amendment seems to have been very carefully worded so as to maintain the authority of the administration to send troops to any nation where the United States is entitled to exercise jurisdiction as, for example, to Cuba and to the Panama Canal Zone. It is simply, as has already been so strongly stated by the gentleman from Tennessee, an attempt to maintain the general principle governing the division of the powers of our Government by asserting and clarifying the power of Congress, so as to have that power less confused than it now is with the power of the Executive. It does nothing more than say that unless the legislative branch of the Government acts, the transportation of troops to another nation shall not be permissible—no more permissible than to declare or wage war in a technical sense without congressional authority.

It is a mere platitude to remark that when the Constitution was framed and adopted the war power was exclusively lodged with Congress upon the fullest consideration of that matter. Is there any gentleman here who wishes Executive practices to continue enabling thoughtful and reasonable men to think and say that the Executive is going a bow shot beyond what was contemplated at the outset in the way of exercising war powers? There is very much discussion of that question in the country and I think we would serve the public interest and tranquillize the situation by removing the opportunity and necessity for any such discussion.

I have looked back over a long stretch of history during which the Executive has sent forces to other nations. I have listened to the illustration just given by the gentleman from Idaho. Taking into account that transaction and all other transactions which have occurred, I fail to find a single instance in which it would not have been entirely possible to obtain the opinion of Congress before the action was taken. Forces can only be sent for one purpose—and no administration has claimed to the contrary—namely, for the purpose of protecting American life and property, not the life and property of a ruler of Haiti or the life and property of other people. I ask gentlemen to cite a case—any case pertinent to the present issue—in which it would not have been entirely possible for Congress to have expressed its view in advance of armed forces being sent abroad.

During a regular session Congress can, of course, act promptly. And should a President at any other time conceive that an armed force should be sent to the territory of another nation, there will be no difficulty in bringing about an extra session. In this day the means of communication and travel make that an easy thing to do.

The opponents of the amendment talk of emergencies, but shall we take counsel of our fear that in some imagined instance events may disastrously outrun the ability of Congress to act? And how unwise it is to stress the inconvenience and expense which may attach to waiting upon action by Congress, and for that or any other reason be willing to continue on a course of gradually but pretty swiftly permitting the Executive to determine under what circumstances hostilities shall be commenced and carried on—activities having all the characteristics and aspects of war, notwithstanding the war power is vested in Congress and nowhere else. [Applause.]

The CHAIRMAN. The time of the gentleman from Virginia has expired.

Mr. BARBOUR. Mr. Chairman, this is not an amendment that should be incorporated in an appropriation bill. It is an amendment that affects our foreign policy. It is a question that should be considered by the Committee on Foreign Affairs and brought before the House in the regular way, considered at length, and the Members of the House fully advised as to what they are voting on. It should not be dragged in here as a rider, you might say, on an appropriation bill. This is no time anyway for legislation of this kind, legislation which is intended to hamper the President of the United States in matters which are now lodged in his discretion, especially when our representatives are gathered with those of our sister Republics of the Western Hemisphere at Habana trying to work out a plan by which we can all dwell in peace and harmony and in a state of mutual respect and good will. I say this is no time for the legislative branch of our Government to be injecting a provision of this kind into an appropriation bill. It seems to me that this amendment might be so construed as to even prevent our sending military attachés abroad. I see the gentleman from Mississippi smiling. It might even go so far, I will say to the gentleman from Mississippi, as to prevent our sending Army teams to the Olympic games next year in Europe. Then it would be ridiculous. Who knows when our forces might be called upon to go into a foreign country and upon foreign soil?

Mr. HOCH. Will the gentleman yield?

Mr. BARBOUR. Yes.

Mr. HOCH. If a marauding band should cross the Mexican border and this amendment were in effect, it would prevent American troops from pursuing those marauders across the border

Mr. BARBOUR. Absolutely.

Mr. MILLER. Will the gentleman yield?

Mr. BARBOUR. I yield to the gentleman from Washington.

Mr. MILLER. I might also suggest the Chinese situation which developed a short time ago.

Mr. BARBOUR. Yes; and the gentleman from Kansas [Mr. HOCH] calls to mind a very memorable occasion which occurred under the administration of the last Democratic President, when marauding Mexicans did cross our border and murdered several of our own citizens on the American side of the line. If my memory serves me right, Congress was not in session at the time and our President, be it said to his credit, sent American troops into Mexico to try to capture and punish the Mexicans who had invaded our country.

Mr. GARRETT of Tennessee. That was by treaty.

Mr. BARBOUR. Suppose that should happen again when Congress is not in session. With this provision in the bill, before any action could be taken Congress would have to be called in session, consider the question, and pass legislation authorizing the President to send troops into a foreign country.

Mr. Chairman, this provision has no place in an appropriation bill. It should not be passed in this way. If anybody is conscientiously in favor of legislation of this kind, let it be brought in in the regular way and met here on the floor of the House with the arguments for and against it. [Applause.]

The CHAIRMAN. The time of the gentleman from California has expired; all time has expired. The question is on the amendment offered by the gentleman from Mississippi.

The question was taken; and on a division (demanded by Mr. COLLINS) there were—ayes 71, noes 103.

So the amendment was rejected.

The Clerk concluded the reading of the bill.

Mr. BARBOUR. Mr. Chairman, I move that the committee do now rise and report the bill back to the House with sundry amendments, with the recommendation that the amendments be agreed to and the bill as amended do pass.

The motion was agreed to.

Accordingly the committee rose; and the Speaker having resumed the chair, Mr. TILSON, Chairman of the Committee of the Whole House on the state of the Union, reported that that committee, having had under consideration the bill H. R. 10286, the War Department appropriation bill, had directed him to report the same back to the House with sundry amendments, with the recommendation that the amendments be agreed to and that the bill as amended do pass.

Mr. BARBOUR. Mr. Speaker, I move the previous question on the bill and all amendments thereto to final passage.

The previous question was ordered.

Mr. BARBOUR. Mr. Speaker, we demand a separate vote on the Wurzbach amendment, the Speaks amendment, and the McDuffie amendment. It has been suggested that the votes be taken to-morrow. We are going to ask for roll calls. Would it be in order to-morrow to ask for aye and no votes on each of the amendments as they come up?

Mr. SPEAKS. Mr. Speaker, would there be any preference with respect to the gentlemen involved in the several amendments?

The SPEAKER. The Chair does not understand the question of the gentleman from Ohio.

Mr. SPEAKS. Have I the right, Mr. Speaker, to demand a separate vote upon the amendment which I introduced and which was agreed to in the committee?

The SPEAKER. Any gentleman may demand a separate vote on any amendment.

Is a separate vote demanded on any other amendment? If not, the Chair will put the other amendments in gross.

The other amendments were agreed to.

### CONSTRUCTION OF PUBLIC BUILDINGS

Mr. ELLIOTT. Mr. Speaker, I submit a conference report on the bill (H. R. 278) to amend section 5 of the act entitled "An act to provide for the construction of certain public buildings, and for other purposes," approved May 25, 1926.

### MISSOURI RIVER BRIDGE, GLASGOW, MONT.

Mr. DENISON. Mr. Speaker, there is a Senate bill (S. 1501) on the Speaker's table. I ask unanimous consent that it may be indefinitely postponed, a similar bill having passed the House and also the Senate.

The SPEAKER. The gentleman from Illinois asks unanimous consent that the bill (S. 1501) on the Speaker's table be indefinitely postponed. Is there objection?

There was no objection.

### LEAVE OF ABSENCE

By unanimous consent, leave of absence was granted as follows:

To Mr. SEARS of Florida, indefinitely, on account of sickness in family.

To Mr. CELLER, for one week, on account of sickness.

### RESTRICTION OF MEXICAN IMMIGRATION

Mr. BOX. Mr. Speaker, I ask unanimous consent to extend my remarks in the RECORD by printing an address delivered by me at an immigration conference.

The SPEAKER. Is there objection to the request of the gentleman from Texas?

There was no objection.

Mr. BOX. Mr. Speaker, under authority granted by the House, I submit for printing in the RECORD an address delivered by me on January 19, 1928, before the immigration conference held in Memorial Continental Hall, Washington, D. C., under the auspices of the Key Men of America, a patriotic organization composed of authorized representatives of a great number of other affiliated patriotic societies engaged in the study of immigration problems.

The address is as follows:

Mr. Chairman, ladies, and gentlemen, during the present session of Congress immigration discussion and legislation will probably center around four important questions:

(1) Shall our deportation laws be strengthened, extended, and better enforced?

(2) Shall the endless chain of relationship existing between immigrants and their kindred abroad be permitted to start dragging out of Europe thousands of those whom the laws now exclude?

(3) Shall we retain in the law the national-origins provisions, written into the act of 1924, making it more accurately and adequately serve the Nation's purpose to keep itself American, or shall they be suspended or repealed at the dictation of certain hyphenated minorities of our population?

(4) Shall the quota provisions of the immigration law be made applicable to Mexico, South America, and adjacent islands?

To this last question I shall devote my brief remarks.

The people of the United States have so definitely determined that immigration shall be rigidly held in check that many who would oppose this settled policy dare not openly attack it. The opposition declares itself in sympathy with the policy and then seeks to break down essential parts of the law and opposes any consistent completion of it making it serve the Nation's purpose to maintain its distinguishing character and institutions. Declaring that they do not believe that paupers and serfs and peons, the ignorant, the diseased, and the criminal of the world should pour by tens and hundreds of thousands into the United States as the decades pass, they nevertheless oppose the stopping of that very class from coming out of Mexico and the West Indies into the country at the rate of 75,000, more or less, per year.

Every reason which calls for the exclusion of the most wretched, ignorant, dirty, diseased, and degraded people of Europe or Asia demands that the illiterate, unclean, peonized masses moving this way from Mexico be stopped at the border. Few will seriously propose the repeal of the immigration laws during the present Congress, but the efforts of those who understand and support the spirit and purpose of these laws to complete them and make them more effective by the application of their quota provisions to Mexico and the West Indies, will be insidiously and strenuously opposed.

