IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Alexandria Division*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 1:21-cr-179 |
| | ) | |
| CLAUDIO ALVAREZ RODRIGUEZ, | ) | |
| | ) | |
| Defendant. | ) | |

**Government's Response in Opposition to Defendant's Motion to Dismiss**

On August 4, 2021, a grand jury charged Claudio Alvarez Rodriguez with one count of unlawful reentry, in violation of 8 U.S.C. § 1326(a), (b)(1). (ECF No. 16.) On September 1, 2021, Rodriguez filed a motion to dismiss. (ECF No. 23.) Through that motion, Rodriguez argues that § 1326 violates the constitution's Equal Protection Clause because in 1929, Congress passed a predecessor version of the illegal reentry statute and did so with improper racial animus.

As explained in Appendix A, Rodriguez's recitation of the history of the 1929 law is rife with inaccuracies, omissions, and half-truths. Rodriguez paints a picture of the legislative buildup to the passage of the 1929 law that is, at best, problematic, and at worst deeply deceptive. The government has catalogued this litany of errors in an appendix attached to this response.[1] In brief, Rodriguez's history of the 1929 law relies on a hodgepodge presentation of historical sources and congressional statements that in most instances do not bear on the 1929 reentry law itself, but instead relate to an earlier law, specifically the National Origins Act of 1924.

Notwithstanding these errors, Rodriguez's argument suffers from several other fatal flaws. Even if the Court accepts Rodriguez's recitation of the 1920s history, it at best implicates a handful

---

[1] The government has included this appendix to aid the Court's consideration of the matter. As a precaution, the government will move to extend the page limit for this response.

of congressmen and the then-Secretary of Labor, who is not a relevant decisionmaker under governing law. *See Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2350 (2021) ("[T]he legislators who vote to adopt a bill are not the agents of the bill's sponsor or proponents"). Courts should be weary of invalidating legislation, "constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it." *United States v. O'Brien*, 391 U.S. 367, 384 (1968) (emphasis added); *see also Brnovich*, 141 S. Ct. at 2349–50 ("And while the District Court recognized that the 'racially-tinged' video helped spur the debate about ballot collection, it found no evidence that the legislature as a whole was imbued with racial motives.").

Moreover, even if the Court assumes the worst about the Congress that enacted the 1929 legislation, Rodriguez's challenge would still fail. As a preliminary matter, immigration laws are subject to a highly deferential standard of review and Rodriguez does not even begin to overcome that standard. Moreover, Rodriguez fails to satisfy his burden of showing that the Congress that enacted § 1326 in 1952 did so with an impermissible motive. His arguments to the contrary lack conceptual force and ignore binding precedent. Put simply, Rodriguez's challenge fails because it is aimed at the wrong law.

## Argument

## I.     Section 1326 does not violate the Equal Protection Clause.

### A.     Statutory Background

Alien migration to the United States was unrestricted until 1875. *See Kleindienst v. Mandel*, 408 U.S. 753, 761 (1972); *see also Harisiades v. Shaughnessy*, 342 U.S. 580, 588 n.15 (1952). In 1882, Congress passed the first general immigration statute. *Id*. Several other statutes quickly followed, *see id.*, and in 1917, Congress passed legislation requiring deportation of certain aliens who entered the United States "at any time or place other than as designated by immigration

2

officials, . . . or who enter[ed] without inspection." Immigration Act of 1917, Pub. L. No. 64-301, § 19, 39 Stat. 874, 889. The 1917 law, however, contained no penalty, other than repeated deportation, for reentering the United States after removal. Accordingly, to enhance the deterrent value of our immigration laws, the 70th Congress made reentry after deportation a felony offense punishable by up to two years' imprisonment. *See* Act of Mar. 4, 1929, Pub. L. No. 70-1018; *see also United States v. Corrales-Vazquez*, 931 F.3d 944, 947 (9th Cir. 2019) ("In 1929, Congress decided that aliens who 'enter the United States surreptitiously' should be subject to not only deportation but also criminal penalties, and revised the prohibitions in the 1917 statute[.]" (internal citation omitted)).

> The Senate Report from the Committee on Immigration outlined the purpose of the law:
>
> Except [for "members of the anarchistic and similar classes"] . . . there is no provision of law under which a penalty, other than repeated deportation, can be imposed on aliens who have been expelled from the United States and who reenter the country unlawfully. It frequently happens that aliens of the criminal and other classes who are deported under the general immigration law reenter the country unlawfully. As a matter of fact, in some instances, such aliens have been deported four or five times, only to return as soon as possible to the United States in an unlawful manner.

S. Rep. No. 70-1456, at 1 (Jan. 17, 1929). The Secretary of the Department of Labor, charged at that time with enforcing the country's immigration laws, stated that the proposed law "would be of material assistance in the administration of existing immigration laws." Continuing, the Secretary noted that

> [i]t is academic that no prohibitive law can successfully be enforced without a deterrent penalty. The fact that possible deportation is not a sufficient deterrent to discourage those who seek to gain entry through other than regular channels is demonstrated by the frequency with which this department is compelled to resort to deportation proceedings for the same alien on several succeeding occasions.

*Id.*

Over twenty years later, in 1952, the 82nd Congress passed the Immigration and Nationality Act ("INA"), an act designed to "revise the laws relating to immigration, naturalization, and nationality" in the United States. *See* Pub. L. No. 82-414, 66 Stat. 163 (introduction); *see also E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 756 (9th Cir. 2018) ("In 1952, Congress replaced this disparate statutory scheme with the [INA], which remains the governing statutory framework."). Through the INA of 1952, "Congress substantially revised the immigration laws[.]" *City & Cty. of San Francisco v. United States Citizenship & Immigration Servs.*, 944 F.3d 773, 795 (9th Cir. 2019). In this renewed and comprehensive legislation, Congress passed another crime for reentry of a deported alien. The new statute provided as follows:

> Any alien who (1) has been arrested and deported or excluded and deported, and thereafter (2) enters, attempts to enter, or is at any time found in, the United States, unless (A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or (B) with respect to an alien previously excluded and deported, unless such alien shall establish that he was not required to obtain such advance consent under this or any prior Act, shall be guilty of a felony[.]

Pub. L. No. 82-414, § 276, 66 Stat. 229. And thus was born 8 U.S.C. § 1326.

Over the years, Congress has updated § 1326 multiple times—and in almost every instance, to increase its deterrent value. For instance, in the Anti-Drug Abuse Act of 1988, the 100th Congress added subsection (b) to § 1326, creating enhanced penalties for aliens with prior felony convictions. *See* Pub. L. No. 100–690, § 7345, 102 Stat. 4181; *see also United States v. Maul-Valverde*, 10 F.3d 544, 545 (8th Cir. 1993) ("Congress enacted 8 U.S.C. § 1326(b) in 1988 to substantially increase the criminal penalty if an illegally reentering alien was previously deported following a felony conviction."). Other modifications occurred in the Immigration Act of 1990, Pub. L. No. 101–649, 104 Stat. 4978 (increasing the fine provision); the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103–322, 108 Stat. 1796 (increasing penalties);

the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104–132, § 441(a), 110 Stat. 1214, 1279 (enacting 8 U.S.C. § 1326(d) in light of *United States v. Mendoza-Lopez*, 481 U.S. 828 (1987)); and the Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104–208, 110 Stat. 3009 (among other modifications, striking "arrested and deported, has been excluded and deported," and inserting "denied admission, excluded, deported, or removed").

Congress's continual strengthening of § 1326's deterrent value "suggests a crystallizing vision on Congress's part of the need for stern punishment in this milieu." *United States v. Dwinells*, 508 F.3d 63, 69 (1st Cir. 2007); *see also United States v. Shill*, 740 F.3d 1347, 1352 & n.5 (9th Cir. 2014). With this statutory backdrop in mind, the government next addresses the merits of Rodriguez's equal protection challenge.

### B.   Immigration laws are subject to deferential rational basis review.

Congress's legislative power in the arena of immigration law is plenary: "'[O]ver no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens." *Johnson v. Whitehead*, 647 F.3d 120, 126–27 (4th Cir. 2011) (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (internal citation omitted).

Given Congress's expansive authority over immigration affairs, its actions in this area are "largely immune from judicial control," *Fiallo*, 430 U.S. at 792, subject only to "narrow judicial review," *Hampton v. Mow Sun Wong*, 426 U.S. 88, 102 n.21 (1976); *see also Mathews v. Diaz*, 426 U.S. 67, 82 (1976) (describing the "narrow standard of [judicial] review of decisions made by the Congress or the President in the area of immigration and naturalization"). Indeed, "the reasons that preclude judicial review of political questions also dictate a narrow standard of review of decisions made by the Congress or the President in the area of immigration and naturalization." *Fiallo*, 430 U.S. at 796 (citing *Mathews*, 426 U.S. at 82); *see also id.* at 792 ("[I]t is important to

underscore the limited scope of judicial inquiry into immigration legislation."). This judicial deference applies equally to constitutional questions. *See Othi v. Holder*, 734 F.3d 259, 269 (4th Cir. 2013) ("[N]oting the extraordinarily deferential standard of review that applies in this [immigration] context, even as to constitutional questions."). These longstanding principles were recently reiterated by both the Supreme Court and the Fourth Circuit. *See, e.g.*, *Trump v. Hawaii*, 138 S. Ct. 2392, 2419 (2018) ("[O]ur opinions have reaffirmed and applied [this] deferential standard of review across different contexts and constitutional claims."); *Sesay v. United States*, 984 F.3d 312, 316 (4th Cir. 2021).

Under governing Supreme Court doctrine, this "deferential standard of review" is limited to considering whether the challenged law is "facially legitimate and bona fide." *Mandel*, 408 U.S. at 769. In *Mandel*, the Attorney General denied admission to a Belgian journalist who had been invited to speak at a conference at Stanford University. 408 U.S. at 756–57. The professors who wished to hear the journalist challenged that decision under the First Amendment. *Id.* at 764–65. Although the Supreme Court acknowledged that the challengers' constitutional "right to receive information" was implicated, it nonetheless limited its review to whether the Executive gave a "facially legitimate and bona fide" reason for its action. *Id.* at 764–65, 769. Given the authority of the political branches over admission, the Court held that "when the Executive exercises this [delegated] power negatively on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification" against the asserted constitutional interests of U.S. citizens. *Id.* at 770. And in so holding, the Court declined Justice Marshall's invitation in dissent to take "[e]ven the briefest peek behind the Attorney General's reason for refusing a waiver," which he asserted was a "sham." *Id.* at 778 (Marshall, J., dissenting). The Supreme Court continues to apply *Mandel*'s instruction. *See Kerry*

6

*v. Din*, 135 S. Ct. 2128, 2141 (2015) ("*Mandel* instructs us not to 'look behind' the Government's exclusion of" the alien); *see also Sesay*, 984 F.3d at 315–16 (same); *Morfin v. Tillerson*, 851 F.3d 710, 713 (7th Cir. 2017) (*Din* "left things as *Mandel* had left them," and "*Mandel* tells us not to go behind a facially legitimate and bona fide explanation").

