# Exhibit E

By Mr. PRIEST:

H. Con. Res. 194. Concurrent resolution requesting the President to set aside and proclaim a national day of prayer; to the Committee on the Judiciary.

By Mr. BUSBEY:

H. Con. Res. 195. Concurrent resolution requesting the President to set aside and proclaim a national day of prayer; to the Committee on the Judiciary.

By Mr. CROSSER:

H. Res. 516. Resolution to provide additional funds for the expenses of the investigations authorized by House Resolution 51; to the Committee on House Administration.

### MEMORIALS

Under clause 3 of rule XXII, memorials were presented and referred as follows:

By Mr. HESELTON: Resolutions relative to an investigation by the President of the United States for a complete investigation of criminal acts against minority groups in the State of Florida; to the Committee on the Judiciary.

By the SPEAKER: Memorial of the Legislature of the State of Massachusetts relative to an investigation by the President of the United States for a complete investigation of criminal acts against minority groups in the State of Florida; to the Committee on the Judiciary.

### PRIVATE BILLS AND RESOLUTIONS

Under clause 1 of rule XXII, private bills and resolutions were introduced and severally referred as follows:

By Mr. BARRETT:

H. R. 6409. A bill for the relief of Constantinos Ioannis Hrisostomides; to the Committee on the Judiciary.

By Mr. BUSBEY:

H. R. 6410. A bill for the relief of Joseph Menard St. Pierre; to the Committee on the Judiciary.

H. R. 6411. A bill for the relief of Elidia Raslau (Reslau); to the Committee on the Judiciary.

By Mr. COLE of New York:

H. R. 6412. A bill for the relief of Lauri Allan Torni; to the Committee on the Judiciary.

By Mr. D'EWART:

H. R. 6413. A bill for the relief of Mrs. Franca Gatti Ohta; to the Committee on the Judiciary.

By Mr. KEATING:

H. R. 6414. A bill for the relief of Alexander Newman; to the Committee on the Judiciary.

By Mr. MANSFIELD:

H. R. 6415. A bill for the relief of George Rodney Giltner (formerly Joji Wakamiya); to the Committee on the Judiciary.

By Mr. MILLER of California:

H. R. 6416. A bill for the relief of Quan Hing Fay; to the Committee on the Judiciary.

By Mr. POULSON:

H. R. 6417. A bill for the relief of Magdalena F. Bristol; to the Committee on the Judiciary.

H. R. 6418. A bill for the relief of Beatrice De Pra Iannantuono; to the Committee on the Judiciary.

By Mr. PRESTON:

H. R. 6419. A bill for the relief of Fred Freeman; to the Committee on the Judiciary.

By Mr. RADWAN:

H. R. 6420. A bill for the relief of Patrick Joseph Blewett; to the Committee on the Judiciary.

By Mr. REES of Kansas:

H. R. 6421. A bill for the relief of Motoko Aoki, the racially ineligible financée of a United States citizen veteran of World War II; to the Committee on the Judiciary.

By Mr. SABATH:

H. R. 6422. A bill for the relief of Joseph (Giuseppe) Gasparini; to the Committee on the Judiciary.

By Mr. THOMAS:

H. R. 6423. A bill for the relief of Russell William Karbach; to the Committee on the Judiciary.

### PETITIONS, ETC.

Under clause 1 of rule XXII, petitions and papers were laid on the Clerk's desk and referred as follows:

526. By Mr. FORAND: Resolution from Ruth Whipple and 33 others urging upon Congress the enactment of legislation prohibiting the advertising of alcoholic beverages through interstate commerce and over the air; to the Committee on Interstate and Foreign Commerce.

527. Also, resolution from Helen D. Bridgford and 27 others urging upon Congress the enactment of legislation prohibiting the advertising of alcoholic beverages through interstate commerce and over the air; to the Committee on Interstate and Foreign Commerce.

528. By the SPEAKER: Petition of Department of Colorado, Veterans of Foreign Wars of the United States, Denver, Colo., urging enactment of legislation and the appropriation of money for the purpose of supplying the necessary equipment and technicians to properly and adequately receive blood from all citizens in all parts of the country; to the Committee on Armed Services.

529. Also, petition of West Texas Chamber of Commerce, Abilene, Tex., relative to resolutions passed on November 14 at the annual convention of the West Texas Chamber of Commerce dealing with the tidelands question, the St. Lawrence seaway, and the employees of the Bureau of Internal Revenue; to the Committee on Expenditures in the Executive Departments.

530. Also, petition of Townsend Club, No. 1, Saint Cloud, Fla., relative to requesting enactment of House bills 2678 and 2679, known as the Townsend plan; to the Committee on Ways and Means.

531. Also, petition of Kay Edmonston, Washington, D. C., relative to stating grievances pertaining to a number of cases involving Kay Edmonston and pending in the United States District Court for the District of Columbia; to the Committee on the Judiciary.

---

# SENATE

Tuesday, February 5, 1952

*(Legislative day of Thursday, January 10, 1952)*

The Senate met at 12 o'clock meridian, on the expiration of the recess.

Rev. F. Norman Van Brunt, associate pastor, Foundry Methodist Church, Washington, D. C., offered the following prayer:

Since it is of Thy mercy, O gracious Father, that another day is added to our lives, we pause in this quiet moment to dedicate it to the service of our fellow men. We give thanks with deep humility that we are summoned to live and give in such a time. Keep us ever mindful that we have been set apart to serve in a climactic hour, that our thoughts, our attitudes, our words, and our acts are not our own, but go out from this place to influence and to mold the structure of human relationships. For the fabric and fiber which we shall put into our task this day, prepare us now, we beseech Thee, O God. Amen.

### THE JOURNAL

On request of Mr. McFARLAND, and by unanimous consent, the reading of the Journal of the proceedings of Monday, February 4, 1952, was dispensed with.

### MESSAGE FROM THE HOUSE

A message from the House of Representatives, by Mr. Maurer, one of its reading clerks, announced that the House had passed, without amendment, the bill (S. 2169) authorizing the acquisition by the Secretary of the Interior of Gila Pueblo, in Gila County, Ariz., for archeological laboratory and storage purposes, and for other purposes.

The message also announced that the House had passed the following bills, in which it requested the concurrence of the Senate:

H. R. 401. An act to amend the Nationality Act of 1940, as amended;

H. R. 1055. An act to provide for the conveyance of certain land in Monroe County, Ark., to the State of Arkansas;

H. R. 3995. An act to authorize the Secretary of Commerce to transfer to the Department of the Navy certain land and improvements at Pass Christian, Miss.;

H. R. 4199. An act to authorize the transfer of lands from the jurisdiction of the Secretary of the Interior to the jurisdiction of the Secretary of Agriculture;

H. R. 4407. An act to amend sections 213 (b), 213 (c), and 215 of title II of the Hawaiian Homes Commission Act, 1920, as amended;

H. R. 4408. An act to amend section 73 (1) of the Hawaiian Organic Act;

H. R. 4515. An act to authorize the acquisition by exchange of certain properties within Death Valley National Monument, Calif., and for other purposes;

H. R. 4686. An act authorizing the transfer of a certain tract of land in the Robinson Remount Station, Fort Robinson, Dawes County, Nebr., to the city of Crawford;

H. R. 4797. An act to ratify and confirm Act 291 of the Session Laws of Hawaii, 1949, section 2 of Act 152 of the Session Laws of Hawaii, 1951, and section 2 of Act 171 of the Session Laws of Hawaii, 1951, which included Maui County Waterworks Board, Kauai County Waterworks Board, and the board of water supply, county of Hawaii, under the definition of "municipality" in the issuance of revenue bonds pursuant to the Revenue Bond Act of 1935;

H. R. 4799. An act to amend section 73 (1) of the Hawaiian Organic Act;

H. R. 4800. An act to further amend section 202 (a) of the Hawaiian Homes Commission Act, 1920, as amended, relating to membership on the Hawaiian Homes Commission;

H. R. 5369. An act to authorize the exchange of certain lands located within, and in the vicinity of, the Federal Communications Commission's primary monitoring station, Portland, Oreg.;

H. R. 5599. An act to provide for the conveyance of the Centre Hill Mansion, Petersburg, Va., to the Petersburg Battlefield Museum Corporation, and for other purposes.

H. R. 5601. An act relating to the disposition of certain former recreational demonstration project lands by the Commonwealth of Virginia to the School Board of Mecklenburg County, Va.; and

H. R. 5680. An act to amend the act of October 5, 1949 (Public Law 322, 81st Cong.), as amended, so as to extend the time of permits covering lands located on the Agua Caliente Indian Reservation.

## COMMITTEE MEETINGS DURING SENATE SESSION

On request of Mr. MAGNUSON, and by unanimous consent, the Committee on Foreign Relations was authorized to sit during the session of the Senate today.

On request of Mr. HUMPHREY, and by unanimous consent, a subcommittee of the Committee on Labor and Public Welfare investigating the wetback situation was authorized to sit this afternoon during the session of the Senate.

### TRANSACTION OF ROUTINE BUSINESS

Mr. McFARLAND. Mr. President, I ask unanimous consent that Senators be permitted to transact routine business, without debate.

The PRESIDENT pro tempore. Without objection, it is so ordered.

### REPRESENTATION OF CONSUMER PUBLIC ON BOARD OF DIRECTORS OF FEDERAL RESERVE BOARD—RESOLUTION OF MINNEAPOLIS (MINN.) CENTRAL LABOR UNION

Mr. HUMPHREY. Mr. President, I present for appropriate reference, and ask unanimous consent to have printed in the RECORD, a resolution adopted by the Central Labor Union of Minneapolis, Minn., on January 15, 1952, relating to the inclusion of nonfinancial and noncommercial representation on the boards of directors of the 12 district banks and the Federal Reserve Board in Washington, thus giving representation to the great consumer public.

There being no objection, the resolution was referred to the Committee on Banking and Currency, and ordered to be printed in the RECORD, as follows:

JANUARY 15, 1952.
Hon. HUBERT H. HUMPHREY,
Senate Office Building,
Washington, D. C.

HONORABLE SENATOR: The Central Labor Union at the last meeting went on record to adopt the following resolution:

"Whereas the money power of this our country is now divorced from our civil government; and

"Whereas this power to create money wields a great deterrent to freedom and democratic government; and

"Whereas our money values fluctuate at the dictate of powerful business and banking interests, both national and international; and

"Whereas the purchasing power of the dollar has declined so rapidly that the welfare of the common man is in jeopardy; and

"Whereas the Federal Reserve System was instituted to expand our monetary system and credit facilities to meet the requirements of rapidly growing economy; and

"Whereas the monetary and credit policies of the Federal Reserve banks are dictated by bankers and powerful business interests, which policies are not formulated with the intent of benefiting the masses; and

"Whereas our Constitution delegates that the peoples' representatives (Congress) shall coin all money and regulate our monetary problems: Be it hereby

XCVIII—50

"Resolved then, That the Congress of the United States be implored to return to the intent of our Constitution and take steps at once to include nonfinancial and noncommercial representation on the board of directors, not only on the board of the various 12 district banks, but in the Federal Reserve Board in Washington, thus giving representation to the great consumer public."

Trusting that favorable action will be taken on the above resolution, we remain

Sincerely yours,
DOMINIC ZAPPIA,
Recording Secretary.

### BILLS AND JOINT RESOLUTION INTRODUCED

Bills and a joint resolution were introduced, read the first time, and, by unanimous consent, the second time, and referred as follows:

By Mr. FERGUSON:
S. 2589. A bill for the relief of Basil Peter Kisy; and
S. 2590. A bill for the relief of Elisa Albertina Cioccio Rigazzi or Elisa Cioccio; to the Committee on the Judiciary.

By Mr. JENNER:
S. 2591. A bill to amend section 5a of the Commodity Exchange Act, as amended, so as to provide for the same discount on grain delivered against futures contracts as in the case of grain sold in the cash market; to the Committee on Agriculture and Forestry.

(See the remarks of Mr. JENNER when he introduced the above bill, which appear under a separate heading.)

By Mr. CAPEHART (for himself, Mr. JOHNSON of Colorado, Mr. JENNER, Mr. MAYBANK, Mr. ROBERTSON, Mr. FREAR, Mr. DOUGLAS, Mr. IVES, Mr. KEM, Mr. THYE, Mr. BRICKER, Mr. WILLIAMS, Mr. ECTON, Mr. WATKINS, Mr. MARTIN, and Mr. SALTONSTALL) :
S. 2592. A bill to amend section 403 (b) of the Civil Aeronautics Act of 1938 so as to permit the granting of free or reduced-rate transportation to ministers of religion; to the Committee on Interstate and Foreign Commerce.

(See the remarks of Mr. CAPEHART when he introduced the above bill, which appear under a separate heading.)

By Mr. HOLLAND:
S. 2593. A bill for the relief of Jean Hamamoto, also known as Sharon Lea Brooks; to the Committee on the Judiciary.

By Mr. MAYBANK:
S. 2594. A bill to extend the provisions of the Defense Production Act of 1950, as amended, and the Housing and Rent Act of 1947, as amended; to the Committee on Banking and Currency.

(See the remarks of Mr. MAYBANK when he introduced the above bill, which appear under a separate heading.)

By Mr. LODGE:
S. 2595. A bill for the relief of Constance Brouiller Scheffer; and
S. 2596. A bill for the relief of Louis R. Chadbourne; to the Committee on the Judiciary.

By Mr. McMAHON:
S. 2597. A bill for the relief of Antonio Joseph Aikler; to the Committee on the Judiciary.

By Mr. IVES:
S. 2598. A bill for the relief of Emilio Veschi; to the Committee on the Judiciary.

By Mr. McMAHON:
S. 2599. A bill to establish a Presidential Honors Board; to provide for the conferring of awards to be known as the Presidential Gold Medal, the Presidential Silver Medal, and the Presidential Bronze Medal; and for other purposes; to the Committee on Labor and Public Welfare.

By Mr. IVES:
S. 2600. A bill for the relief of Samuel V. Goekjian; to the Committee on the Judiciary.

By Mr. HUMPHREY:
S. 2601. A bill for the relief of Lucy Personius; to the Committee on the Judiciary.

By Mr. HUMPHREY (for himself, Mr. BENTON, Mr. LEHMAN, Mr. MOODY, and Mr. MURRAY) :
S. 2602. A bill to promote greater economy in the operations of the Federal Government by providing for a consolidated cash budget, a separation of operating from capital expenditures, the scheduling of legislation action on appropriations measures, yea-and-nay votes on amendments to appropriation measures, and a Presidential item veto; to the Committee on Expenditures in the Executive Departments.

(See the remarks of Mr. HUMPHREY when he introduced the above bill, which appear under a separate heading.)

By Mr. FREAR (for himself and Mr. WILLIAMS) :
S. J. Res. 128. Joint resolution designating the period beginning on the Sunday before Thanksgiving Day and ending on the Sunday after Thanksgiving Day of each year as "Homemakers' Week"; to the Committee on the Judiciary.

### AMENDMENT OF COMMODITY EXCHANGE ACT, RELATING TO DISCOUNT ON CERTAIN GRAIN IN FUTURES MARKETS

Mr. JENNER. Mr. President, I introduce for appropriate reference a bill which would amend the Commodity Exchange Act in such a way as to require uniform discounts for grain delivered in the futures markets and cash markets of the Nation.

The present abuses which this proposed legislation is designed to correct are described very ably by Phil S. Hanna in an article published in the Chicago Daily News of January 19, 1952.

As Mr. Hanna points out, there is often a wide variation in the discount applied against the same quality of grain in the cash market and in the futures market. For example, No. 3 yellow corn of $17\frac{1}{2}$ percent moisture content is discounted 6 cents per bushel when the farmer sells it in the cash market. Yet this same corn can be delivered on the Chicago Board of Trade at a discount of only 2 cents per bushel. This difference of 4 cents rightfully belongs to the producer but he is not receiving it under present practices.

The differential in cash oats and futures oats prices has also brought a flood of Canadian oats into the United States. During the last crop year some 30,000,000 bushels of Canadian oats entered the United States market and it is estimated that 40,000,000 bushels will come in during the 1951–52 crop year. At one time last summer, approximately one-third of all the storage space in Chicago was occupied by Canadian oats—this at a time when American farmers were forced to market their oats at prices well below parity.

It certainly makes no sense to attempt to support American farm prices even at minimum levels when we not only permit but actually encourage the importation of foreign grains. Because Canada has, in addition to large quantities of oats and barely, a huge supply

of low-grade feed wheat, we may expect to see feed grain importations from that country at an all-time high level this year unless something is done to protect American agriculture against indiscriminate dumping.

Although the Department of Agriculture has ample authority under the so-called section 22 to shut off imports whenever they are jeopardizing our domestic price-support program, I have never heard of this authority being invoked in the case of grains, and I can only assume that it never will be used by this administration to protect American farmers.

During the last session I introduced S. 2204, which would prohibit the delivery of foreign-grown grains and certain other specified commodities against futures contracts in the United States. This bill is currently before the Senate Committee on Agriculture and Forestry. While it would not shut off the flow of foreign farm commodities completely, I am certain that it would discourage such importations, particularly in cases where the grains are brought into the country not for normal distribution in regular commercial channels but solely for delivery against futures contracts with a view toward depressing futures prices. It is an indisputable fact that some Canadian oats were brought into this country last year at a loss by the importer who obviously expected to recoup by delivering them in the futures market and forcing prices downward.

The American farmer, harassed by high taxes, high labor costs, and soaring machinery prices, is entitled to protection against cheap foreign farm goods. He must look to Congress for that protection. Certainly he will never get it from the free traders in the State and Agriculture Departments.

I ask unanimous consent that the article by Phil S. Hanna, published in the Chicago Daily News of January 19, 1952, be printed in the RECORD at the conclusion of my remarks.

The PRESIDENT pro tempore. The bill will be received and appropriately referred, and, without objection, the article will be printed in the RECORD.

The bill (S. 2591) to amend section 5a of the Commodity Exchange Act, as amended, so as to provide for the same discount on grain delivered against futures contracts as in the case of grain sold in the cash market, introduced by Mr. JENNER, was read twice by its title, and referred to the Committee on Agriculture and Forestry.

The article presented by Mr. JENNER is as follows:

BLAME GRAIN TRADE LOSS ON MARKET'S OLD RULES—CHICAGO BUSINESS SLIPS AWAY; OAT AND CORN RAISERS SUFFER

(By Phil S. Hanna)

Chicago, historically the gateway for moving the surplus grain of the West to the consumption areas of the East, has been steadily losing ground in recent years.

We still have the board of trade, world's largest grain market, where supply and demand clash to fix a free and open price for grain throughout the world. But various factors have diverted some of the grain from the Chicago market. The shift is a detriment to Chicago commerce.

One of the reasons for loss of business is the movement of grain to ports on the Gulf of Mexico.

But there are important other causes why Chicago has been losing grain trade.

The farmers of the country have been increasing yields per acre and increasing the quality of their grain, but the Chicago Board of Trade still conducts its business under rules and regulations formulated 50 to 75 years ago.

There has been no real attempt to recognize the changes that have taken place in agriculture.

Hence Chicago is not getting the grain that otherwise might come here.

A good example of how obsolete regulations can affect Chicago trade can be seen in the handling of the oat crop.

During the last 2 decades the science of raising oats has vastly improved, the hulls are heavier, the farmers are raising more oats per bushel.

The weight of a bushel of oats has been raised several pounds a bushel.

A survey was made of all the oats received in Chicago during 1950. This showed an average weight of 35.7 pounds a bushel.

Yet the standard delivery weight on the board of trade still is 32 pounds.

It is even permissible to deliver oats weighing 27 pounds a bushel on contracts.

There are of course premiums and discounts for variations in quality and weight in the board's standards. But the futures prices in Chicago are still predicated on 32 pounds a bushel.

This penalizes the seller as high as 7 cents a bushel on his heavy oats.

From the merchant's point of view it is difficult to sell oats weighing 32 pounds a bushel when competitive markets are offering oats weighing 35 or 36 pounds on a relatively cheaper basis. This hurts the Chicago market.

Take the Canadian oats situation.

Canadian oats have poured into the United States by the millions of bushels, in part because Canadian standards recognize that farmers are producing heavier oats.

The differential draws oats to the United States, but the American dealer does not get any benefit therefrom on account of the 32-bushel standard at the board of trade.

At times, with futures at the same price in both Canada and the United States, Canadian oats really are selling 7 cents or more a bushel below Chicago prices.

This creates a tremendous import movement into our country and depresses Chicago prices still further.

One effect of this is to establish a two-price system in the United States prices in Iowa and other major oats producing areas have been 10 to 15 cents a bushel higher than Chicago prices. Normally oats in outlying areas sell at a discount to permit shipment into this market.

A further aggravation is the rule that permits the presence of black hulls in the oats received from Canada and applied on Chicago futures contracts.

Naturally such oats do not appeal to feed manufacturers who desire uniform color.

Discounts of as much as 7 cents a bushel have existed between the ordinary No. 3 extra heavy white oats with uniform color, and the Canadian oats containing black hulls. But the board's regulations do not square with that situation.

In corn there is a similar situation.

Farmers suffer pricewise by the unrealistic system of figuring discounts on wet corn, and much of the popular hybrid corn is wet corn.

According to the rules, No. 3 yellow corn, for example, with a moisture content of 17½ percent is worth 6 cents a bushel under the contract price to the seller.

Yet the identical corn can be delivered on futures contracts at 2 cents under contract price.

Here is 4 cents a bushel profit that belongs to the farmer. Penalties on higher moisture corn are even more drastic. The wetter the corn the more money the elevator makes on its resale.

Both producers and consumers are hurt by this process. Either the scales that determine moisture are obsolete or else the discounts allowed on deliveries should be changed to meet the realities.

If standards were changed to meet the times the trade could merchandise grains better and more widely both at home and abroad.

Grain men appreciate that someday we must sell competitively in foreign markets without Government subsidies. Hence they say Chicago standards should be changed so they will not suffer these serious disadvantages.

New grading provisions and an acceptance of the realities of the cash grain situation would tend to improve the merchandising abilities of the grain merchants in this area. If this were done, Chicago could insure its preeminence as the world's commodity center.

---

## AMENDMENT OF CIVIL AERONAUTICS ACT, RELATING TO FREE OR REDUCED-RATE TRANSPORTATION TO MINISTERS OF RELIGION

Mr. CAPEHART. Mr. President, on behalf of myself, the Senator from Colorado [Mr. JOHNSON], my colleague, the junior Senator from Indiana [Mr. JENNER], the Senator from South Carolina [Mr. MAYBANK], the Senator from Virginia [Mr. ROBERTSON], the junior Senator from Delaware [Mr. FREAR], the Senator from Illinois [Mr. DOUGLAS], the Senator from New York [Mr. IVES], the Senator from Missouri [Mr. KEM], the Senator from Minnesota [Mr. THYE], the Senator from Ohio [Mr. BRICKER], the senior Senator from Delaware [Mr. WILLIAMS], the Senator from Montana [Mr. ECTON], the Senator from Utah [Mr. WATKINS], the Senator from Pennsylvania [Mr. MARTIN], and the Senator from Massachusetts [Mr. SALTONSTALL], I introduce for appropriate reference a bill to amend section 403 (b) of the Civil Aeronautics Act of 1938 so as to permit the granting of free or reduced-rate transportation to ministers of religion. The bill reads as follows:

*Be it enacted, etc.,* That the second sentence of subsection (b) of section 403 of the Civil Aeronautics Act of 1938, as amended, is amended by inserting immediately after the clause "persons injured in aircraft accidents and physicians and nurses attending such persons;" the following: "ministers of religion".

Mr. President, the purpose of the bill is to give to ministers of the gospel of all faiths the same right to half-fare on airlines which they have enjoyed for many years on railroads and busses.

The PRESIDENT pro tempore. The bill will be received and appropriately referred.

The bill (S. 2592) to amend section 403 (b) of the Civil Aeronautics Act of 1938 so as to permit the granting of free or reduced-rate transportation to ministers of religion, introduced by Mr. CAPEHART (for himself and other Senators), was read twice by its title, and referred to the Committee on Interstate and Foreign Commerce.

## ECONOMY ACT OF 1952

Mr. HUMPHREY. Mr. President, on behalf of myself, the Senator from Connecticut [Mr. BENTON], the Senator from New York [Mr. LEHMAN], the Senator from Michigan [Mr. MOODY], and the Senator from Montana [Mr. MURRAY], I introduce for appropriate reference a bill to promote greater economy in the operations of the Federal Government by providing for a consolidated cash budget, a separation of operating from capital expenditures, the scheduling of legislative action on appropriation measures, yea and nay votes on amendments to appropriation measures, and a Presidential item veto.

I should like to point out, Mr. President, that the bill now introduced is in no way to be interpreted as taking the place of a very important bill which is now on the calendar and which was introduced by the Senator from Arkansas [Mr. McCLELLAN], a bill of which I am proud to be a co-sponsor and which I think would bring about long-needed legislation.

The bill (S. 2602) to promote greater economy in the operations of the Federal Government by providing for a consolidated cash budget, a separation of operating from capital expenditures, the scheduling of legislative action on appropriation measures, yea-and-nay votes on amendments to appropriation measures, and a Presidential item veto, introduced by Mr. HUMPHREY (for himself and other Senators), was read twice by its title, and referred to the Committee on Expenditures in the Executive Departments.

## NATIONAL PRAYER DAY

Mr. JOHNSTON of South Carolina (for himself and Mr. NEELY) submitted the following resolution (S. Res. 272), which was referred to the Committee on the Judiciary:

*Resolved,* That it is the sense of the Senate that the President should designate by proclamation a day in the year 1952 as National Prayer Day, calling upon people of the United States to observe the day by praying, each in accordance with his religious faith.

## MARY E. CARLSON

Mr. DOUGLAS submitted the following resolution (S. Res. 273), which was referred to the Committee on Rules and Administration:

*Resolved,* That the Secretary of the Senate hereby is authorized and directed to pay from the contingent fund of the Senate to Mary E. Carlson, widow of Fred A. Carlson, late an official reporter of debates of the Senate, a sum equal to 1 year's compensation at the rate he was receiving by law at the time of his death, said sum to be considered inclusive of funeral expenses and all other allowances.

## PROGRAM TO STIMULATE PRODUCTION OF DOMESTIC WOOL (S. DOC. NO. 100)

Mr. O'MAHONEY. Mr. President, I have had prepared a monograph regarding a program to stimulate the production of domestic wool. The statistical situation is that the United States does not produce sufficient domestic wool even to meet the military needs. A great deal of interest has been expressed in this document. I have consulted the chairman of Joint Committee on Printing, the minority leader and the majority leader, all of whom have concurred. I, therefore, ask unanimous consent that this material be printed as a Senate document.

The PRESIDENT pro tempore. Is there objection to the request of the Senator from Wyoming? The Chair hears none, and it is so ordered.

## HOUSE BILLS REFERRED

The following bills were severally read twice by their titles, and referred as indicated:

H. R. 401. An act to amend the Nationality Act of 1940, as amended; to the Committee on the Judiciary.

H. R. 1055. An act to provide for the conveyance of certain land in Monroe County, Ark.; to the State of Arkansas;

H. R. 4199. An act to authorize the transfer of land from the jurisdiction of the Secretary of the Interior to the jurisdiction of the Secretary of Agriculture;

H. R. 4407. An act to amend sections 213 (b), 213 (c), and 215 of title II of the Hawaiian Homes Commission Act, 1920, as amended;

H. R. 4408. An act to amend section 73 (1) of the Hawaiian Organic Act;

H. R. 4515. An act to authorize the acquisition by exchange of certain properties within Death Valley National Monument, Calif., and for other purposes;

H. R. 4797. An act to ratify and confirm Act 291 of the Session Laws of Hawaii, 1949, section 2 of Act 152 of the Session Laws of Hawaii, 1951, and section 2 of Act 171 of the Session Laws of Hawaii, 1951, which included Maui County Waterworks Board, Kauai County Waterworks Board, and the board of water supply, county of Hawaii, under the definition of "municipality" in the issuance of revenue bonds pursuant to the Revenue Bond Act of 1935;

H. R. 4799. An act to amend section 73 (1) of the Hawaiian Organic Act;

H. R. 4800. An act to further amend section 202 (a) of the Hawaiian Homes Commission Act, 1920, as amended, relating to membership on the Hawaiian Homes Commission;

H. R. 5369. An act to authorize the exchange of certain lands located within, and in the vicinity of, the Federal Communications Commission's primary monitoring station, Portland, Oreg.;

H. R. 5599. An act to provide for the conveyance of the Centre Hill Mansion, Petersburg, Va., to the Petersburg Battlefield Museum Corporation, and for other purposes;

H. R. 5601. An act relating to the disposition of certain former recreational demonstration project lands by the Commonwealth of Virginia to the School Board of Mecklenburg County, Va.; and

H. R. 5680. An act to amend the act of October 5, 1949 (Public Law 322, 81st Cong.), as amended, so as to extend the time of permits covering lands located on the Agua Caliente Indian Reservation; to the Committee on Interior and Insular Affairs.

H. R. 3995. An act to authorize the Secretary of Commerce to transfer to the Department of the Navy certain land and improvements at Pass Christian, Miss.; to the Committee on Interstate and Foreign Commerce.

H. R. 4686. An act authorizing the transfer of a certain tract of land in the Robinson Remount Station, Fort Robinson, Dawes County, Nebr., to the city of Crawford; to the Committee on Agriculture and Forestry.

## EXECUTIVE REPORTS OF A COMMITTEE

As in executive session,

The following favorable reports of nominations were submitted:

By Mr. CONNALLY, from the Committee on Foreign Relations:

David K. E. Bruce, of Virginia, now Ambassador Extraordinary and Plenipotentiary to France, to be Under Secretary of State, vice James E. Webb, resigned; and

Henry S. Villard, of New York, a Foreign Service officer of class 1, to be Envoy Extraordinary and Minister Plenipotentiary to the United Kingdom of Libya.

## ADDRESSES, EDITORIALS, ARTICLES, ETC., PRINTED IN THE APPENDIX

On request, and by unanimous consent, addresses, editorials, articles, etc., were ordered to be printed in the Appendix, as follows:

By Mr. WELKER:

Address delivered by Senator WATKINS at a Lincoln Day rally, February 4, 1952.

By Mr. McMAHON:

A radio address delivered by him on the subject Justice for Poland, together with introductory remarks by Attorney Stanley F. Jorczak.

Editorial entitled "A Matter of National Urgency," from the New York Inquirer.

By Mr. BYRD:

Address delivered by Gov. James F. Byrnes, of South Carolina, before the joint session of the Virginia General Assembly, held in Williamsburg, Va., on Friday, February 1, 1952.

By Mr. MARTIN:

Letter addressed by Senator BYRD to Charles E. Oakes, of Allentown, Pa., describing the situation confronting the United States.

By Mr. LEHMAN:

Address entitled "Accomplishments and Future Responsibility of the Department of State in the Administration of the Displaced Persons Act," delivered by Herve J. L'Heureux, Chief, Visa Division, Department of State, at Chicago, Ill., on January 18, 1952, before the Third National Resettlement Conference of the Displaced Persons Commission.

By Mr. CONNALLY:

Statement by AMVETS relating to friendship among the peoples of the world.

By Mr. KILGORE:

Article entitled "Can He Bring Korea Out of Chaos," written by Ralph G. Martin, and published in the February 1952 issue of the magazine Pageant.

By Mr. KEM:

Editorial entitled "No Urgency Indicated," published in the St. Louis Globe-Democrat of January 30, 1952.

By Mr. HUMPHREY:

Letter from Mr. Robert Heller, chairman of the national committee relative to increasing the efficiency of Congress.

Excerpts from address delivered by Telford Taylor, Administrator, Small Defense Plants Administration, before the Minneapolis Chamber of Commerce, Minneapolis, Minn., January 8, 1952.

Editorial entitled "Labor-Industry Cooperation," published in the New York Times of January 20, 1952.

By Mr. MAGNUSON:

Letter dated January 29, 1952, regarding repeal of section 104 of the Defense Production Act, written by Ralph T. Gillespie, president, Washington State Farm Bureau.

By Mr. ANDERSON:

Editorial entitled "No More Taxes Needed," from the Washington Post of February 4, 1952, and an editorial entitled "The Monster Called Budget," published in the February 4, 1952, issue of Life magazine.

788 CONGRESSIONAL RECORD — SENATE February 9

## CALL OF THE ROLL

Mr. McFARLAND. Mr. President, I suggest the absence of a quorum.

The PRESIDENT pro tempore. The clerk will call the roll.

The roll was called, and the following Senators answered to their names:

| | | |
|---|---|---|
| Aiken | Hennings | Millikin |
| Anderson | Hill | Monroney |
| Bennett | Hoey | Moody |
| Brewster | Holland | Morse |
| Bricker | Humphrey | Mundt |
| Bridges | Hunt | Murray |
| Butler, Md. | Ives | Neely |
| Byrd | Jenner | Nixon |
| Cain | Johnson, Colo. | O'Conor |
| Capehart | Johnson, Tex. | O'Mahoney |
| Case | Johnston, S. C. | Pastore |
| Chavez | Kefauver | Robertson |
| Clements | Kem | Russell |
| Connally | Kilgore | Saltonstall |
| Cordon | Knowland | Smathers |
| Douglas | Langer | Smith, Maine |
| Duff | Lehman | Smith, N. J. |
| Dworshak | Lodge | Smith, N. C. |
| Eastland | Long | Sparkman |
| Ecton | Magnuson | Stennis |
| Ellender | Malone | Taft |
| Ferguson | Martin | Thye |
| Flanders | Maybank | Tobey |
| Frear | McCarran | Underwood |
| Fulbright | McCarthy | Watkins |
| George | McClellan | Welker |
| Gillette | McFarland | Williams |
| Green | McKellar | Young |
| Hendrickson | McMahon | |

Mr. JOHNSON of Texas. I announce that the Senator from Connecticut [Mr. BENTON] and the Senator from Oklahoma [Mr. KERR] are absent on official business.

The Senator from Arizona [Mr. HAYDEN] is necessarily absent.

Mr. SALTONSTALL. I announce that the Senators from Nebraska [Mr. BUTLER and Mr. SEATON], the Senator from Iowa [Mr. HICKENLOOPER], the Senators from Kansas [Mr. SCHOEPPEL and Mr. CARLSON], and the Senator from Wisconsin [Mr. WILEY] are absent on official business.

The Senator from Illinois [Mr. DIRKSEN] is necessarily absent.

The PRESIDENT pro tempore. A quorum is present.

---

## EXTENSION OF DEFENSE PRODUCTION ACT

Mr. MAYBANK. Mr. President, I am sending to the desk a bill to extend the Defense Production Act, including the programs of material allocation, price, credit, and rent controls, and the life of the Small Defense Plants Administration.

While the administration has not as yet sent up its specific legislative recommendation with respect to the Defense Production Act, on January 30 we held a public hearing on the nomination of Mr. Putnam as Economic Stabilization Administrator. At that hearing, Mr. Putnam testified that he felt the economy had achieved reasonably good balance, and that, putting it in his words, "I think by this time next year, if we are still on the same sort of an even keel as we are now, the problem will be all behind us, and we will see daylight."

While Mr. Putnam is in doubt about the soundness of some provisions of the act, I think the committee got the general impression from him that, on the whole, the act had worked fairly well in restraining the increase in the cost of living, at least since the provisions of the act were put into effect in January 1951. He pointed out that during last year the cost of living index increased by 2.9 percent from February 1951 to December 1951, as compared with an increase of 8 percent for the period June 1950 to February 1951.

Mr. Putnam emphasized however, that "this coming 1952, the calendar year, stretching over 1953, is where controls will be more important than they have ever been."

I agree with him. It is for this reason that I am introducing this bill now, so that there will be no excuse for Congress not to act in plenty of time, and so give the American people assurance, insofar as I am able, as the chairman of the committee which bears the heavy responsibility for recommending economic control legislation to the Senate, that I shall do everything in my power to prevent any further inflation and help make our economic system function at its full potential. Only by so doing can we achieve peace and maintain our democratic way of life.

Mr. President, as I have stated on many occasions, no one can question, it seems to me, the good sense of the continuation of the present control program or the importance of a vigorous enforcement of all its provisions. Notwithstanding this, however, I believe the efficiency in administering the act can be increased and unnecessary red tape can be greatly reduced by decontrolling those materials which are now selling, and probably will continue for some time to sell, below their present price ceilings, so long as such decontrol has no adverse effect on any segment of the economy remaining under control.

I discussed the advisability of such a decontrol action with Mr. Putnam when he was before the committee last week, and he told me that he would have his staff study the feasibility of taking such action. He indicated that, while he thought there was much sense in this proposal, he wanted to be certain that any such action would not have derogatory effects on the remainder of the price control program.

It is my intention at an early date to hold hearings on this bill and any amendments that may be proposed to it. I hope that Senators who intend to offer amendments will do so fairly promptly so that the committee can consider them during the course of the hearings on the bill.

The PRESIDENT pro tempore. The bill introduced by the Senator from South Carolina will be received and appropriately referred.

The bill (S. 2594) to extend the provisions of the Defense Production Act of 1950, as amended, and the Housing and Rent Act of 1947, as amended, introduced by Mr. MAYBANK, was read twice by its title, and referred to the Committee on Banking and Currency.

Mr. MAYBANK. Mr. President, I ask unanimous consent to have printed at this point in the RECORD, as part of my remarks, a summary of the bill which I have introduced.

There being no objection, the summary was ordered to be printed in the RECORD, as follows:

SUMMARY OF MAYBANK BILL TO EXTEND
DEFENSE PRODUCTION ACT

1. Extending section 714 (a) (4) for 1 year. Extends the life of Small Defense Plants Administration.

2. Amending section 717 (a). Extends the entire balance of the Defense Production Act, as amended.

3. Amending section 4 (e) of the Housing and Rent Act of 1947, as amended. Extends for 1 year the rights granted veterans for purchase and rental of houses.

4. Amendment section 204 (f) of the Housing and Rent Act of 1947, as amended. Extends the general rent provisions for 1 year.

It should be noted that this bill makes no change in the following termination dates:

1. Section 104 of the Defense Production Act, as amended, concerning restrictions on imports of fats and oils will expire June 30, 1952.

2. Section 303 (b) of the Defense Production Act, as amended, will continue the June 30, 1962, deadline on long-term contracts for purchasing metals, minerals, and other materials.

3. Section 303 (a) will continue to provide that no purchase of any imported agricultural commodity can be made calling for delivery more than 1 year after expiration of the Defense Production Act.

4. The amendment to the Defense Production Act set forth in the Defense Housing and Community Facilities Act of 1951 (Public Law 139, approved September 1, 1951) contains no termination date so there is no mention in this bill. This provision deals with down payments on veterans' housing. (See sec. 602 (b).)

Mr. CAPEHART. Mr. President, will the Senator yield?

Mr. MAYBANK. Yes.

Mr. CAPEHART. I understand that the bill which the Senator from South Carolina has introduced would extend the existing Defense Production Act.

Mr. MAYBANK. Yes; for 1 year.

Mr. CAPEHART. For 1 year?

Mr. MAYBANK. Yes.

Mr. CAPEHART. Just as it now reads?

Mr. MAYBANK. Yes, with the exception of provisions to correct some of the faults that may have been shown to exist in it. However, we shall have ample hearings on the bill. The bill is being introduced now so that it may be before the Senate and the committee may hold hearings on it.

Mr. CAPEHART. When does the Senator from South Carolina think hearings on the bill will be held?

Mr. MAYBANK. I shall discuss that point with the members of the committee at the committee's regular hearing today at 3 o'clock.

Mr. CAPEHART. The bill would extend the existing act, just as it is written, for 12 months?

Mr. MAYBANK. Yes, with the exceptions indicated by me.

Mr. CAPEHART. Is it the intention of the Senator from South Carolina to start holding hearings immediately?

Mr. MAYBANK. I shall take up that question with the committee when it meets at 3 o'clock to hear further Mr. McDonald's testimony.

Mr. CAPEHART. I congratulate the able Senator from South Carolina for

the action taken by him, because it gives the Senate and the committee ample time to act on the question of renewal of the Defense Production Act.

Mr. MAYBANK. That was my intention. I wish to allow ample time for the witnesses to be heard, regardless of whether they favor strengthening some of the controls or whether they favor some of the decontrol actions which I think should be taken.

Mr. MAGNUSON. Mr. President, the Senator from Indiana inquired if the bill as it is being introduced is exactly the same as the existing Defense Production Act. I wish to ask whether the bill being introduced includes section 104.

Mr. MAYBANK. No; section 104 expires.

Mr. MAYBANK. The bill being introduced does not contain section 104; is that correct?

Mr. MAYBANK. Yes, that is correct. Section 104 expires.

Mr. McFARLAND. Mr. President, I am hopeful that the distinguished Senator from South Carolina will hold hearings on the bill at an early date. I think it is important that the bill come before the Senate for consideration as early as possible, because the present act expires on June 30 of this year.

One of our difficulties last year was that we hardly had time to consider the bill on the floor of the Senate before the then existing act expired.

Mr. MAYBANK. The Senator from Arizona is correct.

Mr. McFARLAND. So I congratulate the Senator from South Carolina for introducing the bill at so early a date.

Mr. MAYBANK. Of course, I assure the Senator that whatever the Senate desires to do in this matter will be agreeable to me.

Mr. LEHMAN. Mr. President, the Senator from South Carolina said that, with certain exceptions to correct faults, the bill being introduced is exactly the same as the existing statute, and that hearings will be held on the bill. Do I correctly understand that amendments may be submitted to the committee?

Mr. MAYBANK. Yes; the committee will consider any amendment which any Member of the Senate desires to suggest. The only request the chairman of the committee makes is that Senators who desire to submit amendments will, for the good of all concerned, do so as quickly as possible, so that, as the majority leader has suggested, it will be possible to bring the bill before the Senate promptly for debate in order not to tie up the Congress at a late date in the session.

Mr. McFARLAND. Mr. President, I wish to state to the Senator from New York, that this is done with the knowledge of the departments that are interested, and they agree that it is important to begin hearings on the bill and that the President send us his message as soon as possible.

Mr. LEHMAN. I understand that fully, but I wished to make sure that the committee was not closing the door to the consideration of amendments.

Mr. MAYBANK. No, Mr. President; but I repeat that if Senators wish to submit amendments I hope they will do so by March 1, because otherwise progress on the bill will be delayed.

STATEMENT BY SECRETARY OF DEFENSE LOVETT ON THE DEPARTMENT OF DEFENSE 1953 BUDGET

Mr. O'MAHONEY. Mr. President, yesterday the Appropriations Committee began open hearings on the defense budget, as the President pro tempore who now is presiding well knows. At the hearings a very important statement was made by the Secretary of Defense, Mr. Lovett; and I believe the statement he made at that time should be brought to the attention of all Members of the Senate. In the course of his statement, the Secretary of Defense said that in connection with preparations of the budget—

We have tried to bear in mind that in preparation against the dangers of a hot war we must not be trapped by our own efforts into losing the cold one.

Therefore, Mr. President, I ask unanimous consent that the full text of Secretary Lovett's statement may be printed in the body of the RECORD.

There being no objection, the statement was ordered to be printed in the RECORD, as follows:

STATEMENT BY HON. ROBERT A. LOVETT BEFORE THE ARMED SERVICES SUBCOMMITTEE OF THE COMMITTEE ON APPROPRIATIONS OF THE UNITED STATES SENATE ON THE FISCAL YEAR 1953 BUDGET, DEPARTMENT OF DEFENSE, FEBRUARY 4, 1952

The opportunity to discuss the broad aspects of the President's budget estimates of $52,100,000,000 for the Department of Defense for fiscal year 1953 with this committee provides us with a means by which all Members of the United States Senate may become more familiar with the military program. I will, therefore, begin by summarizing the increases in military forces and production which have been achieved during the past 18 months with the $48,200,000,000 appropriated in fiscal year 1951 and the $59,400,000,000 appropriated to date for fiscal year 1952.

At the end of June 1950, when hostilities began in Korea, the military personnel for the Department of Defense totaled 1,460,000. As of January 1, 1952, this force has been expanded so that we now have nearly 3,500,000 men in service.

The Army, in June 1950, was comprised of about 590,000 men organized into 10 divisions and 11 regimental combat teams, most of which were below peacetime manning levels, and these were without supporting organizational units adequate for combat operations. During the following 18 months the Army had been expanded so that it comprised 1,570,000 men organized into 18 divisions and 18 regimental combat teams with collateral units to support them in combat operations. The units located overseas are at full strength and those in this country at a somewhat reduced strength. The Army has also increased the number of personnel in training and provided for a full pipeline of personnel to support combat operations in Korea, including the rotation system.

Since January 1 an additional National Guard division was called into active service, and it is planned to call another National Guard division on February 15 for a total of 20 divisions. As a result of better utilization of military personnel, it is planned that this increase in organizational units will by June 30, 1952, be accomplished within the total number of military personnel previously planned for the 18-division Army.

The Navy in June 1950 was comprised of 380,000 men with 238 combatant vessels manned at peacetime levels. During the past 18 months the Navy has expanded to approximately 400 combatant vessels and 790,000 men with manning levels having been generally raised throughout the fleet; particularly important is the increase in air power as exemplified by the addition of 5 large carriers and the expansion of the large carrier groups from 9 to 14. Personnel in training has substantially increased during this period.

The Marine Corps, in June 1950 comprised of 74,000 men organized in regimental combat teams and smaller units, during the 18-month period has expanded to a total of 219,000 men organized into 2¼ divisions, 2¼ wings of combat aircraft, plus a substantial expansion in their training activities.

The Air Force in June 1950 was comprised of about 411,000 men and 48 wings. During the 18-month period the Air Force has been expanded to nearly 900,000 men and 90 wings in addition to substantial expansion having taken place in Air Force training activities and supporting units.

While the expansion in military personnel and organized combat units has been very substantial during this period, the expansion of production and production capabilities is of greater proportion and has utilized the major portion of the total funds appropriated by the Congress. On June 30, 1950, the Department of Defense was expending about $300,000,000 per month for hard goods such as aircraft, ships, tanks, guns, and ammunition—now, 18 months later, expenditures for this type of matériel have expanded more than fivefold. These expenditures included substantial amounts for the establishment of a mobilization base which would permit rapid mobilization should world conditions require it.

Our civilian employment has increased from 753,000 on June 30, 1950, to an estimated 1,280,000 on December 31, 1951. This increase is directly related to expansion necessary within the Department of Defense to increase our manufacturing, overhaul, and procurement activities.

The great majority of these employees are engaged in work pertaining to the repair and rebuilding of equipment, ammunition, aircraft and engines, and ships; in the operation of the supply systems, and in the procurement and production of major items of equipment, such as aircraft, ships, combat vehicles, ammunition, and weapons.

To achieve this expansion of military forces and production, the Department of Defense expended, on its own account $19,200,000,000 in fiscal year 1951; during the first 7 months of fiscal year 1952, the Department has expended over $20,000,000,000. It is anticipated that by next June expenditures during fiscal year 1952 for the Department of Defense will be approximately $40,000,000,000. These figures are exclusive of expenditures for the military portion of the foreign aid funds.

As of January 31, 1952, approximately $75,000,000,000 has been obligated of the $108,000,000,000 appropriated for fiscal year 1951 and fiscal year 1952. Part of the unobligated $33,000,000,000 represents funds for aircraft, ships, and other major items of procurement for which contracts will be let and funds obligated during the second half of the year. Another part of the unobligated balance also represents current operating expenses that are normally obligated month by month; for example, military and civilian pay, contracts for services at posts, camps, and stations, and similar items. Except for accounts necessarily reserved for

subsequent engineering changes, substantially all fiscal year 1952 and prior year money will be obligated by the end of this fiscal year.

During the past year the Department has, I believe, made notable strides in improving the management of the procurement program. Among the more important of the improvements that have been made is the technique we have developed for the analysis of requirements and the scheduling of procurement. This procedure was initially started approximately a year ago, about the time I appeared before this committee and first advised you of our plans to provide a substantially increased mobilization base. The first attempts at this analysis and scheduling were not altogether realistic because we lacked information on industry capabilities and raw material availability. However, during the year we have continued to review and revise production schedules and, in cooperation with the Office of Defense Mobilization, to determine more accurately the raw materials and tools required to carry out our programs. On the basis of this experience, it is believed that the Department is now in a position to more realistically schedule production.

As I indicated to the Congress in September, the preparation of the fiscal year 1953 budget could not proceed until decisions were made as to the force levels we planned to maintain. The Joint Chiefs of Staff made recommendations on forces early in October. In order to provide the Office of Defense Mobilization and its associated agencies with a basis for evaluating the material requirements, the Department of Defense provided estimates based generally on the continuation of the forces previously approved. Preparation of the budget was immediately started, both on a "requirements" and on a planning or "benchmark" basis.

As background for the military budget for fiscal year 1953, it may serve a useful purpose to outline the basic considerations which were taken into account in the preparation of the three military departments' requirements for this period.

First of all, the three military departments recognize and fully accept the fact that the essential foundation of our entire military structure is a sound, vital and progressive economy. We cannot have security against an external enemy over any extended period of time if our national economy is not in itself healthy.

On the other hand, we have taken note of the fact that the elasticity of our economy and its powers of recovery are so great as to permit the acceptance of unusually heavy burdens during the period of capital investment, provided always the period of strain is restricted in time and that relief from the unusual burdens is promptly and intelligently given.

Secondly, we have tried to bear in mind that in preparation against the dangers of a hot war, we must not be trapped by our own efforts into losing the cold one. By this, I mean we must try to do first things first and not everything all at once. Our strength defensively and offensively lies very largely in the enormous productive capacity and the imaginative engineering of this country. If a military program is developed which cuts too deeply into the civilian economy by the removal of excessive amounts of scarce raw materials, large numbers of productive enterprises will be forced to cut back and perhaps shut down altogether as a result of the inability to obtain the essential critical materials needed to keep going. All of our principal industries whether large or small have some break-even point in their operations below which it is impossible for them to continue in business. If it is humanly possible, therefore, we should earnestly seek to avoid causing these companies to drop below the break-even point which

would cause unemployment and the loss of tax revenue. This feeling takes realistic note of the fact that a program of adequate preparedness cannot continue over any long period of time if the economic burden on the people as a whole is too heavy.

In the third place, and in the light of the factors mentioned above, the military departments have endeavored during the past year in particular to reschedule certain items of equipment in such a fashion as to avoid excessive peaks which might thereafter result in abrupt and permanent shutdowns. These would be harmful not only to the economy as a whole, but would remove from the military departments the great strength which moving and living lines of production would give us. We have, in other words, tried to reconcile the urgency of our needs with a rate of production which would take care of our requirements for initial equipment and yet avoid the building up of tremendous reserves of completed end items which might rapidly become obsolescent. We have groped for, and in some instances, I think, found what we promised this committee last year, that is a throttle set somewhere between wide open, which is war, and tight shut, which has been our previous habit in peace.

In the fourth place, we have tried to stretch out the procurement of certain types of items in those fields in which unusual technological advances give promise of substantially improved weapons within the next 2 or 3 years. Here again we have tried to get what we need basic lily for our military security in such a fashion that new and supplementary weapons, as developed, may be rapidly supplied without causing us to write off large accumulated stocks of obsolete weapons.

Against the background of events throughout the world which give little evidence of any relaxation of the ultimate ambitions of the Kremlin toward world domination we have tried to exercise both self-restraint and selectivity in our estimates of the end forces required to give us the minimum defense forces needed to serve as a protection to this country and to enable us to meet our commitments overseas; to serve as a deterrent against aggression and to permit a rapid mobilization to wartime strength, if that unhappy necessity were forced upon us.

The procedure in the formulation of the military requirements budgets was essentially the same as that followed in the supplementals of fiscal year 1951 and the basic budget for fiscal year 1952. That is to say, the three armed services estimated their military and end-item requirements based on the forces recommended by the Joint Chiefs of Staff and approved by the National Security Council, related to a readiness date by which each service was to be combatworthy.

One notable and uncomfortable difference between fiscal year 1953 and fiscal years 1952 and 1951 circumstances should be mentioned. Whereas in the previous 2 years the impact of the recently started rearmament program had not noticeably affected industry as a whole, it was apparent, in the case of the fiscal year 1953 military budget, that the test of feasibility of the program in the light of the shortages of certain essential basic raw materials becomes of cardinal importance. The theory and, in fact, the practice in the last year and a half has been that the military services would estimate as carefully as possible their military requirements. Thereafter, other agencies of Government, prior to submission to the Congress, would estimate the effect of the procurement of these military requirements both as to feasibility in a production sense and as to the impact on the national economy as a whole.

As I said earlier, in the previous year the program did not have to be reduced because

of shortages of basic raw materials or because the forecast rate of expenditures would cause excessive financial or economic strains.

In fiscal year 1953 requests, however, we come up against the hard realities that the requests from the military would, in some instances, be unrealistic because of the lack of materials within the compressed period of time. In other cases the requests of the military departments would result in total military expenditures which would be excessive in the judgment of other competent agencies of the Government and which, in their opinion, would jeopardize the economy or financial stability of the country to a degree which was unacceptable and unwise.

The initial budget requests submitted to my office by the three armed services, based on military requirements and early readiness dates, totaled approximately $71,000,000,000, exclusive of the requirements of the military portion of the foreign aid program. As a result of the review conducted by the Office of the Secretary of Defense with the three military departments, and as a consequence of the screening process at that stage of budgetary development, the original estimates in their rough form were reduced, to a finished budget of approximately $55,000,000,000. The Department of Defense recommended the latter figure to the Bureau of the Budget and to the President as a reasonable fund requirement. To reach an acceptable state of readiness by July 1, 1953, in the case of the Army and Marine Corps and later for the Navy and Air Force would have involved, according to the original estimates of the three military departments, expenditures in fiscal year 1953 totaling approximately $73,-000,000,000, exclusive of expenditures for military assistance to other countries.

Subsequent to our budget submission to the Bureau of the Budget and the President, certain further adjustments were made both in terms of new obligational authority and in terms of expenditures. As a result of these adjustments, primarily a stretchout of the period in which readiness is to be developed, the funds being requested in the budget submission before you call for than the $55,000,000,000 figure in our initial submission to the Bureau of the Budget and the President.

The funds being requested herein for fiscal year 1953 will, however, permit the Army to expand toward a goal of 21 full-strength divisions; the Navy toward a goal of 408 combat vessels with 16 carrier air groups; the Marines toward a goal of 3 full divisions and 3 air wings; and the Air Force to build toward a goal of 143 wings. All 3 services will have the appropriate support-type units.

The decision to build toward these goals rather than attempt to reach them in fiscal year 1953 or 1954 was made after careful consideration of the economic, material, fiscal, and military implications involved. The reduction from our initial request to the Bureau of the Budget was in line with these considerations and with an expenditure limitation as directed by the President.

The result was an approval of the military forces recommended by the Joint Chiefs of Staff and a determination by the President that expenditures for fiscal year 1953 for the Department of Defense and military end items financed under the mutual security program should be less than $60,000,000,000. During the consideration of the problem we stated as fully as possible the implications which this calculated risk entails since it involves a stretchout in production and thereby an extension of the dates upon which the services will be equipped with modern and combat-worthy arms and capable of sustaining themselves in battle. I believe you have already heard from Mr. Wilson, Director of the Office of Defense Mobilization, on the problem of scarce ma-

terials. Economic and fiscal considerations have been presented to the Congress in the Economic Report of the President and the budget message.

I would like to emphasize that the problem confronting this committee, the Congress, and the Department of Defense is to complete a military program within the framework of the partial mobilization concept while at the same time maintaining a strong civilian economy. It has never before been attempted in this country. We have always operated military production on the feast or famine basis of large production during actual war and little or no military production at other times. The building of a military organization capable of deterring aggression without destroying our economy is an extremely complicated problem.

With respect to the military situation, I believe it is fair to indicate that this buildup does not attain the number of units with modern equipment or the amount of mobilization reserves as early as the military chiefs, from a purely military point of view, would consider desirable. However, the executive and legislative branches of the Government must of necessity give consideration to all the factors and to arrive at the balance which appears best for the long-term security of this Nation. The budget before you represents such a judgment by the executive branch of the Government.

During the course of the hearings before this committee you will no doubt be frequently advised as to a cut-back in individual programs. It is only fair to indicate that the individual programs being presented to you by the military departments, in most cases, call for substantially less new obligational authority and for somewhat less production during fiscal year 1953 than the levels talked about during the fall of 1951. However, I would like to remind the committee that if the Department of Defense is to achieve the production goals set forth in this budget in conjunction with those for military assistance programs, it will be necessary to double the output of hard goods and construction between December 31, 1951, and December 31, 1952. The achievement of such an increase will require vigorous efforts on the part of the Department of Defense, American industry, and the civilian defense agencies, such as the Office of Defense Mobilization. We believe that it is within our capacity to achieve this doubling of output of the critical long-lead-time items of military production in the next 12 months, but because of past conversations concerning higher rates, many people may consider it comparatively easy to achieve the rates now being proposed. On the basis of my experience, I can assure you that no production schedule is ever achieved unless initiative, effort, and follow-up are applied at the critical points.

During the past year as might be expected in the initiation of a program of the magnitude undertaken by the Department of Defense, numerous individual difficulties have arisen in securing the production the Department desires. In such a tooling-up period there is, of course, a shortage of machine tools. More and more there difficulties are being reduced to shortages of individual types of tools or facilities which make them easier to deal with. In cooperation with the Director of Defense Mobilization we have been working with manufacturers to find ways and means by which production could be expedited pending the delivery of new tools and by the adaptation of existing tools even if somewhat less efficient.

To assure that the goals set forth in this budget are achieved, I have directed the Chairman of the Munitions Board and Mr. Clay Bedford, an outstanding production expert who has recently joined my staff, to work with the three military departments to break any existing bottlenecks in military contracting or production techniques that might retard us in reaching our goals. I believe that with this concentrated effort the desired production will be achieved. Measured in dollars, this means expenditures of over $85,000,000,000 during the next 18 months by the Department of Defense, two-thirds of which will be for hard goods and construction. The quarterly expenditure rate on June 30, 1953, will be approximately $16,000,000,000. I should add that these figures include expenditures for the military portion of the foreign aid program.

As in the two previous years, approximately one-half of the funds being requested would be obligated for capital investment type of items, such as airplanes, tanks, etc. The authority being requested herein for such types of items when used with the funds provided in fiscal year 1953 and fiscal year 1952 will permit the projection of firm production schedules, except for aircraft and ships, generally to June 30, 1954. In the case of aircraft for naval aviation, the schedules would be projected on this basis through December 1954 and in the case of aircraft for the Air Force, into calendar year 1955. In the case of ships, the time will vary depending on the size of the vessel being constructed. This further forward financing for major procurement is the result of our experience during the last 10 months which indicates the advisability of lengthening the period of forward contract commitments—for example, 6 months were added to the financed lead time for aircraft for the Air Force. Details will be presented by the military departments but in general it reflects the increasing complexity of managing the flow of material and production.

It is our opinion that these additional amounts are extremely important if industry is to have a reasonable opportunity to comply with the decision to produce needed military equipment and simultaneously to carry on a reasonable level of production for the civilian economy, because with the additional funds being requested we will be able to make firm contracts for military production involving delivery of goods during the next 2 or 3 years. This will permit the Office of Defense Mobilization to make reasonably firm long-range determinations as to material that will remain available for civilian production and allow manufacturers to so adjust their total production as to meet the schedules for military equipment and at the same time secure maximum civilian production within the limits of material availability. With a lesser amount of money we would be limiting our efforts to a program level that would increase, beyond the realms of prudence, the calculated risks already taken. It would force us to less efficient operations and would not permit the continued accelerated production during the next 2 years of the major military items we need.

In bringing the budget to the level requested by the President and in stretching out the period of force and matériel build-up, we believe that all of the calculated risks, considered prudent, have been accepted. With the objectives outlined above in mind, the Department of Defense strongly recommends that obligational authority in the amount of $89,000,000,000, as submitted in the President's budget, be appropriated for fiscal year 1953.

## THREE-YEAR PROGRAM OF BOY SCOUTS OF AMERICA

Mr. FULBRIGHT. Mr. President, at this time I wish to invite the attention of the Senate to one of America's great agencies, the Boy Scouts of America, which operates under a Federal charter granted by Congress. The Boy Scouts of America was incorporated 42 years ago and is observing Boy Scout Anniversary Week throughout the Nation. Many Senators are actively connected with the Scouts, and I am sure that all Senators are aware of the splendid program of character building and citizenship training which the Boy Scouts organization is conducting for the boys of this country. During the past 42 years more than 19,000,000 boys and men have unselfishly rendered service to their communities as members of this organization. The present membership is nearly 3,000,000, and in these critical days it is reassuring to feel that we have a great force such as this working for the youth of the Nation.

The Boy Scouts of America is nonsectarian, nonpolitical, and nonmilitary. It enrolls country boys and city boys, the sons of the wealthy and boys from the slums. It stands for Americanism and all the traditions our forefathers bought with blood and toil through the years.

This week the Boy Scouts of America is inaugurating what it calls a 3-year program with the slogan "Forward on Liberty's Team." The over-all objective of this program is to make the boy, the Scout movement, and the Nation physically strong, mentally awake, and morally straight. This program is broken down into certain specifics, and the interesting thing is that every boy and every man can have a share in making these things happen.

I urge that all Senators in their local communities give their support to the Boy Scouts. I know of no agency that is more effective in building our future citizens.

## PREVENTION OF ILLEGAL ENTRY OF ALIENS

Mr. McFARLAND. Mr. President, I wish to ask whether there is any objection to temporarily laying aside the unfinished business and considering Senate bill 1851, a bill known as the wetback bill. The title of the bill is "To assist in preventing aliens from entering or remaining in the United States illegally." It is calendar No. 1076.

The contract for Mexican labor expires on February 11, and time is of the essence in connection with the passage of the bill. We are told that if the Senate passes the bill and sends it to the House of Representatives, it will be possible to obtain an extension of the expiration date because action to that extent will then have been taken.

Therefore, I should like to have the Senate pass the bill today, if there is no objection to having it considered.

Mr. O'MAHONEY. Mr. President, will the Senator from Arizona yield to me?

Mr. McFARLAND. I yield.

Mr. O'MAHONEY. Do I correctly understand that the bill has been unanimously reported from the Committee on the Judiciary?

Mr. McFARLAND. That is my understanding.

Mr. O'MAHONEY. There is no objection to the bill, so far as the majority leader knows; is that correct?

Mr. McFARLAND. That is what I am trying to ascertain.

Mr. O'MAHONEY. The Senator from Arizona is of the opinion, is he not, that

the bill is noncontroversial and that its consideration will not take very long?

Mr. McFARLAND. I hope that consideration of the bill will not require much time; if it should take long, I would ask that the bill go over until tomorrow, rather than to have it considered today, because several Senators wish to speak on the unfinished business, which is the Alaska statehood bill.

Mr. HUMPHREY. Mr. President, will the Senator from Arizona yield to me?

Mr. McFARLAND. I yield.

Mr. HUMPHREY. My interest in this measure has been manifested since the first session of the Eighty-second Congress, in connection with the so-called Ellender bill.

At the present time the committee is holding hearings on the question of manpower as it affects the United States. This bill was reported by the committee yesterday, I believe. As yet, none of us has seen a report on the bill or the report which comes from the committee, nor have we had an opportunity to examine any of the hearings on the bill.

I am sure the bill meets the purposes which Senators had in mind at the time of the debate on the so-called Ellender bill. However, in view of the very hot controversy we had at the time of consideration of the Ellender bill, when the Senator from Illinois [Mr. DOUGLAS], who is not at this time on the floor of the Senate, was very much concerned about the very measure on which the Judiciary Committee now has taken action, I think we should have at least several hours today before we agree to the proposed unanimous-consent request.

Mr. McFARLAND. Mr. President, in order that Senators may know what the procedure will be——

Mr. AIKEN. Mr. President, will the Senator from Arizona yield to me?

Mr. McFARLAND. I yield.

Mr. AIKEN. I wish to assure the majority leader that I think this bill should be considered promptly, not later than tomorrow. However, we have heard so much discussion about illegal employment of aliens on farms that I wish to make sure that this bill treats all persons alike, because I have a suspicion that there may be more aliens illegally employed in the cities of the United States than there are on farms. So I desire to make sure that the bill covers those who are in the cities, as well as those who are on farms in the Southwestern States.

Nevertheless, Mr. President, I think the Senate should consider the bill not later than tomorrow, probably, although I must admit that this is the first time I have read the bill.

Mr. McFARLAND. Mr. President, as I stated at the beginning of my remarks, time is of the essence in connection with this bill. On the other hand, I do not wish to ask any Senator to vote for a bill which he feels he has not had sufficient time to study.

Mr. KILGORE. Mr. President, will the Senator from Arizona yield, to permit me to make a brief statement?

Mr. McFARLAND. Yes; I yield to the Senator from West Virginia.

Mr. KILGORE. Let me say that the draft of the bill which now comes before the Senate was accepted by the Department of Agriculture and representatives of the agricultural organizations, and by immigration-service officials. The bill was really drafted by them, and as many safeguards as possible were placed around it. At the same time it gives us the right to obtain evidence with respect to illegal labor at its inception.

Furthermore, on the question of labor, I may say that these groups are in a dangerous situation in the Southwest. There is a legal means of getting labor over the international boundary if the agreement is renewed. But the agreement cannot be renewed, at least until the Senate passes this bill and the bill goes to the House. Renewal of the agreement will then be discussed. This bill would provide the necessary safeguards to protect us against illegal entries. I refer to illegal entries by persons who may be personally unobjectionable, but who are unable to pass the immigration tests.

Mr. AIKEN. Mr. President, will the Senator from Arizona yield?

Mr. McFARLAND. I yield to the Senator from Vermont.

Mr. AIKEN. I should like to ask the Senator from West Virginia whether he is sure that every provision of this bill applies to the illegal employment of aliens within cities, as well as upon farms. Does the bill treat both classes exactly alike?

Mr. KILGORE. It treats everyone in exactly the same way, except for one feature of the bill.

Mr. AIKEN. What is that?

Mr. KILGORE. The exception is that, along the border, the immigration officers are granted a little more authority to conduct searches within a reasonable distance from any external boundary of the United States than they now possess.

Mr. AIKEN. In other words, the bill authorizes the immigration authorities to search for illegal entries along the entire Texas-Arizona-New Mexico border, but not, for example, in the city of Chicago. Is that correct?

Mr. KILGORE. They may search any place.

Mr. AIKEN. The bill says "within a distance of 25 miles from any such external boundary."

Mr. MAGNUSON. That applies to search without a warrant.

Mr. KILGORE. But they may search at any place with a warrant.

Mr. AIKEN. Then, in the mind of the Senator from West Virginia, there is no discrimination at all. If I may have assurance that there is no discrimination with respect to farms, I shall have no objection to the bill.

Mr. KILGORE. I may say to the Senator from Vermont, the bill provides that within a reasonable distance of the external boundaries of the United States the Immigration Service may enter and search any railway car, aircraft, conveyance, or vehicle without a warrant, for the purpose of discovering illegal entries. It also provides that "within a distance of 25 miles from any such ex-

ternal boundary" the immigration authorities may have access to private lands, but not dwellings, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States. They may procure from the district headquarters, of which there are only four, warrants authorizing them, at a day and hour fixed in the warrants, to make a search for illegal entries supposed to be harbored therein.

Mr. AIKEN. I thank the Senator from West Virginia. I simply raised this question, because it seemed that last year an effort was made to obtain legislation which was apparently directed at farmers only; and I wanted to make sure that any legislation we pass would apply to everyone.

Mr. KILGORE. I may say to the Senator from Vermont that the use of one particular word in the bill should convince him. In the previous bill the word "harboring" was employed generally. This bill goes to the matter of employment, no matter where the person may be employed, whether on a farm, in a factory, in a shop, or anywhere else. On page 4, beginning at line 18, the bill reads:

*Provided, however,* That for the purposes of this section, employment (including the usual and normal practices incident to employment) shall not be deemed to constitute harboring.

That is an additional safeguard.

Mr. MAGNUSON. Mr. President, will the Senator from Arizona yield?

Mr. McFARLAND. I yield to the Senator from Washington.

Mr. MAGNUSON. I think it should be pointed out to the Senator from Vermont that the fact that there was no hearing on this bill is not unusual, but is attributable to the time element. However, the bill itself was the result of long conferences between the State Department, the executive department, the farm labor-management groups, including, I believe, the National Grange, and a great legislative council. By reason of the time element, we have amended it in several conferences, and this is the result agreed upon by everyone. That is why no hearings were held.

Mr. AIKEN. I have had no opportunity to read the bill; but, with the assurance that its provisions are equitable, I have no objection.

The PRESIDENT pro tempore. The clerk will read the bill by its title, for the information of the Senate.

The LEGISLATIVE CLERK. A bill (S. 1851) to assist in preventing aliens from entering or remaining in the United States illegally.

The PRESIDENT pro tempore. Is there objection to the present consideration of the bill?

Mr. HUMPHREY. Mr. President, I do not desire to object to the present consideration of the bill. I merely want to say that because of a lack of time, many of us are not going to have any opportunity whatever to study this proposed legislation. But I recognize the difficulty which our Government has encountered in the renegotiation of the agreement with the Republic of Mexico,

and if this is a part of the means to get the agreement renewed so that we can make some forward progress, then I shall not object.

However, I may say, Mr. President, that the problem of the wetback and the problem of migratory labor should not be considered as being properly treated or fully explored by a bill such as Senate bill 1851. This bill treats but one aspect of the problem: it gives the Immigration and Naturalization Service and the Justice Department more direct authority than they have under present law. It is a limited approach to a very difficult problem, and there will be much more which needs to be done. I shall not object, but I want the record perfectly clear that we have not as yet, from what casual study I have been able to make of Senate bill 1851, come anywhere near really getting at the problem of the wetback.

I listened to testimony this morning from Archbishop Lucey, of San Antonio, Tex., and from Dr. Fuller, the executive secretary of the President's Commission on Migratory Labor. There are hundreds of thousands of wetbacks in this country literally adulterating the American employment market and possing great social and legal problems to the people of the United States. This bill as an effort to strengthen our law is commendable, and on that basis, I think it should be supported. But I repeat, Mr. President, we have nowhere near met the obligation which the Congress owes to the American people in dealing with the very difficult and complex problem of migratory labor.

Mr. KILGORE. Mr. President, I should like to remind the Senator that a bill going much further than this is now in the Committee on the Judiciary, a bill which completely takes care of the immigration problem, or attempts to do so, and recodifies the entire immigration laws. This is a temporary expedient to take care of an emergency. The other bill goes much further.

This bill is more or less for the purpose of strengthening the arm of the immigration service pending the passage of complete legislation on the subject of immigration, and to enable them to ferret out certain places which they have heretofore been unable to search. The bill, in short, makes it an offense to harbor or to transport or to bring in wetbacks. The previous law makes it an offense to enter the country illegally. The pending bill provides certain safeguards. It provides that employment shall not be deemed to constitute harboring, if the normal practices of the employment are followed. Second, it allows a search of vehicles within a reasonable distance of the external boundaries, without warrant. It must be realized that we have very few immigration inspectors, and they must not be tied down too tightly. Third, it allows the entry on private lands within 25 miles of the external boundaries, but not the entry of dwelling houses, to search for illegal entries. Fourth, it permits search to be made upon the issuance of a warrant, which warrant must be dated and limited to 30 days for its execution, and the time of day or night at which the warrant may be executed shall be specified. The search may be made at any place in the United States where there is reasonable ground to believe there are illegal entries, and the warrant must be issued either by a district director or his assistant, there being four district directors in the United States and three assistant directors.

Mr. JENNER. Mr. President, will the Senator yield?

Mr. KILGORE. I yield to the Senator from Indiana.

Mr. JENNER. For the benefit of the Senate, I think the Senate might explain that that represented the only disagreement in the committee.

Mr. KILGORE. That is correct.

Mr. JENNER. He might explain also that the farmers of this country are very much interested in that provision, and that it was the intention of this proposed legislation, and so written into the report, to limit the number of assistant directors.

Mr. KILGORE. The Senator is correct. The report will show that that was the intention of the committee. The bill, as originally drafted, used the term "supervisory personnel." The word "supervisory" was spelled out to mean the district directors and their assistants, there being four directors and three assistants.

Mr. CAIN. Mr. President, will the Senator from West Virginia yield for a question?

Mr. KILGORE. In just a moment. I should first like to finish my thought. That was not put into the bill but was written into the report, because the only dispute we had was with reference to the John Doe warrant of the old prohibition days and the fear that such a warrant might be written.

I now yield to the Senator from Washington.

Mr. CAIN. If the bill is passed by the Senate during the course of the day, will the committee's report on the bill be made available to the Members of the Senate?

Mr. KILGORE. The committee's report was filed yesterday, but for some reason it has not come back from the Government Printing Office. I am assured by the Secretary that it will be here some time this afternoon.

Mr. CAIN. I thank the Senator.

Mr. HUMPHREY. Mr. President, will the Senator from West Virginia yield?

Mr. KILGORE. I yield to the Senator from Minnesota.

Mr. HUMPHREY. Mr. President, I notice that the proviso on page 4 of the bill reads as follows:

*Provided, however,* That, for the purposes of this section, employment (including the usual and normal practices incident to employment) shall not be deemed to constitute harboring.

What is the purpose of that particular proviso if the purpose of the bill is to stop the tragic wetback system?

Mr. KILGORE. Many wetbacks have been in the country for years. They are frequently mistaken for American citizens. By stating that so long as an employer lets the employee carry on only the normal work of his employment and does not make any special effort of any kind to conceal him, that of itself shall not constitute harboring. But if he takes any further steps, such as providing a place for the employee to hide out, that does constitute harboring. Letting him carry on the normal course of employment cannot be so considered.

Consider a farmer who takes a hot lunch to the field at noon. The mere fact that that is being done to save time and to give better food to the men would not be classed as harboring, as it would be if the food were taken out into the underbrush to someone who was concealed there.

I know what the Senator has in mind. Practically every State in the Union has had the wetback problem. Some of these people cannot meet the standards of immigration. They may be criminals. Because they are wetbacks, they can be kept in a state of peonage. We have a contract system whereby aliens can legitimately be brought into the United States. But before they are brought in, the local employment service is available, or, if not available, then by the contract system aliens can be brought in to take care of crops in certain places and to perform certain types of work. But they must meet the standards of immigration. This bill would give the Immigration Service some help which it does not now have.

Mr. HUMPHREY. Mr. President, I do not wish to delay the Senate's consideration of this measure, but I want the record expressly, explicitly, and perfectly clear that this measure is but one of the many things which need to be done in terms of dealing with the problem of the wetback and migratory laborer.

I also want it clear as to the restrictions in the bill, namely, the warrant, the number of persons who may issue a warrant, the supervisors or assistant supervisors, and the Attorney General; and the fact that a wetback employed under what are normal conditions of employment severely limits the application of the measure as an effective piece of legislation to deal with the wetback problem.

I am not saying that it is not progress. It is. But the testimony which we heard this morning, and which is still ringing in my mind, of one of the distinguished leaders of a great church, who came all the way from San Antonio, Tex., at his own expense, to testify about the miserable, deplorable conditions which exist in the migratory-labor field, is something which is shocking and revealing.

I think every Member of the Senate ought to be aware of the testimony of the Archbishop of San Antonio in which he pointed out that in Texas alone some 60,000 American citizens sought employment elsewhere, and under the agreement 50,000 Mexicans were brought into the United States to replace Americans who had to go elsewhere for employment. These are not my words, but are the words of a distinguished churchman who appeared in behalf of his people.

Let no Member of the Senate think that Senate bill 1851 is an answer to the

problem. The bill is long overdue, and that is the reason why it must be passed; but it has been restricted and limited and will necessitate, I think, much more consideration of the problem by the Committee on the Judiciary. I know there is an immigration bill before us, and I know that we will take some action on the subject this year. We ought to be as interested in the deportation of persons illegally entering from Canada, England, France, or Germany as we are with reference to Mexicans or persons from the British West Indies. There are all kinds of laws on the books with reference to deporting people who may have a bad idea. The books are filled with legislation providing for the deportation of Communists and Fascists. I want to see to it that those who have entered this country illegally are deported also, that the laws of this land are adequately enforced, and that there is no doubt as to what the purpose of the Congress is, namely, that illegal entries shall be barred.

The wetback problem stands as a blight and a shame on the American Republic. We talk about aid for the underprivileged; we talk about integrity and the enforcement of law. Yet one of the principal problems we face is the way we have permitted the wetback to remain here and to permit himself to be exploited and, at the same time, deprive American laborers of employment.

Mr. President, I have no objection to the consideration of the bill.

Mr. KILGORE. Perhaps the distinguished Senator from Minnesota knows that the original bill introduced was in line with his statement. There is a very strong bill in the House which is in line with the original bill introduced. However, the thought at this time was that it would work a very severe hardship; in other words, action had to be taken gradually so as to accomplish as much as we could this year and do a little more next year and not punish employers who were used to a long practice of carelessness which we had allowed to develop, and at the same time, not punish the type of farmer who wants to pay legitimate wages but cannot find the necessary labor. He wants to bring the aliens into the country temporarily and then send them back after the work is done. We do not want to punish him by having him compete with the wetbacks.

That is the reason for the modification of the pending bill. In the opinion of the Senator from West Virginia, it is a temporary expedient. I hope we shall eventually reach the ultimate.

Mr. LEHMAN. Mr. President, will the Senator from West Virginia yield?

Mr. KILGORE. I yield to the Senator from New York.

Mr. LEHMAN. Mr. President, as the Senator from West Virginia knows, I am strongly in favor of preventing the entry into this country of wetbacks, and I am also in favor of their deportation or of the deportation of any other man or woman who has entered the country illegally. Since I feel that way, does not the Senator agree with me that the point raised by the Senator from Minnesota, that this bill unnecessarily limits the power of the Government in that respect, is valid?

I specifically ask the Senator about a proviso in subsection (4) of section 8, commencing in line 18, page 4, reading as follows:

*Provided, however,* That for the purposes of this section, employment (including the usual and normal practices incident to employment) shall not be deemed to constitute harboring.

My question is whether the Senator from West Virginia does not believe that that provision substantially weakens the force and effect of this entire paragraph in section 8.

Mr. KILGORE. No, I will say to the Senator from New York I do not believe that that proviso, properly interpreted, weakens the section, because this is a bill providing punishment for people who "harbor," and it is very hard, let us say, for the small farmer, or the factory owner, to know, when he sees a man coming into the community, what his previous status was. The Senator from New York must realize, and the Senator from Indiana well knows, that wetbacks come across the border and get a little money in Texas, Arizona, or New Mexico, and then go to Indiana to work for a while on the farms there, and when the season is that area is over, actually trucks are sent to Indiana, Ohio, Illinois, for the workers, and haul them back for the cotton-picking season. The trucks are not sent to West Virginia, because the workers labor in the mines of West Virginia, and the work is not seasonal.

Let us say a farmer picks up a wetback in Illinois from a farm there, and hauls him down to the South, as he has been accustomed to doing, through his agents. So long as he puts the man into employment in the South, that in itself shall not be considered "harboring," so as to render him liable to punishment; but the wetback may still be apprehended.

Mr. LEHMAN. Mr. President, will the Senator yield for another question?

Mr. KILGORE. Certainly.

Mr. LEHMAN. As I read that section, the words in it are as follows: "willfully or knowingly"—I emphasize the words "willfully and knowingly"—"willfully or knowingly encourages or induces, or attempts to encourage or induce, either directly or indirectly, the entry into the United States of any alien, including an alien seaman, not duly admitted by an immigration officer or not lawfully entitled to enter or reside within the United States under the terms of this act," and so forth.

One who comes within that description shall be deemed guilty of a felony. The provision starting in line 18 it seems to me nullifies the other language. A man does not subject himself to any penalty unless it can be shown that he has willfully or knowingly induced the admission or entry of such aliens.

Mr. KILGORE. Oh, no. If he willfully or knowingly induces the aliens to come into the United States, that of itself is an offense, but the mere fact of having them in his employment shall not under the meaning of the words, be classed as "harboring."

Mr. LEHMAN. I understand that, but what I am not clear about in my mind, and possibly the Senator from West Virginia can enlighten me, is why the provision on line 18 is inserted, limiting the effect of the other part of the subsection. I am trying to strengthen the bill.

Mr. KILGORE. So am I, but at the same time I am trying to do it, not at the expense of some man who unwittingly or unknowingly, or thoughtlessly hires a man he does not know to be a wetback, who may be pretty well in the interior of the country, and who is seeking employment. The man to whom I am referring may need an employee, and hires the alien. That of itself should not subject him to a penalty. Once he finds out the real situation, he is knowingly and willfully harboring the man, and the authorities can go after him.

Mr. KNOWLAND. Mr. President, will the Senator from West Virginia yield?

Mr. KILGORE. I yield to the Senator from California.

Mr. KNOWLAND. As a matter of fact, is it not true, particularly in the border States of Texas, New Mexico, Arizona, and California, that with their Spanish-Mexican background, there are a great many people living on our side of the border who are American citizens, who speak Spanish, and there are a great many from the other side who come over who speak English, and it is difficult at times, no matter if one is trying to prevent illegal entry, to differentiate between the American citizen on our side of the border and the person who may have come across?

As I understand the situation, what the Senator from West Virginia has been trying to accomplish is this: If there is in fact a conspiracy to bring in inadmissible persons knowingly and willfully, those guilty would be subject to the penalty, but if in the normal course of employment one happens to get a wetback in his group, he should not then be penalized for a condition to which he has not been a party except in a nonwillful way.

Mr. KILGORE. The Senator from California is correct in his statement. Not only is it true of the border States, but also of my own State of West Virginia, where great numbers of legally entered people of Spanish or Mexican ancestry work in the mines and factories. If someone drifts in, speaking the same language and associating with them, it is very difficult for an employer to know which ones are in the country illegally.

A mine operator, for instance, who may have a hundred Spanish-speaking employees working in his mine, may suddenly learn that there is one wetback among them, but he has not induced that wetback to come there. Unless there is in this bill a clause defining harboring, in accordance with the definition as given by the Supreme Court, such an employer could be held guilty of a felony by reason of the fact that he had harbored a wetback.

Incidentally, that could operate also against a Spanish-speaking person, or a person of Spanish, Italian, or other foreign ancestry, who has come into this

country, who is a bona fide citizen, and who tries to find work, because employers would be reluctant to hire a person who spoke a foreign language.

Mr. LEHMAN and Mr. ELLENDER addressed the Chair.

The PRESIDENT pro tempore. Does the Senator from West Virginia yield, and if so, to whom?

Mr. KILGORE. I yield first to the Senator from New York.

Mr. LEHMAN. I expect to vote for the bill because I believe it is a step forward. But my desire is to make it much stronger than it is at the present time.

It seems to me that, on page 4, lines 18 to 21, beginning with the word "*Provided,*" weaken the effect of the bill very materially. I do not believe that language belongs in the bill or is needed because no one may be found guilty of a crime or a felony unless it can be shown that he has willfully or knowingly encouraged the admission or entry of a wetback into this country.

In the absence of an act on the part of a citizen to induce illegal entry willfully or knowingly, it does not seem to me that he is subject to any penalty at all. Therefore, I believe it is not necessary or advisable to include the escape clause which is inserted at the end of this subsection.

Mr. LEHMAN. Mr. President, will the Senator yield to me for a moment?

Mr. KILGORE. Perhaps the distinguished Senator from New York has not read all the provisions of the bill.

Mr. LEHMAN. I could not have read all of it because I did not see the bill until a few minutes ago.

Mr. KILGORE. Subparagraph (3) of section 8 reads as follows: "willfully or knowingly conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, in any place, including any building or any means of transportation."

This limiting clause affects the definition of the word "harbor" in subsection (3).

I now yield to the Senator from New Mexico.

Mr. CHAVEZ. Mr. President, the point I wish to make in response to the question raised by the distinguished Senator from New York is this: All of us, of course, wish to have some provision adopted affecting the wetback or any other immigrant who is here illegally, but unless there is such a definition as that outlined by the Senator from West Virginia, we shall be completely violating the criminal laws of the country.

Why should a man be punished, or why should he be deemed to have committed a felony, if he has not acted willfully and unlawfully? If he acts as a matter of course, by mistake, because he does not know whether a person is a citizen or not; if he does it in an innocent manner, and does not do it premeditatedly, why should he be punished? I am just as sincere as is any other Senator in trying to solve the wetback problem, because it affects my State.

As was previously stated by the Senator from Minnesota, what Archbishop Lucey said before the committee this morning was correct. Our citizens, brothers of

the boys who are dying in Korea, boys from Texas, New Mexico, and Arizona, are in many instances unable to obtain work because of the wetback problem. However, I do not want to punish an American citizen because he makes a mistake and inadvertently allows someone to come into the United States illegally, or who employs a person when he innocently thinks that he is either a legal entrant or a citizen of this country.

Mr. LEHMAN. Mr. President, I should like to point out to the Senator that I am eager to see this problem solved. I have bills which have been introduced or will be introduced, which would permit the liberalization of our immigration laws, so that decent men and women who conform to the standards set by our Government may be permitted to enter this country.

Mr. CHAVEZ. I should like to associate myself with that idea.

Mr. LEHMAN. On the other hand, I desire to close the doors against the entry of certain persons, and to deport anyone who has entered this country illegally, because I think illegal entries are bad for the country.

Mr. CHAVEZ. So do I.

Mr. LEHMAN. I also believe that the existence of large groups of immigrants, numbering several hundred thousand, who come into the United States illegally militates against the possibility of decent law-abiding, honest men and women coming into this country legally.

Mr. CHAVEZ. I also wish to associate myself with the Senator from New York in that idea. However, I believe that so far as the wetback problem is concerned, this bill represents progress. In dealing with this problem time is of the essence. The law, or the contract made pursuant to the existing law, expires on the 11th of this month, as I understand. I should like to have some action taken. I feel as does the Senator from New York, that the committee has made progress.

Mr. LEHMAN. I thank the Senator. I certainly will not object to the consideration of the bill.

The PRESIDENT pro tempore. Is there objection to the present consideration of the bill?

Mr. KILGORE. Mr. President, I yield the floor.

Mr. ELLENDER. Mr. President, I hope there will be no objection to the consideration of this bill. It will be recalled that the bill which was considered last year to permit the importation of Mexican farm labor was debated to a considerable extent on the floor. I am sure that Senators will remember the amendment which was proposed by the Senator from Illinois [Mr. DOUGLAS], and adopted by the Senate, but later eliminated in conference.

The amendment to the immigration law which we are now considering does not, I admit, go even as far as the so-called Douglas amendment. However, as has been stated many times, the proposed amendment goes a large part of the way. It is my hope that within the next few months the Senate will consider the omnibus bill now on the calendar, which would further strengthen the immigration laws.

The enactment of this amendment is necessary, I understand, because the Mexican Government refuses to enter into another contract pursuant to existing law unless we strengthen our immigration laws. It will be recalled that when the agreement was entered into last year the President of the Republic of Mexico, as well as our own President, decided to limit the contract to 6 months, in the hope that the Congress would enact a law to assist in solving the wetback problem.

Mr. KILGORE. Mr. President, will the Senator yield?

Mr. ELLENDER. I yield.

Mr. KILGORE. The Senator from Louisiana probably well knows that the Republic of Mexico wants to restrict the migration to the United States of Mexicans from northern Mexico, because Mexico is trying to build up her own agriculture. For that reason the Mexican Government is just as much opposed to the wetback as we are. Labor is brought from the southern agricultural section of Mexico into the United States, and then returned to Mexico.

It is for these reasons that we must strengthen the wetback law. Otherwise the Government of Mexico will not enter into an agreement.

Mr. ELLENDER. When we entered into the contract last year there was a provision whereby labor was to be taken from the southern part of Mexico, to meet the very point to which the Senator is now calling attention.

I find that there is a lack of cooperation on the part of the Mexican Government in fighting the wetback problem. For example, there is a law on the statute books of Mexico which makes it a crime punishable by fine and imprisonment if a wetback, returned to Mexico, is shown to have crossed illegally. The Mexican Government can legally prosecute him. However, the Mexican Government will not do it. It puts the entire burden on the American Government. It is my hope that if this bill is passed, we shall get more cooperation from the Mexican Government, and that it will assist us in fighting the wetback problem. I am certain that our present problem would have been substantially reduced if the Mexican Government had taken action to punish, under its existing laws, the thousands of wetbacks who have been returned to Mexico by us. I suggest that this entire wetback problem can be solved only if we get more cooperation from the Mexican Government.

Mr. KNOWLAND. Mr. President, will the Senator yield?

Mr. ELLENDER. I yield.

Mr. KNOWLAND. Let me say for the purpose of the RECORD that during the period Congress was in adjournment I went into the Imperial Valley, where reception centers have been established. I commend the Immigration Service and the Department of Labor for the job they are doing. The fact of the matter is that many of the farm groups, as well as some of those in the Labor Department, have told me that the wages paid were comparable to those paid to other

labor, and that the Mexican labor actually cost the farmer a little more than other labor would cost, because of the expense of bringing the labor in, the bond, and so forth. It is not entirely a one-sided affair. If Mexican labor were allowed to come from the region immediately south of the border, the situation would not be quite so serious, because the agricultural problems in that region are, to some degree, at least, comparable to those in Imperial County. When Mexican labor is brought from farther down in Mexico, many persons come into the United States who have not had very much agricultural experience under modern methods.

When Mexican labor is employed in this country it accumulates a substantial number of dollars to take back to Mexico. I was given certain figures relative to the amounts which Mexicans had accumulated and taken back into Mexico. They also accumulate and take back with them large quantities of American merchandise.

Moreover, as a sort of practical point 4 program, they are taking back with them to their farms and neighborhoods modern methods of agricultural development which I think will prove highly beneficial in improving the standard of living, the production of food, and the general economic condition in certain agricultural regions of Mexico which have not heretofore had the benefit of such modern methods.

Mr. ELLENDER. I am glad that the Senator from California has made that point. It seems that the officials in Mexico do not appreciate the benefits mentioned by the Senator from California.

In a measure they are forcing us to get labor from far down in southern Mexico, in the hope that the labor in northern Mexico will remain in agricultural employment in that area.

So long as the Mexican Government takes the position it does, we will never have the kind of cooperation that is necessary if we are to solve the wetback problem. I am sure that if the Mexican Government took the proper steps and actually punished wetbacks after they are returned to Mexico, the rate of illegal immigration would be substantially reduced.

Mr. President, imagine the amount of money we spent last year to solve the problem. We not only assisted on our own border by making it as hard as possible for wetbacks to enter initially, but when we found them over here, we transported them a few hundred miles into the interior of Mexico, so that they could not just turn around and thumb their way back across the border. That did not stop them. The Mexican Government, under existing statutes, could have punished these people. They could have had them arrested and tried under Mexican law. That would have been a good way to proceed. Yet, when such a proposal was made, there was nobody at home. The Mexican Government seems to expect us to do all the work.

It is my hope that this bill will pass as it is now written, and that from now on the Mexican Government will be a little more cooperative concerning the problem of wetbacks.

Mr. CONNALLY. Mr. President, will the Senator yield?

Mr. ELLENDER. Certainly.

Mr. CONNALLY. I should like to ask some questions of the distinguished Senator from Louisiana, because I know how interested he is and how much work he has done to solve the whole problem. Is it not true that the main problem—and this question should be addressed to the Mexican Government, as well as to our own Government—is that of allowing the aliens who want employment to come across the border, to be employed here, to receive good wages, and then to see to it that they are returned to Mexico? Is not that the problem in a nutshell?

Mr. ELLENDER. That is it.

Mr. CONNALLY. Is it not correct to say that the experience of our Government and of the people of the United States demonstrate that when the so-called wetbacks cross the border and are employed in the United States and receive many times the compensation they would receive if they had remained in Mexico, if something can be worked out to guarantee their return to Mexico the problem would be solved?

Mr. ELLENDER. That is correct.

Mr. CONNALLY. It is not so much a question of letting them into the country. Almost anybody could be permitted to come into the country if there was the demand, and do no harm to either government or either people, so long as there was some assurance that they would return to Mexico?

Mr. ELLENDER. That is correct.

Mr. CONNALLY. Could that problem not be worked out by giving to each one of the wetbacks a card or a certificate of some kind when they entered the country, which would identify them and make it possible for the officers of the law to detect them and thus see to it that they returned to Mexico?

Mr. ELLENDER. That could be done. As the Senator from Texas knows, the border between Mexico and Texas is very long, and it would require quite a number of employees to check thoroughly on all the Mexicans who cross it, and then check again to see that they returned.

Mr. CONNALLY. The Government has employees there now; does it not?

Mr. ELLENDER. Yes, but the method the Senator suggests would require many more employees. It is my belief that more cooperation on the part of the Mexican Government in actually punishing those who are guilty of crossing the border illegally, would go a long way toward solving the problem. The difficulty is that Mexico is putting on us the entire burden of capturing and returning illegal aliens.

Mr. CONNALLY. I agree with the Senator from Louisiana that Mexico has not been cooperative in a proper sense. It is to Mexico's advantage to have its citizens come to the United States, get good wages, and go home with money in their pockets to spend in Mexico, rather than to throw them in jail.

Mr. President, I dislike very much the provisions in the bill with regard to making it a so-called crime to offer any inducements to such aliens, or harbor them, or anything of that kind. That point is greatly exaggerated. How can we induce a Mexican to come across the border when we are not in Mexico and we do not know anything about the man until he comes into the United States? If he wants employment and an American is able to pay him a good wage and needs him for the work, why should we not let him do the work and then carry his earnings back to Mexico and spend them there for the economy of Mexico, rather than put him in jail?

I believe the committee has done excellent work. They have been laboriously toiling over the various measures regarding all the aspects of the wetback situation. However, I very much deplore that the committee has found it necessary to put into the bill the harsh provisions that affect the citizens of my State, of New Mexico, Arizona, and other States. They are not limited to the States I have mentioned.

Mr. CHAVEZ. Every State.

Mr. CONNALLY. Every State. It would be possible to charge a man in Montana with a violation of the act, and he could be confined in a penitentiary, although he would be a thousand miles from the border. I regret that the Mexican Government has been so illiberal and unsound and so lacking in appreciation of the economic aspects of the question involved that they should disagree with everything we want to do, except to undertake to put someone in jail. I very much regret that the committee found it absolutely necessary to insert this provision in the bill in order to get any adjustment with Mexico.

Mr. ELLENDER. Under the present law, which expires in December of this year, our Government and the Government of Mexico entered into a contract.

Mr. CONNALLY. The Government of Mexico, or the citizens of Mexico?

Mr. ELLENDER. The Mexican Government. There is a contract between the Governments. When we were in Mexico City, in February of last year, it was on the insistence of the President of Mexico—and, of course, our own President agreed to it—that the contract was limited to only 6 months, although it could have been made effective until December 31 of this year.

Mr. CONNALLY. When does the act expire?

Mr. ELLENDER. December 31 of this year, 1952.

The point is that when the Senate passed the original bill, it included the so-called Douglas amendment. However, when the bill reached the House, the Douglas amendment was eliminated. We tried in conference to retain the amendment, but there was serious objection, and the legislation was delayed. However, the law as it now reads will become inoperative, that is, the Mexican Government will not agree to another contract, unless the pending measure—which is a very much modified form of what the Senate approved when the original bill was enacted during the last session of Congress—is adopted.

Mr. CONNALLY. In other words, we are letting Mexico dictate our policies; if

we do not do what Mexico wants nothing will be done? That, in short, is the statement of the Senator from Louisiana.

Mr. ELLENDER. They have requested it. Of course, the President of the United States has also requested it.

Mr. CONNALLY. But it is a legislative matter now.

Mr. ELLENDER. Yes, it is; but in order to obtain the labor necessary to harvest the coming crop I believe probably the thing to do is to enact the bill, in the hope that something better can be worked out in the future.

The PRESIDING OFFICER. Is there objection to the present consideration of the bill?

Mr. CHAVEZ. Insofar as the contract is concerned, the law does not expire until December, but the agreement between Mexico and the United States expires on the 11th of February.

Mr. CONNALLY. I do not understand what the Senator means. I thought he said the contract expired in December.

Mr. CHAVEZ. The law itself expires in December. However, under the law an agreement was entered into between the United States and Mexico, and that agreement expires on February 11. So that after February 11 it will not be possible to get the labor.

Mr. CONNALLY. Then, according to the Senator's statement, after the present agreement expires on February 11, the old law will apply; is that correct?

Mr. CHAVEZ. That is correct, although then there would be a law, but no agreement.

Mr. ELLENDER. The law provides that the method of obtaining labor from Mexico is by contract between the two Governments, and the present agreement is limited to 6 months, although it could have been made effective until December 31.

Mr. CONNALLY. My point is that after February 11, when this agreement expires, we shall go under the general immigration law.

Mr. ELLENDER. That is correct. In such event, there will not be any agreement and, in effect, no law on this subject, except the one now in being, but which, of course, requires a new agreement between the two Governments.

Mr. CONNALLY. However, if we have no agreement, then we are relegated to the existing immigration laws, under which very few persons in this category could enter the United States at all. Is that correct?

Mr. ELLENDER. That is correct.

Mr. CONNALLY. Very well; I thank the Senator.

The PRESIDENT pro tempore. Is there objection to the request for the present consideration of the bill?

There being no objection, the Senate proceeded to consider the bill (S. 1851) to assist in preventing aliens from entering or remaining in the United States illegally, which had been reported from the Committee on the Judiciary with an amendment.

The PRESIDENT pro tempore. The amendment reported by the committee will be stated.

The CHIEF CLERK. It is proposed to strike out all after the enacting clause and insert:

That section 8 of the Immigration Act of 1917 (39 Stat. 880; 8 U. S. C. 144), is hereby amended to read:

"SEC. 8. (a) Any person, including the owner, operator, pilot, master, commanding officer, agent, or consignee of any means of transportation who—

"(1) brings into or lands in the United States, by any means of transportation or otherwise, or attempts, by himself or through another, to bring into or land in the United States, by any means of transportation or otherwise;

"(2) knowing that he is in the United States in violation of law, and knowing or having reasonable grounds to believe that his last entry into the United States occurred less than 3 years prior thereto, transports, or moves, or attempts to transport or move, within the United States by means of transportation or otherwise, in furtherance of such violation of law;

"(3) willfully or knowingly conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, in any place, including any building or any means of transportation; or

"(4) willfully or knowingly encourages or induces, or attempts to encourage or induce, either directly or indirectly, the entry into the United States of any alien, including an alien seaman, not duly admitted by an immigration officer or not lawfully entitled to enter or reside within the United States under the terms of this act or any other law relating to the immigration or expulsion of aliens, shall be guilty of a felony, and upon conviction thereof shall be punished by a fine not exceeding $2,000 or by imprisonment for a term not exceeding 5 years, or both, for each alien in respect to whom any violation of this subsection occurs: Provided, however, That for the purposes of this section, employment (including the usual and normal practices incident to employment) shall not be deemed to constitute harboring.

"(b) No officer or person shall have authority to make any arrest for a violation of any provision of this section except officers and employees of the United States Immigration and Naturalization Service designated by the Attorney General, either individually or as a member of a class, and all other officers of the United States whose duty it is to enforce criminal laws.

"(c) When the Attorney General or any district director or any assistant district director of the Immigration and Naturalization Service has information indicating a reasonable probability that in any designated lands or other property aliens are illegally within the United States, he may issue his warrant authorizing the immigration officer named therein to go upon or within such designated lands or other property other than a dwelling in which the warrant states there may be aliens illegally within the United States, for the purpose of interrogating such aliens concerning their right to enter or to be or remain in the United States. Such warrant shall state therein the time of day or night for its use and the period of its validity which in no case shall be for more than 30 days."

SEC. 2. The last proviso to the paragraph headed "Bureau of Immigration" in title IV of the act of February 27, 1925 (43 Stat. 1049; 8 U. S. C. 110), as amended by the act of August 7, 1946 (60 Stat. 865), is hereby further amended so that clause numbered (2) shall read:

"(2) within a reasonable distance from any external boundary of the United States, to board and search for aliens any vessels within the territorial waters of the United States and any railway car, aircraft, conveyance, or vehicle, and within a distance of 25 miles from any such external boundary to have access to private lands, but not dwellings, for the purpos of patrolling the border to prevent the illegal entry of aliens into the United States, and."

The PRESIDENT pro tempore. Without objection, the amendment is agreed to.

Without objection, the bill is passed.

Mr. DOUGLAS. Oh, Mr. President—

The PRESIDENT pro tempore. The Chair begs the pardon of the Senator from Illinois, and withdraws the statement about the passage of the bill.

Mr. DOUGLAS. Thank you, Mr. President. The announcement was made quite rapidly.

Mr. President, we know that enormous numbers of so-called wetbacks enter the United States illegally every year.

Mr. Gladwin Hill, who made an investigation of this matter for the New York Times, last year estimated that between 500,000 and 1,000,000 Mexicans crossed the border in this way in a single year.

The Senate Agriculture Committee placed the number at more than a million in its report on S. 984 last year and conceded the importance of this illegal immigration.

We know also some of the effects of this large migration. The presence of this large number of Mexican laborers who enter our country illegally serves to keep down the wages of American farm workers. Furthermore, since these persons enter the United States illegally, we know that they are at the mercy of their employers, because their employers can turn them over to the authorities at any time and can have them deported. And, therefore, the workers are forced to accept low wages and not very good working conditions.

I believe we must deal with this question much more vigorously than the committee has done, although I wish to pay tribute to the committee for acting to improve the present situation. The committee has voted to tighten up the prohibitions and penalties against transporting wetbacks illegally into the United States and harboring wetbacks, but the committee proposes a specific exemption for employment. It specifically provides that employment shall not constitute harboring. In other words, under the committee proposal it is not illegal for an employer knowingly and willfully to hire a wetback who has illegally entered the United States.

Mr. KILGORE. Mr. President, will the Senator from Illinois yield to me?

Mr. DOUGLAS. I yield.

Mr. KILGORE. I think the Senator from Illinois misinterprets the bill, which provides that the employment itself shall not constitute harboring. If it can be proved that an employer knowingly and willfully has permitted such a person to enter the United States, the bill provides that a penalty shall be imposed.

Mr. DOUGLAS. Very well; then I wish to have the Senate adopt an amendment to cover that point of employment, and to the committee amendment I shall submit my amendment and

send it to the desk and ask that it be stated and considered.

The PRESIDENT pro tempore. Without objection, the action previously taken by the Senate on the committee amendment will be reconsidered, and the committee amendment is now before the Senate.

The amendment submitted by the Senator from Illinois to the committee amendment will be stated.

The CHIEF CLERK. On page 5 of the committee amendment, between lines 17 and 18, it is proposed to insert the following:

(d) Any person who shall employ any Mexican alien not duly admitted by an immigration officer or not lawfully entitled to enter or to reside within the United States under the terms of this act or any other law relating to the immigration or expulsion of aliens, when such person knows or has reasonable grounds to believe or suspect or by reasonable inquiry could have ascertained that such alien is not lawfully within the United States, or any person who, having employed such an alien without knowing or having reasonable grounds to believe or suspect that such alien is unlawfully within the United States and who could not have obtained such information by reasonable inquiry at the time of giving such employment, shall obtain information during the course of such employment indicating that such alien is not lawfully within the United States and shall fail to report such information promptly to an immigration officer, shall be guilty of a felony, and upon conviction thereof shall be punished by a fine not exceeding $2,000, or by imprisonment for a term not exceeding 1 year, or both, for each alien in respect to whom any violation of this section occurs.

Mr. DOUGLAS. Mr. President, this is the precise language of the amendment adopted last year by the Senate.

Mr. McFARLAND. Mr. President, will the Senator from Illinois yield to me?

Mr. DOUGLAS. I am very glad to yield.

Mr. McFARLAND. I hope the Senator from Illinois will not offer the amendment.

Mr. DOUGLAS. Mr. President, I have already offered the amendment to the committee amendment, and I hope my amendment to the committee amendment will be accepted.

Mr. McFARLAND. I may state to my distinguished friend from Illinois that this amendment to the committee amendment presents a highly controversial question. There are those who honestly believe that the amendment proposed by the Senator from Illinois to the committee amendment would make the proposed law too strict.

On the other hand, the bill before the Senate is proposed as stopgap legislation to enable the farmers to obtain the needed labor for another 6 months. If at the time for the renewal of the law in regard to the use of this labor, the Senator from Illinois wishes to submit his amendment, that will be a different proposition. But what will happen if the amendment is insisted upon at this time? The committee has worked a long time in preparing a compromise bill, but the bill cannot be passed by us today if it includes the amendment the Senator from Illinois has submitted to the committee amendment, because there will be

considerable debate on that subject. The bill was taken up by the Senate today with the understanding, of course, that it would be passed as it is and that there would not be a great deal of controversy.

On the other hand, if we throw open to debate the subject matter of the amendment proposed by the Senator from Illinois to the committee amendment, and if we thus bring on the controversy which has existed for the last 6 months, the result will be that the United States may not obtain the important fiber and food which are needed in order that our defense efforts may proceed successfully.

Mr. President, everyone must at least agree that this bill constitutes a step forward, and that those who have worked on the bill, including the Department of Labor, the Department of Agriculture, and the various agriculture organizations, have done what they think is best under the circumstances.

It would be unfortunate to throw this subject into controversy after the departments and farm organizations have agreed upon the language and after the Judiciary Committee made a unanimous recommendation that it pass as reported. As I stated before, time is important and I am hopeful we may act promptly and not in this one bill try to cure all defects in our immigration laws.

Mr. DOUGLAS. Mr. President, the language contained in my amendment to the committee amendment is nothing new. It is the precise language which was adopted last year by the Senate itself, when the question was fully discussed and when the Senate reached agreement that the penalties should be made to apply not only to those who transport such labor illegally, not only to those who conceal or harbor such labor illegally, but also to those who employ that labor which has entered this country illegally. I may say this is the real test and the real milk in the coconut. This will actually determine whether we are to have a really effective law or whether we are to have no law at all.

So I am proposing in this amendment to the committee amendment only what the Senate itself did last year. And I hope the Senate may without delay adopt this proposal again.

It is true that the amendment was eliminated in conference last year; but during the course of the debate on the amendment, the Senator from Louisiana pledged that he was thoroughly in agreement with the principle it involves. I read from the CONGRESSIONAL RECORD, volume 97, part 4, page 4427:

Mr. President, I wish to state that in order to further assist in connection with the wetback problem, and in conformity with the promise which I made to many members of the Mexican delegation that I would sponsor a bill to make it a punishable offense for an American employer knowingly to employ an alien illegally in this country, such a bill was prepared and introduced by me today.

The point is that whenever this issue comes up, it is said that now is not the time to dispose of it, but it should be considered at some other time. I sub-

mit that now is the time, when we are dealing with this bill. So I hope very much the Judiciary Committee and the Senate will accept the amendment, so as to reaffirm the strong position the Senate itself took last year.

Mr. HUMPHREY. Mr. President, will the Senator from Illinois yield to me?

Mr. DOUGLAS. I am glad to yield to the Senator from Minnesota.

Mr. HUMPHREY. My reason for questioning the advisability of bringing up this bill at this time was because of the situation to which the Senator has directed his remarks. As I stated a few moments ago on this floor, it was the Senator from Illinois who proposed the amendment which he now reoffers, and all of us recall that it was hotly debated, and it was finally voted upon and accepted by the Senate.

I pointed out in my discussion of this bill, which is hot off the press, so to speak, with no report on it before the Members of the Senate—which is a most incredible situation—that the proviso which is contained in it is a limiting proviso. The wetback problem is not one which is produced as a result of people getting Mexicans on a train or bus and bringing them across the border. The wetback problem is exactly what it implies—they walk across the river.

Mr. DOUGLAS. That is correct.

Mr. HUMPHREY. They walk across the Rio Grande, come into the United States, and are lost in the population of the United States. The Senator from Illinois is eminently correct when he says, No. 1, that this depresses the local labor market, and, No. 2, it provides an avenue of employer blackmail. All an employer need say is, "If you do not like the working conditions and the pay, I will report you," and under this bill the wetback could be deported. But, further than that, and which I think is the real crux of this situation, it provides for human degradation. There is a time at hand when we must put a stop to this thing, and the wetback problem is the No. 1 problem which faces the country today in terms of illegal entries. It is a problem which is unique to the Southwest. It is a problem which has caused great confusion in agricultural employment throughout America.

I may say to my friend, the Senator from Illinois, that the growers in my own State, meeting with me on the eighth day of January, told me that if the wetback problem was not ended, they could not possibly compete in the agricultural market, because it is required in my State that all children attend school; there are prevailing certain social standards which are enforced by the State government, and wetbacks coming in depress the conditions, and make it completely impossible for the growers who are trying to operate legitimately to operate at all. I submit the time is at hand to consider the amendment which the Senator from Illinois offers. It has been voted upon once, and accepted by the Senate, with the same Members of the Senate, with the exception of the one who has replaced the distinguished late minority leader, and, with the same exception, every

Senator has heard the debate. The RECORD is filled with debate. It seems to me that the least that can be done is for the Senate to reassert its position. If the House finds that it cannot go along with us, that is another matter; but the fact is, that we should reassert the original position which we took; and the time to do it is now, because we have before us a bill which deals directly with the wetback problem. I know of the keen interest of the Senator from Illinois in this problem. I intend to support him and I am glad he offered his amendment. That is exactly what I wanted him to do.

Mr. McFARLAND. Mr. President, will the Senator yield?

Mr. DOUGLAS. I yield.

Mr. McFARLAND. I agree with the distinguished Senator from Minnesota that the Senate adopted this precise language a year ago; but what did we accomplish? The bill went to the House, and agreement on a labor bill was not reached until this provision was eliminated. The pending bill has been worked out by all of the interested parties, and I believe a law on the subject can be enacted at this time if we will merely reject this amendment. I hope the Senate will reject it. I voted for a similar amendment a year ago when the Mexican labor bill was before the Senate, with the thought that inequities, if any, would be corrected in conference, but the House rejected that amendment in its entirety. One must take what he can get once in a while in life, instead of insisting upon getting everything he wants. I have not been in the habit of getting everything I wanted, and so I have usually contented myself with getting what I could and doing the best I could. I think that is what the Senate should do at this time.

Mr. HUMPHREY. Mr. President, will the Senator yield?

Mr. DOUGLAS. I yield.

Mr. HUMPHREY. Mr. President, I direct my remarks to the position taken by the majority leader, which I know is his sincere position. He wants, as does the Senator from Minnesota, to get legislation in this field because it is important, as has been pointed out by the Senator from Louisiana and by the Senator from West Virginia [Mr. KILGORE].

All I am saying is that the process of legislation includes passage of a bill by the two Houses. It also includes, generally speaking, a conference. There is no intent on our part to delay legislation, but I do not think it would be shooting for the sky or shooting for the moon or constitute an unattainable objective if the Senate would restate and reassert what it has already indicated to be its deliberate judgment after full debate in the Eighty-second Congress.

No hearings were held on this bill. Mr. President, there is no report on this bill. The hearings which have been held on this particular measure were held by debate on the Senate floor, and, as a result of that debate, it was the considered judgment of the majority of the United States Senate at the first session of the Eighty-second Congress that the amendment to which the Senator from Illinois now points, and which he resubmits,

should become the public law. That was lost in the House and, as a result of the conference, a bill came from conference with the amendment of the Senator from Illinois deleted. I submit it would be a basic retreat on the part of the Senate to accede to the defeat which it took in conference. At least, the Senate can stand up to say that it wants the bill passed, with proper application to wetbacks. The Senate acted correctly at the last session, and the problem is no less today than it was a year ago. As a matter of fact, that is borne out by the testimony offered this morning by Archbishop Lucey and by Dr. Fuller, of the University of California. The Department of Agriculture this morning also presented testimony to the effect that the wetback problem in 1951 was worse than in 1950, and that it was expected to be worse in 1952. Under those conditions and in view of the testimony presented by eminent citizens of this country before a committee of the Congress within 2 hours from the time we now debate the bill, the evidence is on the side of the Senator from Illinois, and there is no reasonable argument which can be advanced to show that his amendment should not be adopted now when it was adopted a year ago at a time when the evidence was less convincing. I submit that, if we are to have legislation, there is a good way to get it, and that is to accept the amendment proposed by the Senator from Illinois, and to fight it out in the House of Representatives. Neither the Senator from Illinois nor the Senator from Minnesota has tried to block conference reports, but we do feel that we have a right to state our position in the body of which we are Members, and to fight for what we think is an attainable objective. Again I say the amendment of the Senator from Illinois should be adopted and included in this bill.

Mr. AIKEN. Mr. President, will the Senator from Illinois yield?

Mr. DOUGLAS. I yield.

Mr. AIKEN. The Senator from Illinois was not on the floor when I raised a question in connection with bringing up the bill; that is, why not have it apply equally to all types of aliens? I notice that the amendment offered by the Senator from Illinois applies only to Mexicans. I was wondering why it should not apply to Europeans, Asiatics, South Americans, South Pacific aliens, and all others.

Mr. DOUGLAS. I may say to the Senator from Vermont that this language was adopted last year, because we were dealing specifically with Mexican immigrants, and this bill is now being urged in order to help bring about more effective policing of illegal entrants on the Mexican border and more acceptable operations under the agreement with the Government of Mexico. Therefore, since the treaty which this bill is intended to affect deals with Mexicans, we thought the amendment should deal with Mexican labor.

Mr. AIKEN. But does the Senator think we can discriminate constitutionally against the aliens of one particular nation, or the employers of the aliens from one particular nation? As I under-

stand, many Mexican wetbacks who are first employed on farms, later leave the farms and go into the cities. I think the remedy is not to apply the law to Mexican wetbacks alone who are on farms, but to have a law applicable to all aliens who are illegally in the country, and to all employers of aliens, regardless of the countries from which the aliens come.

Mr. DOUGLAS. I may say to my good friend from Vermont that that was the original nature of my amendment of last year. Objection was raised that it would be difficult to ascertain, for instance, whether Canadians who crossed the line were legally or illegally in this country. In order to remove that objection, I consented to the insertion of the term "Mexican." But if the Senator from Vermont is solicitous about the subject, we shall expand it to include all of them. I welcome his support, therefore, for the amendment as a whole.

Mr. AIKEN. I think it should include all of them, I may say to the Senator from Illinois, but I know of no instances of illegal employment of Canadians, although there may have been some. Certainly it is not common. I think probably more aliens may be in this country from other countries of the world illegally than from Canada.

Mr. DOUGLAS. If it will satisfy the Senator from Vermont, I shall be glad to modify my amendment to strike out the word "Mexican" in the second line so that the provision will apply to anyone illegally admitted.

I hope that having jumped out of the frying pan to please the Senator from Vermont I shall not be pushed upon the roasting fire.

Mr. AIKEN. I thank the Senator from Illinois for modifying his amendment, which I think improves it greatly, although I shall read and study it before I promise to fight for or against it.

Mr. MAGNUSON. Mr. President, I was not present when the Senator from Illinois offered his amendment, but I am familiar with the conferences and the discussions which led up to the bill. It was originally my own bill, and it then became the bill of the Senator from West Virginia [Mr. KILGORE] and myself, and finally the bill of the Senator from Mississippi. Several departments of the Government, including the Immigration Service, foreign labor-management groups, the cooperatives, and several others, agreed upon its provisions.

The only reason, as I recall, for the absence of language similar to that which the Senator from Illinois now presents, which was contained in my original bill, was that a problem might arise, for instance, in California, where on a truck farm of 300 or 400 acres a great number of cheap laborers might be employed, and the employer would have to rely upon the contractor who transports the laborers in a truck. It might cause a hardship where great numbers come in trucks, and the employer, under the language of the Senator's amendment, might be in technical violation of the law and technically guilty of a felony. I wonder if the Senator believes that the employer would be protected under the

language of the amendment. That question might be brought up as a practical matter.

Mr. DOUGLAS. The language of the amendment provides that it shall apply only if the employer wilfully and knowingly violates the law, or if he has reasonable grounds for believing that an alien has illegally entered or by reasonable inquiry could have ascertained that fact.

Mr. MAGNUSON. But does it not also place the burden of inquiry upon the employer to make ascertainment of the fact?

Mr. DOUGLAS. I think under my amendment he should make a reasonable effort to ascertain the fact.

Mr. MAGNUSON. It would be very difficult for a large employer of this type of labor to do that. He might have a crop which he has to harvest in 3 or 4 days. He might have to triple or quadruple his normal employment. He would have no time to find out.

Mr. DOUGLAS. It would be a simple thing, as the men come in, for the straw boss to examine them.

Mr. MAGNUSON. Let me ask a further question. Is it the Senator's opinion that under the terms of his amendment if something similar to that were done it would constitute a reasonable inquiry?

Mr. DOUGLAS. Yes, certainly.

Mr. MAGNUSON. I wanted to clear that up, because the question may come up later.

Mr. CORDON. Mr. President, will the Senator from Illinois yield?

Mr. DOUGLAS. I yield to the Senator from Oregon.

Mr. CORDON. I just had occasion to make a personal examination of the amendment of the Senator from Illinois. In my opinion, the bill which is pending is little more than a gesture. There are two questions which bother me. In the first place, there is a requirement on the part of an employer to make an examination over and above the information he would have available to him when he sought to employ a given individual. I should like to see an amendment that would limit its scope to two propositions: First, that the employer knew that the alien was unlawfully in this country or that there was reasonable ground to believe that he was unlawfully in this country, and stop there. Then there would be the basic requirement of knowledge on the part of the employer, which certainly ought to be adequate to justify the imposition of criminal punishment.

Second, that the employer had information which would afford reasonable ground for believing that the individual was unlawfully within the United States.

Would the Senator consider modifying his amendment to exclude the affirmative requirement of investigation, to relieve the employer of the requirement to become affirmatively a policeman thereafter?

Mr. DOUGLAS. I shall be very glad to accept such a change in language.

Mr. CORDON. With those changes I think the amendment offered by the

Senator ought to go into the bill, and then we shall have teeth in it for the first time.

Mr. DOUGLAS. I shall be glad to work out such a change in phraseology.

Mr. McFARLAND. Mr. President, will the Senator from Illinois yield?

Mr. DOUGLAS. I yield, but I hope I do not have to make any further concession.

Mr. McFARLAND. The colloquy which just occurred shows that it is not practicable to try to write legislation on the floor of the Senate.

What is a reasonable inquiry? Who is going to decide what is a reasonable inquiry?

Mr. DOUGLAS. I have eliminated the words "reasonable inquiry."

Mr. McFARLAND. It is not practicable to work out legislation of this kind in a moment. The committee has brought in a compromise bill, and I hope the Senate will agree to it.

Mr. DOUGLAS. Mr. President, I have already moved that in line 2 of my amendment the word "Mexican" be eliminated. I now modify my amendment so that the provision for an inquiry on the part of the employer be eliminated, letting the remainder of the amendment stand.

The PRESIDING OFFICER. The question is on agreeing to the amendment, as modified, offered by the Senator from Illinois. [Putting the question.] The "noes" seem to have it.

Mr. DOUGLAS. I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The Chief Clerk called the roll, and the following Senators answered to their names:

| | | |
|---|---|---|
| Aiken | Hennings | Millikin |
| Anderson | Hill | Monroney |
| Bennett | Hoey | Moody |
| Brewster | Holland | Morse |
| Bricker | Humphrey | Mundt |
| Bridges | Hunt | Murray |
| Butler, Md. | Ives | Neely |
| Byrd | Jenner | Nixon |
| Cain | Johnson, Colo. | O'Conor |
| Capehart | Johnson, Tex. | O'Mahoney |
| Case | Johnston, S. C. | Pastore |
| Chavez | Kefauver | Robertson |
| Clements | Kem | Russell |
| Connally | Kilgore | Saltonstall |
| Cordon | Knowland | Smathers |
| Douglas | Langer | Smith, Maine |
| Duff | Lehman | Smith, N. J. |
| Dworshak | Lodge | Smith, N. C. |
| Eastland | Long | Sparkman |
| Ecton | Magnuson | Stennis |
| Ellender | Malone | Taft |
| Ferguson | Martin | Thye |
| Flanders | Maybank | Tobey |
| Frear | McCarran | Underwood |
| Fulbright | McCarthy | Watkins |
| George | McClellan | Welker |
| Gillette | McFarland | Williams |
| Green | McKellar | Young |
| Hendrickson | McMahon | |

The PRESIDING OFFICER. A quorum is present.

## CAPT. KURT CARLSEN

Mr. HUNT. Mr. President, for the information of the Members of the Senate as well as that of the galleries, I am very much pleased to say that we have with us in the gallery a very distinguished hero in the person of Capt. Kurt

Carlsen of the ill-fated *Flying Enterprise*. I am wondering if the captain will be kind enough to rise so that we may all see him.

(Captain Carlsen rose and was greeted with applause.)

The PRESIDING OFFICER (Mr. FREAR in the chair). We are very glad to have Captain Carlsen with us today.

## IMPORTANCE OF MANGANESE AND CHROMITE IN THE DEFENSE PROGRAM

Mr. ECTON. Mr. President, I shall take but a few minutes of the Senate's time to call attention to a very vital problem concerned with the defense of America.

Defense Mobilization Director Charles E. Wilson recently called attention to the accomplishments of his organization in the expansion program for production of essential materials. At the same time he warned that production facilities would soon feel the lack of certain raw materials.

I know that the Members of the Senate realize, as well as does any government agency, that the ability of this Nation to resist any foreign power or combination of powers depends upon ready sources of raw materials as well as it does upon our manpower and economic strength.

Our great steel industry, for example, cannot produce the kind of steel necessary for today's defense equipment without manganese and chromite. These two items mean more to us, in a defensive sense, than all the gold stored at Fort Knox. Yet, today we depend upon foreign production for approximately 90 percent of the 2,000,000-plus tons of manganese and chromite so necessary for steel production.

Leaders of Nazi Germany attribute their defeat in some measure to the lack of sufficient manganese, although their source of supply was much closer than ours is today. Our air and naval forces cut off that supply to a great extent.

We cannot even estimate the real price America paid for our supplies of manganese and chromite during World War II. The bonuses, the loss of life, and the shipping tonnage sent to the bottom of the sea by Hitler's submarines during our efforts to import sufficient amounts of those raw materials are beyond calculation.

Fortunately, we did overcome that costly handicap before it was too late. In the meantime, we made frantic and costly efforts to speed up American production of manganese and chrome, but we regained control of the sea lanes before our own production totaled more than one-eighth or one-tenth of our needs.

In my own State of Montana the Government spent about $25,000,000 in facilities to produce chromite. But that required time, and the 50,000 tons of concentrates produced stand today in a pile near the scene of operation. We are still paying rent for the space it occupies. The production facilities were sold at

the customary insignificant war-surplus prices.

We might not overcome shipping troubles as quickly next time we become engaged in total war. Again haste will make waste without quick production, and this could mean national disaster.

It requires 12 to 14 pounds of manganese for each ton of steel. Our needs are approximately 2,000,000 pounds of manganese per year. Montana alone furnishes approximately 10 percent of that total, and that 10 percent constitutes about 90 percent of America's total production of this critically short item.

Several other States have manganese deposits. However, in one county in Montana is located the largest deposit of chromite in America.

It is many months since Russia cut off its shipments of manganese to America. It is quite willing to load us up with furs and even gold in exchange for our dollars or machines; but we can buy no manganese or other strategic materials from the Soviet.

Russia is also said to have more than 300 modern snorkel submarines. We know something of what German submarines did to allied shipping in 6 years of war. Are we to stake our entire future on the daring, courage, and strength of our merchant marine? For without capacity steel production we are almost defenseless. To ignore these facts is to invite total disaster.

I am somewhat disturbed by the lack of attention given to the development and maintenance of vigorous, healthy production of these two very strategic materials—manganese and chromite. We are now dipping heavily into our stockpiles and we have not yet actually begun to really mobilize. Our greatest weapons for defense of this Nation are still mere figures and drawings on the draftsmen's tables.

The steel industry is greatly expanding its production facilities. That means we must have still more manganese and chrome than we are using now. A shortage of these raw materials renders greater steel facilities impotent.

I seriously urge the Congress and the Office of Defense Mobilization to give greater consideration to the possible sudden loss of our foreign source of supply of manganese and chromite.

American dollars are now supporting development of the resources and industries of Europe, Asia, and Africa, and there is little doubt that large sums that we have contributed have gone into development of these strategic metals in those countries beyond the seas. That, I may say, is at least a wiser expenditure than many we have made abroad, especially if the world were at peace.

But the world is not at peace and prospects for that happy state of affairs are dim at this time. Moreover, our foreign sources of those raw materials might fall into unfriendly hands.

We appropriated large sums of money to develop synthetic rubber. Now we are practically independent as far as rubber is concerned. We have set up programs for the development of supplies of tungsten, mercury, telluride, uranium, and other necessary materials.

I have every reason to believe a similar program for the production of manganese and chromite would, within a reasonable time, make us independent of foreign sources of those metals.

No appropriation for such purpose has ever been denied since I came to the Senate, and certainly none was denied immediately preceding or during World War II.

The limited program of facilities set up more than 3 years ago is a start in the right direction, but the capacity of facilities at Grants Pass, Oreg., Butte and Philipsburg, Mont., are entirely inadequate.

It requires large capital to develop production of manganese and chromite, as our deposits are not high grade. Present facilities for processing the ore do not warrant the investment required to produce on a scale commensurate with our needs. However, we still have several small and independent producers in several states, but the restrictions governing grade and price prohibit the operation of these independent mines. A few years ago there were about 130 such producers. Today there are about one dozen. They cannot compete with the importer who buys higher grade concentrates produced by cheap labor of Asia, Africa, and Europe.

I believe it is imperative that a broad policy be laid down by the Office of Defense Mobilization to remove the risk that we face in the event our imports may suddenly be cut off. Technical mining and metallurgical problems must be overcome because of our lower-grade domestic supply. American ingenuity can and will overcome these difficulties with the proper incentive and cooperation.

If top mobilization officials will give the manganese and chromite industry a program such as now prevails for tungsten and other strategic materials, we can be assured that our dependence on importations will be reduced to the minimum, and we shall have created a domestic industry that will benefit all industry and add immeasurably to our national security.

We must not place too much reliance in, nor remain shackled to, foreign sources of supply when that risk is entirely unnecessary.

NINETEEN-YEAR PATTERN OF FREE TRADE

Mr. MALONE. Mr. President, will the Senator yield?

Mr. ECTON. I am very happy to yield to the Senator from Nevada.

Mr. MALONE. I should like to ask the distinguished Senator from Montana if he is aware of the pattern, which has existed for the last 19 years, of buying and importing strategic and critical minerals and materials from foreign sources and drying up our own sources of supply through a long-range policy of free trade, as the result of which no protection is given to the labor or to the investors of this country from, as the Senator from Montana so ably said, the sweatshop and slave labor of Europe and Asia?

Mr. ECTON. I will say to the distinguished Senator from Nevada that I have been aware of that policy, and I believe all of us who come from mining States know that it has practically wrecking the mining industry in the Western States.

At this time, when we are faced with the possibility of an all-out world war, we find ourselves primarily dependent upon foreign importations for some of the most strategic metals known to man in the manufacture of essential steel.

SEVENTY-FIVE PERCENT OF MINES CLOSED

Mr. MALONE. Mr. President, will the Senator yield further?

Mr. ECTON. I am glad to yield further.

Mr. MALONE. I know that the Senator from Montana is aware of the fact that 75 percent of the mines in the United States have been closed since the end of World War II because of the operation of that same free trade policy. However, is the Senator aware that not only has the mining industry suffered, but that the textile, crockery, and precision industries, and the manufacturers of all those things without which we cannot live in peace or war, are in the same category, and that all those industries have been sold down the river by the operation of the same policy?

Mr. ECTON. Yes, I realize all that.

It is hard to list the specific industries which are affected, because all of them are affected, both directly and indirectly, and at the present time we certainly are faced with a situation which makes us consider with fear and trembling what may happen overnight to our country.

Mr. MALONE. Mr. President, if the Senator from Montana will yield further, let me ask whether he is aware that we were importing about a million barrels of oil a day, and as a result the oil wells were closing on account of the rationing of the production of oil throughout the Texas and California fields, a policy which was inaugurated before the President started his police action in Korea and began to buy all the oil and all the strategic materials he could get. Is the Senator aware that even before Korea the oil industry was being curtailed?

Mr. ECTON. Yes, I am aware of that fact. If the present situation continues, we might find ourselves in the same position with respect to oil that we are in with respect to strategic materials, if it were not for the fact that in the past year American oil companies, wildcatters, and independents have successfully discovered an entirely new field. I refer to the large field which was opened in North Dakota and Montana, and I think it will help us in this situation.

Mr. MALONE. Mr. President, if the Senator from Montana will yield further, I wish to congratulate him upon the statement he has just made.

I know he will agree with me that it is most important that we maintain the

incentive for wildcatting in oil exploration and the prospecting and exploration in connection with mineral production and the incentive for the investment of private capital in the textile business, the crockery business, and other businesses, and the incentive for further investments by stockholders, so as to persuade the American people to engage in new developments and new explorations for minerals, oil, and other products. Is not that true?

Mr. ECTON. I certainly believe it is true. As the Senator from Nevada well knows, I agree with him that if our country is to remain great, we must preserve that incentive, not only in the case of investors but also in the case of the operators and the laboring men who work in those industries. If we are to destroy completely every incentive, by means of free trade, low cost competition, and higher taxes, the time will soon come when there will not be anyone at work in productive or other fields in our great land.

Mr. MALONE. Mr. President, will the Senator from Montana yield further to me?

Mr. ECTON. I yield.

Mr. MALONE. Then is it not a fact that from the time when we adopted the so-called reciprocal trade theory and placed the authority to determine tariff and import fee rates in the hands of a Secretary of State, who has no more knowledge of what makes industry feasible than a hog has about holy water, and from the time when Congress washed its hands of that responsibility, although it is the constitutional responsibility of the Congress to regulate foreign trade, we acted to lower the standard of living in the United States?

Mr. ECTON. I believe the Senator from Nevada has put his finger on a date which may have been the dividing line. I am not prepared to say definitely whether it was, but I think we can say definitely that unless we look after our own industry and our own people and our own country, any sensible person must come to the conclusion that no one else in the world will do so.

FAIR AND REASONABLE COMPETITION

Mr. MALONE. Mr. President, if the Senator from Montana will yield further, I would add to the fine statement he has made, by saying that the only way we can do that is by having a floor under wages and investments, sometimes called a tariff or import fee of a flexible nature, so as to provide for the differential between the wage-living standard in the United States and that abroad, so there will be a floor under those costs, with the result that when the emergency is over—of course, I hope it will be over in the near future, for now we have had 19 years of emergencies—and when normal competition exists once more, the workingmen and workingwomen of the United State will know that we are operating on a basis of fair and reasonable competition to preserve their investments. Is not that the only way by which we can main-

tain fair and reasonable competition and preserve the incentive of our people to work and invest their money?

Mr. ECTON. I believe it is. It does not make sense to me to have our Government pay foreign importers a higher price for strategic minerals and metals and materials than the price paid to domestic producers of the same commodities. Such a procedure simply does not make sense to me.

Mr. MALONE. I agree most heartily with the Senator from Montana. Let me ask him whether he is aware that at this time, in the case of several of the minerals, we are paying the foreign producer a higher unit price—for instance, in the case of copper, lead, zinc, and many of the other strategic minerals—than we are paying to American producers of those minerals, on whom we place a ceiling price which is relatively low.

We gift-loan to foreign countries money to enable them to outbid us in the world market for these same materials, and those countries are not subject to any ceiling price. However, at this moment the price of copper is being bandied about in Europe at from 50 to 60 cents a pound, and the price of zinc at between 25 and 30 cents a pound, whereas in the United States there is a ceiling of 24½ cents a pound on copper and a ceiling of 18 cents a pound on zinc, thanks to the action taken the other day by the Senate, which set that price as a ceiling for domestic producers, who have to pay their employees anywhere from $11 to $15 a day, whereas foreign labor is paid anywhere from 50 cents to $3 or $4 a day. They are paying these prices on our gift-loans of billions of dollars to them.

Under such circumstances I certainly agree that it does not make sense for the Senate to insist on the passage of such legislation.

Does not the Senator from Montana agree that it makes sense for us to take cognizance of the situation confronting our producers and to take steps to encourage them by establishing fair and reasonable competition through the flexible import fee principle?

Mr. ECTON. I thank the Senator from Nevada for his remarks, and I certainly agree that it is high time that we take cognizance of the discrepancy between the prices paid to our own miners and mine owners and the prices paid to foreign producers.

I thank the able Senator from Nevada very much for the contribution he has made to this discussion.

MESSAGE FROM THE HOUSE

A message from the House of Representatives, by Mr. Snader, its assistant reading clerk, announced that the House had passed, without amendment, the following bills of the Senate:

S. 64. An act for the relief of Helen Dick;
S. 366. An act for the relief of Stanislas d'Erceville;

S. 471. An act for the relief of Ai Mei Yu and Ai Mei Chen;
S. 527. An act for the relief of Youichi Nobori;
S. 605. An act for the relief of Constance Chin Hung;
S. 634. An act for the relief of Stela S. Ransier;
S. 639. An act for the relief of Motoi Kano;
S. 640. An act for the relief of Isamu Furuta;
S. 659. An act for the relief of Ritsuko Chojin;
S. 702. An act for the relief of Joseph Emanuel Winger;
S. 895. An act for the relief of Dr. Yau Shun Leung;
S. 971. An act for the relief of Ralph Albrecht Hsiao;
S. 1120. An act for the relief of Misao Konishi;
S. 1158. An act for the relief of Takako Kitamura Dalluge;
S. 1177. An act for the relief of Misako Kinoshita;
S. 1236. An act for the relief of Kim Song Nore;
S. 1280. An act for the relief of the minor child, Peng-siu Mei;
S. 1323. An act for the relief of Francisca Quinones;
S. 1339. An act for the relief of Dr. Chai Chang Choi;
S. 1421. An act for the relief of Masako Sugiyama;
S. 1448. An act for the relief of Robert William Lauber;
S. 1819. An act for the relief of Wolfgang Vogel;
S. 1909. An act for the relief of Henry Bongart and Evelyn Bongart;
S. 1911. An act for the relief of Michael David Liu, a minor;
S. 2095. An act for the relief of Joe Koshaka; and
S. 2158. An act for the relief of Michiyo Chiba.

ENROLLED BILL SIGNED

The message also announced that the Speaker had affixed his signature to the enrolled bill (S. 2169) authorizing the acquisition by the Secretary of the Interior of the Gila Pueblo, in Gila County, Ariz., for archeological laboratory and storage purposes, and for other purposes, and it was signed by the President pro tempore.

ENROLLED BILL PRESENTED

The Secretary of the Senate reported that on today, February 5, 1952, he presented to the President of the United States the enrolled bill (S. 2169) authorizing the acquisition by the Secretary of the Interior of the Gila Pueblo, in Gila County, Ariz., for archeological laboratory and storage purposes, and for other purposes.

PREVENTION OF ILLEGAL ENTRY OF ALIENS

The Senate resumed the consideration of the bill (S. 1851) to assist in preventing aliens from entering or remaining in the United States illegally.

Mr. DOUGLAS. Mr. President, in the interest of simplification and to meet the suggestions of the Senator from Oregon [Mr. CORDON], I further modify my

amendment to the committee amendment, and I request that the amendment as now modified be read.

The PRESIDENT pro tempore. The amendment as now modified will be read.

The LEGISLATIVE CLERK. As modified, the amendment to the committee amendment reads as follows:

On page 5, after line 17, insert the following:

"Any person who shall employ any alien not duly admitted by an immigration officer or not lawfully entitled to enter or to reside within the United States under the terms of this act or under any other law relating to the immigration or expulsion of aliens, when such person knows or has reasonable grounds to believe that such alien is not lawfully within the United States, shall be guilty of a felony, and upon conviction thereof shall be punished by a fine not exceeding $2,000, or by imprisonment for a term not exceeding 1 year, or both, for each alien in respect to whom any violation of this section occurs."

Mr. DOUGLAS. Mr. President, this amendment is designed to make the pending bill effective. The bill as now drawn merely imposes penalties for those who bring labor illegally into the United States or who harbor labor illegally. We well know that in the case of the Mexicans they are not brought in. They come across the Rio Grande River generally when it is rather low. Sometimes they get their backs wet, sometimes they only get their feet wet. They come in to the United States illegally by the hundreds of thousands each year. At present the immigration authorities are virtually helpless in dealing with them. They enter in such large numbers as to drive down the wages of American farm labor; and they are not well paid, themselves.

In 1950, Mexican labor in the lower Rio Grande Valley, according to testimony, was apparently receiving 25 cents an hour, which was half the rate paid to domestic farm labor in that area, and tended to depress the domestic labor rate to the same level. In the Imperial Valley of California, the so-called wetbacks, namely, Mexicans who had illegally entered, also received appreciably less than domestic labor. So, I think there can be no doubt that these aliens who enter this country in large numbers receive low wages; and they receive low wages in part because the employers know that they have entered illegally, and the employer, therefore, has a whiphand over them and can turn them over to the immigration authorities if they do not accept the terms which are offered them.

The working conditions are also bad; the sanitary and housing conditions are bad; and this situation exercises a depressing influence on community standards of health and on the general level of wages for domestic labor as well.

Mr. LEHMAN and Mr. KNOWLAND addressed the Chair.

The PRESIDENT pro tempore. Does the Senator from Illinois yield; and, if so, to whom?

Mr. DOUGLAS. I yield first to the Senator from New York.

Mr. LEHMAN. Mr. President, I congratulate the Senator from Illinois on his perfected amendment, which, I believe he will agree, remedies a weakness which I pointed out in the debate earlier in the day.

Mr. DOUGLAS. That is correct.

Mr. LEHMAN. As I understand, the pending bill, without this amendment, would permit a man to employ an immigrant whom he knows to be illegally in this country. He could employ him without any question whatever. Am I correct?

Mr. DOUGLAS. At present the bill has no provision to the contrary.

Mr. LEHMAN. Therefore, this amendment which the Senator offers would remedy that very important defect in the bill, a defect which I think would render ineffective the purposes the bill is designed to accomplish. I realize that the purposes of the bill are good, and would make it possible, in my opinion, to deport the greater number of wetbacks and other aliens and women who are illegally in this country.

Mr. KNOWLAND. Mr. President, will the Senator yield?

Mr. DOUGLAS. I yield for a question.

Mr. KNOWLAND. First of all, I should like to ask the Senator from Illinois not to limit me strictly to a question. I will not take more than a minute or two of his time, but I think he wants clarity in the debate. Knowing the able Senator's fair-minded attitude, I wish, since he has mentioned the Imperial Valley, that he would take the time on one of his trips to the west coast to go into the Imperial Valley. I think the Senator would find that the Mexican labor employed there is being paid a wage comparable with wages paid other laborers for comparable work in the Imperial Valley and that the conditions in the valley with respect to the reception centers, and so forth, are satisfactory. I think the Senator would so judge them if he should go there to see them, as I have done.

For the reasons which I pointed out earlier, the labor which has crossed the border into the United States has returned to Mexico with substantial accumulations of wages, a thing which is beneficial to themselves and their families when they go back to Mexico. Furthermore, they go back with suitcases filled with merchandise which they have been able to purchase in this country, to take to their families. But, as I pointed out earlier in this discussion, and which is far more important, they go back with a knowledge of American agricultural methods, which will be highly beneficial to them when they resume farming in Mexico. So I certainly hope that the able Senator from Illinois will take the time and the trouble, in the investigations which I know he likes to carry on, to see for himself, without making statements such as he made regarding the Imperial Valley.

The reason I am opposed to the Senator's amendment is because of the practical situation which faces us. As I understand the situation, this bill, as it was reported unanimously by the Judiciary Committee, has come about as the result of a series of conferences, in which the Department of Labor was represented—and certainly the Department of Labor is and should be interested in the improvement of working conditions—also the Department of Agriculture, which has a great responsibility in seeing to it that our food and fiber crops are harvested in view of the very serious international situation which confronts us at this time. In addition to that, the immigration authorities have been consulted in regard to this measure, as well as the various groups representing the farmers who must harvest the crops.

The facts of the matter are that the amendment offered last year by the Senator was not accepted in conference, and it is not likely to be accepted this time. The days of harvesting are already here, in some instances, or are rapidly approaching. In my judgment, all that can happen as a result of the acceptance of the amendment of the Senator from Illinois is that the passage of this bill will be delayed, we shall not have the legislation which is needed, and it will be impossible to renew the agreement with the Mexican Government. As a consequence, I think a great hardship will result to our own people. If the Senator, after visiting the Imperial Valley and obtaining first-hand information, desires to return to the Senate to offer a pertinent amendment to similar legislation, which will have to be introduced, I think that will be the time for him to propose his amendment.

Mr. DOUGLAS. I was glad to yield to the Senator from California for his questions. Of course, the Mexicans who come into this country illegally generally find better conditions here than they had in Mexico. If they did not find better conditions here, they would not continue to come here. But the question is not whether we afford conditions which are slightly better than those in Mexico. The question is whether we shall have an American standard for agricultural labor and not allow our farm labor to be dragged down to a point approximating the Mexican standard.

We have established what purports to be a legal way of handling the matter by contracts. We make contracts with the Mexican Government for Mexican labor to come into the United States. I believe that in the State of Texas such labor is paid 40 cents an hour, and in other sections of the country, 60 cents an hour. This can be done legally. But the point is that large farming interests in the South and the Southwest do not want to have labor under those legal conditions, because that means higher wage scales than they have to pay the labor which is illegally brought in. It is cheaper for them to have illegal labor than for them to follow the legal method which should be enforced.

Mr. KNOWLAND. Mr. President, will the Senator from Illinois yield for another question?

Mr. DOUGLAS. I yield to the Senator from California.

Mr. KNOWLAND. The Senator from Illinois does not maintain, does he, that so far as the Imperial Valley of California is concerned, the workers are paid less than the legal rate? As a matter of fact, the statement was concurred in by Government officials with whom I talked in that area that in a number of instances it is costing the farmers more to employ Mexican labor because of the transportation and the bond, and they would rather have American labor if they could get it. The problem is that the crop comes along and it is either harvested or wasted. We are dealing with the Nation's food supply in this emergency.

Mr. LEHMAN. Mr. President, will the Senator from Illinois yield?

Mr. DOUGLAS. I yield.

Mr. LEHMAN. I wonder if the Senator from California knows that this morning there was held a hearing conducted by a Subcommittee of the Senate Committee on Labor and Public Welfare, and that testimony was offered to the effect that in 1951 we had about 600,000 migratory laborers who were American citizens or were legally resident in this country, and at the same time it was estimated that in the United States were more than 200,000 Mexicans who had come here illegally and who had not been deported in spite of efforts made to deport them. I wonder whether the Senator from Illinois will not agree with me that under the provisions of the pending bill, the purpose of which I believe is good, there is no way of punishing or even discouraging anyone in connection with the employment of a man or woman whom he knows is illegally in this country. Am I correct in that?

Mr. DOUGLAS. The Senator from New York is completely correct on that point. The effects of the illegal entry of hundreds of thousands of Mexicans are not merely confined to agricultural regions. They receive their immediate employment in the agricultural regions of the South and Southwest, and then move to the North. After they have been here for a time, they go to the cities and increase the labor supply there.

In my own State there are tens of thousands of Mexicans who have illegally entered the country. The only time they are detected is when some of them get into trouble with the police, and where a police record is obtained, it is found that they do not have a certificate entitling them legally to enter the country. In those cases they are deported and sent back to Mexico. But if they do not get into trouble with the police, and most of them do not, they continue to remain here. So we are having a gradual dilution of the working force. These aliens in many cases live under conditions which are very close to peonage, because they are afraid they will be turned over to the public authorities by their employer if they do not agree to the terms which their employer suggests, and they fear that they will be deported. Therefore, they accept conditions of employment which otherwise they would not accept.

The amendment which I have modified in accordance with the suggestions of the senior Senator from Oregon [Mr. CORDON] is very simple. It merely imposes a penalty on those who employ alien laborers knowing, or with reasonable grounds to believe, they are illegally in this country. It does not require the employer to inquire whether the laborer is here legally, nor does it require the employer to serve as an enforcement agency. It merely makes the employer liable if he knows or has good grounds to believe that the laborer has illegally entered the United States.

I see no real reason why anyone should object to this amendment.

Mr. CASE. Mr. President, will the Senator from Illinois yield?

Mr. DOUGLAS. I would prefer not to do so at this time.

I cannot believe that the Senate of the United States wants to encourage cheap and illegal labor. We bear much about protecting American industry. This seems to be a case where we should protect the minimum labor standards. Unless we adopt some such amendment as this, the treaty with Mexico will tend to be a complete dead letter. For every few thousand Mexicans coming in under the treaty with Mexico, there are tens of thousands coming in under no protection at all.

The pending bill provides a penalty against those who transport labor illegally into this country. But most of these aliens do not come in busses or in railroad trains; they come on foot. No one transports them; they transport themselves. So that section is inoperative as any great deterrent. Those laborers usually move individually to the employers; and unless we place some protective measures on the farms that employ the legal entrants, and on the wage and community standards of domestic farm workers, the gravely depressing effects of this illegal immigration will continue.

Mr. CASE. Mr. President, will the Senator from Illinois yield?

Mr. DOUGLAS. I yield.

Mr. CASE. Was not a similar provision placed in the previous bill?

Mr. DOUGLAS. That is correct. It was a stronger provision than is this one.

Mr. CASE. What happened to it?

Mr. DOUGLAS. It was eliminated in conference.

Mr. CASE. Is not the Senator afraid that if this provision is now put into the bill, there will be the same result?

Mr. DOUGLAS. No, I hope not. I think the Senate should not retreat from the position which it took. It was a sound position last year, and it is a sound position this year, and we should not back down.

Mr. CASE. Does the Senator feel that it is necessary to have this legislation on the subject?

Mr. DOUGLAS. Oh, yes. Reasonable men should have no objection to this proposal.

Mr. CASE. It failed before to get by the conference committee. Does the Senator think it will succeed this time?

Mr. DOUGLAS. Time, facts, and logic have a great influence on many people. I think the House conferees will be more amenable than they were last year.

Mr. LEHMAN. Mr. President, will the Senator from Illinois yield?

Mr. DOUGLAS. I yield.

Mr. LEHMAN. Will the Senator not agree with me that it is a remarkable thing that at a time when we are trying to exclude persons who have been guilty of moral turpitude or who have committed crimes or have given definite indications that they would not be loyal to this country and might even be subversive, we are endeavoring to pass legislation which would make it difficult to exclude certain other persons for whom there has been no test whatsoever?

By the very nature of the situation, the men and women, particularly the men, who have come illegally into the United States from Mexico have been subjected to no examination, no test, and no survey. Yet they may stay here for a long period of time, even though they may not have passed any test of eligibility for immigration, and we are depriving the Government of the power to deport them because we are placing no penalty, or any other means of discouragement, upon their employers, although it is known that these aliens are in this country illegally and have passed no test whatsoever. It seems to me to be an entirely unrealistic and contradictory situation.

Mr. DOUGLAS. Certainly it leaves the back door wide open.

Mr. AIKEN. Mr. President, will the Senator yield?

Mr. DOUGLAS. I yield to the Senator from Vermont.

Mr. AIKEN. I should like to ask the Senator from Illinois a question. Suppose an employer hires persons referred to him by the United States Employment Service, and later finds that one of them is an illegal entrant. Would the employer then be liable, or would he be justified in relying upon the employment service not to refer illegal entrants to him for employment?

Mr. DOUGLAS. The question by the Senator from Vermont is as to liability of an employer if a worker has been referred to him by the employment service?

Mr. AIKEN. That is correct. If an employer hires persons who have been referred to him by the United States Employment Service, and later finds that one of them is in this country illegally, would the employer himself then be responsible, or would the responsibility fall upon the employment service?

Mr. DOUGLAS. The employer would not be responsible under those circumstances, because the wording of the amendment is such that the employer must know or have reasonable ground

to believe that the alien has illegally entered. If an alien had been referred to him by the Government Employment Service, the presumption would be that the alien was a legal entrant, and the employer in that case certainly would not be responsible.

Mr. AIKEN. I thank the Senator from Illinois.

Mr. DOUGLAS. Mr. President, while the Senator from California [Mr. KNOWLAND] is in the Chamber, in answer to questions he has raised about Imperial Valley, I should like to read from the report entitled "Migratory Labor in American Agriculture. Report of the President's Commission on Migratory Labor." At page 79 there appears the following:

Notwithstanding the strong and clear tendency for wages to rise as one moves westward, with California the highest of the group, we found wages in the Imperial Valley on the Mexican border to represent a complete reversal of this pattern. The going wage rate for common and hand labor in the Imperial Valley was 50 cents per hour. Thus Imperial Valley farm employers pay no more to get their farm work done than do farm employers in southern New Mexico and probably less than do Arizona farm employers.

I shall skip a sentence which I do not believe has any bearing, and shall resume reading, as follows:

It is thus clear that the Imperial Valley, with its large wetback traffic, represents a substantial contradiction to an otherwise consistent general tendency for farm wages to improve toward the West. The force of the Imperial Valley wetback traffic is strong enough to upset this well-established East-West wage pattern; at the same time, it is strong enough to institute in one of the high-farm-wage States of the Nation, the same type of wage differential that is found on the Texas border. While common farm labor wages in 1950 in the Imperial Valley were 50 cents per hour, the going rate in the San Joaquin Valley was 85 cents per hour.

Mr. President, that is all I wish to say on this amendment. I hope it may be approved.

The PRESIDENT pro tempore. The question is on agreeing to the amendment, as modified, offered by the Senator from Illinois [Mr. DOUGLAS].

Mr. LANGER. Mr. President, I rise to speak in opposition to this modified amendment. Already the American farmer is the "fall guy" for practically all the leaders of industry, and those who live off the farmer and the worker. The small-business men usually give him a square deal.

The greatest gambler today is the farmer. He is dependent upon the weather and upon a conglomerate variety of other things which he is unable to avoid. Under this modified amendment, a group of men may be employed by a farmer who needs men to work, for example, in the sugar-beet fields. This work cannot wait. It must be done in season. If by chance one of that group is an alien, but the farmer does not know it, and does not have time while operating his farm to make an in-

vestigation, the farmer could be found guilty of a felony and be sent to a penitentiary.

It seems to me that the Senate ought to be much more interested in protecting the American farmer, who has practically everything against him, than in preventing the employment of groups of aliens from Mexico or any other country.

The committee had before it an amendment similar to this. After much discussion, the proposed amendment was discarded. The amendment now being offered on the floor is, in my opinion, an amendment which is very dangerous to the welfare of the farmer, and I hope it will be defeated.

Mr. DOUGLAS. Mr. President, I call for a vote on the amendment, as modified.

Mr. CORDON. Mr. President, I rise to speak in favor of the modified amendment with respect to the bill. I support it because without it the bill is little more than a gesture so far as effectiveness is concerned. The bill without the amendment would be much better than no legislation, but it is not as good as it would be if it contained an effective provision such as that now offered by the Senator from Illinois.

If there is a situation along the Rio Grande where it is necessary, for the benefit of the economy of that section, for employers to hire aliens who are illegally in the United States, that is one thing. If that is the case, we should meet it as a fact. If, on the other hand, the policy of the Federal Government is to prevent the entrance of aliens into the country except in accordance with our laws; if it be the policy of the Government to prevent our citizens and others from aiding and abetting any such entry; if it be the policy to prohibit our citizens or others within our borders giving aid and assistance to illegally-entered aliens, why should we hesitate to say to the employers that they also must use ordinary care in their employment relations? Why should we not say to them that they also have a duty to their country?

Mr. President, the amendment which is now offered has never been rejected by any conference committee because it has never been in a bill in the form in which it now appears. The amendment which was before the conferees on a previous occasion carried two further provisions which I can readily understand were exceedingly objectionable to some. The amendment as it was rejected by the conference committee prohibited not only the employment of aliens who were unlawfully within this country when the employer knew that the aliens were here unlawfully, it not only prohibited such employment when the employer had reasonable ground to believe that the aliens were unlawfully in this country, but it prohibited such employment if the employer did not take the affirmative step of making inquiry of each of his employees.

Further than that, it required of every employer that he become an adjunct to the law enforcement service, to the Immigration Service. It required him to look up the appropriate immigration official, and seek to get from him such information as he could acquire with reference to any alien as to whom there was any question.

Mr. LANGER. Mr. President, will the Senator yield for a question?

Mr. CORDON. I will yield in a moment.

All those provisions were in the amendment as it was adopted by the Senate and rejected by the conference.

The pending amendment simply prohibits an individual in the United States from employing an alien unlawfully within the United States under circumstances in which, first, the employer knows as a fact that he is employing an alien unlawfully within the United States, or, second, when he has possession of such knowledge as would reasonably lead him to believe that the alien is unlawfully within the United States. Only then is he in violation of law.

I now yield to the Senator from North Dakota.

Mr. LANGER. Mr. President, take the case of a farmer who needs help immediately. A group of men come along and he hires them. When he hires them, he may know that nine out of 10 have a right to be hired. The farmer assumes that the tenth man is also legally in the United States. That farmer would be placed at the mercy of the tenth man, who might blackmail him. He might work for him for a short time and then say, "Unless I get so much money from you I am going to the United States district attorney and have you arrested." In order to protect himself and keep out of the penitentiary a farmer employing aliens might have to hire a Philadelphia lawyer.

The modified amendment provides that any farmer who has reasonable ground to believe that an alien may be in the United States illegally and hires him is in violation of the law. In other words, he can be arrested and tried before a jury on the question as to whether or not he had reasonable ground to believe that the alien was illegally within the United States. That would place another burden on the farmer, who is already overburdened by the Federal Government with scores of regulations.

Mr. CORDON. Mr. President, I disagree with my friend from North Dakota almost 100 percent. I concede that any man desiring to blackmail a farmer might lie about him and perhaps cause him some trouble. We cannot stop that by any way I know of. I know of no brand of law which can change human nature. The Senator from North Dakota is correct to that extent, but no further.

This amendment does not require any employer to make a single inquiry of any kind or character before he employs any

prospective employee. He is not required to ask him whether he is an alien. He is not required to believe him if he says he is an alien. The farmer may employ any individual who seeks employment. But if he knows as a fact that the alien is unlawfully within the United States, then he may not employ him.

How can he know? In only one way could he have absolute knowledge, and that is if he saw the man cross the border. There is no other way. So if we limit this provision to personal knowledge, we have simply used words. If we include a prohibition in the case in which the employer has reasonable ground to believe that the alien is unlawfully within the United States, then we say to the employer, "You may employ any aliens who come to you seeking employment. You are not required to inquire as to whether or not they are legally within the United States. You may act on the presumption that they are entitled to be here. But if before you employ any individual, the individual himself says to you that he is illegally within the United States, and that fact can be proved, or if a dozen others say that they know he is illegally in this country because they saw him cross the Rio Grande, for example, or if you have possession of enough facts of that character—not the fact of an illegal entry, but the fact that someone has said there was an illegal entry—if there has come to your knowledge enough information from other sources, information which you are not required to seek, but of which you may be in possession, information which would lead an ordinary reasonable mind to the conclusion that a certain individual is illegally within the United States, then you may not employ him without rendering yourself liable to prosecution under this act."

There is no obligation upon the employer to do more than receive the information which comes to him. When he receives it, he need do no more than give it the ordinary evaluation which a reasoning mind gives to the information which flows past it every day.

Mr. President, we need the amendment in the bill if we are honestly to try to do the job we seek to do.

Mr. KILGORE. Mr. President, will the Senator yield for a question?

Mr. CORDON. I am happy to yield to the Senator from West Virginia.

Mr. KILGORE. I would not myself sponsor or vote for the provision with respect to which I should like to ask the Senator a question. I wonder if the Senator from Oregon would be willing to add to the amendment the proviso that every American citizen must carry a card of identification, just as every immigrant must have his record of immigration with him, so that the employer may be assured, by an inspection of an official record, as is the case in Europe and other countries, that he is employing a person legally within the country. I wonder if the Senator and the other proponents of this amendment would want to place

such a provision in the bill, to afford the employer a little safeguard.

Mr. CORDON. Mr. President, I think the inquiry is somewhat facetious. However, let me digress for a moment to suggest that I have no desire to require a dossier operation such as is required in the police countries around the world. By the same token, I believe that this amendment gives to every honest employer every protection he needs. It could not be more liberal and be at all effective. There must be some place where we can reach actions which in themselves represent the reason for the situation which we seek to control.

That situation exists because when immigrants arrive in this country they find conditions so much better than conditions in their own country that they are willing to take the chance of violating our law and make illegal entry.

What do they find here? They find employment at far higher wages than are paid in their own country. They find themselves paid with money which has a very great value when they return with it to their own country. Even though we may think that they are living in squalor here, they find a very much higher level of living than they could ever have known in their own country. So they come here.

Mr. President, the reason they find such conditions is that, having entered unlawfully, they find employment. They are not here to starve. Why, then, should we shut our eyes to one of the evils, the major evil, that of inviting aliens to violate our immigration laws while at the same time we almost guarantee them employment in this country, where, God knows, plenty of our own people could use such employment?

Mr. LEHMAN. Mr. President, will the Senator yield?

Mr. CORDON. Mr. President, if this amendment placed upon the farmer-employer in this country any obligation to do more than be ordinarily, decently responsive to the laws of his own country, I should oppose it. It does not do that. It does not require him to do any affirmative thing. It is sound legislation if any provision in the bill is sound legislation. I hope the amendment will be adopted.

Let me say before I take my seat that I am not moved by the argument that the bill itself will fail if this amendment is placed in it. I am not ready to confess futility on the part of the United States Senate. If it believes that a thing ought to be done, that thing should be done, and we should abide by the event when the result comes before us.

Mr. WELKER. Mr. President, as a taxpayer and as a farmer in eastern Oregon, represented so well by the senior Senator from Oregon [Mr. Cordon], I rise, not to prolong the debate, but to disagree with the remarks of the distinguished senior Senator from Oregon.

I wish to associate myself with the remarks of the distinguished senior Senator from North Dakota [Mr. Langer].

In this amendment I can see only utter confusion and prospective damage to the farmers who hire migrant labor.

I wish to refer for a moment to the time when we on our farms in eastern Oregon need such labor. It may be that the beet-thinning, season is on, or many other types of farm labor which must be done at once, without delay. It is a highly seasonal situation. The beets must be thinned at a particular time. The work must be done without delay. If we go into the city of Ontario, Oreg., and pick up 10 men, perhaps not one of them can speak English. We cannot take the time to find the manager in order to ascertain, with ordinary care, whether or not the men are legally in the United States. We must take the family as a group—and we hire many families—or we must take a crew as we find it without time to investigate. Assuming, Mr. President, after we get them to the camp, an individual tell us, "Well, John Jones in that crew does not have perfect admissibility in the United States," we are in violation of the law. Under the proposed amendment the farmer is criminally liable. The farmer must go to court to answer to a felony. He must hire an attorney—he must take time off to answer for a serious crime, a felony.

Mr. President, I know something about working conditions in the State of California, the State of Oregon, and the State of Idaho, and I say that we do not need this vicious amendment. It would merely open the door for many decent farmers in the hiring season to be exposed to the charge of having committed a felony, when they are not at all criminally inclined. Much serious hardship and damage can be done the farmer under this amendment.

Therefore, I shall vote against the amendment. There is no place for it in the bill. It should be defeated.

Mr. LEHMAN. Mr. President, I am very confident that my colleagues in the Senate know my position with regard to immigration. I have always felt that this country should encourage and help the entry of law-abiding men and women of good character, who have given evidence or indication that they would be worthy citizens and not come into conflict with our laws.

By the same token, Mr. President, I have always taken the position that men and women who are in this country illegally should be deported by due process of law as promptly and as definitely as can be provided.

The men who are the subject of the bill before the Senate have come into the country illegally. There can be no doubt about that. The law itself defines the presence of these men as being illegal. I cannot understand why anyone should say that a citizen of this country, knowing that a person is in the country illegally, should not make every effort to see that the person is returned to his own country.

Under the provisions of the law as it now stands, unless it is amended by the amendment offered by the Senator from Illinois [Mr. Douglas], a farmer could employ a man even though he were told by that man that he was illegally in this country. There would be no penalty

inflicted whatever on a man who offered employment or gave employment to such an alien, even though he had the most definite proof, such as the proof of the prospective employee's own word, that he was in the country illegally.

Mr. President, I want to see such men returned to their own country. I want to see deported the men who have come here illegally, many of whom have been subjected to no test whatever by our immigration officials or by our State Department. I want to see the law strengthened so that they can be sent back. The pending bill alone would not accomplish that result. It would be rendered ineffective, because no penalty would be provided for the employment of men who have come into the country illegally, and who may stay here illegally for an indefinite number of years. No penalty would be provided for such illegal entry. Therefore the law could be disregarded and made completely ineffective.

Mr. KILGORE. Mr. President, will the Senator yield for a question?

Mr. LEHMAN. I yield.

Mr. KILGORE. I have refrained from taking part in the debate. I have been sitting on the floor while other Senators have gone to lunch. I should like to see the debate concluded as soon as possible. However, does the Senator from New York realize that an alien who comes into the country illegally may remain in the country as long as 3 years and is then given an automatic stay of execution, whereas the farmer who employs such an alien would have an automatic term in the penitentiary? Are we out to get the employer, or are we out to get the wetback?

The question I should like to ask of the junior Senator from New York is this: We are dealing with men who grow millions of dollars' worth of crops, American labor will not handle what we call stoop work. It has always been necessary to import labor from abroad to do that kind of work. We used to bring in Japanese, Chinese, Filipinos, and Mexicans. If we defeat the bill we do not get a new contract; we merely invite another invasion by wetbacks, or bankruptcy among the farmers who are concerned with the problem.

Mr. President, I believe that we should look at the problem in a logical way. I agree with the senior Senator from New York that we should eliminate illegal entries. At the same time, I am also in favor of protecting both the American worker and the American employer to the fullest extent. I believe the enactment of the bill with the amendment would invite an invasion by wetbacks. Either we would invite an invasion, or we would subject the farmers who raise the crops to bankruptcy. The farmers who are concerned raise a great canning and deep-freeze crop.

I wonder whether the senior Senator from New York realizes that we have gotten far afield here. The proposed legislation does not legalize wetbacks, and the Immigration Service says it strengthens their opportunity to catch the wet-

backs. I am a little like the old mountain farmer in my State who said that he believed in doing things by the littles. We cannot accomplish it all in one fell swoop. I prefer to do it by the little. We are doing a little, at least. The Immigration Service says they can work with this bill, without the proposed amendment, and they say they can stop the illegal entries and can apprehend the aliens who have been coming in to the United States. I do not want to punish only American employers. Like my distinguished friend, the senior Senator from Illinois [Mr. DOUGLAS], I do not believe in starting 6-year-olds in college. I believe we must start them in the first grade. I realize that American employers——

Mr. DOUGLAS. Mr. President, let me say to my good friend the Senator from West Virginia——

Mr. KILGORE. Mr. President, I did not yield to the Senator from Illinois, and I wonder whether the Senator from New York, who has the floor and who yielded to me, has yielded to the Senator from Illinois.

Mr. DOUGLAS. Mr. President, I rise to a question of personal privilege.

Mr. KILGORE. Very well, Mr. President.

Mr. DOUGLAS. I think the Senator has been reading in the New Yorker an article which is unkindly in nature and which is, in my opinion, as it relates to the city of Chicago and the University of Chicago, somewhat exaggerated and at variance with the actual situation.

Mr. LEHMAN. Mr. President, I have yielded to the distinguished Senator from West Virginia.

Mr. KILGORE. Mr. President, let me say to the distinguished Senator from Illinois that I never have read the New Yorker. I was trying to draw an analogy in this respect: We have had wetbacks for so long that our employers have to be educated from the first grade up, in regard to the wetback problem; and we cannot start the employers on a college course in that subject until they have had education in the lower grades.

Although last year I was just as ambitious and just as buoyant as was the Senator from Illinois in supporting his proposals in regard to this matter, at the same time I think we must handle it according to the suggestion of the West Virginia farmer, namely, "by the littles," and must not begin to punish Americans for things about which our predecessors in Congress were lax, and in regard to which those of us who serve in Congress are in part responsible because of our failure to provide the Immigration Service with appropriations sufficiently large to permit the employment of adequate personnel to patrol the border. My friend, the Senator from Texas, knows, as I used to know, the number of Immigration Service inspectors we maintain on the Mexican border.

So we must raise our sights in regard to the proper number of immigration inspectors and we must try to realize the present situation as it is, and must try to improve it a little at a time.

Mr. LEHMAN. Mr. President, let me ask the Senator from West Virginia whether that was a question which was addressed to me.

Mr. KILGORE. Yes; the question is, Does not the Senator think that is the situation?

Mr. LEHMAN. Mr. President, the question is a long one. [Laughter.] However, I interpret the question as an inquiry whether I wish to get after the wetbacks or after the farmers. Of course, my answer is a very simple one, namely, that I wish to get after the wetbacks. However, I am afraid this bill will render ineffective any efforts we may make to get after the wetbacks.

It may be that the contract we have had, which we now seek to extend with the Mexican Government, providing for the importation into the United States of a certain number of farm laborers, may be of value to American farmers. However, so far as I know, there is nothing in the contract which recognizes or legalizes wetbacks, except the Mexican Government, I believe, assures our Government that it will attempt to cooperate with the United States Government in stopping the entry of wetbacks. However, the Mexican Government has not stopped it, and our Government has not stopped it; and during the last growing season nearly 300,000 wetbacks were in the United States.

Mr. KILGORE. Mr. President, will the Senator from New York permit a slight additional explanation?

Mr. LEHMAN. Of course.

Mr. KILGORE. Such a person who enters the United States legally is provided with a card which has on it his photograph, fingerprints, and so forth. References have been made to a situation which the farmers in the Southwest attempt to use slave labor. We realize that the farmer there pays, in addition to wages, transportation charges and other costs for the labor. As I have said, the laborer is provided with an identification card which he carries with him to the job.

I find that without exception the Southwestern farmers wish to employ legally the laborers they need, and wish to have a legal way of getting them into the United States. That is why I concur in the bill now before the Senate and in the committee amendment submitted to the bill.

Mr. McCLELLAN. Mr. President, I should like to ask the author of the amendment a question or two about it, if I may do so.

Mr. DOUGLAS. I shall be very glad to try to answer any questions the Senator from Arkansas may ask.

Mr. McCLELLAN. I am somewhat concerned about the portion of the amendment which reads "reasonable grounds for belief." Under that language of the amendment, would not it be possible to convict a farmer of a felony, and send him to the penitentiary, on less evidence than is required to convict a person of knowingly receiving stolen property?

In other words, the penalty for employing a wetback would thus be made more severe than the penalty which is imposed upon a person who knowingly receives stolen property and the possibility of conviction would be greater in the case of a farmer who employs such labor, for he could be convicted on less evidence and on less of a showing of guilt and less of a showing of intent.

Mr. DOUGLAS. In reply to the Senator from Arkansas, let me say that under the provisions of the amendment the Government would bear the burden of proof and would have to show beyond a reasonable doubt that the farmer in question had reasonable grounds for believing that the worker was an illegal entrant. In other words, the Government would have to demonstrate beyond a reasonable doubt that the farmer either knew or had reasonable grounds for believing that the alien was not illegally within the United States.

Mr. McCLELLAN. Yes; but the statute which would make the farmer or any other person guilty of a felony for knowingly receiving stolen property does not include a provision similar to the one the Senator from Illinois has included in his amendment to the committee amendment. In this instance the Senator from Illinois goes further and, in respect to knowledge or belief, would require more of a farmer who hires a wetback than would be required to convict a farmer or any other person for receiving stolen property.

Mr. DOUGLAS. I am not familiar with the statute in regard to receiving stolen goods, and therefore I am not competent to speak about it.

I should think that the same criminal law rule would apply to both, namely, that the burden of proof beyond a reasonable doubt would be upon the Government, and it would have to show that the employer knew or had reasonable grounds for believing that the person he was hiring was an illegal entrant.

Mr. McCLELLAN. In other words, according to my interpretation, it would take less proof to send a farmer to the penitentiary for trying to harvest his crop if he happened to hire a wetback to help him harvest it, than it would to send a professional "fence" to the penitentiary for knowingly receiving stolen property.

I should like to ask the Senator from Illinois another question: In this case are we not making a felon out of a farmer because he employs someone who happens to be illegally in the United States, to help him harvest his crop, rather than to permit the crop to go to waste and deteriorate and spoil, whereas it is the responsibility of the Federal Government itself to police the border and to keep out such persons? Thus we would make the farmer a victim of the Government's own failure and inefficiency in policing the border, so far as immigration is concerned. Is not that true?

Mr. DOUGLAS. I am sure the Senator from Arkansas joins me in the high respect and regard I hold for the competence and ability of the senior Senator from Louisiana [Mr. ELLENDER] who, I may say, originally drafted a bill far more stringent than the amendment I am proposing. The Senator from Louisiana had that proposal incorporated in a separate bill which he introduced last year as S. 1391; and what is referred to as the Douglas amendment of last year is really the Ellender amendment somewhat watered down.

This year the amendment is a still further dilution of the Ellender bill, and I am quite certain that the senior Senator from Louisiana would take every proper step to protect the planters and the agriculturists.

I am even more lenient on them than was the senior Senator from Louisiana. So I am sure the historic expiation I have given should serve to assure the Senator from Arkansas that I have not advocated unduly severe penalties on American farmers. If my amendment is more strict than the existing law in reference to receiving stolen property, it is just possible that a legal provision dealing with the labor of human beings and affecting community and farm labor standards generally ought to afford these greater protections.

The PRESIDENT pro tempore. The question is on agreeing to the modified amendment of the Senator from Illinois [Mr. DOUGLAS] to the committee amendment.

Mr. WELKER. Mr. President, I suggest the absence of a quorum.

The PRESIDENT pro tempore. The clerk will call the roll.

The Chief Clerk called the roll, and the following Senators answered to their names:

| | | |
|---|---|---|
| Aiken | Hennings | Millikin |
| Anderson | Hill | Monroney |
| Bennett | Hoey | Moody |
| Bricker | Holland | Morse |
| Bridges | Humphrey | Mundt |
| Butler, Md. | Hunt | Murray |
| Byrd | Ives | Neely |
| Cain | Jenner | Nixon |
| Capehart | Johnson, Colo. | O'Conor |
| Case | Johnson, Tex. | O'Mahoney |
| Chavez | Johnston, S. C. | Pastore |
| Clements | Kem | Robertson |
| Connally | Kilgore | Russell |
| Cordon | Knowland | Saltonstall |
| Douglas | Langer | Smathers |
| Dworshak | Lehman | Smith, Maine |
| Eastland | Lodge | Smith, N. J. |
| Ecton | Long | Smith, N. C. |
| Ellender | Magnuson | Sparkman |
| Ferguson | Malone | Stennis |
| Flanders | Martin | Thye |
| Frear | Maybank | Tobey |
| Fulbright | McCarran | Underwood |
| George | McClellan | Watkins |
| Gillette | McFarland | Welker |
| Hayden | McKellar | Williams |
| Hendrickson | McMahon | Young |

The PRESIDENT pro tempore. A quorum is present.

The question is on agreeing to the amendment, offered by the Senator from Illinois, as modified.

Mr. DOUGLAS and other Senators asked for the yeas and nays.

The yeas and nays were not ordered.

Mr. STENNIS. Mr. President, I shall not detain the Senate more than a very few minutes to give a statement of the factual operation of labor from Mexico as it applies to the cotton-picking problem in Mississippi. These laborers from Mexico are used for only a few weeks, during the peak of the cotton-picking season. My State is approximately a thousand miles from the Mexican border. There is considerable competition for those workers. Men are brought in by trucks, motor transportation, sometimes arriving in the night. There is considerable confusion and scrambling. They are there only a few weeks. If they are not used during those few weeks, it is sometimes too late to use them.

Mr. President, I think we are placing an unreasonable burden upon the employer who is acting in good faith, with all the facilities he may have available. I think the best statement which has been made with reference to the question, as it applies to a matter with which I am familiar, was made by the Senator from Arkansas [Mr. McCLELLAN]. I should like to ask the Senator from Arkansas if he will not compare this bill to the operation of the law regarding the receiving of stolen property. If the Senator will again explain to the Senate——

Mr. McCLELLAN. Mr. President, will the Senator from Mississippi yield?

Mr. STENNIS. I yield.

Mr. McCLELLAN. Mr. President, I have no desire to repeat the statement I made a few moments ago. It was made upon the basis of the pending amendment.

What we are doing, when we place in the bill the provision with reference to the farmer having reasonable grounds to believe, and so forth, is simply to require less proof to convict the farmer of a felony and send him to the penitentiary for employing a wetback than would be required to convict a professional fence for receiving stolen property, because, in order to be convicted of receiving stolen property, the law requires that he knowingly received stolen property. Here we temporize and say that a farmer in distress, trying to harvest his crop, happens to employ a wetback who, there is reasonable ground for believing, is illegally in the country—it may be only rumor, but the farmer cannot stop to inquire—he could be convicted. But that kind of proof would not convict, under the statute, a professional fence who knowingly receives stolen property. The farmer has no other desire than to keep his crop from perishing and to preserve it. Do we want to impose on him a higher obligation when it comes to employing a wetback than we would impose on a professional fence for receiving stolen property?

Mr. STENNIS. Mr. President, I thank the Senator from Arkansas for his very fine statement and to make the point that this amendment, as I understand it, applies not only to the importation of migratory labor, but it is a general amendment to our immigration laws and will apply to all types of persons who happen to be in this country illegally.

In this connection, Mr. President, may I ask the Chair to have the pending amendment now read by the clerk?

The PRESIDENT pro tempore. The clerk will read the pending amendment.

The CHIEF CLERK. On page 5, after line 17, it is proposed to insert the following:

Any person who shall employ any alien not duly admitted by an immigration officer

or not lawfully entitled to enter or to reside in the United States under the terms of this act, or under any other law relating to the immigration or expulsion of aliens, when such person knows or has reasonable grounds to believe that such alien is not lawfully within the United States, shall be guilty of a felony, and upon conviction thereof shall be punished by a fine not exceeding $2,000, or by imprisonment for a term not exceeding 1 year, or both, for each alien in respect to whom any violation of this section occurs.

Mr. STENNIS. I thank the Chair for having the amendment read, and I wish to point out that it applies not to each general offense, but to each alien who might be involved in the transaction.

Mr. CHAVEZ. Mr. President, will the Senator from Mississippi yield to me?

Mr. STENNIS. Of course. I am happy to yield to the Senator from New Mexico.

Mr. CHAVEZ. The Senator from Mississippi knows how hard I have worked in trying to have provisions adopted dealing with immigrants who have come into this country illegally.

Mr. STENNIS. The Senator from New Mexico has been very helpful.

Mr. CHAVEZ. I have consistently been against the wetbacks, for several reasons, including the fact that we have sufficient local labor to take care of the workload.

But in matters of law I endorse the idea that all must be treated alike. Notwithstanding the fact that I should like to see provided some kind of punishment for anyone who premeditatedly and knowingly, according to American law, employs wetbacks, I could not in conscience support this particular amendment, which makes a specialty of punishing the farmer. If the law were to apply generally to everyone, and then the farmer, knowingly, premeditatedly, and with full knowledge and intent, violated the law, I might be for some such provision.

But when it is proposed that under a certain set of circumstances the farmer is to be held guilty of an offense entirely different from any offense heretofore described in the criminal statutes, I cannot in conscience support such an amendment.

Mr. STENNIS. I appreciate the Senator's contribution.

I now yield the floor.

The PRESIDENT pro tempore. The question is on agreeing to the amendment, as modified, offered by the Senator from Illinois [Mr. Douglas].

Mr. MAGNUSON. Mr. President, I merely wish to take a minute or so to state my views upon this matter.

I should like to establish the motive and purpose of the amendment of the Senator from Illinois. The original bill, which was jointly prepared by the Senator from West Virginia [Mr. Kilgore] and myself, went even further than does the pending bill. However, we found, after many conferences with immigration officials and with others interested, that as a practical matter such drastic regulations could not be applied under present circumstances without an injustice being done to farmers who, in harvesting their crops, desired to employ wetbacks.

I therefore have to oppose this amendment; but I believe that in the omnibus immigration bill, which is designed to attack the general over-all problem of aliens, including wetbacks, which is now on the Senate calendar, an amendment might be adopted similar in language to that proposed by the Senator from Illinois. But here we have an altogether different problem.

Time is of the essence, and all the information we received was to the effect that this bill is about as strong a measure as we can pass and still solve the problem of the farmer, involving the labor he needs to harvest his crop, and at the same time protect immigration into this country. The immigration officials have wholeheartedly agreed to the language of the bill now before the Senate.

Mr. CAIN. Will the Senator yield?

Mr. MAGNUSON. I yield the floor.

Mr. CAIN. I wish to ask my colleague a question about the pending amendment, if I may.

My understanding of the amendment is that if a farmer unintentionally hired 50 wetbacks, he would be subject, under the terms of the amendment, to a possible jail sentence of 50 years and a fine of $50,000. Am I correct in that understanding?

Mr. MAGNUSON. I may say to my colleague that it will probably be a rare case when a farmer would be sent to jail for an offense like the one provided for. When the burden is placed upon the farmer to do something, which I think is technically the case here, he is likely to find himself in court, and it will then become a question whether he did make reasonable inquiry, and the court can decide that in any way it wishes.

I think there would be an injustice done in this particular situation, because a farmer sometimes has to employ labor on short notice. He has little time, perhaps, and is somewhat lax in making inquiry, and he may be caught. That is why I think this matter should be taken up in connection with the general immigration law.

Mr. CAIN. My question applies to the amendment as written. I am concerned with its potentials. I think, from a reading of it, it means potentially that a farmer is subject to a thousand-dollar fine and a year in jail, or both, for each alien discovered on his premises.

Mr. MAGNUSON. And it puts the burden on him affirmatively to act in some way. How the courts would determine whether that was adequate or reasonable, I would not know.

Mr. CAIN. I thank my colleague.

Mr. KNOWLAND. Mr. President, I ask unanimous consent that a copy of the report of the committee on the pending bill be printed immediately following the address by the Senator from Washington.

The PRESIDENT pro tempore. Is there objection?

There being no objection, the report (No. 1145) was ordered to be printed in the Record, as follows:

The Committee on the Judiciary, to which was referred the bill (S. 1851) to assist in preventing aliens from entering or remaining in the United States illegally, having considered the same, reports favorably thereon with an amendment in the nature of a substitute and recommends that the bill, as amended, do pass.

AMENDMENT

Strike all after the enacting clause and insert in lieu thereof the following:

"That section 8 of the Immigration Act of 1917 (39 Stat. 880; 8 U. S. C. 144), is hereby amended to read:

"'Sec. 8. (a) Any person, including the owner, operator, pilot, master, commanding officer, agent, or consignee of any means of transportation who—

"'(1) brings into or lands in the United States, by any means of transportation or otherwise, or attempts, by himself or through another, to bring into or land in the United States, by any means of transportation or otherwise;

"'(2) knowing that he is in the United States in violation of law, and knowing or having reasonable grounds to believe that his last entry into the United States occurred less than 3 years prior thereto, transports, or moves, or attempts to transport or move, within the United States by means of transportation or otherwise, in furtherance of such violation of law;

"'(3) willfully or knowingly conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, in any place, including any building or any means of transportation; or

"'(4) willfully or knowingly encourages or induces, or attempts to encourage or induce, either directly or indirectly, the entry into the United States of any alien, including an alien seaman, not duly admitted by an immigration officer or not lawfully entitled to enter or reside within the United States under the terms of this act or any other law relating to the immigration or expulsion of aliens, shall be guilty of a felony, and upon conviction thereof shall be punished by a fine not exceeding $2,000 or by imprisonment for a term not exceeding 5 years, or both, for each alien in respect to whom any violation of this subsection occurs: Provided, however, That for the purposes of this section, employment (including the usual and normal practices incident to employment) shall not be deemed to constitute harboring.

"'(b) No officer or person shall have authority to make any arrest for a violation of any provision of this section except officers and employees of the United States Immigration and Naturalization Service designated by the Attorney General, either individually or as a member of a class, and all other officers of the United States whose duty it is to enforce criminal laws.

"'(c) When the Attorney General or any district director or any assistant district director of the Immigration and Naturalization Service has information indicating a reasonable probability that in any designated lands or other property aliens are illegally within the United States, he may issue his warrant authorizing the immigration officer named therein to go upon or within such designated lands or other property other than a dwelling in which the warrant states there may be aliens illegally within the United States, for the purpose of interrogating such aliens concerning their right to enter or to be or remain in the United States. Such warrant shall state therein the time of day or night for its use and the period of its validity which in no case shall be for more than 30 days.'

"Sec. 2. The last proviso to the paragraph headed 'Bureau of Immigration' in title IV of the act of February 27, 1925 (43 Stat. 1049; 8 U. S. C. 110), as amended by the act of August 7, 1946 (60 Stat. 865), is hereby further amended so that clause No. 2 shall read:

"'(2) within a reasonable distance from any external boundary of the United States, to board and search for aliens any vessel within the territorial waters of the United

States and any railway car, aircraft, conveyance, or vehicle, within a distance of 25 miles from any such external boundary to have access to private lands, but not dwellings, for the purpose of patrolling the border to prevent the illegal entry 'f aliens into the United States, and'"

### PURPOSE OF THE BILL

The purpose of the bill, as amended, is to overcome a deficiency in the present law by making it an offense to harbor or conceal aliens who have entered this country illegally and to strengthen the law generally in preventing aliens from entering or remaining in the United States illegally.

### STATEMENT

While section 8 of the Immigration Act of 1917 (8 U. S. C. 144) purports to make it an offense to harbor or conceal aliens who have entered this country illegally, the Supreme Court in *United States v. Evans* (333 U. S. 483), held that the existing statute does not provide a penalty for such an offense. The instant bill, as amended, corrects this deficiency and provides upon conviction a fine not exceeding $2,000 or imprisonment for a term not exceeding 5 years, or both.

The bill as initially introduced also provided that any "employee of the Immigration and Naturalization Service authorized and designated under regulations prescribed by the Attorney General, whether individually or as one of a class, shall have power and authority while wearing his official insignia or presenting his official credentials and engaged in the performance of his duties in the administration of laws relating to the immigration and expulsion of aliens, to go upon or within any place of employment other than a dwelling within or upon which he believes there are aliens who are illegally within the United States, for the purpose of interrogating such aliens concerning their right to be or remain in the United States."

The bill, as amended, substitutes for the above-quoted language of the bill as initially introduced an administrative search warrant procedure which reads as follows:

"(c) When the Attorney General or any district director or any assistant district director of the Immigration and Naturalization Service has information indicating a reasonable probability that in any designated lands or other property aliens are illegally within the United States, he may issue his warrant authorizing the immigration officer named therein to go upon or within such designated lands or other property other than a dwelling in which the warrant states there may be aliens illegally within the United States, for the purpose of interrogating such aliens concerning their right to enter or to be or remain in the United States. Such warrant shall state therein the time of day or night for its use and the period of its validity which in no case shall be for more than 30 days."

It is the intention of the committee that there shall not be more than one assistant district director in any district who may issue administrative warrants. On the Mexican border where there are three districts of the Immigration and Naturalization Service, there will be three district directors and three assistant district directors who will be authorized to issue administrative warrants, making a total of six officials who will be so authorized. It is felt that the administrative search warrant procedure as provided in the bill will be conducive to effective enforcement of the immigration laws but will at the same time safeguard the rights of the property owners.

The bill, as amended, also strengthens the enforcement procedures of the Immigration and Naturalization Service by amending present law so that enforcement officers may, within a distance of 25 miles from any external boundary of the United States, have access to private lands but not dwellings for

the purpose of patrolling the border to prevent the illegal entry of aliens into the United States.

The bill, as amended, also provides that employment (including the usual and normal practices incident to employment) of an alien illegally in the United States shall not be deemed to constitute harboring. It is the intention of the committee that this will not, however, preclude prosecution of an employer who violates other provisions of the act.

The committee, after consideration of all of the facts, is of the opinion that the bill (S. 1851), as amended, should be enacted.

### CHANGES IN THE PRESENT LAW

In compliance with subsection (4) of rule XXIX of the Standing Rules of the Senate, changes in existing laws made by the bill, as reported, are shown in the following parallel tables (existing law is shown in one column; proposed law is shown in the parallel column):

| EXISTING LAW | PROPOSED LAW |
|---|---|
| BRINGING IN OR HARBORING OR CONCEALING CERTAIN ALIENS; PENALTY | |
| Sec. 8. That any person, including the master, agent, owner, or consignee of any vessel, who shall bring into or land in the United States, by vessel or otherwise, or shall attempt, by himself or through another, to bring into or land in the United States, by vessel or otherwise, or shall conceal or harbor, or attempt to conceal or harbor, or assist or abet another to conceal or harbor in any place, including any building, vessel, railway car, conveyance, or vehicle, any alien not duly admitted by an immigrant inspector or not lawfully entitled to enter or to reside within the United States under the terms of this act, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine not exceeding $2,000 and by imprisonment for a term not exceeding 5 years, for each and every alien so landed or brought in or attempted to be landed or brought in. | That section 8 of the Immigration Act of 1917 (39 Stat. 880; 8 U. S. C. 144) is hereby amended to read:<br><br>"Sec. 8. (a) Any person including the owner, operator, pilot, master, commanding officer, agent or consignee of any means of transportation who—<br><br>"(1) brings into or lands in the United States, by any means of transportation or otherwise, or attempts, by himself or through another, to bring into or land in the United States, by any means of transportation or otherwise;<br><br>"(2) knowing that he is in the United States in violation of law, and knowing or having reasonable grounds to believe that his last entry into the United States occurred less than 3 years prior thereto, transports or moves, or attempts to transport or move, within the United States by means of transportation or otherwise, in furtherance of such violation of law;<br><br>"(3) wilfully or knowingly conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, in any place, including any building, or any means of transportation; or<br><br>"(5) wilfully or knowingly encourages or induces, or attempts to encourage or induce, either directly or indirectly, the entry into the United States of any alien, including an alien seaman, not duly admitted by an immigration officer or not lawfully entitled to enter or reside within the United States under the terms of this act or any other law relating to the immigration or expulsion of aliens, shall be guilty of a felony, and upon conviction thereof shall be punished by a fine not exceeding $2,000 or by imprisonment for a term not exceeding 5 years, or both, for each alien in respect to whom any violation of this subsection occurs: *Provided, however,* That for the purposes of this section, employment (including the usual and normal practices incident to employment) shall not be deemed to constitute harboring.<br><br>"(b) No officer or person shall have authority to make any arrest for a violation of any provision of this section except officers and employees of the United States Immigration and Naturalization Service designated by the Attorney General, either individually or as a member of a class, and all other officers of the United States whose duty it is to enforce criminal laws.<br><br>"(c) When the Attorney General or any district director or any assistant district director of the Immigration and Naturalization Service has information indicating a reasonable probability that in any designated lands or other property aliens are illegally within the United States, he may issue his warrant authorizing the immigration officer named therein to go upon or within such designated lands or other property other than a dwelling in which the warrant states there may be aliens illegally within the United States, for the purpose of interrogating such aliens concerning their right to enter or to be or remain in the United States. Such warrant shall state therein the time of day or night for its use and the period of its validity which in no case shall be for more than 30 days." |

**Existing Law—Continued**

(ACT APPROVED AUGUST 7, 1946 (60 STAT. 865; 8 U. S. C. 110)) (AMENDING THE ACT OF FEBRUARY 27, 1925)

Any employee of the Immigration and Naturalization Service authorized so to do under regulations prescribed by the Commissioner of Immigration and Naturalization with the approval of the Attorney General, shall have power without warrant (1) * * * (2) to board and search for aliens any vessel within the territorial waters of the United States, railway car, aircraft, conveyance, or vehicle, within a reasonable distance from any external boundary of the United States; and.

**Proposed Law—Continued**

SEC. 2. The last proviso to the paragraph headed "Bureau of Immigration" in title IV of the act of February 27, 1925 (43 Stat. 1049; 8 U. S. C. 110), as amended by the act of August 7, 1946 (60 Stat. 865), is hereby further amended so that clause numbered (2) shall read:

"(2) within a reasonable distance from any external boundary of the United States, to board and search for aliens any vessel within the territorial waters of the United States and any railway car, aircraft, conveyance, or vehicle, and within a distance of 25 miles from any such external boundary to have access to provide lands, but not dwellings, for the purpose of patroling the border to prevent the illegal entry of aliens into the United States, and."

The amendment which I am now submitting is identical with the previous amendment except for the fact that the words "or has reasonable grounds to believe" are omitted. In this amendment we have the single standard, that it is a felony when an employer "knows that such alien is not lawfully within the United States."

Objection was made to the previous amendment on the ground that it included the phrase "or has reasonable grounds to believe" that the alien illegally entered. Some Senators seemed to feel it would be unfair if the employer merely had reasonable grounds so to believe, that he could be subjected to a penalty. This objection has been removed by the omission of the phrase referred to. I hope the objectors will not further denude the amendment of its clothing. It is now down to the irreducible minimum, namely, employment with knowledge that the laborer is an illegal entrant; and I see no good reason why the committee and the Senate should not accept the amendment. I hope very much that it will.

The PRESIDENT pro tempore. The amendment offered by the Senator from Illinois is to be stated.

The CHIEF CLERK. On page 5, after line 17, in the committee amendment, it is proposed to insert:

Any person who shall employ any alien not duly admitted by an immigration officer or not lawfully entitled to enter or to reside within the United States, under the terms of this Act or any other law relating to the immigration or expulsion of aliens, when such person knows that such alien is not lawfully within the United States, shall be guilty of a felony, and upon conviction thereof shall be punished by a fine of not exceeding $2,000, or by imprisonment for a term not exceeding 1 year, or both, for each alien in respect to whom any violation of this section occurs.

Mr. CORDON. Mr. President, I ask for the yeas and nays.

Mr. MAGNUSON. Mr. President, if the Senator from Illinois will yield, I believe that the question of acting knowingly is provided for in the bill.

Mr. FERGUSON. Mr. President, will the Senator from Washington please speak louder?

Mr. MAGNUSON. I believe the bill now includes a penalty if one knowingly does these things, and the bill says that mere employment is not to be construed as knowing employment. That is the only difference. I see no objection to the amendment offered by the Senator from Illinois, with that one exception, that we do say that mere employment is not to be construed as knowing employment.

Mr. DOUGLAS. As I read the bill there is no specific inclusion of employment. At page 4, in subsection 4 of the bill, there is the specific exemption that employment shall not be deemed to constitute harboring.

Mr. MAGNUSON. If the Senator will read the bill he will see that subsection 4 of section 8 says: "Provided, however, That for the purposes of this section"—that is, doing wilfully or knowingly what is proscribed—"(including the usual and

---

Mr. LEHMAN. Mr. President, I should like to ask the junior Senator from Washington a question. As I heard his inquiry of his colleague, he used the word "unintentional." Am I correct in that?

Mr. CAIN. The Senator is correct.

Mr. LEHMAN. I may say that that does not reflect the purpose of the amendment under any circumstances. I might ask the Senator from Illinois to read the amendment.

Mr. CAIN. Then I would ask the same question I propounded, deleting the word "unintentional."

Mr. LEHMAN. If the Senator deletes the word "unintentional," it changes the entire purpose of the amendment.

Mr. DOUGLAS. Does the Senator from Washington wish to know the wording of the amendment?

Mr. CAIN. I am asking my colleague a question with reference to the amendment. If I have been misinformed or am uninformed, I should be grateful for any explanation the Senator from Illinois wishes to make.

Mr. DOUGLAS. The amendment I offered would impose a liability on the employer only when he "knows or has reasonable grounds to believe that such alien is not lawfully within the United States." He must know or have reasonable grounds to believe.

Mr. MAGNUSON. He must do something else also; he must make reasonable inquiry.

Mr. DOUGLAS. No; that requirement has been eliminated in the amendment as later presented, to accord with the suggestion made by the senior Senator from Oregon.

The PRESIDENT pro tempore. The question is on agreeing to the amendment as modified offered by the Senator from Illinois [Mr. DOUGLAS].

Mr. DOUGLAS and other Senators asked for the yeas and nays.

The yeas and nays were ordered, and the Chief Clerk called the roll.

Mr. JOHNSON of Texas. I announce that the Senator from Connecticut [Mr. BENTON], the Senator from Rhode Island [Mr. GREEN], the Senator from Tennessee [Mr. KEFAUVER], and the Senator from Oklahoma [Mr. KERR] are absent on official business.

Mr. SALTONSTALL. I announce that the Senators from Nebraska [Mr. BUTLER and Mr. SEATON], the Senator from Iowa [Mr. HICKENLOOPER], the Senators from Kansas [Mr. SCHOEPPEL and Mr. CARLSON], and the Senator from Wisconsin [Mr. WILEY] are absent on official business.

The Senator from Illinois [Mr. DIRKSEN] and the Senator from Ohio [Mr. TAFT] are necessarily absent.

The Senator from Maine [Mr. BREWSTER], the Senator from Pennsylvania [Mr. DUFF], and the Senator from Wisconsin [Mr. MCCARTHY] are detained on official business.

On this vote the Senator from Wisconsin [Mr. MCCARTHY] is paired with the Senator from Maine [Mr. BREWSTER]. If present and voting, the Senator from Wisconsin would vote "yea," and the Senator from Maine would vote "nay."

The result was announced—yeas 12, nays 69, as follows:

YEAS—12

| | | |
|---|---|---|
| Cordon | Johnston, S. C. | Morse |
| Douglas | Lehman | Murray |
| Flanders | Monroney | Neely |
| Humphrey | Moody | Pastore |

NAYS—69

| | | |
|---|---|---|
| Aiken | Hendrickson | McKellar |
| Anderson | Hennings | McMahon |
| Bennett | Hill | Millikin |
| Bricker | Hoey | Mundt |
| Bridges | Holland | Nixon |
| Butler, Md. | Hunt | O'Conor |
| Byrd | Ives | O'Mahoney |
| Cain | Jenner | Robertson |
| Capehart | Johnson, Colo. | Russell |
| Case | Johnson, Tex. | Saltonstall |
| Chavez | Kem | Smathers |
| Clements | Kilgore | Smith, Maine |
| Connally | Knowland | Smith, N. J. |
| Dworshak | Langer | Smith, N. C. |
| Eastland | Lodge | Sparkman |
| Ecton | Long | Stennis |
| Ellender | Magnuson | Thye |
| Ferguson | Malone | Tobey |
| Frear | Martin | Underwood |
| Fulbright | Maybank | Watkins |
| George | McCarran | Welker |
| Gillette | McClellan | Williams |
| Hayden | McFarland | Young |

NOT VOTING—15

| | | |
|---|---|---|
| Benton | Duff | McCarthy |
| Brewster | Green | Schoeppel |
| Butler, Nebr. | Hickenlooper | Seaton |
| Carlson | Kefauver | Taft |
| Dirksen | Kerr | Wiley |

So Mr. DOUGLAS' modified amendment to the committee amendment was rejected.

Mr. DOUGLAS. Mr. President, I send to the desk another amendment which I offer, and which I should like to have the clerk read.

normal practices incident to employment) shall not be deemed to constitute harboring."

Mr. DOUGLAS. I wish to point out that the bill provides that employment shall not be deemed to constitute harboring.

Mr. MAGNUSON. The bill refers to knowingly and wilfully harboring. The Senator from Illinois would eliminate that proviso by his amendment.

Mr. DOUGLAS. No, I would not change that proviso in subsection (4) on page 4; I would merely add my amendment after line 17 on page 5 of the bill.

Mr. EASTLAND. Mr. President, will the Senator from Illinois explain his amendment? I do not understand it.

Mr. DOUGLAS. The amendment merely provides that if an employer knows that an alien whom he employs is an illegal entrant he shall be guilty of a felony?

Mr. EASTLAND. Is that the amendment?

Mr. DOUGLAS. Yes.

Mr. EASTLAND. Mr. President, I cannot conceive of any amendment which could be more unfair to the farmer or the Mexican involved than the amendment proposed by the Senator from Illinois. Some farms of the agricultural industry of the Midwest, including that of the Senator's own State of Illinois, are founded to a considerable extent upon Mexican labor. Mexicans who go to Illinois to work live in south Texas. They go to Indiana, Michigan, Ohio, and Illinois to harvest vegetables. Most of those Mexicans entered this country illegally 30 or 40 years ago. They have reared families in the United States. I know one such family which has lost a son in Europe in the American Army. The farmer knows that those Mexicans came into the country illegally 30 or 40 years ago. They cannot be deported from the United States. If an attempt were made to deport such a man he would be entitled to a stay of deportation. The farmer knows that many of them are illegally in the country, because the workers usually go to the same farms year after year to do that work for the farmers.

The amendment offered by the Senator from Illinois would make a farmer in the Midwest and in the Northwest who hired such Mexicans, who he knew came to this country illegally 20, 30, or 40 years ago, and some of whom have reared families in this country, guilty of a felony. I say that nothing could be more unfair to the farmers, and nothing could be more unfair to the Mexicans, because it would eliminate such laborers from the economic life of this country. I submit that the amendment should be defeated.

The PRESIDENT pro tempore. The yeas and nays have been requested. Is the request sufficiently seconded?

The yeas and nays were not ordered.

Mr. HUMPHREY. Mr. President, will the Senator from Illinois yield for a question?

Mr. DOUGLAS. I am happy to yield to the Senator from Minnesota.

Mr. HUMPHREY. Mr. President, the argument of the Senator from Missis-

sippi appears to me to be somewhat illogical for the purposes of this debate and for the purposes of a legitimate consideration of the question of immigration. Am I to understand, Mr. President, that although there are illegal entrants in the United States, nothing is to be done about them? Am I to understand, because an illegal act was committed, which apparently has become the accepted practice in some areas, that nothing is to be done about it, but that the act is to be condoned? If so, Mr. President, why do not we take down the immigration bars entirely? There are fine citizens of Germany who would like to come to the United States. There are fine citizens of the Scandinavian countries who would like to come to the United States. We deport such people every day. They are people of the highest type. There is nothing to the argument that an illegal entrant who has been in the country for a considerable period of time should for some reason or other be accepted. If that is to be the argument of the Senator from Mississippi, I would say that it is time a bill were introduced which would give these people citizenship status so that they can remain in this country in honor and respectability.

Mr. EASTLAND. Mr. President, will the Senator yield?

Mr. DOUGLAS. I believe I have the floor, Mr. President.

Mr. EASTLAND. Mr. President, will the Senator from Illinois yield so that I may ask a question of the Senator from Minnesota?

Mr. DOUGLAS. Yes, certainly.

Mr. EASTLAND. Does the Senator from Minnesota realize that the men involved, who came to this country from Mexico 30 or 40 years ago, cannot be deported from the United States under the laws of this country?

Mr. HUMPHREY. I will accept the Senator's statement for the purpose of the argument.

Mr. EASTLAND. But that the amendment would deprive such men of a chance to make a living and would doubtlessly put farmers in jail?

Mr. HUMPHREY. Mr. President, I merely say that I shall accept the Senator's statement for the purpose of the argument. The Senator from Mississippi is a member of the Judiciary Committee, which has jurisdiction over immigration matters. I would say to him that rather than allowing the poor souls to continue to live in our country under a cloud of illegality, if the situation is as the Senator from Mississippi has pointed out, the time has come to introduce a bill to blanket such people into American citizenship, so that they may enjoy the privileges of citizenship.

However, Mr. President, I am not willing to accept the argument on the basis on which it is propounded. I say that in this Capitol Building hearings were held at which members of our Government, distinguished leaders in the field of religion, and distinguished leaders in community action appeared and gave the committee details of the problem that confronts us. I should like to have Senators answer the state-

ment of Archbishop Lucey, of San Antonio, Tex., who testified before the committee with respect to the nature of the wetback problem. I should like to have Senators say why it is, even though 500,000 deportations of wetbacks took place last year, that nevertheless we still have a million or more wetbacks living in this country. The explanation, as was pointed out in the testimony, lies in the lack of enforcement. Leaders of religion, lawyers, and members of the Government have testified that unless the wetback legislation is tightened up along the lines proposed by the Senator from Illinois, there is no solution to the problem. There may be no real solution in any event, but at least we can tighten up the law.

The Senator from Illinois surely has drawn up an amendment which is as reasonable as it is humanly possible to draw such an amendment. The amendment provides that a man who knowingly employs an illegal entrant will be subject to the penalty of the law. The only people who could possibly want to get by without having that kind of amendment written into the law are people who would knowingly employ illegal entrants for the purpose of their own special profit, gain, or exploitation.

There are plenty of illegal entrants into the United States. The Government of Mexico is sick and tired of having the Government of the United States suck in illegal entrants, exploiting them, and then shipping them back of the process of deportation. Every month thousands upon thousands of Mexicans come across the borders illegally. They do a few weeks' work, and then the immigration officials must send them back, as many as five or six times a year. That is what we call the wetback problem. Anything that can be done to tighten up the law ought to be done. That is what the Senator from Illinois is proposing to do.

Mr. DOUGLAS. Mr. President, I should like, in one sentence, to state what it is we are trying to accomplish. We are trying to eliminate the magnet by which large numbers of Mexicans are drawn illegally across the border. That magnet which pulls them across the border is the employment which is now open to wetbacks.

The bill as reported to the Senate by the committee does not deal with employment within the United States of persons illegally entering this country. In this amendment we are trying to reduce the volume of such illegal entries by imposing penalties upon those who knowingly employ illegal entrants. This should markedly reduce the number of such persons who cross the border. That is our purpose—not to strike at the farmers, not to penalize innocent persons, but to stop this flood of illegal immigration and restrict the importation of farm labor to the terms of the law and our agreements with Mexico.

Mr. LEHMAN. Mr. President, will the Senator from Illinois yield to me?

Mr. DOUGLAS. I yield.

Mr. LEHMAN. A moment ago the Senator from Washington made the point that the amendment is unnecessary because of section 8. However,

section 8 provides for penalties or punishment in the event of the transportation of such persons into the United States by illegal means, the harboring or protection of such persons who illegally enter the United States, namely, the wetbacks; and that section provides for the fining or punishment of those who knowingly encourage or induce the immigration of wetbacks into the United States by illegal methods. However, in that section no mention whatever is made of employment.

As a matter of fact, the last part of subsection (4) of section 8 does not prohibit the employment of such a person, because that subsection provides, in part:

*Provided, however,* That for the purposes of this section, employment (including the usual and normal practices incident to employment) shall not be deemed to constitute harboring.

In other words, the committee amendment would destroy one of the provisions of section 8 without in any way substituting a prohibition against knowingly employing a person who has illegally entered the United States.

Mr. DOUGLAS. That is correct.

Mr. President, I am ready to yield the floor.

Mr. MAGNUSON. Mr. President, I should like to make a short statement at this time. Reference has been made to a statement which I made a moment ago. What I said was that we are trying to prevent illegal entry into the United States, and we are trying to take care of violations by persons who knowingly employ or harbor aliens whom they know to be illegally in the United States. But we would provide that the mere act of employment itself shall not be considered as knowingly harboring an alien who illegally has entered the United States.

If the Senator from Illinois and the Senator from New York will examine Senate bill 2550, Calendar No. 1072, a bill to revise the laws relating to immigration, naturalization, and nationality, they will find that it is an omnibus immigration bill which has been reported from the Committee on the Judiciary. That bill covers all the evils which have been referred to by the Senator from Minnesota; and if the bill does not cover them, we hope to include in the bill provision for covering them.

So, I hope the Senator from Illinois will do in the case of that bill what he is trying to do in this case if he believes the omnibus bill is not so strong as he thinks it should be.

I do not see much objection to the amendment of the Senator from Illinois in connection with this minor matter, and I would be perfectly willing to accept the amendment, so far as it is within my power to do so. However, I point out that we have on the calendar the omnibus bill to which I have referred, namely, Senate bill 2550, and it will take care of the matter. Furthermore, we have ready, in connection with that bill, some amendments in the nature of a substitute, and I am a cosponsor of some of them.

Mr. LEHMAN. Let me ask the Senator from Washington whether it is a fact that Senate bill 2550 and the amendments in the nature of a substitute have not yet been acted on by the Senate.

Mr. MAGNUSON. That is true. The bill has been reported from the Judiciary Committee, however. Furthermore, the House committee held long hearings on a similar bill, and is ready to report it. For a very long time we have been hoping to have the Senate take up the entire subject of illegal immigration, which the Senator from Minnesota has discussed; and I am sure Senate bill 2550 will be sufficiently strong to cover that subject.

Again I say that I do not see much objection to the amendment submitted by the Senator from Illinois, because he would leave in the exception as to mere employment.

The PRESIDENT pro tempore. The question is on agreeing to the modified amendment of the Senator from Illinois [Mr. DOUGLAS] to the committee amendment.

Mr. LONG. Mr. President, since there probably will not be a yea-and-nay vote on the amendment of the Senator from Illinois to the committee amendment, I should like to say for the RECORD that I shall vote for the Senator's amendment in its present form. The change which has been made by the Senator from Illinois is sufficient, so far as I am concerned, when I consider the present version and the former version of the amendment, to justify me in voting for the amendment as it now has been modified

Mr. NEELY. Mr. President, in the faint hope of checking the epidemic of mouth disease which again has broken out in the Senate, I ask unanimous consent that subsequent debate on the pending measure be limited to 10 minutes on each amendment and 3 hours on the bill.

The PRESIDENT pro tempore. Is there objection to the unanimous-consent request of the Senator from West Virginia?

Mr. McCLELLAN. Mr. President, reserving the right to object, let me say that I did not understand that the proposal includes a provision in regard to the germaneness of amendments. In the absence of such a provision, I shall be compelled to object. I have no objection personally; however, without the inclusion of such a provision regarding germaneness, I certainly must object.

Mr. NEELY. Mr. President, the pertinent amendment suggested by the able Senator from Arkansas is cheerfully accepted.

The PRESIDENT pro tempore. The question is on agreeing to the unanimous-consent request, as modified, of the Senator from West Virginia. Is there objection? Without objection, it is so ordered.

The question now is on agreeing to the modified amendment of the Senator from Illinois to the committee amendment.

Mr. CORDON. Mr. President, I am surprised at the opposition which has been evidenced to this amendment, after it has been cut down to a mere skeleton

and there can be no question that a person must knowingly be in violation of the law before he can stand convicted of violating it.

However, there seems to be some concern that the bill might work an injustice in the case of persons who unlawfully entered the United States many years ago, but who by virtue of the lapse of time cannot be deported from the United States. With reference to persons of that type, I suggest that they no longer are unlawfully in the United States. They may have entered unlawfully; but when the right to deport and arrest and convict them lapses, there is no law against their remaining in the United States, and any person who employs them would not be subject to the prohibition or the penalty provided in the amendment.

The PRESIDENT pro tempore. The question is on agreeing to the modified amendment of the Senator from Illinois to the committee amendment. [Putting the question.]

The Chair is in doubt.

Mr. KNOWLAND. Mr. President, I call for a division.

Mr. EASTLAND. Mr. President, I suggest the absence of a quorum.

The PRESIDENT pro tempore. The clerk will call the roll.

The Chief Clerk called the roll, and the following Senators answered to their names:

| | | |
|---|---|---|
| Aiken | Hendrickson | McMahon |
| Anderson | Hennings | Millikin |
| Bennett | Hill | Monroney |
| Brewster | Hoey | Moody |
| Bricker | Holland | Morse |
| Bridges | Humphrey | Mundt |
| Butler, Md. | Hunt | Murray |
| Byrd | Ives | Neely |
| Cain | Jenner | Nixon |
| Capehart | Johnson, Colo. | O'Conor |
| Case | Johnson, Tex. | O'Mahoney |
| Chavez | Johnston, S. G. | Pastore |
| Clements | Kem | Robertson |
| Connally | Kilgore | Russell |
| Cordon | Knowland | Saltonstall |
| Douglas | Langer | Smathers |
| Dworshak | Lehman | Smith, Maine |
| Eastland | Lodge | Smith, N. J. |
| Ecton | Long | Smith, N. C. |
| Ellender | Magnuson | Sparkman |
| Ferguson | Malone | Stennis |
| Flanders | Martin | Thye |
| Frear | Maybank | Tobey |
| Fulbright | McCarran | Underwood |
| George | McCarthy | Watkins |
| Gillette | McClellan | Welker |
| Green | McFarland | Williams |
| Hayden | McKellar | Young |

The PRESIDENT pro tempore. A quorum is present. The question is on agreeing to the second amendment of the Senator from Illinois [Mr. DOUGLAS]. [Putting the question.] The "noes" appear to have it.

Mr. DOUGLAS. I request a division.

On a division, the amendment was rejected.

The PRESIDENT pro tempore. The question is on agreeing to the committee amendment.

The amendment was agreed to.

The PRESIDENT pro tempore. The bill is open to amendment. If there be no other amendment to be offered, the question is on the engrossment and third reading of the bill.

The bill was ordered to be engrossed for a third reading, read the third time, and passed.

### ADVICE TO MR. NEWBOLD MORRIS

Mr. FERGUSON. Mr. President, Mr. Newbold Morris, new special assistant to the Attorney General, was appointed by the President to look into the question of corruption in Government. After being named, Mr. CHARLES POTTER, a Representative from Michigan who has been a member of the House Un-American Activities Committee, disclosed to the public what the record of the Un-American Activities Committee showed.

Representative POTTER has rendered yeoman service to his State and to the Nation. He has given genuine service to the committee. He is a firm believer in the principles of the Constitution and in the fundamentals of America. In giving the public this information, he was rendering a service. In effect, what he was doing was giving the public what the record shows.

The Senator from South Dakota [Mr. MUNDT] saw the printed remarks of Mr. Newbold Morris with reference to Representative POTTER. Today the Senator from South Dakota wrote a letter to Mr. Newbold Morris, and I think it is worthy of the attention not only of Members of the Senate, but others who read the CONGRESSIONAL RECORD. I ask unanimous consent that the letter be printed in the RECORD, as part of my remarks.

There being no objection, the letter was ordered to be printed in the RECORD, as follows:

Mr. NEWBOLD MORRIS,
*Special Assistant to the Attorney General,*
*The Justice Department,*
*Washington, D. C.*

DEAR MR. MORRIS: I was greatly disturbed this morning by newspaper stories appearing in the morning press reporting a statement issued by Congressman CHARLES POTTER, of Michigan, and your reply to the Congressman's statements.

In addition to the fact that the suggestion that the Special Assistant to the Attorney General selected by Mr. McGrath to investigate corruption in the Federal Government may have been associated with several well-known communistic fronts in this country, I am disturbed by the nature of your reply to the Potter statement and your failure to categorically deny the associations attributed to you by Mr. POTTER.

Congressman POTTER is a friend of mine. He is a distinguished Member of Congress from the State of Michigan whose veracity is well established, and any imputations from you that his reputation and veracity are in doubt are grossly unwarranted.

I regret also that you permitted yourself to indulge in the smear tactics of the Communists by implying that Congressman POTTER is a man of no significance since you are quoted in the Washington Times-Herald of this morning as saying:

"I never heard of Congressman POTTER. Although I have no knowledge of his reputation for veracity, his statement is too asinine for reply.

"I never have been a member of any Communist-front organization—unless he is referring to the American Society for Russian Relief."

Really, Mr. Morris, that is a rather shocking statement since Congressman POTTER is not only a decorated veteran of World War II, who lost both of his legs while leading the One Hundred and Ninth Battalion of the Twenty-eighth Infantry Division in an attack near Colmar, France, but he also has established a reputation for himself in Congress as an honest, hard-hitting, patriotic American who is held in high esteem by colleagues on both sides of the aisle. He was awarded the Order of the Purple Heart with two clusters.

It is even more startling that you have never heard of Congressman POTTER by virtue of the fact that the Washington Sunday Star for January 13 of this year carried a large feature article on Congressman POTTER on his being recognized as one of the 10 outstanding young Americans in the Nation. He was given this award by the Junior Chamber of Commerce, which is a most responsible and respectable organization. Congressman POTTER was selected by a panel of 12 great Americans, including such distinguished citizens as Hon. Frank Pace, Secretary of the Army; William Green, president of the American Federation of Labor; J. Edgar Hoover, Director of the Federal Bureau of Investigation; Dean Rusk, Assistant Secretary of State, and other citizens of like standing and significance.

Incidentally, I might offer the good-natured suggestion that your choice of the word "asinine" in application to Congressman POTTER's statement was an unfortunate choice of terms. That is the very word President Truman used in trying to laugh off the original charges by Congress that the corruption in the Federal Government which you have been appointed to investigate and eliminate actually exists and that they are anything more serious than just another "red herring."

What most Americans are interested in, of course, is not your opinion of Congressman POTTER, whose reputation is well established in American history and who never has had his name linked with any communistic or subversive movements in this country, but whether or not his statement linking your name with various communistic organizations is factual or erroneous. On that point the public is certainly entitled to a frank and forthright answer, rather than simply an ill-tempered attack upon the Congressman.

As one who served for many years as a member of the Un-American Activities Committee of the House during the time I was a Member of the House, your curious answer to his specific allegations sufficiently aroused my curiosity so that I took the time today to examine the files of the Committee To Investigate Un-American Activities. Frankly, I was disappointed to discover that, in fact, the files of that committee disclose clear evidence indicating that your name has been associated with a number of communistic front organizations in this country which the Department of Justice, now you employed you, has listed as communistic.

So that the record may be completely clear, therefore, and so that no injustice can be done against either you or the American public, I would appreciate it if you would answer specifically, the following questions:

1. Were you or were you not a sponsor of the American Committee for Yugoslav Relief? (Attorney General Clark cited the American Committee for Yugoslav Relief as communistic both on June 1 and on September 1, 1948.)

2. If you were a member of the American Committee for Yugoslav Relief, and upon discovering that it was a communistic organization you withdrew from that organization, did you do so publicly? If so, will you indicate on what date the newspapers carried your renunciation and denunciation of that communistic organization?

3. Were you one of the signers of a statement issued by the Action Committee to Free Spain Now? (The Action Committee to Free Spain Now was cited as communistic by Attorney General Clark in a letter to the Military Review Board which was released to the press April 27, 1949.)

4. If you were one of the signers of the statement issued by that communistic front, and if you severed all participation with that committee upon learning it was a communistic organization, will you give me the date that the papers carried your denunciation and renunciation of that front?

5. Were you or were you not a speaker at the model legislature of the American Youth Conference? (Both Attorney General Biddle and Attorney General Tom Clark cited the American Youth Conference as being communistic and press releases to that effect appear in the press on December 4, 1947, and September 21, 1948.)

6. If you were a speaker at this meeting and if upon learning that it was a communistic organization you denounced and repudiated the American Youth Conference, will you please supply the dates when such statement of yours appeared in the press?

7. The files of the Un-American Activities Committee also carried a photostat of a letterhead listing Newbold Morris, Jr. as a member of the lawyers committee for the American League for Peace and Democracy; are you known as Mr. Newbold Morris, Jr., or does that name refer to some other member of your family? (I have no desire to attribute a responsibility to you for the activities of other members of your family, but you should know that the American League for Peace and Democracy was established in this country as a successor to the American League Against War and Fascism, and that Attorney General Tom Clark cited the American League for Peace and Democracy as communistic in a press release on June 1 and September 21, 1948.) If Newbold Morris, Jr., is a correct designation of you, and you withdrew from the American League for Peace and Democracy upon learning it was a communistic organization, will you please designate the dates when you repudiated that Communist organization in the public press?

I might add that the files of the Un-American Activities Committee carry a number of other references indicating that either Mr. Newbold Morris or Mr. Newbold Morris, Jr. have had additional associations with communistic and communistic-front organizations. It is not necessary to list them all in this communication, however, as you. answers to the foregoing questions, if you will make them clear and candid, should be sufficient to satisfy the American public and Members of Congress as to whether or not the statements made in the press by Congressman POTTER were actually asinine or whether in reality they are statements of most alarming and disturbing significance.

I realize, of course, that over the past several years a number of innocent, although not very astute or discerning Americans, have been duped, flattered, or seduced into joining Communist organizations without specifically sharing the Communist convictions of such groups. However, most such gullible Americans who are sincere foes of communism have been quick to publicly repudiate and denounce such organizations once the Department of Justice has published the fact that they are Moscow-run and Moscow-dominated. It is for that reason I have asked you to supply me with the dates and occasions on which you have renounced and denounced the Communist causes with which your name has been associated—unless, as I sincerely hope, you can categorically advise me that such associations with Communist organizations have never actually occurred.

It is not my purpose to prejudice this controversy, Mr. Morris. For that reason I have asked you questions which are clear-cut, definite, and fair. This affords you an opportunity to clarify the record publicly. I have examined the evidence in the files and am greatly disturbed by what I find. If it is in error you are entitled to make a definite and specific denial and your replies to my questions afford that opportunity.

If the evidence is factual on the other hand, the American public has the right to

Case 0:21-cr-00179-AJT Document 29-1 Filed 09/23/21 Page 33 of 59 PageID# 1012

know the truth. Obviously, if the evidence is factual, the least it indicates is a continuing inability on your part to understand the operations of the Communist apparatus in this country and throughout the world and a sense of perception so dull that it is scarcely what is required to investigate, expose, and correct the corruption in the Federal Government, existence of which lead to your appointment by Attorney General McGrath.

For the sake of the country, I sincerely hope you can categorically deny the charges made by Congressman POTTER and the records carried in the files of the House Committee To Investigate Un-American Activities. Certainly if you can make and support such a denial, the publicity given those records by Congressman POTTER will do you no harm and will not impede the honest execution of the great responsibility you have undertaken. In that event, I shall be glad to see that your reply to this letter is given the same publicity as that accorded to the exchange of statements between Congressman POTTER and you in the morning press.

I am sure, Mr. Morris, that I need not tell you that there is a strong operating link between communism and corruption in this country. It is clearly obvious that anyone who might have associated himself with communistic causes is in no position to do battle with corruption because of the intertwining nature of these two forces which make common cause in an effort to sabotage confidence in clean government and the capability of honest representative government to serve the people.

Since I am one who believes that public business should be publicly arrived at, I am releasing a copy of this letter upon dispatching it to you and I hope you will follow a similar pattern when you write your reply to me, or in the absence of that, I hope you will authorize me to publish whatever reply you make.

The elimination of corruption and communism in our Government is one of the major challenges of our time. It is going to require the best collective effort of us all. The Communists and all other elements who would corrupt American officialdom are rendering a most serious disservice to the cause of freedom everywhere. It requires a clear perspective and a definite ability to discriminate between right and wrong and between patriotic and unpatriotic in order to rid this government of the elements which have been sabotaging democracy by their fanatical devotion to communism or their greedy desire to use public position for private profit. It is for that reason and for that reason alone that I feel that the record should be clarified completely and openly concerning the disturbing statements attributed to both you and Congressman POTTER in this morning's newspaper.

I hope that a prompt reply from you may serve to provide this clarifying evidence.

Sincerely yours,

KARL E. MUNDT,
*United States Senator.*

Mr. FERGUSON. I think the Senator from South Dakota states the matter so well that I would merely be repeating if I tried to do the job of letting the Members of the Senate know how the distinguished Senator from South Dakota felt about it. He had at one time been a member of the Un-American Activities Committee of the House, and therefore knew about some of the facts in this particular case. He asked some very pertinent questions in his letter, and requested Mr. Morris to give answers to the public. As Mr. Morris is now a public servant in the employ of the Attorney General of the United States, the Department of Justice, I think he should

answer the questions fairly and openly so that everyone may know what the answers are.

I certainly hope Mr. Morris will be able to ferret out the ramifications of corruption in the United States Government. I hope he has the skill and the ability to do so.

Having had at one time in Wayne County, Mich., the job of ferreting out corruption in the city and county governments, I know something about the problems involved in such a task. I know the hours of work; I know how essential it is not to rely upon those who have had any connection with a particular agency of the Government that is being investigated. I know that if the job is to be done successfully, it must be done by outside help and the help of a few persons who may be in a department, but as to placing any reliance upon those who are under criticism, it is very difficult to obtain evidence.

Let me say, Mr. President, that a department of the Government is somewhat like a porcupine. The minute someone says there is something wrong in the department, it throws out its quills as a means of defense as the porcupine does when he is approached. That is something for which Mr. Morris will have to watch. He says he is going into the Department of Justice and use the members of that department as a means of arriving at whether there is corruption there. I can see the bristles of the porcupine ready to defend that Department against any word or any evidence as to corruption.

Mr. President, that is human nature. That is why in the investigation of Wayne County we could not rely upon the prosecuting attorney to give us aid in ascertaining conditions because of which the prosecuting attorney later went to jail. How could we have asked those who were loyal to him to ferret out the concealed corruption that was in his office? Naturally, the porcupine would have bristled up and defended that office.

Mr. President, I was greatly surprised that Mr. Morris, a lawyer who had reached the age of 50 years, would think that he could bring into the open corruption in Government without the ability to swear witnesses and to punish them for contempt, or for perjury if they did not speak the truth under oath.

I hope he will take this job seriously and not be so naïve as to think he can solve the problem through those who are being accused of corruption. I wish him well, but I hope he will get a staff and will not feel that he can write a report in a few months. It may take 6 months or a year. I know the first 6 months of the work I had to do in Wayne County did not tell the complete story at all. It only scratched the surface.

Mr. President, if I might give him some advice, it would be to watch that the small fry are not delivered to him on a silver platter in order that the large ones may escape, because many a red herring will be pulled across the trail, and it will be no larger than a sardine.

Let us hope he will look for the big ones, the sailfish, the ones which will break the line if it is not held tight; let

him not look at the red herring that is drawn across the trail which is no larger than a sardine.

If Mr. Morris desires to perform his duty well he will not be misled, but will watch for the porcupine quills and the sardines. If he will wait and watch for the big ones, America will be fortunate.

Mr. McFARLAND. Mr. President, I merely wish to say a word about Mr. Morris. I have never met him and I do not know anything about him, but even before he had an opportunity to take the oath of office accusations were being made against him, and it was being stated that he was going to whitewash something.

No man should be smeared by mere charges just because he has accepted an important position in our Government. The passions of politics are running high in this election year, but it is the American way to give a man a fair chance. Personally I do not know how capable Mr. Morris may be, but I am willing that he have a chance before I attempt to judge him and offer him a lot of advice. I presume that he is a capable man. According to some of our leading newspapers, Mr. Morris has had a great deal of experience. According to some of the reports, he is fearless. He should be given a chance to demonstrate what he can do. Let us see what he accomplishes.

## STORAGE OF SURPLUS GRAIN

Mr. WILLIAMS. Mr. President, yesterday in a press conference, the Secretary of Agriculture is quoted as again blaming Congress for the fact that the Department of Agriculture has been utilizing Government property for grain storage through third parties rather than leasing direct. He attributes this extravagant policy to a provision in the Commodity Credit Charter Act of 1948 allegedly written by me. Thus he would escape his own responsibility for the shortages and corruption now being exposed by the Senate Committee on Agriculture and the General Accounting Office in connection with the storage of surplus grain. The fact is there was nothing in that amendment which did or could have handicapped him in his legitimate operations.

Mr. President, in order that there may be no misunderstanding, I ask unanimous consent to have inserted at this point in the RECORD, as a part of my remarks, the debate in explanation of the amendment to which Mr. Brannan referred as it appears in the CONGRESSIONAL RECORD, volume 94, part 4, page 4756.

There being no objection, the debate was ordered to be printed in the RECORD, as follows:

Mr. WILLIAMS. On behalf of myself, the Senator from Georgia [Mr. GEORGE], and the Senator from Nebraska [Mr. BUTLER], I offer an amendment, which I send to the desk and ask to have stated.

The PRESIDING OFFICER. The amendment will be stated.

The CHIEF CLERK. On page 10, line 13, after the words "fee basis," it is proposed to insert the words "privately owned and operated plants and facilities."

On page 10, line 15, it is proposed to strike out all after the word "and" and insert in lieu thereof "shall to the fullest extent practicable utilize existing trade channels for

the marketing, sale, and distribution of such agricultural commodities."

Mr. WILLIAMS. Mr. President, I have proposed this amendment to the bill (S. 1322), providing a Federal charter for the Commodity Credit Corporation. Under section 12 of the bill as reported by the Committee emphasis is put only upon committees, associations of producers, and producer-owned and producer-controlled cooperative associations in the utilization of facilities to conduct the business of the Corporation. I have prepared an amendment, which would not detract in any manner from the language now used in section 12, providing for the utilization of these facilities. I have, however, added additional language which would spell out in greater detail and with more emphasis that the Corporation shall, wherever feasible, utilize the facilities of private enterprise.

Those who believe in the free enterprise system will, I am certain, join with me in the adoption of this amendment.

I understand that the Senator from Vermont is willing to accept this amendment.

Mr. AIKEN. Yes, the amendment is in line with the method now being used by the Commodity Credit Corporation. The Corporation seems to be operating as satisfactorily now as it has at any time in its existence, and I have no objection to the amendment.

Mr. GEORGE. Mr. President, I merely wish to say that the two amendments to be offered by the Senator from Delaware are in line with the present practice of the Commodity Credit Corporation. Generally and consistently the Commodity Credit Corporation has followed the practices called for by the two amendments. But since the proposal now is the granting of a Federal charter over a period of years, the Corporation will be operating with rather extended and extensive powers, and it was deemed advisable that it be made abundantly clear in the act itself granting the charter, or chartering the Corporation, that the present practices were to be adhered to with respect to its commodity transactions.

I am pleased to cooperate with the Senator from Delaware. Both of us seem to have drawn amendments in substantially, though not identically, the same language.

Mr. WILLIAMS. Mr. President, I telephoned the Secretary of Agriculture this morning and asked him to which section of the law he referred, and I was advised that it was section 4 (h) of the bill which became law on June 8, 1948. He claimed that this amendment had handicapped him in his operations until it was repealed by Public Law 85, June 7, 1949, about 1 year later.

I disagree with him completely that this provision handicapped his operations, as can be shown from the legislative debate. It was adopted without opposition. Rather I believe it was the case that the Secretary did not wish the law to operate successfully.

I did ask the Secretary, even assuming he was correct about the law which the Eightieth Congress passed, how he could explain the fact that even since its repeal on June 7, 1949, we still find him blaming the Eightieth Congress but still following the same procedure as before the provision was repealed. He now admits that under the existing law there is nothing to prohibit him from leasing these Government facilities direct from the Government agency to the Commodity Credit Corporation. Should he deny this, how can he account for the fact that at least four Government properties controlled by the General Services Administration have been leased direct?

All four of those plants have been leased in the year 1949 by the Commodity Credit Corporation directly from the controlling agencies. This proves that, even though he might argue about my amendment restricting his operations, now that it is repealed he does have the authority to lease properties of the Government direct and to utilize those services without paying extravagant fees to third parties.

I ask unanimous consent that the record of these four plants which the Secretary has leased may be inserted in the RECORD.

There being no objection, the document referred to was ordered to be printed in the RECORD, as follows:

| Original name of defense plant, number, and location | Controlling agency | Date of lease, permit, or right of entry | Commodity | Maximum quantity stored (CCC) |
|---|---|---|---|---|
| 1. Green River Ordnance Plant, Dixon, Ill. | GSA | {Sept. 23, 1949<br>Oct. 14, 1949<br>Nov. 16, 1949<br>May 1, 1950 | Corn | [1] 600,000 |
| Hemp Mill (Plancor 1531–35)) New Richland, Minn. | do | Sept. 1, 1949 | do | [1] 123,119.49 |
| Oklahoma Ordnance Works, Pryor, Okla. | Federal Works Agency (PBA). | July 1, 1949 | Wheat | |
| Badger Ordnance Works, Merrimac, Wis. | U. S. Army | June 30, 1951 | Linseed oil | [2] 11,000,000 |

[1] Bushels.
[2] Pounds.

Mr. WILLIAMS. All of these above properties are owned by the Government and are now being used by the Commodity Credit Corporation direct, which is as it should be, but unfortunately this is an exception rather than the rule even under the existing law. Notwithstanding the fact that the amendment has been repealed Secretary Brannan is still paying huge sums to private interests who in turn are leasing him Government properties for storage. That is inexcusable waste of the taxpayers' money.

The Secretary pointed out that all these leases were negotiated since the Eighty-first Congress had amended the law—repealing my amendment. He claimed the leases which were being criticized were leases that had been negotiated during the Eightieth Congress. That is not true as the following facts will demonstrate. I shall now place in the record a list of 29 different properties owned by the Government which were leased to third parties and then leased back to the Department of Agriculture.

All but two of these leases were negotiated since my amendment was repealed. There may be numerous other cases which have not come to my attention, but these will certainly prove the point. Secretary Brannan just cannot justify his not having leased these 27 properties direct from the Government agency concerned.

The fact that he did lease the first four properties mentioned demonstrates that he recognizes his authority. In the face of this record and the recent disclosures of corruption in his Department, it is no wonder that Secretary Brannan continues to blame my amendment and the Eightieth Congress, completely ignoring the fact that the law passed by the Eightieth Congress has been repealed nearly 3 years.

I ask unanimous consent that the records of these 29 Government plants be inserted in the RECORD at this point.

There being no objection, the documents referred to were ordered to be printed in the RECORD, as follows:

*Former defense facilities which were controlled by United States at time of utilization for storage of CCC commodities—Lease to third parties*

| Operator | Original name of defense plant, number, and location | Controlling agency | Date of original lease with United States | Commodity | Maximum quantity stored (CCC) |
|---|---|---|---|---|---|
| Allied Warehouse Co., Riverbank, Calif. | Plancor No. 226A1 (Alcoa Reduction Plant, Riverbank, Calif.) | GSA control No. R–Calif., 78. | June 15, 1949 | Wheat<br>Corn<br>Barley | 218,895.20 bushels.<br>533,942.08 bushels.<br>258,121.91 bushels. |
| Maco Warehouse Co., Stockton, Calif. | Stockton Subdepot, Benicia Arsenal, Borden Highway, port of Stockton, Calif. | U. S. Army–D/A lease No. (S) 04-203-eng. 211. | Jun 21, 1950 | Beans | 228,891.29 hundredweight. |
| Mountain States Bean Co., Denver, Colo. | Rocky Mountain Arsenal, Denver, Colo. | Inactive industrial reserve war plant, Army engineers. | Sept. 12, 1947 | do | 191,519 hundredweight. |
| Michigan Processed Food, Illiopolis, Ill. (Mason County Seed Co., Decatur, Ill., lessee). | Sangamon Ordnance Plant, Illiopolis, Ill. | GSA | (1) | Corn | 296,333 bushels. |
| Mansfield-Ford Grain Co., Illiopolis, Ill. (Mason County Seed Co., Decatur, Ill., lessee). | do | do | (1) | do | 168,143 bushels. |
| Distillers International Trading Corp., East Chicago, Ind. | Cast Armor Plant, American Steel Foundry, Ordnance Depot of Army, East Chicago, Ind. | do | May 16, 1950 | Dried milk | 3,924,000 pounds. |

[1] Not readily available in Washington, D. C.

*Former defense facilities which were controlled by United States at time of utilization for storage of CCC commodities—Lease to third parties—Continued*

| Operator | Original name of defense plant, number, and location | Controlling agency | Date of original lease with United States | Commodity | Maximum quantity stored (CCC) |
|---|---|---|---|---|---|
| Lloyd Morrison, Salina, Kans. | Sunflower Ordnance Plant, De-Soto, Kans. | Inactive industrial reserve war plant, Army engineers. | Oct. 10, 1949 | Grain sorghums... Corn... Wheat... | 1,073,875 bushels. 305,554 bushels. 10,382 bushels. |
| Hutchinson Merchandise & Warehouse, Hutchinson, Kans. (Mid-Continent Industries, lessee). | U. S. Navy Air Base, Hutchinson, Kans. | U. S. Navy, Great Lakes, Chicago, Ill. (District P. W. Office, 9th Naval District). | Oct. 10, 1949 Dec. 22, 1949 Jan. 25, 1950 | Corn... | 803,193 bushels. |
| Industrial Storage Co. (Harry Surface & Co.), Kansas City, Mo. | ...do... | | July 21, 1949 | Wheat... | 625,335 bushels. |
| Emergency Grain Storage, Inc. (P-T Air Service, Inc.), Salina, Kans. | Victoria Auxiliary AAF, Wichita, Kans. | Army engineers (inactive auxiliary Air Force base). | June 22, 1949 | Wheat... Barley... | 399,316 bushels. 229,213 bushels. |
| Clark Terminals of Boston, Inc., Boston, Mass., to September 1, 1950. | Boston Tidewater Terminals, 666 Sumner St., Boston, Mass. | U. S. Maritime Commission... | Sept. 25, 1947 | Potato starch... Dried milk... | 8,213,483 pounds. 2,958,248 pounds. |
| Boston Tidewater Terminal, Inc., Boston, Mass., after September 1, 1950. | ...do... | ...do... | Sept. 1, 1950 | | |
| Terminal District Co., U. S. Highway No. 10, Gate 4, New Brighton, Minn. | Twin Cities Arsenal, U. S. Highway No. 10, New Brighton, Minn. | U. S. Army... | Nov. 14, 1947 | Dried milk... Corn... Beans... | 11,014,729 pounds. 3,426,133 pounds. 199,191 pounds. |
| Fairfax Storage Co. (Westinghouse Corp., lessee), Kansas City, Mo. | Pratt-Whitney Plant, Kansas City, Mo. | U. S. Navy... | Nov. 24, 1948 | Beans... A. W. peas... Dried milk... | 70,546 hundredweight. 12,032 hundredweight. 20,656,805 pounds. |
| Industrial Warehouse Corp., Inc., Kansas City, Mo. | Lake City Ordnance Plant, Lake City, Mo. | Inactive industrial reserve war plant, Army engineers. | Feb. 2, 1949 | Dried milk... | 3,829,324 pounds. |
| V. M. Harris Grain Co., Scott City, Mo. | Camp Crowder, Neosho, Mo. | GSA | June 29, 1949 | Wheat... Grain sorghums... | 919,523 bushels. 2,116,079 bushels. |
| Midwest Storage & Realty Co., Inc., Kansas City, Mo. | ...do... | ...do... | Sept. 15, 1949 | Corn... | 2,041,803 bushels. |
| B. & G. Warehouse Co., Omaha Nebr. (assigned Apr. 1, 1948, to Cornhuskers Warehouse, Inc.). | Cornhuskers Ordnance Plant, Copland, Nebr. | Inactive industrial reserve war plant, Army engineers. | June 23, 1947 | Corn... Wheat... Beans... | 1,028,807 bushels. 844,447 bushels. 735,520 hundredweight. |
| Wagner Mills, Inc, Schuyler, Nebr. | Nebraska Ordnance Plant, Wahoo, Nebr. | Inactive industrial war plant, Army engineers. | Oct. 4, 1949 | Corn... | 571,514 bushels. |
| National Terminals Corp., Cleveland, Ohio (Brookpark Warehouse). | Schless: Air Force Plant, 1200 West 9th St., Cleveland, Ohio (Cleveland Tank Plant). | U. S. Air Force (Army engineers). | Apr. 21, 1950 | Dried beans... Corn... | 316 cars. 216,000 pounds. |
| Monmouth Cooperative Association, Monmouth, Oreg. | Camp Adair, Wellsdale, Benton County, Oreg. | U. S. Army—available by license to State of Oregon for National Guard training purposes. With approval of Oregon National Guard, lease was entered into. | Nov. 30, 1948 | A. W. Peas... Vetch... | 17,130 hundredweight. 10,813 hundredweight. |
| Modern Freezing & Storage Co., Corvallis, Oreg. | ...do... | ...do... | Apr. 26, 1950 | Seeds... | (A seed storage agreement was executed, but no commodities, either under loan or owned by CCC were ever delivered for storage.) |
| Philadelphia Wool Scouring & Carbonizing Co., Philadelphia, Pa. | Heppanstall-Eddystone Corp., Eddystone, Pa. | WAA (N-Pa-126) GSA... | June 15, 1949 | Wool... | (See remarks below).[2] |
| National Warehouse Co., Fort Worth, Tex. | Bryan Air Force Base, Bryan, Tex. | U. S. Air Force (Army engineers). | June 9, 1950 | Grain sorghums... | 9,094,067 pounds. |
| Stevenson & Young, Norfolk, Va. | Norfolk Terminals (Army base), Norfolk, Va. | U. S. Maritime Commission... | Mar. 31, 1947 | Tobacco (under loan). | 65,000,000 pounds. |
| Portage Warehouse Co., Merrimac, Wis. | Badger Ordnance Works, Merrimac, Wis. | GSA (control No. W-Wis.-1A)... | Mar. 17, 1950 | | |
| Do... | ...do... | U. S. Army... | Nov. 17, 1949 | Dried milk... | 27,162,160 pounds. |
| Do... | ...do... | ...do... | May 1, 1950 | | |
| Do... | ...do... | ...do... | July 13, 1950 | Linseed oil... | 14,672,360 pounds. |

[2] Records maintained by various wool handlers in Philadelphia who were under contract to CCC. Storage rates were specified in agreements between CCC and wool handlers. CCC received permit from GSA Sept. 15, 1950, for use of facilities for storage of CCC wool still in store here, which was subsequently sold and removed. Operator absorbed all operating and other expenses during this period.

Mr. WILLIAMS. I repeat there is absolutely nothing in the law today nor was there anything in the law at the time he leased those Government plants which would have prohibited the Department of Agriculture from leasing them directly from the particular Government agency which owned them.

Two of these Government properties, namely, the Camp Crowder, Mo., facilities are the properties leased to the Mid West Realty Co. and the V. M. Harris Grain Co., both of which leases I have previously criticized.

These are among the leases now being investigated by the Senate Committee on Agriculture, along with their investigation of the $7,000,000 shortage.

I remind Secretary Brannan that a large part of his shortage of adequate storage capacity is directly due to his own stupid policy of declaring as surplus and selling grain bins which were needed at the time they were sold.

The fact remains that during the same period he was out making speeches at

XCVIII—52

the taxpayers' expense, his agency was declaring surplus and selling new grain bins which had never been dismantled.

Mr. President, I ask unanimous consent to have printed in the RECORD a list of sales of grain bins sold by the Department of Agriculture during the period from 1946 through 1948.

There being no objection, the list was ordered to be printed in the RECORD, as follows:

*Schedule of sales of steel and wooden bins*

STEEL BINS

| Period sold | Number sold | Capacity sold |
|---|---|---|
| From purchase dates to July 1, 1946... | 27, 594 | 57, 947, 400 |
| July 1, 1946–July 1, 1947... | 9, 443 | 19, 830, 300 |
| July 1, 1947–May 31, 1948... | 5, 150 | 10, 925, 700 |
| May 31–July 31, 1948... | 1, 224 | 2, 581, 000 |
| July 31–September 30, 1948... | 932 | 1, 957, 200 |
| September 30–November 30, 1948... | | |
| November 30–December 31, 1948... | 719 | 1, 509, 900 |
| | 283 | 594, 300 |
| Total... | 45, 345 | 95, 345, 800 |
| On hand December 31, 1948... | 17, 584 | 41, 064, 200 |

*Schedule of sales of steel and wooden bins—Continued*

WOODEN BINS

| Period sold | Number sold | Capacity sold |
|---|---|---|
| From purchase dates to July 1, 1943... | 39, 789 | 78, 957, 301 |
| July 1, 1943–44... | 8, 541 | 17, 052, 000 |
| July 1, 1944–45... | 8, 440 | 16, 880, 000 |
| July 1, 1945–46... | 18, 424 | 36, 848, 000 |
| July 1, 1946–47... | 3, 028 | 6, 056, 000 |
| July 1, 1947–48... | 209 | 418, 000 |
| Total... | 78, 431 | 156, 241, 301 |
| On hand July 1, 1948... | 6 | 18, 000 |

NOTE.—The 6 wooden bins are still on hand and are being used for experimental projects.

Mr. WILLIAMS. Mr. President, this report shows that the Department of Agriculture had declared surplus and sold grain bins representing a capacity of 251,000,000 bushels during that 2-year period. They were being sold during the period before and after the Eightieth Congress amended the Storage Agreement Act of 1948.

In 1948, during the election year, he was bewailing the shortage of grain

storage. He said that what was urgently needed was 150,000,000 bushels of capacity to pull the farmers out of their troubles. In other words, he needed 150,000,000 bushels of grain storage capacity, which was 100,000,000 less than he had actually sold as surplus a few months before, and he was still selling such facilities at the same time he was speaking to the American farmers.

This is the same Secretary of Agriculture who, during the time he has held office, sold out the mineral rights of the American farmers which had previously been reserved to the Government. Congress had intended that some of the mineral rights should be held for the interest of the American taxpayers as a whole. When the farms were sold, those rights were reserved, but instead of being held, they were later sold, in some instances to employees of the Department of Agriculture or the Federal land bank.

The farmers who owned the surface were never given a chance to bid or buy these mineral rights under their farms. They were sold down the river by an agency of the Government which was established solely to protect the American farmers.

Mr. President, I ask unanimous consent to have printed in the RECORD a series of articles in reference to the recent administration of the agricultural program. The first is from the Wall Street Journal of December 27, 1951, and is entitled "Some Keepers Turn Huge CCC Hoards to Their Own Use."

There being no objection, the article was ordered to be printed in the RECORD, as follows:

GRAIN GAMBOL—SOME KEEPERS TURN HUGE CCC HOARDS TO THEIR OWN USE—EXAMINE THE DOUBLE TAKE, MAGNETISM, VANISHING ACT SYSTEMS OF PROFIT—THE LAW IS HAVING A LOOK

If one wishes to make money in dealings with the Commodity Credit Corporation, how does one go about it?

Since this price-support agency now has over $2,000,000,000 invested in holding farm commodities off the market, the simplest recipe is to obtain a warehouse and just let the Government know your facilities are available to store its goods, at a fee.

At latest count the CCC owned, among myriad other things 404,000,000 bushels of corn, 136,000,000 pounds of peanuts, 213,000,000 pounds of linseed oil, 364,000,000 pounds of field seed. The typical charge for storing a bushel of CCC wheat for 1 year, for instance, may run around 10¾ cents, so it all adds up. And unquestionably the great bulk of transactions are on just that simple basis.

SOME VARIATIONS

Several variations of this basic business relationship have been worked out, however, by imaginative people.

Elaboration No. 1 involves magnetism—special arrangements to attract CCC goods to the warehouse. A classic example of this, assertedly, was the Rowlands-Cravens case, which got much publicity last summer.

E. M. Rowlands, manager of the Minneapolis office of the Reconstruction Finance Corporation formed a warehouse firm on the side and used it to store CCC dried milk so effectively he was able to draw down $36,356 in dividends between January and November 1950. Guy W. Cravens, administrative assistant in the Minneapolis office of CCC's sister agency, the Production and Marketing Administration, was accused of helping him, and of accepting a Buick, coats, and a TV set at discount prices. Top Washington officials, after relating these charges, fired both, but preferred no charges, saying the Agriculture Department had needed the storage space and lost nothing on the deal.

DOUBLETAKE AND VANISHING ACT

Elaboration No. 2 involves the doubletake—leasing storage space to the Government in buildings one has leased from the Government. Members of the Senate Agriculture Committee have been talking loudly in recent days about an alleged example of this, which may get a public airing next year.

Senator WILLIAMS (Republican), of Delaware, claims five men set up the Midwest Storage & Realty Co. of Kansas City in September 1949, and leased more than a hundred surplus buildings at Camp Crowder, Mo., for less than $1,000 a month. Then, he says, they turned around and got $382,201 from the CCC for 20 months' use of the storage space.

Elaboration No. 3 involves the vanishing act—accepting crops for storage and accepting storage fees, but not continuously storing the stuff.

If a warehouse operator sells the CCC crop instead of hoarding it, he knows that one day the agency will call for delivery and then he will have to hustle and get enough of the commodity to make good on his contract. But meanwhile he has been paid for storage duties not performed. And perhaps in some instances, he has been able, without investment, to speculate in the futures market—he may be able to buy cheaper than he sold. Also, for a time, he has had working capital for other ventures.

Of course, though the price-proppers have few policemen, there is some risk of getting caught, and it is the court records concerning what the Government claims are unsuccessful attempts of this kind that must serve as our instruction.

Last Friday the CCC filed a suit in the Federal District Court for Northern Texas, Amarillo division, for appointment of a receiver against C. M. Henderson of Farwell, Tex. It alleged that $1,056,119 worth of its wheat and grain sorghums, stored in Mr. Henderson's elevators, had turned up missing.

Mr. Henderson, who is mayor of Farwell and also president of the Farwell Chamber of Commerce, agreed in his formal reply to the complaint to put his business in Federal receivership, pending settlement of the CCC claim.

In its suit the CCC listed about $590,000 worth of assets for Mr. Henderson. It claimed a large portion of the property included was bought by Mr. Henderson with proceeds of the sale of CCC-owned grain.

ELEVATORS, TRUCKS, LOTS

Among the assets, it listed:

The main Henderson elevator facilities at Farwell.

About 15 acres of ground, including two elevators, one Quonset storage structure and two flat-top storage elevators.

Plant and equipment in the warehouses.

Elevator machinery.

Automobiles and trucks.

A long list of real property, including about 60 lots in Farwell, plus various lots and buildings in the neighboring town of Texico, N. Mex.

Stock in the Moore County Grain Co. of Dumas, Tex.

Stock (one-fifth interest) in the Garden Grain & Seed Co. of Garden City, Kans.

Accounts receivable, seed stock and other inventory.

A phone call to Mr. Henderson from the Wall Street Journal Dallas regional news bureau brought the statement that in his formal reply to the complaint, still to be filed, he will admit a shortage of grain exists. He said a lot of the shortage was created by grain shrinkage and spoilage. "A lot of those things (shortages) could be prevented if the CCC had a big enough field force to inspect stored grain properly," said Mr. Henderson. He also claimed the CCC had valued the grain about 25 to 30 percent higher than its actual worth.

THE SHANNON CASE

In Sudan, Tex., a small town in the adjoining west Texas county, folks are talking of a similar case. Last month the Government charged O. L. Shannon, of Sudan, in a civil action with disposing of almost $1,000,000 worth of CCC grain. His receiver, Thurston Bower, classes Mr. Shannon as a dreamer with visions of big-time operations.

Mr. Shannon has been a CCC client for more than 3 years. He got three contracts to store United States commodities, one dated September 1, 1948, another June 1, 1949, and a third June 1, 1950. Somewhere along the line, the Government says, 30,797,-572 pounds of yellow milo and 37,772 bushels of hard winter wheat owned by the CCC disappeared. Claimed total value: $978,-364.18.

In his answer, Mr. Shannon admitted a shortage but denied it was so large. He asked that the Government set out each date on which a shortage occurred.

When the Government went to court on November 6 to petition for a receivership, it listed Shannon assets valued at $150,000, with liens of $167,200. These included:

A nine-bin concrete elevator of 90,000-bushel capacity.

A compress and cotton warehouse and two metal and wood buildings on 167 acres of land.

A shop building.

Six warehouses built of sheet iron.

Eleven houses and lots in Sudan.

Seven lots with some improvements.

Thirty-three vacant lots.

Three acres of land in Sudan.

Four trucks.

One 1951 Ford sedan, one 1951 Kaiser sedan.

Machinery, not yet installed, for a new feed mill under construction.

The Government's complaint says "practically all of the property" described, except the original elevator, was bought by Mr. Shannon after the sale of the CCC grain.

His operation was bonded for about $47,000 by the St. Paul-Mercury Indemnity Co., of St. Paul, Minn. The manager of this firm's grain storage bond department, E. C. Swanson, says that as far back as 6 months ago it took a dislike to the Shannon operation and tried to get out of it. Mr. Swanson declares he can't understand how the shortage went on so long without the CCC or PMA agents knowing of it.

THE SPELLMAN CASE

One of the largest shortage cases in the Midwest involves nearly $300,000 in grain and the Spellman Feed & Grain Co., of Rochelle, Ill., controlled by Francis Spellman, Jr., who, in his early thirties, is a comparative newcomer to the warehousing business.

Mr. Spellman entered into his CCC agreement in 1949, and the Government contends it shipped him 163,305 bushels, principally corn. Not until this summer, when it issued a loading order, did it discover the shortage. Pressed by the Agriculture Department, Mr. Spellman petitioned for bankruptcy of Spellman Feed & Grain Co., listing liabilities greater than assets, but continued to do business in a trucking concern partnership maintained with a brother, James. The Government sought a consolidation of the corporation and the partnership in bankruptcy, arguing the two had joint bank accounts, and this was granted by a Federal court in Chicago.

Photographs were obtained by the United States attorney's office in Chicago indicating that false flooring had been constructed in the Spellman elevator so that, covered with a little grain, it would appear that the bins were filled. On July 21 a criminal complaint was filed against Francis Spellman, charging conversion of United States grain to his own benefit and false statements to the

CCC about the grain. He was released on $2,000 bond and though nearly half a year has passed no grand jury has as yet decided whether or not to carry this case to the stage of a formal indictment.

### THE WILLIAMS CASE

A leading citizen of Ashburn, in southern Georgia, is under both civil and criminal charges for an alleged shortage of corn.

H. G. Williams, owner of a storage firm bearing his name, signed a pact with the CCC in November 1949 agreeing to store corn for farmers who placed their product under loan with the agency. Farmers under the arrangement, delivered 45,396 bushels of corn to the Williams storehouse and received negotiable warehouse receipts. These certificates were then taken by the farmers to banks and other lending agencies and discounted for cash—this being the usual system whereby farmers place their crops under price-support loan.

Between December 7, 1949, and June 27, 1950, the CCC bought all the notes held by the lending agencies. According to court papers, the Agriculture Department's inspectors came around in June of last year to look at the grain and found it deteriorating. So during August and September 1950 they ordered it sold. Mr. Williams, however, the Government now claims, delivered only 17,-222 bushels.

Approximately a year elapsed before any legal action was taken, though. The suits were filed on August 21 and September 8, 1951.

The United States now seeks about $54,000 for the 28,173 bushels of corn it declares are missing, and about $13,000 for deterioration in the grain actually delivered. The criminal charge claims conversion of just 650 bushels of this corn.

### THE TANNER CASE

Early this month, December 5, Harold D. Tanner, of Cortez, Colo., pleaded innocent to a four-count criminal indictment charging him with disposing of the CCC's dried pinto beans, and with falsely claiming storage fees while the beans were not in storage. The indictment had been filed October 25; no trial is expected before next February, at the earliest.

A companion civil action was filed early this year, and on March 30 Tanner's, Inc., with warehouses in Cahone, Dolores, Pleasant View, Dove Creek, and Cortez, Colo., was placed in receivership. The suit indicated this was one of the largest CCC shortage cases—the Government asked $872,000 for missing pinto beans plus $5,000 for unearned storage charges.

Much of the loss had gone long undiscovered, according to the criminal indictment.

Mr. WILLIAMS. The next is an article entitled "Twenty-two in CCC Took Gifts, Probers Say," published in the Philadelphia Inquirer of February 4, 1952.

There being no objection, the article was ordered to be printed in the RECORD, as follows:

TWENTY-TWO IN CCC TOOK GIFTS, PROBERS SAY

WASHINGTON, February 3.—House investigators said today that at least 22 Commodity Credit Corporation employees received gifts ranging from Bibles to resort week-ends from firms doing business with CCC.

A House appropriations subcommittee made public information from the Agriculture Department showing that three of the persons had been fired, one resigned under fire, two were suspended for a month, and three others were reprimanded. Action is still pending against the others.

### SECRETARY PAID $1,374

W. Carroll Hunter, department solicitor, informed the House unit that the Government had asked the United States attorney in Virginia to present evidence to a grand jury involving Jack Cowart, fired last August as assistant to Gus Geissler, CCC President.

The Hunter statement said department investigators found that a Texas grain bin manufacturer had paid Cowart's secretary $1,374.40 to settle a claim involving freight rates on portable grain bins shipped under Government contracts.

According to Hunter's report, the money was turned over to Cowart, but the latter said it was in payment of a personal debt.

### SENATORS TO INVESTIGATE

In addition to the House probe, the Senate Agriculture Committee has been granted $50,000 to go over much of the same ground. These are in addition to inquiries by the Department itself and the General Accounting Office.

The department stepped up its investigative efforts a year ago when it became evident that more and more private warehousemen and elevator operators were unable to deliver CCC commodities on demand.

Thirteen cases have been brought to court, involving shortages of nearly $4,000,000. About 20 more cases are under investigation and Secretary of Agriculture Charles F. Brannan calculates the final settlements will cut the losses to less than $1,000,000.

However, Comptroller General Lindsay Warren, in a recent report to the Senate committee, charged that department officials had to be "almost forced" to take corrective action. Brannan flatly denied the Warren accusation.

The House subcommittee, meanwhile, said the department incurred millions of dollars of unnecessary expense because it interpreted too rigidly a price support law requirement that the Government use private storage facilities where possible "consistent with * * * effective and sufficient conduct of its business."

This procedure was listed as the chief cause of the present difficulties.

### CCC OVERHAUL URGED

The subcommittee cited the case of midwestern companies which leased Government buildings at Camp Crowder, Mo., for about $28,000, and then contracted to store CCC grain in them at a cost of more than $675,-000 in Federal funds.

Members of the House unit urged a thorough overhaul of CCC.

Fifteen of the 22 persons alleged to have taken gifts were in the Dallas, Tex., CCC office which covers five States. But the House committee said that, with one exception, the record did not show that any employee granted favors to those who offered the gifts.

Brannan last month fired Latham White and Harry J. Solomon of the Dallas office for "administrative inadequacy," including charges that they accepted gifts from various Texas and Oklahoma firms.

Mr. WILLIAMS. The next is an article entitled "United States Aide Fired by Agriculture Hired by OPS," published in the Washington Post of February 5, 1952.

There being no objection, the article was ordered to be printed in the RECORD, as follows:

UNITED STATES AIDE FIRED BY AGRICULTURE HIRED BY OPS

Revelation that an employee dropped by the Department of Agriculture and later indicted on charges of accepting bribes had been hired by the Office of Price Stabilization came from a House committee yesterday.

The employee was Stephen G. Benit, Jr. Word of his dropping and reemployment in the Government came in published hearings of the Agriculture Subcommittee of the House Appropriations Committee, quoting testimony by Secretary of Agriculture Charles F. Brannan.

"The subcommittee was astonished to learn that Benit * * * has been reemployed by the Office of Price Stabilization," the committee report said.

"There seems to be no justification for any such action by the Civil Service Commission and the hiring agency. Further investigation of the Federal personnel procedures which would permit this to happen appears to be warranted."

Brannan testified that after an investigation of his activities within the Agriculture Department, Benit submitted his resignation, which was accepted "with prejudice."

The Secretary testified that "although our records were made known to his new employer," Benit was given a job at a salary of $4,575 with "another agency," which he identified, under questioning, as the OPS.

However, Max Hall, Information Director at OPS, last night declared that when OPS hired Benit last May it had "no inkling" that he had been involved in the bribery allegations. Hall said Benit was "cleared on his references" and given employment. Later, he said, civil service made a check of Benit's record, and, upon being advised of the facts, the OPS dismissed Benit about the 1st of last September.

Mr. WILLIAMS. The next article is entitled "Deals Behind Cowart Ouster Revealed by Brannan at Quiz," published in the Washington Post of February 5, 1952.

There being no objection, the article was ordered to be printed in the RECORD, as follows:

DEALS BEHIND COWART OUSTER REVEALED BY BRANNAN AT QUIZ

Part of the mystery surrounding the summary firing last August of Jack Cowart of Arlington, $10,500 Assistant to the Administrator of the Agriculture Department's Production and Marketing Administration was removed by a congressional committee yesterday.

Cowart's discharge followed investigation of financial transactions involving Cowart's secretary and his mother-in-law with companies having dealings with PMA, a report of hearings before the agricultural subcommittee of the House Appropriations Committee revealed.

The House group, headed by Chairman JAMIE L. WHITTEN (Democrat, Mississippi) demanded that Agriculture Secretary Charles F. Brannan tell why Cowart was fired. Brannan pleaded that because the matter in due course probably will be presented to a grand jury the matter should not be revealed. When committee members insisted, a report of the Cowart case was presented by W. Carroll Hunter, solicitor of the Agriculture Department.

The original information Hunter asserted came from the Housing and Home Finance Agency. An investigation Hunter said disclosed that a manufacturer of grain bins in Texas has paid $1,374.40 in April 1950, to Cowart's secretary, who in turn paid $1,100 of this amount to Cowart.

"The payment," Hunter reported, "is said to have been made for services rendered to * * * the manufacturer in settling the latter's claim against the Commodity Credit Corporation in connection with freight rates paid on grain bins shipped under contracts of the CCC."

Later, an additional investigation was made by the Agriculture Department's Compliance and Investigation Branch involving a warehousing corporation in Baton Rouge, La. The report of this investigation was given to the solicitor, he said, on December 18 last.

"The report," Hunter stated, "is to the effect that 163 shares of capital stock of the corporation of a par value of $25 each was

issued on December 2, 1949, to the mother-in-law of the employee (Cowart) in consideration of a promissory note of $4,075. The issuance of the stock to the employee's mother-in-law was made at the employee's request on that ground since he was a Government employee, the stock should not be issued in his name.

"The stock was bought back by the corporation on January 13, 1951, for $22,300, plus cancellation of the promissory note, on which no payment had been made."

Mr. WILLIAMS. Mr. Brannan in his statement has indicated that he was very much opposed to the law enacted by the Eightieth Congress.

The amendment to which the Secretary of Agriculture really objected so strenuously was the amendment which required Senate confirmation of the members of the board of directors of the Commodity Credit Corporation. When this amendment went to conference it was stricken out at the request of the Department of Agriculture.

After the conference report came back to the Senate, the Senate rejected the report and instructed the conferees to reinstate this amendment. I think the RECORD will show that that is largely what Mr. Brannan is angry about. He knew that the moment the Senate got the right to confirm the directors, we would be able to get into the records of that corporation to a little greater extent than before.

After we got into the records we learned why he was so insistent that he should retain control, as one man, over this multibillion dollar corporation. It will be remembered that when we got the books, after much persuasion and a resolution by Congress, there was a total of $360,000,000 which the Secretary and his department failed to account for. After months of work by the General Accounting Office, that amount was reduced to $81,000,000, which was finally written off by the Congress as unable to be accounted for. This shortage was largely in the storage division, in a department which is now showing up short again. I think the record will show that that is the phase of the bill to which Secretary Brannan objects. Congress took away from him the single, one-man control over this giant corporation, and required him to render an annual accounting of his expenditures.

I wish to say to the Secretary again today that as one Member of the Senate I intend that he shall continue to submit reports to Congress. I have no patience whatever with his statement that a shortage of $8,000,000 to $10,000,000 represents only peanuts, so far as he is concerned, when compared with a budget of $80,000,000,000. There is no bureaucrat in Washington so big that he can laugh off a loss of $6,000,000, $8,000,000, or $10,000,000 of the American taxpayers' money.

We must not forget that less than 3 years ago Congress was compelled to write off as "unaccounted for" some $81,-000,000 in the same Department of Agriculture.

I compliment the Comptroller General, the Honorable Lindsay C. Warren, for his alertness in catching this shortage early in its initial stages.

## JOHN CARTER VINCENT

Mr. JENNER. Mr. President, recently the Judiciary Committee of the Senate of the United States sent to Secretary Acheson a request for the files of the State Department dealing with John Carter Vincent, a high official of the Department, accused under oath in open hearings before the Senate, of having been a member of the Communist Party. Mr. Acheson referred the request to the President.

Mr. Truman's reply is so astounding that I think the Senate must take immediate cognizance of it.

I believe we all are in agreement that under the separation of powers doctrine of the Constitution the Congress is a coordinate branch of government, equal in power and importance to the executive branch. We all are in agreement that Members of Congress are as patriotic and loyal to the public interest as members of the executive establishment. We also are in agreement, I believe, that secret Communists in high Government office would be as abhorrent to patriotic members of the Civil Service as they are to Congress. Mr. Truman does not think so.

In his reply to Mr. Acheson, President Truman says:

JANUARY 24, 1952.

DEAR MR. SECRETARY: I have given very careful consideration to Mr. Humelsine's memorandum of January 22, relating to Senator McCARRAN's request for the loyalty file of John Carter Vincent and for certain other papers and reports from the internal files of the State Department. It is understood that the Senate Internal Security Subcommittee desires these documents for the protection of Mr. Vincent against misinterpretation of his position and that Mr. Vincent for the same reason has urged compliance with this request. While it is earnestly desired to accommodate Mr. Vincent and the subcommittee to the maximum extent possible, the paramount consideration in ruling upon this matter must be the protection of the interests of the United States.

The surrender to a legislative investigating committee of this type of report and other documents from the confidential files of the State Department would create a serious danger of intimidation and demoralization of foreign service personnel. It is of overriding importance to our national security, internal as well as external, that officers of the foreign service are free to present their reports and express their views as to problems of international relations, without fear or favor, completely and honestly, as they see them at the time and not in anticipation of the possible reaction of some future investigating committee which might hold opposing views. Accordingly, it is considered that it would be clearly contrary to the public interest to furnish these documents.

The release of individual loyalty files to congressional committees has consistently been denied under term of my directive of March 13, 1948, as contrary to the public interest in that it would involve the disclosure of confidential information and sources of information and would tend to undermine the integrity of the loyalty program. The request of Mr. Vincent's loyalty file should be denied.

Very sincerely yours,

HARRY TRUMAN.

Mr. Truman refuses to give the Senate the documents it needs because, he implies, only the executive department protects the interests of the United States. The Senate does not.

The President refuses to give us the documents, because, he implies, the Senate is engaged in "intimidation and demoralization of Foreign Service personnel." If anything is more demoralizing to our loyal Foreign Service officers than an administration which has coddled and protected secret Communists in high office for many years, I cannot imagine what it is.

The President refuses to give the Senate the documents because, he implies, it is the business of Foreign Service officers—at Yalta, for example—to serve only the administration and its interest regardless of what "some future investigating committee"—he means a committee of the United States Senate—may wish to know when the secret agreements leak out. It is clearly not the responsibility of Foreign Service officers, he implies, to serve the people of the United States, or to obey the dictates of their own conscience, so that they can freely let anyone see what they have written.

Under what authority does the President deny the Senate the right to see Government records? Under authority, he says, of his own directive of March 13, 1948. In other words the President has decided that the President has the power to prevent the President's employees from reporting to Congress and the public.

This, Mr. President, is total impudence. It is open defiance of Congress. The Senate of the United States cannot afford to ignore this challenge to its powers, to its right to information collected in the course of public business, by employees on the public payroll.

In the last session I introduced a bill to put an end to all secrecy orders at once. It is now in the Judiciary Committee. This bill (S. 2255) reestablishes two principles of responsible government. First, all information and records arising in the course of public business and of the work of employees on the public payroll are the property of the people of the United States. Public records are not the property of the President or his employees. They are public property, as much as anything else bought with public money.

Second, the power to decide that any specific records may be kept from public view rests in Congress, not in the Executive. It must be a matter of statute law, not of Presidential fiat.

There can be no responsible government and no sovereignty in the people, unless the public record is complete, unexpurgated, and open to all. If public office is a public trust, it must be carried on in the brightest light.

The only reason for keeping any reports secret is that it is in the interest of the citizens to have them kept so. The personal interest of the Executive is of no importance. Congress alone can decide when it is in the interest of the people to keep records confidential. The executive branch cannot decide because it would be deciding whether to protect itself from public criticism.

The FBI has asked for statutory power to protect its information. Any other agency which needs secrecy and can present a case in the public interest,

can get statutory approval for protection of its records. The point is that the case for secrecy must be made in the open.

There is no room in this country for an Executive power which protects itself against criticism by keeping secret the public records.

There is no room in this country for an Executive power which clothes its political activities in secrecy by pretending they are national defense.

This Administration has let the Hisses and the Marzanis, the Coplons and the John Stewart Services have access to private, confidential records vital to our national defense, and transmit copies of them to military and espionage agents of the U. S. S. R. It closes the records only to the American Congress, the American press, and the American people.

Americans do not need secrecy, except in the most extreme cases. Free people conduct their business in the public eye. Even military strategy cannot be kept secret, as Gen. Bonner Fellers has pointed out. Even in wartime the free nations have been willing to take chances with free and full discussion of their government's operations and they have always fared better than those nations whose governments made a cult of secrecy in the name of defense.

This new cult of secrecy in this country is imported from the dictator nations of Europe along with the other seeds of dictatorship. We cannot tolerate either the secrecy or the executive arrogance any longer.

I hope my bill clarifying the status of Government records will be quickly passed; but in the meantime I propose that Congress take up immediately and exercise to the full its right to demand all public records, not specifically declared by law to be secret; that Congress summon individual employees in the executive branch who have refused to surrender the record and hold them in contempt of Congress, subject to imprisonment for contempt if they place their duty to the President above their obligation to the law.

### RECESS

Mr. McFARLAND. Mr. President, I move that the Senate take a recess until 12 o'clock noon tomorrow.

The motion was agreed to; and (at 5 o'clock and 25 minutes p. m.) the Senate took a recess until tomorrow, Wednesday, February 6, 1952, at 12 o'clock meridian.

# HOUSE OF REPRESENTATIVES

### TUESDAY, FEBRUARY 5, 1952

The House met at 12 o'clock noon.
The Chaplain, Rev. Bernard Braskamp, D. D., offered the following prayer:

Almighty and ever-blessed God, may Thy grace, mercy, and peace rest upon us during all the hours of this new day.

Grant that we may respond more eagerly to the lofty aspiration of placing a higher premium on the virtues of integrity, fidelity, and chivalry.

May we never part company with the cardinal virtue of humility or break faith with Thee and our better self. Help us to live out each day in faith, in faithfulness, and in the fear of the Lord.

We pray that all the legislation that we are proposing and seeking to enact may be for Thy glory and for the welfare of the members of the human family and in enabling them to find a healthier and happier and more hopeful way of life.

Hear us in Christ's name. Amen.

The Journal of the proceedings of yesterday was read and approved.

### SPECIAL ORDER GRANTED

Mr. RAMSAY (at the request of Mr. PRIEST) asked and was given permission to address the House for 15 minutes on tomorrow, following the legislative business of the day and any other special orders heretofore entered.

### SUBCOMMITTEE ON ELECTIONS

Mr. BURLESON. Mr. Speaker, I ask unanimous consent that notwithstanding the fact the House may be in session today the Subcommittee on Elections may be allowed to sit.

The SPEAKER. Is there objection to the request of the gentleman from Texas?

There was no objection.

### 4-H CLUBS

Mr. WICKERSHAM. Mr. Speaker, I ask unanimous consent to address the House for 1 minute and to revise and extend my remarks.

The SPEAKER. Is there objection to the request of the gentleman from Oklahoma?

There was no objection.

Mr. WICKERSHAM. Mr. Speaker. I would like to read portions of a letter I have received from Mr. Cheebie Graham, executive secretary of the Oklahoma City Milk Producers Association:

I came across some information the other day at a meeting of the Oklahoma Agricultural Advisory Council that disturbs me very much. As you know the money is allocated to the extension division of the college according to the number of farms. The last few years Oklahoma suffered a big loss in population and much of this has been in rural sections. Mechanized farming has increased the size of farms and lowered the number.

Under the allocation arrangements, Oklahoma will lose $96,000 and Texas $200,000. In our particular case the director of the extension division tells me that we will have to dispense with 24 assistant county agents who are leading 4-H Club work in the State. We have 78,000 members in these clubs at this time.

The years since the war and particularly the last 3 years since I have been working with the milk producers in these 20 counties, I have learned to place a real value on the work done in this State by the extension division. We have never asked for help that they haven't done everything possible. With the tremendous load, production for defense has placed on us and shortages of labor on the farms, if we don't do something to encourage these youngsters to stay on the farms, the next generation is going to be in a very bad shape for food supplies. I am enclosing a list of figures of other States who are losing on this same arrangement and anything that can be done will be a real help to agriculture I know in Oklahoma.

I urge this House to consider these remarks and to act on them.

### SPECIAL ORDER GRANTED

Mr. SMITH of Wisconsin asked and was given permission to address the House for 10 minutes today, following any special orders heretofore entered.

### THE PRIVATE CALENDAR

The SPEAKER. This is Private Calendar day. The Clerk will call the first bill on the calendar.

### HELEN DICK

The Clerk called the bill (S. 64) for the relief of Helen Dick.

There being no objection, the Clerk read the bill, as follows:

Be it enacted, etc., That, for the purposes of the immigration and naturalization laws, Helen Dick, of Long Beach, Calif., shall be deemed to have been born in England, which was the birthplace of her father, Robert McCulloch Dick.

The bill was ordered to be read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

### STANISLAS D'ERCEVILLE

The Clerk called the bill (S. 366) for the relief of Stanislas d'Erceville.

There being no objection, the Clerk read the bill, as follows:

Be it enacted, etc., That, for the purposes of the immigration and naturalization laws, Stanislas d'Erceville shall be held and considered to have been lawfully admitted to the United States for permanent residence as of the date of the enactment of this act, upon payment of the required visa fee and head tax. Upon the granting of permanent residence to such alien as provided for in this act, the Secretary of State shall instruct the proper quota-control officer to deduct one number from the appropriate quota for the first year that such quota is available.

The bill was ordered to be read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

### AI MEI YU AND AI MEI CHEN

The Clerk called the bill (S. 471) for the relief of Ai Mei Yu and Ai Mei Chen.

There being no objection, the Clerk read the bill, as follows:

Be it enacted, etc., That, for the purposes of sections 4 (a) and 9 of the Immigration Act of 1924, as amended, the minor children, Ai Mei Yu and Ai Mei Chen, shall be held and considered to be the natural-born alien children of Adella L. Eggestein, a citizen of the United States.

The bill was ordered to be read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

Case 1:21-cr-00179-AJT    Document 29-6    Filed 08/23/21    Page 40 of 59 PageID# 1019

## YOUICHI NOBORI

The Clerk called the bill (S. 527) for the relief of Youichi Nobori.

There being no objection, the Clerk read the bill, as follows:

*Be it enacted, etc.,* That, solely for the purposes of section 4 (a) and section 9 of the Immigration Act of 1924, and notwithstanding any provisions excluding from admission to the United States persons of races ineligible to citizenship, Youichi Nobori, a minor Japanese child, shall be considered the alien natural-born child of Lt. Col. and Mrs. Richard G. Winters, citizens of the United States.

The bill was ordered to be read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

## CONSTANCE CHIN HUNG

The Clerk called the bill (S. 605) for the relief of Constance Chin Hung.

There being no objection, the Clerk read the bill, as follows:

*Be it enacted, etc.,* That in the administration of the immigration and naturalization laws, the provisions of sections 4 (a) and 9 of the Immigration Act of 1924, as amended, shall be held to be applicable to the alien Constance Chin Hung, the minor, unmarried child of George Chin Hung, a citizen of the United States.

The bill was ordered to be read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

## STELA S. RANSIER

The Clerk called the bill (S. 634) for the relief of Stela S. Ransier.

There being no objection, the Clerk read the bill, as follows:

*Be it enacted, etc.,* That notwithstanding the provisions of section 13 (c) of the Immigration Act of 1924, as amended, Stela S. Ransier, the wife of Otis Ransier, a citizen of the United States, may be admitted to the United States for permanent residence if she is found to be otherwise admissible under the provisions of the immigration laws.

The bill was ordered to be read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

## MOTOI KANO

The Clerk called the bill (S. 639) for the relief of Motoi Kano.

There being no objection, the Clerk read the bill, as follows:

*Be it enacted,* That, solely for the purposes of section 4 (a) and section 9 of the Immigration Act of 1924, and notwithstanding any provisions excluding from admission to the United States persons of races ineligible to citizenship, Motoi Kano, a minor Japanese child, shall be considered the alien natural-born child of Dixon Y. Miyauchi, a citizen of the United States.

The bill was ordered to be read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

## ISAMU FURUTA

The Clerk called the bill (S. 640) for the relief of Isamu Furuta.

There being no objection, the Clerk read the bill, as follows:

*Be it enacted, etc.,* That, in the administration of the immigration laws, the provisions of section 13 (c) of the Immigration Act of 1924, as amended (U. S. C., title 8, sec. 213 (c)) which excludes from admission to the United States persons who are ineligible to citizenship, shall not hereafter apply to Isamu Furuta, husband of an American citizen.

The bill was ordered to be read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

## RITSUKO CHOJIN

The Clerk called the bill (S. 659) for the relief of Ritsuko Chojin.

There being no objection, the Clerk read the bill, as follows:

*Be it enacted, etc.,* That, notwithstanding the provisions of section 13 (c) of the Immigration Act of 1924, as amended, Ritsuko Chojin, the wife of Masakatsu Chojin, a United States citizen, may be admitted to the United States for permanent residence if she is found to be otherwise admissible under the provisions of the immigration laws.

The bill was ordered to be read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

## JOSEPH EMANUEL WINGER

The Clerk called the bill (S. 702) for the relief of Joseph Emanuel Winger.

There being no objection, the Clerk read the bill, as follows:

*Be it enacted, etc.,* That, for the purposes of sections 4 (a) and 9 of the Immigration Act of 1924, as amended, and notwithstanding any provisions excluding from admission to the United States persons of races ineligible to citizenship, Joseph Emanuel Winger shall be deemed to be the natural-born alien child of Sgt. and Mrs. R. L. Winger, citizens of the United States.

The bill was ordered to be read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

## DR. YAU SHUN LEUNG

The Clerk called the bill (S. 895) for the relief of Dr. Yau Shun Leung.

There being no objection, the Clerk read the bill, as follows:

*Be it enacted, etc.,* That, for the purposes of the immigration and naturalization laws, Dr. Yau Shun Leung shall be held and considered to have been lawfully admitted to the United States for permanent residence as of the date of the enactment of this Act, upon payment of the required visa fee and head tax. Upon the granting of permanent residence to such alien as provided for in this act, the Secretary of State shall instruct the proper quota-control officer to deduct one number from the appropriate quota for the first year that such quota is available.

The bill was ordered to be read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

## MARGARET A. USHKOVA-ROZANOFF AND MRS L. A. USHKOVA

The Clerk called the bill (S. 905) for the relief of Margaret A. Ushkova-Rozanoff.

There being no objection, the Clerk read the bill, as follows:

*Be it enacted, etc.,* That notwithstanding the provisions of the ninth category of section 3 of the Immigration Act of 1917, as amended (8 U. S. C. 136 (d)), Margaret A. Ushkova-Rozanoff may be admitted to the United States for permanent residence provided she is found otherwise admissible under the provisions of the immigration laws: *Provided,* That there be given a suitable and proper bond or undertaking, approved by the Attorney General, in such amount and containing such conditions as he may prescribe, to the United States and to all States, Territories, counties, towns, municipalities, and districts thereof holding the United States and all States, Territories, counties, towns, municipalities, and districts thereof harmless against Margaret A. Ushkova-Rozanoff becoming a public charge.

With the following committee amendment:

Page 2, line 5, after the word "charge", insert a semicolon and the following: "and that the immigration visa issued to Mrs. L. A. Ushkova prior to December 31, 1951, shall be regarded as a valid visa: *Provided,* That at the time of her application for admission she is accompanying her grandchild, Margaret A. Ushkova-Rozanoff."

The committee amendment was agreed to.

The bill was ordered to be read a third time, was read the third time, and passed.

The title was amended so as to read: "An act for the relief of Margaret A. Ushkova-Rozanoff and Mrs. L. A. Ushkova."

A motion to reconsider was laid on the table.

## RALPH ALBRECHT HSIAO

The Clerk called the bill (S. 971) for the relief of Ralph Albrecht Hsiao.

There being no objection, the Clerk read the bill, as follows:

*Be it enacted, etc.,* That, in the administration of the immigration and naturalization laws, the provisions of sections 4 (a) and 9 of the Immigration Act of 1924, as amended, shall be held to be applicable to the alien Ralph Albrecht Hsiao, the minor unmarried child of Valley A. Udick, a citizen of the United States.

The bill was ordered to be read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

## MISAO KONISHI

The Clerk called the bill (S. 1120) for the relief of Misao Konishi.

There being no objection, the Clerk read the bill, as follows:

*Be it enacted, etc.,* That, solely for the purpose of section 4 (a) and section 9 of the Immigration Act of 1924, and notwithstanding any provisions excluding from admission to the United States persons of races ineligible to citizenship, Misao Konishi, a minor Japanese child, shall be considered the alien natural-born child of Sgt. and Mrs. Harvey L. Houser, citizens of the United States.

The bill was ordered to be read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

## TAKAKO KITAMURA DALLUGE

The Clerk called the bill (S. 1158) for the relief of Takako Kitamura Dalluge.

There being no objection, the Clerk read the bill, as follows:

*Be it enacted, etc.,* That, notwithstanding the provisions of section 13 (c) of the Immigration Act of 1924, as amended, Takako Kitamura Dalluge, the wife of Gilbert Glen Dalluge, a United States citizen, may be admitted to the United States for permanent residence if she is found to be otherwise admissible under the provisions of the immigration laws.

The bill was ordered to be read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

## MISAKO KINOSHITA

The Clerk called the bill (S. 1177) for the relief of Misako Kinoshita.

There being no objection, the Clerk read the bill, as follows:

*Be it enacted, etc.,* That the provisions of section 13 (c) of the Immigration Act of 1924, as amended, relating to the exclusion of aliens inadmissible because of race shall not hereafter apply to Misako Kinoshita, the Japanese fiancée of Wilbert L. Rice, a citizen of the United States, and that the said Misako Kinoshita may be eligible for a nonquota immigration visa if she is found otherwise admissible under the immigration laws: *Provided,* That the administrative authorities find that marriage between the above-named parties occurred prior to 3 months immediately succeeding the enactment date of this act.

The bill was ordered to be read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

## KIM SONG NORE

The Clerk called the bill (S. 1236) for the relief of Kim Song Nore.

There being no objection, the Clerk read the bill, as follows:

*Be it enacted, etc.,* That, notwithstanding the provisions of law relating to inadmissibility of aliens because of race, Kim Song Nore may be admitted to the United States for permanent residence if he is otherwise admissible under the immigration laws.

The bill was ordered to be read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

## PENG-SIU MEI

The Clerk called the bill (S. 1280) for the relief of the minor child, Peng-siu Mei.

There being no objection, the Clerk read the bill, as follows:

*Be it enacted, etc.,* That, notwithstanding the provisions of section 2 of the act of December 17, 1943, as amended (57 Stat. 601; 60 Stat. 975, 8 U. S. C. 212 (a)), the minor child, Peng-siu Mei, may be admitted to the United States as a nonquota immigrant if such alien is otherwise admissible under the immigration laws.

The bill was ordered to be read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

## FRANCISCA QUINONES

The Clerk called the bill (S. 1323) for the relief of Francisca Quinones.

There being no objection, the Clerk read the bill, as follows:

*Be it enacted, etc.,* That, for the purposes of the immigration and naturalization laws, Francisca Quinones shall be held and considered to have been lawfully admitted to the United States for permanent residence as of the date of the enactment of this act, upon payment of the required visa fee and head tax. Upon the granting of permanent residence to such alien as provided for in this act, the Secretary of State shall instruct the proper quota-control officer to deduct one number from the appropriate quota for the first year that such quota is available.

The bill was ordered to be read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

## DR. CHAI CHANG CHOI

The Clerk called the bill (S. 1339) for the relief of Dr. Chai Chang Choi.

There being no objection, the Clerk read the bill, as follows:

*Be it enacted, etc.,* That, for the purposes of the immigration and naturalization laws, Dr. Chai Chang Choi shall be held and considered to have been lawfully admitted to the United States for permanent residence as of the date of the enactment of this act, upon payment of the required visa fee and head tax. Upon the granting of permanent residence to such alien as provided for in this act, the Secretary of State shall instruct the proper quota-control officer to deduct one number from the appropriate quota for the first year that such quota is available.

The bill was ordered to be read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

## MASAKI SUGIYAMA

The Clerk called the bill (S. 1421) for the relief of Masaki Sugiyama.

There being no objection, the Clerk read the bill, as follows:

*Be it enacted, etc.,* That the provisions of section 13 (c) of the Immigration Act of 1924, as amended, shall not hereafter apply to Masaki Sugiyama, the Japanese fiancée of Patrick I. Duane, a citizen of the United States, and that the said Masaki Sugiyama may be eligible for a nonquota immigration visa if she is found otherwise admissible under the immigration laws: *Provided,* That the administrative authorities find that marriage between the above-mentioned parties occurred within 3 months after the enactment of this act.

The bill was ordered to be read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

## ROBERT WILLIAM LAUBER

The Clerk called the bill (S. 1448) for the relief of Robert William Lauber.

There being no objection, the Clerk read the bill, as follows:

*Be it enacted, etc.,* That, for the purposes of sections 4 (a) and 9 of the Immigration Act of 1924, as amended, and notwithstanding the provisions of section 13 (c) of that act, the minor child, Robert William Lauber, shall be held and considered to be the natural-born alien minor child of Sgt. and Mrs. William J. Lauber, citizens of the United States.

The bill was ordered to be read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

## WOLFGANG VOGEL

The Clerk called the bill (S. 1819) for the relief of Wolfgang Vogel.

There being no objection, the Clerk read the bill, as follows:

*Be it enacted, etc.,* That for the purposes of sections 4 (a) and 9 of the Immigration Act of 1924, as amended, the minor child, Wolfgang Vogel, shall be held and considered to be the natural-born alien child of Mr. and Mrs. Max Dubberke, citizens of the United States.

The bill was ordered to be read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

## WILLY GIROUD

The Clerk called the bill (S. 1839) for the relief of Willy Giroud.

Mr. DOLLIVER. Mr. Speaker, I ask unanimous consent that this bill be passed over without prejudice.

The SPEAKER. Is there objection to the request of the gentleman from Iowa?

There was no objection.

## HENRY BONGART AND EVELYN BONGART

The Clerk called the bill (S. 1909) for the relief of Henry Bongart and Evelyn Bongart.

There being no objection, the Clerk read the bill, as follows:

*Be it enacted, etc.,* That, in the administration of the immigration and naturalization laws, Henry Bongart and Evelyn Bongart shall not be held to have lost United States citizenship under any of the provisions of the Nationality Act of 1940 providing for loss of citizenship through continuous residence in a foreign state: *Provided,* That the said Henry Bongart and Evelyn Bongart return to the United States for permanent residence within a period of 1 year following the effective date of this act.

The bill was ordered to be read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

## MICHAEL DAVID LIU

The Clerk called the bill (S. 1911) for the relief of Michael David Liu, a minor.

There being no objection, the Clerk read the bill, as follows:

*Be it enacted, etc.,* That, notwithstanding the provisions of section 2 of the act of December 17, 1943, as amended (57 Stat. 601; 60 Stat. 975, 8 U. S. C. 212 (a)), Michael David Liu, alien minor unmarried son of Mrs. Gloria Yuen Liu, a United States citizen, may be admitted to the United States as a nonquota immigrant in accordance with sections 4 (a) and 9 of the Immigration Act of 1924, if such alien is otherwise admissible under the immigration laws.

The bill was ordered to be read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

## JOE KOSAKA

The Clerk called the bill (S. 2095) for the relief of Joe Kosaka.

There being no objection, the Clerk read the bill, as follows:

*Be it enacted, etc.,* That, for the purposes of sections 4 (a) and 9 of the Immigration Act of 1924, as amended, and notwithstanding any provisions of law excluding from admission into the United States persons of races ineligible to citizenship, Joe Kosaka shall be held and considered to be the natural-born alien child of Herman W. Hearn and his wife, Marylyn Jeanne Hearn, citizens of the United States.

The bill was ordered to be read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

## MICHIYO CHIBA

The Clerk called the bill (S. 2158) for the relief of Michiyo Chiba.

There being no objection, the Clerk read the bill, as follows:

*Be it enacted, etc.,* That, solely for the purposes of section 4 (a) and section 9 of the Immigration Act of 1924, as amended, and notwithstanding any provisions excluding from admission to the United States persons of races ineligible to citizenship, Michiyo Chiba, a minor Japanese child, shall be considered the alien natural-born child of Corp. Walter V. Subacz, a citizen of the United States.

The bill was ordered to be read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

## YURIKO TSUTSUMI

The Clerk called the bill (H. R. 761) for the relief of Yuriko Tsutsumi.

There being no objection, the Clerk read the bill, as follows:

*Be it enacted, etc.,* That the provisions of section 13 (c) of the Immigration Act of 1924, as amended, relating to the exclusion of aliens inadmissible because of race, shall not hereafter apply to Yuriko Tsutsumi, the Japanese fiancée of Sic Alfred A. Wetmore, a citizen of the United S,ates, and that the said Yuriko Tsutsumi may be eligible for a non-quota immigration visa is she is found otherwise admissible under the immigration laws: *Provided,* That the administrative authorities find that marriage between the above-named parties occurred within 3 months immediately succeeding the enactment date of this act.

The bill was ordered to be engrossed and read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

## CALCEDONIO TAGLIARINI

The Clerk called the bill (H. R. 1446) for the relief of Calcedonio Tagliarini.

Mr. DOLLIVER. Mr. Speaker, I ask unanimous consent that this bill be passed over without prejudice.

The SPEAKER. Is there objection to the request of the gentleman from Iowa?

There was no objection.

## SETSUKO YAMASHITA

The Clerk called the bill (H. R. 2283) for the relief of Setsuko Yamashita, the Japanese fiancée of a United States citizen, veteran of World War II, and her son Takashi Yamashita.

There being no objection, the Clerk read the bill, as follows:

*Be it enacted, etc.,* That the provisions of the immigration laws relating to the exclusion of aliens inadmissible because of race shall not hereafter apply to Setsuko Yamashita, the Japanese fiancée of Ronald William Edrington, a citizen of the United States and an honorably discharged veteran of World War I, and her son, Takashi Yamashita, and that the said Setsuko Yamashita and her son shall be eligible for a visa as a nonimmigrant temporary visitor for a period of 3 months: *Provided,* That the administrative authorities find that the said Setsuko Yamashita is coming to the United States with a bona fide intention of being married to the said Ronald William Edrington, and that they are found otherwise admissible under the immigration laws. In the event the marriage between the above-named parties does not occur within 3 months after the entry of the said Setsuko Yamashita and her son, they shall be required to depart from the United States, and upon failure to do so shall be deported in accordance with the provisions of sections 19 and 20 of the Immigration Act of 1917, as amended (U. S. C., title 8, secs. 155 and 156). In the event that the marriage between the above-named parties shall occur within 3 months after the entry of the said Setsuko Yamashita and her son, the Attorney General is authorized and directed to record the lawful admission for permanent residence of the said Setsuko Yamashita and her son, as of the date of the payment by them of the required visa fees and head taxes.

The bill was ordered to be engrossed and read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

## ADELAIDA REYES

The Clerk called the bill (H. R. 2923) for the relief of Adelaida Reyes.

There being no objection, the Clerk read the bill, as follows:

*Be it enacted, etc.,* That, for the purposes of the immigration and naturalization laws, Adelaida Reyes shall be considered to be the natural born alien child of Mr. Isidro Q. Reyes, a veteran of World War I and World War II, and a citizen of the United States.

With the following committee amendment:

Strike out all after the enacting clause and insert in lieu thereof the following: "That, for the purposes of section 4 (a) and section 9 of the Immigration Act of 1924, Adelaida Reyes, a native and citizen of the Philippine Islands, shall be considered to be the alien, natural-born daughter of Isidro Q. Reyes, a veteran of World Wars I and II, and a citizen of the United States."

The committee amendment was agreed to.

The bill was ordered to be engrossed and read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

## MRS. LOURDES AUGUSTA PEREIRA LADEIRO ROSE

The Clerk called the bill (H. R. 3374) for the relief of Mrs. Lourdes Augusta Pereira Ladeiro Rose.

There being no objection, the Clerk read the bill, as follows:

*Be it enacted, etc.,* That, notwithstanding the provision of the eighth category of section 3 of the Immigration Act of 1917, as amended, Mrs. Lourdes Augusta Pereira Ladeiro Rose may be admitted to the United States for permanent residence if she is found to be otherwise admissible under the provisions of the immigration laws.

With the following committee amendment:

At the end of the bill add the following: "*Provided,* That there be given a suitable and proper bond or undertaking, approved by the Attorney General, in such amount and containing such conditions as he may prescribe, to the United States and to all States, Territories, counties, towns, municipalities, and districts thereof holding the United States and all States, Territories, counties, towns, municipalities, and districts thereof harmless against Mrs. Lourdes Augusta Pereira Ladeiro Rose."

The committee amendment was agreed to.

The bill was ordered to be engrossed and read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

## WILLIAM GRANT BRADEN, JR.

The Clerk called the bill (H. R. 4010) for the relief of William Grant Braden, Jr.

There being no objection, the Clerk read the bill, as follows:

*Be it enacted, etc.,* That, for the purpose of sections 4 (a) and 9 of the Immigration Act of 1924, as amended, and notwithstanding the provisions of section 13 (c) of that act, the minor child, William Grant Braden, Jr., shall be held and considered to be the natural-born alien child of Mr. and Mrs. William Grant Braden, citizens of the United States.

The bill was ordered to be engrossed and read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

## ELVIRA ZACHMANN

The Clerk called the bill (H. R. 4268) for the relief of Elvira Zachmann.

There being no objection, the Clerk read the bill, as follows:

*Be it enacted, etc.,* That for the purposes of sections 4 (a) and 9 of the Immigration Act of 1924, as amended, the minor child, Elvira Zachmann, shall be held and considered to be the natural-born alien child of Mr. and Mrs. John P. Poole, citizens of the United States.

The bill was ordered to be engrossed and read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

## ELEFTHERIOS G. KOKOLIS

The Clerk called the bill (H. R. 4774) for the relief of Eleftherios G. Kokolis.

There being no objection, the Clerk read the bill, as follows:

*Be it enacted, etc.,* That, for the purposes of sections 4 (a) and 9 of the Immigration Act of 1924, as amended, the minor child, Eleftherios G. Kokolis, shall be held and considered to be the natural-born alien child of Mr. and Mrs. Constantine A. Kokolis, citizens of the United States.

The bill was ordered to be engrossed and read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

## FUSAKO TERAO SCOGIN

The Clerk called the bill (H. R. 5347) for the relief of Fusako Terao Scogin and her son, James Wesley Scogin.

There being no objection, the Clerk read the bill, as follows:

*Be it enacted, etc., That, notwithstanding the provisions of section 13 (c) of the Immigration Act of 1924, as amended, Fusako Terao Scogin and her son, James Wesley Scogin, shall be held to be nonquota immigrants and may be admitted to the United States for permanent residence if they are found to be otherwise admissible under the provisions of the immigration laws.*

With the following committee amendment:

Page 1, line 5, after "Scogin", strike out the remainder of the bill and insert the following: "shall be held to be a nonquota immigrant and may be admitted to the United States for permanent residence if she is found to be otherwise admissible under the provisions of the immigration laws."

The committee amendment was agreed to.

The bill was ordered to be engrossed and read a third time, and was read the third time, and passed.

The title was amended so as to read: "A bill for the relief of Fusako Terao Scogin."

A motion to reconsider was laid on the table.

## VIRGINIA LOUISE SLATER

The Clerk called the bill (H. R. 5923) for the relief of Virginia Louise Slater.

There being no objection, the Clerk read the bill, as follows:

*Be it enacted, etc., That, for the purposes of sections 4 (a) and 9 of the Immigration Act of 1924, as amended, the minor child, Virginia Louise Slater, shall be held and considered to be the natural-born alien child of Mrs. Una Slater, a citizen of the United States.*

The bill was ordered to be engrossed and read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

## NIGEL C. S. SALTER-MATHIESON

The Clerk called the bill (H. R. 4535) for the relief of Nigel C. S. Salter-Mathieson.

There being no objection, the Clerk read the bill, as follows:

*Be it enacted, etc., That, notwithstanding the provisions of section 307 (a) (1) and 331 of the Nationality Act of 1940, as amended, Nigel C. S. Salter-Mathieson may file a petition for naturalization in accordance with the requirements of section 332 of that act.*

The bill was ordered to be engrossed and read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

## KENNETH CECIL

The Clerk called the bill (H. R. 3813) for the relief of Kenneth Cecil.

There being no objection, the Clerk read the bill, as follows:

*Be it enacted, etc., That notwithstanding the provisions and limitations of sections 15 to 20, both inclusive, of the act entitled "An act to provide compensation for employees of the United States suffering injuries while in the performance of their duties, and for other purposes," approved September 7, 1916, as amended (U. S. C., 1940 ed., title 5, secs. 765–770), the Labor Department (Bureau of Employees' Compensation) is hereby authorized and directed to receive and consider, when filed, the claim of Kenneth Cecil, of Evansville, Ind., for compensation under such act, within 6 months from the date of enactment of this act, on account of personal injuries alleged to have been sustained by him on date of January 18, 1936, while in the performance of his duty as a census enumerator in Evansville, Ind.; and the Bureau, after such consideration of such claim, shall determine and make findings of fact thereon and make an award for payment of compensation to Kenneth Cecil, provided for in such act of September 7, 1916, as amended: Provided, That no benefits shall accrue prior to the enactment of this act.*

With the following committee amendments:

Page 2, line 3, strike out "on date" and insert "in the month."

Page 2, line 4, strike out "18."

The committee amendments were agreed to.

The bill was ordered to be engrossed and read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

## HENRY T. WEBER

The Clerk called the bill (H. R. 4472) for the relief of Henry T. Weber.

There being no objection, the Clerk read the bill, as follows:

*Be it enacted, etc., That Henry T. Weber, Silver Spring, Md., is hereby relieved of all liability to pay to the United States the sum of $363.11. Such sum represents the amount of certain overpayments certified by him (vouchers Nos. 7–228698 and 7–343884) while he was employed, during the period beginning September 26, 1942, and ending April 22, 1943, as a certifying officer in the regional office of the Federal Public Housing Authority at Chicago, Ill. In the audit and settlement of the accounts of any certifying or disbursing officer of the United States full credit shall be given for any amount for which liability is relieved by this act.*

The bill was ordered to be engrossed and read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

## DELMA L. MAUZEY

The Clerk called the bill (H. R. 5955) for the relief of Delma L. Mauzey.

There being no objection, the Clerk read the bill, as follows:

*Be it enacted, etc., That the Secretary of the Treasury be, and he is hereby authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, to Delma L. Mauzey, Leitchfield, Ky., the sum of $480. Such sum represents the amount of fees earned by the said Delma L. Mauzey for services rendered as United States commissioner for the judicial district of Kentucky during the period from November 1, 1946, through October 31, 1950. Payment of such sum has not been made because the said Delma L. Mauzey failed to file his ac-*

count for fees for such period within 1 year after such services were rendered, as prescribed by law.

With the following committee amendment:

Page 2, line 1, strike out "account" and insert "accounts."

The committee amendment was agreed to.

The bill was ordered to be engrossed and read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

## PATRICK J. LOGAN

The Clerk called the bill (H. R. 6065) for the relief of Patrick J. Logan.

There being no objection, the Clerk read the bill, as follows:

*Be it enacted, etc., That the Secretary of the Treasury is authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, to Patrick J. Logan, of Somerville, Mass., the sum of $1,015. Payment of such sum shall be in full settlement of all claims of the said Patrick J. Logan against the United States by reason of the expenses incurred by him in making a visit to the United States Military Cemetery at Henri Chapelle, Belgium. The Department of the Army had erroneously informed him that his son, First Lt. James A. Logan, was buried there: Provided, That no part of the amount appropriated in this act in excess of 10 percent thereof shall be paid or delivered to or received by any agent or attorney on account of services rendered in connection with this claim, and the same shall be unlawful, any contract to the contrary notwithstanding. Any person violating the provisions of this act shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in any sum not exceeding $1,000.*

The bill was ordered to be engrossed and read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

## ROSARIO GARCIA JIMENO

Mr. WALTER. Mr. Speaker, I ask unanimous consent to take from the Speaker's desk the bill H. R. 1469, an act for the relief of Rosario Garcia Jimeno, with an amendment of the Senate thereto, and concur in the Senate amendment.

The Clerk read the title of the bill.

The Clerk read the Senate amendment, as follows:

Strike out all after the enacting clause and insert "That, for the purposes of the immigration and naturalization laws, Rosario Garcia Jimeno shall be held and considered to have been lawfully admitted to the United States for permanent residence as of the date of the enactment of this act, upon payment of the required visa fee and head tax. Upon the granting of permanent residence to such alien as provided for in this act, the Secretary of State shall instruct the proper quota-control officer to deduct one number from the appropriate quota for the first year that such quota is available."

The SPEAKER. Is there objection to the request of the gentleman from Pennsylvania?

Mr. MARTIN of Massachusetts. Mr. Speaker, reserving the right to object, will the gentleman explain this?

Mr. WALTER. The Senate amendment changes the method of admission

of an alien who is visiting in the United States. This merely concurs with the action that they took. Instead of authorizing the admission, we adjust the status of an alien already here, the alien having arrived after the House passed the bill.

Mr. MARTIN of Massachusetts. Mr. Speaker, I withdraw my reservation of objection.

The SPEAKER. Is there objection to the request of the gentleman from Pennsylvania?

There was no objection.

The Senate amendment was concurred in.

A motion to reconsider was laid on the table.

## PROCEEDINGS AGAINST SIDNEY BUCHMAN

Mr. WOOD of Georgia. Mr. Speaker, by direction of the Committee on Un-American Activities, I submit a privileged report (H. Rept. No. 1293).

The SPEAKER. The clerk will read the report.

The Clerk read as follows:

The Committee on Un-American Activities as created and authorized by the House of Representatives through the enactment of Public Law 601, section 121, subsection (q) (2) of the Seventy-ninth Congress, and under House Resolution No. 7 of the Eighty-second Congress, caused to be issued a subpena to Sidney Buchman. The said subpena directed Sidney Buchman to be and appear before said Committee on Un-American Activities of the House of Representatives of the United States, in its chamber in the city of Washington on Thursday, January 24, 1952, at the hour of 10:30 a. m., then and there to testify touching matters of inquiry committed to said committee, and not to depart without leave of said committee. The subpena served upon said Sidney Buchman is set forth in words and figures, as follows:

"By authority of the House of Representatives of the Congress of the United States of America, to Alvin W. Stokes: You are hereby commanded to summon Sidney Buchman to be and appear before the Committee on Un-American Activities of the House of Representatives of the United States, of which the Honorable JOHN S. WOOD is chairman, in their chamber in the city of Washington, on Thursday, January 24, 1952, room 226, at the hour of 10:30 a. m., then and there to testify touching matters of inquiry committed to said committee; and he is not to depart without leave of said committee.

"Herein fail not, and make return of this summons.

"Witness my hand and the seal of the House of Representatives of the United States, at the city of Washington, this 15th day of January 1952.

"JOHN S. WOOD, Chairman.

"Attest:
"[SEAL]     "RALPH R. ROBERTS,
"Clerk, United States House of Representatives."

The said subpena was duly served as appears by the return made thereon by Alvin W. Stokes, who was duly authorized to serve the said subpena. The return of the service by the said Alvin W. Stokes, being endorsed thereon, is set forth in words and figures, as follows:

"Subpena for Sidney Buchman before the Committee on Un-American Activities at Washington, D. C., January 24, 1952; served January 17, 1952, at 3:40 p. m., in the law offices of Pepper & Siegel, 55 Liberty Street, New York City, phone Worth 4-0285, in the presence of Pepper and Halpern, members of Pepper & Siegel, room 1807.

"ALVIN W. STOKES,
"Investigator, House Committee
on Un-American Activities."

Prior to the issuance of the said subpena Sidney Buchman appeared as a witness before a subcommittee of the Committee on Un-American Activities on September 25, 1951, in Los Angeles, Calif., at which time he admitted having been a member of the Communist Party between 1938 and 1945, but refused to disclose to the subcommittee the names of the persons associated with him in the Communist groups to which he had belonged while a member of the Communist Party. The refusal to testify occurred during the period when a quorum of the subcommittee was not present. At the conclusion of the testimony on September 25, Mr. R. Lawrence Siegel, attorney for Sidney Buchman, addressed the chairman as follows:

"May I make one observation, Mr. WALTER? Will the record please show that since about 15 minutes before the recess, and continuously since then, this committee has functioned without a quorum and has had only two members present? I think for the purpose of the record, in view of the testimony given today, the position of the witness should be protected. Thank you."

On September 27, 1951, Sidney Buchman, by his counsel, telegraphed the chairman of the Committee on Un-American Activities as follows:

LOS ANGELES, CALIF.,
September 27, 1951—11:57 p. m.

The Honorable JOHN S. WOOD,
Chairman, Committee on Un-American Activities, House Office Building, Washington, D. C.:

Please be advised I have instructed my attorney, R. Lawrence Siegel, of New York City, to communicate with you respecting my appearance before a subcommittee of the House Committee on Un-American Activities on September 25, 1951: One, I hereby voluntarily agree to have the record amended so as to read and provide that a quorum was present at all times during my testimony. Two, I hereby waive the lack of a quorum at any time during my appearance as a witness.

Respectfully,
SIDNEY BUCHMAN,
By R. LAWRENCE SIEGEL,
His Attorney,
55 Liberty Street, New York 5, N. Y.

On January 22, 1952, subsequent to the issuance of the said subpena, Mr. R. Lawrence Siegel, attorney for Sidney Buchman, called counsel for the committee by long-distance telephone and inquired whether Sidney Buchman would be used as a witness on January 24. Counsel for the committee advised Mr. Siegel that the committee was behind in its schedule of witnesses; that there was a possibility that his client would not be reached until January 25; and agreed, as a matter of convenience to counsel and his client, that Sidney Buchman should appear as a witness before the committee at 10:30 a. m. on January 25, 1952, instead of January 24.

On January 24, 1952, the chairman presented to the committee in executive session a letter from Sidney Buchman requesting the committee to reconsider the service of the subpena upon him and upon his reconsideration to withdraw it. Sidney Buchman, in his letter, stated that the reason for his request that the subpena be withdrawn was that in the course of his former testimony he had declined as a matter of principle, and not out of disrespect for the committee or Congress, to name the persons who had been members of the Communist groups to which he had belonged; that if he were to testify again he felt that he would be required by his conscience to decline to answer the same questions and he could only testify in exactly the same way; that he was not responsible for the absence of a committee member during parts of his testimony; and, that it seemed cruel to punish him further by requiring him to testify again. The committee considered the request of Sidney Buchman, determined that it desired Sidney Buchman be questioned further, and directed counsel for the committee to advise Mr. Buchman that his request had been denied.

On January 24, 1952, shortly after 5 p. m., Mr. Gerald Halpern, associate of the law firm of Pepper & Siegel, attorneys for Sidney Buchman, appeared in the office of the committee and was advised by counsel for the committee that the request of Sidney Buchman to withdraw the subpena had been denied and that he should have his client in the hearing room available to testify at 11 a. m. on January 25, 1952.

On January 25, 1952, the committee convened at 10:50 a. m. and proceeded to hear various witnesses until 1:10 p. m., at which time the committee adjourned to reconvene at 2:15 p. m. Shortly after 12:50 p. m. on January 25, Mr. Gerald Halpern, attorney for Sidney Buchman, conferred with counsel for the committee and was advised that the committee would reconvene at 2:15 p. m., and that his client, Mr. Sidney Buchman, should appear before the committee as a witness at that time.

The Committee on Un-American Activities convened in open session in room 226, Old House Office Building, Washington, D. C., at 2:20 p. m. on January 25, 1952, at which time the said Sidney Buchman was called as a witness. The said Sidney Buchman failed to answer to his name and willfully defaulted in his appearance before the said committee, as required by the said subpena, and willfully refused to give such testimony as required under and by virtue of Public Law 601, section 121, subsection (q) (2) of the Seventy-ninth Congress, and under House Resolution 7 of the Eighty-second Congress, in compliance with said subpena.

The record of the proceedings before the committee on Friday, January 25, 1952, is set forth as follows:

"(The Committee on Un-American Activities met, at 2:20 p. m., pursuant to adjournment, in room 226, Old House Office Building, Washington, D. C., Hon. FRANCIS E. WALTER, presiding. Committee members present: Representatives FRANCIS E. WALTER, CLYDE DOYLE, JAMES B. FRAZIER, JR., BERNARD W. KEARNEY, DONALD L. JACKSON, and CHARLES E. POTTER.)

"Mr. WALTER. The committee will come to order. Who is your witness, Mr. Tavenner?

"Mr. TAVENNER. Mr. Sidney Buchman.

"(The witness was not present in the hearing room.)

"Mr. TAVENNER (addressing William A. Wheeler, committee investigator). Will you please look in the corridors and see if counsel is there?

"(After a short interval, R. Lawrence Siegel, attorney for Sidney Buchman, the subpenaed witness, appeared, handing a document to committee counsel, Mr. Tavenner.)

"(There was discussion off the record.)

"Mr. WALTER. It is perfectly apparent that the witness is not going to testify, and the committee will stand adjourned.

"Let the chairman state the reason for it. It is that a rule to show cause why the subpena should not be quashed, vacated, and set aside, and all proceedings thereunder enjoined, has been served on the committee, which means that it is a rule for a temporary injunction, returnable at 3 o'clock this afternoon, United States court, District of Columbia.

"It is a rule against all of the members of the committee, naming them, with Sidney Buchman, the witness who refused to testify in California, as the petitioner.

"(Whereupon, at 2:35 p. m., the committee adjourned sine die.)"

On January 25, 1952, at approximately 5 p. m., Mr. Gerald P. Halpern, attorney for

the said Sidney Buchman, delivered the following letter to counsel for the committee:

PEPPER & SIEGEL,
ATTORNEYS AT LAW,
55 LIBERTY STREET, NEW YORK 5, N. Y.,
*January 25, 1952.*

The Honorable JOHN S. WOOD,
*Chairman, Committee on Un-American Activities of the House of Representatives, Old House Office Building, Washington, D. C.*

SIR: This is in reference to the subpena served by the House Un-American Activities Committee upon Sidney Buchman on January 17, 1952, returnable January 24, 1952, and continued by direction of committee counsel, first to January 25 at 11 a. m., and then to January 25 at 2:15 p. m.

Please be advised that Judge Burnita Shelton Matthews, judge of the United States District Court for the District of Columbia, today at about 3 p. m. set down the application of Sidney Buchman for a restraining order enjoining the operation of the subpena to Wednesday, January 30, 1952, at 12 noon. The court has directed that all papers to be filed by Sidney Buchman on the return date are to be served upon counsel to your committee by Tuesday, January 29, 1952, by 4 p. m.

PEPPER & SIEGEL,
By R. LAWRENCE SIEGEL,
*Attorneys for Sidney Buchman.*
[By hand.]

Upon receipt by counsel for the committee of the foregoing letter addressed to the chairman, counsel for the committee delivered to Mr. Gerald F. Halpern, attorney for the said Sidney Buchman, a letter signed by the chairman continuing the said subpena to January 28, 1952, at 10 a. m., which letter is in the following words and figures:

JANUARY 25, 1952.
Mr. SIDNEY BUCHMAN,
*Care of Pepper & Siegel,
55 Liberty Street, New York City.*

DEAR SIR: Please be advised that your appearance before the committee as a witness under the subpena served upon you January 17, 1952, returnable January 24, 1952, and continued by direction of committee counsel, first to January 25, 1952, at 11 a. m., and then to January 25, 1952, at 2:15 p. m., is continued to Monday, January 28, at 10 a. m., in room 226, House Office Building, Washington, D. C.

The subpena served upon you will be continued in full force and effect until the date mentioned.

Sincerely yours,
JOHN S. WOOD,
*Chairman.*

On January 28, 1952, at 10:10 a. m., the Committee on Un-American Activities met in room 226, Old House Office Building, Washington, D. C., at which time the said Sidney Buchman was again called to appear as a witness before the committee. The said Sidney Buchman failed to answer to his name and willfully defaulted in his appearance before the said committee, as required by the said subpena, and willfully refused to give such testimony as required under and by virtue of Public Law 601, section 121, subsection (q) (2) of the Seventy-ninth Congress, and under House Resolution 7 of the Eighty-second Congress, in compliance with said subpena.

The record of the proceedings before the Committee on Un-American Activities on Monday, January 28, 1952, is set forth as follows:

"(The Committee on Un-American Activities met, pursuant to adjournment, at 10:10 a. m., in room 226, Old House Office Building, Hon. FRANCIS E. WALTER presiding. Committee members present: Representatives FRANCIS E. WALTER, MORGAN M. MOULDER, CLYDE DOYLE, JAMES B. FRAZIER, JR. (appearance as noted in record), HAROLD H. VELDE (appearance as noted in record),

BERNARD W. KEARNEY, DONALD L. JACKSON, and CHARLES E. POTTER).

"Mr. WALTER. The committee will come to order, please. Mr. Tavenner, who is the first witness?

"Mr. TAVENNER. Mr. Sidney Buchman.

"Mr. PEPPER. Mr. Chairman.

"Mr. WALTER. Who are you?

"STATEMENT OF MORTON PEPPER, ATTORNEY, NEW YORK CITY

"Mr. PEPPER. My name is Morton Pepper, and I am a lawyer in New York City. In accordance with the notice that was sent to Judge Wood yesterday and to Mr. Tavenner yesterday, Mr. Buchman has commenced an action in the District Court for the District of Columbia to determine whether the subpena that was issued upon him is a valid subpena.

"In that action he has made a motion for a temporary injunction and, incidentally, for a restraining order.

"Last Friday Judge Matthews informed my partner, when he was before Judge Matthews, that if such an action were commenced, she would set down the motion for a temporary injunction for prompt hearing and specify a date and time, to wit, Wednesday of this week at noon.

"Mr. Buchman, therefore, respectfully requests your committee to continue the subpena to permit the district court to determine the question which has been presented to it; that is, whether the subpena is valid.

"He feels that if he appears here and testifies that will deprive the court of jurisdiction, and, therefore, he ought not to be asked to testify at this time, until the court can determine whether the subpena is a valid one.

"Mr. WALTER. As I understand the situation, you claim that a telegram was sent to the chairman of this committee. I know nothing about any such notice which you as a member of the bar know, and ought to know, is not binding upon the committee.

"But on Friday the application for the rule was filed by your client. As I understand it, the application was filed at 10 o'clock on Friday morning; is that correct?

"Mr. PEPPER. I don't know the time, but I presume that is correct.

"Mr. WALTER. It was filed on Friday morning?

"Mr. PEPPER. Yes, sir.

"Mr. WALTER. At about half past 2 on Friday afternoon, there was served on the counsel for this committee a notice that an application would be filed at 3:30.

"The fact is that at the time that notice was served on counsel for this committee the application had already been filed. I do not think that is being fair with the committee. It is resorting to a very sharp practice, as I understand it.

"When the committee adjourned on Friday, counsel for the committee was instructed to repair to the United States court for the purpose of resisting the application. When he got there he learned that the court had already ruled on the application.

"That being the fact, we are now confronted with this situation: That an application was filed at 10 o'clock on Friday morning for a rule. The application was denied.

"Whether or not your client is going to renew the application, I am not or this committee is not, concerned with. The bare facts in the record disclose that this matter has already been adjudicated.

"Where is your client?

"Mr. PEPPER. May I say a word?

"Mr. WALTER. Where is your client?

"Mr. PEPPER. He is in the vicinity of Washington.

"Mr. WALTER. Well, he is supposed to be here. And, Mr. Counsel, I would like the record to show the validity of the service, and that the subpena was served.

"Mr. PEPPER. May I say one word for the record, sir?

"Mr. WALTER. Yes; go ahead.

"Mr. PEPPER. After the events of Friday related by you, it is my understanding that a letter was directed to this committee, either on Friday or Saturday, I am not sure which, I believe Friday, stating that this new action would be commenced, and telegraphic notice was sent yesterday to Mr. Tavenner as well as to Mr. WOOD informing both of those gentlemen that this action would be commenced this morning, and that there would be an application for a temporary stay pending action, and the papers have been filed.

"Mr. WALTER. About that we know nothing and are not concerned.

"After all, what you propose to do in the future has no bearing at all on the fact that your client is in contempt of this committee by not appearing.

"Mr. PEPPER. Congressman, you put him in this dilemma: That if he appears, he, by his own action, would prevent the district court from determining whether the issuance of the subpena was valid because he will make the question moot.

"And it seems to me that that is an unfair position to put him in. Nothing will be lost by waiting the few days until Judge Matthews determines first the question of a temporary stay, and, second, the question of a preliminary injunction. She will set that down for Wednesday, she said.

"And I——

"Mr. WALTER. That matter has already been passed on. Let me repeat, it was passed on on Friday. And you and your law firm knew full well when you appeared here Friday afternoon with a notice of intention to apply for a rule, that the application had already been filed.

"Mr. PEPPER. But the application——

"Mr. WALTER. It was filed in the morning, and you came here and deliberately attempted to deceive this committee. We had no notice, we had no notice of your intention to file the application in the morning. You went in the court without notifying this committee of your intention and actually presented argument in support of your application for a rule.

"When you came up here at 2:30 in the afternoon, we were not told that this matter had been presented before, and I do not think that you are entitled to any consideration, particularly in view of the fact that when we were in California your client there attempted to resort to things that it was determined were not bona fide. He applied for a continuance on the grounds that he was ill, and he was not ill. And his own doctor said that he was not ill.

"So you produce your client now to testify or we will proceed in accordance with what I think is just and proper with regard to the interests of the United States.

"Mr. PEPPER. May I say that I think it is in the interests of the United States and of justice to permit the court to decide this question in an orderly fashion.

"Mr. WALTER. Well, there is nothing before the court—no court in the land is going to interfere with the orderly processes of government. And one of the most important of those processes is the inquiry authority of the Congress of the United States. And no court is ever going to interfere with that, and the court has already so ruled.

"Mr. PEPPER. You may very well be right, Congressman, but then it seems to me nothing will be lost by waiting 2 days.

"Mr. WALTER. We have been waiting a good many days, and we do not propose to permit your Communist client to make a fool of the Congress of the United States.

"Proceed, Mr. Tavenner.

"Mr. Tavenner, will you raise your right hand?

"Do you solemnly swear that the testimony you are about to give this committee shall be the truth, the whole truth, and nothing but the truth, so help you God?

"Mr. TAVENNER. I do.

"TESTIMONY OF FRANK S. TAVENNER, JR., COMMITTEE COUNSEL

"Mr. TAVENNER. Mr. Chairman, I have before me the subpena issued by the chairman of this committee on January 15, 1952, served upon Mr. Sidney Buchman, requiring his appearance before the committee on Thursday, January 24, 1952, in room 226 of the Old House Office Building, at the hour of 10:30 a. m.

"The subpena shows that it was served on January 17, 1952, at 3:40 p. m., in the law office of Pepper & Siegel, 55 Liberty Street, New York City, in the presence of Pepper and Halpern, members of the Pepper & Siegel firm, room 1807, by Mr. Alvin W. Stokes, an investigator for this committee.

"I desire to offer this subpena in evidence and ask that it be marked 'Exhibit 1.'

"Mr. WALTER. Mark it 'Exhibit 1' and let it be received in evidence.

"(The subpena referred to, marked 'Exhibit No. 1,' is filed herewith.)

"Mr. TAVENNER. Mr. Chairman, several days before the return date of the subpena, Mr. Lawrence Siegel, attorney for Mr. Buchman, called me by long distance from New York, and in the course of his conversation with me on a matter unrelated to the Buchman hearing, asked if the witness, Mr. Sidney Buchman, would be reached on January 24. I advised him that the committee had been delayed in the work as scheduled and it was quite possible that Mr. Buchman would not be reached until the 25th.

"And, in order that Mr. Buchman not be required to wait here unnecessarily, I agreed with his counsel that he appear before the committee on January 25, at 10:30 a. m.

"In the afternoon of January 24, Mr. Halpern, associate counsel with Mr. Siegel, appeared at my office and asked what hour Mr. Buchman would be reached on the 25th, and I advised him that the committee would likely reach the witness at 11 a. m.

"And it was understood that he should be here at that time.

"The testimony of other witnesses on the morning of the 25th consumed far more time than was expected, and I advised Mr. Halpern, who was present during the morning session, that Mr. Buchman would be reached at 2:15 p. m.

"Mr. Buchman was called as a witness when the committee convened in open session at approximately 2:20 p. m., on January 25. He failed to answer to his name and did not appear.

"Mr. WALTER. Up to that time, in your conferences with the witness' lawyers, did they indicate that any steps would be taken to vitiate the service of the subpena?

"Mr. TAVENNER. None whatever.

"Mr. WALTER. All right, proceed.

"Mr. TAVENNER. At 2:25 p. m., Mr. Siegel, counsel for Mr. Sidney Buchman, appeared in the hearing room only long enough to deliver to me in the presence of the committee, a notice that he would, at 3:30 p. m., before Hon. Burnita S. Matthews, judge of the United States District Court for the District of Columbia, apply for the entry of a rule to show cause why the subpena served upon Mr. Buchman to appear before the committee, should not be quashed, vacated, and set aside.

"I learned in the clerk's office of the said court that the application for the rule had been denied.

"Mr. WALTER. When had it been filed?

"Mr. TAVENNER. The information obtained through the United States attorney for the District of Columbia was that it had been filed, or, rather, was that Mr. Siegel had appeared and presented the matter and argued it orally.

"Mr. WALTER. By 'the matter,' you mean the application for the rule to show cause?

"Mr. TAVENNER. Yes, sir.

"Mr. WALTER. So that at the time the notice of the intention to apply was served on you, it had already been argued in court, or had been presented and argued in court?

"Mr. TAVENNER. And argued orally.

"Mr. WALTER. Yes.

"Mr. TAVENNER. In court. And that possibly prior to 1:30, the court had denied the application.

"I endeavored to make an investigation to determine whether or not counsel actually knew of the entry of the notation 'Denied' prior to the service of the paper upon me here.

"Mr. WALTER. He certainly knew that it had already been applied for; that is, the rule.

"Mr. TAVENNER. Yes. But from my investigation he did not actually know that the denial had been endorsed on the application.

"Shortly after learning that the application had been denied, I met Mr. Halpern, associate of Mr. Siegel, and also a Miss Shapiro, another associate in the law firm of Mr. Siegel, both of whom had taken part in one way or another in the handling of these matters in court, and I told Mr. Halpern that I understood that the application had been denied, and in light of that, to have his witness returned to the committee hearing room, or, rather, to appear in the committee hearing room at once.

"I returned to the committee hearing room, and Mr. Halpern appeared.

"Mr. WALTER. Did he have Mr. Buchman with him?

"Mr. TAVENNER. No, sir. The time that I had seen Mr. Halpern was approximately 3:50 p. m. Very near to 5 p. m. Mr. Halpern arrived in the hearing room alone. He produced a letter signed by Mr. Siegel, R. Lawrence Siegel, which included this paragraph:

"'Please be advised that Judge Burnita Shelton Matthews, judge of the United States District Court for the District of Columbia, today at about 3 p. m., set down the application of Sidney Buchman for a restraining order enjoining the operation of the subpena to Wednesday, January 30, 1952, at 12 noon. The court has directed that all papers to be filed by Sidney Buchman on the return date are to be served upon counsel to your committee by Tuesday, January 29, 1952, by 5 p. m.'

"Prior to his appearance here I found it was impractical, after talking to you, to have the committee assemble Friday afternoon, and I got in touch with the chairman of the committee, who was here momentarily, and the chairman of the committee, in your absence notified Mr. Sidney Buchman in writing through his counsel of an extension of his subpena, and that he be required to appear here this morning at 10 a. m. to testify before the committee.

"The notice reads as follows:

"JANUARY 25, 1952.

"Mr. SIDNEY BUCHMAN,
"In care of Pepper & Siegel,
"55 Liberty Street, New York City.

"DEAR SIR: Please be advised that your appearance before the committee as a witness under the subpena served upon you January 17, 1952, returnable January 24, 1952, and continued by direction of committee counsel first to January 25, 1952, at 11 a. m., and then to January 25, 1952, at 2:15 p. m., is continued to Monday, January 28, at 10 a. m., in room 226, House Office Building, Washington, D. C.

"The subpena served upon you will be continued in full force and effect until the date mentioned.

"Sincerely yours,
"JOHN S. WOOD,
"Chairman."

"I have before me a copy of that direction, and endorsed at the bottom of it is:

"'Copy received, Gerald P. Halpern, of Pepper & Siegel, attorney for Mr. Buchman.'

"I desire to offer the notice in evidence and ask that it be marked 'Exhibit 2.'

"Mr. WALTER. Mark it and let it be received.

"(The document referred to, marked 'Exhibit No. 2' is filed herewith.)

"Mr. TAVENNER. On Saturday morning, between 11 and 12 a. m., that is January 26, I called the firm of Mr. Siegel in New York by long distance. And the only one of the attorneys who had been active in the matter whom I could contact by long distance was Miss Shapiro. I advised her that the committee was expecting Mr. Buchman to be present this morning; that this extension of his subpena had been given; and I wanted to know whether or not Mr. Buchman had been personally advised of that fact.

"(Representatives JAMES B. FRAZIER, JR., and HAROLD H. VELDE entered the hearing room at this point.)

"Mr. TAVENNER. Around 2 p. m., Miss Shapiro called me in my office here and advised that Mr. Buchman had been so advised and knew that the committee expected his appearance here this morning.

"I may add that when Mr. Halpern appeared here at around 5 o'clock on the afternoon of January 25, when he presented the letter, and when the notice of extension of time of the subpena was given him, that he indicated to me that he understood that we would do that as a matter of form.

"I advised Mr. Halpern that this was not a matter of form; that the committee was serious about it, and that 't desired to interrogate his client, Mr. Buchman, and Mr. Buchman should be ready to appear here and should be ready to testify.

"Mr. MOULDER. Does the subpena require his presence and appearance before the committee in attendance continuously until dismissed by the committee?

"Mr. TAVENNER. Yes, sir; that is the language of it, I am confident.

"The subpena contains the language:

"'And he is not to depart without leave of said committee.'

"Then I received this morning at 9:18 a. m., just about 12 minutes before the time for this hearing, a telegram under date of January 28, at 5:11—I am not certain whether the 5:11 refers to time, or not. I merely state that the telegram is dated '1952, January 28, a. m. 5:11.'

"And this telegram is as follows:

"FRANK S. TAVENNER, JR., Esq.,
"Room 226, Old House Office Building,
Washington:

"'Please take notice that an application for a preliminary injunction and for a temporary restraining order to refrain and enjoin the operation of the subpena served upon Sidney Buchman on January 17, 1952, and continued by your committee to January 28, 1952, at 10 a. m., will be sought by the undersigned as attorneys for Sidney Buchman on Monday morning, January 28, 1952, before the United States District Court, District of Columbia.

"'SIDNEY BUCHMAN,
"'By PEPPER & SIEGEL,
"'Attorneys for Sidney Buchman,
"'55 Liberty Street, New York 5, N. Y.'

"Mr. WALTER. Is your client prepared to testify, Mr. Pepper?

"Mr. PEPPER. He is not, sir.

"Mr. WALTER. Then, Mr. Tavenner, I direct you to direct the Sergeant at Arms to locate him and place him under arrest and incarcerate him in such a place that it is convenient for the Sergeant at Arms to produce him when we are ready to hear him.

"Let the record show that there are present Messrs. MOULDER, DOYLE, FRAZIER, VELDE, KEARNEY, JACKSON, POTTER, and WALTER.

* * * * *

"(During the testimony of another witness during this day's hearing, Representative FRANCES E. WALTER left the hearing room; Representative MORGAN M. MOULDER assumed the chair.)

"Mr. TAVENNER. Mr. Chairman, it is now 12 minutes past 11 o'clock. I have just been advised that Mr. Sidney Buchman did file a proceeding in the district court this morning; that it was in the nature of a motion for a

declaratory judgment, which would take probably a considerable period of time, to be measured in months, to have a hearing and a decision, and that the papers filed in the court also included the motion for a temporary injunction, or the granting of a restraining order, or some other form of immediate relief which might delay the appearance of the witness Buchman before the committee.

"The court ruled on this phase of the matter, possibly, a half hour or more ago, and denied the application for a temporary injunction or a restraining order, as the case may be, on the ground that the matter had been substantially the same as that disposed of on the morning of January 25.

"It would appear, therefore, that Mr. Sidney Buchman is in a state of continuing contempt of the committee in his failure to appear here.

"I am just advised that while I have been speaking his attorney has come in, one of his counsels has come in the room, and if so I would like to ask him a question.

"Mr. PEPPER. Yes, sir.

"Mr. TAVENNER. You are Mr. Pepper?

"Mr. PEPPER. That is right.

"Mr. TAVENNER. Did you hear what I had to say?

"Mr. PEPPER. I heard only part of it. I heard you say that the motion had been denied on the ground that it was substantially the same as had been disposed of on Friday.

"Mr. TAVENNER. Yes, sir. Do you have any information to the contrary?

"Mr. PEPPER. No; I have no information at all. I am waiting here because I am expecting an order here. We arranged that the counsel who handled the matter in district court would come in when he was finished.

"Mr. KEARNEY. Have any arrangements been made to produce your client before the committee?

"Mr. PEPPER. No, sir.

"Mr. TAVENNER. Where is your client now?

"Mr. PEPPER. My client is in the vicinity of Washington, sir.

"Mr. MOULDER. May I ask one question?

"Mr. PEPPER. Yes.

"Mr. MOULDER. There is no question about service of the subpena; is there? You do acknowledge that your client has been duly served or processed by the committee?

"Mr. PEPPER. It was served in my presence. It was served by arrangement with your agent.

"As a matter of fact, Mr. Buchman had arranged to go to Denver, and either he or we got a telephone call from Washington indicating that a subpena had been issued. He immediately canceled his plans to go to Denver, and my office made the arrangements for him to come to my office so that your agent could serve the subpena. He did not want to dodge the subpena; he did not intend to dodge the subpena. He wanted to make himself amenable to the process of the committee.

"Mr. MOULDER. That is the point that is admitted for the record; that the subpena has been duly served as testified by Mr. Tavenner?

"Mr. PEPPER. There is no question about it.

"Mr. MOULDER. All right.

"Mr. TAVENNER. Will your client, Mr. Sidney Buchman, appear now? If so, we will interrupt this hearing at the moment and proceed with the examination of Mr. Buchman.

"Mr. PEPPER. Mr. Tavenner, I cannot answer that question now. I expect to hear from him, but I do not want to mislead either you or the committee. I believe his answer will be that he will not appear. But if you care to give me time so that he can communicate with me, I will tell him what the situation is, and he will make the determination himself, as he has done in the past.

"Mr. KEARNEY. Mr. Chairman?

"Mr. MOULDER. General KEARNEY.

"Mr. KEARNEY. May I suggest, as far as the time element is concerned, with reference to the witness, Sidney Buchman, that I do not see the necessity for the committee to give Mr. Buchman any further time. He is under direction of the subpena to appear before this committee and was ordered to appear here this morning. I think that the direction of the chairman, Mr. WALTER, should be carried out, that all attempts be made to locate the witness and place him under arrest.

"Mr. JACKSON. May I ask a question?

"Mr. MOULDER. Mr. JACKSON.

"Mr. JACKSON. Have the instructions of the chairman been implemented, or are they in the process of being carried out?

"Mr. TAVENNER. No, sir. In my view of it, it would probably take a resolution of the Congress to do it. I would think so.

"Mr. JACKSON. I would certainly say that the committee should proceed at the earliest possible moment to place the matter before the House of Representatives.

"Mr. PEPPER. May I know what the direction of the committee is; whether you want to allow the witness time or not?

"Mr. TAVENNER. Your witness is certainly in contempt now, and I think the next move is up to him."

The foregoing willful default by the said Sidney Buchman in his appearance before the said Committee on Un-American Activities on the 25th day of January 1952 and on the 28th day of January 1952 as required by the said subpena, and the willful refusal by the said Sidney Buchman to give such testimony as required under and by virtue of Public Law 601, section 121, subsection (q) (2) of the Seventy-ninth Congress, and under House Resolution 7 of the Eighty-second Congress, in compliance with said subpena, are violations of the subpena served upon him by the Committee on Un-American Activities, deprived the committee of necessary and pertinent testimony regarding matters which the said committee was instructed by the said public law and House resolution to investigate, and places the said witness, Sidney Buchman, in contempt of the House of Representatives of the United States.

Mr. WOOD of Georgia. Mr. Speaker, I offer a privileged resolution (H. Res. 517) and ask for its immediate consideration.

The Clerk read the resolution, as follows:

*Resolved,* That the Speaker of the House of Representatives certify the report of the Committee on Un-American Activities of the House of Representatives as to the willful default of Sidney Buchman in failing to appear before the Committee on Un-American Activities in response to a subpena duly served upon him, together with all the facts in connection therewith, under seal of the House of Representatives, to the United States Attorney for the District of Columbia, to the end that the said Sidney Buchman may be proceeded against in the manner and form provided by law.

Mr. WOOD of Georgia. Mr. Speaker, under the rules and the parliamentary procedure governing debate on this character of resolution, I yield 30 minutes to the gentleman from Illinois [Mr. VELDE], the ranking minority member of our committee.

Mr. Speaker, I now yield such time as he may desire to the gentleman from Pennsylvania [Mr. WALTER], who served as subcommittee chairman when the witness appeared before the subcommittee in California, and who also served as chairman of the committee when Sidney Buchman failed to appear before it in

response to the committee's subpena duly served upon him.

Mr. WALTER. Mr. Speaker, the proceedings now under consideration relate to the most outrageous contempt of Congress it is possible to conceive of. The witness Sidney Buchman, guided by practitioners whose activities ought to be looked into by the bar associations of which they are members, indicated from the inception of his testimony in California his complete contempt for the orderly processes of this Republic.

Mr. Buchman testified quite frankly that he was a Communist. The committee know that; as a matter of fact, we had this Communist Party membership card in our possession. But when he was asked questions that would have enabled us to report to the Congress of the United States steps that could have been taken and can be taken in order to make the unwary cognizant of the insidious movement of which this man admittedly was a part, he refused to testify.

He could not have justified his refusal to testify on constitutional grounds because, having admitted that he was a Communist, then of course the doors these people close behind them so frequently were not available to him. He knew that. He was aware of that. When he got to the point where he realized he was in contempt of the Congress, he called to the committee's attention the fact that a quorum was not present. Subsequently, other witnesses testified before your Committee on Un-American Activities. As a result of the testimony adduced from these witnesses, we concluded it was necessary to call Mr. Buchman again to make inquiry into activities that we knew he was engaged in. Mr. Buchman was served with a subpena. Every consideration was shown him. His lawyers were advised that it was not necessary for him to remain in the committee room for the balance of a day—or in Washington—he was not in the committee room at any time. His presence was arranged for after consultation between committee counsel and his lawyer at a time convenient to him. He did not appear. When he was called—his lawyer, his legal representative, I will not call him a lawyer—his legal representative handed to the committee, a paper which purported to be a rule to show cause why a restraining order should not be issued. At the time that device was resorted to, his legal representative had already presented the matter to the United States court. The notice was to the effect that the application for the rule to show cause would be made at 3 o'clock. The application was made at 10 o'clock in the morning without our committee ever being accorded the courtesy at least of being notified of this application. It not only had been presented at 10 o'clock in the morning, but at the time the paper was dumped on committee counsel's desk, the court had ruled adversely.

Mr. KEARNEY. Mr. Speaker, will the gentleman yield?

Mr. WALTER. I yield to the distinguished gentleman from New York.

Mr. KEARNEY. And at the time that the order to show cause was served upon the committee, the gentleman from Pennsylvania having stated that the

motion had already been argued in Federal court—at the time the order was served upon the committee, counsel for the witness knew that the order had been argued and that the decision had been made by the Federal court.

Mr. WALTER. Oh, I will not be so uncharitable as to accuse him of anything of that sort. But when the order was handed down I think it is safe to assume that he knew what was in the order.

Mr. RANKIN. I would like to ask the gentleman if it would not be in order for the committee to bring in a resolution to disbar that Communist lawyer from practicing in the Federal courts?

Mr. WALTER. I do not think such a resolution would have any force or effect; that is, of course, a matter for the courts.

Mr. RANKIN. I rather think it would. I dare say that if this Congress passed a resolution of that kind, every judge in the country would recognize it and would abide by it.

Mr. WALTER. Yes; but the judge himself, on his own motion, could not disbar anybody. I am sorry, I must decline to yield further to anyone.

Mr. RANKIN. Well, that is what ought to be done.

Mr. WALTER. A subsequent time for a hearing was fixed. The witness and his legal representatives were notified, and at the appointed time having been served by a process server with a valid subpena, the witness failed to appear. I could not conceive of a clearer case of contempt. I ask you to vote favorably on this resolution.

Mr. McCORMACK. Mr. Speaker, will the gentleman yield?

Mr. WALTER. I yield to the gentleman from Massachusetts.

Mr. McCORMACK. As I understand, when this rule was presented to the committee, it had already been argued, and it was later found to have been denied by the court.

Mr. WALTER. It was not a rule. It was a notice of an application for a rule to show cause. The committee was notified that the application would be made at 3 o'clock in the afternoon when actually it was made at 10 o'clock in the morning, and the committee was never notified that the application was to be made.

Mr. McCORMACK. And it was denied?

Mr. WALTER. It was argued and denied.

Mr. McCORMACK. And the committee was not informed about the fact that it had been argued and denied. No information was given to the committee which would tend to create an impression on the part of the committee, which would bring a conflict between the committee and the court?

Mr. WALTER. On the contrary, a deliberate attempt was made to deceive the committee.

Mr. McCORMACK. That is what I wanted to bring out.

Mr. WALTER. In order to excuse the fact that this man was not in Washington.

Mr. McCORMACK. And that is in addition to the other contempt.

Mr. WALTER. Of course it is.

Mr. CELLER. Mr. Speaker, will the gentleman yield?

Mr. WALTER. I yield to the gentleman from New York.

Mr. CELLER. Is it not true also that the court would have no power to prevent a committee of the House to act?

Mr. WALTER. Well, the Court recognized the limits of its authority and power to interfere with another branch of Government, and very properly decided that this case was without merit, and dismissed it.

Mr. VELDE. Mr. Speaker, I yield myself such time as I may require.

Mr. Speaker, I am in favor of the resolution to cite Sidney Buchman for contempt of Congress, and hope it is unanimously adopted by the House of Representatives.

I did not choose to become a member of the subcommittee which held hearings in Los Angeles at which Sidney Buchman previously testified, and, therefore, am not familiar with the proceedings there with the exception of what I read in the record. It appears to me, however, that notwithstanding the Hollywood hearings, Sidney Buchman is certainly in contempt of this Congress. No witness can be put in jeopardy before a committee of Congress as he can before a court of law, therefore, Sidney Buchman had no grounds whatsoever for refusing now to come before the House Un-American Activities Committee and testify. Even if he were asked the identical questions, and had to give the identical answers here as he did in Hollywood his duty as an American citizen to appear when called upon by a legally issued subpena of this Congress is crystal clear. Sidney Buchman has violated that obligation he owes to the United States of America.

While there is no desire on my part at least to set Buchman up as an example, it appears to me that the House must be in full accord on this citation in order to establish our authority in the matter of congressional hearings. We have had several other witnesses appear before the committee who admitted their Communist affiliations and then attempted to evade questions regarding their association with other members of the Communist Party, and likewise declined to give the names of other Communist Party members in their particular cell or group. The committee has given considerable thought to the question as to whether a person who admits his past Communist affiliation should be obliged to give the names of his Communist associates. Certainly no person likes to betray a friend and we all hate to be squealers or stool pigeons; nevertheless if the Committee on Un-American Activities is to execute its duty and obligation to the American people, I feel that we must do all in our power to obtain the confessions of former Communists and subversives, not only as to their own membership in subversive organizations but also the membership of their associates.

While there are a lot of legal technicalities involved in this particular citation, the main reason Mr. Buchman does not want to testify again is because he either is afraid of retaliation from some of his former Communist associates

or he fears the consequences of further exposing his own manipulations while a member of the Communist Party. From the report of the proceedings thus far, it appears that Sidney Buchman will not, even if he decides to appear before our committee, cooperate with the committee—but this is a matter of little importance compared to the importance of this case as a precedent for future witnesses before any committee of Congress. Should this contempt citation be denied by the House of Representatives today, the witnesses who are subpenaed in the future before any congressional committee will most certainly try to escape giving their testimony. Mr. Buchman, through his attorney, appealed to the judicial brand of our Government for relief in this particular case. The judicial branch of Government wisely decided that he had no standing in a court of law with his particular plea. It is therefore incumbent upon us, as Members of Congress, to put in motion the machinery of the law which we have available and pass this resolution for contempt of Congress. I sincerely hope it is adopted unanimously.

Mr. CRAWFORD. Mr. Speaker, will the gentleman yield?

Mr. VELDE. I yield.

Mr. CRAWFORD. While it may be a little bit tough on Mr. Buchman to face this kind of resolution, so far as I personally am concerned as long as young men are inducted into the military service to fight Communists all over the world, and so long as the taxpayers of this country are required to spend twenty-five, fifty, seventy-five, or one hundred billions in tax funds fighting this bunch, I will have no hesitancy in voting for resolutions of this kind, whether it be my son, my brother, or some other fellow. I just want to get that in the RECORD. If we had no taxation, if we were not fighting, if our people were not spilling their blood all over the world, then it would be a different proposition; but we might just as well come down to the crux of the situation and face it. I am ready to vote.

Mr. VELDE. I thank the gentleman from Michigan.

Mr. FULTON. Mr. Speaker, will the gentleman yield?

Mr. VELDE. I yield.

Mr. FULTON. Can the gentleman assure the House that regardless of the fact that we disagree with this man's views, and disagree strongly, he has been given every right to which he was entitled and has been treated justly by this committee and the Congress?

Mr. VELDE. I certainly agree with the gentleman from Pennsylvania. I may say that not only was he given every opportunity in Hollywood, but he has also been given every opportunity to appear here. As a matter of fact, I think the committee leaned over backward to favor him and see that his rights were protected.

Mr. KEARNEY. Mr. Speaker, will the gentleman yield?

Mr. VELDE. I yield.

Mr. KEARNEY. Supplementing what the gentleman from Illinois just stated, I will also add that the committee did bend over backward to give Mr. Buchman and his attorneys all the leeway possible. He appeared and testified be-

fore the committee at his own convenience. But I want to call the attention of the House to the fact that during the time the arguments are going on between counsel for the committee, the committee, and attorneys for the witness, that at one phase an attorney representing the witness, from the city of New York, I believe, told the committee in substance that while he, the attorney for the witness, would recommend to the witness that he obey the directions of the subpena, Mr. Buchman himself stated in words or in substance that regardless of any subpena he would not appear before the Committee on Un-American Activities.

Mr. VELDE. I am very glad the gentleman brought that point out.

Mr. WALTER. Mr. Speaker, will the gentleman yield?

Mr. VELDE. I yield to the gentleman from Pennsylvania.

Mr. WALTER. I neglected to call to the attention of the House the fact that when Buchman was subpenaed in California and failed to appear, his lawyer presented himself to the committee and said the man was ill; whereupon I was compelled to get the Public Health Service doctor who examined Mr. Buchman. The Public Health Service doctor reported that he was able to testify. More than that, he brought a statement from Mr. Buchman's own doctor to the effect that Buchman was not ill. Therefore we postponed the hearing for half a day while we were ascertaining whether or not the man could appear and whether or not his appearance would be injurious to his health.

Mr. VELDE. I thank the gentleman for bringing that point out. I did not know that that was true. It just demonstrates more clearly that Buchman was given every opportunity, including the medical examination.

Mr. JONAS. Mr. Speaker, will the gentleman yield?

Mr. VELDE. I yield.

Mr. JONAS. I am not quite clear on the picture as to the matter that has been presented to the committee, but I take it that this man Buchman was before the committee, was sworn and testified and then asked to come back again and refused to return.

Mr. VELDE. That is right. He testified that he was a member of the Communist Party, as I understand, and then refused to name any of his associates.

Mr. JONAS. I understand from the report made by the distinguished gentleman from Pennsylvania that this man confessed he was a Communist, or stated so under oath.

Mr. VELDE. He made a statement under oath before the subcommittee.

Mr. JONAS. I want to say by way of explanation that I think the gentleman from Illinois, my very close personal friend, and I have had an experience recently which brought this whole picture home to us when we were up for nomination to our present position in Congress. For the first time in the State of Illinois under our legislative act we had to comply with the law which says that you have to sign an affidavit in which you state you have never been affiliated with the Communist Party, that you are not a member of the Com-

munist Party, that you are not engaged either directly or indirectly, or associated with, any associations, societies, or organizations that have for their objective the overthrow of the Government of the United States. It seems to me if the gentleman and I have to comply with that law there should not be much hesitancy in taking an individual like this and teaching him what the laws and the Constitution of the United States mean at this time.

Mr. VELDE. Yes. I might add that I am sure all of the delegation from Illinois were very happy to sign that oath when they came up for reelection.

Mr. WOOD of Georgia. Mr. Speaker, I have no further requests for time.

Mr. VELDE. Mr. Speaker, I yield 5 minutes to the gentleman from California [Mr. JACKSON].

Mr. JACKSON of California. Mr. Speaker, several Members have asked me during the period of time that this resolution has been under consideration who Mr. Sidney Buchman is and what his relationship was with the international conspiracy which we know today to be that conspiracy which parades under the name of the Communist Party.

If Sidney Buchman's name does not ring a familiar bell here on the floor of the House suffice it to say that he is very well known in the moving-picture industry in Hollywood, a great industry against which there was a determined attack launched by the Communist Party. Mr. Buchman is a writer and producer. He is not a small fry. It is very likely that during the period of his membership in the Communist Party he acquired more extensive information than did the average member in a Communist Party branch or section.

As the gentleman from Pennsylvania [Mr. WALTER] has pointed out, there developed following Mr. Buchman's original appearance before the committee new information which the committee felt should be explored and about which questions should be asked Mr. Buchman. The very essence of the Communist conspiracy is the membership of the conspiracy. The acts and deeds of a conspiracy are the reflection of the people who constitute that conspiracy. Mr. Buchman has refused to cooperate with the committee in this regard.

I am convinced, and I am sure that every member of the committee is convinced, that Mr. Buchman has important testimony which he could give to the Congress and to the people of the United States with respect to the operations of the Communist Party and the nature and extent of the Communist infiltration in Hollywood. It was for this purpose that he was called again before the committee and it was in the course of this proper and legal inquiry that he refused to answer a subpena from the House Committee on Un-American Activities.

Mr. POTTER. Mr. Speaker, will the gentleman yield?

Mr. JACKSON of California. I yield to the gentleman from Michigan.

Mr. POTTER. Does the gentleman have the same view of Sidney Buchman as I have? After attempts were made by the Committee on Un-American Activities to afford him the opportunity of ap-

pearing before the committee after he had been cited as a member of the Communist Party, he did appear in Hollywood and he was in contempt there by refusing to explore the area of his membership in the Communist Party with the committee. He brought up the question of no quorum. He was definitely in contempt of Congress by his refusal to carry out the subpena that was issued him to appear in Washington.

The action of Sidney Buchman leaves you with the impression that, because he was a producer and a man of great renown in the motion-picture industry, he was above the law. Here was a man who set himself up to be above the law established for the every-day common citizen. That was the impression I received from the actions of Sidney Buchman both in Hollywood and here in Washington.

Mr. JACKSON of California. I agree with the gentleman. Certainly Mr. Buchman's actions before the committee have consisted of every effort known to man to stay out of the witness chair.

Mr. POTTER. He was not only in contempt of the Congress but he has insulted the American people.

Mr. JACKSON of California. I agree with the gentleman.

Mr. BELCHER. Mr. Speaker, will the gentleman yield?

Mr. JACKSON of California. I yield to the gentleman from Oklahoma.

Mr. BELCHER. Is he still writing and producing plays at this time?

Mr. JACKSON of California. I question very much whether Mr. Buchman could get a day's work in Hollywood today if his life depended upon it.

Mr. KEATING. Mr. Speaker, will the gentleman yield?

Mr. JACKSON of California. I yield to the gentleman from New York.

Mr. KEATING. Did this same counsel, Mr. Pepper, appear for him out in California?

Mr. JACKSON of California. I would have to ask the committee. I understand that he did not.

Mr. WALTER. Mr. Speaker, will the gentleman yield?

Mr. JACKSON of California. I yield to the gentleman from Pennsylvania.

Mr. WALTER. The same law firm represented him in California that represents him here.

Mr. KEATING. It seems to me that the actions of some of these members of the bar that represent these people are a reflection on the legal profession. They arrange and scheme up these various maneuvers for these people to go through. I wish there were something that could be done about it with the members of the bar. I hope your committee will explore that angle. I think they are a disgrace to the bar.

Mr. JACKSON of California. I agree with the gentleman. There is a lot of room for house cleaning, and certainly the legal profession should explore the situation.

Mr. RANKIN. Mr. Speaker, will the gentleman yield?

Mr. JACKSON of California. I yield to the gentleman from Mississippi.

Mr. RANKIN. I renew my statement that by all means there should be a resolution to disbar that lawyer from

practicing in the Federal courts, and it should be passed on to the American Bar Association and to the courts of the country. This is just a symptom of the real disease. Never in history has there been such Communist infiltration into every phase of American life as there is today, and the whole scheme is to destroy the American way of life, the American Government, and our Christian civilization. The sooner the Congress, both Houses, wakes up to that fact, and begins to expose and drive this gang from public office and from the various professions, the better off the American people are going to be.

Mr. JACKSON of California. I thank the gentleman.

I think it should be stated very clearly that the comittee as such has made no charges against the attorney, except that of possible unethical conduct. I believe the word "Communist" was used in connection with the attorney. We did not imply that the Buchman attorneys are members of the Communist Party, or have any connection with it.

Mr. WALTER. Mr. Speaker, will the gentleman yield further?

Mr. JACKSON of California. I yield.

Mr. WALTER. Is it not a fact that the American Bar Association has appointed a committee and for some months has been studying the problem of situations of this sort, and that it has determined to take positive action against members of the bar that they feel are not acting properly?

Mr. JACKSON of California. My understanding is that the committee so appointed has already passed a resolution calling upon the various subdivisions of the American Bar Association to purge its membership of Communists.

Mr. RANKIN. But a resolution from the Congress of the United States would be very encouraging to those patriotic members of the American Bar Association.

Mr. WOOD of Georgia. Mr. Speaker, I move the previous question on the resolution.

The previous question was ordered.

The SPEAKER. The question is on the resolution.

Mr. WOOD of Georgia. On that, Mr. Speaker, I demand the yeas and nays.

The yeas and nays were ordered.

The question was taken; and there were—yeas 316, nays 0, not voting 115, as follows:

[Roll No. 5]

YEAS—316

| | | |
|---|---|---|
| Aandahl | Beckworth | Bryson |
| Abernethy | Belcher | Budge |
| Adair | Bender | Burdick |
| Addonizio | Bennett, Fla. | Burleson |
| Albert | Bennett, Mich. | Burton |
| Allen, Calif. | Bentsen | Bushey |
| Allen, La. | Berry | Burh |
| Andersen, | Betts | Butler |
| H. Carl | Bishop | Camp |
| Andresen, | Blackney | Carlyle |
| August H. | Boggs, Del. | Carnahan |
| Andrews | Bolling | Carrigg |
| Angell | Bolton | Chatham |
| Arends | Bonner | Chelf |
| Aspinall | Bosone | Church |
| Bailey | Bow | Clevenger |
| Baker | Boykin | Cole, Kans. |
| Bakewell | Bramblett | Cole, N. Y. |
| Baring | Bray | Colmer |
| Bates, Ky. | Brehm | Cooley |
| Bates, Mass. | Brooks | Cooper |
| Battle | Brown, Ga. | Corbett |
| Beamer | Brown, Ohio | Cotton |

| | | |
|---|---|---|
| Coudert | Jackson, Calif. | Rains |
| Cox | Jackson, Wash. | Ramsay |
| Crawford | Jarman | Rankin |
| Crosser | Javits | Redden |
| Crumpacker | Jenison | Reed, Ill. |
| Cunningham | Jenkins | Reed, N. Y. |
| Curtis, Mo. | Jensen | Rees, Kans. |
| Dague | Jonas | Regan |
| Davis, Tenn. | Jones, Ala. | Rhodes |
| Davis, Wis. | Jones, Mo. | Ribicoff |
| Deane | Jones, | Richhman |
| DeGraffenried | Hamilton C. | Riley |
| Dempsey | Jones, | Rivers |
| Denny | Woodrow W. | Roberts |
| Denton | Judd | Robeson |
| Devereux | Karsten, Mo. | Rodino |
| D'Ewart | Kearney | Rogers, Colo. |
| Dolliver | Kearns | Rogers, Fla. |
| Dondero | Keating | Rogers, Mass. |
| Dorn | Kee | Rogers, Tex. |
| Doughton | Kelly, N. Y. | Roosevelt |
| Doyle | Kerr | Sabath |
| Durham | Kersten, Wis. | Sadlak |
| Eaton | Kilburn | St. George |
| Elliott | Kilday | Saylor |
| Elston | Kirwan | Schenck |
| Evins | Lane | Schwabe |
| Fallon | Lanham | Scott, Hardie |
| Feighan | LeCompte | Scott, |
| Fenton | Lesinski | Hugh D., Jr. |
| Fisher | Lind | Scrivner |
| Flood | Lovre | Scudder |
| Fogarty | Lucas | Secrest |
| Forand | Lyle | Seely-Brown |
| Ford | McConnell | Shafer |
| Forrester | McCormack | Sheehan |
| Frazier | McDonough | Short |
| Fulton | McGrath | Simpson, Ill. |
| Furcolo | McGregor | Sittler |
| Gathings | McGuire | Smith, Kans. |
| Golden | McIntire | Smith, Miss. |
| Goodwin | McMillan | Smith, Va. |
| Gordon | McMullen | Smith, Wis. |
| Gore | McVey | Spence |
| Graham | Machrowicz | Springer |
| Granahan | Mack, Wash. | Stockman |
| Granger | Madden | Sutton |
| Grant | Magee | Taber |
| Green | Mahon | Tackett |
| Greenwood | Mansfield | Ta'le |
| Gregory | Marshall | Taylor |
| Gross | Martin, Iowa | Teague |
| Hagen | Martin, Mass. | Thomas |
| Hale | Meader | Thompson, |
| Hall, | Merrow | Mich. |
| Leonard W. | Miller, Calif. | Thompson, Tex. |
| Halleck | Mills | Thornberry |
| Hand | Mitchell | Tollefson |
| Harden | Morgan | Trimble |
| Hardy | Morris | Vail |
| Harris | Multer | Van Pelt |
| Harrison, Va. | Mumma | Van Zandt |
| Harvey | Murdock | Velde |
| Havenner | Murphy | Vinson |
| Hays, Ark. | Murray, Tenn. | Vursell |
| Hébert | Nelson | Walter |
| Hedrick | Nicholson | Weichel |
| Heffernan | Norblad | Werdel |
| Heller | Norrell | Wharton |
| Herlong | O'Brien, Ill. | Wheeler |
| Heselton | O'Hara | Whitten |
| Hess | O'Konski | Widnall |
| Hill | Ostertag | Wigglesworth |
| Hillings | Paiman | Williams, Miss. |
| Hinshaw | Patten | Willis |
| Hoeven | Patterson | Wilson, Tex. |
| Hoffman, Ill. | Perkins | Winstead |
| Holifield | Poage | Withrow |
| Holmes | Potter | Wolverton |
| Hope | Poulson | Wood, Ga. |
| Horan | Preston | Wood, Idaho |
| Howell | Price | Woodruff |
| Hull | Priest | Yorty |
| Hunter | Rabaut | Zablocki |
| Ikard | Radwan | |

NOT VOTING—115

| | | |
|---|---|---|
| Abbitt | Cannon | Fernandez |
| Allen, Ill. | Case | Fine |
| Anderson, Calif. | Celler | Fugate |
| Anfuso | Chenoweth | Gamble |
| Armstrong | Chiperfield | Garmatz |
| Auchincloss | Chudoff | Gary |
| Ayres | Clemente | Gavin |
| Barden | Combs | George |
| Barrett | Curtis, Nebr. | Gwinn |
| Beall | Davis, Ga. | Hall, |
| Blatnik | Dawson | Edwin Arthur |
| Boggs, La. | Delaney. | Harrison, Nebr. |
| Brownson | Dingell | Harrison, Wyo. |
| Buchanan | Dollinger | Hart |
| Buckley | Donohue | Hays, Ohio |
| Buffett | Donovan | Herter |
| Burnside | Eberharter | Hoffman, Mich. |
| Byrnes | Ellsworth | Irving |
| Canfield | Engle | James |

Johnson    Morano    Sasscer
Kean    Morrison    Shelley
Kelley, Pa.    Morton    Sheppard
Kennedy    Moulder    Sieminski
Keogh    Murray, Wis.    Sikes
King, Calif.    O'Brien, Mich.    Simpson, Pa.
King, Pa.    O'Neill    Staggers
Klein    Osmers    Stanley
Kluczynski    O'Toole    Steed
Lantaff    Passman    Stigler
Larcade    Phillbin    Vorys
Latham    Phillips    Watts
McCarthy    Pickett    Welch
McCulloch    Polk    Wickersham
McKinnon    Powell    Wier
Mack, Ill.    Prouty    Williams, N. Y.
Mason    Reams    Wilson, Ind.
Miller, Md.    Reece, Tenn.    Wolcott
Miller, Nebr.    Richards    Yates
Miller, N. Y.    Rooney

So the resolution was agreed to.

The Clerk announced the following pairs:

Mr. Allen of Illinois with Mr. Kelley of Pennsylvania.

Mr. Auchincloss with Mr. Powell.

Mr. Beall with Mr. Welch.

Mr. Brownson with Mr. King of California.

Mr. Buffett with Mr. Stigler.

Mr. Chiperfield with Mr. Engle.

Mr. Canfield with Mr. Gary.

Mr. Ellsworth with Mr. Fine.

Mr. Curtis of Nebraska with Mr. Chudoff.

Mr. Chenoweth with Mr. McKinnon.

Mr. Case with Mr. O'Toole.

Mr. Gwinn with Mr. Keogh.

Mr. Edwin Arthur Hall with Mr. Hart.

Mr. Gamble with Mr. Garmatz.

Mr. Gavin with Mr. Clemente.

Mr. George with Mr. Abbitt.

Mr. Harrison of Wyoming with Mrs. Buchanan.

Mr. Herter with Mr. Barden.

Mr. Hoffman of Michigan with Mr. Passman.

Mr. James with Mr. O'Neill.

Mr. Kean with Mr. Anfuso.

Mr. Latham with Mr. Moulder.

Mr. McCulloch with Mr. Klein.

Mr. Mason with Mr. Barrett.

Mr. Osmers with Mr. Kluczynski.

Mr. Phillips with Mr. Larcade.

Mr. Reece of Tennessee with Mr. Blatnik.

Mr. Prouty with Mr. Morrison.

Mr. Simpson of Pennsylvania with Mr. Rooney.

Mr. Vorys with Mr. Polk.

Mr. Wolcott with Mr. Richards.

Mr. Williams of New York with Mr. Sheppard.

Mr. Anderson of California with Mr. Stanley.

Mr. Wilson of Indiana with Mr. Pickett.

Mr. Miller of Nebraska with Mr. Sikes.

Mr. Armstrong with Mr. Donohue.

Mr. Ayres with Mr. Davis of Georgia.

Mr. Byrnes with Mr. Hays of Ohio.

Mr. Harrison of Nebraska with Mr. Philbin.

Mr. Johnson with Mr. Celler.

Mr. Murray of Wisconsin with Mr. Dollinger.

The result of the vote was announced as above recorded.

A motion to reconsider was laid on the table.

CALENDAR WEDNESDAY

Mr. McCORMACK. Mr. Speaker, I ask unanimous consent that the business in order on Calendar Wednesday of this week be dispensed with.

The SPEAKER. Is there objection to the request of the gentleman from Massachusetts?

There was no objection.

READING OF WASHINGTON'S FAREWELL ADDRESS

Mr. McCORMACK. Mr. Speaker, I ask unanimous consent that on Friday,

February 22, 1952, Washington's Farewell Address may be read by a Member to be designated by the Speaker.

The SPEAKER. Is there objection to the request of the gentleman from Massachusetts?

There was no objection.

## MISS JERRY-LYNN RAINWATER WINS NATIONAL CONTEST

Mr. ARMSTRONG. Mr. Speaker, I ask unanimous consent to address the House for 1 minute and to revise and extend my remarks.

The SPEAKER. Is there objection to the request of the gentleman from Missouri?

There was no objection.

Mr. ARMSTRONG. Mr. Speaker, the National Association of Real Estate Boards is to be congratulated upon conducting each year an essay contest for high-school students, on the subject of the Bill of Rights.

For the year 1951, first prize in this contest was awarded to Miss Jerry-Lynn Rainwater, a senior in Greenwood High School, of Springfield, Mo., for her essay What the Bill of Rights Means to Me.

Out of thousands of splendid essays on the subject of the value and importance of the Bill of Rights as a part of our great American heritage, Miss Rainwater's contribution was given the highest honors. As a result, she is the guest of the National Association of Real Estate Boards here in Washington at the present time.

To honor this splendid representative of patriotic American youth, I have been joined by all my colleagues in the Senate and the House of Representatives in this Congress in presenting to her a plaque, which reads as follows:

To MISS JERRY-LYNN RAINWATER, National Essay Winner, 1951:

On behalf of and joined by the entire Missouri delegation in Congress I congratulate you heartily upon the high honor of winning first prize in the essay contest sponsored by the National Association of Real Estate Boards on the subject, What the Bill of Rights Means to Me. In this achievement you reflect honor upon all youth of Missouri and the Nation.

Senator JAMES P. KEM; Senator THOMAS C. HENNINGS, Jr.; Hon. O. K. ARMSTRONG; Hon. CLAUDE BAKEWELL; Hon. RICHARD BOLLING; Hon. CLARENCE CANNON; Hon. A. S. J. CARNAHAN; Hon. THOMAS B. CURTIS; Hon. LEONARD IRVING; Hon. PAUL JONES; Hon. FRANK M. KARSTEN; Hon. CLARE MAGEE; Hon. MORGAN M. MOULDER; Hon. DEWEY SHORT; Hon. PHIL J. WELCH.

Mr. Speaker, I hope everyone will take time to read this excellent essay by Miss Rainwater, who has expressed in such a fine manner what the Bill of Rights should mean to everyone.

I am including her essay as part of my remarks.

WHAT THE BILL OF RIGHTS MEANS TO ME
(By Miss Jerry-Lynn Rainwater, Greenwood High School, Springfield, Mo.)

Right now I am in a classroom in an average school, located in an average American city. On the wall hangs an American flag surrounded by a great many flags of other nations. The class is studying the problems that face America today, both foreign and

XCVIII—53

within her jurisdiction. Our teacher is not a Government official. She has never pledged loyalty to any political party. She enjoys her personal opinions and beliefs but presents the facts to us in an unbiased manner, leaving us free to form our own opinions. Our text is published by an independent concern, without Government censorship; our reference materials cover all types of newspapers, magazines, and other sources of information. To me, this is what the Bill of Rights offers.

Yesterday in class we viewed a historical movie, revealing uncensored facts produced by an independent company. Today we listened to a news commentator over the radio. He disagreed with some of our Government's policies, but he exercised his right to broadcast his views.

By my own choice, I am attending this school and this class. Neither was compulsory. Seated next to me is a Jew. The chair next to him is vacant. The usual occupant is absent because, according to his Catholic religion, it is a holy day. No questions were asked, no demands were made. I visited his church once, though I am a Protestant. No one tried to prohibit my actions. That's what the Bill of Rights means to me.

My father is attending a political meeting of a party that is not in power. Views and ideas will be discussed openly and freely. It is not a secret meeting; the door is closed to no one, regardless of his or her belief. Some day I shall attend similar meetings, for my right to do so is guaranteed by the Bill of Rights.

During my life as an American citizen, I shall harbor no doubt that my home is free from intrusion by Government officials, or their agents; they, as all others, must respect my rights. My property cannot be confiscated by the Government. Nor shall any member of my family be taken to prison without reason and proper proceedings. Our life is ours to live, free and unmolested. Our liberty cannot be taken from us unless we abuse it. Even then we have the guaranty, through the Bill of Rights, to a fair trial by an unbiased group of our equals.

As I go about, I do not live in fear for my life or liberty; for in America everyone is free to live according to the dictates of his own conscience. This is what the Bill of Rights offers and guarantees to me and to every American, regardless of race, color, or creed. It is a heritage worth protecting—even unto death.

## ECONOMY ACT OF 1952

Mr. ROOSEVELT. Mr. Speaker, I ask unanimous consent to extend my remarks at this point in the RECORD.

The SPEAKER. Is there objection to the request of the gentleman from New York?

There was no objection.

Mr. ROOSEVELT. Mr. Speaker, I have today introduced the Economy Act of 1952, which I am pleased to say is being simultaneously introduced in the Senate by Senators HUBERT HUMPHREY, HERBERT LEHMAN, BLAIR MOODY, WILLIAM BENTON, and JAMES MURRAY.

The purpose of this bill is to put us on the road toward genuine economy by placing the Government's antiquated budget system on a businesslike basis. If we limp along under the burden of present budgetary practices, it will be impossible for anyone—the Congress, Government officials, or the taxpayers—to judge intelligently the efficiency of existing Government programs, proposed expansion in existing programs, and proposals for new programs.

We, the sponsors of this legislation, therefore, hope that all parties, groups and factions will recognize the necessity for rigorous economy and join in the effort to streamline our budget machinery.

Our crusade for genuine economy must be accompanied by a fearless exposé of the advocates of false economy.

There are those in the country who for many years have used the economy cry as a smoke screen behind which to undermine progressive legislation needed for the welfare of the people of America. They are at work today also.

There are those in the country who have found that a call for economy is a useful device to cripple the programs vital to our military strength and that of our allies. They, too, are at work today.

We must, therefore, be on guard against deliberate attempts to sow confusion and spread misinformation on the budget. We must spare no pains in the effort to find out exactly what is called for in the President's budget. A major purpose of the Economy Act of 1952 is to help Congress and the people find out what the budget really calls for and to provide modern procedures for its calm and judicious approval.

The Economy Act of 1952 is modeled upon the provisions of the bill—H. R. 8054—which I introduced in 1950 and which attracted national attention from budgetary experts. The House Committee on Executive Expenditures held detailed hearings on the 1950 bill. These hearings indicated considerable support for many of the bill's provisions. They also brought forth numerous proposals for improvement. In drafting the Economy Act of 1952, I and my colleagues have taken these proposals into account.

There are six provisions in the Economy Act of 1952. The provision on which I believe immediate action would be most profitable is the one calling for an improved scheduling of legislative action on appropriation bills. The provision calls for the chairman and the ranking minority members of the Committee on Appropriations of the House of Representatives and the Senate to work with the Speaker of the House and the President of the Senate to establish and to stick to a specific schedule for handling appropriation bills. Careful consideration of the budget is possible only if there is an opportunity for orderly handling of appropriation measures. In recent years—both when there was an omnibus appropriation bill and when there was no omnibus appropriation bill—the measures rarely were enacted before the beginning of the following fiscal year. This leads to tremendous uncertainties and to great waste.

I hope for particularly wide support on this provision of the bill and I would like to point out that the committee on Government expenditures of the Chamber of Commerce of the United States recently called for the "adoption of a floor schedule in the House which would assure a regular flow of appropriations bills without the end-of-session log jam encountered almost every year"—National Chamber Washington Report, February 1, 1952.

The other five provisions of the bill are as follows:

First. A consolidated cash budget: This type of budget shows the actual flow of money between the Government and the people. It has been strongly supported by the Committee on Economic Development as a very sensible proposition. Just yesterday the Washington Post in an editorial emphasized the need to look at the budget in terms of the cash payments which are made between the Government and the people. It pointed out that "the $14,400,000,000 deficit"—obtained by the legislative budget rather than cash budget—"is not truly the sum by which Government spending will exceed Government income." It does not reflect "the fact that social security and other Government programs take in some $4,000,000,000 more than they spend and thus reduce the cash deficit." The consolidated cash budget does reflect these programs and, therefore, is a true measure of the impact of the budget on our economy.

Second. Separation of capital from operating expenditures: Every business concern makes a clear distinction in its fiscal operations between operating expenditures and those which are capital, developmental, recoverable, and other investment expenditures. One of the central recommendations of the Hoover Commission was to make just such a destinction in the Federal budget—budget and accounting recommendation, No. 3, page 16.

Third. Long-range budget estimates: At present, no one can tell whether the appropriations called for in the coming fiscal year will lead in subsequent years toward additional expenditures. The bill proposes that the budget include estimates of the expenditures that may be required in those subsequent years as a result of the currently authorized appropriations. This proposal leads to the real economy of enabling the Congress to look where it is going in a few years from now as well as where it might end up in the next fiscal year.

Fourth. Yea-and-nay votes on appropriations measures: This is the only way for Members of Congress to be counted on issues affecting economy. Under the present system of voice voting, it is all too easy to avoid responsibility for pork-barreling or for undermining basic programs.

Fifth. Presidential item veto: This is an essential weapon in the arsenal of economy. It can put an end to the practice of inserting in appropriation bills—via log-rolling tactics or legislative riders—individual items that cannot be justified as legitimately serving the public interest. The hearings on the Roosevelt bill of 1950 included letters on behalf of the item veto by the following Senators who had experiences as governors: HOEY, JOHNSON of Colorado, HOLLAND, LEHMAN, HUNT, GREEN, TOBEY, BRICKER, and SALTONSTALL.

May I again emphasize that the purpose of this bill is to begin the remodeling job by eliminating present defects in the budgetary practices of the Federal Government, and I strongly urge the bill's early enactment.

PERMISSION TO ADDRESS THE HOUSE

Mr. VAN ZANDT. Mr. Speaker, I ask unanimous consent to address the House for 1 minute and to revise and extend my remarks.

The SPEAKER. Is there objection to the request of the gentleman from Pennsylvania?

There was no objection.

[Mr. VAN ZANDT addressed the House. His remarks appear in the Appendix.]

SPECIAL ORDERS GRANTED

Mr. LANE asked and was given permission to address the House today for 15 minutes, following any special orders heretofore entered.

Mr. BECKWORTH asked and was given permission to address the House today for 5 minutes, following any special orders heretofore entered.

Mr. MEADER asked and was given permission to address the House today for 10 minutes, following any special orders heretofore entered.

The SPEAKER. Under previous order of the House, the gentleman from Wisconsin [Mr. SMITH] is recognized for 10 minutes.

WHAT PRICE AMERICAN CITIZENSHIP?

Mr. SMITH of Wisconsin. Mr. Speaker, is American citizenship something to be prized today? Does it have the value placed upon it 50 years ago? Can the American citizen abroad in foreign lands expect his Government to protect him in his lawful pursuits?

It is a sad, sad fact of life, Mr. Speaker, that American citizenship under the American flag or an American passport no longer protects an American abroad be he on a vacation or legitimate business.

Mr. Speaker, never in all of the history of our country has the American citizen been subjected to such insult, disrespect, and ridicule as at this time under President Truman and Secretary of State Dean Acheson. It is a national disgrace.

I am not speaking of an isolated instance, Mr. Speaker, but of a series of events over the past 3 years, all while Truman and Acheson have been misdirecting our foreign policy.

Last December 28 our Government paid $120,000 in ransom money to the Communist government in Hungary for the release of four American fliers who were forced down in Hungarian territory. This was outright blackmail unless the charges against them were true but the American people have not been advised of the facts to this day. It was to be expected that the Communist press and radio now cite payment of the ransom money as an admission that the charge against the airmen is true. It is a plausible accusation in view of the ransom payment.

The case of Robert Vogeler, the American businessman is also in point. In that case we were also blackmailed and paid a ransom for his release. The whole story in this case has not been told by the State Department.

Last April, Mr. Speaker, an American newspaperman, William N. Oatis, was arrested in Czechoslovakia and he languishes in a jail there now. Congress has passed a resolution urging the President to negotiate for Mr. Oatis' release but the Czech Government gives us the glassy stare. Of what value is the American citizenship of William Oatis at this time?

Mr. Speaker, there are other cases of a like nature which the State Department has tried to conceal, in fact, there is reliable information that several hundreds of American citizens are forcibly detained in Russia and in the iron curtain countries. Are we afraid to demand the release of our own people? What has happened to our national honor?

A great American once said, "Millions for defense but not one cent for tribute." Jefferson said, "We prefer war in all cases to tribute under any form, and to any people whatever." Theodore Roosevelt and Secretary of State John Hay said to the Sultan of Morocco, "Perdicaris alive or Raisuli dead," when a bandit held an American citizen for ransom He was produced—alive.

Mr. Speaker, even the high school boy and girl knows that the prestige of the United States throughout the world is at a new and all-time low. We have given away billions of dollars the world over for every conceivable kind of project in the hope that it would buy friendship. It has not. Instead it has brought contempt, insult, and ridicule upon us.

Never has this country had such a weak and pusillanimous leadership in the State Department. The situation is so bad as to demand an investigation of all the facts relating to the unlawful seizure of American citizens by other governments. I am today introducing such a resolution and I shall press for immediate consideration.

Mr. RANKIN. Mr. Speaker, will the gentleman yield?

Mr. SMITH of Wisconsin. I yield to the gentleman from Mississippi.

Mr. RANKIN. This illegal organization known as the United Nations that the Senate voted us into, without consulting the American people, has Czechoslovakia as one of its members with the same vote the United States has. You know they voted to outlaw the alien land laws of the various States of this Union. They are now trying to meddle with other internal affairs of the various States. The quicker the American people wake up to the fact that the Senate had absolutely no legal or constitutional right to vote this country into that organization and sacrifice this Government in that way, the sooner we will get out of this so-called United Nations, get back to the Constitution, look after our own affairs, and save America for Americans.

THE ALL-TIME LOW

Mr. SMITH of Wisconsin. Mr. Speaker, I ask unanimous consent to include an article by Mr. Wheeler McMillen entitled "The All-Time Low."

The SPEAKER. Is there objection to the request of the gentleman from Wisconsin?

There was no objection.

(The matter referred to is as follows:)

THE ALL-TIME LOW

(By Wheeler McMillen)

On November 19 four American fliers were forced down in Hungarian territory. They were held by the Communists three and fined for border violations.

On December 28 the United States paid $120,000 to ransom the four men.

Robert A. Vogeler, an American businessman who was Central European representative for the International Telephone & Telegraph Co., spent 17 months in Hungarian prisons. He, too, was charged with spying. Hungary was paid off by the return of undisclosed property.

William N. Oatis, an American reporter from Marion, Ind., attending to his work in Prague, was arrested in April 1951 and presumably is still in jail somewhere in Czechoslovakia. The United States apparently lacks sufficient power to obtain his release.

Another American citizen, John Hvasta, has been held in Czech jails since 1948. The Reds claim he is under a 10-year sentence for espionage.

On December 8 Senator WILLIAM F. KNOWLAND, of California, made public the names of 33 United States citizens known to be held in jails in Communist China. More than 300 other American civilians in China have been refused permission from the Communists to leave the country.

A consul general of the United States, Angus Ward, while serving at Mukden, Manchuria, was held in Chinese jails for more than a month over a trifling incident.

American citizenship, the United States flag, or an American passport no longer protect an American abroad. How many others are in jeopardy no one knows.

Once Americans were proud to recall the words attributed to Charles Cotesworth Pinckney, our Minister to France in 1797, who rejected a proposal from French officials that they would call off their threat of war in return for an ample bribe. "Millions for defense, but not 1 cent for tribute" rang true with a Nation's honor.

They remember, too, that this young Nation sent warships to the Mediterranean back in Thomas Jefferson's time and stopped the Barbary pirates from looting and kidnaping from American ships.

Jefferson had said: "We prefer war in all cases to tribute under any form, and to any people whatever."

A hundred years later Theodore Roosevelt and Secretary of State John Hay did not hesitate to say to the Sultan of Morocco, "Perdicaris alive or Raisuli dead," when a bandit held an American citizen for ransom.

Those days seem to have gone. Now the United States pays ransom.

For more than a dozen years now those who conduct United States foreign affairs have been throwing United States dollars, machinery, food, raw materials, and wealth of various kinds more or less indiscriminately into almost any kind of available international mess.

They have proved that friendship is hard, and hatred easy, to buy.

Wealth and power, even though exhibited lavishly, have by themselves proved completely inadequate to build or even to maintain the world prestige to which the American people, who are America, are justly entitled.

The essential ingredients of effective prestige have been lacking.

There has been no consistent devotion to traditional American ideals.

There has been no evidence of consistent moral force based on simple understanding of human relations.

There has been no solid, unvarying principle upon which foreign policy has been operated. There have been expediency and bargaining, dealing and trading and reckless giving.

There has been no true atmosphere of firm integrity.

Mr. Truman and Mr. Acheson have been unable to supply these indispensable ingredients.

And so American prestige in this world has slumped to an all-time low.

---

### OIL SUBSIDIES

Mr. BAILEY. Mr. Speaker, I ask unanimous consent to address the House for 2 minutes.

The SPEAKER. Is there objection to the request of the gentleman from West Virginia?

There was no objection.

Mr. BAILEY. Mr. Speaker, I have requested this time for the purpose of protesting and denouncing the recommendation of the National Petroleum Administrator to the OPS providing for the payment of subsidy on oil shipments from Louisiana and the gulf sections to the eastern seaboard and New England States. Some time ago producers of oil in Saudi Arabia transported their oil across the Atlantic, and refined it and sold their cheap residual fuel oil to producers of power and manufacturing plants in New England, and took away from West Virginia their coal market. The sale of West Virginia coal in 1948 was 21,000,000 tons in New England alone. In 1951, it had dropped to less than 8,000,000 tons. The situation that is developing in Iran has made it necessary to divert this Saudi Arabian oil from shipment to this country to take up the slack in Europe, and those people up there in New England who have converted from coal to oil now find themselves without supplies of oil, and they are proposing a subsidy of 1 cent a gallon, and that means 42 cents a barrel on a barrel of refined oil as a means of getting this oil to New England.

I want to protest it on behalf of the State of West Virginia, and I am sure I will be joined by every individual in the coal producing territories. I am opposed to a subsidy. It is unfair for one of our industries as compared to the others to pay these subsidies.

The SPEAKER. The time of the gentleman from West Virginia has expired.

---

Under previous order of the House, the gentleman from Massachusetts [Mr. LANE] is recognized for 15 minutes.

### MORE JOBLESS PAY FOR WORKERS DISPLACED BY DEFENSE TURN-OVER

Mr. LANE. Mr. Speaker, the defense-mobilization policy of the United States Government has squeezed many workers out of civilian employment before it was ready to provide them with jobs in military production.

This has left thousands of textile workers out on a limb through no fault of their own.

Some of this was inevitable under the problems inherent in a change-over from a peace economy to one that attempts to reconcile the conflicting needs of civilians and the Armed Forces.

This, however, is of little comfort or material help to those who have been forced into unemployment.

The Government caused this situation. It has a duty to provide more unemployment compensation for those idled by the defense program.

I welcome the support of my colleagues from the State of Michigan where cutbacks in the production of automobiles for civilian use resulted in heavy unemployment of recent origin. We who represent the New England States have had the problem of displaced textile workers for a considerably longer time. Perhaps the claims of our dispossessed citizens, which have thus far met with a cool reception in Washington, will now merit prompt attention and assistance. Otherwise, we cannot be expected to appreciate the stewardship of our National Government. There are those who take the unemployment problem in New England for granted, but I would like to advise them that it could be an explosive factor. Our patience has been strained. There is a limit to our endurance. We have been taxed more than our share to help finance developments in other sections of the country. Now we need your help in return. Thousands of our unemployed have exhausted their benefits. Until defense contracts flow in to provide jobs, they look to you, the Congress, for emergency assistance.

You are faced with a new concept of Government responsibility.

When any national policy beats unemployment, it must make compensation for it.

There is a precedent to guide us in the present system of providing a measure of unemployment insurance for workers in private industry. We have coordination between Federal and State laws and the administrative machinery to carry out the program. But the benefits are out of line with the increased cost of existence. And the readjustment to the needs of defense is causing prolonged periods of unemployment in certain industries. Many people are still jobless after their benefits have run out.

Under the legislation we recommend the States would remain in control of the program.

Only those States or areas within a State that have unemployment of 12 percent and higher, becoming an "E" or distressed area, would qualify for special relief.

This would be certified by the Governor of the State and approved by the Secretary of Labor of the United States.

Thereupon, the Federal Government would—

First. Increase by 50 percent the amount of basic compensation received by the jobless worker from his State.

Second. Match the State dollar-for-dollar in payments for dependents.

Third. Extend by 10 weeks the present duration of unemployment compensation benefits in those States with distressed areas. Three-quarters of the rate would be paid for this additional period, the extra cost to be assumed in full by the Federal Government.

In other words, the individual who is unemployed through no fault of his own, would receive higher benefits for the time limit in his State together with an emergency extension at a lower rate.

His jobless pay would be raised to an existence level, and he would be given more opportunity to look for a new job.

Remember that, in the present readjustment of our economy, it is no longer a question of a man waiting to be called back to his job after a lay-off. He must try to discover one elsewhere, in many cases outside of his home city. Look at the pattern of regional shift in the textile industry. Some of the New England mills have shut down for good. A few of the plants are obsolete, and thus offer no inducement for substitute industries to move in.

This is no time to be squeamish, to avoid realities. Nothing is accomplished by turning our backs on a problem.

After a quick once-over, the economic health of the Nation looks good. A more thorough examination would reveal a few black spots that spell trouble, if we neglect them any longer. The economic charts brag that more people are employed and at higher wages than at any time in the last 6 years. That is, for the United States as a whole. But this does not put money into the empty pockets of unemployed textile workers in New England. There are tens of thousands of these worried people who cannot pay their bills with the promises that come out of Washington.

Believe me, I do not enjoy speaking about these distressing conditions.

But if the term "depression," whatever the reasons for it, is the only one that fits the situation, I intend to use it in order to shake officialdom out of its apathy toward our very real problems in New England. It seems to me that we need a four-point program to help our own people for a change.

It is not my purpose here to diagnose the ills that plague the textile industry in our Northeastern States. My concern is with the victims who need immediate help. Idle plant and machinery should be put to work to provide jobs. The Government can help by pumping in orders. But in the meantime, what about the unemployed human beings who stand and wait? Do I hear some gentleman suggest that all the thousands of jobless in this industry should set up individual enterprises of their own, as if they could turn back time to the days before the industrial revolution? Or must these people put themselves into the deep freeze of suspended animation where they will not need any food?

I believe that we can find a more practical treatment within the design of the legislation under discussion.

It is the first aid that must be applied at once.

Two years ago, in January 1950, we were forewarned about this, but the Government at Washington was not unemployed and it could not appreciate the problems of those communities some distance from the Nation's Capital that were stricken by this economic disease. And so nothing was done to help the people of one-industry areas who struggled against the slow paralysis of unemployment.

Strangely enough, it was in a publication of a Government agency—the Labor Market and Employment Security, put out by the United States Department of Labor—that the warning was given to those who have eyes to see but who choose to ignore.

On page 21 of the January 1950 issue was this paragraph:

It is obvious that the employment security system could have been more effective in combating the effects of unemployment had it not been for the wide variation between States in the amount of weekly benefits paid eligible unemployed workers and in the duration of benefits. While it is a tribute to the States—the States that there have been improvement in State laws, including wider coverage and increased maximum amounts as well as in duration, much more remains to be done. Benefits are still generally inadequate. The potential duration of benefits is still too short. Unemployment insurance is not protecting the worker or maintaining purchasing power as it might.

There you have it—benefits inadequate, duration too short.

While unemployment in spot areas, such as textile communities, continues on a scale second only to the depressing record of the 1930's.

As we have no "make-work" projects, what are people to do who have exhausted their benefits—benefits that had been short-changed by depreciation of the dollar?

Although some States must share the blame for this neglect, I maintain that it is the responsibility of the Federal Government to take the initiative and encourage the States to strengthen the program. The collective prosperity of the United States is enough to extend some help to those areas in a few States that are temporarily in distress. We call it mutual aid on the international level. All the more reason why we should practice it in relations with our own people.

In substance, to provide supplementary unemployment compensation under certain conditions to workers unemployed during the national emergency.

The number of bills dealing with this question is proof that this is a live issue, almost as important as a jobless worker's problem of providing the next meal for his family and himself.

The SPEAKER. Under the previous order of the House, the gentleman from Texas [Mr. BECKWORTH] is recognized for 5 minutes.

## STATISTICS OF THE CONTROL PROGRAM ON RICE

(Mr. BECKWORTH asked and was given permission to revise and extend his remarks and to include certain tables.)

Mr. BECKWORTH. Mr. Speaker, on July 10, 1951, I placed in the CONGRESSIONAL RECORD a rather comprehensive study pertaining to cotton which undertook to show the average per-allotment-dollar value.

On October 17, 1951, I put in a similar study with reference to peanuts.

Today I am pleased to have in my possession a study pertaining to rice, which is another one of the controlled crops. I invite the attention of the Members to the rice study:

*Rice: 1950 acreage allotments, planted acreage, production, and value, by counties, for Arkansas*

| County | Number of farm allotments | Acreage allotted | Acreage planted (measured) | Percentage of alloted acreage planted | Estimated production | Estimated value of production | Average per farm allotment | | | Per allotment average added by value of production |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Acreage allotted | Acreage planted | Production | |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) |
| | | | | | Thousand hundredweight | Thousands of dollars | | | Hundredweight | Dollars |
| Arkansas | 991 | 80,172 | 79,998 | 99.8 | 1,825.3 | 9,353.5 | 81 | 81 | 1,840 | 9,438 |
| Ashley | 49 | 4,497 | 5,183 | 115.3 | 117.3 | 755.6 | 92 | 106 | 3,006 | 15,420 |
| Chicot | 96 | 24,243 | 7,074 | 166.7 | 100.8 | 871.1 | 118 | 196 | 4,717 | 24,197 |
| Clay | 64 | 5,474 | 5,285 | 96.5 | 105.4 | 546.7 | 86 | 83 | 1,647 | 8,448 |
| Craighead | 239 | 16,199 | 18,516 | 102.0 | 310.5 | 1,746.8 | 70 | 72 | 1,980 | 7,505 |
| Crittenden | 4 | 557 | 791 | 142.0 | 21.5 | 110.3 | 139 | 198 | 5,375 | 27,575 |
| Cross | 404 | 29,853 | 32,196 | 107.8 | 713.1 | 3,656.2 | 64 | 66 | 1,452 | 7,451 |
| Desha | 35 | 5,811 | 5,982 | 102.4 | 138.5 | 710.5 | 167 | 171 | 3,957 | 20,300 |
| Drew | 19 | 3,847 | 5,774 | 98.1 | 93.7 | 489.7 | 202 | 199 | 4,932 | 25,300 |
| Greene | 52 | 3,684 | 3,386 | 91.9 | 62.4 | 320.1 | 71 | 65 | 1,200 | 6,155 |
| Jackson | 195 | 16,709 | 18,091 | 108.3 | 411.7 | 2,112.0 | 86 | 93 | 2,111 | 10,831 |
| Jefferson | 43 | 6,839 | 7,133 | 104.3 | 169.7 | 870.5 | 159 | 166 | 3,917 | 20,211 |
| Lafayette | 2 | 435 | 823 | 189.2 | 19.0 | 97.5 | 218 | 412 | 9,500 | 48,750 |
| Lawrence | 66 | 4,818 | 4,739 | 98.4 | 94.6 | 485.3 | 73 | 72 | 1,435 | 7,353 |
| Lee | 55 | 5,507 | 4,823 | 89.4 | 114.1 | 585.3 | 100 | 90 | 2,075 | 10,642 |
| Lincoln | 28 | 3,589 | 3,439 | 95.6 | 86.8 | 445.3 | 128 | 122 | 3,100 | 15,901 |
| Lonoke | 356 | 33,313 | 31,645 | 95.0 | 736.5 | 3,774.2 | 94 | 89 | 2,069 | 10,613 |
| Miller | 1 | 290 | 290 | 100.0 | 4.7 | 24.1 | 290 | 290 | 4,700 | 24,100 |
| Monroe | 163 | 11,173 | 11,526 | 103.2 | 271.2 | 1,391.3 | 69 | 71 | 1,664 | 8,536 |
| Ouachita | 1 | 111 | 112 | 104.9 | 2.9 | 14.9 | 111 | 112 | 2,900 | 14,900 |
| Perry | 5 | 165 | 196 | 118.8 | 6.1 | 31.3 | 33 | 39 | 1,220 | 6,260 |
| Phillips | 9 | 1,610 | 2,846 | 176.8 | 84.9 | 435.5 | 179 | 316 | 9,433 | 48,389 |
| Poinsett | 389 | 35,954 | 33,835 | 94.2 | 741.4 | 3,803.4 | 92 | 87 | 1,906 | 9,777 |
| Prairie | 491 | 38,469 | 40,811 | 106.1 | 880.0 | 4,514.4 | 78 | 83 | 1,792 | 9,194 |
| Pulaski | 4 | 198 | 389 | 196.5 | 9.8 | 50.3 | 50 | 97 | 2,450 | 12,575 |
| Randolph | 6 | 249 | 181 | 73.9 | 4.3 | 22.1 | 42 | 31 | 717 | 3,683 |
| St. Francis | 106 | 7,700 | 7,702 | 100.8 | 176.6 | 906.0 | 73 | 73 | 1,666 | 8,547 |
| White | 5 | 462 | 391 | 84.6 | 8.8 | 45.1 | 92 | 78 | 1,760 | 9,020 |
| Woodruff | 202 | 15,761 | 15,677 | 95.7 | 341.4 | 1,751.4 | 78 | 75 | 1,690 | 8,670 |
| Total | 4,098 | 337,659 | 344,301 | 102.0 | 7,780.0 | 39,911.4 | 82 | 84 | 1,898 | 9,739 |

Rice: 1950 acreage allotments, planted acreage, production, and value, by counties, for California

| County | Number of farm allotments | Acreage allotted | Acreage planted (measured) | Percentage of allotted acreage planted | Estimated production | Estimated value of production | Average per farm allotment | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Acreage allotted | Acreage planted | Production | Value of production |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) |
| | | | | | Thousand hundredweight | Thousands of dollars | | | Hundredweight | Dollars |
| Butte | 234 | 44,639 | 45,908 | 102.8 | 1,612.6 | 7,325.7 | 191 | 196 | 6,896 | 31,306 |
| Colusa | 240 | 48,709 | 47,637 | 97.8 | 1,615.3 | 7,333.5 | 203 | 198 | 6,730 | 30,556 |
| Fresno | 100 | 10,281 | 14,674 | 142.5 | 461.8 | 2,096.6 | 103 | 147 | 4,618 | 20,966 |
| Glenn | 155 | 16,241 | 26,229 | 161.5 | 933.0 | 4,235.8 | 105 | 169 | 6,019 | 27,328 |
| Imperial | 8 | 460 | 451 | 98.7 | 9.0 | 40.9 | 58 | 57 | 1,125 | 5,112 |
| Madera | 17 | 898 | 1,171 | 130.4 | 33.0 | 149.8 | 53 | 69 | 1,941 | 8,812 |
| Merced | 20 | 4,134 | 4,846 | 117.2 | 156.6 | 711.0 | 138 | 162 | 5,220 | 23,700 |
| Placer | 23 | 2,508 | 3,226 | 128.6 | 105.2 | 477.6 | 109 | 140 | 4,574 | 20,765 |
| Sacramento | 48 | 5,533 | 6,478 | 117.1 | 241.7 | 1,097.3 | 115 | 135 | 5,035 | 22,860 |
| San Joaquin | 101 | 4,529 | 6,082 | 134.3 | 210.7 | 956.6 | 45 | 60 | 2,086 | 9,471 |
| Stanislaus | 36 | 1,769 | 1,666 | 94.2 | 57.9 | 262.9 | 49 | 46 | 1,608 | 7,303 |
| Sutter | 305 | 43,028 | 44,015 | 102.3 | 1,631.9 | 7,405.8 | 141 | 144 | 5,350 | 24,291 |
| Yolo | 91 | 28,148 | 29,045 | 103.2 | 939.8 | 4,266.7 | 309 | 319 | 10,327 | 46,887 |
| Yuba | 47 | 7,491 | 7,528 | 95.9 | 203.5 | 1,182.7 | 164 | 160 | 5,343 | 25,164 |
| **Total** | 1,435 | 218,568 | 238,936 | 109.3 | 8,270.0 | 37,545.8 | 152 | 167 | 5,763 | 26,164 |

Rice: 1950 acreage allotments, planted acreage, production, and value, by parishes, for Louisiana

| Parish | Number of farm allotments | Acreage allotted | Acreage planted (measured) | Percentage of allotted acreage planted | Estimated production | Estimated value of production | Average per farm allotment | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Acreage allotted | Acreage planted | Production | Per allotment average value of production |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) |
| | | | | | Thousand hundredweight | Thousands of dollars | | | Hundredweight | Dollars |
| Acadia | 1,971 | 103,345 | 103,694 | 99.9 | 2,099.5 | 10,644.5 | 53 | 53 | 1,065 | 5,401 |
| Allen | 320 | 22,611 | 25,182 | 111.4 | 459.1 | 2,327.6 | 71 | 79 | 1,435 | 7,274 |
| Ascension | 4 | 1,594 | 1,029 | 64.6 | 20.5 | 103.9 | 398 | 257 | 5,125 | 25,975 |
| Assumption | 3 | 430 | 434 | 100.9 | 6.0 | 30.4 | 143 | 145 | 2,000 | 10,133 |
| Avoyelles | 48 | 2,528 | 2,108 | 83.4 | 46.7 | 236.8 | 53 | 44 | 973 | 4,933 |
| Beauregard | 28 | 6,115 | 4,831 | 79.0 | 75.4 | 382.3 | 218 | 173 | 2,693 | 13,654 |
| Calcasieu | 407 | 70,806 | 72,651 | 102.6 | 1,130.5 | 5,731.6 | 174 | 179 | 2,778 | 14,083 |
| Cameron | 73 | 15,739 | 15,858 | 100.8 | 263.8 | 1,337.5 | 216 | 217 | 3,614 | 18,322 |
| East Carroll | 2 | 1,151 | 1,118 | 97.1 | 25.9 | 131.3 | 576 | 559 | 12,950 | 65,650 |
| Evangeline | 1,162 | 50,477 | 45,563 | 90.3 | 930.3 | 4,716.6 | 43 | 39 | 801 | 4,059 |
| Iberia | 62 | 5,792 | 6,288 | 108.6 | 119.6 | 606.4 | 93 | 101 | 1,929 | 9,781 |
| Iberville | 5 | 1,817 | 1,317 | 72.5 | 36.7 | 186.1 | 363 | 263 | 7,340 | 37,220 |
| Jeff Davis | 1,076 | 111,500 | 110,109 | 98.8 | 2,378.9 | 12,061.0 | 104 | 102 | 2,211 | 11,209 |
| Lafayette | 188 | 8,907 | 9,622 | 108.0 | 224.1 | 1,135.2 | 47 | 51 | 1,192 | 6,044 |
| Lafourche | 1 | 80 | 65 | 81.2 | 1.4 | 7.1 | 80 | 65 | 1,400 | 7,100 |
| Morehouse | 5 | 945 | 741 | 78.4 | 16.3 | 82.6 | 189 | 148 | 3,260 | 16,520 |
| Rapides | 3 | 298 | 234 | 78.5 | 6.2 | 31.4 | 99 | 78 | 2,067 | 10,467 |
| Richland | 6 | 686 | 560 | 86.4 | 10.8 | 54.8 | 114 | 99 | 1,800 | 9,133 |
| St. Charles | 4 | 404 | 328 | 83.6 | 7.3 | 37.0 | 101 | 94 | 1,825 | 9,250 |
| St. James | 2 | 2,301 | 2,248 | 97.7 | 30.9 | 202.3 | 115 | 112 | 1,595 | 10,115 |
| St. John | 2 | 677 | 1,019 | 150.5 | 20.0 | 101.4 | 338 | 510 | 10,000 | 50,700 |
| St. Landry | 403 | 18,619 | 15,523 | 83.4 | 323.4 | 1,639.6 | 46 | 39 | 802 | 4,068 |
| St. Martin | 50 | 3,745 | 2,874 | 76.7 | 64.3 | 326.0 | 75 | 57 | 1,286 | 6,520 |
| St. Mary | 17 | 3,619 | 2,907 | 80.3 | 60.5 | 306.7 | 213 | 171 | 3,559 | 18,041 |
| St. Tammany | 8 | 465 | 317 | 68.2 | 5.5 | 27.9 | 58 | 40 | 688 | 3,488 |
| Terrebonne | 3 | 170 | 83 | 48.8 | 1.6 | 8.1 | 85 | 42 | 800 | 4,059 |
| Vermilion | 2,401 | 117,734 | 121,174 | 102.9 | 2,507.8 | 12,714.6 | 49 | 50 | 1,044 | 5,296 |
| **Total** | 8,271 | 553,055 | 547,962 | 99.1 | 10,882.0 | 55,171.7 | 67 | 66 | 1,316 | 6,670 |

Rice: 1950 acreage allotments, planted acreage, production, and value, by counties, for Texas

| County | Number of farm allotments | Acreage allotted | Acreage planted (measured) | Percentage of allotted acreage planted | Estimated production | Estimated value of production | Average per farm allotment | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Acreage allotted | Acreage planted | Production | Per allotment average value of production |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) |
| | | | | | Thousand hundredweight | Thousands of dollars | | | Hundredweight | Dollars |
| Austin | 9 | 1,562 | 1,951 | 124.9 | 45.1 | 246.2 | 174 | 217 | 5,011 | 27,356 |
| Brazoria | 149 | 56,249 | 59,081 | 105.0 | 1,537.2 | 8,393.1 | 378 | 396 | 10,317 | 56,330 |
| Calhoun | 45 | 12,451 | 12,997 | 104.4 | 316.7 | 1,729.2 | 277 | 289 | 7,038 | 38,427 |
| Chambers | 195 | 41,605 | 46,352 | 111.4 | 1,065.2 | 5,816.0 | 213 | 238 | 5,463 | 29,826 |
| Colorado | 183 | 30,222 | 39,353 | 130.2 | 934.9 | 5,104.6 | 165 | 215 | 5,109 | 27,894 |
| Fort Bend | 84 | 17,228 | 19,002 | 110.3 | 431.9 | 2,467.4 | 205 | 226 | 5,304 | 29,374 |
| Galveston | 16 | 16,227 | 13,957 | 98.0 | 431.9 | 2,358.2 | 1,014 | 994 | 26,994 | 147,388 |
| Hardin | 11 | 1,525 | 1,896 | 124.3 | 48.1 | 262.6 | 139 | 172 | 4,373 | 23,873 |
| Harris | 153 | 26,950 | 34,010 | 126.2 | 809.7 | 4,421.0 | 176 | 222 | 5,292 | 28,895 |
| Houston | 2 | 159 | 442 | 278.0 | 11.1 | 60.6 | 80 | 221 | 5,550 | 30,300 |
| Jackson | 83 | 18,829 | 20,793 | 110.4 | 508.0 | 2,773.7 | 227 | 251 | 6,120 | 33,418 |
| Jasper | 1 | 59 | 45 | 76.3 | 1.1 | 6.0 | 59 | 45 | 1,100 | 6,000 |
| Jefferson | 242 | 56,993 | 66,811 | 117.2 | 1,586.3 | 8,661.2 | 236 | 276 | 6,555 | 35,790 |
| Lavaca | 11 | 1,560 | 3,615 | 231.7 | 88.2 | 481.6 | 142 | 329 | 8,018 | 43,782 |
| Liberty | 102 | 30,463 | 31,284 | 102.7 | 711.5 | 3,884.8 | 299 | 307 | 6,975 | 38,086 |
| Matagorda | 187 | 45,679 | 45,681 | 99.6 | 1,083.2 | 5,914.3 | 245 | 244 | 5,793 | 31,627 |
| Newton | 1 | 481 | 470 | 97.7 | 11.8 | 64.4 | 481 | 470 | 11,803 | 64,400 |

*Rice: 1950 acreage allotments, planted acreage, production, and value, by counties, for Texas—Continued*

| Counties | Number of farm allotments | Acreage allotted | Acreage planted (measured) | Percentage of allotted acreage planted | Estimated production | Estimated value of production | Average per farm allotment | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Acreage allotted | Acreage planted | Production | Per allotment aver- age value of production |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) |
| | | | | | *Thousand hundredweight* | *Thousands of dollars* | | | *Hundredweight* | *Dollars* |
| Orange | 49 | 6,970 | 9,005 | 129.2 | 171.4 | 935.8 | 142 | 184 | 3,498 | 19,098 |
| Polk | 2 | 1,003 | 691 | 68.9 | 17.5 | 95.6 | 502 | 346 | 8,750 | 47,800 |
| San Jacinto | 2 | 125 | 102 | 81.6 | 2.6 | 14.2 | 62 | 51 | 1,300 | 7,100 |
| Victoria | 11 | 1,425 | 2,071 | 145.3 | 50.1 | 273.5 | 130 | 189 | 4,555 | 24,864 |
| Waller | 35 | 11,952 | 15,217 | 127.6 | 361.8 | 1,975.4 | 341 | 436 | 10,337 | 56,440 |
| Wharton | 297 | 47,621 | 55,291 | 116.1 | 1,322.7 | 7,221.9 | 140 | 186 | 4,454 | 24,316 |
| Total | 1,870 | 427,538 | 482,080 | 112.8 | 11,568.0 | 63,161.3 | 229 | 258 | 6,186 | 33,776 |

*Rice: 1950 acreage allotments, planted acreage, production, and value, by counties, for minor producing States*

| County | Number of farm allotments | Acreage allotted | Acreage planted (measured) | Percentage of allotted acreage planted | Estimated production | Estimated value of production | Average per farm allotment | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Acreage allotted | Acreage planted | Production | Per allotment aver- age value of production |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) |
| ARIZONA | | | | | *Thousand hundredweight* | *Thousands of dollars* | | | *Hundredweight* | *Dollars* |
| Yuma | 4 | 269 | 231 | 85.9 | 4.3 | 18.9 | 67 | 58 | 1,075 | 4,725 |
| FLORIDA | | | | | | | | | | |
| Calhoun | 2 | 9 | 7 | 77.8 | .1 | .5 | 4 | 4 | 50 | 250 |
| Escambia | 2 | 41 | 33 | 80.5 | .4 | 2.0 | 20 | 16 | 200 | 1,000 |
| Osceola | 0 | 0 | 201 | 0 | 0 | 0 | 0 | | 0 | 0 |
| Palm Beach | 2 | 240 | 340 | 141.7 | 1.4 | 7.1 | 120 | 170 | 700 | 3,550 |
| Polk | 0 | 0 | 150 | 0 | 2.2 | 11.2 | 0 | | 0 | 0 |
| Total | 6 | 290 | 731 | 252.1 | 4.1 | 20.8 | 48 | 122 | 683 | 3,467 |
| MISSISSIPPI | | | | | | | | | | |
| Bolivar | 5 | 328 | 1,411 | 430.2 | 35.6 | 185.1 | 66 | 282 | 7,120 | 37,020 |
| Leflore | 1 | 109 | 188 | 172.5 | 21.4 | 109 | 188 | 4,700 | 24,400 | |
| Sharkey | 1 | 74 | 131 | 181.1 | 3.4 | 17.7 | 74 | 131 | 3,400 | 17,700 |
| Sunflower | 2 | 263 | 329 | 125.1 | 8.3 | 43.2 | 132 | 164 | 4,150 | 21,600 |
| Tallahatchie | 1 | 113 | 124 | 111.5 | 3.2 | 16.6 | 113 | 125 | 3,200 | 16,600 |
| Tunica | 1 | 4 | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 0 |
| Washington | 19 | 3,907 | 5,075 | 130.0 | 133.8 | 695.8 | 206 | 267 | 7,042 | 36,621 |
| Total | 30 | 4,798 | 7,295 | 151.4 | 189.0 | 982.8 | 160 | 212 | 6,300 | 32,760 |
| MISSOURI | | | | | | | | | | |
| Lincoln | 2 | 83 | 0 | 0 | 0 | 0 | 42 | 0 | 0 | 0 |
| Marion | 3 | 788 | 757 | 96.1 | 16.9 | 81.5 | 263 | 252 | 5,633 | 28,167 |
| Pike | 2 | 46 | 29 | 43.5 | .5 | 2.5 | 23 | 10 | 250 | 1,250 |
| Ripley | 5 | 284 | 328 | 115.5 | 7.3 | 36.5 | 57 | 66 | 1,460 | 7,300 |
| Stoddard | 1 | 94 | 0 | 0 | 0 | 0 | 94 | 0 | 0 | 0 |
| Total | 13 | 1,295 | 1,105 | 85.3 | 24.7 | 123.5 | 100 | 85 | 1,900 | 9,500 |
| SOUTH CAROLINA | | | | | | | | | | |
| Beaufort | 8 | 26 | 3 | 11.1 | (1) | .2 | 3 | | 5 | 25 |
| Charleston | 3 | 222 | 260 | 90.1 | 4.5 | 23.0 | 74 | 67 | 1,700 | 7,667 |
| Colleton | 3 | 113 | 124 | 109.7 | 2.7 | 13. | 38 | 41 | 900 | 4,600 |
| Jasper | 10 | 49 | 15 | 30.6 | .2 | 1.0 | 5 | 2 | 29 | 100 |
| Total | 24 | 411 | 342 | 83.2 | 7.4 | 38.0 | 17 | 14 | 308 | 1,583 |

1 Less than 50 hundredweight.
Source: Grain Branch, PMA.

The SPEAKER. Under previous order of the House, the gentleman from Michigan [Mr. MEADER] is recognized for 10 minutes.

## UNEMPLOYMENT IN MICHIGAN

Mr. MEADER. Mr. Speaker, I wish to refer to the remarks made earlier this afternoon by the gentleman from Wisconsin [Mr. SMITH]. He called attention to the low state to which our foreign policy had descended and the lack of respect for our State Department among the other nations of the world.

I also want to refer to the remarks made by the gentleman from Massachusetts [Mr. LANE] concerning unemployment, because the remarks I shall make

before the House will deal with both of these subjects.

The unemployment situation in Michigan is acute. The gentleman from Massachusetts [Mr. LANE] referred to unemployment in the automobile industry in passing. Senator FERGUSON, the senior Senator from Michigan has discussed the same subject on the floor of the Senate recently and has pointed to its cause.

I want to call the attention of the House to action I have taken on that subject in the form of a letter addressed to the chairman of the committee of which I am a member, the Committee on Expenditures in the Executive Departments. This letter is addressed to

Hon. WILLIAM L. DAWSON, chairman, and reads as follows:

FEBRUARY 5, 1952.
Hon. WILLIAM L. DAWSON,
*Chairman, Expenditures Committee of the House of Representatives, Washington, D. C.*

DEAR CHAIRMAN DAWSON: In the CONGRESSIONAL RECORD of Thursday, January 31, 1952, pages 685–687, and again in the RECORD of Monday, February 4, 1952, pages 749–751, Senator FERGUSON discussed the unemployment situation in the State of Michigan and the prospective unemployment situation which is primarily due to the shortage of copper for the production of automobiles.

Senator FERGUSON charged that this shortage of copper was due to the agreement of the International Materials' Conference in allocating world supplies of copper. Sena-

tor FERGUSON pointed out that for a lack of 3,000 tons of copper in the second quarter of 1952, 65,000 automobile workers would be thrown out of work in addition to the 150,-000 already unemployed.

United States participation in the International Materials' Conference is under the State Department.

On Wednesday, August 1, 1951, at a meeting of the Committee on Expenditures in the Executive Departments in the House of Representatives, I presented the following resolution CONGRESSIONAL RECORD, volume 97, part 7, page 9318):

"*Resolved,* That a subcommittee of five members, three of the majority and two of the minority party, is hereby created, charged with the duty of conducting a penetrating investigation of the Department of State, including but not limited to its organizational structure, its procedures, its personnel, its performance, and its relationship to other Federal agencies."

At the next meeting of the Committee on Expenditures in the Executive Departments of the House on October 3, 1951, pursuant to your request, I presented a statement of reasons supporting my request for the creation of this special subcommittee to investigate the State Department. You stated that no action needed to be taken by the committee but that you, as chairman, had authority to create such a special committee and that additional funds would not be required since the committee had on hand sufficient funds to conduct such an investigation.

My original resolution and the remarks I made in connection with it appear in the CONGRESSIONAL RECORD, volume 97, part 7, page 9318. My letter supporting the request for a subcommittee to investigate the State Department appears in the Appendix of the CONGRESSIONAL RECORD, volume 97, part 15, pages A6082 and A6083. Again (p. A6724), I urged further reasons for action on my resolution.

Senator FERGUSON's remarks, to which I have referred above, seem to me to be an additional urgent reason for immediate action on your part to create this special subcommittee to investigate the State Department.

The people of Michigan, not only those who are unemployed but the entire citizenry of the State, are very much concerned about the unemployment in the face of increased defense production. If the cause of this unemployment, not only that which now exists but that which we anticipate will occur in the second quarter of 1952, is a shortage of copper, and if the decisions of the International Materials' Conference have a bearing upon this shortage of copper and therefore upon the unemployment, it seems to me it is important that the Congress obtain all the facts relating to this question as quickly as possible and explore the possibilities of taking corrective action.

Our committee could render a real service to the country by exploring the manner in which the State Department is exercising its functions and powers. High among the benefits would be an immediate examination of the action the State Department has taken in the allocation of scarce materials.

I earnestly urge action now on my resolution.

Sincerely,

GEORGE MEADER.

## SENATE ENROLLED BILL SIGNED

The SPEAKER announced his signature to an enrolled bill of the Senate of the following title:

S. 2169. An act authorizing the acquisition by the Secretary of the Interior of the Gila Pueblo, in Gila County, Ariz., for archeological laboratory and storage purposes, and for other purposes.

## EXTENSION OF REMARKS

By unanimous consent, permission to extend remarks in the Appendix of the RECORD, or to revise and extend remarks, was granted to:

Mr. PRICE and to include a newspaper article.

Mr. HOLIFIELD in four instances and to include extraneous material.

Mr. MANSFIELD in two instances and to include certain extraneous material.

Mr. PICKETT (at the request of Mr. WILSON of Texas) and include an editorial.

Mr. HESS and to include an editorial from the Cincinnati Inquirer.

Mr. WHARTON and to include an editorial from the Millbrook Round Table.

Mr. CUNNINGHAM and to include a letter from a constituent.

Mr. POULSON in three separate instances in each to include extraneous matter.

Mr. DEMPSEY and to include a broadcast by Mr. Earl Godwin, and in another instance to include a letter.

Mr. BAKEWELL and to include an editorial from the St. Louis Globe-Democrat.

Mr. ROOSEVELT (at the request of Mr. PRICE) and to include extraneous matter.

Mr. FEIGHAN and to include articles.

Mr. LANE in two instances and to include extraneous matter.

Mr. BECKWORTH in three instances and to include extraneous matter.

Mrs. BOSONE and to include a newspaper article.

Mr. MITCHELL in two instances and to include extraneous matter.

Mr. JENKINS and to include a report by the American National Red Cross with reference to the floods on the Ohio River.

Mr. SHAFER in two instances.

Mr. BENDER in four instances.

Mr. HAVENNER.

Mr. COUDERT (at the request of Mr. KEATING) and to include an article.

Mr. BATES of Massachusetts and to include a newspaper article.

Mr. KERSTEN of Wisconsin in four instances, in each to include extraneous matter.

Mr. RIVERS (at the request of Mr. BECKWORTH) and to include an address by John Graham Altman, a student at St. Andrews Parish High School, Charleston County, S. C.

## LEAVE OF ABSENCE

By unanimous consent, leave of absence was granted to:

Mr. GARY, for today, on account of official business.

Mr. SIEMINSKI, Mr. CANFIELD, Mr. WILSON of Indiana, and Mr. JAMES, for the remainder of the week, on account of official business for the Committee on Appropriations.

## ADJOURNMENT

Mr. LESINSKI. Mr. Speaker, I move that the House do now adjourn.

The motion was agreed to; accordingly (at 2 o'clock and 6 minutes p. m.) the House adjourned until tomorrow, Wednesday, February 6, 1952, at 12 o'clock noon.

## EXECUTIVE COMMUNICATIONS, ETC.

Under clause 2 of rule XXIV, executive communications were taken from the Speaker's table and referred as follows:

1124. A communication from the President of the United States, transmitting a draft of a proposed language provision for the fiscal year 1952 for the Department of Commerce (H. Doc. No. 340); to the Committee on Appropriations, and ordered to be printed.

1125. A communication from the President of the United States, transmitting proposed adjustments in estimates of appropriation for the fiscal year 1953 for the Department of Defense (H. Doc. No. 341); to the Committee on Appropriations, and ordered to be printed.

1126. A communication from the President of the United States, transmitting a proposed supplemental appropriation for the fiscal year 1952 in the amount of $70,000 for the Motor Carrier Claims Commission (H. Doc. No. 342); to the Committee on Appropriations, and ordered to be printed.

1127. A communication from the President of the United States, transmitting a proposed supplemental appropriation for the fiscal year 1953 in the amount of $288,502 for the Department of State (H. Doc. No. 343); to the Committee on Appropriations, and ordered to be printed.

1128. A letter from the Assistant Secretary of Defense, transmitting a draft of a proposed bill entitled, "A bill to amend the act of July 16, 1892 (27 Stat. 174, c. 195) so as to extend to the Secretary of the Navy, and to the Secretary of the Treasury with respect to the Coast Guard, the authority now vested in the Secretaries of the Army and Air Force with respect to the withholding of officers' pay"; to the Committee on Armed Services.

1129. A letter from the Administrator, General Services Administration, transmitting the thirtieth quarterly report on contract settlement, covering the period October 1 through December 31, 1951, pursuant to Public Law 152, approved June 30, 1949; to the Committee on the Judiciary.

1130. A letter from the Secretary of the Interior, transmitting a report on the activities of, expenditures by, and donations to the Lignite Research Laboratory, Grand Forks, N. Dak., pursuant to the act of March 25, 1948 (62 Stat. 85); to the Committee on Interior and Insular Affairs.

## REPORTS OF COMMITTEES ON PUBLIC BILLS AND RESOLUTIONS

Under clause 2 of rule XIII, reports of committees were delivered to the Clerk for printing and reference to the proper calendar as follows:

Mr. WOOD of Georgia: Committee on Un-American Activities. Report on proceedings against Sidney Buchman; without amendment (Rept. No. 1293). Ordered to be printed.

Mr. McMILLAN: Committee on the District of Columbia. S. 493. An act to require the taking and destruction of dangerous weapons in certain cases, and for other purposes; without amendment (Rept. No. 1294). Referred to the Committee of the Whole House on the State of the Union.

Mr. ENGLE: Committee on Interior and Insular Affairs. H. R. 472. A bill to permit the mining, development, and utilization of the mineral resources of all public lands

Case 1:21-cr-00179-AJT Document 29-6 Filed 08/23/21 Page 58 of 59 PageID# 1037

withdrawn or reserved for power development, and for other purposes; with amendment (Rept. No. 1296). Referred to the Committee of the Whole House on the State of the Union.

## REPORTS OF COMMITTEES ON PRIVATE BILLS AND RESOLUTIONS

Under clause 2 of rule XIII, reports of committees were delivered to the Clerk for printing and reference to the proper calendar as follows:

Mr. FRAZIER: Committee on the Judiciary. H. R. 6444. A bill for the relief of sundry claimants, and for other purposes; without amendment (Rept. No. 1297). Referred to the Committee of the Whole House.

Mr. McMILLAN: Committee on the District of Columbia. H. R. 6273. A bill to amend the act relating to the incorporation of Trinity College of Washington, D. C., in order to make the archbishop of the Roman Catholic Archdiocese of Washington an ex officio member and chairman of the board of trustees of such college; without amendment (Rept. No. 1295). Referred to the Committee of the Whole House.

## PUBLIC BILLS AND RESOLUTIONS

Under clause 3 of rule XXII, public bills and resolutions were introduced and severally referred as follows:

By Mr. WICKERSHAM:
H. R. 6424. A bill to amend section 403 (b) of the Civil Aeronautics Act of 1938 so as to permit the granting of free or reduced-rate transportation to ministers of religion; to the Committee on Interstate and Foreign Commerce.

By Mr. TEAGUE:
H. R. 6425. A bill to provide vocational readjustment and to restore lost educational opportunities to certain persons who served in the Armed Forces on or after June 27, 1950, and prior to such date as shall be fixed by the President or the Congress; to the Committee on Veterans' Affairs.

By Mr. PATTEN:
H. R. 6426. A bill to provide vocational readjustment and to restore lost educational opportunities to certain persons who served in the Armed Forces on or after June 27, 1950, and prior to such date as shall be fixed by the President or the Congress; to the Committee on Veterans' Affairs.

By Mr. KEARNEY:
H. R. 6427. A bill to provide vocational readjustment and to restore lost educational opportunities to certain persons who served in the Armed Forces on or after June 27, 1950, and prior to such date as shall be fixed by the President or the Congress; to the Committee on Veterans' Affairs.

By Mr. SCUDDER:
H. R. 6428. A bill to provide vocational readjustment and to restore lost educational opportunities to certain persons who served in the Armed Forces on or after June 27, 1950, and prior to such date as shall be fixed by the President or the Congress; to the Committee on Veterans' Affairs.

By Mr. BETTS:
H. R. 6429. A bill to provide financial assistance, in the construction of schools, for local educational agencies affected by Federal acquisition of real property; to the Committee on Education and Labor.

By Mr. CELLER:
H. R. 6430. A bill to provide supplementary unemployment compensation benefits in certain cases to workers unemployed during the national emergency, and for other purposes; to the Committee on Ways and Means.

H. R. 6431. A bill to amend section 1114 of title 18, United States Code, so as to extend its protection to postmasters, officers, and employees of the field service of the Post Office Department; to the Committee on the Judiciary.

By Mr. EVINS:
H. R. 6432. A bill to provide vocational readjustment and to restore lost educational opportunities to veterans who served in the Armed Forces on or after June 27, 1950; to the Committee on Veterans' Affairs.

By Mr. FLOOD:
H. R. 6433. A bill to amend the Social Security Act to provide old-age and survivors insurance coverage for certain services performed in the employ of the United States after December 7, 1941; to the Committee on Ways and Means.

By Mr. FOGARTY:
H. R. 6434. A bill to amend the Universal Military Training and Service Act so as to provide that members of the Inactive or Volunteer Reserve who served during World War II shall be released from active duty upon completing 12 months' active duty after June 24, 1950; to the Committee on Armed Services.

By Mr. HAGEN:
H. R. 6435. A bill to adjust the rates for Government postal cards and private mailing post cards; to the Committee on Post Office and Civil Service.

By Mr. JACKSON of Washington:
H. R. 6436. A bill to change the name of the Bonneville Power Administration to the Columbia Power Administration; to the Committee on Public Works.

By Mr. LANE:
H. R. 6437. A bill to provide supplementary unemployment compensation benefits in certain cases to workers unemployed during the national emergency, and for other purposes; to the Committee on Ways and Means.

By Mr. McDONOUGH:
H. R. 6438. A bill amending the Civil Service Retirement Act of May 29, 1930, as amended; to the Committee on Post Office and Civil Service.

By Mr. MURDOCK (by request):
H. R. 6439. A bill to authorize the addition of land to the Appomattox Court House National Historical Monument, Va., and for other purposes; to the Committee on Interior and Insular Affairs.

By Mr. PATMAN:
H. R. 6440. A bill to revive and reenact section 6 of the act entitled "An act authorizing the construction of certain public works on rivers and harbors for flood control, and for other purposes," approved December 22, 1944; to the Committee on Public Works.

By Mr. ROOSEVELT:
H. R. 6441. A bill to promote greater economy in the operations of the Federal Government by providing for a consolidated cash budget, a separation of operating from capital expenditures, long-range budget estimates, the scheduling of legislative action on appropriation measures, yea and nay votes on amendments to appropriation measures, and a Presidential item veto; to the Committee on Expenditures in the Executive Departments.

By Mr. TALLE:
H. R. 6442. A bill to authorize the Attorney General to conduct preference primaries for nomination of candidates for President and Vice President; to the Committee on House Administration.

By Mr. TAYLOR:
H. R. 6443. A bill to provide for the designation of the United States Veterans' Administration Hospital at Albany, N. Y., as the William T. Byrne Veterans' Memorial Hospital; to the Committee on Veterans' Affairs.

By Mr. BOGGS of Delaware:
H. J. Res. 369. Joint resolution designating the period beginning on the Sunday before Thanksgiving Day and ending on the Sunday after Thanksgiving Day of each year as "Homemakers' Week"; to the Committee on the Judiciary.

By Mr. FLOOD:
H. J. Res. 370. Joint resolution authorizing the President of the United States of America to proclaim October 11 of each year General Pulaski's Memorial Day for the observance and commemoration of the death of Brig. Gen. Casimir Pulaski; to the Committee on the Judiciary.

By Mr. SMITH of Wisconsin:
H. Res. 518. Resolution to authorize the Committee on Foreign Affairs to conduct an investigation of the detention of United States citizens by the governments of certain foreign countries; to the Committee on Rules.

## MEMORIALS

Under clause 3 of rule XXII, memorials were presented and referred as follows:

By Mr. GOODWIN: Resolutions of the Massachusetts Legislature relative to an investigation by the President of the United States for a complete investigation of criminal acts against minority groups in the State of Florida; to the Committee on the Judiciary.

## PRIVATE BILLS AND RESOLUTIONS

Under clause 1 of rule XXII, private bills and resolutions were introduced and severally referred as follows:

By Mr. FRAZIER:
H. R. 6444. A bill for the relief of sundry claimants, and for other purposes; to the Committee on the Judiciary.

By Mr. BOW:
H. R. 6445. A bill for the relief of Jacob Athlas Robles and Esther de Castro Robles; to the Committee on the Judiciary.

By Mr. FLOOD:
H. R. 6446. A bill for the relief of Jeanne Marie Miura; to the Committee on the Judiciary.

By Mr. GRAHAM:
H. R. 6447. A bill for the relief of Igor Shwabe; to the Committee on the Judiciary.

By Mr. HEDRICK:
H. R. 6448. A bill for the relief of Christine Anne Hammel; to the Committee on the Judiciary.

By Mr. McDONOUGH:
H. R. 6449. A bill for the relief of Roman Boguslaw Massalski; to the Committee on the Judiciary.

H. R. 6450. A bill for the relief of Young Yuk Ho and Young Yuk Kue (Young Sue Mel); to the Committee on the Judiciary.

By Mr. MITCHELL:
H. R. 6451. A bill for the relief of Don B. Conley; to the Committee on the Judiciary.

H. R. 6452. A bill for the relief of Gregorious Athanasiou Fragglas; to the Committee on the Judiciary.

By Mr. POWELL:
H. R. 6453. A bill for the relief of John Abraham and Ann Abraham; to the Committee on the Judiciary.

H. R. 6454. A bill for the relief of Charles Larkin; to the Committee on the Judiciary.

H. R. 6455. A bill for the relief of Hiromi Kashiwagi Jones; to the Committee on the Judiciary.

By Mr. ROOSEVELT:
H. R. 6456. A bill for the relief of Eugenie Boullen; to the Committee on the Judiciary.

By Mr. SHEEHAN:
H. R. 6457. A bill for the relief of Manuel M. Weiss; to the Committee on the Judiciary.

By Mr. SIKES:
H. R. 6458. A bill for the relief of Susan Patricia Manchester; to the Committee on the Judiciary.

## PETITIONS, ETC.

Under clause 1 of rule XXII, petitions and papers were laid on the Clerk's desk and referred as follows:

532. By Mr. GRAHAM: Petition of 216 members of the Wilmington, Pa., Grange No. 1477, in opposition to compulsory military training; to the Committee on Armed Services.

533. By the SPEAKER: Petition of Kay Edmonston, Washington, D. C., relative to a grievance against J. Edgar Hoover and others, dated June 8, 1948; to the Committee on the Judiciary.

# SENATE

## WEDNESDAY, FEBRUARY 6, 1952

*(Legislative day of Thursday, January 10, 1952)*

The Senate met at 12 o'clock meridian, on the expiration of the recess.

The Chaplain, Rev. Frederick Brown Harris, D. D., offered the following prayer:

Our Father God, with our burdened lives tense and strained in a violent world we seek that peace which is a gift of Thy grace to all those who yield their wills to Thy will, their minds to Thy truth, their hearts to Thy obedience. To us in Thy providence has been given a place of awesome responsibility in this supreme hour of the centuries. We would exercise that stewardship of power with anxious care and deep humility.

We come this noontide conscious that freedom's flags around the earth are weeping today at the passing of a knightly king, who was an emblem of the free world—in times of blood and tears sharing with his people the austerity and sacrifice, as palace and cottage stood together in defying the powers of darkness. God save the kingly qualities which he incarnated for the Commonwealth. And God bring to the victory of a just peace the holy cause of which that throne, never vacant, is an inspiring symbol—the common cause for which our own Nation has pledged its all that liberty may not perish from the earth. We ask it in the name of the King of Kings and the Lord of Lords. Amen.

## THE JOURNAL

On request of Mr. McFARLAND, and by unanimous consent, the reading of the Journal of the proceedings of Tuesday, February 5, 1952, was dispensed with.

## MESSAGES FROM THE PRESIDENT

Messages in writing from the President of the United States submitting nominations were communicated to the Senate by Mr. Miller, one of his secretaries.

## MESSAGE FROM THE HOUSE

A message from the House of Representatives, by Mr. Chaffee, one of its reading clerks, announced that the House had agreed to the amendment of the Senate to the bill (H. R. 1469) for the relief of Rosario Garcia Jimeno.

The message also announced that the House had passed the bill (S. 905) for the relief of Margaret A. Ushkova-Rozanoff, with amendments, in which it requested the concurrence of the Senate.

The message further announced that the House had passed the following bills, in which it requested the concurrence of the Senate:

H. R. 761. An act for the relief of Yuriko Tsutsumi;

H. R. 2283. An act for the relief of Setsuko Yamashita, the Japanese fiancée of a United States citizen veteran of World War II, and her son Takashi Yamashita;

H. R. 2923. An act for the relief of Adelaida Reyes;

H. R. 3374. An act for the relief of Mrs. Lourdes Augusta Pereira Ladeiro Rose;

H. R. 3813. An act for the relief of Kenneth Cecil;

H. R. 4010. An act for the relief of William Grant Braden, Jr.;

H. R. 4268. An act for the relief of Elvira Zachmann;

H. R. 4472. An act for the relief of Henry T. Weber;

H. R. 4535. An act for the relief of Nigel C. S. Salter-Mathieson;

H. R. 4774. An act for the relief of Eleftherios G. Kokolis;

H. R. 5347. An act for the relief of Fusako Terao Scogin;

H. R. 5923. An act for the relief of Virginia Louise Slater;

H. R. 5955. An act for the relief of Delma L. Mauzey; and

H. R. 6065. An act for the relief of Patrick J. Logan.

## ENROLLED BILL SIGNED

The message also announced that the Speaker had affixed his signature to the enrolled bill (H. R. 1469) for the relief of Rosario Garcia Jimeno, and it was signed by the Vice President.

## DEATH OF GEORGE VI, KING OF GREAT BRITAIN

Mr. McFARLAND. Mr. President, it was with deep regret that I heard of the passing of King George VI. He will be long remembered in the annals of England and in the history of the free world.

As a brave man and a gallant gentleman, he was a shining example of all the fine qualities which have made the English people so valiant in war and so sturdy in peace. He had the enduring virtues of complete integrity and quiet courage.

When the forces of Hitlerism threatened to destroy his nation, the King demonstrated again and again his personal bravery and his unconquerable spirit. While Winston Churchill gave voice to the defiant and dauntless soul of England, the King stood forth at the head of his people, a silent symbol of their great strength.

In the troubled years since the end of World War II, King George VI poured out his energies in the service of his people. With dignity and devotion, he fulfilled the immense obligations of a British sovereign in a time of world crisis.

When he was stricken with a fatal illness, he bore his affliction with calm patience. He fought a hard fight against odds, and he won the affection and admiration of millions of people in the United States—all the people who admire a gallant fighter.

Mr. BRIDGES. Mr. President, I wish to associate myself with the statement made by the distinguished majority leader relative to the tragic passing of King George VI of Great Britain, a nation which for the past 140 years has manifested great friendship for the United States; indeed during that period her friendship has been traditional.

George VI was in his own right a king, and presided over a fellow English-speaking nation and the British Commonwealth of Nations during a very critical period in world history.

Speaking for all the Members of the minority I join in expressing sympathy to the family of the King, to Great Britain, and to the British Commonwealth of Nations, in the great loss they have suffered, which is likewise a loss to the entire free world.

Mr. CONNALLY subsequently said: Mr. President, I send to the desk a resolution which I ask to have read, and for which I ask immediate consideration.

The PRESIDENT pro tempore. Without objection, the resolution will be read.

The legislative clerk read the resolution (S. Res. 274), as follows:

*Resolved,* That the Senate of the United States unites with the American people and the rest of the free world in expressing to the Government and people of Great Britain and the British Commonwealth of Nations their deep sorrow and sympathy in the passing of their beloved monarch, King George VI.

*Resolved,* That the foregoing resolution be communicated through the Department of State to the Government of Great Britain and the governments of the British Commonwealth of Nations.

*Resolved,* That as a further mark of respect the Senate, at the conclusion of its business today, take a recess until 12:00 noon tomorrow.

The PRESIDENT pro tempore. Is there objection to the request for the present consideration of the resolution?

Mr. CASE. Mr. President, reserving the right of object, I wish to ask a question. The consideration of the resolution at this time will not displace consideration of the motion of the Senator from Iowa to reconsider the vote on ratifying the protocol. Is that correct?

The PRESIDENT pro tempore. That is correct.

Mr. CASE. Then, Mr. President, I withdraw my reservation of the right to object.

The PRESIDENT pro tempore. Without objection the resolution is unanimously agreed to.

## PRESENTATION OF CERTIFICATE OF MERIT TO CAPT. HENRIK KURT CARLSEN

Mr. CAIN. Mr. President, I ask unanimous consent to address the Senate for not to exceed 2 minutes.

The VICE PRESIDENT. Is there objection? The Chair hears none, and the Senator may proceed.

Mr. CAIN. Mr. President, I have made this request because I will be privileged to attend a ceremony at the White House in a few minutes, at which the