# Exhibit I

DEPOSITED BY THE
UNITED STATES OF AMERICA
12-10-52



# Congressional Record

**United States of America**

## PROCEEDINGS AND DEBATES OF THE 82d CONGRESS, SECOND SESSION

---

## SENATE

### TUESDAY, FEBRUARY 26, 1952

*(Legislative day of Monday, February 25, 1952)*

The Senate met at 12 o'clock meridian, on the expiration of the recess.

The Chaplain, Rev. Frederick Brown Harris, D. D., offered the following prayer:

Almighty God, who has bidden the light of the day to shine out of the darkness of the night, we would still our hearts for this hallowed moment as we bow now for the benediction of Thy loving kindness in the morning; for new mercies each returning day hover around us while we pray.

Grant us, we pray, in all our duties Thy help and in all our perplexities Thy counsel. Thou knowest how we are tempted, the drain of our daily work and the limitations of our strength, and how our yearnings after nobler life are so often frustrated by the down drag of a cynical and covetous world about us. Direct us to the sources of moral energy. Grant us this day the grace to live on the altitudes of our aspirations. Save us from false choices as we face this shattered earth, and guide our hands and minds to heal and bind and build and bless. We ask it in the dear Redeemer's Name. Amen.

---

### THE JOURNAL

On request of Mr. McFARLAND, and by unanimous consent, the reading of the Journal of the proceedings of Monday, February 25, 1952, was dispensed with.

---

### MESSAGES FROM THE PRESIDENT

Messages in writing from the President of the United States submitting nominations were communicated to the Senate by Mr. Miller, one of his secretaries.

---

### MESSAGE FROM THE HOUSE— ENROLLED BILLS SIGNED

A message from the House of Representatives, by Mr. Maurer, one of its reading clerks, announced that the Speaker had affixed his signature to the following enrolled bills, and they were signed by the Vice President:

H. R. 800. An act for the relief of Cindy Eberhardt;

H. R. 1962. An act for the relief of Wanda R. Barnett;

H. R. 2205. An act for the relief of Mary Alice Floyd;

H. R. 2398. An act to amend Public Law 848, Eighty-first Congress, second session;

H. R. 2669. An act for the relief of Maria Sarandrea;

H. R. 2672. An act for the relief of the law firm of Harrington & Graham;

H. R. 3100. An act to repeal the act of August 7, 1939 (53 Stat. 1243; 48 U. S. C., sec. 353);

H. R. 3569. An act for the relief of Louis Campbell Boyd;

H. R. 3860. An act to amend the act for the retirement of public-school teachers in the District of Columbia;

H. R. 3981. An act to amend the act of July 8, 1943 (57 Stat. 388), entitled "An act to authorize the Secretary of Agriculture to adjust titles to lands acquired by the United States which are subject to his administration, custody, or control";

H. R. 3985. An act for the relief of Hai Soon Lee;

H. R. 4130. An act for the relief of Caroline Wu;

H. R. 4224. An act for the relief of Mrs. Elfriede Hartley;

H. R. 4419. An act to amend the District of Columbia Teachers' Salary Act of 1947;

H. R. 4723. An act to provide that the Board of Education of the District of Columbia shall have sole authority to regulate the vacation periods and annual leave of absence of certain school officers and employees of the Board of Education of the District of Columbia;

H. R. 4749. An act authorizing the Secretary of Agriculture to return certain lands to the Police Jury of Caddo Parish, La.;

H. R. 4377. An act for the relief of Mrs. Margherita Caroli;

H. R. 5097. An act to extend the time during which the Secretary of the Interior may enter into amendatory repayment contracts under the Federal reclamation laws, and for other purposes;

H. R. 5235. An act to authorize and direct the Commissioners of the District of Columbia to make such studies and investigations deemed necessary concerning the location and construction of a bridge over the Potomac River, and for other purposes;

H. R. 5256. An act to secure the attendance of witnesses from without the District of Columbia in criminal proceedings; and

H. R. 6273. An act to amend the act relating to the incorporation of Trinity College of Washington, D. C., in order to make the archbishop of the Roman Catholic archdiocese of Washington an ex officio member and chairman of the board of trustees of such college.

---

### COMMITTEE MEETINGS DURING SENATE SESSION

On request of Mr. GILLETTE, and by unanimous consent, the Committee on Foreign Relations was authorized to meet this afternoon during the session of the Senate.

Also on request of Mr. GILLETTE, and by unanimous consent, the Subcommittee on Internal Security of the Committee on the Judiciary was authorized to meet this afternoon during the session of the Senate.

---

### TRANSACTION OF ROUTINE BUSINESS

Mr. McFARLAND. Mr. President, I ask unanimous consent that Senators may be permitted to transact routine business without debate.

The VICE PRESIDENT. Without objection, it is so ordered.

---

### PETITION

The VICE PRESIDENT laid before the Senate a joint resolution of the Legislature of the State of Virginia, which was referred to the Committee on Interior and Insular Affairs, as follows:

#### House Joint Resolution 22

Joint resolution memorializing the Congress of the United States to adopt legislation to provide for compensation in lieu of taxes lost by reason of acquisition of property by the Federal Government

Whereas Virginia counties, cities, and towns are suffering tremendous losses of tax income by reason of acquisition of property by the Federal Government and its removal from local taxation; and

Whereas the Federal Government continues to acquire more property in various parts of the State, such property then becoming tax exempt; and

Whereas a tabulation of tax-exempt property in Virginia made in 1943 shows that the Federal Government had acquired at that time property in various parts of the State aggregating over 2,100,000 acres and with a total value in excess of $250,000,000; and

Whereas in the case of Federal acquisition of real property, a heavy tax burden is unjustly imposed upon those taxpayers remaining in the community from which taxable areas have been removed by Federal acquisition; and

Whereas the loss being suffered in Virginia is constantly increasing through Federal acquisition of additional property, and the growing seriousness of the problem calls for speedy action and early solution; and

Whereas, the Congress of the United States is now considering legislation which will provide for the payment of compensation in lieu of taxes lost by reason of acquisition by the Federal Government of property: Now, therefore, be it

*Resolved by the House of Delegates of Virginia (the Senate concurring)—*

1. That the Congress of the United States is hereby requested to give its earliest possible attention to the adoption of the legislation which is now before it to provide for compensation in lieu of taxes lost by reason of Federal Government acquisition of property.

2. That members of the Virginia delegation in Congress are requested to support such legislation; and

3. That the clerk of the house of delegates is hereby directed to forward a copy of this

resolution to the members of the United States Senate representing Virginia, to the Virginia Members of the House of Representatives, to the Secretary of the United States Senate, and to the Clerk of the House of Representatives.

Agreed to by the house, February 14, 1952.
Agreed to by the senate, February 21, 1952.
A true copy.

E. GRIFFITH DODSON,
*Clerk of the House of Delegates.*

---

GREAT LAKES SHORE EROSION PROBLEM—RESOLUTION OF MILWAUKEE (WIS.) BOARD OF SUPERVISORS

Mr. WILEY. Mr. President, I have commented previously on the floor of the Senate regarding the gravity of the Great Lakes shore problem. At this time there is pending before the House of Representatives legislation dealing with the erosion problem, which is not, however, regarded in many expert quarters in my State, as constituting a constructive answer to this very serious situation. On the contrary, it is believed that diversion of the lake water into the Illinois waterway would actually increase the Lake Michigan shore front erosion problem.

I ask unanimous consent that the text of a resolution forwarded to me by the Milwaukee (Wis.) County Board of Supervisors on this issue be appropriately referred and printed in the RECORD.

There being no objection, the resolution was referred to the Committee on Public Works, and ordered to be printed in the RECORD, as follows:

Whereas several bills have been introduced in the second session of the Eighty-second Congress of the United States, relating to control of the level of Lake Michigan by permitting a diversion of lake water into the Illinois waterway at Chicago, notably H. R. 6080 by HOFFMAN of Michigan, H. R. 6098 by KLUCZYNSKI of Illinois, H. R. 6100 by SHEEHAN of Illinois, all of said bills being under the guise of erosion control; and

Whereas it is believed that the damage to lake harbor channel depths, which would be occasioned by such diversion, would greatly exceed the erosion prevention benefits, if any; and

Whereas Milwaukee County owns a large amount of lands fronting on Lake Michigan: Therefore be it

*Resolved,* That the county board of supervisors of Milwaukee County is opposed to any diversion of Lake Michigan water as contemplated by said congressional bill and requests that the Representatives in Congress from Wisconsin and the United States Senators from Wisconsin oppose such legislation; and be it further

*Resolved,* That a certified copy of this resolution be forwarded to said congressional and senatorial representatives at their offices in Washington; and be it further

*Resolved,* That a certified copy of this resolution be transmitted to the Chairman of the House of Representatives Committee on Public Works at Washington, D. C., with a request that the county clerk of Milwaukee County be notified at the time public hearings are to be held on the legislative bills, to wit: H. R. 6080, H. R. 6098, and H. R. 6100; and be it further

*Resolved,* That the corporation counsel of Milwaukee County or one of his assistants be and is hereby authorized and directed to appear at said hearings and express the opposition of Milwaukee County to the passage of said legislation.

---

REPORT OF A COMMITTEE

The following report of a committee was submitted:

By Mr. CORDON, from the Committee on Interior and Insular Affairs:

S. 539. A bill relating to the administrative jurisdiction of certain public lands in the State of Oregon; with amendments (Rept. No. 1214).

---

BILLS AND JOINT RESOLUTIONS INTRODUCED

Bills and joint resolutions were introduced, read the first time, and, by unanimous consent, the second time, and referred as follows:

By Mr. LANGER:

S. 2725. A bill for the relief of Hanni Marie Matuschke; to the Committee on the Judiciary.

By Mr. RUSSELL (by request):

S. 2726. A bill to authorize the Federal Civil Defense Administrator to acquire, by lease or license, warehouse space for civil defense purposes at Sikeston, Mo.; Zanesville, Ohio; Downingtown, Pa.; and Paw Paw, W. Va., respectively; and

S. 2727. A bill to amend the act of July 16, 1892 (27 Stat. 174 ch. 195) so as to extend to the Secretary of the Navy, and to the Secretary of the Treasury with respect to the Coast Guard, the authority now vested in the Secretaries of the Army and Air Force with respect to the withholding of officers' pay; to the Committee on Armed Services.

S. 2728. A bill to amend the act of July 12, 1950 (Public Law 609, 81st Cong.), as amended, so as to extend free mailing privileges to members of the armed forces of foreign nations serving under the United Nations command in Korea on a reciprocal basis, and for other purposes; to the Committee on Post Office and Civil Service.

S. 2729. A bill to authorize the Administrator of Veterans' Affairs to transfer, without reimbursement, to the Department of the Army the Birmingham General Hospital, Van Nuys, Calif.;

S. 2730. A bill to amend section 301, Servicemen's Readjustment Act of 1944 to further limit the jurisdiction of boards of review established under that section; and

S. 2731. A bill to authorize the transfer of hospitals and related facilities between the Veterans' Administration and the Department of Defense, and for other purposes; to the Committee on Labor and Public Welfare.

By Mr. TAFT:

S. 2732. A bill for the relief of Michiko Takagi; and

S. 2733. A bill for the relief of Donald Lee Ferguson, Jr.; to the Committee on the Judiciary.

By Mr. NEELY:

S. 2734. A bill to provide for the appointment of an additional judge for the Juvenile Court of the District of Columbia; to the Committee on the District of Columbia.

By Mr. NEELY (by request):

S. 2735. A bill to amend the act entitled "An act to provide for the recording and releasing of liens by entries on certificates of title for motor vehicles and trailers, and for other purposes," approved July 2, 1940, as amended; and

S. 2736. A bill to amend the Code of Law of the District of Columbia in respect to the recording, in the Office of the Recorder of Deeds, of bills of sale, mortgages, deeds of trust and conditional sales of personal property, and for other purposes; to the Committee on the District of Columbia.

By Mr. BENNETT (for himself and Mr. WATKINS):

S. 2737. A bill to authorize the Secretary of the Interior to permit the prospecting, de-

---

velopment, mining, removal, and utilization of mineral resources of national forest lands or lands administered for national forest purposes or in connection with national forest programs not subject to the operation of the general mining laws, the Mineral Leasing Act, as amended, or the Mineral Leasing Act for Acquired Lands, or for the development of which no other statutory authority exists; to the Committee on Interior and Insular Affairs.

(See the remarks of Mr. BENNETT when he introduced the above bill, which appear under a separate heading.)

By Mr. HUNT:

S. 2738. A bill to equalize the treatment accorded to commissioned officers of the Veterinary Corps with that accorded to commissioned officers of other corps of the Army Medical Service, and for other purposes; and

S. 2739. A bill providing for the rank of certain officers in the Department of Defense; to the Committee on Armed Services.

By Mr. WILEY:

S. 2740. A bill for the relief of Rosette Sorge Savorgnan; to the Committee on the Judiciary.

By Mr. JOHNSON of Colorado:

S. 2741. A bill to amend section 6 of the act of August 24, 1912, as amended, with respect to the recognition of organizations of postal and Federal employees; to the Committee on Post Office and Civil Service.

By Mr. CAPEHART (for himself, Mr. O'CONOR, and Mr. BRICKER):

S. 2742. A bill to provide for the discontinuance of operations, the disposition of the properties, and the liquidation, of the Inland Waterways Corporation, and for other purposes;

S. 2743. A bill to authorize and direct the Interstate Commerce Commission to determine and prescribe reasonable user charges to be imposed for the use for commercial transportation purposes of inland waterways constructed or improved at the expense of the United States, and for other purposes;

S. 2744. A bill to establish the procedure for the determination of the economic justification of certain inland waterway improvement projects, and for other purposes; and

S. 2745. A bill to eliminate certain sections of the Interstate Commerce Act which provide for preferential treatment in the matter of rates; to the Committee on Interstate and Foreign Commerce.

By Mr. NEELY (by request):

S. J. Res. 137. Joint resolution authorizing the granting of permits to the Committee on Inaugural Ceremonies on the occasion of the inauguration of the President-elect in January 1953, and for other purposes; to the Committee on the District of Columbia.

By Mr. HUNT:

S. J. Res. 138. Joint resolution to provide for the maintenance of public order and the protection of life and property in connection with the Presidential inaugural ceremonies of 1953; to the Committee on the District of Columbia.

---

MINERAL RESOURCES OF NATIONAL FOREST LANDS

Mr. BENNETT. Mr. President, on behalf of my colleague, the senior Senator from Utah [Mr. WATKINS] and myself, I introduce for appropriate reference a bill to authorize the Secretary of the Interior to permit the prospecting, development, mining, removal, and utilization of mineral resources of national forest lands or lands administered for national forest purposes or in connection with national forest programs not subject to the operation of the general mining laws, the Mineral Leasing Act, as amended, or the Mineral Leasing Act for Ac-

quired Lands, or for the development of which no other statutory authority exists. I ask unanimous consent that an explanatory statement of the bill may be be printed in the RECORD.

The VICE PRESIDENT. The bill will be received and appropriately referred, and, without objection, the explanatory statement will be printed in the RECORD.

The bill, S. 2737, to authorize the Secretary of the Interior to permit the prospecting, development, mining, removal, and utilization of mineral resources of national forest lands or lands administered for national forest purposes or in connection with national forest programs not subject to the operation of the general mining laws, the Mineral Leasing Act, as amended, or the Mineral Leasing Act for Acquired Lands, or for the development of which no other statutory authority exists, introduced by Mr. BENNETT (for himself and Mr. WATKINS), was read twice by its title, and referred to the Committee on Interior and Insular Affairs.

The explanatory statement by Mr. BENNETT is as follows:

STATEMENT BY SENATOR BENNETT

The bill would authorize the Secretary of the Interior to permit the prospecting for, development, mining, removal, and utilization of mineral resources of national forest lands or lands administered for national forest purposes in connection with national forest programs under the Secretary of Agriculture which are now not subject to the operation of the general mining laws, the Mineral Leasing Act, of February 25, 1920 (41 Stat. 437), as amended, the Mineral Leasing Act for Acquired Lands (61 Stat. 913), or for the development of which no other statutory authority exists.

This bill would authorize the Secretary of the Interior, under general regulations to be prescribed by him and upon such terms and for specified periods or otherwise as he may deem to be in the best interests of the United States, to permit the prospecting for and the development and utilization of such mineral resources. The Secretary of the Interior would be authorized to issue permits for such prospecting, development and utilization of the mineral resources only with the consent of the Secretary of Agriculture and subject to the conditions the Secretary of Agriculture may prescribe for the adequate utilization and proper protection of national forest lands or lands administered for national forest purposes or in connection with national forest programs. Where mineral resources on any lands which are also withdrawn or reserved for any purpose other than national forest purposes, the permit would be issued by the Secretary of the Interior only when the agency of the Government for which such other withdrawal or reservation was made concurs that the prospecting for, development or other utilization of such mineral resources will not be inconsistent or incompatible with the purpose of such other withdrawal or reservation.

All receipts derived from the permits or licenses issued under the authority of the proposed act would be paid into the same funds or accounts in the Treasury and shall be distributed in the same manner as prescribed for other receipts from the lands affected by the permit or license. It is the intention that the bill would not affect the distribution of receipts pursuant to existing legislation applicable to such land.

The bill would authorize the Secretary of the Interior access to the title records of the Department of Agriculture relating to the lands affected by this act, to the extent necessary for the administration of the proposed act.

At the present time there are some large areas within national forests or within the confines of lands administered in connection with the national forests which, because of technicalities of law are not open for mineral exploration, utilization, or development. I understand that there are also many small areas within the forest lands which are not open for utilization. The bill which I have introduced would supplement existing statutory authorities for the exploration, development, utilization, or removal of mineral resources from national forest lands or lands administered in connection with national forests and would open up new areas to exploration for critical, strategic, and other domestic mineral resources which are now legally locked up.

One of the large areas in the United States which is not now open to prospecting for utilization and development of mineral resources is the Grand Canyon Game Preserve in the Kaibab National Forest in Arizona. I first began to look into this matter because citizens of southern Utah reported to me that valuable copper deposits were to be found within the Grand Canyon Game Preserve which was closed to mineral prospecting and development. When I explored this matter with the Forest Service, I was advised on January 14 by a letter of the Chief of Forest Service that legislation would be required to open the Grand Canyon Game Preserve for mineral prospecting and development. At that time I was advised that not only would the Forest Service look favorably upon legislation designed to open the Grand Canyon Game Preserve but that it would favor general legislation unlocking possible mineral deposits in all the forests of the United States by authorizing prospecting and development on a permit basis such as that provided in the bill which I have sent to the desk. Since that time I have received a letter from the Secretary of Agriculture, pointing out that general legislation would be desirable because it would tend to obviate the need for special bills.

The provisions of the bill are such that the Secretary of Agriculture can protect the interests of the United States in the forest lands and the Secretary of the Interior and the heads of other departments and agencies for which special withdrawals and reservations have been made can protect other interests of the United States in the process of issuing the permits for prospecting for and the utilization and development of mineral deposits. It is anticipated that the conditions and regulations imposed by the Secretary of the Interior will preclude the use of the leases or permits issued under the proposed act for purposes other than prospecting for and the utilization and development of mineral resources.

I am confident that the bill would be in the interests of the United States and an aid to national defense by permitting the prospecting for and development of critical minerals. Since it has general application and is important in the present emergency, I hope that the bill will receive favorable consideration by the Congress and will become law in this session.

PRINTING AND BINDING OF REVISED EDITION OF CONSTITUTION (ANNOTATED)

Mr. WILEY. Mr. President, I submit for appropriate reference a concurrent resolution providing for the printing and binding of a new edition of the Constitution of the United States, annotated. I ask unanimous consent that a statement which I have prepared on the subject be printed in the RECORD.

The VICE PRESIDENT. The concurrent resolution will be received and appropriately referred; and, without objection, the statement will be printed in the RECORD.

The concurrent resolution (S. Con. Res. 65), submitted by Mr. WILEY, was referred to the Committee on Rules and Administration, as follows:

Resolved by the Senate (the House of Representatives concurring), That the Constitution of the United States of America (annotated) prepared by the Librarian of Congress under authority of Senate Joint Resolution 69, Eightieth Congress, and comprising a revision and extension of Senate Document 232, Seventy-fourth Congress, be printed and bound; and that 3,000 copies shall be printed, of which 2,200 copies shall be for the use of the House of Representatives and 800 copies for the use of the Senate.

The statement by Mr. WILEY is as follows:

STATEMENT BY SENATOR WILEY

NEED FOR A NEW EDITION

I have before me the text of the annotated edition of the Constitution of the United States as published in 1938 in the form of Senate Document No. 232 of the Seventy-fourth Congress, second session.

This document, in some 1,246 pages, lists all of the decisions of the United States Supreme Court construing the various provisions of the United States Constitution, up until that time.

I need hardly tell my colleagues how completely invaluable this book is in particular to every attorney in our country, to every serious student of political science and, yes, indeed, to businessmen, laboring men, and just about everyone else who is interested in following the work of the Supreme Court on the great and small constitutional questions of our time.

The 1936 document had been prepared in accordance with Senate Concurrent Resolution No. 35 submitted by one of our distinguished predecessors, Senator Ashurst, of Arizona. That resolution had been adopted on May 14, 1936. Today, I am introducing a companion resolution under which there will be reprinted identically as provided 16 years ago, a new Senate document. As before, 3,000 copies are to be printed and bound for extra allotment purposes by Senators and Representatives—800 for the use of the Senate and 2,200 for the use of the House. This would be in addition to the normal amount reproduced for distribution to the Senate and House libraries, the Library of Congress and designated depository libraries throughout the Nation.

Of course, in turn, this would be independent of the number the Government Printing Office would publish for sale. The 1936 document was sold for $2.50 each and had a very wide circulation, as was expected.

I have a personal and deep interest in this subject, because it was during my chairmanship of the Judiciary Committee in the Republican Eightieth Congress that I introduced Senate Joint Resolution 69, which became Public Law 95. That resolution directed the Librarian of Congress to revise and edit the Annotated Constitution of 1938. It authorized a limitation of $35,000 on the expenses of preparation, but, of course, it made no provision for the ultimate printing.

The preparation work has now been completed under the able editorship of one of the greatest constitutional scholars of our time, Prof. Edward S. Corwin, of Princeton University.

It is a great privilege for me to have played a small part in helping to bring about the revision of this vital document. I need hardly state that a study of the United

States Constitution on the part of every citizen has become more imperative in these times than ever before in American history. And, of course, no study of the Constitution is complete without a consideration of the decisions of the Supreme Court.

Needless to say, moreover, the speed with which the new Annotated Constitution can be printed is a matter of deep interest, particularly to the legal profession of our Nation. An incalculable amount of time is saved by consulting an up-to-date edition, of course. I am hoping, therefore, that the resolution which I am offering today can be taken up promptly and that it can be handled independently of the legislative appropriation bill for the next fiscal year.

I feel that the new annotated Constitution is a work of which the Library of Congress itself, under Dr. Luther Evans and the Legislative Reference Service, under Dr. Ernest Griffith, can be proud, as it was rightly proud of the previous edition which had been prepared under the direct supervision of Mr. Wilfred C. Gilber of the Legislative Reference Service.

---

### AMENDMENT OF DEFENSE PRODUCTION ACT OF 1950 AND HOUSING AND RENT ACT CF 1947—AMENDMENTS RELATING TO COMPENSATION OF CERTIFIED PUBLIC ACCOUNTANTS

Mr. IVES. Mr. President, I submit for appropriate reference amendments intended to be proposed by me to the bill (S. 2645) to amend and extend the Defense Production Act of 1950, as amended, and the Housing and Rent Act of 1947, as amended, and request that they be printed.

I ask unanimous consent that a statement prepared by me in support of the amendments, which would exempt compensation of certified public accountants from salary stabilization, be printed in the RECORD as a part of my remarks.

The VICE PRESIDENT. The amendment will be received, printed, and referred to the Committee on Banking and Currency; and, without objection, the statement will be printed in the RECORD.

The statement by Mr. IVES is as follows:

STATEMENT BY SENATOR IVES IN SUPPORT OF AMENDMENT OF THE DEFENSE PRODUCTION ACT TO EXEMPT COMPENSATION OF CERTIFIED PUBLIC ACCOUNTANTS FROM SALARY STABILIZATION

In the Defense Production Act amendments of 1951, Congress exempted from salary stabilization compensation paid to physicians employed by certain medical institutions and compensation paid to attorneys licensed to practice law, employed in a professional capacity by an attorney or firm of attorneys engaged in the practice of the legal profession.

This amendment was written into the law by a conference committee in lieu of a provision in the bill passed by the House which would have exempted wages, salaries, or other compensation paid for professional services.

The amendment now proposed would grant similar exemption to certified public accountants holding State certificates as such, who are employed by certified public accountants or firms of certified public accountants. Their position is comparable to that of the doctors and lawyers who have been granted exemption, both in that they hold licenses from the State, and also in that the fees charged by their employers are exempt from price control.

Certified public accountants like lawyers furnish a variety of services to clients which are of special importance in a period of national emergency like the present. Among these services are the preparation of tax returns, assistance in the preparation of data required by Government agencies and services in connection with financing by public and private lenders, price controls, contract negotiation and renegotiation. In all of these areas a fundamental safeguard of the public interest is provided by the competence, professional standards and sense of public responsibility of the certified public accountant. The defense emergency has also brought a substantial increase in the work of many certified public accountants in connection with excess profits taxes and figures required under Government contracts. Employees who have added work and responsibilities as a result deserve to have their compensation adjusted accordingly.

Granting of the proposed exemption would not be inflationary, since the number of CPA employees affected, I am advised, is small (about 10,000), since stabilization of their compensation is not a requirement for protection of any existing price ceilings, and since any increase in their compensation would, in all probability, be derived from funds accruing to the individual practitioner or partnership by whom they are employed.

If regulations make it difficult or impossible to recognize the certified public accountants' work with compensation commensurate with his worth, he can improve his status by organizing his own firm to render services on a fee basis or by taking a position in private industry. Traditionally there has been a flow of men to industry where certified public accountants now hold many of the responsible executive positions. This flow is healthy so long as it is moderate, but during the past year this flow has accelerated alarmingly. This is especially serious since it takes several years to train men for advanced professional work. Professional firms cannot make it attractive to able men to remain with them unless they can be given a fair share of the income their services produce. This is difficult to accomplish under stabilization regulations which were not drafted to meet the unusual situations that arise in professional work.

The group affected by the requested exemption is small. In terms of inflationary pressure, even substantial increases in compensation to this group would be negligible. Certified public accountants, like any employers, have every reason to be conservative in granting increases of compensation to their staffs. The exemption is requested solely because a large measure of discretion as to compensation matters is essential to maintenance of healthy professional organizations. As indicated above, maintenance of such healthy organizations is an important factor in promoting the objectives of the Defense Production Act.

The proposed amendment would therefore provide fair treatment for a group which is small in numbers but highly important to the economic health of the community, without in any way endangering the stabilization program.

---

### ADDRESSES, EDITORIALS, ARTICLES, ETC., PRINTED IN THE APPENDIX

On request, and by unanimous consent, addresses, editorials, articles, etc., were ordered to be printed in the Appendix, as follows:

By Mr. HILL:
Address on Federal funds for education, delivered by Senator GILLETTE, and broadcast over Stations WGN, Chicago, and WHO, Des Moines, February 2, 1952.

Article relating to rearmament, entitled "The True Picture," written by Walter Lippmann, and published in the Washington Post of February 14, 1952.

Article discussing use of funds from Federal oil lands for education, written by Dr. Benjamin Fine, and published in the New York Times of February 10, 1952.

Article on Federal funds for education, published in AFL News Reporter of February 13, 1952.

By Mr. MURRAY:
Statement issued by former Senator Claude Pepper at Tallahassee, Fla., on January 26, 1952.

Article entitled "Murder in the Mines," written by Willard Shelton, and published in the Nation magazine for February 9.

By Mr. BRICKER:
Sundry editorials and articles from newspapers throughout the United States, relating to proposed amendment to Constitution relating to treaties.

By Mr. LANGER:
Article entitled "Ten Hours With Mr. Whelan," an account of an interview with United States Ambassador Thomas E. Whelan, published in Novedades, of Managua, Nicaragua, on February 25, 1952.

By Mr. MARTIN:
Statement of agricultural production on 48 farms, East Donegal Township, Lancaster County, Pa.

By Mr. MORSE:
Editorial entitled "Hidden Enemy," written by Harold S. Tuttle, and published in the Portland Oregonian of May 23, 1951.

By Mr. WATKINS:
Editorial entitled, "Fight Must Go On to Protect Schools," published in the Salt Lake Tribune, of February 20, 1952.

Editorial entitled "Significance of Atlantic Pact Extension," published in the Salt Lake Tribune of February 15, 1952.

By Mr. SPARKMAN:
Editorial entitled "Let's Take Another Look at TVA," written by Floyd F. Anderson, and published in the Joe Wheeler News.

Article entitled "Epilepsy: A Social Handicap," written by Dr. Jerome K. Merlis, and published in the February 1952 issue of Valor.

Article entitled "Chiang's Army Has Many Weak Spots," written by Henry R. Lieberman, and published in the New York Times of February 17, 1952.

Article entitled "Basic Aims in Far East Bar Real Peace There," written by James Reston, and published in the New York Times of February 17, 1952.

Article entitled "Invitation to Opportunity," written by Paul W. Chapman, and published in the February 1952 issue of th Progressive Farmer.

---

### PRIVATE-INCOME SOURCES OF FEDERAL OFFICIALS—ARTICLE IN WASHINGTON TIMES-HERALD

Mr. LANGER. Mr. President, in the Washington Times-Herald this morning there appeared an article entitled "Morris Plans Extra Income Quiz of Aides." I ask unanimous consent that this article may be printed in full at this point in my remarks.

There being no objection, the article was ordered to be printed in the RECORD, as follows:

MORRIS PLANS EXTRA INCOME QUIZ OF AIDES—FULL DETAILS WILL BE REQUIRED

The administration's clean-up chief, Newbold Morris said yesterday he is planning to ask officials throughout the Federal service for full details of their private-income sources.

Morris said a questionnaire, now about complete, is expected to be in the hands of the Government Printing Office by the end of this week and will be distributed to Government officials as soon as it is printed.

This will be the first step in Morris' search for any official misconduct in the Government—an inquiry ordered by President Truman in the wake of congressional disclosures

of tax collection scandals and other irregularities.

### HITS UPPER LEVELS

Morris, a New York Republican, was appointed a special assistant to Attorney General McGrath to undertake the task.

A congressional inquiry into McGrath's own income sources was demanded last week by Harold E. Stassen, candidate for the Republican presidential nomination, who said he had heard the attorney general, himself, became a millionaire after taking public office.

McGrath issued a statement thanking Stassen for the compliment but declining further comment.

Morris told reporters his survey of outside income is not intended for rank-and-file Government workers but is aimed at upper-level officials.

A list of those to be questioned is being worked out with the Civil Service Commission.

### M'CARRAN ASKS DELAY

Chairman McCarran, Democrat, of Nevada, said meanwhile he wants his Senate Judiciary Committee to postpone action on the President's unparalleled request for revolutionary powers, as McCarran put it, for Morris.

Morris said his questionnaire would require officials to list all income received in addition to their Government salaries, with a detailed explanation of any services performed to earn such income.

President Truman already has directed everybody on the Federal payroll to give Morris any information he asks.

Morris said answers given on the questionnaire will be kept confidential unless they disclose irregularities calling for prosecution or other Government action.

McCarran's committee held a closed session yesterday to discuss the President's request that Morris be given special powers. The chairman said in advance:

"I am going to recommend that we give much more extensive study to this request for authority to set up an inquisition, if you please, which could deny Congress access to important information in its own investigations."

### OTHERS FAVOR STUDY

Three Republican members of the committee—Senators Ferguson, of Michigan, Wiley, of Wisconsin, and Watkins, of Utah—also said before the meeting they favor more study of the President's request.

A week ago McCarran set up a Judiciary subcommittee with himself as chairman to look into Mr. Truman's request for clean-up powers. The group was instructed to report to the full committee today.

McCarran said in an interview he would report "no sentiment at all" in the subcommittee for giving Morris authority to promise witnesses immunity from prosecution. The House Judiciary Committee already has rejected the President's request for such authority, but has taken no action on the subpena-power issue.

Morris said last week he had not asked for witness immunity authority. He added, however, that he might just as well quit if he didn't get subpena power.

McCarran said yesterday he would favor granting subpena authority only if Congress provided it would have access to any material Morris obtained, a view Ferguson has said he shares.

Mr. LANGER. After reading that article, Mr. President, I wrote a letter to Mr. Newbold Morris, as follows:

FEBRUARY 26, 1952.

Hon. NEWBOLD MORRIS,
*Special Assistant to the Attorney General, United States Department of Justice, Washington, D. C.*

MY DEAR MR. MORRIS: I like the excellent way you are taking hold of your job to clean up graft and corruption in the Government, and I particularly approve of the plan as expressed in the newspapers this morning of your asking officials throughout the Federal service for full details of their private income sources.

The fact that you are going to hit the upper levels is particularly intriguing to me. For some time there have been those of us in the Senate who have believed that investigation of outside income is not intended for the rank and file Government workers alone, but should be aimed at upper level officials.

We believe that every member of the Cabinet and every Member of Congress should be asked to fill out the questionnaire you are having printed. As one of the Senators from North Dakota I should like to have the privilege of being the first to do so from the Senate body. It has always seemed most incongruous to me that a man who is a candidate for the Senate, knowing what the salary is when he becomes a candidate for the office, nevertheless takes on outside sources of income such as continuing to practice law, being a member of a law firm, and other ways with which you are familiar.

Certainly, if a Senator cannot live on the salary of a Senator he should either assist in getting the salary raised or resign his office, and even more certainly, any Senator should not be averse to filing a complete report of just exactly what his sources of income are.

I trust that your questionnaire will request information as to just exactly what outside sources of income the Member has received from the time he entered the service until the present date.

It seems to me that in these troublesome days when we have one investigating committee of Congress after another that the Members of Congress themselves ought to be glad to set the example of disclosing their financial status, just as they took the lead in the economy drive during World War I in reducing their own salaries.

It is my considered judgment that the overwhelming Members of the Senate are honest, hard working individuals, and that the impression prevalent among the public as to the contrary is entirely unjustified. Nothing, in my opinion, would overcome this totally unwarranted assumption better than to have you make the proposed investigation and have the questionnaires returned by the Members of Congress. The people, I am sure, will welcome this, and the constituents of any Senator who voluntarily refused to fill out the questionnaire and return it to you would look askance at that particular public servant.

With every good wish to you, and assuring you that I have often thought of you since the time that you and I addressed the breakfast together at the St. George Episcopal Church in New York, where you gave such a splendid talk in behalf of American leadership, I am,

Very sincerely yours.

Time and time again on this floor various Members have brought the matter of outside income to the attention of the body as a whole, and have asked that legislation on the subject be enacted. Various bills have been introduced. I know of no time more appropriate than the present for Mr. Newbold Morris, who is in charge of the current investigation, to have it include members of the Cabinet and Members of Congress.

---

### STATEHOOD FOR ALASKA

Mr. MORSE. Mr. President, I ask unanimous consent to be allowed such time as may be necessary to make a few brief remarks in explanation of certain material which I wish to introduce into the RECORD.

The VICE PRESIDENT. If the Senator will permit the Chair to lay before the Senate the unfinished business, the Chair will recognize the Senator from Oregon without the necessity of his obtaining unanimous consent.

The Chair lays before the Senate the unfinished business, which is Senate bill 50, to provide for the admission of Alaska into the Union.

---

### CONDITIONS ON THE HOME FRONT

Mr. MORSE. Mr. President, recently I received from Col. Preston B. Waterbury, a retired Army officer living in Ashland, Oreg., an article from the American Legion magazine, entitled "All's Quiet on the Home Front." The subheading is: "An angry report by a marine who recently returned from the Korean combat zone."

The first paragraph of the article reads as follows:

Americans in Korea have been double-crossed by Americans in the United States. And some of us who have come back from that peninsula of misery are mighty ashamed of the home folks.

The article continues to express keen disappointment and harsh criticism on the part of this marine as to what he observed upon his return to the home front.

For a long time past, as a member of the Armed Services Committee, I have urged the strengthening of our mobilization program. I have endeavored, within the proprieties and in keeping with the confidences which it was my trust to protect as a member of the Armed Services Committee to advise the American people that we have not developed our defenses to the point where we could absorb the first shocks of an all-out war with Russia in Asia without suffering tremendous casualties on the home front, casualties which we would not need to suffer if we would only speed up our mobilization program and start producing planes on a mass production basis so that if we should find ourselves in an all-out war with Russia, we would not be in any doubt as to whether or not we had superiority in the air in Asia, Europe, or elsewhere in the world.

I must confess that it is a matter of great sadness to me that we have not moved forward more rapidly in connection with the matter of mobilization. As a member of the Armed Services Committee I have heard the officials of our Military Establishment, both those in civilian capacities and those in uniform, point out that such sudden and rapid changes are taking place in connection with aircraft production that it may be a matter of only a few months—and certainly only a matter of a year or two—before some of the most modern planes may be considered obsolete.

But Russia confronts the same problem. She is producing planes. I want to prevent every dollar of waste in the Military Establishment that can be prevented, and I think a great deal of waste can be eliminated. But there are certain things called waste which I think cannot be avoided.

I am perfectly willing to write off as waste the mass production of airplanes in the immediate future, which may be obsolete in 3 or 4 years or less, in the interest of obtaining a quantity of planes so that we shall no longer hear that we are not presently in a position to absorb the first shocks of an all-out war with Russia, if it should come, because of a serious question mark as to whether or not we have superiority in the air in Asia, Europe, and elsewhere.

One cannot read this article by James C. Jones, Jr., to which I have referred in these remarks, without having a great deal of human understanding of the reactions which he has set forth in these paragraphs, even though they are not very complimentary to us on the home front. I think it is good for us to read of some of these reactions. I would that the reports coming back from our boys in Korea were all that we needed to speed up mobilization to the point I have been suggesting as a member of the Armed Services Committee, so that we might be in a position to leave no doubt in the minds of the Russian leaders that they have everything to lose and nothing to gain by a continuation of their aggressive course of action. I believe that articles such as this are good for us to read. I ask unanimous consent that the entire article be printed in the RECORD at this point as a part of my remarks.

There being no objection, the article was ordered to be printed in the RECORD, as follows:

ALL'S QUIET ON THE HOME FRONT

(By James C. Jones, Jr.)

Americans in Korea have been doublecrossed by Americans in the United States. And some of us who have come back from that peninsula of misery are mighty ashamed of the home folks.

Yanks of the Eighth Army, an infinitesimal cluster of men compared to the United States potential, have carried the fight for a Nation which gives every indication of not caring, which appears to prefer looking the other way, which concerns itself virtually not at all with the fearful casualties, and which has dedicated itself almost exclusively to the betterment of its individual backyards. Those families which have members in Korea evidently are the only people who side completely and devotedly with United States fighters.

Veterans of Korea experience a momentary, ephemeral exhilaration when the ships ease up to United States piers: We are alive, not all of us are crippled, we are as healthy as can be expected, and there is joy in knowing that the next minute or week or year will not be spent fighting—at least, not in Korea. Much of that exquisite, high tension happiness is dispelled in short order.

When we settle down enough to permit a searching look-around, what we see confirms the suspicions that were bred overseas. In the vernacular, nearly everyone here is fat. Despite all the bellyaching about high prices and high taxes, it is quite apparent that nobody is starving, that millions of television aerials stud the housetops, that a vast number of the cars on the streets are sleek new models, and that most of the home-fronters are so busily occupied in tending their own gardens that they seldom have time to drop in at a blood-donor center to squeeze off a pint for the guy who is dribbling his away in a cruddy rice paddy. Giving blood to the Armed Forces is quick, painless, free, soulsatisfying, and lifesaving. Yet tens of millions of backsliding Americans cannot be bothered.

Stepping on to United States shores is, indeed, a pleasant change, environmentally, but more than a little disquieting. When many of us made a similar trip home from the various battlefields of World War II, we enjoyed an abiding sense of pride. There was the feeling that the whole country had been at war, seriously bent upon whipping the common enemies. We survivors returned, knowing the Nation had been solidly behind us, had counted heavily on us, and we were proud because we had not failed.

Precious little pride accompanies the sadly inspired about going into battle in 1950 home-coming. (And I speak for a sizable number of buddies, as well as for myself. My military job was a combat correspondent enabled me to meet many men, to learn much about their feelings and convictions.) None of us can see where we failed this time, but most of us can see where the home guard corked off. No, homecoming is not the great fun it was in 1945. Rather, it is a little embarrassing, because some of us hatch the hot idea that we are little more than red-faced suckers.

Bear in mind that we were probably less than any other Americans in any other war. Why we were hustled into that stinking land at all was well worth pondering. At first, many sloggers entertained the notion that we were buying time for America. What happened? Seven United States divisions came to Korea in the first 4 months of the war, then the tap was shut off. We felt that we had purchased the time, at prohibitive prices, but where were the rest of the soldiers our Nation of 155,000,000 people was supposed to be supplying? A few were in Europe, but most of them were home, and there still are seven United States divisions in the line.

That pittance of incoming manpower sent tumbling the conjecture that we might be trying to keep the Communists out of Japan, too, for we learned belatedly that another of the Yalta deals had situated the Russians only a canoe's ride from Hokkaido, the northernmost island of Japan. Keeping the Reds from engulfing Korea would not prevent them from sweeping across the last American bastion in that part of the world, if they had a yearning to occupy Nippon. Seven not-so-hot-to-trot divisions in Korea would not, at any rate, and the lonesome pair of United States divisions now occupying Japan would be unable to do much about it, either.

Morale could never be strong under such circumstances, and mustering up courage (or developing a strong enough feeling of futility) to attack that next hill was excruciatingly difficult. Especially after that first bit of sweet scuttlebutt concerning peace talks. The capers at Kaesong soon appeared to be largely in the nature of international diddling, though, and viewing it thus, the infantryman found going up that hill a little easier, although he could not see the worth of it. He might die, wondering to the last if a cease-fire would be in effect next morning, or even at the moment he died. It took more than the usual allotment of guts, but he had it, and so he went up that hill day after day.

Morale was anything but aflame in Korea, and it helped not one whit to be prodded urgently by a long shaft from the home side. The American in Korea fought gallantly because he was fighting for his life and he knew it. Americans at home, most of us feel, should be fighting for theirs. Instead, they seem to think this war is a two-bit skirmish being fought on Mars or Venus. This home-front neglect has prompted many a bitter remark which no American should ever feel called upon to make. The 33-year-old two-war corporal who sat in a deep fox hole with me last June in Shrapnel Alley north of Yanggu only repeated what had been said, in effect, many times before.

"I wish to hell a herd of these gooks would blast the berries out of some state-side cities with these high-velocity 76's. San Diego, maybe, or Kansas City or Chicago. Maybe those eight balls would snap out of their hockey then, if a few thousand of 'em got racked up by rusty fragments."

That was not an ill-considered growl made to the accompaniment of incoming mail, and I am not apologizing for the corporal. His was a concrete conviction, genuinely expressed, in the hope that such a catastrophe would result in those eight balls realizing indeed that this war was not being fought on a far-away planet.

One of the first things to raise the hackles of the returning vet is a daily reading of the newspapers. The schoolmasters of the Republic, we soon discovered, very often relegate stiff Korean battles to less than a quarter-column in the second section. We recall that Lt. Gen. James Van Fleet termed the over-all conflict a "dim-out war" after the truce negotiations began. The dim-out was short-lived. Nobody was hiding his light under a basket at Bloody Ridge, the Punchbowl, the month-long battle of Heartbreak Ridge, the incessant slugging in the Iron Triangle sector, the savage infighting on Kim Il Sung Ridge, and the brutal give-and-take at See-Saw Hill and Little Gibraltar. Battle reports in the newspapers dimmed out only because editors and the public preferred to divert the beam to peculiar doings at Kaesong, on manners and morals at the RFC and Internal Revenue Bureau, on hectic but pleasant Saturday gridiron scraps, or on other news sights less bloody than the battle line in Korea. The basket that fell over the terrible glare of combat was dropped from the United States, not Korea.

Are you able to understand the thoughts that pass through our minds when at midweek we pick up newspapers, almost any newspaper, and see that the latest casualty report has received treatment no more dignified than would a filler to the effect that "Texas is the largest State in the Union"? Can you understand our anger when we see that an inconsequential local gang killing has crowded an important thousand-casualty Korean battle off the front page and jammed it into an insignificant corner 15 or 20 pages back?

This almost deliberate disregard of many a dying effort can be interpreted in just one way by the war-weary veteran. He sees it as another shaft, sharpened by the knowledge that it was hurled from home.

Perhaps even more infuriating is the discovery that the blood bank is broke, or nearly so. Red Cross officials tell us that they number our own kind among their heaviest contributors. * * * "You boys know the need for it." Do all Americans have to bleed or watch another bleed before they see the need for it?

It's a little thing, giving a bottle of blood to the sincerest group of Americans I know. Yet I was all but reduced to tears of rage when, after a recent intensive 1-day radio campaign, I heard a newscaster report at 6 p. m. that from a city the size of Detroit, only 350 pledges had been made. Detroit is no exception. Its shamefully small response was directly in line with the national pattern.

When we talk to people, we are surprised to learn that the biggest thing about this war—from a civilian standpoint—was the relieving of General MacArthur. I've heard this a hundred times or more: "What did you fellows think about Truman firing MacArthur?" I produced a stock reply, as have most of my friends from the new war.

"I don't think Thought One about it. Why should I? Where I've been, when you talk back to a superior, no matter whether

he's a screwball or a first-rate statesman or soldier, you expect punishment."

Which is true, of course, but not the whole story. Mostly, I choose to believe that I am expressing a sort of back-handed contempt for the type of shallow thinking that prefers to dwell on matters of personality at the expense of the larger issues at hand. If we felt it necessary, most of us in all likelihood would say (regardless of whether we admire the general or detest him) that we agree with his views on warfare. We know all too well that nobody wins a war by limiting himself to the use of only one fist. The home front limited itself, true enough, but the sloggers suffered because the wheels of America's war machines, and the minds of many home-front leaders, are rusty.

We wore ourselves out puzzling over the United States failure to employ the fleet that was already in far eastern waters in blockading the China coast. Nor has anyone given a logical answer to our question about why the Air Force and the air arms of the Navy and Marine Corps were not permitted to clobber the Communist staging areas beyond the Yalu.

"We crossed the thirty-eighth parallel more than once, didn't we?" I've heard GI's and marines ask. "We were violating a border, weren't we, if you want to get technical? We crossed it to get at the North Koreans. Well, the Chinks have been slugging us for more than a year. Are we afraid to cross into Manchuria to get at them? Is somebody yellow, or just plain nuts?"

May I add that I too believe that the object of war is victory, and that I believe you're full of kimchi if you think you can win or limit a war by staying off the enemy's ground?

Many people will say to the vet: "You don't want to provoke them. If we move into their ground, they might start a war."

This, to men who have served with that relatively small force which has suffered more than 100,000 casualties, who have fought in a country where literally millions of natives have been killed or wounded, who have fought against a force which has suffered an estimated million-and-a-half casualties.

"They might start a war."

"No," a friend said to me, splendid irony in his voice, "don't provoke them. If you do that, they're liable to get mad. They might shoot you twice in the gut, instead of just once."

When we talk to people of the threat we recognize as emanating from Russia, we are apt to hear wishful thinking expressed like this: "I don't think we'll ever have to go to war against them. I think they'll collapse from within." Like Germany, maybe? Or Japan? I heard the answer to that dream voiced nicely last winter, after the dreadful Chosin Reservoir operation.

"So what if you don't agree with the philosophy?" a marine snorted. "You don't agree, so you think they'll fold. All right, I was on the butt-end of the column coming out of Koto-ri. There were hundreds and hundreds of civilians trying to join us and get out. So they didn't agree, but I ain't noticed any collapse from within around there. Their system's winnin' right now, ain't it? They run us out, didn't they? They been workin' on the same theory for a hundred years. You think they'll quit now?"

Perhaps you can sketch out an answer for the discussion I heard in Pusan, while waiting for transportation to the United States:

"What do you think we're gonna do with the atomic bombs we been building? Grow wheat with 'em to feed the hungry gooks? Or just scare every Commie to death by talking A-bomb talk? The only good you'll ever get out of those biscuits is shoving 'em through a hole in the deck when the bomber is over the right spot. We won't do that, though; we aren't that savvy. We'll wait until they do it * * * then we've had it."

You can take that any way you wish: A violation of Christian ethics, historically improper or warmongerish. To those of us who helped fight communism to a bloody draw in Korea, it is nothing less than realistic thinking.

I passed that thinking along to a prominent Washingtonian.

"Human life means more to us than that," he said. "Indiscriminate bombing and killing is a Communist tactic, not American."

He had not taken a bearing on just how fully acquainted he was with killing, indiscriminate or otherwise, and was angered by this challenge:

"You're right, human life does mean more to us. Can you tell me, within 5,000, how many Americans have been killed in this war? How many wounded? How many missing? The total casualties? How many weather casualties?"

He could not. He told me that he was not statistically minded. He's not alone. Millions of my Christian countrymen, I am sure, could not tell me how many statistical troopers have gone down the drain.

Most veterans of Korea and World War II have other figures on killing, figures which emphasize the fury and intensity of this war. In the first 17 months of this war, 100,000 casualties were suffered. World War II was in its twentieth month before that figure was reached. Over the first 15 months of this "two-bit skirmish," the number of United States dead was more than twice the number of killed-in-actions for the same period in World War II. And that was the big war, the World War.

There are those embittering home-front attitudes, and there are others, perhaps less galling, but serious, nevertheless.

All the yapping about high taxes, for instance. Well, perhaps that is somewhat justified. The latest crop of veterans would like to know, too, just what happened to those between-wars billions for defense. How was it that after those monumental sums were spent, the United States military could not afford to equip its fighters adequately last winter? Could not even supply footwear capable of withstanding the Korean winter? Could not come up with much of anything in the way of new weapons? Could not supply our broken-down allies, the Republic of Korea troops?

Or can you answer the questions of the reservists who grabbed their nightsticks and sailed into the police action? Thousands of us—particularly Marine reservists—are now assured that we took the dirty end of a political pole when we were jerked from home and hurried into battle. The situation could not have been so desperate after all, we learned, when no new American ground combat unit entered the battle line after October 1950. When he saw the limp, loop-holed draft law of the land, a friend of mine was convinced somebody had dropped the dunce cap on his head.

"All you have to do if your draft number is upcoming," he noted, "is scrape up tuition money and enter college. Then they let you take an exam, and if you have brain one, you pass it and you're automatically exempt from induction. When you graduate you can hustle out and grab a defense job, because they provide a period of grace for that. The idea isn't what it used to be. Nowadays you don't do your bit for Uncle Sugar. He does his bit for you if you happen to be standing in the right spot. It's a big yak if you can stay home and let the other guy pound the hills for you. It adds up to that old Civil War stunt of buying your way out."

The Regulars, the career men, can frown right along with the reservists. They do just that when they note the dearth of voluntary enlistments. It is no longer fashionable to step forward like a man and serve in the toughest way possible—by putting your life on the block. A badge of honor no longer goes with that sacrifice. The temper of the times bids otherwise. The best thing a veteran of Korea can do, I find, is file his memories in dark slots (in the case of the two-war vet he will just have to find room in those World War II slots), accept the unassuming Government which has forgotten its original purpose in sending troops to Korea, and live with the unattentive public. If he dwells at length on this matter of the subtle betrayal, the effect is as if he has had salt rubbed in his wounds, bad many insults heaped on many injuries.

There will be one development we can watch with interest: The armistice and its after effect. Who leaves Korea? Where will the new boundaries be established? Who won?

Nobody won, of course. We did not rid North Korea of Reds. We did not contain communism. Instead, the Chinese Commies extended their borders to include half of Korea. We were thousands of miles from the root of the festering sore that is communism.

We can watch, all right, but we won't expect any brilliant change of pace. There is nothing in the record to show us that our country will come through with a sterling victory. What we will be watching for most closely will be treacherous appeasement. That seems to be the most likely course of action, viewed in the light of previous performances.

And while the veterans ponder all this and try to forget the disgusting home-front exhibition, they might be excused for murmuring to their countrymen, "You ought to be ashamed. But since you're not, may you all rest in peace."

Mr. YOUNG. Mr. President, will the Senator yield?

Mr. MORSE. I shall be glad to yield for a question.

Mr. YOUNG. I should like to preface the question by making a short statement. I would like to join with the able Senator from Oregon in his concern about our present military preparedness situation, particularly with respect to our Air Force. I think it is tragic that after all the money we have appropriated we are apparently outnumbered 2 to 1 in planes in Korea and there is a serious question of whether our planes are even equal to those which the Communists have in Korea. We are confronted with this bad situation in spite of the fact that we have appropriated tremendous sums of money for the Armed Forces, particularly the Air Force.

The question I should like to ask of the able Senator from Oregon is this: Does the Senator from Oregon believe that any additional appropriations would help correct the situation with respect to the Air Force? Do they not now have all the money they can possibly use?

Mr. MORSE. In my opinion, I will say to my good friend from North Dakota, we should be shown some results from the money we have appropriated.

Mr. YOUNG. I have been reading some figures on the amount of money appropriated to the armed services for research alone. I do not have the exact total before me, but it apparently reaches a sum far above $2,000,000,000 from 1945 through 1950. It is regrettable that we did not have strictly modern planes in at least blueprint stage at the start of the Korean war, which could

have been put into mass production shortly afterward.

Mr. MORSE. I thoroughly agree with the Senator from North Dakota. Of course, the record will speak for itself, but I want to say that there were quite a number of us in the Senate from 1946 on who urged greater expenditures in connection with the development of air power than we were able to persuade our colleagues in the Senate to approve.

I remember very well what to me was a sad afternoon in the Senate, in 1947, when there were only 9, 10, or 11 of us who were willing to support a substantial increase in appropriations for the Air Force. I was of the opinion then that we had better err in the direction of waste in the building of an Air Force than err in the direction of what was called in those days necessary economy.

Of course, I would point out to the Senator from North Dakota that, from the standpoint of the cost factor, some very drastic changes have taken place in air warfare since 1946. I have seen reference to the subject in the press, which is based upon testimony of high officials of the Pentagon given before various committees in recent months. I always thought the subject was top secret, and I am inclined to believe that probably it would have been better to keep that kind of information top secret. Nevertheless, it bears on what the Senator from North Dakota is commenting on. The fact is that by the end of World War II the cost of a B-29 bomber, manufactured on a mass-production basis, had been reduced to a sum between $300,000 and $350,000.

To give some idea of what has happened since World War II, when we did most of our bombing with B-29's, the bomber we are now building, which we must have because of changes that have taken place in air warfare, particularly in view of the fact that bombing is now carried on at heights of 45,000 and 50,-000 feet, costs not between $300,000 and $350,000, but between $3,000,000 and $3,-500,000 for each bomber.

Let me cite what I consider to be another dramatic figure, which illustrates the tremendous change in the cost of air warfare. I speak within reasonable brackets of accuracy when I say that at the end of World War II the cost of the Norden bombsight, on a mass-production basis, had been reduced to a figure of approximately $4,800 per bombsight. Of course, in World War II our planes were bombing with the aid of the Norden bombsight, on the basis of the naked eye. Our planes do not bomb that way today. The bombsight we are building for the jet bomber, which is the bomber that will have to be used in case of another world war, costs not $4,800, but in the neighborhood of $300,000 for each bombsight, or almost equal to the cost of a B-29 bomber in World War II.

Mr. YOUNG. Mr. President, will the Senator yield further?

Mr. MORSE. I shall be glad to yield in a moment after I have finished the thought I have in mind.

In other words, we are confronted with what amounts to a tremendous revolution in the whole field of aviation construction. Of course, it will cost a great deal of money, even on the basis of mass production, for the kind of bomber which will give us superiority in the air. However, I believe that American freedom is worth it no matter what the cost. I am not arguing for waste. I am arguing for the strictest economy, consonant with maximum protection for the security of our country so far as air superiority is concerned.

Thus I could go on citing examples, but I shall not do so because those are the only two items I have seen mentioned in the press. I cite them to buttress a generalization I wish to make. I assure the American people that it is a generalization which can be backed up with the facts. The generalization is that, to gain the supremacy of the air for which I am arguing the cost will be tremendous.

That is all the more reason why I believe, in connection with the budget we will deal with this year, that every Member of this body must be exceedingly hard-boiled in the use of the pruning knife. We shall have to cut from the budget every possible item which can be eliminated, so that we can keep it down to a sum of approximately $70,000,000,000, instead of $85,000,000,000, if we are to protect the greatest defense weapon we have, which is our economy.

Let us not mislead the American people into believing that we can have the kind of mobilization program referred to by the marine in the American Legion article, which I have inserted in the RECORD, without its costing exceedingly large sums of money.

I close my discussion of this point, before again yielding to the Senator from North Dakota [Mr. YOUNG] by saying that I believe it to be the duty of the Committee on Armed Services to continue to press the Air Force officials with what I believe to be a very important question, which is: "What can you show us that you are accomplishing by way of production results?"

I ask that question because until we are able to have in the air a sufficiently large number of planes to stop a Russian attack and to make our own attack, in my judgment there is no hope of convincing the Kremlin that it has everything to lose and nothing to gain by continuation of its aggressive course of action.

I should like to make a further point, Mr. President. Consider the matter of jet fighters. On this occasion I do not wish to do more than to insist that a larger number of jet fighters be provided. I am at a loss to understand why there should be any dispute as to whether ours are superior to the Russians. In view of the great productive power of the United States and the inventive genius of our engineers, certainly we should have superiority in jet fighters. However, that does not change the fact that there is great doubt about it. The American people should face the fact that because of the great revolution which has taken place in air warfare techniques, we shall have to have

bases a great deal closer to Russia, from which to put jet fighters into the air, than we now have.

That statement leads me to point out that the atomic bomb cannot be delivered in sufficient quantities to knock out the industrial power of Russia unless we have a canopy of jet fighters sufficiently large to protect the bombers and permit them to bomb and to return. I ask today, Mr. President, who in this Government thinks he can tell the American people that we have such a canopy? I am satisfied that we do not have it.

We also need to keep in mind the fact that in order to conduct that kind of warfare, no matter where such a war may be fought, we need allies, and we are not going to get them on the basis of any perimeter theory for the protection of Europe. In my opinion, we shall get such allies only to the extent that we implement the North Atlantic Pact and the NATO military program which goes along with it, otherwise we shall drive our potential allies into a position of neutrality with Russia and into a determination that they should also remain neutral in case of war between Russia and the United States because they alone are not going to do all the bleeding on the ground of Europe and because they are not interested, either, in liberation by the United States through a pulverization of their cities and their economy. They have had all of that kind of liberation they want.

That is why I have been heard to say so frequently, and will be heard more and more across our country by way of warning the American people, that in the campaign for the Presidency which now is under way in the United States, we, as a people, had better be on guard against proposals which will cost us the allies in Europe that we need in order to maintain air supremacy in a battle for Europe, or will cost us the allies in Asia that we need in order to maintain an all-out war in Asia with the air supremacy we must have in case we become involved in war there.

Mr. President, I say to the Senator from North Dakota that what should be of immediate concern to us is the production of equipment which will give us the superiority we need both in the air and on the land. Obviously we have superiority on the sea, except for a submarine problem.

Mr. YOUNG. Mr. President, will the Senator from Oregon yield to me at this point?

Mr. MORSE. I yield.

Mr. YOUNG. I think what confronts every citizen today, myself included, is the question of just what we must do in order to obtain the Air Force we need. We have in our country great industrial production and sufficient economic strength, and in my opinion Congress has appropriated sufficient money. For research purposes alone, to develop new planes and other war matériel, since 1945 Congress has appropriated approximately $4,241,000,000. In the period from 1946 through 1951, Congress appropriated for the Air Force alone $673,-000,000. These figures were presented to

the Appropriations Committee's subcommittee on Armed Forces appropriations.

Let me point out again that Congress has appropriated from approximately $4,241,000,000 for research, alone. Congress has provided all the money the military have requested for the Air Force, and more, too; but still with respect to planes we have what amounts, practically speaking, a second-rate Air Force.

Mr. MORSE. Mr. President, I wish to say to my friend, the Senator from North Dakota, and also to my friend, the Senator from New Hampshire [Mr. BRIDGES], who now is on the floor, and who is an able colleague on the Armed Services Committee, and is the ranking Republican member of both the Armed Services Committee and the Appropriations Committee, that I believe it is fair to ask from the Air Force an accounting as to what it has done with the money Congress has appropriated for its use.

I know the Air Force would not object to making such an accounting, for the American people are entitled to know the facts, and from the standpoint of security protection, they can be given all the facts. I favor doing that; and I am sure my colleague, the Senator from New Hampshire, is of the same mind.

As I said earlier in my remarks, I am of the opinion that we are not showing enough finished products in the matter of air power. We should show more planes in being, rather than so many planes on the drafting boards.

Mr. President, if we are to meet the kind of criticism which I think the marine to whom I have referred very correctly sets forth in his article which appears in the magazine of the American Legion, I insist that the time has come when we should show the boys in uniform that we are backing them up on the home front, not with promises, but with finished goods.

Now, Mr. President, I wish to refer to another matter.

The VICE PRESIDENT. The Senator from Oregon has the floor.

FRANK P. GRAHAM

Mr. MORSE. Mr. President, I ask unanimous consent to have printed in the body of the RECORD, as part of my remarks, a very beautiful editorial from a Greensboro, N. C., newspaper. The editorial is entitled "The Mysterious Frank Graham," and is the reply of the editor of the North Carolina newspaper to the very vicious attack which Soviet Delegate Malik, of the United Nations Security Council, made upon Frank Graham at the recent Paris meeting of the Security Council. The editorial is so unanswerable is such a beautiful defense of a former colleague of those of us who serve in the Senate, and a colleague whom I am sure all of us love, that I consider it a great privilege to offer this editorial for printing in the RECORD.

There being no objection, the editorial was ordered to be printed in the RECORD, as follows:

THE MYSTERIOUS FRANK GRAHAM

When Soviet Delegate Malik at the U. N. Security Council meeting in Paris called Frank Graham a "secret agent of the Pentagon" in Kashmir, he got some quick responses.

The foreign minister of Pakistan described the charge that the United States is seeking military bases in Kashmir as "utterly false and without any foundation whatsoever."

Sir Gladwin Jebb, of Britain, told the Council:

"But when it comes to accusing our friend Mr. Graham of being the secret agent of the Pentagon—well, that should, I think, cause even the most ingenious to sit up and think and think. Does Mr. Graham look like a secret agent? I can only say that I am sorry that the absence of television cameras prevented the public from forming its own conclusion on this important point. Anyhow, Mr. Graham is used to this kind of thing. When he was in Indonesia, you will remember he was always called by the Soviet Union the secret agent of Wall Street—a slight difference. Now he is the secret agent of the Pentagon. But that did not prevent the secret agent of Wall Street from ultimately achieving in Indonesia a solution of a very difficult dispute, which even, I think now, the representative of the Soviet Union would admit was both statesmanlike and in accordance with United Nations principles. That is what the secret agent of Wall Street did in Indonesia."

The Soviet Union has been balked in its aim to foment war in Kashmir. So its agents take out their disappointment on the man who helped maintain the peace.

The Fayetteville Observer points to what Dr. Graham did in Indonesia and says:

"Hundreds of thousands of people are living today who quite possibly would be dead were it not for Dr. Graham's quiet, human understanding and tact, his deep grasp of global historical trends, his complete abhorrence of power politics."

No wonder Frank Graham is a deep, dark secret to the men of the Kremlin. No wonder they look on him as a "secret agent" of something or other. He has mystified people over here too. For Frank Graham is that rare phenomenon, a practicing Christian—but Messrs. Malik and company wouldn't be expected to know anything about that.

PROPOSED CANADIAN OIL PIPELINE TO BYPASS PACIFIC NORTHWEST STATES

Mr. MORSE. Mr. President, I ask unanimous consent to have printed in the RECORD a memorandum which I have received in regard to the Canadian oil pipeline problem. It would appear that there is under way a design—and I use the word advisedly—to bypass the Pacific Northwest States in the construction of a Canadian oil pipeline.

The first three paragraphs of the memorandum read as follows:

For several months, the Petroleum Administration for Defense has been considering the allocation of steel for the construction of a pipeline from Edmonton, Canada, to the Pacific Northwest. Its purpose—to meet a shortage of oil on the Pacific coast and to augment our United States oil supply from the vast Canadian reserves. Two proposed routes have been suggested:

1. A line to extend from Edmonton south through Calgary, which is through the plains country east of the mountains. The line to come into the United States near the Washington-Idaho line, thence southwestward, passing near Spokane to the Seattle-Tacoma area with the line extending south to Portland.

Thus the line would provide oil for the refinery at Spokane, Wash., and provide a source of oil for new refineries to be built in the Seattle-Tacoma and Portland areas which afford ideal refinery locations, in that

plants could be built on deep water for ocean transportation, but located 50 to 100 miles from the Pacific shore line.

However, Mr. President, it appears that there is on foot a design to bypass that very logical area for the location of the pipeline, and once again discriminate economically against the Pacific Northwest. The owners of the Canadian oil pipeline are Standard Oil of British Columbia, Imperial of Canada, Shell Oil, Canadian Gulf, Union Oil, and Richfield; and the contractor is Steve Bechtel.

So I am asking unanimous consent to have all of the memorandum on this subject printed at this point in the CONGRESSIONAL RECORD, as part of my remarks, because the memorandum speaks for itself and is, I think, an adequate defense of the position I take here today, namely, that cause should be shown on the part of the responsible officials as to why that Canadian pipeline should not go to the area of the Pacific Northwest where the Seattle-Tacoma refineries could be served, and so that other refineries in that area could be built and served.

The VICE PRESIDENT. Is there objection?

There being no objection, the memorandum was ordered to be printed in the RECORD, as follows:

CANADIAN OIL PIPELINE TO BYPASS PACIFIC NORTHWEST STATES

For several months, the Petroleum Administration for Defense has been considering the allocation of steel for the construction of a pipeline from Edmonton, Canada, to the Pacific Northwest. Its purpose—to meet a shortage of oil on the Pacific coast and to augment our United States oil supply from the vast Canadian reserves. Two proposed routes have been suggested.

1. A line to extend from Edmonton south through Calgary, which is through the plains country east of the mountains. The line to come into the United States near the Washington-Idaho line, thence southwestward, passing near Spokane to the Seattle-Tacoma area with the line extending south to Portland.

Thus, the line would provide oil for the refinery at Spokane, and provide a source of oil for new refineries to be built in the Seattle-Tacoma and Portland areas which afford ideal refinery locations in that plants could be built on deep water for ocean transportation but located 50 to 100 miles from the Pacific shore line.

From the standpoint of national defense, this affords much greater protection than refineries in California which are built near the shore line and were shelled by enemy submarines during the war.

If the proposed pipeline followed this route, it would bring the oil to rest in the United States, where it would be under jurisdiction of the United States.

2. The other proposed route is to have the line extend from Edmonton in the Province of Alberta, to Vancouver, British Columbia, where new refineries may be built and the refined products exported to the Seattle-Tacoma area or shipped by tanker to California to be refined and the products shipped back to Oregon and Washington.

This route would bypass the State of Washington's one refinery at Spokane, the operation of which is restricted because it must receive its oil supplies by tank car, which is expensive and uneconomical. This plant would use 25,000 barrels per day if it could be served by pipeline.

It now appears likely that this route will be selected because two companies, the Gulf

Oil Co. and the Imperial Oil Co. of Canada (owned by Standard of New Jersey), favor this route.

The proposed pipeline will have a capacity of 200,000 barrels of oil a day. The steel for the line must be supplied from the United States during a time of great shortage because of the defense program. Only 25 percent of the oil to be transported through the pipline will be required for local use in the Vancouver area, while 75 percent of it must be marketed in the United States in the form of crude oil or refined products. The Vancouver requirements could be supplied from the Seattle-Tacoma area by barge or by the use of a much smaller pipeline.

While the crude-oil supply of California is diminishing, the oil requirements of the Pacific Northwest States are increasing; they have more than doubled since 1940 and, according to reliable estimates, the demand for the Portland-Seattle-Spokane areas will soon reach 300,000 barrels per day, practically all of which is now being supplied from California refineries.

There is no area in the United States with more potential possibilities of industrial growth than in Oregon and Washington. There is no more logical location for new refineries than in this area, refineries that could supply local needs, as well as off-shore military requirements.

Canada has far more oil than it can use and must find markets for it elsewhere. This oil is needed to supply the west coast States. Seattle, Takoma, Spokane, and Portland are the logical locations of refinery centers to supply this area.

This would bring new industries to these States to supply markets that already exist. As a matter of fact, the oil consumed in these areas will amount to twice the 150,000 barrels per day that will be available to the United States.

The Trans Mountain Oil Pipe Line Co. proposes to build a crude-oil pipeline from a point near Edmonton in the Province of Alberta to Vancouver, British Columbia. They show, on page 4 of their prospectus, the following demand and estimated demand figures:

*Refined products demand and estimated future demand (in terms of barrels of crude oil required per day)*

| Area | 1940 | 1949 | 1955 | 1960 |
|---|---|---|---|---|
| Portland | 50,609 | 97,640 | 119,851 | 130,416 |
| Seattle | 40,533 | 87,884 | 108,302 | 121,495 |
| Vancouver | 19,213 | 37,633 | 45,310 | 50,603 |
| Spokane | 9,892 | 20,585 | 26,310 | 30,909 |
| Pasco | 5,171 | 10,431 | 13,523 | 15,863 |
| Total | 125,438 | 254,173 | 313,296 | 349,286 |
| Alaska | 4,994 | 7,141 | 8,360 | 8,955 |
| Total including Alaska | 130,432 | 261,314 | 321,656 | 358,241 |

## UNIVERSAL MILITARY TRAINING AND THE CHRISTIAN CHURCH

Mr. MORSE. Mr. President, the last insertion for the RECORD is in the form of a letter which I have received from Mr. Miner Aylesworth, attorney, of Hunlock Creek, Pa., who is also an elder in the Presbyterian Church. It is a letter which has enclosed therewith a statement by Mr. Aylesworth who, as I say, is a ruling elder of his Presbyterian Church, in reply to a witness who appeared before the Armed Services Committee testifying against UMT. In view of the fact that the witness set forth arguments against UMT based upon what he claimed to be matters of religious faith and principle, I think it fitting that there should be inserted in the CONGRESSIONAL RECORD a reply to this churchman, because I think Mr. Aylesworth provides very cogent argument in his article answering those very sincere church members who believe that those of us who are supporting UMT, someway, somehow, are sort of walking out on their own Christian training.

I want only to repeat today what I have said before, Mr. President, regarding this UMT bill, namely, I cannot accept the argument that the support of UMT is un-Christian. As a churchman myself, I take the position that, as a member of the Armed Services Committee, I have to find the answer to two questions: First, is there a need for a universal military program? And, second, will a universal military training program best meet the military manpower needs of our country? On the basis of the evidence which has been submitted to date at our hearing, I think the answer to each of the questions is in the affirmative; and, therefore, as a Christian, contrary to the criticisms of a great many church members who have been abusing me of recent date, I support the UMT bill. I ask unanimous consent, Mr. President, to have the letter and the article inserted at this point in the RECORD as a part of my remarks.

The VICE PRESIDENT. Is there objection?

There being no objection, the letter and accompanying article were ordered to be printed in the RECORD, as follows:

HUNLOCK CREEK, PA., *February 15, 1952*
Hon. WAYNE MORSE,
*United States Senate,*
*Washington, D. C.*

DEAR SENATOR: Presbyterian Life's recent articles on universal military training provoked the enclosed discussion. Thought you might be interested to know reader reaction.

Very truly yours,
MINER AYLESWORTH.

UNIVERSAL MILITARY TRAINING AND THE CHRISTIAN CHURCH

Presbyterian Life's editorial statement, January 19, 1952, on the question "Should Americans Adopt Universal Military Training," together with the arguments of United States Senator WAYNE MORSE, and the negative position of Dr. Charles J. Turck, have been carefully read, with these results: (1) As a veteran of World War I, I could readily agree with the frank, dispassionate, factual, and logical arguments of the Senator; and (2) as a ruling elder, I was shocked, disturbed, and embarrassed by Dr. Turck's presentment.

The article by Dr. Turck contained simply statements of his personal opinions or conclusions without giving any facts to support them; an appeal to the emotions such as his appeal to ministers to preach pacifism; and aspersions upon the civil authorities, such as are contained in his words, "sinister influence of the military," victims (of military training), and "your gold braid and your brass hats."

In his opening paragraph, Dr. Turck says: "I oppose universal military training, because in my judgment this system would operate against every ideal which our Lord and Saviour represented in His life and sustained by His death." Obviously this eminent lay leader of our church expected us to accept his judgment or conclusion as an established fact, for he gave no citations to support his judgment.

What were the ideals of our Lord and Saviour with respect to military training? We must rely on the Scriptures for the answer.

Certainly Jesus never cast aspersions upon soldiers, as such, nor upon their training, nor upon the Government that conscripted them. Jesus drew the line separating church and state in that famous piece of advice: "Render therefore unto Caesar the things which are Caesar's; and unto God the things that are God's." Jesus recognized that military training belonged to Caesar (the state) and did not condemn it.

Nowhere do we find Jesus condemning soldiers because they were soldiers or because they were subject to military training.

On the contrary, we find Jesus paying to a soldier the highest compliment, the greatest praise that could come to any man, and rated him better than civilians. He said (Matthew 8: 10): "Verily I say unto you, I have not found so great faith, no, not in Israel." Could this be an example of the sinister influence of which Dr. Turck speaks?

For a concise statement of the Scriptures on this subject see the constitution of our church, the confession of faith, chapter 23, which reads as follows:

"I. God, the Supreme Lord and King of all the world, hath ordained civil magistrates to be under Him over the people, for His own glory and the public good; and, to this end, hath armed them with the power of the sword, for the defense and encouragement of them that are good, and for the punishment of evildoers.

"II. It is lawful for Christians to accept and execute the office of magistrate, when called thereunto; in the managing whereof, as they ought especially to maintain piety, justice, and peace, according to the wholesome laws of each commonwealth; so, for that end, they may lawfully, now under the New Testament, wage war upon just and necessary occasions.

"III. (This section relates to the duties of civil authorities toward the church and need not be quoted here.)

"IV. It is the duty of people to pray for magistrates, to honor their persons, to pay them tribute and other dues, to obey their lawful commands, and to be subject to their authority, for conscience' sake," etc.

The foregoing constitutes the true traditional position of our church, and leads inevitably to a conclusion directly opposite that upheld by Dr. Turck and by the resolutions of our general assembly, as cited by Presbyterian Life's editors. The Scriptures in this respect are plain and do not admit of any other interpretation.

Military training is strictly the business of the state and our church has fallen into error in not following the plain mandate of Jesus regarding obedience to the civil authorities. By meddling in the affairs of Government we thereby compromise our position in opposing the Vatican on the very same grounds, of which we, too, have been guilty in this instance.

The resolutions of the general assembly, being clearly contrary to scripture, were void, and bind neither the church nor its members individually, but they have brought embarrassment to its members and loss of stature to the church. The moderators of those assemblies should have declared such resolutions out of order.

We admit that "the purest churches under heaven are subject to mixture and error" (Confession of Faith, ch. XXV, sec. V.). But we should, at the next general assembly admit our error and resolve that such resolutions should not, in the future, be permitted. The church has no right to intervene in the affairs of government except where the government trespasses upon the rights of the church. Individual members may make such recommendations to the State as their conscience dictates, but those prominently connected with the church should make it clear that their opinions are not necessarily those of their church.

To intervene in the affairs of government on the ground that a moral problem is involved, is not sound, for to follow that reasoning, we might find our church deeply involved in politics, perhaps advocating the election of a Republican President because the corruption in a Democratic administration presents a moral problem. Jesus clearly drew the line against involving His church in such matters.

Since the scriptures and the historic position of the church do not oppose military training, whether it be called selective service, draft, conscription, universal military training or some other name, are there any other cogent reasons which would justify the church in opposing military training?

Dr. Turck seems to have a suspicion or fear that universal military training will destroy democracy. Granting, merely for the sake of argument, that such might be the case, the church is without authority to say what form of government any nation shall have. The church of Christ operates under any form of government, whether it be a democracy or even a dictatorship such as Caesar's.

Could there then be some nonscriptural reason for Dr. Turck's fears? He states that "selective service is admittedly the only way by which we can get enough manpower to resist Russian aggression." He does not oppose conscription but apparently approves it. He does not say how moral problems involved under universal military training will differ from those under selective service. His objection is the emotional plea that young men will be taken from their cozy homes and put into an "artificial and harsh world" known as a military camp. Will it be any more rigorous than for those taken under the system he approves? Obviously not.

The evidence is overwhelming in opposition to the opinions of Dr. Turck. The "victims" of "the sinister influence of the military," as represented by the American Legion and Veterans of Foreign Wars, are the staunchest supporters of the democratic processes which Dr. Turck fears they will destroy. Graduates of military schools are among our finest citizens. Subversives and opponents of democracy are more likely to be found among pacifists.

As to the morals of those "victims," it should be sufficient to point out that the American Legion has recently instituted throughout our country a "Back to God" and "Go to Church" program. Of course some veterans have been guilty of crimes, but their criminal impulses are no more traceable to their military training than crimes committed by ministers of the Gospel could be attributed to their theological training. All in all, veterans will testify that military training has improved rather than harmed their moral understanding.

As one of the victims of World War I, I have since become a ruling elder. It might be suggested that having such sinister influence I ought, for conscience' sake, to resign. However, I shall not resign for such reason, but shall stay in and fight for the purity of the church and the elimination of that mixture and error which has been permitted to creep into it.

In seeking the cause of the mixture and error wherein a majority of ministers and elders at general assemblies adopt resolutions clearly contrary to the confession of faith which they vowed to receive and adopt as containing the system of doctrine taught in the Holy Scriptures, we must look not to military training, or the affairs of state, but to their theological training for the answer.

Overemphasis of parts of God's word to the exclusion of others can be very dangerous. That, it seems to me, is the cause of our present predicament. It is a disease which is doing immeasurable harm to our church, and a remedy should be administered at once.

Too many ministers preach only of God's love and mercy. They will not preach of the wrath of God. Too many will not use the words "damn" or "hell" in a sermon. Jesus used them. Perhaps they do not have the intellectual equipment to distinguish between profanity and God's wrath. Our church, through its seminaries, should caution ministers against such prudishness. An inactive, stagnant church will be found to have a prudish minister. Where a church is virile and active, you will find a pastor who does not hesitate to tell you, as Jesus did, that if you do not believe you will be damned to the everlasting torments of hell.

Too many pastors preach only of peace. Yes; we all like peace, but the trouble here is that they do not, or are unable to, differentiate between peace between nations and the peace which Jesus taught. The latter is peace between the individual and his Creator. What a whale of difference there is between these two kinds of peace. The latter type we must have; the former is not essential to salvation. Peace between nations has no value whatever in the salvation of souls. I dare say that no such sermon ever gained a soul for Christ's kingdom. Yet sermons are usually about this kind of peace and that is what Dr. Turck asks more of. So far as Christ is concerned they are a waste of time. They are contrary to the express doctrine of Jesus. He said there will be "wars and rumors of wars"; and here is His mandate to us: "See that ye be not troubled; for all these things must come to pass." Yet ministers ignore this, and do trouble themselves and everybody else. They will not preach that God is the author of war; that wars are part of Go.'s plans, though that is enjoined upon them, as reference to the confession of faith will divulge.

Too many ministers, in ignoring parts of the scriptures, conceive God to be only kind and gracious, because that is the kind of God we would prefer to have, not having then to worry about His wrath. In substituting their own notions of God and His Son for that given in the scriptures they create a false doctrine, and thereby become "false prophets, deceiving many." (Read the twenty-fourth chapter of Matthew.)

Hardly ever in recent years has a meeting of presbytery, synod, or general assembly adjourned before one of these prudes gets up and introduce a resolution against war or military training, even though God's plans might call for such a war. To pray God to spare us the horrors of war is one thing, but to be found in opposition to God's plans is something else. Unconsciously they make themselves eligible for God's wrath.

"They who, upon pretense of Christian liberty, shall oppose any lawful power, or the lawful exercise of it, whether it be civil or ecclesiastical, resist the ordinance of God." (C. F. ch. XX, sec. IV).

Since so many ministers have become afflicted with this disease, we must conclude that there is something lacking or faulty in the instruction given in our theological seminaries.

In conclusion I would offer the following recommendations:

1. That institutes for ministers and elders be held throughout the jurisdiction of the Presbyterian Church in the U. S. A. to make sure that they become familiar with the confession of faith;

2. That we recommend to our theological seminaries a course of instruction that will not cause distortion of the Holy Scriptures;

3. That we recommend to our next General Assembly that we admit our "mixture and error" and restate our position with respect to government, war and military training in accordance with the principles set forth in the confession of faith; and

4. That the moderator and stated clerk of the Presbyterian Church in the United States

of America initiate such procedures as may be necessary to make effective the foregoing recommendations.

---

INTERNATIONAL CONFERENCE ON SETTLEMENT OF EXTERNAL DEBTS OF THE FEDERAL GERMAN REPUBLIC

Mr. GILLETTE. Mr. President, as a usual thing I consider it very discourteous to place a letter in the RECORD, or to read it from the floor, particularly when it has been addressed to one of the executive departments, before an opportunity has been accorded the recipient of the letter to reply; but because the subject matter of the letter which I now hold in my hand seems to me to be of transcendent importance, and because of the fact that it was addressed to the Assistant Secretary of State, as of last Thursday, and pertains to a meeting scheduled to be held on February 28, there has not been time for the State Department to reply; and, in the hope that the reply will be received so that I may make it available to the Senate, I am presuming on their reply to read into the RECORD at this time the letter which I addressed to the Department of State. The letter is as follows:

FEBRUARY 23, 1952.

Hon. JAMES E. WEBB,
   *Acting Secretary of State,*
      *Department of State,*
         *Washington, D. C.*

MY DEAR SECRETARY: According to State Department press release No. 30, dated January 14, 1952, there is to be held in London on February 28 an international conference on the settlement of the external debts of the Federal German Republic, at which the United States Government and private American creditors will be represented.

There are a number of issues involved in these negotiations on which I should like to have the views of the Department of State, within the shortest possible time.

A study of State Department releases concerning steps toward settlement of the German prewar and postwar external debts (issued on March 6, May 25, June 19, and December 11, 1951, and on January 14, 1952), reveals a pattern or set of facts on which I would appreciate having the Department's further comment.

The Governments of the United States, the United Kingdom, and France have obtained from the Government of the German Federal Republic an acknowledgment of its responsibility for the external debts of the former Reich, for the most part contracted prior to the coming to power of the Nazis, and for the debts derived from postwar economic assistance given by the Allied Governments to Germany. The German Government has also granted priority to reimbursing debts of the latter category.

The Allied Governments, however, have very clearly signified their intention to forego this priority when the time comes, to the extent necessary to insure the fair and methodical settlement of prewar claims.

This can only be interpreted as meaning that the Allied Governments will defer payments by Germany on postwar debts owed them by the German Government in order to guarantee settlement of prewar claims.

The total amount of the German governmental debt to the allies for postwar economic assistance amounts to $3,500,000,000, of which $3,200,000,000 is owed to the United States Government.

The total amount of the prewar German external debt is estimated as ranging from one to two billion dollars.

The prewar external debt subject to settlement includes liabilities arising from the Dawes and Young loans; and debts of States, municipalities, corporations, and individuals located in the German Republic, involving 100 issues of foreign currency bonds floated during the 1920's, as well as commercial and bank debts, including those involved in the Hoover moratorium.

These prewar obligations are held mainly in the United States, the United Kingdom, Switzerland, France, Belgium, Holland, and Sweden, with lesser amounts held in some 15 other countries.

It is thus established that the German prewar external debt ranges in dollars from one to two billion, owed to private institutions, banks, and individuals, and that the German postwar external debt for economic assistance amounts to approximately $3,500,-000,000 owed to the allied governments, principally the United States.

The United States Government has announced (State Department release No. 1082, December 11, 1951) that it is prepared to accept, in settlement of its claim on the German Federal Republic's Government for postwar economic assistance, approximately $1,200,000,000, or 37 cents on the dollar, a scaling down from three billion two hundred million to one billion two hundred million dollars, or about two-thirds.

State Department release No. 30 (January 14, 1952) calls this a considerable write-down. For the United States it amounts to a considerable write-down of $2,000,000,000, for the United Kingdom £51,000,000 (roughly equal to $142,000,000), and for France $3,860,000 payable in francs.

It is thus evidence that if Germany agrees to satisfy the claims of her private private creditors (banks, individuals, etc.), the allied governments will permit her not only to defer payments on postwar intergovernmental debts owed them but will also scale down by nearly 65 percent the total of these postwar debts, with the United States Government, of course, taking by far the greatest loss.

In return for Germany's agreeing to settle prewar debts to private institutions and citizens, the United States is willing to write off $2,000,000,000 owed our Government.

This, in effect, is nothing but the transfer of a $2,000,000,000 load to the banks of the American taxpayer, present and future, in order that a small group of banks and other private creditors may be paid off.

There is no thought in my mind of preventing a fair and proper settlement of legitimate debts owed American creditors for loans on which they risked their money during the twenties to finance various German governmental, corporate, and private borrowers. They knowingly risked their money in purchasing these obligations, and they are entitled to seek repayment if they can and to the extent possible.

But I would vehemently protest an arrangement whereby the debt load and the tax burden of the American people is increased by the enormous sum of $2,000,000,-000 in order to make possible the repayment of from one to two billion dollars in private debts.

I note the comment of the New York Times on January 15, 1952, writing of the willingness of our Government to settle intergovernmental postwar claims for about 37 cents on the dollar: "This willingness to compromise official claims would furnish the framework within which West Germany's prewar private creditors would bargain direct with the officials and private creditors of the Bonn republic for the settlement of claims totaling about $1,500,000,000, including interest."

The international conference in London on February 28 is designed to secure international sanction for the debt settlement as proposed by the Tripartite Commission on the German Debt.

By what authority can the United States representative on the Tripartite Commission proceed to seek international sanction for a debt settlement of this magnitude without the sanction of the United States Congress? The $2,000,000,000 reduction in Germany's postwar debt to the United States Government would represent, in effect, an additional American grant to the Bonn government without the approval of Congress.

I am not persuaded that there exists any authority under which the Department of State or its representatives can commit this Government, by executive agreement, to such a vast scaling down of a legitimate intergovernmental debt, particularly in view of the fact that the obvious purpose of this settlement is to arrange for satisfying the claims of a small number of financial and other private creditors at public expense.

I am strongly of the opinion that this is a matter to be handled as a treaty and that, as such, it must be submitted to the Senate for ratification.

I do not believe that the Congress or the people, when they know the facts, will applaud such bountiful generosity on the part of appointed officials, unless approved after due consideration through the constitutional processes of treaty-making.

What is the purpose of this agreement if not to reduce the governmental debt owed by the German Federal Republic to the United States Government in an amount amply sufficient to permit Germany to pay off prewar debts owed to private creditors in the United States and elsewhere?

What conclusion can be drawn from these transactions other than that the United States Government is willing to charge to the Nation's taxpayers the sum of $2,000,000,-000 owed it by the German Government, in order that banks and other private creditors holding German prewar bonds may receive payment?

Does the proposed settlement also have as one of its purposes to liquidate outstanding prewar claims of American private investors in Germany in order to facilitate new flotations of German bonds in the American market?

Is not the effect of the proposed settlement to permit private American and other creditors to receive payment on German prewar debts at the expense, not of the German Government, but of the American people?

By what authority can the Department of State, through its representative, Ambassador Pierson, increase the ultimate tax burden of American citizens by the enormous sum of $2,000,000,000?

By what authority can the Department agree to a reduction of a debt owed the United States Government by a foreign government unless that agreement be in the form of a treaty ratified by the United States Senate?

I await reply to this letter and urge the speediest possible action, since the international conference at which these transactions are to be finally negotiated is to take place on February 28.

In closing, I note for the record that the head of the German delegation which has been negotiating these matters with the Tripartite Commission on the German Debt is the same person about whose mysterious visit to this country I wrote to the State Department on December 5, 1949: Herman J. Abs, head of the Deutsche Bank under the Hitler regime.

Sincerely,

GUY M. GILLETTE.

Mr. President, as I stated at the outset, the letter is dated February 23. In view of the fact that it referred to an anticipated conference scheduled for February 28, there has been no reasonable time for the State Department to reply to the numerous questions I have raised and asked in the letter addressed to that Department. In fairness to them, I could not wait, and in fairness to the American people I could not wait until opportunity had been given to reply, because of the fact that the conference is to be held on the day after tomorrow, and, to me, it involves one of the most vital matters presented for consideration for some time. I think we are entitled to answers. I hope the answers will be forthcoming soon, and I certainly shall make them available to the Senate.

Mr. FERGUSON. Mr. President, will the Senator from Iowa yield?

The PRESIDING OFFICER (Mr. HUNT in the chair). Does the Senator from Iowa yield to the Senator from Michigan?

Mr. GILLETTE. I yield.

Mr. FERGUSON. From the text of the letter which I heard read it would appear that the matter is not being negotiated as a treaty.

Mr. GILLETTE. It is not.

Mr. FERGUSON. It would come in the realm of an executive agreement?

Mr. GILLETTE. I can reach no other conclusion. The entire letter was based on releases issued by the Department of State. Therefore I have asked the question under what authority they proceeded to scale down the debt from $3,500,-000,000 to $1,500,000,000, and at the same time give priority to private debts, which, in effect, would transfer the whole obligation to the backs of American taxpayers.

---

## ROBERT P. PATTERSON

Mr. LEHMAN. Mr. President, on Tuesday, January 22, a great American, Robert P. Patterson, met a tragic death in an airplane crash at Elizabeth, N. J. I had known and greatly admired Secretary Patterson for more than a quarter of a century. He was a man of unusually high standards, of great personal and moral courage, and of absolute integrity. He gave of himself without stint to many great causes. He was not one to give mere lip service. The nobility of his life demonstrated that he practised what he preached. No man has served his country both in peace and in war better than has Robert P. Patterson, and his untimely death has been a great loss to his country which will long hold him in grateful remembrance.

Mr. President, I ask unanimous consent that there may be printed in the body of the RECORD at this point in my remarks editorials which appeared in the New York Times, the New York Herald Tribune, and the Washington Post on January 23 and January 24, 1952.

There being no objection, the editorials were ordered to be printed in the RECORD, as follows:

[From the New York Times of January 23, 1952]

ROBERT P. PATTERSON

Tragedy has struck again in the air over New Jersey, and this time its sorrow-laden list of casualties includes the name of an American who has served his country with

extraordinary distinction. Robert P. Patterson was one of the great and gallant figures of the times in which we live. He was a soldier on the battlefront in France during the First World War. Returning to his practice of the law, he was appointed a judge of the District Court of the United States at the age of 39, a judge of the high Court of Appeals a few years later. He left the bench, soon after the outbreak of the Second World War in Europe, to become Assistant Secretary and then Under Secretary of War. Few men contributed more notably to the success of the whole American war effort. When Henry Stimson resigned as Secretary of War in 1945, Robert Patterson succeeded him. His own resignation from that office in 1947 was followed by his return to the practice of law in New York City, his selection as president of the Bar Association of the City of New York and his willing and eager participation in a wide range of public-spirited activities.

Here was a man of superlatively high standards, complete integrity and boundless enthusiasm for whatever task he took in hand. No one whose privilege it was to know him is likely ever to forget the candor of his speech, the courage of his faith, the warm and glowing brightness of his friendship. He was a man who never dodged a responsibility, never refused to take on a hard job if it needed to be done. What he preached, he practiced. What he believed, he believed with heart and soul. He fought hard for every cause in which he enlisted, and the causes for which he fought were good and right.

It is tragic to lose so useful a man at the age of 60 with so much to live for, so many unfinished battles needing the strength of his good arm. He served his country greatly. He will be mourned, and missed.

[From the New York Herald Tribune of January 24, 1952]

ROBERT P. PATTERSON

Many in the past hours have wished to pay tribute to Robert P. Patterson; and through the kind of things that have been said, and the kind of people who have said them, there emerges a sharp picture of a man—a man of intelligence, ability, and courage. He was a man of complete integrity, of charm and of toughness, who was willing to give his high qualities without stint to the public service and, when he had returned to private life, to those various public causes which seemed to him of vital national and human significance.

He was an outstanding exemplar of a type of public officer which, if not exactly new in our history, emerged with a new importance in the great crisis of the second war. Often from modest backgrounds, their initial training was neither in government nor in politics but—as lawyers, bankers, or business men—in the climate of competitive enterprise. Like Patterson, however, most of them had given service, and often combat service, to their country as young men during the first war; they were touched with the soldier's ideal of duty as well as the citizen's ideal of freedom and initiative. They had their politics, but theirs was never a politician's attitude toward either the rewards or the obligations of high office. It was Roosevelt's move in 1940 to broaden his administration against the impending storms by appointing Stimson and Knox to his Cabinet which brought many of them into the public service. Patterson was drafted from the Federal bench to become Stimson's Under Secretary of War at about the time that Forrestal was drafted for the equivalent post in the Navy; the two men were unlike in personality, but their two careers ran thereafter in close parallel in the posts they held, the devotion they gave to them and the achievements they accomplished in the Nation's behalf.

Patterson munitioned the Army as Forrestal munitioned the Navy. As the last Secretary of War, Patterson hammered out with Forrestal the problems of unification; the two men's ideas differed, but the result was a joint work, and Patterson might well have been first Secretary of Defense had he not preferred to return to private life. But there he could never regard private practice as any discharge from his public responsibilities. Rugged, colorful, brave, and highminded, he still had much to give to his country when his career was cut suddenly short in the blazing airplane wreck in Elizabeth. The loss is tragic, and all the more so because one does not know how many like him we may be breeding today. We desperately need men of his character, background, outlook and capacity if we are to manage the staggering governmental machinery which we insist on building; one wishes that it were possible to feel greater confidence that we shall get them.

[From the Washington Post of January 24, 1952]

ROBERT P. PATTERSON

The manner of Robert P. Patterson's death in the air crash at Elizabeth, N. J., adds to the sense of shock which his death will evoke from his wartime associates. If ever there was a man who had a dedicated patriotism, it was Robert Patterson. All his life he had responded to the call of duty, and duty to his country was paramount. It did not particularly matter how and where he served. He had austere tastes, and the odd fact that he was doing KP in training camp when he was told of his appointment as Assistant Secretary of War in 1940 made a good anecdote, but left his friends scarcely surprised. Wherever there was something useful to be done, no matter how humble, there was Robert P. Patterson contributing all he had to this or that work, this or that cause, with an unsleeping and dour indefatigability.

On first acquaintance, the stern-visaged Patterson struck one as somewhat wintry, and one called him "Judge" right away. But his fellow-feeling and modesty came through in such short order that in addressing him it was the most natural thing in the world to slip from "Judge" to "Bob." As Bob Patterson he was at the very center of the administrative stage throughout the Second World War. Everybody was glad that the President made him Secretary of War when Secretary Stimson, whom he served with zeal and devotion as Under Secretary, resigned in 1945. It is said that he was the first choice as first Secretary of Defense, for he had been in the forefront of the struggle for unification. But he had done his war job, and was anxious to get back to the law, not only because this was his love but also because his depleted means required replenishment.

Mr. Truman, it is also said, promised him a place on the Supreme Court. He would have liked this, but told Mr. Truman that the President ought to know he had written a letter in behalf of Alger Hiss, so the matter was dropped. He went back to private life. Here he quickly recovered a lucrative practice, but he kept up his participation in public affairs, particularly in the field of international relations. He held fast to his beliefs and never wearied in working for them. He became an eloquent advocate of Federal Union and held offices in Federal Union, Inc., which Clarence Streit had founded.

The key word in Mr. Patterson's life was integrity, a stubborn integrity. Whenever his point of view was sought, as it was by this newspaper several times, he always made a point of explaining any professional interest past or present in the matter under discussion. We refer to this because the last time we mentioned Patterson it was by way of criticism. His legal services had been sought by a German industrial group, and

the intervention for a while appeared to hurt the negotiations on the Schuman plan. The retainer, it turned out, was the result of a misunderstanding, but we well recall the hornet's nest that we brought down on our heads—all out of respect for a man who was upright in all his relations and dealings. We mourn his passing. He will be missed, but his example of disinterestedness and public service will not be forgotten for many a year.

COMMUNIST CONTROL OF CZECHOSLOVAKIA

Mr. McMAHON. Mr. President, I ask unanimous consent to have printed in the body of the RECORD a statement made by the President of the United States on February 25, 1952, concerning the seizure of control of Czechoslovakia by Communists 4 years ago.

The PRESIDING OFFICER. Is there objection?

There being no objection, the statement was ordered to be printed in the RECORD, as follows:

Four years ago today the Communists seized control of the free country of Czechoslovakia. By infiltrating every important branch of the Government, they had strangled all sources of independent opposition in that nation—all but one—the students and young people.

In the last few hours of Czechoslovakia's freedom, more than 5,000 students of Charles University marched toward their president's house to plead with him to save their country from the Communists. But before they could reach their destination, Communist police fired into the orderly crowd, wounding several students.

February 25 should be a very special day for the young men and women of all nations. Let it serve as a symbol—a reminder of youth's determination and will to resist, in the face of hopeless odds.

But let it also serve as a warning to all people, young and old, who are so fortunate that they still have their freedom.

Since February 25, 1948, the world has learned the lessons of Czechoslovakia. The world has learned that communism is aggressive—that communism means conquest, oppression and slavery.

Four years ago the students of Charles University taught us that we must do more than resist—we must be prepared to resist. We are putting this lesson of collective security into practice in Korea, in the North Atlantic Treaty Organization, and the Pacific defense treaties.

All this we learned at the price of freedom for Czechoslovakia and other nations temporarily under the Communist yoke. Let us never forget our lesson.

NATO COUNCIL MEETING AT LISBON

Mr. McMAHON. Mr. President, the meeting of the NATO Council which closed yesterday at Lisbon has been a truly historic landmark in the history of international cooperation. It marks a great step forward in the joint efforts of the western nations to create a strong defense establishment in Western Europe and it is a victory for the diplomacy of the United States.

It demonstrates the genuine willingness of our NATO partners to shoulder their share of this enormous defense burden despite the serious economic difficulties which most of them face internally.

These nations have agreed to undertake a $300,000,000,000 defense effort,

They have agreed to raise 50 divisions of men during this year and 100 divisions before the job is finished. They have agreed to the inclusion of German forces in their continental defense system: and this is perhaps the most difficult decision they made. Furthermore, these nations in this unprecedented collective action agreed to a wholesale reorganization of the NATO administrative structure whereby it will be streamlined and capable of flexible and prompt administrative action.

General Eisenhower's command responsibility now extends from the Aleutians to North Africa, from Northern Ireland to the Turkish Caucasus border, and from Norwegian Arctic frontiers to the Moroccan desert. Never before in history have peaceful nations delegated such far-reaching jurisdictional responsibility to an international command.

We are making progress all along the line. European integration has moved closer to reality in the past 2 years than in the previous two centuries. European military budgets are growing rapidly—I hope not too rapidly for their own economic stability. A paper army is fast becoming an army of men and steel. Confidence is mounting both here and in Western Europe.

We all owe a vote of thanks and appreciation both to the American statesmen and the European statesmen whose patient and skillful negotiation have overcome so many hurdles to bring about the significant accomplishments of the past week.

Mr. President, the agreements which have been adopted by our NATO partners and ourselves at Lisbon are subject to the support of the parliaments of the participating states. I feel certain that the Senate, the Congress as a whole, and the American people will watch with anxious eye the further progress toward implementation of these agreements. So I think it only proper and right to have made the comments I have made today upon what may well prove to be one of the most significant meetings of the past 10 years.

---

PROPOSED TREATY AMENDMENT TO THE CONSTITUTION—NEWSPAPER AND EDITORIAL COMMENT

Mr. BRICKER. Mr. President, I desire to have printed in the Appendix of the RECORD a number of editorials and articles from newspapers published throughout the United States relating to the proposed amendment to the Constitution involving treaties.

The PRESIDING OFFICER. Is there objection?

The Chair hears none, and it is so ordered.

[The articles and editorials will appear hereafter in the Appendix of the RECORD under the appropriate heading.]

Mr. FERGUSON. Mr. President, recently the Subcommittee on Internal Security, of the Committee on the Judiciary, had before it a question involving the principle of this proposed constitutional amendment, when a witness refused to answer a question as to whether or not the State Department had aided the witness in getting employment with the United Nations. The refusal to answer that question was on the ground that the United Nations was a superior government, and that when the United States Senate had ratified the Charter of the United Nations, the Senate had allowed the United Nations, by rules and regulations which in effect would be much less than legislation by this body, to give to a witness who had worked for the United Nations the right to refuse to testify before legislative bodies or courts of the United States. I may say that at the time the testimony of this witness was given, I presided as the acting chairman of the subcommittee.

The Committee on the Judiciary has unanimously voted to send to the Senate a recommendation for citation of this witness for contempt, in order that the question may be litigated before the Supreme Court to ascertain whether it is a fact that ratification of the United Nations Charter has abrogated the domestic laws of this land. I ask the Senator whether or not he feels that his amendment is sufficiently broad to cover that subject.

Mr. BRICKER. I think the amendment does cover that subject. Of course, it is a matter which ought to be litigated up to the Supreme Court of the United States. If the rules and regulations of the United Nations set aside the powers of the Congress or of a committee of the Congress, certainly it emphasizes the need for the consideration of the amendment which I have submitted, which goes to the extent of prohibiting a treaty which would in any way nullify the provisions of the Constitution of the United States or set aside the laws of the various States and of the Congress, and the constitutions of the States, without an act of Congress. Furthermore, it would prohibit any treaty from depriving the Congress, or a committee of the Congress, to which the Senator refers, of their rights or powers, so that they could not be nullified or restricted in any way by treaty or, certainly, by the rules and regulations of a subcommittee of an organization such as the United Nations. So I think that point emphasizes the need for consideration of the amendment.

I am gratified that today the distinguished chairman of the Judiciary Committee has appointed a special subcommittee for the purpose of examining into the question and taking testimony with regard to the amendment which I have submitted. I am also gratified to know that the distinguished senior Senator from Michigan is a member of that subcommittee. So we will give consideration to this subject together when it comes up.

Mr. FERGUSON. I appreciate the remarks of the Senator from Ohio. Even though I am one of the Senators who sponsored this amendment, I wish to make certain that we are going to be able to cover all the ramifications which might be claimed by those who feel that the United Nations Charter has become the supreme law of the land, nullifying constitutional provisions as well as statutory law. Take a case such as the one to which I have referred, a case in which we have cited an individual for contempt. If we could get such a case quickly before the courts, we might find, in the arguments as well as in the opinions to be rendered for or against the idea which is contended for by the witness, further ramifications of the claim. So when the constitutional amendment is framed we should be able to cover the subject completely, rather than find ourselves later, after it is ratified, in the position of having missed another loophole.

Mr. BRICKER. I certainly agree with the Senator. I expressed that wish at the time I presented the amendment, as the Senator will remember.

Mr. FERGUSON. I do remember.

Mr. BRICKER. There is a serious situation in California. The California statutes were set aside because of the ratification of the United Nations Charter by the Senate, under the contract entered into by the President and by the San Francisco Conference. The problem which the Senator cites goes even further than anything we have yet seen. Under a rule or regulation of a committee of the United Nations, or a subcommittee, the Senate of the United States might be deprived of the powers which it otherwise would have under our Constitution.

Mr. FERGUSON. Even the Secretary of the United Nations might make a rule or regulation which would abrogate the Constitution of the United States, or the statutory law of the United States, or of a State.

Mr. BRICKER. The amendment which I have submitted clearly covers a situation of that kind, in my judgment. However, I wish to examine every possibility. That is why I am so gratified that the chairman of the Committee on the Judiciary has today appointed such able members of the subcommittee.

---

STATEHOOD FOR ALASKA

The Senate resumed the consideration of the bill (S. 50) to provide for the admission of Alaska into the Union.

Mr. ECTON. Mr. President, at this time I desire to make a few statements outlining my position on the pending bill, the Alaska statehood bill. Before doing so I wish to compliment the very able and distinguished chairman of the Senate Committee on Interior and Insular Affairs [Mr. O'MAHONEY]. I believe he has devoted more time to the Alaska statehood bill than has any other member of the committee. I commend him for the thorough and complete manner in which he has presented the Alaska statehood point of view. There is nothing that I, or anyone else, for that matter, could add to the arguments which have already been set forth and presented by the very able chairman of the committee.

A few years ago I had the extreme good fortune and pleasure of visiting Alaska with a Senate committee. At that time I was surprised to learn at first hand of the interest and the emotional desire of the great majority of the people of the Territory, that Alaska should become a full-fledged member of the American Union of States. I was so impressed with their attitude and with

their problems as they presented them to us, as well as with the solutions which they had for many of those problems if we would but grant them statehood, that I told them at that time that I would support the Alaska statehood bill.

I was so impressed with their good citizenship, their loyalty to this country, and their great desire to become a member of our Union of States that I told them that if we could not obtain statehood for them, I knew that my people in Montana would be most happy to take them into Montana and let them become a part of what we consider to be a great State.

I was very much impressed by the number of young people who had made their determination to remain in Alaska after the cessation of hostilities at the end of World War II, and to make their homes there and raise their families and educate their children. They told me that they did not believe they could properly hew out the type of home upon which they had set their life ambitions, and that they could not properly educate their children into the ways of good Americanism, as they had in mind, so long as the area of Alaska remained only a Territory. They were sincere and honest in that belief. I know from actual contact with those people that while they have good schools, and while they have been trying to develop a good university, yet most of them feel that it will be impossible to go ahead and fully develop the Territory of Alaska as it would be developed if it became a part of the United States, a full-fledged State with all the rights, privileges, and responsibilities of a State.

The people of Alaska were exercised about the necessity of having later to send their children back to the United States to complete their education. They said, "We love Alaska. We realize its potentialities, and we would like to build our homes and our communities into a full-fledged State of the Union."

After coming back to Washington I had the further privilege of listening to good people, citizens of the Territory, who came by the dozens from Alaska to testify before the subcommittee of the Committee on Interior and Insular Affairs. They represented every walk of life in Alaska. They were businessmen, professional men, and representatives of labor unions. They were all united in their desire and insistence to be one with our Nation. At that time many questions were propounded to them with respect to how they would tackle this or that problem. After listening to their testimony before the subcommittee, of which I was privileged to be a member, I came to the further conclusion that if they were given statehood status, they would be in a position to develop the Territory as it should be developed, to build it up industrially, to go ahead with the development of their agriculture—and there is considerable agriculture in Alaska, notwithstanding reports to the contrary—and that an inducement would be afforded to people in overcrowded sections of the United States to migrate to Alaska and make their future home there. I agree with that attitude.

Because of present world conditions I think we all agree that Alaska occupies a strategic position in our whole defense effort. It is separated from Russia by a very narrow body of water. From all the information we have been able to acquire with regard to the activities of the Soviet Union in that area, they have built up a great military potential very close to the northern borders of Alaska.

When we were there we went into the defense problem of Alaska. The people of Alaska confided to us that they would feel much safer and much better protected in these precarious times if they were accorded the privilege of statehood, with the honor and confidence which go with it. I do not know how many people realize it, but there have been many assertions made that Russia still considers that we underpaid her for the Alaskan Territory. In view of the many claims that she has been making all over the world, with distortions of fact, I have never been fully convinced that she has given up all idea of moving against the Territory of Alaska at some time in the future.

Mr. President, I believe it is important that we grant statehood to the people of Alaska. They have pioneered in that Territory, and they have given their substance and their energies and themselves in protecting it and in supplying manpower and facilities during World War II. They have demonstrated that they have the capacity for citizenship. They have been electing their own legislatures. They have been trying to iron out some of their very knotty problems concerning taxation and representation. They have amalgamated the natives and assimilated them into their own society just about as well as the people of any other section of our country have been able to do. They have even elected officials in their territorial government who are of native stock. The people of Alaska are full-fledged Americans, and they are ready and willing to accept the responsibilities of citizenship.

My own State of Montana had a very sparse population when it was admitted into the Union, but we got along very well. We built up our own State government, our own county governments, and our own municipal governments. Our population increased. Our resources were developed to a greater extent than they ever would have been developed had we remained a territory. I could name many other States which did not have a very large population at the time of their admission into the Union, but they have grown and developed. They have built up their institutions and integrated themselves with the other States of the Union.

It has been mentioned that statehood has been promised Alaska and Hawaii for many years by both political parties. Those people have worked toward that objective. At times I have thought that they had been promised what perhaps those making the promise did not know whether they could fulfill or were not too interested in keeping it. Statehood has been held out to these people for many years. A statehood bill was passed in the House on several occasions,

only to be held up in the Senate. The time has come when we should either give Alaska statehood or should vote down that bill, so that the people of Alaska will know where they stand.

Personally, I feel that it is grossly unfair to the people of Alaska to continue to hold out to them the possibility of statehood and promises of statehood, but never to do anything about it. Certainly that is grossly unfair. I believe it would be unfair to ask representative people of Alaska to come all the way to Washington to testify further regarding this bill. As I stated before, I have been privileged to sit through two very long hearings on bills proposing statehood for Alaska an I for Hawaii. At this time the question is whether we favor or do not favor statehood for those Territories.

Now that the Alaskan statehood bill is before the Senate, I hope the Senate will reach a final determination regarding it, so that the citizens of Alaska will know where they stand. As a member of the Committee on Interior and Insular Affairs, I do not understand how any additional information on this subject could be developed. It seems to me that all the facts regarding it have been presented in a correct and proper way.

I am well aware of the various objections to statehood which have been submitted. I am frank to admit that at first perhaps I myself entertained some of those sentiments. For instance, in the beginning I doubted that it would be proper for us, as the United States of America, to take into full statehood a noncontiguous Territory. However, after having studied that problem from every angle, in order to make up my mind on that point, I can now see no particular validity to that argument, especially in view of modern modes of transportation.

I have visited with a great many persons who have driven their automobiles from Great Falls, Mont., through Canada, all the way to Alaska, and back again. Of course, it is true that at present the roads there are not very good; nevertheless, that trip has been completed a great many times.

Of course, only a few hours of air travel are required to reach either Juneau, Fairbanks, Anchorage, or Ketchikan, even from Washington. I have known people who had dinner in the evening here in Washington, and had lunch the next day in Alaska. That shows how our transportation facilities have overcome great distances. Thus, Mr. President, in my opinion the argument that Alaska is a noncontiguous Territory does not hold water.

Therefore, I hope the Senate will vote favorably on this bill as soon as possible. At this time I am glad to join those who are supporting the move for statehood for Alaska. In the committee I supported that move and the bill for that purpose, and I intend to vote for the bill on the floor of the Senate.

In conclusion, Mr. President, I desire to ask consent to have reprinted the remarks I made before the Senate in 1950 on the subject of the Alaskan statehood bill, when the bill was then before the Senate.

There being no objection, Mr. ECTON's previous remarks were ordered to be reprinted in the RECORD, as follows:

[From the CONGRESSIONAL RECORD of December 1, 1950]

Mr. ECTON. Mr. President, I realize it is impossible for me to add anything to the forceful and impressive arguments which have already been made in behalf of statehood for Alaska. I believe that about everything that has been said in the arguments advanced against the admission of Alaska was said against the admission of Montana into the Union. Montana was admitted to the Union on November 8, 1889. I know that many people at that time thought that about all Montana had was a great many Indians and snow-covered mountains. We did have many Indians and we did have snow-covered mountains. But we had a few people who had migrated into that Territory, who had built their homes there, were rearing families, and intended to proceed to develop the country for their children and children's children.

Three years ago I was one of several members of the Committee on Interior and Insular Affairs who visited Alaska. I then discovered that Alaska had snow-covered mountains and also had many Indians, and Eskimos as well. We do not happen to have Eskimos in Montana. We found likewise a people in Alaska who had migrated there, people with courage, with ambition, with vision, who were building homes, and rearing families, and who intended to stay in Alaska, if possible.

We found that many people from my own State had gone to Alaska. I suppose life in Montana had become too easy for them, so they wanted to go to Alaska to satisfy the old pioneering spirit. They were doing good work there. But back in their minds they hoped for the time when eventually Alaska would become a State. That has been in the minds of the people there for years and years and years. I was surprised to meet as many persons as I did who thought it was essential that Alaska be admitted to the Union, with all the rights of statehood.

Mr. President, I talked to a great many GI's who had been in Alaska during World War II, and who had returned there, bringing their brides with them, and were attempting to make a home there and provide for themselves a livelihood. Many of them told me, however, "We do not expect to stay here all our lives." I asked, "Why?" They said, "This is a Territory. We simply do not like to raise our children to maturity in a Territory. It is all right for them to stay here for a while, but after a bit they will want to go to school, and we will have to make arrangements to go back to the States. Now, if you Members of Congress would give us statehood we think we would be willing to stay here and make it our home for the future. We can develop this country just as those in the West have developed their States, which at the time of statehood were sparsely settled." A great many of them felt that it would mean much to them and to their children if they could say they were citizens of the State of Alaska rather than of the Territory of Alaska. That made a deep impression upon us.

Mr. President, I met in Alaska the finest kind of people I have met anywhere in the world. They are friendly, they are generous, they are hard-working, and they are most forward-looking.

I do not believe we need to worry about whether the resources of Alaska are sufficient to support statehood. In my opinion, Alaska has practically everything that any other State of the Union has except agriculture, and Alaska is developing agriculturally. Under modern methods of using various kinds of soils under differing climatic conditions, I believe eventually Alaska will have

a pretty good agriculture, and will develop agriculturally as well as in other ways.

I believe Alaska has more resources than most of the other States of the Union have at the present time. The Senator from Oregon mentioned the natural resources of Alaska. Natural resources abound in Alaska. Nearly every kind of mineral that can be imagined is hidden away in the mountains and the hills and the valleys of Alaska.

Mr. President, I am happy that someone had the foresight to create Alaska as a Territory for the United States. In the face of the world situation as it is, and knowing of all the strategic materials we need to protect ourselves in this modern age, I am glad that we have the Territory of Alaska under our control.

In view of the fact that the people of that Territory have been promised statehood for so many years, and have been on trial for so many years, since at least a majority of them have worked earnestly and continuously for advancement to statehood, and in view of the fact that the Alaska statehood bill has already been passed by the House twice, that we have for 2 years held long and tedious public hearings on the subject, and that the Senate committee has seen fit to advance it to the floor of the Senate, I had hoped that we could have the bill brought before the Senate, at least so a vote could be had on it, in order to let the people of Alaska see the real picture.

Mr. President, when I was in Alaska 3 years ago I told the people there that I honestly thought statehood legislation could be put through the Congress of the United States. They wanted to know why. I said, "Because in my opinion you occupy the most strategic place on the face of the globe. From a military standpoint all eyes are going to be turned on Alaska in the next few years. I think we are going to recognize your strategic position and realize that we can do a better job if Alaska is a State of the Union, rather than merely a Territory."

Mr. President, I merely wish to say this evening that I honestly believe that Alaska is the key to the proper defense of the North American continent, that it is the key spot on the map where will be determined in the future whether we shall have world peace or not.

Mr. President, now all our eyes are turned on Korea. That is all very well. Korea, however, is not the key to Asia. Korea is not the key to the peace of the world. I say in all sincerity and honesty that I believe our own Territory, which belongs to the United States, is the key. I agree with the Senator from Oregon that we had better be spending our time and our money in making plans for any eventuality, because in my opinion Alaska is the pinnacle of the world.

Senators may say, as I have heard it said here, "Well, what if it is? We will defend Alaska." Of course, we are going to defend Alaska whether it is a Territory or a State. It belongs to us. The people of Alaska are a part of us, even though they live in a Territory, and even though they cannot vote for national officers, and even though they do not have representation in Congress, except through one Delegate, whom they elect, but who has no vote in Congress.

It is no secret that Russia is putting forth propaganda that the United States bought Alaska years ago too cheaply, and that rightfully and justly Alaska should belong to Russia. Mr. President, the good people of Alaska hear those stories and are worried by them. Inasmuch as Alaska now is merely a Territory, some of her people wonder whether perhaps, if the going became tough, the United States would move out and would let them go, rather than put up a fierce battle and possibly involve the entire world.

Mr. President, I say to you that we need to do everything we possibly can to build up the morale of the good citizens who live in Alaska. We should make them under-

stand that they are full-fledged American citizens, with all the rights, privileges, and protections of American citizens, and that they are supported by the determination of a great Government to see that they are protected. That will help their morale; it will give them additional courage; and they, in turn, will give greater morale to the thousands of our citizens who, as members of the Armed Forces, have to be stationed in Alaska.

Mr. President, the towns in Alaska and the homes in Alaska remind me a great deal of towns and cities and homes in my own State of Montana. Naturally the houses in Alaska have to be built well in order to withstand the cold, but they look very much like houses in any other modern city or town. Alaska in the total respect is not the wilderness it is sometimes portrayed to be.

Alaska possesses some of the most beautiful scenery in the world. If we admit Alaska to the Union as a full-fledged State I think that eventually there will be a paved highway between this country, across Canada, to Alaska; and every summer many of our citizens will wish to travel there, instead of going to Europe, South America, or some other foreign land. I do not see how anyone could find in Switzerland or in any other foreign country any sights more beautiful than those which can be found in Alaska.

Mr. President, a large delegation of Alaskans came to Washington and appeared before the Committee on Interior and Insular Affairs, and we went into every detail in regard to what will be involved if Alaska is granted statehood. I know that there are arguments in opposition; but the splendid group of people who came here last winter and who were honest and sincere had given the problem much serious consideration. They are united in believing that Alaska, if admitted to the Union as a State, will be able to finance herself and will be able to overcome all obstacles. They recognize that there are certain obstacles to be overcome if Alaska is granted statehood; but they wish to try, they wish to go forward, they wish to accept the challenge and the responsibility. They are certain they can manage it. I believe they can; and I believe they will if they are granted the opportunity to do so.

Mr. President, I am sorry that certain aspects of the matter have developed in the course of the argument and the effort to bring this bill before the Senate for consideration. In that connection I am not blaming anyone. I know how certain Senators feel about the balance of power and other questions. However, I do not think we need worry about that; I think all those matters can be taken care of. I believe that any Senators or Members of the House of Representatives who might be elected from Alaska and sent to the United States Congress would be fair and open-minded, and would not take undue advantage of anyone. I am not fearful of that situation. Knowing the people of Alaska as I believe I do, I have confidence that they would elect as representatives of the State of Alaska Senators and Representatives who would be fair, open-minded, and sound on all questions of national interest.

Therefore, Mr. President, I wish the RECORD to show that I have not changed my mind since I was in Alaska 3 years ago, when I promised those good people that I would support their statehood bill; and I am supporting it now.

Mr. O'MAHONEY. Mr. President, I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The Chief Clerk proceeded to call the roll.

Mr. O'MAHONEY. Mr. President, I ask unanimous consent that the order

for a quorum call be vacated and that further proceedings under the call be suspended.

The PRESIDING OFFICER (Mr. STENNIS in the chair). Is there objection to the request of the Senator from Wyoming? The Chair hears none, and it is so ordered.

Mr. CORDON. Mr. President, I rise in support of the position of the Interior and Insular Affairs Committee in recommending statehood for the Territory of Alaska, and in opposition to the pending motion to recommit the bill to that committee for further study. As I view it, Mr. President, a recommittal of this bill at this time would serve no purpose other than to kill any hope which the people of Alaska might have, either for the passage during the present session of a bill granting them statehood, or for even having that question voted upon on its merits.

To many of them with whom I have talked, Mr. President, there is a feeling that, whatever the attitude of Members of the Congress might be with respect to granting or denying statehood, and however the Congress might approach that question on its merits, and whether the Members of the Congress believe that incorporation of a Territory is definitely a step toward statehood, and that statehood should thereafter certainly follow, whatever might be the views on these basic propositions, at least there can be no question that a petition, in whatever form it may come, from the people within a geographical area, wherever it may lie, which is under the American flag, should be answered, and answered on its merits. The citizens of the United States are guaranteed by their basic structure of government, the American Constitution, the right of petition. Mr. President, the right to inquire, without the right to an answer, is nothing. The right to petition, without the right to have the petition properly considered and acted upon, is an idle gesture and is of the essence of futility.

Certainly whatever the Members of the United States Senate individually may feel is the proper thing to do with respect to voting for or against statehood, there should be no question in the minds of any that some action should be taken. I can understand those—and there are many, with whom I have talked—who have a feeling that this is not the time to grant statehood to Alaska. I can understand the reasoning of many with whom I have talked. I can understand it, Mr. President, because, not too long ago, I shared their feeling. On the first vote I cast on the question of reporting favorably a statehood bill from the Committee on Interior and Insular Affairs, I had to follow my conviction and vote "no." The reasons which constrained me to cast that vote were similar to those I have heard presented by colleagues on the floor for opposition to statehood for Alaska at this time. At the time I cast that vote I felt sure that there was a grave question as to whether the Territory of Alaska had sufficient economic strength to justify our placing upon its citizens the additional financial burdens of statehood. In other words, I was a little bit afraid that the people of Alaska at that time could not afford statehood. So I voted against a favorable report on the bill.

I am not at all certain today, Mr. President, that the people of Alaska are fully prepared to blossom and burgeon at once into a full-fledged, modern statehood, with all the trappings the years have added to the vehicle of statehood. But, Mr. President, I do know that not a Territory has come into the Union since the beginning of the United States of which it could be said at the time of its admission that it was fully prepared to assume all the responsibilities, including the financial overhead, of statehood as statehood was known at the time of its admission. I want to make that particularly clear.

The Territory of Alaska today could assume all the burdens of statehood that any other Territory ever assumed at the time of its admission into the United States. The difficulty is that in the years since 1912 the people of the several States have required that their State governments assume more and more of the obligations which, in the opinion of old "horse and buggy" people like the present speaker, still should be borne by the citizens themselves.

But, however we may view the matter of whether the burdens are properly those of the individual or of the collective group under the term "States," the fact is that the States have assumed them, and the result is that a greater portion of the productive dollars of the citizens of a State must be taken by the State to be invested by the State in services to the people from whom the money is taken.

If we take as our yardstick the present overhead of the States, if we take the present overhead of, let us say, the States with the least population, or any one of the several States in the group with the least population, we would still find at the present time that the Territory of Alaska had an economic disadvantage.

So, Mr. President, I understand those who feel that that economic disadvantage is sufficient to constrain them to vote against admission at the present time. It was sufficient to cause me to vote against a favorable report on the bill at one time. But, remembering, Mr. President, as I did when I reviewed my history, that none of the States were economically prepared for statehood when it came to them, remembering that there is not in the history of the United States a single instance of a Territory which has gained admission as a State not justifying its admission and becoming economically sound as a State unit, I turned back to the Senate hearings and to the hearings on the House side, again took a look at the facts with respect to Alaska, and changed my mind. I reached the conclusion, Mr. President, that if Alaska at the moment is perhaps at an economic disadvantage, it is not the fault of Alaska. The fault rests with the United States Government which has never given to Alaska its birthright or any hope for the future.

When the other States came into the Union—I speak of those which came in after the Thirteen Original States—there was a policy in the United States of holding all natural resources of the soil as a trust to be available to the individual citizens in any geographical area, either on a basis of free acquisition or upon a basis of a very small, nominal payment. That was true throughout the West. The West was settled by pioneers who had but one major problem, that of keeping body and soul together until they could develop their tracts, their homesteads, their donation land claims, and make themselves economically sufficient. There was never any question as to whether they could have the land. It was there for them. It had been held for them since the American flag first flew over it.

That fact, Mr. President, accelerated the development of all the so-called public land States, and that acceleration would have been, I undertake to say, much greater than it was had the same philosophy continued to prevail. But, Mr. President, long before Alaska was anything more than a distant Arctic outpost, an area thought to be a land where one could gather gold with a spade, drop it into a bucket, become a millionaire over night, and come back to the play spots of the big cities—long before Alaska was anything more than that sort of an outpost, the policy of the United States with reference to its natural resources changed. The Government ceased to become a trustee holding a naked title for transmission to settlers, and became a managing property agent. That type of agency was impressed upon every acre of land in the Territory of Alaska, and rests upon it to this day. If Alaska is not developed at an accelerated rate, we can know why if we will only study the history of land ownership, acquisition, retention, and management by the United States of America.

Mr. President, Congress is responsible for that situation. Congress can change it, Congress can remedy it. The laws will be changed if the people of Alaska are given a voice in Congress, and their representatives can stand in the halls of Congress on an equality with the rest of us and insist on their rights. Then they can plead for the things we should have given them without their plea, and they can demand the things which the law gives them, but which administrative interpretation has withheld from them. Then they can picture their needs to the minds of the Members of the Senate and of the House of Representatives—open minds, Mr. President, I undertake to say, without reference to any side down the middle of the floor—who desire to do the right thing, but do not know what the right thing is. If we have from Alaska voices to present those facts on the floor of the Senate and the floor of the House, then the people of Alaska will have an opportunity to obtain the key which will unlock their economic future, and we shall see a growth such as has been seldom paralleled in all the history of the United States or of the Western World.

True, there are those who, fortunately, have had their being under the warm

southern sun and the palms of the tropics and the near-tropics, who will raise their voices against the rigors of the north, and deny that there are any strong souls who are willing to experience the rigors of the climate and build for themselves homes in the Far North. But we know there are such persons.

We know that other areas in the Far North have been built up, and that there will be many young men and women faring forth gladly to great adventure in the Alaskan area, when they know before they leave that they will have a chance to win.

Mr. President, I do not undertake to say that the bill now pending is a complete answer to the economic needs of a new State in Alaska. I do not know whether or not it is. Nobody else knows. But I undertake to say that that is wholly beside the point. If it is enough, then we do not need any more. If it is not enough, the Congress that grants statehood and grants aids to relieve economic necessity can add to them.

No argument can be made against statehood based upon any shortcomings in this bill. There is finality, true, in the granting of statehood, but there is no finality with respect to the aid which may be granted to a new State in order to assist it in overcoming its economic handicaps of the moment. Along that line, Mr. President, Congress may act again and again and again. Let us not question that statement.

There may be those who will say that all the other Territories got their grants when they became States, and that ended it, and that we should know what we are doing before we grant statehood to Alaska, so that we will not have to take further action. Mr. President, in order that the question or the allegation may be answered before it is raised, I ask unanimous consent at this time to have placed in the RECORD, lists of grants to States at the time of their admission to statehood, grants to States subsequent to their admission to statehood, and the relinquishment by States from time to time of what had been granted to them.

The PRESIDING OFFICER (Mr. HILL in the chair). Is there objection?

There being no objection, the lists were ordered to be printed in the RECORD, as follows:

I. GRANTS TO STATES ON THEIR ADMISSION TO THE UNION

### Alabama

Act of admission, March 2, 1819, (3 Stat. 491, sec. 6).

Grant to Alabama: Section 16 or its equivalent in each township for schools; all salt springs in the State; 36 sections for a seminary; 1,620 acres for the seat of government; and 3 percent of the proceeds from the sale of public lands in the State is to be reserved for construction of public roads and canals and improving the navigation of rivers by the State.

### Arizona

Act of admission, June 20, 1910 (36 Stat. 572–573).

Grant to Arizona: Sections 16, 36, 2, and 32 or their equivalent in each township for schools; in lieu of grants under acts of September 4, 1841, September 28, 1850, and July 2, 1862, above: 200,000 acres for the university, 100,000 acres for public buildings, etc., 100,000 acres for insane asylums, 100,000 acres

for penitentiaries, 100,000 acres for schools and asylums for the deaf, dumb and blind, 50,000 acres for hospitals for disabled miners, 200,000 acres for normal schools, 100,000 acres for charitable institutions, etc., 150,000 acres for agricultural and mechanical colleges, 150,-000 acres for school of mines, 100,000 acres for military institutes and 1,000,000 acres for payment of certain railroad bonds; 5 percent of the proceeds from sale of public lands in the State is to be paid to the State for schools.

### Arkansas

The act of admission of June 15, 1836 (5 Stat. 50–52, ch. 100) made no grant, but a supplementary act of June 23, 1836 (5 Stat. 58–59, ch. 120) made the following grant:

Grant to Arkansas: Section 16 or its equivalent in each township for schools; up to 12 salt springs, etc.; 5 sections for public buildings, in addition to 10 sections granted to the territory under act of March 2, 1831 (4 Stat. 473, ch. 67); 72 sections (two entire townships) for a seminary (which had been granted to the territory under an earlier act); and 5 percent of the proceeds from the sale of public lands in the State is to be reserved for making roads and canals by the State.

### California

The act of admission, of September 9, 1850 (9 Stat. 452–453, ch. 50) made no grant.

### Colorado

Act of admission, March 21, 1864 (13 Stat. 84, secs. 7–9).

Grant to Colorado: Sections 16 and 36 in every township or its equivalent, for schools; 20 sections for public buildings; 20 sections for a penitentiary or State prison; and 5 percent of the proceeds from the sale of public lands within the State is to be paid to the State for roads, ditches, or canals, to effect a general system of irrigation of the agricultural land. [Superseded by an act of March 3, 1875 (18 Stat. 475–476).]

### Florida

The act of admission, March 3, 1845 (5 Stat. 742–743, ch. 48) made no grant, but a supplemental act of the same date (5 Stat. 788, ch. 75) made the following grant:

Grant to Florida: 8 sections for the seat of government; section 16 or its equivalent in each township for schools; 2 townships, in addition to two already reserved, for two seminaries; 5 percent of the net proceeds of the sale of lands within the State thereafter sold by Congress, for educational purposes.

### Idaho

Act of admission, July 3, 1890 (26 Stat. 215–217).

Grant to Idaho: Sections 16 and 36 or their equivalent in each township for schools, 50 sections for public buildings, 72 sections for a university, a penitentiary, an agricultural college, and in lieu of grants under acts of September 4, 1841, and September 28, 1850, above, and any grant of saline lands; 100,000 acres for a scientific school, 100,000 acres for normal schools, 50,000 acres for an insane asylum, 50,000 acres for a university at Moscow, 50,000 acres for a penitentiary, and 150,000 acres for other charitable, educational, penal, and reformatory institutions; 5 percent of the proceeds from the sale of public lands within the State is to be paid to the State for schools.

### Illinois

Act of admission, April 18, 1818 (3 Stat. 430, sec. 6).

Grant to Illinois: Section 16 or its equivalent in each township for schools; all salt springs in the State; 36 sections for a seminary; 3 percent of the proceeds from the sale of public lands within the State is to be reserved for appropriation by the State for encouragement of learning, of which one-sixth is to be used for a college or university.

### Indiana

Act of admission, April 19, 1816 (3 Stat. 290, sec. 6).

Grant to Indiana: Section 16 or its equivalent in each township for schools; certain salt springs, etc.; one township for a seminary; four sections for the seat of government; 3 percent of the proceeds from the sale of public lands in the State is to be applied to construction of roads and canals by the State.

### Iowa

The act of admission, March 3, 1845 (5 Stat. 742–743, ch. 48), made no grant, but a supplemental act of the same date (5 Stat. 789–790, ch. 76) made the following grant:

Grant to Iowa: Section 16 or its equivalent in each township for schools; 72 sections for a university (reserved by an act of July 20, 1840); 5 sections for public buildings; up to 16 salt springs, etc.; 5 percent of the net proceeds of the sale of public lands within the State sold by Congress after its admission, for roads and canals.

### Kansas

Act of admission, January 29, 1861 (12 Stat. 127, sec. 3).

Grant to Kansas: Sections 16 and 36 or their equivalent in each township for schools; 72 sections for a university; 10 sections for public buildings; up to 12 salt springs; 5 percent of receipts from the sale of public lands within the State is to be paid to the State for roads and internal improvements.

### Kentucky

The act of admission, February 4, 1791 (1 Stat. 189, ch. 4) made no grant.

### Louisiana

The act of admission, February 20, 1811 (2 Stat. 641–643), provided in section 5 that 5 percent of the proceeds of public lands after January 1, 1811, were to be applied to construction of roads and levees by the State.

### Maine

The act of admission, March 3, 1820 (3 Stat. 544, ch. 19), made no grant.

### Michigan

The act of admission, June 15, 1836 (5 Stat. 49, ch. 99), made no grant but a supplementary act of June 23, 1836 (5 Stat. 59–60, ch. 121), made the following grant:

Grant to Michigan: Section 16 or its equivalent in each township for schools; 72 sections for a university (reserved under an act of May 20, 1826, 4 Stat. 180, ch. 90); 5 sections for public buildings; up to 12 salt springs; 5 percent of the proceeds from sale of public lands in the State is to be appropriated for making roads and canals by the State.

### Minnesota

Act of admission, February 26, 1857 (11 Stat. 167, sec. 5).

Grant to Minnesota: Sections 16 and 36 or their equivalent in each township for schools; 72 sections for a university; 10 sections for public buildings; up to 12 salt springs; 5 percent of the proceeds from the sale of public lands within the State is to be paid to the State for roads and internal improvements.

### Mississippi

Act of March 1, 1817 (3 Stat. 349, ch. 23, sec. 5).

Three percent of receipts from sale of public lands in Mississippi is to be applied to construction of roads and canals by the State. No lands were granted.

### Missouri

Act of admission, March 6, 1820 (3 Stat. 547, sec. 6).

Grant to Missouri: Section 16 or its equivalent in each township for schools; up to 12 salt springs, etc.; 4 sections for the seat of government; 36 sections and lands previously

reserved for a seminary (an act of February 17, 1818, 3 Stat. 407, sec. 3, had reserved 2 townships for a seminary); 3 percent of the proceeds from sale of public lands in Missouri to be reserved for making roads and canals by the State.

### Montana

Act of admission, February 22, 1889 (25 Stat. 679–681).

Grant to Montana: Sections 16 and 36 or their equivalent in each township for schools; 72 sections for a university; lands for a penitentiary and 90,000 acres for agricultural colleges; 100,000 acres for a normal school, 50,000 additional acres for agricultural colleges, 50,000 acres for a reform school, 50,000 acres for a deaf and dumb asylum; and 150,000 acres additional for public buildings; in lieu of grants under the acts of September 4, 1841, and September 28, 1850; and 5 percent of the proceeds from the sale of public lands in the State is to be paid to the State for schools.

### Nebraska

Act of admission, April 19, 1864 (13 Stat. 49, secs. 7–11).

Grant to Nebraska: Sections 16 and 36 or their equivalent in each township for schools; 72 sections for a university; 20 sections for public buildings; 50 sections for a penitentiary; up to 12 salt springs; 5 percent of the proceeds from the sale of public lands in the State are to be paid to the State for schools.

### Nevada

Act of admission, March 21, 1864 (13 Stat. 32, secs. 7–9).

Grant to Nevada: Sections 16 and 36 or their equivalent in each township for schools; 20 sections for public buildings; 20 sections for a penitentiary; and 5 percent of the proceeds from sale of public lands in the State are to be paid to the State for roads, ditches, and canals to effect a general system of irrigation of agricultural land.

### New Mexico

Act of admission, June 20, 1910 (36 Stat. 561–563).

Grant to New Mexico: Sections 16, 36, 2 and 32 or their equivalent in each township for schools; in lieu of grants under acts of September 4, 1841, September 28, 1850, and July 2, 1862, above; 200,000 acres for the university, 100,000 acres for insane asylums, 100,000 acres for penitentiaries, 100,000 acres for schools and asylums for the deaf, dumb and blind, 50,000 acres for hospitals for disabled miners, 200,000 acres for normal schools, 100,000 acres for charitable institutions, etc., 150,000 acres for agricultural and mechanical colleges; 150,000 acres for school of mines, 100,000 acres for military institutes and 1,000,000 acres for payment of certain railroad bonds; 5 percent of the proceeds from sale of public lands in the State is to be paid to the State for schools.

### North Dakota

Act of admission, February 22, 1889 (25 Stat. 679–681).

Grant to North Dakota: Sections 16 and 36 or their equivalent in each township for schools, 72 sections for a university, lands for a penitentiary and 90,000 acres for agricultural colleges; 40,000 acres for a school of mines, 40,000 acres for a reform school, 40,000 acres for a deaf and dumb asylum, 40,000 acres for the agricultural college, 40,000 acres for the university; 80,000 acres for normal schools, 50,000 acres for public buildings and 170,000 acres for other educational and charitable purposes; in lieu of grants under acts of September 4, 1841, and September 28, 1850; 5 percent of the proceeds from the sale of public lands in the State is to be paid to the State for schools.

### Ohio

Act of admission, April 30, 1802 (2 Stat. 175, sec. 7).

Grant to Ohio: Section 16, or its equivalent in each township, for schools; certain salt springs.

### Oklahoma

Act of admission, June 16, 1906 (34 Stat. 272–275).

Grant to Oklahoma: Sections 16 and 36 or their equivalent in each township for schools; $5,000,000 in lieu of sections 16 and 36 in Indian territory; section 13 in all lands opened to settlement and lands selected in lieu thereof, one-third for the university and normal preparatory school, one-third for normal schools and one-third for the agricultural and mechanical college and the colored agricultural normal university; section 33 and lands selected in lieu thereof previously reserved for charitable and penal institutions and public buildings; and in lieu of grants under the acts of September 4, 1841, and September 28, 1850, above: 250,000 acres for Oklahoma University, 150,000 acres for the university preparatory school, 250,000 acres for the agricultural and mechanical colleges, 100,000 acres for the Colored Agricultural and Normal University and 300,000 acres for normal schools, 5 percent of the proceeds from sale of public lands within the State is to be paid to the State for schools.

### Oregon

Act of admission, February 14, 1859 (11 Stat. 383–384).

Grant to Oregon: Sections 16 and 36 or their equivalent in each township for schools; 72 sections for a university; 10 sections for public buildings; up to 12 salt springs; 5 percent of the proceeds from the sale of public lands within the State is to be paid to the State for roads and internal improvements.

### South Dakota

Act of admission, February 22, 1889 (25 Stat. 679–681).

Grant to South Dakota: Sections 16 and 36 or their equivalent in each township for schools, 72 sections for a university, lands for a penitentiary and 120,000 acres for agricultural colleges; 40,000 acres for a deaf and dumb asylum, 40,000 acres for a school of mines, 40,000 acres for a reform school, 40,000 acres for the agricultural college, 40,000 acres for the university, 80,000 acres for normal schools, 50,000 acres for public buildings and 170,000 acres for other educational and charitable purposes; and, in addition, land for an insane asylum; in lieu of grants under acts of September 4, 1841, and September 28, 1850; and 5 percent of the proceeds from the sale of public lands in the State is to be paid to the State for schools.

### Tennessee

Act of admission, June 1, 1796 (1 Stat. 491, ch. 47), made no grant.

### Texas

The act of admission, March 1, 1845 (5 Stat. 797–798), and December 29, 1845 (9 Stat. 108), made no grant.

### Utah

Act of admission, July 16, 1894 (28 Stat. 109–110).

Grant to Utah: Sections 2, 16, 32, and 36 or their equivalent in each township for schools, 100 sections for public buildings, two townships and 110,000 acres for a university, 200,000 acres for an agricultural college, and in lieu of grants under the acts of September 4, 1841, and September 28, 1850, above; 500,000 acres for water reservoirs for irrigation, 100,000 acres for an insane asylum, 100,000 acres for a school of mines, 100,000 acres for a deaf and dumb asylum, 100,000 acres for a reform school, 100,000 acres for normal schools, 100,000 acres for an institution for the blind; 50,000 acres for a hospital for miners and a penitentiary; 5 percent of the proceeds from sale of public lands within the State is to be paid to the State for schools.

### Vermont

The act of admission, February 18, 1791 (1 Stat. 191), made no grant.

### Washington

Act of admission, February 22, 1889 (25 Stat. 679–681).

Grant to Washington: Sections 16 and 36 or their equivalent in each township for schools, 72 sections for a university, lands for a penitentiary and 90,000 acres for agricultural college; 100,000 acres for a scientific school, 100,000 acres for normal schools, 100,000 acres additional for public buildings, 200,000 acres for charitable, educational, penal and reformatory institutions; in lieu of grants under acts of September 4, 1841, and September 28, 1850; 5 percent of the proceeds from the sale of public lands in the State is to be paid to the State for schools.

### West Virginia

The act of admission, December 31, 1862 (12 Stat. 633–634, ch. 6), made no grant.

### Wisconsin

Act of admission, August 6, 1846 (9 Stat. 56).

Grant to Wisconsin: Section 16 or its equivalent in each township for schools; 72 sections for a university (reserved under an act of June 12, 1838, 5 Stat. 244, ch. 110), 10 sections for public buildings; up to 12 salt springs; and 5 percent of the proceeds from sale of public lands within the State is to be paid to the State for roads and canals.

### Wyoming

Act of admission, July 10, 1890 (26 Stat. 222–224).

Grant to Wyoming: Sections 16 and 36 or their equivalent in each township for schools, 50 sections for public buildings, 72 sections for a university, lands for a fish hatchery, a penitentiary, 90,000 acres for an agricultural college and in lieu of grants authorized by the acts of September 4, 1841, and September 28, 1850, above, and any grant of saline lands; 30,000 acres for an insane asylum, 30,000 acres for a penal, etc. institution in Carbon County, 30,000 acres for a penitentiary, 5,000 acres for a fish hatchery, 30,000 acres for a deaf, dumb, and blind asylum, 10,000 acres for a ,oor farm, 30,000 acres for a hospital for miners, 75,000 acres additional for public buildings, and 260,000 acres for charitable institutions; and 5 percent of the proceeds from sale of public lands within the State is to be paid to the State for schools.

### II. GRANTS TO STATES SUBSEQUENT TO THEIR ADMISSION TO THE UNION AND PRIOR TO 1900

General provisions of law making grants to all States or to States subsequently admitted to the Union:

May 20, 1826 (4 Stat. 179, ch. 83). The Secretary of the Treasury was to select school lands to be reserved in lieu of section 16 in each township where no such lands had been appropriated as authorized by laws granting section 16 to certain States.

June 23, 1836 (5 Stat. 55, secs. 13, 14). Money in the Treasury on January 1, 1837, in excess of $5,000,000 was to be deposited with the State treasurers, who were to give certificates of deposit for safekeeping and repayment when required by the Secretary of the Treasury; payments were to be made in four instalments. An act of October 2, 1837, 5 Stat. 201, c. 1, postponed payment of the fourth instalment of these funds until January 1, 1839, but according to Edward G. Bourne's History of the Surplus Revenue of 1837, p. 41, there was no surplus on January 1, 1839, and so the fourth instalment was not paid.

September 4, 1841 (5 Stat. 453, secs. 2, 8–9). After deducting 10 percent of the proceeds from the sale of public lands in certain States for certain expenses and 5 percent for new States, etc., the proceeds from the sale of

public lands is to be divided among the 26 States, the District of Columbia, and 3 Territories on the basis of population (secs. 1-2).

Five hundred thousand acres is to be granted to each new State for internal improvements (less any lands granted for internal improvements while a Territory), including roads, canals, bridges, etc. (secs. 8-9).

September 28, 1850 (9 Stat. 519-520). Swamp and overflowed lands unfit for cultivation in each State where such lands are situated are granted to the States; proceeds from such lands are to be for reclamation of same.

March 2, 1855 (10 Stat. 634-635). States are to be indemnified for swamp lands erroneously sold.

March 3, 1855 (10 Stat. 719, ch. 21, sec 14.). Money collected from vessels on account of the death of passengers was to be paid by the collector of customs to State boards for care of sick or destitute immigrants. (Repealed by act of August 2, 1882, 22 Stat. 191 sec. 4.)

The Morrill Act of July 2, 1862 (12 Stat. 503-505). Grant to each State, of 30,000 acres of nonmineral lands for each Senator or Representative in Congress under the 1860 apportionment; the Secretary of the Interior was to issue land scrip for and deficiency in lands; the proceeds from the sale of such lands and scrip were to be invested Government bonds, etc., and are to constitute a perpetual fund the interest from which is to be used for endorsement, support and maintenance of at least one college for agriculture and the mechanic arts.

January 30, 1865 (13 Stat. 567, No. 10). Acts passed in 1864 granting lands to States, etc., to aid in the construction of roads, etc., are not construed as embracing mineral lands, which in all cases shall be reserved to the United States unless otherwise specifically provided in the act making the grant.

July 23, 1866 (14 Stat. 208, ch. 209). The grant under the Morrill Act of 1862, above, is extended to any new State which may be admitted to the Union.

March 3, 1879 (20 Stat. 467-469). A trust fund of $250,000 was established to aid in education of the blind. The interest from this fund was to be paid to the American Printing House for the Blind, for manufacture, etc., of books to be distributed among all the public institutions for the education of the blind in the States, etc., upon requisition by the superintendents of such institutions, who are ex-officio trustees of the fund. (An act of June 25, 1906, 34 Stat. 460, ch. 3526, appropriated $10,000 annually for this purpose, instead of the interest from the fund. The amount has been increased many times since then.)

March 3, 1881 (21 Stat. 521, No. 26). The Secretary of the Treasury was to cause a complete set of weights and measures to be delivered to the governor of each State for the use of land grant colleges, the cost of each set not to exceed $200. (This function was later transferred to the Secretary of Commerce.)

Hatch Act of March 2, 1887 (24 Stat. 440-442). Agricultural experiment stations are established in land-grant colleges and $15,000 a year is authorized to be appropriated to each State for expenses of the stations. (This authorization has been increased and supplemented many times since then.)

August 27, 1888 (25 Stat. 450). The Board of Managers of the National Home for Disabled Volunteer Soldiers was to pay the States $100 a year for each disabled veteran in State homes. (These functions have been transferred to the Veterans' Administration and the amount of payments has been increased several times since then.)

March 2, 1889 (25 Stat. 975). The States are required to pay half the cost of maintenance of each disabled veteran for which payments are made under the act of 1888, above.

The Second Morrill Act of August 30, 1890 (26 Stat. 417-419). Annual appropriations, increasing from $15,000 to $25,000 for each State, are authorized for payments to States for further endowment of agricultural and mechanical colleges established under the Morrill Act of July 2, 1862, above. (These authorizations have been increased several times since then.)

The Carey Act of August 18, 1894 (28 Stat. 422, sec. 4). Grant of 1,000,000 acres of desert lands to each of the public-land States, to aid in the reclamation of such lands, provided the States have them irrigated, etc.

Acts of February 24, 1897 (29 Stat. 594, ch. 313, sec. 3) and May 5, 1900 (31 Stat. 169-170). Fines collected from persons setting fires to timber on public lands, etc., are to be paid into the public-school fund of the county in which the lands where the offense is committed are situated. (Now incorporated in 18 U. S. C. 3613.)

## Alabama

May 3, 1822 (3 Stat. 675, ch. 46). The Secretary of the Treasury is directed to pay 3 percent of the proceeds from the sale of public lands in Alabama to the State for roads, canals, and improving the navigation of rivers, as provided in the act of admission of March 2, 1819.

May 23, 1828 (4 Stat. 290, ch. 75). Grant of 400,000 acres for purpose of improving the navigation of certain rivers.

July 4, 1836 (5 Stat. 116, sec. 3). Five percent of the proceeds from sale of certain lands ceded by the Chickasaws is to be reserved for construction of public roads and canals and improving the navigation of rivers by the State.

September 4, 1841 (5 Stat. 453-458, secs. 1, 8-9, 17). An additional 10 percent of the proceeds from sale of public lands in the State of Alabama and certain other States was to be paid to Alabama and the other States (sec. 1). (An act of August 30, 1842 (5 Stat. 567, sec. 30) suspended the 10-percent payments, etc.)

Grant of 500,000 acres for internal improvements (less any lands already granted for this purpose (secs. 8-9)).

Two percent of the proceeds from sale of public lands in the State which had been reserved for construction to the United States of roads leading to the State under the act of March 2, 1819, above, was to be paid to the State for certain roads, etc. (sec. 17).

August 11, 1848 (9 Stat. 281, c. 152). Receipts from sale of public lands may be used for schools.

September 20, 1850 (9 Stat. 466-467), May 17, 1856 (11 Stat. 15-16), March 3, 1857 (11 Stat. 195-197). Grants of lands for construction of railroads.

April 23, 1884 (23 Stat. 12, ch. 27). Grant of 46,080 acres additional for the university.

## Arizona

Act of admission was subsequent to 1900 (June 20, 1910).

## Arkansas

See act of June 23, 1836, in part I, above.

September 4, 1841 (5 Stat. 453-458, secs. 1, 8-9). An additional 10 percent of the proceeds from the sale of public lands in the State of Arkansas and certain other States was to be paid to Arkansas and the other States (sec. 1). (An act of August 30, 1842, 5 Stat. 567, sec. 30, suspended the 10-percent payments.)

Grant of 500,000 acres for internal improvements (less any lands already granted for this purpose) (secs. 8-9).

July 29, 1846 (9 Stat. 42, ch. 68). The use of the 72 sections granted under the act of June 23, 1836, in part I above, for the benefit of common schools is authorized, instead of for a seminary.

September 28, 1850 (9 Stat. 519-520). Grant of swamp and overflowed lands unfit for cultivation in Arkansas to the State; proceeds from the same are to be for reclamation of same.

February 9, 1853 (10 Stat. 155, ch. 59). Grant of rights-of-way and lands for a railroad.

## California

March 3, 1853 (10 Stat. 246-248). Grant of sections 16 and 36 or their equivalent in each township for schools; 72 sections for a university; 10 sections for public buildings.

July 23, 1866 (14 Stat. 219, sec. 4). The Commissioner of the General Land Office is to certify over to California as swamp or overflowed lands all such lands upon approved township surveys and plats.

## Colorado

March 3, 1875 (18 Stat. 475-476). Supersedes the act of admission of March 21, 1864, above. Grant of 50 sections for public buildings (instead of 20), 50 sections for a penitentiary (instead of 20), an additional 72 sections for a State university and up to 12 salt springs, etc.; the 5 percent of proceeds from sales of public lands within the State are to be used for internal improvements.

April 2, 1884 (23 Stat. 30, ch. 20). Colorado is permitted to select for school purposes other lands in lieu of lands in sections 16 and 32.

## Florida

Act of March 3, 1845 (5 Stat. 788, ch. 75). See part I, above.

May 17, 1856 (11 Stat. 15-16). Grant of lands for railroads.

## Illinois

March 3, 1819 (3 Stat. 525, ch. 95). Grant of 4 sections for the seat of government.

December 12, 1820 (3 Stat. 610, ch. 2). The Secretary of the Treasury is to pay the 3 percent provided in the act of admission, above, to the State.

March 2, 1827 (4 Stat. 234, ch. 51). Grant of lands for a canal.

September 4, 1841 (5 Stat. 453-458, secs. 1, 8-9). An additional 10 percent of the proceeds from the sale of public lands in the State of Illinois and certain other States was to be paid to Illinois and the other States (sec. 1). (The 10-percent payments were suspended by act of Aug. 30, 1842, 5 Stat. 567, sec. 30.)

Grant of 500,000 acres for internal improvements (less any lands already granted for this purpose) (secs. 8-9).

September 20, 1850 (9 Stat. 466-467). Grant of lands for a railroad.

## Indiana

April 11, 1818 (3 Stat. 424, ch. 49). The Secretary of the Treasury is directed to pay to Indiana the 3 percent of proceeds from the sale of public lands provided in the act of admission of April 19, 1816, above.

March 2, 1827 (4 Stat. 236, ch. 56). Grant of lands for a canal.

March 2, 1833 (4 Stat. 662, ch. 87). The State was authorized to use the lands granted under the act of 1827, above, to aid in construction of a railroad, instead of a canal.

September 4, 1841 (5 Stat. 453-458, secs. 1, 8-9). An additional 10 percent of the proceeds from the sale of public lands in the State of Indiana and certain other States was to be paid to Indiana and the other States (sec. 1). (The 10 percent payments were suspended by act of August 30, 1842, 5 Stat. 567, sec. 30.)

Grant of 500,000 acres for internal improvements (less any lands already granted for this purpose (secs. 8-9).

May 9, 1848 (9 Stat. 219, ch. 36). Grant of additional lands for the canal.

## Iowa

Act of March 3, 1845 (5 Stat. 789-790). See part I, above.

March 2, 1849 (9 Stat. 349, ch. 78). Iowa was authorized to use the receipts from sale of its 500,000 acre grant under the act of September 4, 1841, above, for schools (instead of internal improvements).

May 15, 1856 (11 Stat. 9, ch. 28). Grant for railroads.

### Louisiana

March 3, 1827 (4 Stat. 244, ch. 97). The Secretary of the Treasury was authorized to locate two townships which had been reserved by acts of 1806 and 1811 for seminaries in Louisiana Territory and title to such lands are vested in the State for use of a seminary or seminaries.

September 4, 1841 (5 Stat. 453–458, secs. 1, 8–9). An additional 10 percent of the proceeds from the sale of public lands in the State of Louisiana and certain other States was to be paid to Louisiana and the other States (sec. 1). (An act of August 30, 1842, 5 Stat. 567, sec. 30, suspended the 10-percent payments.)

Grant of 500,000 acres for internal improvements (less any lands already granted for this purpose) (secs. 8–9).

March 2, 1849 (9 Stat. 352, ch. 87). Grant of certain swamp lands.

June 3, 1856 (11 Stat. 18–19). Grant of land for railroads.

### Michigan

Act of June 23, 1836 (5 Stat. 59–60). See part I, above.

September 4, 1841 (5 Stat. 453–458, secs. 1, 8–9). An additional 10 percent of the proceeds from the sale of public lands in the State of Michigan and certain other States was to be paid to Michigan and the other States (sec. 1). (An act of August 30, 1842, 5 Stat. 567, sec. 30, suspended the 10-percent payments.)

Grant of 500,000 acres for internal improvements (less any lands already granted for this purpose) (secs. 8–9).

August 26, 1852 (10 Stat. 35, ch. 92). Grant of land for rights-of-way and for a ship canal.

June 3, 1856 (11 Stat. 21–22). Grant of land for railroads.

March 3, 1863 (12 Stat. 797). Grant of land for a military wagon road.

June 20, 1864 (13 Stat. 140, ch. 137). Grant of land for wagon roads for military or postal purposes.

### Minnesota

March 3, 1857 (11 Stat. 195–197). Grant of land for railroads.

March 12, 1860 (12 Stat. 3, ch. 5). The benefits of the act of September 28, 1850, above, are extended to Minnesota.

March 2, 1861 (12 Stat. 208, ch. 79). Grant of lands for the university.

### Mississippi

February 20, 1819 (3 Stat. 485, ch. 31). Grant of two sections of land for a seat of government and one township for a seminary.

May 3, 1822 (3 Stat. 674, ch. 46). The Secretary of the Treasury is to pay 3 percent of the proceeds from the sale of public lands in Mississippi to the State for roads and canals.

March 14, 1826 (4 Stat. 149, ch. 15). Receipts from sales of public lands received under act of admission in 1817 may be used for improvement of navigable rivers and bays.

July 4, 1836 (5 Stat. 116, sec. 1). Five percent of the receipts from certain lands ceded by the Chickasaws are to be reserved for construction of roads, canals, etc.

September 4, 1841 (5 Stat. 453–458, secs. 8–9). An additional 10 percent of the proceeds from the sale of public lands in the State of Mississippi and certain other States was to be paid to Mississippi and those States (sec. 1). (The 10 percent payments were suspended by an act of August 30, 1842, 5 Stat. 567, sec. 30.)

Grant of 500,000 acres for internal improvements (less any lands already granted for this purpose) (secs. 8–9).

September 20, 1850 (9 Stat. 466–467). Grant of land for a railroad.

August 11, 1856 (11 Stat. 30–32). Grant of land for railroads.

June 20, 1894 (28 Stat. 94, ch. 110). Grant of 23,040 acres for the university.

February 20, 1895 (28 Stat. 673, ch. 106). Grant of 46,080 acres for agricultural and mechanical colleges.

### Missouri

May 3, 1822 (3 Stat. 674, ch. 46). The Secretary of the Treasury is to pay 3 percent of the proceeds from sale of public lands in Missouri to the State for roads and canals.

January 24, 1827 (4 Stat. 200, ch. 5). Provision for selection of lands for a seminary or seminaries and that title be vested in the State.

September 4, 1841 (5 Stat. 453–458, secs. 1, 8–9, 16). An additional 10 percent of the proceeds from the sale of public lands in Missouri and certain other States was to be paid to Missouri and those States (sec. 1). (The 10-percent payments were suspended by an act of Aug. 30, 1842, 5 Stat. 567, sec. 30.)

Grant of 500,000 acres for internal improvements (less any lands already granted for this purpose (secs. 8–9). Two percent of the proceeds from the sale of public lands in the State which had been reserved for construction by the United States of roads leading to the State was to be paid to the State for certain roads, etc.

June 10, 1852 (10 Stat. 8–10). Grant of land for rights of way and railroads.

February 9, 1853 (10 Stat. 155, ch. 59). Grant of land for rights-of-way and a railroad.

March 3, 1877 (19 Stat. 395, ch. 116). Confirmation of grant of certain lands to Missouri.

### Nebraska

March 30, 1867 (15 Stat. 13, ch. 23). The benefits under the Morrill Act of July 2, 1862, above, are extended to Nebraska.

### Nevada

July 4, 1866 (14 Stat. 85, ch. 166, sec. 2). Grant of 72 sections for a university.

June 16, 1880 (21 Stat. 288, ch. 245). Grant of 2,000,000 acres for schools in lieu of sections 16 and 36 in each township.

### Ohio

March 3, 1803 (2 Stat. 225–226). Grant of additional school lands and one township or 36 sections for an academy; 3 percent of the proceeds from the sale of public lands in the State is to be paid to the State for roads.

March 3, 1827 (4 Stat. 242, ch. 93). Grant of certain lands to aid in making a road.

May 24, 1828 (4 Stat. 305, ch. 108). Grant of land for extending the Miami Canal.

June 19, 1834 (4 Stat. 679, ch. 56). Grant of additional lands for support of schools in the Connecticut Western Reserve.

September 4, 1841 (5 Stat. 453–458, secs. 1, 8–9). An additional 10 percent of the proceeds from the sale of public lands in Ohio and certain other States was to be paid to Ohio and those States (sec. 1). (The 10-percent payments were suspended by an act of Aug. 30, 1842, 5 Stat. 567, sec. 30.)

Grant of 500,000 acres for internal improvements (less any lands already granted for this purpose) (secs. 8–9).

### Oregon

March 12, 1860 (12 Stat. 3, ch. 5). The benefits of the act of September 28, 1850, above, were extended to Oregon.

March 2, 1861 (12 Stat. 208, ch. 79). Grant of lands for the university. (An act of September 27, 1850, 9 Stat. 499, sec. 10, amended by an act of July 17, 1854, 10 Stat. 305, sec. 4, had granted two townships to the Territory of Oregon for a university.)

July 2, 1864 (13 Stat. 355, ch. 213), July 4, 1866 (14 Stat. 86), July 5, 1866 (14 Stat. 89), December 26, 1866 (14 Stat. 374), February 25, 1867 (14 Stat. 409), and March 3, 1869 (15 Stat. 340). Lands were granted to Oregon for military wagon roads.

February 9, 1871 (16 Stat. 595, No. 24). Oregon was authorized to use receipts from lands granted by act of September 4, 1841, above, for schools (instead of for internal improvements).

### Tennessee

February 28, 1867 (14 Stat. 569, No. 31). The benefits of the Morrill Act of July 2, 1862, above, are extended to Tennessee.

### West Virginia

April 14, 1864 (13 Stat. 47, ch. 58, sec. 2). The benefits of the Morrill Act of July 2, 1862, above, are extended to West Virginia.

### Wisconsin

August 8, 1846 (9 Stat. 83). Grant of lands for the purpose of improving the Fox and Wisconsin Rivers, etc.

March 3, 1847 (9 Stat. 179, sec. 3). The State is authorized to dispose of its 5 percent fund for roads and canals, granted in the act of admission of August 6, 1846, for purposes recommended by a certain State convention.

June 3, 1856 (11 Stat. 20–21) and April 25, 1862 (12 Stat. 618, No. 30). Grants of land for railroads.

March 3, 1863 (12 Stat. 797) and June 25, 1864 (13 Stat. 183, ch. 153). Grants of land for military wagon roads.

### III. RELINQUISHMENT OF CLAIMS TO LANDS BY THE ORIGINAL THIRTEEN STATES

Previous to the establishment of the United States, the States laid claim to western territory. Cession of such lands to the Federal Government were made by New York on March 1, 1781, Virginia on March 1, 1784, Massachusetts on April 19, 1785, Connecticut on September 13, 1786, and South Carolina on August 9, 1787.[1]

Virginia consented to the formation of Kentucky (out of the District of Kentucky within Virginia) by act of December 18, 1789 (see act of February 4, 1791 (1 Stat. 189, ch. 4), admitting Kentucky into the Union).

North Carolina ceded her western territory to the United States and the United States accepted the cession by act of April 2, 1790 (1 Stat. 106–109, ch. 6). See act admitting Tennessee into the Union, June 1, 1796 (1 Stat. 491, c. 47).

New York by an act of March 6, 1790, consented to the formation of Vermont and Vermont was admitted by an act of February 18, 1791 (1 Stat. 191, ch. 7).

Connecticut ceded the Western Reserve to the United States in October 1797 and Congress authorized the President on April 23, 1800 (2 Stat. 56–57, ch. 38) to accept the cession.

Georgia had laid claim to western territory. Congress by an act of April 7, 1798 (1 Stat. 549–550, ch. 28) supplemented by an act of May 10, 1800 (2 Stat. 69–70, ch. 50) provides for a Commission to settle the limits of Georgia territory. An agreement was reached and was signed by Georgia on April 24, 1802, whereby Georgia ceded her western territories and received payment of $1,250,000 from the United States. (See 3 Stat. 118–119, ch. 39, sec. 5).

Massachusetts consented to the formation of the State of Maine (out of the district of Maine in Massachusetts) by act of June 19, 1819 (see act of Mar. 3, 1820 (3 Stat. 544, ch. 19), admitting Maine into the Union).

Texas agreed when admitted to the Union that new States, not more than 4, might be formed out of its territory, with its consent (see joint resolution of March 1, 1845 (5 Stat. 797–798, No. 8, consenting to the annexation of Texas).

Texas on November 25, 1850, ceded certain lands to the United States in return for payment of $10,000,000 by the United States, under act of September 9, 1850 (9 Stat. 4466–452, ch. 49).

---

[1] See Donaldson's, The Public Domain, published by the Government Printing Office in 1884, pages 65–68.

Virginia consented to the formation of West Virginia out of certain counties of Virginia by an act of May 13, 1862 (see act of Dec. 31, 1862, 12 Stat. 633–634, ch. 6, admitting West Virginia to the Union).

For a more detailed description of cession of lands to the United States, see Donaldson's the Public Domain cited above.

Mr. CORDON. Mr. President, I believe these lists are complete, and are an adequate answer to any charge which might be made that we may later have to do something different for Alaska than is provided for in the pending bill. We have a wealth of precedent if we find it proper and equitable to act in accordance with it.

Mr. President, at this time I wish to compliment the newest Member of the United States Senate, the junior Senator from Nebraska [Mr. SEATON] upon his masterly presentation the other day of an argument in favor of Alaskan statehood. I hope that every Member of the United States Senate will read the statement by the Senator from Nebraska, and if he has read it, will reread it. In it there will be found, quoted from the CONGRESSIONAL RECORD, every argument which has been made on this floor in opposition to statehood for Alaska, except one—all of them addressed to requests for statehood for other Territories, all of them answered adequately at the time on the floor, and answered finally by the record of the years.

There has been one proposition advanced up to this time which I do not find multiplied in all the old debates down through the years over admissions to statehood. That argument was made by the junior Senator from Florida [Mr. SMATHERS]. I listened to it most carefully and promptly started an investigation to determine its validity.

The junior Senator from Florida called attention to the language in the pending bill describing the Territory of Alaska and the people of Alaska with respect to identity of the area and the people to be admitted as a State. The junior Senator from Florida called attention to the fact that in an earlier bill there had been different language, which had included a description of a boundary line one marine league at sea. He called attention to the fact that there was no such added description in the pending bill. From that he drew the conclusion that, with the present description, if Alaska were admitted into the Union she would be forever cut off from any rights which might accrue to other States if tidelands bills were hereafter passed.

Mr. President, I am one of those who believe, first, that the Supreme Court erred in its tidelands decision; and second, and it is the duty of the Congress of the United States to correct the error. I believe that every maritime State has a right to whatever natural resources rest within its boundaries, and that those boundaries, in every instance in which international waters are concerned, extend at least one marine league to sea.

So it can readily be understood that I was troubled by the conclusion reached by the junior Senator from Florida. I confess that I had not given the matter as full consideration at the time the bill was before us as perhaps I should have

done with respect to that particular question. I had gone into the situation with reference to Hawaii, and had reached the conclusion that if Hawaii were made a State its rights with reference to tidelands would be exactly the same as those of the maritime States of the United States. I assumed that Alaska would be in the same situation. In any event, I was concerned when I heard the junior Senator from Florida suggest that perhaps we were short-changing Alaska with respect to tidelands.

A rather careful investigation reassured me; and, oddly enough, Mr. President, the reassurance came from the Senator's own State of Florida. The State of Florida was admitted to the Union as "that part of east and west Florida as annexed to the United States by reason of a treaty between the United States and Spain." I will not be held to the exact language, but that is the substance of it. That is the language which we used in connection with Alaska. The area came to the United States as the result of a treaty between the United States and Russia.

In other words, the junior Senator from Florida was evidencing great concern with respect to what he said might be a short-changing of Alaska in connection with her tidelands, the while he was claiming exactly all the rights for Florida which he suggested to the Senate of the United States we were taking away from Alaska.

Mr. President, a careful examination and analysis have convinced me that there will be no loss to Alaska as the result of that description. I base that conclusion upon the proposition that the State of Florida came into the Union under almost the identical language, and upon the fact that in the past, many of the decisions of the courts upon which rest the almost universal conviction and interpretation with respect to States' rights in the tidelands, arose from cases which had their inception in the tidewaters of the State of Florida. So we do not need to worry in that regard about Alaska.

There are those—and particularly on the Republican side of the aisle—who have been told, and have told me that they have been told, that Republicans in Alaska are not in favor of statehood as a general proposition, that there is a partisan aspect to the request for statehood for Alaska, and that we who believe in the principles of the Republican Party should therefore proceed with caution when American citizens of our own political faith in Alaska oppose statehood. That suggestion seemed to me to be somewhat sound. If statehood for Alaska had been made a political football, I wanted to know it. If members of the Republican Party in Alaska were, generally speaking, opposed to statehood, I not only wanted to know the fact, but I wanted to know why; so I set about determining the facts.

I hold in my hand a large collection of telegrams which came to me from American citizens in Alaska who are members of the Republican Party in Alaska. I received no telegrams from any Republican in Alaska in opposition to Alaskan statehood.

The senders of the telegrams favor statehood. Some of them are not full-fledged citizens, as, for example, the senders of the following telegram:

SKAGWAY, ALASKA, *February 19, 1952.*
Senator GUY CORDON,
   *United States Senate,*
      *Washington, D. C.:*
We want statehood for Alaska or freedom. The reasons are we could vote, we could control our industries, and build up population.
   22 GRADE-SCHOOL STUDENTS.

Mr. President, I have from Mr. L. H. Johnston, a telegram, which reads:

SKAGWAY, ALASKA, *February 19, 1952.*
Hon. Senator GUY CORDON,
   *United States Senator,*
      *Washington, D. C.:*
I'm a Republican general agent in the transportation business. Have lived in this Territory 40 years and urge Congress to grant statehood. We have shown ability to meet all tax obligations and will continue to do so. Our area and strategic position demand we have greater representation at Washington.
   L. H. JOHNSTON.

Mr. President, I have another telegram. It also comes from Skagway, and reads:

SKAGWAY, ALASKA, *February 19, 1952.*
GUY CORDON,
   *United States Senator,*
      *Washington, D. C.:*
From the viewpoint of a banker it is my conviction that we must have statehood to bring about the sound development of Alaska. With less than 200 miles of highway in the first judicial district we must demand statehood in order to secure necessary inland transportation.
   F. D. CALKINS,
   *Active Vice President National Bank of Alaska, President, Skagway Commercial Club.*

From Kodiak, Alaska:

KODIAK, ALASKA, *February 19, 1952.*
Hon. GUY CORDON,
   *United States Senate,*
      *Washington, D. C.:*
Am lifelong Republican resident of Alaska. Fourteen years practiced as certified public accountant. Nine years before assuming presidency of bank of Kodiak. Urge statehood for Alaska believing it will bring great growth in Territory. Believe Territory has ample resources to support State government. Alaskan people are loyal American citizens and deserve political recognition.
   MARSHALL CRUTCHER.

I have a telegram from Nome, Alaska. It reads:

NOME, ALASKA, *February 19, 1952.*
Senator GUY CORDON,
   *United States Senate,*
      *Washington, D. C.:*
Urge passage statehood bills now before Congress. I am Republican candidate, house, second division; past president, Alaska Native Brotherhood.
   SAMUEL MOGG.

From Anchorage, Alaska:

ANCHORAGE ALASKA, *February 19, 1952.*
Hon. GUY CORDON,
   *Senate Office Building,*
      *Washington, D. C.:*
I favor statehood with control of resources comparable to that given other Territories upon admission. I am Republican and banker by profession.
   RODNEY JOHNSTON.

Mr. President, I interpolate for a moment to say that here are citizens of Alaska who take the position which the

senior Senator from Oregon has been taking on the floor. All they ask in Alaska is that Congress give them the opportunity to control their own natural resources, and they will do the rest, just as Mr. Rodney Johnston says in his telegram. ·

From Anchorage comes another telegram:

ANCHORAGE, ALASKA, *February 19, 1952.*
Hon. GUY CORDON,
   *Senate Office Building,*
      *Washington, D. C.:*
Like many other Republicans I favor statehood under terms of present bill. It is my sincere belief that land and other provisions are adequate as proposed.
                                      ROBERT B. ATWOOD.

Again I want the RECORD to show that I am reading telegrams from Republican citizens of Alaska, because of what I believe to be a studied effort to make my colleagues on this side of the aisle believe that the American citizens in Alaska who believe with us in the principles of the Republican Party are opposed to statehood. I made inquiry to determine whether they were opposed to statehood, and the telegrams I am reading gave me the answer.

This telegram comes from Kodiak:

KODIAK, ALASKA, *February 19, 1952.*
Senator GUY CORDON,
   *United States Senate,*
      *Washington, D. C.:*
As an Alaskan Republican, an attorney by profession, it is my definite conviction that all true Alaskan Republicans are wholeheartedly in favor of statehood for Alaska. We strongly support the statehood issue as the basis and the foundation of a healthy Alaska.
                                      PAUL A. DUPLER.

Another telegram from Kodiak:

KODIAK, ALASKA, *February 19, 1952.*
Senator GUY CORDON,
   *Care of United States Senate,*
      *Washington, D. C.:*
The sender has 23 years residence covering most of Alaska and all of its industries. I endorse statehood; am a Republican. Earn my living as a merchant. Statehood would give us some self-government.
                                      EMIL KNUDSEN.

From Anchorage, Alaska, comes a telegram:

ANCHORAGE, ALASKA, *February 19, 1952.*
Hon. GUY CORDON,
   *Senate Office Building,*
      *Washington, D. C.:*
Present bill appears suitable for Alaska statehood and I favor it. Am Republican and hotel owner and past president Alaska Hotel Association.
                                      WILBUR WESTER.

Another telegram from Anchorage:

ANCHORAGE, ALASKA, *February 19, 1952.*
Hon. GUY CORDON,
   *Senate Office Building,*
      *Washington, D. C.:*
I favor statehood as proposed in present bill. Am a Republican and a gold-mine owner.
                                      HAROLD STRANDBERG.

I am glad to learn that there is one gold-mine owner who is a Republican.

From Skagway, comes this telegram:

SKAGWAY, ALASKA, *February 19, 1952.*
Senator GUY CORDON,
   *United States Senate,*
      *Washington, D. C.:*
It is my personal hope that the United States Senate give Alaska every considera-

tion for statehood. Alaska is the child not the bastard of United States of America and taxation without representation is tyranny. Alaska fisheries cannot continue to produce adequate amount of sea food under present regime. Local control with personal knowledge re people terrain conditions and without influence of outside interests with purpose of exploitation are necessary to fulfill over-all and year-out capacity.
                                      KENT L. FULLER, *Broker.*

I take it he is a fish broker.

From Fairbanks comes this telegram:

FAIRBANKS, ALASKA, *February 19, 1952.*
Senator GUY CORDON,
      *Washington, D. C.:*
I firmly believe majority rank and file Republicans of Alaska are in favor of statehood for Alaska; this includes Republicans who have filed for legislative offices this month, in fact have contacted hardly anyone who definitely states he is against statehood. I sincerely hope the statehood bill will pass the Senate.
                                      ANDREW NERLAND,
   *·  Former Senator, Alaska Legislature.*

That is the sort of telegram that should mean something to the Members of the United States Senate. Here is a man who has taken the time to go among his neighbors and inquire about the subject and to send to the Senate the result of his inquiry. It may be even that he had talked with some Democrats.

From Juneau, Alaska:

Please be advised that the Republican Party in Alaska at its last convention—

I do not see any Republicans on the floor of the Senate, but I am addressing myself now particularly to those who are on the floor. The telegram reads:

JUNEAU, ALASKA, *February 19, 1952.*
Hon. GUY C. CORDON,
   *United States Senate,*
      *Washington, D. C.:*
Please be advised that the Republican Party in Alaska at its last convention held at Sitka made the following statement of its principles and convictions by including in its platform: "We advocate immediate statehood for Alaska." The position taken by that convention was affirmed by the National Republican Convention and on every occasion has been reaffirmed by Republican organizations both within and without Alaska.
                                      HENRY A. BENSON,
   *Secretary, Republican Central Committee for Alaska.*

Probably I have driven home this point, but I shall put in about three more spikes. Another telegram, coming from Juneau, Alaska, reads as follows:

JUNEAU, ALASKA, *February 19, 1952.*
Hon. GUY CORDON,
   *United States Senator,*
      *Washington, D. C.:*
As a lifelong Republican and one long active in party politics, I urge your support of statehood for Alaska. We cannot hope to develop to our full capacity under the crippling restrictions of territoriality. We need full voting representation in Congress and all the rights of first-class citizens at home. I have been a practicing attorney in Alaska for the past 18 years and am presently a candidate for the senate on the Republican ticket. Have lived in Alaska for more than 30 years, and am intimately acquainted with people all over the Territory. I voice their sentiments as well as my own when I say Alaska is ready for statehood, Alaska can support statehood, and Alaska needs statehood. There is no party line on the statehood movement. Its supporters come from both political parties in about the same number, and its foes likewise. And its

friends greatly outnumber its foes in both parties.
                                      MILDRED R. HERMANN.

Another telegram coming from Juneau, Alaska, reads as follows:

JUNEAU, ALASKA, *February 19, 1952.*
Hon. GUY CORDON,
   *United States Senate,*
      *Washington, D. C.:*
I am for Alaska statehood. I am a lifelong Republican. Have been in grocery business in Juneau for 30 years, have served during three sessions of the legislature as a member of the house and the senate, and am now Republican candidate for auditor. I am for statehood because I believe it is necessary if we are to develop our natural resources and build an effective government up here. We need voting representation in Congress, and we need all the privileges of first-class citizenship. All these benefits and many others will come to us with statehood.
                                      Senator ANITA GARNICK.

I have just two more spikes to submit, Mr. President. The next telegram comes from Skagway, Alaska:

SKAGWAY, ALASKA, *February 19, 1952.*
Hon. Senator GUY CORDON,
   *United States Senate,*
      *Washington, D. C.:*
I'm a Republican born in Alaska, manager of a motion-picture theater, World War II veteran who fought with the Third Infantry Division in Italy. I want statehood for many reasons. One time this Territory was too young, too large, and far away. Today this changing world makes us much older, not large enough, and so close to Washington we know what you're doing right after you do it. The true economy of our Territory is at a stalemate and will remain that way until statehood is granted and I feel previous Members of Congress and those who are today fighting against statehood have no right to deny Alaskans their much-earned privilege of being a State of the Union.
                                      WM. E. FEERO,
   *Mayor of Skagway.*

Also from Skagway comes the following telegram:

SKAGWAY, ALASKA, *February 19, 1952.*
Senator GUY CORDON,
   *United States Senate,*
      *Washington, D. C.:*
Alaska, becoming a State, will help those people get more out of their industries instead of the Northwestern States making all the profits.
                                      PETER VAN ZANTEN,
   *Musician.*

Mr. President, I ask unanimous consent to have printed in the RECORD, as a part of my remarks, immediately following the telegrams which I have read to the Senate a letter under date of February 19 of this year, addressed to me by Mr. Lee C. Bettinger, who is, I believe, Mayor of Kodiak, Alaska, and, incidentally, is a member of the Republican Party, and a man who has been very much interested in Alaskan statehood. In his letter he outlines more clearly than could I the situation as it has existed politically in Alaska and the feeling of Alaskans toward favorable action on the statehood bill.

There being no objection, the letter was ordered to be printed in the RECORD, as follows:

WASHINGTON, D. C., *February 19, 1952.*
Hon. GUY C. CORDON,
   *United States Senate,*
      *Washington, D. C.*
DEAR SENATOR CORDON: As a lifelong Republican, I have been vexed to discover

while talking with members of my party in the Senate recently that some of them have gained the impression statehood for Alaska is opposed by Republicans in Alaska. Nothing could be further from the truth. No statement could be more damaging—if Republican Senators believed it and acted upon it—to the fortunes of the Republican Party in Alaska.

The fact is that statehood is supported and desired by an overwhelming majority of the Republican citizens of Alaska. I want to cite in this letter numerous incontrovertible evidences of that fact. First, I want to identify myself. I am a Republican. I live at Kodiak, Alaska, and I have been mayor of that city for six successive terms.

As some evidence of the attitude toward statehood of the citizens of Kodiak, who have so many times shown their confidence in a Republican candidate for their principal local office, let me state that in the official referendum election in October of 1946 on that subject, the vote in Kodiak was in favor of statehood by a margin of better than 3 to 1.

On a Territory-wide basis, let me mention that the voters of Alaska in October of 1946 returned a favorable majority of 3 to 1 in the statehood referendum, in that very same election, from the same polling booths on the same day, elected 13 Republican members to the house of representatives of the Territorial legislature as against only 11 Democrats, and elected 6 Republican members to the Territorial senate as against only 2 Democrats. There could be no clearer evidence that the Republican electorate in Alaska strongly favors statehood.

Those who maintain the opposite, and they must have been very busy in Washington to judge from the impression which I find altogether too widespread among the Republican Members of Congress, are not representative of the Republican rank-and-file in Alaska.

As far as the official position of the party organization in Alaska is concerned, I would like to quote a plank from the platform of the Republican Party in Alaska, adopted at the last Territorial Republican convention in 1948. That plank, the official and latest statement of the Republicans of Alaska on the subject, said: "We advocate immediate statehood for Alaska." There were no ifs, ands, or buts connected with that straightforward endorsement.

There are even more recent evidences of what representatives of the Republican Party in Alaska think of statehood. At the session of our Territorial legislature in 1949, a memorial was adopted urging Congress to grant statehood to Alaska without further delay. The vote on that among the Republican members of the legislature was 5 to 3 in favor in the senate and unanimously in favor in the house.

In that same session of the Territorial legislature, a bill was passed creating an official Alaska Statehood Committee which was empowered to do everything possible to obtain passage of statehood enabling legislation from Congress and otherwise to prepare for statehood for Alaska. Republican members in the Territorial senate voted 7 to 1 in favor of that bill. Republican members in the house voted 4 to 1 in its favor. The committee is composed of six Democrats and five Republicans of whom I am one.

Statehood is strongly favored, as these evidences show, at least by the kind of Republicans who are elected to office in Alaska.

For the Republican Members of the United States Senate to give credence to the anti-statehood talk of the little minority of Alaska Republicans who oppose statehood is, in the face of all this evidence, fantastic. If Republicans in Congress vote to defeat or sidetrack or delay the Alaska statehood bill, they will be doing the worst kind of dis-

service to Republicans in Alaska. They will be insuring that the Republican Party in Alaska will lose all the headway it has gained in recent years.

Alaska is not traditionally Democratic. It is traditionally exactly what the Nation is. A remarkable identity exists, in fact, between political trends nationally and political trends territorially. In every election since 1916, the political party successful in Alaska in electing a Delegate to Congress has been successful that same year in the Nation in electing a President of the United States.

As Alaska goes, so goes the Nation. This is a statement of truth. It can be a statement of good omen for the Republican Party in the Territory and nationally this year. But it will certainly be a statement of despair for Republicans everywhere if the Republican Members of the United States Senate demonstrate extreme isolationism by voting down statehood for Alaska, for then Republican fortunes in Alaska—now so bright and promising—will certainly wane.

Let me mention that the Republican standard-bearer in Alaska, Robert C. Reeve, who is campaigning for election as Delegate to Congress, is for statehood. I quote from a report in the Anchorage Daily Times, a Republican newspaper, on the speech in which Mr. Reeve announced his candidacy: "In outlining his program," the story said, "Reeve declared that 'statehood as soon as possible' is the first need of Alaska." On the same day the Anchorage Daily News, another Republican newspaper, said of Mr. Reeve: "The candidate made himself very clear on the issue of statehood. He said he was one of statehood's 'most enthusiastic supporters.'" Will Republicans in Congress now repudiate their candidate in Alaska, in the face of party endorsement of statehood in both Territorial and National platforms? I sincerely hope not.

Anything you can do to enlighten the Republican Members of the Senate on this issue, and thus avert the political disaster which would ensue in Alaska if Republicans in Washington vote to defeat, delay, or recommit the Alaska statehood bill, will be appreciated.

Sincerely yours,

LEE C. BETTINGER.

Mr. O'MAHONEY. Mr. President, will the Senator from Oregon yield to me?

Mr. CORDON. I am happy to yield to my distinguished colleague.

Mr. O'MAHONEY. I wish to say to the Senator from Oregon that I have listened with a great deal of interest to the catalogue of leading Republican citizens of the Territory of Alaska who are in favor of statehood for Alaska. It is emphasis for the oft-repeated assertion of those of us who have supported statehood for Alaska that this is a matter which is above partisanship.

Likewise, Mr. President, the fact that the Senator from Oregon, like the Senator from California [Mr. KNOWLAND], who now is on the floor, the Senator from Nebraska [Mr. SEATON], and the Senator from Montana [Mr. ECTON], has taken his place on the floor in support of statehood for Alaska is most encouraging evidence of the fact that this is a basic issue which is far greater than any mere factionalism or partisan division.

For a long time I have been observing political events in the United States. I do not believe there ever was a period in my experience when among the leaders of the respective parties there was greater confusion as to what their particular parties stand for. I think there

has been no time within my experience when there was a larger independent vote in the United States than there is now. I venture the prediction that no man can judge what will happen to be the political flavor of the Senators and Representatives who are elected from the proposed two new States.

On this floor there has been a false notion, I believe, that Alaska would certainly and without fail elect Democratic Members to the House and to the Senate, and that in Hawaii the voters would certainly and without fail elect Republican Members. There is no possibility of making any such prediction at all; the result may be completely the reverse. Hawaii might send Democratic Senators and Representatives, and Alaska might send Republicans, because the issues upon which party votes will be cast in November, 1952, are very different from anything we are discussing here at this time.

I feel that the Senator from Oregon has made a most important contribution to an understanding of the basic facts pertaining to the statehood issue, by submitting to the Senate this long list of declarations in support of statehood by prominent Republicans of the Territory of Alaska. I very much appreciate what the Senator from Oregon has done, and I desire to compliment him upon the manner in which he has presented this issue.

Mr. CORDON. Mr. President, I appreciate very much the statement which has been made by my friend, the senior Senator from Wyoming, and particularly his kind reference to me. However, Mr. President, most particularly do I appreciate the meat and the logic inherent in what the Senator from Wyoming has said. I only wish that all of the other 95 Members of the Senate could have sat here in the Chamber and heard the statement of the Senator from Wyoming.

Mr. President, on a question of this kind it is silly for any person to base his action upon any supposition as to what will be at some time in the future the majority vote in any given Territory. For one, Mr. President, I wish to say that if I could be granted the gift of prophesy at this moment, and if I knew beyond peradventure of a doubt that every one of the four Senators to be elected from the two new States would bear the Democratic label, I would be standing where I am standing now, asking for statehood for those two Territories. If the party of which I am a Member cannot take to the people there the kind of basic political principles which the people of the Territories believe are for their own good, then the party does not deserve to prevail. It is childish for anyone to think in any other terms, Mr. President.

I am afraid we have lost sight of the basic principle involved in the application of the men and women of Alaska and the men and women of Hawaii for statehood. They seek what our forebears fought for. They seek what our young men through the years have died to preserve. At this time they seek nothing more than what all our protestations of faith and of loyalty are predicated upon, namely, individual liberty

and the individual right of determination in the field of government. That is all they ask; and how, Mr. President, can we, who enjoy those rights and privileges, we who believe in them—yea, we who have fought for them—deny them to the people of Alaska and Hawaii? In the last analysis, Mr. President, that is the very heart and blood and bone of what we here seek to do, namely, to grant to American citizens, not to non-American citizens, but to American citizens, the full right—and again I say "right"—of citizenship.

I hope, Mr. President, the Senate will make its decision on the basis of principle and not on the basis of evasive expediency brought about by a parliamentary gadget.

Mr. KNOWLAND. Mr. President, will the Senator yield?

Mr. CORDON. I am very happy to yield.

Mr. KNOWLAND. First of all, I want to join with the Senator from Wyoming in commending the able senior Senator from Oregon upon the presentation which he has made today. I, also am sorry that more Members on both sides of the aisle could not have heard him. It so happens that the able Senator from Oregon represents in part one of the Pacific Coast States. I represent in part one of the others, and quite recently the Senators from Washington were in the Chamber, Senators who represent the third State which borders the Pacific Ocean.

My State of California was admitted into the Union in 1850; the State of the able Senator from Oregon came into the Union 9 years later, I believe, in 1859, and the State of Washington in 1889. Our three States together are the closest neighbors to the Territory of Hawaii and the Territory of Alaska; and I think the people of our three States are overwhelmingly in favor of admitting into the Union as new States these two great Territories. As a matter of fact, these two great Territories are much closer in time and in means of communication than was any one of our three States at the time of its admission into the Union.

When the vote comes tomorrow, I hope the Members of the Senate of the United States will have the foresight to stand up and be counted in favor of statehood. I hope they will exhibit the same quality of statesmanship which was evidenced by those who sat in the Senate of the United States in 1850, 1859, and 1889, in the chamber later occupied by the Supreme Court of the United States. I hope the Senate will have a vision of the future of America, and will admit these two great Territories, which I feel are destined to add greatly to the growth and to the wealth of our common country.

Mr. CORDON. Mr. President, I appreciate very much the statement of my friend, the senior Senator from California. Again, we have what seems to me to be unanswerable logic in favor of the position we take.

Mr. President, I want at this time to compliment the Senator from Mississippi, who made a major address a few days ago in opposition to statehood for Alaska. I was able to be on the floor during the major portion of his address. I differ with him; and of course we have both known that for some time. I appreciated the sense of absolute fairness with which the Senator approached his subject. I appreciate the fact that he so clearly recognized that there were other Members of the Senate who differed with him, and who as honestly differed with him as he differed with them. I appreciate the fact that at no time did he intentionally draw from any statement of fact a conclusion which he himself did not feel to be clearly warranted. I think that, from his standpoint, he made a marvelous presentation of the case, and I am not at all certain that, if I had not already been convinced on the other side, he would not have convinced me. But, Mr. President, as I followed the Senator from Mississippi I felt that it would be proper for the RECORD to show where in the Senator was in error in his conclusion. So far as I know, he was never in error in his facts.

Mr. STENNIS. Mr. President, will the Senator yield for a moment?

Mr. CORDON. I am happy to yield to my friend.

Mr. STENNIS. Mr. President, I desire to say to the Senator from Oregon and to the other Members of the Senate that his very generous, indeed, his overgenerous words about me are very highly appreciated. I appreciate them particularly because I am familiar with the fine work which the Senator from Oregon has done in the two committees and on the floor. I have observed his work especially in the Appropriations Committee. Few realize how much work he does in committee and in the Senate.

Mr. President, this is not a mutual admiration society, I can assure the Senator from Oregon, and I am not trying to return compliments, but I used him as an illustration in speeches I made in Mississippi last fall. He is one of the effective, hard-working, and industrious Members of the Senate. He works all the time. In many parts of the Nation he is certainly not what we call a "headline Senator," but with me he is a headline Senator, doing the work connected with the people's business. I appreciate him greatly.

Mr. CORDON. I appreciate the Senator's remarks.

Mr. STENNIS. I have enjoyed his fine presentation today, most of which I was privileged to hear. I found it necessary to leave the Chamber once to answer a personal telephone call. I appreciate his contribution and his very fine work.

Mr. CORDON. I thank my friend.

Mr. O'MAHONEY. Mr. President, I wonder whether the Senator from Oregon will yield to me?

Mr. CORDON. I am happy to yield to my friend from Wyoming.

Mr. O'MAHONEY. I ask this indulgence, Mr. President, because I desire to say that the Senator from Mississippi stated to me this morning in a private conversation what he has now stated publicly, in respect to the qualifications of the Senator from Oregon. I know from remarks made by the Senator from Oregon, also in private conversation, that he entertains the sentiments toward the Senator from Mississippi which he has expressed. But I want to advise the Senator from Mississippi that I have a little information about the Senator from Oregon which he does not have. That information, Mr. President, is, that the Senator from Oregon is a native of the South. [Laughter.]

Mr. STENNIS. I appreciate that statement very much, Mr. President.

Mr. CORDON. Mr. President, I was saying that I felt that the conclusions of the Senator from Mississippi on some instances were in error, and I felt that there should be a traversing of those conclusions in the RECORD. I am not going to take the time of the Senate to follow through, paragraph by paragraph, the statements of the Senator from Mississippi or the statements of the Senator from Florida [Mr. SMATHERS], but I have had reduced to writing what I believe are fair, completely accurate, and wholly adequate answers to the propositions which were predicated in the nature of conclusions upon factual data which were presented in every instance as a condition precedent to the conclusions reached.

I ask unanimous consent that as a part of my remarks there be included in the RECORD this over-all general answer to the arguments of the two Senators to whom I have referred, so that the entire picture may be in the RECORD for those who care to read it.

There being no objection, the document was ordered to be printed in the RECORD, as follows:

Answering Senator STENNIS, who said:

" 'Outsiders' who are residents of disconnected areas should not have a part in determining our own military policy or the farreaching question of taxation."

Precisely because they are American citizens who live on what have become the military frontiers of the Nation, the residents of Alaska and Hawaii should be welcomed into the councils of the Congress on military policy. They should have an influence on that policy not for their own welfare primarily, but because they are in a better position than any other people to assist the Congress with respect to the defense of their own area for the Nation's welfare.

The residents of Alaska and Hawaii are subject to all the tax laws of the United States. Of course, under our democratic system, they should have a part in determining those policies. Taxation without representation was an issue which because it was ignored by Great Britain, led to the founding of this Nation.

The United States cannot in good faith now seek to keep permanently in a dependent status Americans who have asserted their desire to participate on an equal basis, and who have shown they are qualified to do so.

Answering Senator STENNIS, who said:

"It would be a mistake to give political power to people disconnected from our area because between Alaska and the States there is no commingling or passing back and forth; there is not the same extent of interchange of thought and ideas as there is between the people of the various States."

The exact opposite is true. There is more commingling of Alaskans with the people of the States, and of people from the States with Alaskans, than occurs even within the United States proper between citizens of the various States.

Alaskans are great travelers. There is hardly an Alaskan who does not as a matter of course make a trip out to the States at least once every 2 or 3 years, and many habitually travel to the States every year. This is partly because of the high average income of Alaskans which permits them to afford travel and partly because, owing to the newness of settlement, nearly everyone in Alaska is still from somewhere and enjoys a visit to the friends and relatives he left behind.

Similarly, an increasing number of people from the States are visiting Alaska each year. In 1951 more than 75,000 visitors from the States traveled to the Territory as tourists between the months of May and September. The total travel between the States and Alaska annually amounts to more than 100,-000 passengers. In other words, nearly as many people pass through Alaska each year as reside there.

Alaska now enjoys not only the traditional steamship connection with the west coast ports, but also receives frequent and regular airplane service and is connected overland by the Alaska Highway. Planes from Seattle fly daily to Ketchikan, Juneau, Anchorage, and Fairbanks. There is also regular air service to Alaska from Minneapolis-St. Paul and from Portland, Oreg. More than eight regular passenger flights daily are made between the States and Alaska by four-engine airline planes.

The Alaska Highway, which is open and traveled throughout the year, connects Alaska overland with Montana, Idaho, and Washington. In 1950 for the first time in history more people traveled to Alaska in their own automobiles than went by steamship. That year the total number of vehicles entering Alaska was 9,733, carrying 22,507 passengers. Some 7,174 vehicles, carrying 16,623 passengers, passed back out again. Note the balance of nearly 6,000 people who stayed in Alaska and presumably became new residents of that fastest-growing area under the American flag.

Alaska receives network radio programs, which are broadcast by 12 commercial radio stations, making audiences in Alaska simultaneous listeners with audiences in the States to news and other programs.

The Territory has 20 newspapers. Seven of these are dailies which receive their news by teletype from the Associated Press and United Press at the same time the news is ticking into the offices of newspapers all over the United States.

The same magazines, periodicals, and motion pictures are distributed in Alaska as in the States. Time and Newsweek magazines are carried to the Territory by air each week under special arrangements so they can be distributed on exactly the same day there as in the States.

Alaskans are great readers. Every town of any size has a well-patronized public library. The educational attainment of the average Alaskan is high, far above the national average. This produces there a lively interest in current events of the Nation and world.

In summary, Alaska is not an isolated section whose interests differ from those of all the States. The Nation would gain, not lose, by taking Alaskans into their political counsels as equal participants.

Answering Senator STENNIS, who said:

"Only three-tenths of 1 percent of Alaska is in private ownership."

That this should be so after 85 years under the American flag in dependent status is proof that Alaska is never going to be developed under territorialism.

The statehood bill will improve the situation in two ways: First, by making an outright grant to the new State of nearly 23,000,000 acres, which will by that much reduce Federal ownership; second, by spurring economic development and settlement, so that additional areas will pass from the public domain into private ownership

through operation of the appropriate land laws.

Answering Senator STENNIS, who said:

"Agriculture in Alaska is not expanding, but declining. There are fewer farms now than in 1940 and less acreage in cultivation."

And Senator SMATHERS, who said:

"Alaska today is not a burgeoning, growing, or expanding Territory. * * * The number of farms has been reduced."

This is an erroneous conclusion drawn from census figures which in 1940 included under the category of "farms" a large number of fur farms embracing more than 1,000,-000 acres of unimproved land. Actually the number of bona fide farms increased 12.4 percent between 1940 and 1950. Similarly, acreage in cultivation increased 30.8 percent in that decade. The value of crops sold from farms in Alaska increased between 1940 and 1950 by 480 percent. This is certainly evidence that agriculture, like every other form of productive activity, is on the upgrade in Alaska.

Of course, agriculture is but little developed in Alaska compared with the potentialities there. Land considered suitable for farming exists to permit agriculture in Alaska to be increased a hundred-fold.

Answering Senator STENNIS, who said:

"The referendum in Alaska on statehood 'was held more than 2 years ago' and I am informed 'that the bill would not receive as many votes today as it did 2 years ago'."

The referendum was held not 2 years ago, but in 1946. Alaska have repeatedly since that time shown that the sentiment for statehood is growing, not declining.

In 1947, the elected Representatives and Senators of the people of Alaska in the Territorial Legislature adopted a memorial to Congress urging statehood. The vote in the legislature favorable to statehood was 15 to 9 in the House and 10 to 5 in the Senate, or by a margin of nearly 2 to 1.

In 1948, both political parties in Alaska in their territorial conventions adopted planks urging statehood. The official Republican platform most recently adopted says: "We advocate immediate statehood for Alaska." The Democratic platform most recently adopted says: "We urge passage of legislation by Congress enabling Alaska to become a state."

In 1949, the Territorial Legislature, made up entirely of members who are elected directly by the people of Alaska, again adopted a memorial calling upon Congress to grant statehood. The vote on that occasion was 23 to 9 in the House and 13 to 3 in the Senate, or by a margin over all of 12 to 1.

How, in the face of such evidence, can anyone contend that the sentiment for statehood in Alaska is not so strong now as it was at the time of the referendum? The evidence is that statehood sentiment has continued to grow until it is now overwhelming. In fact, the memorial adopted by the Alaska Legislature in 1949 said that very thing. That official memorial to the Congress said: "The people of Alaska now are virtually unanimous in their desire that Alaska shall speedily become a State."

Answering Senator STENNIS, who said:

"The elective governor bill, proposed by Senator BUTLER, would give Alaskans the right to elect their own governor and their own judges and every measure of political power and sovereignty, except membership in the Union."

The Senator from Mississippi must have studied very carefully either of the two measures sponsored by Senator BUTLER pertaining to an elective governor. (S. 50 an amendment to the Statehood bill now under consideration in the form of a substitute and S. 105, "to provide that the Governor of the Territory of Alaska shall be elected by the people of that Territory, and for other purposes.")

Where in either of the bills is there any provision for Alaskans to elect their own judges?

Where in either of the bills mentioned is there any grant of land to Alaska, as is provided in the Statehood bill?

Where in either of the bills is there any provision for Alaskans to regulate their fisheries?

Where in either of the bills is there a provision that Alaska shall receive half the net proceeds from the Pribilof seal fisheries?

Neither the elective governor bill nor the substitute S. 50 are legitimate substitutes for statehood or significant steps toward that goal.

The elective governor bill, S. 105, provides only for the election by the people of the Territory of their governor. The Secretary of Alaska would be appointed by the governor with the advice and consent of the Senate of Alaska.

The substitute measure (S. 50) provides for the election by the people of the governor, the secretary and the auditor of Alaska. Now, of course, Alaskans elect their auditor.

Answering Senator STENNIS, who (in urging the elective governor bill) said:

"Let us give them this training in government and see how far they can go in developing a stable government and financing it on their own economy."

The Senator mentioned that Alaskans already elect members of their territorial legislature. Apparently he is unaware of the fact that the people there also elect their other principal officials with the exception of the governor. They elect a territorial auditor, a treasurer, an attorney general, a labor commissioner and a highway engineer. They also elect, of course, a Delegate to Congress from Alaska. All these elections are carried out in the same manner as elections in the States, with primaries and general elections.

All of the municipalities in Alaska, of which there are 25 incorporated, elect their own mayors and city council members. School boards and public utility district commissioners are also elected. Alaskans already have had substantial training in government.

Alaskans also finance all of this territorial, municipal, and local government out of their own resources, with the exception of about $7,000,000 a year which is spent by the Federal Government to pay for the legislative sessions, the governor's office, the Federal court system, care of the insane and administration of the fisheries. All of these will become State responsibilities under statehood. One result of that will be a saving of $7,000,000 annually in Federal appropriations, a particularly happy reduction in Federal expenditures, as someone has pointed out, because it will entail no reduction in services and the very people who will have to pay the bill, the Alaskans, have been clamoring to assume the burden under Statehood.

Answering Senator STENNIS, who said:

"Alaska claims to have no public debt, yet the law provides that half of the cost of a current $70,000,000 public works program undertaken by the Federal Government there may be recovered from the Territory. Does anyone believe that half of those expenditures will be recovered by the Federal Government?  Of course not."

Senator STENNIS to the contrary notwithstanding, administrators of the Alaska public works program referred to have insisted that 50 percent of the cost of each project be repaid from local sources in Alaska to the Treasury. The local government unit there sponsoring the project, whether it be a school district, a municipality, or the Territory itself, must make a showing in advance of exactly how it will repay its share of the cost.

So far as projects sponsored by the Territorial government are concerned, the administrators of the program have required, because of the provision of law prohibiting the Territory from incurring a debt or pledging

its credit, that the money for the Territory's 50 percent actually be appropriated by the legislature and in hand before the project is commenced.

Answering Senator STENNIS, who said:

"There are no reports from the treasury as to the condition of the economy under the present local government."

The Territorial treasurer of Alaska, Henry Roden, has submitted a statement of the general condition of the treasury as of January 31, 1952, just a few weeks ago. This statement shows a net cash balance of $5,787,-202.07, of which $4,104,544.87 is in special funds earmarked for specific purposes, though they are all Territorial government purposes. The balance of cash in the general fund, even after allowing for all the earmarked funds, was $1,682,657.20.

It should be mentioned that there has been deducted from the actual bank balance of the Territory in making this compilation all sums collected under two tax acts which have been attacked in the courts. This is granting to the prophets of financial despair all possible comfort, probably a good deal more than they are entitled to, for one of these acts, the Territorial property tax, was just last week upheld on every point by the Federal district court, while the other, a tax on nonresident fishermen, was recently sent back by the Supreme Court for rehearing after it had been held invalid by a two-to-one decision of the circuit court of appeals. Many millions of dollars of revenue will become available to the Territory treasury as a result of the upholding of the property tax acts.

When we take this statement of financial condition, and consider along with it the fact that Alaska has no debt, it is easy to see the Territory is in excellent shape and has demonstrated financial responsibility to undertake statehood.

The statement of the Territorial treasurer is submitted in full for incorporation in the record at this point:

### General condition of the treasury

| | |
|---|---:|
| Bank balance as of Jan. 31, 1952 | $6,680,429.91 |
| Less outstanding warrants | 893,227.84 |
| Net cash balance | 5,787,202.07 |

Less special funds and funds incorporated in the general fund which are not available for the general operation of the Territory:

| | |
|---|---:|
| Public school permanent fund | 2,915.27 |
| University of Alaska, permanent | 408.67 |
| Smith-Lever | 57,571.45 |
| Engineers' and architects' | 13,701.93 |
| Museum bequest and donation | 1,261.59 |
| Radio telephone | 4,974.49 |
| Teachers' retirement | 17,984.70 |
| Vocational education (Federal) | 7,023.49 |
| School-lunch program (Federal) | 55.28 |
| Forest reserve (Federal) | 36,509.62 |
| Aleutian Island moneys (Federal) | 1,302.85 |
| Old-age assistance: | |
| Grants (Federal) | 99,462.54 |
| Administration (Federal) | 24,094.16 |
| Child welfare service (Nevada) | 13,635.17 |
| Allowances to mothers: | |
| Grants (Federal) | 74,598.46 |
| Administration (Federal) | 11,153.62 |
| Employment security commission (Federal) | 41,244.32 |
| General health (Federal) | 33,691.52 |
| Maternal and child health (Federal) | 20,967.43 |
| Crippled children (Federal) | 34,560.29 |
| Venereal-disease control (Federal) | 7,109.33 |
| Control of tuberculosis (Federal) | 17,620.69 |
| Hospital survey (Federal) | 528.58 |
| Alaska grants (Federal) | 243,706.24 |
| Heart-disease control (Federal) | 1,808.73 |
| Water pollution (Federal) | 7,433.64 |
| Military base schools (Federal) | 154,281.63 |
| Polio epidemic (special) | 4,582.48 |
| Veterans' Administration, revolving (special) | 177,836.40 |
| Veterans' housing, revolving (special) | 18,945.99 |
| Alaska merit system (special) | 551.91 |
| Territorial building fund (special) | 543.63 |
| Vision-conservation program (special) | 305.53 |
| Alaska Crippled Children's Association (special) | 17,824.36 |
| American Red Cross (special) | |
| Motor fuel-oil tax (ch. 33, SLA 1947) (special) | 124,077.14 |
| Alaska aeronautical revolving fund (special) | 63,887.30 |
| Second injury fund (special) | 19,511.03 |

### General condition of the treasury—Con.

Less special funds and funds incorporated in the general fund which are not available for the general operation of the Territory—Continued

| | |
|---|---:|
| Nurses' examining board (special) | $816.63 |
| Military land (special) | 112,023.38 |
| Estimated net income refunds (special) | 150,000.00 |
| School fund (tobacco tax) (special) | 511,219.00 |
| Fisheries experimental, special research (special) | 1,063.58 |
| Alaska Tuberculosis Association (special) | 461.14 |
| Refund of amusement device tax (special) | 88,005.62 |
| Refund of business licenses (special) | 357,090.54 |
| Refund of punch board (special) | 10,255.11 |
| Property tax (special) | 257,640.16 |
| Refunds, nonresident fishermen's licenses (special) | 350,000.00 |
| Vital statistics fund (special) | 1,757.10 |
| Production marketing program (Federal) | 1,043.68 |
| Alaska on-base schools (Federal) | 147,355.40 |
| Johnson O'Malley schools (Federal) | 4,849.25 |
| School survey (Federal) | 1,554.22 |
| Invested funds (special) | 419,085.21 |
| Liquor refunds (special) | 99,215.60 |
| Contribution fund (special) | 18,082.99 |
| Loan to World War II veterans (special) | 150,000.00 |
| Certifications to old-age assistance (special) | 108,231.00 |
| Certifications for aid to dependent children (special) | 82,975.50 |
| Certification for aid to the blind (special) | 783.00 |
| Total | 4,104,544.87 |
| Balance of cash to general fund | 1,682,657.20 |

[1] Balance of $400,000 to be earmarked later.

Answering Senator LONG, who said:

"Thirty-seven and five-tenths percent of all the revenue produced from all the land in Alaska—365,000,000 acres—will go to the State of Alaska as royalties from oil, gas, and minerals."

The total land area of Alaska is 365,000,000 acres. Some of this is already in private ownership. Approximately 23,000,000 acres will be granted to the new State of Alaska under the terms of S. 50 for support of schools and State institutions.

The provision of the Mineral Leasing Act of 1920 to which Senator LONG refers does not operate throughout even the balance of the area of Alaska left after subtraction of the acreage cited. It does not operate, for example, with respect to the 49,000,000 additional acres which have been withdrawn in naval petroleum reserves. No royalties will accrue to the State from oil taken from these Federal reserves.

The oil discoveries to which the Senator referred have been made in the Federal petroleum reserve. All royalties from them will go to the people of the United States as a whole, not to the people of Alaska.

The statehood bill before the Senate will have no effect whatever on proceeds from oil royalties. Alaska, as a Territory, already participates from oil and gas leases on exactly the same basis as any State. It does so not under special legislation but under the general terms of the Mineral Leasing Act of 1920, which was amended to include Alaska in 1947.

Answering Senator SMATHERS, who said:

"Once we depart from the rule of admitting only Territories which are contiguous to other States, we shall have brought before us the cases of Hawaii, Puerto Rico, Guam, the Virgin Islands, and others."

The States of Louisiana and California were admitted when they were not contiguous to other States. Modern communications make Alaska closer from every practical consideration than were immediately adjacent States in earlier times.

The case of Hawaii, which is a good one, is already before the Congress. It, like Alaska, should be admitted. These are the last two incorporated Territories of the United States.

The cases of Puerto Rico, Guam, and the Virgin Islands are totally unlike those of Hawaii and Alaska. They are different from the legal standpoint, because none of these

is an incorporated Territory, and the promise of eventual statehood is given only by the act of incorporation. They are different from the moral standpoint, because the people of the other island areas have not, like those of Hawaii and Alaska, petitioned for statehood. They don't want it and haven't asked for it.

Answering Senator SMATHERS, who said:

"S. 50 calls for action by the Territory of Alaska and, if it complies, the wheels set in motion can never be stopped."

S. 50 is merely an enabling act. It does not make Alaska a State. Only Alaskans can do that, even after S. 50 is passed. The bill provides that delegates elected by the people of Alaska will draft a proposed State constitution which then must be submitted to the people of Alaska for ratification. If Alaskans should refuse to ratify the proposed constitution, that would stop the wheels. Congress, too, would retain a measure of control, for S. 50 provides that the proposed State constitution after it is ratified by the people must be submitted to the Congress for approval. If Congress disapproves, that would stop the wheels at the Washington end.

Answering Senator SMATHERS, who said:

"In all the history of the United States, no State has ever been admitted with so small a population, compared with the total population of the United States, as would be the case with Alaska."

Alaska's population in 1950 was reported by the Bureau of the Census to be 128,643. The population of the United States in that census was 150,697,361. In other words, the population of Alaska constituted approximately nine one-hundredths of 1 percent of the population of the United States.

Let us look at the figures for the last census immediately preceding admission of other Territories. Minnesota, in 1850, the census preceding her admission as a State, had less than three one-hundredths of 1 percent of the population of the United States at that time. Alaska, remember, had nine one-hundredths of 1 percent of the 1950 population of the Nation.

Oregon, in 1850, the census preceding her admission, had less than six one-hundredths of 1 percent of the population of the Nation.

Nevada, in 1860, the census preceding that Territory's admission, had only two one-hundredths of 1 percent of the United States total.

Nebraska, in 1860, the census preceding admission, had slightly better than eight one-hundredths of 1 percent of the United States total.

Montana, in 1880, the census preceding admission, had less than eight one-hundredths of 1 percent of the total population of the United States.

In all of these States, then—Minnesota, Oregon, Nevada, Nebraska, and Montana—the census preceding their admission as States showed them to have less population, compared to the population of the Nation as a whole at that time, than Alaska has compared to the 1950 population of the United States. Nevada, as a matter of fact, bore a population ratio to that of the United States which was less than one-fourth as great as Alaska's today. Minnesota, which has become a great State, had only one-third as much population, compared to the national total, as is the case with Alaska now.

It might be contended by some opponents of Alaska Statehood that it isn't fair to cite the population of those earlier Territories at the census which in each case was taken immediately preceding admission. Yet that is what those opponents are themselves doing in Alaska's case. That Territory has not yet been admitted to Statehood.

Nobody can say with exactness what the population of Alaska will be when admission is actually accomplished. It is certain, however, based on all the evidences, that it

will be substantially greater than was Alaska's population in 1950. The count there was taken on April 1 of that year. By July 1, 1950, just 3 months thereafter, the Bureau of the Census estimated that Alaska's population had increased to 135,000. There is little doubt that it has by now passed the 150,000 mark.

Even if S. 50 should be passed by the United States Senate today and by the House of Representatives next week, Alaska's admission could not occur until 1954. There is a long procedure set up by this enabling act. The people of the Territory would have to elect delegates to a constitutional convention, draft a constitution, hold an election on its ratification, gain approval of the proposed State constitution by the Congress, elect State officials and Congressmen, and the like, all prior to the actual event of admission. By 1954, the earliest date at which this process could be carried through, Alaska should have a population of at least 180,000, based on the trend of growth there since 1940.

*This is without giving any effect to the phenomenon which has occurred on every previous occasion when a Territory of the United States became a State. This phenomenon is the very pronounced spurt of population growth which occurs coincidental with and because of statehood. When national attention focuses on Alaska as a new State, there is no doubt but what we shall see this historic precedent fulfilled again.*

Alaska has the area and the resources to in time become a great and populous State. It will never become very populous as a Territory, as the history of the United States has demonstrated everywhere else and in Alaska itself. The sleeping giant in Alaska needs to be unchained by striking off territorial bondage. Then watch it grow.

Answering Senator SMATHERS, who said:

"Alaska is going downhill. In 1947 some 31,163 acres were filed upon for homesteading; yet in 1951 only 18,143 acres were filed upon, indicating a decrease of almost 50 percent."

The figures used by the Senator were furnished by the Bureau of Land Management and are correct—as far as they go. At the time they were given to him the Bureau went on to say that in Alaska there has been a trend away from homesteads, which are only one means of land acquisition, and toward other methods of taking up land for settlement.

The Senators were told, for example, that in the 2 years he cites for illustrative purposes, there were only 26 small tract leases embracing 31 acres in effect in 1948, while in 1951 there were 1,126 such leases comprising 5,677 acres. This was an increase of 4,000 percent in number of settlers in this category, and an increase of 18,000 percent in amount of land taken up under it. Compared to this, the 50 percent decrease in acreage of new homestead filings to which the Senator refers is seen in proper perspective.

The junior Senator from Florida referred to the number and acreage of homestead entries allowed. He said nothing about homesteads which actually went to patent in Alaska in the 2 years he cites as examples. In 1948 the Federal Government issued 20 patents embracing 1,719 acres of Alaska land. In 1951 it issued 207 patents embracing 23,-679 acres. The increase was 935 percent in number of homestead patents and 1,277 percent in their acreage. This, mind you, was land actually passing from the public domain into private ownership.

In addition, the other means of land disposal in Alaska all show large increases. Many new townsites are being opened up and town lots within them sold at auction. Numerous additions are being made to existing townsites. The taking up of homesites, as distinguished from homesteads, has shown a steady upward trend.

Considering all the various methods of disposal of the public domain together, the Bureau of Land Management estimates that the number of applications for land use and disposal in Alaska have increased seven-fold since 1946. This is the answer to any charge that settlement in Alaska is declining. It is actually increasing, and at a very satisfactory rate.

Answering Senator SMATHERS, who said:

"Federal income-tax returns reveal that from 1945 through 1950 the income declined in the Territory of Alaska, and was only revived after the Korean war broke out, and the Federal Government, through the military department, put tremendous sums of money into Alaska."

The figures on income taxes paid by Alaskans, which are readily available from the Bureau of Internal Revenue, show no such trend as the Senator described in his remarks.

World War II ended in 1945, practically simultaneous with the beginning of the 1946 fiscal year. Starting with that year, a steady growth was shown in Federal income taxes paid by Alaskans.

The figures, supplied by the Bureau of Internal Revenue, are as follows:

*Income taxes paid in Alaska*

Fiscal year:

| | |
|---|---|
| 1946 | $15,187,544.11 |
| 1947 | 15,831,344.82 |
| 1948 | 18,891,145.13 |
| 1949 | 18,226,201.68 |
| 1950 | 17,393,930.93 |
| 1951 | 38,762,327.11 |

Note that in fiscal 1947 tax collections were slightly better than in 1946. In fiscal 1948 they again increased, this time substantially. While it is true, collections fell off very slightly from the 1948 level in 1949 and 1950, in each of those years they were better than in years before 1948. In 1949, collections were 15 percent greater than they had been in 1947. In the next year, 1950, they were 10 percent above the 1947 level.

Now it is perfectly true that tax collections in Alaska increased phenomenally in 1951. They were in fact just about double the amount ever collected before in history. Is this any argument against statehood for Alaska? Are we operating here on some basis of "no taxation without representation" in reverse? Are we saying that the more taxes an area pays the less that area is entitled to self-government?

The fact that Alaskans in fiscal 1951, the year which ended last June 30, paid the Federal Government $38,762,327.11 in income taxes should be a powerful argument for the admission of Alaska as a State.

There is a circumstance relative to Alaska's contribution in taxes to the Federal Government which does not even appear from the figures we get from the Bureau of Internal Revenue, favorable as those figures are to Alaska's case. The Bureau's figures show only collections made in Alaska. Many of the largest taxpayers earning all or nearly all their income from Alaska activities do not file their income tax returns in Alaska at all. They are the big corporations, salmon canning companies, steamship companies, mining companies, airlines, construction firms, trucking companies—which have their business headquarters in what Alaskans refer to as "the outside." Their offices are in Seattle, Bellingham, Tacoma, Portland, Boise, San Francisco, Salt Lake City, Omaha, and Boston. It is in offices of the Bureau of Internal Revenue in those cities and not in Alaska at all that these companies file their returns and pay their Federal taxes. It has been estimated that if the taxes on income generated by activities in Alaska were all paid in Alaska the collections of Federal tax money from the Territory would be seen to be double what the present figures show.

Answering Senator SMATHERS, who said:

"The people of Alaska are having such economic difficulties that they are already having a hard time meeting the costs of their government."

The most recent report of the Territorial Tax Commissioner shows that for calendar 1951 tax collections in Alaska totaled $13,-979,813. This is at the rate of $27,959,626 for the biennium. Since appropriations voted by the Territorial legislature for the 1951–53 biennium totaled only $21,832,155, this indicates that existing tax laws in Alaska are currently producing over $6,000,000 more for the biennium than is required to finance all the costs of the Territorial government.

In the face of these figures on the actual collections and expenditures, how can anyone contend that Alaskans are "having a hard time meeting the costs of their government"? They are having such an easy time that they are raising 30 percent more money than they need. They are, in fact, producing from existing tax laws very nearly enough revenue to finance State government.

Answering Senator SMATHERS, who said:

"Even the proponents of statehood for Alaska will admit that the cost of carrying on State government will be anywhere from 50 to 100 percent more than the present cost."

The financial presentation of Alaska statehood proponents was made at the Senate hearings by Mrs. Mildred Hermann, an attorney residing at Juneau. Her estimate was that the additional gross cost of State government in Alaska over Territorial government would be $4,242,500 per year. Against this gross cost must be credited new revenues which will go to the new State under the terms of S. 50. These, including half of the proceeds from the Pribilof seals, were estimated in the 1950 hearings at $1,442,500 per year. The net added cost of statehood, therefore, according to the proponents of statehood, would be $2,800,000 annually.

Operating the Territorial government currently is costing Alaskans $21,832,155 for the biennium, or $10,916,078 per year. The increased cost of operating a state government as computed by statehood proponents, are seen therefore to be not 50 to 100 percent, as stated by the junior Senator from Florida, but 25 percent greater than the present cost of Territorial government.

In this connection it should be mentioned that the tax system already in effect in the Territory produced in 1951 some $3,100,000 in revenues more than the total of expenditures. If the proponents of statehood are correct, and they will spend $2,800,000 a year more for State government, they are already producing more than enough revenue with their present tax system to pay for statehood.

Answering Senator SMATHERS, who said:

"The figures show that, with the costs of their present Territorial government, Alaskans are having to pay a higher per capita tax than the citizens of any State are having to pay for their State government."

It would be interesting to know where the Senator's figures come from. Figures on the per capita tax burden of the various States are available from the publication Facts and Figures on Government finances, 1950–51 which is published by the tax foundation. It shows that per capita State taxes in 1950 ranged from $30.10 in New Jersey to $90.86 in Louisiana. Alaskans that year were paying $68.40 per capita. Among the residents of States paying a higher tax per capita than Alaskans were the people of Oklahoma, Colorado, California, Washington, Delaware, New Mexico, Louisiana, and the Senator's own State of Florida.

This comparison, even though it shows Alaska's tax burden is not the highest in the Nation, is extremely unfair to Alaskans for a number of reasons.

First, since Alaska has no county form of government, the functions which elsewhere are performed by counties are in Alaska a responsibility of the Territory itself. Thus the tax burden shown in Alaska should really be compared with the total of State and county taxes in each of the States. In any such comparison, Alaska would be seen to have not the highest per capita tax in the Nation but the lowest.

Second, the figures cited in the study are in the case of all the States for the fiscal years ending in 1950 while those for Alaska are for the calendar year 1950. The difference is significant because this is an era of rising State taxes. In fact, State taxes have been increasing on the average about 10 percent per year since 1945. In such a situation, a difference of only a few months in the actual 12-month periods being compared makes a big difference in the totals. This difference works to Alaska's disadvantage in comparisons, because the "year" spoken of in the case of the Territory is later than the fiscal year spoken of in the case of any State. For calendar 1950, the average per capita tax of all the States was probably about $64.90, or very nearly that of Alaska.

The third circumstance tending to make the tax burden in Alaska look higher than it actually is, when figured on a per capita basis, is that in addition to the year-round population reported by the census and which is used to compute per capita taxes, Alaska each year has a migratory additional population of nearly 100,000 persons. These include nonresident workers in the fishing, mining, and construction industries. They include nearly 75,000 tourists who go to Alaska each year. All of these people help in one way or another to pay taxes there. The workers are taxed directly through the Territorial income tax, which has withholding features. The visitors pay taxes directly through the Territorial gasoline and liquor taxes and indirectly every time they spend money for board, lodging, or other purchases or services. The fact that there are so many "part-time Alaskans" helps very substantially to decrease the actual per capita tax burden of the people who live there.

Fourth, a very large percentage of the taxes collected in Alaska are not on the people of the Territory at all but upon the products of the Territory. Severance taxes in Alaska account for 23.74 percent of total revenues as compared with only a 2.6-percent dependence on this category of taxation by the States as a whole. There is no necessary coordination between the number of people, which is the basis for a per capita tax computation, and the amount collected from products of the Territory. For example, it is probable the Territory could collect just as much from its taxes on canned-salmon production if there were only a few thousand people in Alaska as it would if there were several millions. If we adjust the Alaska tax computation to reflect only taxes paid by the people of Alaska, as differentiated from taxes paid on the products of the Territory, which would seem reasonable if it is a per capita comparison we want, we would find that Alaska has one of the lowest per capita levels of taxation in the Nation. In 1950 it was $51.30. A comparison with the per capita burden in each of the 11 western States, similarly adjusted by subtracting severance taxes, shows the Alaska tax is lower than that of any of them except Idaho.

Finally, the per capita method of comparing taxes between areas may be a convenient one, but it is no real measure of ability to pay or of seriousness of a tax burden. Taxes are nowhere assessed on a per capita basis. They are based instead on extent and value of property controlled and the volume and profitableness of business transacted. A high per capita tax is more an indication of a vigorous, profitable economy than it is of a staggering burden. It is a

better index to ability to pay than it is to inability. We might for example compare the per capita tax burden of the United States with that of India or China and, if we should fall into the same fallacy as that which has ensmeshed the junior Senator from Florida go on to argue from that that China and India can afford things in the way of government service that the United States cannot because our tax burden is greater.

Mr. CORDON. Mr. President, I regret that we could not have gone over the answers sentence by sentence on the floor. It would have provided an interesting interchange.

Mr. O'MAHONEY. Mr. President, the Senator from Minnesota [Mr. THYE] indicated this morning that he wanted to add his voice to those which have been raised upon the floor in support of statehood for Alaska. Unfortunately, he is detained at a meeting of the Foreign Relations Committee where he is testifying with respect to the St. Lawrence seaway.

It has been observed on many occasions this afternoon and previously that Senators who rise to discuss the pending business or any other business, for that matter, have been talking to empty seats. As the speeches have been made I have been observing parties of visitors coming in and out of the galleries of the Senate. I never notice them without a feeling that those who visit the galleries and find only a few Senators upon the floor will inevitably go away with the feeling that Members of the Senate are not paying attention to their duties. I think I should take advantage of this opportunity, while waiting for the Senator from Minnesota to reach the floor, to point out from the RECORD what is transpiring. I am talking to the visitors in the galleries and not to Members of the Senate.

In the CONGRESSIONAL RECORD, every day, at the conclusion of the proceedings, there appears in the Daily Digest a list of committee meetings which are scheduled for the following day. Five of the standing committees of the Senate are meeting this afternoon, holding hearings in various committee rooms.

The Subcommittee on Army Civil Functions of the Committee on Appropriations is meeting in one of the rooms of the Capitol in connection with an appropriation bill.

The Committee on Banking and Currency was called to order at 2:30 o'clock today for the purpose of discussing in executive session procedure under the proposed extension of the Defense Production Act.

The Committee on Foreign Relations, as I remarked a moment ago, was in session this afternoon taking testimony on the proposal to build the St. Lawrence seaway.

The Internal Security Subcommittee of the Committee on the Judiciary was scheduled to have a meeting in the Senate Office Building this afternoon and is now in session.

Meanwhile, a subcommittee of the Committee on Post Office and Civil Service is holding a hearing.

This goes on day after day, and here upon the floor, where the business of the Senate is transacted in the final analysis, we have empty seats while the

Members are preparing various bills for consideration later on.

Last week a unanimous-consent agreement was entered by which the Senate agreed that on Wednesday, tomorrow, there would be a limitation of debate upon the motion of the Senator from Florida [Mr. SMATHERS] to recommit the Alaskan statehood bill with certain instructions.

So that absence from the floor is not evidence of a lack of something to do on the part of Members of the Senate. It is only evidence of the concentration in Washington of legislative responsibility over the entire United States and over a large part of the world.

I see that the distinguished and able Senator from Minnesota has arrived, so I shall merely complete my sentence and then yield to him.

It came to my mind, as I looked over this catalog of committee meetings, that the argument has been made against statehood, particularly for Alaska, upon the ground that Alaska should not have statehood because so much of that area is under the control of a bureau of the Federal Government in Washington. Is it not clear that to deny statehood to Alaska is the most sure and certain way to make permanent bureaucratic control from Washington over the destinies of the people of that Territory and over the utilization and development of its resources?

Unless we find a way to stimulate local government at the State level as well as at the municipal level, this concentration of political and executive power in Washington is bound to continue. If there was ever a time when statehood should be granted, this is the time. We are dealing with the only two incorporated Territories that are left.

Mr. STENNIS. Mr. President, will the Senator yield?

Mr. O'MAHONEY. I yield to the Senator from Mississippi.

Mr. STENNIS. Referring to bureaucracy, let me ask the Senator from Wyoming if he really believes that the incorporation of Alaska as a State into the Union will prevent the Department of the Interior operating in Alaska, or lessen its activity there; or, on the other hand, if he does not believe that the activities of the Department of the Interior will be increased, when more than 99 percent of the land will continue to be owned by the Federal Government?

Mr. O'MAHONEY. While the enactment of the pending bill will not prevent the Department of the Interior operating in Alaska, yet it will lessen the responsibility of the Department of the Interior, and will give to the people of Alaska a power which they now completely lack, namely, power to develop their own resources.

This bill makes a grant of almost 23,-000,000 acres of public land to the proposed new State of Alaska. Therefore, it conveys to that prospective State and its people an opportunity, which they do not now have, to develop those lands.

Mr. STENNIS. Does not the Senator from Wyoming know that bureaucracy in Washington will continue to build

most of the roads in Alaska, even though Alaska should become a State?

Mr. O'MAHONEY. I may say to the Senator from Mississippi that the Bureau of Public Roads is at this moment building most of the roads in the State of Mississippi, the State of Wyoming, the State of Minnesota, indeed, in all the States of the Union, and has been doing so ever since 1916, when, under a Democratic President, the late Woodrow Wilson, the original Federal highway aid law was passed.

Mr. STENNIS. Mr. President, as the Senator from Wyoming probably will agree that is true only to the extent of the contribution by the Federal Government of a part of the cost of road construction. Of course, Federal agencies have their engineers in the States, but primarily the construction of roads is the responsibility of the States.

Mr. O'MAHONEY. Let me give the Senator from Mississippi another example. The United States Forest Service was created during the administration of Theodore Roosevelt, a Republican President, as it happened. But after a few years there was passed by Congress a special law which was, if I recall correctly, initiated by members from the Southern States, by which great areas of land within the boundaries of Southern States were voluntarily conveyed to the United States Forest Service by those States.

Mr. STENNIS. Largely for experimental or demonstration purposes.

Mr. O'MAHONEY. But they were conveyed, and the United States Forest Service now has control, just as it does in Alaska.

Mr. STENNIS. Mr. President, I have said in debate that I thought the reservation of some land in Alaska for forestry purposes was a sound provision of the bill.

Mr. O'MAHONEY. It is gratifying to know that the Senator has found something sound in the bill.

Mr. STENNIS. I do not know that I am ready to surrender as much of that land as is the Senator from Wyoming.

Mr. O'MAHONEY. Do I understand the Senator from Mississippi to say, then, that he desires to retain this land for the Federal Government?

Mr. STENNIS. We shall not go into that now.

Mr. O'MAHONEY. Ah, but the Senator has said he is not sure that he wishes to have the Federal Government surrender that much land.

Mr. STENNIS. I think the question of minerals and forests, and matters like that should certainly be looked into further than it has been possible for the Senator from Wyoming to do recently, with reference to deciding what shall be done with them.

If I may, I wish to continue with my line of questions dealing with bureaucracy. Does not the Senator from Wyoming know that the Alaska Railroad will continue to be operated by Washington bureaucracy, even though the pending bill should be enacted?

Mr. O'MAHONEY. Of course, this bill has nothing to do with the railroad. But I venture to say to the Senator from

Mississippi that the granting of Statehood will result in promoting local means of transportation. Private initiative may even be developed to take over this railroad, which was originally built by the Government for the purpose of attempting to develop Alaska.

Mr. STENNIS. But under the terms of the bill, Washington bureaucracy will continue to operate the railroad. Is that correct?

Mr. O'MAHONEY. The Senator from Mississippi is quite correct about that. This bill does not attempt to deprive the Federal Government of its functions immediately, certainly not, any more than it did when any other State was admitted into the Union. The functions which the Federal Government has had, it has retained. Unfortunately, some functions have been added, but my whole point has been that there seems to be very little logic in the argument that we can prevent the growth of bureaucracy by refusing to take any responsibility away from bureaucracy, which is the argument the Senator from Mississippi makes.

Mr. STENNIS. I beg the Senator's pardon. That is the Senator's interpretation of the argument the Senator from Mississippi is making.

Further, with reference to bureaucracy, of the approximately 108,000 people in Alaska—and that is my understanding of what the population is, except for those in the military service——

Mr. O'MAHONEY. The Census has put the figure somewhat higher.

Mr. STENNIS. About 35,000 of them are referred to as natives, are they not?

Mr. O'MAHONEY. They are a highly intelligent group of people.

Mr. STENNIS. So far as Washington bureaucracy is concerned, they will still be governed largely by the bureaucracy, will they not?

Mr. O'MAHONEY. No; I do not think so.

Mr. STENNIS. What does the bill do to change the situation with reference to the natives?

Mr. O'MAHONEY. According to the last count, there were at least six natives in the Territorial Legislature of Alaska.

Mr. STENNIS. I am not casting any aspersions on them. My question is, What are we going to do to get away from Washington bureaucracy? The question is, What does the bill do to change the situation with reference to Washington bureaucracy as it pertains to the natives?

Mr. O'MAHONEY. What I am pointing out to the Senator is that the natives are free and independent except by their own choice.

Mr. STENNIS. Is that the answer of the Senator to the question as to what the bill does?

Mr. O'MAHONEY. It is.

Mr. STENNIS. I should like to call the attention of the Senator to a statement on page 514 of the report, a statement prepared by the Legislative Reference Service of the Library of Congress, in which they very briefly refer to these matters and like the treatment of the natives as being one of the matters that is left unchanged. There is an admis-

sion which tends to show that the natives are treated more or less as many of our American Indians are, and that they will still be semiwards of the Federal Government.

Mr. O'MAHONEY. I will say to the Senator from Mississippi that in my sincere judgment we shall do more to prevent the Alaska Indians and natives from becoming wards of the Federal Government by granting statehood than we shall by denying statehood, because when statehood is granted there will be a greater opportunity for more of them to assume the full responsibilities of citizenship, which so many of them have already assumed, and by reason of which they have been trusted by the other citizens of Alaska by election to public office, both municipal and Territorial.

Mr. STENNIS. But the Senator is clear, is he not, that so far as the bill itself is concerned, it brings about no change in the activities of bureaucracy as they relate to Alaska?

Mr. O'MAHONEY. Oh, the bill does not change that, but the bill does not attempt to deal with the Forest Service, the Grazing Service, the Bureau of Reclamation, the Bureau of Land Management, or any other Federal function that operates in Alaska, just as the law admitting any other Territory did nothing of the kind. This bill grants to the people of the Territory statehood privileges.

When such statehood privileges are granted, I assure the Senator that he will find that the powers of bureaucracy will be reduced. If the Senator is interested in reducing the powers of bureaucracy, he cannot accomplish his purpose by refusing statehood, because he will be denying the very instrument by which bureaucratic control can be reduced.

Mr. THYE. Mr. President, will the Senator yield?

Mr. O'MAHONEY. I yield to the Senator from Minnesota.

Mr. THYE. Just as I entered the Chamber the able and distinguished Senator from Wyoming was referring to me, and also referring to the fact that many committees were in session. They were permitted by unanimous consent to remain in session. Personally I appeared before the Foreign Relations Committee at 2:30 o'clock this afternoon to testify in behalf of the approval of the bill authorizing the St. Lawrence seaway project.

Does the Senator from Wyoming yield the floor?

Mr. O'MAHONEY. I took the floor merely to hold it until the Senator from Minnesota arrived. I shall be very happy indeed to yield the floor.

Mr. THYE. Does the Senator from Mississippi care to continue the colloquy?

Mr. STENNIS. Mr. President, let me say, in the time of the Senator from Wyoming, that I do not wish to delay the Senator from Minnesota. I had in mind one or two further questions, but I shall defer them. I am very glad to have the Senator from Minnesota proceed.

The PRESIDING OFFICER (Mr. Hunt in the chair). The Senator from Minnesota is recognized.

Mr. THYE. Mr. President, I should have liked to be present when the Sena-

tor from Oregon [Mr. CORDON] made his statement in support of the Alaska statehood bill, and also the bill granting statehood to Hawaii. Any time I am privileged to hear the senior Senator from Oregon speak I am not only enlightened, but thrilled by the message he brings us, because he never speaks unless he has a positive and constructive statement to make. Therefore it was a source of regret to me to learn that he had already spoken on the subject of statehood for Alaska and Hawaii.

As I have previously stated, I appeared before the Foreign Relations Committee this afternoon, and therefore I was not able to be present in the Chamber. However, I have studied the question of statehood for Alaska and Hawaii. I am a cosponsor of both Senate bill 50 and Senate bill 49. I have given much thought to the interesting question, What are we endeavoring to do in the world today? What is the major conflict? The Soviets are endeavoring to capture the minds of men in their section of the world, while we, comprising the children of all nations, seek not to bring warfare to mankind anywhere on earth, not to suppress peoples or to deny them their liberties, but, as a great nation, a democracy, to try to hold the minds of men by our philosophy and our ideology.

In the world today there are two camps, one endeavoring to promote communism and the other endeavoring to promote the dignity and freedom of mankind. How shall we win? Shall we win by means of a great armament program? We know that many billions of dollars were appropriated last year for military defense. We know what has been requested in the way of appropriations for military defense this year. We know that the Committee on Appropriations, through its various subcommittees, is studying this question every day. Huge appropriations must be made to maintain our military strength.

What is to be the ultimate result? It is not many years since World War II was fought. We were victorious in that war; but, even though we were victorious, what have we been compelled to do? In order to establish a society of free people in the South Pacific, including Japan, and in order to redevelop their industrial economy so that it can support the people there in a decent standard of living under a stable government, we have spent five and a half billion dollars rehabilitating the islands, exclusive of the occupation expenses in Japan.

We were victorious on the European Continent in World War II. We did not do as was done by the ancient Romans when they engaged in warfare. They enslaved the people whom they conquered and exploited the resources of the conquered country for their own special benefit. We went back into the territory of the people with whom we had been engaged in war and endeavored to rehabilitate their economy and reestablish their society. We endeavored to uphold the dignity of those people and to establish an economy which would support a government. We have endeavored to rehabilitate and aid in

XCVIII—89

the reestablishment of the governments and economies of the countries of Western Europe so that they could be self-supporting.

What did it cost us? We have spent more than $20,000,000,000 in the reestablishment of the economies of the countries of Western Europe, including Germany. That is exclusive of the occupational costs in those countries. In the South Pacific and in Western Europe we have expended more than $25,500,-000,000 to reestablish governments and maintain societies which could resist the infiltration of the communistic ideology and philosophy.

Mr. STENNIS. Mr. President, will the Senator yield?

Mr. THYE. I am happy to yield to my distinguished friend from Mississippi.

Mr. STENNIS. Does not the Senator believe that the facts which he has just recited conclusively prove that we are not imperialists, that we are not aggressors, and that we are not trying to set up a colonial system?

Mr. THYE. I will answer my distinguished and cherished friend by saying that what he has said is positively true. However, the purpose of doing what we did was to turn men's minds and cause them to embrace the philosophy of a free people, so that they could be clothed with the dignity of freedom. After having spent this great sum of money in trying to capture the minds of men, how do we proceed from now on, to win the people to our ideas, our way of government, and our way of life? We do it by undertaking to make it plain that we are not aiming to suppress peoples, but to aid them in establishing themselves. Nothing could destroy the confidence of the people of Asia, the Near East, or anywhere else on earth more than denying statehood to two Territories of Alaska and Hawaii.

Mr. STENNIS. Mr. President——

Mr. THYE. Let me continue my thought. I sat and listened to the distinguished Senator from Mississippi on the day he delivered his speech. I agreed with him in part, and I disagreed with him in part. But with all due respect to my cherished friend from Mississippi, I did not endeavor either to ask him questions at the time or to disturb his chain of thought.

Mr. STENNIS. It is not my purpose to try to interrupt the Senator's speech. I thought perhaps he would like a little interchange of views.

Mr. THYE. I wanted to lay a foundation by showing what we are endeavoring to do in all our defense program. We have done all this in order to get men to think in terms of our democracy and our philosophy of government, rather than to follow the philosophy of the communistic type of government.

Mr. STENNIS. Mr. President, I shall not interrupt the Senator further.

Mr. THYE. We have done all this in the South Pacific in order to rehabilitate Japan and the South Pacific islands. We have followed a similar program in Western Europe, not only with respect to Germany, but with respect to countries which suffered the ravages of occu-

pation—countries such as France, the Netherlands, parts of Denmark, and other sectors of Western Europe, such as Norway. We have endeavored to repair the devastation which Great Britain suffered, not only in order to establish a free society, but to establish a Government which could support itself and resist the encroachment of the communistic ideology and philosophy, which cannot be seen or attacked physically, because they find lodgement in the hearts and minds of men.

If we have done all that in furtherance of the type of philosophy of government which prevails in our country, how else can we proceed to make certain that mankind will follow us and embrace the principles which we hold dear that all men are equal, so far as practicable and possible, that all men should be free to worship God as they learned it at their mother's knee, and that all mankind should have the right of self-government? Mr. President, we certainly cannot assure the people of Alaska and Hawaii that they have such opportunity for positive self-government unless we make them a part of this great Republic as States of the Union.

I have cited the Far East and I have cited the European Continent with respect to what we have done in rehabilitating those areas. My statements have been made for no other purpose than to give light to the tremendous sums of money we have expended in order to keep other peoples moving in our direction rather than in the direction and within the orbit of the Soviets.

I do not believe we can completely convince the European and Asiatic people that we are a freedom loving people and that we wish all mankind to be free unless we make Alaska and Hawaii parts of the United States.

Some of us are the offspring of pioneer or immigrant families who laid the trails across the wilderness of North America. Our forefathers did not go forth looking for adventure. They did not go through the wilderness on a lark. They went because they wanted to be the possessors of property of their own and because they wanted to have a part in the development of this great country. Many of the areas settled by them were in Territories which later became States. Those pioneers blazed trails into the wilderness, many of them in covered wagons. My own parents went by wagon beyond the railroad, to settle in the great Midwest.

Our great Nation was built by the pioneers' desire to be a part of it. They wanted to have a part in the building of thir great Nation. They built well, Mr. President. We have been the beneficiaries of their building.

Those who go into the Territory of Alaska have the same burning desire to play the part of the builder. If they know they are building a new State and if they know they will eventually become a part of the local government and a part of the State government, as well as a part of the great United States of America, they will have the same burning desire that our parents had when they blazed trails into the wilderness.

Mr. President, we must not deny the people of Alaska and Hawaii the right to statehood. Statehood would develop their industry and agriculture. We do not have to stretch our imagination to realize that Hawaii has every possibility of making a valuable contribution to the great American Republic, both in what it produces and in wealth which lies dormant to be further developed, the development of which will add to the strength and resources of our country.

Both Alaska and Hawaii will contribute to the cause we are all striving for; namely, the right of mankind to be free and not suppressed by communistic ideology and philosophy, and thus able to stand on our side, rather than to stand on the Communist side. We certainly do not set the best example when we continue to hold Alaska as a Territory under the dominion of our Government. The same applies to Hawaii. By not granting them statehood we deny them the right to be self-respecting and ambitious citizens such as our parents and the friends of our parents were when they entered the wilderness to establish their homes, schools, and churches, knowing that the day would come when the Territory in which they lived would be permitted to stand as a self-respecting sovereign State within the Union.

Mr. President, if we were willing to spend the billions of dollars we have spent in Western Europe and in the Pacific, and if we were willing to make the sacrifices that our taxpayers have made in aiding Western Europe, all for the purpose of making it possible for mankind to continue to be free, we cannot deny Statehood to Alaska or Hawaii.

Reference to the history of this great Nation discloses how fallacious were the arguments and the verbal exchanges upon this floor against the admission of other Territories which finally achieved statehood. History is only repeating itself in the Senate. We can turn to the early pages of the CONGRESSIONAL RECORD to find what was said in the days when the Territory of which Minnesota was a part was being considered for admission into the Union as a State.

If we hope to be able to win men's minds and hearts to our side in the struggle between the ideology and philosophy of a free people and those of communism we had better demonstrate here in this section of the world that we are willing to let Alaska and Hawaii become States.

Mr. President, I wish to say to the Senator from Mississippi [Mr. STENNIS] that I did not intend to be rude to him, because I respect him too highly. I merely wanted to carry through with my thought at the time. I do not have a prepared statement. I came directly from a committee meeting (and I spoke from my mind and heart, not from a prepared statement. If I had been interrupted at various time it would have been very difficult for me to carry through with the thoughts I had in my mind at the time. That is the only reason why I said to the Senator from Mississippi that I would rather not be interrupted.

Mr. STENNIS. Mr. President, will the Senator from Minnesota yield to me briefly?

Mr. THYE. I am very happy to yield to the distinguished Senator from Mississippi.

Mr. STENNIS. I want to assure the Senator from Minnesota that not only was I not offended by his asking me not to interrupt him further, but that it was not my intention to interrupt him in his very fine presentation of his splendid thoughts. At the time I thought he had a prepared statement before him, which he could leave for the moment to permit me to ask him some questions.

Mr. THYE. Mr. President, I was attending a meeting of the Committee on Foreign Relations when the distinguished Senator from Wyoming [Mr. O'MAHONEY] sent a message to me, which I hold in my hand, informing me that debate on the Alaska bill was about to come to an end today. I hurried to the Chamber because I wanted to speak my thoughts and convictions on the question before debate was closed.

Mr. STENNIS. I will say that I am glad the Senator spoke this afternoon, and I appreciate his fine thoughts on the subject. I know he speaks with great sincerity. I had the pleasure of traveling in Europe with him and of visiting Norway, and I know the great thrill he had in visiting the homeland of his father and mother. Is the Senator from Minnesota on the committee which considered this bill?

Mr. THYE. No; I am not.

Mr. STENNIS. I did not think the Senator was.

In my studies of the subject I have been greatly impressed with the idea that more than 40 percent of the people of Alaska have voted against statehood. Because I seek enlightenment on that subject, I ask the Senator from Minnesota whether he can give us any information regarding the matter that 5 years ago more than 40 percent of the people of Alaska voted against statehood.

Mr. THYE. No; I cannot enlighten the Senator from Mississippi on that matter, because I am not a member of the Committee on Interior and Insular Affairs and I have never visited Alaska. My own study of Alaska has been confined to reading the testimony given at the committee hearings and to listening to Senators speak on the subject on the floor of the Senate.

I am able to judge the reaction of others only by my own reaction. I cannot conceive of anyone living indefinitely in a Territory without hope of being a part of the governmental body of the Territory and without hope that he and his children would be a part of the national governmental body. For the life of me, Mr. President, I cannot understand why a person would live in a Territory if he did not wish to have that Territory become a part of the great United States of America and to be on the same level as all the present States. Accordingly, I could not even project my own thinking into that of those who may have said they were opposed to their Territory becoming a sovereign State within the great United States of America.

Mr. STENNIS. Mr. President, if the Senator from Minnesota will yield fur-

ther to me, let me say that I have the same conception. It seems to me that everyone in Alaska would want Alaska to become a state. My impression was that if so many of the persons living in Alaska voted against statehood for Alaska, there must be some overwhelming reason therefor. From my further investigation I concluded that those persons did not think the present economy of Alaska could carry the burden which would be imposed by full-fledged statehood for Alaska.

I thank the Senator from Minnesota very much for yielding to me.

Mr. THYE. I thank the Senator from Mississippi.

Mr. President, I now yield the floor.

## CONDITIONS IN PUERTO RICO

Mr. BRIDGES. Mr. President, it has been with a great deal of interest that I have observed a growing restiveness among Senators in regard to conditions in Puerto Rico. As all of us know, there has been among Senators much informal discussion of that subject, and recently at least three Senators have spoken on this floor concerning it.

The senior Senator from Maine [Mr. BREWSTER] has called our attention to charges of dictatorship which have been made against Governor Muñoz-Marín of Puerto Rico, and has suggested that action on the nomination of a federal district judge for Puerto Rico be deferred until those charges can be investigated.

The junior Senator from South Carolina [Mr. JOHNSTON] has pointed out that the Department of the Interior has contributed to an atmosphere conducive to dictatorship in Puerto Rico by failing to follow through with the appointment of a federal coordinator for Puerto Rico, although in 1947 a statute calling for such an appointment was enacted. The Senator from South Carolina has joined the Senator from Maine in calling for an investigation.

The junior Senator from Maryland [Mr. BUTLER] has raised the highly pertinent question of whether American taxpayers' funds are being squandered in Puerto Rico by a dictatorial regime operating with thorough approval of the Department of the Interior. He, too, has joined in the call for investigation.

Mr. O'MAHONEY. Mr. President, will the Senator from New Hampshire yield to me?

Mr. BRIDGES. Certainly.

Mr. O'MAHONEY. Within the past week or 10 days, some reference was made here on the floor to the alleged development of dictatorial government in Puerto Rico. At about that time last week, I believe it was, there was transmitted to me by the Commissioner for Puerto Rico who sits in the House of Representatives a copy of the new constitution for Puerto Rico, which within the past month or so was drawn up by a convention authorized by Congress. That constitution, which I placed in the RECORD at that time, and which was adopted with the full approval of Governor Muñoz Marín of Puerto Rico—who, by the way, was elected Governor under a bill sponsored by the distin-

guished senior Senator from Nebraska [Mr. BUTLER]—takes away from the Governor powers which he now has. So actually the new constitution will result in a reduction of the executive powers of the Governor and an expansion of the powers of the legislature and other branches of the government of Puerto Rico.

Last week the Senator from Maryland [Mr. BUTLER] made some comments about the sums of money which have been expended in Puerto Rico. At that time I assured him that inasmuch as under the existing law the constitution of Puerto Rico will have to be approved by the people of Puerto Rico before it comes to the United States for approval by the Congress of the United States, the Committee on Interior and Insular Affairs would be very happy indeed to go into all those matters. If there is any abuse of the generous fiscal policy which the Government of the United States has adopted toward the island of Puerto Rico, of course every Member of Congress will, I am sure, wish to make any necessary modifications. However, I think it important to point out the fact that the Governor, far from seeking more power, has voluntarily surrendered powers which he has under existing law.

Mr. BRIDGES. That is very interesting, Mr. President.

Mr. O'MAHONEY. I trust that the study the committee will make when the constitution, which is to be voted upon by the people of Puerto Rico on March 3, is presented to us, will cover every aspect of all the intimations, allegations, and charges which have been made.

Mr. BRIDGES. I trust it will, and I thank the Senator from Wyoming.

Mr. CORDON. Mr. President, will the Senator from New Hampshire yield to me for a question?

Mr. BRIDGES. Certainly.

Mr. CORDON. A little later in his discussion will the Senator from New Hampshire indicate specifically what are the charges against the Governor of Puerto Rico?

Mr. BRIDGES. The Senator from Oregon probably is aware that I was merely referring to charges which have been made by others. For instance, I was going to refer particularly to the subsidizing in Puerto Rico, by the Puerto Rican Government, of textile industries in competition with those in our own country. Already I have referred to the remarks previously made by three Members of the Senate; I did so at the beginning of my statement today. I myself have not made any charges; I have only referred to charges which have been made by others.

Mr. CORDON. I think there is no question that Puerto Rico has granted subsidies to any group which would set up in the island of Puerto Rico processing plants which would give employment to Puerto Ricans. However, so far as I know, such subsidies have never taken any form other than that of relief from taxation for a specific period of time, and have been predicated upon the number of persons employed.

If the Senator from New Hampshire could refer me to any place where I could be able to determine exactly what has been charged as misconduct or misdeeds by the Governor of Puerto Rico, that would be of help to me as a member of the Committee on Interior and Insular Affairs and as one who has supported the present self-government law for the island of Puerto Rico.

Mr. BRIDGES. I thank the Senator from Oregon. At the present time I do not have the details regarding that matter, for I did not intend to cover that phase of the subject. However, I shall be glad to talk to other Senators who have gone into it, and to call the matter later to the attention of the Senator from Oregon, insofar as those Senators have information on the subject. I myself do not have information on it.

Mr. O'MAHONEY. Mr. President, will the Senator from New Hampshire yield further to me?

Mr. BRIDGES. Certainly.

Mr. O'MAHONEY. When I heard those statements, I immediately initiated an inquiry. I asked the Resident Commissioner for Puerto Rico, Mr. Fernós-Isern, to provide me with a statement, from his point of view, at least, regarding the legislation which has been enacted by Congress for Puerto Rico since the occupation of Puerto Rico by United States troops during the Spanish-American War.

I think the first law which Congress passed for Puerto Rico was enacted in 1900. In recognition of the fact that the island of Puerto Rico was without industrial enterprises, to any practical extent, that Puerto Rico was an agricultural area which was very much overpopulated, and in which poverty had reached a very distressing level, the Congress of the United States at that time, under a Republican regime, undertook the first of the generous fiscal grants; and since that time there have been several others.

If the Senator will bear with me, I shall merely say that at the conclusion of his speech I intend to ask leave to insert in the RECORD the report which I have received from Dr. FERNÓS-ISERN, which I am sure will be enlightening to all persons who are interested in this matter. Let me read one paragraph from the summary:

In 1950–51, Puerto Rico sold $264,639,190 worth of merchandise to the United States (including the value of tax on rum shipments, $13,027,346, and sugar-benefit payments, $17,474,000). In the same year, Puerto Rico purchased from the mainland $400,397,676 worth of goods at domestic prices and carried by high-cost transportation in United States registry vessels. Foreign ships cannot be used, since Puerto Rico is included in the coastwise-shipping laws.

In other words, Mr. President, this paragraph, itself, tends to bear out the evidence which has been submitted to our committee since the chairmanship of the Senator from Nebraska [Mr. BUTLER] in the Eightieth Congress, when a subcommittee of the Committee on Interior and Insular Affairs, including the Senator from Oregon, who is presently on the floor, the Senator from Wyoming, the Senator from Nebraska, and nu-

merous other Senators, went all through the island. Frankly, I say I was very much impressed with the progress which was being made in raising the standard of living by this very device of seeking to encourage the establishment of local industries. It was my impression, I may say, that the purpose was not to induce industries to move from the States, but to provide an incentive to bring about the creation of new industries. Whether that effort has been successful, I do not know.

Mr. BRIDGES. The Senator from Wyoming is a little optimistic, or is perhaps looking through tinted glasses in that respect, because industries have certainly been drawn to Puerto Rico from my section of the country. It is pitiful, as I shall proceed to show the Senator by a few examples.

Mr. O'MAHONEY. As I said to the Senator, I have no knowledge of the facts which have recently developed. It was my understanding, at the time, that the purpose of the program which had been initiated was as I have stated.

Mr. BRIDGES. Mr. President, I also am considerably apprehensive about conditions in Puerto Rico. I, too, feel that an investigation is in order, an investigation into the questions raised by the three Senators who have made known their views but there is a particular phase of the Puerto Rican matter which, in my judgment, requires special attention in such an investigation.

A number of our States, in particular those which comprise New England, have a special interest in this Puerto Rican matter, owing to the fact that our economy is being seriously damaged, and our people consequently are suffering, by a competition which is unfair and which helps no one but a group of politicians in Puerto Rico. I refer to the Puerto Rican Government's program to lure industry away from the United States by the unfair use of the incentives of tax exemption and low-wage scales.

Every Senator the economy of whose State is based in part on a successful textile industry is familiar with the fact that Puerto Rico has held out to this industry the bait of cheap labor and exemption from taxes for a considerable period. I am sure that these Senators would join with me in the statement that we have no fear of fair competition in the American tradition. What we do object to, however, is the impoverishment of our textile communities by taking away whole organizations on this patently unfair basis. On the one hand our communities must operate under a system of laws which provide minimum wages and certain stipulated working conditions while on the other hand the Puerto Rican program involves no such high standards either in wages or working conditions. When there is added to this the fact that a tax-incentive bait is provided our communities are placed at a considerable disadvantage.

For many years management and labor have struggled with the problem of eliminating the sweatshop in American industry. This has been particularly true in the textile field. Only recently have we had an equitable arrangement whereby the American textile worker has

enjoyed fair pay, reasonable hours, and other good conditions, while at the same time a legitimate profit has been assured to ownership. Now through the siren song of Puerto Rico these advantages are being taken away. Certain areas in New England are becoming distressed, it would seem, only to contribute to a sweatshop economy in Puerto Rico. If some positive action is not taken this can well become a major national problem.

The question of destroying the textile economy is not peculiar to New England alone; it applies equally to the Southern States. Of course, there has long been high competition between the Southern and New England States in the textile field. This has been a healthy competition in recent years since a minimum-wage law has been equally applicable in both areas.

It is ironic to note that the Puerto Rican industrial development program, which is designed to take our industries away from us by using unfair tactics, is in effect being subsidized by the American taxpayer. It is really a ludicrous situation when, for example, the New Englander pays taxes, a part of which are used to impoverish his own community and his own family, while the Puerto Rican, who receives the alleged benefits of this shift in locale of industry, continues to work for substandard pay and, of course, contributes nothing to the general economy of the United States through payment of taxes.

The most charitable view of this situation would make it appear to be a matter of robbing Peter to pay Paul.

The good people of New England would not feel so badly about their own sad plight in losing their industries to Puerto Rico if they felt that the Puerto Rican people were profiting thereby. But let us consider how much this industrial development program has meant in benefits to Puerto Rico as balanced against damages to New England and southern textile communities.

It is impossible to discover just how much the Puerto Rican development program has cost to date. As far back as 1949, the Senate Committee on Interstate and Foreign Commerce reported, following an investigation of the closing of Nashua, N. H., mills, that—

The Government has no complete and accurate compilation of figures to show the extent of our various subsidy programs conducted under our various Federal departments.

The committee at that time felt it serious enough to recommend "that the Department of the Interior be authorized and instructed to obtain current figures and to provide the Congress with a complete picture of our subsidy program and that reports be rendered to the committee periodically.

Insofar as I have been able to determine, this recommendation has not been followed and it remains well-nigh impossible to get a clear and complete picture of the use of Federal funds in Puerto Rico for the development program or any other program.

It is certainly true that a great deal of money has been spent by the Puerto Rican Industrial Development Adminis-

tration, and it is further true that this money has come largely from the pockets of the American taxpayer. It is hardly justifiable that our own money should be used against us in such a way that whole American communities are distressed and no tangible benefits can be seen in Puerto Rico. I am told that the industrial development program in Puerto Rico is a costly flop. It is tragic that fine communities throughout New England and the South have so seriously suffered in order to make this flop possible.

Although there appears to be no way of determining just how much the Puerto Rico Industrial Development Administration has squandered, all reports agree that it is an expensive operation and that the tangible results are pitifully negligible. The administration maintains plush offices in four American cities and employs a high-salaried, high-pressure staff plus a New York publicity firm. The latter alone is said to draw $152,000 annually for singing Puerto Rico's siren song in the press, radio, television, movies, and wherever else the propaganda may be effective.

Yes, the industrial development administration spends millions to lure industry from our States to the tax-exempt, cheap-labor paradise where large Government subsidies ease the way for the faithful. But, according to reports by interested and objective persons, the administration's program has fallen far short of its goal of giving gainful employment to the poverty-stricken Puerto Rican people.

In the words of the 1949 report of the subcommittee of the Committee on Interstate and Foreign Commerce, after its investigation of the closing of Nashua, N. H., mills:

Any program conducted or tolerated by our Government should not be at the undue expense of our continental wage earners and our continental industries.

Mr. President, I have before me a copy of the subcommittee print, Senate Report 101, on the closing of Nashua, N. H., mills. It is a report by a subcommittee of the Committee on Interstate and Foreign Commerce of the Senate, Eighty-first Congress, first session. I read from the report:

The subcommittee was unable to get current figures to show the extent of United States subsidies to Puerto Rico. The latest figures available from the Puerto Rican University show that in excess of $150,000,000 a year was provided to Puerto Rico by the United States Government in 1944, 1945, and 1946, the amount in the latter year being $184,986,000. This is substantially in excess of the total amount the Puerto Rican government received from its own taxpayers. Accordingly, one cannot escape the conclusion that the United States Government, to a very substantial degree, is by its subsidizing program enabling the Puerto Rican government to institute its widely advertised tax moratorium program and thereby lure from the continental United States industries employing thousands of workers. In stating this fact we again emphasize that Puerto Rico pays none of its tax funds into the United States Treasury.

It may fairly be said that our continental industrial concerns, our farmers, our wage

earners (through the withholding tax), and indeed all of our taxpayers are paying a higher tax to support our subsidy program with respect to Puerto Rico. In short, they are being penalized by threat of loss of jobs and by threat of unfair competition, and are being forced by added taxation to pay the cost of the penalty which is being imposed upon them.

The subcommittee recognizes that when our Government acquired Puerto Rico it assumed an obligation to take reasonable steps to help this impoverished territory to improve its economic condition, with the hope that eventually it could arrive at an economic parity with the continental United States. However, any program conducted or tolerated by our Government should not be at the undue expense of our continental wage earners and our continental industries.

Mr. President, I have various newspaper articles about the general situation regarding our textile industries and the hardships faced today in many communities in the New England States. I have one from the Washington Evening Star of February 4, 1952, entitled "Poverty Amid Plenty—Hard Hit New Hampshire Cities Fight To Avert Grim Disaster."

Another one is entitled "Poverty Amid Plenty—New England Textile Industry, Union Locked in Death Battle."

Another one is entitled "Poverty Amid Plenty—New England Textile Industry in Doldrums, Fights for Life."

Another one is entitled "Poverty Amid Plenty—Once-Prosperous Textile City Faces Threat of Extinction."

Another one is entitled "Poverty Amid Plenty—Economy Sets Near-Record Clip But Jobless Suffer in Some Areas—Unemployment Concentrated in New England, New York City, Detroit, and Hard-Coal Areas."

Mr. President, I think those articles tell the story.

I did not intend to go into the charge of dictatorship or anything of that kind when I started. I merely quoted from other Senators and other authorities, because I had made no special study. But I do know what is happening to the industrial communities in New England, on the eastern seaboard, and in the Southern States as well, and I do know of the unfair competition which is created when Puerto Rico pays substandard wages, with workers employed under sweatshop conditions, combined with tax exemptions offered by Puerto Rican communities to our industries, luring them away from our country. That is unfair competition to our communities and our industries, and it is unfair to our workers. It has created a very serious and critical situation in city after city. Today men and women are walking the streets in this land of so-called prosperity, because of the displacement problem which has been brought about by unfair and vicious competition that cannot be justified.

Mr. President, I feel that the American Congress which has doled out money so generously to Puerto Rico, almost shoveling it out, should look into the situation. The lot of the Puerto Ricans has not been improved. The money goes into huge profits for those who own the industries and who are using tax exemptions to lure our industries away. The

United States is contributing to the tune of hundreds of millions of dollars to the island of Puerto Rico which makes that situation possible.

I say, Mr. President, the situation demands attention. One can be a "one-worlder" or a "do-gooder," or anything else, and I myself have a global outlook on the world, and am glad to meet anyone on that issue, but when it comes to taking the bread out of the mouths of the people of certain communities in our own country, the Congress of the United States and the administration owe a duty to the American people to meet the issue. It should be done by getting the facts, and, after the facts are secured, then taking appropriate action to meet the situation.

Mr. President, I ask unanimous consent to have the articles to which I have referred printed in the RECORD.

There being no objection, the articles were ordered to be printed in the RECORD, as follows:

[From the Washington Star]

POVERTY AMID PLENTY—ECONOMY SETS NEAR-RECORD CLIP BUT JOBLESS SUFFER IN SOME AREAS—UNEMPLOYMENT CONCENTRATED IN NEW ENGLAND, NEW YORK CITY, DETROIT, AND HARD-COAL AREAS

(By James Y. Newton)

The American economy as a whole is moving along at a near-record clip, yet important segments of that economy are bogged down in a state of near depression.

There are more than 61,000,000 civilians working, all but 2.7 percent of the country's total work force. Yet there is heavy unemployment in a number of areas, enough to constitute a national problem.

The total number of people seeking work—about 1,700,000—is small, so small, in fact, as to be the cause nationally of more concern from the standpoint of labor shortness than from the standpoint of labor surplus.

But this unemployment is heavily concentrated. Most of the jobless are in New England, New York City, the hard-coal mining section of eastern Pennsylvania, the Detroit area, and some other localities scattered over the country.

Unusual situations are numerous. Connecticut, as a whole, with its new metal-working industry geared to defense work, is booming. But adjacent Rhode Island, a large part of Massachusetts and New York City are in the throes of slump because their economies are tied principally to civilian work.

Tiny Rhode Island, population 791,000, has 35,000 unemployed; New York City, over 100,-000; New York City, over 200,000 and increasing. Yet, Hartford, Conn., a few miles away, cannot find enough people to man its busy defense plants or enough housing for those who are there.

Scranton, Wilkes-Barre, Pottsville, Pa., are in bad shape, with unemployment running over 10 percent of the work force. Most of the jobless are hard-coal miners, who can't find work in the dying industry. Not far away are centers of steel and other industries, where manpower is badly needed.

A call for workers to remove the snow from Detroit streets results in a mob scene of the jobless eager to earn a few dollars.

Schemes reminiscent of the 1930's are being used by merchants trying to drum up business. In Fall River, Mass., books of coupons good for $25 in trade at various stores are being offered at $2.50.

Speaking generally, there are two types of unemployment. The type receiving the most attention is so-called defense unemployment, resulting from the transfer of scarce metals—copper, steel, nickel, aluminum—from civilian to military production.

Detroit is the most spectacular example of a city suffering from defense unemployment. Estimates of the number of jobless in the city and environs run from 125,000 up.

Senator MOODY, Democrat, of Michigan, said more than 175,000 workers in the State, most of them in the automobile and auto parts manufacturing industries, have been laid off because of cutbacks in civilian production. The automobile industry is operating at about half of capacity because of transfer of scarce metals to military production.

The other type of unemployment is one caused by curtailed buying of some types of civilian goods, notably soft goods—cottons, rayons, woolen, and worsted textiles and shoes.

Present-day economic troubles of a large part of New England are directly the result of this last-mentioned situation. New England's many textile cities are fighting hard for existence. The threat to them comes from the general slump in textiles, plus a growing inability of its mills to compete for business with low-wage areas of the South.

SHORT- AND LONG-TERM PROBLEM

The New England situation poses both an immediate and a long-term problem of jobs. Finding a cure for the area's economic ill health will be a vastly more complicated task than that of relieving defense unemployment in Detroit.

New England, too, has a large jewelry industry which, like manufacture of automobiles, has been hard hit by cut-backs in metals usage.

In order to find out first-hand something of conditions in areas of unemployment, how people were faring in these local depressions, what was being done to correct the situations. The Star conducted a survey of New England and the Detroit area.

The jobless person of 1952 is hard put to provide for self and family, but his plight is not nearly so desperate as was that of his apple-peddling counterpart of the early 1930's.

PRICES CAUSE MOST TROUBLE

High prices cause him the most trouble. In the big depression, living costs were at rock bottom. But more than off-setting that are the cushions against economic hardship available to the present-day unemployed. He has unemployment compensation and help in the form of organized relief. Generally, he has some savings to fall back on. There may be another member of the family still working.

Then, something the jobless man of 1932 couldn't do because the depression was general, he can in most instances get a job in another town. Most of them are not moving, however, like the big Irishman in the employment office in Lawrence.

"Ain't it a helluva note," he remarked, putting the $25 weekly compensation in a pocket. "Over in Hartford they rain C-notes on a guy just for decorating one of them airplane engine factories. But the old lady won't have none of it. She's been here all her life, and she's going to stay here even if she starves."

MISERY LOVES COMPANY

In the misery-loves-company department, another unemployed New Englander didn't bat an eye when a guest on a television quiz show said he was a jobless textile worker. But his interest picked up when the man said he was from Charlotte, N. C.

"It sort of helps you to know that at least some of those people down there are not working," he remarked later.

Since the depressions both in Michigan and New England have been going on for some months, the matter of the unemployed running out of compensation is becoming more serious each day. Many thousands already have exhausted allowances.

The proposal has been made that Michigan extend its benefit period from the present 20 weeks to a year. The employment crisis is expected to last at least that long.

BILLS ENTERED IN CONGRESS

In addition, Senator MOODY and Representative DINGELL, Democrat, of Michigan, have introduced bills in Congress to supplement the States' payments by 50 per cent with Federal funds. On the national average this would add $10.50 to the $21 weekly now paid by the States.

The Moody-Dingell bill is aimed at helping those persons thrown out of work because of transfer of materials to defense production. But, obviously, there would be no way of separating defense unemployment from any other type.

Senator Moody, Governor Williams, of Michigan, the automobile industry, and Walter P. Reuther, president of the CIO United Auto Workers, have tried hard to persuade the Government to increase allocations of metals to the industry. So far, they have had little success.

The best hope of relief from unemployment is offered by the Government's program to channel defense contracts into distressed areas. A ruling by Comptroller General Lindsay Warren permits Government procurement officers to award contracts to companies in the areas even though they might get lower bids elsewhere.

TASK FORCE COMMITTEE

As a means of carrying through this plan, Production Administrator Manly Fleischmann, appointed a task force committee to survey plant facilities and manpower to determine just what and how many contracts can be placed in the hard-hit sections.

The task force is headed by Reginald P. Gillmor, vice president of the Sperry Corp. On it are representatives of the Army, Navy, Air Force, Atomic Energy Commission, and General Services Administration.

Mr. Gillmor's group arrived in Detroit yesterday on its first assignment.

POVERTY AMID PLENTY—NEW ENGLAND'S TEXTILE INDUSTRY IN DOLDRUMS, FIGHTS FOR LIFE

(By James Y. Newton)

BOSTON, January 31.—The long fight for life of New England's once great textile industry has reached a dramatic climax.

A decision whether it will be life or death may come in the next few months.

Manufacture of woolen, worsted, cotton and rayon cloth, although far smaller than it was once, still is the biggest industry, the largest employer in this area, and particularly in Massachusetts and Rhode Island.

Whether textiles will remain a major factor in the New England economy probably will be decided by events immediately ahead. The industry is making its last stand in Yankee land.

The business barometer in New England as a whole rises and falls with the state of the textile industry. It is the backbone, and in some instances, almost the whole, economy in cities like Providence, R. I.; Fall River, New Bedford, Lowell, Lawrence, Mass.; and in Manchester, New Hampshire's largest city.

TEXTILE BUSINESS BAD

Right now the textile business is very bad in woolens and worsteds, as well as in cottons and rayons, and there is no improvement in sight.

So a large part of New England is in a slump at a time when the economics of most parts of the country are riding at all-time high levels. Unemployment is heavy and mounting. Many mills, including some of the largest employers, are threatening to shut down permanents or move to the South.

If they carry through the threats, New England, or a large part of it, will be in a major depression.

"Unless the situation is changed shortly," said Edward F. Walker, of the Rhode Island Textile Association, "there will be no situation to change."

There are two reasons for the critical situation. One is that the textile business nationally has been in a slump since last May and it has gradually become more severe. High inventories of goods and apparel at all levels of trade and slackened civilian demand have caused it.

The other reason is the old one of the inability of northern producers to meet the competition for business of mills in the South, where the costs are much less because of lower wages, higher worker output, and more favorable tax situations.

### CAN'T MATCH BIDS

Effects of this one-sided competition obviously become more acute when the industry nationally is in the doldrums. The northern producers cannot match the bids of the South either for military or civilian orders.

Only when the demand for textile products equaled or exceeded the national supply have the New England mills enjoyed prosperity. This has happened three times in the last 30 years and never in a normal period. It happened during the war, when the Government was supplying a huge Army; for 3 years right after the war, because of abnormal pent-up civilian demand, and for 10 months after Korea, when buying was active because of fear of shortages and high prices.

Right now, textile production of all types in New England is off more than 50 percent. Mills are closing almost daily because there are no orders. Within a few days, five plants shut down in Fall River, Mass., alone, throwing 4,100 people out of work. Some may not reopen. The number drawing unemployment compensation in this city of 100,-000 increased 2,500 in a week to over 10,000. Thousands of other jobless have exhausted their compensation.

### SOME SLUMP IN SOUTH

Business has slumped in the South, too, but not so markedly—an estimated 25 percent. The South has been doing better in getting both civilian and military orders. Some northern mills have even been buying yarns and other materials in the South for less than they can produce them in their own plants.

The current situation has brought the pattern of southern competition to a showdown. All sides—the State governments, the labor unions and, above all, the managements—are acutely aware that something must be done, and quickly. Just what will or can be done involves a wide difference of opinion among the three groups.

A large number of people believe that loss of the entire textile industry to the South is inevitable and that little should be done to save it. They say efforts should be concentrated on bringing in new industries, particularly in the metal-working field. Connecticut has done much in that direction, and the State is booming.

But the bringing in of new and different industries is a long, slow process. It probably could not be done in time to save the economies of Massachusetts and Rhode Island. After all, the New England textile industry still employs more than 160,000 people, and that's a lot of jobs to write off or fill.

### NO ANSWER YET

It is safe to say this textile situation has been studied and investigated more than anything else in the country. There are two studies aimed at determining what to do going on right now. One is sponsored by the six New England Governors and the other, by the National Planning Association.

"Everybody surveys us, but no one comes up with the answers to our problems," commented one city official.

Thirty years ago, 80 percent of cotton goods manufactured was concentrated in New England and 20 percent in the South. Now, the situation is just about reversed. Mill employment in Fall River has dropped from 35,000 to 10,000 during that time. The whole New England cotton and rayon industry now employs about 70,000.

The movement southward of the woolen and worsted industry has developed fairly recently. Only 15 percent even now is located in the South. Most of it is in New England. But the movement is on. Thirty-two woolen mills have been liquidated or moved since the war. Worse still, some of the biggest producers, including the American Woolen Co., which makes over 20 percent of the Nation's wool cloth, are considering moving south.

Woolen and worsted mills in New England employ about 90,000 persons.

## POVERTY AMID PLENTY—NEW ENGLAND'S TEXTILE INDUSTRY, UNION LOCKED IN DEATH BATTLE

### (By James Y. Newton)

BOSTON, February 1.—A big industry and a big union are fighting for their lives in New England, and the health of the area's economy depends on the outcome. The industry is textiles, New England's biggest. The union is the Textile Workers Union, one of the CIO's largest.

Their interests are nearly identical, and one would think they would be battling together. But the truth is they spend much more time fighting each other. A blockbuster of words is loosed almost daily by labor or management.

Each blames the other for the sad plight of textile manufacture in New England—the industry's inability to meet southern competition and the consequent long lines of jobless at the employment offices of mill cities. Obviously, little good can come from such a situation.

The two sides will battle it out face to face in wage and contract negotiations to start soon. The negotiations are unusual, in these times, in that they were demanded by the managements, who are seeking more favorable terms. The union said earlier it would not demand a wage increase and is seeking to maintain status quo in wages and working conditions.

### MANY CANCEL CONTRACTS

A large part of the woolen and worsted industry has served notice of cancellation of its contracts on March 15, the expiration date. Some companies are demanding a wage cut. All are demanding an increase in the work assignments of the men who operate their machines.

Most of the cotton and rayon contracts run into 1953 but can be reopened on wage issues this March 15. The manufacturers have served notice of reopening. Here, too, there is some talk of wage cuts, and a unanimous demand for increasing employee work loads. Contracts involving part of cotton and rayon, notably in Rhode Island, run until 1954 and may not be reopened.

The union warned the woolen and worsted people there would be a strike if there is no contract after March 15. The industry replied, in effect, let them strike, we are not doing much anyway.

The consensus of employers is there will be no cut in wages. Their real demand will be for an increase in daily work assignments as a means of lessening the competitive advantage of the South. In other words, the manufacturers say, their employees must work harder for the same pay they now receive.

### UNION ON THE SPOT

There is little or no talk on the surface of trying to bust the CIO union. Relations over the years have been better than in most industries. Strikes have been few. But the union definitely is on the spot.

New England textiles are nearly 100 percent unionized in the CIO, the smaller AFL United Textile Workers and a few independents. Despite 6 years of intense effort, the CIO and AFL have been able to organize only 10 to 20 percent of southern mills. Operation Dixie, into which the CIO poured millions, was nearly washed away in an unsuccessful strike last spring.

The CIO union has done an excellent job in New England of lifting textile wages, once very low, to a point where they compare not too unfavorably with pay of other industries. It has won holidays and vacations with pay, insurance, sickness benefits, for its members. But in so doing it has created a wide differential of wages and costs with the unorganized South and, in effect, pulled the rug from under its members.

In luring New England interests to warmer climes, the South has taken full advantage of the appeal of lower wages and costs in general, greater per worker output theme.

It is undoubtedly true that many New England manufacturers in the past granted wage demands in the belief the South soon would be unionized and the cost differential largely eliminated through efforts of the union and other factors. Now they see it will not come to pass any time soon and they are taking matters in their own hands to reduce the differential. They say, if unsuccessful, they must either move South or quit.

### BUILD-UP CATCHES WORKERS

"We have no objection to high wages, so long as we can secure business and sell our goods," says President K. B. Cook, of the Rhode Island Textile Association. "And we are very happy that textile workers earn good wages. Unfortunately, however, one group has been favored over another and the gradual build-up over the years has caught up with its proponents (the union) with the result many textile workers are losing their jobs and many more are facing that disagreeable certainty."

Employer and union estimates of the size of the competitive advantage of the South vary widely. In cost of wages and fringes—welfare, paid holidays, vacations, etc., which are not prevalent in the South—the union places the difference at 10 cents per hour per worker or slightly above.

William F. Sullivan, president of the National (New England) Association of Cotton Manufacturers, says the difference in fringes and wages amounts to 31 cents per hour. He estimates the average hourly pay at $1.46 an hour in the Fall River-New Bedford area and $1.22 an hour in the South. Difference in fringe benefit costs is placed at 7½ cents an hour per worker.

The gap in average hourly earnings between North and South has widened the last 2 years from 11 to 24 cents an hour, Mr. Sullivan says.

To this already wide cost spread, Mr. Cook adds 10 cents as his estimate of the work load differential translated into cents per hour. Mr. Sullivan did not attempt to evaluate that item, although he said the worker output was considerably greater in the South.

### WORK DIFFERENCES CONCEDED

The official union position is that the New England mill worker puts out as much effort and produces as much as his southern contemporary. But privately, some will admit not only differences in work loads between North and South, but between different parts of New England.

They attribute these differences largely to newer mill machinery, better supervision,

better management. They also point out that, in most of their contracts, the work load for a particular job is subject to arbitration, if management and the union are unable to agree on size.

"Unfortunately," says Solomon Barkin, research director of the textile workers, "many New England textile managements were more keen upon withdrawing their investments than in using their new-found wealth to modernize. Their equipment has been among the most backward; their methods have needed the greatest change; their supervision needed the most training."

In other words, the union charges, Yankee employers have failed to keep pace with the times in either plant machinery or management methods. The employers reply they have installed more than $100,000,000 worth of new machinery the last 5 years.

Francis W. White, president of the giant American Woolen Co., says "our mills' managements are equal to those of our competitors in New England or anywhere else in the world. We apologize to no one." The big company is considering moving south largely, Mr. White says, because it is unable to get "a fair day's work" from men and machines.

He adds that arbitrary limitation of production, worker slow-downs, and make-work schemes on the part of the union are responsible for much of American Woolen's troubles.

### WORKER OUTPUT FINDINGS

On the subject of per worker output, North versus South, Seabury Stanton of New Bedford, a leader to keep the industry in New England, points to a survey made by textile engineers of comparative work assignments in mills of both sections. He says it showed that work performed by New England's 70,-000 cotton and rayon employees would be handled by 52,278 workers in the South.

The union replies that, because of differences in managements, machines, and materials with which they work, it is impossible to get a fair comparison of work loads in two adjacent mills, much less in northern and southern plants.

Some employers say tradition is responsible for limitation of production. A woolen executive said his employees had the attitude of, "My father operated our loom. Why should I handle more?" The executive said the workers fail to take into account easier operation of present-day automatic machines as compared to the old ones operated largely by hand. On that point, the union says, it is up to managements to educate their employees.

Mr. White offered to rent a mill to the union "if these self-styled textile experts who profess to know all the answers would like to show us how to operate at a profit in this area." He said they could keep whatever profit they made "if they will agree to pay any losses and pay all of the taxes that business must pay."

American Woolen paid $2,262,000 last year in State and city taxes in Massachusetts.

### EIGHT HUNDRED AND SIXTY-ONE THOUSAND FOUR HUNDRED AND SIXTY-SEVEN DOLLARS IN SOUTH

"Our total tax bill for the same operations in one Southern State would have been $861,467," Mr. White said.

A New England manufacturer who is moving South will be free of property taxes on the new $6,000,000 mill he will operate. The city in Mississippi floated a bond issue to build and equip the mill. The manufacturer gets it on a long-term lease.

As a means of meeting this sort of competition, Governor Dever has proposed to the Massachusetts Legislature setting up of a State authority to build plants, lease them to industry, and pay a fixed fee in lieu of taxes to communities where they are located.

Similarly, Gov. Dennis J. Roberts, of Rhode Island, has suggested creation by the State of a revolving fund to be used to induce new industry to come into the State, help acquire plant sites, etc.

### STIPULATIONS TO UNION

Mr. Cock, of the Rhode Island Textile Association, said that to solve the crisis the union should agree to:

"Give blanket approval to all New England mills to install workloads comparable with the South, with the understanding the workloads must be checked by impartial and competent firms of textile engineers.

"Declare a moratorium on all demands on northern mills until such time as the 30-cent (pay) differential is wiped out or, at least, narrowed to not over 10 cents an hour."

Since the manufacturers' solution involves getting employees to work harder for the same pay, obviously it will be a very tough proposition to put over.

### POVERTY AMID PLENTY—ONCE-PROSPEROUS TEXTILE CITY FACES THREAT OF EXTINCTION

#### (By James Y. Newton)

LAWRENCE, Mass., February 2.—A threat of extinction hangs heavily over Lawrence, Mass., and it is not caused by fear that a Russian plane may drop an A-bomb.

This once-prosperous textile-manufacturing center, almost due north of Boston, is in more trouble than at any time since an enterprising group of Yankees, known as the Essex Co., dammed the Merrimack River, built two canals, and laid out the mill city over a century ago.

There are over 13,000 workers unemployed in Lawrence, a city of 85,000 with an area population of 126,000. More than 20 percent of an unusually big work force of 60,000 are looking for a job and not finding it. The State employment security division listed 68 job openings, most of them in small shops or as domestics.

#### FUTURE ALSO UNCERTAIN

But that is only part of the story of the sad plight of Lawrence, a story that is repeated many times in the cities and towns of Massachusetts and other New England States. The threat to Lawrence and other textile cities lies more in what the future may bring rather than in its present low economic state.

The American Woolen Co.—the General Motors or United States Steel of the wool industry and producer of over 20 percent of the country's woolen and worsted cloth—has hung a veritable Sword of Damocles over Lawrence.

Francis W. White, American Woolen's president, bluntly told the Lawrence Chamber of Commerce recently, "We are now giving serious consideration to moving all our operations out of this, and other New England communities."

#### CAN'T COMPETE WITH SOUTH

The news shook New England like an earthquake. The reason American Woolen is considering moving out, bag and baggage, is an old story in cotton textiles, a much newer one in woolen and worsteds. It is the inability of northern mills to operate on a competitive basis with mills in the South. Lower costs, Mr. White said, enable southern mills to undersell his company from 30 to 50 cents a yard.

For this situation, Mr. White blamed high State and local taxes that are more than double those of the South, lower productivity of northern workers, and "make work" policies of the textile unions. Most New England workers belong to unions, against comparatively few in the South.

Mr. White and other producers held the matter of what they called getting "a fair day's work" from men and machines of more

immediate importance in meeting southern competition than the wide differential in pay that exists. Most of this gap, estimated at 30 cents an hour per worker in wages and fringe benefits, they feel can be bridged by superior know-how of Yankee management and workers, provided the work assignments of North and South are equalized.

### PRODUCE MOSTLY WORSTEDS

Lawrence's over 22,000 textile workers are employed almost exclusively in making worsteds, tight-woven woolen cloth used in making suits for American Woolen and other concerns. The woolen-worsted industry in the South is growing, but as yet amounts to only about 15 percent of the national total.

Mr. White's words were not unexpected in Lawrence. American Woolen already was opening a new mill in Raleigh, N. C. But business, union leaders, and workers still were deeply shocked by the announcement. It meant that movement southward was on in full force if this old New England firm was considering moving out. Mr. White said his company was searching for other mills and mill sites in the South.

"We have, at present, every intention of removing a great deal more of our machinery from this area," he said. "Whether any of it will remain here depends entirely on whether we and our workers can operate mills in this city, and in New England, on a competitive basis with the mills and workers of the South."

### EMPLOYS 20,000 WORKERS

American Woolen employs 20,000 persons at present, the vast majority in a score or more New England mills, and from 6,000 to 8,000 in three big mills in the Lawrence area. Full employment of the company in Lawrence is 12,000. If American Woolen moves, other mills likely would follow. Add this to the already long list of unemployed and an appreciation may be had of the enormity of the threat to Lawrence's existence.

The busiest place by far in Lawrence is the employment security office, where those who are out of work come to file claims for unemployment compensation, pick up checks, and sometimes look for a job. The unemployed come in droves, over 2,000 a day, and about 70 percent are textile workers. Well dressed and well fed for the most part, they form a true cross section of the New England population. They are old-line Yankees, people of Irish, Italian, and French extraction.

### MUCH LIKE DEPRESSION

An Italian construction worker said he was having a tough time supporting his two children because his wife, a worsted-mill employee, was out of work, too. He couldn't find anything much to do in winter, a few odd jobs shoveling snow, etc. She was getting about a week of work per month. They were getting by with a big assist from unemployment compensation of $25 a week each, plus $4 extra for the children.

"This is as bad as the depression as far as I am concerned," commented a big Irishman who said his compensation had about run out. An unmarried millworker, he had worked only 3 weeks the past 6 months. A brother, who worked about half the time, helped support their aged parents.

A wool sorter, 39, said he had a difficult enough time supporting his wife and three young children even when working full time at $35 a week. He had worked very little since last spring, but the neighbors "have been wonderful."

"Things are rotten around here," said a 34-year-old mill truck driver who was out of work a week. "But they are going to get tougher, especially if they (the mills) go South."

A well-dressed woman, 36, said both she and her husband have been laid off by a mill which had run out of orders. Neither was able to find another job.

A first-aid girl, 40, had been out of a job since November. She had recently married a small-dairy farmer of nearby New Hampshire whose 15 cows "help see us through." She was discouraged about the job outlook "because they don't want women around here after you are 40."

None of those interviewed blamed the employers for the situation. They seemed to accept unemployment as a matter of course in New England's feast-or-famine textile industry.

### FEW CASES OF DISTRESS

Despite the high unemployment, there are few instances of distress among the people of Lawrence. There were 360 families on relief, compared to 340 a year ago when there were only about half as many jobless.

Another paradox was that business in the city was surprisingly good, as gaged by the usual barometers. Savings deposits dropped 10 percent the past year; goods carried off by train and trucks was down 20 percent; retail sales were off 2 or 3 percent; delinquencies on time sales were less than one-fourth percent.

But city officials said all of this could change quickly for the worse unless things picked up at the worsted mills, and a pick-up wasn't in sight. There were about 10,300 persons receiving weekly unemployment checks, and new claims were running about 2,000 a week. A total of nearly 6,000 had exhausted compensation. This number is increasing because the present depression in Lawrence began last May, the end of the post-Korean boom in textiles.

### WORK DIVIDED UP

Both business and union officials said that share-the-work clauses in union contracts with the mills had done much to prevent real hardship in Lawrence. Whatever work the mills get is divided among what is called the normal work force—generally about 65 percent of capacity employment. These are workers of 10 years or more seniority. This results in the regulars getting somewhat less than a week's work out of every two. They get unemployment compensation for the week they are out.

"This plan has been the salvation of Lawrence," said Philip Salem, vice president of the AFL United Textile Workers.

"It has prevented people from choking up on their spending," commented Jack Berry, of the chamber of commerce. "Most workers here are making about $180 a month. They get $60 a week for the 2 weeks they work and $25 a week compensation the other two."

### ONE WEEK'S WORK IN 10

William E. Chessl of the CIO Textile Workers said that despite the share-the-work plan some of their members were getting only a week's work out of each 10.

"The employment situation here became acute last July and people are running out of compensation now," he said. "The picture will get very dark the next month or so unless the mills pick up."

Lawrence inaugurated a new mayor this month, John J. Buckley, 35, a graduate of Georgetown University. Running on a platform built around immediate action on unemployment, he unseated, in a nonpartisan election, a man who had held the job for 10 years. Both are Democrats.

Mayor Buckley admits constructive fulfillment of his campaign promise will be very difficult. He plans to offer full cooperation of his government to both labor and management in the effort to solve the employment problem, hire a trained industrial engineer, appoint a new industrial development committee to replace the old one which resigned when he came in.

"We must retain our present industries and bring in new and diversified ones," he said.

New and diversified industry is Lawrence's real hope of curing unemployment. Mr. Barry, of the chamber of commerce, said:

"We need 10,000 new jobs in diversified industries to provide pretty full employment. Of course, if our woolen manufacturers move out that would change the picture. In 1948 and 1949 we got 1,500 new jobs in the needle trades, men's clothing, plastics, electronics. We are shooting for anything but textiles."

Mr. Barry attributed Lawrence's plight to an excess capacity of the worsted industry generally; diminished civilian demand for clothes; heavy inventories of cloth at all trade levels; competition of synthetics—rayon, nylons, blends—and competition of southern producers "who are underbidding us on Government orders."

### UNION DEFENDS WORKERS

The CIO and the AFL cited those reasons. They said poor management and ancient machinery rather than the workers are largely responsible for low productivity at the mills.

Union contracts with most of the mills expire March 15. American Woolen and others have served notice they are not renewing on present terms. The big issue in forthcoming talks about a new contract is certain to be what is a fair day's work, rather than wages. The unions will renew the present contract. They point out the size of workloads for the employees are subject to arbitration under the present agreements where managements and unions are unable to agree.

"Productivity is where they beat hell out of us," said Mr. Barry, of the chamber. "They run four to six looms here, far more in the South."

### TAKES SLAP AT EMPLOYERS

"They, employers, believe a man has done a full day's work when he is carried out on a stretcher," commented Francis Schaufenbil, of the AFL.

Mr. White of American Woolen said worker slow-downs and "arbitrary limitations on employees' production" are among New England's major problems. And he added contracts with the unions "should allow us to accomplish the job that labor and management must do if we are going to find solutions to this problem" of southern competition.

"How much longer are we people in New England going to be outsmarted politically, economically, and industrially by other sections of this country?" Mr. White asked.

### URGES LAST-DITCH FIGHT

"Our taxes have develope. these competing areas and have aided our competitions. Our shoe industry has practically vanished to the West. Our cotton and synthetic fabric mills have, for the most part, migrated to the South. And now the once great New England woolen and worsted industry is on its way to this area. What kind of people are we to let this thing happen?

"Are city and State governments of New England ready to meet southern competition? Is this community ready to meet the competition of southern communities? Are you workers ready to meet the competition of southern workers? You are going to have one more opportunity to do this and, if you are ready, I solemnly promise you that as president of the American Woolen Co. I will join you in the fight of our lives to keep our mills here."

---

POVERTY AMID PLENTY—HARD-HIT NEW HAMPSHIRE CITIES FIGHT TO AVERT GRIM DISASTER

(By James Y. Newton)

MANCHESTER, N. H., February 4.—The two largest cities of New Hampshire—Manchester and Nashua—prove today that an industrial community by hard work and enterprise can turn back from the brink of economic disaster.

Each had its economic foundation knocked out by sudden collapse of textile industries upon which the cities were depended. The way each picked up the pieces and built a new and sounder business foundation should be inspiration to other hard-pressed New England textile cities and other one-industry towns about the country.

Both Manchester and Nashua still have many problems. They must bring in additional new industries to furnish jobs. Unemployment still is severe, particularly in Nashua, which recently received the second hard blow in 4 years in the closing of a big textile mill. But both cities have passed most of the rough spots to security.

The Nashua story is largely one about the efforts of a young ex-GI, 33-year-old Hugh Gregg, who pulled the city together when it was falling apart and, as a reward, may be elected the next Governor of New Hampshire.

Manchester faced virtual extinction and became a national problem in 1936 when the Amoskeag, world's largest cotton mill, closed its doors in bankruptcy. The mill buildings stretched more than a mile along the Merrimack River beside the city, and in them worked 13,000 persons, over half the city's breadwinners.

### PURCHASED HUGE MILL

This blow came before the country, and Manchester, had pulled out of the depression of the 1930's. It took a long time for Manchester to recover, but the city was saved when a group of enterprising citizens, led by Arthur E. Moreau, a hardware dealer, formed a company to purchase the Amoskeag property. They bought it for $5,000,000, with the help of the seven Manchester banks in handling the financing.

The new company gradually sold parts of the huge property, some to firms already in the city, others to new outside interests, until today 127 different companies are doing business in the mill yard. There is more textile manufacture than any other single type, but the enterprises are well diversified, making literally everything from soup to caskets. The firms employ 12,500, well over half of the city's industrial workers.

The two largest manufacturing industries are textiles and shoes, in the city of 82,000. Both have been in the doldrums, but the shoe companies dropped prices a dollar a pair, and business has picked up. Manchester's rayon and blended textile mills also are busier than those in other parts of New England.

Unemployment has been reduced in the past year to 2,600, or 6 percent of the working force. Total payrolls in the city have risen nearly 10 percent in the last year, and business was reported as generally good.

### CIO REPRESENTS WORKERS

The textile workers are organized in the CIO Textile Workers Union, which represents most employees of the industry in New England. On the subject of productivity, Michael Botelho, CIO State director, said the Manchester workers produce more than those of adjacent cities, because they worked with newer machinery and daily work assignments were larger.

New England manufacturers blame low workloads largely for their inability to compete with textile mills of the South.

"We pioneered in higher workloads," Mr. Botelho said, "and the rest of New England is going to follow. The employers in this neck of the woods tackled the problem of modernizing their plants in very vigorous fashion. They didn't wait until the bottom dropped out of their machines. Now they are reaping the benefits."

Nashua, hard by Manchester, and near the Massachusetts border, received its biggest jolt in 1948 when the Textron Corp., employer of 3,600 people in a city of 33,000, announced it was closing its two cotton mills. The company, headed by Royal Little, was one of the country's largest cotton goods manufacturers. It had purchased the mills only 2 years before, and the Nashuans flocked there to work.

### LED TO SENATE PROBE

The shut-down of the mills led to a congressional investigation of Textron and its charitable trust operations, by a committee headed by Senator TOBEY, Republican, of New Hampshire.

Textron sold the machinery in one plant, employing 2,200, and it was moved away.

It was at that time young Hugh Gregg started to move. The son of a wealthy woodwork manufacturer, he had opened a law business in 1946 after 4 years in the Army. Meantime, he was elected as alderman-atlarge of Nashua.

Mr. Gregg rounded up some of the leading citizens of the town to buy the Textron mill properties. They set up the Nashua Foundation, a public trust, main purpose of which was to promote the welfare of Nashua and solve the job problem created by the Textron closing. Any profits made by the foundation were to go to the New Hampshire Society for Crippled Children and Handicapped Persons.

The foundation bought the two mills for $500,000, raising a down payment of $100,000 from banks and other firms and giving Textron a $400,000 mortgage. They leased the smaller mill, electric plant, bleachery, and die works back to Textron at $66,000 a year. Textron, meantime, had decided to continue operations at the smaller plant and the lease was for 10 years.

### SOLICITED NEW BUSINESS

Then, Mr. Gregg and his coworkers scurried about the country persuading new business to move into Nashua and take over the larger mill property purchased from Textron.

They succeeded well, bringing in 12 firms, the largest of which make electronic equipment, greeting cards, and shoes. The firms employ about 2,350 people, more than were laid off by Textron.

The enterprise has worked out so well that the foundation has paid off the $400,000 mortgage to Textron and most of its debts about town. The Society for Crippled Children is assured of a large and steady income. Property owned by the foundation now is valued at $1,000,000 and the rents are coming in.

Largely because of his work for Nashua, Mr. Gregg was persuaded to run for mayor in 1949. He surprised friends by winning, despite some heavy handicaps. Nashua is a Democratic mill town. Sixty-five percent of the people are Catholic and of French-Canadian descent. Mr. Gregg, a Republican, is from a wealthy Protestant family. His opponent was an elderly doctor, of French-Canadian descent, who said if only all of the babies he had delivered would vote for him he would win. But he didn't.

### TO RUN FOR GOVERNOR

Now Mr. Gregg, who was called back into the Army on a Reserve commission before his term as mayor was up, has declared for the Republican nomination as Governor. He is expected to be released by the Army soon and his friends are betting he will win again.

Meanwhile, Textron last fall began closing their second plant—the one it ceased from the Foundation. So far about 1,200 persons have lost their jobs. Officers of the Foundation said that Textron is still paying the rent but it does not appear they will reopen the mill.

It poses a new problem for Nashua. The city has 2,000 unemployed, about half of whom are still out of work because of the latest Textron shutdown. There are 1,800 receiving unemployment compensation.

The Foundation set up by Mr. Gregg and his friends is stymied for the moment because Textron still has a lease on the plant and it is the only vacant manufacturing space in the city.

### HARDSHIP CASES

The situation has brought real hardship to some of Nashua's people.

Thomas J. Pitarys, head of the CIO Textile Workers' Union in the city, cited the case of a man and wife and 11 children, who lost his job with Textron. He has been unable to get work and is collecting $28 a week compensation. One daughter is netting $23 a week in a shoe factory. A boy in the family has just reached the age of employment and hopes to go to work soon. Meantime, the whole 13 are getting by on $51 a week.

Another case, Mr. Pitarys said, involves a widower with 7 children, the youngest only 4 years old.

"His means of support," continued Mr. Pitarys, is $28 per week unemployment compensation, some aid from charitable organizations in the community and a little aid from the neighbors."

Another man, 56, has a wife, who is in poor health, and four children. He gets the $28 a week, but he has to pay $45 a month rent. He doesn't know where his next job will come from, because the textile industry seldom hires men his age.

### [From the Wall Street Journal]
### TEXTILE MARKETS—COMPANIES SELL BELOW COST TO KEEP MILLS BUSY; TWO MORE PLANTS CLOSED

#### (By T. A. Wise)

The gloom overhanging the textile industry grew thicker last week.

More mill closings or curtailments were announced, new price reductions were made and trading in the textile markets showed no signs of picking up. Mills also were selling their products below cost to keep operating.

Last week a mill closed in the North and one in the South. The Hathaway Manufacturing Co. in New Bedford, Mass., announced it was closing its rayon division this week and would reopen on February 25 operating on a two-shift, three-day-week basis.

The curtailment is due to the extremely adverse market conditions, the management stated.

Seabury Stanton, president, in explaining the action, said the company finds itself undersold by a substantial margin almost every day, "even when we cut our prices below our actual costs."

"We recently bid on a Government order for approximately 10,000,000 yards," Mr. Stanton noted. "We put in a bid substantially below our actual cost because we wanted this order badly enough to keep our plant running on its present schedule. But when the bids were awarded we were able to get only a small part of it, less than 500,000 yards—because we were greatly underbid by other mills. As a matter of fact, ours was the highest bid which was awarded any part of the contract and our bid was sharply below our actual cost."

Several other mills in the rayon, woolen, and cotton goods market agreed that many mills are submitting below cost bids on Government contracts merely to keep their plants busy and their working force intact.

Last Friday, Albert A. List, president of William Whitman Co., of Lawrence, Mass., said he was able to buy goods from a Pennsylvania mill for 30 cents a yard less than it would cost his mill to make.

### MILL CLOSED IN GEORGIA

The mill closing in the South was announced by A. D. Juilliard, Inc. The company said it is closing its Floyd Mills plant in Rome, Ga. The plant manufactures cotton corduroy and light duck. The company blamed poor market conditions and added that a recent 8 cents an hour wage boost to employees had made the plant wage scale the highest in the South.

The action of Celanese Corp. and Tennessee Eastman Corp. in slashing the price of acetate staple fibre from 48 cents to 42 cents a pound was one attempt to boost sales. Stocks of acetate staple have piled up to a point where they are over seven times greater than the inventories on hand a year ago.

The move is also significant because for the first time it wipes out the traditional gap between the prices of acetate and viscose staple rayon. Some rayon men immediately forecast a price cut in the price of viscose rayon. But the statistics don't bear out their predictions. In the last 3 months of 1950 shipments of acetate staple totaled 31,000,000 pounds, while in the last quarter of 1951 they were only 24,000,000 pounds. But viscose staple shipments jumped in the same period from 49,200,000 pounds in 1950 to 52,800,000 in the last 1951 quarter.

The rayon fabric makers took the news in stride, asserting it would be some months before the benefits of such a price cut would mean much at the mill level where fabric prices are already depressed.

### NYLON ALLOTMENTS CUT

Hosiery and lingerie makers raised a sort of "tempest in a teapot" when it was announced that the DuPont Co. was cutting March nylon allotments by 20 percent. The reason: the Government is buying more of the synthetic fabric for military use.

But before the threat of a nylon shortage could be spread some nylon dealers explained that production of the synthetic yarn had increased rapidly since last fall. It is probable that even after the 20 percent cut in allocations there will be more nylon yarn available to the industry as a whole than was produced last fall.

The hosiery industry had one other stormy development last week when Julius Kayser Co. and the rest of the Nation's hosiery makers clashed. Kayser claims patent rights on a specific technique of finishing off stockings. The "loopless toe" system of making a pair of women's stockings has been used widely in the industry since the introduction of nylon. But Kayser claims it has patent rights on the method and informed an estimated 500 manufacturers they are infringing on its patent rights. Last week 100 hosiery makers joined to file suit voiding Kayser's patent rights.

Actual trading in the Worth Street cotton goods market last week was nil as buyers stayed on the side lines watching the erratic price movements of cotton futures. Raw cotton prices tumbled as much as 44.50 a bale at the beginning of the week, recovered some ground and then declined again on the week end. The mills again asserted they are confident some of their customers will be forced to buy soon but those customers seem able to go to the second-hand market to get goods.

In the wool goods market trading was still in nominal amounts. Wool men noted, with some uneasiness, that raw fleece prices declined about 5 percent in the Australia auctions last week.

The Chatham Manufacturing Co. reported its 1952 blanket line prices would be reduced. An example: One all-wool blanket that sold for $14.95 last year will be $12.95 this year.

Mr. BRIDGES. I yield the floor.

Mr. O'MAHONEY. Mr. President, I should like to say to the Senator from New Hampshire that I am sure all Members of this body share the belief that Congress should give the very closest scrutiny to the problems he has outlined.

All members of the Committee on Interior and Insular Affairs are, I am sure, concerned that no improper advantage of the generous laws of the United States should be taken to the detriment of any State in the Union.

Mr. President, I ask unanimous consent to have printed in the RECORD at this point a memorandum on conditions in Puerto Rico, which has been submitted to me by Dr. A. FERNÓS-ISERN, Resident Commissioner of Puerto Rico, in response to my request. This memorandum is accompanied by two exhibits, one a résumé of legislation enacted by the Congress of the United States for Puerto Rico since the occupation of Puerto Rico by United States troops in the Spanish-American War, and the second, a list of expenditures from Federal grants-in-aid made to agencies of the government of Puerto Rico from the year 1949–50 to 1951–52.

The PRESIDING OFFICER (Mr. SPARKMAN in the chair). Is there objection?

There being no objection, the memorandum and exhibits were ordered to be printed in the RECORD, as follows:

MEMORANDUM FROM A. FERNÓS-ISERN, RESIDENT COMMISSIONER OF PUERTO RICO

Puerto Rico has been termed the Gibraltar of the Caribbean. The headquarters of the Tenth Naval District is there; the Army Antilles Command has its quarters there; the Air Force has its Fifty-fifth Strategic Reconnaissance Wing. Expenditures in Puerto Rico by the Defense Department vary from year to year. Neither the people of Puerto Rico nor the government of the Commonwealth of Puerto Rico have any authority or control over these expenditures. Defense expenditures are by far the largest made by the Federal Government in Puerto Rico, more so if payments to veterans are included. Puerto Ricans are subject to military service as are all other United States citizens.

The people of Puerto Rico do not share the tax burden for defense, but they do make notable contributions to it. These contributions are in blood, loyalty, and devotion to democratic principles.

More than 75,000 Puerto Rican youths served the colors during the Second World War. Since the beginning of the current conflict, the Sixty-fifth Infantry Regiment has been fighting for the cause of democracy in Korea. The Sixty-fifth Infantry Regiment is made up mostly of Puerto Ricans. Its fine record speaks for itself.

Puerto Rico is the one spot where the prestige of American institutions, as wise and proper for Spanish-Americans, either rises or falls.

Puerto Rico contains only 3,500 square miles. It is densely populated. Its population figures, according to the last census, exceed 2,200,000; more than 600 people per square mile. It is an agricultural community. Land is too scarce and too precious for the people to give up. However, whenever the Defense Department requires land for its installations, the Federal Government acquires it under the same procedures as in the mainland. Owners are compensated for their land acquired by the Government, but the available arable land area in Puerto Rico grows even smaller as the defense installations expand. Production is thus diminished, and the commonwealth government and its municipalities are deprived of taxes.

The greater part of the municipality of Culebra and two-thirds of the land in the municipality of Vieques have been taken over by the Navy. Culebra and Vieques are unable to finance their own municipal governments. It is necessary each year for the commonwealth government to appropriate money to help maintain local government in Culebra and Vieques. Many people from Culebra and even more from Vieques, have had to emigrate to the Virgin Islands.

Large expanses of agricultural land are held by the Navy in the eastern part of Puerto Rico (Ensenada Honda). Fine sugarcane land is held by the Army at Camp O'Reilly. The Air Force has a sizable area on the northwest tip of Puerto Rico, and it is still expanding. Valuable lands in and around San Juan have been relinquished by the insular government for defense installations. Puerto Rico has always been entirely willing that the military acquire land to the extent that it is necessary in the interest of the national defense.

The economic development of Puerto Rico is of concern not alone to Puerto Rico. It is to the economic interest of the United States that Puerto Rico be developed economically. Amongst other reasons, and since the United States tariff is operative in Puerto Rico, Puerto Rico is an almost exclusive market for United States products. In 1950–51, Puerto Rico sold $284,839,190 worth of merchandise to the United States. This includes the added value of the tax on rum shipments to the tune of $13,027,348 (this tax is paid directly by Puerto Rican producers), and the benefit payments to sugar producers in the amount of $17,474,000. In the same year, Puerto Rico purchased $400,397,676 worth of goods at domestic prices, from the mainland. There are no customs duties on trade between Puerto Rico and the mainland.

Since 1900, under the first organic act, it has been the policy of Congress to exempt Puerto Rico from federal taxation and to let the government of Puerto Rico be entirely locally supported.

From 1900 when the first organic act was passed until the years of the great depression, there were few Federal services operating in Puerto Rico. No grant-in-aid laws existed, and no special Federal help of importance was extended to Puerto Rico except following the 1928 hurricane when Public Resolution 74, Seventieth Congress created the Puerto Rico Hurricane Relief Commission to assist in the rehabilitation of agriculture in the island and to aid in the repair and restoration of schools and roads and to aid in providing employment for unemployed and destitute laborers. The resolution authorized $6,000,000 for agricultural loans with 5 percent interest and $2,100,000 for schoolhouses and roads and seeds. An additional authorization for $2,000,000 loans and $1,000,000 for rehabilitation were given in 1930.

Puerto Rico was included within the emergency recovery measures designed to meet the depression, and was thus tided over until the inception of the Second World War. Since that time, Federal services have been gradually and increasingly extended. Federal legislation especially extending such services to Puerto Rico is listed in exhibit 1.

TABLE OF THE MORE IMPORTANT CIVILIAN FEDERAL AGENCIES OPERATING IN PUERTO RICO

1. Department of Agriculture including—
   (a) Farmers Home Administration.
   (b) Production and Marketing Administration.
   (c) Soil Conservation Service.
   (d) Agricultural experiment stations.
2. Department of Commerce.
3. Federal Security Agency.
4. Department of Justice.
5. Department of Labor.
6. Post Office Department.
7. Selective Service System.
8. Veterans' Administration.

During the Second World War, Puerto Rico was hard hit economically because of the submarine blockade. Its sugar production was severely curtailed for lack of fertilizer and converting the sugar fields for the production of food crops—all due to shipping difficulties.

No war industries were established in Puerto Rico. However, the rum industry boomed, since production of whisky was reduced in the United States. This allowed Puerto Rico to collect unprecedented revenues from rum shipments. But the boom in the rum industry ended as soon as whisky production in the States was resumed. The rum tax dwindled to very low figures. It has been gradually recovering to a little higher prewar levels. Reference is made below to the exact income from this source.

The revenues of the Commonwealth of Puerto Rico are derived from customs duties, locally imposed internal-revenue taxes, including the income and the excise taxes; from its real-estate taxes and from the excise tax on shipments of certain Puerto Rican products to the States, which is collected under law of Congress and is equal to United States excise tax on like products.

Customs duties yield very little as follows:

*Income from customs in Puerto Rico*

| Year | Amount |
| --- | --- |
| 1944–45 | $2,150,000 |
| 1945–46 | 3,439,000 |
| 1946–47 | 2,975,000 |
| 1947–48 | 2,567,000 |
| 1948–49 | 2,197,000 |
| 1949–50 | 2,193,000 |
| 1950–51 | 3,054,000 |

A résumé of the situation: Since Puerto Rico came under United States sovereignty it has been the policy of Congress not to tax the people of Puerto Rico to support the Federal Government. The government of Puerto Rico has been required to support itself with its own income, without Federal appropriations. Foreign imports coming into Puerto Rico are subject to tariff rates equal to those applied in the United States. This revenue has been covered in the insular treasury. There has been no tariff between Puerto Rico and United States. Federal agencies operating in Puerto Rico as elsewhere in United States are supported and administered by the Federal Government. Special appropriations for Puerto Rico have been made from time to time only because of serious emergencies.

The Sugar Act, as will be explained, has modified free-trade arrangements between Puerto Rico and the United States by curtailing the free and unhampered admission of Puerto Rican sugar into the continent.

That Puerto Rico's government be locally supported was provided under the 1900 organic act as follows:

"SEC. 12. That all expenses that may be incurred on account of the government of Puerto Rico for salaries of officials and the conduct of their offices and departments, and all expenses and obligations contracted for the internal improvement or development of the island not, however, including defenses, barracks, harbors, lighthouses, buoys, and other works undertaken by the United States, shall be paid by the Treasurer of Puerto Rico out of the revenue in his custody."

Section 6 (1917 Organic Act of Puerto Rico): "That all expenses that may be incurred on account of the Government of Puerto Rico for salaries of officials and the conduct of their offices and departments, and all expenses and obligations contracted for the internal improvement or development of the island, not, however, including defenses, barracks, harbors, lighthouses, buoys, and other works undertaken by the United States, shall except as otherwise specifically provided by the Congress, be paid by the Treasurer of Puerto Rico out of the revenue in his custody."

This latter provision will continue in force as part of the Puerto Rico Statute of Federal Relations after the Constitution of Puerto Rico goes into effect.

Appropriations are made by Congress for the support of the Territorial governments of Hawaii, Alaska, Guam, Samoa, and the Virgin Islands, but not for Puerto Rico. In this sense, Puerto Rico therefore has occupied a unique position, similar only to that of the Philippine Islands while they were under United States sovereignty.

Puerto Rico participates in grant-in-aid programs as shown in exhibit 2. The Government of Puerto Rico matches these funds according to Federal law either within the formulas applied to the States or by special formulas.

The Government of Puerto Rico operates within the scope of a State government. Federal Government agencies operate in Puerto Rico as anywhere else in the United States. This stems from section 9 of the organic act which is preserved in the Puerto Rico Statute of Federal Relations. Section 9 reads as follows:

"That the statutory laws of the United States not locally inapplicable, except as hereinbefore or hereinafter otherwise provided shall have the same force and effect in Puerto Rico as in the United States, except the internal revenue laws: *Provided, however,* That hereafter all taxes collected under the internal revenue laws of the United States on articles produced in Puerto Rico and transported to the United States, or consumed in the Island, shall be covered into the Treasury of Puerto Rico."

The latter taxes are those levied on Puerto Rican shipments to the United States. They are collected from producers before shipment.

There are two fundamental practical differences between the status of Puerto Rico and that of a State:

1. Puerto Ricans, although under the jurisdiction of Federal law, equally as citizens of any State (under sec. 9 of the organic act above quoted), take no part in National elections and are represented in the Congress only by a voteless Member of the House of Representatives.

2. Puerto Rico is included in the United States Customs Union (Federal Tariff System) but customs collected in Puerto Rico are deemed to be local revenue. No Federal revenue taxes are collected in Puerto Rico, except on income derived from sources outside Puerto Rico. As before mentioned, taxes equal to United States internal revenue taxes are collected on locally produced merchandise before shipment to the mainland, and are deemed to be local revenue.

Puerto Rico is unincorporated Territory. That is to say, although subject to the sovereignty of the United States in accordance with the terms of the Treaty of Paris of 1898, constitutionally it is not a part of the United States.

As aforementioned, there are no customs duties on trade between Puerto Rico and the mainland, although this does not exactly mean free trade. Congress has extended the Federal minimum wage law to Puerto Rico under a flexible arrangement, and merchandise shipped from Puerto Rico to the United States must be produced under a minimum wage system established and enforced by United States officials under United States law.

Again, sugar, Puerto Rico's most important product, is subject to the quota system. The sugar act allows a fixed amount of Puerto Rican sugar to be sold in the mainland and only a small proportion of it may be refined in the island. It must be sold raw to be refined in the mainland. There are no restrictions to shipments from the mainland to Puerto Rico.

Puerto Rico is included within the coastwise shipping laws of the United States. Trade between Puerto Rico and the United States must be carried by United States registered boats.

Since merchandise produced in Puerto Rico and shipped to the mainland is subject to a tax equal to the internal revenue tax of the United States regularly collected before shipment and covered into the Puerto Rico Treasury, United States manufacturers are protected from unfair competition from Puerto Rican producers in the mainland market. They are also equally protected in Puerto Rico against any discrimination, since under the organic act, excise taxes in Puerto Rico on mainland products therein consumed must be equal to those collected on local products.

Excise taxes collected on merchandise shipped from Puerto Rico to the United States have yielded to the Treasury of Puerto Rico:

| Year: | Total |
|---|---|
| 1944–45 | $37,448,000 |
| 1945–46 | 33,217,000 |
| 1946–47 | 18,232,000 |
| 1947–48 | 2,661,000 |
| 1948–49 | 7,440,000 |
| 1949–50 | 9,575,000 |
| 1950–51 | 13,501,000 |

During the first 6 months of the fiscal year 1951–52 revenues from this source amounted to $6,946,638.

This tax, principally from rum, apparently has brought about great confusion and misunderstanding. Naturally, it is to be expected, the Puerto Rican producers pass as much of this tax along to the consumer as they are able to do. Moreover, the tax is collected by United States Treasury officials in Puerto Rico. Therefrom comes the interpretation that Federal tax money is turned over each year to Puerto Rico. It comes to be a rather technical matter. In practice this arrangement, as I see it, was established by the Congress in 1900 in consideration of the fact that under the Spanish regime, the customs and export taxes were very important sources of revenue for Puerto Rico. The application of United States tariff rates on foreign imports into Puerto Rico and free trade with the mainland would channel Puerto Rico's commerce toward the United States, and very little foreign trade would take effect. This is exactly what has come to pass. The tax on shipments to the United States would have to take the place of the former customs and export tax revenues.

Fifty years have elapsed, however. Sugar has become our mainstay. But free trade has been curtailed in this important commodity under the sugar-quota system. Tariff rates have been revised. Tariff protection on Puerto Rico's products (sugar, rum, needlework, fruits, tobacco, and coffee) either have been reduced or are nonexistent. Food Puerto Rico buys in the mainland in large amounts continues to have substantial tariff protection—rice, beans, meat, etc.

Although, upon acceptance of Public Law 600, the people of Puerto Rico agreed to the continuation of present economic relationships, as soon as the constitution of the Commonwealth goes into effect, it might be desirable to give attention to the 50-year-old arrangement for its over-all reexamination and possible readjustment in the light of all factors concerned, and in line with the principle of compact of Public Law 600.

The people of Puerto Rico consider themselves to be free citizens individually, and collectively to be a free commonwealth within the terms of their union with the United States. This will be more firmly established once their constitution goes into effect. They comprise a community of United States citizens living in a territory subject to the sovereignty of, but not a part of, the United States. Their status and relationship

has been determined by Congress until, as aforementioned, they have come to be the subject of a compact under Public Law 600, Eighty-first Congress.

The people of Puerto Rico love, understand, and practice democracy. They resent charges of dictatorship on the government they freely elect in honest elections, free from the taint of any fraud or pressure. They would resent any attempt to curtail their liberties either directly or indirectly. They would never tolerate dictatorship. They abhor it. They do not like colonialistic overlordship any better.

## SUMMARY

In 1950–51, Puerto Rico sold $284,839,190 worth of merchandise to the United States (including the value of tax on rum shipments, $13,027,348, and sugar-benefit payments, $17,474,000). In the same year Puerto Rico purchased from the mainland $408,397,676 worth of goods at domestic prices and carried by high-cost transportation in United States registry vessels. Foreign ships cannot be used, since Puerto Rico is included in the coastwise shipping laws.

The Government of Puerto Rico is self-financed with insular funds. No Federal moneys are appropriated by Congress for this purpose. The United States spends approximately $10,000,000 per year to maintain Federal civilian agencies operating in Puerto Rico. Roughly, $10,000,000 additional is appropriated for Puerto Rico in connection with joint grants-in-aid programs. Puerto Rico often shares in these programs under special formulas which are unfavorable to Puerto Rico as compared with the formulas applied to States. During the past 10 years an estimated average of $100,000,000 in Federal moneys may have been spent per year in Puerto Rico for defense (including bases and personnel) and payments to veterans. Only by including the latter figure could it be said that $1,000,000,000 in Federal funds is spent in Puerto Rico in a 10-year period. Against this, it has been estimated that Puerto Rico is deprived of an income of approximately $25,000,000 per year under Federal sugar legislation which prevents Puerto Rico from selling all its sugar in refined form.

### EXHIBIT 1

RÉSUMÉ OF LEGISLATION ENACTED BY THE CONGRESS OF THE UNITED STATES FOR PUERTO RICO SINCE THE OCCUPATION OF PUERTO RICO BY UNITED STATES TROOPS ON THE 25TH OF JULY 1898

1. Public Law 44, approved March 24, 1900:
An act appropriating, for the benefit and government of Puerto Rico, revenues collected on importations therefrom since its evacuation by Spain and revenues hereafter collected on such importations under existing law.

2. Public Law 69, approved April 12, 1900:
An act temporarily to provide revenues and a civil government for Puerto Rico and other purposes.

NOTE.—This was the first organic act for Puerto Rico. Under section 2, the same tariffs, customs, and duties shall be levied, collected, and paid upon all articles imported into Puerto Rico, from ports other than those of the United States, which are required by law to be collected upon articles imported into the United States from foreign countries.

This provision of law was continued under section 58 of the organic act of 1917, and will continue to be in effect under the Puerto Rican Statute of Federal Relations when the Constitution of the Commonwealth of Puerto Rico becomes effective.

Under section 3 of this same act, all merchandise coming into the United States from Puerto Rico and coming into Puerto Rico from the United States, was to be admitted at the several ports of entry, upon payment of 15 percent of the duties which are required to be levied, collected, and paid upon like

articles of merchandise imported from foreign countries. This provision was to cease not later than the 1st day of March 1902. After March 1, 1902, all such merchandise and articles were to enter and have continued to enter at the several ports of entry free of duty.

These two measures in reality created a customs union between the United States and Puerto Rico. The same section provided that articles of merchandise of Puerto Rican manufacture coming into the United States and withdrawn for consumption or sale, shall be entered at the several ports of entry upon payment of a tax equal to the internal revenue tax imposed in the United States upon the like articles of merchandise of domestic manufacture. This is what has come to be known as the rum tax.

Under section 4, the duties and taxes collected in Puerto Rico in pursuance of this act, less the cost of collecting the same, and gross amount of all collections of duties and taxes in the United States upon articles of merchandise coming from Puerto Rico, were not to be covered into the general fund of the Treasury, but held as a separate fund and placed at the disposal of the President to be used for the government and benefit of Puerto Rico until the government of Puerto Rico was organized. All moneys collected under the above provisions were to be transferred to the local treasury of Puerto Rico. Thereafter all collections of duties and taxes in Puerto Rico under the provisions of the act, were to be paid into the treasury of Puerto Rico, instead of being paid into the Treasury of the United States.

Under this act, trade between Puerto Rico and the United States was regulated in accordance with the provisions of law applicable to such trade between any two great coasting districts of the United States.

Under section 11, Puerto Rican coins in circulation were substituted by coins of the United States.

Under section 12, all expenses incurred on account of the government of Puerto Rico, were required to be paid by the treasurer of Puerto Rico and of revenues in his custody; not, however, including defenses, barracks, harbors, lighthouses, buoys, and other works undertaken by the United States.

Under section 14, statutory laws of the United States not locally inapplicable, except as thereinbefore or thereinafter otherwise provided, have the same force and effect in Puerto Rico as in the United States, except the internal revenue laws, which in view of the provisions of section 3, do not have force and effect in Puerto Rico.

This act became effective on the first day of May 1900.

3. Public Resolution 23, approved May 1, 1900:

Amongst other things, provides that no corporation shall be authorized to conduct the business of buying and selling real estate or be permitted to hold or own real estate except such as may be reasonably necessary to enable it to carry out the purposes for which it was created, and every corporation hereafter authorized to engage in agriculture shall by its charter be restricted to the ownership and control of not to exceed 500 acres of land.

NOTE.—This provision has been included as part of the Constitution of the Commonwealth of Puerto Rico.

4. Public Law 133, approved May 31, 1900:

An act to facilitate the entry of steamships engaged in the coasting trade between Puerto Rico and the Territory of Hawaii and the United States.

5. Public Resolution 32, approved June 6, 1900:

Joint resolution to authorize and empower the Banco Español de Puerto Rico to amend its bylaws.

6. Public Law 55, approved March 22, 1902:

An act for the acknowledgement of deeds and other instruments in the Philippine Is-

lands and Puerto Rico affecting land situated in the District of Columbia or any Territory of the United States.

7. Public Law 89, approved April 29, 1902:

An act to refund the amount of duties paid in Puerto Rico upon articles imported from the several States from April 11, 1899, to May 1, 1900, to confer jurisdiction of the Court of Claims to render judgment thereon and making an appropriation therefor.

8. Public Law 249, approved July 1, 1902:

An act authorizing the President to reserve public lands and buildings in the island of Puerto Rico for public uses and granting other public lands and buildings to the government of Puerto Rico, and for other purposes.

9. Public Law 166, approved March 3, 1903:

An act to refund the amount of duties paid on merchandise brought into the United States from Puerto Rico between April 11, 1899, and May 1, 1900, and also on merchandise brought into the United States from the Philippine Islands between April 11, 1899, and March 8, 1902, and for other purposes.

10. Public Law 221, approved June 11, 1906:

An act to empower the Secretary of War, under certain restrictions, to authorize the construction, extension, and maintenance of wharves, piers, and other structures on lands underlying harbor areas and navigable streams and bodies of waters in or surrounding Puerto Rico and the islands adjacent thereto.

11. Public Law 294, approved June 25, 1906:

An act defining the qualifications of jurors for service in the United States district court in Puerto Rico.

12. Public Law 359, approved June 29, 1906:

An act to provide means for the sale of internal revenue stamps in the island of Puerto Rico.

NOTE.—This act allowed payment of the tax on merchandise shipped from Puerto Rico to the United States, to be paid in Puerto Rico before shipment. Under the 1900 law, these payments could only be made at the port of entry in the mainland. At present, this tax is paid almost exclusively in Puerto Rico before shipment. The law provided for the appointment of a deputy collector of internal revenue to have charge of collections in Puerto Rico.

13. Public Law 262, approved March 4, 1907:

An act to readjust the boundaries of the naval reservations in Puerto Rico, established in pursuance of the act of July 1, 1902.

14. Public Law 265, approved February 4, 1909:

An act to impose a tax upon alcoholic compounds coming from Puerto Rico, and for other purposes.

15. Public Law 275, approved February 25, 1909:

An act to authorize Behn Bros. of San Juan, P. R., to construct a bridge across a portion of the Condado Bay at the eastern extremity of San Juan.

16. Public Law 4, approved July 15, 1909:

An act to amend an act entitled "An act temporarily to provide revenues and a civil government for Puerto Rico, and for other purposes; approved April 12, 1900."

NOTE.—A provision was added to the first Organic Act of Puerto Rico to the effect that if at the termination of any fiscal year, the appropriations necessary for the support of government for the ensuing fiscal year, shall not have been made, an amount equal to the sums appropriated in the last appropriation bills for such purpose, shall be deemed to be appropriated.

It also provided that all reports required by law to be made by the Governor or members of the Executive Council of Puerto Rico to any official in the United States, shall hereafter be made to an executive department of the Government of the United States to be designated by the President, etc.

Under this act the President placed Puerto Rico under the War Department.

17. Public Law 210, approved June 14, 1910:

An act to authorize the President to convey to the people of Puerto Rico certain land and buildings not needed for purposes of the United States.

18. Public Law 333, approved August 24, 1912:

An act to authorize the government of Puerto Rico to construct a bridge across the Caño de Martin Peña and estuary of the harbor of San Juan, Puerto Rico.

19. Public Law 346, approved January 7, 1913:

An act to provide for holding the District Court of the United States for Puerto Rico during the absence from the island of the United States District Judge and for the trial of cases in the event of the disqualification of or inability to act by the said judge.

NOTE.—Under this provision a justice of the Supreme Court of Puerto Rico under Presidential appointment, acts as a temporary judge of the United States District Court in the absence of the judge of the United States District Court.

20. Public Law 73, Sixty-third Congress, approved March 24, 1914:

An act to authorize the government of Puerto Rico to construct two bridges across the Arecibo River near the City of Arecibo, Puerto Rico.

21. Public Law 241, approved January 28, 1915:

An act to amend an act entitled "An act to codify, revise and amend the laws relating to the judiciary," approved March 3, 1911.

NOTE.—Under this act, Puerto Rico was included in the first circuit together with Rhode Island, Massachusetts, New Hampshire and Maine.

22. Public Law 312, Sixty-third Congress, approved March 4, 1915:

An act to provide for the allowance of a drawback of taxes on articles shipped to the island of Puerto Rico or to the Philippine Islands.

23. Public Law 368, approved March 2, 1917:

NOTE.—This is the second organic act adopted by Congress for Puerto Rico. The main changes were:

It included a bill of rights; Puerto Ricans were declared to be citizens of the United States; an elective senate was created to take over the legislative functions of the executive council, which theretofore had both executive and legislative functions. (The executive council theretofore had been appointed by the President of the United States by and with the advice of the Senate of the United States.)

In addition, four out of six heads of departments were to be appointed by the governor, with the advice and consent of the Senate of Puerto Rico. Two of the heads of departments were still to be appointed by the President of the United States with the advice and consent of the Senate of the United States. The governor and the auditor were also to be appointed by the President of the United States, as well as the supreme court.

Under section 58, such provisions of the first organic act as were not in conflict with the new organic act, were continued in effect. These include provisions on customs, internal revenue, coin, coastwise shipping, etc. (Already discussed above.)

24. Public Law 301, Sixty-sixth Congress, approved February 3, 1921:

To amend the Organic Act of Puerto Rico. It provides that no public money or property shall be appropriated, donated, etc., for the support of any sect, church, etc. Also it establishes a limit to the public indebtedness of Puerto Rico.

25. Public Law 334, Sixty-sixth Congress, approved February 27, 1921:

Amend section 4 of the Federal Farm Loan Act extending its provisions to Puerto Rico.

26. Public Law 327, Sixty-seventh Congress, approved September 21, 1922:

Confers to the territorial courts of Puerto Rico concurrent jurisdiction with the United States courts on all offenses under the National Prohibition Act.

27. Public Resolution 102, Sixty-seventh Congress, approved March 4, 1923:

To authorize the transportation to Puerto Rico of a committee representing the Fourth Ohio Infantry War with Spain.

28. Public Law 311, Sixty-eighth Congress, approved January 8, 1925:

Authorizes the Court of Appeals for the First Circuit to hold sitting at San Juan.

29. Public Law 467, Eightieth Congress, approved February 25, 1925:

An act authorizing the Secretary of War to convey to the Federal Land Bank of Baltimore certain land in the city of San Juan, Puerto Rico.

30. Public Law 128, Sixty-ninth Congress, approved April 17, 1926:

An act to provide for the enlargement of the present customs warehouse at San Juan, Puerto Rico.

NOTE.—An amount not to exceed $230,000 was authorized to be paid out of duties collected in Puerto Rico.

31. Public Law 165, Sixty-ninth Congress, approved May 1, 1926:

An act to provide for the completion and repair of customs buildings in Puerto Rico.

NOTE.—The sums of $7,700, $1,826.80, and $300 were to be paid out of duties collected in Puerto Rico.

32. Public Law 296, Sixty-ninth Congress, approved May 26, 1926:

An act exempting from the provisions of the Immigration Act of 1924 certain Spanish subjects residents of Puerto Rico on April 11, 1899.

NOTE.—According to the Treaty of Paris, these persons had been recognized as having a right to stay in Puerto Rico after the change of sovereignty.

33. Public Law 635, Sixty-ninth Congress, approved February 24, 1927:

An act authorizing the Secretary of War to convey to the Association Siervas de Maria, San Juan, Puerto Rico, certain property in the city of San Juan, Puerto Rico.

NOTE.—For the sum of $4,000 which was to be made available for the construction of noncommissioned officers' quarters on the military reservation at San Juan, Puerto Rico, to replace quarters then occupied by a noncommissioned officer on the land to be conveyed, as certain property was ceded under quit-claim deed to the Siervas de Maria, a religious order. The property is located on the top of the old fortifications on San Juan and contains about 6,000 square feet. It adjoins Fortaleza, the Governor's residence. It was to be used for an extension to hospital facilities therein existing. A passage of 1 meter in width was to be left along the outer wall of the fortification to remain military property.

34. Public Law 797, Sixty-ninth Congress, approved March 4, 1927:

Amends the organic act of 1917. Most important provisions are amended. Refers to acquisition of citizenship by persons born in Puerto Rico not previously provided for; increases the salary of the auditor; limits the legislative session to 60 days; creates a public service commission. It also provides that no suit for the purpose of restraining the assessment or collection of any tax imposed by the laws of Puerto Rico shall be maintained in the District Court of the United States for Puerto Rico.

35. Public Law 302, Seventieth Congress, approved April 23, 1928:

An act for the relief of certain Puerto Rican taxpayers.

NOTE.—This refers to lawsuits affected by Public Law 797.

36. Public Law 414, Seventieth Congress, approved April 23, 1928:

An act to provide for the completion and repair of customs buildings in Puerto Rico.

NOTE.—The total sum of about $50,000 was appropriated out of duties collected in Puerto Rico.

37. Public Resolution 74, Seventieth Congress, approved December 21, 1928:

Joint resolution for the relief of Puerto Rico.

NOTE.—This was passed as a result of the hurricane which swept over the island in September 1928. The Congress appropriated $50,000 for administrative expenses of a commission made up of the Secretary of the Treasury, the Secretary of War, and the Secretary of Agriculture, with the Secretary of War as chairman. The commission was empowered to make loans to individual coffee planters, coconut planters, fruit growers, or other agriculturists in the amount for Puerto Rico in amounts not to exceed $25,000. Six million dollars was authorized. Moneys received as repayments were to be used as a revolving fund thereafter to be covered into the Treasury as miscellaneous receipts. Also, an appropriation of $2,000,000 was authorized for the rebuilding and repairing of schoolhouses, and for the employment of labor and the purchase of materials for repairing insular and rural municipal roads. One hundred thousand dollars was authorized for seeds and seedlings.

38. Public Resolution 33, Seventy-first Congress, approved March 4, 1929:

To amend the second paragraph of section 4 of the Federal Farm Loan Act, as amended.

NOTE.—Extends certain provisions of the Federal Farm Loan Act to Puerto Rico and Alaska.

39. Public Resolution 33, Seventy-first Congress, approved January 22, 1930:

Joint resolution to authorize additional appropriations for the relief of Puerto Rico.

NOTE.—An additional appropriation of $1,000,000 was made for loans and $2,000,000 for the building and repairing of school houses and employment of labor and for repairing and constructing of insular and rural municipal roads.

40. Public Law 677, Seventy-first Congress, approved February 18, 1931:

To amend the Organic Act of Puerto Rico, approved March 2, 1917.

NOTE.—It added a Department of Labor to the Government of Puerto Rico.

41. Public Resolution 129, Seventy-first Congress, approved March 3, 1931:

It extends sections 1, 2, 6, and 7 of the act of Congress entitled, "An act to provide for the protection of forest lands, for the reforestation of denuded areas, for the extension of national forests, and for other purposes, in order to promote the continuous production of timber on lands chiefly suitable therefor" to the territory of Puerto Rico, approved June 7, 1924.

NOTE.—This seems to be the first time a special law was passed extending a permanent Federal service to Puerto Rico since the enactment of the 1900 Organic Act where such services as lighthouses, buoys, maritime quarantine were placed under Federal Government.

42. Public Law 791, Seventy-first Congress, approved March 3, 1931:

An act to extend the provisions of certain laws relating to vocational rehabilitation to Puerto Rico.

NOTE.—$105,000 was authorized for Puerto Rico.

43. Public Law 846, Seventy-first Congress, approved March 4, 1931:

An act to provide for the extension of agricultural experiment stations to Puerto Rico.

NOTE.—The agricultural experiment station to be connected with the College of Agriculture of the University of Puerto Rico. There is a separate Federal Agricultural Experiment Station in Puerto Rico conducted for general national purposes.

44. Public Resolution 20, Seventy-second Congress, approved May 17, 1932:

To change the name of the island of "Porto Rico" to "Puerto Rico."

NOTE.—Since 1900, through error, Puerto Rico had been officially designated as "Porto Rico." Evidently a misspelling.

45. Public Law 108, Seventy-third Congress, approved March 2, 1934:

An act to repeal prohibition in Puerto Rico.

46. Public Law 411, Seventy-third Congress, approved June 18, 1934:

Ratified a resolution approved by the Legislature of Puerto Rico imposing an import duty on coffee imported into Puerto Rico.

NOTE.—Coffee is the only item on which the Puerto Rico tariff is not identical with United States tariff.

47. Public Law 477, Seventy-third Congress, approved June 27, 1934:

Amends the Organic Act of Puerto Rico, approved March 2, 1917.

NOTE.—Provides for certain persons to become citizens of the United States.

48. Public Resolution 29, Forty-fifth Congress, approved June 17, 1935:

Provides for the extension of cooperative work of the Geological Survey to Puerto Rico.

49. Public Law 236, Seventy-fourth Congress, approved August 3, 1935:

Exempts refunding bonds of the Government of Puerto Rico from the limitation of public indebtedness under the Organic Act.

50. Public Resolution 51, Seventy-fourth Congress, approved August 20, 1935:

Amends the previous act ratifying a Joint Resolution of the Legislature of Puerto Rico on the importation of coffee.

51. Public Resolution 59, Seventy-fourth Congress, approved August 27, 1935:

To permit an adjudication with respect to liens of the United States arising by virtue of loans under previous joint resolution for the relief of Puerto Rico after the 1928 hurricane.

52. Public Resolution 60, Seventy-fourth Congress, approved August 27, 1935:

Amends the joint resolution for the relief of Puerto Rico approved December 21, 1928.

53. Public Law 442, Seventy-fourth Congress, approved February 11, 1936:

Provides that funds allocated to Puerto Rico under the Emergency Relief Appropriation Act of 1935 may be expended for permanent rehabilitation, and for other purposes.

54. Public Law 766, Seventy-fourth Congress, approved June 23, 1936:

Extends to Puerto Rico the act to provide aid in the construction of rural post roads.

55. Public Law 116, Seventy-fifth Congress, approved May 26, 1937:

Authorizes the Secretary of War to transfer to the people of Puerto Rico certain real estate pertaining to the post of San Juan, P. R., in exchange for insular property.

56. Public Law 313, Seventy-fifth Congress, approved August 17, 1937:

Authorizes the Secretary of Commerce to transfer to the government of Puerto Rico a portion of land.

57. Public Law 315, Seventy-fifth Congress, approved August 17, 1937:

Authorizes the Secretary of Commerce to exchange with the people of Puerto Rico the Guanica Lighthouse Reservation for two adjacent plots of insular forest land.

58. Public Law 391, Seventy-fifth Congress, approved August 26, 1937:

Amends the Organic Act, increasing the borrowing margin of the municipality of Mayaguez.

59. Public Law 400, Seventy-fifth Congress, approved August 28, 1937:

Amends the Revenue Act of 1926, to exempt persons traveling between Puerto Rico and the continental United States from the payment of a stamp tax on steamship tickets.

60. Public Law 407, Seventy-fifth Congress, approved August 28, 1937:

Extends the benefits of section 21 of the Bankhead-Jones Act to Puerto Rico.

61. Public Law 449, Seventy-fifth Congress, approved March 26, 1938:

Increases the salary of the Judge in the United States District Court for Puerto Rico.

62. Public Law 494, Seventy-fifth Congress, approved April 26, 1938:

Authorizes the transfer of certain military reservations to other agencies of the Government and to the people of Puerto Rico.

63. Public Law 521, Seventy-fifth Congress, approved May 16, 1938:

Corrects United States citizenship status of certain persons born in Puerto Rico.

64. Public Law 570, Seventy-fifth Congress, approved June 1, 1938:

Amends the Organic Act of Puerto Rico relative to vacancies in the legislature.

65. Public Law 641, Seventy-fifth Congress, approved June 16, 1938:

Provides for the ratification of all joint resolutions of the Legislature of Puerto Rico and of the former legislative assembly.

66. Public Law 707, Seventy-fifth Congress, approved June 23, 1938:

Authorizes the Secretary of War to transfer to the Government of Puerto Rico certain real estate of the War Department.

67. Public Law 745, Seventy-fifth Congress, approved June 25, 1938:

To authorize the Legislature of Puerto Rico to create public corporate authorities to undertake slum clearance and projects, to provide dwelling accommodations for families of low income, and to issue bonds therefor; and for other purposes.

68. Public Law 414, Seventy-sixth Congress, approved February 12, 1940:

Refers to rules promulgated by the Supreme Court of the United States to be applicable by the United States District Court of Puerto Rico.

69. Public Law 15, Seventy-seventh Congress, approved March 17, 1941:

Authorizes an exchange of lands between the people of Puerto Rico and the United States.

70. Public Law 214, Seventy-seventh Congress, approved August 18, 1941:

Extends to Puerto Rico the permission to organize military units not a part of the National Guard.

71. Public Law 30, Seventy-eighth Congress, approved April 10, 1943:

Authorizes the Secretary of War to convey to the people of Puerto Rico certain real estate now under the jurisdiction of the United States.

72. Public Law 86, Seventy-eighth Congress, approved June 22, 1943:

Authorizes an appropriation for work relief in Puerto Rico and the Virgin Islands.

NOTE.—The sum was not to exceed $8,000,000.

73. Public Law 464, Seventy-eighth Congress, approved December 6, 1944:

Authorizes the Secretary of War to convey to the people of Puerto Rico for school purposes a certain building and lot known as the Mayaguez Barracks Military Reservation now under the jurisdiction of the War Department.

74. Public Law 362, Eightieth Congress, approved August 5, 1947:

Amends the Organic Act of Puerto Rico.

NOTE.—This act allowed Puerto Rico to elect its Governor and the Governor to appoint all members of the executive council. The auditor and the supreme court were still to be appointed by the President of the United States.

75. Public Law 746, Eightieth Congress, approved June 24, 1948:

Relating to salaries of certain officers and employees of the United States and certain officers and employees of Puerto Rico.

76. Public Law 776, Eightieth Congress, approved June 25, 1948:

Amends the Organic Act of Puerto Rico to take care of the citizenship status of certain persons in Puerto Rico.

77. Public Law 294, Eighty-first Congress, approved September 7, 1949:

To amend the Organic Act of Puerto Rico. Provisions concerning the salaries of the judges in the supreme court.

78. Public Law 406, Eighty-first Congress, approved October 26, 1949:

Extends the benefits of section 23 of the Bankhead-Jones Act to Puerto Rico.

79. Public Law 433, Eighty-first Congress, approved October 29, 1949:

Amends the Federal Farm Loan Act to authorize loans through national farm-loan associations in Puerto Rico.

80. Public Law 600, Eighty-first Congress, approved July 3, 1950:

Authorizes the organization of a constitutional government in Puerto Rico.

NOTE.—This law enacted in the nature of a compact would become effective upon its acceptance by the people of Puerto Rico as expressed in a public referendum. This was held on June 4, 1951. The people of Puerto Rico, having accepted the law, elected delegates to a constitutional convention which met in San Juan on September 17, 1951, and adjourned on February 6, 1952. The constitution as drafted by the convention shall be voted upon by the people of Puerto Rico on March 3, 1952; thereupon, it shall be submitted to the President and the Congress of the United States for approval. Upon the the constitution becoming effective, most sections of the present organic act shall stand repealed and the remaining sections shall be continued and referred to as the Puerto Rican Statute of Federal Relations.

81. Public Law 615, Eighty-first Congress, approved July 18, 1950:

Enables the Governments of Alaska, of Hawaii, of Puerto Rico, and of the Virgin Islands to authorize public bodies or agencies to undertake slum clearance, etc.

82. Public Law 703, Eighty-first Congress, approved August 17, 1950:

Amends the Organic Act of Puerto Rico to increase the borrowing capacity of the Bayamon and Rio Piedras.

83. Public Law 734, Eighty-first Congress, approved August 28, 1950:

Extends and improves the Federal old-age and survivors' insurance system and amends the public assistance and child welfare provisions of the Social Security Act.

NOTE.—Under its terms, old-age and survivors' insurance was extended to Puerto Rico as well as public assistance to be extended to Puerto Rico according to a special formula.

84. Public Law 775, Eighty-first Congress, approved September 8, 1950:

Extends United States Employment Service to Puerto Rico.

85. Public Law 140, Eighty-second Congress, approved September 1, 1951:

Extended the Sugar Act of 1948; increased Puerto Rico's quota by 170,000 tons; continues the provisions limiting the amount of refined sugar Puerto Rico may sell in the United States to 126,000 tons.

EXHIBIT 2

*Expenditures from Federal grants-in-aid made to agencies of the government of Puerto Rico, 1949–50 to 1951–52*

| | 1951–52 [1] | 1950–51 | 1949–50 | | 1951–52 [1] | 1950–51 | 1949–50 |
|---|---|---|---|---|---|---|---|
| FOR OPERATING EXPENSES | | | | FOR OPERATING EXPENSES—continued | | | |
| Office of the Governor: Civilian defense programs of Puerto Rico | $120,000 | 0 | 0 | Department of Education: | | | |
| National Guard of Puerto Rico: Rental of hangars | 15,000 | $23,214 | $12,892 | School needs survey | $33,755 | $7,536 | 0 |
| Department of the Interior: Highway research | 41,159 | 72,869 | 131,043 | Cooperative vocational rehabilitation | 291,252 | 231,373 | $202,110 |
| Agricultural Extension Service: Smith-Lever, Bankhead-Jones, Clark-McNary and Flannagan-Hope Acts | 641,589 | 614,923 | 542,935 | George Bardee Act | 394,491 | 370,737 | 227,816 |
| Agricultural Experiment Station: Hatch, Adams, Purnell, Bankhead-Jones, etc., acts | 270,616 | 247,865 | 247,865 | Vocational agriculture | 105,000 | 105,589 | 88,200 |
| Department of Labor: Employment Service Administration | 431,302 | 129,499 | 0 | School lunchrooms program [3] | 3,500,000 | 3,510,046 | 4,102,443 |
| Department of Health: | | | | Future Farmers of America, Puerto Rico chapter | 6,700 | 6,761 | 6,144 |
| Mental health | 53,400 | 63,510 | 11,136 | University of Puerto Rico: University fund | 60,000 | 82,463 | 115,213 |
| Hospital survey and planning | 4,500 | 1,575 | | Department of Agriculture, Marketing and Research | 17,000 | 36,684 | 26,885 |
| Cancer control | 55,700 | 62,911 | 31,559 | Pittman-Robertson Act | 3,012 | 2,251 | |
| Child Welfare Service, title V | 340,871 | 136,895 | 82,503 | | | | |
| Social security fund, titles I, IV, X, and XIV | 4,061,000 | 202,875 | 0 | Subtotal operating expenses | 12,013,218 | 7,455,609 | 7,317,649 |
| Water pollution control | 26,220 | 18,437 | 4,541 | FOR CAPITAL EXPENSES | | | |
| Heart disease control | 35,600 | 28,662 | 0 | National Guard of Puerto Rico: Construction of armories | [2] 480,000 | 0 | 0 |
| Tuberculosis control | 198,700 | 207,349 | 207,962 | Department of the Interior: Highway Survey and Construction Act | 1,758,841 | 1,522,427 | 1,274,957 |
| Maternal and child health, fund "A" | 138,905 | 137,933 | 133,762 | Department of Health: Hospital Survey and Construction Act | [2] 2,487,331 | [2] 1,208,472 | 0 |
| Maternal and child health, fund "B" | 251,776 | 257,101 | 287,232 | Transportation Authority: Airports Construction Act | 600,000 | 471,295 | 515,000 |
| Crippled children, fund "A" | 118,672 | 97,283 | 88,158 | Public Housing Administration | 299,971 | 322,000 | 262,000 |
| Crippled children, fund "B" | 211,316 | 160,056 | 125,753 | | | | |
| General health | 339,539 | 345,383 | 366,522 | Subtotal capital expenses | 5,626,143 | 3,524,194 | [2] 2,051,957 |
| Venereal disease control | 250,643 | 203,334 | 273,270 | | | | |
| Maternal and child health-maternity care | | | | | | | |

[1] Estimate.
[2] Includes estimated $1,100,000 for 1951–52, $1,160,830 for 1950–51, and $1,755,790 for 1949–50 of Federal grants in kind (foodstuffs).
[3] Allotment.
[4] In addition to this amount, $121,871.93 were reimbursed by the USPHS to the General Conference Corporation of the Seventh-Day Adventists, sponsors of Bella Vista Hospital and Sanatorium, project Puerto Rico 6 through the Department of Health.

Mr. JOHNSTON of South Carolina. Mr. President, I am very glad the Senator from New Hampshire [Mr. BRIDGES] spoke as he did today. We in the South, and particularly in South Carolina, are feeling the effects of the conditions to which he has referred.

Is it right to be sending to Puerto Rico aid to the extent of millions of dollars, collected from the taxpayers of the United States, and then, on the other hand, to have Puerto Ricans starting industries with our money, in some instances competing with industries in the United States? I am not so fearful of cotton mills being located in Puerto Rico, if they will meet us on an equal footing, if they will pay the salaries which are paid in the United States, and if they will have to pay the same taxes as those paid in the United States.

I have been led to make this statement because I have found that some of the industries which have been established in Puerto Rico are making so many seconds that they cannot sell their goods. Some of the production is running as high as 80 percent in seconds.

Having worked in a cotton mill for 11 years, I know what it means when an attempt is made to sell such goods. The price at which the seconds sell is not nearly so much as the prices obtained for goods that are not seconds. There is a reason for the making of so many seconds.

With the experience I have had in a mill—in the spinning room, the carding room, and the weaving shop—I know that the condition begins even further back. It begins with the grade of cotton. A really and truly good garment cannot be made unless good cotton is used. I fear that many Puerto Rican manufacturers are now buying a cheap grade of cotton, the shortest staple. I fear also that all along the line these manufacturers have not had experience in processing. They do not have what is needed to meet competition in the United States. For instance, to make a good weaver requires at least 2 years' experience; to make a good loom fixer, from 3 to 5 years. The manufacturers in Puerto Rico have not had the necessary experience. It is going to take time for them to gain it. I warn people who go there now that when they begin operations without experienced help they are not going to be able to meet competition, particularly when they pay the taxes they will have to pay.

Americans ask only that they be enabled to meet Puerto Rican manufacturers on an equal footing, and they can well take care of the situation.

Mr. BRIDGES. Mr. President, will the Senator yield?

Mr. JOHNSTON of South Carolina. I yield to the Senator from New Hampshire.

Mr. BRIDGES. I gather from the remarks made by the Senator from South Carolina that there exist in his State and in other sections of the South conditions similar to those which I have described as existing in the New England States. I think the condition is more extreme in the New England States, where in community after community there is supposed to be, at least in normal times, prosperity, but where today people are walking the streets, out of employment, as a result of the removal of textile industries to Puerto Rico.

Mr. JOHNSTON of South Carolina. People are walking the streets 4 or 5 days a week, and many mills are running only 2 or 3 days a week, instead of 5 days. So I fear the situation. I think the only thing for the United States as a nation to do is to have Puerto Rican manufacturers meet our own manufacturers on an equal footing.

Mr. McMAHON. Mr. President, will the Senator yield?

Mr. JOHNSTON of South Carolina. I yield to the Senator from Connecticut.

Mr. McMAHON. I may say to the Senator from New Hampshire that some of the textile industries that have left his State, and mine, have gone into the State of the Senator from South Carolina. One reason for that has been the passage by Congress of what is known as the Taft-Hartley Act. I do not know whether the Senator is aware of that.

In that act we wrote a provision that if a State was against the union shop, the Federal Government would not force the union shop, even though the union shop were desired by a majority of employees of the shop. This fact has been pointed out by chambers of commerce in New Hampshire and Connecticut. In those States there will be labor unions regardless of the Taft-Hartley Act. Labor unions are so strong in numbers there that they do not need the protection of the Federal Government to maintain their integrity.

I should like to advise the Senator that some of the troubles with textile plants in our section of the country have been caused by the Taft-Hartley Act, which was supported in the Eightieth Congress by so many Members of the Senate.

Mr. JOHNSTON of South Carolina. Mr. President, I do not agree entirely with the Senator from Connecticut. I believe that the textile plants were moving South to some extent even before the Taft-Hartley Act was passed. I voted against the Taft-Hartley Act when it was under consideration, and I offered a substitute for it at the time. I think the trouble goes deeper than that. I did not want to go into this question today on the floor of the Senate. I did not come here anticipating that I would do so. However, it must be said that when the raw product is available near the source, and there is plenty of labor, suitable climate, ample power, and other things which enter into the process of manufacture, such competition is difficult to meet. That is what has happened in the South. I think it happened to a great extent even before the Taft-Hartley Act.

Mr. McMAHON. Mr. President, will the Senator yield?

Mr. JOHNSTON of South Carolina. I yield.

Mr. McMAHON. I do not deny that some of those considerations have been helpful to the South. The South is certainly entitled to the benefit of its natural advantages. The same may be said of all other sections of the country. They are entitled to the benefit of their natural advantages and resources. However, I say to the Senator that the movement which is in progress has been hastened by the provisions of the Taft-Hartley Act and by the diversity in wages which that Act has helped to stimulate, as between the South and the North.

Mr. JOHNSTON of South Carolina. I think it will be found that today wages paid in the cotton mills in the South are equal to those paid in the North.

Mr. McMAHON. That is not my information.

Mr. JOHNSTON of South Carolina. That is my information.

---

STATEHOOD FOR ALASKA

The Senate resumed the consideration of the bill (S. 50) to provide for the admission of Alaska into the Union.

Mr. STENNIS. Mr. President, a great deal of the debate with reference to the Alaska statehood bill has revolved around a claimed premise that those of us who happen not to favor this particular proposed legislation are trying to suppress the people of Alaska or deny to them a freedom to which they are entitled, and keep them from having control of their own affairs. It is said that it is our aim to control their affairs by a bureaucracy from Washington.

Mr. President, there is no basis whatsoever for such a claim. I think it is addressed to the emotions and feelings of the people. It is an effort to have them assume the role of underdog.

Let me point out, not what the Senator from Mississippi says about some of these things, but what the people of Alaska themselves say. I have before me an editorial from the Anchorage, Alaska, Daily News of December 26, 1950, entitled "Why Not Elect Our Own Governor?" This editorial was published soon after a bill for that purpose had been under consideration on the floor of the Senate, but had failed of passage. The editorial has this to say with reference to home rule in Alaska:

Delegate BARTLETT is only practicing heroics when he says in effect that nothing constructive for Alaska must be done until statehood is granted.

That was the stand he took recently when he was asked to support a bill calling for the election of a governor of Alaska.

Such a move was recently proposed by Senator HUGH BUTLER, the Republican Senator who led the opposition fight against H. R. 331, the Alaska statehood bill.

It might have been expected that Delegate BARTLETT would not feel kindly toward any measure proposed by the Nebraskan Senator, but in denouncing support of BUTLER's proposed bill Delegate BARTLETT put himself squarely on record as opposing one basic principle of free democracy so far as Alaskans are concerned.

As I say, this is not the Senator from Mississippi speaking. This is the people of Alaska speaking, through one of their responsible agencies, one of the leading newspapers of that Territory. They are not talking about me or about the Senator from Nebraska [Mr. BUTLER], who opposed their bill. They are talking about Delegate BARTLETT, their own chosen representative. Of course, there is nothing personal in my references to

Delegate BARTLETT. He is a very estimable Member of Congress, whom I respect very highly. This is the comment of the people of Alaska on freedom for Alaska. Quoting further with reference to Delegate BARTLETT:

He has said in effect that he will block any move allowing Alaskans to use their right of franchise until statehood is granted.

That is the cry of the proponents of the bill. It is not an attitude of saying, "We want local self-government, but if we cannot get it all now, we will take a part." That is not the attitude. The slogan is "Statehood or nothing."

The bill to which reference has been made is gathering dust, and has been gathering dust for some time in the very committee which is proposing this legislation for statehood and parading before the Nation the idea that those who do not go along with them are trying to suppress the people of Alaska, trying to deny them their freedom and the rights of citizenship. Some of the people of Alaska are proclaiming that the thing to do is to get the right to elect their governor, and then continue to work for statehood.

I think this explains something which none of the proponents of the bill have been able to explain. They have not explained why 42 percent of the people of Alaska voted against statehood about 5 years ago. I submit that that has never been satisfactorily explained. It cannot be explained by them according to their viewpoint on the bill. But when we look back into the files of local newspapers we find that some reasons come seeping through.

Quoting further from the editorial:

"I regret that I cannot agree with you that Alaska is only entitled to an elective governor," Delegate BARTLETT replied to Senator BUTLER when asked if he would support an elective governor bill in the next session of Congress. "It seems to me that the first step toward statehood was taken a long time ago and the final step preceding statehood occurred on August 12, 1912, when Alaska's Organic Act was signed. In urging statehood now I stand for an elective governor plus many other things. Some of those changes would be far, far more important than the privilege of electing our own governor."

That is the end of the quotation from Delegate BARTLETT. Continuing with the editorial:

Delegate BARTLETT and the others who made such a valiant and commendable effort for their cause should come down to earth again, forget the grandstand and play the game for the people in the bleachers. Moaning a lost cause now is a pitiful waste of time.

Delegate BARTLETT's stand is especially puzzling now when 2 years ago he himself pledged unqualified support to an elective governor bill. It was later shelved at his insistence with the reason given that it might harm the cause of statehood.

These are the words which come from the mouths of the people of Alaska themselves. I believe that the governorship bill would win almost unanimous support in the Senate. However, the proponents of statehood for Alaska say "No; down with that idea. It is statehood or nothing."

Quoting further from the editorial:

Clear-thinking people fail to see how a measure to elect our own governor could possibly harm statehood. Statehood will come when the time is ripe, and in the meantime a governor, elected by the people, a governor in whom the people of Alaska had faith and confidence, a governor who had Alaska at heart, could do more to aid the cause of statehood than any other form of strategy that could be adopted.

Those are well chosen, reasonable, and logical words. I submit them to the reasoning processes of the Senate. They represent a sound approach. They say, in effect, that they must take these steps progressively.

I pointed out the other day that Alaska has no county government. Consequently, they have no place where American citizenship is trained. I am not boasting that they do not have it; I am sorry that they do not have it. However, if they attain statehood, though they may not realize it now, they will find the woeful inadequacy of the system they have now. When it comes to training in the fundamental system of self-government from the lowest levels to the top, they need the experience that would come from a governorship.

I quote from another newspaper of almost the same date as the other newspaper to which I referred. The editorial from which I am about to quote appeared in the Ketchikan Daily News. It reads:

In the first place, the bill giving us the right to elect our governor would not conflict or interfere with the statehood bill in any manner.

That is the editor speaking.

Even if the 1951 Senate had a change of heart and voted approval of the statehood bill in January, it would still require 2 or 3 or 4 years before the people of Alaska could elect a constitutional convention, draft and approve a State constitution, and receive favorable action from Congress on the work accomplished. In the meantime, if the chance were given us to elect our own governor this work could be carried on under a man in whom the people have faith and trust.

I will not quote the remainder of the editorial. Some of it is of a rather personal nature, and I shall not quote it. However, the point is that they recognize the fact that a logical step to statehood would be the process of electing their own governor and in going through other democratic processes.

With all deference to the Senators in charge of the bill, I submit that that is another reason why I believe they are rushing it along before the Senate just as they rushed it before the committee. Six of the thirteen members of the committee asked in all sincerity for further hearings. Nevertheless the bill was rushed onto the floor of the Senate.

Mr. President, when the Senator from Minnesota [Mr. THYE] came to the Chamber, the Senator from Mississippi had been asking some questions with reference to the assertions made by the Senator from Wyoming [Mr. O'MAHONEY] on the subject of elimination of bureaucracy by the granting of statehood. I submit that we are going to have bureaucracy augmented from

Washington if we pass the statehood bill. Most of the functions of government in Alaska would be continued on a Federal basis. That is a matter which is overlooked by many of the proponents of the bill. It is not generally known by Members of the Senate that most of the major operations of government in Alaska would continue to be on the Federal level even though statehood were granted. The most that they would get by way of hard terms with respect to the Federal activities in Alaska would be two Members on the floor of the Senate as Senators from the new State, who would be able to contact the many departments of Government in trying to get money for that area. That is bringing the matter down to practical terms. That is how it would operate. They would have two Senators who would be in a position to urge appropriation of funds for Federal programs in Alaska.

I do not say that such programs would not be worthy programs. My point is that the functions of government would go on just the same as they are going on now. We would not get out from under financial responsibility by granting statehood to Alaska. We would not add one ounce of democracy; but we would augment, intensify, magnify, and multiply bureaucracy.

I am certain of my facts and of my conclusions with respect to those facts.

I submit that the serious side of this matter is, Where do we go from here? Where do we go from here with reference to the admission of areas beyond the confines of our present 48 States?

One step leads to another. About 50 years ago when these Territories were taken under the American flag I doubt that anything was said about statehood. Let us look at Guam, for example. Guam has a population now of 59,498 people. It is a way out in the Pacific Ocean. We have already created Guam as an unincorporated Territory. We did it by Public Law 600 of the Eighty-first Congress. Nothing was said about Statehood.

The next logical step, of course, will be to put Guam into the next category, that of an incorporated Territory. As times change a little it will become more important that we have more bases in that area, and it will become logical for Guam to become an incorporated Territory. Then the next logical step will be to say, "Having given them all this preparation and having created a Territory which the Supreme Court calls an inchoate state, why should we not make Guam a State?" The same arguments will be made on the floor of the Senate. It will be said that for the survival of our Nation we should take Guam into the Union.

Mr. President, 50 years is not a very long time. It will probably come in less than 50 years. It will come sooner if we continue to go into other noncontiguous areas to take in more States.

Let us look at the Virgin Islands. It may be said that it is preposterous to talk about the Virgin Islands in terms of statehood within the United States. Mr. President, the Virgin Islands have a population of 26,665. Their status now is

that they are organized, but unincorporated. They are operating under an organic act. They are not an incorporated Territory. We have already taken the first step. They have an appointed governor and they have an elected legislature. I am glad that they have both. However, my point is that the same logical steps will be followed with respect to the Virgin Islands.

Where are we going? We have trusteeships in the Pacific with respect to the Marianas, Marshalls, and Carolines. They are held in some way under a trusteeship from the United Nations. They were awarded to us for strictly military reasons. They do not have an organized status, as the Virgin Islands have, but they are all a part of the picture.

The relation of Puerto Rico to the United States is almost the same as that of Hawaii. In the Eighty-first Congress we sidestepped Puerto Rico in the great march of freedom. Much has been said about bringing down the iron curtain on freedom unless we grant statehood to Alaska and Hawaii. It seems that the freedom train failed to stop at Puerto Rico.

There are advocates on the floor of the Senate who favor statehood for Puerto Rico. Puerto Rico has a population of 2,210,703. They organized under a form of self-government by virtue of Public Law 600 of the Eighty-first Congress. Their constitution probably will be ratified next month. It is a good form of government that has been set up in Puerto Rico. I am not critical of it. My point is that they have a logical claim for statehood. Morally I think they have just as much right as is claimed for some other Territories.

However, Mr. President, there is no use in debating at this time the relative weight of those matters. We must recognize the fact that when we open this door, we shall be adopting a new policy and shall be going further than we have ever gone before and shall be opening up a new field.

It is not a matter of treating the people of Alaska properly. Anyone who does not know that we want to treat them properly will never be convinced that we want to do so. If our record in the past, particularly in the past 10 years, does not convince everyone of our willingness and our sincere desire to treat these people properly, such persons will never be convinced that is our desire.

The question goes far deeper than that. The question is whether we shall take these people into the bosom of our own Government, particularly the legislative branch of our Government, and give them power, not merely over themselves, but over all of us, as well. For instance, the other day I mentioned the question of taxation. I say to the Members of the Senate, Mr. President, that that question is becoming the most serious of all questions, either foreign or domestic, before the American people, because when any nation reaches the point where it is collecting in taxes approximately one-third of all the earnings of all its people, some kind of a danger line is rapidly being approached.

With all deference to the people of these outlying Territories, I do not believe they will be so deeply concerned as we are with that problem; they will not have the capacity to be so deeply concerned with it as we are, because the problem will not be of immediate concern to them, even though it is of immediate and grave concern to us. I do not think they will have the knowledge that we have of that problem.

So, Mr. President, with all deference to them, I do not think that power over us should be given to them. I speak of the 160,000,000 people who at the present time comprise the United States of America. It seems to me that during this debate very little has been said in behalf of the people of the United States itself; practically all the remarks which have been made relate to those who live in the Territories.

I do not mean to be selfish about this matter; but somehow, somewhere down the line, in respect to our policies affecting ourselves and all the rest of the world, someone must consider the Union itself, the Federal Union which already takes one-third of all the income of all the people of the United States and uses the money to pay the bills of the Federal Government.

That is why I say that before we take into the Federal Government, and particularly into its legislative branch, the people of these two Territories, we must give great consideration to that matter. We must be very careful that we consider all phases of the problem before we take the proposed step which, I repeat, can never be retracted or retraced, once it is taken.

The people of Alaska and Hawaii already have more power, more political independence, more opportunities in life, more freedom, and more of all the so-called good things in life than do any other people who ever have lived along the shores of the Pacific Ocean, save those who live in the States on the western border of the United States of America. The people of these two Territories already have everything that goes with sound government and constitutional liberties as we know them. In that respect they have much more than do any other people in that area of the world. We can give them more, and I am willing to give them whatever is considered to be sound after the arguments are heard and after the evidence is taken. But in order to do all those things and in order to protect those people, we do not have to surrender control over our own affairs and over our own taxation system and over the establishment of our own foreign policy.

So, Mr. President, tomorrow will be a historic day for the 48 States of the United States. If the Territory of Alaska is to be given statehood—a step which will open up new avenues and new doors—we shall be taking a step which we cannot retract or retrace. We shall be committed; the die will be cast.

I believe we can provide strength, security, protection, and greater measures of self-government to these people, and can make them strong and can develop the areas where they live just as well and just as effectively under other measures, and not take the proposed fateful step, certainly not until world affairs subside just a little, anyway, and until we feel that we are standing on surer and safer ground.

Mr. President, I yield the floor.

MATTERS PRINTED IN THE APPENDIX

The PRESIDING OFFICER (Mr. SPARKMAN in the chair). At this time the Chair, in his capacity of Senator, wishes to request the insertion of certain matters in the Appendix of the RECORD. If there is no objection, the matters will be inserted as requested.

EXECUTIVE SESSION

Mr. O'MAHONEY. Mr. President, I now move that the Senate proceed to the consideration of executive business.

The motion was agreed to; and the Senate proceeded to the consideration of executive business.

EXECUTIVE MESSAGES REFERRED

The PRESIDING OFFICER (Mr. SPARKMAN in the chair) laid before the Senate messages from the President of the United States submitting sundry nominations, which were referred to the appropriate committees.

(For nominations this day received, see the end of Senate proceedings.)

EXECUTIVE REPORTS OF COMMITTEES

The following favorable reports of nominations were submitted:

By Mr. MURRAY, from the Committee on Labor and Public Welfare:

Zadok D. Harrison, for appointment as senior assistant sanitary engineer in the Regular Corps of the Public Health Service; and

Norman B. Atkins, and sundry other candidates for appointment in the Regular Corps of the Public Health Service.

By Mr. JOHNSTON of South Carolina, from the Committee on Post Office and Civil Service:

Seventeen postmasters.

The PRESIDING OFFICER. If there are no further reports of committees, the clerk will state the nomination on the calendar.

UNITED STATES MARSHAL

The legislative clerk read the nomination of Charles M. Eldridge, of Rhode Island, to be United States marshal for the district of Rhode Island.

Mr. O'MAHONEY. Mr. President, I understand that there is agreement on both sides in regard to this nomination, and that there is no objection to confirmation of the nomination.

The PRESIDING OFFICER. Without objection, the nomination is confirmed; and, without objection, the President will be immediately notified of the confirmation.

That concludes the Executive Calendar.

1412 CONGRESSIONAL RECORD—HOUSE February 26

## RECESS

Mr. O'MAHONEY. Mr. President, as in legislative session, I now move that the Senate stand in recess until tomorrow, at 12 o'clock noon.

The motion was agreed to; and (at 4 o'clock and 39 minutes p. m.) the Senate took a recess until tomorrow, Wednesday, February 27, 1952, at 12 o'clock meridian.

## NOMINATIONS

Executive nominations received by the Senate February 26 (legislative day of February 25), 1952:

SUBVERSIVE ACTIVITIES CONTROL BOARD

Watson B. Miller, of Maryland, to be a member of the Subversive Activities Control Board for a term of 3 years.

UNITED STATES PUBLIC HEALTH SERVICE

Leonard A. Scheele, of Michigan, to be Surgeon General of the United States Public Health Service for a term of 4 years. (Reappointment.)

UNITED STATES ATTORNEYS

Percy C. Fountain, of Alabama, to be United States attorney for the southern district of Alabama. He is now serving in this office under an appointment which expired February 6, 1952.

William W. Hart, of Illinois, to be United States attorney for the eastern district of Illinois. He is now serving in this office under an appointment which expired February 6, 1952.

Howard L. Doyle, of Illinois, to be United States attorney for the southern district of Illinois. He is now serving in this office under an appointment which expired February 6, 1952.

UNITED STATES MARSHAL

Arthur J. B. Cartier, of Massachusetts, to be United States marshal for the district of Massachusetts. He is now serving in this office under an appointment which expired December 22, 1951.

## CONFIRMATION

Executive nomination confirmed by the Senate February 26 (legislative day of February 25), 1952:

UNITED STATES MARSHAL

Charles M. Eldridge, of Rhode Island, to be United States marshal for the district of Rhode Island.

# HOUSE OF REPRESENTATIVES

TUESDAY, FEBRUARY 26, 1952

The House met at 12 o'clock noon.
The Chaplain, Rev. Bernard Braskamp, D. D., offered the following prayer:

O Thou who art the Supreme Intelligence, show us how we may interpret and decide wisely and rightly the great questions and problems which we are about to consider.

Thou knowest how deeply and vitally concerned we are about the defense and safety of our Republic and the welfare of the whole world.

We humbly confess that our own finite judgment is so faulty and fallible that we cannot predict what lies before us.

Forgive us for sinning against Thee and against ourselves by allowing our minds and hearts to be tortured and tormented with feelings of doubt and despair.

The future belongs to Thee. May we then daily put our trust in Thee and seek Thy divine guidance faithfully and confidently for Thou alone art too wise to err and too kind to injure.

Hear us in Christ's name.

The Journal of the proceedings of yesterday was read and approved.

## MESSAGE FROM THE SENATE

A message from the Senate, by Mr. Landers, its enrolling clerk, announced that the Senate had passed without amendment bills of the House of the following titles:

H. R. 200. An act for the relief of Cindy Eberhardt;
H. R. 1962. An act for the relief of Wanda R. Barnett;
H. R. 2205. An act for the relief of Mary Alice Floyd;
H. R. 2398. An act to amend Public Law 848, Eighty-first Congress, second session;
H. R. 2669. An act for the relief of Maria Sarandrea;
H. R. 2672. An act for the relief of the law firm of Harrington & Graham;
H. R. 3100. An act to repeal the act of August 7, 1939 (53 Stat. 1243; 48 U. S. C., sec. 353);
H. R. 3569. An act for the relief of Louis Campbell Boyd;
H. R. 3860. An act to amend the act for the retirement of public-school teachers in the District of Columbia;
H. R. 3981. An act to amend the act of July 8, 1943 (57 Stat. 388), entitled "An act to authorize the Secretary of Agriculture to adjust titles to lands acquired by the United States, which are subject to his administration, custody, or control";
H. R. 3985. An act for the relief of Hal Soon Lee;
H. R. 4130. An act for the relief of Caroline Wu;
H. R. 4224. An act for the relief of Mrs. Elfriede Hartley;
H. R. 4419. An act to amend the District of Columbia Teachers' Salary Act of 1947;
H. R. 4703. An act to provide that the Board of Education of the District of Columbia shall have sole authority to regulate the vacation periods and annual leave of absence of certain school officers and employees of the Board of Education of the District of Columbia;
H. R. 4749. An act authorizing the Secretary of Agriculture to return certain lands to the Police Jury of Caddo Parish, La.;
H. R. 4877. An act for the relief of Mrs. Margherita Caroli;
H. R. 5097. An act to extend the time during which the Secretary of the Interior may enter into amendatory repayment contracts under the Federal reclamation laws, and for other purposes;
H. R. 5235. An act to authorize and direct the Commissioners of the District of Columbia to make such studies and investigations deemed necessary concerning the location and construction of a bridge over the Potomac River, and for other purposes;
H. R. 5256. An act to secure the attendance of witnesses from without the District of Columbia in criminal proceedings; and
H. R. 6273. An act to amend the act relating to the incorporation of Trinity College of Washington, D. C., in order to make the archbishop of the Roman Catholic Archdiocese of Washington and ex officio member and chairman of the board of trustees of such college.

The message also announced that the Senate had passed, with amendments in which the concurrence of the House is requested, bills of the House of the following titles:

H. R. 1012. An act to permit educational, religious, or charitable institutions to import textile machines and parts thereof for instructional purposes;
H. R. 3219. An act to confer jurisdiction upon the United States District Court for the Northern District of Texas to hear, determine, and render judgment upon the claim of Robert E. Vigus;
H. R. 4645. An act for the relief of Mrs. Marguerite A. Brunell; and
H. R. 5317. An act to confer jurisdiction on the Court of Claims to hear, determine, and render judgment upon a certain claim of the George H. Whilke Construction Co., of Canton, Ohio.

The message also announced that the Senate had passed bills and concurrent resolutions of the following titles, in which the concurrence of the House is requested:

S. 194. An act to prohibit age requirements or limitations with respect to the appointment of persons to positions in the competitive civil service during periods of war or national emergency;
S. 523. An act for the relief of Walter Duschinsky;
S. 554. An act for the relief of Boutros Mouallem;
S. 853. An act for the relief of Dr. Ying Tsik Chan;
S. 1032. An act to authorize each of the States of Montana, North Dakota, South Dakota, and Washington to pool royalties derived from lands granted to it for public schools and various State institutions;
S. 1085. An act for the relief of Kane Shinohara.
S. 1121. An act for the relief of Matsuko Kurosawa;
S. 1192. An act for the relief of Demetrius Alexander Jordan;
S. 1234. An act for the relief of Toshiko Konishi;
S. 1333. An act for the relief of Maria Seraphenia Egawa;
S. 1344. An act to amend the law of the District of Columbia relating to forcible entry and detainer;
S. 1372. An act for the relief of Mrs. Madelaine Viale Moore;
S. 1429. An act to prohibit the transportation in interstate or foreign commerce of lethal munitions except when movement is arranged for, or on behalf of, the United States of America or an instrumentality thereof;
S. 1470. An act for the relief of Panagiotes Koumeliotis;
S. 1534. An act for the relief of Midori Akimoto, also known as Sharlene Akimoto;
S. 1539. An act to amend an act entitled "An act to provide extra compensation for overtime service performed by immigrant inspectors and other employees of the Immigration Service," approved March 2, 1931;
S. 1566. An act for the relief of Constantin Alexander Solomonides;
S. 1580. An act for the relief of Alevtina Olson and Tatiana Snejina;
S. 1637. An act for the relief of Doreen Iris Neal;
S. 1639. An act for the relief of Osvaldo Castro y Lopez;
S. 1676. An act for the relief of Helen Sadako Yamamoto;
S. 1681. An act for the relief of Sister Maria Seidl and Sister Anna Ambrus;
S. 1692. An act for the relief of Hilde Schindler and her minor daughter, Edeline Schindler;
S. 1697. An act for the relief of Sister Maria Gasparetz;
S. 1715. An act for the relief of Else Neubert and her two children;

S. 1731. An act for the relief of Rhee Song Wu;

S. 1796. An act for the relief of Bruno Leo Freund;

S. 1798. An act granting the consent of Congress to a compact entered into by the States of Oklahoma, Texas, and New Mexico relating to the waters of the Canadian River;

S. 1822. An act to amend the act creating a juvenile court for the District of Columbia, approved March 19, 1906, as amended;

S. 1833. An act for the relief of Barbara Jean Takada;

S. 1836. An act for the relief of act approved March 3, 1899 (30 Stat. 1045, 1057, ch. 422), so as to provide for the appointment by the Commissioners of the District of Columbia of special policemen, and for other purposes;

S. 1846. An act for the relief of Misako Watanabe and her daughter, Irene Terumi;

S. 1853. An act for the relief of Hidemi Nakano;

S. 1879. An act for the relief of Ernest Nanpei Ihrig;

S. 1988. An act for the relief of Leslie A. Connell;

S. 2113. An act for the relief of Martha Brak Foxwell;

S. 2147. An act for the relief of Arthur K. Prior;

S. 2149. An act to confer Federal jurisdiction to prosecute certain common-law crimes of violence when such crimes are committed on an American airplane in flight over the high seas or over waters within the admiralty and maritime jurisdiction of the United States;

S. 2150. An act for the relief of Joachim Nemitz;

S. 2199. An act to amend the Contract Settlement Act of 1944 and to abolish the Appeal Board of the Office of Contract Settlement;

S. 2211. An act to amend section 221 (c) of the Interstate Commerce Act in order to clarify certain requirements relating to the designation of persons upon whom process may be served;

S. 2214. An act to amend section 709 of title 18 of the United States Code;

S. 2232. An act for the relief of the Detroit Automotive Products Co.;

S. 2322. An act prohibiting the manufacture or use of the character "Smokey Bear" by unauthorized persons;

S. 2381. An act to amend section 86, Revised Statutes of the United States relating to the District of Columbia, as amended;

S. 2383. An act to amend the act entitled "An act to create a board of accountancy for the District of Columbia, and for other purposes," approved February 17, 1923;

S. 2394. An act to repeal the 10 percent surcharge on postcards;

S. 2408. An act to amend the act authorizing the negotiation and ratification of certain contracts with certain Indians of the Sioux Tribe in order to extend the time for negotiation and approval of such contracts;

S. 2418. An act for the relief of Britt-Marie Eriksson and others;

S. 2440. An act for the relief of Hanne Lore Hart;

S. 2447. An act to amend the Federal Credit Union Act;

S. 2458. An act to correct a typographical error in Public Law 504, Eighty-second Congress, relating to assistant superintendents in the Motor Vehicle Service of the Post Office Department;

S. 2549. An act to provide relief for the sheep-raising industry by making special quota immigration visas available to certain alien sheepherders;

S. 2566. An act for the relief of Niccolo Luvisotti;

S. 2638. An act to amend the act of September 25, 1950, so as to provide that the liability of the town of Mills, Wyo., to furnish sewerage service under such act shall not extend to future construction by the United States;

S. 2667. An act to authorize the Board of Commissioners of the District of Columbia to establish daylight-saving time in the District;

S. Con. Res. 58. Concurrent resolution favoring the suspension of deportation of certain aliens; and

S. Con. Res. 63. Concurrent resolution favoring the suspension of deportation of certain aliens.

### SPECIAL ORDER GRANTED

Mr. LANE asked and was given permission to address the House for 15 minutes today, following the legislative program and any special orders heretofore entered.

### SWEARING IN OF MEMBER

Mr. MARTIN of Massachusetts. Mr. Speaker, I ask unanimous consent that the gentleman from New York, Mr. ROBERT TRIPP ROSS, be permitted to take the oath of office. His certificate of election has not arrived, but there is no contest and there is no question as to his election.

The SPEAKER. Is there objection to the request of the gentleman from Massachusetts?

There was no objection.

The SPEAKER. The Member-elect will present himself to the bar of the House to take the oath.

Mr. ROSS appeared at the bar of the House and took the oath of office.

### SPECIAL ORDER GRANTED

Mr. JAVITS asked and was given permission to address the House today for 5 minutes, following any special orders heretofore entered.

### ALIENS ENTERING OR REMAINING IN THE UNITED STATES ILLEGALLY

Mr. WALTER. Mr. Speaker, I move that the House resolve itself into the Committee of the Whole House on the State of the Union for the further consideration of the bill (S. 1851) to assist in preventing aliens from entering or remaining in the United States illegally.

The motion was agreed to.

Accordingly the House resolved itself into the Committee of the Whole House on the State of the Union for the further consideration of the bill S. 1851, with Mr. HERLONG in the chair.

The Clerk read the title of the bill.

The CHAIRMAN. When the Committee rose on yesterday the Clerk had read the first section of the bill. Are there any amendments to that section?

Mr. SHELLEY. Mr. Chairman, I ask unanimous consent to extend my remarks at this point in the RECORD.

The CHAIRMAN. Is there objection to the request of the gentleman from California?

There was no objection.

Mr. SHELLEY. Mr. Chairman, S. 1851 as we are considering it on the floor today, purports to be an answer to the demand voiced by the Government of Mexico that the United States take decisive steps to close our borders to the flow of Mexican citizens who stream into southwestern United States seeking work on our farms. It purports to comply with the President's demand that our Immigration Service be given the enforcement tools it needs to cope with the hundreds of thousands of so-called wetbacks who cross the Rio Grande and other border points each year to add to our swollen migrant farm-labor population and to fan out into industrial areas throughout the country. S. 1851, in its present form, will do neither of these jobs in the way that they should be done.

As originally introduced in the Senate in S. 1851, and as originally provided in section 274 of H. R. 5678, the omnibus immigration bill which the House will consider shortly, the legislation contained the teeth necessary to really bite into the problem. But, as passed by the Senate, so much dental surgery has been applied that the measure cannot begin to do the job it should do. It cannot begin to clean up the stinking cesspools of human misery which we are now tolerating within our borders. It cannot begin to dry up the traffic in human flesh, the bottomless pool of cheap labor, which is the source of the shameful condition we now have throughout the Southwest; in California, in many of the Southern States, and which continues to spread like a cancer.

This bill now contains no effective search procedure for rooting out illegal aliens. Further, it goes out of its way to make a special exception of the one circumstance and one group which contributes more than anything else to the growth of the vicious peonage system resulting from the swarming of wetbacks into the United States. It is the willful desire to create this miserable peonage that is the cause of our failure to control entry into the country by its potential victims. And it is the very group responsible who are singled out for special consideration in S. 1851. I refer to the employers of illegal aliens, for the most part the large farmers of the Southwest who knowingly encourage the traffic and build it up, and now have the temerity to ask that their practices be exempt from penalty, and that their lands not be subject to any effective method of ferreting out the poor humans whom they are exploiting.

It is these large scale farmers who send their emissaries into Mexico to advertise the blessings lying across the border, and even make arrangements for their entry, or who deal with so-called labor contractors—the modern version of the slave trader—to provide them with the number of hands they need and no questions asked. These are the people who use the wetbacks as they need them, pay them little or in some cases nothing, and then turn them out to live in the ditchbanks and to starve. It is their lands which are the scenes of the degrading conditions reported in the press, denounced by the President's Commission on Migratory Labor, and repudiated by every socially conscious group and individual in the country. Theirs are the practices we are trying today to do something about. If it were not for them we would have no problem. And yet, if S. 1851 passes the House in

its present form, we will have virtually written them, and any chance of forcing a change in their vicious policies, out of the bill.

With the present number of border patrolmen, and with the present limited funds available to the Immigration Service for its operations, we cannot hope to stop up the open sieve the border has become. Our only chance to apprehend and take action against any effective percentage of the great numbers of wetbacks who penetrate beyond the border is to find them where they "hole up" in this country—on the large farms. When information is received as to the presence of wetbacks on any farm, if the Immigration Service cannot move immediately they might just as well not move at all. Limiting free entry to farm lands to a distance of 25 miles from the border, and prescribing exceedingly limited and time consuming search-warrant powers in all other areas, effectively hamstrings any chance of cleaning out the concentrations of wetbacks on farms in the interior—the great bulk of those now here. In addition, it makes almost impossible any thought of imposing any penalty upon any employer in those areas no matter how guilty he may be of evading the intent or actually violating the letter of the law. Unless the wetback can be found on the property, and strong evidence of the employer's willful and knowing action to harbor or conceal him can be produced, the proviso of paragraph (4) of section 1, of this bill exempting employment from definition as "harboring," will permit the employer to laugh at the law. And remember that the law is necessary only because of this same employer's activities.

The bill would limit authority to issue administrative search warrants to six officials in the three Immigration Service districts between the Gulf of Mexico and the Pacific coast—an area of thousands of square miles, and the area now most blighted by the influx of wetbacks. It would limit the search authority to one immigration officer named therein who, in many cases involving the most flagrant offenders, would have to cover hundreds or thousands of acres. It would limit the use of the warrant to a certain specified time of the day or night; and it places a 30-day time limit upon the period in which the warrant could be used. Judge for yourself the hopelessness of making any effective use of such a system with all the opportunities for giving warning in advance to the suspected offenders. The time required to prepare evidence, travel possibly hundreds of miles to a district immigration office to secure a warrant and return to make a search, would give ample time for the offending farm or farms to move their wetbacks out or lend them to a neighboring farm long before the enforcement officer could hope to put the warrant into the limited effect possible. The employer would need to remove his wetbacks only for the hour named in the warrant, and could at any other time put them to work in the fields while he laughed at the officer outside the fences. What a farce. It is a well known fact that the associations of large farmers

have more than enough friends in a position to know of warrants, as issued, that they need never fear the effects of such a procedure. Until our law enforcement authorities are given power to act immediately on reasonably sufficient information that illegal aliens are employed on any particular farm, and until we provide enough officers to give effective coverage to the large farming sections of the affected areas, we cannot hope to cure the wetback problem and its attendant evils. No law is any better than its enforcement provisions. S. 1851, without more drastic powers for uncovering evidence of violations, would be hardly better than no law at all.

I shall most certainly support any amendment designed to replace the procedures I have outlined. Authorized immigration service officers should not be hamstrung in apprehending illegal aliens whom they have valid reason to believe are in a particular area. They should be provided with the authority to enter farm lands when acting in their official capacities and in the performance of their duty. Without that authority practically the whole of the Southwest becomes a sanctuary within which the authorities are powerless to act effectively.

The bill's proviso that "for the purposes of this section, employment (including the usual and normal practices incident to employment) shall not be deemed to constitute harboring," is an unnecessary weakening of the purposes of the bill. The long fight which the associations of large farmers waged with the committee to have the proviso included is, in itself, proof of their intention to continue the schemes for obtaining wetbacks which they have accepted as usual and normal practices incident to building up their cheap labor pool. All they want is the cloak of congressional sanction so that they can continue on their merry way and continue to avoid paying decent wages to the people who harvest their crops. When we consider how such a proviso may be interpreted in practice and in the courts it would be more than unwise to permit it to remain in the bill. It would amount to a mandate from Congress that the farming corporations are a privileged class, and that they may not be interfered with in their pernicious practices. It would be a barefaced admission that our only reason for passing this bill is to throw a sop to the Government and people of Mexico who demand that we do something to clean house before they will permit any more of their contract nationals to cross the border. Mexico is righteously indignant at the conditions under which their people must work and live on the farms of the United States. They recognize that only if we force the corporation farmer to provide decent living conditions and pay decent wages will he do so. They also recognize that as long as the border is open to crossings at will, and as long as a mass of cheap wetback labor is available, conditions will get no better and their contract nationals as well as our native migrant labor will pay the penalty. Writing this protective clause for the employer of

wetbacks into S. 1851 simply underwrites the purpose of the large farmer's associations to have Congress pass the kind of a measure which will persuade the Government of Mexico to extend its agreements with the United States to provide a continuing supply of contract nationals, while at the same time doing nothing to jeopardize the supply of wetbacks who can be more easily ground into the dirt from which they squeeze fantastic profits for the corporation farms.

The proviso in paragraph (4) of section 1 of this bill must be stricken out if we are to keep faith with ourselves and with our Mexican neighbors. It must be stricken out as a sign that this Congress is in no mood to temporize with the forces responsible for the human misery spreading through the South, the Southwest, and into other sections of the land. It must be stricken out if we are to raise the intolerable living standards of American farm labor in those areas, and if we are to keep the millions of legitimately run small farms in this country secure from the merciless competition of the corporation farms. We do not want our food supplies brought to us from farms made more fertile by the flesh and blood of ill-fed, ill-housed, and ill-clothed human beings.

There is no reason why the same standards of living cannot prevail among our farm labor population as prevails among our factory workers. No reason save the greed and selfishness of those who are willing to grind people into the ground so that they may grind more profits from it. The factory sweatshops of the 1800's find their counterpart on many of the corporation farms of America today. It is time we legislated them out of existence just as enlightened Congresses legislated the sweatshop out of existence. S. 1851 as it now stands is only a gesture in that direction. If we give real authority to our Immigration Service officers and eliminate from the bill the free hand given to employers of wetbacks we shall have taken a giant stride.

Mr. Chairman, it is my purpose to move or support amendments which will be offered to strike from S. 1851 the proviso protecting the willful employers of wetbacks, and to revise paragraph (c) of section 1 of the bill so that Immigration Service officers may effectively root the wetbacks out of the farms on which they are hidden in semislavery. I strongly urge my colleagues who value humanity more than the fattened profits of the corporation farmers to do the same.

The bill, unless drastically improved, is a weak approach to a solution of a critical social and international problem. True it is some approach, and any improvement in the present loosely legislated situation is for the better. I hope the bill is made better than it is.

Mr. WALTER. Mr. Chairman, I offer an amendment.

The Clerk read as follows:

Amendment offered by Mr. WALTER: Page 3, line 10, after "officers", strike out "of the United States."

Mr. WALTER. Mr. Chairman, the purpose of this amendment is to make it

possible for any law enforcement officer to make an arrest. It is necessary because under the language as contained in the Senate bill the only officers authorized to make arrests are members of the Immigration and Naturalization Service or of the FBI. Now quite obviously it is not always possible to attract the attention of officers of those classifications, and I feel that any law enforcement officer, whose duty it is to enforce the criminal laws, should have the authority under this statute to make an arrest of a felon.

The CHAIRMAN. The question is on the amendment offered by the gentleman from Pennsylvania.

The amendment was agreed to.

Mr. WALTER. Mr. Chairman, I offer an amendment.

The Clerk read as follows:

Amendment offered by Mr. WALTER: Page 3, line 17, strike out "issue his warrant" and insert "obtain a warrant under oath from any court of competent jurisdiction."

Mr. WALTER. Mr. Chairman, this amendment is designed to require the Attorney General or his subordinates to obtain a search warrant where it is the intention of these officers to make a search. It is the intention by this language to give jurisdiction to any court of competent jurisdiction, whether it be a State or a Federal court.

Those who argue that it would be very difficult to obtain search warrants in certain sections of the country should bear in mind the fact that in the event that local judges would not issue search warrants, then, upon cause shown, it would be entirely possible for the enforcement officers to obtain the necessary search warrant in the United States courts.

While there is authority, and I believe it is ample authority, for this administrative search warrant, so-called, nevertheless I feel that we ought not to take any chances on running afoul of the provisions of the Constitution. For that reason, I feel that this amendment is necessary.

Mr. HILLINGS. Mr. Chairman, will the gentleman yield?

Mr. WALTER. I yield to the gentleman from California.

Mr. HILLINGS. In the gentleman's opinion, the amendment he is now offering will definitely satisfy the constitutional provision under amendment 4 of the Constitution guaranteeing the right of protection against unlawful and unreasonable search and seizure; is that correct?

Mr. WALTER. Yes; that is correct. There are, of course, precedents for the so-called administrative warrants. The Postmaster General has the authority to issue an administrative search warrant. The Public Health Service has the same authority. However, on examination of the cases I do not find where the constitutionality of either of those statutes has been passed upon. In my judgment, there is a very serious question as to whether or not the language in the Senate bill violates the fourth amendment of the Constitution.

Mr. HILLINGS. In effect, what the gentleman's amendment will do is sub-stitute existing law as codified in rule 41, title 18 of the United States Code, for the language now in section (c) of the bill?

Mr. WALTER. Yes; that is in effect what this language does.

Mr. HILLINGS. I believe the amendment is most worthy of support, particularly at a time when we are concerned about our freedoms in this country. It seems particularly important that we guarantee the protection of those freedoms as outlined in the Constitution.

Mr. WALTER. More than that, I think it is essential that we endeavor to enact legislation that will make it possible to impose a penalty on the most serious offenders in cases of this sort, namely, those people who are willfully and knowingly harboring aliens illegally in the United States.

Mr. HILLINGS. I agree with the gentleman. I think this amendment will make it possible to properly enforce the law as contained in the other sections of the bill.

Mr. FISHER. Mr. Chairman, will the gentleman yield?

Mr. WALTER. I yield to the gentleman from Texas.

Mr. FISHER. Will the gentleman again read his amendment? I must have missed part of it.

Mr. WALTER. Mr. Chairman, I ask unanimous consent that the Clerk again read the amendment.

There being no objection, the Clerk again read the amendment.

Mr. FISHER. Is that the only amendment the gentleman proposes to offer to subsection (c) on page 3?

Mr. WALTER. Yes. Then the language would continue, "authorizing the immigration officer named therein," meaning the search warrant thus obtained.

Mr. FISHER. Does the gentleman feel that the Constitution authorizes the issuance of a search warrant for going on private property for the purpose of interrogating people, not searching for anything, but just the general interrogation authority?

Mr. WALTER. I actually do not think the search warrant is necessary for that purpose, but in an overabundance of caution, to see that violence is not done to the Constitution, this language has been offered. I feel that under the law where an immigration officer has reason to believe that aliens are illegally on a man's premises he has a right to interrogate those aliens. I do not think any search warrant is necessary.

Mr. FISHER. I am sure if he has probable cause under the proper circumstances he can do it, but I am sure the gentleman would agree that he would be responsible for the abuse of that authority if he did not have proper authority.

Mr. CELLER. Mr. Chairman, I move to strike out the last word, merely possibly to clarify the amendment offered by the gentleman from Pennsylvania.

When the gentleman uses the words "Court of competent jurisdiction" I presume he means a court of record; is that not correct?

Mr. WALTER. That is correct.

Mr. CELLER. By the rules of criminal procedure, rule 41, under the title "Search and Seizure," which rules of criminal procedure were adopted by the Congress under title 28 of the United States Code, we have the following:

Authority to issue warrant: A search warrant authorized by this rule may be issued by a judge of the United States or of a State or of a Territorial court of record, or by a United States Commissioner within the district wherein the property sought is located.

So I think in any future interpretations of this amendment, if it is adopted, and I hope it will be adopted because I am in favor of it, the courts are now instructed (as per the following), at least so far as I am concerned, and if I hear no objection to what I say, the courts are deemed to consider this as the view of the House: That when the words "competent jurisdiction" are used that means a court of record either of the State or of the United States.

Mr. HILLINGS. Mr. Chairman, will the gentleman yield?

Mr. CELLER. I yield.

Mr. HILLINGS. Did I understand the gentleman from New York, the distinguished chairman of the Committee on the Judiciary, to refer to the rule, which he has been reading, as title 28 of the United States Code?

Mr. CELLER. No, I was referring to rule 41 of the Rules of Criminal Procedure, which is title 28 of the United States Code.

Mr. HILLINGS. I see. There was a confusion in my mind over the fact that the law as to the issuing of warrants is codified under rule 41, title 18, but the rule to which you are referring comes under the Rules of Criminal Procedure, is that correct?

Mr. CELLER. That is correct. I just wanted to make this statement so the courts interpreting this amendment will be guided by what we say here.

Mr. HOFFMAN of Michigan. Mr. Chairman, I move to strike out the last word.

Mr. Chairman, I am no doubt laboring under the same disadvantage as many other Members of the House in that we lack time to give this legislation the consideration which it merits. But having the greatest confidence in the judgment and ability of the gentleman from Pennsylvania [Mr. WALTER] and in that of the gentleman from Pennsylvania [Mr. GRAHAM] as well as in like qualities of the gentleman from Texas [Mr. FISHER], I would like to have the gentleman from Pennsylvania [Mr. WALTER] tell me whether this legislation, as now proposed, authorizes anyone other than the courts to issue search and seizure warrants.

Mr. WALTER. The bill, as it passed the other body, authorized the Attorney General to designate certain commissioners in the Bureau of Immigration and Naturalization to issue search warrants. The amendment, which I offer, requires the warrant application to be

made under oath to a court of competent jurisdiction.

Mr. HOFFMAN of Michigan. Instead of to an immigration official?

Mr. WALTER. That is correct.

Mr. HOFFMAN of Michigan. Is that the understanding of the gentleman from Pennsylvania [Mr. GRAHAM]?

Mr. GRAHAM. Yes; that is my understanding.

Mr. HOFFMAN of Michigan. Then, that would take care of the objection of the gentleman from Texas; would it not?

Mr. GRAHAM. We think so.

Mr. FISHER. Mr. Chairman, I rise in opposition to the pro forma amendment.

Mr. Chairman, I have asked for this time in order to try to get a little more clarification of the import of the pending amendment of the gentleman from Pennsylvania. Is it true under the terms of the pending amendment that the Attorney General or any district director or any assistant director of the Immigration and Naturalization Service would not be permitted to issue a search warrant for any purpose?

Mr. WALTER. Yes; it is very plainly stated. The words are "must obtain a warrant under oath from any court of competent jurisdiction."

Mr. FISHER. When the court issues that warrant it must be based upon probable cause; is that correct?

Mr. WALTER. Certainly; and I do not think that the Immigration Service is going to work under any particular hardship, even in those counties in Texas where judges of the courts are the most flagrant violators of the law. I think that in those circumstances the immigration authorities can go to the United States courts, and upon proper showing obtain a search warrant, and search premises in which illegal border crossers are being concealed and harbored.

Mr. FISHER. But, under the amendment proposed this warrant would be obtained "upon information indicating a reasonable probability that in any designated land or other property, aliens are illegally within the United States." That language remains in the bill. In other words, it must not be based necessarily upon probable cause at all, but, to quote again, "upon information indicating a reasonable probability." Does not the gentleman think that the language ought to be the same as it is now in the issuance of a warrant for search for stolen property, or other similar offenses under the criminal code? I am afraid this merely gives them a blank check to obtain a search warrant upon a hunch, without any probable cause at all. It is a complete departure from the constitutional protection that has always been recognized in making searches.

The gentleman's reference to the courts is, I can assure you, both unwarranted and unfair.

Mr. WALTER. Well, I do not know whether the gentleman can determine "probable cause" as contained in the fourth amendment to the Constitution from the language contained in this statute. Frankly, I cannot. I have examined authorities. I am sure the terminology is synonymous.

Mr. FISHER. I will confer with the gentleman further regarding that. The gentleman has offered an amendment and he says it has a certain meaning. I want to be sure of that.

Let me ask the gentleman another question. Under the terms of this bill these search warrants, which may be more accurately described as a fishing expedition, have to be returned in 30 days. In other words, the applicant says: "There are some illegal aliens at a certain place at this time." The search warrants are issued and they have 30 days within which to go out and look for them. Does the gentleman think that is a reasonable time?

Mr. CELLER. Mr. Chairman, will the gentleman yield to me on the prior question?

Mr. FISHER. My time is about to expire.

Mr. CELLER. The gentleman can get more time. I would like to read to the committee rule 41, subsection (c):

Warrant shall issue only on affidavits sworn to before a judge or commissioner, establishing the grounds for issuing the warrant. If the judge or commissioner is satisfied that the grounds for the application exist and there is probable cause to believe that they exist, he shall issue the warrant, identifying the property, naming or describing the place or person to be searched.

You have that in the law now.

Mr. FISHER. Is the gentleman agreeable to inserting that in this present bill?

Mr. CELLER. Why have it in this bill? It is now the law. A warrant can only be issued on probable cause.

Mr. FISHER. But you can change laws and amend them and the present bill proposes amendments.

The CHAIRMAN. The time of the gentleman from Texas has expired.

Mr. FISHER. Mr. Chairman, I ask unanimous consent to proceed for five additional minutes.

The CHAIRMAN. Is there objection to the request of the gentleman from Texas?

There was no objection.

Mr. FISHER. The gentleman's position is that this does not in any way affect the main provisions of existing law which he has just read?

Mr. CELLER. It does not.

Mr. FISHER. Is it the gentleman's position, then, that the language which he has put into this bill saying that a search warrant can be issued on information indicating reasonable probability is meaningless, and that it will actually have to be on probable cause? Is that the gentleman's position?

Mr. CELLER. I do not think there is any real difference between the language of the rule I have mentioned and the language of the bill.

Mr. FISHER. I regret that the amendment to the bill before us is not more specific. It provides an improvement in the bill, and I am pleased to have the gentleman's assurance that there will be the same requirement for probable cause in obtaining a search warrant under this bill as would be the case if a warrant were issued for the search of stolen property, for example.

Mr. CELLER. It is very difficult to amend a bill as carefully considered as this has been. These are words of art, legal art, that have been used in the bill. Now, suddenly to come upon us and ask us to change that language—I would want as a result of mere surface thinking to accede to the gentleman's request; so I think it perfectly safe when you have the provisions in rule 41 that the warrant can only be issued upon probable cause; then in addition when you have the safeguards that are in the bill itself, I do not think the gentleman need be concerned at all.

Mr. FISHER. I appreciate the gentleman's solicitude about my concern, but I still am at a loss to understand why the gentleman says that because of the art in which this language was designed and put into this bill there is something sacrosanct about it and it should not be changed to conform to the exact words now in the existing law on other subjects.

One other question I was going to ask the gentleman: I should like to know why the gentleman feels that these general search warrants to look for anybody without any description of the people they are going to look for, without any allegation of what they look like, their names, or anything else, that they are going to use blanket search warrants, general search warrants, and have the right to use them for 30 days without making a report—why wait 30 days to look for a criminal or violator when he is known? The general practice on time for making these reports is 10 days.

Mr. CELLER. The rule now applicable, which is not changed by these provisions, says that the warrant must identify the property, must name or describe the person or place to be searched. I do not know what more the gentleman wants. That is in the law now.

Mr. FISHER. There is no description whatever in the bill; it does not require the description of any persons they are searching for, none whatever. It is just a fishing expedition; that is what it means. Now, it is all right for them to have the power to search places, but let it be in conformity to established rules and procedures that have always been followed in protecting people against unreasonable searches and seizures.

One further question of the gentleman before I conclude, Mr. Chairman; will the gentleman indicate, if he knows, how long a time is permitted an officer under present law to return a search warrant that is issued for searching for stolen property?

Mr. WALTER. There is no limit.

Mr. FISHER. Oh, yes; it is 10 days.

Mr. WALTER. What is it?

Mr. FISHER. Ten days.

Mr. WALTER. I do not know of any limitation on any Federal search warrant.

Mr. FISHER. Yes; there is, if the gentleman will only read it. Why should we wait for 30 days? That, of course, puts the imprint of blanket authority, a general right to search with absolute freedom and without any restriction and without any immediate anticipation of what they are going to do when it is

issued, because they will have 30 days to make the search day after day, night after night, day or night. Why grant it for 30 days? That is a very dangerous departure from every precedent in every law we have ever had. If you know a man is wanted why wait for 30 days to get him? As a matter of fact, why not go out and get him right away? What are they doing waiting 30 days? That in itself raises a question of the good faith of those who obtain warrants under these circumstances.

This bill contains some provisions which every one approves, and I wish some undesirable provisions could be corrected to prevent unwarranted abuse of the authority that is given.

Mr. MORRIS. Mr. Chairman, I move to strike out the last word.

Mr. Chairman, I would like to have this matter clarified. Amendment IV to the Constitution reads as follows:

The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Now, in reference to the unreasonable search part of it, I take it that what is meant generally is when an officer sees a person in the commission of a crime he has a perfect right to make an arrest and to make a search as an incident to the arrest; also when an officer discovers by seeing, smelling, and so forth that an offense is being committed in his presence he has a right to search as an incident to that arrest. But the Constitution provides, Mr. Chairman, and I repeat, that no warrant shall issue but upon probable cause supported by oath or affirmation.

Section (c) on page 3 of this bill provides:

When the Attorney General or any district director or any assistant district director of the Immigration and Naturalization Service has information indicating a reasonable probability.

It seems to me that is not sufficient under the Constitution of the United States.

I ask, where in section (c) do you find any provision whatsoever that the warrant will issue upon oath or affirmation? How can you pass any law without that provision?

Mr. WALTER. Mr. Chairman, will the gentleman yield?

Mr. MORRIS. I yield to the gentleman from Pennsylvania.

Mr. WALTER. The gentleman was not here when the amendment was read apparently. It provides that it is necessary to obtain a warrant under oath from any court of competent jurisdiction.

Mr. MORRIS. Has that been adopted?

Mr. WALTER. It has not been adopted. It is before the committee at this time.

Mr. MORRIS. I am speaking on that amendment. The amendment ought to be adopted, there is no question about

that, else it would be unconstitutional and very dangerous.

This says that the Attorney General or any district director or any assistant director may issue the warrant. Will this amendment take care of that? Does it provide that the warrant can only be issued by a court?

Mr. WALTER. By a court of competent jurisdiction.

Mr. MORRIS. Then we ought to adopt the amendment and that will cure it.

Mr. WILSON of Texas. Mr. Chairman, will the gentleman yield?

Mr. MORRIS. I yield to the gentleman from Texas.

Mr. WILSON of Texas. If the amendment is adopted, will that be sufficient? I am of the opinion it will be. There seems to be some difference of opinion here.

Mr. MORRIS. I would want to study the language and I shall study it immediately. I rather think it will from what the gentleman from Pennsylvania has suggested. I believe it will be sufficient, but I want to study the language before I answer that finally.

The CHAIRMAN. The question is on the amendment offered by the gentleman from Pennsylvania [Mr. WALTER].

The amendment was agreed to.

The Clerk read as follows:

SEC. 2. The last proviso to the paragraph headed "Bureau of Immigration" in title IV of the act of February 27 1925 (43 Stat. 1049; 8 U. S. C. 110), as amended by the act of August 7, 1946 (60 Stat. 865), is hereby further amended so that clause numbered (2) shall read:

"(2) within a reasonable distance from any external boundary of the United States, to board and search for aliens any vessel within the territorial waters of the United States and any railway car, aircraft, conveyance, or vehicle, and within a distance of 25 miles from any such external boundary to have access to private lands, but not dwellings, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States, and."

Mr. PHILLIPS. Mr. Chairman, I offer an amendment.

The Clerk read as follows:

Amendment offered by Mr. PHILLIPS: On page 4 strike out the words on line 10 beginning with "and within," line 11 to and including the words on line 12 ending with "but not dwellings."

Mr. PHILLIPS. Mr. Chairman, the amendment which I have just offered follows the amendment offered by the gentleman from Pennsylvania [Mr. WALTER]. The gentleman from Pennsylvania offers an amendment which requires that a search warrant be secured from a court of competent jurisdiction. That is the proper way to handle the matter.

Now that the first part of the bill has been amended to make it necessary to go to a court of competent jurisdiction, which is correct, and which I was glad to support, it becomes unnecessary to have in the bill this area, this band of 25 miles along the external border. It is discriminatory and it is unnecessary and I hope the gentleman from Pennsylvania will accept the amendment.

What I am striking out are the words "and within a distance of twenty-five miles from any such external boundary to have access to private lands."

This is antagonistic to the basic theory of our Government of the right of a man to have his property, his home—and these are homes as well as farms—free and safe from search except under the provisions of a search warrant procured from a court of competent jurisdiction. That is the intent of the amendment.

Mr. WALTER. Mr. Chairman, I rise in opposition to the amendment.

Mr. Chairman, the adoption of this amendment would mean that we are merely restating existing law. The purpose of this language is to permit the border patrol and the Immigration and Naturalization Service to patrol those vast areas, not any dwelling houses, not any buildings, for the purpose of apprehending people who are being surreptitiously brought across the border at points other than the established border crossings. The adoption of this language would make it absolutely impossible for the immigration people to patrol our borders.

It is indeed unfortunate, and I repeat what I said yesterday, that we should consider this as being only a wetback bill. It is not anything of the sort. Those of us along the Atlantic seaboard, it seems to me, are on one side trying to get rid of aliens illegally in the United States, and there are other people here who want to keep them. I should think that the gentleman from California would consider the fact that this is a law now under consideration applying to all parts of the United States. As far as this border patrol phase is concerned, there are hundreds and thousands of miles along the borders between the United States and Mexico and the United States and Canada. Now if our border patrol would not have the right to pass freely over that open territory in order to attempt to apprehend these people, then it certainly seems to me that we are not doing our full duty toward aiding the properly constituted officers to enforce the law.

Mr. Chairman, I ask that the amendment be defeated.

Mr. GRAHAM. Mr. Chairman, I rise in opposition to the amendment.

Mr. Chairman, it seems to me the first thing we should do in connection with this matter is be properly informed on the law. The fourth amendment to the Constitution has been quoted. Remember what it states, "their persons, houses, papers, and effects." It does not mention the transport of human beings. These human beings that are being imported into this country are not only the so-called wetbacks but others that come across the border in other places. You can locate a paper or the personal effects of an individual, but you cannot locate the individual if he moves around from place to place.

If this amendment were to succeed, instead of the border patrol going right along for 25 miles, they would have to look in and out, in and out, leaving bare great unexplored and uninspected places.

The second thing it seems to me we ought to realize is this: In the case of *Hester* v. *United States* (265 U. S. 52), the Supreme Court has said:

The amendment does not mean that the lands or premises of a person shall not be searched; these are not included in the term "house."

Note that the lands and premises may be searched.

There is nowhere any provision against an officer searching one's land or premises without a warrant.

That is exactly what these border patrolmen will do. They will search the land without entering the house. Therefore, there is no violation of the fourth amendment.

Finally, let us realize the nature of deportation proceedings. In the case of *Quan Quan Poy* v. *Johnson* (273 U. S. 352), the Supreme Court held that deportation proceedings are not criminal. All the arguments in the last 2 days we have heard on the authority of the issuance of search warrants have been directed to the fact that they were criminal proceedings. Deportation proceedings are not criminal proceedings. They are intended to get these individuals who have been surreptitiously and illegally brought into this country. We have now the word of the Supreme Court that deportation proceedings are not criminal prosecutions within the meaning of the fifth and sixth amendments.

It is stated:

The authority to deport is drawn from the authority of Congress to regulate the coming of aliens within the United States and to impose conditions upon the performance of which the continued liberty of the alien to reside within the country may be made to depend; and findings of fact reached by executive officials after a fair though summary hearing may constitutionally be made conclusive.

Now, to crystallize this matter, here is a provision in this bill which provides for a search along a great border, either the Mexican or Canadian border, whatever border it may be, going back for 25 miles, for the purpose of searching the lands, not the houses but the lands, in furtherance of the authority as laid down in the fifth and sixth amendments, of deporting those aliens who have been unlawfully brought into this country. It is not to search the persons, houses, papers, and effects, but to search for aliens illegally within our borders.

There is the whole thing in a nutshell. What we are asking for is not the case of Texas alone, but for the whole border of the United States. In the section around New York it is estimated there are over 200,000 aliens at the present time who have come in in avoidance of the law, who have been gathered up by certain contractors and herded and used for their selfish purposes. The same thing applies along the Canadian border. So, in fixing a law that embraces the whole territorial extent, all of the 18,000 miles of the boundaries of the United States, taking care of all the 48 States, it is necessary that we apply this in a manner that will cover the whole thing.

Mr. MORANO. Mr. Chairman, will the gentleman yield?

Mr. GRAHAM. I yield to the gentleman from Connecticut.

Mr. MORANO. The gentleman says a deportation proceeding is not a criminal proceeding?

Mr. GRAHAM. It is so held by the Supreme Court.

Mr. MORANO. Under the proposed law, the harboring of such illegally entered alien would be criminal; is not that so?

Mr. GRAHAM. If it is done with the knowledge that he entered unlawfully, and was being harbored in violation of the law.

Mr. MORANO. There would not be any criminal procedure against the alien who entered, but there would be against the man or woman who harbored him; is that correct?

Mr. GRAHAM. The proceedings would be possible against both in this sense, that while the importation proceedings are not exactly criminal in nature, they are in effect in that the man is to be deported or returned to where he came from. That is to be done on the part of the immigration official. On the part of the individual who has harbored him unlawfully, knowing that he entered unlawfully—and get this chain of thought, as explained yesterday in the Supreme Court decision.

The CHAIRMAN. The time of the gentleman from Pennsylvania has expired.

Mr. FISHER. Mr. Chairman, I move to strike out the last word.

Mr. Chairman, I rise in support of the amendment, offered by the gentleman from California. I hesitate to take more of the time of the House, which has already heard quite a bit of explanation from me about the different phases of this bill today, but since it happens that I represent a district which runs along the Mexican border for some distance, I think I am fairly well acquainted with the situation there.

Mr. Chairman, I would like to explain very briefly what this situation is. I think there is a great deal of confusion about it, and if I can contribute anything toward a better understanding of what we are dealing with, I feel I will be doing my duty here with respect to this proposition.

What is being attempted? A few moments ago there was approved tentatively an amendment to this bill which gave quite a bit of latitude in the issuance of search warrants for the searching for illegal aliens without naming them, or identifying them, or describing them in any way when the search warrant is obtained. That search-warrant provision applies along the 25-mile area. But, they are not satisfied with that. They want authority—blanket authority—a permanent easement, if you please, for all of the immigration officers in the country to have access to people's property to come and go, day or night, any time of the year, any time of the week, over an area of 25 miles from the border for the purpose of patrolling the border. Of course, you have to patrol the border. No one would defend the position that officers should not have reasonable access to the border in order to prevent aliens from coming in who are illegals—of course not—they have that authority now. Several members of the Committee on Agriculture are present on the floor at this time. They had a great deal to do with the foot-and-mouth disease and the patrol work that goes with it. At one time 660 patrolmen were patrolling the Rio Grande. Did they come to Congress to get blanket authority and a permanent easement to enter land 25 miles from the border in order to patrol that area? Of course not, because they did not need it, they have that authority. The immigration authorities have that same authority now, but they cannot abuse it, they cannot go out miles from the border without any possible recourse to any person for abuses or indiscretions that may be involved in searching over a distance of 25 miles from the border. They must be reasonable about it, and they must not abuse that right. The question was raised about the authority of the patrolmen to go up and down the border under the foot-and-mouth-disease program, under the quarantine. I have a letter here from Dr. Simms, in which he discusses that. Here is what he says in a letter which was written on February 8 of this year. Dr. Simms is in charge of this program, and this is a statement that he made.

Some years ago when a question came up concerning the authority for Bureau of Animal Industry inspectors to enter private property in patrolling the Mexican border, we were advised that although there did not appear to be any specific legislative authority for the entry of our inspectors upon private property for the purpose of patrolling the border to enforce the foot-and-mouth-disease quarantine, which such entry is essential to the carrying out of the quarantine, a position of implied authority to enter existists.

And, he said he had the legal authority to do that. The letter reads further as follows:

Under these conditions it was of course desirable that entry of private lands for the purpose of patrol should be made with the cooperation of the property owner.

He went on to say:

However, we have been further advised that if the entry cannot be made with the cooperation of the property owner that the implied authority may be relied upon.

In other words, they have the authority now. There is no question about it. If they have authority to go on property, as he indicates here, to prevent livestock from coming across under the livestock quarantine, certainly the immigration authorities have the implied authority to go along the border for the purpose of patrolling or enforcing the quarantine against illegal aliens coming in. But that authority applies to the border—not to a 25-mile area far removed from the border itself.

There is no question about it. But why should we give them a 25-mile permanent, perpetual easement, to go on property at all hours of the day or night, break down gates if they need to, interfere with livestock, and run roughshod if they so desire—and some of them

sometimes are inclined to do that—over that vast area? Why do they not go and get the search warrant they have been fighting for? They can already operate within a reasonable distance of the border under the present law, and this amendment should be adopted. You will still have all the enforcement you need under this law, all that any person could reasonably ask for.

The CHAIRMAN. The time of the gentleman from Texas has expired.

Mr. HILLINGS. Mr. Chairman, I rise in support of the amendment, and I yield to the gentleman from California [Mr. PHILLIPS] for a unanimous-consent request.

Mr. PHILLIPS. Mr. Chairman, I observe what it is that is causing the argument over the amendment, which I did not think was that controversial. I ask unanimous consent, at the end of the amendment as I placed it on the desk, that the word "and" may be added.

The CHAIRMAN. Is there objection to the request of the gentleman from California?

There was no objection.

Mr. PHILLIPS. Mr. Chairman, will the gentleman yield further?

Mr. HILLINGS. I yield.

Mr. PHILLIPS. That makes it read in brief "within a reasonable distance from any external boundary of the United States, to board and search for aliens any vessel within the territorial waters of the United States," under the provisions adopted in the previous amendment, "and for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States."

It was not intended to shut off the right to patrol the border under the terms of the act as it presently exists, or under proper patrol. It was my intent, as it was the desire expressed by the gentleman from Texas [Mr. FISHER], to confine it, not to a 25-mile limit arbitrarily, not to a fixed distance, but only to that necessary area required for patrol. I think this is a desirable and necessary amendment.

Mr. HILLINGS. Would the gentleman read the entire section as it would read with his amendment?

Mr. PHILLIPS.

Within a reasonable distance from any external boundary of the United States, to board and search for aliens any vessel within the territorial waters of the United States and any railway car, aircraft, conveyance, or vehicle and for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States.

Mr. HILLINGS. I thank the gentleman. I think the clarification which the gentleman has made of the amendment to that section shows that there is no intention of preventing reasonable search of border territory in conformity with the operation of the Immigration Service. With that purpose in mind the amendment is worthy of support.

Mr. HUNTER. Mr. Chairman, will the gentleman yield?

Mr. HILLINGS. I yield to the gentleman from California.

Mr. HUNTER. On what basis would the arbitrary distance of 25 miles be fixed?

Mr. HILLINGS. Perhaps that question had better be directed to the gentleman from Pennsylvania [Mr. WALTER].

Mr. WALTER. The distance of 25 miles was a compromise agreed upon by the proponents and the opponents of the bill. It was a distance arbitrarily selected. In the House omnibus bill it is "reasonable distance," but the objection still exists to the amendment offered by the gentleman from California [Mr. PHILLIPS], because access to private lands is not given. That is the important part of the whole amendment. The amendment offered by the gentleman denies access to private land for patrolling purposes.

The CHAIRMAN. The time of the gentleman from California has expired.

Mr. BENTSEN. Mr. Chairman, I was born and reared 5 miles from the Rio Grande on the Mexican border. Down there on the Rio Grande in south Texas we feel that our private-property rights are just as sacred and just as much to be preserved as those in the interior of the United States.

If we say we are going to require that search warrants in the interior of the United States be issued by a recognized court, then we along the borders are also entitled to the same right. We have no objection to patrolling the Rio Grande; certainly I would agree to an amendment which left it at 1 mile, because I can see the necessity for patrolling the border, but I believe that the present amendment which sets a 25-mile limit where border patrolmen can come into private property without a search warrant is arbitrary. We will find most border patrolmen are capable and of good judgment but in a force of that size some overzealous border patrolmen will abuse their authority. It would be a very serious thing to have happen to those border areas. Over in Russia today they have set up an iron curtain and they have condemned the land along the borders for an area of several miles for the purpose of catching people going across. Are we going to do the same thing here in the United States? Are we going to violate private property along the border? Are we who live within 25 miles of the border to be denied the rights that citizens in the interior of the country enjoy? We enjoy our privacy as much as you do yours. This legislation without the proposed amendment is discriminatory.

I know the argument will be made that they can catch them better in 25 miles than they can in 1. That may have been true in years gone by in the horse and buggy days, but in this age of modern transportation a person trying to cross the border and evade the border patrol is not limited to the first 25 miles, for in 30 minutes he can be far into the interior of the United States. I agree that they should have authority to patrol along the Rio Grande to enforce our laws and to enforce the bill; but there is no justification to say that those of us who live as much as 20 or 25 miles away from the border are without pri-

vate property rights, but when we suddenly reach a patrol line of 25 miles once again regain our rights in our private property.

I know that people who live in the cities sometimes do not realize the situation we along the border are up against, that we too are entitled to the same property rights. We feel just the same about our private lands as they do about their homes, and we do not want a pistol-toting overzealous border patrolman abusing our rights and violating our private interests; and we very sincerely ask the sponsors of this discriminatory legislation to see that we have the same private rights that you have in the interior of the United States, and require that search warrants issued by a recognized court must be obtained before they can invade our private property.

Mr. PHILLIPS. Mr. Chairman, will the gentleman yield?

Mr. BENTSEN. I yield.

Mr. PHILLIPS. I want to ask the gentleman from Pennsylvania a question, if I may: Where do you read in this bill inability to patrol the immediate area along the border within a reasonable distance from any external boundary for the purpose of patrolling the border to prevent illegal entry?

Mr. WALTER. It was felt by the proponents of this legislation that in view of the action on the part of certain Texans in resisting patrolmen by using sawed-off shotguns, rifles, and what not, that it was necessary to spell out the right to have access, to ride their horses and their jeeps along over private lands, and by eliminating this language "the private lands" if the gentleman's amendment is adopted then the right to patrol the border is certainly limited.

Mr. PHILLIPS. It confines it to a reasonable distance. I might ask where the patrolmen were who were being resisted by the Texans, but I do not think that has anything to do with the discussion.

Mr. BENTSEN. To some extent, this seems to be aimed at Texans. Let me cite the case of a Texan, Mr. Cavazos had a family living in their home; he had a rather large family, so he had to house some of them in a garage apartment. Early one morning his children were awakened to find some overzealous border patrolmen were shining lights in their eyes without any warrant of any kind. And do not tell me that some of them will not abuse authority if they have it, because I have seen it from past experience. That is why I ask you to see that we have the same protection as the rest of the citizens of the United States have.

Mr. WALTER. Does not the gentleman feel that the language already adopted is sufficient?

Mr. BENTSEN. No; not in the 25-mile limit.

The CHAIRMAN. The question is on the amendment offered by the gentleman from California.

The question was taken; and on a division (demanded by Mr. WALTER) there were—ayes 53, noes 43.

Mr. WALTER. Mr. Chairman, I demand tellers.

Tellers were ordered, and the Chairman appointed as tellers Mr. WALTER and Mr. PHILLIPS.

The Committee again divided; and the tellers reported there were—ayes 76, noes 81.

So the amendment was rejected.

Mr. FISHER. Mr. Chairman, I offer an amendment.

The Clerk read as follows:

Amendment offered by Mr. FISHER: On page 4, line 10, strike out the words "twenty-five" and insert in lieu thereof "five."

Mr. FISHER. Mr. Chairman, I hope the committee is willing to accept this amendment. In other words, the committee having just acted to refuse to strike out the 25-mile blanket authority provision to all the patrolmen in the service, the pretended purpose and objective of it being to allow them to patrol the border, we now say that it should be at least within a reasonable distance, if that is the position the House desires to maintain. We feel that 5 miles is a reasonable distance. As has been very well pointed out here, property rights, security, the privacy of those who happen to own land within a 25-mile radius of an international border is just as sacred as that owned by people 1,000 miles away over in Michigan, Ohio, or any other place in the Nation. Five miles is enough.

As I have already pointed out, it has been demonstrated by the patrolmen in the foot-and-mouth-disease quarantine program along the Rio Grande, that they have no difficulty whatever; that they now have legal, implied authority to patrol the Rio Grande in preventing livestock from coming across. Likewise there is no question but what the immigration officers now have the implied authority against illegal aliens coming across to go on people's land. They are doing it every day, and all this poppycock here about somebody using a shotgun on somebody, somewhere, at some time, is the kind of a story that could not withstand a very severe cross examination, I am sure. I never heard of such things in all my life, and I have lived down there all my life. I never heard of an instance where immigration officers had any difficulty in patrolling along the river. They have been doing it for 100 years. Now what do they want to do? They just do not want ordinary patrol along the Rio Grande; that is not what they want. The immigration authorities wrote this language, and not the committee. They want authority, a permanent easement for 25 miles, to send their men day or night, 10 and 20 times a day, if they desire, to break down a gate or a fence or anything else in order to carry out their functions of patrolling the border maybe 25 miles away from where an event took place. Now, do you want to give that kind of blanket, unrestricted authority to a large group of people to invade the privacy of people's own land, their own premises? They can get a search warrant, which has already been authorized in this bill, with practically no showing of probable cause. But, let them do it according to law. Let us not give them a permanent easement, a perpetual right, at all hours of the day or night, to go on people's private property, who happen to live in that 25-mile area. I dare say if that authority was extended in your district, in the Middle West, or in the North, or any place else, you sure would be in here fighting this kind of a thing giving them permanent privileges to go on your land day or night. You know, on the ranches in the country of the Rio Grande people raise sheep and goats. During the lambing and kidding seasons—as I have already pointed out in general debate—it is a custom—and a necessary one—to lock the gates and keep even their neighbors out. Just driving through a pasture during those times disturbs the livestock, separates the young animals from their mothers, and heavy losses usually result.

Perhaps that does not mean much to you in the East because your constituents are not affected, but mine are. It is important.

It is not a matter of giving the border patrol the authority to enforce the immigration laws against illegal aliens. They can go along there for a distance of 5 miles without any kind of search warrant. So I beg of you in this instance, at least, let us compromise this particular authorization to bring it within reasonable limitations and put it at a distance of 5 miles. It has already been said that the 25 miles was purely arbitrary, something picked out of a clear sky. It was put in by a compromise and set by somebody over in the other body. Let us take it out by a compromise and, in this body, put it down within reason.

Mr. Chairman, I would like to be able to vote for this bill, but I cannot with these objectionable and unnecessary provisions in it. If the objectionable provisions were removed there would still be ample authority for necessary enforcement of laws against illegal aliens.

Mr. WALTER. Mr. Chairman, I rise in opposition to the amendment.

Mr. Chairman, I personally think that the language should be "reasonable distance," but apparently there is so much opposition to anything as vague as that that I will not propose any amendment. However, we must bear in mind this fact in fixing the limit at 5 miles. These aliens are not congregated close to the border, they are spread way up into the State. It is necessary for our border patrolmen to go over the lands leading to the trunk highways. There are many small feeder roads these people get on that the border patrolmen never get on. It is essential that the border patrolmen be given the authority to go across the lands to get onto those feeder roads to apprehend people on the way up to move over to the trunk highways.

Mr. BENTSEN. Mr. Chairman, I rise in support of the amendment.

Mr. Chairman, I will make this short. If the majority of the Committee here today has made up its mind to discriminate against private property rights in border districts, I ask you if you will please cut the discrimination of those property rights from 25 miles to 5 miles.

The border patrol will be well able to do their job despite that cut. I urge you to support the amendment.

Mr. MORRIS. Mr. Chairman, will the gentleman yield?

Mr. BENTSEN. I yield to the gentleman from Oklahoma.

Mr. MORRIS. It is my understanding from the committee, and I should like to have a clarification if it is not true, that the search warrant provision as adopted by the majority as applicable to section (c) would also apply to clause 2 on page 4.

Mr. BENTSEN. No, that is not my understanding. If that were the case, why would they have the 25 miles?

Mr. FISHER. Mr. Chairman, my attention has just been called to the fact that by inadvertence the amendment I offered proposes to strike the words "twenty-five" from line 9 instead of line 10 on page 4 of the bill. It seems there are two versions of this bill, which has caused the confusion. I ask unanimous consent that my amendment be changed to apply to line 10 instead of line 9.

The CHAIRMAN. Is there objection to the request of the gentleman from Texas?

There was no objection.

Mr. McCARTHY. Mr. Chairman, I rise in opposition to the amendment.

Mr. Chairman, I agree with the committee position that the "reasonable-distance clause" should be retained in the bill. I think we should remember that the border between Texas and Mexico is not the only land border that we are concerned about in this bill; that the whole northern half of the United States borders on Canada. The State of Minnesota, for example, has a northern border, which in some places is entirely swamp land and lake so that over a distance of 25, 50, or 100 miles, it is impossible to adequately patrol the border. I think that the 25-mile limitation is a reasonable compromise, and that it should be retained in this bill.

The CHAIRMAN. The question is on the amendment offered by the gentleman from Texas [Mr. FISHER].

The question was taken; and on a division (demanded by Mr. FISHER) there were—ayes 38, noes 70.

So the amendment was rejected.

The CHAIRMAN. Under the rule, the Committee rises.

Accordingly the Committee rose; and the Speaker having resumed the chair, Mr. HERLONG, Chairman of the Committee of the Whole House on the State of the Union, reported that that Committee, having had under consideration the bill (S. 1851) to assist in preventing aliens from entering or remaining in the United States illegally, pursuant to House Resolution 529, he reported the bill back to the House with sundry amendments adopted by the Committee of the Whole.

The SPEAKER. Under the rule, the previous question is ordered.

Is a separate vote demanded on any amendment? If not, the Chair will put them en gros.

The amendments were agreed to.

The SPEAKER. The question is on the third reading of the bill.

The bill was ordered to be read a third time, and was read the third time.

The SPEAKER. The question is on the passage of the bill.

The question was taken; and on a division (demanded by Mr. FISHER) there were—ayes 162, noes 10.

Mr. FISHER. Mr. Speaker, I object to the vote on the ground that a quorum is not present, and I make the point of order that a quorum is not present.

The SPEAKER. The Chair will count.

Mr. FISHER. Mr. Speaker, I withdraw the point of order.

So the bill was passed.

A motion to reconsider was laid on the table.

### RESIGNATION FROM COMMITTEE

The SPEAKER laid before the House the following communication:

FEBRUARY 26, 1952.

Hon. SAM RAYBURN,
*Speaker, House of Representatives,*
*Washington, D. C.*

DEAR MR. SPEAKER: I herewith submit my resignation as a member of the Committee on Interior and Insular Affairs to take effect immediately.

Sincerely yours,

SIDNEY A. FINE.

The SPEAKER. Without objection, the resignation is accepted.

There was no objection.

### ELECTION TO STANDING COMMITTEE OF THE HOUSE

Mr. DOUGHTON. Mr. Speaker, I offer a resolution (H. Res. 535) which I send to the desk.

The Clerk read the resolution, as follows:

*Resolved,* That SIDNEY A. FINE of New York, be, and he is hereby, elected a member of the standing Committee of the House of Representatives on the Judiciary.

The resolution was agreed to.

A motion to reconsider was laid on the table.

### SPECIAL ORDER GRANTED

Mr. McCORMACK. Mr. Speaker, March 4 is the two hundred and fourth anniversary of the birth of Gen. Casimir Pulaski. I ask unanimous consent that the gentleman from Michigan [Mr. DINGELL], after disposition of the legislative business of the day and other matters on the Speaker's desk, may have permission to address the House for 1 hour, and that he may have control of the time and may yield to other Members.

The SPEAKER. Is there objection to the request of the gentleman from Massachusetts?

There was no objection.

### NATIONAL SECURITY TRAINING CORPS ACT

Mr. COX. Mr. Speaker, by direction of the Committee on Rules, I call up House Resolution 528 and ask for its immediate consideration.

The Clerk read the resolution, as follows:

*Resolved,* That immediately upon the adoption of this resolution it shall be in order to move that the House resolve itself into the Committee of the Whole House on the State of the Union for the consideration of the bill (H. R. 5904) to provide for the administration and discipline of the National Security Training Corps, and for other purposes. That after general debate, which shall be confined to the bill and continued not to exceed 12 hours, to be equally divided and controlled by the chairman and ranking minority member of the Committee on Armed Services, the bill shall be read for amendment under the 5-minute rule. At the conclusion of the consideration of the bill for amendment, the Committee shall rise and report the bill to the House with such amendments as may have been adopted and the previous question shall be considered as ordered on the bill and amendments thereto to final passage without intervening motion except one motion to recommit.

Mr. COX. Mr. Speaker, I yield 30 minutes to the gentleman from Illinois [Mr. ALLEN], and yield myself such time as I may use.

Mr. Speaker, by way of suggestion to the Committee on the Armed Services, I should like to say that that committee will have to carry the burden of combating the argument that is being heard in the cloakrooms now that this measure is expected to be used as an Anna Rosenberg social integration scheme.

We are here being called upon to make an important decision. The question is not whether this is the kind of legislation that we want, but it is whether it is the legislation that necessity demands. To make a political issue out of the measure would be a discreditable thing to do. It would be playing fast and loose with the most precious thing we possess, our liberty. To beat our swords into plowshares might be excusable procedure after war has ended and all danger passed, but it would be an act of self-destruction if done in time of deadly conflict. If to make surrender there went with it a reasonable hope of survival, then there might be some excuse for the cowards, but even these should know that to those arrayed against us, mercy and compassion are virtues that are unknown.

Mr. Speaker, we are in the midst of a world conflict between atheistic paganism on the one hand and Christian civilization on the other, and the role that we are playing is by no means inconsiderable. Under the compulsion of the law of self-preservation, we are expending the lives of the young manhood of the country and billions of our national resources, all believed to be necessary to national survival. In making up our minds as to what we should do, it might be well to take into consideration the attitude of those with whom we are at war. Does any one doubt that there is a Communist or a Communist sympathizer who does not want to see this measure fail of adoption? I cast no reflection upon the millions of Christian and right-motived people who oppose compulsory military training. They are so much entitled to their views as I am to mine. I simply think they do not see the picture in its entirety, and therefore do not realize the deadly peril that hangs over our heads—a drawn sword in the iron hand of a spiritual and blood descendant of Genghis Khan.

Is there any doubt anywhere about the designs of Russia? Witness what has happened during the last several years. Latvia, Lithuania, Estonia, Poland, Bulgaria, Rumania, Hungary, Albania, Czechoslovakia, and Eastern Germany have disappeared behind the iron curtain. Witness what Russia has done to China and is attempting to do to India, and what she is doing to undermine the still free governments of Europe and the countries of North and South America. Her minions are everywhere. Her long and sinewy tentacles are fast drawing into her ravenous maw the entire world.

Are there those who, in the face of this record, still contend that to refer to what has happened and is going on is to try to create hysteria and stampede the adoption of this measure? To those who still doubt, who hesitate, let me ask: Has not Stalin in Korea already "opened the purple testament of bleeding war" in which the flower of our young American manhood is dying? What more is needed that the people realize that the security of all mankind is in peril, that the life of the Republic is in jeopardy? How can we afford to longer rely upon reason and moral suasion? Is it safe to merely hope and pray for the restoration of reason and sanity before we go the way of Poland and the Ukraine?

The fact that we have never lost a war does not mean that we cannot lose one. Ours is a great country, but as mighty and powerful as it is, it is not strong enough to contend with the rest of the world organized against us, which means that it would be suicidal for us to draw within our own shell. We either go forward or we perish.

What of the military power of the Soviet Union? It is widely known that in land power the Russians have 4,000,-000 soldiers, with 15,000,000 reservists maintained on a war footing; that she has at her command a million European satellite troops and 4,000,000 highly trained and highly disciplined Chinese. She has more than 50,000 heavy tanks, with a productive capacity of 90,000 annually, and is capable of producing 350,-000 pieces of artillery annually. A year ago Russia could produce 900,000 machine guns each year, and had the expectation of increasing this to 1,350,000 annually. It is estimated that by 1955 she can produce 15,000,000 small arms annually and 22,000,000,000 bullets annually—and here I should like to point out that we never approached these figures in the peak of our production in World War II—and, what is extremely important, it can be done with half as much steel as is available to America.

The Russian ground forces are exceedingly formidable and will become steadily more so as time passes on. Their armored vehicles are excellent; the tenacity of their soldiers is superb; their numbers are tremendous; and their geographical location in the heartland of Europe and Asia gives them an impressive strategic advantage, especially since, from the Russian viewpoint, Western Europe is little more than a peninsula extending from Russia proper—but a peninsula which will more than double Russian production if it falls into Russian hands—a production which, added

to Russia's, would overwhelm even the vaunted industrial might of America and make our doom follow as surely as day follows night.

As to Russian aerial strength, it is estimated that they have from 25,000 to 30,000 aircraft, with a potential annual production of approximately 80,000. This can be increased to approximately 120,000 annually by 1955, even though we thought our top aircraft production of $6,000 annually in the last war was a production miracle. Russia's new MIG jet fighter has already demonstrated it is as fine an airplane as our Nation has immediately available, and there is no reason to believe that the Russians do not have more like it, not only in fighters but in other aircraft types as well. We know that they have some 400 B-29 type of aircraft, identified as the TU-4 bomber, which were seized by the Russians when they made forced landings in Russian territory during the war. These aircraft have the capability of attacking every point in America on one-way, one-refueling missions, and we know further that the Russians are now building jet bombers and that their air strategy envisages an increased role for their strategic bombing force. Combined with this aerial might, which is steadily growing, is the Russian atomic bomb which we know is being produced in daily increasing numbers.

We know further, from repeated public statements by the leaders of our own Air Force, that we cannot hope to destroy even as much as half of an attacking aerial fleet, so that the time will inevitably, inescapably, surely come when Russia will have immediately available the force to deliver a terribly devastating attack on the United States in a sort of gigantic, horrible Pearl Harbor.

We understand that the Russians have the ability to produce some 250 jet fighters monthly, and a professor of the Armed Forces Industrial College announced a year ago that the Russian production of guided missiles and rockets equals our own. We know, furthermore, that the Russians have developed an extremely capable defensive fighter force to intercept American bombers, and that they have decentralized their industry in vital areas to a degree undreamed of even yet by America, so that it is problematical at best as to the damage America could do to the Soviet Union through its vaunted strategic bombing attack on the outbreak of war. It was announced as long as 2 years ago by an authoritative organization in Europe that Russian military aircraft production in 1949 was almost 12,000 aircraft, including 5,000 fighters, mostly jet propelled, and 5,000 to 6,000 heavy and medium bombers, of which a third or perhaps half were jet propelled. We know further from former Air Force Secretary Symington that a Russian surprise atomic offensive might inflict a mortal wound from which our Nation might not completely recover in time. More than a year ago Mr. Symington announced to the Nation that Russia has the largest air force in the world, and combined with that grim fact is the knowledge that Russian tactical air power, like her

mighty ground forces, is strategically located in the immediate proximity of the greatest commercial, industrial, and cultural prize of the world, Western Europe.

Combined with this force of great attacking capabilities is a vast air network comprising thousands of aircraft and covering more than 50,000 miles now in operation in the Soviet Union and the Communist bloc nations. This system, known as Aeroflot, was a year ago announced to have 96 landing fields stretching from Finland to Albania, across Europe and Asia to Siberia and the Bering Straits. There can be no doubt that the Russian air power is exceedingly impressive and formidable and capable of inflicting terrific damage both to America directly and to her present and potential allies abroad.

As to Russian naval power, surfacewise it does not compare to the American fleet, but in underwater craft, it has been authoritatively estimated that Russia, quite some time ago, had at least 360 submarines, and it is further estimated that some 70 of these are Snorkel types. The significance of this force cannot be discounted. It was with less than 50 submarines that Germany commenced the last war, and these almost ran the Allied fleets off of the ocean. These submarines are, like the Russian air and ground forces, strategically located throughout the world. In the Far East they could virtually crumble the American sea power there through a sudden unannounced attack, and in Europe the submarine pens of the Soviet Union are skillfully hidden in carefully protected areas which would make it virtually impossible to destroy the Russian capability of continuing and expanding this formidable force even under attack by American air power.

In the face of this exceedingly threatening standing military force now available to the Soviet Union, we have in western Europe today some 5 divisions and supporting elements thereto, of whom scarcely 50,000 are combat personnel. We cannot lose sight of the fact, furthermore, that in western Europe there are from 50,000 to 60,000 women and children who are dependents of American military personnel now stationed in that area. There can be no doubt that an attack by Russian forces there must necessarily mean war in which America is fully engaged. There can be no question that modern America will not stand idly by and permit the slaughter of 60,000 American women and children, not to speak of the 100,000 American military personnel who would also face destruction unless America turned every available source of power to their support.

In the Far East the situation is very comparable. There is no thinking American but who realizes full well that our forces are there at the mercy of the Soviet Union. If Russia turns loose her ground forces in Asia, if Russia attacks with her air power in this area, if Russia releases suddenly the Russian submarine force against the American Navy and American transports in the Korean region, then the military effort now operating in Korea would very likely be

completely crumbled within a relatively short time.

It has not been the tradition of the great American Republic to exist on mercy or hope alone. It has not been the tradition of America intentionally to place American lives in the hands of a foreign power without providing adequate protection for them. Our forces in Europe are at the mercy of Russia. Our forces in Asia are in a similar situation. This afternoon, tomorrow, a week from tomorrow or next month—at any time, and entirely at Russia's choosing—the world could suddenly dissolve in flames in the cataclysm of a third world war, which would make all of the haggling, all of the fault-finding on this bill, not only academic but hideous in retrospect.

Knowing as we do the brutality of Russian leadership; knowing as we do the intensity of Russian leadership for world conquest; knowing as we do the Russian contempt for life and for western ideals; how utterly unrealistic and dangerous and short-sighted it is to treat the requirements of national defense in an atmosphere of business as usual, of complacency, and as if American lives were not being daily lost on the battlefields of Korea.

In the face of an alien and brutal force consisting of the largest ground forces in the world, the largest air forces in the world, and the largest submarine force in the world, a force working day and night within the national structure of other nations to subvert their institutions of government and their will to resist, a force bent on conquest of the world and dedicated to the complete destruction of every standard beloved by our Nation, our course is clear. It can be only to prepare as swiftly as possible an adequate counterforce. It is to devise at once a long-range military policy which will stand up to the long-range challenge this alien force presents.

So, Mr. Speaker, in the light of these facts, what is the proper thing that we should do? Would not the defeat of this bill be construed as a surrender to fear? Would it not in fact and in truth be accepted as a cowardly appeasement of Russia?

I am not advocating all-out war with Russia, but I am pleading for preparation for the all-out war that the Soviet Union has expressed determination to wage, if she has not already started in Korea and other parts of the world. I want peace, but in this modern world where there are no longer barriers erected by nature to aggression, I know this is something that cannot be had except through strength. George Washington himself said that "to be prepared for war is one of the most effectual means of preserving peace."

Mr. Speaker, what is here proposed is completely consistent with what we have been doing in the endeavor to organize group resistance to terrorism. We have spent billions to strengthen the remaining free countries of the world in order to make possible their contributing their part to the cause of freedom and and security. We have urged economic federation and political confederation on the countries of Western Europe. We

helped bring into existence the Atlantic Pact, and have had General Eisenhower in Europe for a long while. We have seen France and Western Germany lay aside their age-old animosities and join hands in the determination to live in peace. We see them, in cooperation with their neighbor countries, setting out to organize a Western European Army of 50 divisions in order to hold back Russian aggression, all done at our instigation. What would happen to this upsurge of patriotism, this will to live as free peoples, which is rooted in the confidence that we are standing with them, if we defeat this bill? Would they not feel, and rightly so, that we had let them down and had become indifferent about our own safety? Would it not be a breaking of a thread in the loom that would cause the whole pattern to unravel under strain?

Mr. Speaker, the argument that the adoption of this bill would lead to moral decadence of American youth is sickening. Does not the young man owe some duty to his country, and if so, when has it become immoral for him to perform it? What answer have the more than 18,000,000 veterans of the country to make to this indictment lodged against them? Are they prepared to say that they were debased because of their military service, and that their morals are of an inferior quality to the morals of those who did not have the privilege of waging war for the flag? What say our brave boys that are bleeding and dying in Korea? Those of this body who bear the scars of war will this day have their opportunity to make answer. And let no one dignify the slander by adopting the argument as his own.

I have four grandsons, all schoolboys, all subject to the draft and the provisions of this bill. I should feel disgraced if I thought that they would not feel that I had cast dishonor upon their names were I to vote against this measure.

And so, Mr. Speaker, here in the atmosphere in which we operate, the law of sacrifice and the law of love take the form of positive duty, and in its performance may God give us the courage and the determination to consecrate our every faculty.

Mr. ALLEN of Illinois. Mr. Speaker, I yield myself such time as I may require, and I ask unanimous consent to revise and extend my remarks.

The SPEAKER pro tempore (Mr. Murdock). Without objection, it is so ordered.

There was no objection.

Mr. ALLEN of Illinois. Mr. Speaker, I am opposed to this bill presently before us because it is impractical. At the present time we have the selective-service law. It provides that every young man 18½ years of age or older who is mentally and physically fit can be conscripted into Federal service for 24 months.

As you know, this bill provides that instead of youngsters being conscripted for 24 months, instead of being 18½ years of age they are to be taken at 18 years of age, and they are to be put in for a period of 6 months, after which

they will be held in servitude and bondage for 7½ years. They will be subject to the whim of the President of the United States, minute after minute, both day and night, for 7½ long years, to be sent at the slightest whim of the President of the United States to any place in the entire world. If there is any question about that, I refer you to our esteemed ex-colleague, Senator Wadsworth, in the hearings before the Armed Services Committee, on page 2315, so admitted.

I am opposed to this indenture and slavery of our young men for 7½ or 8 years. If you will pardon a personal reference, I volunteered in World War I and was at the active front in France; my eldest son served in World War II in Europe, and my youngest son now is in Ellington Field, Tex., training to be a pilot after having volunteered for 4 years. In my opinion 4 years is plenty long to serve one's country unless there is more evidence of insecurity than there is at the present time. I, for instance, see these young pages here. Can you conceive of forcing them into this slavery and bondage and keeping them tied up for 7½ years after they come out of service? For instance, one of them might go down to a banker for a loan to help him get started in business. The banker looks at him and says: "You are a fine young fellow; just what do you want?" "Well, I would like to borrow a little money. I served my country. I have an idea that I can make work profitably." The banker looks at him and it appears very clearly that this young man is honest, that he has a good idea, but the banker says to him: "I am sorry, young fellow; we appreciate that you served your country, but now you are subject to conscription for 7½ long years, and much as we would like to lend you this money we cannot do it because of the uncertainty of your position." The young man goes down the street and probably winds up using a broom on the street.

I am sorely disappointed that I am in conflict with my friend from Georgia [Mr. Cox] the State that previously had stood for States' rights and not regimentation especially of our youngsters. I am indeed sorry that I cannot go along with him in this matter. I am opposed to this bill because it is not practical. The military brass, Anna Rosenberg, and others, come up and testified that it will cost about $4,000,000,000. We know about those estimates that the military make; you cannot depend on them. But you can depend on its costing two or three times more than they say it will cost. The reason I say that is because Senator Wadsworth said they would start off with 60,000 and then raise it to 800,000 youths. You cannot house 800,000 of the young men of our country for peanuts; it takes considerable money and materials at a time when there is a shortage of material.

The bill provides for a staff of reserves, inspectors, traveling inspectors, and technicians; it would require hundreds of doctors, and dentists, and nurses, and technicians to provide for the welfare of these youngsters. That would require money; it would require expendi-

ture for hospitals, entertainment halls, churches, and many other things. It all would require money; it would require the services of many tens of thousands of civilians. I think all admit that they would have to be housed.

The bill also provides for dependency allowance; it provides for death benefits; it provides for physical disability; which are expensive. So I say to you that I think it is really fanatic that Members will rise on this floor and say these things can be obtained without its costing anybody anything. We have heard that for a good long time. Every time the Congress appropriates money that must be borrowed some say, "Why worry, we owe it to ourselves?"

Another reason why I do not think this is practical is because it does not conform to our true American way of life as I have been brought up to understand it. I was amazed at the testimony of that esteemed and great naval hero, Admiral Kinkaid, before the committee. Of course, we know that when this commission was formed, and we all agree to this I am sure, it was stacked. The commission was going to be for the commission of our youngsters and insist upon it even should they have heard no evidence. That is the reason they were named. Not one Member had an open mind in the matter. But speaking about our American way of life I was surprised at this gentleman and naval hero, Admiral Kinkaid, and his testimony. I wish to quote what he said before the Armed Services Committee. This appears on page 2341 of the hearings. The paragraph is entitled "The American Heritage," and reads as follows:

Last but not least, the instruction and training he would receive under UMT would give every young man of 18 a better understanding of the principles upon which our country was founded and a realization of his obligation to do his part in the defense of those principles.

Each year between 800,000 and 1,000,000 young Americans will reach the age of 18 and become ready for training under the proposed program. What a wonderful thing it would be if they could be made to feel not only the spirit of greatness of our country but something of the power that animated past generations and gave purpose and meaning to their lives.

I do know about past generations and our ancestors who came over here; and as a history student I have always been under the impression that our ancestors came over to this country to get away from this same sort of regimentation and goose step as provided in this measure. May I say that my great grandfather said he left foreign soil to come over here because he wanted freedom of thought and action. He left because of but a 2-year term of servitude. This provides for 8 years. Recalling the days of Hitler and Mussolini, even they did not dare to saddle that many years on to the youngsters of their nations.

Here is another reason why I do not believe this bill is practical. It is my idea that the best defense of a nation includes a solvent government. Today we find ourselves owing $257,000,000,000, which is practically the assessed valuation of all property west of the Mississippi River. We owe $257,000,000,000 and

we have our tax rate at the confiscatory level now so far as our taxpayers are concerned. We are going into the red this year by fifteen to twenty billion dollars more.

I say to the people down at the Pentagon it is about time for us to stop, look, and listen. We know that in the United States we have tremendous resources. We have the knowledge and know-how to produce. But there are some here who not only want us to furnish military equipment for our own soldiers and military equipment for all our allies, but they want us to furnish food for ourselves and food for our allies, and they went us to do all of the combat fighting in addition. All this I do not believe we can do and keep our solvency. Remember, officially Russia has not fired a shot or lost a life.

Inasmuch as we do have these tremendous and marvelous resources, we have the know-how of mass production, our allies should be told that we will confine our effort to doing those particular things and they will have to come in and furnish some combat troops. I think it is a shame that they call upon us to furnish 90 percent of the combat troops in Korea after we have done so much for them.

I was astonished in talking with a representative of the Pentagon the other night. He said, "Congressman, the reason the western democracies are not sending any combat troops to Korea is because they need their able-bodied men to build up their war-torn countries."

I emphatically replied to him, "If through some miracle tonight the immigration restrictions were taken off of the books of the United States and Canada and Australia and South American countries, why, those same able-bodied men over there that they say are needed for war-torn countries would be flocking over here by the millions, and they would be aided and assisted and encouraged and given the finances to do so by their own countries."

We hear about young men being conscripted off the farms in the United States and sent to Europe to defend them over there and then able-bodied men in Western Europe who should be in uniform defending themselves come over here as DP's and take the places on the farms of these youngsters who have been conscripted. Maybe that makes sense to some people, but it does not to Leo Allen.

Now, in addition to those countries of Western Europe furnishing some of these troops, I cannot see for the life of me how the State Department can refuse to accept 500,000, or at least a few hundred thousand troops of Gen. Chiang Kai-shek, which are now defending Formosa. Why could not the State Department accept a few hundred thousand of those troops to go up there into the land they know about. Our Navy and Air Force could well guard Formosa.

In addition to that, I believe had we left General MacArthur over in Japan, the Japanese people, having great respect for him would have volunteered for combat service in Korea. In my opinion, they would have been eager to

have served under him as he brought them the first taste of democracy.

Another thing that confuses me is this. I talked to a young fighter who had lost his legs and arms. I said, "How did you lose them?" He said, "I was over in Korea last winter. They ordered us to take a hill about 100 yards ahead. It was 20 degrees below zero." He said, "Now, Congressman ALLEN, can you tell me the military objective or what we accomplished when they ordered us to go ahead and take a hill 100 yards ahead, with a loss of 3,000 casualties? What did we accomplish? Where are we trying to go?"

Well, of course, I could not answer that. I do not believe anyone can answer that. I know if I were over there and somebody would order me to go and dig in for a couple of weeks and then we were ordered to take a hill, and about 3,000 of us were lost and we did not know where we were going or what the purpose to be accomplished was, I would wonder, too.

So I say in my opinion I believe that the United States should use its energies in furnishing military equipment and food for ourselves and our allies, and let some of these so-called friends of ours aid themselves by furnishing their share of combat troops.

Mr. COX. Mr. Speaker, will the gentleman yield?

Mr. ALLEN of Illinois. I yield to the gentleman from Georgia.

Mr. COX. My friend knows something of my admiration for him. It is seldom that we are in disagreement. I regret that we are not together on this bill. May I ask my friend if, in his opinion, militarily speaking, our present strength is sufficient to insure our safety.

Mr. ALLEN of Illinois. I would say this to the gentleman, my dear friend from Georgia, that in my opinion it is, because right now selective service provides for the drafting of youngsters down to 18½ years of age. We have 3,500,000 now, and they are still in the 20-year age bracket. If they wanted more, if they had the facilities to provide for more, they would be drafting those boys down to the 18½-year bracket. They have not even reached all of the 19-year-olds.

Mr. COX. No; not satisfactorily, of course.

Mr. ALLEN of Illinois. Why have they not drafted them down to those 18½ years of age? If they need more, they have the power to do that, and my experience has been that the more in uniform the better, as far as they are concerned.

Mr. Speaker, we are going to hear in this debate who is for this bill and who is opposed to it. Every farm organization is opposed to this bill; the Farm Bureau, the Grange, and the Farm Union. The American Federation of Labor and the CIO are opposed to the bill. Every ministerial organization in the United States, of every church denomination, with millions in all the churches, is opposed to this bill. Educators, civil leaders, patriotic leaders, and above, all, the people back home are against this bill, as evidenced by the letters you have re-

ceived in regard to it. Those letters were written with pencils and with pens on scratch paper and in every conceivable manner. We cannot laugh off the fact that each of us are receiving 25 to 50 of these self-inspired letters opposing conscription to every one that favors it. They have accepted the selective-service bill. There is probably some partiality shown, but little. We have given them a bill that brings it down to 18½ years of age. They can draft those boys. The people generally have accepted that, but they are not accepting this servitude for 7½ or 8 years for youngsters who are too young to be taught to kill.

You are going to hear plenty about how this will save money. I must leave today to go back to Illinois, but I would like to be here to hear those sponsoring this measure explain how it can be done.

In conclusion, I have attempted to be practical in this matter. I am not going to ask for a vote on this rule because I want the membership to see how ridiculous the whole thing is. Then I am certain it will be decisively defeated.

Mr. ALLEN of Illinois. Mr. Speaker, I yield 7 minutes to the gentleman from Illinois [Mr. SIMPSON].

Mr. SIMPSON of Illinois. Mr. Speaker, last year when the proposed study of universal military training passed the House I voted against it. I am going to vote against the present House Resolution 594, which places it in effect.

I have studied the resolution and the committee print of pertinent questions and answers.

After doing this and other research, I have concluded that I should vote "no" on this resolution exactly the same as I voted "no" last year on the study legislation.

Mr. Speaker, on December 16 last, a Washington Associated Press article contained the following information:

SIX THOUSAND SEVEN HUNDRED DEPENDENTS GO ABROAD MONTHLY TO JOIN SERVICEMEN

WASHINGTON, December 16.—The Armed Forces said today that 6,700 dependents embark each month to join husbands or fathers serving overseas.

About 3,000 go to the Far East. Another 3,700 leave for the European and Caribbean areas.

Many of these wives and children waited a long time to embark. Many more await calls to go.

The services hope to increase gradually the number sent to the Far East. They doubt if an increase can be made soon in the number headed for Europe.

The speed with which dependents receive calls depends on the travel space and housing where the serviceman is stationed. Right now, the supply is limited and a waiting period is required.

In general, only officers and men in the top three enlisted grades may have their dependents join them. In a few cases, dependents of men in the lower enlisted grades may go to Europe.

After reading this article, I came to this conclusion. Either those in charge in this country do not think we are in danger of war with Russia or they are guilty of criminal carelessness. Not only that, but they are guilty of discrimination when, in general, only officers and men in the top three enlisted grades may have their dependents join them.

Surely a private, corporal, or sergeant wants and is entitled to have his family near him just the same as officers. Case after case in our area of reservists with many years' service have been recalled, left their start in business, professions, and farming when they wanted to serve in the United States, if at all.

With 6,700 dependents monthly being sent overseas at heavy Government expense, how could they be evacuated if war actually would start in Europe.

This situation of itself is enough of a paradox to cause me to vote "no."

The recommendation in 1945 in the report of the economic policy and planning committee of this body, and of which I was a member, was to take a firm stand on Russia. The recommendation to the best of my knowledge was not followed.

The present draft is taking capable young men experienced in mechanized farming from agriculture. The same land owned by parents of these young men is being returned to grazing instead of grain. If this continues the United States Army and the United States people may suddenly come up hungry in the near future.

If you take boys too young to be drafted off the farms for 6 months' training and then the Reserve period, a large percentage of that year's crops will be badly curtailed.

Taking them out of 4-H Clubs from butter to guns, will not help our national position. This resolution in addition, removes the spirit of the pioneer mothers.

The National Guard has always been trained in State armories. With many State Guard units called into service, could not a volunteer training program be placed in effect in these armories? Could it not be effected on nights the Guard was not using them, if the Guard itself has not been called?

Would not every service club in the United States such as Rotary, Lions, Kiwanis, and all others, sponsor and help with, through their members, a training program for these boys? Could not older, uncalled reservists help at home with this training?

I believe they would. Many present members of these service clubs were noncoms and officers in World War II. It might be worth the trial, training these boys two nights a week. Would not every American Legion and Veteran of Foreign Wars post do the same as a patriotic duty? It should be a great deal cheaper from an expense standpoint. The suggestions will not cost $1,434 per year per boy. Under the committee questions and answers in No. 1 question, it states:

The sole objective of universal military training is to create a Ready Reserve of nonveterans.

One of the three things to be done on starting universal military training in the committee pamphlet is to pass the code of conduct and penalties for young boys.

Is it more severe than civil laws and reform schools for minor violations? Is it a military court and stockades? All of this when you are not at war. Are you going to vote for a different military penalty for American youth of nonvot-

ing, nondraft age than you do for civil violations? I am not. In my opinion, these young boys, if violators, should be tried by civil courts, not the military.

On page 3 of the questions and answers, it states:

Universal military training will save tremendous sums of money which may mean—

Think of it—

the difference between economic collapse and economic stability.

Mr. Speaker, I wonder if the Armed Services Committee asked the advice of the Ways and Means Committee before they had that one printed. Have we sunk so low as a Nation that this one piece of legislation will make or break us? Then God help us. We need it. If we are that near broke, let us nationally sink with the parents happy and their boys at home and with them. If we cannot afford an Army, now can we afford a war.

Speaking of economic stability, Mr. Speaker, and I make no pretense of being an economist, I want to make an observation. If this resolution becomes public law, what effect will it have on the Nation 3 to 7½ years from now? These boys being in the Reserve for that many years will be 21 to 26 years of age. They in these 7½ years probably will be in business, farming or in a profession for themselves.

No doubt they will have gone in debt on the business or profession or for a home.

If they are called in this Reserve period, who pays the interest, their notes at the bank? Who pays their life insurance? Who supports their family? Who gets their car, their tractor, their home, their refrigerator, when in good faith they have made honest future obligations in the American way for better living conditions? It seems to me, Mr. Speaker, the Members of this body had better give this legislation a good thinking over before they forfeit the future of the next 10 years. I am not condoning police action by voting for it.

Mr. COX. Mr. Speaker, I yield 2 minutes to the gentleman from New Jersey [Mr. CANFIELD].

Mr. CANFIELD. Every student of American history knows that we have been unprepared for all our wars and thousands of our youth have been slaughtered unnecessarily because they were green troops without adequate training in military fundamentals.

Every student of world history knows that today the Soviet Union is training their youth in the art of modern warfare as never before. Boys are inducted into training at the age of 15.

I am not going to have any difficulty in voting for this measure and my people will not be surprised. In every campaign for the last 6 years I have stressed my honest and sincere belief in this program and my conclusions have not been based merely on home studies. I have gone abroad and I have been with our men under fire and I know something about their feelings on the issue now to be resolved.

There are safeguards in this bill and as a member of the House Committee on Appropriations I desire to emphasize that every year our committee will have

to reappraise the program as to the funds needed. Will we with your concurrence go along with a program that is keeping our boys in slavery or any kind of bondage such as has been referred to? Not for a minute.

Let me document what I have in mind about the tragic story of green troops in our fighting forces. I could tell you hundreds of stories but here is one I know very well. Every 10 days or so I have my hair cut by a barber in my home neighborhood in Paterson, N. J. His name is Tom Aufiero. There used to be a young Tom but he is no more. This lad of 18 years was killed at St. Lo, France, in World War II, 4 months and 5 days after he was inducted into the Army of the United States. As his father trims my hair he drums into my ears this theme:

"That kid, my boy, Congressman, never knew what it was all about. He never had the proper training. It is something every American boy should have in the future."

The SPEAKER. The time of the gentleman from New Jersey has expired.

Mr. ALLEN of Illinois. Mr. Speaker, I yield myself the remaining 2 minutes.

Mr. Speaker, I am reading from the Cincinnati Inquirer:

It is a saying born of the desert that once a camel's nose enters beneath the tent, the whole camel shortly enters.

I think it is obvious, Mr. Speaker, that the Committee on the Armed Forces cannot cram this thing down the throats of the majority of the Members here; consequently, I think it is apparent that they are going to water this bill where it means nothing, send it over to the Senate, and let them put in these slavery and bondage provisions, return it here and then try to have us accept the conference report. I now bring that to the attention of the Members of this body.

Mr. COX. Mr. Speaker, it is completely unfair that anyone should argue that there is any compulsory feature to the measure that is to be compared to slavery. The bill does provide that after the boy has had his training he remains subject to call provided Congress intervenes or takes cognizance of the measure and enacts a law.

Mr. Speaker, I move the previous question.

The previous question was ordered.

The resolution was agreed to.

Mr. VINSON. Mr. Speaker, I move that the House resolve itself into the Committee of the Whole House on the State of the Union for the consideration of the bill (H. R. 5904) to provide for the administration and discipline of the National Security Training Corps, and for other purposes.

The motion was agreed to.

Accordingly the House resolved itself into the Committee of the Whole House on the State of the Union for the consideration of the bill H. R. 5904, with Mr. COOPER in the chair.

The Clerk read the title of the bill.

By unanimous consent, the first reading of the bill was dispensed with.

The CHAIRMAN. Under the rule, the gentleman from Georgia [Mr. VINSON] is entitled to recognition for 6 hours and

the gentleman from Missouri [Mr. SHORT] for 6 hours.

Mr. VINSON. Mr. Chairman, I yield myself 35 minutes.

Mr. Chairman, 175 years ago this Nation embarked on a course of action that has led it to the unchallenged position of the greatest world power in the history of mankind.

This was achieved through sacrifice, bloodshed, and heartbreak. The War for Independence, the War of 1812, the Mexican War, the War Between the States, the Spanish-American War, World War I, World War II, and the current struggle in Korea, have all been challenges which our Nation has met through the common virtue of uncommon valor.

To defend their freedom, every generation of Americans has had to fight. Our people, composed of every nationality in the world, have never failed in their obligation as citizens to preserve this great democracy.

In each war in which this Nation has been engaged we have had one great ally, time, in which to prepare.

We had 3 years to prepare for World War I; two full years to prepare for World War II. We may still have some little time on our side, but every one of you knows that sudden and devastating war of incomparable magnitude could be unleashed upon us tomorrow.

Friendly nations that once absorbed the initial onslaught of a determined enemy may not be able to provide the time that heretofore has permitted us to train and mobilize our manpower.

In this atomic age every Member of this House knows that every city, village, and hamlet throughout our land is today on the front lines.

War can be brought to our own shores in a matter of hours.

In the alternative, and just as deadly, is the realization that we may be facing insidious self-destruction through economic chaos, brought about by maintaining our standing forces at tremendous costs, for an indefinite period.

A healthy American economy is just as necessary in the struggle with communism as any other feature of our defense program.

In the opinion of some people, we have almost reached the limit of deficit financing, but regardless of whose opinion we accept, it is obvious that we cannot continue this tremendous borrowing and deficit spending for any extended period of time. That path leads us straight into national bankruptcy.

Our American economy is based on the profit motive. If the answer to deficit spending is higher and higher taxes over a long extended period, we will most certainly destroy private enterprise.

We are faced with a possibility of sudden war tomorrow and a threat of war over an extended period of time. Both threats require preparedness. We must provide that preparedness in a manner which will not gain for the Communists a bloodless victory. Such a type of preparedness is what this bill will accomplish.

These are perilous times.

Since the end of World War II we have been faced with a giant and ever-growing challenge.

Our action in response to this challenge will determine the fate of this Nation.

We all recognize that the Soviet Union is progressively and brutally acting to enslave and dominate the world, and all freemen therein.

This threat cannot be ignored.

By the action of our Government in resisting aggressors, by our courageous and ever-expanding moves throughout the world to meet aggression, we have accepted the Soviet challenge. Let this thought ever remain with you, to meet this challenge we must be strong both economically and militarily. This bill gives us both military and economic strength at the same time.

If we fail to adequately arm those nations who are our allies, Russia will take them one by one through external military aggression, and finally will so control the world that the United States will stand alone. But in providing for our military defenses we must guard against overextending our energies, both militarily and economically.

The Congress must solve the problem of strengthening those nations who are our allies, providing for our own defenses, and assuring against economic collapse.

I do not pretend that these problems will be fully solved by UMT. However, I do contend that any legislation which will solve any part of these problems, is essential to our freedom and a duty which this Congress owes the Nation.

For that reason UMT should be adopted as speedily as possible. It is one of the most important steps, both economically and militarily, that we will ever be called upon to take to assure our safety.

Through UMT this Nation will have adequate preparedness, and at the same time, economic solvency.

Now, as you know, military strength is measured in several ways.

It is measured in matériel.

It is measured in scientific know-how.

It is measured in industrial potential.

It is measured in adequacy of transportation.

It is measured finally in that most important of all elements, the capabilities of the individual citizen.

The ultimate weapon is not the A-bomb.

The ultimate weapon is man.

Preparedness, then, is the proper mixture of these elements, men and materials.

Whenever either is not of top quality, whenever the ingredients are carelessly or fraudulently mixed, the Nation suffers.

All of our production, all of our tanks, repeating rifles, A-bombs, and other military weapons are of no value if our men do not know how to use them. This bill is a training bill. It provides the machinery to train the young men of the Nation how to use these weapons; and how to survive in battle.

In this day when force alone is recognized, trained military manpower is the basis upon which any successful foreign policy must be placed.

Unfortunately, trained and equipped manpower costs money and a great deal of it. It costs a great deal of money for matériel—the munitions of war.

A great deal is added to that cost by the expense of training and maintaining large numbers of men in our armed forces.

In looking about for a place to save money, we must search all possible nooks and crevices without impairing our security. One of these is readily apparent. It is set out in the bill now before you.

Military strength is measured not only by forces in being in the field and in the camps but also, and just as important, by the numbers of trained ready reserve forces which can be called to the colors on a moment's notice.

Trained ready Reserve forces cost far less to provide and maintain than a huge standing force. A trained Reserve is the objective of this bill.

It is certainly obvious that the cost of food, housing, clothing, equipment, and salaries for three and one-half to four million men per year indefinitely would be exorbitant, and I warn you, if continued indefinitely, will imperil the economic stability of the Nation.

It is obviously much cheaper to train men for 6 months, place them in the Reserve where they are kept fresh in their skills, and subject to call in the number and manner which Congress determines, when absolutely needed.

The bill provides for the training of approximately 800,000 men per year. These trained nonveteran Reserve forces which we are seeking to obtain through this bill will give to this Nation an adequate defense to meet the Communist threat.

After full implementation of UMT, as the report indicates, the program will provide these trained Reserves, and will reduce our expenditures for national defense by $13,000,000,000 annually, without weakening our security.

This Congress and the Nation faces the difficult but inevitable choice of maintaining for the foreseeable future a large standing force, unprecedented in our history—or adopting a system of universal military training—under which the youth of the Nation would be trained for 6 months and then be transferred to Reserve components in sufficient numbers to permit us to reduce the size of our standing forces.

The issue is clean cut.

No one can fail to understand it. We can enact the legislation now before us and make it possible to implement universal military training with its resultant benefits—or we can tell the Nation that for years and years to come we must continue to draft their sons for service, maintain a large standing force with its staggering costs, and continue, again and again, to call out our veteran reservists.

Let me emphasize again that the sole objective of universal military training is to create a strong, well-trained, ready Reserve, made up of nonveterans,

which will permit us to stop drafting men for service, and will likewise permit us to reduce the size of our standing forces.

The issue is squarely up to you.

This is the time to make that choice. On many occasions I have stood in the well of this House urging the adoption of defense legislation which I sincerely believed to be in the best interests of the Nation. But I can say to you today that nothing that I have urged in the past can compare with the far-reaching importance of this bill. Its enactment may shape the destiny of this Nation and possibly the peace of the world for the rest of this century. Its enactment will be reflected in all of the diplomatic negotiations in which this Nation will be involved for the foreseeable future.

The bill before you contains all of the legislation necessary to implement a program of universal military training—from the oath that the trainee takes to the code of conduct under which discipline will be maintained. It provides for maintenance and moral safeguards.

It is complete, intact, and easily administered. It provides for civilian control.

It is not a surrender of the youth of the Nation to the military, but on the contrary, subjugates the military to civilian control.

You will note that we have strengthened the civilian control of this program by giving to the Commission authority to first approve the budget estimates proposed by the Defense Establishment for the implementation of the program.

This is training under a civilian commission—it is not military conscription. It is universal military training under civilian control for 6 months followed by service in the Reserve. And to further strengthen civilian control we have provided categorically and without reservation, that men transferred to the Reserve components following their training in the corps may only be ordered to active duty in such numbers and in such manner as the Congress may hereafter determine.

There can be no charge that this is hastily considered legislation; no one in fairness can say that all views have not been presented. The choice is crystal clear. Accept this bill and establish the machinery for UMT, or defeat it once and for all.

The time has arrived to make your choice.

UMT can never be started unless legislation is enacted to permit its initiation. Every day that passes without the Congress enacting a UMT program forces us to maintain a large standing force and brings us that much closer, day by day, to economic disaster.

I am fully aware of the fact that we cannot implement UMT on a full-scale basis at this particular time. But we must make a start now. We must begin the process of building up the Ready Reserve without delay. We will never have it if we do not start it.

Let me say to those who oppose UMT that I am fully conscious of their charge that we are seeking to capitalize upon the hysteria of the present emergency.

And yet these same people would also argue in peacetime that UMT was unnecessary because there was no immediate danger. And strange to say, I find that these same people are the greatest proponents of economy. Let me say to you that if you defeat UMT you are placing a burden upon the American taxpayers from which there may be no recovery.

We have only two ways to provide adequate military defense. We can continue to travel the road we are on today—a large expensive standing force based upon conscription; or we can take the new road that affords adequate defense through the creation of a trained reserve brought about by universal military training. That is the issue—take your choice.

When I think of the billions and billions of dollars that this Nation has wasted, thrown down the drain, scattered to the winds, because of its refusal to prepare for the worst when the skies were relatively clear, I shudder. When I think of the billions and billions of dollars that this Nation has spent when hasty mobilization was forced upon us and then threw away through hasty demobilization, I cannot help but feel how short-sighted our policies in the past have been. I suppose that it is impossible to calculate the manpower and dollars that have been wasted as a result of our past philosophy of frantic mobilization and training of our youth when war has come to the United States followed by our equally frantic efforts to demobilize when a temporary peace has resulted from that war. It probably involved enough to cancel the national debt.

Now, how would we prevent this from happening in the future. Well, that is what universal military training will accomplish.

In plain language, the objective and purpose of universal military training is to create a strong, virile, Ready Reserve of trained young men capable of rapid mobilization should war or a threat of war appear on the horizon.

Its implementation will eventually permit us to suspend or eliminate entirely the drafting of men for service in the Armed Forces and will also permit us to reduce the size of our standing forces without impairing our national security.

Now how do we propose to start UMT? The law which this Congress enacted during the last session is clear on that. The program can be initiated after this implementing legislation has been enacted whenever the President, or the Congress by concurrent resolution, reduces or eliminates the period of service in the Armed Forces for young men under the age of 19.

Bear in mind then that the Congress has already enacted into law the method by which this great economy program can be started. All that remains is for the Congress to pass the housekeeping legislation contained in the proposed bill now before you.

When is UMT to start? That, in my opinion, is a military decision to be made when the Joint Chiefs of Staff and other military advisers feel that it is possible to induct young men for 6 months of

training followed by transfer to inactive duty in a Reserve component. I repeat—when it should start must be a military decision.

Under the bill now being considered, no young man who has been trained in the corps and transferred to a Reserve component can be ordered to active duty except in such manner and in such numbers as the Congress may hereafter determine. For that reason, the military leaders of the Nation must make the decision as to when we can initiate the program, with the knowledge that the men trained in the program will not become active members of the Armed Forces unless the Congress takes further action.

Now let us look at the manpower situation.

The Director of Selective Service advised us that the manpower pool will be in excess of 900,000 men in June of this year, and would permit a withdrawal of sixty, seventy, or eighty thousand young men for the purpose of initiating universal military training. The manpower situation, therefore, will permit its early initiation.

The committee has made no recommendations as to when the program should be started, although it recognizes the fact that the sooner the better.

The Department of Defense suggested the initiation of universal military training in a different manner than provided for in the bill. But I want the Congress and the country to distinctly understand that this is not a Pentagon bill. This bill is the result of study on the part of the Commission and the Armed Services Committee.

The Department of Defense proposed to initiate universal military training through the use of volunteers who would agree to serve 18 months on active duty following their 6 months' training. The committee gave this suggestion careful study, but reached the conclusion that this was not the way to initiate the program. The objection was made, and rightfully so, that universal military training followed by immediate service in the Armed Forces would not create the Ready Reserve of nonveterans which this bill seeks to attain.

Every young man who has been inducted or who has enlisted in the Armed Forces since June 24, 1948, is required by law to assume a Reserve obligation following his period of active duty. Most of these men are the veterans of Korea and we must not subject them, and other veterans, to be called again should another emergency arise.

For that reason we have taken the firm position that universal military training should be initiated as soon as possible and on an ever-increasing scale.

If another emergency comes upon us we will first call upon those reservists obtained through UMT who have not seen prior service.

We deleted from the proposed bill a provision which would have allowed the trainers, that is, the men who will train these young men, to be in addition to the authorized strengths of the Armed Forces. Our objective is to reduce the size of our standing forces—not to enact

provisions of law which would permit additional permanent personnel in the Armed Forces.

Speaking of the trainer-trainee relationship, I want to call your attention to a provision in the bill which prevents the Armed Forces from requesting additional personnel for implementing universal military training, except for medical, dental, and religious personnel. We are of the firm opinion, as are many others who testified before the committee, that the ratio of two trainees to each trainer is unreasonably high. The provision which I have cited will force a drastic reduction in this.

In summarizing our position with respect to the initiation of this program it is fair to say that we feel it is basically a military decision. I am firmly of the opinion that the sooner we start the program, the better off we will be, although obviously it must start on a small scale basis of probably not more than 5,000 men per month.

If started on this basis, no new camps will be needed. Since we are not permitting the services to request additional personnel for the trainers in this program, there will be no additional funds required in that respect. The only cost involved in the initial implementation, therefore, will be the direct costs for the trainees, such as pay, food, and clothing, which is estimated to be about $44,000,-000 for fiscal 1953, and I shall propose an amendment requiring the Department of Defense to absorb this cost.

As the program increases in size, as world conditions permit, and as the size of the Regular Armed Forces is reduced, present training facilities and equipment will be used. Let me repeat that no new training camps will be established for the initiation of UMT.

It is our sincere hope and belief that no matter when or how this program begins, that it will be increased as the months go by so that eventually only young men between the ages of 18 and 19 will be inducted into the National Security Training Corps and then all drafting for service will cease. Our objective, as I have stated, is to train these young men for 6 months and then send them home to become members of a Reserve component as now required by law. That will create the strong Ready Reserve of nonveterans and I again impress upon you that it will permit the Congress to reduce the size of our standing force.

I grant you that we must continue to draft men for service in the Armed Forces during the transition period while we are building up our Ready Reserve of nonveterans, but the drafting of men for service will terminate when we have a sufficient number of reservists to permit a considerable reduction in the standing forces.

You just cannot stop drafting men for service the day you inaugurate UMT. Both must run simultaneously for a limited time. But when UMT gets into full swing, drafting for service will fade away.

Our manpower pool is sufficiently large to permit us to do this as those inducted for UMT will be between 18 and 19, half

of whom would otherwise be deferred by the time they reached the age of 19.

As the months go by and we start to build a Ready Reserve of young men who have received this training, the Nation will then be in a position of having well-trained young men in sufficient numbers to permit a reduction in our standing forces.

It is possible that by this time next year, we can, with reasonable safety, begin to reduce our Armed Forces. At the proper time I will offer an amendment that will insure reduction in our standing forces as the Reserves are built up, without impairing our national security.

This is the objective of the bill—this is what makes it possible for us to save billions of dollars annually. This will be our savings account.

Now, let me explain that further. If you will visualize the present Selective Service System as a checking account and universal military training as a savings account, I think you will get a very good understanding of this whole problem. Whenever we draw a man out of the manpower pool, and draft him for service in the Armed Forces, we are drawing on our checking account to meet our current needs. But when we induct a man into the National Security Training Corps for 6 months of training and then transfer him to a Ready Reserve, we are building up a savings account to be used should a rainy day descend upon us.

Now, I recognize the fact that under selective service every man we draft into the Armed Forces has a Reserve obligation. But I believe that every member of this House has firmly resolved that never again will he quietly sit by and permit the heartbreak that occurred when we indiscrimately ordered our veteran reservists to active duty to meet the Korean situation. I cannot believe that any Member of this House wants to force upon the veterans of this war the obligation to serve in any future emergency because they were unfortunate enough to be drafted for service, while their neighbors go to college or obtain some other deferred status which permits them not only to escape the draft for service but likewise permits them to escape any Reserve obligation.

In the name of decency and common justice we simply cannot continue the policy of placing the sole obligation on those who have already served once or twice to be first on the firing line again in the event of a national emergency.

A universal military training program will more evenly distribute this responsibility among the young men of our Nation before they have had an opportunity to place themselves in a protected status. When they have completed their universal military training they will be fully aware of this obligation, which is the obligation of every young man in the Nation, to be ready to serve his Nation in time of need.

It is my sincere hope that under universal military training 9 men out of every 10 will receive this training and

assume an obligation to serve in the Ready Reserve.

Now suppose universal military training is initiated in the very near future. If that happens, I know that some of you will say that we will then be inducting some young men between the ages of 18 and 19 for 6 months of training while other young men over the age of 19 and those not inducted into the Corps before they attain the age of 19, will be drafted into the Armed Forces for 24 months.

Let me say here and now that the young men who receive this 6 months' training and who are then transferred to a Ready Reserve unit will, due to the fact that they have seen no service, be the first to be called if it becomes necessary to suddenly increase our Armed Forces or if another emergency is forced upon us. They will be the readiest of the Reserves and rightfully so, for they will be the recently well-trained young men.

While it may appear on the surface to be unfair to induct one man for 6 months and to induct another man, a year older, for 24 months, it must be remembered that it is a lot fairer than the present system which permits many young men to escape all obligation to serve in the Armed Forces because they are either in college or have obtained some other deferred status which removes them from any obligation to serve in the Armed Forces or in the Reserve.

Complete fairness in any system which seeks to obtain service through compulsion is impossible to obtain. Is it fair to place one young man in the front lines in Korea while another man hands out trousers in a quartermaster depot back in the States? Is it fair for one young man to be drafted because he has good health, while another man who has a physical impairment which does not prevent him from obtaining employment in private industry assumes no obligation to serve his Nation whatsoever? Is it fair to defer a young man who is needed on a farm while his brother is required to serve in the Armed Forces? Is it fair to draft into the Armed Forces a married man without children while deferring another married man who is fortunate to have a family?

The whole question of fairness is one of degree. We have got to start UMT some time in order to reduce the size of the standing forces. We cannot reduce the size of the standing forces unless we have a strong Ready Reserve. Unless we want to wait until we have a Reserve composed of veterans who would be subject to call to serve again, we have to initiate UMT now in order to move into the transition period between the build-up of a Reserve of nonveterans while at the same time we are maintaining the standing force necessary to provide the protection deemed necessary by the Joint Chiefs of Staff.

Suppose we do not pass this bill, and in the next year or two international conditions indicate that we might begin to reduce the size of our standing forces without UMT, what then happens? Now, listen, I will tell you exactly what hap-

pens. You fix it so that only men who are inducted for service assume a reserve obligation. And who are they? The veterans of Korea. Let me repeat that. Only draftees or men who enlist voluntarily in the Armed Services assume a reserve obligation,..and they are forced to do so by the plain letter of the law. Therefore your reserve is made up of men who have seen prior service. Are these the only ones in the Nation that should be called upon to serve if an emergency arises? Therefore, if for any period of time we reduce draft calls or cease drafting men for service, thousands upon thousands of young men completely escape their obligation to serve their Nation—lock, stock, and barrel. And should another partial mobilization occur again in the future or should it be necessary to suddenly increase the size of our Armed Forces short of total mobilization, it will be the reservists who have previously served in the Armed Forces,, the veterans of Korea, if you will, who are required by law to retain a reserve obligation, who will be called upon to again serve their Nation. Other young men who escape the draft during 'the temporary lull will bask in the protection that has been afforded them through failure to enact UMT.

Mr. Chairman, one of the great virtues of this training program is its equity of application. Its operation on a full-scale basis means that no young man capable of bearing arms will escape the duty to serve this Nation whenever its existence is threatened. It distributes the load on a more equitable basis than any system yet devised.

I do not know of a single Member in this body who has not raised his voice in protest against the involuntary recall of inactive reservists, many of whom were combat veterans of World War II. That unfortunate situation would not have occurred had this Nation had in operation a universal military training program prior to Korea.

The sad truth is that we had to call on these veterans who remained in the Reserve even though in an inactive status because it took less time to retrain them than it would have taken to induct the same number of men and train them for combat. For those of you who have raised your voices in public condemnation of the treatment of the recalled reservists, I can only say that I know of no better method of preventing a repetition of this incident than through the adoption of the bill now before us.

When our Nation possesses a Ready Reserve made up of well-trained young men who will have received their training at an early age—young men who will be liable to call in most instances before they have acquired substantial civilian responsibilities, we will not again impose upon our citizen soldiers the heartbreak and broken homes that was the inevitable result of recalling our veteran reservists for this emergency.

Mr. Chairman, I have touched only upon some of the more important features of universal military training. I could discuss the moral safeguards that will surround these young men, the restrictions against the use of alcoholic beverages and the protection against prostitution, but I do not want to unduly emphasize those features as compared with the basic military training which they will receive.

However, let me say that when young men from all walks of life: The millionaire's son, the farmer's son, the laborer's son, and the doctor's son all live and work together for 6 months they will have acquired a common understanding and a philosophy for their life ahead which will make each of them a better citizen when he returns to his community.

Now, I would like to turn to the subject of the economy that will be achieved by this bill.

The budget submitted by the Department of Defense for fiscal 1953 for direct appropriations for our Armed Forces involves approximately $52,000,000,000. For this $52,000,000,000 we can support an armed force of 3,700,000 men on active duty.

The House should understand that all of this $52,000,000,000 is not for the maintenance of our Armed Forces alone, since portions of it will be used for the projected build-up in our defense program. That is, part of this money will be used for the modernization of antiaircraft guns, tanks, bombsights, aircraft, artillery pieces, ships, submarines, and other instruments of war. In addition, portions of this $52,000,000,000 will be used for the procurement of new additional aircraft for the Air Force and the Navy over and above present operating forces, the construction of new additional ships, the construction of new major military installations here and abroad, and the establishment of reserve war materials such as ammunition, fuel, parts, vehicles, and other necessary items all of which will cost approximately $11,-000,000,000. That leaves $41,000,000,000 for the maintenance of an armed force of 3,700,000 men, or $11,000 per man.

Now bear in mind that it will cost us $41,000,000,000 per year to maintain an armed force of 3,800,000 men, after we have modernized our equipment and completed the procurement of new capital investments. This forty-one billion is the amount that it will take merely to maintain an armed force of 3,700,000 men.

But we can reduce our Armed Forces from 3,700,000 men to 2,000,000 men and save $13,000,000,000 annually if we have in existence a Ready Reserve of 2,500,000 men and a training program involving 800,000 men annually being trained under the universal military training program. Such a program will provide the same degree of security as a standing force of 3,700,000 men at a cost of $41,-000,000,000.

Let us examine that defense structure for just a moment.

To maintain a Military Establishment of 2,000,000 men in the Armed Forces, would cost on an average of $11,500 per man. This amounts to $23,000,000,000 annually. The additional $500 per man is brought about by the many recurring fixed charges that increase the cost per man as the size of the Armed Forces is reduced.

Now, a Ready Reserve that is really ready will cost money. And we estimate that a Ready Reserve of 2,500,000 men might well involve an additional $2,500,-000,000 per year.

This would be enough for the cost of training. It would be enough to keep the equipment up to date and would provide for expanded training facilities.

To train the 800,000 young men under universal military training, including the cost of the trainers, will cost approximately $2,400,000,000 per year. Thus, if you add the $2,500,000,000 for the Reserve, the $2,400,000,000 for the universal military training program, and the $23,000,000,000 for maintaining a standing force of 2,000,000 men in the Armed Forces, the total amounts to almost $28,000,000,000.

Thus, the total cost of a defense program based on 2,000,000 men on active duty in the Armed Forces, a really Ready Reserve of 2,500,000 men, and 800,000 young men in training annually, including the cost for keeping the equipment and units of the Reserve up to date, would amount to approximately $28,-000,000,000 a year.

Compare that with the $41,000,000,000 we will spend in fiscal 1953 and every year thereafter for a defense program that will not add a single nonveteran reservist to our Ready Reserve.

Here is a saving of $13,000,000,000 a year that can be brought about without impairing the adequacy of our national security in the slightest degree.

Here then is economy of the highest order.

Pass this legislation and build a ready reserve of 2,500,000 men kept constantly fresh and recently trained through the in-put of new trainees who graduate from the program each year.

Pass this legislation and we can eventually eliminate the necessity of drafting men into the Armed Forces for 2 years.

Pass this legislation and we tell our heroic veterans of World War II and Korea that they will not be the first to be called in the event of another emergency but that the obligation to serve the Nation will be placed upon all young men capable of bearing arms.

Pass this legislation and we can reduce our standing force to 2,000,000 men and save the taxpayers of the nation $13,-000,000,000 a year.

But if the Congress chooses to kill this legislation, then it is saying to the Nation that it prefers to continue drafting its sons into the Armed Forces for 24 months, for an indefinite period, instead of training them for 6 months and sending them home to join reserve components.

Kill this legislation and the Congress has killed an opportunity to save the taxpayers of the Nation $13,000,000,000 a year.

Kill this legislation and the Congress has told the veterans of Korea and World War II that they will again have to be called if another emergency arises.

Kill this legislation and the Congress will have saddled a burden upon the backs of the American people which may lead us into economic chaos.

The issue is clear cut. The choice is yours.

Never before has the Congress had a greater opportunity to equalize the obligations to serve one's Nation. Never before has there been a greater opportunity to eliminate the drafting of men into the Armed Forces. Never before has the Congress had a greater opportunity to save the taxpayers such a tremendous sum of money.

Here is your opportunity—take it.

Mr. SHORT. Mr. Chairman, I yield 40 minutes to the gentleman from Illinois [Mr. ARENDS].

Mr. ARENDS. Mr. Chairman, this bill is the most important measure to come before the Congress. It deals with human lives. It proposes a transgression on individual liberties. A bill of this character should give us pause. It should give us cause to reflect hard not alone on its military aspects but also upon its far-reaching economic and social consequences.

As the free representatives of a free people, we profess to be guardians of individual rights and liberties of our people. We not infrequently declare our abiding faith in and allegiance to American tradition. We represent ourselves to our people as being their unyielding protectors of American principles of government and uncompromising defenders of their personal liberties.

The bill now before us presents an actual test to these worthy claims. It is proposed by this bill that hereafter, and forever more, every American boy shall, upon reaching the age of 18, forego his cherished individual freedom for a period of 8 years. It is proposed by this bill that hereafter, and forevermore, every 18-year-old American boy shall no longer be completely free to follow his normal peacetime pursuits. Our vote on this bill is the test of our professed adherence to American principles.

Simply but accurately stated, this bill proposes a stockpiling of young Americans. The boy is first given 6 months' basic training. During this 6 months' period he will be taught the fundamentals of warfare, the rudiments in how to kill, and be mentally conditioned to unquestioning obedience to military commands. That is the primary purpose of the basic training. It can have no other purpose and be justified at all in a military sense.

The sponsors of this legislation persist in stressing the training to be given during this 6 months' period in religion, morals, and citizenship. Admiral Thomas C. Kinkaid, one of the Commissioners of the National Security Training Commission, made an excellent statement on this phase when he appeared before our Committee on Armed Services.

As important as that is in the training of our youth, we certainly are not so naïve as to believe that any military camp, however carefully supervised by civilians, is a good training place for character building and virile American citizenship. By its very nature mass military training is not conducive to making real Americans of independent thought and action. On the contrary, it produces a disciplined, regimented mind

entirely unprepared for the responsibilities of free citizenship. This is inevitable for, as Hanson Baldwin, the Nation's leading military writer, describes military life—"their lives are regulated, ordered, and directed in neat patterns, with 'security assured' and the hard processes of thinking too often reduced to a minimum."

I am not exaggerating when I say that this much ado in the Commission's report and in our committee report about training in morals, religion, and character during this 6 months' training period is just a "lot of window dressing." It is part of the masquerade to try to make this militaristic bill more palatable to the American people. It goes without saying that there is no substitute for the freedom and environment of the home, for the freedom and environment of the community, church, and schools in producing the kind of men that make this country what it is.

Dr. Hutchins, former chancellor of the University of Chicago, said:

It stands to reason that though free and independent citizens make the best army, the Army is not the best place to make free and independent citizens.

Surely we have sufficient insight into the nature of this proposal to recognize that it is not really a defense measure made necessary by the existing emergency. That is also part of its masquerade. Whatever the merits of the proposal, above all else, let us recognize it for what it actually is. Let us accept it or reject it for what it is, and not allow ourselves to be misled by the pretense of its sponsors.

The legislation before us today is not new. For many years some of our military men have been advocating a program of this character. But they have never been able to sell the American people on their glorious military dream of requiring every young man to serve in war or peace a period of his life under their command.

It is perhaps not without significance that one of the leading advocates of such a program as this has been Gen. George C. Marshall, and one of the leading opponents is Gen. Douglas MacArthur. The committee report quotes General Marshall. I prefer to quote General MacArthur. He said of UMT:

While intended and designed to strengthen freedom's defense, it carries within itself the very germs of freedom's destruction * * * it etches the pattern to a military state.

With our people naturally concerned over our national security, with the war in Korea and the present emergency being foremost in their thoughts, the sponsors of this program have seized upon this anxious state of public mind as a good opportunity for them to put across their military training program, which, in truth, has no relationship whatever to the existing emergency. Relying on public anxiety, they are cleverly endeavoring to saddle on the American people something which the American people do not want. They have selected this apparently auspicious time to revive an old, old plan, giving it a new name and dressing it up with some fancy clothes to conceal its true identity.

The bill before us is officially titled the National Security Training Act, but was previously called and is more generally known as the universal military training bill. They are innocuous-sounding titles, no doubt selected by the advocates of this program for peacetime conscription to try to make their product more saleable. I suspect these titles have been selected, if not to conceal, at least not to reveal the true nature of this legislation. I suspect the title "National Security Training," or "Universal Military Training," has been selected more for propaganda purposes than to describe the bill itself. They well know the opposition of the American people to their program. By hook or by crook, military brass in the Pentagon is determined to get on the statute books some kind of peacetime conscription so that at least a beginning is made for realizing their dream of a great stockpile of men under their jurisdiction.

This is not a universal military training bill. There is nothing universal about it. Exactly the same standards will be used for inducting 18-year-old boys under this proposed law as are now used for induction of 18½-year-old boys under the Selective Service Act. The bill before us is nothing more or less than a compulsory military training law. It sets up a system for permanent peacetime conscription. It provides that henceforth, and forevermore, every 18-year-old American boy shall be subject to military service for a period of at least 8 years. Whether we adopt or reject this proposal, let it at least be clearly understood by all of us, and particularly by the people we represent, what kind of a program we have before us.

There is another very important fact with respect to the pending bill I wish to get straight. The proponents, including our beloved chairman of the Committee on Armed Services, Mr. VINSON, of Georgia, have been contending that the Congress has already approved the principle of universal military training. That is also part of their propaganda line. They state that Congress approved UMT in principle when we passed the draft extension bill last year. When our Committee on Armed Services began the hearings on this bill, our chairman stated in his opening statement that the witnesses who appeared before our committee should direct their testimony to the plan itself rather than to the principle of universal military training.

By no stretch of the imagination can it be said that the Congress voted for the principle of universal military training when we passed the bill last year to extend the draft law. I voted for the extension of the Draft Act. It was passed by an overwhelming majority as an emergency measure. I, for one, certainly did not express approval of the principle of universal military training by that vote. I believe most of you take the same position. The RECORD substantiates this fact.

There is no Member of this House for whom I have a greater affection, greater respect, and greater admiration than the gentleman from Georgia, the chairman of our Committee on Armed Serv-

cles. I am proud to serve on the committee under his chairmanship. In this I believe I am expressing the sentiment of the entire committee membership from both sides of the aisle. Our committee is charged with tremendous responsibilities involving our national defense. We have our differences in committee but they are not now and never have been differences arising out of political considerations.

Our chairman is extremely able. He must be appreciated for his skill in strategy and procedure, as well as for his knowledge of subject matter. He is more than well informed. He is astute. He is an exceptionally clever strategist in devising ways and means to sidestep opposition to reach his preconceived destination. He is ingenious in finding methods by which you are forced to say a hesitant "Yes" on something you normally would utter an emphatic "No."

By shrewd parliamentary maneuvering when we considered the draft extension bill last year the gentleman from Georgia [Mr. VINSON] and the advocates of UMT believe they maneuvered us into a position where we unknowingly approved the principle of UMT. Not being able to secure favorable action by the House on UMT itself standing on its own merits, the proponents of the program, aided and abetted by the gentleman from Georgia, decided to incorporate provisions for UMT in the bill to extend the Selective Service Act. They conceived the idea of putting their program across by incorporating unwanted permanent legislation in a necessary emergency measure. They well knew that the American people and the Congress as a whole would approve extension of the Draft Act, but were bitterly opposed to UMT. They had hoped that by tying a permanent measure to a temporary measure they could by this means saddle the American people with something they did not want. To avoid an out-and-out vote on UMT as such they did not present it as a separate and distinct title to the draft extension bill, but cleverly interwove the UMT provisions in with the draft provisions to make them almost inseparable.

It soon became apparent, however, that the provisions for UMT contained in the Selective Service extension bill would be completely stricken from the bill or possibly the Congress would not even extend the draft bill. The Congress was insisting that it at least be given the opportunity to pass on UMT on its own merits. It was obvious that one way or another the UMT program was destined for a complete defeat on the floor of the House. It was then that the gentleman from Georgia [Mr. VINSON] made one of his adroit parliamentary maneuvers. He offered as an amendment, which was certainly preferable to what was in the bill, the rather unusual provision which provided for the setting up of the National Security Training Commission of five members to draw up a plan for UMT and requiring that the committee must act on it within 45 legislative days. Everyone recognized this as a very unusual provision whereby UMT legislation

was made privileged, but all of us were more or less willing to accept it in lieu of the original plan to make UMT permanent, as we would at least have the opportunity to pass on UMT itself on its own merits. It would, at least, avoid our being stampeded into adopting the program as a part of an emergency bill.

My distinguished chairman now contends that by virtue of this unique provision being in the emergency draft legislation we have approved the principle of UMT. This simply is not a logical conclusion. If you read carefully the record of the debate on this particular provision you will find that the question of approving UMT in principle was raised. The chairman repeatedly was asked the question in various forms as to whether acceptance of his amendment would mean acceptance of UMT. He never answered the question directly. He avoided a direct answer. He tried to satisfy those who were skeptical by repeatedly saying that nothing could happen until Congress approved a plan.

During the course of this discussion, however, the gentleman from Georgia [Mr. COX], whom all of us recognize as an extremely able lawyer with unusual ability for analyzing and clarifying issues, made the following statement to allay the expressed fear of Members that we might be approving UMT in principle. I now quote the words of the gentleman from Georgia [Mr. COX], to be found in the CONGRESSIONAL RECORD, volume 97, part 3, page 3600. He said:

Is it not perfectly apparent to the gentleman and to all others hearing this debate that those opposing the UMT provisions of the committee bill have won their fight and that the Vinson amendment means this, and nothing more—an expression of concern or an expression of interest or desire for further exploration of the subject, all in the interest of establishing a basis for enactment of the law, if it is the will of the Congress to so legislate?

Those assuring words of the gentleman from Georgia [Mr. COX] expressed the understanding of all of us. In other words, when the Congress accepted the provision that was contained in the draft extension bill for the setting up of the Commission to submit a plan, it was not expressing its approval of UMT in principle but simply expressing a willingness to explore this subject. That was what we voted for, and nothing more. The chairman of the Committee on Armed Services may sincerely believe that he cleverly maneuvered us into a compromising position whereby the UMT proponents can claim approval in principle, but I think he will find when the vote is taken on this pending bill how wrong he is.

It should be apparent to all of us from the legislative history of this bill that the proponents of UMT are determined to get some kind of a program into effect, public opinion to the contrary notwithstanding. That is why they have masqueraded this bill in several particulars; that is why they have endeavored to make it appear as innocuous as possible; and that is why they have employed the step-by-step strategy in getting it

through the Congress. They are not to be denied their ultimate objective. They recognize that the strongest opposition to UMT comes from this side of the Capitol. We are closer to the people. The military believe that if they can get this bill passed by the House, and sent to the other side of the Capitol, they will ultimately be able to get practically the type law they want.

It is for this reason that I believe I should call your special attention to the committee amendment to the bill which provides that after a boy has completed his 6 months' training and has been placed in the Reserves, he cannot be called to active duty until Congress specifies the number and the manner in which they are to be called. The proponents repeatedly emphasize this protective provision in their propaganda. They point out that the Congress will retain control over, when, and in what manner the boys will be called to active duty. They believe that by including this provision, not in the original bill, the House is more likely to accept the program.

Of course such a provision makes the program more acceptable. We too well know the hit-and-miss manner by which reservists were called to active duty at the outbreak of war in Korea. We have been extremely critical of the military in their method of recalling and releasing reservists.

But I seriously doubt that this provision to give Congress control over calls to duty will remain in the bill in its final form. The Pentagon is opposed to it. Some of the members of the Senate Armed Services Committee have already expressed publicly their opposition to it. The Senate committee did not include it in the bill they reported.

Under the Reserve bill which is still pending in the other body, the President would be authorized to order to active duty all reservists in case of a war or a national emergency declared by the Congress. That bill does not specify that the Congress shall subsequently determine the manner in which reservists shall be called. There is, therefore, this inconsistency between the pending proposal and the pending Reserve bill in the other body. Moreover, the President has, under existing law, the authority to order all reservists to active duty for a period of 24 months.

Obviously, these differences with respect to the time and manner in which reservists will be called to active duty as provided in existing law, the pending Reserve bill and the pending UMT bill must be ironed out. I venture to say that when the legislation takes its final form, the President and the Pentagon will get exactly what they want, and the amount of control which the Congress will have over the time and the manner in which reservists will be called will be reduced to a bare minimum, if any congressional control at all. While all of us approve the proposed committee amendment to the pending bill, let us not allow the UMT proponents to lead us to believe it represents an absolute safeguard. You may be reasonably certain

that if this bill passes the House, they will then work to get the provision removed or amended. It has happened before. It will happen again.

A pertinent question to ask is why we are now called upon with such great haste to consider a UMT program designed for building up a Reserve Corps when we have not yet taken final action on a Reserve program as a whole. The proponents of this bill stress that all UMT really amounts to is a method of building up of a large Reserve Corps. Accepting that thesis, that UMT is a procurement method for reservists, why, then, not wait for the final enactment of the Reserve program in the bill we sent to the Senate before taking action on a bill designed to raise the manpower for the Reserve Corps.

It is also rather strange that the military brass should emphasize the absolute necessity of UMT to inaugurate a Reserve program when they themselves have been so derelict and so wanting over the last several years in developing a proper Reserve program. If Gen. George C. Marshall so fervently believed in the necessity of a sound Reserve program, why did he not develop such a program following World War II? Why did we find our Reserve program so completely lacking in so many particulars when reservists were called to active duty following the outbreak of war in Korea?

There are some who believe that the military deliberately sabotaged the Reserve program in order to have an excuse to secure this proposed UMT legislation. It is contended that the military are not as interested in a so-called Reserve program as they pretend, but their real desire is to secure the enactment of this proposed permanent peacetime conscription law.

When is this proposed program to begin? To be sure, the proposed law is clear that either the President, by Executive order, or the Congress, by concurrent resolution, can initiate the program. But when as a practical matter, as distinguished from the legal, can the program be initiated when we are already scraping the bottom of the barrel to get sufficient manpower for an armed force of 3,700,000 men, the goal set for next year. With the war in Korea continuing, and other outbreaks in prospect, there is nothing in the present international picture, as I see it, to encourage us to reduce the size of our standing Army. If the UMT program is initiated at this time some boys would serve 6 months under the UMT law and then go into the Reserve Corps for service at some future date. Other boys would be drafted for 24 months' service under the Selective Service Act. It is obvious that the operation of the draft law and UMT concurrently is not practical from the point of view of equity. It discriminates.

Something should also be said with respect to the cost of this proposed program. It is fair to say that no one really knows how much it will cost, if for no other reason than that no one knows when it can begin or to what extent. The so-called National Security Commission has estimated that the total cost

for the full implementation of the program in the first year would be over $4,000,000,000 and in excess of $2,000,000,000 for each year thereafter.

These are, of course, estimates prepared by the Pentagon. Inasmuch as it is the military that is so anxious to have the proposal adopted, we can be reasonably certain that the cost estimates are on the ultra-ultra-conservative side.

Any estimate of the cost of UMT must include both the cost of the 6 months' camp program of UMT and the cost of the 7½-year Reserve program which is a part of the same bill. The UMT program is divided into two parts. Each boy would be drafted into 6 months of training in Army, Navy, Marine, or Air Force camps. At the end of 6 months he would be placed in the Reserves for 7½ years. Although the Reserve program is a complicated one, each boy would be subject to 15 days' refresher training each year. Many would be expected to drill each week in the year for at least 3 years. The Armed Forces have estimated the cost of the 6 months' training program, but have not announced any figures for the Reserve program.

The cost of a 6-month program of UMT for 800,000 boys has been estimated for the first year of full operation as $4,107,983,600, and the recurring annual cost as $2,158,746,200.

The Defense Department, in submitting a proposed bill for a Reserve program to implement UMT, stated in its covering letter of July 18, 1951:

     Cost and budget data: It is not possible to estimate the fiscal effect of this proposed bill. (House Armed Services Committee hearings on Reserve components, August 6, 1951, p. 534.)

It is our normal experience with the executive departments that they deliberately set the initial cost of their new programs extremely low. The important thing is to get the program authorized. Once that is accomplished and underway, the basic estimates go out the window, and the necessity for larger and larger appropriations increases.

Under the terms of the pending bill, the trainees are to be paid $30 a month during the 6 months they are in training. As you know, the men drafted under the Selective Service Act are paid $75 per month. I venture to predict that if this program is inaugurated it will not be long before there will be irresistable pressure on the Congress to raise the pay of the trainees from $30 a month to equal or approximate that paid those inducted under the Selective Service Act. I also venture to predict that once this program is adopted, the number, size, and nature of the military installations claimed to be necessary for the carrying out of the program will substantially increase. It will be argued that to vote against them will be voting against a defense need. It is a fair assumption that the costs are likely to be two, if not three times and maybe four times, greater than the estimate of $4,000,000,000 submitted to us by the Commission.

The proponents have recognized that the potential enormous cost of the program is one of the strong public objections to it. The country is, at long last,

becoming cost conscious. In order to meet this public objection, our ingenious committee chairman sharpened his pencil, consulted a crystal ball, and, by a formula which not even Einstein could understand, suddenly advises us in the committee report that if this program is adopted, there would be annual savings of $13,000,000,000. We discussed costs rather extensively in committee, but this hypothetical conjectural saving the chairman now claims for UMT came as a complete surprise to all of us when we saw the statement for the first time embodied in the committee report. The very best that can be said for this estimated savings is that the chairman's additions and subtractions are mathematically correct but he bases the figures on mere assumptions in order to arrive at his predetermined conclusion. He must prove his case.

You will note that the committee report does not say in so many words that the savings will amount to $13,000,000,000 annually if this program is adopted. I call your special attention to the very guarded language used in offering this wishful figure, which is obviously designed solely for propaganda-selling purposes.

I now quote from the bottom of page 26 of the committee report:

     Full implementation of UMT may eventually save in excess of $13,000,000,000 annually.

They do not say that it will save $13,000,000,000 annually. They state that it may save that amount annually. You will also note they say that it may eventually save $13,000,000,000. Moreover, this figure is based upon the full implementation of the law.

It is perfectly apparent that the alleged projected savings will be realized when we are no longer drafting men into the service, when the present emergency is past, and the world is at peace. When that day arrives, what they project as a saving will actually be an added peacetime expense to our defense budget.

With respect to this figure as to UMT cost saving, I will say to my beloved chairman exactly what he said to a witness who appeared before our committee. The witness was Mr. John C. Lynn, representing the American Farm Bureau Federation, and he was discussing the large number of reservists who would be attending Army training camps, pointing out that during the summer of 1959 we would have a total of 11,900,000 men in Army camps. To his projected figure, our chairman said, and you will find his statement on page 2515 of the hearings:

     We all recognize the inalienable right of every applicant to always get figures to fit his case. So that is universal, that every man has an opportunity to do that so we never criticize anybody when he gets his figures to fit his case.

Accordingly, I am not criticizing the State of Georgia's greatest mathematician.

That is what our chairman told witness Lynn, and I suppose that is the position that we should take with respect to the chairman's own figure as to the cost of UMT. For my part I do not see any other conclusion, but that UMT will cost

the American people at least several billion dollars every year. After this emergency has passed, this will represent a continuing peace-time cost which would be otherwise avoidable.

This proposed program is based on the premise that for many years to come the United States will need a large army for our own defense. It is proposed by this program that we build up an enormous Reserve Corps, on the theory that we will have available men who can be readily mobilized and put into service. Do not overlook the fact that should an emergency arise and the reservists be called to duty, it would still be necessary to give them refresher courses and still be necessary for them to take extensive training to condition themselves physically and prepare themselves technically for the task at hand. When you consider that equipment is constantly improved and changed, that the technique of warfare is constantly changing, it should be obvious that 4, 5, 6, or 7 years after a man has concluded his basic training, additional training will be necessary before he is ready for combat duty. The money that would be spent for this so-called UMT and the reservist program could well be spent for other defense purposes. It could well be spent on equipment or on research improving existing equipment.

The great strength and power of the United States has not been in the immediate availability of a trained mass of men, but rather in our superior equipment and our great productive capacity. We have fought and won two world wars without resorting to the old Prussian system of a mass army. We have been able to quickly recruit and train an army, because so many of our boys have been technically trained in their civilian pursuits and readily utilized along the same lines in military fields.

The committee report places great emphasis upon the need for a program of this character in order that we may have young men available for service in the event of full mobilization. To substantiate this contention they point to the speed with which the German armies overrun Holland and Belgium, and brought France to its knees.

This thesis overlooks three extremely important facts: One is that the countries so quickly overrun by Germany were geographically adjacent to Germany itself. Do not forget that France had a conscripted army, but France was economically weak. The Germans did not bring England to its knees. The English Channel represented a natural barrier to a quick and easy invasion, and there are thousands of miles of water between the United States and our potential enemies.

The second important fact which the committee argument ignores is that the strength of the German Army was not so much its size but its striking power in guns, tanks, and aircraft. It should be borne in mind that while Germany was stopped by Soviet Russia, it was not because Russia was superior in the number of men but because Russia had American equipment to put into the battle.

A third important fact to which the committee has apparently closed its eyes is that with the advances in aircraft and the destructive power of the atom bomb, no modern warfare will be conducted by great masses of men. It will be largely a war of attrition. I am convinced that if we emphasize having a superior Navy, a superior Air Force, and a strong, mobile Marine Corps as shock troops, we will have the basis for a defense no country can overcome, so long as we remain economically strong.

I am frankly surprised that the Committee on Armed Services is thinking in eighteenth century terms in their reasoning with respect to our defense needs. I am frankly surprised that the majority on our committee should in this day of air power and atomic power be disposed to place so much reliance on a mass army as a defense need. Of course, if it is proposed that the United States is to send its troops all over the globe, if it is proposed that we station our troops in the Far East, the Middle East, in Africa and in Europe, if that is what is contemplated by national defense, then we should enact this bill. Indeed, I doubt that this bill will provide the manpower we need for such global purposes, and that certainly is not what I have in mind when I speak of our national defense requirements. Nor do I believe that the American people have any such conception as the entire globe being a part of our national defense.

This is a permanent peacetime conscription bill, brought here under the guise of an emergency need and on an erroneous conception as to our defense requirements. This bill is abhorrent to the thinking of the free people of America. They are violently opposed to it.

The people have expressed themselves on this bill in no uncertain terms. The farm organizations are against the bill: the American Farm Bureau Federation, the National Grange and the National Farmers Union. Organized labor is against this bill: The American Federation of Labor, the Brotherhood of Railroad Trainmen, the CIO, and the United Mine Workers. The churches of all denominations have expressed their opposition to this proposed legislation. Every major educational organization has registered its opposition. Various civic organizations have expressed their opposition.

The only major non-Government organizations that have endorsed this proposed program of peacetime conscription or compulsory military training are the veteran organizations, such as the American Legion. I hold a great respect for the American Legion, the Veterans of Foreign Wars and the other veteran groups. But I do not believe that the leaders of these organizations are on this issue expressing the sentiment of the rank and file of their members.

I have been and continue to be an active legionnaire. I proudly boast that at one time I had the honor of being a district commander of the Illinois department of the American Legion. I have personally talked with a great many rank and file Legion members. Some of them have been misled by the military propaganda as to what this bill really is. When I explain to them what is proposed by this legislation they invariably express their surprise and emphatic opposition.

As representatives of the people we have the duty of translating into legislative action the wishes, wants, ideas, and ideals of the people who elected us as their voice in Congress. We represent the people as a whole, not the Pentagon or any organization. To vote for this bill is to betray the people whose liberties we were sent here to protect. To vote for this bill is to saddle on the great American people an obnoxious program, repugnant to the very principles of freedom that have been our constant source of strength. A vote for this bill is a vote against the wishes of the American people. You may be quite certain that if this legislation is adopted those who are responsible for it will one day, perhaps not too many months hence, be forced to stand in judgment as guilty before the bar of public opinion.

When I urge the House to reject this proposal as being undemocratic, costly, impractical, inequitable, and unnecessary, I know I am expressing the sentiment of the great mass of our free and independent citizens. They want to remain free and independent and not become mere pawns for a military hierarchy in Washington.

Mr. KEARNEY. Mr. Chairman, will the gentleman yield?

Mr. ARENDS. I yield to the gentleman from New York.

Mr. KEARNEY. Will the gentleman kindly explain to me and other Members of the House where and how this vast reservoir of manpower is to be trained, after they have completed their 6 months' tour of duty?

Mr. ARENDS. Under a provision of the bill we are going to send the 18-year-olds who have taken 6 months home, and let them stay there in Reserve units until called to duty. When called to duty, we will then train them all over again. Each boy will be a reservist, subject to call, for 7½ years. He may be obliged during these 7½ years to leave his work or profession, his home and family, to take tours of duty.

Mr. VINSON. Mr. Chairman, I yield 30 minutes to the distinguished gentleman from Louisiana [Mr. BROOKS], who will answer the question that has just been asked.

Mr. COLE of New York. Mr. Chairman, before the gentleman starts his discourse, will he yield to me in order that I may add to the list of those organizations which have been indicated and identified as being opposed to this proposal?

Mr. BROOKS. I yield.

Mr. COLE of New York. In addition to the labor organizations and the farm organizations and the church organizations which are opposed to this proposal, it should also be noted that the American Labor Party is opposed to it, the Young Progressives of America is opposed to it, the Daily Worker is opposed to it, and the Daily Compass.

Mr. BROOKS. At this point, Mr. Chairman, I should like to add to the list of those mentioned as in favor of it a letter I have received today from the General Federation of Women's Clubs of America, who are very much in favor of it.

Mr. Chairman, I rise in support of this measure this afternoon because the debate which starts this afternoon represents the climax of two continuous decades of debate on this subject, universal military training.

Since the conclusion of World War I, when the need for training for combat troops was so desperately shown, as a result of the reading of the history of that World War there has been this movement in the United States for universal military training. It has not subsided regardless of the vicissitudes and the changes of events in the United States. On the contrary, the world events and the history of this country have served but to increase the tension and increase the demand on the part of the American people for adequate national defense and, in doing so, for universal military training. They are again demanding, as they have demanded before of the Congress of the United States, that we take a definite position in reference to universal military training. I am certainly glad, as I have said repeatedly before, that we are here today and that we are going to vote definitely one way or the other on this whole momentous and historical American question. For 10 years, in my judgment, I have thought the Congress of the United States ought to have expressed itself in reference to universal military training. But they have failed.

Mr. Chairman, my advocacy of universal military training far precedes my service in the House of Representatives. It goes back, Mr. Chairman, to the First World War when men were mowed down on the field of combat in squads of eight because of the lack of military training, and when life was wantonly taken away from our citizens because we had failed to train them properly before putting them into battle. My advocacy of this cause goes back to the time when I saw men come back from the front, badly wounded, on hospital trains with less than 30 days of actual military training. Then and there, at that time I solemnly pledged myself that should the hour come when I would be able to vote on whether or not American boys are going to be given a fair chance, if they should be called into battle again, to vote in favor of proper military training. I am not going to change my thoughts on this occasion on the proposition that if we are going to send men into combat, then we ought to send them into combat properly trained, and not take the lives of American boys by failing to give them, before they are used in combat, the background and training to protect themselves and safeguard the interests of the United States of America.

Mr. Chairman, this matter came to the forefront again when Korea broke, as it did, with stunning suddenness upon the whole world. It was at that time that the Armed Forces called from peaceful pursuits thousands upon thousands of reservists who had served in World War II. We had what we thought was a vast reservoir of reserves from which we could call in the event of need. We had that reservoir set up in such a way that we thought, and they thought, they would be called only in the event of an all-out war, and many of those men performed duty in World War II as combat troops—as soldiers, sailors, and airmen, 85 percent of our reservists at the time of Korea were men who were veterans. In spite of that fact, we had to reach down and call those men back into service again to send a great many of them to Korea. At the present time, Mr. Chairman, there are over 800,000 reservists on active duty in the Armed Forces of the Nation, and of those 800,000 Reserves, 85 percent of them are veterans—men who have already served their country in uniform and men who up until that time had felt that they had discharged their military obligation to the people of the United States, and to the cause of safeguarding the safety and national defense of this country.

Yes, I have heard criticisms, Mr. Chairman, of the call of those men back into service. I have heard criticisms that were amply justified and borne out by events which occurred then, and have since followed. I join with those who have criticised the Pentagon for failure to use proper intelligence and proper principles of justice in handling the recall of these reservists. But I think more important than anything else is the fact that 85 percent of our reservists were men who were veterans who had already served their Nation.

Someone asked me the other day, "Where do we now get our Reserves from?" I said, "We get our Reserves now from only two sources: one is from the volunteering of men who come in and agree to go into the Reserve Establishment." I might say that source has practically dried up since Korea. I see my colleague, the gentleman from Missouri nodding affirmatively. I must say that he and I agree completely that the source of our Reserves has dried up insofar as the volunteers are concerned, and we have very little hope of stimulating enough interest and enough enthusiasm in the future in our Reserve program to reopen that source by attracting our Reserves in voluntarily. The other source from which our Reserves now come is the draft. We draft the boys and we send them to Korea. They spend 2 years over there. Then they come back to the United States and they are put in the Reserves. Those will be our trained Reserves in the future. Those will be the men we will have to call upon should another emergency strike this country, such as Korea. Those will be the men who will be called out a second time, like we have called out the veterans of World War II. Unless you pass this bill there is no escape from it. You have no adequate number of Reserves for the future except from Korea and the Second World War. As we move away from the Second World War, the importance of that source as a means of supplying our reserve needs of course becomes less each year. So in the future, without UMT, the Nation, in the event of a sudden emergency, must call upon those who have already served their Nation 24 months over there in Korea. That is the situation.

Mr. KEARNEY. Mr. Chairman, will the gentleman yield?

Mr. BROOKS. I yield for a question.

Mr. KEARNEY. I wonder if the gentleman can answer the question that I asked the gentleman from Illinois. After an individual has completed a 6-months' tour of duty or training, and he goes into the Reserves, can the gentleman tell me how that individual is going to be trained and where?

Mr. BROOKS. Surely. I will answer the gentleman. I think I can answer him very briefly, because I have only limited time. After these trainees, under universal military training, finish 6 months' training they are given the option, within reasonable limits, of selecting what branch of the service they care to go into. They will be assigned to the proper branch of the service, their own desires being considered. They will be put into the Reserve organizations in the ranks that they have expressed an interest in. They will be required to serve 6 years in the Ready Reserves. If they want to, by attending drills regularly, by performing satisfactory Reserve service, that time can be reduced to a minimum of 3 years. During that period they are required to have 2 weeks' training in midsummer. That will be in the form of a refresher course. So, while they are in the Ready Reserves, they will have that refresher course during the 2 weeks in the summer.

Mr. VINSON. Mr. Chairman, will the gentleman yield?

Mr. BROOKS. I yield to the gentleman from Georgia.

Mr. VINSON. What the gentleman has just explained to the gentleman from New York [Mr. KEARNEY] is all set out in the Reserve bill which the House passed during the last session, is it not?

Mr. BROOKS. Yes.

Mr. VINSON. It has all been taken care of?

Mr. BROOKS. Yes. It passed the House unanimously. The Reserve bill which was passed unanimously by the House is now in the Senate. I am assured that it will be acted upon in the very near future. It is, in effect, a Magna Charta for our Reserve establishments; but regardless of how badly that Reserve bill is needed by our Reserves at the present time, and regardless of how the National Guard and the Reserves and the American Legion and Veterans of Foreign Wars, and all other patriotic organizations plead for the passage of that bill, that bill is not going to be adequate to do the job unless we supplement that bill by universal military training. Without UMT, which will provide Reserves for the future because we are not going to be able to get those Reserves from volunteer sources—without UMT that bill will break down and not be able to function properly.

Mr. KEARNEY. Mr. Chairman, will the gentleman yield further?

Mr. BROOKS. I yield to the gentleman from New York.

Mr. KEARNEY. Does the distinguished chairman of the Armed Services Committee, the gentleman from the State of Georgia, believe that there are facilities all over the United States to train these Reserves?

Mr. VINSON. After they have gone through the 6 months' period, facilities will be provided, as the gentleman from Louisiana just stated, a period of 30 days after they go into the Reserves. I will say that the country is large enough and there are plenty of places in the country that the Reserves can be mobilized and trained without the establishment of a single new training facility for a Reserve. Now, it may be necessary in certain cases to build armories, and that is already provided for in the armory bill that has been passed.

Bear this in mind: There are three things that are provided for step by step: The armories have been provided for by legislation; the Brooks bill for the reservists has been passed by the House; now the UMT bill is before us. If you do not have a UMT bill you will not have anybody in your Reserves and you will not have anybody to utilize your armories.

Mr. KEARNEY. And these various bills the gentleman is speaking about will cover the entire area of the country?

Mr. VINSON. That is right; it will cover the whole thing.

Mr. BROOKS. Let me say to the membership that the gentleman from New York has an excellent record in his service in the House in supporting defense legislation, and I hope he will go along with this piece of legislation.

Mr. VINSON. If you do not pass UMT then who is in the Reserves? No one except the veterans of Korea or any boy who has been inducted or who has enlisted since 1948 who by statute pulled over into the Reserves. Those would be the only people in this country in the Reserves, the veterans and those who have volunteered or those who have been drafted since July 2, 1948.

Mr. KEARNEY. Does the gentleman recall the testimony before the Armed Services Committee by General Walsh, the president of the Guard association, stating that if this bill went through it would mean the ruination of the National Guard?

Mr. VINSON. Mr. Chairman, will the gentleman yield?

Mr. BROOKS. I yield.

Mr. VINSON. General Walsh was apprehensive of that; as a matter of fact you will find in the report a letter that the general wrote to me and which I incorporated in the report because I anticipated that the question might be raised. The maximum authorized strength of the National Guard is 399,-000. We will ultimately get together on some kind of process whereby we can assure the National Guard that it will get its proportionate share of these reservists and ultimately be filled completely up. We deal with that entire subject matter in the report.

Mr. KEARNEY. Would the gentleman favor an amendment in the pending bill which would guarantee that enough men would be sent to the National Guard to enable the Guard to maintain its full strength?

Mr. VINSON. Not if we are going to say to the States, in effect, that the State could not decide who it wanted in its National Guard. It is for the State to say, not the Federal Government, what men they will have in the National Guard.

Mr. KEARNEY. Even after the Guard is federalized?

Mr. VINSON. The Guard is not federalized as long as it is under State control; it is only federalized when it is called in by the Federal Government; in fact, prior to federalization, that is, called or ordered to active duty, it is under the jurisdiction of the States completely, and the State has the right to say who goes into the National Guard.

Mr. KEARNEY. That is absolutely true, but at the same time the Government can call the National Guard.

Mr. VINSON. That does not make a particle of difference. The country can understand and the House can understand that the position of the Armed Services Committee is that the National Guard is a State organization and no bureaucrat or anyone else in Washington can force this or that individual into the National Guard over the protest of the sovereign States of this country. The only time the Federal Government has anything to do with it is when units are called into the Federal service.

Mr. CUNNINGHAM. Mr. Chairman, will the gentleman yield?

Mr. BROOKS. I want to go ahead and finish my statement; then if I have further time I will be very happy to yield. May I say in addition to what has already been said in reference to the Guard that we in the committee have a friendly interest in the Guard and I think the needs of the Guard are going to be well cared for. I do not think the Guard has one single reason to worry about the results of the bill; as a matter of fact when we put through the Reserve Act the Guard came in and was 100 percent satisfied with the Reserve Act. It is only since the Reserve Act was passed that the Guard has brought up the question which gives the Guard some degree of uneasiness which I think is not really justified at the present time.

To me, the equality of obligation of universal military training is one of its greatest virtues. Eight or nine out of every ten young men who attain the age of 18 will undergo this training. They will not escape universal military training as they are now being omitted under the draft.

In other words, at the present time you have some men being drafted and sent to Korea for 2 years. When they come out from Korea they are put in a Reserve and in the event of an emergency in the future those same men will be called first into active service to defend the Nation. I say, Mr. Chairman, that it is unfair to place the whole burden of military obligation on certain limited groups in the United States of America.

When my friends from the Congress came to me at the time the Reserve matter was being heard by the subcommittee on reservists in the Armed Forces, as you did, and you told me you thought it was unfair to call the veterans of World War II with 4 or 5 years' service to go to Korea, I fully agreed with you. By the same token I say that in the future it is going to be unfair to take a man who has served 2 years in Korea, over on the bleak steppes of that country, fighting the Communists over there, when he finishes and has come back, it is unfair, I say, to contemplate calling him first in the event of another limited emergency during which we will need suddenly well trained troops. Without UMT we have no alternative.

We have talked about economy. Now here is an opportunity to practice what we preach. Anyone who will analyze this program will quickly realize that there are tremendous savings involved through the initiation of a universal military training program. But instead of considering these savings; instead of accepting this method of equalizing the obligation to serve one's nation; instead of giving our veterans a fair break in life, there are some who oppose the program because war or anything militaristic is wrong. Of course war is wrong—and it has never been the choice of this Nation. But the best way to avoid world war III is to be prepared for it. Is this House going to permit an organized minority to overcome the wishes and desires of a majority of the American people? I think not. I think the membership of this House will meet this issue squarely and will approve the legislation. I think the membership of this House wants economy in government. I think the membership of this House wants equality of obligation to serve one's nation and, above all, I think the membership of this House wants to give the reservists and the draftees who are living in the mud and cold of Korea the assurance that should another emergency arise, they will not be the first called but, instead, other young men in their communities, who will otherwise escape service, will do their share.

Russia today stands threateningly at the gateway of world peace. She is building atomic-powered submarines and when war comes, they will be there. She is building atomic-powered airplanes and when war comes, they also will be there. Russia's development of atomic bombs and artillery and submarines and airplanes make it necessary that our defense be ready and available at a moment's notice if they are to serve this country before the stunning crash comes.

In conclusion, Mr. Chairman, since the birth of this Republic, we have depended upon a reasonable Military Establishment expanded in time of emergency by men taken from a strong, well-organized and well-trained Reserve. This has certainly been our objective although many times the Nation found itself in critical emergencies without a strong Reserve.

As the generations have come and gone, in my judgment, the Regular Establishment has been built up in strength

and in effectiveness and in power. Regardless of the criticisms and the complaints which we hear on all sides at the present time regarding the waste and inefficiency of the Armed Forces, and many of these criticisms and complaints are fully justified, we have yet the best Regular Establishment of any nation on the globe, and this includes Russia. I, therefore, am not casting off on the Regular Establishment, but my criticism is in our failure to develop our Reserve components.

The father of his country, George Washington, proclaimed the principle of a reasonable regular military establishment supported in time of emergency by a well-organized reserve establishment, and yet Gen. George Washington found himself most of the time commander of poorly trained and ill-equipped troops and without reflection upon the magnificent chapters of patriotism of the Revolution, it is obvious that many mistakes and failures of the Revolutionary period were the result of poorly trained and inefficient troops. In fact, so poor was the training of the militia which had been brought into the Revolutionary Army that in the depth of the Revolutionary War, General Washington brought from Europe General Van Steuben from the armies of Frederick the Great to give his force during the winter at Valley Forge the discipline and the training and the efficiency which later was reflected in the victories at Trenton and at Yorktown.

Although this Nation is a peace-loving one, it is a matter of record that we have been engaged in war every 20 years since the Constitution was adopted, and they have been defensive wars and practically everyone of these wars we entered either without any Reserve or with a poorly organized and trained and equipped Reserve. Our best showing, of course, was in the Second World War; but even in this instance the National Guard required 12 months training before it was considered efficient and ready for major combat operations. The like was the case with reference to other Reserve components. The strength of European defenses and the benediction of the Almighty gave us the time necessary to train our troops taken from civilian walks of life or from the Reserves in both World War I and World War II.

Korea gave us some idea what we may expect in the future. There was no time for training for Korea. If our men reached there in time they were compelled to go at once. They were called out with short notice and many were sent overseas in a hurry. As a result of that fact, the veterans with previous training were taken from civilian walks of life although at another time and on another field of battle, they had discharged their military responsibilities to the United States.

The future is not going to change the military posture of this country. It is going to increase rather than decrease the dependency which we have upon our Reserve establishment and upon the citizen soldier. As the wealthiest Nation in the world with the highest form of civil-

ization, the burden is going to fall heavily upon this country to furnish the leadership in world affairs and to back it up with proper support in the future. This can be done only by universal military training by which men are trained and placed in well organized Reserve units. They are kept there available for the defense of the Nation in times of critical and immediate emergencies. They are civilians and yet they are soldiers of the highest order who have an abiding faith in the United States of America and are willing to do their just part to meet their military responsibilities under a system of universal training.

Mr. YATES. Mr. Chairman, will the gentleman yield?

Mr. BROOKS. I yield to the gentleman from Illinois.

Mr. YATES. The testimony of General Hershey discloses that under the Selective Service System approximately 1 draftee out of every 10 who are called goes into the service. He estimated, too, that under universal military training they hope to be able to take in 8 out of 10 who are called for service. Will the gentleman tell me how the system of deferments would work?

Mr. BROOKS. Let me tell my friend this, and I do not mean to cut him off at this point. I think that is something that cannot be developed within the limited time I have here. I would far prefer for my chairman to take the lead in answering that and developing that question.

Mr. VINSON. May I say to the gentleman from Illinois that there are only two statutory deferments, only two deferments fixed by law. The other deferments it is to be hoped will be kept at the very minimum. I am hoping that when it gets into full implementation it will apply so universally at least 8 or 9 out of every 10 will have the benefit of service.

Mr. YATES. Suppose that under this plan people are called for universal military training and are accepted under the training program. The time comes when they conclude their 6 months training and they are subject then to selective service.

Mr. VINSON. No, they are not subject to selective service. I want the House to understand that. When he has once been inducted into universal military training and gets the 6 months training and is put in the Reserve, he stays in the Reserve until the gentleman and the other Members of this Congress take him out of it. He is not subject to the draft.

Mr. YATES. Did not General Hershey testify, then, that the present manpower, if that be the system, would not be adequate to supply sufficient men for selective service?

Mr. VINSON. No. General Hershey testified that in June of this year we will have a pool of 900,000 men, and with ease we can take at least sixty or seventy or eighty thousand this year. That is what he testified and that is in my statement.

The CHAIRMAN. The time of the gentleman from Louisiana has expired.

Mr. VINSON. Mr. Chairman, I move that the Committee do now rise.

The motion was agreed to.

Accordingly the Committee rose; and the Speaker having resumed the chair, Mr. COOPER, Chairman of the Committee of the Whole House on the State of the Union, reported that the Committee, having had under consideration the bill (H. R. 5904) to provide for the administration and discipline of the National Security Training Corps, and for other purposes, had come to no resolution thereon.

## SPECIAL ORDERS GRANTED

Mr. YORTY asked and was given permission to address the House today for 1 hour, following any special orders heretofore entered.

Mr. MEADER asked and was given permission to address the House for 30 minutes tomorrow, following the conclusion of any special orders heretofore entered.

Mr. McCORMACK asked and was given permission to address the House for 15 minutes today, following any special orders heretofore entered.

Mr. WILLIAMS of Mississippi asked and was given permission to address the House for 15 minutes today, following any special orders heretofore entered.

## CORRUPTION IN GOVERNMENT

Mr. HAVENNER. Mr. Speaker, I ask unanimous consent to extend my remarks at this point in the RECORD and to include an excerpt from Fortune Magazine.

The SPEAKER. Is there objection to the request of the gentleman from California?

There was no objection.

Mr. HAVENNER. Mr. Speaker, buried away on page 128 of the February issue of Fortune magazine is a simple truth which provides a profound commentary on the morals of our Federal servants as compared with those of the businessmen with whom they deal.

This clipping again brings to our attention the fact that the greatest danger to our republic comes from the would-be briber or corrupter, the fast-money boy who believes that everything is for sale. Too often our investigations bring to public view the tempted, but fail to reveal the tempter. Let us search more intensively and get to the real root of the trouble. Let us bring forth the bribers, the corrupters, the fixers, the underground lobbyists, and the election buyers who attempt to seduce public officials from the performance of their duty, or who try to subvert by back-door methods the will of the people as expressed at elections.

I insert the following passage from page 128 of the February issue of Fortune in the RECORD:

There is excellent evidence that the demand for venality in government, and for improper influence short of venality exceeds the supply. Shocking numbers of American businessmen are quite prepared to bribe their way through Washington. Shocking numbers of them persist in believing, even when

advised to the contrary, that decisions in their favor can be obtained only by the purchase and exercise of improper influence. The proportion of public officials who are open to bribes and to improper influence short of bribery is far lower than these businessmen tend to believe.

The SPEAKER. Under previous order of the House, the gentleman from Connecticut [Mr. SEELY-BROWN] is recognized for 15 minutes.

## DEPENDENTS OF MEN AND WOMEN OF UNITED STATES COAST GUARD

Mr. SEELY-BROWN. Mr. Speaker, one of the primary concerns and responsibilities of this Nation and of this Government is to protect the rights and privileges of the dependents of the men and women who wear the uniform of the United States. It comes as a shock to me to learn that we have one large group who seems to have been forgotten. I am speaking specifically of the dependents of the men and women of the United States Coast Guard.

The Coast Guard by act of Congress is a member of the Nation's Armed Forces. The Coast Guard is a military service, yet its members are denied the complete benefits and protection of medical care for dependents that presently are provided for the dependents of all other members of the armed services.

The Army, the Navy, and the Air Force, operating by reciprocal agreement under the Unification Act, provide medical and hospital care to dependents of any of the members of these three services. However, the Coast Guard, while a member of the Armed Forces, was not included under the Unification Act and by reason of this fact Coast Guard dependents are not eligible for hospital care in the medical facilities of the other services.

Blame for this situation should not be directed against the Army, the Navy, or the Air Force. Neither should we blame the Public Health Service, which provides medical and hospital care for Coast Guard dependents under most circumstances. All of them are required by law to operate within well-defined limits.

Obviously, it would not be practical to build and operate Public Health Service hospitals at every Coast Guard Establishment. To me, it is just as obvious that the needs of the Coast Guard could be met if its dependents were made eligible to receive care in the medical facilities presently available to the dependents of members of the other branches of the Armed Forces.

I have the honor to represent the congressional district in which is the home of the United States Coast Guard Academy. Also in my district is one of the important training facilities for Coast Guard personnel. It is at these facilities that the men whose work is of such immense importance to safety, as well as to science and security, are trained. I am happy to serve once again on the Board of Visitors to the Coast Guard Academy. I, therefore, consider it my duty as a Member of this House, to arouse interest in, and to seek action to remedy a situation which has caused much suf-

fering among the dependents of our Coast Guard personnel.

This is not a matter of appropriating additional money. It will not lay any further burden on the taxpayers of this Nation. The enactment of legislation now presently before both the Committee on Armed Services and the Committee on Merchant Marine and Fisheries will open the legal door making possible the proper care for the dependents of the Coast Guard.

There is not a Member of this House who does not recall some memorable deed of the Coast Guard. We who live in New England know that story well, and its continuing epic is being written in the news of the day as the winter sea reaches out for the lives and property of this Nation. The historic missions of the Coast Guard in all parts of the globe during World War II is a glorious chapter in the ever-widening battle for freedom. Today the name Coast Guard is being carried forward with honor in many places but the families of these brave men are deprived of the medical care and comfort to which they ought to be by law entitled.

The facilities of the Public Health Service are not always available in the many areas to which duty sends the fathers of these families. This lack of Public Health Service facilities places an undue hardship on the dependents of Coast Guard personnel due to the ever-rising costs of comparable medical care in civil institutions.

I do not come before you today to criticize—but rather to correct. I come in support of enabling legislation to open the doors of countless medical facilities of the armed service to these worthy Coast Guard dependents. I do not blame the Department of Defense, because today there are legal barriers to such a policy. We must break these barriers. It is the responsibility of the Congress to act and to act with speed in this matter.

A recent letter from the wife of an enlisted man of the Coast Guard Air Detachment at Barber's Point Naval Air Station, Oahu, Territory of Hawaii, has been brought to my attention. I quote directly from this letter:

I am 7 months pregnant again, but with the cost of living here I don't see how we can pay for this baby. My big question is why are the Coast Guard dependents excluded from medical services of the Armed Forces? I am told the reason Coast Guard dependents cannot go to Tripler Army Hospital (the only service hospital in this area) is because the Coast Guard comes under the Treasury Department and Public Health in times of peace—and during the last war we were part of the Navy.

That leaves us holding the bag now because there is no public health hospital in Hawaii. I can go to the public health office for my office calls, but I still have to pay the $75 delivery fee to the doctor and the hospital bill for me and my child. • • •

The Coast Guard men must stand duty every third night, carry firearms on watch, pass marksmanship tests, are subject to transfer, come under the service pay bill, etc., wear the same uniforms as the Navy except for the shield on the sleeve. Why is there this discrimination against us when it comes to medical attention?

Coast Guard babies cost about $200, while Navy, Army, and Air Forces, and so forth,

pay only $12 to $15, which is for laundry and food while the mother is in the hospital.

This touching letter just about sums up the case against the present inequality in medical care for dependents of the Coast Guard. This mother knows what she is writing about. She certainly has every moral right for admission to that Army Hospital, and it is up to this Congress to give her the legal right.

Coast Guard dependents in Argentia complained about their plight back in 1946. Last December, the commanding officer of the Loran Transmitting Station at Port Aux Basques, Newfoundland, reported that dependents there suffered for lack of medical attention. In November 1950, the commander of the Coast Guard Depot at Tongue Island Naval Station, Astoria, Oreg., asked for the alleviation of a similar condition. Last May, the commander of the Fifth Coast Guard District reported that Coast Guard dependents were being denied treatment at the Naval Clinic at Wilmington, N. C., and at Camp Le Jeune. Even at the huge installation of the Great Lakes Naval Training Station, dependents of Coast Guardsmen have been refused treatment, even though it is immediately available. The same situation currently prevails in Alaska.

I merely cite these instances to demonstrate that my views are based on facts—poignant human facts—that plead for themselves. Since proper legislation has already been introduced in the House and Senate to adjust these inequities, I do not propose any further measure. I do call your attention in particular to H. R. 342, introduced on January 3, 1951, by the gentleman from South Carolina, Congressman RIVERS. This bill is presently before the Committee on Armed Services. I also call your attention to S. 1557, introduced on May 29, 1951, by Senator MCCARRAN, and to H. R. 6212, introduced January 24, 1952, by the gentleman from North Carolina, Congressman BONNER.

I bring this message to you today lest we in the haste of an election year may forego action. I am sure such will not be the case if we can be made to realize the gravity of the situation which I have attempted to describe.

Like every other facility in these atomic days, the duties and the scope of the Coast Guard have broadened with the times. Its members are asked to do more and to be ready for even more hazardous undertakings than those which brought that service such a distinguished record of courage and daring. We ask much of these men of the Coast Guard. We expect much of them. We must not ask them to bear financial burdens beyond their ability.

These men wear the uniform and carry the flag of the United States. There very motto—Semper paratus—describes their willingness always to be ready for any emergency. This is an emergency for the Congress. We, too, must be prepared to fulfill the duty which rests upon us. I hope that every Member of this House will join with me in urging that immediate action be taken by the appropriate committees on the legislation to which I have referred.

The SPEAKER. Under previous order of the House, the gentlewoman from Massachusetts [Mrs. ROGERS] is recognized for 5 minutes.

## LITHUANIA

Mrs. ROGERS of Massachusetts. Mr. Speaker, I ask unanimous consent to revise and extend my remarks, and to include an editorial from the Lowell Sun, a resolution of the Lithuanian Council, and a letter from the director of the Lithuanian American Information Center.

The SPEAKER. Is there objection to the request of the gentlewoman from Massachusetts?

There was no objection.

Mrs. ROGERS of Massachusetts. Mr. Speaker, Lithuania is a small country, even though it is the largest of the three Baltic countries, with a population of about 3,000,000. The story of the Lithuanians and their historic homeland goes back to the early middle ages, but their history as an independent nation begins in the thirteenth century. In the middle of that century they formed a unified state to protect themselves against the Teutonic knights and other disturbers of their peaceful life. The next century was the most glorious in Lithuanian history. Under the grand dukes the country grew in size and stature, becoming one of the largest and most important states of medieval Europe. In 1385 Lithuanian Grand Duke Jagello married the daughter of Poland's king and thus was brought about a close alliance between these two countries. In the sixteenth century when they both were hard pressed by the Russians, Poland and Lithuania were completely merged—in 1569. This union, however, proved to be of no avail against the threat from the east; it was impossible to forestall advances of the ponderous Russian bear. Finally, in 1795, when Poland was partitioned and ceased to exist as an independent country, Russia annexed all of the eastern part of the country and with it Lithuania.

From 1795 to 1918, the history of Lithuania is one of continuous subjugation to the Russian czars. At first the Lithuanians enjoyed considerable autonomy, but soon they were deprived of all vestiges of political, cultural, and even spiritual autonomy. A policy of Russification was carried out ruthlessly. Suppression and exile were the principal methods employed by the czar's officers. Russian was made the official language; monasteries were closed; and the teaching of the Lithuanian language in the schools was forbidden. In this manner growth of an intellectual class was purposely discouraged. But during all those years, underground activity on the part of national-conscious Lithuanians continued. They rebelled against their ruthless oppressors in 1830, in 1863, and in 1905, each time falling short of their aim, that of securing either complete autonomy or full independence.

During World War I Lithuania was invaded by the Germans and remained under their occupation for more than 3 years. Toward the end of 1917, the Ger-

mans acknowledged the strength of the Lithuanian nationalist movement by permitting its leaders to hold a conference. A 20-member national council was formed, and this council, under the leadership of Antanas Smetona, proclaimed Lithuania's independence on February 16, 1918. Thus began the independence of modern Lithuania, the thirty-fourth anniversary of which is being celebrated today.

The history of Lithuania during the interwar years from 1918 to 1940 is remarkable in many ways. The country literally pulled itself up from chaos by its own bootstraps. Overrun by war, despoiled of resources for generations, oppressed for centuries, the Lithuanian people in the course of less than 25 years created a self-supporting, progressive, and modern democratic state. By 1920 Russian and German troops either had left the country or were expelled. Lithuanians settled their internal and external problems by their own efforts. They evolved a stable government and managed to secure a balanced economy for the country. In short, Lithuania became a model state in northeastern Europe. Unhappily this progressive period did not last long. In mid-1940 Lithuania's independence became a casualty of World War II.

In October 1939, the nation was forced to accept the quartering of a certain number of Soviet troops in strategic bases along the Lithuanian Baltic coast and in the country. In May, the following year, the Soviet Government ordered its forces to occupy the entire country at once, and demanded that the Lithuanians agree not to oppose this occupation. Having no alternative, the latter reluctantly accepted the harsh terms of the ultimatum. Immediately the entire country was overrun by the Red army. The Lithuanian Government was summarily dismissed by the occupying authorities and, following an "election" conducted under strict Soviet supervision, a new left-wing government, "friendly to the Soviet Union," was instituted. This government voted "unanimously" on July 21, for the union of Lithuania with the Soviet Union, thus bringing about the formal incorporation of that once independent, sovereign and democratic country into the U. S. S. R. This first phase of Soviet annexation lasted only about a year, but it was long enough to upset the entire political, economic and social structure of the country. Collectivization of farms and the socialization of all means of production and distribution were pressed vigorously. Arrests, detentions, deportations, and executions took place on an unprecedented scale. Former government functionaries, prominent men in all walks of life who were unable to flee the country were deported to the interior of the Soviet Union. In June 1941, when Hitler attacked the Soviet Union, the Germans expelled the Russians from Lithuania. The Germans then remained in control of the country for more than 3 years. In late 1944 the Russians returned as "liberators," again with their dreaded secret police and military commissars. They

have been in full control ever since. Instead of being liberated, however, the Lithuanians have been held down and literally crushed by some of the most ruthless oppressors in all history—Stalin's heartless henchmen.

Today, Lithuania is best described as one large prison camp, sealed off from the outside world behind an iron curtain. We hear very little of what goes on behind that barrier. And that little is disheartening. There is every reason to believe that tens of thousands, perhaps hundreds of thousands of innocent men and women have been liquidated—martyred for their patriotism, for their religious faith, for their steadfast resistance to tyranny. Lithuanians have been wrested from their families, their homes, their native towns and villages for service as slaves in Siberia. Some estimates hold that 700,000 Lithuanians have been sent off to the interior of the Soviet Union. The ruthless Soviet policy is to extirpate all ideas of national freedom and national independence; to rid the country of all patriotic, independent-minded, liberty-loving Lithuanians, and then colonize it with Russians and Mongolians brought in from far-off Asiatic regions. It is reliably reported that the coastal areas of the country are already colonized "almost exclusively by the Russians."

Now, 34 years after the declaration of their independence, Lithuanians everywhere solemnly celebrate their independence day. With their country still writhing under the heel of the conqueror they commemorate that day with heads unbowed. In spite of the severe repressive measures operating in Lithuania, no decrease has been reported in the armed anti-Soviet resistance on the part of the underground guerrilla forces. Until recently, they retained the mastery of the countryside. Against the heaviest odds patriotic Lithuanians carry on the seemingly endless struggle. In such fights they are showing their finest characteristic: their devotion to the high ideals common to the civilized west. They have shown themselves willing to sacrifice their lives for freedom and independence. To them these words are sacred. They are fighting not only for their own freedom but to rouse the conscience of the world against tyranny.

It is to the everlasting credit of this country that we have never recognized the annexation of Lithuania and its incorporation into the Soviet Union. Lithuanian people still continue to have their diplomatic representatives in Washington who, as their true spokesmen, make constant appeals to the governments of the West and to the United Nations. Let us hope that soon the world will take note of these appeals and, in the name of justice and humanity, give them the recognition they deserve.

[From the Lowell (Mass.) Sun of February 14, 1952]

REPORT ON LITHUANIA

It has been Lithuania's tragic fate to have suffered under the oppression of both the Nazis and the Soviet tyrants; and if this

ill-fated land were to speak out, it might say, "A plague on both your houses."

The Lithuanian national resistance carries on against the Russian occupation forces, but it is only a matter of time before whatever spirit is left in the patriots will be gone. The force of the Russian control is too great, and the methods used to kill nationalism are brutal.

A report in the Lithuanian Bulletin, published in Washington, says that the Soviet occupational regime systematically and without interruption is trying to merge Lithuania organically into the Soviet economic system, to assimilate ideologically the Lithuanian people with the Soviet people, and to exterminate the hostile native anti-Soviet element. The latter is accomplished by genocidal operations, by killings of the resistant groups and by Russification and colonization by Russian elements.

All efforts are concentrated on leveling the social, economic and cultural standards of the occupied nation to the standards of the USSR.

Lithuanian patriots in exile and descendants of Lithuanians who now live in the United States and other lands have little hope left in respect to the country of their forebears. The situation has gone from bad to worse, and while there was a time when it was expected that the United States might effectively intervene in behalf of the beleaguered country, there is now little hope of such action. The Soviets would reject all and any American proposals, just as they have tossed aside so many other ideas that have come out of Washington.

The main hope of Lithuania and other European countries that are suffering under the yoke of the Communists is a possible break-up of the whole red pattern. Already there has been considerable dissension among the Communists, and when this breaks out into open hostility on a major scale, then the Lithuanians may have a chance to regain their place in the sun and to again enjoy the freedoms of their ancestors.

In anticipation of a positive break in the Communist association of nations, exiles from eastern Europe have already banded together in organizing a Central-Eastern European Commission in Washington, to try to stimulate resistance in the nine iron curtain lands that they came from, and to plan for the union of their lands into a group dedicated to the task of meeting communism head-on.

Their planning goes forward, day by day, and they are confident that they will have the chance to move against the Soviets who now control their homelands.

But even as this type of patriotic work goes on, so, too, are the Soviets continuing their relentless business of Russification of the small iron curtain lands. In their own savage, barbaric way they are reducing hopefulness to helplessness.

The spirit that still lives vividly in the hearts and minds of all Lithuanians is probably no greater than that of other patriots of other small lands that have been swallowed up by the Russians.

Their day of reckoning as a united group anxious to escape from tyranny and oppression cannot come too soon—and the free world is fully in sympathy with them.

Unanimously adopted at the mass meeting of Lithuanian Americans of the city of Lowell, Mass., held under the auspices of the local branch of the Lithuanian American Council, Inc., on the 10th day of February 1952, to commemorate the thirty-fourth anniversary of the declaration of independence of Lithuania:

"Whereas the people of Lithuania, one of the first victims of the Stalin-Hitler conspiracy, have been forcibly deprived of the exercise of their sovereignty and of the basic rights of individual, religious, political, social, cultural, and economic liberty, and are subjected to inhuman policy of oppression, terror, murder, and mass deportation to Siberia and other parts of vast Soviet territory;

"Whereas the freedom-loving Lithuanian Nation is strongly opposed to any alien domination and continues to resist enslavement with an ardent desire to regain freedom and independence;

"Whereas because of their manifest and unmistakable attitude toward international communism, the people in Lithuania, backed by their kinsmen in the free world, represent a reliable outpost in the present defense line of the free nations against Communist aggression;

"Whereas when the evil forces of enslavement are directed by the single hand of the Kremlin masters of hundreds of millions of human beings, no nations, great or small, can regain freedom unaided by others;

"Whereas the eyes of the unfortunate are set on the United States of America which always has been looked upon as the strongest champion of the oppressed: Therefore be it

"Resolved, That this meeting appeal to the President, Secretary of State, and Members of the United States Senate with the request to do everything possible—

"(1) That the Genocide Convention which represents the most powerful legal instrument for preventing the crime of genocide, be immediately ratified by the United States Senate, thus demonstrating to the world that this country not only professes but also stands for humanitarian ideals;

"(2) That the ratification of the Genocide Convention be thereafter implemented by energetic and unceasing efforts of the United States Government within the United Nations to enlighten the world regarding the barbaric practices of the Soviets against enslaved peoples and to take all steps that this horrible crime be stopped;

"(3) That the liberation of Lithuania and other Russian-occupied countries be included in the program of the American foreign policy; and

"(4) That the existing underground movements behind the iron curtain be given direct and effective assistance in their unequal life-and-death struggle for freedom and independence; be it further

"Resolved, That this meeting expresses its gratitude to the Government of the United States for its ever-growing initiative in supporting the cause of free Lithuania and for its favorable attitude toward the suffering Lithuanian Nation; and be it finally

"Resolved, That we, the Lithuanian Americans of the city of Lowell, Mass., reaffirm our adherence to the American democracy and pledge our wholehearted support of the Government in its efforts to stop Communist aggression and to secure an international peace founded on principles of freedom and justice for all the peoples on the earth."

LITHUANIAN AMERICAN COUNCIL, INC.,
REV. JOHN J. SKALANDES,
Chairman.
MONICA P. BLAZONIS, Secretary.
LOWELL, MASS.

LITHUANIAN AMERICAN
INFORMATION CENTER,
New York N. Y., January 29, 1952.
The Honorable EDITH NOURSE ROGERS,
United States Representatives from
Massachusetts, Washington, D. C.
DEAR MRS. ROGERS: Lithuanian Americans on February 16 will observe the thirty-fourth anniversary of the Independence of Lithuania. Because the voice of the Lithuanians in the homeland has been stilled, it is but fitting that their descendants, wherever they may be, should pause and mark an independence which has been temporarily set aside.

Most Lithuanian Americans still have relatives in the homeland with whom all contact has been broken. Today a letter from America is a ticket to Siberia.

Lithuania's progress during her days of independence was exemplary in the economic and cultural fields. Today, as a nation, Lithuania is being exterminated. She has lost over 500,000 of her people because of political executions, planned starvation, torture, and exile to death camps; and finally collectivization is leveling her social, economic, and cultural standards to those of Soviet Russia. Collectivization has converted the farmfolk into such slaves of the state as the Lithuanians have never experienced in their long history.

The Lithuanian American Information Center, as spokesman for the Lithuanian-American Council, representing the overwhelming majority of one million Lithuanian Americans requests an expression of your sentiments on this occasion. It may bring a shred of hope to a tragic nation which is still resisting a merciless occupant.

Thanking you in advance, we beg to remain,

Sincerely yours,
MARY M. KIZIS,
Director.

The SPEAKER. Under previous order of the House, the gentleman from California [Mr. YORTY] is recognized for 1 hour.

## MOST SHOCKING TAX SCANDAL IN HISTORY — ADMINISTRATION TRIES TO HAMPER COMMITTEE—MILLIONS LOST TO GOVERNMENT IN SECRET BARGAINING

Mr. YORTY. Mr. Speaker, surely this century has witnessed the most shocking tax scandal in the history of our Nation. The Bureau of Internal Revenue has proved to be a sensitive agency which requires constant supervision and surveillance.

During the past 40 years, the duties of the Bureau have increased tremendously. The staff of the Bureau has grown proportionately and the responsibility of those who collect most of the Nation's taxes has become more and more a responsibility which requires for its proper discharge the highest kind of integrity and devotion to the public trust.

Congressional committees digging into Internal Revenue irregularities deserve the unstinting cooperation of the administrative agencies of the Government. It is lamentable indeed that there have been occasions when this has not been forthcoming. In fact, there have been occasions when the administrative agencies tried in every way to hamstring and scuttle the work of our committees of the Congress. In spite of this, it has been proved that untold millions of dollars have been lost to the Treasury of the United States and shifted to other taxpayers by questionable secret bargaining procedures employed by the Bureau without demonstrable authorization from Congress. On occasions too much discretionary power has been delegated to or usurped by Bureau division heads. One report dealing with this subject says:

### DIVISION HEADS SUPREME

The practically unlimited discretionary power vested in the Commissioner of Internal Revenue is actually exercised by the

division heads. These division heads are governed by no adequate rules or instructions, and unless a taxpayer is dissatisfied with the determination of his tax, or unless a refund exceeding $50,000 is involved, there is no review of the work done under a division head.

Under the procedure of the Bureau of Internal Revenue there is no way for any tax determination which is satisfactory to the taxpayer and which does not involve a refund of $50,000 or more to be brought to the attention of the Commissioner of Internal Revenue or any other superior of a division head, except by the protest or complaint of a subordinate of such division head.

All communications from subordinates of division heads to superiors of division heads are forwarded through the division heads. Communications from section chiefs to the Commissioner and solicitor relating to official business have been suppressed. It is the policy of the Income Tax Unit to discourage complaints and protests by subordinates. This policy leaves the division heads supreme and their superiors in ignorance of how the law is really administered.

Publicity of principles and practices: Many of the principles, practices, methods, and formulas applied in the determination of tax liability have never been reduced to writing, and only 15½ percent of the formal written rulings applicable to income taxes have been published.

This failure to promulgate and publish the principles and practices to be followed in the determination of tax liability has had the following results:

1. Information for the guidance of the employees of the Income Tax Unit is so incomplete that gross discrimination results from the failure to apply uniform principles to similar cases.

2. Taxpayers, in many instances, have failed to claim allowances granted others similarly situated.

3. To secure the benefit of unpublished precedents, taxpayers are forced to employ former employees of the Income Tax Unit to advise and represent them in tax cases.

4. Their exclusive possession of information as to the unpublished precedents and practices of the Income Tax Unit has placed an artificial premium upon the value of the services of exemployees which enables them to demand and receive immense fees for information which should be freely available to everybody.

5. This artificial premium, thus placed upon the exclusive information possessed by the employees of the income-tax unit, and the opportunity thus afforded for highly lucrative outside employment, is the cause of the extraordinary turnover among the employees of the unit and of the difficulty experienced by the unit in retaining the services of competent employees at salaries within the range of the salaries paid by the Government for comparable services.

6. The failure to consider closed cases as precedents and to publish the principles and practices followed in closed cases as precedents has deterred the formation of a body of settled law and practice. The unsettled state of the law and practice has encouraged the filing of claims for allowances and require the constant rediscussion and reconsideration of questions, which should be settled by precedents established by closed cases.

7. The fact that a ruling will be published, and the benefit of its principles claimed by taxpayers similarly situated, is the strongest possible deterrent against making unsound rulings.

8. During the course of the hearings there has been a great deal of evidence tending to show that it is the policy of the bureau to fix taxes by bargain rather than by principle. Rulings based upon bargains cannot be published as precedents. The best and most persistent trader gets the lowest tax and gross discrimination is the inevitable result of such a policy.

Publicity of records: The unsatisfactory conditions developed by this investigation are the inevitable result of the delegation of almost unlimited discretion to be secretly exercised. It is believed that few of the unsound settlements to which attention has been called would have been made if it were not for the belief that they would never become public.

While the objections to throwing the records of the income-tax unit open to the public are recognized, the necessity for the opportunity for some outside scrutiny is imperative.

Congress is imposing a system of taxation the administration of which necessarily involves the exercise of so much discretion as assumes some duty to the public to see that such discretion is not abused.

Causes of delay in disposal of cases: This investigation discloses that the principal causes of the delay in the disposal of old cases may be stated as follows:

1. Bargaining with taxpayers instead of assessing taxes in accordance with published precedents.

2. Innumerable conferences incident to the bargaining policy.

3. Granting innumerable extensions of time for furnishing information required to determine the validity of deductions.

## WAR PROFITS CONTROL

Every one of us wants to see warprofiteering stopped. Yet provision for accelerated amortization of defense facilities has proved a wise inducement to the indispensable increase of our defense capacity, but such amortization in fairness to older established industries and in fairness to the taxpayer, generally must be carefully limited and controlled. The rulings of the Bureau of Internal Revenue in the matter of amortization allowances have not always been fair or ethical. For instance, one congressional report said:

While the purpose of the amortization provision was to encourage the acquisition of facilities for the production of war necessities, a large part of the allowances are upon facilities acquired by contract entered into before April 6, 1917.

Amortization has also been allowed on prewar facilities in full operation on April 6, 1917, because they were transferred from a corporation to its subsidiary or by a group of corporations to a consolidation without any real change of ownership or increase of capacity for war production.

There has been gross discrimination in arbitrarily allowing amortization for reduced postwar cost of replacement in some cases and in denying it in others similarly situated, in allowing amortization to some transportation companies, while it is generally denied others, and in allowing amortization on land.

## RULES SHOULD BE PUBLISHED

Mr. Speaker, one of the worst practices in which the Bureau has ever indulged is a failure to publish the principles and rulings guiding its action. Any failure to set out clear guideposts for the guidance of taxpayers and especially the employees of the Bureau itself cannot help but lead to confusion, discrimination and opportunity for irregularity.

As an example of this, I should like to cite the following from one of our reports. It is particularly shocking because it shows that hundreds of millions of dollars were refunded to a long list of corporations without satisfactory records of the transactions being kept or the principles on which they were based being publicly published by the Bureau:

Principles not published until October 1925: The solicitor's ruling in this case, published on October 26, 1925, 8 years after the amortization provision was inserted in the law, and a year and 8 months after the close of the period within which amortization allowances could be redetermined, constitutes the first official statement of the principles which are to govern the determination of amortization allowances ever promulgated by the Bureau of Internal Revenue for the guidance of either the taxpayers interested or the engineers whose duty it is to pass on these deductions. Thus amortization aggregating approximately $600,000,000 is allowed before there is any authoritative definition of the principles which are to be applied to its determination. This is a clear case of "locking the barn after the horse is stolen."

## OFFICIALS SHOULD NOT PERSONALLY PROFIT

Of course, Mr. Speaker, it goes without saying that we must look askance at transactions by which the Bureau of Internal Revenue refunds taxes to corporations in which the Secretary of the Treasury has an interest. This was done and is most certainly to be condemned unless it can be clearly shown that the fact of the Secretary's interest had no relation whatsoever to the determination made by the Bureau. There have been times when this has certainly not been made very clear. These cases have also been mentioned in the congressional report referred to above.

## FRAUD ENCOURAGED

Another practice of the Bureau which has been condemned, and which we all condemn, is one found to actually encourage fraud. As one of our reports showed, an attempt of the Bureau to protect creditors of a corporation guilty of fraud is the policy most certainly not in the public interest, and one not actually authorized by the Congress. The report in question in dealing with the subject says:

If the fraudulently concealed income of a taxpayer is discovered after the taxpayer has suffered such losses that the payment of the legal tax will bring its liabilities above what can be recovered on the forced sale of its assets, this policy declares that such taxpayer shall be relieved of tax upon its fraudulently concealed income to the extent necessary to save it from insolvency. Such a policy places a premium upon concealing income and speculating with the money due the Government as tax, because if a loss results the Government stands the loss. * * *

Delegating discretion as to how much of a legal tax the Government can collect is one thing. Delegating discretion as to how much tax a taxpayer can pay without becoming insolvent is quite another thing. Congress has fixed the rate at which profits shall be taxed without regard to the solvency of taxpayers. Injecting the element of solvency fixes another standard than that fixed by Congress. An insolvent person or corporation may earn a taxable income, and Con-

gress has not seen fit to exempt from tax income earned either before or after insolvency.

Compromising taxes on the basis of ability to collect is within the power delegated by section 3229, Revised Statutes. Deliberately compromising taxes for less than can be collected is an abuse of discretion and constitutes a voluntary relinquishment without consideration of a debt due the Government. This, the Attorney General has said, the Commissioner is not authorized to do. In making such compromise the Commissioner has arrogated to himself the function of determining, not what can be collected, but the tax rate at which the taxpayer should be taxed. It is doubtful whether Congress could delegate such authority, and it is clear that it has not attempted to do so.

### WAR PROFITS TAX

We all recognize the serious responsibility of the Bureau in the matter of collecting excess war profits and the trust placed in Bureau officials in dealing with fraudulent tax evasion. Our committee, in reporting relative to this and other subjects, said:

The importance of this subject can also be seen from the amount of refunds, credits, or abatements which have I een made through the application of this provision of the law. As there are still about 7,000 undetermined cases pending in the special assessment section of the Income Tax Unit, the present importance of this subject is appalling.

Notwithstanding the importance of the subject and the admitted difficulty of a proper application of the provisions of the law, the Bureau, as in the case of amortization, has failed to lay down any adequate statement of the principles and method to be applied either by the taxpayers or the auditors of the special assessment section.

The time limitations upon the authority of this committee permitted only a hasty examination of this subject. This investigation did develop the fact that the authority delegated by the revenue acts is being exceeded and abused and that the following conclusions are justified:

1. The Bureau has, without authority, made retroactive the provisions of sections 327 and 328 of the 1918 revenue act in regard to abnormalities of invested capital and income in determining taxes for the year 1917.

2. No scientific basis has been set up by the Bureau for determining when a company is entitled to special assessment.

3. The grounds for special assessment granted by the Bureau are in some cases economically unsound and in other cases result in nullifying those provisions of the act limiting the allowance of good-will values in invested capital, excluding borrowed capital from invested capital, providing for the taxation of gains due to appreciation after March 1, 1913, and providing for the valuations of stock issued on reorganization. In certain cases the results which would be obtained from the application of the war-profits tax are also nullified.

4. The Bureau's methods in administering the special assessment provision of the act have resulted in gross discrimination between taxpayers.

### FAITHFUL EMPLOYEES PUNISHED

Mr. Speaker, one of the most shocking practices revealed by investigation of the Bureau is the discrimination against employees faithful to their trust. That such employees should be discouraged, demoted, and even discharged, for insisting upon protecting the interests of the Government is something to give concern

to all of us. An example of the way conscientious employees of the Bureau have been treated is set forth in the following report of our committee:

There was no way for this case to come to the attention of any higher authority unless the auditor had protested over the head of his division chief. The efficiency rating of this auditor, his chances of promotion, and liability to discharge were all under the absolute control of this division head, and if this auditor had any desire to hold his position, to say nothing of being promoted, it was necessary for him to keep silent.

Protests of subordinates discouraged: Notwithstanding the fact that under the established procedure the Commissioner of Internal Revenue and the officers of the income-tax unit, superior to the division heads, are absolutely dependent upon protests from the subordinates of these division heads for information as to irregularities, it has been and now is the policy of the Commissioner of Internal Revenue to discourage such protests and to make examples of subordinates who make them.

The case of Mr. John H. Briggs, former chief of the nonmetals valuation section of the engineering division, is an example of what happened to an able, conscientious engineer who sought to protect the interests of the Government.

John H. Briggs: Mr. Briggs, an engineer and a graduate of Yale, entered the service as an auditor. His work attracted the attention of Mr. Hamilton, then head of the metals section, who caused him to be transferred and promoted to the position of appraisal engineer. Mr. Briggs was successively promoted to the position of assistant chief and then chief of the nonmetals valuation section.

Mr. Nash, assistant commissioner, testified that the work under Mr. Briggs' direction had been so nearly disposed of that it was possible to consolidate his section with the metals valuation section.

A most thorough examination of the work of the nonmetals valuation section while under Mr. Briggs' direction failed to disclose a single case in which the determination of that section was not sound and proper. Our investigation did disclose several cases in which Mr. Briggs had been overruled by the head of the engineering division, a special conferee working directly under the head of the engineering division, and the committee on appeals and review, and most ridiculous results determined. Some of these cases have been reviewed in the depletion section of this report. The harmful results of these determinations were not confined to the cases involved, as they established precedents which, if followed, would upset the sound principles being followed in the nonmetals section, and which, if not followed as precedents, would result in gross discrimination.

Mr. Briggs filed a protest against the determination of the committee on appeals and review in the Penn Sand & Gravel case and against the action of the conferee in the Climax-Fire-Brick Co. case. In response to his protest in the Penn Sand & Gravel case he received a memorandum from S. M. Greenidge, head of the engineering division, which concludes as follows: "It is my opinion that the above-named case should be closed in accordance with the instructions of the committee on appeals and review, and also that something be done to curb the tendency of engineers toward taking issue with the decisions or instructions of their superior officers" (4105).

For some time the amortization allowances were handled by the nonmetals section. While Mr. Briggs was chief of this section,

he was not permitted to see the reports to which his name was signed (4105).

Mr. Briggs finally laid the whole situation before Mr. C. B. Allen, Assistant Deputy Commissioner, who advised him "to keep still and leave things run along as smoothly as possible" (4105).

After the Penn Sand & Gravel case, the Climax-Fire-Brick case and other cases, against the determination of which Mr. Briggs protested, were presented to this committee, they were ordered reconsidered by the commissioners, and upon reconsideration Mr. Briggs was sustained (4071). Notwithstanding the fact that Mr. Briggs' protests in these cases have saved the Government an immense amount of tax, he was summarily dismissed on April 23, 1925, in the interest of economy.

This investigation disclosed the fact that the chiefs of the metals, coal, and timber valuation sections of the engineering division were exceptionally capable men, who have consistently tried to protect the Government from the unsound bargaining policy which has been pursued in the Income Tax Unit. Since the conclusion of our hearings every one of these men has been removed from the executive position he held.

The dismissal of Mr. Briggs, the resignation of Mr. Tanner, chief of the timber section, and the demotion of Mr. Grimes, chief of the metals-valuation section, and Mr. Davis, chief of the coal section, stand as examples of what happens to employees of the Income Tax Unit who protest against the action of their superiors.

No communication except through division heads: The office practice requiring all official communications from any subordinate to a superior of a division head to be transmitted through the division head is effective in preventing anything reaching the commissioner, deputy commissioner, or solicitor which the division head desires to keep from him.

### DISCRIMINATORY REFUNDS IN SECRET

Most shocking, of course, is the fact that refunds of hundreds of millions of dollars have been made to taxpayers in accordance with principles which were not made clear even to the employees of the Bureau, and most certainly not to taxpayers generally. Many similarly situated taxpayers were unable to request refunds because there were no published rules to guide them in making such requests. This, of course, resulted in the favored few with proper access to tax information getting refunds at the expense of their less fortunate competitors all to the detriment of the other taxpayers in the Nation. In dealing with this subject, a report of our committee said:

Only 15½ percent of formal rulings published: As of March 6, 1925, there had been issued by the solicitor, the tax advisory board, the committee on appeals and review, and by the rules and regulations section 20,-311 rulings, of which only 3,163, or 15½ percent, had been published. * * * The representatives of the commissioner stated to this committee that all rulings upon novel questions of general application were published, provided it were possible to so delete the facts as to destroy the identity of the case, and that unpublished rulings are never used as precedents. This statement is not sustained by the facts as disclosed by the investigation. * * *

Unwritten rules and practices: Many rules and formula for the determination of tax liability followed by the unit have never been even reduced to writing, except in the particular cases to which they were applied. Formal rulings are made only in response to

taxpayers' inquiries upon taxpayers' appeals, and when requested from the solicitor. Where the taxpayer makes no such inquiry and is satisfied with the unit's determination of his tax there is no occasion for a ruling. The rules and formula applied in such case can only be ascertained by digging such cases out of the files. As there is no record or index of cases showing the questions involved, the location of cases to ascertain how any particular question has been determined is entirely dependent upon the personal recollection of the employees of the unit. * * * Notwithstanding the fact that taxes amounting to over $100,000,000 were lost through improper amortization allowances, there is nothing to show that the Commissioner of Internal Revenue had ever had his attention called to one amortization case or ever gave this great subject one moment's consideration until attention was called to it by the Senate investigating committee. It was also impossible for this committee or anyone else to ascertain how this subject was treated by the Bureau, except by examining the record in each particular case.

The generally recognized published precedent on the valuation of good will provides for the capitalization of prospective profits at 20 percent, while in some cases good will has been valued on a 6 percent basis. These rates are as important as precedents as the formula to which they are applied.

The tax expert: This system had not only led to the lack of uniformity and lack of consistency in rulings upon the same and closely related questions but has given rise to and now maintains the lucrative business of the tax expert or "fixer." There is nothing so involved, complicated or technical about the procedure in the Income Tax Unit that anyone of ordinary intelligence cannot understand it, provided he has access to the information. Taxpayers generally, however, to secure the advantages accorded others similarly situated find it necessary to employ someone with "inside" information.

To illustrate this situation, let us again resort to the subject of amortization.

A solicitor's ruling published in November 1924, held that the value in use of facilities, upon which amortization is claimed, is to be determined by the actual use or usefulness of that particular facility in the taxpayer's postwar business. Until October 1925, this was the only published rulings on the subject, and no one not initiated in the secret methods of the department would ever dream that the unit would hold in the face of that opinion, as it has, that the usefulness of a new, modern facility which is the last word in efficient, economical operation, and which is in constantly daily operation, would be reduced because the taxpayer also possessed other facilities which had about reached the end of their useful lives and the actual use of which had been abandoned because they could not be economically operated.

Taxpayers found that by employing "experts" with inside information they could secure the allowance of deductions in amounts vastly in excess of the claims made in their original returns, upon a basis specifically condemned by the only published ruling upon the subject. The "expert" with "inside" information knew that such allowances had been made in other cases and could urge such cases as precedents to be applied to his own case.

Amortization is not the only subject with reference to which this situation exists. It is generally true throughout the Income Tax Unit.

This system has created, as a favored class of taxpayers, those who have employed "tax experts." It has created a special class of tax practitioners, whose sole stock in trade is a knowledge of the secret methods and practices of the Income Tax Unit.

This special knowledge of secret precedents has created a demand by large taxpayers for the services of Income Tax Unit employees, and is the principal cause of the immense turnover in the personnel of the unit.

### ALL SHOULD BE TREATED ALIKE

Mr. Speaker, it is obvious that irregularities are encouraged by failure to mandatorily treat all taxpayers alike in accordance with fixed rules made available for the study and guidance of everyone. If we had always insisted upon this, some of the practices discovered by the aforementioned committee could never have existed. The committee deserves commendation for directing attention to them and calling for correction. Permit me to quote here what the committee had to say on this subject:

Practice and procedure should be written and published: No taxpayer should receive the benefit of special treatment which is not to be given all other taxpayers similarly situated. It therefore follows that every ruling, practice, and formula which has been followed in any case should be a precedent whether published or unpublished or whether written or unwritten.

Our system of legal and equitable jurisprudence are both the result of the accumulated precedent, arising out of the decisions of courts, in the application of law and equity to particular cases. This body of law is evidenced by, and is preserved in, the written decisions of the courts. When the courts give to a statute a construction which is contrary to the public will, the Congress or the State legislature are advised by the publicity given the decision of the construction so given it by the courts and can amend it. Anyone desiring to know how a statute has been construed by the courts has but to look to the published decisions, which are open to everyone. A system of jurisprudence which provided for the secret trial of cases without published decisions and guided by no published rules would not be tolerated by any free, self-governing people.

All practices and formula being followed in the work of the Income Tax Unit should be reduced to writing, at least tentatively approved by the Commissioner of Internal Revenue, and published. There can be no such thing as uniformity of treatment among taxpayers similarly situated unless there are written rules for the government of the employees of the unit.

The commissioner should be subject to the same responsibility for the practice of the Bureau in cases where taxpayers are satisfied and there are no "rulings" as in cases where the appeals of dissatisfied taxpayers result in "rulings." Under the present practice it is doubtful whether the Commissioner, in whom all authority under the act is vested, has the least idea how the law is being construed and applied in the case of satisfied taxpayers. It is certain that, under the present procedure, there is no provision for bringing the principles applied to such cases to the Commissioner's attention.

Every taxpayer also has the same right to know the standard applied to other taxpayers in cases where there are no appeals as in cases where there are appeals. Congress should be as interested in knowing how the law has been construed and applied in the cases of subjects which have been so unfirmly handled to the taxpayer's satisfaction that no appeals resulting in published rulings have been taken.

The methods followed by the Bureau in handling amortization cases indicate that when the entire body of taxpayers are so well satisfied that no appeals are taken the Government is most liable to suffer.

### AUDITING AND INSPECTION

It must be obvious to every Member that, while income-tax records cannot be thrown open to all kinds of public inspection, there most certainly must be some means of checking on these records, and checks must constantly be made by auditors with the power to carefully investigate every transaction made by the Bureau. That this was not the case one of our committees reported in the following words:

Publicity of records: The unsatisfactory conditions developed by this investigation are the inevitable result of the delegation of almost unlimited discretion to be secretly exercised. It is believed that but few of the unsound settlements, to which attention has been called, would have been made if it were not for the belief that they would never become public.

While the objections to throwing the records of the income-tax unit open to the public are recognized, the necessity for the opportunity for some outside scrutiny is imperative.

Congress, in imposing a system of taxation the administration of which necessarily involves the exercise of so much discretion, assumes some duty to the public to see that such discretion is not abused. It is suggested that the law should provide that any Member of Congress or Senator shall have the right to examine any return or record at any time and take a copy thereof.

To insure the full publicity of the rulings, practices, methods, and formulas in use in the determination of tax, it is suggested that the law provide that no settlement of any tax be considered final unless the principles applied in determining such tax shall have been published within 30 days after such determination.

### ADMINISTRATION SHOULD COOPERATE

Now, Mr. Speaker, it is obvious that the report of our committee from which I have quoted so copiously deals with a scandalous situation; one that certainly cried out for correction. Under the circumstances one would think that the administration would have gladly cooperated to see that proper reforms were promptly carried out. Instead, the man who led the committee was hampered at every turn. In fact, the attitude of the administration toward him was so hostile that the Secretary of the Treasury caused suit for $10,000,000 in back taxes to be brought against him. The court case ran right along with the investigation which he led. In the end, he was vindicated not only by the court but by the Congress. In the tax case filed against him the court caused a refund to be made to him when it found he had actually overpaid his taxes. Senator James Couzens, of Michigan, who led this investigation into the worst internal revenue scandal in our history, signed the majority report, along with two Democrats. Two Republicans on the committee refused to sign the report, and instead filed a minority report attempting to whitewash the scandals dis-

closed by the committee. These two men were both later defeated in seeking re-election.

The report of the committee which conducted the investigation touched off by Senator James Couzens, Republican, of Michigan, is available to every Members of Congress. It is entitled "Investigations of the Bureau of Internal Revenue, Sixty-ninth Congress, First Session, 1925-26."

THIS ADMINISTRATION IS COOPERATING

In contrast with the defiant attitude of the administration then under investigation, the present administration is cleaning out those found guilty of wrongdoing instead of firing those found trying to protect the Government as was done during the last Republican era of control of our Government.

The Couzens committee listed a long list of corporations constituting a veritable who's who of the industrial giants of America, all of whom received refunds from the Republican-led administration. To make matters worse, much of the money refunded was money collected during the war and constituted wartime taxes.

WE ALL DEPLORE IRREGULARITIES

Every one of us deplores any irregularity in any Government agency, and particularly in an agency entrusted with the collection of taxes. We all know the results that flow from failure to treat all taxpayers alike, from failure to collect taxes in accordance with the law. In view of this deplorable record of the last Republican regime, it seems to me that all Republicans should recognize the fact that the present committees of this Congress, led by Democrats, are vigorously endeavoring to ferret out all cases of irregularity. That such cases exist, we readily admit, but we are trying to put our house in order. The administration is not hampering our investigators or opposing their inquiries as was done by the last Republican regime. Certainly in view of these facts, and in view of the fact that the present scandals, serious as they are, have disclosed nothing to compare in magnitude with those which were exposed during the last Republican regime, it seems that the Republicans who are trying to make a political issue out of the current Internal Revenue scandals can afford to be a little bit less self-righteous in pretending to have given the American people such honest government when they had the opportunity to do so.

REPUBLICANS SUFFER BY COMPARISON

The last Republican regime would be made to look pretty bad by any comparison between the wrongs exposed by Senator Couzens and those which our committees have exposed to date. Perhaps we should just admit that neither party has a monopoly on virtue, and that human frailties are apt to cause a relatively small number of employees to succumb to temptation which they lack the strength to resist. In any large organization entrusted with vast responsibilities, there are likely to be some who will depart from the straight and narrow

XCVIII—92

path. This will happen in either a Democratic or a Republican administration. Neither vice nor ethics is partisan.

CLEAN-UP SHOULD BE UNPARTISAN

Each one of us owes a duty to cooperate in an unpartisan spirit to keep our Government as honest as it possibly can be—that goes for the Congress, the President, and every member of the administration. Our Democratic administration, we admit, has been somewhat slow in appreciating the seriousness of the conditions existing in the Bureau of Internal Revenue, but it is now vigorously acting to clean up the situation. It is not trying to fight the committees of Congress which are investigating the Bureau. It is not trying to employ partisan politics to whitewash the Bureau as was done by the last Republican regime. One should, in this connection, point out that former President Herbert Hoover was a member of the Cabinet during the time these Internal Revenue scandals were being exposed. So far as I know, he never spoke out against them. He has condemned the moral climate existing in Washington now, but he is hardly the one to criticize the present administration when he was part of one which not only condoned the irregularities exposed by Senator Couzens but refused to cooperate with Congress in exposing them. In fact, Senator Couzens even had to personally pay committee counsel part of the time.

PERSPECTIVE NEEDED

In dealing with matters of this kind, Mr. Speaker, we need to keep our perspective and to realize that this is not the first time that we have found that a relatively small number of public employees have strayed away from the straight and narrow path. Unfortunately, it will probably not be the last time. Neither one of the great political parties has been above reproach but, in all fairness, one must admit that considering the amount of money the Democratic administrations have been compelled to handle during the course of a long and costly war, the scandals, bad and inexcusable as they are, have not involved the kind of brazen and wrongful special favoritism to certain industrial giants at the expense of the people which existed under the last Republican regime.

I hope we can all, Republicans and Democrats alike, cooperate in exposing any wrongdoing in any part of our Government, in finding the wrongdoers and punishing them where they have violated our criminal statutes, and in seeing to it that they are not given the opportunity to repeat such wrongs. In view of their record, set forth above for the benefit of Republicans with short memories, the Democrats are entitled to say to the Republicans, "Let him who is without sin cast the first stone." We may differ on some issues, but when honesty is involved we must stand together to prevent corruption from undermining the fundamental structure of our Government. The present circumstances call for reasonable partisan restraint lest

exaggeration result in despair and disillusionment not warranted by a sober appraisal of the facts.

The SPEAKER. Under previous order of the House, the gentleman from New York [Mr. JAVITS] is recognized for 5 minutes.

TELEVISING AND BROADCASTING OF CONGRESSIONAL SESSIONS AND COMMITTEE HEARINGS

Mr. JAVITS. Mr. Speaker, House Resolution 62 to amend rule XXXV to permit televising and broadcasting of important congressional debates has been pending since January 12, 1951. Discharge petition No. 3 which followed the failure of the Rules Committee to report the resolution after a hearing has been pending since May 2, 1951.

The Speaker has with typical candor stated that if the House rules are changed he will be guided by them but until then bars televising and broadcasting of committee hearings. My bill proposes to effect this change and gives the Speaker the administering authority. The fundamental question is whether the limited facilities of the public galleries and of the committee hearing rooms shall now be extended to 15,000,-000 American television and 45,000,000 American radio sets because this is made possible by modern science. I am firmly convinced this should now be done as a logical and necessary extension of our democratic system. It should not be done on a partial basis but should be authorized for both important congressional sessions and committee hearings with the selection and administration entrusted to the Speaker. Such vital issues as the war in Korea, price and wage controls, selective service and military training, the protection of civil rights and the United States part in European defense all demand the most informed public understanding. Voting in presidential years is off to about 50 percent of those eligible. I believe that much can be done to increase this percentage in this vital presidential year by televising and broadcasting congressional proceedings and getting our people to feel part of Government. The protection of witnesses, fairness in presenting both sides in debate and an opportunity to answer charges against individuals under congressional immunity can all be dealt with by appropriate rules and proper administration.

I am very glad to see such outstanding support for this measure from my Republican side of the aisle and urge my colleagues to sign the discharge petition so that legislation for a rules change may be before us. Every public opinion survey shows that the people of the country want this opportunity to see legislation made and the least the Congress can do is to consider it in a deliberate way.

Appended is an article from the New York Times of January 13, 1952:

### CASE FOR TELEVISING CONGRESS

(By Hon. JACOB K. JAVITS, of New York)

Television has long since come into its own as teacher of living history. It aroused the indifferent against political corruption by making them eyewitnesses of the Kefauver crime committee hearings. It broadened the American people's interest in world affairs through its coverage of the United Nations. This year it will bring the political conventions into homes from coast to coast, and it may well prove decisive in the presidential campaign to follow. Why, then, should Congress continue to be blacked out? Why shouldn't TV bring crucial House and Senate debates to American voters?

The right of the people to see and hear their elected representatives in action is recognized now in principle but hardly in practice: any citizen is privileged to pay his own way to Washington and hunt for a place in the public galleries—616 seats for spectators in the House of Representatives, 621 in the Senate. We ought to make it possible for everyone to share it—free. Broadcasting important congressional debates would be a tonic for our democracy. It is the best opportunity under modern conditions for bringing to the people knowledge of the basis for the far-reaching decisions made for the people.

The test of our democracy's strength is the degree to which people take an active part in it. Voting figures suggest the need for stimulating such popular interest. On the average, not over half of all eligible Americans vote in congressional elections, scarcely more in presidential years. The Eighty-second Congress was voted in by only 43.7 percent of those who might have participated; only 52 percent voted for President in 1948.

Bringing Capitol Hill more intimately in touch with the public by way of the TV screen—or radio receiver—might not cure this situation overnight. But it should at least provoke some healthy improvement. The impact of TV, as commercial advertisers soon discovered, makes the not negligible influence of radio on American life seem almost pallid by comparison. Yet Congress has not caught up with even the first of these twentieth century revolutions in mass communications.

Radio coverage of legislative proceedings has been amply tested and already proved to be practical. New Zealand, despite a cautious respect for British parliamentary traditions, has authorized radio broadcasts of its national legislature since 1936. Australia also permits regularly scheduled broadcasts of its Parliament 2 days a week, a program which has been in operation now for 5 years; so does the Canadian Province of Saskatchewan.

In our country, Oklahoma has thrown open its State legislature to radio listeners. Many communities have long since permitted municipal court or legislative proceedings to be put on the air over local stations. Congress itself now permits broadcasting and televising of joint sessions—but only when addressed by the President, dignitaries like General MacArthur, or visiting heads of state. In addition, certain committee hearings are also broadcast from time to time.

Yet the proposal to let 15,000,000 TV sets and 40,000,000 radios in on the day-to-day work of Congress continues to receive a mixed reception from our Federal lawmakers.

A recent magazine poll on this question among 20 Senators found 9 in favor, 6 against, and 5 who said "perhaps." A confidential poll which I took recently in the House of Representatives showed 61 opposed out of 118 Members interviewed. House Resolution 62, which I sponsored, proposing that televising and broadcasting of important House debates be authorized under conditions established by the Speaker, has not yet been approved.

The arguments in opposition to giving TV and radio the same privileges as the press and other on-the-spot observers boil down to these points:

It is not practical for the reason that a great deal of congressional business is routine or technical, and therefore boring.

It would interfere with serious consideration of public business because it would lead some members to play to the gallery.

It could produce serious injustices because demagogic Members might—under the protection of congressional immunity—make charges against individuals or organizations lacking equal facilities for reply.

About the first point—practicality—there seems to be general agreement in Congress that it would be unwise to televise Congress on indiscriminate schedules. It is true enough that televising all the proceedings would show up plenty of dull moments, and that floor debates alone do not give anything like a full picture of legislative activities on Capitol Hill. In the Senate, particularly, discussion often wanders far afield under its broad parliamentary rules.

But the serious advocates of congressional broadcasts propose coverage of only the most important debates and most significant votes. These are frequently scheduled in advance at both ends of Capitol Hill under limitations which restrict the length of speeches and apportion the time equally between supporters and opponents of the issue at hand.

To make the most of telecasts of important congressional debates they should be held at night and legislative schedules should be especially arranged for that purpose. Britain's House of Commons generally meets at night. Such night sessions, however, would compete for the best commercial broadcast time and some critics of the idea argue that the networks wouldn't want to give up that time to nonpaying public interest programs. There have already been some criticisms because the private networks televised only the opening session of the San Francisco conference on the Japanese Peace Treaty some months ago and omitted later sessions of world-wide importance.

However, NBC, CBS, and ABC have all recently expressed interest in televising the important debates of Congress. In a letter to a Senate subcommittee, the National Broadcasting Co. said: "We believe we should have the right to televise proceedings of Congress and other legislative bodies on important occasions. * * * We believe that televising Congress should be on the basis of news merits and that the television medium should have the same access to important news events that the press services, newsreels, and newspapers have."

Whether the commercial networks could arrange to do the job thoroughly, if televising of Congress should be approved, is an uncertainty that could only be cleared in the actual practice. If they do not, Government-operated facilities might be set up to do the job.

One of my colleagues, Representative ARTHUR KLEIN, has suggested that Congress establish two broadcasting outlets—one east and one west of the Mississippi—as an exclusive network for programs originating on Capitol Hill.

About the second point—interference with serious legislative business‡—there have been misgivings by some congressional leaders. Senate Majority Leader ERNEST W. McFARLAND is one who has raised this objection. "I do not object to the Senators making a show outside of the Senate," he is reported to have said, "but I do not think they should in the Senate."

The fact is, however, that both branches of Congress down through the years have contained many Members who played to the galleries. A broadcaster has sagely observed that "if a spectacle ensues, its elements must have been there in the first place before they were picked up by the eye of the camera."

I believe that if congressional debates were televised the incentive to stop clowning and get on with important business would actually be increased. Members who now realize that debates can be only partially reported in the news columns sometimes feel the urge to attract special attention to themselves. The penalty for "hamming" in full view of thousands of their constituents might be much more severe than it is now. In the very first election after radio broadcasts of Australia's Parliament were instituted, many of the more bombastic performers were defeated.

I think it fair to say that Rudolph Halley's remarkable victory in the recent election for president of the city council of New York was heavily influenced by housewives who saw him in action during the Kefauver hearings and kept that memory vivid, though the hearings had been over for many months. It should be noted, moreover, that Mr. Halley's role was made spectacular by events rather than by an eye-catching display of his own; his performance, in fact, was restrained in comparison to the witnesses from the underworld.

About the third point, possible injustices done by character assassins under the cloak of congressional immunity, most members agree that it presents a serious problem. The fact is that the evil already exists. Drastic charges have been made from the floor of Congress, widely published, and broadcast on news programs and subsequent denials or refutations have often failed to catch up with the prominence given the original attack.

It is a rare case when attacks of this kind are not answered by some other Member of Congress. But the rebuttal often loses out in the competition for newspaper space and air time. Television and radio broadcasting of the living event would, I believe, improve the situation rather than aggravate it.

Senator ALEXANDER WILEY, of Wisconsin, a member of the Kefauver committee, has proposed a code of fair practices to deal with this problem. The Kefauver committee, in its code of procedures, provided that persons or organizations whose names were mentioned in a hearing should be afforded an opportunity to give their own stories. Such rules would be an essential preliminary to putting my proposal to televise Congress into effect.

Here, again, if the private chains are unable to spare the time for adequate and equal reply to damaging accusations made under the cloak of legislative immunity, Congress itself might supply the facilities.

In the last analysis, the good sense of the people is the ultimate protection of our democratic system against rabble-rousers. The more people who are directly exposed to demagogues in action—filtered through no eyes but their own—the more there will be who are practiced in reaching judgments with discrimination. I believe in bringing demagogues out into the open and taking our chances on the judgment of an informed electorate.

When we consider the complex problems of the future, we may well resolve to get a maximum number of minds at work on the solutions. Here is a place for showing our faith in democracy as well as preaching its benefits. To make public participation effective in our decisions, the public must be

equipped with the necessary information. How better to inform the American people than through using the vast capabilities of television and radio?

The average citizen realizes the value of such broadcasting. A public opinion survey shows that 65 percent are in favor of televising Congress for at least an hour a day, with 18 percent opposed and 17 percent doubtful. Let me quote a few samples from the mail I have received since sponsoring the proposal.

A New Yorker writes to commend my "courageous effort to help every American citizen understand what is happening so that he may be aided in supporting, to the best of his abilities, the right issues." A voter from California says that televising Congress will bring home exactly what our representatives are doing in Washington instead of the hot-air promises they hand out during elections. A student from Brooklyn says it would "be of great aid to students such as myself in learning what makes America tick."

People will listen and people will look. The facilities for televising and broadcasting important congressional debates are available. The possible evils can be handled by appropriate rules and by a discriminating public. It certainly should be tried. To defer it any longer is to take counsel of our fears and to remain firmly rooted in past traditions despite the urgent needs and opportunities of the present.

The SPEAKER. Under previous order of the House, the gentleman from Mississippi [Mr. WILLIAMS] is recognized for 15 minutes.

## UNIVERSAL MILITARY TRAINING

Mr. WILLIAMS of Mississippi. Mr. Speaker, I regret the necessity of taking the time of the House at this late hour to discuss the subject of universal military training, which has already consumed a major part of the afternoon. Unfortunately, however, this became necessary by the refusal of the chairman of the Armed Services Committee to honor his promise to me—that I would be given time during general debate today. I would not transgress on your time or patience to give a comprehensive discussion of universal military training today. I am opposed to the bill which has been reported to the House by the Armed Services Committee, and it is my hope that I may, at some time during the ensuing days of general debate, have an opportunity to discuss my reasons for opposing the program which has been reported to the House.

The reason I have taken the floor today is that I have certain information in my possession which I think should be made available to the House at the very outset of its consideration of UMT. This information is so vital—as it may affect certain sections of this country—that I feel it my duty to place it in the RECORD at this time.

With that in mind, I now address my remarks to my colleagues who happen to represent that great patriotic section of this country known as the Southern States.

I realize that many southern Members of Congress, as well as some from other sections of our country, have been greatly disturbed over recent policies promulgated in the Armed Forces with reference to nonsegregation. Although Congress has repeatedly refused to enact laws to provide for a nonsegregated Military Establishment, the President, through the Secretary of Defense, has promulgated Executive orders to the Armed Forces which outlaw the practice of segregation and to integrate Negroes into white units.

I have for the past several weeks waded through countless hundreds of pages of committee hearings on the subject of UMT in search of some definite statement in regard to racial segregation as it is contemplated under the UMT program. I have read the committee's reports, as well as the report of the Commission. Nowhere in these official documents have I been able to find the subject mentioned, or any definite policy stated. The bill fails to deal with the subject of racial segregation and apparently leaves this matter to the discretion of the Armed Forces or the National Security Training Commission.

For weeks I have attempted to elicit a statement from the distinguished Armed Services Committee chairman, the gentleman from Georgia [Mr. VINSON], but on each occasion he has artfully dodged the answers to my questions.

After having failed to secure any satisfactory answer from an official source concerning contemplated racial policies under universal military training as it is now projected, I wrote letters to Hon. James W. Wadsworth, Chairman, National Security Training Commission, and Mrs. Anna M. Rosenberg, Assistant Secretary of Defense, requesting this information.

The following is the text of my letter to Mr. Wadsworth:

CONGRESS OF THE UNITED STATES,
HOUSE OF REPRESENTATIVES,
*Washington, D. C., February 14, 1952.*
Hon. JAMES W. WADSWORTH,
*Chairman, National Security Training Commission, Geneseo, N. Y.*

DEAR MR. WADSWORTH: As you know, the House is soon to consider legislation providing for a system of universal military training.

I have read the Commission's report to the Armed Services Committee, as well as the hearings before the committee on the bill, H. R. 5904, implementing legislatively the Commission's recommendations. Nowhere in the report or hearings do I find any definite information relating to the question of racial segregation as it is contemplated under the program.

As the stated policy of the Defense Department has, in recent years, been directed toward the elimination of racial identities within the armed services by providing integration of Negroes into white units, and as this is a matter of grave concern to the people whom I represent, I feel that I am entitled to know whether such a policy will be continued into the projected universal military training program.

I would like to know the following:

1. Is it contemplated that State laws will be followed with regard to racial segregation in all States wherein this training is given?

2. Is it contemplated that racial segregation will be maintained, or will the general policy be to provide for integration of trainees into mixed racial units?

3. Is it contemplated that a trainee may have a free choice of serving with an all-white, all-Negro, or mixed unit?

I trust that in replying, answers to these questions will not be evaded. I hope, and am confident, that you will not be reluctant to furnish specific answers to these questions.

Looking forward to hearing from you within the next few days, I am,

Sincerely yours,
JOHN BELL WILLIAMS.

On February 25, I received, from Mr. Wadsworth, this letter in reply:

DEAR MR. WILLIAMS: Permit me to acknowledge receipt of your letter of February 14 addressed to me at Geneseo, N. Y., and forwarded to me here in Washington.

Replying to your inquiries concerning racial segregation, let me say that during our long discussions relating to universal military training we were assured by people representing the Armed Forces that the policy now being pursued within those forces with respect to nonsegregation would be maintained in a universal military training program. Our Commission, believing that the present policy is working satisfactorily and being assured that it would be applied to UMT, decided that we need not refer to it in our report. Incidentally, the present nonsegregation policy as applied to members of the Armed Forces is uniform in its application throughout the country. In other words, it is not subject to State laws.

I wrote an almost identical inquiry to Mrs. Rosenberg under date of February 14, and received, this morning, the following reply from her:

ASSISTANT SECRETARY OF DEFENSE,
*Washington, D. C., February 25, 1952.*
Hon. JOHN BELL WILLIAMS,
*House of Representatives.*

DEAR MR. WILLIAMS: Thank you for your letter of February 14, expressing your interest in the vital legislation to provide for a system of universal military training. With reference to your particular inquiry concerning racial segregation, at the present time there is no segregation on the grounds of race, creed, color or national origin in the training establishments of the Armed Forces, nor is any such segregation contemplated for the training establishments of the National Security Training Corps. In carrying out the current policy in the training establishments of the Armed Forces, insofar as is known to the Department of Defense, there have been no difficulties or incidents of any kind.

To give you specific answers to the three questions in your letter, the answer to your first question is that, in accord with present policies, outside the confines of the training installations, military personnel and trainees will be expected to conform to applicable State laws and to observe local practices and customs with regard to social relations with the civilian community. Further, when visitors from the local civilian community are present in our installations, every precaution will be taken that they will not be embarrassed by required deviation from the social customs and practices they expect in their own community. However, on the actual grounds of the training establishment, racial segregation will not be maintained among the trainees. As to your second question, it is not contemplated that racial segregation will be maintained. Trainees will be integrated into mixed racial units. In this regard the services, insofar as possible, follow the normal percentage distribution of racial groups in the population in making assignment to training units. In answer to your third question, in accord

with the policies indicated above, the answer is "No."

These policies concerning our training establishment have been made after careful consideration of all factors involved, including the experience of the Armed Forces in conducting basic training programs. As previously indicated, they have been successful in our current training programs. It is believed that these policies, properly administered as they will be, will not cause injustice to any particular group and that they will contribute to the primary purpose of military training, which is to prepare all of our citizens to defend our country in time of emergency.

Sincerely yours,

ANNA M. ROSENBERG.

I realize that Mrs. Rosenberg has been a most controversial figure since receiving her appointment to the high position which she now holds. But regardless of anything else that might be said of her, it must be admitted that she speaks openly and frankly. I appreciate the frank reply which she has given me, although I cannot appreciate the position which she has taken on the subject of racial segregation.

Mrs. Rosenberg said in her letter to me—and I quote—"Insofar as is known to the Department of Defense, there have been no difficulties or incidents of any kind." I would remind Mrs. Rosenberg of last year's racial riot at Camp Rucker, Ala., which was called to the attention of the House by my good friend and distinguished colleague on the Armed Services Committee the gentleman from Alabama [Mr. DEGRAFFENREID]. Other such incidents have occurred at Camp Chaffee, Ark., and various other installations throughout the country where Negroes have been integrated with white units. Either Mrs. Rosenberg has closed her eyes to these incidents or she is so naive that she refuses to believe they could occur.

It will be noted that the bill now under consideration by the House provides, in effect, that trainees will be trained—insofar as possible—in the States where they reside. Applying Mrs. Rosenberg's policy to the situation in the State of Mississippi, where the ratio of white to Negro is 54 to 46, is it to be expected that Mississippi youths being trained in the State will be mixed in interracial units in those proportions? The same question is of course, applicable to other States in our Union.

I do not believe that any Member of Congress from my section of the country can conscientiously support legislation of this type, which fails to provide safeguards against the integration of our white sons into mixed racial units. As far as I am concerned, I do not intend to vote for such a bill, when one of its admitted purposes is to promote the administration's program of racial amalgamation.

Amendments will be offered under the 5-minute rule which would provide these safeguards. I hope that the membership of this House will fully appreciate the dangers to our democratic institutions which are inherent in this type of bill, and amend it so as to make the program conform to State laws—at least in this respect. In the absence of any such safeguards, I do not intend to support universal military training.

The SPEAKER. Under the previous order of the House, the gentleman from Massachusetts [Mr. McCORMACK] is recognized for 15 minutes.

## WHAT OUR ACTION IN KOREA MEANS

Mr. McCORMACK. Mr. Speaker, General Ridgway, speaking last Thursday—February 21, 1952—rightly answered those faint hearts who ask, "Why are we in Korea?" Such faint hearts existed also at Valley Forge. Today, as then, they are a small minority.

The great bulk of the Nation knows, as General Ridgway said, that we resisted aggression in Korea because "to have done otherwise would have been a repudiation of every principle we had previously professed."

The great majority of Americans knows that we have already accomplished great things in Korea. This Nation knows that the Korean effort is an indispensable part of our world-wide struggle against communism, designed to preserve both the freedom and general peace. It knows the bitter cost of our fight in Korea, but also that these sacrifices have not been in vain.

Let us review the record:

On June 27, 1950, President Truman electrified the world by his decision to halt Communist aggression in Korea.

This now historic act prompted Gen. Douglas MacArthur to say:

The decision of President Truman lighted into a flame a lamp of hope throughout Asia that was burning dimly toward extinction. It marked for the Far East the focal and turning point in this area struggling for freedom. It swept aside in one great monumental stroke all of the hypocrisy and the sophistry which has confused and deluded so many people distinct from the actual scene.

Since then the whole free world has come to share this view, for it is now plain to see how much has been accomplished by this courageous and farsighted decision, and also how much would have been lost had it not been made.

### I. WHAT WE HAVE WON IN KOREA

Starting from scratch, and under great handicaps, the United Nations forces first completely destroyed the North Korean army in 3 months' time. Then these gallant forces recovered from the first surprise offensive of the Chinese Communists in which huge masses of manpower were thrown against them. Finally, General Ridgway's forces chewed to bits the new Communist armies that were thrown against them one after the other.

### OUR MILITARY SUCCESS IN KOREA

By last spring the enemy's casualties had passed the million mark and all of South Korea had been retaken and liberated.

For the first time since the World War the United States had a real battle-tested Army, Navy, and Air Force. Their record should inspire every American. And also for the first time, Chinese Communist armies tasted serious defeat and the prestige of the Communist regime in China was seriously impaired.

### REDS BEATEN—ASKED ARMISTICE

In their testimony before the Russell committee last spring General Marshall

and other military leaders suggested that the enemy could not indefinitely afford such destruction of their armies. They were right. In June 1951, just a year after the outbreak of the war, they did propose an armistice. The final terms of this armistice have not yet been agreed upon, but a virtual cease-fire condition has been achieved; no further offensives have been launched by the Communists, and U. N. casualties are now at a minimum.

### OUR KOREA ACTION AVERTED DISASTER

Had the Red Army not been checked in Korea it is probable that it would have swept over Indochina and Malaya, which are just as important to the United Nations as Korea.

Had not the Red Army been thrown back in Korea, it would also have threatened Formosa and Japan itself.

Had we abandoned Korea as some suggested, it is almost impossible to calculate the disaster which might have followed. Above all else, we must keep in mind the fact that Korea bought us time to prepare our defenses of even more important fronts.

### ACTION IN KOREA BOUGHT TIME IN FAR EAST

In the Far East it bought us time to fashion a whole new chain of defense which now secures the Pacific for the free nations. In the last year we negotiated the new Japanese Peace Treaty and a new military agreement for common defense.

Our Seventh Fleet protected Formosa from invasion and our military mission has greatly strengthened the defensive forces on that island.

We have achieved a new mutual defense pact with the Philippines and have negotiated an alliance with Australia and New Zealand for the protection of the Pacific.

### KOREA RESISTANCE GAVE TIME IN EUROPE

On the western front we have changed the North Atlantic Treaty Organization from a mere piece of paper into a real fighting alliance which holds promise of securing Europe from aggression. And, with our cooperation, Korea has given our European allies time to pool their common resources in the Schumann plan and the European defense community. Despair and defeatism have been largely banished from Western Europe. Inspired by the determination of the United States to resist aggression, Western Europe has clearly shown a new spirit of hope and a will to resist Communist aggression.

Most important of all, however, Korea awakened America to its danger, and the gallant resistance of our Armed Forces bought us time to launch our present great mobilization effort, the success of which may very well deter Soviet Russia from risking another world war.

### II. KOREA A PART OF THE WORLD-WIDE STRUGGLE

As we now look back to June of 1950, Americans may well feel like crossing their fingers that not only the right decision was made but that it was made in time. The hour-by-hour history of just what took place in Korea and what took place in Washington after the invasion started has now been documented. This record shows very clearly that had

the President faltered or procrastinated, Korea would have been lost.

### OUR ANTIRED STRUGGLE REQUIRED KOREAN ACTION

In reviewing those tense hours it is important to understand that the President's swift decision was not merely a lucky or fortunate one made on the spur of the moment. That great decision sprang naturally and consistently from the foreign policy which the administration began to fashion shortly after President Truman took office. Therefore, in order to understand the Korea decision it is first necessary to put it in its proper perspective.

For the last 5 years the United States has been engaged in a unique struggle against Communist imperialism and aggression.

This is an unprecedented situation for America and has called for unprecedented measures to deal with it.

For the last 5 years, therefore, our supreme policy has been to curb Communist aggression and, if possible, to avoid another world war in doing so.

### TO PREVENT WORLD WAR III: PATIENCE, FIRMNESS, DETERMINATION

The execution of this policy has required extraordinary patience, firmness, and determination in meeting, and helping our allies to meet, the challenges in Iran, Greece, Turkey, Trieste, Berlin, Indochina, and finally Korea. The results speak for themselves. Year by year the United States has opposed these aggressions with courage and poise, and in each instance the threats were curbed or overcome without involving the United States in a total war.

The struggle between the democracies and the Communist powers is a continuing one. It has already lasted for 5 years and it may last for as many more, or even longer. There can be no quick and decisive solution to this global struggle short of resorting to another world war. The cost of such a conflict, both in lives and treasure, is beyond calculation. It is therefore our policy to contain Communist aggression without resorting to total war if possible. This policy also is costly, but even if maintained over a period of years, the price would be small in comparison with that of atomic war.

### CONTAINMENT AND PEACE REQUIRE LONG, HARD PULL

Korea is only the latest challenge in this long, hard, continuing world-wide struggle. We are applying there the same policy that we have successfully applied in the attempted aggressions that preceded it elsewhere in the world. Each incident has required different military and diplomatic efforts on our part to cope with the situations as they developed. In one way or another all of them have been costly, but Korea the most costly of all for it has involved the lives of American troops.

Nevertheless, even though the conditions have been different, our policy has been uniform in the following respect: First, we have spurned appeasement; second, we have brought to bear whatever has been necessary in money and manpower to curb the aggressor; and, third, we have sought in every possible way to avoid world war III.

The application of this policy has not always been easy or popular.

### KOREAN COMPLAINTS NOT THE ONLY ONES

Korea is not the first time that there have been complaints of a stalemate. And it is not the first time that there have been demands for a quick and decisive solution. Korea has lasted 20 months, but the Berlin crisis lasted almost 15 months. There were times when the fight for Berlin also looked like a stalemate, but we kept our heads and persevered and in the end won a notable victory. This, too, was costly in money and manpower.

There were those who wanted to end this situation by smashing through the Russian blockade, even though this might have precipitated world war at once. We refused to take that risk as long as there were other means of accomplishing our ends.

It should also be recalled that there were critics who were impatient over our policy in Greece. The effort to free Greece from Communist aggression took 18 months. There were those who said that this was a hopeless adventure and that we were merely wasting our economic and military assistance to that country.

It is true that our rescue of Greece was costly but it is also true that it paid off. Not only did we save Greece but during the course of this fight, Russia suffered its greatest post-war setback in the defection of Yugoslavia. Had Greece succumbed to the Communists it is hardly conceivable that Tito would have dared to break with Russia.

### OUR FOREIGN POLICY IS SUCCEEDING

While our foreign policy has placed considerable burdens upon the United States in recent years, it is likewise true that it has imposed great strains on Russia and has created significant tensions within the Soviet orbit which, in the end, may yield decisive advantages to this country and our allies.

### I.I. OUR SACRIFICES ARE NOT IN VAIN

The contention that Korea has been and is a hopeless and fruitless stalemate is a shallow view of the matter. We have lost 18,000 dead and 76,000 men in wounded and missing. These sacrifices have not been in vain.

### NO EASY WAY OUT IN THIS GRIM WORLD

There are those who hold out the alluring promise that extra measures in Korea would end all of our troubles. That is not likely to be the case. For even an armistice in Korea is not likely to bring a quick and decisive solution to the world struggle in which we are deeply engaged. There is no assurance that Korea will not be followed by new aggressions elsewhere.

How long this will go on, no man can say. We may, in the next few years, be called on to check even more dangerous challenges. This is a grim prospect but the alternatives to persevering in our present policy are: First, appeasement and surrender; or second, atomic world war.

There is no blinking the fact that Communist aggression cannot be contained without paying some price for it. But if we become involved in another

world war, the price will not be thousands dead, but many millions.

### OUR PRESENT COURSE THE BEST

As a result of our present foreign policy, the United States can now face the future with renewed courage. For 5 years this policy has safely steered us through dangerous waters mined with the explosive threat of another world war. But there is still a distance to go, and the fate of the world depends on how well the ship of state is piloted the rest of the way.

The SPEAKER. Under the previous order of the House, the gentleman from Massachusetts [Mr. LANE] is recognized for 10 minutes.

## THE UNITED STATES COAST GUARD TO THE RESCUE

Mr. LANE. Mr. Speaker, heroism is part of the day's work for all who serve in the United States Coast Guard.

Their job is to protect and save the ships and men who engage in commerce on the oceans and that border three sides of our country and on the Great Lakes.

When a radio call for help goes out from a vessel that is in distress, the crew members hope that the Coast Guard will get there first, because the high morale and expert skill of the men in this service can be depended upon when all else fails.

I do not believe that they get the credit that is due them from the people of the United States. At a time when the leadership of some Federal agencies is not living up to the trust that is reposed in them, it is refreshing to honor the integrity of the United States Coast Guard and all of its personnel.

I ask that the Representatives from our 20 landlocked States join with us in public acknowledgment of those who serve us above and beyond the call of duty.

With characteristic brevity and modesty, the Coast Guard says that its functions are to enforce maritime laws, laws relating to internal revenue, customs, immigration, neutrality, and to be responsible for the conservation and protection of fisheries and wildlife in cooperation with other agencies. It watches over life and property on the seas, provides navigational aids to maritime commerce and to transoceanic air commerce, promotes the efficiency and safety of the American merchant marine, and is ever ready for military operations.

This covers a lot of water.

Recently two tankers split in half under the impact of raging seas off Cape Cod, Mass. Most of the crew members from both ships were saved from certain death by the amazing courage and seamanship of the United States Coast Guard.

A motor lifeboat out of the Chatham station and the cutter *Yakutat* went to the aid of the broken tankers, the *Pendleton* and the *Fort Mercer*. As the Boston Post of Tuesday, February 19, reported, it was a "feat that is without parallel in the centuries-old tradition of the sea and its hazards along the New England coast."

The cutter *McCulloch* also took part in the operations.

As Fred Brown, one of the survivors of the *Pendleton*, said to John S. Mannion, a Post staff reporter who covered the disaster:

Believe me, when I saw the dancing light of the rescue boat bobbing its way toward us, I offered up a prayer of thanksgiving and a second prayer for the Coast Guard and the brave men who risked their lives to save us.

It was like two epochal rescues in one. The two tankers, within miles of each other, were split by mountainous waves that were whipped up by a severe northeast blizzard. As night began to close in, it seemed impossible that anyone could be saved.

Even now we cannot understand how so many were snatched from the broken ships that were wallowing in tempestuous seas, half hidden by the blinding snow and spume.

They are alive today, thanks to the "guts" and "know-how" of the United States Coast Guard and the divine guidance that comes to men of courage and unselfishness.

All hands share the credit, but I would like to give special mention to bosun's mate first class, Bernard C. Webber and his three crewmen, Andrew Fitzberald, Richard L. Livesey, and Irving Maske, who manned the 36-foot motorboat in this incredible victory of a few men in a frail craft over the terrifying power of the angry ocean.

And Commander Theodore F. Knoll, who directed operations from the bridge of the cutter *McCullough*. The two doors of his home at Reading, Mass., were sealed by the snow, at the time he received the call to report back to his ship in a hurry. The skipper tore through the interior decorating that covered an unused porch doorway to get out and fight his way through the storm so that he could reach his ship and get on with the job.

As 16-year-old Carroll Kilgore, of Portland, Maine, who was making his first trip aboard the tanker *Pendleton*, said: "I'll say one thing though, the Coast Guard is wonderful."

He knows it, as hundreds of others who have been saved from shipwreck in past storms know it.

With all the evil news about us that weakens our faith in human nature, I believe it is time to recognize the clean and inspiring courage that too often goes unnoticed.

These men would be the last to seek recognition, but I say that we would be derelict in our duty if we failed to express our thanks and gratitude.

Therefore, I ask the Congress of the United States to pass a resolution commending all members of the United States Coast Guard who took part in this gallant rescue, and expressing our admiration for the high standard of public service that they have set for us by their example.

## EXTENSION OF REMARKS

By unanimous consent, permission to extend remarks in the Appendix of the RECORD, or to revise and extend remarks, was granted to:

Mr. THOMPSON of Texas and to include a report.

Mr. YORTY in five instances and to include extraneous matter.

Mr. CHUDOFF and to include a speech.

Mr. KELLEY of Pennsylvania and to include an editorial from the Pittsburgh Press.

Mr. BENNETT of Michigan and to include a table.

Mr. BAKER and to include an editorial.

Mr. BERRY and to include an editorial.

Mr. BOGGS of Delaware and to include a newspaper article.

Mr. MILLER of Nebraska.

Mr. COLE of New York.

Mr. LANE in five instances and to include extraneous matter.

Mr. ENGLE and to include an editorial.

Mr. HILL and to include an address by George J. Burger, vice president, National Federation of Independent Business.

Mr. HILLINGS in two instances and to include extraneous matter.

Mr. DORN and to include an article.

Mr. DOYLE in three instances and to include in each appropriate material.

Mr. MARTIN of Iowa and to include his own compilation of the returns from a questionnaire.

Mr. SMITH of Wisconsin in two instances and to include extraneous matter.

Mr. OSTERTAG and to include a letter from the Governor's conference.

Mr. VELDE (at the request of Mr. MARTIN of Massachusetts) to include a statement.

Mr. BROWNSON (at the request of Mr. MARTIN of Massachusetts).

Mr. FORD.

Mr. SHORT in two instances and to include extraneous matter in each.

Mr. BOW and to include a resolution.

Mr. JUDD and to include extraneous matter.

Mr. GARMATZ (at the request of Mr. YATES).

Mr. MILLER of California and to include extraneous matter.

## SENATE BILLS AND CONCURRENT RESOLUTIONS REFERRED

Bills of the Senate of the following titles were taken from the Speaker's table and, under the rule, referred as follows:

S. 194. An act to prohibit age requirements or limitations with respect to the appointment of persons to positions in the competitive civil service during periods of war or national emergency; to the Committee on Post Office and Civil Service.

S. 523. An act for the relief of Walter Duschinsky; to the Committee on the Judiciary.

S. 554. An act for the relief of Boutros Mousllem; to the Committee on the Judiciary.

S. 853. An act for the relief of Dr. Ying Tak Chan; to the Committee on the Judiciary.

S. 1032. An act to authorize each of the States of Montana, North Dakota, South Dakota, and Washington to pool royalties derived from lands granted to it for public schools and various State institutions; to the Committee on Interior and Insular Affairs.

S. 1085. An act for the relief of Kane Shinohara; to the Committee on the Judiciary.

S. 1121. An act for the relief of Matsuko Kurosawa; to the Committee on the Judiciary.

S. 1192. An act for the relief of Demetrius Alexander Jordan; to the Committee on the Judiciary.

S. 1234. An act for the relief of Toshiko Konishi; to the Committee on the Judiciary.

S. 1333. An act for the relief of Maria Seraphenia Egawa; to the Committee on the Judiciary.

S. 1344. An act to amend the law of the District of Columbia relating to forcible entry and detainer; to the Committee on the District of Columbia.

S. 1372. An act for the relief of Mrs. Madelaine Viale Moore; to the Committee on the Judiciary.

S. 1429. An act to prohibit the transportation in interstate or foreign commerce of lethal munitions except when movement is arranged for, or on behalf of, the United States of America or an instrumentality thereof; to the Committee on Interstate and Foreign Commerce.

S. 1470. An act for the relief of Panagiotes Roumeliotis; to the Committee on the Judiciary.

S. 1534. An act for the relief of Midori Akimoto, also known as Sharlene Akimoto; to the Committee on the Judiciary.

S. 1539. An act to amend an act entitled "An act to provide extra compensation for overtime service performed by immigrant inspectors and other employees of the Immigration Service," approved March 2, 1931; to the Committee on the Judiciary.

S. 1566. An act for the relief of Constantin Alexander Solomonides; to the Committee on the Judiciary.

S. 1580. An act for the relief of Alevtina Olson and Tatiana Snejina; to the Committee on the Judiciary.

S. 1637. An act for the relief of Doreen Iris Neal; to the Committee on the Judiciary.

S. 1639. An act for the relief of Osvaldo Castro y Lopez; to the Committee on the Judiciary.

S. 1676. An act for the relief of Helen Sadako Yamamoto; to the Committee on the Judiciary.

S. 1681. An act for the relief of Sister Maria Seidl and Sister Anna Ambrus; to the Committee on the Judiciary.

S. 1692. An act for the relief of Hilde Schindler and her minor daughter, Edeline Schindler; to the Committee on the Judiciary.

S. 1697. An act for the relief of Sister Maria Gasparetz; to the Committee on the Judiciary.

S. 1715. An act for the relief of Else Neubert and her two children; to the Committee on the Judiciary.

S. 1731. An act for the relief of Rhee Song Wu; to the Committee on the Judiciary.

S. 1726. An act for the relief of Bruno Leo Freund; to the Committee on the Judiciary.

S. 1798. An act granting the consent of Congress to a compact entered into by the States of Oklahoma, Texas, and New Mexico relating to the waters of the Canadian River; to the Committee on Interior and Insular Affairs.

S. 1822. An act to amend the act creating a juvenile court for the District of Columbia, approved March 19, 1906, as amended; to the Committee on the District of Columbia.

S. 1833. An act for the relief of Barbara Jean Takada; to the Committee on the Judiciary.

S. 1836. An act to amend the act approved March 3, 1899 (30 Stat. 1045, 1057, ch. 422), so as to provide for the appointment by the Commissioners of the District of Columbia of special policemen, and for other purposes; to the Committee on the District of Columbia.

S. 1846. An act for the relief of Misako Watanabe and her daughter, Irene Terumi; to the Committee on the Judiciary.

S. 1853. An act for the relief of Hidemi Nakano; to the Committee on the Judiciary.

S. 1879. An act for the relief of Ernest Nanpei Ihrig; to the Committee on the Judiciary.

S. 1988. An act for the relief of Leslie A. Connell; to the Committee on the Judiciary.

S. 2113. An act for the relief of Martha Brak Foxwell; to the Committee on the Judiciary.

S. 2147. An act for the relief of Arthur E. Prior; to the Committee on the Judiciary.

S. 2149. An act to confer Federal jurisdiction to prosecute certain common-law crimes of violence when such crimes are committed on an American airplane in flight over the high seas or over waters within the admiralty and maritime jurisdiction of the United States; to the Committee on the Judiciary.

S. 2150. An act for the relief of Joachim Nemitz; to the Committee on the Judiciary.

S. 2199. An act to amend the Contract Settlement Act of 1944 and to abolish the Appeal Board of the Office of Contract Settlement; to the Committee on the Judiciary.

S. 2211. An act to amend section 221 (c) of the Interstate Commerce Act in order to clarify certain requirements relating to the designation of persons upon whom process may be served; to the Committee on Interstate and Foreign Commerce.

S. 2214. An act to amend section 709 of title 18 of the United States Code; to the Committee on the Judiciary.

S. 2232. An act for the relief of the Detroit Automotive Products Co.; to the Committee on the Judiciary.

S. 2381. An act to amend section 86, Revised Statutes of the United States relating to the District of Columbia as amended; to the Committee on the District of Columbia.

S. 2383. An act to amend the act entitled "An act to create a board of accountancy for the District of Columbia, and for other purposes," approved February 17, 1923; to the Committee on the District of Columbia.

S. 2418. An act for the relief of Britt-Marie Eriksson and others; to the Committee on the Judiciary.

S. 2440. An act for the relief of Hanne Lore Hart; to the Committee on the Judiciary.

S. 2447. An act to amend the Federal Credit Union Act; to the Committee on Banking and Currency.

S. 2458. An act to correct a typographical error in Public Law 204, Eighty-second Congress, relating to assistant superintendents in the Motor Vehicle Service of the Post Office Department; to the Committee on Post Office and Civil Service.

S. 2549. An act to provide relief for the sheep-raising industry by making special quota immigration visas available to certain alien sheepherders; to the Committee on the Judiciary.

S. 2566. An act for the relief of Niccolo Luvisotti; to the Committee on the Judiciary.

S. 2667. An act to authorize the Board of Commissioners of the District of Columbia to establish daylight-saving time in the District; to the Committee on the District of Columbia.

S. Con. Res. 58. Concurrent resolution favoring the suspension of deportation of certain aliens; to the Committee on the Judiciary.

S. Con. Res. 63. Concurrent resolution favoring the suspension of deportation of certain aliens; to the Committee on the Judiciary.

## ENROLLED BILLS SIGNED

Mr. STANLEY, from the Committee on House Administration, reported that that committee had examined and found truly enrolled bills of the House of the following titles, which were thereupon signed by the Speaker:

H. R. 800. An act for the relief of Cindy Eberhardt;

H. R. 1962. An act for the relief of Wanda R. Barnett;

H. R. 2205. An act for the relief of Mary Alice Floyd;

H. R. 2398. An act to amend Public Law 848, Eighty-first Congress, second session;

H. R. 2669. An act for the relief of Marla Sarandrea;

H. R. 2672. An act for the relief of the law firm of Harrington & Graham;

H. R. 3100. An act to repeal the act of August 7, 1939 (53 Stat. 1243; 48 U. S. C., sec. 353);

H. R. 3569. An act for the relief of Louis Campbell Boyd;

H. R. 3860. An act to amend the act for the retirement of public-school teachers in the District of Columbia;

H. R. 3981. An act to amend the act of July 8, 1943 (57 Stat. 388), entitled "An act to authorize the Secretary of Agriculture to adjust titles to lands acquired by the United States which are subject to his administration, custody, or control";

H. R. 3985. An act for the relief of Hai Soon Lee;

H. R. 4130. An act for the relief of Caroline Wu;

H. R. 4224. An act for the relief of Mrs. Elfriede Hartley;

H. R. 4419. An act to amend the District of Columbia Teachers' Salary Act of 1947;

H. R. 4703. An act to provide that the Board of Education of the District of Columbia shall have sole authority to regulate the vacation periods and annual leave of absence of certain school officers and employees of the Board of Education of the District of Columbia;

H. R. 4749. An act authorizing the Secretary of Agriculture to return certain lands to the Police Jury of Caddo Parish, La.;

H. R. 4877. An act for the relief of Mrs. Margherita Caroli;

H. R. 5097. An act to extend the time during which the Secretary of the Interior may enter into amendatory repayment contracts under the Federal reclamation laws, and for other purposes;

H. R. 5235. An act to authorize and direct the Commissioners of the District of Columbia to make such studies and investigations deemed necessary concerning the location and construction of a bridge over the Potomac River, and for other purposes;

H. R. 5256. An act to secure the attendance of witnesses from without the District of Columbia in criminal proceedings; and

H. R. 6273. An act to amend the act relating to the incorporation of Trinity College of Washington, D. C., in order to make the archbishop of the Roman Catholic archdiocese of Washington an ex officio member and chairman of the board of trustees of such college.

## BILLS PRESENTED TO THE PRESIDENT

Mr. STANLEY, from the Committee on House Administration, reported that that committee did on this day present to the President, for his approval, bills of the House of the following titles:

H. R. 800. An act for the relief of Cindy Eberhardt;

H. R. 1962. An act for the relief of Wanda R. Barnett;

H. R. 2205. An act for the relief of Mary Alice Floyd;

H. R. 2398. An act to amend Public Law 848, Eighty-first Congress, second session;

H. R. 2669. An act for the relief of Marla Sarandrea;

H. R. 2672. An act for the relief of the law firm of Harrington & Graham;

H. R. 3100. An act to repeal the act of August 7, 1939 (53 Stat. 1243; 48 U. S. C., sec. 353);

H. R. 3569. An act for the relief of Louis Campbell Boyd;

H. R. 3860. An act to amend the act for the retirement of public-school teachers in the District of Columbia;

H. R. 3981. An act to amend the act of July 8, 1943 (57 Stat. 388), entitled "An act to authorize the Secretary of Agriculture to adjust titles to lands acquired by the United States which are subject to his administration, custody, or control;

H. R. 3985. An act for the relief of Hai Soon Lee;

H. R. 4130. An act for the relief of Caroline Wu;

H. R. 4224. An act for the relief of Mrs. Elfriede Hartley;

H. R. 4419. An act to amend the District of Columbia Teachers' Salary Act of 1947;

H. R. 4703. An act to provide that the Board of Education of the District of Columbia shall have sole authority to regulate the vacation periods and annual leave of absence of certain school officers and employees of the Board of Education of the District of Columbia;

H. R. 4749. An act authorizing the Secretary of Agriculture to return certain lands to the Police Jury of Caddo Parish, La.;

H. R. 4877. An act for the relief of Mrs. Margherita Caroli;

H. R. 5097. An act to extend the time during which the Secretary of the Interior may enter into amendatory repayment contracts under the Federal reclamation laws, and for other purposes;

H. R. 5235. An act to authorize and direct the Commissioners of the District of Columbia to make such studies and investigations deemed necessary concerning the location and construction of a bridge over the Potomac River, and for other purposes;

H. R. 5256. An act to secure the attendance of witnesses from without the District of Columbia in criminal proceedings; and

H. R. 6273. An act to amend the act relating to the incorporation of Trinity College of Washington, D. C., in order to make the archbishop of the Roman Catholic archdiocese of Washington an ex officio member and chairman of the board of trustees of such college.

## ADJOURNMENT

Mr. WILLIAMS of Mississippi. Mr. Speaker, I move that the House do now adjourn.

The motion was agreed to; accordingly (at 4 o'clock and 28 minutes p. m.) the House adjourned until tomorrow, Wednesday, February 27, 1952, at 12 o'clock noon.

## EXECUTIVE COMMUNICATIONS, ETC.

Under clause 2 of rule XXIV, executive communications were taken from the Speaker's table and referred as follows:

1198. A letter from the Attorney General, transmitting a report showing the special assistants employed during the period from July 1 to December 31, 1951, with compensation payable from the allotment contained in section 202, General Provisions, Department of Justice, pursuant to the Department of Justice Appropriation Act for the fiscal year 1952, approved October 22, 1951; to the Committee on Expenditures in the Executive Departments.

1199. A letter from the Director, Administrative Office of the United States Courts, transmitting a report of the Director of the Administrative Office of the United States

Courts for 1951, and the annual report of the Judicial Conference of Senior Circuit Judges of the United States for 1951; to the Committee on the Judiciary.

## REPORTS OF COMMITTEES ON PUBLIC BILLS AND RESOLUTIONS

Under clause 2 of rule XIII, reports of committees were delivered to the Clerk for printing and reference to the proper calendar, as follows:

Mr. MURRAY of Tennessee: Committee on Post Office and Civil Service. H. R. 5900. A bill to repeal the 10 percent surcharge on postal cards; with amendment (Rept. No. 1427). Referred to the Committee of the Whole House on the State of the Union.

## REPORTS OF COMMITTEES ON PRIVATE BILLS AND RESOLUTIONS

Under clause 2 of rule XIII, reports of committes were delivered to the Clerk for printing and reference to the proper calendar, as follows:

Mr. WILSON of Texas: Committee on the Judiciary. H. R. 5931. A bill for the relief of Holly Prindie Goodman; without amendment (Rept. No. 1422). Referred to the Committee of the Whole House.

Mr. GRAHAM: Committee on the Judiciary. H. R. 5936. A bill for the relief of Kunio Itoh; with amendment (Rept. No. 1423). Referred to the Committee of the Whole House.

Mr. DONOHUE: Committee on the Judiciary. H. R. 6012. A bill for the relief of Gylda Daydel Wagner; without amendment (Rept. No. 1424). Referred to the Committee of the Whole House.

Mr. GRAHAM: Committee on the Judiciary. H. R. 6026. A bill for the relief of Joseph Yukio; without amendment (Rept. No. 1425). Referred to the Committee of the Whole House.

Mr. DONOHUE: Committee on the Judiciary. H. R. 6172. A bill to effect entry of Manami Tago to be adopted by a United States citizen; with amendment (Rept. No. 1426). Referred to the Committee of the Whole House.

## PUBLIC BILLS AND RESOLUTIONS

Under clause 3 of rule XXII, public bills and resolutions were introduced and severally referred as follows:

By Mr. ALBERT:

H. R. 6799. A bill authorizing the construction and operation of facilities for experiments in underground gasification of coal and lignite, oil shale, and other carbonaceous deposits to promote the national defense and increase the energy and chemical resources of the Nation; to the committee on Interior and Insular Affairs.

By Mr. BENNETT of Michigan:

H. R. 6800. A bill to amend the Railroad Unemployment Insurance Act; to the Committee on Interstate and Foreign Commerce.

By Mr. CROSSER (by request):

H. R. 6801. A bill to amend part IV of the Interstate Commerce Act, so as to require the obtaining of a certificate of public convenience and necessity as a prerequisite to engaging in service as a freight forwarder, and for other purposes; to the Committee on Interstate and Foreign Commerce.

H. R. 6802. A bill to amend the Interstate Commerce Act, as amended, to provide more definite standards for determining who is entitled to exemption from part IV of said act as an association of shippers or a shippers' agent; to the Committee on Interstate and Foreign Commerce.

By Mr. DORN:

H. R. 6803. A bill to amend the World War Veterans' Act, 1924, as amended, to assure continuance of insurance benefits to certain veterans who are permanently and totally disabled; to the Committee on Veterans' Affairs.

By Mr. ENGLE:

H. R. 6804. A bill to provide that the costs of certain functions served by reclamation projects shall be nonreimbursable under the Federal reclamation laws, and for other purposes; to the Committee on Interior and Insular Affairs.

By Mr. HARRIS (by request):

H. R. 6805. A bill to increase the salary of the Administrator of Rent Control for the District of Columbia; to the Committee on the District of Columbia.

By Mr. McGUIRE:

H. R. 6806. A bill to amend the Railroad Unemployment Insurance Act; to the Committee on Interstate and Foreign Commerce.

By Mr. MITCHELL:

H. R. 6807. A bill to exempt certain parcels containing educational reading matter, articles, objects, and material from the reduced size and weight limitations imposed by the act of October 24, 1951, on fourth-class (parcel post) mail; to the Committee on Post Office and Civil Service.

By Mr. MURDOCK:

H. R. 6808. A bill to implement section 25 (b) of the Organic Act of Guam by carrying out the recommendations of the Commission on the Application of Federal Laws to Guam and for other purposes; to the Committee on Interior and Insular Affairs.

By Mr. O'BRIEN of Michigan:

H. R. 6809. A bill to amend part III of Veterans' Regulation No. 1 (a) to provide that veterans of all wars shall be considered to be permanently and totally disabled at age 70; to the Committee on Veterans' Affairs.

By Mr. OSTERTAG:

H. R. 6810. A bill to provide that an individual who is entitled to a monthly insurance benefit under title II of the Social Security Act shall not be deprived of that benefit because of work performed by him or by the person on whose wage record that benefit is based; to the Committee on Ways and Means.

By Mr. SMITH of Virginia (by request):

H. R. 6811. A bill to amend the act entitled "An act to provide for a tax on motor-vehicle fuels sold within the District of Columbia, and for other purposes," approved April 23, 1924, as amended, and for other purposes; to the Committee on the District of Columbia.

By Mr. THOMPSON of Texas:

H. R. 6812. A bill to provide that the existing project for navigation on the Guadalupe River, Tex., be incorporated with and made a part of the project for the Gulf Intracoastal Waterway; to the Committee on Public Works.

By Mr. ZABLOCKI (by request):

H. R. 6813. A bill to amend section 1020c, title 12, banks and banking, United States Code, and to provide for payment by the Federal Farm Mortgage Corporation of the unpaid balance due on defaulted joint stock land bank bonds; to the Committee on Agriculture.

By Mr. ANFUSO:

H. Res. 536. Resolution authorizing and directing the Committee on Post Office and Civil Service to conduct thorough studies and investigations relating to matters coming within the jurisdiction of such committee under rule XI (1) (e) of the Rules of the House of Representatives; to the Committee on Rules.

By Mr. REECE of Tennessee:

H. Res. 537. Resolution authorizing the Committee on Foreign Affairs to conduct thorough studies and investigations of the performance by the executive agencies concerned of their duties, responsibilities, and other activities under the Mutual Security Act of 1951 and any amendments thereto; to the Committee on Rules.

## MEMORIALS

Under clause 3 of rule XXII, memorials were presented and referred as follows:

By Mr. GOODWIN: Memorial of the Massachusetts Legislature memorializing Congress to enact laws which will lower the high cost of food; to the Committee on Banking and Currency.

Also, memorial of the Massachusetts Legislature memorializing Congress to enact legislation authorizing a loan to alleviate hardship to certain persons in Italy; to the Committee on Foreign Affairs.

Also, memorial of the Massachusetts Legislature memorializing Congress in favor of supplementary unemployment compensation payments from Federal funds as provided in H. R. 6437; to the Committee on Ways and Means.

By Mrs. ROGERS of Massachusetts: Memorial of the General Court of Massachusetts to enact legislation providing funds for public-works projects for the Commonwealth of Massachusetts; to the Committee on Appropriations.

Also, memorial of the General Court of Massachusetts to enact laws which will lower the high cost of food; to the Committee on Banking and Currency.

Also, memorial of the General Court of Massachusetts in favor of the enactment of legislation granting aid to the Israeli Government; to the Committee on Foreign Affairs.

Also, memorial of the General Court of Massachusetts to adopt the Edwards perpetual calendar; to the Committee on Foreign Affairs.

Also, memorial of the General Court of Massachusetts to enact legislation authorizing a loan to alleviate hardship to certain persons in Italy; to the Committee on Foreign Affairs.

Also, memorial of the General Court of Massachusetts to enact a Federal fair employment practices act; to the Committee on Education and Labor.

Also, memorial of the General Court of Massachusetts memorializing the President of the United States for a complete investigation of criminal acts against minority groups in the State of Florida; to the Committee on the Judiciary.

Also, memorial of the General Court of Massachusetts urging Congress to lower the premiums on national service life insurance; to the Committee on Veterans' Affairs.

Also, memorial of the General Court of Massachusetts in favor of supplementary unemployment compensation payments from Federal funds as provided in H. R. 6437; to the Committee on Ways and Means.

Also, memorial of the General Court of Massachusetts to reduce to 63 years the age for eligibility for old-age assistance; to the Committee on Ways and Means.

Also, memorial of the General Court of Massachusetts favoring increase of bicycle importation tariff; to the Committee on Ways and Means.

## PRIVATE BILLS AND RESOLUTIONS

Under clause 1 of rule XXII, private bills and resolutions were introduced and severally referred as follows:

By Mr. SHELLEY:

H. R. 6814. A bill for the relief of Mrs. Lee Tai Hung Quan and Quan Ah Sang; to the Committee on the Judiciary.

H. R. 6815. A bill for the relief of Lee Kwang Nong (George Clifford Roeder); to the Committee on the Judiciary.

By Mr. COX:

H. J. Res. 392. Joint resolution directing the Secretary of the Army to furnish a flat bronze marker for the grave of George Roddenbury, a veteran of the Revolutionary War; to the Committee on Armed Services.

### REGULATION OF LOBBYING ACT

In compliance with Public Law 601, Seventy-ninth Congress, title III, Regulation of Lobbying Act, section 308 (b), which provides as follows:

(b) All information required to be filed under the provisions of this section with the Clerk of the House of Representatives and the Secretary of the Senate shall be compiled by said Clerk and Secretary, acting jointly, as soon as practicable after the close of the calendar quarter with respect to which such information is filed and shall be printed in the CONGRESSIONAL RECORD.

The Clerk of the House of Representatives and the Secretary of the Senate jointly submit their report of the compilation required by said law and have included all registrations and quarterly reports received for the fourth calendar quarter of 1951.

#### QUARTERLY REPORTS

The following quarterly reports were submitted for the fourth calendar quarter 1951:

(NOTE.—The form used for reports is reproduced below. In the interest of economy questions are not repeated, only the answers are printed and are indicated by their respective letter and number. Also for economy in the RECORD, lengthy answers are abridged.)

File two copies with the Secretary of the Senate and file three copies with the Clerk of the House of Representatives.
This page (page 1) is designed to supply identifying data; and page 2 (on the back of this page) deals with financial data.
Place an "X" below the appropriate letter or figure in the box at the right of the "Report" heading below:
"PRELIMINARY" REPORT ("Registration"): To "register," place an "X" below the letter "P" and fill out page 1 only.
"QUARTERLY" REPORT: To indicate which one of the four calendar quarters is covered by this Report, place an "X" below the appropriate figure. Fill out both page 1 and page 2 and as many additional pages as may be required. The first additional page should be numbered as page "3," and the rest of such pages should be "4," "5," "6," etc. Preparation and filing in accordance with instructions will accomplish compliance with all quarterly reporting requirements of the Act.

| Year: 19_____ | REPORT PURSUANT TO FEDERAL REGULATION OF LOBBYING ACT | P | QUARTER |  |  |  |
|---|---|---|---|---|---|---|
|  |  |  | 1st | 2d | 3d | 4th |
|  |  |  | (Mark one square only) |  |  |  |

NOTE ON ITEM "A".—(a) In General: This "Report" form may be used by either an organization or an individual, as follows:
  (i) "Employee."—To file as an "employee," state in Item "B" the name, address, and nature of business of the "employer". (If the "employee" is a firm [such as a law firm or public relations firm], partners and salaried staff members of such firm may join in filing a Report as an "employee.")
  (ii) "Employer".—To file as an "employer," write "None" in answer to Item "B."
  (b) Separate Reports.—An agent or employee should not attempt to combine his Report with the employer's Report:
  (i) Employers subject to the Act must file separate Reports and are not relieved of this requirement merely because Reports are filed by their agents or employees.
  (ii) Employees subject to the Act must file separate Reports and are not relieved of this requirement merely because Reports are filed by their employers.

A. ORGANIZATION OR INDIVIDUAL FILING.—(1) State name, address, and nature of business; (2) if this Report is for an Employer, list names of agents or employees who will file Reports for this Quarter.

NOTE ON ITEM "B".—*Reports by Agents or Employees.* An employee is to file, each quarter, as many Reports as he has employers; except that: (a) If a particular undertaking is jointly financed by a group of employers the group is to be considered as one employer, but all members of the group are to be named, and the contribution of each member is to be specified; (b) if the work is done in the interest of one person but payment therefor is made by another, a single Report—naming both persons as "employers"—is to be filed each quarter.
B. EMPLOYER.—State name, address, and nature of business. If there is no employer, write "None."

NOTE ON ITEM "C".—(a) The expression "in connection with legislative interests," as used in this Report, means "in connection with attempting, directly or indirectly, to influence the passage or defeat of legislation." "The term 'legislation' means bills, resolutions, amendments, nominations, and other matters pending or proposed in either House of Congress, and includes any other matter which may be the subject of action by either House"—Section 302 (e).
  (b) Before undertaking any activities in connection with legislative interests, organizations and individuals subject to the Lobbying Act are required to file a "Preliminary" Report (Registration).
  (c) After beginning such activities, they must file a "Quarterly" Report at the end of each calendar quarter in which they have either received or expended anything of value in connection with legislative interests.

C. LEGISLATIVE INTERESTS, AND PUBLICATIONS in connection therewith:

1. State approximately how long legislative interests are to continue. If receipts and expenditures in connection with legislative interests have terminated, place ☐ an "X" in the box at the left, so that this Office will no longer expect to receive Reports.

2. State the general legislative interests of the person filing and set forth the *specific* legislative interests by reciting: (a) Short titles of statutes and bills; (b) House and Senate numbers of bills, where known; (c) citations of statutes, where known; (d) whether for or against such statutes and bills.

3. In the case of those publications which the person filing has caused to be issued or distributed, in connection with legislative interests, set forth: (a) description, (b) quantity distributed, (c) date of distribution, (d) name of printer or publisher (if publications were paid for by person filing) or name of donor (if publications were received as a gift).

(Answer items 1, 2, and 3 in the space below. Attach additional pages if more space is needed.)

4. *If* this is a "Preliminary" Report (Registration) rather than a "Quarterly" Report, state below what the nature and amount of anticipated expenses will be; and if for an agent or employee, state also what the daily, monthly, or annual rate of compensation is to be. *If this is a "Quarterly" Report, disregard this item "C 4" and fill out Items "D" and "E" on the back of this page.* Do not attempt to combine a "Preliminary" Report (Registration) with a "Quarterly" Report.

### AFFIDAVIT

[Omitted in printing]

PAGE 1

Note on Item "D".—(a) *In General.* The term "contribution" includes *anything of value.* When an organization or individual uses printed or duplicated matter in a campaign attempting to influence legislation, money received by such organization or individual—for such printed or duplicated matter—is a "contribution." "The term 'contribution' includes a gift, subscription, loan, advance, or deposit of money, or anything of value and includes a contract, promise, or agreement, whether or not legally enforceable, to make a contribution"—Section 302 (a) of the Lobbying Act.

(b) If This Report Is for an Employer.—(i) *In General.* Item "D" is designed for the reporting of all receipts from which expenditures are made, or will be made, in connection with legislative interests.

(ii) *Receipts of Business Firms and Individuals.*—A business firm (or individual) which is subject to the Lobbying Act by reason of expenditures which it makes in attempting to influence legislation—but which has no funds to expend except those which are available in the ordinary course of operating a business not connected in any way with the influencing of legislation—will have no receipts to report, even though it does have expenditures to report.

(iii) *Receipts of Multipurpose Organizations.*—Some organizations do not receive any funds which are to be expended solely for the purpose of attempting to influence legislation. Such organizations make such expenditures out of a general fund raised by dues, assessments, or other contributions. The percentage of the general fund which is used for such expenditures indicates the percentage of dues, assessments, or other contributions which may be considered to have been paid *for that purpose.* Therefore, in reporting receipts, such organizations may specify what that percentage is, and report their dues, assessments, and other contributions on that basis. However, each contributor of $500 or more is to be listed, regardless of whether the contribution was made solely for legislative purposes.

(c) If This Report Is for an Agent or Employee.—(i) *In General.* In the case of many employees, all receipts will come under items "D 5" (received for services) and "D 12" (expense money and reimbursements). In the absence of a clear statement to the contrary, it will be presumed that your employer is to reimburse you for all expenditures which you make in connection with legislative interests.

(ii) *Employer as Contributor of $500 or More.*—When your contribution from your employer (in the form of salary, fee, etc.) amounts to $500 or more, it is not necessary to report such contribution, under "D 5" and "D 14," since the amount has already been reported under "D 5," and the name of the "employer" has been given under item "B" on page 1 of this report.

D. Receipts (Including Contributions and Loans):

Fill in every blank. If the answer to any numbered item is "None," write "None" in the space following the number.

*Receipts (other than loans)*

1. $........Dues and assessments
2. $........Gifts of money or anything of value.
3. $........Printed or duplicated matter received as a gift
4. $........Receipts from sale of printed or duplicated matter

5. $........Received for services (e. g., salary, fee, etc.)
6. $........Total for this Quarter (Add items "1" through "5")

7. $........Received during previous Quarters of calendar year
8. $........Total from Jan. 1 through this Quarter (Add "6" and "7")

*Loans Received*

"The term 'contribution' includes a . . . loan . . ."—Sec. 302 (a).

9. $........Total now owed to others on account of loans
10. $........Borrowed from others during this Quarter
11. $........Repaid to others during this Quarter

12. $........"Expense Money" and Reimbursements received this Quarter

Contributors of $500 or More
(from Jan. 1 through this Quarter)
13. Have there been such contributors?
    Please answer "yes" or "no":........
14. In the case of each contributor whose contributions (including loans) during the "period" from January 1 through the last day of this Quarter, total $500 or more:
Attach hereto plain sheets of paper, tabulate data under the headings "Amount" and "Name and Address of Contributor"; and indicate whether the last day of the period is March 31, June 30, September 30, or December 31. Prepare such tabulation in accordance with the following example:

| *Amount* | *Name and Address of Contributor* ("Period" from Jan. 1 through ----------------, 19----) |
|---|---|
| $1,500.00 | John Doe, 1621 Blank Bldg., New York, N. Y. |
| $1,785.00 | The Roe Corporation, 2511 Doe Bldg., Chicago, Ill. |
| $3,285.00 | Total |

---

Note on Item "E".—(a) *In General.* "The term 'expenditure' includes a payment, distribution, loan, advance, deposit, or gift of money or anything of value and includes a contract, promise, or agreement, whether or not legally enforceable, to make an expenditure"—Section 302 (b) of the Lobbying Act.

(b) If This Report Is for an Agent or Employee. In the case of many employees, all expenditures will come under telephone and telegraph (item "E 6") and travel, food, lodging, and entertainment (item "E 7").

E. Expenditures (Including Loans) in connection with legislative interests:

Fill in every blank. If the answer to any numbered item is "None," write "None" in the space following the number.

*Expenditures (other than loans)*

1. $........Public relations and advertising services
2. $........Wages, salaries, fees, commissions (other than item "1")

3. $........Gifts or contributions made during Quarter
4. $........Printed or duplicated matter, including distribution cost

5. $........Office overhead (rent, supplies, utilities, etc.)
6. $........Telephone and telegraph
7. $........Travel, food, lodging, and entertainment
8. $........All other expenditures

9. $........Total for this Quarter (add "1" through "8")
10. $........Expended during previous Quarters of calendar year

11. $........Total from January 1 through this Quarter (add "9" and "10")

*Loans Made to Others*

"The term 'expenditure' includes a . . . loan . . ."—Sec. 302 (b).

12. $........Total now owed to person filing
13. $........Lent to others during this Quarter
14. $........Repayment received during this Quarter

15. Recipients of Expenditures of $10 or More
    In the case of expenditures made during this Quarter by, or on behalf of, the person filing: Attach plain sheets of paper approximately the size of this page and tabulate data as to expenditures under the following headings: "Amount," "Date or Dates," "Name and Address of Recipient," "Purpose." Prepare such tabulation in accordance with the following example:

| Amount | Date or Dates—Name and Address of Recipient—Purpose |
|---|---|
| $1,750.00 | 7–11: Roe Printing Co., 3214 Blank Ave., St. Louis, Mo.—Printing and mailing circulars on the "Marshblanks Bill." |
| $2,400.00 | 7–15, 8–15, 9–15: Britten & Blatten, 3127 Gremlin Bldg., Washington, D. C.—Public relations service at $800.00 per month. |
| $4,150.00 | Total |

PAGE 2

A. J. Carson Adkerson, 976 National Press Building, Washington, D. C.

C. (1) Indefinite. (2) Strategic minerals, including manganese. (a) Amendment to Contract Settlement Act. (b) H. R. 3418.

E. (4) $5.60; (5) $2.50; (6) 90 cents; (7) $13.05; (9) $22.05; (10) $462.52; (11) $484.57.

A. Aircraft Industries Association of America, Inc., 610 Shoreham Building, Washington, D. C.

C. (1) Indefinite. (2) Generally any legislation which will affect the aircraft industry. No specific bills at this time.

E. (1) $3,666.66; (9) $3,606.66; (10) $10,-769.32; (11) $14,435.98.

A. Air Transport Association of America, 1107 Sixteenth Street NW., Washington, D. C.

C. (1) Legislative interests are c.ntinuous. (2) H. R. 2, 13, 25, 92, 104, 114, 134, 189, 190, 191, 194, 196, 198, 207, 285, 391, 402, 466, 505, 506, 507, 508, 520, 541, 544, 1031, 1277, 1285, 1308, 1309, 1890, 1898, 1985, 2332, 2379, 2466, 2567, 2739, 2740, 2749, 2816, 2827, 2925, 2985, 2986, 3303, 3307, 3310, 3320, 3413, 3622, 3675, 3678, 3682, 3693, 3693, 3742, 3765, 3901, 3905, 3910, 3914, 4006, 4473, 4621, 4740, 4827, 5505. House Joint Resolution 20. S. 8, 9, 10, 12, 114, 305, 436, 437, 439, 475, 477, 478, 479, 480, 481, 482, 1139, 1141, 1146, 1183, 1218, 1309, 1335, 1402, 1539, 1588, 1659, 1818, 1889, 2055, 2148, 2149. Senate Joint Resolution 16. Senate Resolution 154.

D. (6) $11,300.68.

E. (2) $10,203.26; (4) $970.18; (7) $127.24; (9) $11,300.68; (10) $10,731.88; (11) $22,-032.56.

A. Nels Peter Alifas, room 303, Machinists Building, Washington, D. C.

B. District Lodge No. 44, International Association of Machinists, room 303, Machinists Building, Washington, D. C.

C. (2) Legislation affecting working conditions of Government employees and incidentally organized labor in general.

D. (6) $2,000.06.

E. (7) $5; (9) $5; (10) $55; (11) $60.

A. W. L. Allen, 5913 Georgia Avenue NW., Washington, D. C.

B. The Commercial Telegraphers' Union, International (AFL), 5913 Georgia Avenue NW., Washington, D. C.

C. (1) No definite date. (2) Labor-Management Relations Act, 1949; wage-and-hour law.

A. R. G. Allman, 927 Fifteenth Street NW., Washington, D. C.

C. (1) Until section 8 of the War Claims Act of 1948 is passed.

E. (5) $30; (6) $20; (7) $50; (9) $100; (10) $900; (11) $1,200, all sums approximate.

A. Ellsworth C. Alvord, World Center Building, Sixteenth and K Streets NW., Washington, D. C.

B. Committee of American Contractors Engaged in Foreign Work, 140 Cedar Street, New York, N. Y.

C. (2) Taxation of American employees engaged in foreign work; (a) Revenue Act of 1951; (b) H. R. 4473; (d) for.

D. (6) $14,919.73.

E. (6) $9.66; (9) $9.66; (11) $9.66.

A. American Association of University Women, 1634 I Street NW., Washington, D. C.

C. (1) Legislative interests are continuing. (2) Federal aid to education, ECA and point 4 program, qualified equal-rights amendment, strengthening the United Nations, school construction and teachers' pay, independent status to the United States Office of Education, reciprocal trade agreements without peril points.

E. (10) $157.82; (11) $157.82.

A. American Chamber of Commerce of Mexico, Edificio Bearn, Plaza Santos Degollado, Mexico, D. F.

C. (1) Two years. (2) I. R. C., sec. 116 (a) to exempt from United States income taxes income derived from sources abroad by nonresident United States citizens actively engaged in a trade or business abroad.

A. American Coalition, Southern Building, Washington, D. C.

D. (6) $1,008.25.

E. (2) $750; (5) $165; (6) $70.54; (8) $393.23; (9) $1,378.77; (10) $4,568.57; (11) $5,905.24; (15) $165, October, November, December, Mohoot Sand & Gravel Corp., Washington, D. C., rent; $12.24, October 1, Fox-Jones Co., Washington, D. C., office supplies; $128.70, October 8, collector of internal revenue, Baltimore, Md., withholding and social-security tax; $22.93, October 9, Chesapeake & Potomac Telephone Co., Washington, D. C., service; $23.25, November 17, Chesapeake & Potomac Telephone Co., Washington, D. C., service, etc.[1]

A. American College of Radiology, 20 North Wacker Drive, Chicago, Ill.

C. (1) Indefinitely. (2) Legislation involving the practice of medicine and all national health insurance legislation.

D. (6) $4,275.

E. (10) $54.88; (11) $54.88.

A. American Cotton Manufacturers Institute, Inc., 203–A Liberty Life Building, Charlotte, N. C.

C. (1) Indefinitely. (2) Legislation affecting the cotton textile industry, including tariffs, corporate taxes, price and production controls.

D.[1] (6) $1,627.05.

E. (2) $1,332.30; (5) $64.17; (6) $8.35; (7) $222.23; (9) $1,627.05; (11) $1,627.05; (15) $756.10, October–December 1951, Robert C. Jackson, 416 Argyle Drive, Alexandria, Va., salary and expenses; $375.29, October 1–December 31, 1951, C. G. Caffrey, 215 South Royal, Alexandria, Va., salary and expenses; $264.09 October 1–December 31, 1951, C. T. Murchison, 1625 Eye Street NW., Washington, D. C., salary and expenses; $46.50, October 1–December 31, 1951, Irma J. Irwin, 2120 Sixteenth Street NW., Washington, D. C. stenographic and clerical; $42.50, October 1–December 31, 1951, B. N. Muhly, 11 Sherwood Road, Silver Spring, Md., stenographic and clerical, etc.[1]

A. American Council of Style & Design, Inc., 60 East Forty-second Street, New York, N. Y.

C. (1) Indeterminate. (2) Interest of council is in securing adequate legislation to protect original commercial styles and designs on textile fabrics and other commodities.

A. American Dental Association, 222 East Superior Street, Chicago, Ill.

C. (1) Indefinitely. (2) Legislation affecting the dental profession.

D. (1) $4,681.42; (6) $4,681.42; (7) $19,-742.46; (8) $24,423.88.

E. (2) $4,681.42; (9) $4,681.42; (10) $19,-882.12; (11) $24,563.54; (15) $2,425.90, October 1, 1951, Francis J. Garvey, 222 East Superior Street, Chicago 11, Ill., salary as counsel for council on legislation; $1,316.34, October 1, 1951, B. J. Conway, 222 East Superior Street, Chicago 11, Ill., salary as legislative assistant; $1,041, October 1, 1951, O. O. Norberg, 222 East Superior Street, Chicago 11, Ill., salary as secretary to Mr. Garvey; $741, October 1, 1951, Helen Hofener, 222 East Superior Street, Chicago 11, Ill., salary as stenographer; $75, October 1, 1951, Barbara Hull, 142 Washington Street, Albany, N. Y., salary as stenographer.

A. American Farm Bureau Federation, 221 North La Salle Street, Chicago, Ill.; 261 Constitution Avenue NW., Washington, D. C.

C. (1) Will continue during the coming years. (2) Legislation affecting agriculture directly. (3) The Nation's Agriculture and a news weekly.

D and E.[1]

A. American Federation of Labor, 901 Massachusetts Avenue NW., Washington, D. C.

C. (1) Indefinitely. (2) Legislation affecting the interests of working people. (3) American Federationist.

E. (1) $6,691.50; (2) $12,934.94; (4) $4,-639.10; (5) $1,150.25; (9) $25,415.79; (10) $78,841.10; (11) $104,256.89; (15) $6,691.50, October 1 to December 31, 1951, Furman Felner & Co., 117 West Forty-sixth Street, New York, N. Y., radio; $4,639.10, October 1 to December 31, 1951, Ransdell, Inc., 805 Rhode Island Avenue NE., Washington, D. C., printing; $1,150.25, October 1 to December 31, 1951, postage on American Federationist; $2,730, October 1 to December 31, 1951, W. C. Hushing, 901 Massachusetts Avenue NW., Washington, D. C., salary; $249, October 1 to December 31, 1951, W. C. Hushing, expenses; etc.[1]

A. American Federation of the Physically Handicapped, 1370 National Press Building, Washington, D. C.

C. (2)[1] S. 1202, opposed; S. 1318, for; H. R. 3559, for; H. R. 4748, for; H. R. 4051, for.

D. (6) $6,431.55.

E. (2) $1,000; (5) $150; (6) $50; (7) $50; (9) $1,250; (10) $5,805; (11) $7,055.

A. American Hotel Association, 221 West Fifty-seventh Street, New York, N. Y.

C. (1) Indefinitely. (2) All bills and statutes of interest to the hotel industry. (3) No publications except bulletins to State hotel associations and to members thereof.

D. (6) $123,452.28.

E.[1]

A. American Hospital Association, 18 East Division Street, Chicago, Ill.

C. (2) All legislation which may affect hospital care for the American people.

D. (6) $12,957.34.

E. (2) $6,828.50; (4) $1,210.43; (5) $780.17; (6) $449.30; (7) $983.70; (8) $755.24; (9) $11,007.34; (10) $30,250.94; (11) $41,258.28.

A. American Institute of Marine Underwriters, 99 John Street, New York, N. Y.

C. (1) Indefinite. (2) Legislation which affects the conduct of the business of marine insurance. (a) Merchant Marine Act of 1936.

D. (2) $3,750; (7) $1,239.53; (9) $4,989.53; (11) $4,989.53; (15) $4,989.53, December 27, 1951, Bigham, Englar, Jones & Huston, 99 John Street, New York, N. Y., counsel fee for services, together with their disbursements.

A. The American Legion, national headquarters, 700 North Pennsylvania Street, Indianapolis, Ind.

C. (1) Indefinitely. (2) and (3).[1]

D. (6) $365.17.

---

[1] Not printed. Filed with Clerk and Secretary.

E.[1] (1) $728.82; (2) $11,168.50; (4) $4,-
085.11; (5) $1,418.49; (6) $532.39; (7) $4,-
922.25; (9) $22,855.56; (10) $67,945.06; (11)
$90,800.62.

**A. American Life Convention, 230 North Michigan Avenue, Chicago, Ill.**
C. (1) Indefinitely. (2) All prospective legislation which will or may affect the life-insurance business. (a) Revenue Act of 1951, H. R. 4473; Federal Unemployment Tax Act, H. R. 3392; Defense Production Act, House Journal Resolution 278; Securities Exchange Act, H. R. 4143; National Bankruptcy Act, S. 25; War Disaster Act, S. 1848; various bills concerning veterans' insurance benefits.
D. (6) $4,053.43.
E. (2) $2,787.67; (5) $431.57; (6) $441.66; (7) $392.53; (9) $4,053.43; (10) $10,957.70; (11) $15,011.13; (15) $2,500, September 30 to December 31, Robert L. Hogg, salary; $287.67, September 30 to December 31, Emma F. Randel, salary; $416.66, September 30 to December 31, Randall H. Hagner & Co., Inc., rent; $441.66, September 30 to December 31, telephone and telegraph; $14.91, September 30 to December 31, supplies and miscellaneous office expenses $393.52, September 30 to December 31, Robert L. Hogg, travel, hotel, meals, taxi, tips, and miscellaneous expenses.

**A. American Marine Hull Insurance Syndicate, 99 John Street, New York, N. Y.**
C. (1) Indefinite. 'Counsel keeps us advised of Federal legislative developments as they may arise. (2) Legislation which affects the business of hull insurance. (a) Merchant Marine Act of 1936.
E. (2) $3,750; (7) $1,239.52; (9) $4,989.52; (11) $4,989.52; (15) $4,989.52, November 21, Bigham, Englar, Jones & Houston, 99 John Street, New York, N. Y.: counsel fee for services, together with their disbursements.

**A. American Medical Association, 535 North Dearborn Street, Chicago, Ill.**
C. (1) Indefinitely. (2) The general legislative interest of the American Medical Association is to advance the science and art of medicine. The specific legislative interest of the American Medical Association at the present time is shown on pages 3, 4, and 5 of this report.[1]
E. (1) $75,000; (2) $33,347.13; (5) $4,-219.34; (6) $1,159.12; (7) $2,616.49; (8) $1,-136.16; (9) $117,478.24; (10) $332,894.33; (11) $450,372.57; (15) $8.25, October 5, 1951, M. D. Lamborne, Jr., AMA, Washington office, staff sundry; $4.50, October 5, 1951, James W. Foristel, AMA Washington office, staff sundry; $16, October 5, 1951, D. M. Perry, AMA Washington office, staff sundry; $22, October 5, 1951, George L. Connery, AMA Washington office, staff sundry; $17, October 5, 1951, C. H. Maxwell, AMA Washington office, staff sundry, etc.[1]

**A. American National Cattlemen's Association, 515 Cooper Building, Denver, Colo.**
C. (2) Price controls, quotas, land legislation, tax matters, etc.
D. (6) $21,894.36.
E.[1] (2) $4,950; (4) $79.14; (7) $1,120.81; (8) $14; (9) $6,163.95; (10) $22,965.89; (11) $29,129.84.

**A. The American Optometric Association, Inc., Development Fund, care of Dr. Samuel L. Brown, 111 East North Street, Fostoria, Ohio.**
C. (1) Continuing interest in legislation in the health field affecting the profession of optometry. (2) S. 106, bill to amend the District of Columbia optometry law; S. 337, bill to amend the Public Health Service Act and Vocational Education Act of 1946; H. R. 146, bill to improve health services; H. R.

2707, bill to provide for Federal grants-in-aid for health; all bills pertaining to health and visual care; H. R. 4675 and H. R. 4528, bill to prohibit transportation of fireworks into any State.
E. (6) $7.26; (9) $7.26; (10) $9,542.63; (11) $8,549.89; (15) $7.26, Dr. C. G. Melton, Wade Building, Fayetteville, Ark., long-distance telephone calls.

**A. American Osteopathic Association, 212 East Ohio Street, Chicago, Ill.**
C. (1) Indefinitely. (2) Bills affecting the public health; such as H. R. 910 and S. 2301, nurses education aid; H. R. 5215, funds for National Science Foundation; H. R. 4473, hospital exemption from admissions tax; S. 337, medical education aid.
D. (6) $450.72.
E. (2) $375 (10 percent); (5) $69 (10 percent); (6) $6.72 (10 percent); (9) $450.72; (10) $1,785.13; (11) $2,235.85.

**A. American Paper and Pulp Association, 122 East Forty-second Street, New York, N. Y.**
C. (1) Legislative interests will continue indefinitely. (2) Legislative interests are those affecting the paper and pulp industry, its operations, practices, and properties.
D. (6) $115.
E. (2) $100; (6) $10; (7) $5; (9) $115; (10) $1,620.88; (11) $1,735.88.

**A. American Parents' Committee, Inc., 132 Third Street SE., Washington, D. C.; 52 Vanderbilt Avenue, New York, N. Y.**
C. (1) Interest will continue indefinitely. (2) National school health services bill, H. R. 3238; public school construction bill, H. R. 3362; national child-research bill, H. R. 1879; Federal aid for medical education, S. 337, 2707; local public-health units, H. R. 274, S. 445; physically handicapped children's education bill, S. 3102, H. R. 7396; school-lunch appropriation; Children's Bureau appropriation; Cabinet status for the Federal Security Agency; Federal aid to day-care centers in defense areas; Federal aid to elementary and secondary schools; emergency maternal and infant care, S. 1245; defense housing and community facilities, H. R. 2988, S. 349.
D. (6) $1,587.
E. (8) $486.47; (9) $486.47; (10) $12,-166.10; (11) $12,652.57; (15) G. J. Hecht, railroad fare, $18; Charity Wells, Inc., Wishing Well, $300; Mrs. D. B. Stough, travel expense, $37.64; Washington Post, want ads, $10.60; Smith Transfer & Storage, $10.50; Wishing Well expense, $18; Bachrach, printing expense, $18.10; board of directors' luncheon, $63.63.

**A. American Petroleum Institute, 50 West Fiftieth Street, New York, N. Y.**
C. (1) Indefinitely. (2) Legislation affecting the petroleum industry.
D.[1] (6) $227.
E. (2) $5,400; (5) $3,400; (6) $380; (6a) $1,548; (9) $10,728; (10) $32,986; (11) $43,714; (15) $2,400, October 1–December 31, 1951, J. E. Kane, API, Washington, D. C., salary: $735.65, October 1–December 31, 1951, J. E. Kane, API, Washington, D. C., expenses; $483.60, October 1–December 31, 1951, J. E. Kane, District of Columbia Petroleum Institute, Washington, D. C., expenses; $3,000, October 1–December 31, 1951, J. L. Dwyer, API, Washington, D. C., salary; $328.63, October 1–December 31, 1951, J. L. Dwyer, API, Washington, D. C., expenses, etc.[1]

**A. American Pulpwood Association, 220 East Forty-second Street, New York, N. Y.**
C. (1) Legislative interests will continue indefinitely. (2) Legislative interests in-

clude all measures affecting the pulpwood industry, its practices or properties.

**A. American Retail Federation, 1625 Eye Street NW., Washington, D. C.**
D. (6) $46,391.42.
E.[1] $8,750; (4) $66.09; (5) $785.83; (6) $465.10; (7) $371.76; (9) $10,438.78; (10) $26,132.93; (11) $36,571.71.

**A. American Short Line Railroad Association, 2000 Massachusetts Avenue NW., Washington, D. C.**
C. (1) Continuous. (2) See pages 170 through 173 of Proceedings, copy attached. (3) Annual Proceedings.
D.[1] (6) $1,415.51.
E. (2) $250; (4) $154.81; (5) $501.12; (6) $28.10; (7) $164.61; (8) $316.87; (9) $1,415.51; (10) $5,120.86; (11) $6,536.37; (15) $41.14, October 4, J. M. Hood—reimbursement personal expenses, total $411.36—10 percent of which estimated to be in furtherance of legislative program; $16.78, October 26, Margie Witt, Canal Building, New Orleans, La.—reporting annual meeting, total $167.82—10 percent of which estimated to be in furtherance of legislation; $154.81, November 2, Wilson-Epes Printing Co., Washington, D. C.—1,000 copies Proceedings, total cost $1,548.05—10 percent of which estimated to be in furtherance of legislation; $65.64, November 7, J. M. Hood—reimbursement personal expenses, total $656.37—10 percent of which estimated to be in furtherance of legislative program; $300.09, November 13, Superintendent of Documents, GPO, Washington, D. C.—copies all bills during Eighty-second Congress—100 percent legislation, etc.[1]

**A. The American Tariff League, Inc., 19 West Forty-fourth Street, New York, N. Y.**
C. (2) H. R. 5505.
D. (6) $12,450.
E. (1) $500; (2) $9,084.14; (4) $3,217.98; (5) $1,385.53; (6) $182.61; (7) $3,095.06; (8) $1,234.14; (9) $18,699.46; (10) $39,546.84; (11) $58,246.30; (15) $870.97, October 17, November 8, December 13, Charles F. House Co., 40 Wall Street, New York, N. Y., rent and electricity; $675.17, October 17, November 8, Argo Photo-Offset Corp., 333 Avenue of America, New York City, printing and distributing literature; $173.79, October 17, November 8, December 13, Graham Stationery Co., 26 West Forty-fourth Street, New York City, stationery and supplies; $136.99, October 17, Aetna Printing Co., 64 Reade Street, New York City, stationery; $169.50, October 17, November 8, December 13, New York Telephone Co., post-office box 0, New York City, telephone service, etc.[1]

**A. America's Wage Earners' Protective Conference, 424 Bowen Building, Washington, D. C.**
C. (1) Indefinitely. (2) H. R. 4059, Copyright amendment bill, relating to the manufacturing clause. R. R. 3711, Photoengraving; temporary free importation of samples under bond. H. R. 5505, Customs Simplification bill. Tuna bill.
D. (6) $4,080.
E. (2) $4,059.01; (6) $33.64; (7) $37.95; (8) $82.99; (9) $4,213.59; (10) $12,995.04; (11) $17,208.63; (14) $55.75; (15) $1.04, October 5, District Unemployment Compensation Board, taxes, third quarter; $9.20, October 19, C. & P. Telephone Co., telephone bill; $30.30, October 31, O. R. Strackbein, 424 Bowen Building, October expenses out of pocket; $12.14, November 2, Trades Unionist, Washington, D. C., printing salary receipts; $12.22, November 20, C. & P. Telephone Co., telephone bill, etc.[1]

A. Angelina & Neches River Railroad Co., Keltys, Tex.; The Chicago, Rock Island & Pacific Railway Co., Fort Worth, Tex.; Fort Worth & Denver City Railway Co., Fort Worth, Tex.; Gulf, Colorado & Santa Fe Railway Co., Galveston, Tex.; The Kansas City Southern Railway Co., Kansas City, Mo.; Louisiana & Arkansas Railway Co., Kansas City, Mo.; International-Great Northern Railroad, Houston, Tex.; Missouri-Kansas-Texas of Texas, Dallas, Tex.; New Orleans, Texas & Mexico Railway Co., Houston, Tex.; Panhandle & Santa Fe Railway Co., Amarillo, Tex.; Paris & Mount Pleasant Railroad Co., Paris, Tex.; Quanah, Acme & Pacific Railway Co., Quanah, Tex.; Roscoe, Snyder & Pacific Railway Co., Abilene, Tex.; St. Louis, San Francisco & Texas Railway Co., Fort Worth, Tex.; St. Louis, Southwestern Railway Co. of Texas, St. Louis, Mo.; Southern Pacific Co., San Francisco, Calif.; Texas & New Orleans Railroad Co., Houston, Tex.; Texas South-Eastern Railroad Co., Diboll, Tex.; The Texas & Pacific Railway Co., Dallas, Tex.; The Texas Mexican Railway Co., Laredo, Tex.; The Union Terminal Co., Dallas, Tex.; Wichita Falls & Southern Railroad Co., Wichita Falls, Tex; Wichita Valley Railway Co., Fort Worth, Tex.; Walter Woodul, Chronicle Building, Houston 2, Tex.

C. (1) Through year 1952. (2) Generally legislation affecting Texas railroads. For: S. 1335 and H. R. 3465, parcel post rates, etc. H. R. 2416, exclusion from gross income from discharge of indebtedness. S. 1657, air mail subsidy separation. H. R. 4483, to amend section 307 (d) of the Interstate Commerce Act. H. R. 3587, third supplemental appropriation bill. S. 1603, bill to assure allocations for building and repair of freight cars and locomotives. S. 719, clarifying Robinson-Patman Act. H. R. 3282, Post Office appropriation bill, for clarifying amendment with reference to unlimited powers of Postmaster General as to mail movements. Opposed: House Joint Resolution 2 and Senate Joint Resolution 27, St. Lawrence seaway. H. R. 4473, tax bill as to withholding dividend and interest payments. H. R. 3880, Independent Offices appropriation bill as to Long amendment giving borrowing power to inland barge lines. H. R. 1998, to amend section 25 of the Interstate Commerce Act relating to communication systems and operating rules. S. 1347 and H. R. 3669, and S. 1353 and H. R. 3755, amending Railroad Retirement Act, but for Priest bill, H. R. 4641, on same subject. Neither for nor against H. R. 4386, appropriations for civil functions of Army.

E. (2) $4,374.99; (8) $700; (9) $5,074.99; (10) $18,291.07; (11) $23,366.96; (15) see page 3.[1]

———

A. Richard H. Anthony, The American Tariff League, Inc., 19 West Forty-fourth Street, New York, N. Y.

B. The American Tariff League, Inc., 19 West Forty-fourth Street, New York, N. Y.

C. (2) H. R. 5505.

D. (6) $3,125.

E. (7) $20.64; (9) $20.64; (10) $604.64; (11) $625.28.

———

A. Hector M. Aring, 826 Woodward Building, Washington, D. C.

B. Johns-Manville Corp., 22 East Fortieth Street, New York, N. Y.

C. (1) During present session of Congress; (2) Tax legislation; labor legislation; amendments to the Clayton Act; merchant-marine legislation; price basing point legislation; Defense Production Act.

D. (6) $1,250.

E. (8) $771.01; (9) $771.01; (10) $2,425.89; (11) $3,196.90.

———

A. W. C. Arnold, 200 Colman Building, Seattle, Wash.

B. Alaska Salmon Industry, Inc., 200 Colman Building, Seattle, Wash.

E. (10) $1,952.30; (11) $1,952.30.

———

A. Association of American Railroads, 928 Transportation Building, Washington, D. C.

C. (1) Indefinitely. (2) See rider C–2.[1] (3) See rider C–2.[1]

D. (6) $49,796.43.

E.[1] (2) $28,600.86; (3) $9,000; (4) $1,317.02; (5) $3,331.83; (6) $288.53; (7) $2,499.73; (8) $4,658.46; (9) $49,796.43; (10) $188,013.46; (11) $237,809.69.

———

A. Association of American Ship Owners, 90 Broad Street, New York, N. Y.
C.[1]

———

A. Association of Casualty and Surety Companies, 60 John Street, New York, N. Y.

C. (1) Indefinite. (2) Legislation affecting casualty and surety companies. Specific legislative interests: H. R. 5566 amending section 5 of the Longshoremen's and Harbor Workers' Compensation Act to exclude liability for loss of services and loss of consortium. (3) Casualty and Surety Journal.

D. (6) $1,658.72.

E.[1] (2) $1,241.98; (4) $42.63; (5) $111.61; (6) $34.23; (7) $45.95; (8) $182.32; (9) $1,658.71; (10) $5,005.51; (11) $6,664.23.

———

A. Association of Petroleum Refaners, 2201 North Oak Street, Arlington, Va.

D. (6) $3,422.41.

———

A. (1) The Association of Western Railways, 474 Union Station Building, Chicago, Ill.

C. (1) All Federal legislative proposals which may affect the western railroads.

———

A. Atlantic Union Committee, Inc., 537 Fifth Avenue, New York, N. Y.

D. (7) $37,548.93.

E. (2) $18,291.49; (4) $5,078.25; (5) $847.80; (6) $1,179.13; (7) $4,959.25; (8) $866.22; (9) $31,222.14; (10) $127,492.34; (11) $158,714.48.

———

A. Charles E. Babcock, route 4, box 73, Vienna, Va.

B. The National Council, Junior Order United American Mechanics of the United States, 3025–3029 North Broad Street, Philadelphia, Pa.

C. (1) Continue indefinitely. (2) Patriotic legislation; restriction of undesirable immigration; improvement in free public schools; suppression of communism, etc.

D. (6) $249.99.

E. (2) $46.90; (6) $2.33; (7) $19.76; (8) $5.40; (9) $87.49; (10) $345.20; (11) $432.49.

———

A. Charles B. Bailey, 2035 South Avenue, Toledo, Ohio.

B. Brotherhood of Railway and Steamship Clerks, 1015 Vine Street, Cincinnati, Ohio.

C. (1) Terminated October 20, 1951. (2) Various legislation affecting members of the Brotherhood of Railway and Steamship Clerks.

D. (6) $400.

———

A. Gibbs L. Baker, 1044 Shoreham Building, Washington, D. C.

C. (2) The Defense Production Act of 1950, as amended, and proposed amendments thereto, i. e., S. 2092, S. 2104, and S. 2170.

———

A. Mary Alice Baldinger, +607 Connecticut Avenue NW., Washington, D. C.

B. American Civil Liberties Union, 170 Fifth Avenue, New York, N. Y.

C. (1) Indefinitely. (2) The major activities of the American Civil Liberties Union are nonlegislative. It is interested, however, in congressional, as well as other, action in any way affecting civil liberties. Among its specific legislative interests are: (generally supported) antilynching (H. R. 28; S. 127, S. 1733); antipoll tax (H. R. 1320; S. 1734); omnibus civil rights (H. R. 29); FEPC (S. 1732); home rule for the District of Columbia (S. 1976); statehood for Alaska and Hawaii (S. 49, S. 50). Also immigration legislation including the omnibus immigration bills (H. R. 5678, S. 2055) on which some sections are supported and some opposed.

D. (6) $375.

E. (5) $14.50; (6) $9.06; (7) $14.55; (8) $2.75; (9) $40.86; (10) $225.30; (11) $266.16.

———

A. Joseph H. Ball, 1713 K Street NW., Washington, D. C.

B. Association of American Ship Owners, 90 Broad Street, New York, N. Y.

C. (1) Indefinite. (2) During the period for which this report is filed the registrant did not support, advocate, or oppose any specific legislation.

E.[1]

———

A. Loren C. Bamert, post-office box 189, Ione, Calif.

B. American National Cattlemen's Association. 515 Cooper Building, Denver, Colo.

C.[1]

E. (6) $69.02; (7) $868.19; (9) $937.21; (10) $1,036; (11) $1,973.21.

———

A. Hartman Barber, room 407, 10 Independence Avenue SW., Washington, D. C.

B. Brotherhood of Railway Clerks, 1015 Vine Street, Cincinnati, Ohio.

C. (1) Indefinitely. (2) Interested in any legislation affecting labor, especially railroad labor.

D. (6) $1,691.31.

E. (2) $218; (6) $228.67; (7) $336.12; (8) $47; (9) $829.79; (10) $2,105.14; (11) $2,934.93.

———

A. Joel Barlow, 701 Union Trust Building, Washington, D. C.

B. National Association of Mutual Savings Banks, 60 East Forty-second Street, New York, N. Y.

C. (1) and (2). The undersigned was retained to advise the National Association of Mutual Savings Banks in connection with H. R. 4473, which became the Revenue Act of 1951, Public Law 183, Eighty-second Congress. The association and the undersigned opposed enactment of secti n 313 of the Revenue Act of 1951, which repealed the exemption of mutual savings banks from Federal income tax. (3) (See attached, p. 3.)[1]

———

A. James T. Barnes, 203 Capital Club Building, Raleigh, N. C.

B. Medical Society of the State of North Carolina, Raleigh, N. C.

C. (1) Continuous. (2) H. R. 14, 87, 149, 274, 348, 417, 483, 910, 913, 1140, 1272, 1368, 1502, 1545, 1614, 1752, 1781, 3298, 3456, 4371,

———

[1] Not printed. Filed with Clerk and Secretary.

[1] Not printed. Filed with Clerk and Secretary.

[1] Not printed. Filed with Clerk and Secretary.

4373, 4473; H. Res. 38; S. 1, 101, 337, 349, 351, 465, 1166, 1328, 2171, 2246, 2247, 2248.

E. (2) $1,875; (9) $1,875; (10) $5,625; (11) $7,500.

---

A. Arthur R. Barnett, 1200 Eighteenth Street NW., Washington, D. C.

B. National Association of Electric Companies, 1200 Eighteenth Street NW., Washington, D. C.

C. (1) Of indefinite duration. (2) (See appended statement, p. 5.)[1]

D. (6) $4,125.

E. (6) $2.56; (7) $277.23; (8) $37.28; (9) $317.37; (10) $1,670.86; (11) $1,987.93; (15) $11.25, October 10, 1951, Colony, Washington, D. C. (restaurant); $10.55, October 31, 1951, La Salle, Washington, D. C. (restaurant).

---

A. Irvin Barney, Jr., 10 Independence Avenue SW., Washington, D. C.

B. Brotherhood Railway Carmen of America, 4929 Main Street, Kansas City, Mo.

C. (1) Indefinitely. (2) H. R. 3669 and S. 1347 to amend Railroad Retirement Act. House Resolution 426 to integrate railroad retirement funds with social security. All legislation of interest to railroad employees and labor in general.

D. (6) $2,100.

---

A. A. K. Barta, 810 Eighteenth Street NW., Washington, D. C.

B. The Proprietary Association, Washington, D. C.

C. (1) Indefinite. (2) Bills affecting proprietary medicines industry. (3) (a) Legislative bulletins; (b) approximately 500; (c) weekly average; (d) mimeographed.

E. (7) $125; (9) $125; (10) $375; (11) $500.

---

A. J. A. Beirne, 1808 Adams Mill Road NW., Washington, D. C.

B. Communications Workers of America—CIO, 1808 Adams Mill Road NW., Washington, D. C.

C. (1) Indefinitely. (2) Legislative matters affecting the interests of the membership of the union.

---

A. C. Jasper Bell, 904 Bryant Building, Kansas City, Mo.

B. National Institute of Oil Seed Products, P. O. Box 3500, San Francisco, Calif.

C. (1) This is final report; services terminated. (2) Seeking amendment of paragraph 23 of H. R. 1535, entitled "Customs Simplification Act of 1951" or any companion bill in the United States Senate.

E. (10) $1,207.34; (11) $1,207.34.

---

A. Bell, Taylor & Co. (a partnership consisting of Luther K. Bell & O. A. Taylor) 350 Fifth Avenue, New York, N. Y.

B. See statement attached.[1]

C. (2) (a) 1951 Defense Production Act; (b) S. 1717; (c) S. 1717; (d) our studies, investigations, recommendations were in effect support the main provisions of S. 1717.

D. (6) $47.87.

E. (5) $20.10; (6) $17.80; (7) $9.97; (9) $47.87; (10) $2,091.98; (11) $2,139.95.

---

A. Julia D. Bennett, Hotel Congressional, Washington, D. C.

B. American Library Association, 50 East Huron Street, Chicago, Ill.

C. (1) Interested throughout the session. (2) Interested in legislation affecting libraries and librarians. Library services bills, S. 1452, H. R. 5229, H. R. 5195, H. R. 5190, H. R. 5216, H. R. 5227, H. R. 5221, H. R. 5222, H. R. 5311, H. R. 1535. Customs Simplification Act as it affects libraries. H. R. 2982 and S. 1046, postal rates and their affect on library budgets. Senate Joint Resolution 76 and S. 1579 on educational television. House Resolution 474 on school construction as it affects higher education and libraries. Senate Joint Resolution 20, oil-for-education amendment as its affects libraries.

---

A. Wendell Berge, 1002 Ring Building, Washington, D. C.

B. American Association of Independent Industries, Inc., 1346 Connecticut Avenue NW., Washington, D. C.

C. (1) Indefinite. (2) Pending bills to abolish RFC, opposed; Fulbright bill to revise RFC, in favor.

E. (6) $1.32; (9) $1.32; (10) $431.56; (11) $432.88; (12) $192.09.

---

A. Wendell Berge, Posner, Berge, Fox & Arent, 1002 Ring Building, Washington, D. C.

B. Associated Third Class Mail Users, Inc., 1406 G Street NW., Washington, D. C.

C. (1) Legislative interest to continue to October 19, 1952. (2) Any legislation affecting third-class postal rates.

D. (6) $1,000.

E. (6) 83 cents; (7) $215.76; (9) $216.59; (10) $533.96; (11) $750.55; (12) $1,650.17.

---

A. Kenneth W. Bergen, 84 State Street, Boston, Mass.

B. The Merchants National Bank of Boston, Executor.

C. (1) Matter completed by enactment of section 609 of the Revenue Act of 1951. (2) Section 609 of Revenue Act of 1951—transfers taking effect at death.

E. (See statement attached.)[1]

---

A. Preston B. Bergin, 1625 I Street NW., Washington, D. C.

B. American Retail Federation, 1625 I Street NW., Washington, D. C.

C. (See page 3.)[1]

D. (6) $1,000.

E. (6) $29.49; (7) $4.85; (9) $29.49; (10) $12.30; (11) $41.75.

---

A. Bigham, Engler, Jones & Houston, 99 John Street, New York, N. Y.

B. The firm represents companies engaged in the business of marine insurance and as members of The American Institute of Marine Underwriters, The Association of Marine Underwriters of the United States; American Cargo War Risk Reinsurance Exchange; American Marine Hull Insurance Syndicate.

C. (1) Indefinite. (2) General questions affecting the insurance of ships and their cargoes against marine risks; reparations; subrogation. (a) Merchant Marine Act, 1936. (b) H. R. 2562, taxation of marine insurance; H. R. 2110, a private bill for relief based on subrogation.

D. (6) $7,500.

E. (6) $10.80; (7) $72.17; (9) $82.97; (10) $2,396.28; (11) $2,479.05; (14) $2,479.05.

---

A. Norman E. Biorn, 520 Endicott Building, St. Paul, Minn.

B. Minnesota Associated Businessmen, Inc., 520 Endicott Building, St. Paul, Minn.

C. (1) Legislative interests will continue indefinitely. (2) Federal and State taxation and governmental expenditures.

D. (7) $216.82.

E. (5) $216; (6) $16.19; (9) $166.19; (10) $600.67; (11) $775.86; (15) $166.19; (16) $150, October-November-December. Miscellaneous stenographers.

---

A. James C. Black, 1625 K Street NW., Washington, D. C.

B. Republic Steel Corp., Republic Building, Cleveland, Ohio.

D. (6) $600.

E. (7) $500; (9) $500; (10) $1,500; (11) $2,000.

---

A. William Rhea Blake, 162 Madison Avenue, Memphis, Tenn.

B. National Cotton Council of America, P. O. Box 18, Memphis, Tenn.

C. (1) Indefinitely. (2) The National Cotton Council of America favors such action on any legislation affecting raw-cotton industry as will promote the purposes for which the council is organized.

D. (6) $72.11.

E. (7) $35.49; (9) $35.49; (10) $293.11; (11) $328.60.

---

A. Charles B. Blankenship, 1808 Adams Mill Road NW., Washington, D. C.

B. Communications Workers of America, CIO, 1808 Adams Mill Road NW., Washington, D. C.

C. (1) Indefinitely. (2) Legislative matters affecting the interests of the membership of this union.

D. (6) $1,862.14.

E. (2) $1,732.78; (5) $10.20; (7) $108.55; (8) $10.61; (9) $1,862.14; (10) $7,652.43; (11) $9,514.57.

---

A. Bleakley, Platt, Gilchrist & Walker, 120 Broadway, New York, N. Y.

B. Elisabeth von Elverfeldt, Hotel New Weston, Madison Avenue at Fiftieth Street, New York, N. Y.

C. (1) Legislative interest has terminated. (2) Person filing had been interested in furthering passage of S. 302, H. R. 1620, H. R. 2559, H. R. 8656, or other substantially similar legislation.

E. (6) $18; (7) $149.46; (8) $5; (9) $172.46; (10) $90.59; (11) $163.05; (15) $31.92, Sept. 5, railroad fare to Washington and return; $25.54, September 17, railroad fare to Washington and return; $92, September 17–29, hotel bill, meals, and taxis in Washington.

---

A. Morton Bodfish, 221 North La Salle Street, Chicago, Ill.

B. United States Savings and Loan League, 221 North La Salle Street, Chicago, Ill.

C. (1) Continuous. (2) Support all legislation favorable to thrift and home ownership and particularly helpful to savings and loan associations and cooperative banks in carrying out their thrift and home financing objectives and oppose legislation detrimental to home ownership and these institutions. During present quarter registrant has been interested in H. R. 4473 (a bill to provide revenue, and for other purposes). (3) Washington Notes; Flash Notes.

E. (7) $272.64; (9) $272.64; (10) $1,205.58; (11) $1,478.22; (15) October 8, Hotel Statler, Washington, D. C., $4.42; October 19, Morton Bodfish (for taxis, meals, and incidental expenditures), $115.85; October 19, Hotel Statler, Washington, D. C., $11.69; October 22, Hotel Statler, Washington, D. C., $45.82; November 6, Cosmos Club, Washington, D. C., $52.54; November 27, Eastern Airlines, 10 Rockefeller Plaza, New York 20, N. Y., $42.32.

---

A. Paul H. Bolton, 708 Ring Building, Washington, D. C.

B. National Association of Wholesalers, Inc., 708 Ring Building, Washington, D. C.

---

[1] Not printed. Filed with Clerk and Secretary.

A. Sanford H. Bolz, 927 Fifteenth Street NW., Washington, D. C.
B. American Jewish Congress, 15 East Eighty-fourth Street, New York, N. Y.
C. (1) Indefinite. (2) General; to oppose anti-Semitism and racism in all its forms, and to defend civil rights incident thereto. Specific; (a), (b), and (d), H. R. 2379, S. 716, S. 2055, and H. R. 5678, omnibus immigration bills, against; S. 2543, immigration bill, for.
D. (6) $125.
E. (7) $3.25; (9) $3.25; (10) $12.12; (11) $15.37.

———

A. R. B. Bowden, 608 Hibbs Building, Washington, D. C., and 100 Merchants Exchange, St. Louis, Mo.
B. Grain and Feed Dealers National Association, 608 Hibbs Building, Washington, D. C., and 100 Merchants Exchange, St. Louis, Mo.
C. (1) Legislative interests continue indefinitely since 1896. (2) Interested in legislation affecting the grain and/or feed trade. Specifically during this quarter, interested in equal taxation of cooperatives in general tax bill.
D. (6) $4,500.
E. (7) $841.07; (9) $841.07.

———

A. Charles M. Boyer, 2517 Connecticut Avenue NW., Washington, D. C.
B. Reserve Officers Association of the United States, 2517 Connecticut Avenue NW., Washington, D. C.
C. (1) Indefinitely. (2) Legislation for development of a military policy for the United States which will guarantee adequate national security. (3) (a) The Reserve Officer and ROA Washington Newsletter.

———

A. D. H. Brackett, post-office box 622, Atlanta, Ga.
C. (1) Through Eighty-second Congress or longer. (2) Interested in Federal legislation to prohibit unbonded, unelected, irresponsible city policemen from being armed with deadly weapons (and the same to apply to all other petty arresting officers), or otherwise to require them to be underwritten by solvent bonds, as is required of elected and bonded responsible high sheriffs.
D. (6) $35.
E. (4) $10; (9) $10; (11) $10; (15) Paid Atlanta, Ga., post office $5 for postal cards, and $5 for multigraphing the cards. Multigraphing was done by Ace Letter Service, 306–11 Pryor Street Building, Atlanta, Ga., on December 29, 1951.

———

A. Fontaine C. Bradley, 701 Union Trust Building, Washington, D. C.
B. American Institute of Accountants and its members, 270 Madison Avenue, New York, N. Y.
C. (1) Duration—During the pendency of any proposed legislation tending to restrict the right of accountants to appear before Government agencies. (2) S. 17, H. R. 3097, S. 1705.
E. (5) $30.80; (8) $60.30; (9) $72.30; (10) $133.10.

———

A. Joseph E. Brady, 2347 Vine Street, Cincinnati, Ohio.
B. International Union of United Brewery, Flour, Cereal, Soft Drink, and Distillery Workers of America, 2347 Vine Street, Cincinnati, Ohio.
(C) (1) As long as registrant holds present office and legislation affecting interest of employing organization is pending. (2) All legislation involving or in the direction of national prohibition, taxation of alcoholic beverages, etc. (3) The Brewery Worker.
E. (10) $189.46; (11) $189.46.

———

A. Harry R. Brashear, 610 Shoreham Building, Washington, D. C.
B. Aircraft Industries Association of America, Inc., 610 Shoreham Building, Washington, D. C.
C. (1) Indefinite; (2) any legislation affecting transportation matters in which members of the Association are interested. No specific bills at this time.

———

A. Glenn A. Brennan, 27–31 Cleveland Street, Hammond, Ind.
B. Brotherhood of Railway Clerks, 1015 Vine Street, Cincinnati, Ohio.
C. (1) Final report.
D. (6) $400.

———

A. James M. Brewbaker, 918 Sixteenth Street NW., Washington, D. C.
B. National Association of Manufacturers.

———

A. O. O. Bright, 1302 Eighteenth Street NW., Washington, D. C.
B. Southern Pine Industry Committee, New Orleans, La.
C. (2) Legislation affecting the lumber-manufacturing industry.
D. (6) $1,200.
E. (7) $58.70; (9) $58.70; (10) $153.35; (11) $217.05.

———

A. H. E. Brinckerhoff, 220 East Forty-second Street, New York, N. Y.
B. American Pulpwood Association, 220 East Forty-second Street, New York, N. Y.

———

A. Dawes E. Brisbine, 952 National Press Building, Washington, D. C.
B. National Highway Users Conference, Inc., 952 National Press Buildington, Washington, D. C.
C. (1) Continuous, as long as there be legislation pending before the Congress dealing with Federal grants-in-aid to States for highways, or repeal, modification, or extension of Federal excise taxes on motor vehicles, gasoline, oil, tires, or auto parts. (2) Such legislative interest is primarily for analysis and reporting: (a) Revenue Act of 1951; (b) H. R. 4473, and the Senate version; (d) for modification of automotive excise tax provisions.

———

A. Milton E. Brooding, 215 Fremont Street, San Francisco, Calif.
B. California Packing Corp., 215 Fremont Street, San Francisco, Calif.
C. (1) Indefinitely. (2) Legislation related specifically to food processing and farming.
D. (6) $250.
E. (6) $25; (9) $25; (10) $1,665; (11) $1,690.

———

A. A. E. Brooks, 2202 Fort Worth National Bank Building, Fort Worth, Tex.
B. American Chamber of Commerce of Mexico, Edificio Bearn, Plaza Santos Degollado, Mexico, D. F.
C. (1) Two years. (2) I. R. C. sec. 116 (a) (to exempt from United States income taxes income derived from sources abroad by nonresident United States citizens actively engaged in a trade or business abroad).

———

A. William F. Brooks, 604 Hibbs Building, Washington, D. C.
B. National Grain Trade Council, 604 Hibbs Building, Washington, D. C.

———

A. Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees, 1015 Vine Street, Cincinnati, Ohio.
C. (1) Indefinitely. (2) Interested in all legislation affecting labor, more particularly railroad labor.

D. (1) $7,804.10; (6) $7,804.10.
E. (2) $4,940.23; (7) $2,863.87; (9) $7,-804.10; (10) $22,871.91; (11) $30,676.01.

———

A. C. R. Brown, room 411, Independence Avenue SW., Washington, D. C.
B. Brotherhood of Maintenance of Way Employes, 12050 Woodward Avenue, Detroit, Mich.
C. (2) H. R. 3669 and S. 1347, to amend Railroad Retirement Act; and H. Res. 426, to integrate railroad retirement funds with Social Security.
D. (6) $2,977.22.

———

A. Paul W. Brown, 925 South Homan Avenue, Chicago, Ill.
B. Sears, Roebuck & Co., 925 South Homan Avenue, Chicago, Ill.
C. (2) Postal legislation.
E. (4) $3,937; (9) $3,937; (10) $299.10; (11) $4,236.10.

———

A. Brown, Lund & Fitzgerald, Washington Loan & Trust Building, Washington, D. C.
B. National Association of Electric Companies, Ring Building, 1200 Eighteenth Street NW., Washington, D. C.
C. (1) Indefinitely. (2) Any legislation that might affect the members of the NAEC.
D. (6) $7,500.
E. (2) $8,441.57; (5) $375; (6) 81 cents; (8) $3,855.93; (10) $21,349.31; (11) $30,205.24; (15) $1,250, December 1, 1951, $416.67, December 7, 1951, Brown & Brown, St. Ignace, Mich., services; $450, October 15, 1951, $150, November 15, 1951, $450, December 7, 1951, B. M. Fitzgerald, 900 F Street NW., Washington, D. C., services; $1,253.33, October 15, 1951, $1,258.33, November 16, 1951, $2,458.24, December 7, 1951, A. Manning Shaw, 900 F Street NW., Washington, D. C., services; $150, October 15, 1951, $150, November 15, 1951, $150, December 15, 1951, Geraldine DeFoe, 900 F Street NW., Washington, D. C., stenographic services; $100, October 1, 1951, $100, November 1, 1951, $100, January 2, 1952, Washington Loan & Trust Co., 900 F Street NW., Washington, D. C., rent; $75, stationers, engravers, and Chesapeake and Potomac Telephone Co., Washington, D. C.; stationery, office supplies, miscellaneous; and local telephone service, $25 per month.

———

A. Russell B. Brown, 1110 Ring Building, Washington, D. C.
B. Independent Petroleum Association of America, 1110 Ring Building, Washington, D. C.
C. (1) Legislative interests are continuing.
E. (8) $4; (9) $4; (10) $8, (11) $102.

———

A. Thad H. Brown, Jr., 1771 N Street NW., Washington, D. C.
B. National Association of Radio and Television Broadcasters, 1771 N Street NW., Washington, D. C.
C. (2) Any legislation, local, State, or Federal, which relates to the television-broadcasting industry.
D.[1]

———

A. William A. Bryans III, 1044 Gas & Electric Building, Denver, Colo.
B. Public Service Co. of Colorado, 900 Fifteenth Street, Denver, Colo.
C. (1) Legislative interests to continue indefinitely. (2) Legislation having to do with activities of the Bureau of Reclamation, the Rural Electrification Administration, and tax matters, all of which directly affect the interests of the company.
E. (10) $3,606.69; (11) $2,606.69.

———

[1] Not printed. Filed with Clerk and Secretary.

A. Jack Bryson, 1600 I Street NW., Washington, D. C.

B. Motion Picture Association of America, Inc., 1600 I Street NW., Washington, D. C.

C. (1) Indefinite. (2) Any legislation affecting the motion-picture industry.

D. (6) $6,280.79.

E. (7) $1,211.23; (8) $644.90; (9) $1,856.13; (10) $5,602.31; (11) $7,458.44; (15) $699.59, October, November, and December, Shoreham Hotel, food and entertainment; $146.33, October, November, and December, Mayflower Hotel, food and entertainment; $365.31, October, November, and December, Statler Hotel, food and entertainment.

—

A. Henry H. Buckman, 405 Dorset Avenue, Chevy Chase, Md.

B. Florida Inland Navigation District, Citizens Bank Building, Bunnell, Fla.

C. (1) For an indefinite term. (2) Potentially interested in all legislation affecting river and harbor works, flood control, and other water use and conservation, and related subjects. Specific legislative interests during this calendar year (1951) included appropriations for civil functions of the Army, H. R. 4386.

D. (6) $1,350.

E. (8) $49.64; (9) $49.64; (10) $169.70; (11) $219.34.

—

A. Henry H. Buckman, 405 Dorset Avenue, Chevy Chase, Md.

B. The Vulcan Detinning Co., Sewaren, N. J.

—

A. The Budd Co., Philadelphia, Pa.

C. (1) During the Eighty-second Congress. (2) Corporate income and excess-profits taxes. (a) Excess Profits Tax Act of 1950 and revenue bill of 1951. (b) H. R. 4473. (c) 64 Stat., ch. 1199. (d) For amendment of Excess Profits Tax Act of 1950.

E. (2) $7,500; (6) $16.35; (7) $22.49; (9) $7,538.84; (11) $7,538.84.

—

A. George Bugbee, 18 East Division Street, Chicago, Ill.

B. American Hospital Association, 18 East Division Street, Chicago, Ill.

D. (6) $1,562.51.

E. (7) $443.35; (9) $443.35; (10) $1,087.88; (11) $1,531.23.

—

A. Harold J. Buoy, 825 Bowen Building, Washington, D. C.

B. International Brotherhood of Boilermakers, Iron Ship Builders and Helpers of America, Kansas City, Kans.

C. (1) Indefinitely. (2) H. R. 3669, S. 1347 (amendments to Railroad Retirement Act).

D. (6) $326.76.

—

A. George J. Burger, Burger Tire Consultant Service, 250 West Fifty-seventh Street, New York, N. Y.

B. National Federation of Independent Business, 714 Bond Building, Washington, D. C.

C. (2) Interested in rubber-tires bill, basing-point legislation, antitrust law legislation, spare-tire monopoly, all legislation affecting independent small business.

—

A. Burley and Dark Leaf Tobacco Export Association, post-office box 860, Lexington, Ky.

D. (7) $9,533.50.

E. (9) $4,239.28; (10) $13,226.35; (11) $17,465.63; (16) $255, rent (office for Mr. Taylor); $99.58, telephone and telegraph; $2,153.16, Hugh W. Taylor, salary; $632, Inez M. Pontier, salary; $295.50, Margaret Adair; etc.[1]

—

[1] Not printed. Filed with Clerk and Secretary.

A. George B. Burnham, 132 Third Street SE., Washington, D. C.

B. Numerous stockholders of the Burnham Chemical Co., 5653 College Avenue, Oakland, Calif.

C. (1) Probably until desired legislation is passed. (2) Legislation for the relief of the Burnham Chemical Co., Senate Joint Resolution 23, House Joint Resolutions 181, 182, 183, 186, and 159.

D. (6) $2,359.46.

E. (2) $800; (4) $763.45; (5) $355.44; (6) $44.02; (7) $364.94; (8) $11.61; (9) $2,359.46; (10) $5,544.70; (11) $7,904.16; (15) $600, various, G. B. Burnham, 132 Second Street SE., Washington, D. C., salary; $200, various, Pearl M. Burnham, 132 Second Street SE., Washington, D. C., salary; $384.94, various, travel, food, lodging, miscellaneous; $61.86, various, ABA Electric Typed Letters, 1013 Eleventh Street NW., Washington, D. C., typing; $125.30, November 21, Commercial Printing Co., 517 New Jersey Avenue NW., Washington, D. C., printing, etc.[1]

—

A. F. Hugh Burns, 821 Cafritz Building, Washington, D. C.

B. Great Lakes-St. Lawrence Association, 821 Cafritz Building, Washington, D. C.

C. (2) (a) St. Lawrence legislation: (b) Senate Joint Resolution 27, House Joint Resolutions 2, 3, 4, 15, 101, 122, 159, 337.

D. (6) $1,805.

E. (7) $732.09; (9) $732.09; (10) $2,008.84; (11) $2,740.93; (15) November 14, Hotel Morton, Atlantic City, N. J., $16; December 9, Hotel Sherman, Chicago, $23.88; December 10, Baltimore & Ohio Railroad, $88.66; December 13, Savery Hotel, Des Moines, Iowa, $15.32; December 14, Hotel Onesto, Canton, Ohio, $13.11.

—

A. Robert M. Burr, 155 East Forty-fourth Street, New York, N. Y.

B. National Electrical Manufacturers Association, 155 East Forty-fourth Street, New York, N. Y.

C. (1) Duration not predictable. (2) Legislation regarding excise taxes on electric refrigerators, electric ranges, electric water heaters, domestic electric appliances, commercial electric cooking equipment, and electric fans.

D. (6) $260.16.

E. (7) $220.46; (9) $220.46; (10) $194.83; (11) $415.29.

—

A. Orrin A. Burrows, 1200 Fifteenth Street NW., Washington, D. C.

B. International Brotherhood of Electrical Workers, 1200 Fifteenth Street NW., Washington, D. C.

C. (1) Indefinitely, as needed. (2) All legislation dealing with the electrical workers in particular and labor in general, such as attempts made by Congress to reduce annual and sick leave for Federal employees, and to support unemployment coverage and other more liberal benefits for the workers.

D. (6) $2,067.

—

A. Eugene J. Butler, 1312 Massachusetts Avenue NW., Washington, D. C.

B. National Catholic Welfare Conference, 1312 Massachusetts Avenue NW., Washington, D. C.

C. (2) All legislation affecting religious, charitable, and educational institutions and organizations.

D. (7) $2,474.99.

E. (7) $64.33; (9) $64.33; (10) $570.45; (11) $634.78.

—

A. Carl Byoir and Associates, Inc., 10 East Fortieth Street, New York, N. Y.

B. Schenley Industries, Inc., 350 Fifth Avenue, New York, N. Y.

—

[1] Not printed. Filed with Clerk and Secretary.

C. (1) Legislative interests expected to continue. (2) Opposed the proposed increase in the rate of Federal excise tax on distilled spirits.

E. (1) $9,000; (2) $10,287; (4) $125; (6) $25; (7) $60; (8) $265; (9) $19,782; (10) $61,-991; (11) $81,773.

—

A. Carl Byoir & Associates, Inc., 10 East Fortieth Street, New York, N. Y.

B. W. A. Sheaffer Pen Co., Fort Madison, Iowa.

C. (1) Interest expected to continue. (2) Interested in the Defense Production Act of 1950 and such other bills as may pertain to economic controls over industry, especially during emergency periods.

—

A. C. G. Caffrey, 1625 I Street NW., Washington, D. C.

B. The American Cotton Manufacturers Institute, Inc., 203-A Liberty Life Building, Charlotte, N. C.

C. (1) So long as Congress is in session. (2) H. R. 1724, Renegotiation Act of 1951. H. R. 5605—Customs simplification. H. R. 4473—Revenue bill of 1951 (Public Law 183, 82d Cong.). Public Law 773, Eighty-first Congress; Public Law 96, Eighty-second Congress. The Defense Production Act of 1950, as amended by the Defense Production Act Amendments of 1951. H. R. 1612 (Public Law 50, 82d Cong.), Trade Agreements Extension Act of 1951.

E. (7) $75; (9) $305; (10) $375.

—

A. Wallace J. Campbell.

B. The Cooperative League of the United States of America Association, Inc., 343 South Dearborn Street, Chicago, Ill.

—

A. John L. Carey, 270 Madison Avenue, New York, N. Y.

B. American Institute of Accountants, 270 Madison Avenue, New York, N. Y.

C. (1) Duration—during the pendency of any proposed legislation tending to restrict the right of accountants to appear before Government agencies. (2) S. 17, to provide general rules of practice and procedure before Federal agencies (against, unless amended); H. R. 3097, to protect the public with respect to practitioners before administrative agencies (if any legislation is needed in this field, we are for this bill, and in any event are not opposed to it); S. 1725, to protect the public with respect to the practice of the law by others than duly licensed attorneys before Government agencies and United States Tax Court (against); S. 913, to provide for the establishment of Joint Committee on Budget (against); H. R. 4371 and 4373, to provide for retirement fund for self-employed persons (not opposed to these bills).

D. (7) $917.

E. (6) $50; (9) $50; (11) $50.

—

A. R. B. Carothers, Paris, Tenn.

B. H. C. Spinks Clay Co., Inc., Paris, Tenn.; Kentucky-Tennessee Clay Co., Cooley Clay Co., Kentucky Clay Mining Co., Mayfield, Ky.; Bell Clay Co., Gleason, Tenn.; United Clay Mines Corp., Trenton, N. J.; Old Hickory Clay Co., Paducah, Ky.; all mine and ship ball and sagger clay.

C. (1) Our interest in retaining percentage depletion allowance for ball and sagger clays. This is allowed by section 114, Internal Revenue Code, title 26. (2) I am interested in retaining percentage depletion allowance and shall continue my effort in behalf of the H. C. Spinks Clay Co., Inc., and the other companies. This title 26, section 114, Internal Revenue Code.

E. (6) $52.76; (7) $1,565.19; (8) $225; (9) $1,868.95; (10) $2,568.14; (11) $4,437.09.

A. T. C. Carroll, Brotherhood of Maintenance of Way Employees, 12050 Woodward Avenue, Detroit, Mich.

C. (1) Indefinitely. (2) At present working for passage of H. R. 3669 and S. 1347, to amend Railroad Retirement Act; also House Resolution 426, to integrate retirement funds with social security, which we oppose.

___

A. Henderson H. Carson, 640 Shoreham Building, Washington, D. C.; 600 First National Bank Building, Canton, Ohio.

B. East Ohio Gas Co., 1405 East Sixth Street, Cleveland, Ohio.

C. (1) Unknown. Regular client for many years. (2) All legislation of interest to natural-gas industry.

D. (6) $3,461.79.

E. (1) $37; (2) $98; (3) $75; (4) $17; (5) $88.66; (6) $19.43; (7) $97.60; (8) $29.10; (9) $461.79; (10) $1,456.10; (11) $1,917.89.

___

A. Joseph K. Carson, Jr., 17 Battery Place, New York, N. Y.

B. The Propeller Club of the United States, 17 Battery Place, New York, N. Y.

C. (1) Indefinite. (2) Any matters affecting the welfare of the American merchant marine, arising under the Merchant Marine Act, 1936, and other legislation affecting the shipping industry.

___

A. Albert E. Carter, 1026 Sixteenth Street NW., Washington, D. C.

B. Pacific Gas & Electric Co., 245 Market Street, San Francisco, Calif.

C. (1) Indefinite. (2) Retained to represent the company before administrative agencies and commissions and on legislative matters affecting company's interest.

D. (6) $3,000.

E. (5) $634.86; (6) $35.80; (7) $370.70; (9) $1,041.36; (10) $3,245.98; (11) $4,287.24; (12) $1,041.36; (14) $1,317.34; (15) $634.86, October 1, November 1, December 1, Munsey Trust Co., rent; $36.80, October 15, November 15, December 15, C. & P. Telephone Co., telephone; $341.20, December 18, United Air Lines and S. P. R. R., travel; $29.50, December 20, Statler Hotel, University Club.

___

A. Clarence B. Carter, post office box 798, New Haven, Conn.

B. Railroad Pension Conference, post office box 798, New Haven, Conn.

C. (2) For enactment of 30-year, half-pay railroad retirement legislation, S. 1308, H. R. 63, H. R. 382.

E. (7) $19.32; (9) $19.32; (10) $156.58; (11) $175.90.

___

A. D. E. Casey, 419 Munsey Building, Washington, D. C.

B. American Taxpayers Association, Inc., 419 Munsey Building, Washington, D. C.

___

A. Lawrence J. Casey, Jr., 1737 K Street NW., Washington, D. C.

B. National Association of Real Estate Boards, 22 West Monroe Street, Chicago, Ill.

C. (2) Any legislation affecting the real estate industry. (3)[1]

D. (6) $708.34.

E. (7) $205.55; (8) $6.25; (9) $211.80; (11) $211.80.

___

A. Larry Cates, 1185 National Press Building, Washington, D. C.

B. C. N. Sayen, president, Air Line Pilots' Association, International, 3145 West Sixty-third Street, Chicago, Ill.

C. (2) Aviation legislation, Railway Labor Act.

D. (6) $1,386.22.

___

[1] Not printed. Filed with Clerk and Secretary.

XCVIII—93

A. William E. Chace, 616 Investment Building, Washington, D. C.

B. The National Fertilizer Association, Inc., 616 Investment Building, Washington, D. C.

C. (2) Any legislation that might affect the manufacture or distribution of fertilizer or the general agricultural economy?

D. (6) $20.

___

A. Chamber of Commerce of the United States of America, 1615 H Street NW., Washington, D. C.

C. (2) Legislation pertaining to business. (3) Legislative Daily, Legislative Outlook, Special number, etc.[1]

D.[1] (10) $711,294.49.

E. (9) $24,278.07;[1] (10) $92,104.83; (11) $116,382.90.

___

A. Walter Chamblin, Jr., 918 Sixteenth Street NW., Washington, D. C.

B. National Association of Manufacturers, 14 West Forty-ninth Street, New York, N. Y.

C. (2) Legislation affecting industry.

D. (6) $10,650.96.

E. (9) $2,650.96.

___

A. Chase National Bank of the City of New York, 18 Pine Street, New York, N. Y.

C. (2) Proposed Federal tax legislation affecting the interests of the Chase National Bank of the City of New York.

E. (10) $899.87; (11) $899.87.

___

A. Christian Amendment Movement, 914 Clay Street, Topeka, Kans.

C. Promoting Senate Joint Resolution 29 and House Joint Resolution 156, a proposed Christian amendment to the Constitution of the United States. (3) The Christian Patriot.

D. (6) $3,677.56.

E. (12) $2,600.80; (4) $1,200.16; (5) $188.27; (6) $56.05; (7) $160.05; (8) $5; (9) $5,059.65; (10) $9,323.08; (11) $14,382.73; (15) $75, Mrs. T. B. Boyle, 914 Clay Street, Topeka, Kans., office rent; $67, Joseph B. Bryson, House of Representatives, Washington, D. C., copies of House Joint Resolution 156; $15.37, Crane & Co., East Eighth Street, Topeka, Kans., office supplies, $15.95, Mrs. T. B. Boyle, 914 Clay Street, Topeka, Kans., clerical services; $580.50, Floyd Burres Printing Service, Harrison Street, Topeka, Kans., printing; etc.[1]

___

A. Citizens' Committee on Foreign Policy, 100 East Fiftieth Street, New York, N. Y.

C. (2) Foreign policy.

E. (10) $343.94; (11) $343.94.

___

A. Robert M. Clark, 525 Shoreham Building, Washington, D. C.

B. Atchison, Topeka & Santa Fe Railway Co., 80 East Jackson Boulevard, Chicago, Ill.

C. (2) Pending and prospective legislation affecting the interest of the railway company.[1]

D. (6) $4,275.

___

A. Classroom Periodical Publishers' Association, 38 West Fifth Street, Dayton, Ohio.

C. (2) General interest in second-class postal rates; particular interest H. R. 2982 and S. 1046.

D. (6) $1,721.73.

E. (2) $1,500; (8) $221.73; (9) $1,721.73; (10) $5,603.84; (11) $7,325.57; (15) $23.58, C. & P. Telephone Co. for telephone and telegraph charges including tax; $1,721.73, Donald M. Counihan, 1420 New York Avenue NW., Washington, D. C., for services as legislative counsel at $500 per month plus out-of-pocket expenses.

___

[1] Not printed. Filed with Clerk and Secretary.

A. Clear Channel Broadcasting Service (CCBS), 532 Shoreham Building, Washington, D. C.

C. (2) Oppose any proposed legislation (such as S. 491 and H. R. 4004, 81st Cong.) calling for the duplication of class I–A clear-channel frequencies or the limitation of the power of class I–A standard broadcast stations. CCBS opposes ratification of the so-called NARBA agreement signed November 15, 1950.

D. (6) $7,042.39.

E. (2) $5,625; (3) $35.58; (4) $40.80; (7) $202.64; (9) $5,904.02; (10) $18,276.84; (11) $24,180.86; (15) $5,625 Ward L. Quaal, CCBS director, salary; $40.80, Batt, Bates & Co., Inc., mimeographing; $16.22, Brentanos, books; $25.78, Mayflower, food and refreshments; $19.36, Waldron Flowers, Inc., flowers; etc.[1]

___

A. Francis P. Cleere, 3831 Drysdale Avenue, Los Angeles, Calif.

B. Brotherhood of Railway Clerks, 1015 Vine Street, Cincinnati, Ohio.

C. (2) H. R. 3669 and S. 1347, amendments to Railroad Retirement Act.

D. (6) $180.

E. (7) $100.56; (9) $100.56; (10) $114.40; (11) $274.96.

___

A. W. Frank Clucas, 1016 Twentieth Street NW., Washington, D. C.

B. National Association of Master Plumbers, 1016 Twentieth Street NW., Washington, D. C.

___

A. Marcus Cohn, 1625 I Street NW., Washington, D. C.

B. American Jewish Committee, 386 Fourth Avenue, New York, N. Y.

C. (2) Genocide, the President's civil rights program, H. R. 2467, H. R. 2379, H. Res. 364, S. 728, S. Res. 105.

E. (2) $93.75; (5) $68.89; (6) $7.38; (7) $5.42; (9) $175.44; (10) $612.58; (11) $788.02; (15) $450, Cafritz Co., 1404 K Street NW., Washington, D. C., rent; $808.98, Helene Braun, 2904 Argyle Drive, Alexandria, Va., salary.

___

A. C. Fred Coleman, Lewisville, Ark.

B. St. Louis Southwestern Railway Co., Lewisville, Ark.

C. (2) H. R. 3669, known as railroad retirement bill.

D. (6) $315.

E. (7) $748; (9) $748; (10) $3,269; (11) $4,017.

___

A. Russell Coleman, 616 Investment Building, Washington, D. C.

B. The National Fertilizer Association, 616 Investment Building, Washington, D. C.

C. (2) Any legislation that might affect the manufacture or distribution of fertilizer or the general agricultural economy?

D. (6) $100.

___

A. Marvin J. Coles, 813 Washington Building, Washington, D. C.

B. Keystone Shipping Co., et al.[1]

___

A. Marvin J. Coles, Ingoldsby & Coles, 813 Washington Building, Washington, D. C.

B. Committee for the Promotion of Tramp Shipping Under the American Flag in Foreign Commerce, 80 Broad Street, New York, N. Y.

C. (2) The committee is interested in amending existing shipping legislation in order to extend operating and construction differential subsidies to American-flag vessels engaged in so-called tramp trades.

___

[1] Not printed. Filed with Clerk and Secretary.

E. (4) $79.56; (5) $2; (6) $21.38; (7) $17.75; (9) $120.69; (10) $208.94; (11) $329.63; (15) $79.56, Bowman Service Corporation, Washington, D. C., mimeographing; $21.38, Chesapeake & Potomac Telephone Co., long-distance charges; $17.75, Washington Hotel, Washington, D. C., entertainment.

A. Colorado Associated Businessmen, Inc., 335 Symes Building, Denver, Colo.

C. (2) General legislative interests of the group is the taxing of competitive business on the same basis without regard to exemptions under section 101 of the present Internal Revenue Code.

E. (4) $160.32; (5) $42; (6) $6.57; (7) $28.18; (8) $60; (9) $297.07; (10) $3,018.02; (11) $3,315.09; (15) $101.46, Smith-Brooks Printing Co., Denver, Colo., letterheads and envelopes; $28.25, Edna P. Hubbard, Symes Building, Denver, Colo., stenographic services; $58.86, Laman for Letters, Denver, Colo., mailing letter to membership; $60, National Associated Businessmen, Inc., 1025 Vermont Avenue NW., Washington, D. C.; $13.75, Russo and Russo, Symes Building, Denver, Colo., stenographic services; etc.[1]

A. Colorado Railroad Legislative Committee,[1] 615 C. A. Johnson Building, Denver, Colo.

C. (2) All legislation both general and special that affects the above-named railroads.

E. (2) $475; (7) $371.52; (9) $846.52; (10) $2,741.38; (11) $3,587.90; (15) $846.52, Leo J. Crowley, 922 Equitable Building, Denver, Colo.

A. Colorado River Association, 306 West Third Street, Los Angeles, Calif.

C. (2) Opposing S. 75 and H. R. 1500; favoring passage of Senate Joint Resolution 26 and House Joint Resolution 21.   (3).[1]

E. (1) $2,408.10; (2) $9.942; (3) $334.49; (4) $3,123.94; (5) $1,882.61; (6) $992.02; (7) $4,883.81; (9) $23,566.97; (10) $69,055.73; (11) $92,622.70; (15) $110; Viola M. Adrian, 310 Lima Street, Burbank, Calif., salary; $15.33, Aldine Co., 232 South Spring Street, Los Angeles, office supplies; $66.96, Allen's Press Clipping Bureau, 124 West Fourth Street, Los Angeles, clipping service; $15, Amarillo Tent & Awning Co., Amarillo, Tex., display stand; $61.90, Max R. Brents, Imperial irrigation district, Imperial, Calif., expense account; $49.94, Burbank Chamber of Commerce, 162 East Orange Grove Avenue, Burbank, Calif., stationery, etc.[1]

A. Committee on National Affairs, 100 East Fiftieth Street, New York, N. Y.

D. (6) $25.

E. (10) $1,224.82; (11) $1,224.82.

A. Committee for the Nation's Health, Inc., 1416 F Street NW., Washington, D. C.

C. (2) Legislative interests: President Truman's national health plan as embodied in H. R. 27 and H. R. 54; also interested in the following measures: S. 337, S. 445, H. R. 1781, H. R. 2152, H. R. 516, H. R. 910, H. R. 274, H. R. 913, H. R. 14, H. R. 149, H. R. 342, H R. 416.   (3).[1]

D. (6) $10,703.29.

E. (2) $5,404.34; (4) $385.62; (5) $2,071.17; (6) $236.90; (7) $332.46; (8) $308.51; (9) $8,729; (10) $29,050.32; (11) $37,789.32; (15) $750, estate of Henry K. Willard, 1416 F Street NW., Washington, D. C., rent; $590.38, postmaster, Washington, D. C., stamps and envelopes; $45, Washington Report on the Medical Sciences, 903 Sixteenth Street NW., Washington, D. C., subscription renewal; $32.90, Eastern Photoprint Co., Shoreham Building, Washington, D. C., photostat of a

reprint; $92.36, Frederick E. Robin, 4415 Maple Avenue, Bethesda, Md., out-of-pocket expenses; $93.89, Channing Frothingham, 101 Bay Street Road, Boston, Mass., travel reimbursement, etc.[1]

A. Committee for Pipe Line Companies, Box 1107, Shreveport, La.

C. (2) The Committee for Pipe Line Companies was organized and functions to protect the legitimate interests of petroleum pipeline.[1]

E. (2) $9,644.24; (4) $649.44; (5) $523.61; (6) $233.91; (7) $525.31; (8) $1,901; (9) $13,-477.51; (10) $32,180.55; (11) $45,658.06; (15) $3,694.40, Gordon C. Locke, Munsey Building, Washington, D. C., salary; $410.16, Barbara L. Coogan, Munsey Building, Washington, D. C., salary; $539.68, Flavia Ann Lee, Munsey Building, Washington, D. C., salary; $5,000, Fayette B. Dow, Munsey Building, Washington, D. C., legal services; etc.[1]

A. Committee on the Present Danger, 711 Fourteenth Street NW., Washington, D. C.

C. (2) Mutual Security Act of 1951.

D. (6) $2,651.74.

E. (1) $13.39; (2) $1,154.01; (5) $849.47; (6) $365.11; (7) $399.74; (8) $501.24; (9) $3,-282.06; (10) $89,440.44; (11) $102,723.40; (15) $738, Kass Realty Co., 4461 Connecticut Avenue NW., Washington, D. C., office rent; $29.74, Wilfred J. Garvin, 1213 Radnor Place, Falls Church, Va., adjustment for deduction of FICA taxes in excess of $3,600; $132.18, Collector of Internal Revenue, Baltimore, Md., withholding taxes; $39, Thomas J. Gletner, 2816 Eighth Street South, Arlington, Va., accounting services; $13.39, J. Walter Thompson Co., 420 Lexington Avenue, New York, N. Y., advertising; etc.[1]

A. Committee for Promotion of Tramp Shipping Under American Flag in Foreign Commerce, 80 Broad Street, New York, N. Y.

C. (2) The committee is interested in amending existing shipping legislation in order to extend operating and construction differential subsidies to American-flag vessels engaged in so-called tramp trades. A bill to this effect has been introduced in the House as H. R. 5346.

E. (1) $1,250; (4) $30.10; (6) $23.23; (7) $522; (8) $75; (9) $1,900.33; (10) $1,116.91; (11) $3,017.24; (15) $1,250, Seth Levine, 711 Fourteenth Street NW., Washington, D. C., consultant; $650.33, American Foreign Steamship Corp., 80 Broad Street, New York, N. Y., printing, stationery, postage, telephone, traveling.

A. Communications Workers of America, CIO, 1808 Adams Mill Road NW., Washington, D. C.

C. (2) Legislative matters affecting the interests of the membership of the union. (3) CWA News.

D. (6) $913,950.04.

E. (2) $3,195.30; (5) $10.20; (6) $322.47; (7) $13.36; (8) $3,541.33; (9) $3,778.94; (10) $7,320.27.

A. Arthur D. Condon, 1000 Vermont Avenue NW., Washington, D. C.

B. Amana Refrigeration, Inc., Amana, Iowa.

A. Arthur D. Condon, 1000 Vermont Avenue NW., Washington, D. C.

B. Trucking Industry National Defense Committee, Inc.

D. (6) $674.

A. D. C. Cone, 10 Independence Avenue SW., Washington, D. C.

B. Brotherhood of Railroad Signalmen of America, 503 Wellington Avenue, Chicago, Ill.

C. (2) H. R. 3669 and S. 1347, to amend the Railroad Retirement Act, and all legislation directly affecting the interests of railroad employees in particular and labor in general.

D. (6) $100.

A. John C. Cone, 815 Fifteenth Street NW., Washington, D. C.

B. Pan American World Airways, Inc., 815 Fifteenth Street NW., Washington, D. C.

C. (2) Very infrequently interested in any legislation, but may be interested in supporting or opposing any aviation legislation that might have a bearing on the operation of Pan American World Airways, Inc.

A. Congress of Industrial Organizations, 718 Jackson Place NW., Washington, D. C.

C. (2) Support all legislation favorable to the national peace, security, democracy, prosperity, and general welfare; oppose legislation detrimental to these objectives.   (3) Legis-letter.

D. (6) $10,168.63.

E. (2) $1,775; (3) $6,000; (4) $601; (5) $430; (6) $900; (7) $22.75; (8) $439.88; (9) $10,-168.63; (10) $20,552.32; (11) $30,720.95; (15) $925, Marguerite Nadoney, 718 Jackson Place NW., Washington, D. C., clerical salary; $850, Patricia Shilby, 718 Jackson Place NW., Washington, D. C., clerical salary; $22.75, Nathan Cowan, 718 Jackson Place NW., Washington, D. C., travel; $4,000, CIO Housing Committee, 723 Fifteenth Street NW., Washington, D. C., contribution; $2,000, CIO Housing Committee, 723 Fifteenth Street NW., Washington, D. C., contribution; $101, Cornelius Printing Co., 912 Burlington Avenue, Silver Spring, Md., printing and distribution costs; etc.[1]

A. Julian D. Conover, Ring Building, Washington, D. C.

B. American Mining Congress, Ring Building, Washington, D. C.

C. (2) Measures affecting mining, such as income taxation, social security, public lands, stockpiling, monetary policy, etc.

D. (6) $2,500.

E. (6) $35.19; (7) $9.10; (9) $44.29; (10) $183.28; (11) $227.57.

A. J. Milton Cooper, 505 Washington Building, Washington, D. C.

B. Sullivan, Bernard, Shea & Kenney, Ring Building, Washington, D. C.

C. (2) Provisions of H. R. 4473 which were enacted as section 15 (c) of the Internal Revenue Code.

D. (6) $12,500.

A. Cooperative League of the United States of America Association, Inc., 343 South Dearborn Street, Chicago, Ill.

C. (2) Defense of the general public interest of the American people; defense of the right of any group of people voluntarily to organize cooperative business enterprises without discrimination against them on the part of Government, and the securing of such enabling legislation for this purpose as may from time to time be necessary; the over-all problem of agriculture and the preservation of the family-sized farm; representation of the interest of the people as consumers; conservation of natural resources, and the extension of true economic freedom and the combating of monopoly.

E. (2) $500; (5) $125; (6) $50; (7) $210; (9) $840; (10) $2,520; (11) $3,360.

[1] Not printed.   Filed with Clerk and Secretary.

[1] Not printed.   Filed with Clerk and Secretary.

[1] Not printed.   Filed with Clerk and Secretary.

A. John T. Corbett, 10 Independence Avenue SW., Washington, D. C.
B. Brotherhood of Locomotive Engineers, B. of L. E. Building, Cleveland, Ohio.
C. (2) Legislation affecting labor and transportation.
D.¹ (6) $3,294.56.
E. (5) $357.39; (6) $29.80; (9) $367.19; (10) $1,238.52; (11) $1,625.71.

A. Cordage Legislative Committee, 350 Madison Avenue, New York, N. Y.
C. Bills to amend the Tariff Act of 1930 to permit the free entry of baler twine, H. R. 1005 and S. 449, approved October 25, 1951, effective October 26, 1951; opposed.
D. (6) $600.
E. (2) $90; (4) $59.66; (5) $27.97; (6) $71.03; (7) $95.51; (9) $344.17; (10) $690.37; (11) $1,034.54; (15) $59.66, Cordage Institute, 350 Madison Avenue, New York City, mimeographing and mailing memoranda and circulars, including postage; $27.97, Pope & Vernum, Inc., 205 Madison Avenue, New York City, stationery and supplies; $41.03, Jackson, Nash, Brophy, Barringer & Brooks, 15 Broad Street, New York City, telephone and meeting expense; $54.33, Cordage Institute, 350 Madison Avenue, New York City, telephone charges.

A. Harold B. Corwin, 1616 I Street NW., Washington, D. C.
B. Retired Officers Association, Inc., 1616 I Street NW., Washington, D. C.
C. (2) Any and all legislation pertinent to the rights, benefits, privileges, and obligations of retired officers, male and female, regular and reserve, and their dependents and survivors, of whatever nature, dealing with personnel matters, pay and retirement benefits, and pensions, studying and analyzing bills, preparing statements for presentation to the cognizant committees, and drafting amendments where indicated, appearing before committee of Congress, principally the Committees on Armed Services, the Committees on Veterans' Affairs, and the committees dealing with various privileges, opportunities, and obligations of the personnel involved. (3) The Retired Officer.
D. (6) $1,120.

A. John M. Costello, 3434 Porter Street NW., Washington, D. C.
B. American League for an Undivided Ireland, care of Charles T. Rice, 122 East Forty-second Street, New York City, N. Y.
C. (2) Any legislation which may help to effectuate the unification of all Ireland.
D. (7) $1,558.
E. (4) $550.19; (6) $17.45; (7) $240.36; (9) $808; (10) $694.10; (11) $1,502.10; (15) $550.19, Government Printing Office, reprint congressional debate on rule for Fogarty resolution; Chesapeake & Potomac Telephone Co., $17.45; TWA, round trip, Chicago, $80.50; the Calvert Shop, Washington, $140.36, entertainment.

A. Council for Clarification of Pricing Practices, 1 North La Salle Street, room 3500, Chicago, Ill.
C. (2) S. 719 and H. R. 2820.
D. (6) $11,865.
E. (2) $10,000; (7) $4,200; (9) $14,200; (11) $14,200; (15) $14,200, Miller, Gorham, Wescott & Adams, and William Simon, a partner, 1 North La Salle Street, Chicago, Ill., fees and expenses.

A. Council for Social Action, 289 Fourth Avenue, New York, N. Y.
C. (2) Generally interested in welfare, international, civil liberties, and economic legislation where ethical principles of interest to the church are involved, such as point 4 program, grain for India, reciprocal trade agreements, farm labor legislation, and national housing program. (3) Social Action magazine and Advance.
D. (6) $1,500.
E. (2) $700; (4) $50; (5) $400; (6) $50; (7) $300; (9) $1,500; (10) $4,500; (11) $6,000.

A. Donald M. Counihan, 1420 New York Avenue NW., Washington, D. C.
B. Classroom Periodical Publishers' Association, 38 West Fifth Street, Dayton, Ohio.
C. (2) General interest in second-class postal rates; particular interest in H. R. 2982 and S. 1046.
D. (6) $1,721.73.
E. (2) $1,500; (8) $221.73; (9) $1,721.73; (10) $5,603.84; (11) $7,325.57; (15) $23.58, C. & P. Telephone Co., telephone and telegraph.

A. Donald M. Counihan, 1420 New York Avenue NW., Washington, D. C.
B. Harnischfeger Corp., Milwaukee, Wis.
C. (2) General interest in defense production and economic controls, tax increase, and housing legislation.
D. (6) $321.80.
E. (2) $300; (8) $21.80; (9) $321.80; (10) $3,150; (11) $3,471.80.

A. Nathan E. Cowan, 718 Jackson Place NW., Washington, D. C.
B. Congress of Industrial Organizations, 718 Jackson Place, NW., Washington, D. C.
C. (2) Support all legislation favorable to the national peace, security, democracy, prosperity, and general welfare; oppose legislation detrimental to these objectives.
D. (6) $2,795.
E. (7) $920; (9) $920; (10) $2,730; (11) $3,650.

A. W. W. Coxe, 108 North Jefferson Street, Roanoke, Va.
B. Norfolk & Western Railway Co., 108 North Jefferson Street, Roanoke, Va.
E. (10) $260.03; (11) $260.03.

A. Charles J. Crampton, 700 Insurance Building, San Antonio, Tex.
B. State Tax Association, post-office box 2559, Houston, Tex.
C. (2) State and Federal tax legislation and administrative rulings and court decisions in tax matters affecting community property taxpayers inequitably.
E. (7) $43.20; (9) $43.20; (10) $1,275.04; (11) $1,318.24.

A. F. M. Crance, 408-409 Young Building, Lynchburg, Va.
B. Brotherhood of Maintenance of Way Employees, 12050 Woodward Avenue, Detroit, Mich.
C. (2) H. R. 3669 and S. 1347 to amend the Railroad Retirement Act and other bills pertaining to labor.
D. (6) $532.20.
E. (2) $532.20; (7) $360; (9) $892.20; (10) $2,539.21; (11) $3,431.41.

A. W. A. Crawford, 545 Hurt Building, Atlanta, Ga.
B. Railroad Association of Georgia, 545 Hurt Building, Atlanta, Ga.
C. (2) The general legislative interests of the person filing this report concern legislation of general or specific relation to the railroads.
D.¹ (6) $3,750.

A. Credit Union National Association, Inc., 1617 Sherman Avenue, Madison, Wis.
C. (2) Legislation affecting credit unions.
D.¹ (6) $13,754.62.
E. (10) $35.84; (11) $35.84.

A. Leo J. Crowley, 922 Equitable Building, Denver, Colo.
B. Colorado Railroad Legislative Committee, 615 C. A. Johnson Building, Denver, Colo.¹
C. (2) All legislation, both general and special, that affects the railroads.
D. (6) $846.52.
E. (2) $475; (7) $371.52; (9) $846.52; (10) $2,741.38; (11) $3,587.90; (15) $151.52, Congressional Hotel, Washington, D. C., accommodations, meals, and incidentals; $30.93, Pennsylvania Railroad, pullman accommodations and dining car services; $33.14, Union Pacific Railroad, Pullman accommodations and dining car services.

A. Leo F. Cullinane, 4906 Westway Drive, Washington, D. C.
B. National Associated Businessmen, Inc., 1025 Vermont Avenue NW., Washington, D. C.
D. (6) $1,230.32.

A. Cummings, Stanley, Truitt & Cross, 1625 K Street NW., Washington, D. C.
B. General Refractories Co., 1520 Locust Street, Philadelphia, Pa.; Harbison-Walker Refractories Co., Farmers Bank Building, Pittsburgh, Pa.; A. P. Green Fire Brick Co., Mexico, Mo.; North American Refractories Co., Cleveland, Ohio.
C. (2) Legislation involving percentage depletion allowances.
E. (10) $12.50; (11) $12.50.

A. Cummings, Stanley, Truitt & Cross, 1625 K Street NW., Washington, D. C.
B. Estate of Margery Durant Green, 1 Atlantic Street, Stamford, Conn.
C. (2) To extend to the estates of living incompetents the benefits of the Technical Changes Act of 1949.
D. (6) $3,500.
E. (6) $10.38; (7) $24.54; (9) $34.92; (11) $34.92.

A. Cummings, Stanley, Truitt & Cross, 1625 K Street NW., Washington, D. C.
B. Estate of W. D. Johnson, deceased, 900 Walnut Street, Kansas City, Mo.
C. (2) Amendment of section 1000 (e) of Internal Revenue Code to permit an executor or administrator to release powers of disposition where the decedent was under a disability during his lifetime.
D. (6) $5,000.

A. Cummings, Stanley, Truitt & Cross, 1625 K Street NW., Washington, D. C.
B. New Process Co., Warren, Pa.
C. (2) Legislation and proceedings relating to postal rates.
D. (6) $1,500.
E. (6) $29.06; (7) $5.50; (9) $34.56; (10) $318.09; (11) $352.65.

A. Ralph E. Curtiss, 944 Washington Building, Washington, D. C.
B. National Licensed Beverage Association, 420 Seventh Street, Racine, Wis.
C. (2) Any legislation affecting tavern and restaurant industry.
D. (6) $1,900.
E. (6) $84.46; (7) $63.91; (9) $148.37; (10) $357.56; (11) $505.93.

¹ Not printed. Filed with Clerk and Secretary.

A. Dairy Industry Committee, 1112 Barr Building, Washington, D. C.
C. (2) Any legislation affecting the dairy industry.
D. (6) $3,300.

A. William L. Daley, 911 Investment Building, Washington, D. C.
B. Newspaper Publishers' Association, 222 North Michigan Avenue, Chicago, Ill.
C. (2) H. R. 3760, H. R. 2682, H. R. 505, H. R. 2516, S. 1137, S. 719, H. R. 2188, H. R. 1514, S. 672, H. Res. 116, S. 106, H. R. 1768, H. R. 116, H. R. 525, H. R. 3341, H. R. 5575, S. 436, H. R. 5379, H. Res. 423, H. R. 5056, H. R. 4745. H. R. 5204, H. R. 4741, S. 2170.   (3) The Publishers Tab and The National Publisher.
D. (6) $825
E. (5) $59.36;  (6) $64.07;  (7) $100;  (8) $56.31;  (9) $279.74;  (10)  $878.63;  (11) $1,158.37;  (15) $60.15, C. & P. Telephone Co., telephone service; $49.10, United States post office, postage.

A. William V. Dameron, Machinists Building, Washington, D. C.
B. International Association of Machinists, Machinists Building, Washington, D. C.

A. John A. Danaher, 50 State Street, Hartford, Conn., and 1625 K Street NW., Washington, D. C.
B. The Firestone Tire & Rubber Co., Akron, Ohio.
C. (2) H. R. 277 and similar legislation dealing with distribution of motor vehicle tires and prevention of manufacturers from selling goods at retail; study of Federal legislation re same; examination of reported cases concerning constitutionality of proposed bills; preparation of legal memoranda and briefs re same; study of economic data and preparation of hearings.
D. (6) $1,875.
E. (10) $10.95; (11) $10.95.

A. John A. Danaher, 50 State Street, Hartford, Conn., and 1625 K Street NW., Washington, D. C.
B. The B. F. Goodrich Co., Akron, Ohio.
C. (2) H. R. 277 and similar legislation dealing with distribution of motor vehicle tires and prevention of manufacturers from selling goods at retail; study of Federal legislation re same; examination of reported cases concerning constitutionality of proposed bills; preparation of legal memoranda and briefs re same; study of economic data and preparation of hearings.
D. (6) $1,875.

A. N. R. Danielian, 821 Cafritz Building, Washington, D. C.
B. Great Lakes-St. Lawrence Association, 821 Cafritz Building, Washington, D. C.
C. (2) St. Lawrence legislation.
D. (6) $4,500.
E. (7) $1,523.14;    (9)    $1,523.14;    (10) $2,862.30; (11) $4,405.44; (15).[1]

A. Paul J. Daugherty, 820 Huntington Bank Building, Columbus, Ohio.
B. Ohio Chamber of Commerce, 820 Huntington Bank Building, Columbus, Ohio.
C. (2) Such matters affecting business and commerce in Ohio as are referred to me from time to time by the Ohio Chamber of Commerce; proposals in the fields of taxation, general appropriations, old-age and survivors insurance, unemployment compensation, industrial development and other management problems.
D. (6) $2,749.98.
E. (10) $445.36; (11) $445.36.

[1] Not printed.  Filed with Clerk and Secretary.

A. Aled P. Davies, 59 East Van Buren Street, Chicago, Ill.
B. American Meat Institute, 59 East Van Buren Street, Chicago, Ill.
C. (2) Legislation affecting the meat-packing industry.
D. (6) $2,307.72.
E. (6) $108.09; (7) $1,776.08; (9) $1,884.17; (10) $9,981.09; (11) $11,865.26.

A. Sherlock Davis, 1117 Barr Building, 910 Seventeenth Street NW., Washington, D. C.
B. United States Cuban Sugar Council, 30 Pine Street, New York, N. Y.
C. (2) Anything which pertains to sugar or trade with Cuba.

A. Homer R. Davison, 59 East Van Buren Street, Chicago, Ill.
B. American Meat Institute, 59 East Van Buren Street, Chicago, Ill.
C. (2) Legislature affecting the meat packing industry.
D. (6) $500.
E. (4) $60; (9) $60; (10) $2,163; (11) $2,-223.

A. Robert N. Denham, 1025 Connecticut Avenue NW., Washington, D. C.
B. Continental Baking Co., 630 Fifth Avenue, New York City, N. Y.
C. (2) Labor relations and general industrial regulatory legislation.
D. (6) $2,530.38.
E. (6) $11.11; (7) $19.27; (9) $30.38; (10) $209.06; (11) $239.44.

A. A. W. Dickinson, Ring Building, Washington, D. C.
B. American Mining Congress, Ring Building, Washington, D. C.
C. (2) Measures affecting mining, such as income taxation, social security, public lands, stockpiling, monetary policy, etc.
D. (6) $1,375.
E. (6) $0.25; (7) $8.80; (9) $9.05; (10) $88.20; (11) $97.25.

A. Cecil B. Dickson, 1600 I Street NW., Washington, D. C.
B. Motion Picture Association of America, Inc., 1600 Eye Street NW., Washington, D. C.
C. (2) H. R. 3408 and legislation affecting the motion-picture industry.
D. (6) $3,900.
E. (7) $1,300; (9) $1,300; (10) $3,400; (11) $4,703.

A. Disabled American Veterans, National Headquarters, 1422 East McMillan Street, Cincinnati, Ohio.
C. (2) All legislation affecting war veterans, their dependents and survivors of deceased veterans.  (3) DAV semimonthly.
E. (2) $5,066.60; (7) $95.41; (9) $5,162.01; (10) $14,544.22; (11) $19,706.23.

A. Walter L. Disbrow, 900 F Street NW., Room 314, Washington, D. C.
B. Retirement Federation of Civil Service Employees of the United States Government, 900 F Street NW., room 314, Washington, D. C.
C. (2) General legislative interests are: Retention and improvement of the Civil Service Retirement and United States Employees Compensation Acts.[1]
D. (6) $1,365.68.
E. (7) $100.50; (9) $100.50; (10) $246.20; (11) $346.70.

[1] Not printed.  Filed with Clerk and Secretary.

A. Wesley E. Disney, World Center Building, Washington, D. C.
B. American Potash & Chemical Corp., Trona, Calif.
C. (2) Specific legislation was for percentage depletion.
D. (6) $5,000.

A. Wesley E. Disney, World Center Building, Washington, D. C.
B. Eastern Magnesia Talc Co., 206 Bank Street, Burlington, Vt.
C. (2) Specific legislation was for percentage depletion.
D. (6) $1,500.

A. Wesley E. Disney, World Center Building, Washington, D. C.
B. Independent Natural Gas Association of America, World Center Building, Washington, D. C.
C. (2) General legislative interests include any matters affecting the natural-gas industry.
D. (6) $1,250.
E. (7) $188.55; (9) $188.55; (10) $1,001.64; (11) $1,190.19.

A. Wesley E. Disney, World Center Building, Washington, D. C.
B. International Talc Co., Inc., 41 Park Row, New York, N. Y.
C. (2) Specific legislation was for percentage depletion.
D. (6) $1,500.

A. Wesley E. Disney, World Center Building, Washington, D. C.
B. National Building Granite Quarries Association, 114 East Fortieth Street, New York, N. Y.
C. (2) Specific legislation was for percentage depletion.
D. (6) $8,000.

A. Wesley E. Disney, World Center Building, Washington, D. C.
B. Ozark-Mahoning Co., Tulsa, Okla.
C. (2) Specific legislation employed was for percentage depletion.
D. (6) $1,625.
E. (10) $30.25; (11) $30.25.

A. District of Columbia Petroleum Industries Committee, 1625 K Street NW., Washington, D. C.
C. (2) Legislation affecting the sale or distribution of petroleum products in the District of Columbia.
D. (6) $483.60.
E. (2) $300; (7) $183.60; (9) $483.60; (10) $1,608.75; (11) $2,092.35.

A. Homer Dodge, 1244 National Press Building, Washington, D. C.
B. Committee for Constitutional Government, Inc., 205 East Forty-second Street, New York, N. Y.
C. (2) Any proposed legislation or policies involving a constitutional question.
D. (6) $870.

A. William C. Doherty, 1525 H Street NW., Washington, D. C.
B. National Association of Letter Carriers, 1525 H Street NW., Washington, D. C.
C. (2) All legislation pertaining to postal and Federal employees.
D. (6) $6,000.

A. W. J. Donald, 155 East Forty-fourth Street, New York, N. Y.
B. National Electrical Manufacturers Association, 155 East Forty-fourth Street, New York, N. Y.
C. (2) Legislation regarding excise taxes on electric refrigerators, electric ranges, elec-

tric water heaters, domestic electric appliances, commercial electric cooking equipment, electric fans, and legislation with respect to amendment of the Labor Management Relations Act.

A. Thomas J. Donovan, Tax Council of the Alcoholic Beverage Industries, 155 East Forty-fourth Street, New York, N. Y.
C. (2) Legislation affecting excise taxes on alcoholic beverages. (3) America's Greatest Tax Leak.
D. (6) $50,806.63.
E. (3) $98.22; (4) $27.68; (5) $37.33; (7) $8,072.30; (8) $8,855.70; (9) $57,204.50; (10) $66,090.22; (15) $8,072.30, Glass & Lynch, 170 Broadway, New York, N. Y., retainer and miscellaneous expenditures; $620.17, Hill & Knowlton, Inc., 350 Fifth Avenue, New York, N. Y., public relations counsel; $58.83, Select Multigraph Service, 76 Ninth Avenue, New York, N. Y., preparing and mailing letters and releases; $39.39, Commerce Photo Print, 1 Wall Street, New York, N. Y., photostats; $26.43, Postmaster, New York, N. Y., postage; $37.33, New York Telephone Co., New York, N. Y., telephone.

A. J. Dewey Dorsett, 60 John Street, New York, N. Y.
B. Association of Casualty and Surety Companies, 60 John Street, New York, N. Y.
C. (2) Legislation affecting casualty and surety companies.
D. (6) $90.

A. C. L. Dorson, 900 F Street NW., room 314, Washington, D. C.
B. Retirement Federation of Civil Service Employees of the United States Government, 900 F Street NW., room 314, Washington, D. C.
C. (2) General legislative interests are: Retention and improvement of the Civil Service Retirement and United States Employees Compensation Acts.[1]
D. (6) $1,239.12.
E. (7) $28.65; (9) $28.65; (10) $52.70; (11) $81.35.

A. John E. Dougherty, 211 Southern Building, Fifteenth and H Streets NW., Washington, D. C.
B. The Pennsylvania Railroad Co., 1740 Broad Street Station Building, Philadelphia, Pa.
C. (2) Any legislation affecting the interest of the Pennsylvania Railroad Co.[1]
D. (6) $2,271.07.
E. (9) $43.90.

A. Robert E. Dougherty, 1319 Eighteenth Street NW., Washington, D. C.
B. National Lumber Manufacturers Association, 1319 Eighteenth Street NW., Washington, D. C.
C. (2) All legislation affecting the interest of the lumber manufacturing industry.
D. (6) $1,850.
E. (7) $168.50; (9) $168.50; (10) $815.50; (11) $984.

A. John H. Davis, 744 Jackson Place NW., Washington, D. C.
B. National Council of Farmer Cooperatives, 744 Jackson Place NW., Washington, D. C.
C. (2) H. R. 4473, Revenue Act of 1951; S. 892, Revenue Act of 1951. (3) Washington Situation.
D. $3,874.98.
E. (7) $226.92; (9) $226.92; (10) $1,091.26; (11) $1,318.18.

[1] Not printed. Filed with Clerk and Secretary.

A. Fayette B. Dow, Munsey Building, Washington, D. C.
B. Committee for Pipe Line Companies, Tulsa, Okla.
C. (2) The Committee for Pipe Line Companies is interested in any legislation which if enacted would divorce pipe lines that are subject to the Interstate Commerce Act from their existing owning companies.

A. M. J. Dowd, El Centro, Calif.
B. Imperial Irrigation District, El Centro, Calif.
E. (10) $1,689.06; (11) $1,689.06.

A. Adin M. Downer, Wire Building, 1000 Vermont Avenue NW., Washington, D. C.
B. Veterans of Foreign Wars of the United States.
C. (2) Legislation affecting all veterans and their dependents in relation to employment, hospitalization, rehabilitation, pensions, disability compensation and housing; welfare of servicemen of the Armed Forces and their dependents; matters relating to the national security, immigration and naturalization, the combatting of subversive activities; and the furtherance of a sound foreign policy; other matters included in the resolutions adopted by the national encampment and the National Council of Administration. (3) VFW Foreign Service and VFW Legislative Newsletter.
D. (6) $1,625.
E. (7) $7; (9) $7; (10) $65.80; (11) $72.80.

A. Sheridan Downey, 1025 Connecticut Avenue NW., Washington, D. C.
B. Board of Harbor Commissioners of Long Beach, Calif., 1333 El Embarcadero, Long Beach, Calif.
C. (2) These legislative interests relate to all proposed legislation which will affect the controversy between the Federal Government and Long Beach concerning title to the inland and territorial waters off the coast of California.
D. (7) $9,000.
E. (2) $2,719; (5) $1,106.87; (6) $443.55; (7) $817.32; (9) $5,086.74; (10) $13,887.95; (11) $18,974.69.

A. W. A. Dozier, Jr., 17 Molton Street, Montgomery, Ala.
B. Medical Association of the State of Alabama, 537 Dexter Avenue, Montgomery, Ala.
C. (2) All health matters covered by legislative action; pending legislation and legislative actions are reported to all members of the association. (3) PR Notes.
D. (6) $1,650.
E. (4) $225; (9) $225; (10) $675; (11) $900.

A. Robert M. Drysdale, Jr., Railway Progress Building, Washington, D. C.
B. Federation for Railway Progress, Railway Progress Building, Washington, D. C.
C. (2) S. 436, Airmail subsidy bill, for, with amendments; S. 1134, S. 1139, S. 1143, S. 1146, S. 1150, Hoover Commission bills, no position; S. 1385, H. R. 3465, to readjust size and weight of parcel-post shipments, against; H. R. 4572, S. 1018, to alleviate freight car shortages, for; H. R. 4473, 1951 tax revision bill, against increase in corporate taxes for railroad companies.
D. (6) $1,000.
E. (2) $157.50; (4) $5.16; (5) $200.10; (6) $57.31; (7) $267.24; (9) $687.31; (10) $2,612.05; (11) $3,299.36.

A. Stephen M. DuBrul, 5-141 General Motors Building, Detroit, Mich.
B. General Motors Corp., 3044 West Grand Boulevard, Detroit, Mich.

E. (6) $36.96; (7) $604.95; (9) $641.91; (15) $96.86, Mayflower Hotel, Washington, D. C., lodging, meals, telephone, telegraph, laundry, valet, etc.; $137.62, Plaza Hotel, New York City, N. Y., lodging, meals, telephone, telegraph, laundry, valet, etc.; $38.72, Waldorf-Astoria, New York City, N. Y., lodging, meals, telephone, telegraph, laundry, valet, etc.; $11.94, Michigan Bell Telephone, Detroit, Mich., telephone calls; $64.68, Wabash Railroad, transportation; etc.[1]

A. Alice Dunlap, Hotel Congressional, Washington, D. C.
B. American Library Association, 50 East Huron Street, Chicago, Ill.
C. (2) Interested in legislation affecting libraries and librarians.

A. Read Dunn, Jr., 1832 M Street NW., Washington, D. C.
B. National Cotton Council of America, post office box 18, Memphis, Tenn.
C. (2) The National Cotton Council of America favors such action on any legislation affecting raw cotton industry as will promote the purposes for which the Council is organized.
E. (10) $232.85; (11) $232.85.

A. William M. Dunn, 1808 Adams Mill Road NW., Washington, D. C.
B. Communications Workers of America, CIO, 1808 Adams Mill Road NW., Washington, D. C.
C. (2) Legislative matters affecting the interests of the membership of the union.

A. Joseph L. Dwyer, 1625 K Street NW., Washington, D. C.
B. American Petroleum Institute, 50 West Fiftieth Street, New York, N. Y.
C. (2) Petroleum legislation, S. 1498, Senate Resolution 50, and various petroleum bills before House Interstate Commerce Committee; current tax bills, Senate Joint Resolution 42 and House Joint Resolution 206.
D. (6) $3,000.
E. (7) $328.63.

A. Eastern Meat Packers Association, Hotel Statler, New York, N. Y., and 740 Eleventh Street NW., Washington, D. C.
C. (2) Defense Production Act.
D. (6) $19.86.
E. (2) $24.81; (4) 54 cents; (5) $1.64; (7) 74 cents; (8) 21 cents; (9) $37.94; (11) $37.94; (15) $16.06, LaBr›e, Brown and Winn, 743 Investment Building, Washington, D. C., counsel fee and expense; $10.39, C. B. Heinemann, 740 Eleventh Street NW., Washington, D. C., secretary, salary and expense.

A. George S. Eaton, 906 Public Square Building, Cleveland, Ohio.
B. National Tool and Die Manufacturers Association, 906 Public Square Building, Cleveland, Ohio.
C. (2) Bills especially affecting the interests of contract tool and die shops, which are small businesses.
D. (6) $300.

A. John W. Edelman, 910 Warner Building, Washington, D. C.
B. Textile Workers Union of America, 99 University Place, New York, N. Y.
C. (2) Support all legislation favorable to the national peace, security, democracy, and general welfare; oppose legislation detrimental to these objectives.[1]
D.[1](6) $2,017.66.
E. (7) $392.66; (9) $392.66; (10) $995.72; (11) $1,388.38.

[1] Not printed. Filed with Clerk and Secretary.

A. Bernard H. Ehrlich, 1367 Connecticut Avenue NW., Washington, D. C.

B. National Association and Council of Business Schools, 2601 Sixteenth Street NW., Washington, D. C.

C. (2) S. 1940 and other legislation relating to GI education for Korean veterans.

D. (6) $600.

E. (6) $42.25; (9) $42.25; (10) $12.50; (11) $54.75.

---

A. Louis Eisenstein (on behalf of the law firm of Paul, Weiss, Rifkind, Wharton & Garrison), 1614 I Street NW., Washington, D. C.

B. Pabco Products, Inc., 475 Brannan Street, San Francisco, Calif.

C. (2) An amendment to section 444 of the Internal Revenue Code to provide more equitable excess-profits taxation for expanding companies; section 520 of the Revenue Act of 1951, H. R. 4473, contains this amendment.

D. (6) $25,000.

E. (6) $105.18; (7) $2; (8) $36.72; (9) $145.90; (10) $103.61; (11) $249.51.

---

A. Courtleigh W. Eliason, 5-139 General Motors Building, Detroit, Mich.

B. General Motors Corp., 3044 West Grand Boulevard, Detroit, Mich.

E. (9) $1,973.48; (15) $254.76, Mayflower Hotel, Washington, D. C., lodging, meals, telephone, telegraph, valet, and laundry; $12, Hotel Cleveland, Cleveland, Ohio, lodging; $61.16, Hotel Utah, Salt Lake City, Utah, lodging, telephone, meals, and laundry, $124.60; Southern Pacific Railroad, transportation; $56.37, Multnomah Hotel, Portland, Oreg., lodging, meals, telephone, valet, laundry; $69.09, Western Pacific Railroad, transportation, meals, etc.[1]

---

A. Newell W. Ellison, 701 Union Trust Building, Washington, D. C.

B. American Institute of Accountants and its members, 270 Madison Avenue, New York, N. Y.

C. S. 17, to provide general rules of practice and procedure before Federal agencies, against, unless amended; H. R. 3097, to protect the public with respect to practitioners before administrative agencies; S. 1725, to protect the public with respect to the practice of the law by those other than duly licensed attorneys and counselors at law, before the United States Government departments, bureaus, commissions, and agencies, and in the United States tax courts, against.

D. (6) $1,000.

E. (6) $60.80; (9) $60.80; (10) $72.30; (11) $133.10.

---

A. John H. Else, 302 Ring Building, Eighteenth and M Streets NW., Washington, D. C.

B. National Retail Lumber Dealers Association, 302 Ring Building, Washington, D. C.

C. (2) Legislation affecting the retail lumber and building materials dealer.

D. (6) $2,750.

E. (7) $250.73; (9) $250.73; (10) $427.08; (11) $617.81.

---

A. John Doyle Elliott, 305 Pennsylvania Avenue SE., Washington, D. C.

B. Townsend Plan, Inc., 6875 Broadway Avenue, Cleveland, Ohio.

C. (2) Promotion toward passage of H. R. 2678, Eighty-second Congress, first session, generally known as the Townsend plan.

D. (6) $910.

E. (7) $292.62; (9) $292.62; (10) $138.86; (11) $431.48.

---

[1] Not printed. Filed with Clerk and Secretary.

---

A. Law offices of Northcutt Ely,[1] 1209 Tower Building, Washington, D. C.

B. American Public Power Association, 1757 K Street NW., Washington, D. C.

D. (6) $2,000.

E. (10) $194.71; (11) $194.71.

---

A. Law offices of Northcutt Ely,[1] 1209 Tower Building, Washington, D. C.

B. Department of Water and Power of the City of Los Angeles, 207 South Broadway, Los Angeles, Calif.

C. (2) Conferences and reports to clients on legislation affecting California's rights in the Colorado River and other matters, including S. 75, to authorize the Central Arizona project; H. J. Res. 42 and counterparts, Central Arizona project examination and report, and H. J. Res. 21, S. J. Res. 26 and counterparts, Colorado River litigation resolutions; S. 18, adjudication of water rights; Public Law 171, San Diego Aqueduct.

D. (6) $1,800.

---

A. Law offices of Northcutt Ely,[1] 1209 Tower Building, Washington, D. C.

B. East Bay Municipal Utility District, 512 Sixteenth Street, Oakland, Calif.

D. (6) $2,100.

E. (10) $152.72; (11) $152.72.

---

A. Law offices of Northcutt Ely,[1] 1209 Tower Building, Washington, D. C.

B. Imperial Irrigation District, El Centro, Calif.

C. (2) Conferences and reports to clients on legislation affecting California's rights in the Colorado River and other matters, including S. 75, to authorize the Central Arizona project; H. J. Res. 42 and counterparts, Central Arizona project examination and report, and H. J. Res. 21, S. J. Res. 26 and counterparts, Colorado River litigation resolutions, H. R. 2813 and S. 943, Collbran project; Public Law 171, San Diego aqueduct.

D. (6) $2,550.28.

E. (4) $142.49; (6) $35.06; (7) $250; (8) $22.73; (9) $150.28; (10) $705.65; (11) $1,155.93; (15) $17.56, Western Union Telegraph Co., Washington, D. C., telegrams; $17.50, Chesapeake & Potomac Telephone Co., Washington, D. C., telephone, long distance; $95.66, Henry Schroen, Albee Building, Washington, D. C., mimeographing; $46.63, Leet Bros., Washington, D. C., Photostating; $250, airline companies, hotels, etc., travel.

---

A. Law offices of Northcutt Ely,[1] 1209 Tower Building, Washington, D. C.

B. Six Agency Committee and Colorado River Board of California, 315 South Broadway, Los Angeles, Calif.

C. (2) Conferences and reports to clients on legislation affecting California's rights in the Colorado River and other matters, including S. 75, to authorize the Central Arizona project, House Joint Resolution 42 and counterparts, Central Arizona project examination and report, and House Joint Resolution 21, Senate Joint Resolution 26 and counterparts, Colorado River litigation resolutions, H. R. 2813 and S. 943, Collbran project; Public Law 171, San Diego aqueduct.

D. (6) $6,513.18.

E. (6) $15.38; (7) $248.86; (8) $18.94; (9) $283.18; (10) $757.54; (11) $1,040.72; (15) $15.38, Chesapeake & Potomac Telephone Co., Washington, D. C., telephone service; $23.86, Congressional Hotel, Washington, D. C., dinner conferences; $225, airline companies, motels, etc.

---

[1] Not printed. Filed with Clerk and Secretary.

---

A. Law offices of Northcutt Ely,[1] 1209 Tower Building, Washington, D. C.

B. Water Project Authority of the State of California, Sacramento, Calif.

C. (2) Conferences and reports to clients on legislation affecting the Central Valley project including Public Law 136, Interior Department appropriations, 1952; H. R. 413, Kings River Water Rights; H. R. 6 and H. R. 7, saltwater research; H. R. 1637, National Water Resources basic data; S. 75, Central Arizona project; Public Law 171, San Diego aqueduct; H. R. 5363, Santa Margarita River; S. 18, adjudication of water rights; S. 943 and H. R. 2813, Collbran project.

D. (6) $1,584.15.

E. (7) $84.15; (9) $84.15; (11) $84.15.

---

A. Law Offices of Northcutt Ely,[1] 1209 Tower Building, Washington, D. C.

B. Water Resources Board of the State of California, Sacramento, Calif.

C. (2) Conferences and reports to clients on H. R. 4063, civil functions appropriations bill, 1952; S. 528 and H. R. 1618, California levee and flood-control damage; and H. R. 1307, flood control on Redwood Creek, Humboldt County, Calif.

---

A. Emergency Committee of Small- and Medium-Size Magazine Publishers, 400 Madison Avenue, New York, N. Y.

C. (2) Interested in H. R. 2982 and S. 1016, postal rate legislation.

E. (2) $1,500; (6) $122.13; (7) $93.18; (8) $122.40; (9) $1,837.71; (10) $10,089.10; (11) $11,926.81; (15) $1,837.71, Robert A. Saltzstein, 511 Wyatt Building, Washington, D. C., fees and expenses.

---

A. Leon J. Engel, 20 Hopkins Place, Baltimore, Md.

C. (2) Excise taxes.

---

A. Oliver F. Erickson, 1016 Twentieth Street, NW., Washington, D. C.

B. National Association of Master Plumbers, 1016 Twentieth Street NW., Washington, D. C.

---

A. Herman Fakler, National Press Building, Washington, D. C.

B. Millers' National Federation, 309 West Jackson Boulevard, Chicago, Ill.

C. (2) Legislation dealing with wheat and wheat flour.

E. (10) $8.90; (11) $8.90.

---

A. Farmers Educational and Cooperative Union of America (National Farmers Union), 1555 Sherman Street, Denver, Colo. (home office); 300 Independence Avenue SE., Washington, D. C. (legislative office).

C. (2) The general legislative interests of this organization are all matters affecting the interests of farmers or matters which from time to time may be regarded by the board of directors as affecting the program of the National Farmers Union as set forth in the program adopted by the convention of the National Farmers Union.[1]

D. (6) $183,366.50.

E. (15) $39.20, Angus McDonald, Washington, D. C., travel, telephone, and newspaper expense; $103.84, Dorchester House, Washington, D. C., rent; $81.23, The Chesapeake & Potomac Telephone Co., Washington, D. C., telephone service; $16.90, Telephone Secretary, Washington, D. C., secretarial service; $15, Mountain Valley Water Co., Washington, D. C., water service; $22, The National Press Club, Washington, D. C., dues; etc.[1]

---

[1] Not printed. Filed with Clerk and Secretary.

A. Charles J. Farrington, 1026 Seventeenth Street NW., Washington, D. C.
B. National Automobile Dealers Association, 1026 Seventeenth Street NW., Washington, D. C.
C. (2) All Small Business Committee legislation, tax-revision, funds for public roads, highway-safety legislation.
D. (6) $6,249.99.
E. (7) $1,836.30; (9) $1,836.30; (10) $3,-183.52; (11) $5,020.12.

A. Donald D. Farshing, 1025 Connecticut Avenue NW., Washington, D. C.
B. Management Planning of Washington, Inc., 1025 Connecticut Avenue NW., Washington, D. C.
D. (6) $1,300.
E. (7) $87.65; (9) $87.65; (10) $415.90; (11) $503.55.

A. Harold E. Fellows, 1771 N Street NW., Washington, D. C.
B. National Association of Radio and Television Broadcasters, 1771 N Street NW., Washington, D. C.
C. (2) Registrant is interested in any legislation—local, State, Federal, or international—which affects the broadcasting industry.[1]

A. Abner H. Ferguson, 1139 Shoreham Building, Washington, D. C.
B. United States Savings and Loan League, 221 North La Salle Street, Chicago, Ill.
C. (2) All legislation affecting savings and loan associations and general mortgage lending.
D. (6) $900.
E. (6) $10.71; (9) $10.71; (10) $53.95; (11) $64.66.

A. John A. Ferguson, 918 Sixteenth Street NW., suite, 501, Washington, D. C.
B. Independent Natural Gas Association of America, 918 Sixteenth Street NW., Washington, D. C.
C. (2) Tax legislation and any other bills affecting the natural-gas industry.
D. (6) $3,750.
E. (10 $973.68; (11) $973.88.

A. Josiah Ferris, 510 Union Trust Building, Washington, D. C.
B. United States Sugar Corp., Clewiston, Fla.; Fellsmere Sugar Producers Association, Fellsmere, Fla.; American Sugar Cane League, New Orleans, La.

A. Stephen E. Fitzgerald, doing business as the Stephen Fitzgerald Co., 502 Park Avenue, New York, N. Y.; and Raymond C. Baker and Jay Richter, as employees.
B. National Association of Electric Companies, 1200 Eighteenth Street NW., Washington, D. C.
C. (2) Assists the NAEC in articulating and expressing its point of view with respect to general legislative questions which affect the interests of the public and of electric light and power companies.
D. (7) $14,576.16.
E. (4) $7.54; (6) $337.67; (7) $1,482.86; (8) $248.09; (9) $2,076.16.

A. F. Stuart Fitzpatrick, 1615 H Street NW., Washington, D. C.
B. Chamber of Commerce of the United States, 1615 H Street NW., Washington, D. C.
C. (2) Legislation in the general field of public works, city planning, urban redevelopment, and housing.

A. George E. Flather, Jr., Union Trust Building, Washington, D. C.
B. Gillette Safety Razor Co., Boston, Mass.
C. (2) Section 131, Internal Revenue Code.
D. (6) $1,820.
E. (6) $16.88; (8) $55.25; (9) $72.13; (10) $69.14; (11) $141.27.

A. Donald G. Fletcher, 745 McKnight Building, Minneapolis, Minn.
B. Rust Prevention Association, 745 McKnight Building, Minneapolis, Minn.
C. (2) Legislation affecting funds for research on plant-disease control and crop improvement; items in Agriculture Department's budget affecting research and control work on black-stem rust through plant breeding and barberry eradication.
D. (6) $1,625.
E. (2) $325; (4) $184; (5) $107.25; (6) $59.25; (7) $84.67; (9) $760.37; (10) $2,933.53; (11) $3,753.90.

A. W. G. Flinn, Machinists Building, Washington, D. C.
B. International Association of Machinists, Machinists Building, Washington, D. C.

A. Florida Inland Navigation District, Citizens Bank Building, Bunnell, Fla.
C. (2) Potentially interested in all legislation affecting river and harbor works, flood control, and other water use and conservation, and related subjects. Specific legislative interest during this calendar year (1951) included appropriations for civil functions of the Army, H. R. 4386.
E. (2) $1,350; (8) $49.64; (9) $1,399.64; (10) $4,215.70; (11) $5,615.34; (15) $1,409.44, Henry H. Buckman., 405 Dorset Avenue, Chevy Chase, Md.

A. Florida Railroad Association,[1] 404 Midvale-Moor Building, Tallahassee, Fla.
C. (2) Proposed legislation of interest to members of Florida Railroad Association.
D. (6) $2,512.50.
E. (2) $1,320; (6) $27; (9) $1,337; (10) $4,116.08; (11) $5,453.08.

A. E. F. Forbes, 604 Mission Street, suite 906-907, San Francisco, Calif.
B. Western States Meat Packers Association, Inc., 604 Mission Street, suite 906-907, San Francisco, Calif.
C. (2) Interested in legislation affecting livestock and meat-packing industry; elimination of Government controls from our industry, as imposed under the Defense Production Act of 1950; advocating the effective methods and principles of the free-price system.
D. (6) $5,000.04.

A. Aaron L. Ford, Munsey Building, Washington, D. C.
B. Nicholas B. Perry, 1841 Columbia Road NW., Washington, D. C.
C. (2) Retained to assist in obtaining passage of a private bill to provide compensation from blocked or vested funds to Nicholas B. Perry for losses suffered as a result of seizure of his property by the Governments of Rumania or Hungary, or either of them.
C. (7) $5.25; (9) $5.25; (11) $5.25.

A. Mrs. J. A. Ford, 305 Pennsylvania Avenue SE., Washington, D. C.
B. Townsend Plan,[1] Inc., 6875 Broadway, Cleveland, Ohio.
C. (2) H. R. 2678 and H. R. 2679, bills to provide every adult citizen in the United

States with equal basic Federal insurance, permitting retirement with benefits at age 60; to give protection to widows with children; to provide an ever-expanding market for goods and services through the payment and distribution of such benefits to be carried by every citizen in proportion to the income privileges he enjoys, and also covering total disability, from whatever cause, for certain citizens under 60. (3) The Townsend National Weekly.
D. (6) $1,640.

A. Forest Farmers Association Cooperative, Box 692, Valdosta, Ga.
C. (2) Agricultural appropriations bill for 1952 (forestry items), H. R. 3934, S. 1767, H. R. 2752, S. 1149, and H. R. 5474. (3) The Forest Farmer.
E. (4) $7.75; (9) $7.75; (10) $9.15; (11) $923.65.

A. J. Carter Fort, 929 Transportation Building, Washington, D. C.
B. Association of American Railroads, Transportation Building, Washington, D. C.
C. (2) Generally to keep informed with respect to legislation affecting transportation; to support such legislation as members of the Association of American Railroads believe to be in their interest and in the interest of a sound national transportation policy; and to oppose legislation which they believe to be contrary to such interests.[1]
D. (6) $6,343.32.
E. (7) $211.40; (9) $211.46; (10) $296.90; (11) $508.36.

A. Charles E. Foster, 1701 Eighteenth Street NW., Washington, D. C.
B. Disabled American Veterans, National Headquarters, 1423 East McMillan Street, Cincinnati, Ohio.
C. (2) Interested in all legislation affecting war veterans, their dependents and survivors of deceased veterans. (3) DAV semimonthly.
D. (6) $2,160.

A. George H. Frates, 1163 National Press Building, Washington, D. C.
B. National Association of Retail Druggists.
C. (2) To oppose legislation detrimental to independent retail druggists and to further legislation favorable to the profession. (3) NARD Journal.
D. (6) $2,800.
E. (2) $675; (5) $399; (6) $105; (9) $1,179; (10) $2,396; (11) $3,575.

A. Dr. John H. Frederick, 842 Wyatt Building, Washington, D. C.
B. Transportation Association of America, 130 North Wells Street, Chicago, Ill.
C. (2) All legislation having anything to do with transportation including pending bills before the House and Senate.
D. (6) $2,166.88.
E. (9) $216.88; (10) $319.48; (11) $608.36.

A. Fred J. Fredrickson, Lafayette Hotel, Washington, D. C. (Home address: 247 Third Street SW., Valley City, N. Dak.)
B. North Dakota Resources Board, 311 Broadway, Fargo, N. Dak.
C. (2) Legislation affecting the development and utilization of the land, water, and other natural resources of North Dakota, including authorizations and appropriations.
D. (6) $2,867.19.
E. (5) $142.48; (6) $172.34; (7) $816.37; (9) $1,131.19; (10) $4,253.33; (11) $5,284.52.

[1] Not printed. Filed with Clerk and Secretary.

A. H. Maurice Fridlund, 120 Broadway, New York, N. Y.

B. Alloys Development Co., 2537 Koppers Building, Pittsburgh, Pa.

C. (2) For H. R. 4054, to provide patent extensions.

D. (6) $520.

E. (7) $20; (9) $20; (11) $20.

———

A. H. Maurice Fridlund, 120 Broadway, New York, N. Y.

B. National Federation of American Shipping, 1809 G Street NW., Washington, D. C.

C. (2) H. R. 3715 and H. R. 3797, to amend Excess Profits Tax Act of 1950; for these bills or equivalent.

———

A. Friends Committee on National Legislation, 1000 Eleventh Street NW., Washington, D. C.

C. (2) The general legislative interest is to work where legislation is involved for the development of the United Nations into a world federation; the international control and reduction of armaments; recognition of its responsibility on the part of the United States Government for assuming its share in the burden for world-wide economic rehabilitation and development; protection of recognized civil liberties; and adequate recognition of rights of conscience.

D. (6) $13,391.56.

E. (2) $5,878.44; (3) $150; (4) $2,447.24; (5) $1,401.34; (6) $219.66; (7) $873.95; (8) $707.21; (9) $11,767.84; (10) $39,577.39; (11) $51,345.23; (15) $32.87, Addressograph-Multigraph Corp., 1200 Babbitt Road, Cleveland, Ohio, office supplies; $46.95, Ellen S. Brinton, Swarthmore College, Swarthmore, Pa., travel and services; $172.81, Chesapeake & Potomac Telephone Co., 725 Thirteenth Street NW., Washington, D. C., telephone; $595.60, National Savings & Trust Co., Fifteenth and New York Avenue NW., Washington, D. C., withholding taxes deposited; $283.50, collector of internal revenue, Baltimore, Md., withholding taxes; $32.64, Congressional Quarterly News Features, 1156 Nineteenth Street NW., Washington, D. C., subscription; etc.[1]

———

A. George M. Fuller, 1319 Eighteenth Street NW., Washington, D. C.

B. National Lumber Manufacturers Association, 1319 Eighteenth Street NW., Washington, D. C.

C. (2) Any legislation inimical to the interests of the lumber industry, American industry, and free enterprise.

D. (6) $4,075.

E. (7) $975.98;[1] (9) $3,567.93; (10) $4,543.91.

———

A. Wallace H. Fulton, 1625 K Street NW., Washington, D. C.

B. National Association of Securities Dealers, Inc.

———

A. Charles E. Gage, 927 Fifteenth Street NW., Room 904, Washington, D. C.

B. The American Tobacco Co., Inc., 111 Fifth Avenue, New York, N. Y.

C. (2) Any legislation affecting a company engaged in the manufacture and sale of tobacco products.

———

A. M. J. Galvin, 207 Union Depot Building, St. Paul, Minn.

B. Minnesota railroads.[1]

C. (2) Interested in all matters affecting railroads, and particularly any matters relating to Railroad Retirement Act and proposed amendments; Interstate Commerce Act and proposed amendments; Federal Employers' Liability Act and proposed amendments.

D. (6) $500.

E. (7) $578.24; (9) $578.24; (10) $356.08; (11) $934.30; (15) $13.28, Pullman Co., Chicago, Ill.; $173.58, Taft Hotel, New York City, N. Y.; $13.28, Pullman Co., Chicago, Ill.; $172.61, Carlton Hotel, Washington, D. C.

———

A. Earl H. Gammons, 801 Warner Building, Washington, D. C.

B. Columbia Broadcasting System, Inc., 485 Madison Avenue, New York, N. Y.

C. (2) Legislation applicable to or affecting the radio and/or television industry, including S. 658, S. 1579, Senate Resolution 127, H. R. 10, H. R. 73, H. R. 4473.

E. (7) $142.41; (9) $142.41;[1] (10) $248.84; (11) $391.25.

———

A. Gardner, Morrison & Rogers, 1126 Woodward Building, Washington, D. C.

B. The Lehigh Valley Railroad Co., 143 Liberty Street, New York, N. Y.; Agency of Canadian Car & Foundry Co., Ltd., 30 Broad Street, New York, N. Y.; and other holders of awards of Mixed Claims Commission, United States and Germany, World War I.

C. (2) Legislation relating to World War I awards of the Mixed Claims Commission, United States and Germany, such as H. R. 6074, Eighty-first Congress; H. R. 4702 and H. R. 5802, Eighty-second Congress.

E. (6) $3.25; (7) $58.58; (9) $61.83; (10) $120.53; (11) $182.36.

———

A. Marion R. Garstang, 1731 I Street NW., Washington, D. C.

B. National Milk Producers Federation, 1731 I Street NW., Washington, D. C.

C. (2) Any legislation that may affect milk producers or the cooperatives through which they act together to process and market their milk. (3) News for Dairy Co-ops.

D. (6) $2,289.25.

E. (8) $1.75; (9) $1.75; (10) $36.91; (11) $38.66.

———

A. Francis J. Garvey, 222 East Superior Street, Chicago, Ill.

B. American Dental Association, 222 East Superior Street, Chicago, Ill.

C. (2) Explanation and analysis of Federal bills; rendering of advice concerning their relationship to ADA policy.

D. (6) $2,425.90.

———

A. Gas Appliance Manufacturers Association, Inc.,[1] 60 East Forty-second Street, New York, N. Y.

C. (2) In general, legislation which concerns or affects members of the Gas Appliance Manufacturers Association, Inc.

E. (10) $4,887.72; (11) $4, 897.72.

———

A. Mrs. Paul Gebhard, 830 Witherspoon Building, Philadelphia, Pa.

B. The Board of Christian Education of the Presbyterian Church in the United States of America.

———

A. General Electric Co., 570 Lexington Avenue, New York, N. Y.

E. (10) $7,353.80; (11) $7,353.80.

———

A. J. M. George, 165 Center Street, Winona, Minn.

B. The Inter-State Manufacturers Association, 163–165 Center Street, Winona, Minn.

C. (2) H. R. 2982, S. 1046, H. R. 30, H. R. 525, H. R. 3392, S. 1335, H. R. 3465, Senate Joint Resolution 60, House Joint Resolution 235, S. 1369.

D. (6) $1,500.

———

A. J. M. George, H. K. Brehmer, and C. S. McMahon, constituting the partnership of George, Brehmer & McMahon, 165 Center Street, Winona, Minn.

B. National Association of Direct Selling Cos., 163–165 Center Street, Winona, Minn.

C. (2) H. R. 2982, S. 1046, H. R. 30, H. R. 525, H. R. 3392, S. 1335, H. R. 3465, Senate Joint Resolution 60, House Joint Resolution 235, S. 1369, H. R. 3298, S. 345, S. 1186.

D. (6) $3,000.

———

A. Leo E. George, 711 Fourteenth Street NW., Washington, D. C.

B. National Federation of Post Office Clerks, 711 Fourteenth Street NW., Washington, D. C.

C. (2) All legislation pertaining to the postal service and the welfare of postal and Federal employees. (3) Union Postal Clerk.

D. (6) $4,000.

———

A. John S. Gibson, Sibbett Building, Douglas, Ga.

B. St. Marys Kraft Corp., St. Marys, Ga.

C. (2) An appropriation for dredging at St. Marys Harbor and up St. Marys River.

D. (6) $750.

E. (10) $476.97; (11) $476.97.

———

A. Ernest Giddings, 1201 Sixteenth Street NW., Washington, D. C.

B. Legislation-Federal Relations Division of the National Education Association of the United States, 1201 Sixteenth Street NW., Washington, D. C.

C. (2) Bills pending before the Eighty-second Congress relating to public education.

D. (6) $1,340.83.

E. (7) $42.10; (9) $42.40; (10) $173.15; (11) $215.25.

———

A. C. C. Gilbert, Nashville, Tenn.

B. Southern States Industrial Council, Stahlman Building, Nashville, Tenn.

C. (2) Support of legislation favorable to free enterprise system and opposition to legislation unfavorable to that system.

D. (6) $2,012.50.

———

A. William Glazier, 930 F Street NW., Washington, D. C.

B. International Longshoremen's and Warehousemen's Union, 150 Golden Gate Avenue, San Francisco, Calif.; National Union of Marine Cooks and Stewards, 86 Commercial Street, San Francisco, Calif.

C. (2) General interest in legislation affecting trade-unions and their members and the maritime industry as well.

E. (10) $1,694.63; (11) $1,694.63.

———

A. Richard Gonzales, 825 Victor Building, 724 Ninth Street NW., Washington, D. C.

B. National Farm Labor Union, AFL, 825 Victor Building, Washington, D. C.

C. (2) Farm-labor legislation, immigration, social security, housing, health, fair-labor standards, labor relations.

D. (6) $2,050.

E. (2) $2,050; (10) $2,309.65; (11) $4,359.65.

———

A. Dr. H. T. Gordon, post-office box No. 2214, Washington, D. C.

B. The Townsend Legislative Bureau, 305 Pennsylvania Avenue SE, Washington, D. C.

C. (2) H. R. 2678 and H. R. 2679, to provide every adult citizen in the United States with equal basic Federal insurance, permitting retirement, with benefits, etc., at age 60,

———

[1] Not printed. Filed with Clerk and Secretary.

and also covering total disability, from any cause, etc.
D. (6) $910; (9) $50; (11) $50.
E. (7) $444.42; (9) $444.42.

——

A. Lawrence L. Gourley, 1757 K Street NW., suite 603, Washington, D. C.
B. American Osteopathic Association, 212 East Ohio Street, Chicago, Ill.
C. (2) Bills affecting the public health such as H. R. 910 and S. 2301, nurses' education aid; H. R. 5215, funds for National Science Foundation; H. R. 4473, hospital exemption from admissions tax; S. 337, medical education aid.
D. (6) $375.

——

A. Government Employees' Council, American Federation of Labor, 900 F Street NW., Washington, D. C.
C. (2) All legislation that affects Government employees is of interest to this council.
D. (6) $4,060.29.
E. (2) $3,034.06; (4) $232.05; (5) $490.20; (6) $121.13; (8) $251; (9) $4,128.44; (10) $14,194.93; (11) $18,323.37; (15) $2,230.06, Thomas G. Waters, 900 F Street NW., Washington, D. C., salary; $804, Gladys M. Monroe, 900 F Street NW., Washington, D. C., salary.

——

A. Grain and Feed Dealers National Association, 100 Merchants Exchange Building, St. Louis, Mo.
D. (6) $505.80.
E. (10) $293.56; (11) $293.56.

——

A. Grand Lodge of the Brotherhood of Locomotive Firemen and Enginemen, 318–418 Keith Building, Cleveland, Ohio.
C. (2) To promote general interests of locomotive firemen and enginemen.
D. (6) $10.50.
E. (2) $3,686.65; (5) $398.85; (6) $56.36; (7) $848.89; (8) $31.53; (9) $5,022.28; (10) $16,300.24; (11) $21,322.52; (15) $2,500.03, Jonas A. McBride, 10 Independence Avenue SW., Washington, D. C., salary; $1,186.62, Glenn C. Russell, 310 Labor Building, 10 Independence Avenue, Washington, D. C., salary; $337.50, Labor, Labor Building, 10 Independence Avenue, Washington, D. C., rent; $30, Jonas A. McBride, 10 Independence Avenue SW., Washington, D. C., postage; $12.45, Mallorey Office Supply Co., 732 Ninth Street NW., Washington, D. C., supplies; etc.[1]

——

A. Cassius B. Gravitt, Jr., 1110 F Street NW., Washington, D. C.
B. National League of District Postmasters, 1110 F Street NW., Washington, D. C.
C. (2) Legislation affecting postmasters. (3) The Postmasters' Advocate.
D. (6) $1,375.

——

A. David G. Gray, Humble Oil & Refining Co., Houston, Tex.
B. Humble Oil & Refining Co., post-office box 3180, Houston, Tex.
C. (2) Legislation affecting business in general.
D. (6) $1,500.

——

A. Great Lakes-St. Lawrence Association, 821 Cafritz Building, Washington, D. C.
C. (2) St. Lawrence legislation.
D. (6) $30,948.50.
E. (1) $1,807.65; (2) $9,843.27; (4) $1,521.50; (5) $1,470.26; (6) $782.29; (7) $2,242.88; (8) $362.58; (9) $18,030.43; (10) $63,182.69; (11) $101,213.12; (15) Enders Advertising, Inc., Washington, D. C., printing, $107.06; Postmaster, Washington, D. C., postage, $375.76; Hotel Statler, Washington, D. C.,

——

restaurant, $15.07; National Press Club, Washington, D. C., dues, $12; Colony Restaurant, Washington, D. C., restaurant, $23.72; etc.[1]

——

A. Ernest W. Greene, 731 Investment Building, Washington, D. C.
B. Hawaiian Sugar Planters' Association, post-office box 2450, Honolulu, T. H.

——

A. Jerry N. Griffin, 544 Washington Building, Washington, D. C.
B. National Coal Association, Southern Building, Fifteenth and H Streets NW., Washington, D. C.
C. (2) Legislative interests are general in character and we are interested in any legislation which affects the coal industry.
D. (7) $3,200.

——

A. Mrs. Enid H. Griswold, 7501 Empire State Building, New York, N. Y.
B. National Economic Council, Inc., 7501 Empire State Building, New York, N. Y.
C. (2) My legislative interests are in favoring any legislation that tends to support private enterprise and maintain American independence, and to oppose any measures that work contrariwise.
D. (6) $685.
E. (10) $85; (11) $85.

——

A. John J. Gunther, 1740 K Street, Washington, D. C.
B. Americans for Democratic Action, 1740 K Street NW., Washington, D. C.
C. (2) All bills covered by convention-adopted program of organization.
D. (6) $1,300.
E. (7) $444.81; (9) $444.81; (10) $449.58; (11) $939.39.

——

A. Violet M. Gunther, 1740 K Street, Washington, D. C.
B. Americans for Democratic Action, 1740 K Street NW., Washington, D. C.
C. (2) All bills covered by convention-adopted program of organization.
D. (6) $1,462.50.
E. (7) $297.15; (9) $297.15; (10) $604.38; (11) $901.53.

——

A. David J. Guy, 1615 H Street NW., Washington, D. C.
B. Chamber of Commerce of the United States, 1615 H Street NW., Washington, D. C.
D. (6) $2,250.
E. (10) $32.65; (11) $32.65.

——

A. Frank E. Haas, 280 Union Station Building, Chicago, Ill.
B. The Association of Western Railways, 474 Union Station Building, Chicago, Ill.
C. (2) Federal legislative proposals which may or do affect western railroads.

——

A. Hoyt S. Haddock, 132 Third Street SE., Washington, D. C.
B. CIO Maritime Committee, 132 Third Street SE., Washington, D. C.
C. (2) Support legislation in interest of seamen; oppose legislation detrimental to them.
D. (6) $1,560.
E. (6) $64.75; (7) $98.37; (9) $163.12; (10) $704.32; (11) $867.45.

——

A. Radford Hall, 515 Cooper Building, Denver, Colo.
B. American National Cattlemen's Association, 515 Cooper Building, Denver, Colo.
D. (6) $1,650.
E. (10) $2,180.23.

——

A. E. C. Halbeck, 711 Fourteenth Street NW., Washington, D. C.
B. National Federation of Post Office Clerks, 711 Fourteenth Street NW., Washington, D. C.
C. (2) All legislation pertaining to the postal service and the welfare of postal and Federal employees. (3) Federation News Service Bulletin.
D. (6) $2,395.80.
E. (7) $199.93; (9) $199.93; (10) $729.27; (11) $929.20.

——

A. Harry G. Hamlet, 1616 I Street NW., Washington, D. C.
B. Retired Officers Association Inc., 1616 I Street NW., Washington, D. C.
C. (2) Any and all legislation pertinent to the rights, benefits, privileges and obligations of retired officers, male and female, regular and reserve, and their dependents and survivors, of whatever nature, dealing with personal matters, pay and retirement benefits, and pensions, studying and analyzing bills, preparing statements for presentation to the cognizant committees, and drafting amendments where indicated, appearing before committees of Congress, principally the Committees on Armed Services, the Committees on Veterans' Affairs, and the committees dealing with various privileges, opportunities, and obligations of the personnel involved. (3) The Retired Officer.
D. (6) $750.

——

A. Joseph J. Hammer, 26 Broadway, New York, N. Y.
B. Socony-Vacuum Oil Co., Inc., 26 Broadway, New York, N. Y.
D. (6) $1,417.58.
E. (6) $5.28; (7) $287.30; (9) $292.58; (10) $1,498.66; (11) $1,791.24.

——

A. Murray Hanson, 1625 K Street NW., Washington, D. C.
B. Investment Bankers Association of America, 1625 K Street NW., Washington, D. C., and 33 South Clark Street, Chicago, Ill.
C. (2) Tax and other legislation affecting the securities business.
D. (7) $600.
E. (2) $97.50; (5) $134.16; (6) $34.08; (7) $141.91; (9) $407.65; (10) $1,570.21; (11) $1,977.86; (15) $407.65.

——

A. Ralph W. Hardy, 1771 N Street NW., Washington, D. C.
B. National Association of Radio and Television Broadcasters, 1771 N Street NW., Washington, D. C.
C. (2) Registrant is interested in any legislation—local, State, Federal, or international—which affects the broadcasting industry.[1]

——

A. L. James Harmanson, Jr., 744 Jackson Place NW., Washington, D. C.
B. National Council of Farmer Cooperatives, 744 Jackson Place NW., Washington, D. C.
C. (2) Legislation pertaining to transportation, legal, and tax matters of interest to farmers cooperatives. (3) Washington Situation.
D. (6) $2,274.84.
E. (7) $178.03; (9) $178.03; (10) $257.16; (11) $435.19.

——

A. Harnischfeger Corp., Milwaukee, Wis.
C. (2) General interest in defense production and economic controls, tax increase, and housing legislation.
E. (2) $300; (8) $21.80; (9) $321.80; (10) $3,150; (11) $3,471.80; (15) $321.80, Donald

——

M. Counihan, 1420 New York Avenue NW., Washington, D. C.

---

A. Miss Elsie D. Harper, 600 Lexington Avenue, New York, N. Y.

B. National Board, YWCA, 600 Lexington Avenue, New York, N. Y.

C. (2) Narcotics, settlement of refugees, child-care centers in defense-housing areas, foreign aid, point 4, and UN appropriations.

E. (2) $150; (4) $70; (6) $20; (7) $60; (9) $300; (11) $300.

---

A. Robert E. Harper, 1001 Fifteenth Street NW., Suite 55, Washington, D. C.

B. National Business Publications, Inc., 1001 Fifteenth Street NW., Suite 55, Washington, D. C.

C. (2) That which affects postal rates of periodicals published by members of the above-named association.

D. (6) $4,500.

E. (7) $2.80; (9) $2.80; (10) $72.93; (11) $75.73.

---

A. Winder R. Harris, 441 Washington Building, Washington, D. C.

B. Shipbuilders Council of America, 21 West Street, New York, N. Y.

C. (2) Maritime matters; interested in passage of S. 241, to amend Merchant Marine Act of 1936.

---

A. Merwin K. Hart, Empire State Building, New York, N. Y.

B. National Economic Council, Inc., Empire State Building, New York, N. Y.

C. (2) My legislative interests are in favoring any legislation that tends to support private enterprise and maintain American independence, and to oppose any measures that work contrariwise.

E. (10) $284.63; (11) $284.63.

---

A. Stephen H. Hart, 350 Equitable Building, Denver, Colo.

B. National Live Stock Tax Committee,[1] 515 Cooper Building Denver, Colo.

C. (2) Interested in general livestock tax matters including specifically proposed amendments to the Internal Revenue Code concerning capital gains on sale of breeding livestock and deduction of soil conservation, brush control and other ranching expenditures.

---

A. John E. Hartshorn, 1625 K. Street NW., Washington, D. C.

B. Cummings, Stanley, Truitt & Cross, 1625 K Street NW., Washington, D. C.

C. (2) Legislation involving percentage depletion allowances.

---

A. Paul M. Hawkins, 1625 I Street NW., Washington, D. C.

B. American Retail Federation, 1625 I Street NW., Washington, D. C.

C. (2) Registrant is generally interested in all legislation and legislative proposals affecting the retail industry, including the industry's relations with the Federal Government, with its suppliers, with its employees and with its customers.[1]

D. (6) $3,375.

E. (7) $59.05; (9) $59.05; (10) $259.05; (11) $38.10.

---

A. Kit H. Haynes, 744 Jackson Place NW., Washington, D. C.

B. National Council of Farmer Cooperatives, 744 Jackson Place NW., Washington, D. C.

[1] Not printed. Filed with Clerk and Secretary.

---

C. (2) General agricultural and farmer cooperative legislation. (3) Washington situation.

D. (6) $2,025.

E. (10) $148.86; (11) $148.86.

---

A. Joseph H. Hays, 280 Union Station Building, Chicago, Ill.

B. The Association of Western Railways, 474 Union Station Building, Chicago, Ill.

C. (2) Interested in any and all Federal legislative proposals which may or do affect Western Railroads.

---

A. John C. Hazen, suite 808, Kass Building, 711 Fourteenth Street NW., Washington, D. C.

B. National Retail Drygoods Association, 100 West Thirty-first Street, New York, N. Y.

C. (2) H. R. 1938, all appropriation legislation, all parcel post legislation, H. R. 3622, S. 1309, H. R. 5505, S. 2170, H. R. 5189, H. R. 5767, H. R. 5101. (3) Stores.

E. (6) $17.54; (7) $58.95; (8) $2.50; (9) $78.99; (10) $219.58; (11) $298.57.

---

A. Thomas P. Healy, 1808 Adams Mill Road NW., Washington, D. C.

B. Communications Workers of America, CIO, 1808 Adams Mill Road NW., Washington, D. C.

C. (2) Legislative matters affecting the interests of the membership of this union.

D. (6) $1,533.79.

E. (7) $1,462.52; (7) $68.52; (8) $2.75; (9) $1,533.79; (10) $3,169.36; (11) $4,703.15.

---

A. Felix Hebert, 602 Turks Head Building, Providence, R. I.

B. Associated Factory Mutual Fire Insurance Companies, Turks Head Building, Providence, R. I.

C. (2) Amendment to Internal Revenue Code, Section 207.

E. (7) $232.20; (9) $232.20; (10) $234.66; (11) $466.86.

---

A. K. W. Heberton, room 101, 1405 G Street NW., Washington, D. C.

B. Western Union Telegraph Co., 60 Hudson Street, New York, N. Y.

C. (2) General legislative interests cover any legislative proposals affecting the interests of the telegraph company.

E. (7) $83.35; (9) $83.35; (10) $401.02; (11) $484.37.

---

A. George J. Hecht, 52 Vanderbilt Avenue, New York, N. Y.

B. American Parents' Committee, Inc., 132 Third Street SE., Washington, D. C.

C. (2) National school health services bill, public school construction bill, national child research bill, Federal aid for medical education, local public health units, physically handicapped children's education bill, school lunch appropriation, children's bureau appropriation, cabinet status for the Federal Security Agency, Federal aid to day care centers in defense areas, Federal aid to elementary and secondary schools, emergency maternal and infant care, defense housing and community facilities.

A. Leo J. Heer, 1028 Connecticut Avenue, Suite 822, Washington, D. C.

B. National Retail Furniture Association, 666 Lake Shore Drive, Chicago, Ill.

C. (2) Defense Production Act, seek retention of Herlong amendment; oppose principle of Federal sales tax. (3) National Furniture.

D. (6) $500.

E. (7) $25; (9) $25; (10) $250; (11) $275.

---

A. C. B. Heinemann, 740 Eleventh Street NW., Washington, D. C.

B. Eastern Meat Packers Association, Inc., Hotel Statler, New York, N. Y., and 740 Eleventh Street NW., Washington, D. C.

C. (2) Defense Production Act.

D. (6) $875.01.

E. (7) $164.25; (9) $164.25; (11) $164.25.

---

A. C. B. Heinemann, 740 Eleventh Street NW., Washington, D. C.

B. The National Independent Meat Packers Association, 740 Eleventh Street NW., Washington, D. C.

C. (2) Defense Production Act.

D. (6) $1,644.20.

E. (7) $1,302.71; (9) $1,302.71; (11) $1,302.71.

---

A. Robert B. Heiney, 1133 Twentieth Street NW., Washington, D. C.

B. National Canners Association, 1133 Twentieth Street NW., Washington, D. C.

C. (2) Defense controls and all measures directly affecting the food-canning industry.

D. (6) $2,202.47.

E. (7) $12.40; (9) $12.40; (10) $226.65; (11) $239.05.

---

A. Maurice G. Herndon, 1002 Washington Loan and Trust Building, Washington, D. C.

B. National Association of Insurance Agents, 60 Maiden Lane, New York, N. Y., and 1002 Washington Loan and Trust Building, Washington, D. C.

C. (2) Any legislation which affects either directly or indirectly the interests of local agents. (3) The American Agency Bulletin.

D. (6) $114.23.

E. (7) $114.23; (9) $114.23; (10) $529.55; (11) $643.78.

---

A. Ewart A. Hester, 432 Shoreham Building, Washington, D. C.

B. Law offices of Clinton M. Hester, 432 Shoreham Building, Washington, D. C.

C. (2) Any proposed legislation affecting the brewing industry, wool industry, etc.[1]

D. (6) $2,500.

---

A. Robert C. Hibben, 1105 Barr Building, Washington, D. C.

B. International Association of Ice Cream Manufacturers, 1103 Barr Building, Washington, D. C.

C. (2) Legislation which may affect the ice-cream industry.

---

A. M. F. Hicklin, 507 Bankers Trust Building, Des Moines, Iowa.

B. Iowa Railway Committee,[1] 507 Bankers Trust Building, Des Moines, Iowa.

C. (2) Legislation affecting the railroad industry.

E. (10) $2,567.08; (11) $2,567.08.

---

A. H. C. Hicks, 2201 North Oak Street, Arlington, Va.

B. Association of Petroleum Re-refiners, 2201 North Oak Street, Arlington, Va.

D. (6) $600.

---

A. Ray C. Hinman, 26 Broadway, New York, N. Y.

B. Socony-Vacuum Oil Co., Inc., 26 Broadway, New York, N. Y.

D. (6) $1,427.01.

E. (6) $10.31; (7) $166.70; (9) $177.01; (10) $301.14; (11) $478.15.

[1] Not printed. Filed with Clerk and Secretary.

A. John L. Hoen, 1741 De Sales Street NW., Washington, D. C.

B. American-Hawaiian Steamship Co., 90 Broad Street, New York, N. Y., and Eastern Steamship Lines, Inc., 40 Central Street, Boston, Mass.

C. (2) Any legislation affecting the interest of the American Merchant Marine.

D. (6) $5,000.

---

A. Frank N. Hoffmann, 718 Jackson Place NW., Washington, D. C.

B. United Steelworkers of America, 1500 Commonwealth Building, Pittsburgh, Pa.

C. (2) Support all legislation favorable to the national peace, security, democracy, prosperity and general welfare; oppose all legislation detrimental to these objectives.

D. (6) $1,999.98.

E. (7) $3,800; (9) $3,800; (10) $11,150; (11) $14,950.

---

A. Donald D. Hogate, 1028 Connecticut Avenue, Washington, D. C.

B. Brantford Cordage Co. Ltd., Brantford, Ontario, Canada.

C. (2) Passage of H. R. 1005 to amend the Tariff Act of 1930 to provide for the free importation of baler twine.

D. (6) $2,000.

E. (4) $80.38; (5) $75; (6) $21.39; (7) $70.50; (8) $7.60; (9) $254.87; (10) $823.83; (11) $1,078.70; (15) $66.73, Henry M. Schroen, 820 Albee Building, Washington, D. C., mimeographing; $13.60, Ever-Ready Sterro Service, 1741 K Street NW., Washington, D. C., typing.

---

A. Robert L. Hogg, 230 North Michigan Avenue, Chicago, Ill.

B. American Life Convention, 230 North Michigan Avenue, Chicago, Ill.

C. (2) All prospective legislation which will or may affect the life insurance business.[1]

D. (6) $2,500.

E. (6) $26.19; (7) $366.34; (9) $392.53; (10) $940.33; (11) $1,332.86.

---

A. Charles W. Holman, 1731 I Street NW., Washington, D. C.

B. National Milk Producers Federation, 1731 I Street NW., Washington, D. C.

C. (2) Any legislation that may affect milk producers or the cooperatives through which they act together to process and market their milk.

D. (6) $4,125.

E. (10) $5.90; (11) $5.90.

---

A. J. M. Hood, 2000 Massachusetts Avenue NW., Washington, D. C.

B. American Short Line Railroad Association, 2000 Massachusetts Avenue NW., Washington, D. C.

D. (6) $250.

---

A. Victor Hood, Twelfth and Delaware Streets, Indianapolis, Ind.

B. The Journeymen Barbers, Hairdressers, Cosmetologists, and Proprietors' International Union of America, Twelfth and Delaware Streets, Indianapolis, Ind.

C. (2) The District Barber Act, Veterans Regulation Act, Defense Production Act, S. 573, H. R. 1656, H. R. 3102, H. R. 1668, S. 1717, H. R. 3871.

D. (6) $1,901.56.

E. (7) $521.56; (9) $521.56; (10) $2,363.79; (11) $2,885.35.

---

A. Richard Hooker, 10 Independence Avenue SW., Washington, D. C.

B. Brotherhood Railway Carmen of America, 4929 Main Street, Kansas City, Mo.

---

C. (2) H. R. 3669 and S. 1347, to amend Railroad Retirement Act; House Resolution 426, to study integrating railroad retirement funds with social security; all legislation of interest to railroad employees and labor in general.

D. (6) $100.

---

A. Jesse V. Horton, room 100, Continental Hotel, Washington, D. C.

B. National Association of Postal Supervisors, post-office box 2013, Washington, D. C.

C. (3) All legislation affecting the postal service and its employees, including supervisors. (3) The Postal Supervisor.

D. (6) $2,125.

E. (7) $134.78; (9) $134.78; (10) $319.53; (11) $454.31.

---

A. S. H. Howard, 1414 Evergreen Avenue, Pittsburgh, Pa.

B. Brotherhood of Railroad Signalmen of America, 503 Wellington Avenue, Chicago, Ill.

C. (2) H. R. 3669 and S. 1347, to amend the Railroad Retirement Act, and all legislation directly affecting the interests of railroad employees in particular and labor in general.

D. (6) $600.

---

A. Robert B. House, employed by Cummings, Stanley, Truitt & Cross, 1625 K Street NW., Washington, D. C.

B. New Process Co., Warren, Pa.

C. (2) Legislation and proceedings relating to postal rates.

---

A. Harold K. Howe, Suite C, 2480 Sixteenth Street NW., Washington, D. C.

B. American Institute of Laundering, box 1187, Joliet, Ill.

C. (2) Legislation affecting the laundry industry and the members thereof.

D. (6) $2,649.99.

E. (2) $929; (7) $470.89; (9) $1,399.89; (10) $5,186.49; (11) $6,586.38.

---

A. Robert E. Howe, Jr., 1435 K Street NW., Washington, D. C.

B. United Mine Workers of America, 900 Fifteenth Street NW., Washington, D. C.

C. (2) Any and all legislation construed to be directly or indirectly beneficial or detrimental to the United Mine Workers of America and its members.[1]

D. (6) $3,302.

---

A. Hudson, Creyke & Lipscomb, 400 Washington Building, Washington, D. C.

C. (2) To obtain relief for applicants for leases on submerged lands and for those persons whose activities led the Government to assert title to submerged lands.

D. (6) $2,400.

E. (7) $755.16; (9) $755.16; (10) $4.75; (11) $759.91.

---

A. W. T. Huff, 806 Connecticut Avenue NW., Washington, D. C.

B. Trans World Airlines, Inc., 10 Richards Road, Kansas City, Mo.

C. (2) Legislation generally favorable to economic development of airline operation.

D. (6) $2,201.03.

E. (7) $242.90; (9) $242.90.

---

A. C. A. Hummel, 122 West Washington Avenue, Madison, Wis.

B. Wisconsin Railroad Association, 122 West Washington Avenue, Madison, Wis.

C. (2) All legislation affecting railroads and transportation generally.

D. (6) $348.

---

E. (7) $304.83; (9) $304.83; (10) $559.91; (11) $864.74; (15) $90.86, Carlton Hotel, Washington, D. C., lodging; $54.15, Carlton Hotel, Washington, D. C., lodging; $18.50, The Good Earth, Washington, D. C., meals; $14.75, Mayflower Hotel, Washington, D. C., meals; $20.99, Pennsylvania Railroad Co., pullman space; etc.[1]

---

A. Carroll B. Huntress, 17 Battery Place, New York, N. Y.

B. National St. Lawrence Project Conference, 843 Transportation Building, Washington, D. C.

C. (2) Any legislation with reference to the St. Lawrence waterway and power project; House Joint Resolution 337, opposed.

E. (6) $866.32; (7) $1,276.38; (9) $1,362.70; (10) $3,552.69; (11) $4,915.59.

---

A. George Hurley, 49 Westminster Street, Room 810, Providence, R. I.

B. National Association of Mutual Savings Banks, 60 East Forty-second Street, New York, N. Y.

C. (2) Legislation affecting mutual savings banks which may be before the House Ways and Means Committee or Congress.

D. (6) $3,500.

E. (7) $7.51; (9) $7.51; (10) $1,721.60; (11) $1,729.11.

---

A. William C. Hushing, 901 Massachusetts Avenue NW., Washington, D. C.

B. American Federation of Labor, 901 Massachusetts Avenue NW., Washington, D. C.

C. (2) All bills affecting the welfare of the country generally, and specifically bills affecting workers.

D. (6) $2,730.

E. (2) $2,730; (6) $20.50; (8) $228.50; (9) $2,979; (10) $8,411; (11) $11,390.

---

A. Independent Bankers Association, Sauk Centre, Minn.

E. (11) $41,040.73.

---

A. Independent Natural Gas Association of America, 918 Sixteenth Street NW., suite 501, Washington, D. C.

C. (2) Tax legislation, and any other bills affecting the natural gas industry.

D. (6) $24,340.90.

E. (2) $5,750; (5) $300; (9) $6,050; (10) $31,683.93; (11) $40,733.93; (15) $3,750, John A. Ferguson, 918 Sixteenth Street NW., Washington, D. C., salary; $1,250, W. E. Disney, 918 Sixteenth Street NW., Washington, D. C., salary; $750, Louis E. Whyte, 918 Sixteenth Street NW., Washington, D. C., salary; $300, Herbert Harvey Real Estate, Inc., 912 Seventeenth Street NW., Washington, D. C., rent.

---

A. Indiana State Medical Association, 1021 Hume Mansur Building, Indianapolis, Ind.

C. (2) All bills pending before Congress which would create national health insurance.

E. (11) $7,773.45; (2) $2,800; (4) $2,275; (5) $22.87; (6) $18.32; (7) $462.10; (8) $33.07; (9) $13,384.81; (10) $17,360.02; (11) $30,744.83; (15) $620.60, Betty Palmer, Indianapolis, Ind., salary; $1,883.20, James A. Waggener, Indianapolis, Ind., salary; $168.78, James A. Waggener, Indianapolis, Ind., traveling expenses; $18.32, Indiana Bell Telephone Co., Indianapolis, Ind., tolls; $28.07, Columbia Club, Indianapolis, Ind., luncheon meeting; $296.20, Fletcher Trust Co., Indianapolis, Ind., income tax withheld; etc.[1]

---

[1] Not printed. Filed with Clerk and Secretary.

[1] Not printed. Filed with Clerk and Secretary.

[1] Not printed. Filed with Clerk and Secretary.

A. The Indiana Tax Equality Committee, Inc., Board of Trade Building, Indianapolis, Ind.

C. (2) Bills affecting equality of taxation.

D. (6) $35.

E. (2) $600; (4) $117.72; (6) $7.40; (9) $725.12; (10) $3,695.08; (11) $4,420.20; (15) $600; Maurice C. Gronendyke, salary; $117.72, Indiana State Chamber of Commerce, printed or duplicated matter, including distribution cost.

---

A. William Ingles, 1624 I Street NW., Washington, D. C.

C. (2) Legislation affecting industry.

D. (6) $6,324.50.

E. (2) $600; (5) $797.01; (6) $200.26; (7) $231.60; (8) $360; (9) $2,188.87; (10) $9,301.50; (11) $11,490.37.

---

A. J. Stuart Innerst, 426 North Raymond Avenue, Pasadena, Calif.

B. Friends Committee on National Legislation, 1000 Eleventh Street NW., Washington, D. C.

C. (2) Work in the general field of constructive foreign policy, support of the United Nations; international reduction of armaments; and opposition to the enactment of the Universal Military Training and Universal Military Service Act of 1951.

D. (6) $400.01.

E. (2) $34; (4) $5.24; (5) $13.07; (6) $5.43; (7) $46.76; (9) $104.50; (10) $369.45; (11) $473.95.

---

A. International Association of Machinists, Machinists Building, Washington, D. C.

C. (2) Legislation affecting the socio-economic and political interests of the American workingman including all pending legislation dealing with social security, national health, aid to physically handicapped, labor relations, displaced persons, etc.

D. (6) $1,650.

E. (1) $750; (4) $250; (5) $150; (6) $200; (7) $300; (9) $1,650; (10) $4,950; (11) $6,600.

---

A. International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers, room 311-222, East Michigan Street, Indianapolis, Ind.

C. (2) Federal and State legislation affecting the interest and welfare of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, including its affiliate local unions and members.

E. (2) $3,750; (9) $3,750; (10) $11,250; (11) $15,000; (16) $15,000; Fred A. Tobin, 438 Bowen Building, Washington, D. C., services.

---

A. Inter-State Manufacturers Association, 163-165 Center Street, Winona, Minn.

C. (2) H. R. 2982, S. 1046, H. R. 30, H. R. 525, H. R. 3392, H. R. 3465, Senate Joint Resolution 60, S. 1335, House Joint Resolution 235, S. 1369, H. R. 3298, S. 1186.

D. (6) $3,000.

E. (10) $80.73; (11) $80.73.

---

A. Iowa Associated Businessmen, Inc., 463 Westwood Drive, Ames, Iowa.

C. (2) H. R. 240, H. R. 1177, S. 892, H. R. 4473; favor those calling for real tax equality as it applies to payment of income taxes on annual net profits, savings, earnings, etc.

D. (6) $25.

E. (2) $893.25; (4) $10.40; (5) $26.37; (6) $109.60; (7) $92.69; (8) $77.37; (9) $1,209.68; (10) $7,981.99; (11) $9,191.67.

---

A. Seward H. Jacobi, 119 Monona Avenue, Madison, Wis.

B. Wisconsin State Chamber of Commerce, 119 Monona Avenue, Madison, Wis.

---

C. (2) Legislation affecting business and industry.

D. (6) $2,750.

---

A. C. Clinton James, 900 F Street NW., Washington, D. C.

B. District of Columbia Building and Loan League, No. 1 Thomas Circle, Washington, D. C.

C. (2) Federal legislation affecting savings and loan business.

D. (6) $300.

E. (5) $125; (9) $125; (10) $485; (11) $610.

---

A. Japanese American Citizens League Anti-Discrimination Committee, Inc., 406 Beason Building, Salt Lake City, Utah.

C. (2) To promote the welfare of persons of Japanese ancestry in the United States.[1]

E. (1) $37.50; (2) $900; (3) $428.30; (4) $44.20; (5) $294.16; (6) $49.32; (7) $41.45; (8) $8.41; (9) $1,803.34;[1] (10) $4,558.45; (11) $6,361.79.

---

A. Robert G. Jeter, Dresden, Tenn.

B. H. C. Spinks Clay Co., Paris, Tenn.; Bell Clay Co., Gleason, Tenn.; United Clay Mines Corp., Trenton, N. J.; Old Hickory Clay Co., Paducah, Ky.; Kentucky-Tennessee Clay Co., Cooley Clay Co., and Kentucky Clay Mining Co., Mayfield, Ky.

C. (2) We are interested in retaining our present percentage depletion allowance for ball and sagger clays as shown in title 26, section 114, Internal Revenue Code, as now shown in House bill H. R. 4473.

D. (6) $4,608.73.

E. (6) $17.19; (7) $578.18; (8) $13.36; (9) $608.73; (10) $672.84; (11) $1,281.57.

---

A. Peter Dierks Joers, Mountain Pine, Ark.

B. Dierks Lumber & Coal Co., 1006 Grand Avenue, Kansas City, Mo.

C. (2) Flood Control Act of 1945, Millwood Dam; legislation affecting lumber industry.

---

A. Johns-Manville Corp., 22 East Fortieth Street, New York, N. Y.

C. (2) Tax legislation, labor legislation, amendments to the Clayton Act, merchant marine legislation, price basing-point legislation, Defense Production Act.

E. (2) $1,250; (8) $771.01; (9) $2,021.01; (10) $5,342.55; (11) $7,363.56.

---

A. Elmer Johnson, 1246 Twentieth Street NW., Washington, D. C.

B. National Association of Retired Civil Employees, 1246 Twentieth Street NW., Washington, D. C.

C. (2) Legislation affecting retired civil employees, S. 995, S. 500, and H. R. 2732.

(3) The Annuitant.

D. (6) $250.

E. (2) $250; (9) $250; (10) $999.70; (11) $1,249.70.

---

A. Vernon A. Johnson, 1000 Vermont Avenue NW., Washington, D. C.

B. Lockheed Aircraft Corp., Burbank, Calif.

C. (2) All legislation affecting aviation.

D. (6) $3,510.

E. (7) $1,250.32; (9) $1,250.32; (10) $2,757.96; (11) $4,008.28.

---

A. W. D. Johnson, 10 Independence Avenue SW., Washington, D. C.

B. Order of Railway Conductors, O. R. C. Building, Cedar Rapids, Iowa.

C. (2) H. R. 1998, to amend section 25 of the Interstate Commerce Act, St. Lawrence

[1] Not printed. Filed with Clerk and Secretary.

---

seaway, and all legislation directly and indirectly affecting the interests of labor, generally and employees of carriers under the Railway Labor Act, in particular.

---

A. Bascom F. Johns, 930 Broadway, Nashville, Tenn.

B. Class I railroads operating in Tennessee.

C. (2) Legislation affecting railroads operating in Tennessee.

---

A. O. C. Jones, post-office box 24, North, S. C.

B. The Order of Railroad Telegraphers, 3860 Lindell Boulevard, St. Louis, Mo.

C. (2) H. R. 3669 and S. 1347, to amend the Railroad Retirement Act.

D. (6) $54.97.

---

A. J. M. Jones, 414 Pacific National Life Building, Salt Lake City, Utah.

B. National Wool Growers Association, 414 Pacific National Life Building, Salt Lake City, Utah.

C. (3) National Wool Grower.

D. (7) $2,499.99.

E. (10) $4,087.63; (11) $4,087.63.

---

A. L. Dan Jones, 1110 Ring Building, Washington, D. C.

B. Independent Petroleum Association of America, 1110 Ring Building, Washington, D. C.

C. (2) Legislation that might affect the petroleum industry.

E. (8) $11; (9) $11; (10) $51; (11) $62.

---

A. Rowland Jones, Jr., 1625 I Street NW., Washington, D. C.

B. American Retail Federation, 1625 I Street NW., Washington, D. C.

C. (2) Registrant is generally interested in all legislation and legislative proposals affecting the retail industry, including the industry's relations with the Federal Government, with its suppliers, with its employees, and with its customers.[1]

D. (6) $3,000.

E. (7) $273.26; (8) $273.26; (9) $850.91; (10) $1,124.17; (11) $1,124.17.

---

A. The Journeymen Barbers, Hairdressers, Cosmetologists, and Proprietors' International Union of America, Twelfth and Delaware, Indianapolis, Ind.

C. (2) The District of Columbia Barber Act, Veterans' Regulation Act, Defense Production Act of 1950, S. 573, H. R. 1656, H. R. 3102, H. R. 1668, S. 1717, H. R. 3871.

E. (1) $1,901.56; (9) $1,901.56; (10) $6,273.79; (11) $8,175.35.

---

A. H. B. Judd, 10 Independence Avenue SW., Washington, D. C.

B. Brotherhood of Maintenance of Way Employees, 12050 Woodward Avenue, Detroit, Mich.

C. (2) H. R. 3660 and S. 1347, to amend Railroad Retirement Act, and House Resolution 426, for integration of railroad retirement funds with social security.

D. (6) $285.01.

---

A. John E. Kane, 1625 K Street NW., Washington, D. C.

B. American Petroleum Institute, 50 West Fiftieth Street, New York, N. Y.

C. (2) Legislation affecting the petroleum industry and its customers.

D. (6) $2,100.

E. (7) $735.65; (9) $735.65; (10) $1,789.25; (11) $2,524.90.

[1] Not printed. Filed with Clerk and Secretary.

A. John E. Kane, 1625 K Street NW., Washington, D. C.

B. District of Columbia Petroleum Industries Committee, 1625 K Street NW., Washington, D. C.

C. (2) Legislation affecting the sale or distribution of petroleum products in the District of Columbia.

D. (6) $300..

E. (7) $183.60; (9) $183.60; (10) $708.75; (11) $892.35.

---

A. Kansas Independent Business Men's Association, 205 Orpheum Building, Wichita, Kans.

C. (2) Tax equality and other legislation affecting independent business.

E. (5) $154.21; (9) $154.21; (10) $596.74; (11) $750.95.

---

A. Jerome J. Keating, 1525 H Street NW., Washington, D. C.

B. National Association of Letter Carriers, 1525 H Street NW., Washington, D. C.

C. (2) All legislation pertaining to postal and Federal employees.

D. (6) $1,374.

---

A. Thomas J. Keefe, 1319 F Street NW., Washington, D. C.

B. American Road Builders' Association, 1319 F Street NW., Washington, D. C.

C.(2) Legislation affecting the road-building industry.

D. (6) $2,750.

E. (6) $48.50; (7) $1,162.80; (8) $136.89; (9) $1,348.19; (10) $4,362.46; (11) $5,710.65.

---

A. Thomas B. Keehn, 1751 N Street NW., Washington, D. C.

B. Council for Social Action, Congregational Christian Churches, 289 Fourth Avenue, New York, N. Y.

C. (2) Generally interested in welfare, international, civil liberties, and economic legislation where ethical principles of interest to the church are involved. (3) Advance.

D. (6) $700.

E. (7) $300; (9) $300; (10) $900; (11) $1,200.

---

A. Francis V. Keesling, Jr., 315 Montgomery Street, San Francisco, Calif.

C. (2) Legislation of interest to the city and county of San Francisco, including civil functions appropriation, civil defense, payment in lieu of taxes, airports and aviation, merchant marine development, national defense appropriations, housing and urban development, transbay bridge, taxation and Government controls.

D. (6) $3,000.

E. (5) $1,015; (6) $429.57; (7) $1,501.56; (8) $199.25; (9) $3,145.38; (10) $6,724.63; (11) $9,870.01.

---

A. Isaiah L. Kenen, 342 Madison Avenue, New York, N. Y.

B. American Zionist Council, 342 Madison Avenue, New York, N. Y.

C. (2) Legislation for financial aid to Israel. (3).[1]

D. (6) $1,050.

E. (2) $640; (4) $128.50; (5) $250; (6) $165.34; (7) $655.65; (8) $156.70; (9) $1,996.-19; (10) $23,607.63; (11) $25,603.82; (15) $195.89, Du Pont Plaza Hotel, Washington, D. C., hotel bills; $31.74, Hotel Congressional, Washington, D. C., hospitality; $93.89, New York Telephone Co., New York City, N. Y., phone bill; $88.50, Schulte Press, 119 West Twenty-third Street, New York City, N. Y., printing; $400, Ruth Ludwin, 1202 Hudson Street, Hoboken, N. J., salary; $240, Rae Blitzstein, 811 Ninth Avenue, New York City, N. Y., salary.

[1] Not printed. Filed with Clerk and Secretary.

---

A. Harold L. Kennedy, 203 Commonwealth Building, Washington, D. C.

B. The Ohio Oil Co., Findlay, Ohio.

C. (2) Generally interested in all legislative matters that would affect the oil and gas industry.

E. (6) $25; (7) $10; (8) $25; (9) $60; (10) $947.50; (11) $1,007.50.

---

A. Miles D. Kennedy, 1608 K Street NW., Washington, D. C.

B. The American Legion, 700 North Pennsylvania Street, Indianapolis, Ind.

C. (2) The American Legion and all veterans of World War I and World War II and their dependents on all matters affecting their care, rehabilitation, hospitalization, reeducation and housing; all matters affecting the general welfare of our country with regard to national defense; Americanism, included in which is opposition to all subversive activities, with particular attention to our immigration and naturalization laws; child welfare, not only for children of veterans but for all children; aid and assistance to veterans in agriculture development; matters, dealing with our foreign policy and foreign relations; the development of sound civil aviation programs and policies, and the development of sound and progressive programs for the employment and reemployment of veterans in civilian pursuits and in Civil Service; legislation which would eliminate all improper discriminations and be of benefit to the men and women who are still in our armed services, etc. (3) The American Legion magazine.

D. (6) $3,000.

E. (2) $1.25; (4) $4.75; (5) $1.13; (7) $814.87; (8) $7.90; (9) $829.90; (10) $520.22; (11) $1,350.12.

---

A. Ronald M. Ketcham, 1757 K Street NW., Washington, D. C.

B. Los Angeles Chamber of Commerce, 1151 South Broadway, Los Angeles, Calif.

D. (6) $2,550.

E. (2) $2,550; (9) $2,550; (10) $7,650; (11) $10,200.

---

A. Omar B. Ketchum, Wire Building, 1000 Vermont Avenue NW., Washington, D. C.

B. Veterans of Foreign Wars of the United States.

C. (2) Legislation affecting all veterans and their dependents in relation to employment, hospitalization, rehabilitation, pensions, disability compensation and housing; welfare of servicemen of the Armed Forces and their dependents; matters relating to the national security, immigration and naturalization, the combating of subversive activities; and the furtherance of a sound foreign policy; other matters included in the resolutions adopted by the National Encampment and the National Council of Administration. (3) VFW Foreign Service and VFW Legislative Newsletter.

D. (6) $3,000.

E. (7) $105.50; (9) $105.50; (10) $276; (11) $381.50.

---

A. H. Cecil Kilpatrick, 912 American Security Building, Washington, D. C.

B. Eangamo Electric Co., Springfield, Ill.

C. (2) Employed to seek adoption of amendments to Excess Profits Tax Act of 1950; H. R. 9827, Eighty-first Congress, second session; Public Law 909.

---

A. Willford I. King, room 300, 205 East Forty-second Street, New York, N. Y.

B. Committee for Constitutional Government, Inc., 205 East Forty-second Street, New York, N. Y.

C. (2) Favor all constitutional legislation according with sound economic principles.

D. (6) $3,075.

---

A. Clifton Kirkpatrick, 162 Madison Avenue, Memphis, Tenn.

B. National Cotton Council of America, P. O. Box 18, Memphis, Tenn.

C. (2) The National Cotton Council of America favors such action on any legislation affecting raw-cotton industry as will promote the purposes for which the Council is organized.

D. (6) $150.

E. (7) $27.73; (9) $27.73; (10) $112.64; (11) $140.37.

---

A. C. W. Kitchen, 777 Fourteenth Street NW., Washington, D. C.

B. United Fresh Fruit and Vegetable Association, 777 Fourteenth Street NW., Washington, D. C.

C. (2) Interested in any legislation affecting the marketing and distribution of fresh fruits and vegetables, directly or indirectly.

---

A. W. H. Kittrell, Empire Bank Building, Dallas, Tex.

B. Melben Oil Co., Benedum-Trees Building, Pittsburgh, Pa.

C. (2) Legislation affecting oil industry, especially tidelands.

D. (6) $3,000.

E. (6) $601.63; (7) $409.17; (9) $1,010.80; (10) $11,462.70; (11) $12,473.50; (15) $101.10, Mayflower Hotel, Washington, D. C., lodging and related expenditures; $168.48, American Airlines, fare to and from Washington, D. C.; $24.59; Harvey's Restaurant, Washington, D. C., restaurant expenses; $576.23, Southwest Bell Telephone, Dallas, Tex., long-distance calls; $25.40, Western Union, Dallas, Tex., business wires; etc.[1]

---

A. Robert F. Klepinger, 1720 M Street NW., Washington, D. C.

B. Jewelers Vigilance Committee, Inc., 45 West Forty-fifth Street, New York, N. Y.

C. (2) Excise taxes, H. R. 4473.

D. (6) $250.

E. (10) $1.38; (11) $1.38.

---

A. Allan B. Kline, 221 North La Salle Street, Chicago, Ill., and 261 Constitution Avenue NW., Washington, D. C.

B. American Farm Bureau Federation, 221 North La Salle Street, Chicago, Ill.

C. (2) The legislative interests cover only the legislative matters in which American Farm Bureau Federation is interested, primarily matters affecting directly American agriculture. (3) The Nation's Agriculture and Official News Letter.

D. (6) $5,000.

---

A. A Joint Venture Agreement, care of Charles Klint, post-office box 1562, Fresno, Calif.

C. (2) To obtain relief for applicants for leases on submerged lands and for those persons whose activities led the Government to assert title to submerged lands.

D. (6) $1,500.

E. (2) $1,200; (9) $1,200; (10) $8,202.30; (11) $9,402.30.

---

A. J. Daun Knisely, 350 Kenwood Avenue, Delmar, N. Y.

B. Brotherhood of Railway and Steamship Clerks, 1015 Vine Street, Cincinnati, Ohio.

C. (2) Railroad Retirement Act amendments, S. 1347 and H. R. 3669; changes in parcel-post packaging, S. 1335 and H. R. 3465.

D. (6) $380.

---

A. Oscar R. Kreutz, 907 Ring Building, Eighteenth and M Streets NW., Washington, D. C.

B. National Savings and Loan League, 907 Ring Building, Eighteenth and M Streets NW., Washington, D. C.

[1] Not printed. Filed with Clerk and Secretary.

C. (2) Support of bills to improve facilities of savings and loan associations for encouragement of thrift and home financing; oppose legislation inimicable to interests of savings and loan industry.
D. (6) $2,000.

———

A. Herman C. Kruse, 245 Market Street, San Francisco, Calif.
B. Pacific Gas & Electric Co., 245 Market Street, San Francisco, Calif.
C. (2) Legislation affecting water and power projects, flood control, and reclamation.
D. (6) $3,492.
E. (10) $7,358.66; (11) $7,358.66.

———

A. Lake Carriers Association, 305 Rockefeller Building, Cleveland, Ohio.
C. (2) Legislation pertaining to Great Lakes maritime industry.
E. (2) $991.12; (7) $46; (9) $1,037.12.

———

A. Alfons Landa, 1000 Vermont Avenue NW., Washington, D. C.
B. Amana Refrigeration, Inc., Amana, Iowa.

———

A. Alfons Landa, 1000 Vermont Avenue NW., Washington, D. C.
B. Director of Trucking Industry National Defense Committee, Inc.

———

A. Fritz G. Lanham, 2737 Devonshire Place NW., Washington, D. C.
B. American Fair Trade Council, 11 East Forty-fourth Street, New York, N. Y.
D. (6) $1,000.

———

A. Fritz G. Lanham, 2737 Devonshire Place NW., Washington, D. C.
B. National Patent Council, Inc., 1434 West Eleventh Avenue, Gary, Ind.
D. (6) $1,500.

———

A. Fritz G. Lanham, 2737 Devonshire Place NW., Washington, D. C.
B. State Tax Association, post-office box 2259, Houston, Tex.
C. (2) Study of State and Federal tax legislation to bring about constructive cooperation between community property and common-law States for the development of a plan of tax equalization which will afford an equitable basis for income, estate, and gift taxation in the State and Federal tax structure; to support complete retroactive repeal of the 1942 estate and gift tax amendments as they apply to community property States in an unfair, discriminatory, inequitable manner; to support the elimination of Federal estate taxes and restore estate taxation to the several States.
D. (6) $2,500.

———

A. Fritz G. Lanham, 2737 Devonshire Place NW., Washington, D. C.
B. Trinity Improvement Association, Inc., 1308 Commercial Standard Building, Fort Worth, Tex.
D. (6) $900.

———

A. LaRoe, Brown & Winn, 743 Investment Building, Washington, D. C.
B. Eastern Meat Packers Association, Statler Hotel, New York, N. Y.
C. (2) S. 2170 and S. 2180, Defense Production Act of 1950 amendments.
D. (6) $1,500.
E. (5) $2,889.61; (7) $106.16; (9) $2,995.77; (10) $6,636.35; (11) $9,632.12.

———

A. LaRoe, Brown & Winn, 743 Investment Building, Washington, D. C.
B. The National Independent Meat Packers Association, 740 Eleventh Street NW., Washington, D. C.

C. (2) S. 2170 and S. 2180, Defense Production Act of 1950 amendments.
D. (6) $4,500.
E. (5) $2,889.61; (6) $125.32; (7) $837.60; (9) $3,852.53; (10) $7,512.90; (11) $11,-365.43.

———

A. William V. Lavelle, 718 Jackson Place NW., Washington, D. C.
B. Congress of Industrial Organizations, 718 Jackson Place NW., Washington, D. C.
C. (2) Support all legislation favorable to the national peace, security, democracy, prosperity and general welfare, oppose legislation detrimental to these objectives.
D. (6) $1,750.
E. (7) $1,664; (9) $1,664; (10) $4,910; (11) $6,574.

———

A. John V. Lawrence, 1424 Sixteenth Street NW., Washington, D. C.
B. American Trucking Associations, Inc., 1424 Sixteenth Street NW., Washington, D. C.
D. (6) $6,333.32.
E. (7) $5.10; (9) $5.10; (10) $32.25; (11) $37.35.

———

A. Joseph S. Lawrence, M. D., 1523 L Street NW., Washington, D. C.
B. American Medical Association, 535 North Dearborn Street, Chicago, Ill.
C. (2) All bills (House and Senate) relating to health and medicine.
D. (6) $9,878.53.
E. (7) $1,414.03; (9) $1,414.03; (10) $1,-315.04; (11) $2,729.07.

———

A. John G. Laylin, 701 Union Trust Building, Washington, D. C.
B. Kennecott Copper Corp., 120 Broadway, New York, N. Y.
C. (2) The general legislative interests are resolutions, bills, and statutes relating to mining, smelting, and refining, and to foreign or international investment, trade or commerce.
D. (6) $6,250.
E. (10) $541.80; (11) $341.80.

———

A. A. Alvis Layne, Jr., of the firm of Posner, Berge, Fox & Arent, 1002 Ring Building, Washington, D. C.
B. Associated Third Class Mail Users, Inc., 1406 G Street NW., Washington, D. C.
C. (2) Any legislation affecting third-class postal rates.
D. (6) $1,000.
E. (6) 83 cents; (7) $215.76; (9) $216.59; (10) $533.96; (11) $750.55.

———

A. Clarence F. Lea, 842 Wyatt Building, Washington, D. C.
B. Transportation Association of America, 130 North Wells Street, Chicago, Ill.
C. (2) I am interested in all legislation having anything to do with transportation, including pending bills before the House and Senate.
D. (6) $1,697.94.
E. (7) $197.94; (10) $454.38; (11) $652.32.

———

A. League of Women Voters of the United States, 1026 Seventeenth Street NW., Washington, D. C.
C. (3) The National Voter, significant roll calls, memo.
D. (6) $1,015.15.
E. (2) $412.50; (4) $804.40; (6) $9.52; (9) $1,226.42; (10) $2,415.49; (11) $3,641.91.

———

A. Ivy Lee and T. J. Ross, 405 Lexington Avenue, New York, N. Y.
B. United States Cuban Sugar Council, 30 Pine Street, New York, N. Y.

C. (2) Legislation affecting the importation by the United States of sugar produced in Cuba. (3).[1]
D. (6) $7,669.42.
E. (4) $1,264.49; (6) $24.21; (8) $230.72; (9) $1,519.42; [1] (10) $5,521.21; (11) $7,040.63.

———

A. James R. Lee, 604 Albee Building, 1426 G Street NW., Washington, D. C.
B. Gas Appliance Manufacturers Association, Inc., 60 East Forty-second Street, New York, N. Y.
C. (2) In general, legislation which concerns or affects members of the Gas Appliance Manufacturers Association.

———

A. Legislative Committee of the Office Equipment Manufacturers Institute, 1903 N Street NW., Washington, D. C.
C. (2) Legislation affecting the Federal excise tax on business and store machines imposed by section 3406 (a) (6) of the Internal Revenue Code.
E. (10) $3,000; (11) $3,000.

———

A. Legislation-Federal Relations Division of the National Education Association of the United States (J. L. McCaskill, director), 1201 Sixteenth Street NW., Washington, D. C.
C. (2) Bills pending before the Eighty-second Congress relating to public education. (3) Legislative News.
E. (2) $1,558.36; (4) $562.77; (7) $42.10; (9) $2,163.23; (10) $19,423.85; (1) $21,-587.08; (15) $362.77, National Education Association, 1201 Sixteenth Street NW., Washington, D. C.; $218.13, J. L. McCaskill; $1,-340.83, Ernest Giddings.

———

A. Joseph F. Leopold, 936 National City Building, Dallas, Tex.
B. National Tax Equality Association, 231 South La Salle Street, Chicago, Ill.
C. (2) Legislation relating to corporate income taxation; specifically interested in those provisions of the Revenue Act of 1951 which dealt with the taxation of cooperative corporations, savings and loan associations, and other tax-exempt commercial corporations.
D. (6) $1,500.
E. (7) $441.52; (8) $176.63; (9) $618.15; (10) $1,788.55; (11) $2,406.70.

———

A. Wilbur R. Lester, 701 Union Trust Building, Washington, D. C.
B. Kennecott Copper Corp., 120 Broadway, New York, N. Y.
C. (2) The general legislative interests are resolutions, bills, and statutes relating to mining, smelting, and refining, and to foreign or international investment, trade, or commerce.
D. (6) $6,250.
E. (10) $7.74; (11) $7.74.

———

A. Arnold Levy, 829 Washington Building, Washington, D. C.
B. Anthracite Institute, Wilkes-Barre, Pa.
C. (2) All legislation affecting the anthracite industry.
D. (6) $4,635.84.
E. (6) $20.64; (7) $89.32; (8) $25.88; (9) $135.84; (10) $560.67; (11) $696.51.

———

A. George J. Lewis, Union Station Building, Lexington, Ky.
B. Kentucky Railroad Association, Union Station Building, Lexington, Ky.
C. (2) Legislation affecting the railroad industry.
E. (10) $824.75; (11) $824.75.

———

[1] Not printed. Filed with Clerk and Secretary.

A. Frederick J. Libby, 1013 Eighteenth Street NW., Washington, D. C.

B. National Council for Prevention of War, 1013 Eighteenth Street NW., Washington, D. C.

C. (2) Bills affecting world peace, such as appropriations and supplementary appropriations, particularly where they bear on military matters or on the government of occupied areas, manpower legislation, including military training and services, proposed peace treaties with Japan and Germany, economic assistance (point 4), universal disarmament, expellees and displaced persons, educational exchange, etc.

D. (6) $1,440.31.

E. (7) $215.28; (9) $215.28; (10) $553.42; (11) $768.70.

———

A. Life Insurance Association of America, 428 Madison Avenue, New York, N. Y., and 1000 Vermont Avenue, Washington, D. C.

C. (2) Legislation which might affect the welfare of policyholders and annuitants.[1]

D. (6) $3,793.05.

E. (2) $2,541.39; (5) $1,030.21; (6) $121.10; (7) $100.35; (9) $3,793.05; (10) $19,242.21; (11) $23,035.26.

———

A. Life Insurance Policyholders Protective Association, 116 Nassau Street, New York, N. Y.

C. (2) General education concerning the effect of inflation on the purchasing power of life insurance, as it relates to Federal policies or measures deemed to be inflationary in character.

D. (6) $14,024.64.

E. (2) $2,676.20; (4) $3,089.17; (5) $835.23; (6) $293.85; (7) $3,856.98; (8) $151.50; (9) $10,902.93; (10) $15,710.45; (11) $26,613.38; (15) $200, 116 Realty Corp., 116 Nassau Street, New York, N. Y., office rent; $63.33, New York Telephone Co., 195 Broadway, New York, N. Y., telephone; $19.18, Goldsmith Bros., 77 Nassau St., New York, N. Y., office supplies; $11.55, Massachusetts Bonding & Insurance Co., 10 Post Office Square, Boston, Mass., disability insurance; $19.92, Pacific Telephone & Telegraph Co., San Mateo, Calif., telephone; etc.[1]

———

A. Walter J. Little, 510 West Sixth Street, Los Angeles, Calif.

B. Major steam railroads of California.[1]

C. (2) H. R. 337, H. R. 3669, St. Lawrence Seaway, Railroad Retirement Act.

D. (6) $2,150.94.

E. (6) $8.60; (7) $1,547.53; (9) $1,556.43; (10) $2,823.53; (11) $4,379.96; (15) $86, Old New Orleans, Washington, D. C., dinner; $36.40, Congressional Hotel, Washington, D. C., lunch; $20,338, United Air Lines, Washington, D. C., transportation; $1,119.42, Carlton Hotel, Washington, D. C., meals, lodging, telephone, etc.

———

A. L. Blaine Liljenquist, 917 Fifteenth Street NW., Washington, D. C.

B. E. F. Forbes, president and general manager, Western States Meat Packers Association, Inc., 604 Mission Street, San Francisco, Calif.

C. (2) Support or oppose legislation affecting the livestock and meat industry.

D. (6) $2,675.04.

E. (10) $265.79; (11) $265.79.

———

A. John W. Lindsey, 1625 K Street NW., Washington, D. C.

B. National Association of Securities Dealers, Inc., 1625 K Street NW., Washington, D. C.

———

A. Robert G. Litschert, 1200 Eighteenth Street NW., Washington, D. C.

B. National Association of Electric Companies, 1200 Eighteenth Street NW., Washington, D. C.

C. (2) All Federal legislation that might affect its members as going electric utilities.[1]

D. (6) $2,749.88.

E. (6) $32.40; (7) $847.04; (8) $137.70; (9) $1,017.14; (10) $1,769.74; (11) $2,786.88; (15) $63.24, Mayfair Hotel, St. Louis, Mo., room; $225.15, Baltimore & Ohio Railroad Co., fare; $38.20, Pan and Bill's, Washington, D. C., luncheon.

———

A. Norman M. Littell, 1422 F Street NW., Washington, D. C.

B. 46 Bands of Mission Indians of California.[1]

C. (2) All legislation pertaining to the above-named Bands of Mission Indians of California.

———

A. Norman M. Littell, 1422 F Street NW., Washington, D. C.

B. The Navajo Tribe of Indians residing in Arizona, Utah, New Mexico, and Colorado; address of superintendent, Window Rock, Ariz.

C. (2) All legislation pertaining to the Navajos.

D. (6) $1,875.

E. (10) $15.87; (11) $15.87.

———

A. John M. Littlepage, 840 Investment Building, Fifteenth and K Streets NW., Washington, D. C.

B. The American Tobacco Co., Inc., 111 Fifth Avenue, New York, N. Y.

C. (2) Any legislation affecting a company engaged in the manufacture and sale of tobacco products, specifically H. R. 4473.

———

A. Gordon C. Locke, 643 Munsey Building, Washington, D. C.

B. Committee for Pipe Line Companies, Box 1107, Shreveport, La.

C. (2) My general legislative interests are those of the Committee for Pipe Line Companies, which was organized to represent and act for a group of interstate petroleum pipe line companies, which are subject to the Interstate Commerce Act; such representation naturally includes services in support of legislation favorable to the pipe line industry and activities against any proposed legislation we think harmful to the industry.

D. (6) $4,500.

———

A. F. S. Lodge, 616 Investment Building, Washington, D. C.

B. The National Fertilizer Association, Inc., 616 Investment Building, Washington, D. C.

C. (2) Any legislation that might affect the manufacture or distribution of fertilizer or the general agricultural economy.[1]

D. (6) $25.

———

A. Lord, Day & Lord, 25 Broadway, New York, N. Y., and 1216 Tower Building, Washington, D. C.

B. Agency of Canadian Car and Foundry Co., Ltd., 30 Broadway, New York, N. Y.

C. (2) Legislation having relation to World War I claims.

———

A. Mrs. Frances B. Lucas, 1776 D Street NW., Washington, D. C.

B. National Defense Committee, National Society, Daughters of the American Revolution, 1776 D Street NW., Washington, D. C.

C. (2) In general, all legislation concerning defense and freedom; all bills concerning

———

[1] Not printed. Filed with Clerk and Secretary.

world government, such as S. 56, S. 57, and S. 66; and all bills relating to socialized medicine. (3) Press Digest and D. A. R. Magazine.

E. (7) $13; (9) $13; (10) $19.40; (11) $32.40; (15) $13.

———

A. James C. Lucas, 1625 I Street NW., Washington, D. C.

B. American Retail Federation, 1625 I Street NW., Washington, D. C.

C. (2) Registrant is generally interested in all legislation and legislative proposals affecting the retail industry, including the industry's relations with the Federal Government, with its suppliers, with its employees, and with its customers.[1]

D. (6) $750.

———

A. Lucas & Thomas, 605 Southern Building, Washington, D. C., a partnership of which the partners are Scott W. Lucas and Charles A. Thomas.

B. Acacia Mutual Life Insurance Co., Washington, D. C.

C. (2) Interested in aiding the company as consultant council in connection with Federal tax matters affecting life insurance companies.

D. (6) $1,250.

E. (7) $5.50; (8) $2.50; (10) $8; (11) $8.

———

A. Lucas & Thomas, 605 Southern Building, Washington, D. C., a partnership of which the partners are Scott W. Lucas and Charles A. Thomas.

B. American Finance Conference, Suite 1200, 176 West Adams Street, Chicago, Ill.

C. (2) Legislation which may deal with credit controls.

D. (6) $1,250.

E. (4) $433.35; (6) $66.31; (7) $19.35; (8) $3.75; (10) $522.76; (11) $522.76; (15) $118.35, Batt, Bates & Co., Inc., 1407 K Street NW., Washington, D. C., mimeographing; $14, Treasurer of the United States, Washington, D. C., for transcript of testimony; $114, Columbia Reporting Co., 631 Pennsylvania Avenue NW., Washington, D. C., for transcript of testimony; $187, Sybil A. Sills, 1805 H Street NW., Washington, D. C., for transcript of testimony.

———

A. Lucas & Thomas, 605 Southern Building, Washington, D. C.

B. Brunswick-Balke-Collender Co., 623 South Wabash Avenue, Chicago, Ill., Billiard and Bowling Institute of America, 257 Fourth Avenue, New York, N. Y., Bowling Proprietors Association of America, 6626 Gratiot Avenue, Detroit, Mich.

D. (6) $1,250.

E. (6) $8.35; (8) $2.50; (10) $10.85; (11) $10.85.

———

A. Lucas & Thomas, 605 Southern Building, Washington, D. C.

B. Trailer Coach Manufacturers Association, 20 North Wacker Drive, Chicago, Ill.

C. (1) Legislative interests will probably continue throughout Eighty-second Congress. (2) General legislative interest in tax bills and other measures intended to classify trailer coaches as homes.

D. (6) $1,250.

E. (6) $13.68; (7) $4.50; (8) $2.50; (10) $20.68; (11) $20.68.

———

A. Lucas & Thomas, 605 Southern Building, Washington, D. C.

B. Radar-Radio Industries of Chicago, Inc., 77 West Washington Street, Chicago, Ill.

D. (6) $1,250.

E. (6) $13.88; (8) $1.25; (10) $15.13; (11) $15.13.

———

[1] Not printed. Filed with Clerk and Secretary.

A. Dr. Carl E. Lunn, 2315 East Yale Street, Phoenix, Ariz.

B. Townsend Plan, Inc., 6875 Broadway, Cleveland, Ohio.

C. (1) Until Townsend plan, as per H. R. 2679, is adopted.

D. (6) $163.49.

E. (5) $1; (6) $3.34; (7) $28.60; (9) $32.90; (11) $32.90.

———

A. A. L. Lynn, Huntington, W. Va.

C. (1) Of a continuing nature. (2) Legislation affecting the coal industry, such as taxes, transportation, Government controls, Government expenditures, etc.

D. (7) $5,500.

———

A. A. E. Lyon, Railway Labor Executives Association, 10 Independence Avenue SW., Washington, D. C.

C. (1) Indefinitely. (2) Any legislation affecting labor, especially railway labor. All bills affecting Railroad Retirement and Unemployment Insurance Act.

D. (6) $600.

———

A. Avery McBee, 610 Shoreham Building, Washington, D. C.

B. Hill & Knowlton, Inc.

C. (1) Indefinite. (2) Am generally interested in legislation affecting aviation, the steel industry, and other industries which may be clients of Hill & Knowlton.

———

A. Edward A. McCabe, 777 Fourteenth Street NW., Washington, D. C.

B. American Hotel Association, 221 West Fifty-seventh Street, New York, N. Y.

C. (1) Indefinitely. (2) Any and all bills and statutes of interest to the hotel industry.

D. (6) $2,250.

E. (7) $336.65; (9) $336.65; (10) $425.44; (11) $762.09.

———

A. J. L. McCaskill, 1201 Sixteenth Street NW., Washington, D. C.

B. Division of legislation and Federal relations of the Nation Education Association of the United States, 1201 Sixteenth Street NW., Washington, D. C.

C. (1) Indefinite. (2) Bills pending before the Congress relating to public education.

D. (6) $218.13.

———

A. Frank J. McCarthy, 211 Southern Building, Fifteenth and H Streets NW., Washington, D. C.

B. The Pennsylvania Railroad Co., 1740 Broad Street Station Building, Philadelphia, Pa.

C. (1) Indefinitely. (2) Any legislation affecting the interest of the Pennsylvania Railroad Co., including: S. 1657, H. R. 189, separation air-mail subsidies; H. R. 1998, railroad communications and operating rules; H. R. 1528, H. R. 2957, Federal barge lines; H. R. 3669, H. R. 3755, H. R. 4641, S. 1347, S. 1353, railroad retirement; Senate Joint Resolution 27, House Joint Resolution 3, St. Lawrence seaway; H. R. 4473, H. R. 2416, taxes; Senate Resolution 55, House Resolution 107, transportation investigation.

———

A. Bryson deHaas McCloskey, 404 Woodford Avenue, Baltimore, Md.

B. Because of acts precipitated by the organizations against which lobbyist herein has been demanding congressional investigations, lobbyist herein adds to previously reported interests Happy Homes, Inc., and Homeowners Honest Service, Inc., of which he is president.

C. Because it has been found that the organizations investigations of which have been demanded have no patriotic feelings but rather are taking advantage of the semi-war conditions, all of the demands previously made are hereby renewed, and particularly those which have a bearing on the preservation of free enterprise, good housing at reasonable prices and better title VIII housing for military and civilian personnel in critical areas in or near military installations, and stopping and preventing unethical and illegal actions in restraint of trade by organizations which are working for big business. Plans are under way to resume publication of Publix Patriot monthly tabloid. Attached copies of prepublication releases and full-page ad.[1]

———

A. Warren C. McClure, Mississippi Valley Association, box 107, Camden, Ark.

B. Mississippi Valley Association, 511 Locust Street, St. Louis, Mo.

C. (2) Legislation relating to soil conservation and flood control.

D. (6) $900.

E. (10) $233.51; (11) $233.51.

———

A. Glen McDaniel, 777 Fourteenth Street NW., Washington, D. C.

B. Radio-Television Manufacturers Association, 777 Fourteenth Street NW., Washington, D. C.

C. (1) Indefinite. (2) General legislative interests: Those relating directly or indirectly to the radio and television manufacturing industry. Special legislative interests are: Revenue Revision Act of 1951; electromagnetic-radiation bill (S. 537). (3) RTMA Industry Report.

———

A. A. J. McFarland, 126 North Eighth Street, Sterling, Kans.

B. Christian Amendment Movement, 914 Clay Street, Topeka, Kans.

C. (2) Working for a Christian amendment to the Constitution of the United States, House Joint Resolution 156 and Senate Joint Resolution 29.

D. (6) $800.

E. (7) $400; (9) $400; (10) $1,625; (11) $2,025.

———

A. M. C. McKercher, Order of Railroad Telegraphers Building, St. Louis, Mo.

B. The Order of Railroad Telegraphers, Order of Railroad Telegraphers Building, St. Louis, Mo.

C. (1) Indefinite. (2) Legislation affecting the welfare of railroad employees, S. 1347 and H. R. 3669.

D. (6) $435.

———

A. Joseph V. McLaughlin, 923 Chestnut Street, Chattanooga, Tenn.

B. Railway Express Agency, Inc., 230 Park Avenue, New York, N. Y.

D. (6) $1,500.

E. (7) $861.28; (9) $861.28; (10) $2,754.18; (11) $3,615.46.

———

A. Robert E. McLaughlin, 400 DeSales Building, Washington, D. C.

B. National Association of Storekeeper-Gaugers, care of above representative.

C. (1) Indefinitely. (2) All legislation affecting Federal classified employees, and particularly that which would affect storekeeper-gaugers.

D. (6) $449.99.

E. (8) $11.72; (9) $11.72; (10) $131.93; (11) $143.65.

———

A. W. H. McMains, 1135 National Press Building, Washington, D. C.

B. Distilled Spirits Institute, 1135 National Press Building, Washington, D. C.

C. (1) Indefinitely. (2) Any legislation affecting the domestic distilling industry; specifically during the fourth quarter of 1951, H. R. 2745 and H. R. 4473.

———

A. Ralph J. McNair, 1000 Vermont Avenue, Washington, D. C.

B. Life Insurance Association of America, 488 Madison Avenue, New York, N. Y.

C. (1) Continuous. (2) General: Legislation which might affect the welfare of policyholders and annuitants. Specific: (See D. 3.[1])

D. (6) $250.

E. (7) $12.42; (9) $12.42; (10) $7.23; (11) $19.65.

———

A. Joseph P. McSparron, 320 North Hopkins Street, Sayre, Pa.

B. International Association of Machinists, Machinists Building, Washington, D. C.

C. (1) Subject to call for lobbying assignment in 1952. In such case report will be filed pursuant to the act. (2) Interested in substantially all legislation affecting the socio-economic and political interests of the American workingmen, including all pending legislation dealing with railroad matters.

D. (6) $496.50.

E. (2) $192.50; (7) $304; (9) $496.50; (10) $2,620; (11) $3,116.50.

———

A. William P. MacCracken, Jr., 1152 National Press Building, Washington, D. C.

C. (1) Legislative interests for the clients listed under C (2) hereof will continue for an indefinite period. (2) S. 106, bill to amend the District of Columbia optometry law; S. 337, bill to amend the Public Health Service Act and Vocational Education Act of 1946; H. R. 146, bill to improve health services; H. R. 2707, bill to provide for Federal grants-in-aid for health; all bills pertaining to health and visual care; H. R. 4675 and H. R. 4528, bills to prohibit transportation of fireworks into any State on behalf of the District of Columbia and American Optometric Associations, care of Dr. Samuel L. Brown, 111 East North Street, Fostoria, Ohio. On behalf of Ruth Obre Dubonnet, 50 East Seventy-second Street, New York City, bill to reacquire American citizenship, S. 1772; on behalf of Vera Sarah Keenan, Franton Court, Greens Farms, Conn., bill to permit residence in the United States, S. 1126; on behalf of Remington Rand, Inc., H. R. 4473, bill to revise the tax laws insofar as it proposed a manufacturer's excise tax on electric shavers; on behalf of John J. Braund, 900 Alabama Avenue SE., Washington, D. C., H. R. 4507, bill to compensate John J. Braund for use of patents by the United States Government.

E. (6) $47.87; (7) $34.69; (8) $11.35; (9) $93.91; (10) $157.99; (11) $251.90.

———

A. Lachlan Macleay, 511 Locust Street, St. Louis, Mo.

B. Mississippi Valley Association, 511 Locust Street, St. Louis, Mo.

C. (1) Matters relating to river and harbor maintenance and improvement; the American merchant marine; soil conservation; flood control; regulation of domestic transportation.

D. (6) $4,500.

E. (7) $922.48; (9) $922.48; (10) $2,643.23; (11) $3,565.71; (15) October 1–9, 1951, St. Louis to Houston, Tex., New Orleans and return, $287.04; October 11–November 4, St. Louis to Kansas City, Mo., Omaha and Lincoln, Nebr., Columbia, Mo., and return, $143.81; November 7–10, St. Louis to Chicago, Ill., and return, $74.28; November 22–December 7, St. Louis to New Orleans, La., Birming-

ham, Ala., Memphis, Tenn., and return, $409.76; December 19, expenses in Kansas City, Mo., $7.59.

---

A. W. Bruce Macnamee, 1809 G Street NW., Washington, D. C.

B. National Federation of American Shipping, Inc., 1809 G Street NW., Washington, D. C.

C. (1) Indefinitely. (2) H. R. 5215, Supplemental Appropriation Act, 1952. H. R. 5693, duties on importation of tuna. S. 241, H. R. 4729, amendment of Merchant Marine Act, 1936 (long-range bill).

D. (6) $1,050.

E. (7) $43.15; (9) $43.15; (10) $73.66; (11) $116.81.

---

A. Carter Manasco, 4201 Chesterbrook Road, Falls Church, Va.

B. National Business Publications, Inc., 1001 Fifteenth Street NW., Washington, D. C.

C. (1) Interest to continue indefinitely. (2) All legislation affecting the members of the above-named trade association.

D. (6) $600.

E. (6) $12.65; (7) $194.28; (9) $206.93; (10) $567.32; (11) $774.25.

---

A. Carter Manasco, 4201 Chesterbrook Road, Falls Church, Va.

B. National Coal Association, Southern Building, Washington, D. C.

C. (1) Interest to continue indefinitely. (2) All legislation affecting the bituminous-coal industry.

D. (6) $2,600.

E. (6) $12.65; (7) $194.28; (9) $206.93; (10) $567.32; (11) $774.25.

---

A. Olya Margolin (Mrs.), 1637 Massachusetts Avenue NW., Washington, D. C.

B. National Council of Jewish Women, 1 West Forty-seventh Street, New York, N. Y.

D. (6) $1,400.

E. (8) $37.65; (9) $37.65; (10) $271.21; (11) $308.86.

---

A. James Mark, Jr., 1435 K Street NW., Washington, D. C.

B. United Mine Workers of America, 900 Fifteenth Street NW., Washington, D. C.

C. (1) Indefinitely. (2) Any and all legislation construed to be directly or indirectly beneficial or detrimental to the United Mine Workers of America and its members. H. R. 1316, 3022, 1612, 257, 268, 2658, 1019, 3282; House Joint Resolutions 102, 7, 4; S. 1, 1040, 397, 990, 984, 1301.

D. (6) $3,302.

---

A. John J. Marr, 3 Raymond Heights, Barlen, Conn.

B. The Order of Railroad Telegraphers, 3860 Lindell Boulevard, St. Louis, Mo.

C. (1) Indefinite. (2) Legislation affecting railroad employees.

---

A. Mrs. Etsu M. Masaoka, 300 Fifth Street NE., Washington, D. C.

B. Japanese American Citizens League Anti-Discrimination Committee, 406 Beason Building, Salt Lake City, Utah.

C. (1) Eighty-second Congress. (2) To promote the welfare of persons of Japanese ancestry in the United States (legislation is a part of this activity). (a) To provide for the expeditious naturalization of former citizens of the United States who have lost United States citizenship through voting in a political election or in a plebiscite held in occupied Japan, H. R. 2865; (b) to amend the Trading With the Enemy Act of 1917, as amended, S. 865; (c) to revise the laws relating to immigration, naturalization, and nationality, and for other purposes, S. 2055 and H. R. 5678, and similar bills.

D. (6) $300.

XCVIII—94

---

A. Mike M. Masaoka, 300 Fifth Street NE., Washington, D. C. ·

B. Japanese American Citizens League Anti-Discrimination Committee, 406 Beason Building, Salt Lake City, Utah.

C. (1) Eighty-second Congress. (2) To promote the welfare of persons of Japanese ancestry in the United States (legislation is a part of this activity). (a) To provide for the expeditious naturalization of former citizens of the United States who have lost United States citizenship through voting in a political election or in a plebiscite held in occupied Japan, H. R. 2865; (b) to amend the Trading With the Enemy Act of 1917, as amended, S. 865; (c) to revise the laws relating to immigration, naturalization, and nationality, and for other purposes, S. 2055 and H. R. 5678, and similar bills.

D. (6) $600.

---

A. Langdon P. Marvin, Jr., 3032 Q Street NW., Washington, D. C.

C. (1) Throughout the year 1951 and thereafter for indefinite period. (2) General interest in any proposed legislation having direct or specific relationship to air transportation costs. H. R. 508 by Mr. Kennedy (air mail subsidy separation bill). In favor of enactment.

E. (4) $187.37; (9) $187.37; (10) $797.64; (11) $985.01.

---

A. Will Maslow, 15 East Eighty-fourth Street, New York, N. Y.

B. American Jewish Congress, Inc., 15 East Eighty-fourth Street, New York, N. Y.

C. (1) Indefinite. (2) To oppose anti-Semitism and racism in all its forms and to defend civil rights incident thereto. Senate Resolution 203.

D. (6) $112.50.

E. (7) $30; (9) $30; (10) $90; (11) $120.

---

A. Walter J. Mason, 901 Massachusetts Avenue NW., Washington, D. C.

B. American Federation of Labor, 901 Massachusetts Avenue NW., Washington, D. C.

C. (1) Indefinitely. (2) All bills affecting the welfare of the country generally, and specifically all bills affecting workers.

D. (6) $2,340.

E. (2) $2,340; (6) $20; (8) $176; (9) $2,536; (10) $7,952.75; (11) $10,488.75.

---

A. P. H. Mathews, Transportation Building, Washington, D. C.

B. Association of American Railroads, Transportation Building, Washington, D. C.

C. (1) Legislative interest is continuing. (2) Generally to support legislation which the railroads believe to be in their interest and in the interest of a sound national transportation policy and to oppose legislation which they believe contrary to such interest. Bills opposed in whole or in part were House Joint Resolution 337, to authorize construction of the St. Lawrence seaway; H. R. 3669, S. 1347, amendments to Railroad Retirement Act. Bills supported were H. R. 3465, S. 1335, sizes and weights of fourth-class mail; House Resolution 426, study and investigation of the Railroad Retirement Act; certain amendments to H. R. 4473, Revenue Act of 1951.

D. (6) $4,399.98.

E. (7) $596.11; (9) $596.11; (10) $1,090.75; (11) $1,686.86; (15) Sir Walter Hotel, Raleigh, N. C., $14.36, for room, meals, and telephone calls; Southern Railroad, $11.70 for meals; Ansley Hotel, Atlanta, $18.42 for room, meals, and telephone calls; St. Charles Hotel, New Orleans, $38.48, for room, meals, and telephone calls; Grady Manning Hotel, Little Rock, Ark., $10.96 for room and meals.

---

A. Cyrus H. Maxwell, M. D., 1523 L Street NW., Washington, D. C.

B. American Medical Association, 535 North Dearborn Street, Chicago, Ill.

---

C. (1) Indefinite. (2) All bills (House and Senate) relating to health and medicine.

D. (6) $3,341.53.

E. (7) $607.55; (9) $607.55; (10) $184.84; (11) $782.39.

---

A. Medical Association of State of Alabama, 537 Dexter Avenue, Montgomery, Ala.

C. (1) Indefinitely. (2) All health matters covered by legislative action. Pending legislation and legislative actions are reported to all members of the association. Our purpose is to keep the rank and file of the membership acquainted with the Washington scene and this is but a small part of our total activities which do not relate to legislative activity. (3) PR Notes.

E. (2) $1,650; (4) $225; (9) $1,875; (10) $5,475; (11) $7,350.

---

A. The Medical Society of the District of Columbia, 1718 M Street NW., Washington, D. C.

C. (1) Society's interest is continuous in legislation affecting the public health. (2) Interested in legislation pertaining to the practice of medicine and all related services and that affecting the public health, including extension of social security into the field of the practice of medicine. (3) Medical Annals of the District of Columbia.

D. (6) $2,828.55.

E. (8) $2,828.55; (9) $2,828.55; (10) $26,133.95; (11) $28,962.50.

---

A. E. A. Meeks, National League of District Postmasters, 1110 F Street NW., Washington, D. C.

B. National League of District Postmasters, 1110 F Street NW., Washington, N. C.

C. (1) Permanently. (2) Any legislation which affects the interests of postmasters. (3) The Postmasters' Advocate (monthly magazine).

D. (6) $1,500.

---

A. James Messer, Jr., 404 Midyette-Moor Building, Tallahassee, Fla.

B. Florida Railroad Association, 404 Midyette-Moor Building, Tallahassee, Fla., an association composed of Atlantic Coast Line Railroad Co., Seaboard Air Line Railroad Co., Louisville & Nashville Railroad Co., Southern Railway System, Florida East Coast Railway Co., Atlanta & St. Andrews Bay Railway Co., Live Oak, Perry & Gulf Railroad Co., and St. Louis–San Francisco Railway Co.

C. (1) Indefinite. (2) Proposed legislation of interest to members of Florida Railroad Association set forth under B. Crosser bill amending Railroad Retirement Act (H. R. 3669); S. 1335, parcel post bill, St. Lawrence seaway.

D. (6) $1,320.

---

A. Ross A. Messer, post-office box 1611, Washington, D. C. (room 512 Victor Building, 724 Ninth Street NW., Washington, D. C.).

B. National Association of Post Office and General Services Maintenance Employees, post-office box 1611, Washington, D. C. (room 512 Victor Building, 724 Ninth Street NW., Washington, D. C.).

C. (2) All beneficial legislation affecting the custodial employees of the Post Office and GSA.

D. (6) $500.

E. (7) $9; (8) $122.60; (9) $131.60· (10) $1,593.33; (11) $1,724.99; (15) $122.60, October 1, 1951, November 2, 1951, postmaster, Washington 13, D. C., postage and stamped envelopes.

---

A. Harold M. Miles, 65 Market Street, San Francisco, Calif.

B. Southern Pacific Co., 65 Market Street, San Francisco, Calif.

C. (1) Indefinite. (2) Measures affecting steam railroads, including H. R. 3669.

D. (6) $117.50.

---

A. Milk Industry Foundation, 1625 Eye Street NW., Washington, D. C.

C. (1) Such legislative interests as the foundation has are expected to continue indefinitely. (2) The foundation has a general legislative interest in statutes or bills which affect the interests of milk dealers. It has no specific legislative interest at present.

D. (6) $1,500.

E. (3) $1,500; (9) $1,500; (10) $4,531; (11) $6,031.

---

A. Charles C. Miller, 1832 M Street NW., Washington, D. C.

B. Rubber Manufacturers Association, Inc., 444 Madison Avenue, New York, N. Y.

C. (1) Through the first session of the Eighty-second Congress. (2) Excise taxes on rubber products; H. R. 2823; any legislation relating to I. T. O. and/or customs simplification; any hearings with reference to administration of the Rubber Act of 1950 and the rubber program. (3) National Defense Bulletin series.

E. (10) $2,671.84; (11) $2,671.84.

---

A. Dale Miller, Mayflower Hotel 372, Washington, D. C.

B. Dallas (Tex.) Chamber of Commerce.

C. (1) At will of employer. (2) General legislation affecting Dallas and Texas, such as appropriations and revenue bills.

D. (6) $2,060.

E. (2) $75; (5) $136.58; (6) $28.87; (7) $960.50; (8) $39; (9) $1,239.95; (10) $2,664.80; (11) $3,904.75.

---

A. Dale Miller, Mayflower Hotel 372, Washington, D. C.

B. Intracoastal Canal Association of Louisiana and Texas, Second National Bank Building, Houston, Tex.

C. (1) Indefinitely. (2) For adequate river and harbor authorizations and appropriations; H. R. 4386.

D. (6) $1,500.

E. (5) $32.32; (6) $37.62; (7) $581.94; (8) $12.50; (9) $664.58; (10) $1,650.07; (11) $2,314.65.

---

A. Dale Miller, Mayflower Hotel, 372, Washington, D. C.

B. Texas Gulf Sulphur Co., Newgulf, Tex., and New York, N. Y.

C. (1) At will of employer. (2) For retention of existing depletion allowances in tax laws, H. R. 4473.

D. (6) $1,500.

E. (5) $825.57; (6) $112.91; (7) $195.24; (8) $122.12; (9) $1,255.84; (10) $3,698.70; (11) $4,954.54.

---

A. Miller, Gorham, Wescott & Adams, and William Simon, a partner thereof, Room 3500, 1 North La Salle Street, Chicago, Ill.

B. Council for Clarification of Pricing Practices.

C. (1) Life of S. 719 and H. R. 2820. (2) Good-faith competition. S. 719 and H. R. 2820.

D. (6) $10,000.

E. (6) $39.70; (7) $479.61; (8) 69 cents; (9) $520; (10) $5,045.18; (11) $5,565.18.

---

A. Justin Miller, 1771 N Street NW., Washington, D. C.

B. National Association of Radio and Television Broadcasters, 1771 N Street NW., Washington, D. C.

C. (1) Legislative interests will continue for an indefinite period. (2) General legislative interests: Those relating directly or indirectly to the radio and television broadcasting industry. Specific legislative interests presently are: Communications Act of 1934, as amended (47 U. S. C. 151), Administrative Procedure Act (5 U. S. C. 1001), McFarland bill (S. 658) to amend Communications Act of 1934, copyright bills (H. R. 3589, H. R. 2464), radio fraud bill (H. R. 2348), bills to establish National Citizens' Advisory Board on Radio and Television (S. J. Res. 76, S. 1579), bills exempting organized sports from antitrust laws (S. 1526, H. R. 3239-4231), bill to amend section 315 of Communications Act (H. R. 5470), transmission of gambling information in interstate commerce bills (S. 1553, S. 1624, S. 2116).

---

A. Millers' National Federation, 309 West Jackson Boulevard, Chicago, Ill.

E. (10) $594.40; (11) $596.40.

---

A. Charles J. Milton, 1 Exchange Place, Jersey City, N. Y.

B. The Prudential Insurance Co. of America, Newark, N. J.

C. (1) No definite period. (2) General legislative matters to do with insurance companies.

---

A. Minnesota Associated Businessmen, Inc., 520 Endicott Building, St. Paul, Minn.

C. (1) Legislative interests will continue indefinitely. (2) Federal and State income taxation and governmental expenditures.

E. (4) $183.76; (5) $216.82; (7) $93.72; (8) $10.50; (9) $504.87; (10) $6,089.35; (11) $6,594.22; (15) $216.02, October, November, December, Norman E. Biorn, St. Paul, Minn., stenographic, postage, travel; $168.76, October, November, December, St. Paul Letter Co., St. Paul, Minn., mailing and postage; $93.79, October 13, Edward J. Bachman, St. Paul, Minn., telephone, postage, travel; $10.50, October 13, W. C. Sexton Co., Minneapolis, Minn., reports.

---

A. Mississippi Associated Businessmen, Inc., 301–303 Millsaps Building, P. O. Box 1329, Jackson, Miss.

C. (1) Until objectives are reached. (2) Legislation relating to Government economy, Government regulations of business, and taxation, such as Mason bill (H. R. 240), Davis bill (H. R. 1177), and Senator Williams' bill (S. 892).

D. (6) $690.

E. (2) $567.16; (3) $305; (4) $78.29; (5) $289.30; (6) $63.18; (7) $15.84; (8) $16.86; (9) $1,335.63; (10) $2,509.69; (11) $3,845.31; (15) $517.16, October 1, 5, 12, 19, 26, November 2, 8, 16, 26, 30, December 7, 14, 21, 28, Mrs. Marie F. Walker, Jackson, salary for 3 months; $120, October 1, November 2, December 3, James M. Walker, Jackson, office rent for 3 months; $16.86, October 1, collector of internal revenue, Jackson, S. S. taxes; $21.43, October 2, Sleigher Office Supplies, Jackson, supplies; $36.94, October 11, Southern Bell Telephone & Telegraph Co., Jackson, phone; etc.[1]

---

A. Missouri Valley Chapter Association of Refrigerated Warehouses, 508 Security Building, St. Louis, Mo.

C. (1) Don't know. Depends upon type of legislation.

---

A. F. E. Mollin, 515 Cooper Building, Denver, Colo.

B. American National Cattlemen's Association, 515 Cooper Building, Denver, Colo.

C. (2) Tax matters, price controls, quotas, etc.

D. (6) $3,300.

E. (6) $10.12; (7) $252.62; (8) $14; (9) $276.74; (10) $3,399.66; (11) $3,676.40.

---

A. Donald Montgomery, 734 Fifteenth Street NW., Washington, D. C.

B. United Automobile, Aircraft, Agricultural Implement Workers of America (UAW-CIO), Solidarity House, 8000 East Jefferson, Detroit, Mich.

C. (1) Indefinitely. (2) Support all legislation favorable to the national peace, security, democracy, prosperity, and general welfare; oppose legislation detrimental to these objectives.

D. (6) $1,300.

E. (6) $15.75; (7) $319.65; (9) $335.40; (10) $1,425.20; (11) $1,760.60.

---

A. William W. Mooney, 406 Bernice Building, Tacoma, Wash.

B. The Townsend Plan, Inc., 6875 Broadway, Cleveland, Ohio.

C. (1) Until action has been taken by United States Congress on the bill. (2) Townsend plan bill in the Ways and Means Committee, H. R. 2678 and H. R. 2679. (3) Townsend National Weekly.

D. (6) $1,182.08.

E. (3) $15; (7) $308; (9) $323; (10) $905.85; (11) $1,228.85.

---

A. George W. Morgan, 90 Broad Street, New York, N. Y.

B. Association of American Shipowners, 90 Broad Street, New York, N. Y.

C. (1) The duration of registrant's employment is indefinite.

---

A. The Morris Plan Corp. of America, 103 Park Avenue, New York, N. Y.

C. (1) While legislation similar to that proposed in S. 2318 and H. R. 5744 of the Eighty-first Congress is pending. (2) (a) Bank-holding company bills and similar legislation. (d) Against.

E. (10) $6,997.20; (11) $6,997.20.

---

A. Giles Morrow, Freight Forwarders Institute, 1220 Dupont Circle Building, Washington, D. C.

C. (1) Indefinitely. (2) Any legislation affecting freight forwarders.

D. (6) $3,750.

E. (5) $23.82; (6) $4.11; (7) $30.01; (9) $57.94; (10) $147.35; (11) $205.29.

---

A. Harold G. Mosier, Shoreham Hotel, Washington, D. C.

B. The Glenn L. Martin Co., Baltimore, Md.

C. (1) Indefinitely. (2) All legislation in the aircraft field.

D. (6) $3,000.

E. (6) $117.25; (7) $152.60; (8) $6.75; (9) $276.60; (10) $2,030.83; (11) $2,307.43; (15) $117.25, Chesapeake & Potomac Telephone Co., Washington, D. C., telephone conferences; $52.35, various Washington and Baltimore cab companies, transportation; $100.25, Shoreham Hotel, Washington, D. C., entertainment and meals.

---

A. Walter J. Munro, 10 Independence Avenue SW., Washington, D. C.

B. Brotherhood of Railroad Trainmen.

C. (2) Advocating legislation favorable to labor and opposing unfavorable labor legislation.

---

A. Dr. Emmett J. Murphy, 5737 Thirteenth Street NW., Washington, D. C.

B. National Chiropractic Insurance Co., Webster City, Iowa.

C. (1) Permanent. (2) Insurance coverage of employer is restricted to chiropractors. Legislative interest of employer is to promote the welfare of its policyholders and prevent discrimination against the chiropractic profession. H. R. 1368.

D. (6) $300.

E. (8) $300; (9) $300; (10) $300; (11) $1,200.

---

[1] Not printed. Filed with Clerk and Secretary.

A. John S. Murphy, 355 Boyce Building, Sioux Falls, S. Dak.

B. American Pyrotechnics Association, 6711 Loch Raven Boulevard, Baltimore, Md.

C. (1) Indefinite. (2) Pending and prospective legislation affecting the pyrotechnics industry, including but not limited to the following bills: H. R. 4528 and H. R. 4675.

E. (6) $11.35; (9) $11.35; (11) $1,820.76; (12) $2,500.

———

A. Ray Murphy, 60 John Street, New York, N. Y.

B. Association of Casualty and Surety Companies, 60 John Street, New York, N. Y.

C. (1) Indefinite. (2) Legislation affecting casualty and surety companies. No specific interests during fourth quarter of the year.

D. (6) $90.

———

A. J. Walter Myers, Jr., post-office box 692, Valdosta, Ga.

B. Forest Farmers Association Cooperative, post-office box 692, Valdosta, Ga.

C. (1) Indefinitely, as there is legislation introduced on forestry matters. (2) Agricultural appropriations bill for 1952 (forestry items). H. R. 3994 and S. 1767, to amend the definition of "agriculture" as contained in section 3 (f) of the Fair Labor Standards Act of 1938, as amended. H. R. 2752, to encourage the prevention of water pollution. S. 1149, reorganization act of Department of Agriculture. H. R. 5474, to provide for accelerated amortization of stream-control expenditures. (3) The Forest Farmer.

E. (4) $7.75; (9) $7.75; (10) $915.90; (11) $923.65.

———

A. National Association of Attorneys General, 917 District National Building, 1406 G Street NW., Washington, D. C.

C. (2) To confirm and establish title in the States to lands beneath navigable waters within State boundaries.

D. (6) $4,000.

E. (2) $5,222.67; (4) $70; (5) $558.06; (6) $196.80; (7) $1,079.58; (8) $819.30; (9) $7,946.41; (10) $24,518; (11) $32,464.41; (15) $128.70, collector of internal revenue, Baltimore, Md., withholding and social-security taxes; $225, Riggs National Bank, Washington, D. C., rental allowance; $329, Walter R. Johnson, Arlington, Va., expenses; $50.42, Ann M. Conway, Washington, D. C., salary; etc.[1]

———

A. National Association and Council of Business Schools, 418–419 Homer Building, 601 Thirteenth Street NW., Washington, D. C.

C. (2) Legislation concerning education of all types, particularly S. 1940 and other bills relating to GI education for Korean veterans. (3) Business School News.

D. (6) $17,802.74.

E. (2) $5,510.14; (4) $1,686.27; (5) $672.16; (6) $273.33; (7) $2,146.76; (8) $977.34; (9) $11,265; (10) $32,851.45; (11) $44,117.45; (15) $181.74, Batt, Bates & Co., Inc., 1407 K Street NW., Washington, D. C., wrapping, mailing, and postage; $2,000, National Accreditation Authority for Private Business Schools, 133 West Chelten Avenue, Philadelphia, Pa., loan; $63.12, International Business College, 512 North Mesa Avenue, El Paso, Tex., refund; $159.78. O. J. Dickey, 3301 Chestnut Street NW., Washington, D. C., salary; $75.17, R. G. Cooley, 4317 Fifteenth Street NW., Washington, D. C., wages; $850, J. S. Noffsinger, 2601 Sixteenth Street NW., Washington, D. C., salary, etc.[1]

———

A. National Association of Direct Selling Cos., 163–165 Center Street, Winona, Minn.

C. (2) H. R. 2982, S. 1046, H. R. 30, H. R. 525, H. R. 3392, S. 1335, H. R. 3465, Senate Joint Resolution 60, House Joint Resolution 235, S. 1369, H. R. 3298, S. 345.

D. (6) $12,693.75.

E. (6) $14.39; (9) $14.39; (10) $741.07; (11) $755.46.

———

A. National Association of Electric Cos., 1200 Eighteenth Street NW., Washington, D. C.

C. (2) All legislation that might affect its members as going electric utilities.[1]

D. (6) $18,791.71.

E. (1) $20,378.36; (2) $72,414.16; (3) $25; (4) $2,350.52; (5) $4,809.04; (6) $1,986.70; (7) $5,057.69; (8) $3,758.10; (9) $110,779.57; (10) $323,546.34; (11) $434,325.91; (15) $44.54, Addressograph-Multigraph Corp., 1200 Babbitt Road, Cleveland, Ohio, addressograph plates; $617.01, American Airlines, Inc., 910 South Boston Avenue, Tuls., Okla., transportation; $98.74, R. P. Andrews Paper Co., First and H Streets SE., Washington, D. C., office supplies; $6,308.37, Awalt, Clark & Sparks, 822 Connecticut Avenue NW., Washington, D. C., counsel fee and expenses; $669.78, Baltimore & Ohio Railroad Co., Baltimore, Md., transportation; $317.07, Arthur R. Barnett, 1200 Eighteenth Street NW., Washington, D. C., miscellaneous and traveling expenses, etc.[1]

———

A. National Association of Insurance Agents, 80 Maiden Lane, New York, N. Y.

C. (2) Any legislation which affects, directly or indirectly, local property insurance agents.[1] (3) American Agency Bulletin.

D. (6) $2,633.43.

E. (2) $3,436.63; (5) $455.19; (6) $351; (7) $114.23; (6) $55; (9) $4,412.05; (10) $17,125.24; (11) $21,537.89; (15) $2,566.63, Maurice G. Herndon, 207 Fairfax Road, Alexandria, Va., salary; $870, Margaret E. Yeager, 4115 Nicholas Avenue SW., Washington, D. C., salary; $360, Washington Loan & Trust Co., Washington, D. C., office rent; $114.23, Maurice G. Herndon, 207 Fairfax Road, Alexandria, Va., travel expense; $331.94, Chesapeake & Potomac Telephone Co., Washington, D. C., telephone service, etc.[1]

———

A. National Association of Letter Carriers, 1525 H Street NW., Washington, D. C.

C. (2) All legislation pertaining to postal and Federal employees.

D. (6) $25,427.91.

E. (2) $3,674; (4) $1,867.01; (6) $3,394.67; (9) $8,935.68; (10) $37,472.86; (11) $46,408.54; (15) $1,867.01, Ransdell, Inc., 810 Rhode Island Avenue NE., Washington, D. C., printing and mailing of N. A. L. C. Bulletins; $2,791.23, Western Union, Washington, D. C., telegraph service; $603.44, Chesapeake & Potomac Telephone Co., Washington, D. C., telephone service.

———

A. National Association of Margarine Manufacturers, 1028 Munsey Building, Washington, D. C.

C. (2) Interested in passage of H. R. 3207, Eighty-second Congress, first session, to amend navy ration statute (34 U. S. C. 902a); interested in any other legislation that may relate to margarine.

E. (10) $36; (11) $36; (15) $30, Slert F. Riepma, 1028 Munsey Building, Washington, D. C., salary.

———

A. National Association of Mutual Savings Banks, 60 East Forty-second Street, New York, N. Y.

C. (2) The general legislative interests consist of any legislation which the mutual savings banks have a legitimate interest in supporting or opposing.

D. (6) $54,325.33.

E. (2) $22,975; (6) $588.49; (7) $3,395.79; (8) $704.09; (9) $26,663.36; (10) $34,315.82; (11) $60,979.18; (15) $127.37, A. George Gilman, Malden, Mass., travel; $217.22, Hotel Statler, Washington, D. C., expenses of A. George Gilman and John W. Sandstedt; $132.24, Hotel Statler, Washington, D. C., expenses of E. B. Schwulst; $1,001.45, Oliver & Donnally, 110 East Forty-second Street, New York, N. Y., reimbursement of expenses; $76.23, J. Milton Cooper, Washington, D. C., travel and telephone; $142.43, Charles A. Knight, Gardiner, Maine, travel and telephone; etc.[1]

———

A. National Association of Postal Supervisors, room 100, Continental Hotel, Washington, D. C.

C. (2) All legislation affecting the postal service and its employees, including supervisors. (3) The Postal Supervisor.

D. (6) $6,194.

E. (2) $1,879.35; (5) $225; (6) $35; (9) $4,264.60; (10) $13,224.12; (11) $17,548.72.

———

A. National Association of Post Office and General Services Maintenance Employees, room 512–513, Victor Building, 724 Ninth Street NW., Washington, D. C.

C. (2) Beneficial legislation affecting postal employees and General Services employees, and Post Office custodial employees and GSA employees in PBS, in particular. (3) The Post Office and General Services Maintenance News.

D. (6) $3,476.44.

E. (2) $50.60; (4) $333.99; (5) $110; (6) $278.58; (7) $9; (8) $122.60; (9) $1,354.17; (10) $4,325.70; (11) $5,679.87; (15) $500, Ross A. Messer, post-office box 1611, Washington, D. C., salary; $33.99, Progressive Printing Co., H Street NW., Washington, D. C., printing; $110, New Victor Co., 724 Ninth Street NW., Washington, D. C., office rent; $278.58, Telephone Co. and Western Union, Washington, D. C., telephone and telegrams; $131.60, Ross A. Messer, post-office box 1611, Washington, D. C., travel and postage.

———

A. National Association of Retired Civil Employees, 1246 Twentieth Street NW., Washington, D. C.

C. (2) Legislation affecting retired civil employees, particularly during this quarter, S. 995, S. 500, and H. R. 2732. (3) The Annuitant.

D. (6) $250.

E. (2) $250; (9) $250; (10) $999.70; (11) $1,249.70.

———

A. National Association of Travel Organizations, 1424 K Street NW., Washington, D. C.

C. (2) Legislation affecting the welfare of the travel industry.

D. (6) $6,925.

E. (9) $417.50; (10) $1,252.50; (11) $1,670.

———

A. National Association of United States Storekeeper-Gaugers, 4543 North Hicks Street, Philadelphia, Pa.

C. (2) All legislation affecting Federal classified employees, and that in particular

———

[1] Not printed. Filed with Clerk and Secretary.

[1] Not printed. Filed with Clerk and Secretary.

[1] Not printed. Filed with Clerk and Secretary.

which would affect our position, United States storekeeper-gagers.

D. (6) $697.20.

E. (2) $500; (9) $500; (10) $1,500; (11) $2,000; (15) $500, Robert E. McLaughlin, care Roberts & McInnis, 400 DeSales Building, Connecticut Avenue and DeSales Street, Washington, D. C., legal representation and advice.

A. National Associated Businessmen, Inc., 1025 Vermont Avenue NW., Washington, D. C.

C. (2) NAB is generally interested in laws affecting businessmen, particularly with relation to taxation, labor, Government regulation of business, social security, and tax-privileged corporations in business.

E. (2) $5,880.22; (4) $7.14; (5) $984.03; (6) $215.71; (7) $219.06; (8) $573.70; (9) $7,879.86; (10) $19,999.70; (11) $27,879.56; (15) $1,230.32, Leo Cullinane, 4906 Westway Drive, Washington, D. C., salary; $649.90, Helen Berman, 1025 Vermont Avenue NW., Washington, D. C., salary; $105, Corporation Trust Co., 100 West Tenth Street, Wilmington, Del., annual statutory representation service; $280.20, United States Collector of Internal Revenue, Baltimore, Md., taxes; $26.01, Allpure Spring Water Co., 1225 Twenty-fifth Street NW., Washington, D. C., service and charges; $28.13, Western Union, 1405 G Street NW., Washington, D. C., charges; etc.[1]

A. National Board, YWCA, 600 Lexington Avenue, New York, N. Y.

C. (2) Narcotics, settlement of refugees, child-care centers in defense housing areas, foreign aid and point 4, UN appropriations.

E. (2) $150; (4) $70; (6) $20; (7) $60; (9) $300; (11) $300.

A. National Business Publications, Inc., 1001 Fifteenth Street NW., suite 55, Washington, D. C.

C. (2) That which affects postal rates of periodicals published by members of the above-named association.

E. (2) $600; (7) $2.80; (9) $602.80; (10) $1,872.93; (11) $2,475.73.

A. National Canners Association, 1133 Twentieth Street NW., Washington, D. C.

C. (2) Defense controls and all measures directly affecting the food-canning industry.

E. (2) $3,702.47; (4) $73.13; (5) $14.69; (7) $127.47; (9) $3,917.76; (10) $6,390.18; (11) $10,307.94; (15) $2,202.47, Robert B. Heiney, McLean, Va., salary; $12.40, Robert B. Heiney, McLean, Va., local transportation; $1,500, Otto Lowe, Washington, D. C., legal services; $115.07, Walter L. Graefe, Griffin, Ga., travel; $10, Farm Reporter, Washington, D. C., subscription.

A. National Coal Association, 802 Southern Building, Washington, D. C.

C. (2) All measures affecting bituminous coal industry.

D. (6) $467,791.52.

E. (1) $8,933.29; (2) $18,838.55; (5) $4,-454.41; (6) $212.59; (9) $32,438.84.

A. National Committee for Fair Emergency Excise Taxation, 60 East Forty-second Street, New York, N. Y.

C. (2) Fair emergency excise taxation.

E. (2) $7,032; (6) $40.55; (9) $7,072.55; (10) $52,517.05; (11) $59,589.60; (15) $1,500, Leon Henderson, 1026 Seventeenth Street NW., Washington, D. C., professional services; $2,466, Addison B. Clohosey, 1026 Seventeenth Street NW., Washington, D. C., professional services and expenses; $1,816, Lerner and Lerner, 1025 Connecticut Avenue NW., Washington, D. C., professional services and expenses; $1,250, H. Leigh Whitelaw, 60 East Forty-second Street, New York, N. Y., services; $40.55, Gas Appliance Manufacturers Association, Inc., 60 East Forty-second Street, New York, N. Y., telephone charges.

A. National Committee for Strengthening Congress, 1135 Tower Building, Washington, D. C.

C. (2) Legislative interests include any and all legislation dealing with the organization of Congress.

E. (4) $5.10; (5) $43.26; (7) $91.86; (9) $140.22; (10) $813.65; (11) $953.87; (15) $43.26, William Feather Co., Cleveland, Ohio, stationery; $91.86, Robert Heller and Associates, Cleveland, Ohio, traveling expenses for Mr. Beckwith.

A. National Cotton Compress and Cotton Warehouse Association, 586 Shrine Building, Memphis, Tenn., and 1008 Sixteenth Street NW., Washington, D. C.

C. (2) Any matters substantially affecting the cotton compress and warehouse industry.

E. (10) $994.89; (11) $994.89.

A. National Cotton Council of America, post-office box 18, Memphis, Tenn.

C. (2) The National Cotton Council of America favors such action on any legislation affecting the raw-cotton industry as will promote the purposes for which the council is organized.

D. (6) $1,481.85.

E. (2) $494.24; (4) $41.21; (5) $196.50; (6) $108.79; (7) $641.11; (9) $1,481.85; (10) $15,-072.24; (11) $16,554.09; (15).[1]

A. National Council Against Conscription, 1013 Eighteenth Street NW., Washington, D. C.

C. (2) Its only legislative interest is opposition to peacetime conscription. (3) Conscription News.

D. (6) $4,051.94.

E. (2) $330.65; (4) $6,312.95; (5) $545.61; (6) $31.16; (7) $223.12; (8) $4.99; (9) $7,-448.38; (10) $10,469.51; (11) $17,917.89; (15) $223.91, Drake Press, 916 New York Avenue NW., Washington, D. C., printing; $1,000, R. Alfred Hassler, R. F. D. No. 1, Pomona, N. Y., services; $255, Sowers Printing Co., Lebanon, Pa., printing; $97.50, National Council of Churches, 297 Fourth Avenue, New York City, N. Y., printing; etc.[1]

A. National Council on Business Mail, Inc., 105 West Monroe Street, Chicago, Ill.

C. (2) H. R. 2982 and S. 1046, H. R. 3465 and S. 1335, and all other similar legislation relating to the postal service.

D. (7) $3,199.49.

E. (1) $2,499.93; (4) $393.54; (5) $24.33; (6) $236.64; (7) $10.82; (8) $33.97; (9) $3,-199.49; (10) $13,707.31; (11) $16,906.80; (15) $10.82, Mayflower Hotel, Washington, D. C., meals and lodging; $10.34, George F. McKiernan & Co., 1085 West Van Buren, Chicago, Ill., printing; $260.09, Olson Letter Service, 19 South La Salle Street, Chicago, Ill., mimeographing; $2,499.99, Sam O'Neal, 211 National Press Building, Washington, D. C., public-relations council fee; $19.08, Superintendent of Public Documents, Government Printing Office, Washington, D. C., publications.

A. National Council of Coal Lessors, Inc., 316 Southern Building, Washington, D. C.

C. (2) Legislation affecting the interests of lessors of coal lands.

E. (3) $1,943.25; (5) $16.98; (6) $2.04; (7) $192.71; (8) $14.05; (9) $2,169.03; (10) $7,-468.72; (11) $9,637.75; (15) $31.27, Jewell Ridge Coal Corp., Tazewell, Va., telegrams; $22.01, Western Union Telegraph Co., Washington, D. C., telegrams; $500, L. H. Parker, Washington, D. C., retainer; $49.25, Virginia Talbott, Washington, D. C., salary; $44.49, Jewell Ridge Coal Corp., Tazewell, Va., telephone; $49.25, Virginia Talbott, Washington, D. C., salary; etc.[1]

A. National Council of Farmer Cooperatives, 744 Jackson Place NW., Washington, D. C.

C. (2) H. R. 5505, Customs Simplification Act, for amendments; H. R. 5792 and S. 2104, repeal section 104, Defense Production Act, opposed; S. 2180, to provide livestock quotas under Defense Production Act, opposed; S. 1149, Department of Agriculture Reorganization Act, for amendments; S. 892, to provide special tax treatment for cooperatives, opposed; H. R. 4473, Revenue Act of 1951, in favor of some provisions, opposed to others; H. R. 1005, to amend Tariff Act of 1930 to provide for the free importation of twine used for baling hay straw, etc., for.

D. (6) $31,671.25.

E. (1) $147; (2) $15,959.72; (4) $337.84; (5) $2,158.14; (6) $3,058.50; (7) $1,024.68; (8) $883.08; (9) $23,568.96; (10) $87,967.41; (11) $111,536.37; (15) $25.45, Freda B. Couch, Washington, D. C., postage; $22.00, George S. Peer, Washington, D. C., taxicabs; $485.80, Interstate Properties, Inc., Washington, D. C., rent; $12, National Press Club, Washington, D. C., club membership; $31.46, L. James Harmanson, Jr., Washington, D. C., taxicabs; $57.07, Norwood Office Supply Co., Washington, D. C., office supplies and expenses; etc.[1]

A. National Council, Junior Order United American Mechanics, 3027 North Broad Street, Philadelphia, Pa.

C. (2) Restriction of immigration, suppress communism, patriotic legislation, support American free public schools. (3) Junior American.

E. (2) $249.99; (3) $129.22; (9) $379.21; (10) $1,123.80; (11) $1,503.01.

A. National Council for Prevention of War, 1013 Eighteenth Street NW., Washington, D. C.

C. (2) Bills affecting world peace, such as appropriations and supplementary appropriations, particularly where they bear on military matters or on the government of occupied areas, manpower legislation including military training and services, proposed peace treaties with Japan and Germany, economic assistance, (point 4), universal disarmament, expellees and displaced persons, educational exchange, etc. (3) Peace Action.

D. (6) $8,027.11.

E. (2) $5,134.02; (3) $123; (4) $803.27; (5) $1,360.27; (6) $149.25; (7) $374.30; (8) $1,061.17; (9) $9,005.28; (10) $30,074.92; (11) $39,080.20.

A. National Economic Council, Inc., Empire State Building, New York, N. Y.

C. (2) Our legislative interests are in favoring any legislation that tends to support private enterprise and maintain American independence, and to oppose any measures that work contrariwise.

---

[1] Not printed. Filed with Clerk and Secretary.

D. (6) $28,223.82.

E. (2) $15,129.03; (4) $4,711.88; (5) $3,906.41; (6) $639.12; (7) $2,966.91; (8) $805.09; (9) $28,158.44; (10) $90,321.22; (11) $118,479.66; (15) $465.85, Brooklyn Eagle Press, Inc., 24 Johnson Street, Brooklyn, N. Y., printing.

A. National Education Campaign, American Medical Association, 1 North LaSalle Street, Chicago, Ill.

B. American Medical Association, 535 North Dearborn, Chicago, Ill.

C. (2) Any legislation for compulsory health insurance such as S. 1140, S. 337, H. R. 54, H. R. 274, H. R. 910, H. R. 913, S. 401.

D. (6) $19,258.15.

E. (1) $12,873.34; (4) $6,384.81; (9) $19,-258.15; (10) $77,188.13; (11) $96,446.28; (15) $1,720.69, Medical Mailing Service, Inc., 2611 Indiana Avenue, Chicago, Ill., printing and mailing; $13.75, The Outlook, Lawrence, Kans., printing; $34.54, Railway Express Agency, Inc., 817 South Wells Street, Chicago, Ill., express; $2,610.93, Mercury Press, 942 Howard Street, San Francisco, Calif., printing; $2,400, E. Hofer & Sons, 1405 SW. Harbor Drive, Portland, Oreg., subscription; $287.21, Norman Letter Service, 1 North La-Salle Street, Chicago, Ill., mimeographing and mailing; etc.[1]

A. National Electrical Manufacturers Association, 155 East Forty-fourth Street, New York, N. Y.

C. (2) Legislation regarding excise taxes on electric refrigerators, electric ranges, electric water heaters, domestic electric appliances, commercial electric cooking equipment, and legislation with respect to amendment of the Labor-Management Relations Act.

E. (2) $344.83; (4) $13.24; (5) $60.92; (6) $93.82; (7) $308.45; (8) $100; (9) $921.26; (10) $1,157.20; (11) $2,078.46; (15) $260.16, R. M. Burr, 155 East Forty-fourth Street, New York, N. Y., salary; $84.67, Margaret Johnson, 155 East Forty-fourth Street, New York, N. Y., wages; $220.46, R. M. Burr, 155 East Forty-fourth Street, New York, N. Y., travel expenses; $87.99, Eastern Air Lines, Inc., 10 Rockefeller Plaza, New York, N. Y., airline tickets; $100, Craige & Craige, 119 Lawyers Row, Salisbury, N. C., services; $13.24, Batt, Bates & Co., Inc., 1407 K Street NW., Washington, D. C., mimeograph work.

A. National Federation of American Shipping, Inc.,[1] 1809 G Street NW., Washington, D. C.

C. (2) H. J. Res. 337, H. R. 5215, S. J. Res. 104, H. R. 5693, S. 241 and H. R. 4729, S. 1221, H. R. 1764, H. R. 3419.

E. (2) $31,956.25; (5) $1,350; (6) $217.01; (7) $143.37; (9) $33,666.63; (10) $22,000; (11) $55,666.63.

A. National Federation of Business and Professional Women's Clubs, Inc., 1819 Broadway, New York, N. Y.

C. (2) Legislation which affects the interests of women in business and the professions. (3) The Independent Woman.

D. (6) $68,338.20.

E. (2) $833.32; (5) $230.68; (6) $45.48; (8) $30.85; (9) $1,140.33; (10) $3,050.67; (11) $4,191.

A. National Federation of Post Office Clerks, room 502, 711 Fourteenth Street NW., Washington, D. C.

C. (2) All legislation pertaining to postal service and the welfare of postal and federal employees. (3) The Union Postal Clerk and Federation News Service Bulletin.

D. (6) $127,046.87.

E. (2) $7,468.85; (4) $10,832.45; (5) $380; (6) $18,086.27; (8) $6,006.90; (9) $42,774.47; (10) $65,558.47; (11) $108,332.94; (15) $65.48, E. C. Hallbeck, legislative expenses; $4,906.84, Western Union Telegraph Co. service; $91.36, Postmaster, Washington, D. C., postage; $71.50, Ransdell, Inc., printing; $70, Radio Station WCFM, postage on transcriptions; $1,389.05, Radio Station WCFM, talent, program time, packing charges, etc.[1]

A. National Federation of Private School Associations, 2601 Sixteenth Street NW., Washington, D. C.

C. (2) All legislative proposals that affect private non-tax-supported schools.

D. (6) $260.

E. (4) $78.14; (6) $19.31; (9) $97.45; (10) $1,132.03; (11) $1,229.48.

A. National Food Brokers Association, 527 Munsey Building, Washington, D. C.

C. Opposing S. 719 and H. R. 2820.

D. (6) $922.39.

E. (2) $500; (4) $392.39; (5) $89.17; (9) $922.39; (10) $2,238; (11) $3,160.39; (15) $190.39, Leo D. Gatlin, 751 Terminal Street, Los Angeles, Calif., printing and postage; $500, Watson Rogers, 527 Munsey Building, Washington, D. C., salary.

A. National Grain Trade Council, 604 Hibbs Building, Washington, D. C.

D. (6) $16,532.50.

E. (9) $15,514.16.

A. National Housing Conference, Inc., 1025 Vermont Avenue NW., Washington, D. C.

D. (6) $21,495.65.

E. (1) $50.40; (2) $6,753.50; (3) $10; (4) $1,502.21; (5) $1,712.31; (6) $491.81; (7) $1,-223.28; (8) $3,966.79; (9) $15,710.30; (10) $41,-465.66; (11) $57,175.96; (15) $50.40, Survey Associates, 112 East Nineteenth Street, New York City, N. Y., director listing; $80.22, Western Union, Washington, D. C., telegraph and messenger service; $411.59, Chesapeake and Potomac Telephone Co., Washington, D. C., telephone service; $10, Police-Fire Post 2979, F. F. W., Washington, D. C., contribution; $18, Urban Land Institute, Washington, D. C., pamphlets; $50, Ajay, New York City, art work; etc.[1]

A. National Independent Meat Packers Association, 740 Eleventh Street NW., Washington, D. C.

C. (2) Matters affecting meat packers.

D. (6) $24.50.

E. (1) $17.74; (2) $96.42; (4) $40.03; (5) $25.42; (6) $6.40; (7) $16.49; (8) $6.08; (9) $208.58; (11) $208.58; (15) $29.46, C. B. Heinemann, 740 Eleventh Street NW., Washington, D. C., salary and expenses; $12.60, Washington Gas Light Co., 740 Eleventh Street NW., Washington, D. C., rent; $48.87, La Roe, Brown & Winn, 743 Investment Building, Washington, D. C., counsel fee and expense; $14.58, Onslow & Brown, 1028 Connecticut Avenue NW., Washington, D. C., public relations counsel; $61.76, Batt Bates & Co., Inc., 1407 K Street NW., Washington, D. C., mimeographing.

A. National Labor-Management Council on Foreign Trade Policy, 424 Bowen Building, Washington, D. C.

C. (2) H. R. 4059, H. R. 3711, and H. R. 5505.

D. (6) $285; (12) $65.50.

E. (2) $1,625.01; (4) $93.74; (5) $603.41; (6) $72.93; (7) $133.77; (8) $131.76; (9) $2,660.62; (10) $9,549.97; (11) $12,210.59; (15).[1]

A. National Livestock Tax Committee, 515 Cooper Building, Denver, Colo.

C. (2) Amendment of Internal Revenue Code.

D. (6) $4,563.60.

E. (2) $3,166; (8) $1,130.43; (9) $4,296.43; (11) $9,693.40.

A. National Lumber Manufacturers Association, 1319 Eighteenth Street NW., Washington, D. C.

C. (2) All legislation affecting the interests of the lumber manufacturing industry. (3) National Lumber News.

D. (6) $10,113.07.

E. (1) $2,948.34; (2) $3,634.24; (4) $1,235.26; (5) $200.01; (6) $18.76; (7) $1,596.63; (8) $1,180.42; (9) $10,813.66; (10) $35,317.89; (11) $46,131.59; (15) $704.37, Darby Printing Co., Twenty-fourth and Douglas Streets NE., Washington, D. C.; $101.21, R. P. Andrews Paper Co., First and H Streets SE., Washington, D. C.; $106.79, Lithographic Photo Services, Inc., 1713 Pennsylvania Avenue NW., Washington, D. C.; $20.40, George Lohr Studios, 937 I Street NW., Washington, D. C.

A. National Milk Producers Federation, 1731 I Street NW., Washington, D. C.

C. (2) Any legislation that may affect milk producers or the cooperatives through which they act together to process and market their milk. (3) Dairy Director, News for Dairy Co-ops, and Legislative Letter.

D. (6) $46,803.82.

E. (1) $2,192.48; (2) $11,282.04; $25,421.91; (3) $5,025; (4) $4,044.31; (5) $655.13; (6) $1,521.14; (7) $3,075.35, $3,309.45; (9) $56,826.81; (10) $128, 486.95; (11) $185,315.76; (15) $300, Postmaster, Washington, D. C., postage; $52.29, Pennsylvania Railroad Co., Washington, D. C., travel; $80, Margaret K. Taylor, 3636 Sixteenth Street NW., Washington, D. C., travel; $309.02, Val C. Sherman, 411 Highland Drive, Kenwood, Md., salary; $323.40, Otie M. Reed, 8009 Westover Road, Bethesda, Md., salary; etc.[1]

A. National Renderers Association, 1424 K Street NW., Washington, D. C.

C. (2) Any legislation which would specifically have an effect upon the production, consumption, import, export, or taxation of any animal or vegetable fat or oil as well as all legislation generally affecting business, particularly small business.

D. (6) $2,700.

E. (2) $862.41; (4) $78.61; (5) $115.87; (6) $70.53; (7) $217.74; (8) $19.43; (9) $1,364.59; (10) $4,596.52; (11) $6,961.11.

A. National Reclamation Association, 1119 National Press Building, Washington, D. C.

C. (2) Reclamation Act, 1902 (53 Stat. 1187, 43 U. S. C. 485), and all amendatory and supplementary acts thereto; all other statutes relating to water and land conservation measures.[1]

D. (6) $9,582.65.

E. (2) $6,974.97; (4) $555.09; (5) $795.65; (6) $339.30; (8) $6,729.01; (9) $15,366.93; (10) $36,455.89; (11) $51,822.82; (15) $1,224.98, M. H. Kroeger, 1527 New Hampshire Avenue NW., Washington, D. C., salary; $12.43, E. V. Wuerth, Denver, Colo., public stenographer; $70.14, Franks Duplicating Service, National Press Building, Washington,

[1] Not printed. Filed with Clerk and Secretary.

[1] Not printed. Filed with Clerk and Secretary.

[1] Not printed. Filed with Clerk and Secretary.

D. C., mimeographing; $546, National Press Building Corp., National Press Building, Washington, D. C., rent; $71.97, Mallory Office Supply Co., Washington, D. C.; $305.68, Ransdell, Inc., Washington, D. C., printing, etc.[1]

———

A. National Retail Dry Goods Association, 100 West Thirty-first Street, New York, N. Y.

C. (2) Fair Labor Standards Act; Defense Production Act; Revenue Act of 1951; H. R. 5765, resale price maintenance; Fur Products Labeling Act; H. R. 1938, LIFO; S. 1335 and H. R. 3465, postal legislation; S. 1309, war-damage insurance; H. R. 1535 and H. R. 5505, customs simplifications; S. 2164, cotton labeling; H. R. 5189, Consumers' Research Bureau; S. 1046 and H. R. 3982, postal rates; H. R. 5101, unemployment compensation.

D. (6) $1,000.

E. (2) $3,250; (4) $1,545.06; (5) $517.60; (6) $17.54; (7) $58.95; (8) $5; (9) $5,394.15; (10) $16,112.07; (11) $21,506.22; (15) $2,953.99. John C. Hazen, Kass Building, Washington, D. C.; services; $377.50, Erskine Stewart, Kass Building, Washington, D. C., services.

———

A. National Retail Furniture Association, 666 Lake Shore Drive, Chicago, Ill.

C. (2) Defense Production Act, seek retention of Herlong amendment; oppose principle of Federal sales tax. (3) National Furniture.

E. (2) $1,966.66; (4) $200; (5) $500; (6) $100; (7) $271.28; (9) $3,037.94; (10) $6,-018.27; (11) $9,056.21; (15) $525, Leo J. Heer, suite 822, 1028 Connecticut Avenue NW., Washington, D. C., salary; $1,226.32, Willkie, Owen, Farr, Gallagher & Walton, 15 Broad Street, New York, N. Y., travel expenses; $437.62, Isaac Benwitt, 21 East Fortieth Street, New York, N. Y., professional counsel.

———

A. National Rivers and Harbors Congress, 1720 H Street NW., Washington, D. C.

C. (2) All matters pertaining to river and harbor development, flood control, navigation, irrigation-reclamation; soil and water conservation, and related subjects.

D. (6) $1,145.

E. (2) $1,330.60; (3) $3; (5) $129.84; (6) $13.43; (7) $153.87; (8) $390.40; (9) $2,021.14; (10) $14,369.95; (11) $16,411.09; (15) $13.43; Chesapeake & Potomac Telephone Co., 725 Thirteenth Street NW., Washington, D. C., telephone bill; $376.30, collector of internal revenue, Baltimore, Md., withholding tax; $13.70, Gulf Oil Corp., 1515 Locust Street, Philadelphia, Pa., charges; $150, Hamilton National Bank, 619 Fourteenth Street NW., V. ashington, D. C., payroll-deduction bonds; $20.95, the Mayflower, 1127 Connecticut Avenue NW., Washington, D. C., charges; $15, National Press Club, National Press Building, Washington, D. C., dues, etc.[1]

———

A. National St. Lawrence Project Conference, 843 Transportation Building, Washington, D. C.

C. (2) Any legislation with reference to the St. Lawrence waterway and power project.

D. (6) $11,000.

E. (1) $125; (2) $4,559.19; (4) $2,585.05; (5) $845.29; (6) $631.41; (7) $1,623.92; (8) $226.89; (9) $10,796.75; (10) $58,871.23; (11) $69,667.98; (15).[1]

———

A. National Savings and Loan League, 907 Ring Building, Eighteenth and M Streets NW., Washington, D. C.

B. Member Associations of the League.[1]

C. (2) Support of bills to improve facilities of savings and loan associations for en-

couragement of thrift and home financing; oppose legislation inimicable to interests of savings and loan industry.

D. (6) $212.40.

E. (2) $2,000; (4) $511.09; (6) $669.11; (9) $3,180.20; (10) $11,921.69; (11) $15,101.79; (15) $2,000, Oscar R. Kreutz, salary; $511.09, Batt, Bates & Co., Washington, D. C., printing and mailing; $519.11, Western Union Telegraph Co., telegrams; $150, Chesapeake & Potomac Telephone Co., phone calls.

———

A. National Small Businessmen's Association, 2834 Central Street, Evanston, Ill.

D. (6) $5,000.

E. (2) $4,011.25; (5) $1,723.62; (6) $208.39; (7) $251.60; (8) $388.93; (9) $6,583.79,[1] (10) $47,390.20; (11) $53,973.99.

———

A. National Society of Professional Engineers, 1121 Fifteenth Street NW., Washington, D. C.

C. (2) All legislation affecting the interests of professional engineers, specifically the Taft-Hartley Act, the Fair Labor Standards Act, the Walsh-Healey Act, the Bacon-Davis Act, universal military training and selective service, Great Lakes-St. Lawrence bills, National Science Foundation, Hoover Commission bills.

D. (6) $9,334.45.

E. (2) $875; (9) $875; (10) $2,625; (11) $3,500; (15) $90, Colortone Press, Washington, D. C., printing.

———

A. National Tax Relief Coalition, box 401, Greensboro, N. C.

C. (2) Favor tax limitation.

D. (6) $712.50.

E. (2) $375; (7) $337.50; (9) $712.50; (10) $2,435; (11) $3,147.50.

———

A. National Woman's Christian Temperance Union, 1730 Chicago Avenue, Evanston, Ill.

D. (6) $689.86.

E. (2) $1,075; (5) $369.61; (8) $9.95; (9) $1,454.56.

———

A. National Wool Growers Association, 414 Pacific National Life Building, Salt Lake City, Utah.

C. (3) National Wool Grower.

D. (6) $46,668.06.

E. (2) $2,499.99; (7) $312.99; (8) $825; (9) $3,637.98; (10) $18,859.13; (11) $22,497.11; (15) $2,499.99, J. M. Jones, 414 Pacific National Bank Building, Salt Lake City, Utah; $312.99, W. H. Stiewer, Fossil, Oreg.; $825, Wyoming Wool Growers Association, McKinley, Wyo.

———

A. William S. Neal, 918 Sixteenth Street NW., Washington, D. C.

B. National Association of Manufacturers, 918 Sixteenth Street NW., Washington, D. C.

C. (2) Reduction of Federal expenditures, revision of tax laws with approval of manufacturers' excise tax, maintenance of labor-regulatory laws, protection of patent system, maintenance of antitrust laws, freedom of competition, opposition to price and wage controls, and opposition to extension of existing economic controls. (3) NAM News.

D. (6) $4,477.59.

E. (7) $727.59.

———

A. Nebraska Tax Equality Committee, Inc., 714 Stuart Building, Lincoln, Nebr.

C. (2) All legislation designed to bring about equality of taxation between private business and cooperatives.

D. (6) $300.

E. (4) $308.26; (8) $1,301; (9) $1,609.26; (10) $1,465.85; (11) $3,075.11; (15) $1,275, National Associated Businessmen, Inc., 1025 Vermont Avenue NW., Washington, D. C., for aid in solicitation of funds and furnishing information; $306.86, Nebraska Farmer Printing Co., 1418 P Street, Lincoln, Nebr., printing; $10, postmaster, Lincoln, Nebr., 1952 bulk third-class mailing fee; $15, William P. Helm, Colorado Building, Washington, D. C., 1952 subscription to Reports From Washington.

———

A. C. Roger Nelson, 910 Seventeenth Street NW., Washington, D. C.

B. Dr. Walter Duschinsky, 93 Perry Street, New York, N. Y.

C. (2) Legislation to grant permanent residence to client (S. 523).

E. (6) $1.10; (8) $6.86; (9) $7.96; (10) $38.31; (11) $46.27.

———

A. G. W. Nelson, 10 Independence Avenue SW., Washington, D. C.

B. Brotherhood of Railroad Trainmen, 10 Independence Avenue SW., Washington, D. C.

C. (2) Advocating legislation favorable to labor and opposing unfavorable labor legislation.

———

A. George R. Nelson, Machinists Building, Washington, D. C.

B. International Association of Machinists, Machinists Building, Washington, D. C.

C. (2) Interested in substantially all legislation affecting the socio-economic and political interests of the American workingman including all pending legislation dealing with social security, national health, aid to physically handicapped, labor relations, displaced persons, etc.

D. (6) $900.

———

A. Herbert U. Nelson, 22 West Monroe Street, Chicago, Ill., and 1737 K Street NW., Washington, D. C.

B. National Association of Real Estate Boards, 22 West Monroe Street, Chicago, Ill., and 1737 K Street NW., Washington, D. C.

C. (2) Any legislation affecting the real estate industry.

D. (6) $2,591.24.

E. (6) $29.35; (7) $1,311.89; (9) $1,341.24; (10) $6,082.28; (11) $7,403.52; (15) $41.28, D. E. Wilder, railroad travel; $50, Carey Winstone Co., 739 Fifteenth Street NW., Washington, D. C., apartment rental; $17.50, Beatrice Fitzhugh, 2723 P Street NW., Washington, D. C., cleaning apartment; $37.84, Olymic Hotel, Seattle, Wash., room, laundry, breakfast, etc.[1]

———

A. Donald F. Nemitz, 211 Columbia Building, Louisville, Ky.

B. Tax Equality Committee of Kentucky, 211 Columbia Building, Louisville, Ky.

C. (2) Removal of exemptions granted by section 101 of Internal Revenue Code.

D. (6) $375.

E. (10) $111.70; (11) $111.70.

———

A. New Jersey Associated Businessmen, Inc.,[2] 112 Bowers Street, Jersey City, N. J.

C. (2) Any laws or proposals adversely effecting business.

D. (6) $435.

E. (2) $20; (5) $18; (6) $33.63; (8) $4.90; (9) $76.53; (10) $1,094.52; (11) $1,171.05.

———

A. New York Stock Exchange, 11 Wall Street, New York, N. Y.

C. (2) Proposed Federal tax legislation affecting the interests of the New York Stock Exchange and its members.

E. (10) $5,759; (11) $5,759.

———

[1] Not printed. Filed with Clerk and Secretary.

[1] Not printed. Filed with Clerk and Secretary.

[1] Not printed. Filed with Clerk and Secretary.

[2] Filed with the Secretary only.

A. Russ Nixon, 930 F Street NW., Washington, D. C.

B. United Electrical, Radio and Machine Workers of America, 11 East Fifty-first Street, New York, N. Y.

C. (2) Support all legislation favorable to national peace, security, democracy, prosperity, and the general welfare; oppose legislation detrimental to these objectives.

D. (6) $1,105.

E. (10) $410; (11) $410.

———

A. W. R. Noble, suite 509, 1028 Connecticut Avenue NW., Washington, D. C.

B. National Retail Farm Equipment Association, 207 Hotel De Soto Building, St. Louis, Mo.; and National Retail Hardware Association, 964 North Pennsylvania Street, Indianapolis, Ind.

C. (2) Keeping associations informed as to pending legislation and interpretations of legislation; special attention given to all labor legislation, tax bills, the Defense Production Act, and all legislation affecting the retail farm equipment and hardware trade. (3) Farm Equipment Retailing and Hardware Retailer.

D. (7) $3,375.

E. (6) $832.19; (7) $597.70; (8) $294.30; (9) $1,724.19; (10) $1,843.38; (11) $3,567.57.

———

A. J. S. Noffsinger, 2601 Sixteenth Street NW., Washington, D. C.

B. National Federation of Private School Associations, 2601 Sixteenth Street NW., Washington, D. C.

C. (2) All legislative proposals that affect private non-tax-supported schools.

———

A. O. L. Norman, 1200 Eighteenth Street NW., Washington, D. C.

B. National Association of Electric Companies, 1200 Eighteenth Street NW., Washington, D. C.

C. (2) Legislation that might affect its members as going electric utilities.[1]

D. (6) $4,041.68.

E. (6) 85 cents; (7) $488.68; (8) $92.17; (9) $581.70; (10) $2,204.18; (11) $2,785.88; (15) $17, National Press Club, dues; $26.50, Shoreham Hotel, Washington, D. C., dinner; $16.80, Washington Hotel, Washington, D. C., breakfast; $22.75, Mayflower Hotel, Washington, D. C., lunch; $24.45, Herrington Hotel, Amarillo, Tex., hotel.

———

A. North Dakota Resources Board, 311 Broadway, Fargo, N. Dak.

C. (2) Legislation affecting the development and utilization of the land, water, and other natural resources of North Dakota, including authorizations and appropriations.

D. (6) $1,750.

E. (2) $1,736; (5) $142.48; (6) $172.34; (7) $816.37; (9) $2,867.19; (10) $7,727.03; (11) $10,584.22; (15) $2,867.19, Fred J. Fredrickson, Lafayette Hotel, Washington, D. C., salary and expenses.

———

A. Northern Hemlock and Hardwood Manufacturers Association, Washington Building, Oshkosh, Wis.

C. (2) Legislation affecting the timber industries of Wisconsin and Michigan; taxation, forestry, and labor-management relations.

———

A. Harry E. Northam, 360 North Michigan Avenue, Chicago, Ill.

B. Association of American Physicians and Surgeons, Inc., 360 North Michigan Avenue, Chicago, Ill.

C. (2) All matters concerning the practice of medicine and surgery for the self-improvement and protection of its dues-paying members. (3) News Letter.

———

A. Charles E. Noyes,[4] 270 Madison Avenue, New York, N. Y.

B. American Institute of Accountants, 270 Madison Avenue, New York, N. Y.

C. (2) S. 17, S. 1725, S. 913, against; H. R. 3097, H. R. 4371, and H. R. 4373, for.

D. (7) $1,083.

E. (6) $50; (7) $228.21; (9) $278.21; (11) $278.21.

———

A. T. C. Nugent, 1111 Tulane Avenue, New Orleans, La.

B. The California Company, 1111 Tulane Avenue, New Orleans, La.

C. (2) The business of the company requires that it be interested in all types of legislation, regulation or order affecting the lands of the United States and the procedures by which exploration and production of oil and gas are to be accomplished.

D. (6) $1,000.

E. (6) $75; (7) $1,125; (9) $1,200; (10) $8,160; (11) $9,360.

———

A. Peter Q. Nyce, 1266 National Press Building, Washington, D. C.

C. (2) Affiant is interested in acquiring information from time to time on all legislation pertaining to land of the United States.

———

A. Edward H. O'Connor, 176 West Adams Street, Chicago, Ill.

B. Insurance Economics Society of America, 176 West Adams Street, Chicago, Ill.

C. (2) H. R. 27, to provide a national health insurance and public health program, and H. R. 54, to provide a program of national health insurance and public health.

D. (7) $4,436.

———

A. Eugene O'Dunne, Jr.,[2] Southern Building, Washington, D. C.

B. Wilbur-Ellis Co., Inc., 334 California Street, San Francisco, Calif.

C. (2) General interest in any proposed legislation having direct or specific impact on any food products produced or handled by this company; (3) Press Release—150 copies—December 21, 1951—mimeographed.

E. (4) $51.03; (6) $51.33; (7) $55; (8) $20.90; (9) $178.26; (11) $178.26.

———

A. Eugene O'Dunne, Jr.,[2] Southern Building, Washington, D. C.

B. National Association of Wool Manufacturers, 386 Fourth Avenue, New York, N. Y.

C. (2) General interest in proposed legislation having direct or specific impact on the wool textile industry.

E. (6) $21.16; (7) $2.20; (9) $23.36; (10) $57.85; (11) $81.21.

———

A. Ohio Railroad Association, 16 East Broad Street, Columbus, Ohio.

C. (2) Legislation affecting railroad interests.

E. (7) $393.16; (9) $393.16; (10) $203.10; (11) $596.26; (15) $393.16, E. C. Shively, reimbursement for travel, food, lodging and entertainment.

———

A. Fred N. Oliver, 110 East Forty-second Street, New York, N. Y., and Investment Building, Washington, D. C., partner in the law firm of Oliver & Donnally.

B. National Association of Mutual Savings Banks, 60 East Forty-second Street, New York, N. Y., and Railroad Security Owners Association, Inc., 110 East Forty-second Street, New York, N. Y.

C. (2) The general legislative interests consist of any legislation which the mutual savings banks or railroad security owners have a legitimate interest in supporting or opposing.

D. (6) $7,762.50.

E. (10) $2,122.06; (11) $2,122.06.

———

A. Clarence H. Olson, 1608 K Street NW., Washington, D. C.

B. The American Legion, 760 North Pennsylvania Street, Indianapolis, Ind.

C. (2) The American Legion and all veterans of World War I and World War II and their dependents on all matters affecting their care, rehabilitation, hospitalization, re-education and housing; all matters affecting the general welfare of our country with regard to national defense; Americanism, included in which is opposition to all subversive activities, with particular attention to our Immigration and Naturalization laws; child welfare, not only for children of veterans but for all children; aid and assistance to veterans in agriculture development; matters dealing with our foreign policy and foreign relations; the development of sound civil aviation programs and policies, and the development of sound and progressive programs for the employment and reemployment of veterans in civilian pursuits and in civil service; legislation which would eliminate all improper discriminations and be of benefit to the men and women who are still in our armed services; etc. (3) The American Legion magazine.

D. (6) $1,837.50.

E. (2) $2.25; $384.65; (9) $386.90; (10) $379.56; (11) $766.46.

———

A. Order of Railway Conductors of America, O. R. C. Building, Cedar Rapids, Iowa.

E. (2) $2,125; (15) $1,145.70; (6) $70.77; (9) $3,341.47; (10) $9,733.58; (11) $13,075.05.

———

A. Thomas R. Owens, 718 Jackson Place NW., Washington, D. C.

B. United Rubber, Cork, Linoleum and Plastic Workers of America, High at Mill Street, Akron, Ohio.

C. (2) Support all legislation favorable to the national peace, security, democracy, prosperity, and general welfare; oppose all legislation detrimental to these objectives.

D. (6) $1,220.

E. (8) $704.26 (9) $704.26; (10) $1,462.76; (11) $2,167.02.

———

A. Mrs. Theodor Oxholm, 654 Madison Avenue, New York, N. Y.

B. Volunteer worker for Spokesmen for Children, Inc., 654 Madison Avenue, New York, N. Y.

C. (2) Better laws for maternal and child health and welfare.

D. (6) $48.13.

E. (7) $48.13; (9) $48.13; (10) $125.57; (11) $173.70.

———

A. Lovell H. Parker,[3] 614 Colorado Building, Washington, D. C.

B. National Coal Association, National Council of Coal Lessors, American Trucking Association, and Television Broadcasters' Tax Committee, all of Washington, D. C.

C. (2) Tax legislation affecting the bituminous coal industry, the highway freight industry, and the television broadcasting industry.

D. (8) $19,500.

———

[1] Not printed. Filed with Clerk and Secretary.

[2] Filed with the Secretary only.

[4] Filed with the Clerk only.

[3] Filed with the Secretary only.

A. George F. Parrish,[2] Charleston, W. Va.
B. West Virginia Railroad Association, post-office box 7, Charleston, W. Va.
C. (2) Railroad retirement legislation.
D. (7) $3,000.
E. (7) $250.82; (9) $250.82; (10) $431.75; (11) $682.57; (15) $250.82.

———

A. James G. Patton,[2] 300 Independence Avenue SE., Washington, D. C.
B. Farmers Educational and Cooperative Union of America (National Farmers Union), 1555 Sherman Street, Denver, Colo. (home office); 300 Independence Avenue SE., Washington, D. C.

———

A. Randolph Paul (on behalf of the law firm of Paul, Weiss, Rifkind, Wharton & Garrison), 1614 I Street NW., Washington, D. C.
B. Gillette Safety Razor Co., Boston, Mass.
C. (2) Amendment of section 127 of the Internal Revenue Code to provide more equitable treatment of war losses.
D. (6) $35,000.
E. (7) $31.06; (8) $14.50; (9) $45.56; (10) $42.33; (11) $87.89.

———

A. Randolph Paul (on behalf of the law firm of Paul, Weiss, Rifkind, Wharton & Garrison), 1614 I Street NW., Washington, D. C.
B. Pabco Products, Inc., 475 Brannan Street, San Francisco, Calif.
C. (2) An amendment to section 444 of the Internal Revenue Code to provide more equitable excess-profits taxation for expanding companies.
D. (6) $25,000.
E. (7) $105.18; (7) $2; (8) $38.72; (9) $145.90; (10) $103.61; (11) $249.51.

———

A. Edmund W. Pavensteadt, c/o White & Case, 14 Wall Street, New York, N. Y.
B. International Minerals & Chemical Corp., 20 North Wacker Drive, Chicago, Ill.
C. (2) To amend section 34 of Trading With the Enemy Act to protect interests of domestic corporations owning stock in enemy corporations, assets of which have been seized by the Alien Property Custodian.
E. (7) $106.86; (9) $106.86; (10) $359.43; (11) $466.29.

———

A. Albert A. Payne, 1737 K Street NW., Washington, D. C.
B. Realtors' Washington Committee of the National Association of Real Estate Boards, 1737 K Street NW., Washington, D. C.
C. (2) Any legislation affecting the real estate industry.
D. (6) $2,000.
E. (6) $13.44; (7) $711.16; (8) $4.44; (9) $729.04; (10) $405.58; (11) $1,144.62.

———

A. Merl B. Peek, 1119 National Press Building, Washington, D. C.
B. National Reclamation Association, National Press Building, Washington, D. C.
C. (2) Reclamation Act, 1902 (53 Stat. 1187, 43 U. S. C. 485), and all amendatory and supplementary acts thereto; all other statutes relating to water and land conservation measures.
D. (6) $1,749.99.
E. (7) $484.50; (9) $484.50; (10) $837.07; (11) $1,321.57.

———

A. George S. Peer, 744 Jackson Place NW., Washington, D. C.
B. National Council of Farmer Cooperatives, 744 Jackson Place NW., Washington, D. C.

———

[2] Filed with the Secretary only.

C. (2) H. R. 1005, to amend Tariff Act of 1930 to provide for the free importation of twine used for baling hay, straw, etc.
D. (6) $1,624.98.
E. (7) $65.16; (9) $65.16; (10) $276.82; (11) $341.98.

———

A. Pierson & Ball, 1007 Ring Building, Washington, D. C.
B. Bridgeport Brass Co., Bridgeport, Conn.
C. (2) Excess-profits tax bills.
D. (6) $5,410.
E. (9) $483.30.

———

A. Pierson & Ball, 1007 Ring Building, Washington, D. C.
B. Radio Television Manufacturers Association, 1317 F Street NW., Washington, D. C.
C. (2) Excess-profits tax and excise tax bills.
D. (6) $2,130.
E. (9) $178.26.

———

A. Albert Pike, Jr., 488 Madison Avenue, New York, N. Y.
B. Life Insurance Association of America, 488 Madison Avenue, New York, N. Y.
C. (2) Legislation which might affect the welfare of policyholders and annuitants.
D. (6) $50.

———

A. Rufus G. Poole, 1625 K Street NW., Washington, D. C.
B. The Retail Shoe Committee for Equitable Taxation, 345 Hudson Street, New York, N. Y.
C. (2) Legislative interests ended with the disposition of section 123 of H. R. 4473, the enactment of which section registrant opposed.
D. (6) $7,500.
E. (6) $12.07; (9) $12.07; (10) $9.38; (11) $21.45.

———

A. Pope, Ballard & Loos, 707 Munsey Building, Washington, D. C.
B. Basic Vegetable Products, Inc., Vacaville, Calif.; Gentry, Inc., Los Angeles, Calif.; Puccinelli Packing Co., Turlock, Calif.; and J. R. Simplot Dehydrating Co., Caldwell, Idaho.
C. (2) Tariff legislation, Trade Agreements Extension Act, for; customs-simplification bill, against.
E. (6) $21.63; (9) $21.63; (10) $37.16; (11) $58.81.

———

A. Pope, Ballard & Loos, 707 Munsey Building, Washington, D. C.
B. California Fruit Growers Exchange and California Walnut Growers Association, Los Angeles, Calif.; Northwest Nut Growers, Dundee, Oreg.; and California Almond Growers Exchange, Sacramento, Calif.
C. (2) Agricultural and farmer cooperative matters; tariff and tax legislation; Trade Agreements Extension Act, import quotas, Revenue Act of 1951, agricultural appropriations, for; customs revisions, against.
D. (6) $1,441.25.
E. (2) $1.75; (4) $13.73; (6) $27.76; (7) $21.15; (8) $3.28; (9) $67.67; (10) $377.65; (11) $445.32.

———

A. Pope, Ballard & Loos, 707 Munsey Building, Washington, D. C.
B. Mushroom Growers Cooperative Association and Cultivated Mushroom Institute of America, both of Kennett Square, Pa.
C. (2) Tariff legislation; Trade Agreements Extension Act, for; customs-simplification bill, against.
E. (10) $2.06; (11) $2.06.

———

A. Pope, Ballard & Loos, 707 Munsey Building, Washington, D. C.
B. The Parker Pen Co., Janesville, Wis.; W. A. Sheaffer Pen Co., Fort Madison, Iowa; and Fountain Pen and Mechanical Pencil Manufacturers Association, New York City.
C. (2) Trade Agreements Extension Act, H. R. 1612, for; Revenue Act of 1951, H. R. 4473, against.
D. (6) $1,500.
E. (10) $90.25; (11) $90.25.

———

A. Frank M. Porter, 50 West Fiftieth Street, New York, N. Y.
B. American Petroleum Institute, 50 West Fiftieth Street, New York, N. Y.

———

A. James E. Poulton, Machinists Building, Washington, D. C.
B. International Association of Machinists, Machinists Building, Washington, D. C.

———

A. William I. Powell, Ring Building, Washington, D. C.
B. American Mining Congress, Ring Building, Washington, D. C.
C. (2) Measures affecting mining, such as income taxation, social security, public lands, stockpiling, monetary policies, etc.
D. (6) $1,000.
E. (7) $3.20; (9) $3.20; (10) $110.33; (11) $113.53.

———

A. Kenneth L. Pray, 1632 K Street NW., Washington, D. C.
B. Schenley Distillers, Inc., and affiliated companies.
C. (2) Legislative matters affecting Schenley Distillers, Inc., and affiliated companies.

———

A. William H. Press, 204 Evening Star Building, Washington, D. C.
B. Washington Board of Trade, 204 Evening Star Building, Washington, D. C.
C. (2) Legislation affecting the District of Columbia of interest to the Washington Board of Trade.
D. (6) $3,712.50.

———

A. Allen Pretzman, 50 West Broad Street, Columbus, Ohio.
B. Scioto-Sandusky Conservancy District, 50 West Broad Street, Columbus, Ohio.

———

A. William M. Price, 901 Massachusetts Avenue NW., Washington, D. C.
B. Central Labor Union and Metal Trades Council of Canal Zone, Balboa, Canal Zone.
C. (2) All legislation affecting employees of the Canal Zone.
D. (6) $1,733.
E. (1) $40; (2) $175; (3) $110; (4) $80; (5) $50; (6) $155; (7) $1,127; (9) $1,743; (10) $1,720; (11) $3,463.

———

A. Harry E. Proctor, 1110 Investment Building, Washington, D. C.
B. Oliver & Donnally, 1110 Investment Building, Washington, D. C., representing National Association of Mutual Savings Banks, 60 East Forty-second Street, New York City, N. Y.
C. (2) Tax revision bill, H. R. 4473; in opposition to repeal of section 101 (2) of Internal Revenue Code.
D. (6) $4,750.
E. (7) $28.30; (9) $28.30; (10) $231.64; (11) $259.94.

———

A. The Proprietary Association, 810 Eighteenth Street NW., Washington, D. C.
C. (2) Measures affecting proprietary medicines industry.
E. (11) $193,805.97.

A. Prudential Insurance Co. of America, 763 Broad Street, Newark, N. J.
C. (2) General interest in all legislation affecting the business of the company.
E. (2) $3,500; (7) $525.05; (9) $4,025.05; (10) $17,858.75; (11) $21,883.80; (15) $4,-025.05, Milo J. Warner, Nicholas Building, Toledo, Ohio, services.

A. Ganson Purcell, 910 Seventeenth Street NW., Washington, D. C.
B. Dr. Walter Duschinsky, 93 Perry Street, New York, N. Y.
C. (2) Legislation to grant permanent residence to client (S. 523).
E. (6) $1.10; (8) $6.86; (9) $7.96; (10) $38.31; (11) $46.27.

A. Ganson Purcell, 910 Seventeenth Street NW., Washington, D. C.
B. Insular Lumber Co., 1405 Locust Street, Philadelphia, Pa.
C. (2) General legislative interests of client are those affecting foreign commerce of the United States, including tax and tariff legislation.
D. (6) $1,400.
E. (6) $3.06; (8) $1.25; (9) $4.31; (10) $64.84; (11) $69.15.

A. Alexander Purdon, 1809 G Street NW., Washington, D. C.
B. National Federation of American Shipping, Inc., 1809 G Street NW., Washington, D. C.
C. (2) General legislative interests are concerned with the declaration of policy as expressed by the Congress in the 1936 Merchant Marine Act and such other legislation as may affect the development of an adequate merchant marine.
D. (6) $406.25.
E. (7) $66.62; (9) $66.62; (10) $192.52; (11) $259.14.

A. Edmund R. Purves,[2] 1741 New York Avenue NW., Washington, D. C.
B. American Institute of Architects, 1741 New York Avenue NW., Washington, D. C.
C. (2) Legislation in relation to the architectural profession.
D. (6) $200.
E. (10) $149; (11) $149.

A. C. J. Putt, 920 Jackson Street, Topeka, Kans.
B. The Atchison, Topeka, and Santa Fe Railway Co., 920 Jackson Street, Topeka, Kans.
C. (2) General legislative interest in matters affecting railroads.
E. (7) $297.15; (9) $297.15; (10) $1,162.01; (11) $1,459.16

A. Ward L. Quaal, 532 Shoreham Building, Washington, D. C.
B. Clear Channel Broadcasting Service (OCBS), suite 532, Shoreham Building, Washington, D. C.
C. (2) OCBS will oppose any proposed legislation (such as S. 491 and H. R. 4004, 81st Cong.) calling for the duplication of class I–A clear channel frequencies, or the limitation of the power of class I–A standard broadcast stations; CCBS opposes ratification of the so-called NARBA agreement signed November 15, 1950. See page 6.
D. (6) $5,625.
E. (7) $176.86; (9) $176.86; (10) $1,306.61; (11) $1,483.47; (15).[1]

---

[1] Not printed. Filed with Clerk and Secretary.
[2] Filed with the Secretary only.

---

A. Frank Quigley, 725 Thirteenth Street NW., Washington, D. C., and 195 Broadway, New York, N. Y.
B. American Telephone and Telegraph Co., 195 Broadway, New York, N. Y.
C. (2) Matters affecting Bell System communications.[1]
D. (6) $7,500.
E. (7) $838.38; (9) $338.38; (10) $2,079.18; (11) $2,917.56; (15) $66.38, Atlantic Coast Line Railroad, transportation; $35.87, Chevy Chase Club, Chevy Chase, Md., conference; $15.42, Metropolitan Club, Washington, D. C., conference.

A. F. Miles Radigan, 1200 Eighteenth Street NW., Washington, D. C.
B. National Association of Electric Companies, 1200 Eighteenth Street NW., Washington, D. C.
C. (2) Legislation that might affect its members as going electric utilities.[1]
D. (6) $1,500.

A. Alex Radin,[2] 1757 K Street NW., Washington, D. C.
B. American Public Power Association, 1757 K Street NW., Washington, D. C.
C. (2) Any legislation affecting the generation, transmission and distribution of electrical energy by local publicly owned electric systems, and the management and operation of such systems.
D. (6) $1,999.98.

A. Radio-Television Manufacturers Association, 777 Fourteenth Street NW., Washington, D. C.
C. (2) Excess profits tax or additional corporate income tax bills and regulation W.
E. (2) $1,510; (8) $593.31; (9) $2,103.31; (10) $40,294.05); (11) $42,307.36; (15) $2,-103.81, Pierson and Ball, Ring Building, Washington, D. C., services and expenses.

A. Leon Raesly, suite 624, 1625 I Street NW., Washington, D. C.
C. (2) S. 1671 and S. 1672.

A. Railroad Pension Conference, post-office box 798, New Haven, Conn.
C. (2) Enactment of 30-year half-pay railroad retirement legislation, based on 5 years of highest earnings, H. R. 63, H. R. 382, and S. 1308.
D. (6) $110.74.
E. (4) $71.39; (5) $39.62; (7) $19.32; (8) $8.06; (9) $138.39; (10) $486.15; (11) $624.54.

A. Railroad Security Owners Association, Inc., 110 East Forty-second Street, New York, N. Y.
C. (2) The general legislative interests consist of any legislation in which the members of the association have a legitimate interest in supporting or opposing.

A. Railway Labor Executives' Association, 10 Independence Avenue, SW., Washington, D. C.
C. (2) Any legislation affecting labor, especially railroad labor; all bills affecting Railroad Retirement and Unemployment Insurance Act.
D. (6) $9,175.
E. (2) $5,252.71; (5) $3,846.46; (6) $75.83; (9) $9,175.

A. Alan T. Rains, 777 Fourteenth Street NW., Washington, D. C.
B. United Fresh Fruit and Vegetable Association, 777 Fourteenth Street NW., Washington, D. C.

---

[1] Not printed. Filed with Clerk and Secretary.
[2] Filed with the Secretary only.

---

C. (2) Interested in any legislation affecting the marketing and distribution of fresh fruits and vegetables, directly or indirectly.

A. DeWitt C. Ramsey, 610 Shoreham Building, Washington, D. C.
B. Aircraft Industries Association of America, Inc., 610 Shoreham Building, Washington, D. C.
C. (2) Any legislation affecting the aviation industry.

A. Donald J. Ramsey, 1612 I Street NW., Washington, D. C.
B. Silver Users Association, 1612 I Street NW., Washington, D. C.
C. (2) H. R. 1321, to repeal certain legislation relating to the purchase of silver, and for other purposes.
D. (6) $4,249.98.
E. (7) $828.68; (8) $2,340.48; (9) $3,169.16.

A. Otie M. Reed, 1731 I Street NW., Washington, D. C.
B. National Milk Producers Federation, 1731 I Street NW., Washington, D. C.
C. (2) Any legislation that may affect milk producers or the cooperatives through which they act together to process and market their milk. (3) News for Dairy Co-ops and Legislative Letter.
D. (6) $2,287.50.
E. (10) $1; (11) $1.

A. Retail Shoe Committee for Equitable Taxation, 345 Hudson Street, New York, N. Y.
C. (2) Legislative interests ended with the disposition of section 123 of H. R. 4473, the enactment of which section registrant opposed.
E. (2) $7,500; (9) $7,500; (10) $7,775; (11) $15,275; (15) $7,500, Rufus G. Poole, 1625 K Street NW., Washington, D. C., services.

A. Retired Officers Association, Inc., 1616 I Street NW., Washington, D. C.
C. (2) Any and all legislation pertinent to the rights, benefits, privileges, and obligations of retired officers, male and female, Regular and Reserve, and their dependents and survivors, of whatever nature, dealing with personnel matters, pay and retirement benefits and pensions, studying and analyzing bills, preparing statements for presentation to the cognizant committees, and drafting amendments where indicated, appearing before committees of Congress, principally the Committees on Armed Services and the Committees on Veterans' Affairs, and the committees dealing with various privileges, opportunities, and obligations of the personnel involved. (3) The Retired Officer.
D. (6) $18,469.75.

A. Retirement Federation of Civil Service Employees of the United States Government, 900 F Street NW., room 314, Washington, D. C.
C. (2) General legislative interests are: Retention and improvement of the Civil Service Retirement and United States Employees Compensation Acts.[1]
D. (6) $2,475.60.
E. (2) $3,314.17; (4) $403.94; (5) $576.99; (6) $37.27; (8) $1,962.51; (9) $6,294.88; (10) $17,077.81; (11) $23,372.69; (15) $121.56, Standard Typewriter Co., 910 G Street NW., Washington, D. C., typewriter repairs and adding machine; $1,466.38, Walter L. Disbrow, 900 F Street NW., Washington, D. C., salary and expenses; $141.99, Commercial Office Furniture Co., 915 E Street NW., Washington, D. C., office supplies; $108.80, Shepherd Printing Co., 110 High Street, Portsmouth, Va., printing: $548.80, Hotel Raleigh, Twelfth Street and Pennsylvania Ave., Washington, D. C., annual banquet costs; $110,

---

[1] Not printed. Filed with Clerk and Secretary.

Thomas W. Filer, 7419 Kenmore Drive, Norfolk, Va., convention expenses; etc.[1]

A. Hubert M. Rhodes, 740 Eleventh Street NW., Washington, D. C.
B. Credit Union National Association, Inc., 1617 Sherman Avenue, Madison, Wis.
C. (2) Legislation affecting credit unions.
D. (6) $400.
E. (10) $35.84; (11) $35.84.

A. Charles R. Richey, 777 Fourteenth Street NW., Washington, D. C.
B. American Hotel Association, 221 West Fifty-seventh Street, New York, N. Y.
C. (2) Any and all bills and statutes of interest to the hotel industry.
D. (6) $1,800.
E. (7) $59.75; (9) $59.75; (10) $537.29; (11) $597.04.

A. Siert F. Riepma, 1028 Munsey Building, Washington, D. C.
B. National Association of Margarine Manufacturers, 1028 Munsey Building, Washington, D. C.
C. (2) Any specific legislation that may relate to margarine; also interested in passage of H. R. 3207, Eighty-second Congress, first session, to amend Navy ration statute (34 U. S. C. 902a); also interested in passage of H. R. 5012, which is likewise designed to amend Navy ration statute.
E. (10) $6; (11) $6.

A. John J. Riggle, 744 Jackson Place NW., Washington, D. C.
B. National Council of Farmer Cooperatives, 744 Jackson Place NW., Washington, D. C.
C. Indefinitely. (2) H. R. 5505, Customs Simplification Act, for amendments; H. R. 5792 and S. 2104, repeal section 104, Defense Production Act, opposed; S. 2180, to provide livestock quotas under Defense Production Act, opposed; S. 2149, Department of Agriculture Reorganization Act, for amendments.
D. (6) $2,325.
E. (7) $26.05; (9) $26.05; (10) $75.44; (11) $101.49.

A. George D. Riley, 901 Massachusetts Avenue NW., Washington, D. C.
B. American Federation of Labor, 901 Massachusetts Avenue NW., Washington, D. C.
C. (1) Indefinitely. (3) All bills affecting the welfare of the country generally, and specifically bills affecting workers.
D. (6) $2,340.
E. (2) $2,340; (6) $19.30; (8) $205.70; (9) $2,565; (10) $7,721; (11) $10,286.

A. H. J. Ripp, 811 North Twenty-second Street, Milwaukee, Wis.
B. Brotherhood of Railway and Steamship Clerks, 1015 Vine Street, Cincinnati, Ohio.
C. (1) Services terminated October 20, 1951. (3) H. R. 3669 and S. 1347, amending Railroad Retirement Act and other legislation affecting labor generally.
D. (6) $400.

A. E. W. Rising, 1215 Sixteenth Street NW., suite 3, Washington, D. C.
B. National Water Conservation Conference, 341 Broad Street Station Building, Philadelphia, Pa.
C. (1) No limitation as to time. (2) All legislation relative to development, utilization, and conservation of natural resources,

including bills to authorize projects and appropriations for construction of projects.
E. (2) $232.50; (4) $102.77; (5) $167; (6) $19.80; (7) $50.59; (9) $572.66; (10) $1,837.12; (11) $2,409.78; (15) $232.50, wages: Mrs. Ann Glass, Washington, D. C., stenographic, October $64.69, November $60.44, December $57.80; District unemployment, 23 cents; collector of internal revenue, Baltimore, Md., taxes and wage deduction, $49.34. $102.77, printed and duplicated matter: Mississippi Valley Association, Washington, D. C., $27.15; United States Post Office, $7.88; Andrews Paper Co., Washington, D. C., $67.74. $167, office rent, etc.: Mrs. Miriam Keller, Simpsonville, Md., $165; Pacific Northwest Development Association, Portland, Oreg., $2. $19.80, Chesapeake & Potomac Telephone Co.: October $6, November $6, December $7.80. $50.59, travel: Union Pacific Railway Co., $40.59; E. W. Rising, Washington, D. C., $10.

A. E. W. Rising, 1215 Sixteenth Street NW., Washington, D. C.
B. Southwestern Idaho Water Conservation Project, Inc., P. O. Box 1576, Boise, Idaho.
C. (1) Length of legislative interest censed as of December 31, 1951. (2) All legislation affecting directly or indirectly the development and utilization of the land and water resources of the United States. Specifically interested in legislation pertaining to Snake and Columbia River basins. No bills have been introduced in Congress at this session for authorization of projects in which we are interested in the Snake or Columbia River basins.
D. (6) $1,050.
E. (2) $200.47; (5) $285; (6) $33.27; (7) $682.28; (9) $1,200.02; (10) $1,580.67; (11) $2,780.69; (15) $200.47, Ann Glass, stenographic, Washington, D. C.; October, $74.71; November, $64.16; December, $61.60. $285, rent, etc., Mrs. Miriam Keller, Simpsonville, Md.; October, $80; November, $80; December, $80; E. W. Rising, use of furniture; October, $15; November, $15; December, $15. $33.27, telephone and telegrams, Chesapeake & Potomac Telephone Co.; October, $21.75; November, $10.52. $682.28, travel, C. B. & Q. Railway Co., Washington, D. C.; November, $84.25; December, $40.42; Capital Air Line, Washington, D. C., December, $31.40; Herring Hotel, Amarillo, Tex., October, $25; E. W. Rising, Washington, travel expenses, meals, hotels, stationery, cab fares, auto service, and miscellaneous expenses; October, $183.56; November, $146.04; December, $171.58.

A. E. W. Rising, 1215 Sixteenth Street NW., Suite 3, Washington, D. C.
B. Western Beet Growers Association, P. O. Box 742, Great Falls, Mont.
C. (1) No limitations as to time. (2) Legislation that may affect or limit right of American farmers to grow and market sugar beets; H. R. 4521, recently enacted by Congress.
D. (6) $310.
E. (2) $27; (4) $51.94; (5) $47; (6) $2; (7) $110.66; (9) $238.60; (10) $736.81; (11) $975.41; (15) $27, wages, Mrs. Ann Glass, Washington, D. C., stenographic, October $7, November $10, December $10; $51.94, printed matter and postage, postmaster, Washington, October $25.72, November $26.22; $47, office rent, etc., Mrs. Miriam Keller, Simpsonville, Md., $30; E. W. Rising, Washington, $15; Sugar Journal, New Orleans, $2; $2, Western Union Telegraph Co., $2; $110.66, Great Northern Railway Co., November $23.06, December $13.79; Union Pacific Railway, December $12.26; E. W. Rising, travel expenses, October $10, November $29.60, December $21.05.

A. Paul H. Robbins, 1121 Fifteenth Street NW., Washington, D. C.
B. National Society of Professional Engineers, 1121 Fifteenth Street NW., Washington, D. C.
C. (1) Indefinitely. (2) All legislation affecting the interests of professional engineers, specifically the Taft-Hartley Act, the Fair Labor Standards Act, the Walsh-Healey Act, the Bacon-Davis Act, universal military training and selective service, Great Lakes-St. Lawrence bills, National Science Foundation, Hoover Commission bills. (3) Legislative Bulletin.
D. (6) $250.

A. Dr. Frederick E. Robin, 1416 F Street NW., Washington, D. C.
B. Committee for the Nation's Health, 1416 F Street NW., Washington, D. C.
C. (1) Legislative interests will continue until the passage of national health insurance as stated in attachment A. (2) Legislative interests: President Truman's national health plan as embodied in H. R. 27, H. R. 54. This individual is also interested in the following measures: S. 445, S. 337, H. R. 1781, H. R. 2152, H. R. 516, H. R. 910, H. R. 274, H. R. 913, H. R. 14, H. R. 149, H. R. 342, H. R. 146. (3) The Government in Medicine, Draft Taft Clubs of America, The Compulsory Proposal—Its Advantages.
D. (6) $2,974.98.
E. (7) $92.36; (9) $92.36; (10) $103.79; (11) $196.15.

A. Watson Rogers, 527 Munsey Building, Washington, D. C.
B. National Food Brokers Association, 527 Munsey Building, Washington, D. C.
C. (1) Indefinite. (2) Opposing S. 719, a bill to establish beyond doubt that, under the Robinson-Patman Act, it is a complete defense to a charge of price discrimination for the seller to show that its price differential has been made in good faith to meet the equally low price of a competitor. Opposing H. R. 2820, a bill to clarify the right of sellers to engage in competition by in good faith meeting the equally low price of a competitor.
D. (6) $500.

A. Carlton H. Rose, 1025 Connecticut Avenue NW., Washington, D. C.
B. National Lead Co., 111 Broadway, New York, N. Y.
C. (1) Legislative interests are to continue indefinitely. (2) Legislative interests are confined to legislation affecting the operation of National Lead Co., including the manufacture and sale of its products. S. 770, H. R. 4390, H. R. 4948, H. R. 5448, H. R. 2698, H. R. 2862.

A. Roland H. Rowe, 400 Investment Building, Washington, D. C.
B. United States Wholesale Grocers' Association, 400 Investment Building, Washington, D. C.
C. (1) Indefinitely. (2) Legislation affecting interests of wholesale grocers. (a) Future legislation for taxing co-ops, Basing Point-type bills, amendments to Interstate Commerce Act, Fair Trade legislation. (b) H. R. 2820, S. 719, S. 1889, H. R. 5767. (c) Revenue Code, Robinson-Patman Act, Federal Trade Commission Act, Interstate Commerce Act, Miller-Tydings Act. (d) For more adequately taxing co-ops; for H. R. 5767; against S. 719, H. R. 2820 and S. 1889. (3) United States Wholesale Grocers' Association's Activity Report Bulletin.
D. (6) $62.70.
E. (9) $44.72; (10) $8.80; (11) $53.52.

[1] Not printed. Filed with Clerk and Secretary.

A. John Forney Rudy, 1809 G Street NW., Washington D. C.
B. National Federation of American Shipping, Inc., 1809 G Street NW., Washington, D. C.
C. (1) Legislative interests expected to continue indefinitely. (2) General legislative interests are concerned with the Declaration of Policy as expressed by Congress in the Merchant Marine Act of 1936. Specific legislative interests apply to proposals that support or contravene this policy.
E. (7) $33.60; (9) $33.60; (10) $714.43; (11) $748.03; (14) $33.60.

A. Edward A. Rumely, 205 East Forty-second Street, New York, N. Y.
B. Committee for Constitutional Government, Inc., 205 East Forty-second Street, New York, N. Y.
D. (6) $6,999.64.

A. Charles J. Rush, 312 Wire Building, 1000 Vermont Avenue NW., Washington, D. C.
B. Washington Real Estate Board, Inc., 312 Wire Building, 1000 Vermont Avenue NW., Washington, D. C.
C. (1) While Congress is in session and measures affecting local real estate are being considered. (2) All local measures affecting the District of Columbia are of interest.

A. Albert R. Russell, 162 Madison Avenue, Memphis, Tenn.
B. National Cotton Council of America, post-office box 18, Memphis, Tenn.
C. (1) Indefinitely. (2) The National Cotton Council of America favors such action on any legislation affecting raw cotton industry as will promote the purposes for which the Council is organized.
D. (6) $153.75.
E. (7) $541.38; (9) $541.38; (10) $908.27; (11) $1,449.65.

A. Francis M. Russell, 724 Fourteenth Street NW., Washington, D. C.
B. National Broadcasting Co., Inc., 724 Fourteenth Street NW., Washington, D. C.
C. (1) Indefinite. (2) As a part of registrant's duties as vice president in charge of Washington office of National Broadcasting Co., Inc., including supervision of the company's network activities in Washington, registrant may engage in activities relating to legislation affecting National Broadcasting Co., Inc., and/or its affiliated companies.
E. (7) $47.50; (9) $47.50; (10) $931.50; (11) $979; (15) $47.50; October 8, 1951, Willard Hotel, six persons, $47.50.

A Horace Russell, 7 South Dearborn Street, Chicago, Ill.
B. United States Savings and Loan League, 221 North La Salle Street, Chicago, Ill.
C. (1) Indefinitely. (2) Legislation directly or indirectly affecting the savings and loan business.
D. (6) $2,750.
E. (7) $139.04; (9) $139.04; (10) $849.91; (11) $988.45; (15) October 2, 1951, Baltimore & Ohio Railroad round-trip ticket Chicago to Washington, D. C. (reimbursed by league), $75.38; the Pullman Co. (reimbursed by league), $9.55; October 5, 1951, miscellaneous expenses (reimbursed by league), $54.11.

A. M. O. Ryan, 777 Fourteenth Street NW., Washington, D. C.
B. American Hotel Association, 221 West Fifty-seventh Street, New York, N. Y.
C. (1) Indefinitely. (2) Any and all bills and statutes of interest to the hotel industry.
D. (6) $3,750.
E. (7) $296.40; (9) $296.40; (10) $940.05; (11) $1,236.45.

A. Sterling St. John, Jr., 1317 F Street NW., Washington, D. C.
C. (1) Indefinitely. (2) Act of June 18, 1934 (48 Stat. 998, 1001), as amended, to provide for the establishment, operation, and maintenance of foreign-trade zones in ports of entry of the United States, to expedite and encourage foreign commerce, and for other purposes. In opposition to H. R. 5263 (82d Cong.), to amend the act of June 18, 1934, in order to extend foreign-trade zone privileges to certain types of warehouses.
D. (6) $17.25.
E. (7) $163.49; (9) $163.49; (10) $545.59; (11) $709.08; (15) $163.49, October 22, self, out-of-pocket expenses in connection with attending a meeting in New York of foreign-trade zone grantees and a luncheon in connection therewith.

A. St. Louis Local Meat Packers Association, 508 Security Building, St. Louis, Mo.
E. (10) $267.47; (11) $267.47.

A. Benjamin F. Saltzstein, 625 North Milwaukee Street, Milwaukee, Wis.
B. Hedwig Lydia Riedner, Astor Hotel, Milwaukee, Wis.
C. (1) During Eighty-second Congress or until client's matter is finally determined. (2) S. 302; H. R. 1620 and H. R. 2656; amendments to Public Law 859.
E. (4) $12.79; (6) $78.15; (7) $64; (9) $154.94; (10) $396.83; (11) $551.77; (15) Robert A. Saltzstein, as reimbursement of expenses, 511 Wyatt Building, Washington, D. C., $90.94.

A. Robert A. Saltzstein, 511 Wyatt Building, Washington, D. C.
B. Emergency Committee of Small and Medium Size Magazine Publishers, 400 Madison Avenue, New York, N. Y.
C. (1) During Eighty-second Congress. (2) Interested in H. R. 2982 and S. 1046, postal rate revision legislation.
D. (6) $1,000.
E. (6) $82.25; (7) $35.85; (8) $13.75; (9) $131.85; (10) $722.51; (11) $854.36; (15) October 30, 1951, Chesapeake & Potomac Telephone Co., $82.25; December 30, 1951, Chesapeake & Potomac Telephone Co., $35.62; November 27, 1951, travel, plane fare, $30.85; October 30, 1951, secretarial services, Washington, D. C., $13.75.

A. Robert A. Saltzstein, 511 Wyatt Building, Washington, D. C.
B. Benjamin F. Saltzstein, attorney for Hedwig Lydia Riedner, 625 North Milwaukee Street, Milwaukee, Wis.
C. (1) During Eighty-second Congress or until client's matter is finally determined. (2) S. 302; H. R. 1620 and H. R. 2656; amendments to Public Law 859.
E. (4) $12.79; (6) $78.15; (7) $64; (9) $154.94; (10) $396.83; (11) $551.77; (15) October 30, 1951, Chesapeake & Potomac Telephone Co., $63.15; December 30, 1951, Chesapeake & Potomac Telephone Co., $15; October 17, 1951, Batt, Bates & Co., 1407 K Street NW., Washington, D. C., mimeographing 60 copies of memorandum of testimony, S. 302. $12.79.

A. L. R. Sanford, 21 West Street, New York, N. Y.
B. Shipbuilders Council of America, 21 West Street, New York, N. Y.

A. Sangamo Electric Co.,[4] Springfield, Ill.
C. (1) Throughout present session of Congress. (2) Seeking amendments to Excess Profits Tax Act of 1950; H. R. 9827, Eighty-first Congress, second session; Public Law 909.
E. (10) $2,200; (11) $2,200.

---

[4] Filed with the Clerk only.

A. John T. Sapienza, 701 Union Trust Building, Washington, D. C.
B. National Association of Mutual Savings Banks, 60 East Forty-second Street, New York, N. Y.
C. (1) and (2) The undersigned was retained to advise the National Association of Mutual Savings Banks in connection with H. R. 4473, which became the Revenue Act of 1951, Public Law 183, Eighty-second Congress. The association and the undersigned opposed enactment of section 313 of the Revenue Act of 1951, which repealed the exemption of mutual savings banks from Federal income tax.
D. and E.[1]

A. Stuart T. Saunders, 108 North Jefferson Street, Roanoke, Va.
B. Norfolk & Western Railway Co., 108 North Jefferson Street, Roanoke, Va.
E. (10) $488.36; (11) $488.36.

A. Henry P. Schmidt, 10 Independence Avenue SW., Washington, D. C.
B. Brotherhood Railway and Steamship Clerks, Freight Handlers, Express and Station Employees, 1015 Vine Street, Cincinnati, Ohio.
C. (2) H. R. 3669 and S. 1347 particularly, which are amendments to the Railroad Retirement Act, and all other legislation generally affecting labor.
D. (6) $400.

A. Paul W. Schoen, 711 Fourteenth Street NW., Washington, D. C.
B. American Paper and Pulp Association, 122 East Forty-second Street, New York, N. Y.
C. (1) Legislative interests will continue during employment. (2) Legislative interests are those of employer.
D. (6) $100.
E. (6) $10; (7) $5; (9) $15; (11) $15.

A. Schoene & Kramer, 1625 K Street NW., Washington, D. C.
B. Railway Labor Executives' Association, 10 Independence Avenue SW., Washington, D. C.
C. (1) Indefinite. (2) Railroad retirement and unemployment insurance matters. No specific bills under active consideration at present.
D. (6) $4,500.
E. (6) $12.31; (7) $40.35; (9) $52.66; (10) $13.80; (11) $66.46.

A. Mrs. Andrew Mackay Scott, 1026 Seventeenth Street NW., Washington, D. C.
B. League of Women Voters of the United States, 1026 Seventeenth Street NW., Washington, D. C.
C. (1) Indefinitely.
D. (6) $412.50.
E. (7) $4; (9) $4; (10) $50.90; (11) $54.90.

A. Jack Garrett Scott, 839 Seventeenth Street NW., Washington, D. C.
B. National Association of Motor Bus Operators.
C. (1) Legislative interests are to continue indefinitely. (2) General legislative interests are in the field of transportation and other measures which may affect the interests of intercity motor-bus operators, and the ability of that industry to perform adequate service in the public interest.

A. Mildred Scott, 1370 National Press Building, Washington, D. C.
B. American Federation of the Physically Handicapped, 1370 National Press Building, Washington, D. C.

---

[1] Not printed. Filed with Clerk and Secretary.

C. (2) S. 1202—National services for disabled persons amendments of 1951 (introduced March 22, 1951, by Senator DOUGLAS and others), opposed. S. 1318—To establish the Federal Agency for Handicapped—an act to increase defense manpower, and help preserve our Nation, by establishing the Federal Agency for Handicapped Agency for Handicapped (introduced by Senator MATTHEW M. NEELY), for. H. R. 3559—To establish the Federal Agency for Handicapped—an act to increase defense manpower, and help preserve our Nation, by establishing the Federal Agency for Handicapped (introduced by JOHN W. McCONMACK); similar bills: H. R. 3560, Hon. PAUL W. SHAFER; H. R. 3581; Hon. HAROLD C. HAGEN; H. R. 3540, Hon. EMANUEL CELLER; H. R. 3747, Hon. GARDNER WITHROW; H. R. 3762, Hon. FRANCK R. HAVENNER; H. R. 3769, Hon. GEORGE M. RHODES; H. R. 3805, Hon. THOR C. TOLLEFSON; H. R. 3809, Hon. CHARLES P. WOLVERTON; H. R. 3836, Hon. HUGH B. MITCHELL; H. R. 3848, Hon. EDITH NOURSE ROGERS; H. R. 3902, Hon. RAY J. MADDEN; H. R. 4912, Hon. CARL D. PERKINS, for. H. R. 4748—Tax exemptions for handicapped and for those who support handicapped who cannot care for themselves (introduced by Hon. GEORGE M. RHODES), for. H. R. 4051, National Leprosy Act, Hon. J. PERCY PRIEST.

D. (6) $300.

———

A. Vernon Scott and Loring A. Schuler, 231 South La Salle Street, Chicago, Ill.

B. Firm retained by National Associated Businessmen, Inc., 1025 Vermont Avenue NW., Washington, D. C.

C. (1) Indefinitely. (2) General legislative interests relate to taxation, Government regulation of business, and other legislation directly affecting business. Specifically interested in legislation affecting businessmen, such as the Revenue Act of 1951.

D. (6) $4,000.
E. (7) $47.30; (9) $47.30; (10) $203.45; (11) $250.75.

———

A. W. J. Sears, suite 210, Marsh Building, 1832 M Street NW., Washington, D. C.

B. The Rubber Manufacturers Association, Inc., 444 Madison Avenue, New York, N. Y.

C. (1) Legislative interests stated in second quarterly report terminated with quarter ended June 30, 1950.

———

A. Harry See, 10 Independence Avenue SW., Washington, D. C.

B. Brotherhood of Railroad Trainmen.

C. (2) Advocating legislation favorable to labor and opposing unfavorable legislation.
E. (7) $29.14; (9) $29.14; (10) $699.56; (11) $728.70.

———

A. E. J. Shackelford, 10 Independence Avenue, Washington, D. C.

B. Brotherhood of Maintenance Way Employees, 12050 Woodward Avenue, Detroit, Mich.

C. (2) H. R. 3669 and H. R. 1347, to amend Railroad Retirement Act; House Resolution 426, to make study of integrating railroad retirement with social security.

D. (6) $600.

———

A. A. Manning Shaw,[2] Washington Loan and Trust Building, Washington, D. C.

B. Brown, Lund & Fitzgerald, Washington Loan & Trust Building, Washington, D. C. National Association of Electric Companies, Ring Building, 1200 Eighteenth Street NW., Washington, D. C.

C. (1) Indefinitely. (2) Any legislation that might affect the members of the N. A. E. C. Public Law 9, Eighty-second Congress

———

(renegotiation of contracts). Appropriations for the Interior Department, fiscal 1952. Revenue Act of 1951. Internal Revenue Code (53 Stat. 1). TVA Act (48 Stat. 58). Federal Power Act (49 Stat. 803). REA of 1936 (49 Stat. 1363). Reclamation acts (25 Stat. through 45 Stat). Flood Control Act, 1944 (58 Stat. 887). Modifications.

D. (6) $4,974.90.

———

A. Mark R. Shaw, 114 Trenton Street, Melrose, Mass.

B. National Council for Prevention of War, 1013 Eighteenth Street NW., Washington, D. C.

C. (1) Indefinitely, as long as I continue as secretary of the NCPW. (2) Favor economic aid to Europe and Asia, point 4 program, etc. Favor plans for universal disarmament. Favor full cooperation with the U. N. economic and social welfare. Oppose UMT, UMS, and military-aid programs. Other measures related to the issues of peace and war. (3) Peace Action.

D. (6) $800.
E. (7) $115.70; (9) $115.70; (10) $347.38; (11) $463.08.

———

A. Bruce E. Shepherd, 488 Madison Avenue, New York, N. Y.

B. Life Insurance Association of America, 488 Madison Avenue, New York, N. Y.

C. (1) Continuous. (2) General: Legislation which might affect the welfare of policyholders and annuitants. Specific: None.

D. (6) $100.
E. (10) $9.56; (11) $9.56.

———

A. Earl C. Shively, 16 East Broad Street, Columbus, Ohio.

B. The Ohio Railroad Association, 16 East Broad Street, Columbus, Ohio.

C. (1) Indefinite. (2) Legislation affecting railroad interests. (a) Parcel post bills, H. R. 3465 and S. 1335; railroad retirement bill, H. R. 3669; St. Lawrence waterway, House Joint Resolution 4. (b) H. R. 3465, S. 1335, H. R. 3669, and House Joint Resolution 4.

D. (6) $393.16.
E. (7) $393.16; (9) $393.16; (10) $596.26; (15) $14.66, October 5, 1951, Pennsylvania Railroad Co., pullman expenses. $32.81, October 5, 1951, Hotel Raleigh, Washington, D. C., hotel expenses. $36.06, October 23, 1951, Hotel Raleigh, Washington, D. C., hotel expenses. $195.61, November 26, 1951, Hotel Raleigh, Washington, D. C., hotel expenses.

———

A. Paul Sifton,[2] 734 Fifteenth Street NW., Washington, D. C.

B. United Automobile, Aircraft, Agricultural Implement Workers of America (UAW-CIO), 8000 East Jefferson Avenue, Detroit, Mich.

C. (1) Indefinitely. (2) Support all legislation favorable to the national peace, security, democracy, prosperity, and general welfare; oppose legislation detrimental to these objectives.

D. (6) $1,560.
E. (6) $31; (7) $488.49; (9) $519.49; (10) $899.41; (11) $1,418.90.

———

A. Silver Users Association 1612 I Street NW., Washington, D. C.

C. (1) Indefinite. (2) Legislation involving silver, H. R. 1321: To repeal certain legislation relating to the purchase of silver, and for other purposes.

D. (6) $295.
E. (2) $5,462.48; (5) $1,118.57; (6) $863.44; (7) $1,468.81; (8) $1,061.31; (9) $9,974.61; (10) $28,061.96; (11) $38,036.57.

———

A. Six Agency Committee,[4] 315 South Broadway, Los Angeles, Calif.

C. (1) Indefinite. (2) Legislation affecting California's rights in the Colorado River and legislation relating to reclamation and water resources policies including S. 75, to authorize the central Arizona project, House Joint Resolution 42 and counterparts, central Arizona project examination and report, and House Joint Resolution 21, Senate Joint Resolution 26, and counterparts. Colorado River litigation resolutions, H. R. 2513 and S. 943, Collbran project; Public Law 171, San Diego aqueduct.

D. (6) $100.
E. (2) $4,030; (8) $282.13; (9) $4,313.18; (10) $21,967.54; (11) $26,280.72; (15) $1,830, October 16, 1951, Northcutt Ely, 1209 Tower Building, Washington, D. C., retainer and per diem; $239.15, October 16, 1951, Northcutt Ely, 1209 Tower Building, Washington, D. C., reimbursement of expenses; $2,180, November 28, 1951, Northcutt Ely, 1209 Tower Building, Washington, D. C., retainer and per diem; $44.03, November 28, 1951, Northcutt Ely, 1209 Tower Building, Washington, D. C., reimbursement of expenses.

———

A. Stephen G. Slipher, room 911, 711 Fourteenth Street NW., Washington, D. C.

B. United States Savings and Loan League, 221 North La Salle Street, Chicago, Ill.

C. (1) Continuous. (2) H. R. 3178, 1385, 3177, 4473, S. 610, 1212. (3) Washington Notes, Flash Notes.

D. (6) $1,000.
E. (7) $25; (9) $25; (10) $129.80; (11) $154.80.

———

A. Miss Elizabeth A. Smart, 100 Maryland Avenue NE., Washington, D. C.

B. National Woman's Christian Temperance Union, 1730 Chicago Avenue, Evanston, Ill.

C. (1) One year. (2) Legislation dealing with alcohol, international relations, narcotics, women and children; H. R. 1749, sale of alcohol to members of the land and naval forces, etc.; H. R. 2187, reduce absenteeism, conserve manpower, and speed production of materials to security of the United States; H. R. 2188, advertisement of alcoholic beverages in interstate commerce; H. R. 2340, violations of narcotics laws; H. R. 264, use and sale of intoxicating beverages to Indians; H. R. 1206, District of Columbia sales-tax exemptions of foods in hotels, cafes, bars, etc.; H. R. 1736, excise tax on cabarets, roof gardens, etc.; H. R. 3072, abolish functions of Indian Bureau, repeal act of June 18, 1934; H. R. 2982, increase postal rates; S. 1046, increase postal rates; S. 1, universal service and training bill.

D. (6) $612.
E. (5) $138.13; (6) $30.14; (9) $168.27; (10) $473.17; (11) $641.44.

———

A. Anthony W. Smith, 718 Jackson Place NW., Washington, D. C.

B. Congress of Industrial Organizations, 718 Jackson Place NW., Washington, D. C.

C. (1) Indefinite continuation. (2) General, forestry, regional development, resource conservation; specific, none.

———

A. Harold O. Smith, Jr., 400 Investment Building, 1511 K Street NW., Washington, D. C.

B. United States Wholesale Grocers' Association, Inc., Investment Building, 1511 K Street NW., Washington, D. C.

A. Howard J. Smith, 510 Goodrich Building, Phoenix, Ariz.

B. Central Arizona Project Association, 510 Goodrich Building, Phoenix, Ariz.

C. (1) Legislative interest will continue through the Eighty-second Congress. (2) S. 75, Bridge Canyon Act; and H. R. 1500 and H. R. 1501. Bridge Canyon Act (known more frequently as central Arizona project bill). (3) The Case for Water in Central Arizona, Work for Water, California's Stake in Arizona's Share of Colorado River, What the Central Arizona Project Means to You, Truth, Setting Up Time, Facts You Should Know Respecting the Central Arizona Project, National Tax Benefits From the Central Arizona Project.

D. (6) $9,294.77.

E. (1) $1,233.37; (2) $8,418.26; (3) $35; (4) $477.72; (5) $1,493.05; (6) $276.82; (7) $1,704.73; (8) $319.60; (9) $13,988.55; (10) $52,830.37; (11) $66,818.92; (15).[1]

A. Lloyd W. Smith, 425 Shoreham Building, Washington, D. C.

B. Chicago, Burlington & Quincy Railroad Co., 547 West Jackson Boulevard, Chicago, Ill.

C. (1) Indefinitely. (2) Any legislation affecting directly or indirectly the Chicago, Burlington & Quincy Railroad Co., including the following bills being considered this session: Railroad communications and operating rules bills, H. R. 1998; Federal barge-line bills, H. R. 1528, H. R. 2957; Railway Labor Act bills, H. R. 2658; transportation investigation, Senate Resolution 55; all measures purporting to amend the Railway Retirement Act.

D. (6) $2,085.

A. Purcell L. Smith, 1200 Eighteenth Street NW., Washington, D. C.

B. National Association of Electric Companies, 1200 Eighteenth Street NW., Washington, D. C.

C. (1) Of indefinite duration. (2) H. R. 4386, 4473, 3400, 1442, 4963, 5743.

D. (6) $16,249.97.

E. (6) $9.38; (7) $280.40; (9) $289.78; (10) $1,432.14; (11) $1,721.92; (15) $193.90, various restaurants; dinners and lunches for company executives and NAEC employees; $16.20, November 30, Dayton-Biltmore Hotel, Dayton, O., lodging; $11.70, December 13, Pennsylvania Railroad, transportation.

A. Robert E. Smith,[2] 116 Nassau Street, New York, N. Y.

B. Life Insurance Policyholders Protective Association, 116 Nassau Street, New York, N. Y.

C. (1) Indefinite. (2) General education concerning the effect of inflation on the purchasing power of life insurance, as it relates to Federal policies or measures deemed to be inflationary in character. (a-b-c-d). In support of House Joint Resolution 323, proposing constitutional amendment relative to taxes on incomes, inheritances and gifts. (3) Stop inflation.

D. (6) $900.

E. (7) $936.92; (9) $936.92; (10) $1,376.26; (11) $2,313.18; (12) $4,800.47; (13) $2,000; (15) $56.30, October 1–8, restaurants, Seattle, Tacoma, meals; $38.55, October 1–8, hotel and motel, Seattle, Tacoma, lodging; $19.25, October 1–8, miscellaneous, Seattle, Tacoma, phones, postage, etc.; $88.40, October 9–20, restaurants, Portland, Salem, Medford, San Francisco, meals; $53.65, October 9–20, hotel and motel, Portland, Salem, Medford, San Francisco, lodging, etc.[1]

A. R. G. Smith, 10 Independence Avenue NW., Washington, D. C.

B. Brotherhood Railway Carmen of America, Kansas City, Mo., International Brotherhood Firemen and Oilers, Chicago, Ill.

D. (6) $778.24.

A. Sylvester C. Smith, Jr., 763 Broad Street, Newark, N. J.

B. Prudential Insurance Co. of America, 763 Broad Street, Newark, N. J.

C. (1) During my official connection as general counsel of the company. (2) General interest in all legislation affecting the business of the company.

A. Calvin K. Snyder, 1737 K Street NW., Washington, D. C.

B. Realtors' Washington Committee of the National Association of Real Estate Boards, 1737 K Street NW., Washington, D. C.

C. (1) Indefinitely. (2) Any legislation affecting the real estate industry.

D. (6) $5,250.

E. (6) $154.19; (7) $1,449.27; (8) $25.85; (9) $1,629.31; (10) $2,784.52; (11) $4,413.83; (15) $18.23, November 12, 1951, Netherland Plaza Hotel, Cincinnati, Ohio, breakfast conference; $22.60, December 1, 1951, George C. Shaffer, Inc., Washington, D. C., flowers for Wherry family; $114.35, December 22, 1951, Jeweler's Market, 3904 Fourteenth Street NW., Washington, D. C., purchases in connection with dinner meeting November 22, 1951; $40.20, December 22, 1951, Avignone Confections, 5612 Connecticut Avenue, Washington, D. C., purchases in connection with dinner meeting of January 22, 1951; $35, December 22, 1951, Thomas Norman, 1024 Browning Place NE., Washington, D. C., wages for services in connection with dinner meeting of January 22, 1951.

A. J. D. Snyder, room 1040, La Salle Hotel, Chicago, Ill.

B. Illinois Railroad Association, room 1526, 33 South Clark Street, Chicago, Ill.

C. (1) Indefinitely. (2) Legislation affecting railroads.

D. (6) $500.

E. (6) $13.14; (7) $296.10; (8) $66.37; (9) $375.61; (10) $192.73; (11) $568.34.

A. Southern States Industrial Council, Stahlman Building, Nashville, Tenn.

C. (1) Indefinite. (2) Support of legislation favorable to free enterprise system and opposition to legislation unfavorable to that system. (3) Southern States Industrial Council Bulletin.

D. (6) $32,624.50.

E. (2) $15,815.43; (4) $3,150.58; (5) $1,184.17; (6) $176.84; (7) $534.58; (8) $388.47; (9) $21,250.07; (10) $80,175.89; (11) $101,423.96; (15) $325, Mecklenburg Real Estate Co., rent; $150, postmaster, postage; $4.08, Elliott Typewriter Co., rent of machine; $17, Manufacturers Record Co., printing; $28.98, Travel, Inc., transportation, etc.[1]

A. Spence, Hotchkiss, Parker & Duryee, 40 Wall Street, New York, N. Y.

B. Aircraft Industries Association of America, Inc., 610 Shoreham Building, Washington, D. C.

C. (1) Indefinite. (2) Legislation to establish a national air policy.

A. Lyndon Spencer, 305 Rockefeller Building, Cleveland, Ohio.

B. Lake Carriers' Association, 305 Rockefeller Building, Cleveland, Ohio.

A. Jerome H. Spingarn, 132 Third Street SE., Washington, D. C.

B. United World Federalists, Inc., 125 Broad Street, New York, N. Y.

C. (1) Legislative interests will continue indefinitely. (2) H. R. 64 and other measures to strengthen the United Nations; aid and technical assistance to underdeveloped areas. Support of United Nations and its specialized agencies.

D. (6) $2,124.99.

A. Spokesmen for Children, Inc., 654 Madison Avenue, New York, N. Y.

D. (6) $23.

E. (4) $8.75; (5) $123.81; (6) $6.70; (7) $48.13; (9) $187.39; (10) $1,772.50; (11) $1,959.89; (15) $22, November 6, 1951, Willike Memorial Buildings, New York, room rent for meeting; $10.30, November 5, 1951, Plaza Typewriter Exchange, New York, typewriter rent; $24.41, December 11, 1951, Universal Reporting Service, New York, 21 Spruce Street, stenotypist; $48.13, December 14, 1951, Mrs. Theodor Oxholm, New York, travel.

A. Thomas G. Stack, 1104 West One Hundred and Fourth Place, Chicago, Ill.

B. National Railroad Pension Forum, Inc., 1104 West One Hundred and Fourth Place, Chicago, Ill.

C. (1) Indefinite. (2) H. R. 166, H. R. 2129, S. 399, H. R. 2423, S. 510, H. R. 2422, H. R. 2688, H. R. 2313, H. R. 2343, H. R. 1313, S. 1125, Public Law 234, and any bills before the various committees of Congress, pertaining to improving our Railroad Retirement Act, and to secure additional benefits for the rank and file of railroad employees covered by the act. (3) Rail Pension News.

D. (6) $1,320.

E. (1) $214.50; (2) $1,320; (4) $1,400; (6) $31.89; (7) $264.95; (9) $3,231.25; (10) $10,-899.97; (11) $14,131.22.

A. Howard M. Starling, 837 Washington Building, Washington, D. C.

B. Association of Casualty and Surety Companies, 60 John Street, New York, N. Y.

C. (1) Indefinite. (2) Legislation affecting casualty and surety companies. Numerous House and Senate bills dealing with the subject of bonding of Federal employees, and bills reactivating War Damage Corporation.

D. (6) $150.

E. (10) $79.45; (11) $79.45.

A. State Tax Association, post office box 2559, Houston, Tex.

C. (1) A continuous study of Federal tax legislation and administrative rulings and court decisions in tax matters affecting community property taxpayers inequitably. (2) No specific legislation.

D. (6) $2,895.

E. (2) $828.12; (4) $141.22; (7) $43.20; (8) $338.76; (9) $1,351.30; (10) $5,771.70; (11) $7,123.

A. Otts D. Steinback, room 407, 10 Independence Avenue SW., Washington, D. C.

B. Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express, and Station Employees, 1015 Vine Street, Cincinnati, Ohio.

C. (1) Indefinitely. (2) H. R. 3669 and S. 1347 and other legislation affecting labor, more particularly railroad labor.

D. (5) $300; (6) $400; (7) $2,804; (8) $2,804.

A. Charles I. Stengle, room 716, AFGE, 900 F Street NW., Washington, D. C.

B. American Federation of Government Employees, room 716, 900 F Street NW., Washington, D. C.

---

[1] Not printed. Filed with Clerk and Secretary.

[2] Filed with the Secretary only.

[1] Not printed. Filed with Clerk and Secretary.

C. (1) Permanently. (2) All bills of interest to Federal Government employees and District of Columbia government employees.
D. (6) $1,615.32.
E. (7) $17.60; (9) $17.60; (10) $125.60; (11) $143.20.

---

A. Charles T. Stewart, 1737 K Street NW., Washington, D. C.
B. National Association of Real Estate Boards, 22 West Monroe Street, Chicago, Ill.
C. (1) Indefinite. (2) Any legislation affecting the real-estate industry. (3).[3]
D. (6) $3,872.47.
E. (7) $511.06; (8) $61.41; (9) $572.47; (10) $976.37; (11) $1,548.84.

---

A. Erskine Stewart, Suite 808, Kass Building, 711 Fourteenth Street NW., Washington, D. C.
B. National Retail Dry Goods Association, 100 West Thirty-first Street, New York, N. Y.
C. (2) LIFO, all appropriation legislation, all parcel-post legislation, Fair Labor Standards Act, war-damage insurance and other war-damage insurance bills, customs simplification, unemployment compensation, cotton labeling, consumers research bureau, and fair trade.
D. (6) $375.
E. (8) $2.50; (9) $2.50; (10) $18.95; (11) $21.45.

---

A. Sterling F. Stoudenmire, Jr., 1729 H Street NW., Washington, D. C.
B. Waterman Steamship Co., 61 St. Joseph Street, Mobile, Ala.
C. (2) Any legislation affecting the American merchant marine and transportation generally.
D. (6) $1,000.
E. (7) $4.90; (9) $4.90; (10) $112.38.

---

A. Edwin L. Stoll, 1737 K Street NW., Washington, D. C.
B. National Association of Real Estate Boards, 22 West Monroe Street, Chicago, Ill.
C. (2) Any legislation affecting the real-estate industry.
D. (6) $2,454.33.
E. (7) $244.38; (8) $34.95; (9) $279.33; (10) $116.90; (11) $396.23; (15) $12, National Press Club, Washington, D. C., dues.

---

A. Benton J. Stong,[2] 300 Independence Avenue SE., Washington, D. C.
B. Farmers Educational and Cooperative Union of America (National Farmers Union), 1555 Sherman Street, Denver, Colo. (home office); 300 Independence Avenue SE., Washington, D. C.
C. (2) Legislation of interest to the National Farmers Union.
D. (6) $2,750.

---

A. Paul A. Strachan, 1370 National Press Building, Washington, D. C.
B. American Federation of the Physically Handicapped, 1370 National Press Building, Washington, D. C.
C. (2) Opposed S. 1202; for S. 1318, H. R. 3559, H. R. 3560, H. R. 3561, H. R. 3640, H. R. 3747, H. R. 3762, H. R. 3769, H. R. 3805, H. R. 3809, H. R. 3836, H. R. 3848, H. R. 3902, H. R. 4912, H. R. 4748, H. R. 4051.
D. (6) $700.
E. (7) $50; (8) $50; (9) $50; (10) $390; (11) $440.

---

A. O. R. Strackbein, 424 Bowen Building, Washington, D. C.
C. (2) H. R. 4059, copyright amendment bill, relating to the manufacturing clause;

H. R. 3711, photoengraving; temporary free importation of samples under bond; H. R. 5505, customs simplification bill, and tuna bill.
D. (6) $3,000.
E. (7) $37.95; (8) $17.80; (9) $55.75; (10) $234.58; (11) $290.33.

---

A. O. R. Strackbein, 424 Bowen Building, Washington, D. C.
C. (2) H. R. 4059, copyright amendment bill, relating to the manufacturing clause; and H. R. 3711, photoengraving, temporary free importation of samples under bond.
D. (6) $625.

---

A. O. R. Strackbein, 424 Bowen Building, Washington, D. C.
D. (6) $1,625.01.
E. (7) $65.50; (9) $65.50; (10) $448.82; (11) $514.32.

---

A. William C. Stronach, 20 North Wacker Drive, Chicago, Ill.
B. American College of Radiology, 20 North Wacker Drive, Chicago, Ill.
C. (2) Legislation affecting the practice of medicine and all national health insurance legislation.

---

A. Arthur D. Strong, 1034 Midland Bank Building, Minneapolis, Minn.
B. Upper Mississippi Waterway Association, 1034 Midland Bank Building, Minneapolis, Minn.
C. (2) All legislation relating to the improvement and development of navigable waterways in the Upper Mississippi River, together with legislation relating to flood control conservation, pollution, recreation, fish and wildlife, including all legislation that has to do with the development of water resources of the upper Mississippi River and its tributaries as this legislation relates to all types of public benefits.
D. (6) $1,160.97.

---

A. Arthur Sturgis, Jr., 1625 I Street NW., Washington, D. C.
B. American Retail Federation, 1625 I Street NW., Washington, D. C.
C. (2) Registrant is generally interested in all legislation and legislative proposals affecting the retail industry, including the industry's relations with the Federal Government, with its suppliers, with its employees, and with its customers.
D. (6) $625.
E. (7) $10; (9) $10; (10) $13.40; (11) $23.40.

---

A. J. E. Sturrock, post-office box 2084, Capitol Station, Austin, Tex.
B. Texas Water Conservation Association, post-office box 2084, Capitol Station, Austin, Tex.
C. (2) Interested in all legislation concerning the development, conservation, protection, and utilization of Texas' land and water resources through existing State and Federal agencies; opposed to all legislation creating Federal valley authorities and all legislation seeking to superimpose Federal control over State control in the distribution of the State's water resources; opposed to House Joint Resolution 102, approving agreement between United States and Canada relating to the Great Lakes-St. Lawrence Basin; for H. R. 1344, to prohibit establishment of valley authority in any State without vote of people of the State; for H. R. 2646, to facilitate the development of small reclamation projects; for bill quitclaiming title to tidelands to the several States. (3) Texas water.
D. (6) $1,500.

E. (2) $57.38; (5) $15.42; (6) $7; (7) $631.87; (8) $211.37; (9) $923.04; (10) $1,091.54; (12) $2,014.58; (15) $404.25.[1]

---

A. Sullivan, Bernard, Shea & Kenney, 804 Ring Building, Washington, D. C.
B. An informal group of finance companies.[1]
C. (2) Employer was opposed to the proposal, which would amend Internal Revenue Code so as to permit only one surtax exemption and one minimum excess profits tax credit to a group of affiliated corporations; this proposal became section 23 of H. R. 4473, as it passed the House and was eliminated from such bill as it passed the Senate; a compromise proposal was adopted by the conferees and enacted as section 15 (c) of the Internal Revenue Code.
D. (6) $35,000.
E. (2) $12,500; (6) $13.32; (9) $12,513.32; (11) $12,513.32; (15) $12,500, J. Milton Cooper, Washington Building, Washington, D. C., fees.

---

A. Francis M. Sullivan, 1701 Eighteenth Street NW., Washington, D. C.
B. Disabled American Veterans, National Headquarters, 1423 East McMillan Street, Cincinnati, Ohio.
C. (2) All legislation affecting war veterans, their dependents, and survivors of deceased veterans. (3) DAV Semimonthly.
D. (6) $2,906.60.

---

A. A. D. Sutherland, 104 South Main Street, Fond du Lac, Wis.
B. Bankers Farm Mortgage Co., Fond du Lac, Wis., in behalf of former bondholders of the Bankers Joint Stock Land Bank of Milwaukee, Wis., and F. A. Carlton, 135 South LaSalle Street, Chicago, Ill.
E. (7) $31; (9) $31; (10) $173.80; (11) $204.80.

---

A. Thomas N. Tarleau, 15 Broad Street, New York, N. Y.
B. National Retail Furniture Association, 666 Lake Shore Drive, Chicago, Ill., and 1028 Connecticut Avenue NW., Washington, D. C.
C. (2) In favor of amendment to internal revenue law giving excess profits tax relief to instalment basis taxpayers.
D. (7) $2,500.
E. (2) $15.30; (6) $24.20; (7) $110.50; (9) $150; (11) $150; (15) $150.

---

A. James A. Tawney, 504 Hibbs Building, Washington, D. C.
B. Grain and Feed Dealers National Association, 100 Merchants Exchange Building, St. Louis, Mo.
C. (2) All legislation affecting members of the association.
D. (6) $1,687.50.
E. (7) $1; (8) $1; (9) $2; (10) $10; (11) $12.

---

A. James A. Tawney, 504 Hibbs Building, Washington, D. C.
B. National Association of Fan Manufacturers, Inc., and Propeller Fan Manufacturers Association, 2159 Guardian Building, Detroit, Mich.
C. (2) H. R. 4473, to provide revenue, and for other purposes; favored clarifying amendment with respect to applicability of tax on fans.
D. (6) $350.
E. (6) $5; (7) $4; (9) $9; (10) $8.39; (11) $17.39.

---

[1] Not printed. Filed with Clerk and Secretary.
[2] Filed with the Secretary only.

[1] Not printed. Filed with Clerk and Secretary.

A. Tax Equality Association of Montana, McKay Building, 107 East Main, Missoula, Mont.

C. (2) Repeal of the exemption contained in section 101 (12) and (13) of the Internal Revenue Code and all bills so to do which apply to the conduct of business competition with goods and services produced for a livelihood by the citizenry.

D. (6) $10.

E. (2) $1,063; (6) $0.63; (7) $77.30; (8) $0.45; (9) $1,141.38; (10) $4,430.94; (11) $5,572.32.

---

A. Tax Equality Committee of Kentucky, 211 Columbia Building, Louisville, Ky.

C. (2) Advocating revision of section 101, Internal Revenue Code.

D. (6) $688.

E. (2) $521.25; (4) $38.60; (5) $210; (6) $9.76; (8) $22.84; (9) $302.45; (12) $3,117.14; (11) $3,919.59; (15) $375, Donald F. Nemitz, 211 Columbia Building, Louisville, Ky., salary; $146.25, Dorothy Gates, 211 Columbia Building, Louisville, Ky., salary; $38.60, Franklin Printing Co., 416 West Main, Louisville, Ky., printing and stationery; $210, Kentucky Tax Research Association, 211 Columbia Building, Louisville, Ky., joint office expense; $15, William P. Helm, Colorado Building, Washington, D. C., subscription.

---

A. Edward D. Taylor, 1903 N Street NW., Washington, D. C.

B. Office Equipment Manufacturers Institute, 1903 N Street NW., Washington, D. C.

C. (2) Legislation affecting Federal excise tax on business and store machines.

---

A. Hugh W. Taylor, 1507 M Street NW., Washington, D. C.

B. Burley and Dark Leaf Tobacco Export Association, Inc., 620 South Broadway, Lexington, Ky.

C. (2) Economic Cooperation Act of 1948, as amended; H. R. 4473, the 1951 tax-revision bill; H. R. 4475, authorizing the Secretary of Agriculture to make additional increases in tobacco-acreage allotments to meet market demands.

D. (7) $2,500.

E. (7) $238.89; (8) $85.16; (9) $324.16; (10) $790.60; (11) $1,114.76.

---

A. Margaret K. Taylor, 1731 I Street NW., Washington, D. C.

B. National Milk Producers Federation, 1731 I Street NW., Washington, D. C.

C. (2) Any legislation that may affect milk producers or the cooperatives through which they act together to process and market their milk. (3) News for Dairy Co-ops and Legislative Letter.

D. (6) $2,288.65.

E. (8) $1.15; (9) $1.15; (10) $39.45; (11) $40.60.

---

A. Television Broadcasters' Tax Committee, 1771 N Street NW., Washington, D. C.

C. (2) Tax legislation affecting the television broadcasting industry.

D. (6) $25,530.

E. (2) $14,000; (5) $50.72; (6) $661.14; (7) $2,765.93; (8) $1.44; (9) $17,479.20; (10) $4,524.46; (11) $22,003.65; (15) $390.51, The Fort Industry Co., 199 Pierce Street, Birmingham, Mich., telegrams; $500, Lovell H. Parker, 614 Colorado Building, Washington, D. C., retainer fee; $13.13, Birmingham Eccentric, Birmingham, Mich., stationery; $5,000, Lovell H. Parker, 614 Colorado Building, Washington, D. C., retainer fee; $3,036.53, Poole, Warren & Littell, 924 Ford Building, Detroit, Mich., travel and hotel expense; $7,500, Poole, Warren & Littell, 924 Ford Building, Detroit, Mich., fee; etc.[1]

---

A. Marjorie L. Temple, 1917 I Street NW., Washington, D. C.

B. National Federation of Business and Professional Women's Clubs, Inc., 1819 Broadway, New York, N. Y.

C. (2) Legislation which affects the interest of women in business and the professions. (3) The Independent Woman.

E. (2) $833.32; (5) $230.68; (6) $45.48; (8) $5.95; (9) $1,140.33; (10) $3,050.67; (11) $4,191.

---

A. John U. Terrell, 424 Wyatt Building, Washington, D. C.

B. Colorado River Association, 306 West Third Street, Los Angeles, Calif.

C. (2) S. 75 and H. R. 1500.

D. (6) $3,000.

---

A. Texas Water Conservation Association, 207 West Fifteenth Street (P. O. Box 2084, Capitol Station), Austin, Tex.

C. (2) Interested in all legislation concerning the development, conservation, protection, and utilization of Texas land and water resources through existing State and Federal agencies; opposed to all legislation creating Federal Valley Authorities and all legislation seeking to superimpose Federal control over State water resources; opposed to House Joint Resolution 102, approving agreement between United States and Canada relating to the Great Lakes–St. Lawrence Basin; for H. R. 1344, to prohibit establishment of valley authority in any State without vote of people of the State; for H. R. 2646, to facilitate the development of small reclamation projects; for bill quitclaiming title to tidelands to the several States. (3) Texas water.

D. (6) $6,107.75.

E. (2) $1,629.45; (4) $2,144.13; (5) $236.93; (6) $289.99; (7) $1,509.01; (8) $1,286.44; (9) $7,295.95; (10) $18,479.22; (11) $25,775.17; (15) $225, C. S. Heacock, Austin, Tex., office rent; $86.59, Vivian Meeks, Austin, Tex., salary; $174.99, United States post office, Austin, Tex., stamps; $1,236.60, J. E. Sturrock, Austin, Tex., salary; $566.26, Mildred B. Vaught, Austin, Tex., salary; $146.65, The Whitley Printing Co., Austin, Tex., printing; etc.[1]

---

A. Whitney Tharin, 930 F Street NW., Washington, D. C.

B. National Potato Council, 930 F Street NW., Washington, D. C.

---

A. Oliver A. Thomas, 43 Sierra Street, Reno, Nev.

B. Nevada Railroad Association, 43 Sierra Street, Reno, Nev., composed of Union Pacific Railroad Co., Western Pacific Railroad Co., and Southern Pacific Co.

C. (2) All Senate and House bills and resolutions affecting the interests of Nevada railroads.

D. (6) $675.

E. (7) $65; (11) $65.

---

A. Chester C. Thompson, 1319 F Street NW., Washington, D. C.

B. The American Waterways Operators, Inc., 1319 F Street NW., Washington, D. C.

C. (2) All matters affecting barge and towing vessel industry and water transportation.[1]

D. (6) $6,000.

E. (4) $159.63; (7) $69.25; (9) $228.23; (10) $287.02; (11) $515.90.

---

A. Eugene M. Thoré, 1000 Vermont Avenue, Washington, D. C.

B. Life Insurance Association of America, 488 Madison Avenue, New York, N. Y.

C. (2) Legislation which might affect the welfare of policyholders and annuitants.[1]

D. (6) $833.33.

E. (7) $87.93; (9) $87.93; (10) $559.83; (11) $647.76.

---

A. Arthur P. Tiernan, 201 Southeast Third Street, Evansville, Ind.

B. Vanderburgh County Medical Society, 201 Southeast Third Street, Evansville, Ind.

C. (2) All bills pending before Congress which would create national health insurance.

---

A. E. W. Tinker, 122 East Forty-second Street, New York, N. Y.

B. American Paper and Pulp Association, 122 East Forty-second Street, New York, N. Y.

---

A. William H. Tinney, 211 Southern Building, Fifteenth and H Streets NW., Washington, D. C.

B. The Pennsylvania Railroad Co., 1740 Broad Street Station Building, Philadelphia, Pa.

C. (2) Any legislation affecting the interest of the Pennsylvania Railroad Co.[1]

D. (6) $1,842.36.

E. (9) $46.15.

---

A. S. G. Tipton, 1107 Sixteenth Street NW., Washington, D. C.

B. Air Transport Association of America, 1107 Sixteenth Street NW., Washington, D. C.

C. (2) General legislative interests for the proper advancement of the airline industry.[1]

D. (6) $7,500.

E. (7) $5; (9) $5; (10) $105.06; (11) $110.06.

---

A. Fred A. Tobin, 438 Bowen Building, 821 Fifteenth Street NW., Washington, D. C.

B. International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America, 222 East Michigan Street, Indianapolis, Ind.

D. (6) $3,750.

---

A. H. Willis Tobler, 1731 I Street NW., Washington, D. C.

B. National Milk Producers Federation, 1731 I Street NW., Washington, D. C.

C. (2) Any legislation that may affect milk producers or the cooperatives through which they act together to process and market their milk. (3) News for Dairy Co-ops and Legislative Letter.

D. (6) $2,136.66.

E. (8) $27.10; (9) $27.10; (10) $147.80; (11) $174.90.

---

A. John A. Todd, 1008 Sixteenth Street NW., Washington, D. C.

B. National Cotton Compress and Cotton Warehouse Association, 586 Shrine Building, Memphis, Tenn.

C. (2) Any matters substantially affecting the cotton compress and cotton warehouse industry.

E. (10) $92.33; (11) $92.33.

---

A. Wallace Townsend, 306 Commercial National Bank Building, Little Rock, Ark.

B. Southwestern Gas & Electric Co., Shreveport, La.

C. (2) My interests have been in the appropriation for the Southwestern Power

---

[1] Not printed. Filed with Clerk and Secretary.

[1] Not printed. Filed with Clerk and Secretary.

Administration in the appropriation bill for Department of the Interior.
D. (6) $600.
E. (10) $522.05; (11) $522.05.

---

A. Trailer Coach Manufacturers Association, 20 North Wacker Drive, Chicago, Ill.
E. (1) $900; (2) $1,450; (4) $306.52; (6) $7.95; (7) $154.39.

---

A. Transportation Association of America, 130 North Wells Street, Chicago, Ill.
C. (2) Legislation which bears upon the future of competitive private ownership of any form of transportation and related subjects.
D. (6) $83,740.22.
E. (2) $5,025; (5) $998.69; (6) $206.41; (7) $949.11; (8) $397.23; (9) $7,576.44; (10) $12,-207.73; (11) $19,784.17.

---

A. Matt Triggs,[2] 261 Constitution Avenue NW., Washington, D. C.
B. American Farm Bureau Federation, 221 North La Salle Street, Chicago, Ill.
C. (2) Proposed legislation on the following has been supported or opposed: Mexican farm labor importation, farm machinery and supplies, baler twine, fertilizer, agricultural labor, tobacco, ICC decision on prohibition of trip leasing, control and eradication of brucellosis, establishment of revolving fund for financing exports of farm commodities.
D. (6) $2,166.76.
E. (7) $1,050.95; (9) $1,050.95; (10) $1,-053.67; (11) $2,104.62; (15) $835.97.[1]

---

A. Trucking Industry National Defense Committee, Inc., 1000 Vermont Avenue NW., Washington, D. C.
E. (15) $169.20, collector of Internal Revenue, Baltimore, Md., social-security and income-tax deduction; $139.27, E. Dowty, Washington, D. C., salary; $13.63, Chesapeake & Potomac Telephone Co., Washington, D. C., telephone service; $99.05, A. D. Condon, Washington, D. C., expenses; etc.[1]

---

A. Paul T. Truitt, 817 Barr Building, Washington, D. C.
B. American Plant Food Council, Inc., 817 Barr Building, Washington, D. C.
C. (2) Generally interested in legislation affecting the fertilizer industry.

---

A. Harold J. Turner, Henry Building, Portland, Oreg.
B. Spokane, Portland & Seattle Railway Co., Southern Pacific Co., and Union Pacific Railroad Co., Henry Building, Portland, Oreg.
C. (2) All bills which directly affect railroads of Oregon.
D. (6) $3,291.25.
E. (6) $25.94.

---

A. United States Cane Sugar Refiners Association, 115 Pearl Street, New York, N. Y., and 408 American Building, Washington, D. C.

---

A. United States Cuban Sugar Council, 30 Pine Street, New York, N. Y.
C. (2) Statutes and bills affecting the importation by the United States of sugar from

---

[1] Not printed. Filed with Clerk and Secretary.
[2] Filed with the Secretary only.

---

Cuba, tariff rates on such sugar, and trade between the United States and Cuba, particularly sugar.
D. (6) $1,927.46.
E. (1) $7,711.88; (4) $1,401.83; (9) $9,-113.71; (10) $28,856.17; (11) $37,969.88; (15) $7,711.88, Ivy Lee and T. J. Ross, 405 Lexington Avenue, New York, N. Y., fee, salary of council secretary, and incidental items; $37.08, Graphic Presentation Services, 239 East Sixtieth Street, New York, N. Y., services; $1,364.75, J. C. Dillon Co., Inc., 227 East Forty-fifth Street, New York, N. Y., printing.

---

A. United States Savings and Loan League, 221 North La Salle Street, Chicago, Ill.
C. (2) Support all legislation favorable to thrift and home ownership and particularly helpful to savings and loan associations and cooperative banks in carrying out their thrift and home financing objectives and oppose legislation detrimental to home ownership and these institutions.[1]
E. (2) $3,685.19; (4) $3,369.04; (5) $493.22; (6) $1,137.63; (7) $449.53; (8) $423.70; (9) $9,558.41; (10) $40,891.37; (11) $50,449.78; (15).[1]

---

A. Albert F. Versen, 508 Security Building, St. Louis, Mo.
B. Missouri Valley Chapter Association of Refrigerated Warehouses, 508 Security Building, St. Louis, Mo.

---

A. Albert F. Versen, 508 Security Building, St. Louis, Mo.
B. St. Louis Local Meat Packers Association, 508 Security Building, St. Louis, Mo.

---

A. A. L. Viles, 444 Madison Avenue, New York, N. Y.
B. The Rubber Manufacturers Association, Inc., 444 Madison Avenue, New York, N. Y.

---

A. Tracy S. Voorhees, 711 Fourteenth Street NW., Washington, D. C.
C. (2) Supporting the Mutual Security Act of 1951.

---

A. H. Jerry Voorhis, 343 South Dearborn Street, Chicago, Ill.
B. The Cooperative League of the United States of American Association, Inc., 343 South Dearborn Street, Chicago, Ill.
C. (2) All legislation affecting the health, welfare, and safety of the American people.

---

A. Vulcan Detinning Co., Sewaren, N. J.

---

A. James A. Waggener, 1021 Hume Mansur Building, Indianapolis, Ind.
B. Indiana State Medical Association, 1021 Hume Mansur Building, Indianapolis, Ind.
C. (2) All bills pending before Congress which would create national health insurance.

---

A. Stephen M. Walter, 1200 Eighteenth Street NW., Washington, D. C.
B. National Association of Electric Companies, 1200 Eighteenth Street NW., Washington, D. C.
C. (2) Legislation that might affect members as going electric utilities.[1]

---

[1] Not printed. Filed with Clerk and Secretary.

---

D. (6) $6,625.02.
E. (6) $43.40; (7) $578.46; (8) $90.45; (9) $712.31; (10) $1,462.13; (11) $2,174.44.

---

A. Thomas G. Walters, 900 F Street NW., Washington, D. C.
B. Government Employees' Council, A. F. of L., 900 F Street NW., Washington, D. C.
C. (2) Represent the member unions and the Government Employees' Council on matters affecting them before the Congress.
D. (6) $2,013.40.

---

A. Milo J. Warner, 904 Nicholas Building, Toledo, Ohio.
B. The Prudential Insurance Co. of America, Newark, N. J.
C. (2) Attention to legislation which may affect the interests of the mutual policyholders of the Prudential Insurance Co. of America.
D. (7) $3,500.
E. (6) $3.06; (7) $521.99; (9) $525.05; (10) $1,456.74; (11) $1,981.79.

---

A. Washington Board of Trade, 204 Evening Star Building, Washington, D. C.
C. (2) Legislation affecting the District of Columbia, of interest to the Washington Board of Trade.

---

A. Washington Real Estate Board, Inc., 312 Wire Building, 1000 Vermont Avenue NW., Washington, D. C.
C. (2) All local measures affecting the District of Columbia.
E. (10) $495; (11) $495.

---

A. Vincent T. Wasilewski, 1771 N Street NW., Washington, D. C.
B. National Association of Radio and Television Broadcasters, 1771 N Street NW., Washington, D. C.
C. (2) Any legislation relating directly or indirectly to the radio and television industry.[1]
D. (6) $1,824.11.

---

A. J. R. Watson, room 1, I. C. R. R. passenger station, Jackson, Miss.
B. Mississippi Railroad Association, room 1, I. C. R. R. passenger station, Jackson, Miss.
C. (2) Legislation affecting railroads in Mississippi.
E. (10) $873.70; (11) $873.70.

---

A. Newton Patrick Weathersby, room 303, Machinists Building, Washington, D. C.
B. District No. 44, International Association of Machinists, room 303, Machinists Building, Washington, D. C.
C. (2) Legislation affecting working conditions of Government employees and incidentally organized labor in general.
D. (6) $1,499.94.

---

A. William H. Webb, 1720 M Street NW., Washington, D. C.
B. National Rivers and Harbors Congress, 1720 M Street NW., Washington, D. C.
C. (2) All matters pertaining to river and harbor development, flood control, navigation, irrigation-reclamation, soil and water conservation, and related subjects.
D. (6) $1,299.82.

---

[1] Not printed. Filed with Clerk and Secretary.

E. (3) $7; (4) $29.58; (5) $26.95; (6) $34.05; (7) $184.41; (8) $449.99; (9) $634.40; (10) $1,635.20; (11) $2,269.60; (15).[1]

———

A. Ernest N. Webster, 10 Independence Avenue SW., Washington, D. C.
B. Brotherhood of Maintenance of Way Employees, 10 Independence Avenue, Washington, D. C.
C. (2) For passage of S. 1347 and H. R. 3669.
E. (2) $440; (6) $12.58; (7) $312.22; (9) $764.80; (11) $764.80.

———

A. J. W. Weingarten, 1004 Farnam Street, Omaha, Nebr.
B. Chicago, Burlington & Quincy Railroad Co., 547 West Jackson Boulevard, Chicago, Ill.
C. (2) Any legislation or regulation affecting the railroad business.
D. (6) $3,200.

———

A. Wayne Weishaar, 1025 Connecticut Avenue NW., Washington, D. C.
B. Aeronautical Training Society, 1025 Connecticut Avenue NW., Washington, D. C.
C. (2) Any legislation affecting aviation training or contract overhaul of aircraft which may arise at any time in future; also interested in bills dealing with ROTC as they apply to colleges, universities, and other schools engaged in aviation training.
D. (6) $3,300.

———

A. W. S. Weismann, Jr., suite 400, 918 Sixteenth Street NW., Washington, D. C.
B. American Airlines, Inc., suite 400, 918 Sixteenth Street NW., Washington, D. C.
C. (2) Legislation affecting air transportation.
D. (6) $2,750.
E. (6) $10; (7) $400; (9) $410; (10) $464; (11) $874.

———

A. Bernard Weitzer, 3147 Sixteenth Street NW., Washington, D. C.
B. Jewish War Veterans of the United States of America, 50 West Seventy-seventh Street, New York, N. Y.
C. (2) Support such legislation as will carry out the purpose of the Jewish War Veterans of the United States of America as expressed in the preamble to its constitution and to oppose legislation which would tend to frustrate the purpose therein expressed. (3) The Jewish Veteran.
D. (7) $2,250.
E. (5) $19.19; (6) $11.07; (7) $324.27; (8) $5.56; (9) $360.09; (10) $1,125.40; (11) $1,485.90; (15) $247.59.

———

A. Don Welch, P. O. Box 231, Madill, Okla.
B. The seven railroads named in original declaration.
C. (2) The interests of the railroad industry generally; particularly S. 1335 and H. R. 3669.
D. (7) $1,241.70.
E. (7) $483.41; (9) $483.41; (10) $485.22; (11) $968.63; (15) $1,241.70.

———

A. Edward M. Welliver, 1424 Sixteenth Street NW., Washington, D. C.
B. American Trucking Associations, Inc., 1424 Sixteenth Street NW., Washington, D. C.
D. (6) $1,350.

———

A. William E. Welsh, 1119 National Press Building, Washington, D. C.
B. National Reclamation Association, 1119 National Press Building, Washington, D. C.
C. (2) Reclamation Act, 1902 (53 Stat. 1187, 43 U. S. C. 485), and all amendatory and supplementary acts thereto; all other statutes relating to water- and land-conservation measures.[1]
D. (6) $4,000.
E. (7) $1,226.14; (9) $1,226.14; (10) $2,-632.88; (11) $3,859.02.

———

A. Wenchel, Tannenbaum & Nunan, 1625 K Street NW., Washington, D. C.
B. Lerner Stores Corp.; Howard Clothes, Inc.; Franklin Stores Corp.; Diana Stores Corp.; National Shirt Shops; A. S. Beck Shoe Co.; Miles Shoe Co.; Dee-Jay Stores; Lane Bryant, Inc.; the Felsway Shoe Corp.; United Merchants & Manufacturers, Inc.; Kitty Kelly Shoe Corp.; Mangel Stores Corp.; Seligman & Latz.
C. (2) Revenue Act of 1951; opposition to section 123 of H. R. 4473.
D. (6) $12,500.
E. (6) $19.69; (7) $75.28; (8) $2.75; (9) $97.72; (11) $97.72.

———

A. Western States Meat Packers Association, Inc., 604 Mission Street, suite 906-907, San Francisco, Calif.
C. (2) Interested in legislation affecting livestock and meat-packing industry.
D. (6) $5,165.38.
E. (10) $265.79; (11) $265.79.

———

A. Howard C. Westwood, 701 Union Trust Building, Washington, D. C.
B. American Institute of Accountants and its members, 270 Madison Avenue, New York, N. Y.
C. (2) Against S. 17 unless amended; against S. 1725; H. R. 3097, not opposed.
D. (6) $1,000.
E. (6) $60.80; (9) $60.80; (10) $72.30; (11) $133.10.

———

A. Edward K. Wheeler, 704 Southern Building, Washington, D. C.
B. Shore Line Oil Co., Las Vegas, Nev., and Craw Co., Las Vegas, Nev.
C. (2) Measures pertaining to the so-called tidelands-oil question.
E. (8) $4.50; (9) $4.50; (10) $121.99; (11) $126.49.

———

A. George Y. Wheeler 2d, 724 Fourteenth Street NW., Washington, D. C.
B. National Broadcasting Co., Inc., 724 Fourteenth Street NW., Washington, D. C.
C. (2) Legislation affecting National Broadcasting Co., Inc., and/or its affiliated companies.
E. (7) $25; (9) $25; (10) $29.65; (11) $54.65; (15) $25.

———

A. Wheeler & Wheeler, 704 Southern Building, Washington, D. C.
B. Contract Carrier Conference, 1424 Sixteenth Street NW., Washington, D. C.
C. (2) Any proposed legislation pertaining to the investigation of domestic land and water transportation under Senate Resolution 50 or to the Motor Carrier Act.

D. (6) $3,000.
E.(7) $111.60; (8) $20; (9) $131.60; (10) $27.93; (11) $159.53.

———

A. Clem Whitaker, 1 North La Salle Street, Chicago, Ill.
B. National Education Campaign, American Medical Association, 1 North La Salle Street, Chicago, Ill.
C. (2) Any legislation for compulsory health insurance.
D. (6) $6,262.50.
E. (4) $70; (7) $327.04; (8) $27.88; (9) $424.92; (10) $1,673.60; (11) $2,098.52; (15) $424.92.[1]

———

A. Leone Baxter Whitaker, 1 North La Salle Street, Chicago, Ill.
B. National Education Campaign, American Medical Association, 1 North La Salle Street, Chicago, Ill.
C. (2) Any legislation for compulsory health insurance.
D. (6) $6,262.50.
E. (4) $70; (7) $327.04; (8) $27.88; (9) $424.92; (10) $1,673.60; (11) $2,098.52; (15) $424.92.[1]

———

A. John C. White, 838 Transportation Building, Washington, D. C.
B. American Cotton Association, Cotton Exchange Building, Memphis, Tenn.
C. (2) Legislation affecting cotton and foreign trade, such as ECA, CCC, commodity futures exchanges, and price control.
D. (6) $250.
E. (6) $11.06.

———

A. Richard F. White, 635 Southern Building, Washington, D. C.
B. American Association of Nurserymen, Inc., 635 Southern Building, Washington, D. C.
C. (2) Any legislation affecting the nursery industry directly.
D. (6) $3,125.02.
E. (2) $31.25; (4) $7.58; (5) $18.06; (6) $2.81; (7) $5.81; (9) $65.51; (10) $170; (11) $235.51.

———

A. Albert V. Whitehall, 1756 K Street NW., Washington, D. C.
B. American Hospital Association, 18 East Division Street, Chicago, Ill.
D. (6) $1,812.51.
E. (7) $540.33; (9) $540.35; (10) $1,288.12; (1) $1,828.47.

———

A. H. Leigh Whitelaw, 60 East Forty-second Street, New York, N. Y.
B. Gas Appliance Manufacturers Association, Inc., 60 East Forty-second Street, New York, N. Y.
C. (2) Any and all legislation particularly affecting the interests of manufacturers of gas appliances and equipment.
E. (10) $1,352.03; (11) $1,352.03.

———

A. H. Leigh Whitelaw, 60 East Forty-second Street, New York, N. Y.
B. National Committee for Fair Emergency Excise Taxation, 60 East Forty-second Street, New York, N. Y.
C. (2) Fair emergency excise taxation.
D. (6) $1,250.
E. (10) $256.66; (11) $256.66.

A. Louis E. Whyte, 918 Sixteenth Street NW., suite 501, Washington, D. C.

B. Independent Natural Gas Association of America, 918 Sixteenth Street NW., Washington, D. C.

C. (2) Tax legislation and any other bills affecting the natural gas industry.

D. (6) $750.

E. (10) $17.25; (11) $17.25.

---

A. John J. Wicker, Jr., 501 Mutual Building, Richmond, Va.

B. American Mutual Alliance, 919 North Michigan Avenue, Chicago, Ill.

C. (2) All legislation affecting mutual fire and casualty insurance companies, including, for example, Federal tax legislation and war damage insurance legislation.

D. (6) $3,634.22.

E. (2) $2,580; (5) $178.85; (6) $22.43; (7) $853.26; (9) $3,634.22; (10) $10,347.78; (11) $13,982; (15) $622.53.[1]

---

A. Claude C. Wild, Jr., 605 Commonwealth Building, Washington, D. C.

B. Mid-Continent Oil and Gas Association, 308 Tulsa Building, Tulsa, Okla.

C. (2) All legislation directly or indirectly affecting the oil and gas industry.

D. (6) $2,500.

E. (5) $675; (6) $121.49; (8) $25; (9) $821.49; (10) $2,588.51; (11) $3,410.

---

A. Franz O. Willenbucher, 1616 I Street NW., Washington, D. C.

B. Retired Officers Association, Inc., 1616 I Street NW., Washington, D. C.

C. (2) Any and all legislation pertinent to the rights, benefits, privileges, and obligations of retired officers, male and female, regular and reserve, and their dependents and survivors, of whatever nature. (3) The Retired Officer.

D. (6) $1,800.

---

A. John C. Williamson, 1025 Connecticut Avenue NW., Washington, D. C.

B. Realtors' Washington Committee, National Association of Real Estate Boards, 1737 K Street NW., Washington, D. C.

C. (2) Legislative interests are those affecting the real-estate industry generally and of concern to the National Association of Real Estate Boards.

D. (6) $1,200.

E. (7) $381.37; (9) $381.37; (11) $381.37.

---

A. John C. Williamson, 1025 Connecticut Avenue NW., Washington, D. C.

B. Trailercoach Dealers National Association, 39 South La Salle Street, Chicago, Ill.

D. (6) $1,025.

E. (7) $249.77; (9) $249.77; (10) $486.37; (11) $735.14.

---

A. Carl H. Willingham, Washington Loan and Trust Building, Washington, D. C., and 4 Park Avenue, New York, N. Y.

B. Oneida, Ltd., Oneida, N. Y., and National Association of Chain Drug Stores, 4 Park Avenue, New York, N. Y.

C. (2) Excise taxes and health insurance.

---

A. Frank E. Wilson, M. D., 1523 L Street NW., Washington, D. C.

B. American Medical Association, 535 North Dearborn Street, Chicago, Ill.

C. (2) All bills (House and Senate) relating to health and medicine. (3) Informational Bulletins and weekly letter published in Journal of American Medical Association.

D. (6) $4,791.72.

E. (7) $1,066.49; (10) $1,210.81; (11) $2,277.30.

---

A. E. Raymond Wilson,[2] 1000 Eleventh Street NW., Washington, D. C.

B. Friends Committee on National Legislation, 1000 Eleventh Street NW., Washington, D. C.

C. (2) The general legislative interest is to work where legislation is involved for the development of the United Nations into a world federation; the international control and reduction of armaments; recognition of its responsibility on the part of the United States Government for assuming its share in the burden for world-wide economic rehabilitation and development; protection of recognized civil liberties; and adequate recognition of rights of conscience. (3) The Washington Newsletter.

D. (6) $1,812.50.

E. (6) $24.45; (7) $133.76; (9) $158.21; (10) $636.31; (11) $794.52.

---

A. Robert J. Wilson, 2003 I Street NW., Washington, D. C.

B. Washington Restaurant Association, 2003 I Street NW., Washington, D. C., and National Restaurant Association, 8 South Michigan Avenue, Chicago, Ill.

---

A. Everett T. Winter, 719 Omaha National Bank Building, Omaha, Nebr.

B. Mississippi Valley Association, 511 Locust Street, St. Louis, Mo.

C. (2) Legislation relating to river and harbor maintenance and improvement, the American merchant marine, soil conservation, flood control, and regulation of domestic transportation.

D. (6) $2,500.

E. (10) $1,935.95; (11) $1,935.95.

---

A. Theodore Wiprud, 1718 M Street NW., Washington, D. C.

B. The Medical Society of the District of Columbia, 1718 M Street NW., Washington, D. C.

C. (2) Legislation pertaining to the practice of medicine and all related services and that affecting the public health, including extension of social security into the field of the practice of medicine. (3) Medical Annals of the District of Columbia.

D. (6) $2,500.

---

A. Wisconsin Railroad Association, 122 West Washington Avenue, Madison, Wis.

C. (2) All legislation affecting railroads and transportation generally.

D. (7) $652.83.

E. (2) $348; (7) $304.83; (9) $652.83; (10) $1,023.91; (11) $1,676.74; (15) $652.83, C. A. Hummel, 122 West Washington Avenue, Madison, Wis., salary and expenses.

---

A. F. B. Wise, 1424 K Street NW., Washington, D. C.

B. National Renderers Association, 1424 K Street, Washington, D. C.

C. (2) Any legislation which would specifically have an effect upon the production, consumption, import, export, or taxation of any animal or vegetable fat or oil as well as all general legislation affecting business, particularly small business.

---

A. Walter F. Woodul, Chronicle Building, Houston, Tex.

B. Angelina & Neches River Railroad Co., Keltys, Tex.; the Chicago, Rock Island & Pacific Railway Co., Fort Worth, Tex.; Ft. Worth & Denver City Railway Co., Fort Worth, Tex.; Gulf, Colorado & Santa Fe Railway Co., Galveston, Tex.; the Kansas City Southern Railway Co., Kansas City, Mo.; Louisiana & Arkansas Railway Co., Kansas City, Mo.; International-Great Northern Railroad, Houston, Tex.; Missouri-Kansas-Texas of Texas, Dallas, Tex.; New Orleans, Texas & Mexico Railway Co., Houston, Tex.; Panhandle and Santa Fe Railway Co., Amarillo, Tex.; Paris and Mt. Pleasant Railroad Co., Paris, Tex.; Quanah, Acme & Pacific Railway Co., Quanah, Tex.; Roscoe, Snyder & Pacific Railway Co., Abilene, Tex.; St. Louis, San Francisco & Texas Railway Co., Fort Worth, Tex.; St. Louis, Southwestern Railway Co. of Texas, St. Louis, Mo.; Southern Pacific Co., San Francisco, Calif.; Texas & New Orleans Railroad Co., Houston, Tex.; Texas Southeastern Railroad Co., Diboll, Tex.; the Texas & Pacific Railway Co., Dallas, Tex.; the Texas Mexican Railway Co., Laredo, Tex.; the Union Terminal Co., Dallas, Tex.; Wichita Falls & Southern Railroad Co., Wichita Falls, Tex.; Wichita Valley Railway Co., Fort Worth, Tex.

C. (2) Generally legislation affecting Texas railroads.[1]

D. (6) $5,023.44.

E. (6) $61.51; (7) $350.43; (9) $411.94; (10) $5,698.25; (11) $6,110.19; (15) $116.91, Washington Hotel, Washington, D. C., hotel expense; $26.57, Austin Hotel, Austin, Tex., hotel expense; $26, Reeck's Manitowoc, Wis., supplies; $38.98, Pullman Co., Fort Worth, Tex., pullman.

---

A. Wyatt, Grafton & Grafton, 300 Marion E. Taylor Building, Louisville, Ky.

B. National Committee for Fair Emergency Excise Taxation, 60 East Forty-second Street, New York, N. Y.

C. (2) Fair emergency excise taxation, H. R. 4473, Revenue Act of 1951.

E. (6) $16.37; (9) $16.37; (10) $2,621.36; (11) $2,637.75.

---

A. J. Banks Young, 1832 M Street NW., Washington, D. C.

B. National Cotton Council of America, post-office box 18, Memphis, Tenn.

C. (2) The National Cotton Council of America favors such action on any legislation affecting raw cotton industry as will promote the purposes for which the council is organized.

D. (6) $54.

E. (7) $29.63; (9) $29.63; (10) $265.99; (11) $295.62.

---

[1] Not printed. Filed with Clerk and Secretary.

[2] Filed with the Secretary only.

[1] Not printed. Filed with Clerk and Secretary.

## REGISTRATIONS

The following registrations were submitted for the fourth calendar quarter 1951:

(NOTE.—The form used for registration is reproduced below. In the interest of economy, questions are not repeated, only the answers are printed, and are indicated by their respective letter and number. Also for economy in the RECORD, lengthy answers are abridged.)

FILE TWO COPIES WITH THE SECRETARY OF THE SENATE AND FILE THREE COPIES WITH THE CLERK OF THE HOUSE OF REPRESENTATIVES:
This page (page 1) is designed to supply identifying data; and page 2 (on the back of this page) deals with financial data.
PLACE AN "X" BELOW THE APPROPRIATE LETTER OR FIGURE IN THE BOX AT THE RIGHT OF THE "REPORT" HEADING BELOW:
"PRELIMINARY" REPORT ("Registration"): To "register", place an "X" below the letter "P" and fill out page 1 only.

"QUARTERLY" REPORT: To indicate which one of the four calendar quarters is covered by this Report, place an "X" below the appropriate figure. Fill out both page 1 and page 2 and as many additional pages as may be required. The first additional page should be numbered as page "3," and the rest of such pages should be "4," "5," "6," etc. Preparation and filing in accordance with instructions will accomplish compliance with all quarterly reporting requirements of the Act.

| Year: 19____ ← | REPORT  PURSUANT TO FEDERAL REGULATION OF LOBBYING ACT | P | QUARTER | | | |
|---|---|---|---|---|---|---|
| | | | 1st | 2d | 3d | 4th |
| | | | (Mark one square only) | | | |

NOTE ON ITEM "A".—(a) IN GENERAL. This "Report" form may be used by either an organization or an individual, as follows:
(1) "Employee".—To file as an "employee", state (in Item "B") the name, address, and nature of business of the "employer". (If the "employee" is a firm [such as a law firm or public relations firm], partners and salaried staff members of such firm may join in filing a Report as an "employee".)
(ii) "Employer".—To file as an "employer", write "None" in answer to Item "B".
(b) SEPARATE REPORTS. An agent or employee should not attempt to combine his Report with the employer's Report:
(i) Employers subject to the Act must file separate Reports and are not relieved of this requirement merely because Reports are filed by their agents or employees.
(ii) Employees subject to the Act must file separate Reports and are not relieved of this requirement merely because Reports are filed by their employers.

A. ORGANIZATION OR INDIVIDUAL FILING:

| 1. State name, address, and nature of business. | 2. If this Report is for an Employer, list names of agents or employees. who will file Reports for this Quarter. |
|---|---|

NOTE ON ITEM "B".—*Reports by Agents or Employees.* An employee is to file, each quarter, as many Reports as he has employers; except that: (a) If a particular undertaking is jointly financed by a group of employers, the group is to be considered as one employer, but all members of the group are to be named, and the contribution of each member is to be specified; (b) if the work is done in the interest of one person but payment therefor is made by another, a single Report—naming both persons as "employers"—is to be filed each quarter.

B. EMPLOYER—State name, address, and nature of business. If there is no employer, write "None."

NOTE ON ITEM "C".—(a) The expression "in connection with legislative interests," as used in this Report, means "in connection with attempting, directly or indirectly, to influence the passage or defeat of legislation." "The term 'legislation' means bills, resolutions, amendments, nominations, and other matters pending or proposed in either House of Congress, and includes any other matter which may be the subject of action by either House"—§ 302 (e).
(b) Before undertaking any activities in connection with legislative interests, organizations and individuals subject to the Lobbying Act are required to file a "Preliminary" Report (Registration).
(c) After beginning such activities, they must file a "Quarterly" Report at the end of each calendar quarter in which they have either received or expended anything of value in connection with legislative interests.

C. LEGISLATIVE INTERESTS, AND PUBLICATIONS in connection therewith:

| 1. State approximately how long legislative interests are to continue. If receipts and expenditures in connection with legislative interests have terminated, [ ] place an "X" in the box at the left, so that this Office will no longer expect to receive Reports. | 2. State the general legislative interests of the person filing and set forth the *specific* legislative interests by reciting: (a) Short titles of statutes and bills; (b) House and Senate numbers of bills, where known; (c) citations of statutes, where known; (d) whether for or against such statutes and bills. | 3. In the case of those publications which the person filing has caused to be issued or distributed, in connection with legislative interests, set forth: (a) Description, (b) quantity distributed, (c) date of distribution, (d) name of printer or publisher (if publications were paid for by person filing) or name of donor (if publications were received as a gift). |
|---|---|---|

(Answer items 1, 2, and 3 in the space below. Attach additional pages if more space is needed)

4. If this is a "Preliminary" Report (Registration) rather than a "Quarterly" Report, state below what the nature and amount of anticipated expenses will be; and if for an agent or employee, state also what the daily, monthly, or annual rate of compensation is to be. If this is a "Quarterly" Report, disregard this item "C4" and fill out Items "D" and "E" on the back of this page. Do not attempt to combine a "Preliminary" Report (Registration) with a "Quarterly" Report. ←

AFFIDAVIT

[Omitted in printing]

PAGE 1 ←

A. Ellsworth C. Alvord, World Center Building, Sixteenth and K Street NW., Washington, D. C.

B. Committee of American Contractors Engaged in Foreign Work, 140 Cedar Street, New York, N. Y.

C. (1) During Eighty-second Congress, first session. (2) Taxation of American employees engaged in foreign work. (3) None. (4) Anticipated expenses are actual out-of-pocket expenses for telephone, telegraph, travel, etc. Compensation to be determined at conclusion of work.

A. Harold J. Buoy, home address, rural route 6, Decatur, Ill.; business address, 825 Bowen Building, Washington, D. C.

B. International Brotherhood of Boilermakers, Iron Ship Builders and Helpers of America, A. F. of L., Kansas City, Kans.

C. (1) Indefinitely. (2) Legislation pertaining to labor generally. (3) None.

A. Lawrence J. Casey, Jr., 1737 K Street NW., Washington, D. C.

B. National Association of Real Estate Boards, 22 West Monroe Street, Chicago, Ill.

C. (1) Indefinitely. (2) Any legislation affecting the real-estate industry. (4) $4,250 per year.

A. The Consumers' Lobby, room 1, 826 Connecticut Avenue NW., Washington, D. C. Robert I. Fine, Philip L. Rizzo.

C. (1) One year. (2) Legislation directly affecting the consumer, specifically S. 169, of which we are in favor. (3) None. (4) $1,-500 (for office and literature).

A. Cooperative Health Federation of America, 343 South Dearborn, Chicago, Ill.

C. (2) Senate bill 1875. (4) Approximately $250 per quarter, or $1,000 per year, which represents approximately 10 percent of the total income of the organization and which will be spent for portions of salaries of the regular staff, telephone and telegraph, and general office expenses.

A. J. G. Corona, suite 101, 1405 G Street NW., Washington, D. C.

B. Western Union Telegraph Co., 60 Hudson Street, New York, N. Y.

C. (1) Will continue during tenure of my position. (2) Any legislative proposals affecting the interests of the telegraph company. (3) Nil. (4) Anticipated quarterly expenses for travel, food, lodging, and entertainment, $100. Registrant is paid an annual salary for his general legislative and administrative duties and is not allocated any specific sum for legislative activities.

A. M. F. Crass, Jr., 246 Woodward Building, Washington, D. C.

B. Manufacturing Chemists' Association, Inc., 246 Woodward Building, Washington, D. C.

C. (1) Indefinitely. (2) H. R. 3257, H. R. 1535, and H. R. 5505; S. 2170. (4) Compensation is on a fixed-salary basis of $15,000 per year, payable semimonthly, plus actual expenses.

A. Cummings, Stanley, Truitt & Cross, attorneys and counselors, 1625 K Street NW., Washington, D. C.

B. Estate of Margery Durant Green, 1 Atlantic Street, Stamford, Conn.

C. (1) Not determined. (2) To extend to the estates of living incompetents the benefits of the Technical Changes Act of 1949. No such legislation pending at this time. (4) (a) Compensation is to be paid by retainer covering both legislative and nonlegis-

lative interests, with additional compensation depending on nature and result of services to be performed; (b) $3,500 of current retainer allocable to services relating to legislative interests; proper allocation of part of retainer to be paid in 1952 cannot be determined at this time but will be subsequently reported; (c) not determined; (d) nominal, may not exceed $100.

A. Cummings, Stanley, Truitt & Cross, attorneys and counselors, 1625 K Street NW., Washington, D. C.

B. Estate of W. D. Johnson, deceased, 900 Walnut Street, Kansas City, Mo.

C. (1) Not determined. (2) Amendment of section 1000 (e) of Internal Revenue Code to permit an executor or administrator to release powers of disposition where the decedent was under a disability during his lifetime. No legislation to this effect now pending. (4) (a) Compensation is to be paid by retainer covering both legislative and nonlegislative interests, with additional compensation depending on nature and result of services to be performed; (b) $5,000 of retainer allocable to services relating to legislative interests; (c) not determined; (d) nominal, may not exceed $100.

A. Eastern Meat Packers Association, corporate address, Hotel Statler, New York, N. Y.; mailing address, 740 Eleventh Street NW., Washington, D. C.

C. (1) Indefinite. (2) Defense Production Act of 1950 and amendments. (3) Mimeographed bulletins to members occasionally contain some legislative matter. (4) Nature: Cabs, telephone, mimeographing, and mailing; amount unknown at this time.

A. Robert I. Fine, room 1, 826 Connecticut Avenue NW., Washington, D. C.

B. The Consumers' Lobby.

C. (1) One year. (2) Legislation directly affecting the consumer, specifically Senate Resolution 169, of which I am in favor. (3) None. (4) $750 for office and literature; compensation contingent.

A. Marion R. Garstang, 1731 I Street NW., Washington, D. C.

B. National Milk Producers Federation, 1731 I Street NW., Washington, D. C.

C. (1) Indefinitely. (2) Any legislation that may affect milk producers or the cooperatives through which they act together to process and market their milk. (4) Salary of $9,450 per annum, effective December 1, 1951, paid by the above employer, and is to be reimbursed for all actual expenses incurred in connection with his work.

A. J. M. George, 165 Center Street, Winona, Minn.

B. The Inter-State Manufacturers Association, 163–165 Center Street, Winona, Minn.

C. (1) Indefinite, dependent upon legislative occurrences. (2) Federal legislation is a very minor part of my services to employer. (4) Amount of expenses unknown until incurred. Expenses, if any, will be transportation, hotel and meals, communications, and similar items necessary or incidental to services performed. Compensation is $500 per month, payable monthly and without regard to whether any legislative service or expense is incurred.

A. W. W. Gerhard, 1549 Burmont Road, Drexel Hill, Pa.

B. Household Finance Corp., 919 North Michigan Avenue, Chicago, Ill.

C. (1) Legislative interests will probably continue indefinitely. (2) (a) The general legislative interest of registrant is Federal

regulation and control of consumer credit; (b) the particular statute in which registrant is interested is section 601 of the Defense Production Act of 1950. (4) Registrant's annual salary is $7,560, but registrant has numerous other duties on behalf of his employer not connected with Federal lobbying and estimates that not more than 50 percent of total employable time will be spent in such lobbying activities. Registrant anticipates that his only expenses will be travel expenses and will not exceed $2,400 per annum.

A. George S. Goldstein, 930 F Street NW., Washington, D. C.

B. United Electrical, Radio and Machine Workers of America, 11 East Fifty-first Street, New York, N. Y.

C. (1) Indefinite. (2) Support all legislation favorable to national peace, security, democracy, prosperity, and the general welfare; oppose legislation detrimental to these objectives. (4) Salary, $390 monthly; expenses, $65 monthly (cab fares, meals, etc.).

A. Robert C. Harris, 440 Downing Avenue, Fort Wayne, Ind.

B. National Retired Teachers Association.

C. (1) During Eighty-second Congress. (2) H. R. 2764.

A. C. B. Heinemann, 740 Eleventh Street NW., Washington, D. C.

B. Eastern Meat Packers Association; corporate address, Hotel Statler, New York, N. Y.; mailing address, 740 Eleventh Street NW., Washington, D. C.

C. (1) Indefinite. (2) Defense Production Act of 1950 and amendments. (3) None. (4) Nature, cabs, telephone, etc.; compensation, percentage of $3,500 annual fee; amount, unknown at this time.

A. C. B. Heinemann, 740 Eleventh Street NW., Washington, D. C.

B. National Independent Meat Packers Association, 740 Eleventh Street NW., Washington, D. C.

C. (1) Indefinite period. (2) Defense Production Act and amendments. (4) Nature, percentage of trade association expenses; amount, unknown at this time; compensation, percentage of $10,000 salary.

A. William Ingles, 1624 I Street NW., Washington, D. C.

B. American Steel Foundries, Chicago, Ill.

C. (1) Indefinite. (2) Legislation affecting industry. (3) None. (4) (a) Annual; (b) undetermined; (c) indefinite; (d) none, excepting traveling expenses authorized as necessary.

A. Vernon A. Johnson, 1000 Vermont Avenue NW., Washington, D. C.

B. Lockheed Aircraft Corp., Burbank, Calif.

C. (1) Indefinite. (2) Any legislation affecting aircraft manufacturing. (4) Salary is at rate of $14,040 per year.

A. Robert J. McBride, 1424 Sixteenth Street NW., Washington, D. C.

B. Regular Common Carrier Conference of the American Trucking Associations, Inc., 1424 Sixteenth Street NW., Washington, D. C.

C. (1) It is not known how long legislative interest will continue. (2) The general legislative interest of registrant is the protection and fostering of the interests of federally regulated motor common carriers of general commodities. No known bills have been introduced in which registrant is interested. (4) Registrant is compensated at an annual rate.

A. Mackoff, Kellogg, Muggli & Kirby, Dickinson, N. Dak.

B. Brooks Keogh, Roy Lillibridge & John H. Hanson, trustees operating under the name of Mineral Recovery Trustees, Dickinson, N. Dak. Trustees in behalf of former owners of lands sold to United States, seeking recovery of mineral rights.

C. (1) During present session of Congress. (2) Will be interested in a bill proposed to be introduced seeking the recovery or right to repurchase mineral rights by former owners of lands which were sold to the United States. (3) (a) Circular letter with form of acceptance of trust was issued by trustees addressed to former owners of lands; (b) approximately 200 or 300 have been distributed; (c) about October 1951; (d) Doherty Printing Co. (4) Attorneys are to receive cash out-of-pocket expenses and the contingent fee of one-fourth of minerals recovered for the persons who join in the trust agreement.

A. Manufacturing Chemists' Association, Inc., 246 Woodward Building, Washington, D. C.

C. (1) Indefinitely. (2) The association has a general interest on behalf of its members in any legislation affecting the chemical industry. (3) Regular association bulletins, including Federal Legislative Bulletins (weekly listing and occasional digest of pertinent bills), State Legislative Bulletins, General Bulletins (biweekly), Defense Mobilization Reports (biweekly), Labor Relations Reports, etc. (4) Anticipated expenses are indeterminate at this time, and will probably consist of an allocated proportion of public relations fees (the association has recently employed a public relations firm for the first time), together with such incidental disbursements as travel, per diem, meals, etc.

A. National Independent Meat Packers Association, 740 Eleventh Street NW., Washington, D. C.

C. (1) Indefinite. (2) Defense Production Act of 1950 and amendments. (3) Regular mimeographed bulletins, issued to members, occasionally contain legislative material. (4) Nature, percentage of trade association expenses; amount, unknown at this time.

A. National Tobacco Tax Research Council, 204 Broad-Grace Arcade, Richmond, Va.

C. (1) The organization's legislative interests are expected to continue indefinitely. (2) Our present Federal legislative interests are confined to excise taxes imposed on tobacco as presently contained in subtitle B, chapter 15, of the Internal Revenue Code and to any and all modifications of the said chapter. (3) We have not published any specific documents with reference to such legislative interests. (4) We do not anticipate any expenses in the immediate future.

A. Eugene O'Dunne, Jr., Southern Building, Washington, D. C.

B. Wilbur-Ellis Co., Inc., 334 California Street, San Francisco, Calif. (fish and other food products).

C. (1) Throughout the year 1951 and thereafter for indefinite period. (2) H. R. 5693, Eighty-second Congress, an amendment to the Tariff Act of 1930; amendments to this bill will be proposed. (4) For all services, my compensation including that covered by item C-4 is $15,000 per year commencing November 5, 1951. Any incidental expenses (telephone tolls, travel, taxis, etc.) are reimbursable.

A. Mr. F. M. Parkinson, 204 Broad-Grace Arcade, Richmond, Va.

B. National Tobacco Tax Research Council, 204 Broad-Grace Arcade, Richmond, Va.

C. (1) My legislative interests are expected to continue during the course of my employment with National Tobacco Tax Research Council. (2) My present Federal legislative interests are confined to excise taxes imposed on tobacco as presently contained in subtitle B, chapter 15, of the Internal Revenue Code and to any and all modifications of the said chapter. (4) I do not anticipate that my employment will require any expenditures of this nature in the immediate future.

A. Hugh Peterson, 408 American Building, Washington, D. C.

B. United States Cane Sugar Refiners Association, 115 Pearl Street, New York, N. Y., and 408 American Building, Washington, D. C.

C. (1) Indefinitely. (2) Any legislation referring to the cane sugar refining industry. (3) I have considerable doubt as to my activities necessitating my filing under this act. However, so that there can be no question, I am doing so. (4) The expected compensation is $2,000 for the first quarter of 1952.

A. J. Hardin Peterson, attorney at law, post-office box 2097, Dixieland Station, Lakeland, Fla.

B. Alaska Statehood Committee, Juneau, Alaska, organized under the Territorial Laws of Alaska.

C. (1) During time S. 50 is pending in the Senate. (2) Statehood for Alaska, S. 50, for the bill. (4) Only expense anticipated railroad fare to Washington and living expense while here and small amount clerical, $300.—Compensation $1,500, plus actual expenses.

A. J. Hardin Peterson, post-office box 2097, Dixieland Station, Lakeland, Fla.

B. Government of Guam, an unincorporated Territory of the United States, Agana, Guam, M. I.

C. (1) Till October 1, 1952, and through second session of the Eighty-second Congress. (2) Legislation affecting the welfare of Guam. To make applicable laws to Guam which should be made applicable and to oppose those that should not be made applicable. A bill making certain laws applicable to Guam and declaring some laws inapplicable. Certain bills amending National Guard and housing acts making same applicable to Guam. (4) Estimated expenses $2,500 covering traveling expenses and living expenses when away from home, stenographic, telephone and telegraph. Compensation $10,000 per year and $2,500 in lieu of expenses and actual traveling expenses (payable quarterly). This covers other legal work other than legislative but impossible to accurately divide.

A. Pope Ballard & Loos, 707 Munsey Building, Washington, D. C.

B. Pin Clip and Fastener Association, 74 Trinity Place, New York, N. Y.

C. (1) Indefinite. (2) Tariff, customs, and foreign trade legislation generally. Customs simplification bill H. R. 5505, against certain provisions which are not truly simplifications of customs procedure or administration. (4) Anticipated expenses; minor cash expenditures, travel, taxis, telephone, telegraph, etc.; rates of compensation (fees), $125 per day.

A. Otie M. Reed, 1731 I Street NW., Washington, D. C.

B. National Milk Producers Federation, 1731 I Street NW., Washington, D. C.

C. (1) Indefinitely. (2) Any legislation that may affect milk producers or the cooperatives through which they act together to process and market their milk. (4) Applicant is paid and is to receive a salary of $9,450 per annum effective December 1, 1951, paid by the above employer, and is to be reimbursed for all actual expenses incurred in connection with his work.

A. Regular Common Carrier Conference of the American Trucking Associations, Inc., 1424 Sixteenth Street NW., Washington, D. C.

C. (1) It is not known how long legislative interests will continue. (2) The general legislative interest of registrant is the protection and fostering of the interests of federally regulated motor common carriers of general commodities. (4) The only compensation expected to be made by this conference for legislative activity is to its staff, particularly to its general manager in the form of an annual salary for the composite of his numerous duties, as shown in his registration made this day.

A. The Retail Shoe Committee for Equitable Taxation (David W. Herrmann, chairman), seventh floor, 345 Hudson Street, New York, N. Y.

C. (1) and (2). Legislative interests will continue until the disposition of section 123 of H. R. 4473, the enactment of which section registrant opposes. (4) Fair and reasonable attorney's fees to be determined at the conclusion of the legal services, with a retainer of $7,500. Ordinary out-of-pocket expenses for telephone, telegraph, trips to Washington, travel, food, and lodging, amount of which is indefinite.

A. Roland Rice, 537 Washington Building, Washington, D. C.

B. Registrant performs legal services for, among others, the Regular Common Carrier Conference of American Trucking Associations, Inc., 1424 Sixteenth Street NW., Washington, D. C.

C. (1) It is not known how long legislative interests will continue. (2) The general legislative interest of registrant is the protection and fostering of the interests of federally regulated motor common carriers of general commodities. No known bills have been introduced in which registrant is interested. (4) Annual salary.

A. Philip L. Rizzo, room 1, 826 Connecticut Avenue NW., Washington, D. C.

B. The Consumers' Lobby, room 1, 826 Connecticut Avenue NW., Washington, D. C.

C. (1) One year. (2) Legislation directly affecting the consumer, specifically S. 169, of which I am in favor. (4) $750 (for office and literature) compensation: Contingent.

A. Mrs. Ada Barnet Stough, 132 Third Street SE., Washington, D. C.

B. American Parents Committee, 132 Third Street SE., Washington, D. C., and 52 Vanderbilt Avenue, New York, N. Y.

C. (1) Interest will continue indefinitely. (2) National school health services bill, H. R. 3238; public school construction bill, H. R. 3362; National child research bill, H. R. 1879; Federal aid for medical education, S. 337 and H. R. 2797; local public health units, H. R. 274, S. 445; physically handicapped children's education bill, S. 1302, H. R. 7396; school-lunch appropriation; Children's Bureau appropriation; Cabinet status for the Federal

Security Agency; Federal aid for day-care centers in defense areas; Federal aid to elementary and secondary schools; emergency maternal and infant care. S. 1245; defense housing and community facilities. H. R. 2988 and S. 349. (3) A mimeographed newsletter entitled "Washington Report on Legislation for Children." About 250 copies, 6 to 8 times a year. Mimeographed by Parents' Institute, Bergenfield, N. J. (4) Salary, $416.66 per month. Anticipated expenses for taxicabs, incidentals, probably less than $50 a month.

A. Margaret K. Taylor, 1731 I Street NW., Washington, D. C.
B. National Milk Producers Federation, 1731 I Street NW., Washington, D. C.
C. (1) Indefinitely. (2) Any legislation that may affect milk producers or the cooperatives through which they act together to process and market their milk. (4) Applicant is paid and is to receive a salary of $9,450 per annum, effective December 1, 1951, paid by the above employer, and is to be reimbursed for all actual expenses incurred in connection with her work.

A. H. Willis Tobler, 1731 I Street NW., Washington, D. C.
B. National Milk Producers Federation, 1731 I Street NW., Washington, D. C.
C. (1) Indefinitely. (2) Any legislation that may affect milk producers or the cooperatives through which they act together to process and market their milk. (4) Applicant is paid and is to receive a salary of $8,715 per annum effective December 1, 1951, paid by the above employer, and is to be reimbursed for all actual expenses incurred in connection with his work.

# SENATE

WEDNESDAY, FEBRUARY 27, 1952

*(Legislative day of Monday, February 25, 1952)*

The Senate met at 12 o'clock meridian, on the expiration of the recess.

The Chaplain, Rev. Frederick Brown Harris, D. D., offered the following prayer:

Eternal God, in this still moment, pausing reverently at this altar of prayer, make us vividly aware of Thy divine invasion through all the areas of our yearning lives. Give us the grace of hospitality to the highest. As citizens of a world that carries on its bent shoulders a burden of suffering greater than humanity has ever borne, make us inwardly adequate to be Thy ministers of reconciliation. May the poisoning evils which now blight the earth not devastate our own inner lives, subduing us to its low standards, confusing us by its chaos, or crushing our faith under its tragedy. Clothed in the undefiled garments of love's pure vestment, humbly may we walk with Thee in white as in the spirit of the Master we face the infinite pathos of this troubled world we fain would serve before we fall on sleep. In the Redeemer's name we ask it. Amen.

## THE JOURNAL

On request of Mr. McFARLAND, and by unanimous consent, the reading of the Journal of the proceedings of Tuesday, February 26, 1952, was dispensed with.

## MESSAGES FROM THE PRESIDENT— APPROVAL OF BILL

Messages in writing from the President of the United States were communicated to the Senate by Mr. Miller, one of his secretaries, and he announced that on February 26, 1952, the President had approved and signed the act (S. 2119) for the relief of Claudia Tanaka.

## MESSAGE FROM THE HOUSE

A message from the House of Representatives, by Mr. Snader, its assistant reading clerk, announced that the House had passed the bill (S. 1851) to assist in preventing aliens from entering or remaining in the United States illegally, with amendments, in which it requested the concurrence of the Senate.

## COMMITTEE MEETINGS DURING SESSIONS OF THE SENATE

On request of Mr. HAYDEN, and by unanimous consent, the Committee on Foreign Relations was authorized to meet during the session of the Senate today.

Also on request of Mr. HAYDEN, and by unanimous consent, the Subcommittee on Internal Security of the Committee on the Judiciary was authorized to meet during the sessions of the Senate the remainder of this week.

## STATEHOOD FOR ALASKA

The PRESIDENT pro tempore. The Senate is operating under a unanimous-consent agreement which provides that beginning at the hour of 12 o'clock noon today debate on the motion of the Senator from Florida [Mr. SMATHERS] to recommit, with certain instructions, Senate bill 50 shall be limited to not exceeding 4 hours, to be equally divided, and controlled respectively by the Senator from Florida and the Senator from Wyoming [Mr. O'MAHONEY]. In accordance with the agreement the Chair lays before the Senate the bill (S. 50) to provide for the admission of Alaska into the Union.

## TRANSACTION OF ROUTINE BUSINESS

Mr. McFARLAND. Mr. President, I ask unanimous consent that Senators be permitted to make insertions in the RECORD and to transact other routine business, without debate, the time not to be charged to either side.

The PRESIDENT pro tempore. Is there objection? The Chair hears none, and it is so ordered.

## PETITION

The PRESIDENT pro tempore laid before the Senate a joint resolution of the Legislature of the State of Virginia, which was referred to the Committee on the Judiciary, as follows:

House Joint Resolution 32

Joint resolution memorializing Congress to call a convention for the purpose of considering an amendment to the Constitution of the United States relative to taxes on incomes, inheritances, and gifts

Whereas the Federal Government has abused the taxing power to the point of confiscation, the General Assembly of Virginia respectfully petitions the Congress of the United States to call a convention for the purpose of proposing the following article as an amendment to the Constitution of the United States:

"ARTICLE —

"SECTION 1. The sixteenth article of amendment to the Constitution of the United States is hereby repealed.

"SEC. 2. The Congress shall have power to lay and collect taxes on incomes, from whatever source derived, without apportionment among the several States, and without regard to any census or enumeration: provided that in no case shall the maximum rate of tax exceed 25 percent.

"SEC. 3. The maximum rate of any tax, duty, or excise which Congress may lay and collect with respect to the devolution or transfer of property, or any interest therein, upon or in contemplation of or intended to take effect in possession or enjoyment at or after death, or by way of gift, shall in no case exceed 25 percent.

"SEC. 4. The limitations upon the rates of said taxes contained in sections 2 and 3 shall not apply during hostilities while the United States is in a state of war declared by Congress and shall be subject to the further qualification that in the event of a grave national emergency requiring such action to avoid national disaster, the Congress by a vote of three-fourths of each House may for a period not exceeding 1 year increase beyond the limits above prescribed the maximum rate of any such tax upon income subsequently accruing or received or with respect to subsequent devolutions or transfers of property, with like power to repeat such action as often as such emergency may require.

"SEC. 5. Sections 1 and 2 shall take effect at midnight on the 31st day of December following the ratification of this article. Nothing contained in this article shall affect the power of the United States after said date to collect any tax on income for any period ending on or prior to said 31st day of December laid in accordance with the terms of any law then in effect.

"SEC. 6. Section 3 shall take effect at midnight on the last day of the sixth month following the ratification of this article. Nothing contained in this article shall affect the power of the United States to collect any tax on any devolution or transfer occurring prior to the taking effect of section 3, laid in accordance with the terms of any law then in effect": Now, therefore, be it

*Resolved by the senate (the house of delegates concurring),* That the Congress of the United States be, and it hereby is, requested to provide as the mode of ratification that said amendment shall be valid to all intents and purposes, as part of the Constitution of the United States, when ratified by the legislatures of three-fourth of the several States; and be it further

*Resolved,* That a duly attested copy of this resolution be transmitted by the keeper of the rolls of the State to the Secretary of the Senate of the United States, the Clerk of the House of Representatives of the United States and to each Member of the Congress from this State.

Agreed to by the house February 5, 1952.
Agreed to by the senate February 21, 1952.
A true copy:
                    E. GRIFFITH DODSON,
          *Clerk of the House of Delegates and Keeper of the Rolls of the State.*

## REPORTS OF COMMITTEES

The following reports of committees were submitted:

By Mr. MURRAY, from the Committee on Labor and Public Welfare:
S. 2390. A bill to amend section 302 (4) of the Soldiers' and Sailors' Civil Relief Act