IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Hon. Anthony J. Trenga |
| | ) | |
| CLAUDIO ALVAREZ RODRIGUEZ | ) ) | Motions Hearing: October 6, 2021 |

### DEFENDANT'S REPLY IN SUPPORT OF MOTION TO DISMISS INDICTMENT

The government's response to the defense Motion rests largely on the government's own *post hoc* conclusion that there must be a non-discriminatory purpose for the illegal reentry statute. In the government's telling, because today's prosecutors can muster an explanation for § 1326 that is not discriminatory, the statute is justified no matter the purpose for which it was enacted, and notwithstanding the disparate impact it has had over the past century. But the question here is not whether a non-discriminatory purpose can be offered now. Rather, the question is with what purpose was the statute enacted when it was enacted. The historical record is unfortunately clear. At the time Congress enacted the illegal reentry statute in 1929 and when it recodified the statute in 1952, one aim was to discriminate against Latinx people – indeed, the era was steeped in deeply offensive language largely targeting Mexican immigrants and culminating in the criminalization of unauthorized reentry. The goal surely was achieved as nearly all defendants prosecuted for illegal reentry for the past 100 years have been Latinx. As

a result, the statute is unconstitutional under binding Supreme Court precedent, and the government's protestations to the contrary fall apart under close inspection.

## I. The government is wrong on the law.

As an initial matter, the government jumbles two distinct legal principles. It suggests that when Congress enacts legislation in the area of immigration, congressional power is "plenary" and "at its zenith." Govt Response, Dkt. No. 29, at 5, 11, 12, 13. True enough, perhaps. But the government extrapolates quite a bit further from there and in doing so ignores long-standing Supreme Court authority. The government suggests that equal protection principles must cede way to congressional power in the realm of immigration. Of course, this is not true. Congress cannot enact laws in violation of Constitutional principles even when it acts at the height of its powers.

In reality, though, the government is attacking a straw man. The defense's Motion has not suggested that Congress does not have the authority to enact a statute criminalizing illegal reentry. All the defense suggests is that any such statute must not have a discriminatory purpose aimed at, or disproportionate impact on, one ethnic group, as 8 U.S.C. § 1326 has. That is where *Arlington Heights* comes in. *See Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252 (1977). Just last year, the Supreme Court acknowledged the relevance of the *Arlington Heights* inquiry in an immigration context.[1] *See, e.g., U.S. Dep't of Homeland Sec. v. Regents*

---

[1] The government's reliance on *United States v. Carpio-Leon* to the contrary is misplaced. *See* Govt Response at 11-12 (citing 701 F.3d 974 (4th Cir. 2012)). As

*of the Univ. of California*, 140 S. Ct. 1891, 1915-16 (2020) (accepting that *Arlington Heights* analysis applied to race-based equal protection challenge to government's decision to terminate DACA, though ultimately finding the facts insufficient for plaintiffs to prevail).

The government's claim that *Arlington Heights*-style scrutiny of racial animus is inapplicable to immigration laws suggests that Congress can make patently discriminatory laws in the context of immigration and judicial review must give way. *See, e.g.*, Govt Response at 6. But the Supreme Court has repeatedly made clear that even in the most sensitive arenas where legislative prerogative is generally unquestioned the law must comport with Constitutional dictates. *See, e.g.*, *Korematsu v. United States*, 323 U.S. 214, 216 (1944), overruled on other grounds by *Trump v. Hawaii*, 138 S. Ct. 2392 (2018) (in wartime national security context, where governmental power is at its peak, courts must apply "the most rigid scrutiny" to racial classifications); *Johnson v. California*, 543 U.S. 499, 512 (2005 (in prison setting, where administrators receive extreme deference and fundamental rights are dramatically curtailed, *see Turner v. Safley*, 482 U.S. 78, 89 (1987), courts must nonetheless subject racial classifications to strict scrutiny).

---

*Arlington Heights* makes clear, a statute's challenger bears the initial burden of proving that Congress enacted the law at issue with racial animus. *See* 429 U.S. at 266. Because the defendant in *Carpio-Leon* did not present evidence of racial animus, "no fundamental constitutional right [wa]s at stake, [so] the appropriate standard of review [in that case wa]s the rational-basis review." 701 F.3d at 982.

3

The government's remarkable proposition that *Arlington Heights* should not apply here may be explained, in part, by its mischaracterization of the statute at issue. In fact, 8 U.S.C. § 1326 is not an immigration law in the arena on which the government so heavily relies, *i.e.*, Congressional authority to say who may and may not enter the United States. Rather, 8 U.S.C. § 1326 is a criminal statute that authorizes the arrest, conviction, incarceration of and imposition of a host of collateral consequences on individuals present in the United States. Thus, the government's assertion that that it represents the apex of congressional power is not entirely accurate. Greater protections apply in criminal cases, where the government seeks to "punish[] by deprivation of liberty and property." *See Wong v. United States*, 163 U.S. 228, 237 (1896) (finding that although the United States may deport foreign nationals who come to the country illegally, it may not criminally punish them for the same acts without triggering constitutional protections). And "[t]he distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law . . . [O]nce an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).

