1

1        UNITED STATES DISTRICT COURT
         EASTERN DISTRICT OF VIRGINIA
2           ALEXANDRIA DIVISION

3
  UNITED STATES OF AMERICA        )
4                                 )
                                  )
5       VS.                       )   1:21-CR-179  AJT
                                  )
6                                 )   ALEXANDRIA, VIRGINIA
                                  )     OCTOBER 6, 2021
7                                 )
  CLAUDIO ALVAREZ RODRIGUEZ       )
8  _____ )

9

10

11

12

13  _____

14      **TRANSCRIPT OF MOTION HEARING, PLEA, AND SENTENCING**
          **BEFORE THE HONORABLE ANTHONY J. TRENGA**
15           **UNITED STATES DISTRICT JUDGE**
    _____

16

17

18

19

20

21

22

23

24  **Proceedings reported by stenotype, transcript produced by**

25  **Julie A. Goodwin.**

1                       **A P P E A R A N C E S**

2

3    FOR THE PLAINTIFF:
         UNITED STATES ATTORNEY'S OFFICE
4        By:  MR. JACOB M. GREEN
         MR. TONY R. ROBERTS
5        Assistant U.S. Attorney
         2100 Jamieson Avenue
6        Alexandria, Virginia  22314
         703.299.3700
7        jacob.green3@usdoj.gov

8        UNITED STATES ATTORNEY'S OFFICE
         By:  MR. JOSEPH ATTIAS
9        SunTrust Building
         919 East Main Street
10       Suite 1900
         Richmond, Virginia  23219
11       804.819.5400
         joseph.attias2@usdoj.gov

12

13

14   FOR THE DEFENDANT:
         OFFICE OF THE FEDERAL PUBLIC DEFENDER
15       By:  MS. CADENCE MERTZ
         MR. RYAN HOPE
16       Assistant Federal Public Defenders
         1650 King Street
17       Suite 500
         Alexandria, Virginia  22314
18       703.600.0800
         cadence_mertz@fd.org

19

20

21   OFFICIAL U.S. COURT REPORTER:
         MS. JULIE A. GOODWIN, CSR, RPR
22       United States District Court
         401 Courthouse Square
23       Eighth Floor
         Alexandria, Virginia  22314
24       512.689.7587

25

3

1  (OCTOBER 6, 2021, 9:08 A.M., OPEN COURT.)

2       THE COURTROOM DEPUTY:  Criminal Case Number 21-CR-179,

3  *United States of America versus Claudio Alvarez Rodriguez.*

4       Will Counsel come to the podium and state your name

5  for the record.

6       MR. GREEN:  Good morning, Your Honor.  Jake Green,

7  Joseph Attias, and Tony Roberts for the United States.

8       THE COURT:  Good morning.

9       MR. ROBERTS:  Good morning, Your Honor.

10      MS. MERTZ:  Good morning, Your Honor.  Cadence Mertz

11  and with me is Ryan Hope.  He's a volunteer attorney in our

12  office for Mr. Alvarez, who is present in the courtroom.

13      THE COURT:  All right.  Welcome everyone.

14      We're here on the defendant's motion to dismiss the

15  indictment.  I have reviewed the pleadings.  Be pleased to hear

16  further from counsel.

17      MS. MERTZ:  Your Honor, I know the Court will have --

18  be very well steeped in the pleadings and familiar with the --

19  with what I think is very thorough briefing on both sides, so

20  I'm going to be very brief.  I just wanted to make one point

21  crystal clear, which is that the law regarding -- the Supreme

22  Court precedent regarding whether or not the purpose of the

23  1929 law is imported into the 1952 law is clear and direct and

24  not in the government's favor here.

25      The law says that the purpose of the originally

4

1    enacted statute does import in the -- in the later reenactment

2    when there's substantive similarity and no statement to the

3    contrary.  The cases that the government cites to try to attack

4    that principle don't represent the situation we have here,

5    which is a substantive reenactment of the exact same language

6    with very minimal distinctions.

7            The two primary cases on which the government

8    relies which are *Abbott v. Perez*, which is a Supreme Court

9    case, and *NAACP v. Raymond*, which is a Fourth Circuit case, in

10   those cases the Courts were talking about, prior provisions

11   that either were not enacted or had been -- in fact, in the

12   *Raymond* case had been rejected, and then the North Carolina

13   Congress came back and made a new law, which had different

14   provisions and was substantively different which was the

15   subject of that opinion.

16           So it is -- that is not what we have here.  We have

17   the Immigration Naturalization Act reenacting substantively the

18   exact same language which became -- which is what we now know

19   as 1326(a).  So we -- I just want to highlight that point.

20           That said, for all of the reasons that we have put

21   in our papers and that the District of Nevada put -- you know,

22   discussed in detail in *Carrillo-Lopez*, the 1952 enact --

23   reenactment was problematic for its own reasons and had its own

24   racial animus at the -- at that time.  That was -- that was a

25   purpose of the reenactment.  And the -- and so it is -- this

5

1    Court does not need to rely entirely on what happened in 1929.

2            Our argument at that -- is that, yes, and -- and

3    the government has previously conceded this in *Carrillo-Lopez*,

4    the 1929 law had as a purpose racial animus.  But in 1952 that

5    Congress also had racial animus, and so this Court doesn't have

6    to rely entirely on 1929.

7            Your Honor --

8            THE COURT:  What's the standard of review in your

9    view?

10           MS. MERTZ:  I'm sorry.

11           THE COURT:  What's the standard of review of this

12   legislature?

13           MS. MERTZ:  Your Honor, our -- for -- for the question

14   of whether or not equal protection --

15           THE COURT:  Whether it's constitutional --

16           MS. MERTZ:  Yeah.

17           THE COURT:  -- or not.

18           MS. MERTZ:  Our -- so our -- our argument is that,

19   that this Court should be looking at the test that was laid out

20   in *Arlington Heights* and applying that test, which is whether

21   or not there is -- a purpose was racial animus, and then

22   whether or not there is disproportionate impact, which there

23   overwhelmingly is.  I don't think the government really --

24   other than pointing to geography, there really isn't almost

25   anybody else who has been prosecuted under this statute.

6

1        And Mr. Alvarez is Mexican.  He was born in Mexico.

2   He is in fact who this law originally was intended to target,

3   which was stated in the congressional record, and -- and that's

4   been the case consistently for the last hundred years.