The admission of a large and increasing number of Mexican peons to engage in all kinds of work is at variance with the American purpose to protect the wages of its working people and maintain their standard of living. Mexican labor is not free; it is not well paid; its standard of living is low. The yearly admission of several scores of thousands from just across the Mexican border tends constantly to lower the wages and conditions of men and women of America who labor with their hands in industry, in transportation, and in agriculture. One who has been in Mexico or in Mexican sections of cities and towns of southwestern United States enough to make general observation needs no evidence or argument to convince him of the truth of the statement that Mexican peon labor is poorly paid and lives miserably in the midst of want, dirt, and disease.

In industry and transportation they displace great numbers of Americans who are left without employment and drift into poverty, even vagrancy, being unable to maintain families or to help sustain American communities. Volumes of data could be presented by way of support and illustration of this proposition. It is said that farmers need them. On the contrary, American farmers, including those of Texas and the Southwest, as a class do not need them or want them. I state the rule as of country-wide application, without denying that a small percentage of farmers want them, and that in some restricted regions this percentage is considerable. I doubt if a majority of the bona fide farmers of any State want or need them. I have given much attention to the question and am convinced that as a state-wide or nation-wide proposition they are not only not needed and not wanted, but the admission of great numbers of them to engage in agricultural work would be seriously hurtful to the interests of farmers, farm workers, and country communities. They take the places of white Americans in communities and often thereby destroy schools, churches, and all good community life.

American farmers are now burdened with a surplus of staple farm products which they can not sell profitably at home or abroad. That surplus weighs down the prices of the entire crop in both the domestic and foreign markets until it threatens agriculture with financial ruin. Individual farmers, farm organizations, their Representatives in Congress, students of farm economics, bankers, and business men of the farming sections, all are striving to find a means of getting rid of this surplus of farm products, with its dead weight upon the price of farmers' crops. Congress is continually being urged to make appropriations to help carry the farmers' surplus, to levy taxes on farm products, to restrain overproduction, and otherwise to provide a method of getting rid of this oversupply of the farmers' leading crops. The President in his messages to Congress has repeatedly discussed this surplus and dealt with proposed remedies for it.

The importers of such Mexican laborers as go to farms at all want them to increase farm production, not by the labor of American farmers, for the sustenance of families and the support of American farm life, but by serf labor working mainly for absentee landlords on millions of acres of semiarid lands. Many of these lands have heretofore been profitably used for grazing cattle, sheep, and goats. Many of them are held by speculative owners.

A great part of these areas can not be cultivated until the Government has spent vast sums in reclaiming them. Their development when needed as homes for our people and in support of American communities is highly desirable. Their occupation and cultivation by serfs should not be encouraged. These lands and this mass of peon labor are to be exploited in the enlargement of America's surplus farm production, possibly to the increased profit of these speculative owners, but certainly to the great injury of America's present agricultural population, consisting of farmers, living and supporting themselves by their own labor and that of their families, on the farms of America.

The dreaded surplus, which already makes an abundant crop worse for farmers as a whole than a scant one, is to be made more dreadful by the importation of foreign labor working for lower wages and under harder conditions. The surplus which I have mentioned often hurts worse than a pest of locusts on the wheat crop or of boll weevil in the cotton fields.

While farmers, business interests in agricultural sections, Congress, and the President are deep in the consideration of the great problem presented by the farm surplus, and when presidential campaigns may turn on the condition and its consequences, labor importers are scheming and propagandizing for the purpose of bringing in armies of alien peons, claiming that they are needed on the farms, where they would only make the farm-surplus problem worse. If the Government tries to relieve this distress of the farmer caused by surplus production, shall it at the same time be de-Americanizing farms and farming communities and making the surplus and price situation worse by importing masses of serf laborers? Some think that agricultural prices can be sustained by a high tariff. Why have a tariff wall to keep out the products of pauper labor abroad and at the same time be bringing in armies of peons to increase the oversupply inside the tariff wall to the ruin of our own farmers?

Another purpose of the immigration laws is the protection of American racial stock from further degradation or change through mongrelization. The Mexican peon is a mixture of Mediterranean-blooded Spanish peasant with low-grade Indians who did not fight to extinction

but submitted and multiplied as serfs. Into that was fused much negro slave blood. This blend of low-grade Spaniard, peonized Indian, and negro slave mixes with negroes, mulatoes, and other mongrels, and some sorry whites, already here. The prevention of such mongrelization and the degradation it causes is one of the purposes of our laws which the admission of these people will tend to defeat.

Every incoming race causes blood mixture, but if this were not true, a mixture of blocs of peoples of different races has a bad effect upon citizenship, creating more race conflicts and weakening national character. This is worse when the newcomers have different and lower social and political ideals. Mexico's Government has always been an expression of Mexican impulses and traditions. Rather, it is an exhibition of the lack of better traditions and the want of intelligence and stamina among the mass of its people. One purpose of our immigration laws is to prevent the lowering of the ideals and the average of our citizenship, the creation of race friction and the weakening of the Nation's powers of cohesion, resulting from the intermixing of differing races. The admission of 75,000 Mexican peons annually tends to the aggravation of this, another evil which the laws are designed to prevent or cure.

To keep out the illiterate and the diseased is another essential part of the Nation's immigration policy. The Mexican peons are illiterate and ignorant. Because of their unsanitary habits and living conditions and their vices they are especially subject to smallpox, venereal diseases, tuberculosis, and other dangerous contagions. Their admission is inconsistent with this phase of our policy.

The protection of American society against the importation of crime and pauperism is yet another object of these laws. Few, if any, other immigrants have brought us so large a proportion of criminals and paupers as have the Mexican peons. If time permitted, I could present masses of authentic reports sustaining the truth of this statement. As one of a great many instances, I read a news item from the Dallas News of January 5, 1928:

MEXICANS SUFFERING FROM UNEMPLOYMENT, AGENCY MAN REPORTS

"Unemployment conditions among Mexicans in Dallas is the most acute in the history of 'Little Mexico,' A. Luna, operator of an employment agency, said Wednesday. He declared that hundreds of families are suffering severely, especially on account of the recent cold weather.

"'These people are badly in need of immediate relief,' Mr. Luna said, 'perhaps much more relief than is now available.'"

Note the term "Little Mexico" used in this news item. These "Little Mexicos" are springing up in many sections in and about the cities and industrial centers and all over the Nation. Some of them are assuming large proportions, and all of them together are becoming disturbingly large.

The number of such reports coming from California, Colorado, Arizona, New Mexico, and the whole Southwest, through the press and from public and private charity organizations, is very great and covers the whole period of mass peon immigration from its beginning until now.

The statements made in connection with each of these propositions are presented to this company, containing many students of the problem and a large percentage of those with whom the present and future public welfare is a paramount consideration, with the assurance that such citizens will give further attention to the question and disprove or verify the statements made.

The volume of Mexican immigration, the attending circumstances, and the prospects for its continuance and enlargement are such as to make this an important part of one of the Nation's greatest problems. Mexico has nearly 15,000,000 people who are prolific breeders, capable of producing millions of new inhabitants every year.

Their economic condition will continue worse than ours for an indefinite time and cause their laborers to want to migrate to the United States. Under a well-known law of population, the gaps left at home by those who come from year to year will be rapidly refilled by a natural increase. Thus Mexico will become an inexhaustible source of this low-grade immigration.

Immigrants who have poured upon our shores from Europe and Old World countries have had to pay the expense of land travel in reaching foreign seaports, after which the heavy expense of ocean transportation had to be paid. Mexico's masses have only to tramp to the border. The expense of their transportation, whether paid by them or others, is trifling compared to the cost of crossing the ocean from Europe or Asia to America. The methods by which labor importers reach them and induce them to come are inexpensive and easy. The building of barriers against the flood flowing in from elsewhere must increase the inpouring from Mexico. Unless it is checked it will continue with increasing volume.

The most dangerous mass immigration now menacing us is that from Mexico.

Our efforts to deal wisely and adequately with Mexican peon immigration from the standpoint of public and patriotic interest are opposed by the same selfish interests which have hindered all the Nation's efforts in dealing with our immigration, namely, the short-sighted, present profit-seeking interests of those who want cheap labor. If it were not for this opposition, the grave question which I am suggesting would be settled soon and the settlement made would be with a patriotic view to the public welfare now and hereafter.

If we ask Mexico, Haiti, Cuba, and South America to consent to the application of this necessary restriction, they will, of course, refuse and the evil stream will continue to pour its pollution into the mass of our population.

Efforts to obtain the consent of foreign countries to our immigration policy have been an unbroken failure throughout the history of our dealing with the problem. More than one presidential administration tried to settle the Chinese immigration question by the Burlingame treaty, in which it was recited that the right of races to migrate was inherent and inalienable. This was to apply as between the hundreds of Chinese millions and America. The United States Congress had to cut the Nation's way out of that ruinous entanglement.

Italy did not consent to our present law, but wanted to handle the subject by treaty to which her consent would be necessary, but the Constitution had vested this power in Congress, and Congress exercised it, accomplishing the Nation's purpose and helping to save its future. Other instances could be cited; one more will be enough. Japan had interests and a will concerning Japanese immigration in conflict with the interests and will of the United States. Every effort was made to avoid having America declare its will by congressional action as our Constitution contemplates. So long as we dickered with that question, consulting any but our constitutional rule, it remained unsettled and troublesome. It would have been with us yet had Congress waited for the consent of a foreign power or left that question to be settled in any but the constitutional way; but the will of America was accomplished in the manner provided by the fathers. The world did not crumble, its peace was not disturbed, but our friends of former times remain our friends, respecting us and being by us respected. Any other course would have continued the question and the irritation it caused.

These and other national experiences in dealing with the immigration problem should be recalled by the public when men say that in this instance we must consult the wishes of the people south of the Rio Grande or farther south.