The Supreme Court later confirmed that *Mandel*'s deferential test applies equally to congressional decision-making. In *Fiallo*, the Supreme Court considered a law giving immigration preferences to mothers of illegitimate children. 430 U.S. at 795. In other words, the state created a "categorical" entry classification that discriminated on the basis of sex and legitimacy. In reviewing an equal protection challenge alleging discrimination against fathers, the Supreme Court found "no reason to review the broad congressional policy choice at issue . . . under a more exacting standard than was applied in *Kleindienst v. Mandel*, a First Amendment case." *Id.* at 795. In rejecting the constitutional challenge, the Court remarked that the issue was one "solely for the responsibility of the Congress and wholly outside the power of this Court to control." *Id.* at 799 (quotation omitted). The Court also made clear that it was "not the judicial role in [immigration cases] to probe and test the justifications for the legislative decision." *Id.*; *see also Hawaii*, 138 S. Ct. at 2419 (citing *Fiallo*'s principle that the judiciary is not to probe the justifications underlying Congress's immigration decisions).

The Supreme Court continues to apply rational basis review to immigration related challenges, *Hawaii*, 138 S. Ct. at 2420, and recently described that standard as one providing for "minimal scrutiny." *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1693 (2017). And in the Fourth Circuit, *Mandel* and *Fiallo*'s "facially legitimate and bona fide" test requires courts to apply rational basis review when considering matters of immigration and naturalization. As the Fourth Circuit explained in *Whitehead*, when assessing the legitimacy of a statute addressing immigration,

7

"our role is not to second-guess the judgment of Congress. Rather, the question is whether the statute is supported by a rational basis." 647 F.3d at 127; *see also Midi v. Holder*, 566 F.3d 132, 137 (4th Cir. 2009).

### C.   Section 1326 easily satisfies even ordinary rational basis review.

The rational basis test "is quite deferential. It simply requires courts to determine whether the classification in question is, at a minimum, rationally related to legitimate governmental goals." *Wilkins v. Gaddy*, 734 F.3d 344, 347–48 (4th Cir. 2013). The test is met where "there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller v. Doe*, 509 U.S. 312, 320 (1993). The government "has no obligation to produce evidence to sustain the rationality of a statutory classification." *Id.* Instead, the "burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it[.]" *Id.*

Rodriguez has not even attempted such a showing. The government has a legitimate interest in deterring illegal reentry into the United States. After all, "[i]t is axiomatic that the United States, as sovereign, has the inherent authority to protect, and a paramount interest in protecting, its territorial integrity." *United States v. Flores-Montano*, 541 U.S. 149, 153 (2004); *see also United States v. Ayala-Bello*, 995 F.3d 710, 715 (9th Cir. 2021) ("[T]he federal government has a legitimate interest in controlling our borders. So when individuals enter the United States illegally, it is not irrational for the government to conclude that detaining them is in the public's best interest."). This interest is over a century old. *See Int'l Refugee Assistance Project v. Trump*, 961 F.3d 635, 648–49 (4th Cir. 2020); *see also Elhady v. Kable*, 993 F.3d 208, 213 (4th Cir. 2021) ("The government has had authority to . . . control the border since the beginning of the nation."). The Supreme Court recognized as much at least as far back as 1893: "The right to exclude or to expel all aliens, or any class of aliens, absolutely or upon certain conditions, in war or in peace,

being an inherent and inalienable right of every sovereign and independent nation, essential to its safety, its independence, and its welfare[.]" *Fong Yue Ting v. United States*, 149 U.S. 698, 711 (1893). The right of a sovereign to criminally sanction those illegally within its borders is of a similar vintage. *See Wong Wing v. United States*, 163 U.S. 228, 235 (1896) ("[I]t would be plainly competent for Congress to declare the act of an alien in remaining unlawfully within the United States to be an offence punishable by fine or imprisonment. . . .").

The relationship between these interests and § 1326—which provides sanctions for repeated violations of U.S. immigration law—is obvious. It is also clearly rational. As the Ninth Circuit put it, "it is plain that § 1326 is a necessary piece of the immigration-regulation framework; without the threat of criminal prosecution that it provides, Congress's immigration-regulation authority would be fatally undermined—all bark and no bite." *United States v. Hernandez-Guerrero*, 147 F.3d 1075, 1078 (9th Cir. 1998); *see also United States v. Henry*, 111 F.3d 111, 114 (11th Cir. 1997) ("Section 1326 . . . is a regulatory statute enacted to assist in the control of unlawful immigration by aliens." (citation omitted)); *United States v. Cupa-Guillen*, 34 F.3d 860, 863 (9th Cir. 1994) ("[T]here is a strong societal interest in controlling immigration and in effectively policing our borders. This interest is furthered by enhancing punishment against persons who illegally enter the country after having previously committed aggravated felonies."); *United States v. Barron-Rivera*, 922 F.2d 549, 555 (9th Cir. 1991) ("8 U.S.C. § 1326 is designed to effectively enforce the immigration laws").

As if this were not enough, Rodriguez is charged with violating § 1326(a), (b)(1), which Congress enacted in 1988 to increase significantly the criminal penalty for the reentry of an alien to the United States who was previously deported following a felony conviction. Pub.L. 100-690, Title VII, § 7345, 102 Stat. 4471. "By amending § 1326, Congress intended to create enhanced

penalties for 'certain' aliens who commit the underlying offense of unlawfully reentering the United States after having been previously deported[.]" *United States v. Crawford*, 18 F.3d 1173, 1177 (4th Cir. 1994). These amendments provide an additional rational basis for the law.  As courts have recognized, "through § 1326(b), Congress has determined that illegally reentering the United States after being deported following conviction on another crime is a more serious offense than simply illegally reentering the United States, and that conduct should be deterred." *United States v. Osorto*, 995 F.3d 801, 808 (11th Cir. 2021). Indeed, the enactment of § 1326(b)(1) "strongly suggests a Congressional judgment that the flouting of American immigration laws is a far graver matter where the defendant's prior deportation was for committing a serious crime than where the prior deportation was for a technical violation of the immigration laws." *United States v. Campbell*, 967 F.2d 20, 24 (2d Cir. 1992); *see also Maul-Valverde*, 10 F.3d at 545 ("Congress enacted 8 U.S.C. § 1326(b) in 1988 to substantially increase the criminal penalty if an illegally reentering alien was previously deported following a felony conviction."). Section 1326(b) also addresses recidivism. *Almendarez-Torres v. United States*, 523 U.S. 224, 230 (1998).

Because § 1326's purpose is plainly legitimate and inextricably linked to the government's undeniable interest in enforcing its immigration laws, the statute easily passes that "minimal [form of] scrutiny" known as rational basis review. *Morales-Santana*, 137 S. Ct. at 1693; *see also United States v. Spruhan*, 989 F.3d 266, 270 (4th Cir. 2021) (rejecting equal protection challenge to § 1B1.10(b)(2)); *United States v. Timms*, 664 F.3d 436, 448 (4th Cir. 2012) (same as to 18 U.S.C. § 4248); *United States v. Khan*, 461 F.3d 477, 495 (4th Cir. 2006) (same as to 18 U.S.C. § 924(c)); *accord Midi*, 566 F.3d at 137; *Appiah v. U.S. I.N.S.*, 202 F.3d 704, 710 (4th Cir. 2000).

As noted above, under rational basis review the government is not obligated to produce evidence to sustain the rationality of the challenged law. *See Heller*, 509 U.S. at 320; *Timms*, 664

F.3d at 447. To the contrary, the burden of negation lies with the challenger. *See id*. Because Rodriguez has failed to even attempt such a showing, his challenge to § 1326 fails under governing law. But this failure is especially pronounced in this case, where Rodriguez challenges a statute deriving from Congress's plenary immigration powers. *See Hernandez-Guerrero*, 147 F.3d at 1078.

Consider, for example, the Fourth Circuit's decision in *United States v. Carpio-Leon*, 701 F.3d 974 (4th Cir. 2012). There, the court considered whether 18 U.S.C. § 922(g)(5), a criminal statute barring aliens from possessing firearms, violated the defendant's Second Amendment and Fifth Amendment equal protection rights. In rejecting the defendant's Second Amendment challenge, the court noted as follows:

> [B]ecause the regulation of aliens' entry into the United States draws on the exercise of national sovereignty, "the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government." It is well settled that decisions made by the political branches on immigration are subject only to a "narrow standard of review." The Supreme Court, resting on the sovereign aspect of regulating aliens, "has repeatedly emphasized that 'over no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens."

> Thus, when Congress regulates illegal aliens by prohibiting them from possessing firearms, it is functioning in a special area of law committed largely to the political branches, and on which we owe Congress special deference. Indeed, in addition to making the possession of firearms by illegal aliens a crime, Congress has also made Carpio–Leon's unexamined entry into the United States a crime.

*Id*. at 981–82 (internal citations omitted). In addressing the defendant's equal protection challenge, the court next held that

> Carpio-Leon cannot show that there is no rational relationship between prohibiting illegal aliens from bearing firearms and the legitimate government goal of public safety. . . . More generally, the Supreme Court has "firmly and repeatedly endorsed the proposition that Congress may make rules as to aliens that would be unacceptable if applied to citizens." Congress therefore surely can rationally distinguish between legal aliens and illegal aliens.

*Id*. at 982–83 (internal citations omitted).

Like the statute at issue in *Carpio-Leon*, § 1326 derives from that "special area of law" where Congress's power to regulate illegal aliens is at its apex. *See Abebe v. Mukasey*, 554 F.3d 1203, 1207 n.6 (9th Cir. 2009) ("[F]ederal power is at its zenith" in immigration setting). And in this context, Congress may legislate in ways that might otherwise be impermissible. *See Carpio-Leon*, 701 F.3d at 983; *Whitehead*, 647 F.3d at 127 ("[I]n matters of immigration and naturalization, 'Congress regularly makes rules that would be unacceptable if applied to citizens.'" (quoting *Fiallo*, 430 U.S. at 792)). This is so even with respect to criminal statutes. *See Carpio-Leon*, 701 F.3d at 983. Defendants always bear the burden of demonstrating the absence of a rational relationship between the challenged statute and the government's interest. And while special deference is afforded to Congress's legislative decisions in the immigration context, none is needed to reject the defendant's challenge to § 1326. *See Tuan Anh Nguyen v. I.N.S.*, 533 U.S. 53, 72–73 (2001) ("In light of our holding that there is no equal protection violation, . . . we need not assess the implications of statements in our earlier cases regarding the wide deference afforded to Congress in the exercise of its immigration and naturalization power." (internal citations omitted)).