Thus, even if the government were correct that Congress is not subject to the same constitutional restrictions as it ordinarily would be when it legislates in the

arena of immigration at the heart of its power – controlling admission into the United States – the statute at issue here, 8 U.S.C. § 1326, is not such a law. An alien in this country who is arrested and facing a deprivation of their liberty *is* entitled to constitutional protections of due process and equal protection. As such, § 1326 is subject to inquiry under *Arlington Heights*.

## II. It is unmistakable that § 1326 is unconstitutional under *Arlington Heights*.

Applying the *Arlington Heights* analysis to the illegal reentry statute demonstrates that it had a discriminatory purpose at the time of its enactment; that no later recodification or reenactment has eliminated that impermissible purpose; and that the statute has disproportionately impacted members of the targeted group, Mexicans, specifically, and Latinos, generally – just as intended.

### A. The illegal reentry statute was enacted with discriminatory purpose.

First, the law criminalizing illegal reentry was enacted, at least in part, to target Mexicans and other Central American migrants. In short, it was intentionally discriminatory. The government suggests the legislative history cited by the defense can be cast aside as non-representative of the Congress that enacted the illegal reentry statute. *See* Govt Response at 1, 18. The contrary is true. As the defense presented in its Motion, the decade leading to the passage of "The Undesirables Act of 1929" was fairly saturated with discriminatory animus and inflammatory rhetoric aimed primarily at Mexican immigrants. *See* Def. Motion, Dkt. No. 23, at 7-23. That the years immediately preceding the illegal reentry statute's initial passage saw the

5

rise of eugenics – a principal proponent testified before Congress multiple times, embraced by the legislators who later pushed the Undesirables Act – and odious language about preserving the purity of American bloodlines and the threat posed by "peon" and "mongrel" "undesirables," namely Mexicans, ***supports*** the conclusion that the 1929 Congress was inflamed by animus against Mexicans and acted on that basis. This was not the brief musings of a few bit players, but a years-long crusade that culminated, in part, with the passage of the statute at issue in this case. Contrary to the government's assertions, the Court ***may*** consider the broader historical context when analyzing the intent of a statute. *See, e.g.*, *Hunter v. Underwood*, 471 U.S. 222, 228 (1985) (describing "that the Alabama Constitutional Convention of 1901 was part of a movement that swept the post-Reconstruction South to disenfranchise blacks" in concluding that the statute at issue was enacted with discriminatory purpose).

During the debate on the Undesirables Act itself, members of Congress continued to make clear that racial animus against Mexicans was the reason the crime of illegal reentry needed to be enacted. Rep. Thomas L. Blanton complained that Mexicans "come into Texas by hordes" and that "my friend Judge Box has been making a just fight against this situation for years." *See* Def. Motion Exhibit B at 3619. Rep. Fitzgerald then added that from a "moral standpoint," Mexicans were "poisoning the American citizen" because they are "of a class" that is "very undesirable." *See id*. at 3620. Minutes later, the Act passed the House of

Representatives. *See id.* at 3621. The president signed it into law three days later. *See* Def. Motion Exhibit J.

As the government acknowledges, it conceded that the 1929 law had a discriminatory purpose during argument in *United States v. Carrillo-Lopez*. *See* Govt Response at 31 n.12 (citing 2021 WL 3667330, at *7 n.17). Perhaps recognizing the extent of evidence in the legislative history demonstrating the invidious intent of the 1929 illegal reentry statute, the government does not offer contrary evidence here. Instead, it falls back on the contention that, in the abstract, there exists a non-discriminatory justification for § 1326. *See* Govt Response at 8 (suggesting, without citation, that § 1326 is justified by the government's "legitimate interest in deterring illegal reentry into the United States"). The problem with this proffered justification, is that it is just that, a *post hoc* justification offered by the present-day prosecutors. In seeking to offer a non-discriminatory justification, the government essentially acknowledges that no such justification manifests in the legislative history of the 1929 statute. That a non-discriminatory justification for the statute could exist does not negate the fact that in this case, this statute was clearly enacted with racial animus. That is what *Arlington Heights* requires. *See* 429 U.S. at 265.