5        So with that, Your Honor, if the Court has

6   questions, I would be happy to answer them, but --

7        THE COURT:  All right.

8        MS. MERTZ:  -- otherwise we -- we believe that this

9   law should be struck down at this point.

10       THE COURT:  All right.  Well, let me ask a question.

11  What's the status of the case in the Fourth Circuit on this

12  issue?

13       MS. MERTZ:  It's my understanding and Mister -- I

14  think Mr. Attias may know more about this, but I believe it's

15  going to be argued next week.  And so we're cognizant,

16  obviously, that that is going to happen, and obviously -- it

17  may take a while, obviously, for the Court to issue an opinion,

18  but it's my understanding they argue next week.

19       THE COURT:  All right.

20       Counsel.

21       THE COURT REPORTER:  Can I get your name?

22       MR. ATTIAS:  Joseph Attias, A-T-T-I-A-S.

23       THE COURT REPORTER:  Thank you.

24       MR. ATTIAS:  Sure.

25       Your Honor, the case in the Fourth Circuit was

7

1    listed for the October sitting, but unfortunately, it was

2    pulled off the calendar.  So I'm guessing it will end up in

3    early December, but we don't know yet, so there's actually no

4    date yet.

5                THE COURT:  Yeah.

6                MR. ATTIAS:  So --

7                THE COURT:  It's -- it's an interesting issue where a

8    lot of different strains of constitutional thought seem to, I

9    don't want to say collide, but certainly bump into each other.

10               MR. ATTIAS:  I agree.

11               THE COURT:  Since you're dealing with the immigration

12   area, there seems to be -- there's a whole different approach

13   that courts have adopted.

14               What struck me, which apparently is not a correct

15   thought, but it occurred to me, since no one's really briefed

16   it or mentioned it, is that, you know, at the border the Fourth

17   Amendment doesn't apply.  On admissibility issues, the due

18   process clause doesn't apply.  But apparently the equal

19   protection clause in some fashion would apply even though when

20   enacted it would be directed to people who are noncitizens

21   outside of the United States and who would typically not have

22   any standing or constitutional rights.  But I understand that's

23   not the analysis that's been adopted anywhere, and it comes

24   down to whether the *Arlington Heights* approach is really even

25   applicable to this context.

8

1        MR. ATTIAS:  That -- that's right, Your Honor, and

2   there are different shades of protection, I think if you go

3   through the law.  Even *Zadvydas* -- Supreme Court's decision in

4   *Zadvydas* recognizes that aliens, even illegally here, have

5   certain due process rights --

6        THE COURT:  That's after they're here.

7        MR. ATTIAS:  Right.

8        THE COURT:  Yes.

9        MR. ATTIAS:  Is applicable.  We think that right is

10   protected by the rational basis review.  But even *Zadvydas*

11   recognizes that the extent of that protection will vary

12   depending on circumstances.

13        THE COURT:  Right.

14        MR. ATTIAS:  And how you have cases like *Reno versus*

15   American Arab -- *American-Arab Anti-Discrimination Committee*

16   which concluded -- that's a Supreme Court decision -- which

17   concluded that aliens unlawfully present in the United States

18   don't have a constitutional right to lodge a selective

19   enforcement challenge to their deportation.  That's

20   deportation.  It's not a criminal proceeding.

21        But I agree.  These questions are definitely

22   complicated.

23        If I could respectfully make a suggestion to the

24   Court which is the way most courts have handled this is to

25   basically just assume that *Arlington Heights* applies and -- and

9

1    apply the factors under our --

2              THE COURT:  Right.

3              MR. ATTIAS:  -- our argument.  The defendant's theory

4    fails notwithstanding applying *Arlington Heights*.  That's also

5    the approach the Supreme Court actually took in *Regents*.  I

6    don't think it's fair to characterize *Regents* as having decided

7    that *Arlington Heights* applies full stop to the immigration

8    context.

9              The Supreme Court in *Regents* was they were faced

10   with a situation where the Solicitor General took the position

11   that the rescission of DACA should be subjected to no review,

12   not as to the APA claim, but as to the equal protection claim,

13   so they were faced with no review versus *Arlington Heights'*

14   motive probing review.  And the Supreme Court just decided to

15   apply *Arlington Heights*, apply all the criteria, and they held

16   that the defendants -- well, that the challenger's argument

17   failed even under -- under *Arlington Heights*.

18             If I could just make two brief, historical points

19   and then hit on the key -- what I think are the key aspects

20   of --

21             THE COURT REPORTER:  Can you be a little louder?

22             MR. ATTIAS:  Sure.

23             -- (Continuing) the key aspects of our argument.

24             Number one - and I saw this repeatedly through

25   the -- through the pleadings - there is no such act as the

1    Undesirable Aliens Act of 1929.  Congress did not pass an act

2    called the Undesirable Aliens Act of 1929.  I think the

3    confusion can be explained as follows:

4              On December 28, 1928, Senator Coleman Blease

5    introduced the unlawful reentry provision into the Senate.  The

6    House then took that bill and basically sent it back to the

7    Senate substantially in large.  What they basically did is

8    attach their own bill to it, and in Section 10 of that bill,

9    they said -- the House said, we're going to call this act the

10   Undesirable Aliens Act of 1929.

11             The reason why they added that provision is because

12   one of the -- one of the major provisions that they added

13   to the Senate's very streamlined 1929 unlawful reentry law was

14   a provision adding eight additional grounds for deportation of

15   certain aliens.  Those would have been the undesirables who

16   would have been subject to deportation.

17             The Senate then got that bill back, and because it

18   was substantially different from what they had sent to the

19   House, the two chambers created a committee.  They conferenced;

20   they ironed out their differences, and in the House report

21   detailing the -- in the compromise's House Report 2802, from

22   March 1st, 1929, which is three days before the law was passed,

23   the House specifically states in two places that the House

24   recedes from its proposed amendment to the title of that act.

25             So as it -- as introduced into the Senate and as

1    enacted by Congress and signed by the president, there's never

2    been an act called the Undesirable Aliens Act of 1929.  It's

3    always been called an act making it a felony with penalty for

4    certain aliens to enter the U.S. under certain conditions of

5    violation of the law.  So that's historical point number one.