Ladies and gentlemen, practically all of the reasons which have moved the United States to adopt and adhere to the policy of restricting immigration from Europe and Asia argue for the restriction of peon immigration from Mexico and the countries to the south and east. The difficulties which folly and greed have heretofore thrown in the Nation's path are being thrown in its way now. Let us hope that the people of these times and the membership of this Congress will be as wise and courageous as those who have preceded us.

LEAVE TO FILE MINORITY VIEWS

Mr. GIBSON. Mr. Speaker, I ask unanimous consent that the gentleman from Wisconsin [Mr. LAMPERT] may file minority views on the so-called market site bill, and that I may have the privilege also of filing separate minority views on the same bill.

The SPEAKER. The gentleman from Vermont asks unanimous consent that the gentleman from Wisconsin [Mr. LAMPERT] and himself may file separate minority views on the market site bill. Is there objection?

There was no objection.

AGRICULTURAL RELIEF

Mr. CONNALLY of Texas. Mr. Speaker, I ask unanimous consent to extend my remarks in the RECORD.

The SPEAKER. Is there objection to the request of the gentleman from Texas?

There was no objection.

Mr. CONNALLY of Texas. Mr. Speaker, under leave granted me to extend my remarks in the RECORD, I desire to include my speech before the Committee on Agriculture on February 9, 1928, which is as follows:

Mr. CONNALLY. Mr. Chairman and gentlemen of the committee, I thank you for giving me this opportunity to make a few observations in reference to agricultural legislation, and I thank also the gentleman from Michigan, Mr. KETCHAM.

Probably most of you know I voted against the McNary-Haugen bill. I have been abused by many cooperative representatives here who are drawing pretty handsome salaries. But I have been trying to vote for the farmer, whether he belonged to a cooperative organization or not; and what I wanted to suggest to the committee this morning is that it seems to me as a Member of Congress that it is about time for this committee and for the Congress to quit fooling the farmer and really pass some practical measure that stands some chance of becoming a law.

We know when the Haugen bill was up before, a lot of gentlemen said that the President would veto it; a great many others just as solemnly, who had been down and eaten some corn cakes with the President a few mornings, were just as sure he was going to approve it. . It was easy for those who voted either way to console themselves. But we know now that he did veto it and we know now that if he did have the nerve to veto it once he has got nerve enough to veto it again. It would be very easy for us to come along and say, "We will have the McNary-Haugen bill or nothing, and we will take it over and put it on the President's doorstep and let him veto it if he wants to." That will get you some farmer votes probably; it will get you the loyal devotion of some cooperatives, and a lot of them that do not understand the situation will still vote for you. But for the farmer who is on the farm that really wants some action, that is not going to get you very far as soon as he finds out the truth about the thing. That is what the "co-ops" did last year. They demanded the Haugen bill or nothing, and they got nothing.

I have been down mixing among the farmers. They are not fools; they are not all being fooled by these maneuvers of political farmers up here in Washington. There is a whole lot of difference between a high-salaried lobbyist, whose job will play out as soon as real relief is granted, and the farmer back home who works on the farm with his hands.

I know something about farming. I have got a farm myself; my wife has got a farm; and I have been on that farm this fall and up to pretty recently terracing it and looking after it and trying to put it in shape and to make it productive. You will not fool these farmers. It seems to me, as I say, that the time has come to really pass some bill that can pass, one that will not be vetoed.

Well, now, what is that bill? I want to indorse it—I want to go a little further than the bill of the gentleman from Michigan, Mr. KETCHAM; and I want to indorse in very large part what the master of the grange has said this morning. I do not agree with him about tariffs. I am a low-tariff man. But, be that as it may—he did not state his own view—the bill I have here does not look like the attitude of these farm-relief fellows from Iowa, Mr. HAUGEN and Mr. DICKINSON, who stood in the halls of Congress and wept copious tears over the high tariff running and robbing the farmer. And yet a few days ago, when they had an opportunity to vote for the McMaster resolution to reduce the tariff, they wrapped their snug garments of political fealty about themselves and voted to not have any reduction of the tariff. [Laughter.] They went and shed tears last year about the misery and the poverty of the farmer, and said it had been caused by high tariffs, and only the other day they voted to confirm him in that misery and consign him to several more years of that misery and that poverty. So, we are not going to get anything through tariff reduction as long as we have this farm-relief crowd from Iowa running the Government. [Laughter and applause.]

Now, let us pass something practical; let us pass something that will give real relief. What will do it? I want to commend the bill of my colleague, Mr. JONES, of Texas, which is similar to the Ketcham bill.

I want to say that I was very much pleased this morning to hear the master of the grange pay my colleague, Mr. MARVIN JONES, that splendid compliment that he had shown a grasp of the farm situation that few Members of Congress had shown. I would go still further. I recently had an article in Texas Farm and Ranch, a leading farm magazine of the United States, in which I proposed this sort of a plan, and I think my colleague has the very plan in mind. I proposed the establishment of an export corporation, with a revolving fund of $300,000,000 or $400,000,000, or whatever is necessary, out of the Treasury, on the same plan as the McNary-Haugen bill.

Then I tied into that plan—I would tie into that this export debenture system. So that if the exporter would not pay back to that producer you were talking about, Mr. KINCHELOE, the fellow who did not belong to the cooperative, the fellow with 15 kids and 10 bales of cotton, who has got to sell those 10 bales of cotton and can not hold them; he can not wait; he does not belong to a cooperative; he can not wait until next summer; he has got to sell it now; the corporation would give him a market. I would have this export corporation, with sufficient capital, so that when the price fell below a reasonable figure, based on the cost of production, that that export corporation would get into the market and buy cotton and hold it, and then that export corporation when it exported that cotton could take the export debentures and either import the manufactured goods back on its own account or it could sell them to importers and take the money from the export debentures and put it into this revolving fund as capital account——

Mr. KINCHELOE. You would have those debentures negotiable, would you not?

Mr. CONNALLY. Absolutely negotiable. That plan would bring a raise in price to every farmer, whether a member of the cooperative or not, because that export corporation would afford healthy competition with all other exporters; it would afford a competitive market, and if the exporter bought that cotton or that wheat he would

have to pay the price that would move it away from the export corporation itself. Then I would, under the debenture system, allow the exporter and the cooperatives to have the same privilege of getting the debentures that the export corporation would have; and the reason for that is that you would then be setting up competitive agencies there, each one bidding for the farmers' product, and naturally that would stimulate the price and make it go to its highest possible level.

Mr. JONES. Mr. CONNALLY, do you not think it would take an export corporation or something similar to that to take care of this individual farmer?

Mr. CONNALLY. That is what I way saying. I want the export corporation tied right in here with the debenture system.

Mr. JONES. I think the gentleman is exactly right. I am thinking along the same line.

Mr. CONNALLY. I understand Mr. JONES has a bill that provides that in a way.

Mr. JONES. The gentleman is giving some new suggestions in connection with it, and I am glad to hear him on it.

Mr. CONNALLY. That is my idea and my plan.

That is workable. Let me show you why: The export debentures, according to the master of the grange here, would probably supplement that revolving fund of $150,000,000 a year, would it not? And every farmer in America would get a reflection of that advance in price. That plan would add $240,000,000 annually to the price of farm products, and on cotton 2 cents per pound, or $10 per bale. It would not be confined to the cooperatives, because it would raise the whole commodity market. The man would not have to wait until next summer to get his returns. That would be the direct result, but the indirect result in stimulating the market would be still greater.

Let us get to one other point. Why did I vote against the McNary-Haugen bill? I voted against the McNary-Haugen bill, gentlemen, just like a great many of you voted against it, because it had that equalization fee in it. The Attorney General of the United States has said that equalization fee is unconstitutional. The law makes the Attorney General the adviser of the President on legal questions; and do you suppose any President, with any self-respect, is going to approve a bill that the Attorney General tells him has got a clause in it that is absolutely unconstitutional? If you think that Mr. Coolidge is that kind of a man, you are simply a Christian Science farm-relief man. You think you are for farm relief, but you are not. [Laughter.] That is all there is to that, if you really think that he is not going to do it, you don't know; and anybody who believes he is believes in ghosts. [Laughter.] He is not going to do it.

So, now, in that situation, what do you want to do?

Mr. RUBY. He says he is going to do that way, anyway.

Mr. CONNALLY. The governor says he is going to do that way. So what are you going to do? Are you going to fool the farmers—are you going down home and make that same speech you made all over your district last year, painting the picture of the farmer in disaster and all that, and say, "We tried to do something"? Oh, yes; "We tried to do something, and the President would not let us do it." You can go down there and make that speech, but you are not fooling all of them.

Mr. ASWELL. Three times.

Mr. FULMER. May I ask you a question, Mr. CONNALLY?

Mr. CONNALLY. You may; yes.

Mr. FULMER. In stimulating the price under your proposition, would you not naturally stimulate production?

Mr. CONNALLY. It would not stimulate production any more than it would stimulate it under the McNary-Haugen bill.

Mr. FULMER. That is right. Do you have anything in this bill——

Mr. JONES. I will state to the gentleman that there is a provision in both bills here presented for a reduction of these debentures in the event there is an increase in production.

Mr. CONNALLY. There is a clause in both the bills to regulate the debenture certificates in amount. If it stimulates production too much you lower the debentures.

Mr. JONES. And you may take it off altogether?

Mr. CONNALLY. Yes. That has a tendency to slow it up. Whenever a man makes the statement that he wants to raise the price of the farmers' product and tries to avoid the fact that that is going to stimulate production, of course, he is in error. But what are all these bills trying to do? Raise the price, are they not? That argument that it is to raise the price is going to meet every one of you on every plan you have got, because if you were not trying to raise the farmers' price you would not be up here in this room to-day.

What else about the equalization fee? I say it is unconstitutional, and I voted against it. We tried to get you to limit the bill to $25 per bale on cotton, but you would not do it, and gave the board power to fix it at any figure it might choose.