Of course, Rodriguez's inability to successfully challenge § 1326 under rational basis review was predictable. As the Supreme Court recently stated, "it should come as no surprise that the Court hardly ever strikes down a policy as illegitimate under rational basis scrutiny." *Hawaii*, 138 S. Ct. at 2420. "On the few occasions where we have done so," the Court continued, "a common thread has been that the laws at issue lack any purpose other than a bare . . . desire to harm a politically unpopular group." *Id*. (internal quotation marks and citation omitted). That is clearly not the case with § 1326—a law seeking to deter *all* aliens from illegally reentering the

country following deportation. The statute's relationship to its goal—one which is at the core of sovereignty, *see Dep't of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959, 1982 (2020) ("The power to admit or exclude aliens is a sovereign prerogative" (alteration omitted)); *Sesay*, 984 F.3d at 316 ("[T]he admission and exclusion of those seeking entry is a 'fundamental sovereign attribute'" (quoting *Hawaii*, 138 S. Ct. at 2418))—is beyond question.

Because § 1326 easily satisfies rational basis review, this Court should reject Rodriguez's equal protection challenge.

### D.   Rodriguez's reliance on *Arlington Heights* is misplaced.

Notwithstanding the foregoing doctrinal framework, Rodriguez insists that § 1326 violates the Equal Protection Clause due to its predecessor statute's allegedly checkered past. Rodriguez's "forever tainted" argument hinges almost exclusively on *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). That case, which involved a rezoning request to accommodate the placement of low-income housing, is both inapplicable and unhelpful to Rodriguez.

First, the rubric of *Arlington Heights* in inapplicable to Congress's immigration laws. The expansive *Arlington Heights* inquiry is antithetical to the longstanding principle that it is "not the judicial role . . . to probe and test the justifications for [] legislative decision[s]" in the immigration context. *Fiallo*, 430 U.S. at 799; *see also Mandel*, 408 U.S. at 778. *Arlington Heights* invites inquiry into "circumstantial and direct evidence of intent," the "historical background of the decision," the "specific sequence of events leading up to the challenged decision," and the "legislative or administrative history." 429 U.S. at 267–68. Such an inquiry cannot be squared with the plenary power given to Congress over immigration policy and the narrow judicial review over such policymaking. A test drawn from a Supreme Court case involving a local zoning ordinance

cannot control judicial review in the highly circumscribed context of immigration legislation. *Accord Hawaii*, 138 S. Ct. at 2420 n.5 (criticizing "the dissent's assumption that courts should review immigration policies . . . under the *de novo* 'reasonable observer' inquiry applicable to cases involving holiday displays and graduation ceremonies.").

But even if that were not the case—and the Court could, in fact, probe the motives of the legislators who passed the challenged immigration law—Rodriguez's challenge would still fail. The reason for this is simple. The vast majority of Rodriguez's equal protection argument hinges on the motives of a handful of Congressmen involved in passing a 1929 reentry statute—not the statute Rodriguez is actually charged with violating, § 1326. Putting aside the fact that "it is extremely difficult for a court to ascertain the motivation, or collection of different motivations, that lie behind a legislative enactment[,]" *Palmer v. Thompson*, 403 U.S. 217, 224 (1971), Rodriguez challenge fails because it is levelled at the wrong set of legislative motives.

The governing statutory framework of United States immigration law comes from 1952, when Congress replaced prior disparate statutes with the comprehensive INA. *See* Pub. L. No. 82-414, 66 Stat. 163; *see also E. Bay Sanctuary Covenant*, 932 F.3d at 756. Moreover, in addition to enacting § 1326 in 1952, Congress has amended the statute multiple times since, including in 1988, 1990, 1994, 1996, and 1997. Rodriguez has no argument or evidence regarding these subsequent enactments. Such omissions are fatal to his claim, which, as explained in greater detail below, falters for both legal and conceptual reasons.[2]

---

[2] Even if Rodriguez's equal protection argument were properly framed, the import of any legislative animus, assuming such evidence could be considered, would likely be greatly diminished. *Accord Hawaii*, 138 S. Ct. at 2418 ("[T]he issue before us is not whether to denounce the [President's] statements. It is instead the significance of those statements in reviewing a Presidential directive, neutral on its face, addressing a matter within the core of executive responsibility. In doing so, we must consider not only the statements of a particular President, but also the authority of the Presidency itself.").

On Rodriguez's view, history stopped in 1929. But Rodriguez's almost exclusive focus on legislators' comments from the 1920s sheds little light on a statute that was enacted in 1952 and amended multiple times since.[3] According to Rodriguez, the taint of prior discriminatory intent forever prevents the criminalization of illegal reentry—absent some sort of affirmative congressional disclamation of prior wrongs. But this approach makes little sense. Whether intentional discrimination existed in 1929 legislation is a question about the motives of the 1929 legislature. Legislative intent, however, is not an artifact that "carr[ies] over" from one law to the next. *See City of Mobile v. Bolden*, 446 U.S. 55, 74 (1980) (plurality opinion) (asking "whether a discriminatory intent has been proved" as to the particular enactment at issue, because "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful"); *cf. Palmer*, 403 U.S. at 225 ("[T]here is an element of futility in a judicial attempt to invalidate a law because of the bad motives of its supporters" because, among other reasons, "it would presumably be valid as soon as the legislature or relevant governing body repassed it for different reasons"). As the Supreme Court has put it in a related context:

> It is entirely a different matter when we are asked to void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it. What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork. *We decline to void essentially on the ground that it is unwise legislation which Congress had the undoubted power to enact and which could be reenacted in its exact form if the same or another legislator made a 'wiser' speech about it.*

*O'Brien*, 391 U.S. at 384 (emphasis added).

---

[3] By 1952, the Congressmen cited in Rodriguez's motion were either out of Congress (Albert Johnson, Patrick O'Sullivan, Robert Green, John Schafer) or no longer alive (Coleman Blease, John Box, Harry Laughlin). James Davis, the Secretary of Labor from 1921 to 1930, died in 1947.

Viewed accordingly, even assuming *Arlington Heights* applies to this case, it would only get Rodriguez so far. First, even when a court finds that prior discrimination was recent, "[t]he ultimate question remains whether a discriminatory intent has been proved in [the] given case"—that is, for the challenged enactment. *City of Mobile*, 446 U.S. at 74 (plurality opinion). Here, the discriminatory intent cited by Rodriguez is neither recent—preceding § 1326 by over two decades—nor proven in the "given case," *i.e.*, in the 1952 statute or in any of its subsequently amended versions. While it is true that under *Arlington Heights* "legislative or administrative history may be highly relevant," the Supreme Court has specified that this is especially so "where there are contemporary statements by members of the decision making body[.]" *Arlington Heights*, 429 U.S. at 268; *see also id*. at 267 (focusing the Court's "historical background" analysis on the "specific sequence of events leading up to the challenged decision"). Rodriguez, however, has offered no such "contemporary statements." *See DHS v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1916 (2020) (plurality opinion) ("[T]hese statements—remote in time and made in unrelated contexts—do not qualify as 'contemporary statements' probative of the decision at issue." (quoting *Arlington Heights*, 429 U.S. at 268)); *Ramos v. Wolf*, 975 F.3d 872, 898 (9th Cir. 2020) ("[W]e find it instructive that these statements occurred primarily in contexts removed from and unrelated to TPS policy or decisions." (citing *Regents*, 140 S. Ct. at 1916)); *see also Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1261 (9th Cir. 2016).

Second, even if the Court were to conduct a motive-probing inquiry under *Arlington Heights* and conclude that improper animus motivated the 1929 law's enactment, Rodriguez would still face two problems. First, that exercise would shed little light on the 1952 statute. But even if it did, the burden would then "shift[] to the law's defenders to demonstrate that the law would have been enacted without this factor." *North Carolina State Conference of NAACP v. McCrory*, 831

16

F.3d 204, 221 (4th Cir. 2016) (internal quotation marks and citation omitted). That burden is easily met here, where the law has a clear rational basis and where Rodriguez fails to demonstrate that Congress was motivated by impermissible animus when it enacted § 1326 in 1952 or when it repeatedly amended it in the years since. Indeed, the Court need not speculate that the law *would have been* enacted: it was, and several times over.

Thus, even if we accept the worst about the Congress that enacted the 1929 legislation—itself a substantial leap—§ 1326 would still not violate the Equal Protection Clause. Congress's repeated efforts—over the course of multiple decades—to strengthen the law against unlawful reentry underscores the implausibility of Rodriguez's claim that Congress has been acting out of a discriminatory animus, rather than seeking to address the lasting, and difficult problem of illegal immigration.

The way in which later congressional enactments undermine Rodriguez's argument accords with post-*Arlington Heights* cases, which recognize, for example, that the historical background of a decision is one source of evidence of intentional discrimination, but that "unless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value." *McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987); *see also id.* ("Although the history of racial discrimination in this country is undeniable, we cannot accept official actions taken long ago as evidence of current intent."). Other post-*Arlington Heights* cases have viewed variants of the "taint argument" with equal skepticism. For example, in *Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, the Supreme Court held that a law sharing a "common heritage" with an earlier bill should not be "presumed to have been enacted for the same purposes." 461 U.S. 190, 215 (1983). As the Court explained, "these [earlier] provisions and their pedigree do not taint other parts of the" challenged Act. *Id.* at 216.

17

And, most recently, in *Abbott v. Perez*, the Supreme Court explained that "the presumption of legislative good faith [is] not changed by a finding of past discrimination." 138 S. Ct. 2305, 2324 (2018). In so holding, the Court reiterated its almost forty-year-old statement that "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *Id*. (quoting *City of Mobile*, 446 U.S. at 74). The Court also held that in assessing an equal protection challenge, the relevant focus must be on the legislature that enacted the challenged law or policy, not on earlier legislatures. *Abbott* rebuffed the challenger's attempt to tar a 2013 redistricting plan on the basis of its 2011 predecessor, holding that "there can be no doubt about what matters: It is the intent of the 2013 Legislature." *Id*. at 2325; *see also id*. ("[I]t was the plaintiffs' burden to overcome the presumption of legislative good faith and show that the 2013 Legislature acted with invidious intent.").