### B. The illegal reentry statute's later recodifications have not removed its discriminatory purpose.

The government contends, however, that even if the 1929 law was enacted with discriminatory purpose, the statute is inoculated by its later recodification in 1952. This is incorrect for two reasons. First, the Supreme Court has instructed that

7

statutory intent carries forward unless a later Congress clearly states to the contrary. Second, as the Nevada district court explained in exacting detail in *Carrillo-Lopez*, the 1952 Congress itself was motivated by discriminatory purpose when it reenacted the illegal reentry statute.

Where a law is reenacted with minor changes, more than a century of Supreme Court law instructs that, in fact, the reenacted law ***does*** import the originally enacted statute's purpose. *See* Def. Motion at 26-28 (citing, among others, *Hunter v. Underwood*, 471 U.S. 222, 232-33 (1985), *Bear Lake & River Waterworks & Irrigation Co. v. Garland*, 164 U.S. 1, 11-12 (1896), and *United States v. Ryder*, 110 U.S. at 729 (1884)). As *Bear Lake* explained 125 years ago, statutory ***re***-enactment does not impact the effect of substantively unchanged provisions from the original law. *See* 164 U.S. at 11-12 ("Upon comparing the two acts of 1888 and 1890 together, it is seen that they both legislate upon the same subject, and in many cases the provisions of the two statutes are similar, and almost identical. Although there is a formal repeal of the old by the new statute . . . it is, as we think, entirely correct to say that the new act should be construed as a continuation of the old with the modification contained in the new act."). This was not a novel concept at the time. *See Ryder*, 110 U.S. at 740 ("It will not be inferred that the legislature, in revising and consolidating the laws, intended to change their policy, unless such intention be clearly expressed."). Nor is it an outdated concept now – just last year, the Supreme Court reaffirmed the

principle. *See* Def. Motion at 27 (citing *Ramos v. Louisiana*, 140 S. Ct. 1390, 1401 & n.44 (2020), and *Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246, 2259 (2020)).

But even more to the point, the Supreme Court has spoken more than once on the precise question at issue here: In *Hunter v. Underwood*, the Court explained that simply reenacting a statute will not vitiate the originally enacted statute's discriminatory intent – though that is exactly what the government advocates. *See* 471 U.S. at 232-33 (applying *Arlington Heights* and rejecting suggestion that 80 years of amendments to the statute at issue, including some that eliminated the "more blatantly discriminatory selections," did not change that the "original enactment was motivated by a desire to discriminate against blacks on account of race and the section continues to this day to have that effect"). And in *Abbott v. Perez*, on which the government puts weight, *see* Govt Response at 18 (citing 138 S. Ct. 2305 (2018)), the Court drew a critical distinction that the government overlooks: While the *Abbott* Court did discuss a presumption of legislative good faith it distinguished situations, such as that in *Hunter*, "in which a law originally enacted with discriminatory intent is later reenacted by a different legislature" – that is, the precise situation described in this case. 138 S. Ct. at 2325.

Thus, the law is clear. Where, as here, the statute's original enactment was with invidious purpose, a later reenactment that does not substantively amend the offending provision or redress the discriminatory purpose will not "legitimate[]" the

9

statute and is not entitled to a presumption of legislative good faith. *See Hunter*, 471 U.S. at 233.

But the government's position suffers from a second, equally fatal problem. The 1952 Congress, which reenacted the substantively nearly identical illegal reentry statute, itself acted with discriminatory purpose. *See* Def. Motion at 28-29 (citing *Carrillo-Lopez*, No. 3:20-cr-26, 2021 WL 3667330, at *10-11 (D. Nev. Aug. 18, 2021). The court in *Carrillo-Lopez* devoted pages of its analysis to the discriminatory intent evidenced **by the 1952 Congress**. *See id*. at *9-15. For example, the Court noted the "relative lack of discussion [about the illegal reentry provision] compared to robust Congressional debate regarding other provisions of the INA; [and] explicit, recorded use of the derogatory term 'wetback' by supporters of Section 1326." *Id*. at *10.

The district court emphasized a point raised by the defense's expert that "members of [the 1952] Congress are acknowledging that there are problematic racial aspects to the 1924 Johnson-Reed Act, which comes five years before the Undesirable Aliens Act, and yet they choose to not only recodify the 1326, but to recodify it [ ] without any examination." *Id*. at *11 (second alteration original). The court concluded that the 1952 Congress "was more concerned with which racial and ethnic groups warranted continued discriminatory exclusion, rather than any desire to confront or revise the nativism reflected in the Act of 1929." *Id*. That this silence continued even though the President weighed in to encourage Congress to reconsider problematic and prejudicial legislation convinced the district court that the 1952

10

Congress at least tacitly accepted the invidious intent of the 1929 act that it was recodifying:

> Truman expressly drew the INA into dialogue with prior immigration legislation, from both 1924 and 1929, which were concededly racist. But the 1952 Congress rejected that call and overrode the veto. The Court finds that Congress' failure to heed President Truman's call to "reimagine" immigration while simultaneously making the INA, and particularly Section 1326, more punitive in nature, is evidence of at least indifference to the nativist motivations of the statute's predecessor.