6            Point number two is that Congress didn't just

7    blindly reenact the 1929 law in 1952.  The easiest way of

8    seeing that is because the 1929 law was about this big, and

9    Section 276 in the INA is about this big.  So, that's a

10   superficial way of looking at it, but it's clearly not the case

11   that Congress just copied and pasted the law.  In fact, made a

12   few important changes.

13           Number one is that Congress added the found-in

14   clause.  The found-in clause is not present in the 1929 law.

15           Number two, Congress removed the phrase, in

16   pursuance of the law.  That phrase was in the 1929 law.  They

17   took it out of the 1952 law, and interestingly in

18   *Mendoza-Lopez*, the Supreme Court identified that phrase in

19   pursuance of the law as a possible textual hook for the right

20   that they would later go on to identify as the right of a -- of

21   the defendant to collaterally challenge their deportation --

22   their deportation order, what would eventually become 1326(d).

23           Number three, Congress merged together the 19

24   seven -- the 1917 and the 1918 unlawful reentry statutes.  That

25   applied only to prostitutes and to anarchists.  Each of those

1    provisions had their own penalty.  The 1929 law had its own

2    penalty.  This is in the center of court.  Congress fused the

3    three together and said, this is just a general unlawful

4    reentry's -- unlawful reentry provision.  It applies no matter

5    what the reason you are deported, and the penalty is going to

6    be too -- is going to be the same no matter the reason for your

7    deportation.

8              Congress also defined the phrase -- the term enter

9    in the definition sections in the INA.  Previously that phrase

10   was not defined.

11             And there are other -- there are other changes that

12   Congress made in 1952.  The point is Congress didn't just copy

13   and paste the 1929 law and stick it into the INA in 1952.

14             At the end of the day, though, Your Honor, none of

15   this really matters because we're not here challenge -- we're

16   not here defending the 1929 law.  We know from *Abbott* that even

17   a finding of prior discrimination doesn't flip the burden of

18   proof.  And so what that means in this case is that even if the

19   Court concludes as a factual matter or just assumes for the

20   purposes of this motion that in 1929 -- and that's the way most

21   courts have dealt with this issue, that in 1929 Congress passed

22   the unlawful reentry statute out of an impermissible motive.

23   That wouldn't get the defendant -- that would only get the

24   defendant so far because, again, the critical mistake the

25   district court made in *Abbott* was to put the onus on the law as

13

1  defender to purge or expede or cure the taint of the prior law,

2  and that is exactly the argument the defendant makes here.

3         On page 25 of the defendant's motion, the defendant

4  writes:  The Congress made no attempt to remove or distance

5  itself from the 1929 legislation's discriminatory purpose.

6         Page 26, the defendant says, The absence of any

7  congressional statement to vitiate the racist origins --

8         THE COURT REPORTER:  Can you go a little bit slower?

9         MR. ATTIAS:  Sure.

10        The absence of any congressional statement in 1952

11  to vitiate the racist origins and intent of the 1929 statute,

12  dot, dot, dot, defeats the contention that the later enactment

13  cleansed the original statute's discriminatory purpose.

14        The same thing on page 27, In reenacting the crime

15  of illegal reentry in 1952, Congress could have chosen to

16  reflect on the law's racist origin and consequences, but that

17  didn't happen.  And I'm paraphrasing, cutting out a little bit

18  of the middle, that did not happen.

19        That's exactly the argument, in fact, the same

20  exact word:  Cleanse and cure and purge.  That's the same

21  language that the Supreme Court found in *Abbott* to be

22  reversible error.  And it's actually the same argument the

23  district court in *Abbott* concluded that the legislator in 2013

24  didn't engage in, quote, any deliberative process.  That's

25  exactly the same argument we see here.

1          And *Raymond*, to the extent that there's any

2    daylight between this case and *Abbott* -- and I agree, *Abbott* is

3    not exactly on all fours of this case because the procedural

4    posture of *Abbott* is much more complex, but *Raymond* entirely

5    forecloses the defendant's argument.  *Raymond* enacted the very

6    same voter ID provision maybe two, three years after the Fourth

7    Circuit itself had concluded that that provision was passed out

8    of an intent to disenfranchise black voters.  The district

9    court in *Raymond* concluded, just like the district court in

10   *Abbott*, that the law's defenders had to purge, cleanse, expede

11   the taint of the prior enactment.

12          The Fourth Circuit looked at that, applied *Abbott*,

13   and said that that's reversible error.  And that's exact same

14   argument the defendant makes here.

15          Your Honor, I'm happy to answer any other

16   questions --

17          THE COURT:  All right.  Thank you.

18          MR. ATTIAS:  -- to sit down.

19          THE COURT:  Ms. Mertz, I'll give you the last word on

20   this.

21          MS. MERTZ:  Thank you, Your Honor.

22          Your Honor, I think we would just point the Court

23   back to the case law, to the distinctions between *Abbott* and

24   *Raymond* in this case and, again, remind the Court of *Hunter v.*

25   *Underwood*, which is very similar in terms of the situation that

1    the Court was confronted with there, sort of a fomented

2    environment leading up, culminating and the passage of a racist

3    voter disenfranchising the statute.  And in that -- in that

4    case, the Court -- the Court applied, did look back at the

5    historical context, which is what *Arlington Heights* instructs

6    the Courts to do.

7              And -- and what it was confronted with was

8    something similar to what we saw building in the '20s and in

9    the '50s aimed at Mexicans and other Latino people and -- and

10   could see that the motivation despite in the *Hunter* case many

11   amendments to that -- to that law, where provisions had over

12   time been stripped away, taking away criminal conduct that

13   could be considered disenfranchising, whereas in this case the

14   only thing that has happened to the illegal reentry statute is

15   to ratchet up the penalties over time, although not really

16   amendments to 1326(a) which is separate obviously from B and D.

17             In any event, we would just point the Court back to

18   the case law, which we think is very clear in terms of how the

19   Court should approach its analysis, why this case is not like

20   *Abbott* and *Raymond*, we are talking about.  And essentially not

21   a cut and paste, because they didn't have that then, but an

22   importation of the identical language with the minor

23   distinction which was propagated by I believe it was

24   attorney -- Attorney General Ford, that was intended to target

25   Mexicans.  And although the government has sort of tried to

1　diminish that point because he was not a legislature, that is

2　the one amendment that was made in 1952 to the language that

3　already had existed.