Gentlemen, that equalization fee is beautiful in theory. The gentleman from South Carolina asked a question there which is splendid, because the theory of the equalization fee is that this omniscient all-powerful, all-wise board is going to know just exactly when the market

## 2820      CONGRESSIONAL RECORD—HOUSE      February 9

requires that they pop on the fee so as to reduce production and regulate it. That is a beautiful theory. But, gentlemen, it will not work; it is not workable. To tax each bale of cotton from $10 to $25, and turn the farmer's money over to some one else to spend will not relieve the farmer of anything except his money. You tell me that the farmer who goes up to sell a bale of cotton or who goes up to sell a bushel of wheat—I am not talking about these professional farmers, these book farmers, who draw big salaries to agitate and propagandize. But I am talking about the fellow who raises wheat and corn and cotton. You can not tell me that he favors the equalization fee. I am talking about the man who does not belong to the cooperatives. If he wanted to join the cooperatives, he would join it. But a great many people in this country do not believe in that; they want to run their own business; they want to sell their own stuff in their own way.

I can see that fellow in Texas who has raised only about three bales of cotton. In the fall he takes a bale of it up to the gin and gets it under the sucker and begins to scratch the cotton up the blowpipe. About that time a Government inspector comes out to collect the equalization fee. He says, "Hold on. Don't begin to gin this cotton yet. Have you paid the equalization fee?" The fellow says, "What? What did you say?" "Why, the $10 to $25 equalization fee on this bale of cotton," or $15 or $20. "What is that for?" "That is the new farm relief provided in the farm relief bill." [Laughter.] He says, "What did you say—farm what?" "Farm relief; farm relief bill." "I never joined nothing like that." "No; I know you didn't, but your Congressman joined for you." [Laughter.] "The devil he did." [Laughter.]

Gentlemen, you can laugh all you please about that; but that is a fact. That is not workable. It will not work.

What else does it do? The equalization fee would create an army of employees. You can not dodge that. It would create an army of employees and bureaucrats. And who is going to pay for them? Who would pay all these salaries? Gentlemen, it would come out of the farmers; it would come out of the equalization fee. And what are you planning here? You would absolutely consume him with this army of employees and hangers-on and understrappers; and that would come out of the farmer's own pocket, and you know it would. It would come out of the $10 or $25 the farmer would pay on each bale of cotton.

Let me tell you something. The boys who are not members of these cooperatives are not for the McNary-Haugen bill; and let me tell you why they are not for it. They are beginning to find out that under the McNary-Haugen bill every man who sells a bushel of wheat or bale of cotton or any other agricultural commodity under that bill has got to pay the equalization fee, whether he belongs to an organization or not. What goes with that fee? These farmers that run their own business are beginning to learn; these farmers are beginning to find out that their $10, $15, or $20 on a bale of cotton and 25 cents or 50 cents on a bushel of wheat is going to be thrown into a fund, and turned over to whom? Turned over to the cooperatives. That is the truth. They are finding it out. They are going to turn over the money collected from all of the farmers and put it into a fund and turn that fund over to the cooperatives to handle and manage and speculate with and carry their cotton and their wheat, and such other as they choose to buy; and they are not for—they are not for it, and I as a representative of all these farmers who do not belong to the co-ops am not going to vote for a law that makes him—I mean that makes them—join the cooperatives whether they want to or whether they do not. And if he does not do it I am not going to tax him and take his money and turn it over to the cooperatives to exploit and practice on.

One other thing. They say you must not have a subsidy. I submit that under this debenture plan there is no subsidy. It is shown here that the Treasury would not get so much money in tariff duties. It is true. But in the case of aluminum, these farm-relief fellows of Iowa, when they voted to give Andrew Mellon a monopoly on the aluminum business they kept out of the Treasury, according to the department's figures, $300,000. Three hundred thousand dollars would have gone in there if they had not raised the tariff on aluminum, and by the same token took several millions out of the pockets of the farm wives, the city wives, and all other housewives in this country in added cost of the aluminum ware they use. So it is no more a subsidy than the raised tariff on aluminum.

I submit that all this is going to be more or less of an experiment. The whole project of farm relief is going to be an experiment. I think it is worth several hundred millions, even if you do go into the Treasury and take it out, to demonstrate either the success of some of these plans or the failure of some of these plans. They talk about the railroads. When you turned the railroads back to their stockholders, for that six-month period in which they were granted a certain income, where did it come from? It came out of the Treasury of the United States; it did not come out of any equalization fee levied on the railroads themselves, did it? No.

The CHAIRMAN. That is what this bill will do; it will take the money out of the Treasury.

Mr. CONNALLY. The gentleman voted for the Esch-Cummins law, did he not?

The CHAIRMAN. I did not.

Mr. CONNALLY. You have been asked that you do for the farmer what has been done for the railroads. Under the Esch-Cummins law you did that for the railroads. Now, why is it not fair, according to their own doctrine, to do the same thing for the farmers? Suppose we spend $200,000,000 or $300,000,000 in the experiment and find out we have made a failure; we can quit, can we not? The Treasury is not so badly off that it can not afford it. This is a great industry and it is worth the experiment.

Let me tell you about the equalization fee. This country is supposed to be still a country of free men and free industry. The McNary-Haugen bill with that equalization fee would build up the most autocratic tyranny in an industry that could be conceived of in this country. Here is a fellow who has a farm out here and he goes out and raises a bale of cotton or a bushel of wheat. He raises it with the sinews and the muscles of his own hands, out under God's own sunlight, tilling it with his own implements in his own soil. If when he produces it and comes up to the markets of the world with a bale of cotton in one hand and a bushel of grain in the other, the McNary-Haugen bill says: "You shall not sell it. You shall not exchange the fruits of your toil and the fruits of your soil, brought together there by the mystic elements in nature's laboratory, under God's sun. You shall not sell either one of them until you pay tribute in the form of an equalization fee." What for; to run the Government? Oh, no. To maintain armies in the national defense? Oh, no. To keep the Navy afloat to protect the national honor? Oh, no. What for? To maintain the courts? No. To punish crime? No. Why, to turn it over to some little board selected by a group of particular organizations, representing only 7 or 8 per cent of the entire farmers of the United States. Are we going to say to the farmer that "You shall not sell your product until you pay this tribute to this group and let them dissipate it in their unwisdom, as they may dissipate it"?

But here is the Grange, as I understand it, the largest and the oldest agricultural organization on the earth, advocating this debenture doctrine. I approve the plan as outlined in my remarks a few minutes ago and substantially that of my distinguished colleague from Texas, Mr. MARVIN JONES, and that is the establishment of an export corporation with sufficient capital or a revolving fund out of the Treasury, to be replenished from time to time by the debenture, and then tied into that system this debenture plan; and it will operate for the benefit of every farmer that produces a bushel of wheat or a bale of cotton anywhere in these United States. And you will not have this great army of employees and fee collectors and inspectors and auditors and officials. You will have a very small organization. It will not cost the Government a dollar, except in the method of this debenture system. And I submit that it is workable; it is a practical system and it really offers some hope of relief. While everybody knows who knows anything that the McNary-Haugen bill as it was in the last session with the equalization fee, even if it passes both Houses, can not pass the White House. And we are mad—we are mad, or else we are insincere and we are mountebanks—we are either mad or mountebanks if we try to bunco the American farmer again with the McNary-Haugen bill with the equalization fee in it, that you know is going to be vetoed the moment it is laid on the President's desk. The man who insists on passing the McNary-Haugen equalization fee when he knows it will be vetoed does not want any farm relief. He is merely trying to fool the farmer.

The CHAIRMAN. Do you yield for a question?

Mr. CONNALLY. Yes.

The CHAIRMAN. Something was said about fooling the farmer. Let us examine the two measures before us and see which one fools the farmer. Let us assume that we export wheat to the extent of 200,000,000 bushels, where under the debenture plan it would cost the Government $42,000,000. Under the equalization fee plan, if you advance the price 50 cents, the equalization fee would be 12½ cents, which would leave the farmer 37½ cents net. The farmer would be receiving 37½ cents instead of 21 cents, which is 16½ cents above the debenture plan. Hence a profit to the farmer of 16½ cents a bushel over the debenture plan, or $300,000,000 net, and the cost to the Government under the debenture plan would be $42,000,000.

Mr. CONNALLY. I thought the gentleman was asking me a question.

The CHAIRMAN. I want you to tell the committee which plan has the best values for the farmer.

Mr. CONNALLY. You ask me to tell you, and I am telling you. I want to answer your question.

The CHAIRMAN. Which plan is the better for the farmer? The equalization plan that pays $300,000,000 net, or the debenture plan that pays $168,000,000, with $42,000,000 at the expense of the Treasury; the equalization plan which gives the farmer 37½ cents, or the debenture plan which gives him 21 cents; the equalization plan giving him $300,000,000 net, or the debenture plan giving him $168,000,000, at an expense of $42,000,000 borne by the Treasury? As a result, under the equalization plan the farmer would be ahead $132,000,000 and the Government would be ahead $42,000,000. The farmer and the Federal Treasury would be $174,000,000 ahead.

Mr. CONNALLY. I never have understood what the gentleman's question is. I do not understand it.

The CHAIRMAN. Turn your attention to the two plans.

Mr. CONNALLY. I know about the two plans.

The CHAIRMAN. Two hundred million bushels of wheat exported would cost the Government $42,000,000——

Mr. CONNALLY. I shall be glad to answer a question, but every time I start to answer the gentleman starts again and I can not do it.

The CHAIRMAN. I am going to show you which plan would give the most to the farmer.

Mr. CONNALLY. The gentleman arbitrarily assumes that his bill will do things that can not be proven.

The CHAIRMAN. If you do not want to answer the question, we will take it up later.

Mr. CONNALLY. I will answer any questions the gentleman may ask. I do not want to be discourteous.

The CHAIRMAN. I asked this question—it is a simple one: Under the debenture plan, if 800,000,000 bushels of wheat are marketed or sold and 200,000,000 bushels exported, the cost to the Government would be $42,000,000. Assuming that the price would advance 21 cents a bushel, the producers would receive from the Government 21 cents a bushel on the 200,000,000 bushels exported—that is $42,000,000; and 21 cents a bushel on the 600,000,000 bushels—that would be $126,000,000, a total of $168,000,000.