Taken collectively, this trio of cases counsel strongly in favor of rejecting Rodriguez's attempt to shoehorn cherry-picked legislative history from the 1920s into the present-day version of § 1326. As in *McCleskey*, Rodriguez's evidence from the 1920s "has little probative value" for understanding Congress's motivation for enacting § 1326 in 1952, to say nothing of its intent in 1988, 1990, 1994, 1996, or 1997. 481 U.S. at 298 n.20. Similarly, and more fundamentally, *Pacific Gas & Elec. Co.* instructs that viewing § 1326 through the lens of its possible predecessor statute makes little conceptual sense, as the 1929 statute is simply "not before the Court[.]" 461 U.S. at 215–16. And finally, *Abbott* reinforces the intuitive approach adopted in the Court's prior decision in *City of Mobile* that legislative intent is not indelibly ingrained in statutory text, and that in weighing the motives of legislators in the context of an equal protection challenge, courts should focus on the legislature that passed the challenged law, not on earlier legislatures. 138 S. Ct. at 2324–25. The Supreme Court's recent decision in *Brnovich* is also fully in accord. 141 S. Ct. at

18

2349 n.22 (endorsing a district court's finding that evidence of discriminatory intent by an earlier legislature "had less probative value for inferring the purpose behind [the challenged action] because the bills were passed 'during different legislative sessions by a substantially different composition of legislators'" (citation omitted)).[4]

The principles articulated in the above cited cases are on full display in the Fourth Circuit's recent decision in *North Carolina State Conference of the NAACP v. Raymond*, 981 F.3d 295 (4th Cir. 2020). There, the court faced a challenge to a 2018 North Carolina voter identification law that the challengers alleged was passed with the same intent as a 2013 law the Fourth Circuit, in *McCrory*, 831 F.3d at 215, had previously held was enacted with racially discriminatory intent.[5] The district court granted a preliminary injunction against the 2018 law's enforcement, concluding that the challengers were likely to succeed on the merits of their equal protection claim. *Raymond*, 981 F.3d 295 at 298. The Fourth Circuit reversed, framing the question presented thusly: "The outcome [of this case] hinges on the answer to a simple question: How much does the past matter?" *Id*. And in concluding that the district court erred, the court rejected the notion that "the North Carolina General Assembly's recent discriminatory past was effectively dispositive of the Challengers' claims[.]" *Id*. As the court put it, "[a] legislature's past acts do not condemn the acts

---

[4] Rodriguez relies on the Ninth Circuit's "cat's paw" theory to support his argument, *see* Def. Mot. 20 (citing *Democratic National Committee v. Hobbs*, 948 F.3d 989, 1041 (9th Cir. 2020)), but fails to acknowledge that the Supreme Court reversed that decision in *Brnovich*, and in doing so, explicitly rejected the applicability of the "cat's paw" theory to this context. *See* 141 S. Ct. at 2350 ("The 'cat's paw' theory has no application to legislative bodies. The theory rests on the agency relationship that exists between an employer and a supervisor, but the legislators who vote to adopt a bill are not the agents of the bill's sponsor or proponents. Under our form of government, legislators have a duty to exercise their judgment and to represent their constituents. It is insulting to suggest that they are mere dupes or tools.").

[5] Although Rodriguez repeatedly cites *McCrory*, he fails to cite *Raymond*, which is the sequel to *McCrory* and entirely forecloses his argument. Rodriguez also fails to cite *Abbott* even once.

19

of a later legislature, which we must presume acts in good faith. *Id.* (citing *Abbott*, 138 S. Ct. at 2324).

Key to *Raymond*'s holding was the proper operation of the presumption of legislative good faith and the correct assignment of the burden of proof in equal protection challenges. As *Raymond* stated:

> The district court here considered the General Assembly's discriminatory intent in passing the 2013 Omnibus Law to be effectively dispositive of its intent in passing the 2018 Voter-ID Law. In doing so, it improperly flipped the burden of proof at the first step of its analysis and failed to give effect to the Supreme Court's presumption of legislative good faith. These errors fatally infected its finding of discriminatory intent.

*Id.* at 303. Moreover, *Raymond*, rejected the precise burden-shifting argument Rodriguez makes here in stating that "Congress made no attempt to remove or distance itself from the 1929 legislation's discriminatory purpose[.]" Def. Mot. 25; *see also id.* at 26 ("The absence of any congressional statement in 1952 to vitiate the racist origins and intent of the 1929 statute that the 1952 statute reenacted defeats the contention that the later enactment cleansed the original statute's discriminatory purpose."; *id.* at 27 ("In reenacting the crime of illegal reentry in 1952, Congress could have chosen to reflect on the law's racist origins and consequences, decided that there were other permissible reasons to keep the law on the books, and reenacted the law without the taint of racism. That did not happen."). As *Raymond* held, the district court erroneously assumed that the North Carolina legislature's positions "remained virtually unchanged[.]" 981 F.3d at 304. By "requiring the General Assembly to purge the taint of the prior law, the district court flipped the burden and disregarded *Abbott*'s presumption." *Id.* at 305; *see also accord Riddick by Riddick v. Sch. Bd. of City of Norfolk*, 784 F.2d 521, 539 (4th Cir. 1986) ("We reject plaintiffs' argument that the Norfolk school board must continue to justify all of its actions because of the history of segregation. While that history of discrimination cannot and should not be ignored, it 'cannot in

20

the manner of original sin, condemn governmental action that is not itself unlawful.'" (quoting *City of Mobile*, 446 U.S. at 74)).  Like the challengers in *Raymond*, Rodriguez asks this Court to flip the operative burden of proof and disregard the presumption of legislative good faith.[6] But Supreme Court and Fourth Circuit precedent foreclose that approach.[7]

Notably, the principles that animated *Raymond* are equally applicable to criminal statutes. For example, in *United States v. Johnson*, 40 F.3d 436 (D.C. Cir. 1994), the D.C. Circuit rejected an argument conceptually identical to that lodged by Rodriguez. There, the defendants challenged 21 U.S.C. § 841(b) (enacted as part of the Anti–Drug Abuse Act of 1986) on the grounds that its "sentencing scheme violates the equal protection component of the Fifth Amendment by disproportionately and invidiously impacting blacks through meting out of harsher penalties for offenses involving crack cocaine[.]" *Id*. at 439. As part of their challenge, the defendants pointed to racist legislative statements made during debates that preceded a 1914 statute that criminalized cocaine trafficking. The D.C. Circuit rejected this line of attack:

> Appellants urge us to ascribe a discriminatory intent to Congress based on rather sketchy and unpersuasive bits of information. They point first to the undeniable racism that animated legislative debate leading to the passage of a 1914 statute criminalizing cocaine trafficking generally, long before the crack/powder distinction was contemplated. We think this information is of no relevance to our inquiry into the motives of the Congress that passed the 1986 Act.

---

[6] Rodriguez's argument also assumes that there is, in fact, a taint to be "purged." As explained in Appendix A, Rodriguez's recitation of the history surrounding the 1929 law is skewed and inaccurate. Thus, his argument rests on the faulty premise that the 1929 unlawful reentry statute is the product of impermissible racial animus.

[7] Other courts of appeals are in accord. *See, e.g.*, *Greater Birmingham Ministries v. Sec'y of State for State of Alabama*, 992 F.3d 1299, 1324–26 (11th Cir. 2021); *Hayden v. Patterson*, 594 F.3d 150, 166–67 (2d Cir. 2010); *Johnson v. Governor*, 405 F.3d 1214, 1223–24 (11th Cir. 2005) (en banc); *Chen v. City of Houston*, 206 F.3d 502, 520–21 (5th Cir. 2000); *Cotton v. Fordice*, 157 F.3d 388, 391–92 & n.7 (5th Cir. 1998). And, like the Supreme Court in *Abbott* and the Fourth Circuit in *Raymond*, these courts have also rejected the proposition that prior intent "remains legally operative" unless and until some affirmative contrary showing is made. *Johnson*, 405 F.3d at 1223; *Hayden*, 594 F.3d at 166–67; *accord Cotton*, 157 F.3d at 392.

*Id*. at 440 (citing *McCleskey*, 481 U.S. at 298 n.20). Concluding, *Johnson* observed that "it would be anomalous to attempt to tar the present Congress with the racist brush of a pre-World War I debate." *Id*. Echoing *Johnson*, the Ninth Circuit has rejected a like challenge to § 841(b):

> In support of his discriminatory purpose argument, Dumas points to the racism which permeated the legislative debates leading to enactment of the Harrison Act of 1914, the first federal law to criminalize cocaine. The crack/powder cocaine sentencing distinction was adopted in 1986, with the passage of the Anti-Drug Abuse Act. The changes which occurred in American society between 1914 and 1986—changes brought about in part by successive Congresses and by the impact of the Voting Rights Act on the makeup of Congress itself—make it "anomalous" to ascribe to the 1986 Congress the racism of the Congress of 1914.

*United States v. Dumas*, 64 F.3d 1427, 1430 (9th Cir. 1995) (citing *Johnson*, 40 F.3d at 440).

This line of cases makes eminent sense. In any challenge to a statute, the critical focus must be on the contested law itself, not its two-decade old predecessor. Divining the intent of a particular legislature is a difficult enough enterprise. The Supreme Court has described it as "a problematic undertaking," *Hunter v. Underwood*, 471 U.S. 222, 228 (1985), and "a hazardous matter," *O'Brien*, 391 U.S. at 383. Attempting to ascertain the intent of a Congress from 1929 and then imputing it—with no supporting evidence—to a Congress from 1952 (or 1988, 1990, 1994, 1996, or 1997), is not only "problematic" or "hazardous," it is illogical. *See Veasey v. Abbott*, 888 F.3d 792, 801 (5th Cir. 2018) ("The court also erred in apparently presuming, without proof, that any invidious intent behind SB 14 [enacted in 2011] necessarily carried over to and fatally infected SB 5 [enacted in 2017]."). This Court should decline Rodriguez's invitation to participate in this metaphysical undertaking.

In fact, this undertaking is even more complex than even Rodriguez recognizes. Adding to the conceptual difficulty of imputing to the 1952 Congress the supposed motives of the 1929 Congress is the fact that the 1929 Act was not the only precursor to what eventually became § 1326 in 1952. Prior to passing the general reentry statute in 1929, Congress had previously passed (in

22

1917 and 1918) two other reentry statutes targeting anarchists and prostitutes, each with differing penalties. *See Mendoza-Lopez*, 481 U.S. at 835 ("Before § 1326 was enacted, three statutory sections imposed criminal penalties upon aliens who reentered the country after deportation"). Section 1326 is the product of Congress combining all the existing reentry statutes. As a 1950 Report of the Senate Committee on the Judiciary stated, "[t]he provisions relating to reentry after deportation should be carried forward in one section and apply to any alien deported for any reason and provide for the same penalty." S. Rep. No. 81–1515 at 656 (1950). And "[t]he purpose of § 1326 was to impose the same penalty on any person who returned to the United States without permission after deportation, regardless of the basis of the original deportation." *Mendoza-Lopez*, 481 U.S. at 835 n.10 (citing S. Rep. No. 1515, 81st Cong., 2d Sess., 655, 656 (1950)). Thus, although the 1929 Act remains closest in time to the 1952 statute, § 1326 actually owes its existence to a number of statutory ancestors. *See United States v. Corrales-Beltran*, 192 F.3d 1311, 1319 (9th Cir. 1999) (Immigration Act of 1917 was "precursor statute to § 1326"); *United States v. Aldana*, 878 F.3d 877, 880 (9th Cir. 2017) (1917 Act was the "predecessor" to 8 U.S.C. § 1325).