*Id.* at *12.

Further, *Carrillo-Lopez* considered the odious language – rife in the legislative history of the 1929 law – that continued to infect the reenactment proceedings in 1952. *See id.* at *13. Although the government brushes off the use of the term "wetback" in discussion of the 1952 bill because of the source, *see* Govt Response at 37, this entirely misses the point. The casual repetition of an ethnic slur in the discussion around the 1952 law "evidences the racial environment and rhetoric in 1952, even among high-ranking government officials and committees, specifically with regard to Mexican and Latinx people." *Id.* And while the government protests that Attorney General Ford was not a legislator whose intent can be considered in the analysis of the motivations of the 1952 Congress, in fact Ford's suggestion to expand the grounds for illegal reentry prosecution to include those "found in" the United States was the "only significant alteration" the 1952 Congress made to the 1929 provision. *See id.*

The government disputes the reference back to the history and context surrounding the passage of the 1929 law and its 1952 recodification in § 1326, but it is indisputable that these are relevant considerations. *Arlington Heights* itself so instructs. *See* Def. Motion at 4-5.

### C. The evidence of disparate impact on Latinx people is irrefutable.

In light of the clear evidence that the illegal reentry statute was enacted with a discriminatory purpose, this Court also must consider the law's disproportionate impact on the targeted group. The evidence that § 1326 has been used overwhelmingly to prosecute, convict and incarcerate Mexicans and other Latinx people is demonstrated by irrefutable data. *See* Def. Motion at 23-26 (citing Sentencing Commission statistics). Indeed, the statute has hardly been used against anyone else.

The government explains this disparate impact away by pointing to geography. Geography may be one reason the law has had a disparate impact, but it cannot negate the cold fact that 99 percent of defendants in illegal reentry cases are Latinx. But further, the evidence also shows that § 1326 is being enforced ***geographically*** in a way that disproportionately affects Latinx people. A prior attorney general outright stated that this was true: "the Department of Homeland Security is now referring 100 percent of ***illegal Southwest Border crossings*** to the Department of Justice for prosecution. And the Department of Justice will take up those cases." *See* Def. Motion at 25 (quoting Attorney General Jeff Sessions). To be clear, although the

12

United States has countless entry points, thousands of miles of land border with Canada, not to mention thousands of miles of shoreline, enforcement of § 1326 was not geographically diffuse, but rather concentrated on the entry points most likely to be used by Mexicans and Latinos. That is precisely the problem.

The law criminalizing illegal reentry was enacted nearly 100 years ago to target, primarily, Mexicans. It was reenacted 23 years later by a Congress that – still steeped in inflammatory rhetoric targeting one ethnicity – recodified the statute with at least tacit acceptance of its odious purpose, and then ratcheted up the penalties disproportionately meted out against Latinos. Almost a century later, the law's animating purpose has never been disavowed. At the same time, 99 percent of those who bear its brunt are Latinx, *i.e.*, those whom the original law pointedly targeted on the ground that they were "undesirable." The law's discriminatory purpose here matches its disproportionate impact. As a result, the *Arlington Heights* test is clearly met.

\*     \*     \*

For these reasons and those stated in the defense Motion, 8 U.S.C. § 1326 denies defendants equal protection under the law and violates the due process clause of the Fifth Amendment. It cannot stand, and this indictment must be dismissed.

    Respectfully submitted,

    CLAUDIO ALVAREZ RODRIGUEZ

    By counsel,

13

Geremy C. Kamens
Federal Public Defender

\_\_\_\_\_/s/_____
Cadence A. Mertz
Va. Bar No. 89750
Assistant Federal Public Defender
R. Ryan Hoak
Va. Bar No. 94200
*Pro Bono* Attorney
Office of the Federal Public Defender
1650 King Street, Suite 500
Alexandria, VA 22314
(703) 600-0800 (Tel)
(703) 600-0880 (Fax)
Cadence_Mertz@fd.org

## **CERTIFICATE OF SERVICE**

I certify that on Sept. 28, 2021, I will file the foregoing using the CM/ECF system, which will automatically serve true and correct copies on counsel of record.

\_\_/s/_____
Cadence A. Mertz
Va. Bar No. 89750
Assistant Federal Public Defender
Office of the Federal Public Defender
1650 King Street, Suite 500
Alexandria, VA 22314
(703) 600-0800 (Tel)
(703) 600-0880 (Fax)
Cadence_Mertz@fd.org