4　　　　　So, Your Honor, we would just point the Court back

5　to the Supreme Court law here that should govern the steps for

6　the analysis.

7　　　　　THE COURT:  All right.  Thank you.

8　　　　　I've reviewed the briefing in this case, as well as

9　the many cases that have already considered this issue, and I'm

10　not sure I can meaningfully add to the writings on and opinions

11　on this that have already been issued.  This issue is before

12　the Fourth Circuit, and I suspect would likely eventually

13　reach -- reach the Supreme Court.

14　　　　　In any event, I've reviewed the arguments on both

15　sides and concludes that in Section 30 1323 does withstand

16　constitutional scrutiny under the equal protection clause and

17　is not unconstitutional based on an impermissible motive in

18　its -- in its origins or its provenance.

19　　　　　So for the reasons -- those reasons and also for

20　the reasons that have been already stated in the case of *United*

21　*States versus Francisco Eduardo Palacios Arias*, which is an

22　opinion by Judge Gibney and from our Richmond Division, which

23　the Court adopts, the Court's going to deny the motion to

24　dismiss.

25　　　　　All right.  How do we proceed from here?

1          MS. MERTZ:  Your Honor, in that case, the parties have

2     anticipated how to proceed and have prepared conditional plea

3     paperwork, which Mr. Alvarez Rodriguez has reviewed and already

4     signed so that -- for the purpose of moving forward smoothly.

5              If the Court would take a conditional plea today,

6     we would ask the Court to do that and proceed immediately to

7     sentencing.  I know the government yesterday filed their --

8          THE COURT:  Yes.

9          MS. MERTZ:  -- position on sentencing.  We would be

10    prepared to orally proffer some history, and that there's

11    agreement on the guideline applicability here.

12             Mr. Alvarez Rodriguez is prepared to do that now.

13    And if the Court is willing, we would ask the Court to go

14    forward with that.  And again, it would be a conditional plea,

15    which is what the parties have agreed to, preserving this one

16    single issue.

17         THE COURT:  All right.

18             What's the government's position on this?

19         MR. GREEN:  Your Honor, we -- we agree with the

20    defense.  We have no problem moving forward with the

21    conditional plea and -- and immediate sentencing.

22         THE COURT:  All right.  Hold on a second.

23      (BRIEF PAUSE.)

24         THE COURT:  Is a conditional plea, Counsel,

25    specifically governed by Rule 11?

1       MS. MERTZ:  Yes, Your Honor, (a)(2).

2       THE COURT:  I'm sorry?

3       MS. MERTZ:  Yes, Rule 11(a)(2).

4       THE COURT:  (a)(2)?

5       MS. MERTZ:  Yes.

6       THE COURT:  I see.  Thank you.

7           All right.  The Court will proceed.

8           All right.  Defendant will come to the podium,

9  please, and be sworn.

10     (DEFENDANT COMPLIES.)

11       THE COURTROOM DEPUTY:  Please raise your right hand.

12     (THE OATH WAS ADMINISTERED TO DEFENDANT.)

13       THE COURT:  Would you state your full name, please.

14       THE DEFENDANT:  Claudio Rodriguez Alvarez.

15       THE COURT:  Mr. Alvarez, the purpose of this hearing

16  is to give you the opportunity to enter a conditional plea to

17  the charge of illegally reentering the United States after

18  having been removed, after having been convicted of a felony.

19  If you enter such a plea, it will be the responsibility of this

20  Court to ensure that your plea is entered voluntarily.  That

21  is, that no one is forcing you to enter a guilty plea against

22  your will, and that your guilty plea is not being entered in

23  exchange for any promises or agreements.

24           The Court also will have the responsibility to

25  ensure that your plea is entered knowingly.  That is, that you

19

 1  understand the consequences of pleading guilty.  And in order

 2  for the Court to make those determinations, I'm going to ask

 3  you a series of questions, and for that purpose, you've been

 4  placed under oath.

 5          And having been placed under oath, you have the

 6  obligation to answer all of the Court's questions truthfully.

 7  If any of your answers prove to be untrue, you may be

 8  subjecting yourself to additional criminal penalties, including

 9  those for perjury based on the responses you give here in court

10  today.

11          Do you understand that?

12          THE DEFENDANT:  Yes, Your Honor.

13          THE COURT:  What is your age?

14          THE DEFENDANT:  46.

15          THE COURT:  And what is your highest level of formal

16  education?

17          THE DEFENDANT:  12th grade.

18          THE COURT:  And you read, write, and understand the

19  English language.  Is that correct?

20          THE DEFENDANT:  Yes, sir.

21          THE COURT:  And of what country are you a citizen?

22          THE DEFENDANT:  Mexico.

23          THE COURT:  And what is your status here in the United

24  States?

25          THE DEFENDANT:  What's my status?

```
1              THE COURT:  Yes.
2              THE DEFENDANT:  I don't understand.
3                  No, Your Honor, I don't have --
4              THE COURT:  You have no status?
5              THE DEFENDANT:  No.
6              THE COURT:  All right.
7                  You've been represented by a lawyer in connection
8    with this case.  Is that correct?
9              THE DEFENDANT:  Yes, sir.
10             THE COURT:  You've been represented by a lawyer.
11                 Have you met with your lawyer?
12             THE DEFENDANT:  You're my lawyer.  Right?
13                 Yes.  Yes, Your Honor.  Sorry.
14             THE COURT:  And has your lawyer explained to you the
15   charge against you and what the government must prove in order
16   to convict you of that charge?
17             THE DEFENDANT:  Yes, Your Honor.
18             THE COURT:  Has your lawyer explained to you the
19   consequences of pleading guilty?
20             THE DEFENDANT:  Yes, Your Honor.
21             THE COURT:  Have you provided to your lawyer all the
22   facts and information you have and know that may relate to this
23   charge?
24             THE DEFENDANT:  Yes, Your Honor.
25             THE COURT:  Have you understood -- have you had all
```

1  your questions answered to your satisfaction?

2          THE DEFENDANT:  Yes, Your Honor.

3          THE COURT:  Have you had any difficulty understanding

4  anything your lawyer has told you, anything about the charge

5  against you, or anything about the nature of these proceedings,

6  including why you're in court here today?