Under the equalization plan, if the price is advanced—the tariff of 42 cents and 8-cent cost of bringing to our port of entry, or total of 50 cents—and 200,000,000 bushels are exported, the equalization fee would be 12½ cents, which would leave the farmer 37¼ cents net, or 16½ cents above the 21 cents received under the debenture plan; and the producers' net profit would be $300,000,000 or $132,000,000 more than under the debenture plan. In other words, under the debenture plan, the producers would receive $168,000,000, of which $42,000,000 would be at the expense of the Federal Treasury; and under the equalization fee plan they would receive a net gain of $300,000,000. In other words, the debenture plan not only makes a raid on the Treasury to the extent of $42,000,000, but pays the producers $132,000,000 less than under the equalization plan, where the cost is paid by the producers themselves and no burden placed on the Treasury.

Mr. CONNALLY. Is that your question?

The CHAIRMAN. That is the question. Is that fooling the people?

Mr. CONNALLY. Let me say to the gentleman that I do not think anybody, unless it be the gentleman from Iowa, believes that the McNary-Haugen bill would raise the price of wheat 50 cents a bushel. In the past the gentleman voted for a tariff of 42 cents a bushel on wheat, and he told the House at the time it passed that all we had to do to raise the price of wheat 42 cents a bushel was to pass the bill. Now he comes back in the McNary-Haugen bill and says it does not raise the price 42 cents a bushel, and you have to devise some other artificial contrivance to do what he said would be done by the 42 cents a bushel tariff. He may be just as much in error again.

The CHAIRMAN. It has never been declared that it would advance the price 42 cents a bushel, nor has a vote ever been taken to fix the tariff at 42 cents.

Mr. CONNALLY. It is a beautiful theory, but it will not work. It has not worked. Let me ask the question. Does the gentleman believe the President will approve the McNary-Haugen bill?

The CHAIRMAN. I am not so much concerned about that.

Mr. CONNALLY. I know you are not, but I am. I want the gentleman to answer my question. If you really want farm relief, you ought to be concerned whether it will be vetoed.

The CHAIRMAN. I think every Member should vote as his conscience dictates.

Mr. CONNALLY. Does the gentleman want a bill or a veto?

The CHAIRMAN. I do not think the President would have any respect for me if I should do as he might direct. I have a higher conception of my duty than that; I have a higher regard for Members of Congress than to suggest such a thing. Personally, I would not want it said that I am serving as a bellhop for the President or anybody else.

Mr. CONNALLY. Do you think the President is going to be your bellhop and approve this bill if you pass it?

ADJOURNMENT

Mr. BARBOUR. Mr. Speaker, I move that the House do now adjourn.

The motion was agreed to; accordingly (at 4 o'clock and 37 minutes p. m.) the House adjourned until to-morrow, Friday, February 10, 1928, at 12 o'clock noon.

COMMITTEE HEARINGS

Mr. TILSON submitted the following tentative list of committee hearings scheduled for Friday, February 10, 1928, as reported to the floor leader by clerks of the several committees:

COMMITTEE ON APPROPRIATIONS
(10.30 a. m.)

Department of Agriculture appropriation bill.

COMMITTEE ON AGRICULTURE
(10 a. m.)

To place agricultural products upon a price equality with other commodities (H. R. 10656).

To foster agriculture and to stabilize the prices obtained for agricultural commodities by providing for the issuance of export debentures upon the exportation of such commodities (H. R. 10568).

COMMITTEE ON THE CENSUS
(10.30 a. m.)

To provide for the fifteenth and subsequent decennial censuses (H. R. 393).

COMMITTEE ON THE POST OFFICE AND POST ROADS
(10 a. m.)

To amend Title II of an act approved February 28, 1925, regulating postal rates (H. R. 9296).

COMMITTEE ON THE MERCHANT MARINE AND FISHERIES
(10.30 a. m.)

To amend an act entitled "An act for the regulation of radio communications," approved February 23, 1927 (H. R. 8825).

COMMITTEE ON INTERSTATE AND FOREIGN COMMERCE
(10 a. m.)

To promote the unification of carriers engaged in interstate commerce (H. R. 5641).

COMMITTEE ON THE JUDICIARY SUBCOMMITTEE NO. 2
(10 a. m.)

To provide for a joint reunion of the surviving veterans of both sides of the war 1861 to 1865 in the city of Washington in the year 1928; to authorize the appropriation of sufficient money from the United States Treasury to pay the expenses of such joint reunion; and to provide for a commission to carry into effect the provisions of this act (H. R. 5577).

REPORTS OF COMMITTEES ON PUBLIC BILLS AND RESOLUTIONS

Under clause 2 of Rule XIII,

Mr. SNELL: Committee on Rules. H. Res. 112. A resolution providing for the consideration of H. Con. Res. 18, a concurrent resolution proposing an amendment to the Constitution; without amendment (Rept. No. 612). Referred to the House Calendar.

Mr. HOUSTON of Hawaii: Committee on the Public Lands. H. R. 10483. A bill to revise the boundary of a portion of the Hawaii National Park on the island of Hawaii in the Territory of Hawaii; without amendment (Rept. No. 613). Referred to the House Calendar.

Mr. VINSON of Georgia: Committee on Naval Affairs. H. R. 5531. A bill to amend the provision contained in the act approved August 29, 1916, relating to the assignment to duty of certain officers of the United States Navy as fleet and squadron engineers; without amendment (Rept. No. 614). Referred to the House Calendar.

Mr. DRANE: Committee on Naval Affairs. S. 771. An act providing for the loan of the U. S. S. Dispatch to the State of Florida; without amendment (Rept. No. 615). Referred to the House Calendar.

Mr. HILL of Washington: Committee on Indian Affairs. H. R. 8731. A bill to authorize an appropriation for the construction of a road on the Lummi Indian Reservation, Wash.; without amendment (Rept. No. 616). Referred to the Committee of the Whole House on the state of the Union.

REPORTS OF COMMITTEES ON PRIVATE BILLS AND RESOLUTIONS

Under clause 2 of Rule XIII,

Mr. WURZBACH: Committee on Military Affairs. H. R. 3268. A bill for the relief of John De Camp; with amendment (Rept. No. 617). Referred to the Committee of the Whole House.

Mr. WURZBACH: Committee on Military Affairs. H. R. 4865. A bill for the relief of Dock Leach; with amendment (Rept. No. 618). Referred to the Committee of the Whole House.

Mr. FROTHINGHAM : Committee on Military Affairs. H. R. 10715. A bill to authorize Col. Charles A. Lindbergh, United States Army Air Corps Reserve, to accept decorations and gifts from foreign governments; with amendment (Rept. No. 619). Referred to the Committee of the Whole House.

## CHANGE OF REFERENCE

Under clause 2 of Rule XXII, committees were discharged from the consideration of the following bills, which were referred as follows:

A bill (H. R. 7086) granting an increase of pension to Ellen M. Willey; Committee on Pensions discharged, and referred to the Committee on Invalid Pensions.

A bill (H. R. 10052) granting an increase of pension to Jessie Sparrow; Committee on Pensions discharged, and referred to the Committee on Invalid Pensions.

A bill (H. R. 10569) for the relief of Gilbert P. Chase; Committee on Claims discharged, and referred to the Committee on Naval Affairs.

## PUBLIC BILLS AND RESOLUTIONS

Under clause 3 of Rule XXII, public bills and resolutions were introduced and severally referred as follows:

By Mr. JOHNSON of Oklahoma: A bill (H. R. 10754) to authorize the construction of an auditorium and school rooms at the Concho Indian School at Concho, Okla.; to the Committee on Indian Affairs.

Also, a bill (H. R. 10755) to authorize the construction of additional sleeping porches at the Concho Indian School, at Concho, Okla.; to the Committee on Indian Affairs.

By Mr. CANFIELD: A bill (H. R. 10756) authorizing the State of Indiana to construct, maintain, and operate a toll bridge across the Miami River, between Lawrenceburg, Dearborn County, Ind., and a point in Hamilton County, Ohio, near Columbia Park, Hamilton County, Ohio; to the Committee on Interstate and Foreign Commerce.

By Mr. LANKFORD: A bill (H. R. 10757) to establish a Federal farm board to aid in the orderly marketing and in the control and disposition of the surplus of agricultural commodities in interstate and foreign commerce; to the Committee on Agriculture.

By Mr. AYRES: A bill (H. R. 10758) to amend the tariff act of 1922; to the Committee on Ways and Means.

By Mr. BLACK of New York: A bill (H. R. 10759) amending section 266 of the United States Judicial Code by denying injunctions against city and State officials; to the Committee on the Judiciary.

By Mr. BURTON: A bill (H. R. 10760) to authorize the settlement of the indebtedness of the Hellenic Republic to the United States of America and of the differences arising out of the tripartite loan agreement of February 10, 1918; to the Committee on Ways and Means.

By Mr. HUDSON: A bill (H. R. 10761) to prevent obstruction and burdens upon interstate trade and commerce in copyrighted motion-picture films, and to prevent the restraint upon the free competition in the production, distribution, and exhibition of copyrighted motion-picture films, and to prevent the further monopolization of the business of producing, distributing, and exhibiting copyrighted motion pictures, by prohibiting blind booking and block booking of copyrighted motion-picture films and by prohibiting the arbitrary allocation of such films by distributors to theaters in which they or other distributors have an interest, direct or indirect, and by prohibiting the arbitrary refusal to book or sell such films to exhibitors in which they have no such interest; to the Committee on Interstate and Foreign Commerce.

By Mr. JONES: A bill (H. R. 10762) to place agricultural products upon a price equality with other commodities; to the Committee on Agriculture.

Also, a bill (H. R. 10763) relating to investigation of new uses of cotton; to the Committee on Agriculture.