Given this reality, if the Court were to adopt Rodriguez's approach of reading the 1952 statute by recourse to the views of the 1929 legislature, it presumably would have to extend that inquiry to reach § 1326's other two antecedents. Rodriguez, however, does not even acknowledge these other precursors.

Nor does Rodriguez acknowledge the fact that he is charged with violating § 1326(a), (b)(1), which was enacted in 1988, and, as noted above, signals Congress's determination "that illegally reentering the United States after being deported following conviction on another crime is a more serious offense than simply illegally reentering the United States, and that conduct should be deterred." *Osorto*, 995 F.3d at 808; *see also Campbell*, 967 F.2d at 24 (enactment of

23

§ 1326(b)(1) "strongly suggests a Congressional judgment that the flouting of American immigration laws is a far graver matter where the defendant's prior deportation was for committing a serious crime than where the prior deportation was for a technical violation of the immigration laws."). Rodriguez provides no evidence that Congress was motivated by impermissible considerations when it amended the statute in 1988. Indeed, the Anti-Drug Abuse Act of 1988 passed the Senate by an 87-3 votes and was supported by then Senator Joseph R. Biden, as well as Senators John Kerry, Patrick Leahy, and numerous others not generally considered among the racist class. *See* 134 Cong. Rec. 30826 (1988).

*      *      *

This Court should reject Rodriguez's argument as both ahistorical, conceptually flawed, and inconsistent with binding precedent. Doing so would align the Court with jurists in this District and almost every other court in the country. *See United States v. Palacios-Arias*, No. 3:20-cr-62 (JAG), ECF No. 29  at 6–7 (E.D. Va. Oct. 13, 2020) ("Even assuming[] [] that the Court can consider the discriminatory purpose that the defendant alleges motivated Congress to pass the Undesirable Aliens Act of 1929, this evidence has only marginal relevance to the defendant's challenge to the INA, passed by Congress twenty-three years later."); *United States v. Cac-Chon*, No. 3:20-cr-61 (HEH), ECF No. 27 at 4 (E.D. Va. Nov. 10, 2020) ("[E]ven if this Court accepted Defendant's analysis that Congress's primary purpose in passing the Undesirable Aliens Act of 1929 was discriminatory, it would be improvident and inappropriate to use that same basis to infer the intent of the 82nd Congress."); *see also United States v. Machic-Xiap*, No. 19-cr-407 (MHS), 2021 WL 3362738, at *14 (D. Or. Aug. 3, 2021) ("Mr. Machic-Xiap argues that the Court should look for evidence that the 1952 Congress that passed the INA cured the discriminatory taint of the 1929 Act, but that is exactly what the Supreme Court in Abbott criticized a district court for

24

doing."); *United States v. Novondo-Ceballos*, No. 21-cr-383 (RCB), 2021 WL 3570229, at *5 (D.N.M. Aug. 12, 2021) ("[T]he Court finds that subsequent reenactments of § 1326 have cleansed the law of its original taint."); *United States v. Wence*, No. 20-cr-27 (RAM), 2021 WL 2463567, at *7 (D.V.I. June 16, 2021) ("Wence in turn employs an argument from the negative, asserting that by failing to clearly repudiate the 1929 Act's racist origins, the subsequent reenactments of 8 U.S.C. § 1326 are necessarily tainted by the 1929 Act's discriminatory purpose. This argument, however, improperly seeks to shift the burden to the Government and incorporates fallacious reasoning." (internal citation omitted)); *United States v. Gutierrez-Barba*, No. 19-cr-1224 (DJH), 2021 WL 2138801, at *4 (D. Ariz. May 25, 2021) ("Neither *Ramos* or *Espinoza* hold, as the Defendant asserts, that 'courts must examine the racial motivations of a law at the time of its passage and later reenactments do not cleanse a law of its original taint.'"); *United States v. Medina-Zepeda*, No. 20-cr-57 (FMO), at ECF No. 33 at 5 (C.D. Cal. Jan. 5, 2021) ("Defendant provides no authority or basis for the court to evaluate the 1952 statute solely on the basis of the legislative history relating to the Undesirable Aliens Act of 1929."); *United States v. Rios-Montano*, No. 19-cr-2123 (GPC), 2020 WL 7226441, at *3 (S.D. Cal. Dec. 8, 2020) ("While the precursor illegal entry statute enacted in 1929 was enacted with discriminatory intent, the taint from the 1929 statute had dissipated by 1990 [when Congress criminalized attempted unlawful entry under 8 U.S.C. § 1325(a)(1)] and there is no evidence that the 1990 Congress entertained any discriminatory purpose."); *United States v. Lucas-Hernandez*, No. 19-MJ-24522 (LL), 2020 WL 6161150, at *2 (S.D. Cal. Oct. 21, 2020) ("The Court finds that Defendant's *Arlington Heights* analysis of § 1325(a)(1) is fatally flawed because it relies entirely on legislative history from the 1920s, decades before § 1325(a)(1) was enacted."); *United States v. Morales-Roblero*, No. 3:19-MJ-24442 (AHG), 2020 WL 5517594, at *9 (S.D. Cal. Sept. 14, 2020) ("Defendant's *Arlington*

*Heights* analysis of § 1325(a)(1) is fatally flawed, however, because it relies entirely on legislative history from the 1920s, decades before § 1325(a)(1) was enacted.").

### E.    Rodriguez's disparate impact claim is misplaced.

As explained above, Rodriguez has failed to show any discriminatory purpose on the part of the Congress that passed (or subsequently modified) § 1326. In addition to this failure, Rodriguez is also unable to demonstrate a cognizable disparate impact. The only real argument the defendant attempts on this score is to point out that a large percentage of defendants charged with unlawful reentry are Hispanic. Def. Mot. 22–23.

As a threshold matter, § 1326 applies to any alien who reenters the U.S. illegally. The statute makes no distinctions based on nationality or race and such laws are presumptively compliant with equal protection principles. *See Vacco v. Quill*, 521 U.S. 793, 800 (1997) ("Generally speaking, laws that apply evenhandedly to all unquestionably comply with the Equal Protection Clause." (internal quotation marks and citation omitted)). In any event, geography— not discrimination—accounts for the fact that the majority of those prosecuted for Illegal Reentry are Mexican or Hispanic. For instance, in Fiscal Year 2019, Customs and Border Patrol had 859,501 total "encounters."[8] Ninety-nine percent of those encounters (851,508) occurred on the Southwest border.[9] Those numbers are neither surprising, *see, e.g.*, *Arizona v. United States*, 567 U.S. 387, 397 (2012) ("Arizona bears many of the consequences of unlawful immigration. Hundreds of thousands of deportable aliens are apprehended in Arizona each year."), nor illuminating of Congress's intent in 1929 or 1952.[10] And they are certainly not sufficient to demonstrate a cognizable disparate impact.

---

[8] *See* https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics-fy2019.
[9] *See* https://www.cbp.gov/newsroom/stats/sw-border-migration/fy-2019.
[10] Unsurprisingly, it was in the federal districts along the Southern border (Texas, New

Indeed, the Supreme Court recently rejected just this sort of equal protection claim, holding that the disparate impact caused by the rescission of Deferred Action for Childhood Arrivals ("DACA") on Hispanics from Mexico—totaling 78 percent of DACA recipients—did not establish a plausible equal protection claim "because Latinos make up a large share of the unauthorized alien population, [and] one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program." *See Regents*, 140 S. Ct. at 1915. Continuing, the Court noted that "[w]ere this [statistical] fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds." *Id.* at 1916; *see also Ramos*, 975 F.3d at 898 (applying *Regents* to reject similar argument).

Like the Supreme Court, the Ninth Circuit has rejected a similar statistics-based argument in a related context, noting that "common sense suggests that it would be substantially more difficult for an alien removed to China to return to the United States than for an alien removed to Mexico to do so." *United States v. Arenas-Ortiz*, 339 F.3d 1066, 1070 (9th Cir. 2003). The Fourth Circuit has also rejected a similar line of attack in the equal protection context. *See United States v. Perkins*, 108 F.3d 512, 518 (4th Cir. 1997) (declining invitation to reconsider the constitutionality of 21 U.S.C. § 841(b) "in light of a 1995 report by the United States Sentencing Commission showing that over eighty percent of those convicted for cocaine base trafficking or possession are black" and holding that "[t]he fact that the statute does not have a uniform racial impact, however, is not enough to establish an equal protection violation."); *see also United States v. D'Anjou*, 16 F.3d 604, 612 (4th Cir. 1994) ("In this instance, there is evidence that the line

---

Mexico, Arizona, and California) that the so-called fast-track programs for processing immigration crimes, subsequently authorized by the PROTECT ACT, initially began. *See United States v. Marcial-Santiago*, 447 F.3d 715, 718 (9th Cir. 2006).

Congress and the Sentencing Commission have drawn has a disproportionate impact upon blacks. But this is not sufficient to make out an Equal Protection Violation.").

And of course, these holdings are in accord with longstanding Supreme Court precedent, including *Arlington Heights*, holding that "official action will not be held unconstitutional solely because it results in a racially disproportionate impact." 429 U.S. at 264–65; *see also Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 272 (1979) ("When the basic classification is rationally based, uneven effects upon particular groups within a class are ordinarily of no constitutional concern."); *Washington v. Davis*, 426 U.S. 229, 242 (1976) ("[W]e have not held that a law, neutral on its face and serving ends otherwise within the power of government to pursue, is not invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than of another.").

For these reasons, the Court should reject Rodriguez's attempt to demonstrate purposeful discrimination based on disparate impact. *Austin v. Berryman*, 955 F.2d 223, 229 (4th Cir. 1992).

### F.    Rodriguez's remaining arguments are unavailing.

To support his equal protection challenge, Rodriguez attempts to seek refuge in two recent Supreme Court decisions. Def. Mot. 27. Both are inapposite.