7          THE DEFENDANT:  No, Your Honor.

8          THE COURT:  Have you been satisfied with the services

9  of your lawyer?

10         THE DEFENDANT:  Yes, Your Honor.

11         THE COURT:  Do you think you've had enough time to

12 meet with your lawyer and discuss whether or not you should be

13 entering a guilty plea at this point?

14         THE DEFENDANT:  Yes, Your Honor.

15         THE COURT:  Have you been under the influence of any

16 drugs or medication or any other substance that's affected your

17 ability to understand anything about the charge against you,

18 anything about -- anything that your lawyer has told you or

19 anything about the nature of these proceedings?

20         THE DEFENDANT:  No, Your Honor.

21         THE COURT:  Ms. Mertz, based on everything you know,

22 is Mr. Alvarez -- I'm sorry, Mr. Rodriguez competent to enter a

23 guilty plea here today?

24         MS. MERTZ:  Yes, Your Honor.

25         THE COURT:  Do you understand that the charge to which

1   you would plead guilty is illegally reentering after removal

2   and having been convicted of a felony?

3           THE DEFENDANT:  Yes, Your Honor.

4           THE COURT:  And do you understand that by entering a

5   guilty plea you will be convicted of that charge, just as if

6   you had gone to trial on a plea of not guilty and were

7   convicted by a jury?

8           THE DEFENDANT:  Yes, Your Honor.

9           THE COURT:  Has your lawyer explained to you the

10  maximum punishment you could receive based on the conviction

11  that would result from your guilty plea?

12          THE DEFENDANT:  Yes, Your Honor.

13          THE COURT:  The maximum punishment you could receive

14  is a term of imprisonment up to ten years, a fine of up to

15  $250,000, a $100 special assessment that will be imposed, and a

16  period of supervised release of up to three years.

17              Do you understand that's the maximum punishment you

18  could receive?

19          THE DEFENDANT:  Yes, Your Honor.

20          THE COURT:  I understand that you have not entered

21  into any written plea agreements.  Is that correct?

22          THE DEFENDANT:  Yes, Your Honor.

23          MS. MERTZ:  Your Honor, actually there is a written

24  plea agreement.

25          THE COURT:  There is a plea agreement?  All right.  Do

1    you have a copy of it?

2              THE DEFENDANT:  Oh, sorry.

3              MS. MERTZ:  Yes, Your Honor.

4              THE COURT:  Is there a statement of facts as well?

5              MS. MERTZ:  Yes.

6              THE COURT:  All right.  I understand you have entered

7    into a written plea agreement.  Do you have that in front of

8    you?

9              THE DEFENDANT:  Yes, sir.  Yes, Your Honor.

10             THE COURT:  Does your signature appear on that

11   document?

12             THE DEFENDANT:  Yes, Your Honor.

13             THE COURT:  And you signed that document?

14             THE DEFENDANT:  Yes, Your Honor.

15             THE COURT:  Did you read that document?

16             THE DEFENDANT:  Yes, Your Honor.

17             THE COURT:  Did you have all your questions answered

18   about that document?

19             THE DEFENDANT:  Yes, Your Honor.

20             THE COURT:  And did you understand everything in that

21   document?

22             THE DEFENDANT:  Yes, Your Honor.

23             THE COURT:  Did anyone threaten you or try to

24   influence you in any way into signing that written plea

25   agreement against your will?

24

1          THE DEFENDANT:  No, Your Honor.

2          THE COURT:  Is this written plea agreement the entire

3   agreement you think you have with the United States government?

4          THE DEFENDANT:  Yes, Your Honor.

5          THE COURT:  Do you think you have any other promises

6   or agreements or understandings in exchange for your guilty

7   plea, your conditional guilty plea, that's not in this written

8   plea agreement?

9          THE DEFENDANT:  No, Your Honor.

10         THE COURT:  If you were to go to trial in this case,

11  and if after that trial you were convicted, you would have the

12  right to appeal that conviction and any sentence to a higher

13  court.  Under this plea agreement, you waive, that is you give

14  up your right of appeal, both as to the conviction that would

15  result from your guilty plea and any sentence imposed based on

16  that conviction.

17              Do you understand you've waived your right of

18  appeal?

19         THE DEFENDANT:  Yes, Your Honor.

20         THE COURT:  Also under this plea agreement, the

21  government agrees to make certain recommendations.  You

22  understand those are only recommendations.  They're not binding

23  on the Court.  Only the Court will decide what sentence to

24  impose in this case?

25         THE DEFENDANT:  Yes, Your Honor.

25

1        THE COURT:  Do you understand that your guilty plea

2  will be binding on you for the purposes of any immigration

3  proceedings?

4        THE DEFENDANT:  Yes, Your Honor.

5        THE COURT:  Do you understand that as a result of this

6  conviction there may be immigration consequences?

7        THE DEFENDANT:  Yes, Your Honor.

8        THE COURT:  And is it your decision to enter a guilty

9  plea here today regardless of what the immigration consequences

10 are?

11       THE DEFENDANT:  Yes, Your Honor.

12       THE COURT:  Have you discussed with your lawyer the

13 rights you have as someone charged with a crime and that you

14 would waive, that is give up those rights by pleading guilty?

15       THE DEFENDANT:  Yes, Your Honor.

16       THE COURT:  You have the absolute right to proceed to

17 a public and speedy trial before a jury of 12 United States

18 citizens.

19           Do you understand that?

20       THE DEFENDANT:  Yes, Your Honor.

21       THE COURT:  And in order to convict you of this

22 charge, that jury must unanimously find you guilty.

23           Do you understand that?

24       THE DEFENDANT:  Yes, Your Honor.

25       THE COURT:  At that trial you would be entitled to be

1  represented by a lawyer, and if you could not afford one, one

2  would be appointed for you.

3          Do you understand that?

4          THE DEFENDANT:  Yes, Your Honor.

5          THE COURT:  Also at that trial you would be presumed

6  innocent of this charge, and the government would have the

7  obligation of proving each and every element of this charge

8  beyond a reasonable doubt.

9          Do you understand that?

10         THE DEFENDANT:  Yes, Your Honor.

11         THE COURT:  Also at that trial you and your lawyer

12 would have the right to confront any witnesses that the

13 government presented, to cross-examine those witnesses and to

14 challenge the admissibility of any evidence that the government

15 offered.