By Mr. KVALE: A bill (H. R. 10764) to amend the Federal reserve act and the national banking laws, and for other purposes; to the Committee on Banking and Currency.

By Mr. WHITE of Maine: A bill (H. R. 10765) to create, develop, and maintain a privately owned American merchant marine adequate to serve trade routes essential in the movement of the industrial and agricultural products of the United States and to meet the requirements of the commerce of the United States; to provide for the transportation of the foreign mails of the United States in vessels of the United States; to provide naval and military auxiliaries, and for other purposes; to the Committee on the Merchant Marine and Fisheries.

By Mr. KVALE: A bill (H. R. 10766) to amend section 5197 of the Revised Statutes, as amended, and for other purposes; to the Committee on Banking and Currency.

By Mr. CANNON: A bill (H. R. 10767) providing for the purchase of a site and erection of a public building at Owensville, Mo.; to the Committee on Public Buildings and Grounds.

By Mr. CARTWRIGHT: A bill (H. R. 10768) to amend section 182 of the Judicial Code in so far as it relates to the eastern district of Oklahoma; to the Committee on the Judiciary.

By Mr. EVANS of California: Joint resolution (H. J. Res. 196) designating the American Green Cross as a national body for education and research work in connection with the protection of forests, reforestation of denuded areas, flood control, and allied problems, and for other purposes; to the Committee on Education.

By Mr. WILSON of Mississippi: Joint resolution (H. J. Res. 197) authorizing and directing an investigation of the activities of the spinners and brokers, and particularly the New York Cotton Exchange, and for other purposes; to the Committee on Agriculture.

By Mr. SNELL: Resolution (H. Res. 112) providing for the consideration of House Concurrent Resolution 18, a concurrent resolution proposing an amendment to the Constitution of the United States of America; to the Committee on Rules.

By Mr. KIESS: Resolution (H. Res. 113) providing for the printing of the journal of the Twenty-eighth National Encampment of the Veterans of Foreign Wars of the United States; to the Committee on Printing.

## PRIVATE BILLS AND RESOLUTIONS

Under clause 1 of Rule XXII, private bills and resolutions were introduced and severally referred as follows:

By Mr. BEERS: A bill (H. R. 10769) granting an increase of pension to Anna Hilbert; to the Committee on Invalid Pensions.

By Mr. BRAND of Georgia: A bill (H. R. 10770) granting a pension to Wilson M. Slaughter; to the Committee on Pensions.

Also, a bill (H. R. 10771) granting a pension to Alice Mabel Lang; to the Committee on Pensions.

By Mr. BRAND of Ohio: A bill (H. R. 10772) granting an increase of pension to Sarah M. Armstrong; to the Committee on Invalid Pensions.

By Mr. CANNON: A bill (H. R. 10773) for the relief of Marion M. Gray; to the Committee on Pensions.

By Mr. COMBS: A bill (H. R. 10774) for the relief of the Carlisle Commission Co.; to the Committee on War Claims.

Also, a bill (H. R. 10775) for the relief of Charles Cubberly; to the Committee on Military Affairs.

By Mr. CRAIL: A bill (H. R. 10776) to authorize the appointment of Quartermaster Sergt. John Imhof, second grade, retired, United States Army, to quartermaster sergeant, first pay grade, retired, United States Army; to the Committee on Military Affairs.

Also, a bill (H. R. 10777) granting a pension to Thomas A. West; to the Committee on Pensions.

By Mr. DARROW: A bill (H. R. 10778) granting an increase of pension to Patrick W. O'Donnell; to the Committee on Pensions.

Also, a bill (H. R. 10779) granting a pension to Susie E. Richards; to the Committee on Invalid Pensions.

By Mr. DICKINSON of Missouri: A bill (H. R. 10780) granting an increase of pension to Nancy J. Wager; to the Committee on Invalid Pensions.

By Mr. FULBRIGHT: A bill (H. R. 10781) granting a pension to Thomas Dowler; to the Committee on Invalid Pensions.

Also, a bill (H. R. 10782) granting an increase of pension to Zippora B. Sowards; to the Committee on Invalid Pensions.

By Mr. GAMBRILL: A bill (H. R. 10783) for the relief of William A. Miles; to the Committee on Claims.

By Mrs. KAHN: A bill (H. R. 10784) granting a Pension to Ruth D. Covell; to the Committee on Pensions.

By Mrs. LANGLEY: A bill (H. R. 10785) granting a pension to Martha Bowles; to the Committee on Invalid Pensions.

By Mr. MORROW: A bill (H. R. 10786) authorizing surveys and investigations to determine the best methods and means of utilizing the waters of the Gila River and its tributaries above the San Carlos Reservoir in New Mexico and Arizona; to the Committee on Irrigation and Reclamation.

By Mr. NELSON of Maine: A bill (H. R. 10787) granting an increase of pension to Nettie S. Staples; to the Committee on Invalid Pensions.

By Mr. SPEAKS: A bill (H. R. 10788) granting an increase of pension to Susanna Dakin; to the Committee on Invalid Pensions.

Also, a bill (H. R. 10789) granting an increase of pension to Alice E. Murphy; to the Committee on Invalid Pensions.

Also, a bill (H. R. 10790) granting an increase of pension to Mary A. Schwartz; to the Committee on Invalid Pensions.

By Mr. SPEARING: A bill (H. R. 10791) to provide for a survey of Bayou Sennette, in Jefferson Parish, La., with a view to maintaining an adequate channel of suitable width; to the Committee on Rivers and Harbors.

By Mr. STOBBS: A bill (H. R. 10792) granting an increase of pension to Emma S. Rust; to the Committee on Invalid Pensions.

By Mr. SWICK: A bill (H. R. 10793) granting an increase of pension to Eliza J. Newton; to the Committee on Invalid Pensions.

Also, a bill (H. R. 10794) granting a pension to Rebecca B. McConaughy; to the Committee on Invalid Pensions.

Also, a bill (H. R. 10795) granting an increase of pension to Retta Chatland; to the Committee on Invalid Pensions.

By Mr. UNDERWOOD: A bill (H. R. 10796) granting a pension to Anna Cupp; to the Committee on Invalid Pensions.

By Mr. WINTER: A bill (H. R. 10797) granting an increase of pension to Mary L. Huff; to the Committee on Invalid Pensions.

## PETITIONS, ETC.

Under clause 1 of Rule XXII, petitions and papers were laid on the Clerk's desk and referred as follows:

3530. By Mr. ALDRICH: Resolution of Swedish Mission Church, Auburn, R. I., protesting against new quota provisions of immigration law and urging continuance of quota at present in force; to the Committee on Immigration and Naturalization.

3531. By Mr. BACHMANN: Petition of Mrs. Charles Tout and 67 citizens of Power, Brooke County, W. Va., protesting against the Lankford compulsory Sunday observance bill (H. R. 78); to the Committee on the District of Columbia.

3532. Also, petition of 37 representatives of the Clerksburg Drug Co., and 82 representatives of the Ohio Valley Drug Co., respectively, urging that close attention and serious consideration be given to House bill 11, introduced by Representative CLYDE KELLY, of Pennsylvania; to the Committee on Interstate and Foreign Commerce.

3533. By Mr. BEERS: Memorial from members of Yeagertown Council, No. 211, Sons and Daughters of Liberty, and Washington Camp, No. 426, Patriotic Order Sons of America, favoring restricted immigration; to the Committee on Immigration and Naturalization.

3534. By Mr. BOIES: Petition signed by citizens of Woodbury and Ida Counties, Iowa, protesting against compulsory Sunday observance bill (H. R. 78); to the Committee on the District of Columbia.

3535. By Mr. BOYLAN: Resolution of New York State National Guard, favoring the national matches item in Army appropriation bill; to the Committee on Military Affairs.

3536. Also, resolution of New York State National Guard convention, favoring the Tyson-Fitzgerald bill; to the Committee on Military Affairs.

3537. By Mr. BURTON: Petition of citizens of East Russia, Ohio, expressing disapproval of the bill now pending to authorize an ambitious naval program; to the Committee on Naval Affairs.

3538. Also, petition of citizens of Cleveland, Ohio, and vicinity, protesting against the passage of the Brookhart bill (S. 1667) in regard to the sale and distribution of motion pictures; also the Cannon bill (H. R. 9298) on the same subject; to the Committee on Interstate and Foreign Commerce.

3539. Also, petition of the Pasadena Monthly Meeting of the Religious Society of Friends, Pasadena, Calif., protesting against the proposed increase in naval construction; to the Committee on Naval Affairs.

3540. Also, petition of 30 members of the Girl Reserve Club of the High Point High School, High Point, N. C., protesting against the big Navy program; to the Committee on Naval Affairs.

3541. By Mr. COMBS (by request): Petition of citizens of Missouri, opposing Senate bill 1667; to the Committee on Interstate and Foreign Commerce.

3542. By Mr. DALLINGER: Resolution of Crusader Commandery, No. 293, Knights of Malta, of Cambridge, Mass., opposing any weakening of the present immigration laws; to the Committee on Immigration and Naturalization.

3543. Also, petition signed by certain citizens of Melrose, Mass., urging the enactment of legislation to increase the pensions of Civil War veterans and their widows; to the Committee on Invalid Pensions.

3544. Also, resolutions of the Baptist Minister's Conference of Boston and vicinity, opposing the Navy bill; to the Committee on Naval Affairs.

3545. Also, protest of members of the Church of the Epiphany, Winchester, Mass., against the Navy bill; to the Committee on Naval Affairs.

3546. By Mr. DARROW: Memorial of the Philadelphia Board of Trade, opposing the enactment of the Jones bill (S. 744); to the Committee on the Merchant Marine and Fisheries.

3547. By Mr. EATON: Petition of 279 residents of Trenton, N. J., protesting against proposed enactment of compulsory Sunday observance legislation for the District of Columbia; to the Committee on the District of Columbia.

3548. By Mr. ESTEP: Petition of Alva C. Davies and 155 other residents of Pittsburgh, Pa., protesting against the passage of bill known as the Lankford compulsory Sunday observance bill (H. R. 78); to the Committee on the District of Columbia.