Rodriguez cites *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020), as supporting his position on the correctness of consulting a progenitor law's legislative history in assessing the constitutionality of a now-existing law. Such reliance is misplaced. The question presented in *Ramos* was whether a state law allowing non-unanimous jury verdicts in criminal trials was constitutional. *Ramos*, 140 S. Ct. at 1392. The Court held that the Sixth Amendment right to a jury trial "requires a unanimous verdict to convict a defendant of a serious offense." *Id*. at 1394. While it is true that the Court noted that laws requiring non-unanimous verdicts in criminal cases were rooted in racism, the

Court's fundamental holding was not that such laws are unconstitutional due to their past, but that the Sixth Amendment demanded unanimity in criminal trials. *See id*. at 1397 ("There can be no question either that the Sixth Amendment's unanimity requirement applies to state and federal criminal trials equally."). *Ramos* was not an equal protection case and never applied, or even cited, *Arlington Heights*. *See id*. at 1410 ("Ramos does not bring an equal protection challenge.") (Sotomayor, J., concurring). In fact, in explaining its acknowledgment of the racist history of non-unanimous jury laws, the Court stated that it did so as part of the "functional" analysis required by the Sixth Amendment. *See id*. at 1401 n.44. As such, *Ramos* provides no support for Rodriguez's attempt to invalidate § 1326.

Equally irrelevant is *Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246 (2020). There, the Court considered whether application of a "no-aid" provision barring religious schools from participating in a state scholarship program violated the Free Exercise Clause of the First Amendment. *Espinoza*, 140 S. Ct. at 2254. The answer was yes, because the provision "plainly exclude[d] schools from government aid solely because of religious status." *Id*. at 2255. Notably, the Court did not rule on equal protection grounds. *See id*. at 2263 n.5. Nor was the challenged provision found unconstitutional because of any "checkered tradition," as the defendant suggests. Def. Br. 28–29. That phrase appears briefly in the opinion in response to the argument that a tradition arose in the second half of the 19th century against state support for religious schools. *Espinoza*, 140 S. Ct. at 2258. The Court rejected that movement as illuminating the historical understanding of the Free Exercise Clause. *Id*. at 2259 ("The no-aid provisions of the 19th century hardly evince a tradition that should inform our understanding of the Free Exercise Clause.").

In other words, neither *Ramos* nor *Espinoza* stands for the proposition Rodriguez claims—that "reenacting a law with a discriminatory purpose does not cleanse the law of that purpose." Def. Mot. 27. For these reasons, Rodriguez's reliance on *Ramos* and *Espinoza* should be rejected.

## II. *Carrillo-Lopez* is wrong.

Rodriguez relies on *United States v. Carrillo-Lopez*, No. 320-cr-26 (MMD), 2021 WL 3667330 (D. Nev. Aug. 18, 2021), *appeal docketed*, No. 21-10233 (9th Cir. Aug. 20, 2021), to support his argument that Congress continued to be motivated by improper considerations when it passed § 1326 in 1952. Def. Mot. 1, 28. *Carrillo-Lopez* is the only decision in the country to dismiss an indictment based on the theory propounded in Rodriguez's motion to dismiss. This Court should decline to follow *Carrillo-Lopez*. As explained below, the decision is wrong on the law and wrong on the facts, and in any event, is inconsistent with Fourth Circuit precedent.[11]

### A. Congressional silence is not evidence of animus.

*Carrillo-Lopez* concluded that because Congress did not debate Section 276 (ultimately codified as § 1326) in 1952, but robustly debated other provisions of the bill pertaining to national origins quotas, that silence "supports [the defendant's] argument that discriminatory intent was a motivating factor in its reenactment in 1952." 2021 WL 3667330, at *11. In other words, *Carrillo-Lopez* held that Congress's silence in 1952 as to § 1326 (as compared to other contentious provisions) implies its acquiescence to the motivations of the 1929 legislature. This argument fails on both legal and historical grounds.

First, the same way Congress does not silently adopt case law interpreting its statutes, it just as equally does not quietly acquiesce to the motivations of a handful of legislators from two

---

[11] Moreover, to the extent Rodriguez attempts to piggyback off the testimony offered in *Carrillo-Lopez* (or the factual findings premised on that testimony), he should not be permitted to do so. That testimony is untested in this case.

decades prior. *United States v. Wells*, 519 U.S. 482, 495–96 (1997) ("We thus have at most legislative silence on the crucial statutory language, and we have frequently cautioned that it is at best treacherous to find in congressional silence alone the adoption of a controlling rule of law" (internal quotation marks, citation, and alternation omitted)); *Zuber v. Allen*, 396 U.S. 168, 185 (1969) ("Where, as in the case before us, there is no indication that a subsequent Congress has addressed itself to the particular problem, we are unpersuaded that silence is tantamount to acquiescence, let alone the approval discerned by the dissent."). *Carrillo-Lopez*'s promotion of congressional silence to a dispositive level is simply at odds with well-established principles of statutory interpretation. *Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731, 1747 (2020).

Moreover, this mode of reasoning is at odds with the Fourth Circuit's decision in *Raymond*. *Raymond* reinforced the Supreme Court's principle that legislatures are entitled to a presumption of good faith and that subsequent legislatures need not affirmatively disclaim the motivations of the past in order to pass laws that are constitutional. 981 F.3d at 304 (by "requiring the General Assembly to purge the taint of the prior law, the district court flipped the burden and disregarded *Abbott*'s presumption."). Thus, if Congress was under no obligation to affirmatively disclaim the alleged motivations of the entire 1929 legislature, then its silence as to § 1326 in 1952 has no bearing on the relevant inquiry. But *Carrillo-Lopez* ignored the *Abbott* presumption and instead looked for evidence of affirmative congressional disclamation. *See* 2021 WL 3667330, at *11 ("If it did not ignore the Act of 1929's history, there was opportunity to either adopt its racial animus or refute its improper motivation and clarify a purpose for the statute that did not violate the Equal Protection Clause."). Such an inquiry is inconsistent with both *Abbott* and *Raymond*.[12]

_____

[12] *Carrillo-Lopez*'s approach also assumes that the 1929 law was wholly the product of an impermissible motive. At oral argument in *Carrillo-Lopez*, the government conceded that the defendant had presented enough evidence to prove that the 1929 Act was passed out of a discriminatory intent. *See* 2021 WL 3667330, at *7 n.17. Based on the evidence presented by

Moreover, even if *Carrillo-Lopez*'s ability to rely on congressional silence had some footing in the law, it would still fail. Contrary to *Carrillo-Lopez*'s interpretation of the legislative history, there is, in fact, an obvious, non-speculative reason for why Congress hardly debated § 1326 in the buildup to the INA's passage. *See United States v. Ortiz-Martinez*, 557 F.2d 214, 216 (9th Cir. 1977) ("An exhaustive reading of the congressional debate indicates that Congress was deeply concerned with many facets of the Immigration and Nationality Act of June 27, 1952, but ss 1325 and 1326 were not among the debated sections."). The provision was not debated because almost everybody appeared to agree that it should be passed. Hence, the dearth of discussion.

On March 12, 1952, a group of 13 Senators led by Herbert Lehman and Hubert Humphrey introduced S. 2842 ("the Humphrey-Lehman bill"), which included more liberal national origin provisions.[13] Humphrey and Lehman were vocal opponents of the INA and opposed the structure of the national origin quotas that eventually became law. They vocally criticized those provisions and ultimately voted against the INA. Notwithstanding, the Humphrey-Lehman bill contained its own Section 276, which is a word-for-word copy of the law Congress would later pass in June 1952, and which would be codified as § 1326. *See* S. 2842 (1952) (Exhibit A at 92.)

As noted above, Lehman and Humphrey were vocal opponents of the INA and voted against the law. The other 11 senators who introduced the bill either voted against the INA or abstained. But none of their opposition to the INA stemmed from Section 276. Instead, their opposition stemmed from the national origin quotas. Hence the silence as to Section 276. Congress did not debate Section 276 because both the majority and the minority agreed it should be passed.

_____

Rodriguez in this case, the government does not agree that he has established that point.

[13] The INA's quota provisions did not apply to south and central America.

Moreover, Lehman and Humphrey, two well-known liberals, were perhaps the most outspoken critics of the INA's national origin provisions, criticizing them as xenophobic and based on a theory of racial superiority. *See* 82 Cong. Rec. 5169 (1952) (Lehman criticizing the national origin provision as stemming from "a discredited theory of racial superiority.") (Exhibit B); 82 Cong. Rec. 5170–71 (Humphrey similar) (Exhibit J); 82 Cong. Rec. 5768 (1952) (Lehman criticizing quotas as "recogniz[ing] the people of the so-called Nordic strain" but "turn[ing] [a] thumb[] down on people from southern or eastern Europe.") (Exhibit C); 82 Cong. Rec. 5803 (1952) (Lehman criticizing bill and contrasting its "philosophy" with S. 2842) (Exhibit C). Yet, Humphrey and Lehman simultaneously included in their own competing bill the very same provision *Carrillo-Lopez* concluded was tainted by an adoption-by-silence theory. Even assuming *Carrillo-Lopez*'s adoption-by-silence theory was legally or logically sound, such a result should make no sense.

If in 1952, the unlawful reentry statute continued to carry the racist baggage of the past, and if Congress's silence as to that alleged baggage implied its acquiescence, then the two leading critics of the INA's quota provisions—critics who panned those provisions for the exact same reasons Rodriguez alleges continue to taint § 1326—would seemingly not have included Section 276 in their own bill. Under *Carrillo-Lopez*'s reasoning, that would make Humphrey and Lehman the silent carriers of the racism allegedly baked into the text of the statute. But of course, that makes no sense.

There is a historical and a speculative explanation for why Congress did not debate § 1326. *Carrillo-Lopez* chose to find clues buried in Congress's silence. The historical record, however, refutes *Carrillo-Lopez*'s speculation. *Cf. Helvering v. Hallock*, 309 U.S. 106, 119–20 (1940) ("To

explain the cause of non-action by Congress when Congress itself sheds no light is to venture into speculative unrealities.").[14]

### B.     President Truman's veto is irrelevant to divining Congress's intent.

*Carrillo-Lopez* next concluded that President Truman's decision to veto the INA in 1952, and Congress's decision to override that veto, is further evidence that Congress passed § 1326 out of an impermissible motive. *See* 2021 WL 3667330, at *12. Like the preceding argument, *Carrillo-Lopez*'s conclusion is wrong on both the law and the facts.

First, President Truman was not a lawmaker. Thus, his position with respect to the INA is only minimally probative of Congress's intent. Second, even if that were not the case, the statements of a bill's opponents should always be treated with great caution. *See Shell Oil Co. v. Iowa Dep't of Revenue*, 488 U.S. 19, 29 (1988) ("This Court does not usually accord much weight to the statements of a bill's opponents."); *NLRB v. Fruit & Vegetable Packers, Local 760*, 377 U.S. 58, 66 (1964) ("[W]e have often cautioned against the danger, when interpreting a statute, of reliance upon the views of its legislative opponents. In their zeal to defeat a bill, they understandably tend to overstate its reach.").