16         Do you understand?

17         THE DEFENDANT:  Yes, Your Honor.

18         THE COURT:  Also at that trial you and your lawyer

19 would have the right to present your own defense, and that

20 would include the right to require any person with relevant

21 information to be brought into court and to testify and to

22 bring with him or her any documents relevant to this charge.

23         Do you understand that?

24         THE DEFENDANT:  Yes, Your Honor.

25         THE COURT:  Also at that trial, as part of your

1  defense, you could testify yourself.  You could take the

2  witness stand, be placed under oath, and testify subject to

3  cross-examination, but you would have absolutely no obligation

4  to testify.  You could remain silent in the face of this

5  charge, and if you decided not to testify, the government could

6  not force you to testify or to incriminate yourself in any way.

7             Do you understand that?

8             THE DEFENDANT:  Yes, Your Honor.

9             THE COURT:  Also if you made the decision not to

10 testify, no inference of guilt could be inferred from the fact

11 that you decided not to testify.  You would continue to be

12 presumed innocent of this charge, and the government would

13 continue to have the obligation of proving each and every

14 element of this charge beyond a reasonable doubt.

15            Do you understand that?

16            THE DEFENDANT:  Yes, Your Honor.

17            THE COURT:  And as I mentioned earlier, if after that

18 trial you were convicted, you would have the right to appeal

19 that conviction and any sentence to a higher court.

20            Do you understand?

21            THE DEFENDANT:  Yes, Your Honor.

22            THE COURT:  Having heard all these rights that you

23 have and that you would give up all these rights by pleading

24 guilty is it still your decision to enter a conditional guilty

25 plea here today?

28

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  In addition to the rights that I have

3   mentioned that you would give up, there will be other

4   collateral consequences of your entering your guilty plea,

5   including the forfeiture of any right you might have to vote,

6   hold public office, serve on a jury, possess a firearm.

7              Do you understand that?

8          THE DEFENDANT:  Yes, Your Honor.

9          THE COURT:  Have you discussed with your lawyer how

10  the Court would go about deciding what sentence to impose in

11  your case?

12         THE DEFENDANT:  Yes, Your Honor.

13         THE COURT:  Have you discussed what we call the

14  Sentencing Guidelines and how they pertain to you and your

15  offense?

16         THE DEFENDANT:  Yes, Your Honor.

17         THE COURT:  Those are only guidelines.  They're not

18  binding on the Court.  Only the Court will decide what sentence

19  to impose.  It may impose a guideline sentence, and it may

20  impose a sentence greater than the guidelines or less than the

21  guidelines, obligated only to impose a sentence within the

22  maximum punishment that I described to you.

23             Do you understand that?

24         THE DEFENDANT:  Yes, Your Honor.

25         THE COURT:  And in addition to the guidelines, the

1  Court would consider a whole range of other factors, including

2  the nature and seriousness of this offense, your own personal

3  history and characteristics and generally what sentence will be

4  sufficient, but no more than necessary to constitute a just

5  punishment and to protect the public.

6              Do you understand that?

7              THE DEFENDANT:  Yes, Your Honor.

8              THE COURT:  Also as I mentioned earlier, only the

9  Court is going to decide what sentence to impose so that if you

10 receive a sentence that is different than what the government

11 recommends or that your lawyer recommends, or if you receive a

12 sentence that is different than someone told you you're likely

13 to receive or that you're expecting, or if you receive a

14 sentence that you just think is unfair in some way, you

15 nevertheless are going to be bound by your guilty plea, and you

16 will not be permitted to withdraw your guilty plea after you

17 hear what the sentence is.

18             Do you understand that?

19             THE DEFENDANT:  Yes, Your Honor.

20             THE COURT:  I understand that there will be a request

21 that the Court sentence you today.  Do you understand the Court

22 may or may not do that?

23             THE DEFENDANT:  Yes, Your Honor.

24             THE COURT:  And is it your decision to enter a guilty

25 plea here today regardless of whether the Court sentences you

1    today?

2              THE DEFENDANT:  Yes, Your Honor.

3              THE COURT:  In a moment I'm going to ask the

4    government to tell the Court what evidence it would present

5    against you if this case were to go to trial.  I want you to

6    listen carefully to what the government tells the Court,

7    because when the government's done, I'm going to ask you

8    whether you disagree with anything the government has told the

9    Court about your conduct.

10             Have a seat for a moment, and we'll hear from the

11   government.

12             MR. GREEN:  Your Honor, at trial, the United States

13   would have proven the following facts beyond a reasonable doubt

14   with admissible and credible evidence.

15             The defendant is a native and citizen of Mexico,

16   who does not have lawful status in the United States and is an

17   alien for the purposes of Title 8, U.S. Code, Section 1326.

18             On -- on or about December 31st, 2001, the

19   defendant was convicted of a felony in the Superior Court for

20   Los Angeles County, California.  The defendant was removed from

21   the United States pursuant to a final order of removal on or

22   about September 12th, 2002, from at or near Calexico,

23   California.  Thereafter, the defendant reentered the United

24   States.

25             He was removed from the United States pursuant to

1  an order of expedited removal on or about February 15th, 2003,

2  from at or near San Ysidro, California.  Thereafter, the

3  defendant reentered the United States.

4        He was removed from the United States pursuant to a

5  reinstatement of a removal order on or about February 2nd,

6  2004, from at or near San Ysidro, California.

7        On or about July 14th, 2021, United States

8  Immigration and Customs Enforcement Officers found the

9  defendant, who was being held on local charges, at the

10  Rappahannock Regional Jail in Rappahannock County, Virginia,

11  within the Eastern District of Virginia.

12        At no time prior to his reentry, and at no time

13  thereafter, did the defendant obtain the consent of the

14  Attorney General of the United States or the Secretary of the

15  Department of Homeland Security to reenter the United States or

16  reapply for admission to the United States.

17        This statement of facts includes those facts

18  necessary to support the defendant's plea of guilty to the

19  charge listed in the indictment in this case, does not include

20  each and every fact known to the defendant or to the United

21  States, and is not intended to be a full enumeration of all the

22  facts surrounding the defendant's case.

23        The actions of the defendant, as recounted here,

24  were in all respects knowing and deliberate and were not

25  committed by mistake, accident, or other innocent reason.