3549. Also, petition of Dr. H. W. Kelly and 262 other residents of Pittsburgh, Pa., protesting against House bill 78, known as the Lankford compulsory Sunday observance bill; to the Committee on the District of Columbia.

3550. Also, petition of Edward H. Grapp and 30 other residents of Pittsburgh, Pa., protesting against House bill 78, known as the Lankford compulsory Sunday observance bill; to the Committee on the District of Columbia.

3551. Also, petition of Dr. W. A. Kelly and 297 other residents of Pittsburgh, Pa., protesting against House bill 78, known as the Lankford compulsory Sunday observance bill; to the Committee on the District of Columbia.

3552. Also, petition of Council on National Parks, Forest, and Wild Life (formerly National Park Committee), 233 Broadway, New York City, urging that Congress give greater heed to the need for forest-fire prevention and provide more appropriations for the detection and suppression of fires; to the Committee on the Public Lands.

3553. By Mr. FISHER: Petition of V. J. Isle and 27 other petitioners, protesting against the bill known as the Brookhart bill; to the Committee on Interstate and Foreign Commerce.

3554. By Mr. FORT: Petition of residents of Newark, Orange, and Irvington, N. J., protesting against House bill 78, the so-called Sunday blue law; to the Committee on the District of Columbia.

3555. By Mr. FOSS: Petition of Albion Minty and several other citizens of South Athol, Mass., protesting against the passage of House bill 78, known as the Lankford Sunday observance bill; to the Committee on the District of Columbia.

3556. Also, petition of E. O. Hutchinson and other citizens of Athol, Mass., protesting against the passage of House bill 78, known as the Lankford Sunday observance bill; to the Committee on the District of Columbia.

3557. Also, petition of J. Franklin Wilkinson and 79 other citizens of Gardner, Mass., protesting against the passage of House bill 78, known as the Lankford Sunday observance bill; to the Committee on the District of Columbia.

3558. By Mr. FRENCH: Petition of 106 citizens of Latah County, Idaho, urging enactment of legislation increasing pensions of Civil War veterans and their widows; to the Committee on Invalid Pensions.

3559. By Mr. FULBRIGHT: Petition of citizens of Nixa, Mo., urging legislation in behalf of Civil War veterans and their widows; to the Committee on Invalid Pensions.

3560. By Mr. GARBER: Petition of residents of Grant County, Okla., in protest to the enactment of legislation for compulsory Sunday observance as embodied in House bill 78; to the Committee on the District of Columbia.

3561. Also, letter of James Bowser, post service officer of George Walker Post, No. 18, of Muskogee, Okla., in support of House bill 6688 and Senate bill 2259; to the Committee on World War Veterans' Legislation.

3562. Also, petition of residents of Buffalo, Harper County, Okla., urging the enactment of legislation for Civil War veterans and their widows; to the Committee on Invalid Pensions.

3563. Also, petition of residents of Meno, Okla., in protest to the enactment of compulsory Sunday observance bill (H. R. 78); to the Committee on the District of Columbia.

3564. Also, petition of residents of Texas County, Okla., in protest to House bill 78, for compulsory Sunday observance; to the Committee on the District of Columbia.

3565. Also, petition of residents of Guymon, Texas County, Okla., in protest to the enactment of legislation for compulsory Sunday observance as embodied in House bill 78; to the Committee on the District of Columbia.

3566. Also, petition of residents of Knowles, Okla., in protest to the enactment of legislation for compulsory Sunday observance as embodied in House bill 78; to the Committee on the District of Columbia.

3567. By Mr. GALLIVAN: Petition of the Anti-National Origins Clause League of Michigan, protesting against the national origins method of determining quotas; to the Committee on Immigration and Naturalization.

3568. By Mr. GARNER of Texas: Petition of citizens of Kingsville, Tex., favoring Sunday observance legislation; to the Committee on the District of Columbia.

3569. Also, petition of citizens of La Feria, Tex., against compulsory Sunday observance; to the Committee on the District of Columbia.

3570. By Mr. GIBSON: Petition of residents of Randolph, Vt., protesting against legislation for compulsory Sunday observance in the District of Columbia; to the Committee on the District of Columbia.

3571. By Mr. HADLEY: Petition of Sarah J. Prouty, of Bellingham, Wash., for further relief of Civil War veterans and widows; to the Committee on Invalid Pensions.

3572. Also, petition of residents of Sequim, Wash., protesting against the Lankford Sunday closing bill; to the Committee on the District of Columbia.

3573. By Mr. KADING: Petition signed by citizens of Wyocena, Wis., advocating increase in pension for Civil War veterans and widows of Civil War veterans; to the Committee on Invalid Pensions.

3574. By Mr. KORELL: Petition of citizens of Portland, Oreg., protesting against compulsory Sunday observance bill (H. R. 78); to the Committee on the District of Columbia.

3575. By Mr. KVALE: Petition of mass meeting under auspices of Fifth Congressional District Council of Agriculture of Minnesota, urging immediate enactment into law of House bill 7940, with the equalization fee provisions retained intact; to the Committee on Agriculture.

3576. Also, petition of several residents of Murdock, Minn., protesting against compulsory Sunday observance; to the Committee on the District of Columbia.

3577. Also, petition of 79 officers and members of the Stevens County (Minn.) Farm Bureau Federation, appealing to Minnesota Members of Congress to insist on immediate enactment into law of farm-relief legislation which includes provisions for levy of an equalization fee, and insisting that northwestern farmers wish no substitute or compromise legislation; to the Committee on Agriculture.

3578. Also, petition of Associated General Contractors of America, Northwest Branch, of Minnesota, opposing passage of House bill 8125; to the Committee on Public Buildings and Grounds.

3579. Also, petition of 40 commercial beekeepers representing all sections of the State of Minnesota, protesting against the corn sugar bill; to the Committee on Interstate and Foreign Commerce.

3580. By Mr. LEA: Petition of 96 residents of Humboldt County, Calif., protesting against the Lankford bill (H. R. 78); to the Committee on the District of Columbia.

3581. By Mr. LINDSAY: Petition of New York State National Guard Convention, Albany, N. Y., January 14, 1928, being a set of resolutions indorsing the principles of the Tyson-Fitzgerald bills (S. 777 and H. R. 500) and urging speedy passage thereof; to the Committee on World War Veterans' Legislation.

3582. Also, petition of New York National Guard Convention, Albany, N. Y., January 14, 1928, petitioning Congress to support legislation favorable to continuation of national rifle matches and school for small-arms firing; to the Committee on Appropriations.

3583. By Mr. McKEOWN: Petition of Ben Crouch and 65 other citizens of Sapulpa, Okla., protesting the passage of House bill 78; to the Committee on the District of Columbia.

3584. Also, petition of Homer H. Bishop and 26 other citizens of Oklahoma, protesting the passage of House bill 78; to the Committee on the District of Columbia.

3585. Also, petition of Claud Gerard and 55 other citizens of Oklahoma, protesting the passage of House bill 78; to the Committee on the District of Columbia.

3586. Also, petition of Mrs. Fred Jones, Mrs. C. M. Sims, and 40 other citizens of Bristow, Okla., protesting the passage of House bill 78, or any compulsory Sunday observance law; to the Committee on the District of Columbia.

3587. Also, petition of Mary T. Barnard, W. T. King, and 32 other citizens of Shawnee, Okla., urging the increase of pensions for Civil War veterans and their widows; to the Committee on Invalid Pensions.

3588. Also, petition of Sanders Dunlap and 65 other citizens of Konawa, Okla., protesting the passage of any compulsory Sunday observance law; to the Committee on the District of Columbia.

3589. Also, petition of Dr. W. L. Moore and 30 other citizens of Lima, Okla., protesting the passage of any compulsory Sun-

day observance law; to the Committee on the District of Columbia.

3590. Also, petition of K. W. Hill and 20 other citizens of Oilton, Okla., protesting the passage of any compulsory Sunday observance law; to the Committee on the District of Columbia.

3591. Also, petition of Mrs. Basil B. Hughes and 65 other citizens of Seminole County, Okla., protesting the passage of any compulsory Sunday observance law; to the Committee on the District of Columbia.

3592. Also petition of O. O. Davis and 65 other citizens of Sapulpa, Okla., protesting the passage of any compulsory Sunday observance law; to the Committee on the District of Columbia.

3593. Also, petition of T. J. Blake and 40 other citizens of Stroud, Okla., protesting the passage of any Sunday observance law, particularly House bill 78; to the Committee on the District of Columbia.

3594. Also, petition of V. D. Farnsworth and about 45 other citizens of Lincoln County, Okla., protesting the passage of any compulsory Sunday observance law; to the Committee on the District of Columbia.

3595. Also, petition of E. O. Cooper and 65 other citizens of Stroud, Okla., protesting the passage of a compulsory Sunday observance law; to the Committee on the District of Columbia.

3596. Also, petition of Mrs. J. H. Epperson and 40 other citizens of Sapulpa, Okla., protesting the passage of any Sunday observance law, particularly House bill 78; to the Committee on the District of Columbia.

3597. Also, petition of William H. Gossadge and five other citizens of Seminole County, Okla., protesting the passage of House bill 78; to the Committee on the District of Columbia.

3598. Also, petition of Mrs. Ora Harris and 25 other citizens of Lincoln County, Okla., protesting the passage of House bill 78; to the Committee on the District of Columbia.

3599. Also, petition of John Eagan and 65 other citizens of Sapulpa, Okla., protesting the passage of House bill 78; to the Committee on the District of Columbia.

3600. Also, petition of Cora Winchester and 65 other citizens of Olive, Okla., protesting the passage of any compulsory Sunday observance law; to the Committee on the District of Columbia.

3601. By Mr. McREYNOLDS: Petition signed by 175 voters of Sparta, White County, Tenn., urging that immediate steps be taken to bring to a vote a Civil War pension bill carrying the rates proposed by the National Tribune; to the Committee on Invalid Pensions.