Third, President Truman's decision to veto the INA had nothing to do with § 1326 and everything to do with, among other things, his objection to the INA's quota system based on national origin. Nowhere in President Truman's veto does he mention the unlawful reentry statute. *See* ECF No 23-11. Indeed, everything that happened after the INA's passage confirms that

---

[14] Moreover, even assuming *Carrillo-Lopez*'s adoption-by-silence theory made conceptual sense, because Rodriguez has at best offered the views of only a handful of legislators from 1929, the theory would presumably allow the 1952 Congress to silently adopt the "pure" or "neutral" motives of the hundreds of other legislators who voted for the law. If Congress can silently appropriate the allegedly bad motives of a few lawmakers, it could seemingly—and more easily— adopt the majority view instead of the minority.

Truman's veto had nothing to do with the unlawful reentry statute. After the INA was passed, Truman established a Commission to examine several issues, such as quotas and other admission and deportation related matters. *See* Executive Order 10392 (Establishing the President's Commission on Immigration and Naturalization). The Commission then held hearings (Hearings Before the President's Commission on Immigration and Naturalization). But none of the hearings addressed § 1326 or the issue of unlawful reentry. Like Truman, the Commission was unsurprisingly focused on national origin quotas and other admission and deportation issues. And of course, all of this makes sense. As discussed above, even the opposition (lead by Humphrey and Lehman) wanted to pass an unlawful reentry statute.

*Carrillo-Lopez* even acknowledged that "President Truman did not address Section 1326 specifically," but nonetheless concluded that Congress's decision to override his veto "is evidence of at least indifference to the nativist motivations of the statute's predecessor." 2021 WL 3667330, at *12. But this conclusion assumes too much. First, as already noted, Truman's veto statement did not address § 1326. Thus, Congress's decision to override his veto *necessarily* had nothing to do with the alleged "nativist motivations of the statute's predecessor." There is no "predecessor statute" because Truman was not commenting on § 1326. Furthermore, instead of viewing Congress's decision to override Truman's veto as "indifference the nativist motivations" of the 1929 Act, it is equally—if not more—plausible that Congress overrode Truman's veto because it simply disagreed with his charge that the INA was racially discriminatory. *See, e.g.*, S. Rept. 1515, 81st Cong., 2d sess. (1950), p. 455. Finally, even if a presidential veto could shed some light on congressional motives, recourse to Truman's veto would still fail.  As one court has explained,

> President Truman's veto, however, does little to advance Mr. Machic-Xiap's argument. For one thing, courts generally should not place much weight on the statements of those who oppose the legislation. For another, the statement tells the Court nothing about what President Truman thought about § 1326 specifically.

President Truman's full statement reveals that his concern with the INA mostly was about the INA's continued use of the quotas that disfavored immigrants from Asia and southern and eastern Europe, not with its treatment of immigrants from Latina America. President Truman's statements, thus, do not prove that racial animus motivated Congress to enact § 1326.

*Machic-Xiap*, 2021 WL 3362738, at *13 (internal citation omitted).

### C.   The court misread Deputy Attorney General Peyton Ford's letter.

*Carrillo-Lopez* next considered a letter submitted to Congress by Deputy Attorney General Ford. According to the court, Ford's use of a racial epithet in this letter "is significant" because he was a "supporter of the bill[.]" 2021 WL 3667330, at *13. *Carrillo-Lopez* then concluded that "[n]ot only does Ford's letter employ racially derogatory language, but it advises Congress to expand the grounds for deportation. Specifically, the letter recommended amendments to the bill including clarifying the 'found in' clause in Section 276[.]" *Id*. According to the court, "Congress' decision to adopt this recommendation, the only substantive change made to Section 1326 in 1952, in light of its silence regarding all other aspects of the provision, is further evidence of racial animus." *Id*.; *see also id*. ("Attorney General Ford's recommendation, conveyed to Congress along with racial slurs, was adopted by the 1952 Congress and became a part of Section 1326."); *id*. at *14 ("The only significant alteration between the unlawful reentry provision in the Act of 1929 and Section 1326 was this one, recommended by Ford."). Rodriguez makes the same argument accepted by the court in *Carrillo-Lopez*. *See* Def. Mot. 29 ("The only substantive change to the 1952 statute expanded the grounds for prosecution and conviction making the statute more punitive than the 1929 version—a change adopted from the letter of support from Deputy Attorney General Peyton Ford that included the use of the racially derogatory word 'wetback.'"). These arguments falter on both legal and historical grounds.

First, Ford was not a relevant decision maker. Ford supported the law, but he was not a legislator. His views are therefore only minimally probative of Congress's intent. *See Brnovich*, 141 S. Ct. at 2350 ("[T]he legislators who vote to adopt a bill are not the agents of the bill's sponsor or proponents"); *see also Machic-Xiap*, 2021 WL 3362738, at *13 ("Because Ford was not a member of Congress, however, his use of the epithet is limited evidence of Congress's purpose in enacting § 1326."). Indeed, even the statements of a law's sponsor are not controlling in analyzing legislative history. *Roy v. Cty. of Lexington, S.C.*, 141 F.3d 533, 539 (4th Cir. 1998) ("The remarks of individual legislators, even sponsors of legislation, however, are not regarded as a reliable measure of congressional intent." (citing *West Virginia Univ. Hosp., Inc. v. Casey*, 499 U.S. 83, 98–99 (1991); *Chrysler Corp. v. Brown*, 441 U.S. 281, 311 (1979); *United States v. Charleston County Sch. Dist.*, 960 F.2d 1227, 1233 (4th Cir. 1992))).

Second, Ford did not actually *use* the derogatory term "wetback." He quoted an earlier report from the President's Commission on Migratory Labor, Migratory Labor in American Agriculture, which itself used the term. *See* ECF No. 23-12 at 9. Ford did not endorse the term in the letter and did not even quote the Commission's use of the term within his discussion of Section 276. *See id.* (addressing Section 287). But even if he had, "[t]he bigoted comments of a few citizens, even those with power, should not invalidate action which in fact has a legitimate basis." *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 558 F.2d 1283, 1292 (7th Cir. 1977). Finally, *Carrillo-Lopez* wrongly assumed that a desire to strengthen a law necessarily stems from an improper racial motive when there is no evidence for that proposition in Ford's letter.

As to *Carrillo-Lopez*'s conclusion that Ford recommended that Congress include in Section 276 the "more punitive" "found in" language present in today's version of the statute, the court's conclusion rested on a misreading of both the legislative history and Ford's own letter.

Contrary to *Carrillo-Lopez*'s conclusion, Ford did not recommend that Congress include the "found in" clause in the statute. That language already existed in the bill Ford received for review. Instead, Ford recommended that Congress clarify a defense to unlawful reentry.

Ford's letter, dated May 14, 1951, began by noting that he was providing the Department of Justice's view on S.716. *See* ECF No. 23-12 at 2. Ford stated that Section 276

> adds to existing law by creating a crime which will be committed if a previously deported alien is subsequently found in the United States. This change would overcome the inadequacies in existing law which have been observed in those cases in which it is not possible for the Immigration and Naturalization Service to establish the place of reentry, and hence the proper venue, arising in prosecution against a deported alien under the 1929 act.

ECF No. 23-12 at 7. Here, Ford was referring to Congress's addition of the "found in" clause present in the bill he *was already reviewing*. *See* S.716 (Jan. 29, 1951) (Exhibit D at 154.) Ford was not recommending that Congress include a "found in" clause. Instead, he was commenting that Congress's addition of that clause will solve a preexisting venue problem that arose in prosecutions under the 1929 law. *See, e.g.*, *Lazarescu v. United States*, 199 F.2d 898 (4th Cir. 1952). In addition to solving a venue issue, "Congress included the ["found in"] term to extend the scope of the conduct element 'entry' to when and where the alien is found, thus creating a continuing offense centered on the aliens entry into the United States and presence therein until found." *United States v. Ayon-Brito*, 981 F.3d 265, 269 (4th Cir. 2020) (quoting *United States v. Rodriguez-Rodriguez*, 453 F.3d 458, 460 (7th Cir. 2006)). But it did not do so at Ford's request. As already noted, that provision existed in the version of the law Ford had before him.

Ford's letter continued as follows:

> it is believed that the language of Section 276 is somewhat obscure, particularly the language beginning on line 10, page 154, reading "and if such alien is at any time found in the United States, unless he shall establish that he has been lawfully admitted."

38

ECF No. 23-12 at 7. Ford then proposed language that would clarify the problematic lines. Consulting the specific lines identified by Ford ("line 10, page 154") confirms that he was not referring to the "found in" clause. Instead, he aimed to clarify a defense to the charge of unlawful entry. *See* S.716 (1951) (Exhibit D at 154.) Indeed, his proposal made its way into the law in the italicized portion below.

> SEC. 276. Any alien who—
>
> (1) has been arrested and deported or excluded and deported, and thereafter
> (2) enters, attempts to enter, or is at any time found in, the United States, unless (A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or *(B) with respect to an alien previously excluded and deported, unless such alien shall establish that he was not required to obtain such advance consent under this or any prior Act, shall be guilty of a felony, and upon conviction . . . .*

Thus, *Carrillo-Lopez* wrongly concluded that Ford recommended that Congress adopt the "found in" clause. That clause was already present in the bill he received for review. *Carrillo-Lopez* also wrongly concluded that Ford recommended strengthening the law to make it more punitive. In reality, Ford recommended that Congress clarify a defense to the charge of unlawful entry.

### D. Congressional awareness of disparate impact is insufficient.

*Carrillo-Lopez* held that Congress's awareness in 1952 of § 1326's disparate impact on Hispanics is "further evidence of continued racial animus." 2021 WL 3667330, at *15. As explained above, § 1326's disparate impact on Hispanics is easily explained by geography and insufficient to state a cognizable claim of invidious discrimination. *See Regents*, 140 S. Ct. at 1915. Furthermore, a congressional decision to pass a law, even with full knowledge that the law will disparately impact a particular group, is not enough to raise an equal protection challenge. *Austin*, 955 F.2d at 228; *United States v. Burgos*, 94 F.3d 849, 877 (4th Cir. 1996); *United States v. Romero*, 819 F. App'x 150, 153 (4th Cir. 2020); *see also McCleskey*, 481 U.S. at 297–99;

*Columbus Bd. of Ed. v. Penick*, 443 U.S. 449, 464 (1979) ("[D]isparate impact and foreseeable consequences, without more, do not establish a constitutional violation."); *Feeney*, 442 U.S. at 279 ("'Discriminatory purpose' . . . implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group.").

Finally, given that Congress has repeatedly amended § 1326—and all in the face of this continuing disparate impact—one would have to assume (adopting *Carrillo-Lopez*'s logic) that those amendments are also "evidence of continued racial animus" when there is simply no support for that assumption. Indeed, as explained below, the historical record points in the opposite direction.