32

1          THE COURT:  Thank you.

2              Mr. Rodriguez, would you return to the podium,

3    please.

4       (DEFENDANT COMPLIES.)

5          THE COURT:  Do you disagree with anything the

6    government has told the Court about your conduct?

7          THE DEFENDANT:  No, Your Honor.

8          THE COURT:  I understand you've also signed a written

9    statement of facts.  Is that correct?

10         THE DEFENDANT:  Yes, Your Honor.

11         THE COURT:  Do you have that document in front of you?

12         THE DEFENDANT:  Yes, Your Honor.

13         THE COURT:  Your signature appears on that document,

14   and you signed that document.  Is that correct?

15         THE DEFENDANT:  Yes, Your Honor.

16         THE COURT:  Did you read, understand, and have all

17   your questions answered about that document?

18         THE DEFENDANT:  Yes, Your Honor.

19         THE COURT:  Did anyone threaten you or try to

20   influence you in any way into signing that written statement of

21   facts against your will?

22         THE DEFENDANT:  No, Your Honor.

23         THE COURT:  Are these -- is this written -- are the

24   statements in this written statement of facts true and correct?

25         THE DEFENDANT:  Yes, Your Honor.

1        THE COURT:  And is it your decision to enter a

2   conditional guilty plea here today because you are, in fact,

3   guilty subject to your preservation of your issue raised on

4   your motion to dismiss?

5        THE DEFENDANT:  Yes, Your Honor.

6        THE COURT:  Counsel, based on everything you know, is

7   there an adequate factual basis for the plea in this case?

8        MS. MERTZ:  Yes, Your Honor.

9        THE COURT:  Before pleading further to the indictment,

10  would you like to speak with your lawyer?

11       THE DEFENDANT:  No, Your Honor.

12       THE COURT:  With respect to count one of the

13  indictment, charging illegally reentering the United States

14  after having been removed and after having been convicted of a

15  felony in violation of Title 8, U.S. Code, Section 1326(a) and

16  (b)(1), how do you plead, guilty or not guilty?

17       THE DEFENDANT:  Guilty.

18       THE COURT:  All right.

19            Let the record reflect that based on the responses

20  of this defendant through the Court's questions,

21  representations of counsel for the government and for the

22  defendant, it's a finding of this Court in the case of *United*

23  *States versus Claudio Alvarez Rodriguez* that the defendant is

24  fully competent and capable of entering an informed plea, that

25  the nature -- defendant is aware of the nature of the charges

1    and the consequences of the plea, and that the plea of guilty

2    is a knowing and voluntary plea supported by an independent

3    basis and fact containing each of the essential elements of the

4    offense.  The conditional plea is therefore accepted, and

5    defendant is now adjudged guilty of that offense subject to his

6    preserving for review the Court's adverse determination on his

7    pretrial motion to dismiss the indictment.

8              I understand the government does not oppose

9    immediate sentencing?

10              MR. GREEN:  That's correct, Your Honor.

11              THE COURT:  Does the government want to be heard on

12    that issue?

13              MR. GREEN:  On sentencing --

14              THE COURT:  Yes.

15              MR. GREEN:  Yes, Your Honor.

16              THE COURT:  And I've read your memorandum.

17              MR. GREEN:  Thank you, Your Honor.

18              Your Honor, I'll just speak briefly since I know

19    you've seen the sentencing position paper that we've put

20    forward.

21              We've asked for a sentence of three to four months.

22    We agree with defense that the guideline range is between zero

23    to six months, and we do think there are circumstances in this

24    case that differentiate from sort of a run-of-the-mill case

25    where we would support a time-served sentence.

1          In this case, there are three prior removals, as --
2     as the Court knows and as the defendant has admitted.

3          In addition to that, there's a fairly extensive
4     criminal history, albeit old.  The defendant has a prior
5     felony.  And then in addition, you know, just looking at the
6     general criminal history, it goes back to -- you know, mainly
7     between 2000 and 2004, there's domestic violence, there's
8     vehicle theft, there's drug possession, all the while while
9     being removed from and then reentering the United States.  And
10    then now it's, you know, basically a 16- to 17-year gap where
11    the defendant is, you know, for all intents and purposes
12    unaccounted for.  And then we have recent charges at the state
13    level which involved drug possession and also a false
14    identification to a law enforcement officer.

15         So, what we know about the defendant is that he had
16    a lengthy criminal history, and then essentially no record for
17    a long period of time.  We don't know where he was during that
18    time, but now we know that he has state charges and of course
19    those haven't been resolved yet.  But for that reason, you
20    know, there's -- there is no facts to conclude that the
21    defendant has changed his ways.  It's a possibility, but the
22    recent charges suggest that certainly has and especially given
23    the drug charge related to his state conduct, and so instead
24    what we have is multiple prior removals, returning to the
25    United States, sometime between now and 2004, and then getting

1   more state charges that have yet to be revolved.

2          On the other hand, the defendant has accepted

3   responsibility for his conduct, and so for that reason we think

4   the appropriate middle ground is a three to four-month

5   sentence, what should be approximately one additional month

6   beyond what the defendant has already served.

7          THE COURT:  He's been in custody since -- federal

8   custody since July 15.  Is that --

9          MR. GREEN:  Yes, Your Honor.

10          THE COURT:  All right.

11          MR. GREEN:  That's all I have, unless the Court has

12   questions.

13          THE COURT:  All right.  Thank you.

14          MR. GREEN:  Thank you, Your Honor.

15          THE COURT:  Ms. Mertz.

16          MS. MERTZ:  Thank you, Your Honor.

17          Your Honor, just to frame the math here, he has

18   been in custody since July 15th, Marshals custody; was taken

19   into ICE custody the day before.  He actually was in custody

20   since June 23rd, on credited state time.

21          So actually, we are asking for time served, but

22   we're not far apart at all --

23          THE COURT:  Right.

24          MS. MERTZ:  -- if apart at all.  We're not -- there's

25   really not much daylight there.

1          Time served in this case would be about three and a

2    half months.  Mr. Alvarez -- that's a longer period than would

3    normally be requested for time served in a zero to six month

4    case, largely a function of litigating this motion to dismiss,

5    which has taken a little bit longer than the parties usually

6    would resolve the case maybe more quickly.