3602. By Mr. MARTIN of Massachusetts: Petition of Lawrence J. Daley, Nancy C. Simmons, and 42 other residents of Fall River, Mass., protesting against the enactment of the so-called compulsory Sunday observance bill; to the Committee on the District of Columbia.

3603. By Mr. MEAD: Petition of residents of Buffalo, N. Y., protesting against the passage of Senate bill 1667; to the Committee on Interstate and Foreign Commerce.

3604. By Mr. MORIN: Petition of Mrs. J. H. Riemann and 500 petitioners of Pittsburgh, Pa., protesting against the Lankford compulsory Sunday observance bill (H. R. 78); to the Committee on the District of Columbia.

3605. Also, petition of A. J. Robling and 550 petitioners of Pittsburgh, Pa., protesting against the Lankford compulsory Sunday observance bill (H. R. 78); to the Committee on the District of Columbia.

3606. By Mr. MURPHY: Petition of R. B. Arnold, of Bellaire, Ohio, and 44 others, asking for the passage of House bill 11, to protect the public against misleading price manipulation; to the Committee on Interstate and Foreign Commerce.

3607. Also, petition of J. L. Burris, of Smithfield, and 20 others, asking for the passage of House bill 11, to protect the public against misleading price manipulation; to the Committee on Interstate and Foreign Commerce.

3608. By Mr. O'CONNELL: Petition of the New York State National Guard Association, heartily indorsing the principles of the Tyson-Fitzgerald bills (S. 777 and H. R. 500); to the Committee on World War Veterans' Legislation.

3609. Also, petition of the New York State National Guard associations, favoring legislation for national matches and in connection therewith the school for small-arms firing; to the Committee on Military Affairs.

3610. By Mrs. ROGERS: Petition of Edna D. Douglas, of 20 Walden Street, Lowell, Mass., and 80 others against House bill 78 or any other national religious legislation which may be pending; to the Committee on the District of Columbia.

3611. By Mr. SELVIG: Petition of Mrs. Sigrid Danielson and 53 adult residents of Roseau County, protesting against the passage of House bill 78 or any other bill providing for

compulsory Sunday observance; to the Committee on the District of Columbia.

3612. By Mr. SPEAKS: Petition signed by Mrs. A. L. Gilmore and some 50 citizens of Columbus, urging the enactment of legislation increasing pension rates of Civil War soldiers and survivors; to the Committee on Invalid Pensions.

3613. Also, petition signed by Fred B. Lytle, Columbus, Ohio, and some 137 residents of Franklin County, Ohio, protesting against the enactment of House bill 78; to the Committee on the District of Columbia.

3614. Also, petition signed by C. W. Kussmaul and some 14 other citizens of Columbus, favoring the enactment of legislation increasing pension rates of Civil War veterans and widows; to the Committee on Invalid Pensions.

3615. By Mr. YON: Petition of G. A. Hawkins and 100 other citizens of Bay County, Fla., protesting against the passage of the Sunday observance bill (H. R. 78); to the Committee on the District of Columbia.

---

# SENATE

## Friday, February 10, 1928

### (Legislative day of Thursday, February 9, 1928)

The Senate reassembled at 12 o'clock meridian, on the expiration of the recess.

#### PRESIDENTIAL TERMS

The VICE PRESIDENT. The Chair lays before the Senate the unfinished business, Senate Resolution 128.

The Senate resumed the consideration of the resolution (S. Res. 128) submitted by Mr. LA FOLLETTE, as follows:

*Resolved,* That it is the sense of the Senate that the precedent established by Washington and other Presidents of the United States in retiring from the presidential office after their second term has become, by universal concurrence, a part of our republican system of government, and that any departure from this time-honored custom would be unwise, unpatriotic, and fraught with peril to our free institutions; and be it further

*Resolved,* That the Senate commends the observance of this precedent by the President.

Mr. JONES. Mr. President, if this were a resolution submitting an amendment to the Constitution providing for not more than one or two terms for a President, there might be much urged in favor of it. It does nothing of the kind. It proposes no action by the Senate. It proposes no study or legislation and not even an investigation of any sort. The passage of the resolution, in my judgment, amounts to nothing more than the declaration of 49 or more Senators that in their judgment the people of the country are not competent to select their President.

Mr. President, I can not subscribe to any such doctrine. I shall vote against the resolution and await with interest the vote of Senators whose party slogan a few years ago was "Let the people rule." Nor can I subscribe to the declaration in the resolution that leaving the selection of their President to the American people would be "unwise, unpatriotic, and fraught with peril to our free institutions." Such a reflection as that upon the American people is wholly unwarranted and unjustified. If there is such danger in trusting the people, let an amendment be submitted to the Constitution restricting or limiting the terms of their Presidents, and give the people the opportunity of deciding as to whether or not they want to limit themselves further as to the selection of their Presidents.

Mr. EDGE and Mr. HARRISON suggested the absence of a quorum.

The VICE PRESIDENT. The clerk will call the roll.

The legislative clerk called the roll, and the following Senators answered to their names:

| | | | |
|---|---|---|---|
| Ashurst | Ferris | McKellar | Shipstead |
| Barkley | Fess | McLean | Shortridge |
| Bingham | Fletcher | McMaster | Simmons |
| Black | Frazier | McNary | Smith |
| Blaine | George | Mayfield | Smoot |
| Blease | Gerry | Metcalf | Steck |
| Borah | Gillett | Moses | Steiwer |
| Bratton | Glass | Neely | Stephens |
| Brookhart | Gooding | Norbeck | Swanson |
| Broussard | Gould | Norris | Thomas |
| Bruce | Greene | Nye | Trammell |
| Capper | Harris | Oddie | Tydings |
| Caraway | Harrison | Overman | Tyson |
| Copeland | Hawes | Pine | Wagner |
| Couzens | Hayden | Pittman | Walsh, Mass. |
| Curtis | Heflin | Ransdell | Walsh, Mont. |
| Cutting | Howell | Reed, Pa. | Warren |
| Dale | Johnson | Robinson Ark. | Waterman |
| Deneen | Jones | Robinson, Ind. | Watson |
| Dill | Kendrick | Sackett | Willis |
| Edge | King | Schall | |
| Edwards | La Follette | Sheppard | |

Mr. JONES. I desire to announce that the junior Senator from New Hampshire [Mr. KEYES] is necessarily absent on official business.

The VICE PRESIDENT. Eighty-six Senators having answered to their names, a quorum is present.

Mr. SHORTRIDGE. Mr. President, I crave the indulgence of the Senate while I discuss, and I hope briefly, a resolution which I venture to suggest has no place in this body. I apologize, therefore, for taking up the time of the Senate upon a subject such as this; but perhaps I will be pardoned in view of the example which has been set.

Mr. President, I keep uppermost in my mind the Constitution of our country. That Constitution was framed by wisdom and ratified by a patriotic people. Under that Constitution we have grown from weakness unto strength, from a Nation of three and one-half millions of people to a mighty Republic of over 110,000,000, from a little Nation to one of the greatest and the most prosperous on the earth.

Naturally the pending resolution has brought to our attention the father of our country. All the resources of lofty and loving eloquence have been exhausted in vain attempts to portray the greatness and the genius for war and government of Washington. Orators, poets, historical writers, philosophers on government, each in his turn has paid tribute to the father of our country. The character of Washington, his words, his thoughts, his example have properly and naturally been brought to our attention, and before I shall have finished I hope to quote the very words of Washington in respect to the very matter embraced within the resolution before us.

I digress to say aside that I have been somewhat surprised that Senators have not consulted the writings of Washington; not what has been said of him in eulogy, but what he, the wise man, the patriotic man, the great man, said in respect of this very proposition, namely, the eligibility or ineligibility of the occupant of the presidential office. I now say at the very outset that if we read what he wrote we shall see that George Washington saw no danger to the Republic in leaving it to the wisdom and the patriotism of the people of America to choose their President.

I say with respect, as I remarked in passing a moment ago, that a resolution of this sort has no place in the Senate. This is a legislative body. The Constitution very wisely divides our Government into three great departments—the legislative, with certain delegated power; the executive, with well-defined power; and the judicial, with power to interpret, to construe the Constitution and the laws made in pursuance thereof, and laws enacted by the different States to determine whether those laws run counter to the supreme law of the Constitution or laws made in pursuance thereof.

Mr. BINGHAM. Mr. President, will the Senator yield at that point?

The PRESIDENT pro tempore. Does the Senator from California yield to the Senator from Connecticut?

Mr. SHORTRIDGE. I yield.

Mr. BINGHAM. The Senator has said that the Senate is a legislative body. Has he forgotten that it recently considered itself to be judicial?

Mr. SHORTRIDGE. I had. I should add that while it is a legislative body, its functions may be divided into three parts: First, legislative power proper; second, advisory power in the matter of treaties and certain Federal officers; and, third, judicial power when it comes to sit as a court or a body of impeachment. So the purpose and essence of this resolution can not fall within any one of these three functions which the Senate specifically has under the Constitution.

Ah, it may be said that this is a mere idle remark; but, Mr. President, if this resolution is proper to be entertained, proper to be discussed, taking the time of the Senate for hours and days, then it is quite easy to suggest that there are many other resolutions that might well, with equal propriety, be introduced and disposed of. This resolution might well be debated by members of some kindergarten school in some remote village; but the Senate of the United States is not the place for its consideration. However, the Senator from Wisconsin [Mr. LA FOLLETTE], seeing the pillars of the Republic trembling and the "wide arch of the ranged empire" collapsing, and fearing that Plymouth Rock may be taken up and thrown into the sea, introduces this moth-eaten resolution.

It has afforded a coveted opportunity for Senators to display knowledge of a few scraps of history; and it has enabled some Senators to unleash their tongues, rush to the door of the temple of liberty, and beat back the enemies of the Republic—as though to-day, in this year of our Lord 1928, an enemy was at our gate, that Hannibal was within sight of Rome.