**E.  Strengthening a law is not evidence of animus.**

*Carrillo-Lopez* also concluded that increasing a statute's deterrent value is evidence of animus. 2021 WL 3667330, at *23. The court cited no caselaw for this novel proposition. Indeed, courts generally treat that act of repeatedly strengthening a law as evidence of "a crystallizing vision on Congress's part of the need for stern punishment[.]" *Dwinells*, 508 F.3d at 69; *Shill*, 740 F.3d at 1352 & n.5. Congress's decision to impose strict penalties for certain conduct is not evidence of an equal protection violation. *United States v. Hayden*, 85 F.3d 153, 157–58 (4th Cir. 1996); *United States v. Thomas*, 900 F.2d 37, 39–40 (4th Cir. 1990); *United States v. Richards*, 737 F.2d 1307, 1310 (4th Cir. 1984).

As noted above, Congress has repeatedly amended § 1326. And although *Abbott* and *Raymond* make clear that Congress need not affirmatively disclaim the alleged taint of prior enactments, there is strong evidence that it has, in fact, done so. And, contrary to *Carrillo-Lopez*'s

binary framework (where strengthening a law necessarily implies racial animus), Congress has increased § 1326's deterrent value while simultaneously eschewing forms of racial discrimination. For example, in the Immigration Act of 1990, Congress amended § 1326 to authorize greater fines. Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978. In the same Act, Congress more than doubled then then-existing cap on immigration, granted Temporary Protected Status to citizens of El Salvador fleeing that country's civil war, and created a diversity visa program to increase the number of visas provided to countries that were underrepresented in admission to the United States. *Id*. Congress also included a new provision barring from admission any alien who under the direction or in association with the "Nazi government of Germany" "ordered, incited, assisted, or otherwise participated in the persecution of any person because of race, religion, national origin, or political opinion[.]" *Id*. It should seem anomalous that a Congress purportedly under the silent spell of white supremacy and anti-Hispanic animus included these provisions in the 1990 Act.

The nondiscriminatory purpose of this law could hardly be more apparent, and one court has described the legislative history behind the 1990 Act as "about face away from the racist trope that accompanied the enactment of the 1929 immigration law." *United States v. Gallegos-Aparicio*, No. 19-cr-2637 (GPC), 2020 WL 7318124, at *3 (S.D. Cal. Dec. 11, 2020); *see also Rios-Montano*, 2020 WL 7226441, at *5 (noting that the 1990 Act enjoyed support from Bruce Morrison, Nancy Pelosi, Kika de la Garza, Bill Richardson, Edward Roybal, Esteban Torres, the Mexican American Legal Defense and Education Fund, and the American Civil Liberties Union and that such support "further weakens Mr. Rios-Montano's argument that congressional silence on the changes to Section 1325 should be construed as evidence of an impermissible motive.").

That Congress has viewed § 1326 as an important tool to further its immigration policies, in the absence of any discriminatory motive, is plainly demonstrated by the 1990 Act. Yet, according to *Carrillo-Lopez*, these amendments do nothing but continue the proliferation of racism allegedly baked into the statute. This conclusion is at odds with the historical record.

### F.     The court mistook the origin and purpose of the "Wetback bill."

Finally, *Carrillo-Lopez* concluded that Congress's passage of the so-called "Wetback Bill" two months prior to the INA's enactment was evidence of Congress's intent to discriminate when it enacted § 1326. As the court explained, "both the derogatory nickname of the Wetback Bill and its criminalization of Mexican immigrant laborers while shielding employers evidences the racially discriminatory motives and intent of the same Congress who enacted Section 1326 only two months later." 2021 WL 3667330, at *15. *Carrillo-Lopez*'s conclusion is marred by legal and historical errors.

As a preliminary matter, it is questionable whether courts may rely on a law passed two months prior to the challenged law to discern the motives of the legislators who voted on the latter statute. *Cf.   Pittston Coal Group v. Sebben*, 488 U.S. 105, 118–19 (1988) (refusing to consider post enactment statements of key sponsor as those statements were not relied upon by legislators who enacted the law); *W. Virginia ex rel. McGraw v. CVS Pharmacy, Inc.*, 646 F.3d 169, 177 (4th Cir. 2011).

In any event, contrary to the court's understand of the law, the so-called Wetback Bill did not "criminaliz[e] of Mexican immigrant laborers[.]" 2021 WL 3667330, at *14. The bill was an anti-harboring provision that criminalized transporting, harboring, or enticing illegal aliens to enter the country. United Statutes at Large, 82 Cong. ch. 108, 66 Stat. 26 (March 20, 1952). *Carrillo-Lopez* bemoaned the fact that the bill "fail[ed] to punish employers who hired illegal immigrants

42

and instead only punish[ed] the laborers themselves." *Id*. But again, the law did not punish laborers. And the court's dissatisfaction that the law did not punish those who employed illegal aliens is besides the point. Congress's decision to exempt employers was a legislative judgment—indeed, the product of compromise—whose validity is not contingent on the *Carrillo-Lopez* court's perception of its efficacy. And anyhow, "it is well settled that the legislature may choose to attack a problem one step at a time," *Richards*, 737 F.2d at 1310, which is exactly how Congress proceeded when it ultimately criminalized the employment of illegal aliens in the Immigration and Control Act of 1986. *See* H.R. No. 101-723(i) at 46 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5649, 5649, 5650; 8 U.S.C. § 1324a. Moreover, the bill still penalized employers who induced aliens to cross the border for employment purposes. *See* 82 Cong. Rec. 793–94 (1952) (Exhibit E).

*Carrillo-Lopez* concluded that the "bill demonstrate [] Congress' racist motives and intent," but never actually addressed the relevant legislative history of the bill. S. 1851 (the "Wetback bill") was the product of competing interests surrounding President Truman's renegotiation of the Bracero Program with Mexico. The Bracero Program was a series of laws and bi-lateral agreements between the U.S. and Mexico addressing the issue of migratory labor. S. 1851 was introduced to the Senate on July 13, 1951. As one Senate Report makes clear, the bill corrects a deficiency in the Immigration Act of 1917 created by the Supreme Court's decision in *United States v. Evans*, 333 U.S. 483 (1948). *See* S. Rep. No. 82–1145 at 2 (1952) (Exhibit F). On the same day S. 1851 was introduced, President Truman addressed Congress as to the need for new anti-harboring legislation:

> First, legislation should be enacted providing punishment for the offense of harboring or concealing aliens who have entered this country illegally. While we have a law on the books purporting to make this an offense, that law is not enforceable, because no penalty was adequately provided. This should be remedied at once. In addition, to help discourage the smuggling of aliens, the existing provisions of law punishing transportation of illegal immigrants must be

strengthened. While such legislation will be very useful in bringing illegal immigration from Mexico under control, it will also be a valuable addition to our general immigration laws.

*Special Message to the Congress on the Employment of Agricultural Workers from Mexico* (Exhibit G). Two months later, President Truman approved House Joint Resolution 311, which made interim appropriations for the Department of Labor to begin bringing Mexican laborers to the United States "in conformity with the recently concluded agreement between this Government and the Republic of Mexico." *Statement by the President Upon Signing Bill Relating to the Employment of Mexican Agricultural Workers* (August 16, 1951) (Exhibit H). The United States' agreement with Mexico, however, expired within six months and renegotiation was contingent on certain congressional action. *Id*. As such, President Truman hoped Congress would "give expeditious consideration" to the proposals set forth in his July 13, 1951 message. *Id*.

Lawmakers recognized they were on the clock to pass a law that would placate various entities, specifically the government of Mexico. *See* 82 Cong. Rec. 1413–14 (1952) (statement of Representative Shelley) (Exhibit I); 82 Cong. Rec. 792 (1952) (statement of Senator Humphrey) (Exhibit E); 82 Cong. Rec. 1340 (1952) (statement of Representative Lyle) (Exhibit K). President Truman and the government of Mexico wanted Congress to criminalize the employment of illegal aliens as a condition of reauthorizing the Bracero Program.[15] Other lawmakers agreed that the bill should include a penalty for employing illegal aliens. 82 Cong. Rec. 793–94 (1952) (Exhibit E). Several agreed that the bill was aimed at those "who exploit these illegals." 82 Cong. Rec. 1347 (1952) (statement of Representative Celler) (Exhibit K); *see also id*. at 1346 (statement of Representative Walter ("[I]t is absolutely essential if we are to adequately deal with these racketeers who are concealing aliens by the hundreds all over the United States. That is the crowd

---

[15] Richard B. Craig, *The Bracero Program: Interest Groups and Foreign Policy* (Austin: University of Texas Press, 1971), p. 94.

we are trying to do something about. . . . We are thinking about the professional gangster")). To Representative Graham, "[t]his bill is perfectly simple. It is to apply to all our borders and applies against every type of person who has the intent of concealing or harboring aliens." 82 Cong. Rec. 1350 (1952) (Exhibit K).

Ultimately, Congress chose not to criminalize outright employment of illegal aliens and opted for a compromise that would provide the legislation President Truman needed while simultaneously assuaging domestic opposition. Some supporters maintained that although the bill was a good first step, it did not go far enough. 82 Cong. Rec. 793–94 (1952) (Exhibit E); *see also* 82 Cong. Rec. 1413–14 (Exhibit I). President Truman signed the bill into law on March 20, 1952.

Far from demonstrating "Congress' racist motives and intent," the passage of S. 1851 is evidence of a far more complex history than *Carrillo-Lopez* recognized. Instead of focusing on this history, the competing interests animating the bill, and the congressional compromise these interests spawned, *Carrillo-Lopez* overemphasized the bill's unfortunate nickname at the expense of everything else. Indeed, *Carrillo-Lopez*'s conclusion that the bill was solely the product of racial animus is not even consistent with its own theory of diving legislative intent. Previously, *Carrillo-Lopez* held that President Truman's veto of the INA was evidence that Congress enacted § 1326 due to racial animus, despite Truman never once mentioning the statute. But when it came to S. 1851, *Carrillo-Lopez* failed to mention that the bill became law by virtue of Truman's signature. One would therefore expect that Truman—purportedly the only person with clean hands according to *Carrillo-Lopez*'s telling of events—would not have signed a law motivated by racial animus. Yet he did. *Carrillo-Lopez* does not even attempt to square that circle.

## Conclusion

For the reasons explained above, the Court should decline to follow *Carrillo-Lopez* and deny Rodriguez's motion to dismiss.

Respectfully submitted,

Raj Parekh
Acting United States Attorney


By: _____/s/_____
Tony R. Roberts
Assistant United States Attorney
Jacob M. Green
Special Assistant United States Attorney
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, VA 22314


By: _____/s/_____
Joseph Attias
Assistant United States Attorney
Eastern District of Virginia
919 East Main Street, Suite 1900
Richmond, Virginia 23219
Joseph.Attias2@usdoj.gov

**Certificate of Service**

I hereby certify that on September 22, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record.

By: _____ /s/ _____
Joseph Attias
Assistant United States Attorney