7          But in any event --

8          THE COURT:  Where was he in state custody?

9          MS. MERTZ:  Rappahannock Regional Jail.  He was

10   arrested in Spotsylvania on possession of -- a possession

11   charge.

12         THE COURT:  All right.

13         MS. MERTZ:  So he was there three weeks and has a

14   court date tomorrow which was the next scheduled court date.

15         THE COURT:  All right.

16         MS. MERTZ:  It's a coincidence, but it's tomorrow.

17         Your Honor, Mr. Alvarez was brought to this country

18   as a toddler in the 1970s.  He was educated here.  Literally

19   his entire family is here.

20         His parents are citizens.  All of his siblings are

21   citizens.  His wife is a citizen.  She's a born American

22   citizen, just to distinguish that from naturalization.

23         He has children who are all American citizens.  His

24   wife is pregnant.  He's lived -- as you can hear from his --

25   you know, he doesn't need an interpreter.  He is -- feels

1   American.  He's been here since he was a toddler, so it is

2   difficult for him to -- to return to Mexico, but he is aware of

3   the consequences, obviously having spent this time in custody.

4         I -- I want to push back on this, the government's

5   notion of his criminal record.

6         He had lawful status as a child.  He was granted

7   first temporary residency and then permanent residency.  And he

8   did fall into drug addiction in the late '90s and early 2000s

9   and did have a criminal record at that time.

10        That was actually, unfortunately, while he had

11  lawful status, and it is the reason he lost that status and was

12  deported in 2002.  But since then, he actually -- although he

13  did come back twice thereafter trying to get into the country,

14  and obviously a third time successfully, he has done everything

15  to show that he has reformed his life.

16        He moved across the country -- his whole family is

17  in California -- and he has lived without any incident for

18  almost 20 years.  So I would strongly dispute this

19  characterization that we don't know, you know, what his

20  trajectory is and that he hasn't given any facts to -- to show

21  that he has reformed.

22        He does have a pending drug charge, and we all know

23  that addiction is a difficult thing.  But it's a possession

24  charge.  It is not something other than that.

25        Your Honor, he's already served three and a half

1  months.  I won't belabor the point, but we think time served

2  here is appropriate and that would be three and a half months.

3          THE COURT:  All right.

4          MS. MERTZ:  Again, this is a zero to six-month case,

5  so we're talking about the center of the range.

6          THE COURT:  All right.  Thank you.

7              Mr. Rodriguez, you have the right to address the

8  Court before it decides whether to sentence you and what that

9  sentence should be, if it decides to sentence you.

10          THE DEFENDANT:  I'm sorry.  Excuse me?

11          THE COURT:  Yes.  You have the opportunity to address

12  the Court if you would like to say anything --

13          THE DEFENDANT:  Your Honor --

14          THE COURT:  -- before it decides what sentence --

15          THE DEFENDANT:  -- I apologize for any wrongdoings or

16  any felonies or things that I have done wrong in the past.  I

17  mean, like she says, I've been here my whole life.  I mean,

18  this -- all I know is United States.  I don't know nothing from

19  Mexico.

20              I mean, the reason I came back was because of my

21  family.  I have none -- I have nobody there.  I mean, if I were

22  to stay there, I would be living in the streets because I have

23  nowhere to live.

24              I've been married for 15 years now.  I mean, I have

25  three kids, and my wife is pregnant now.  I mean, I have

40

1   nothing -- I have nothing in Mexico for me, sir.

2        THE COURT:  All right.  Thank you.

3        The Court's reviewed the file, and based on the

4   file of the Court finds it has sufficient information to

5   meaningfully exercise its sentencing authority and will proceed

6   with sentencing.

7        In that regard, the defendant is -- guideline

8   sentence is zero to six months based on the criminal history of

9   I.  The Court has also considered the sentencing factors under

10  Section 3553, including the nature and seriousness of the

11  offense and the defendant's own personal history and

12  characteristics.

13       The Court has also considered the details of the

14  criminal history, including the age of the convictions and the

15  nature of those convictions.  The Court has also considered the

16  amount of time that he has spent in custody and that he'll

17  continue to remain in immigration custody following his

18  completion of any sentence.

19       The Court has also considered his acceptance of

20  responsibility.  The Court's in a position to impose sentence

21  at this time.

22       Mr. Rodriguez, it will be the sentence of this

23  Court that you be committed to the Bureau of Prisons for a

24  period of time served following which you'll be placed on

25  supervised release for a period of two years under the standard

41

1  terms and conditions, and also upon your completion of your

2  incarceration you'll be surrendered to a duly-authorized

3  representative of Homeland Security for any deportation

4  proceedings.

5           And if deported, you'll remain outside the United

6  States and not reenter without the written consent of the

7  Attorney General.  And your supervised release will also be

8  subject to the other standard terms and -- terms and

9  conditions.  And that will be the sentence of the Court.

10          The Court will not impose a fine.  The Court will

11  impose a $100 special assessment.

12          All right.  Anything further?

13          MR. GREEN:  No, Your Honor.

14          MS. MERTZ:  No, Your Honor.  Thank you, Your Honor.

15          THE COURT:  All right.  Thank you.  Counsel are

16  excused.  Defendant is remanded.

17          (PROCEEDINGS CONCLUDED AT 9:55 A.M.)

18                        -o0o-

19

20

21

22

23

24

25

42

1  UNITED STATES DISTRICT COURT    )

2  EASTERN DISTRICT OF VIRGINIA    )

3

4           I, JULIE A. GOODWIN, Official Court Reporter for

5  the United States District Court, Eastern District of Virginia,

6  do hereby certify that the foregoing is a correct transcript

7  from the record of proceedings in the above matter, to the best

8  of my ability.

9           I further certify that I am neither counsel for,

10  related to, nor employed by any of the parties to the action in

11  which this proceeding was taken, and further that I am not

12  financially nor otherwise interested in the outcome of the

13  action.

14           Certified to by me this 15TH day of DECEMBER, 2021.

15

16

17

18                    __/s/_____

                      JULIE A. GOODWIN, RPR
19                    Official U.S. Court Reporter
                      401 Courthouse Square
20                    Eighth Floor
                      Alexandria, Virginia  22314
21

22

23

24

25

Julie A. Goodwin, CSR, RPR